No. 1:13-CV-00125

IN THE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MELISSA ELIZABETH LUCIO,
Petitioner,

v.

WILLIAM STEPHENS, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE -
CORRECTIONAL INSTITUTIONS DIVISION
Respondent.

_____

BRIEF FOR PETITIONER
_____

LAW OFFICE OF MARGARET SCHMUCKER

MARGARET SCHMUCKER
9311 North FM 620 # 254
Austin, Texas 78726
Tel: (512) 236-1590
Fax: (877) 465-7066

ATTORNEY FOR PETITIONER,
MELISSA ELIZABETH LUCIO

CERTIFICATE OF INTERESTED PERSONS

The signed counsel of record certifies that the following listed persons have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**A.      Parties**

        1.  Trial Plaintiff:  The State of Texas

        2.  Habeas Respondent: William Stephens, Director TDCJ-CID

        3.  Trial Defendant / Habeas Petitioner: Melissa Elizabeth Lucio

**B.      Attorneys For Trial Plaintiff:**

**C.      Attorneys for Habeas Respondent:**

| | |
|---|---|
| In State Trial Court: | Armando Villalobos, DA |
| | Joseph W. Krippel, ADA |
| | Alfredo Padilla, ADA |
| | Maria de Ford, ADA |
| | Cameron County District Attorney's Office |
| |  964 E. Harrison St. |
| | Brownsville, TX 78520 |
| | Phone: 956-544-0849 |
| | |
| On Direct Appeal and | LJ Rabb, ADA |
| in State Habeas proceedings: | Rene Gonzalez, ADA |
| | Lane Haygood, ADA |
| | 974 East Harrison St. |
| | Brownsville, TX 78520 |
| | (956) 544-0849 |
| | |
| In Federal Court: | Edward Marshall, AAG |
| | Office of the Attorney General of Texas |
| | 300 West 15th Street, 8th Floor |
| | Austin, TX 78701 |

i

**D.**     **Attorneys for Trial Defendant / Habeas Petitioner:**

Attorney on State &
Federal Habeas:                     Margaret Schmucker
                                    Law Office of Margaret Schmucker
                                    9311 North FM 620 # 254
                                    Austin, Texas 78726
                                    Phone: (512) 236-1590

Attorney on Direct Appeal:          Larry Warner Sr.
                                    Larry Warner, Attorney at law
                                     3109 BANYAN
                                    Harlingen, TX 78550
                                    Phone: 956-230-0361

Attorneys at Trial:                 Peter C. Gilman
                                    Cameron County District Attorney's Office
                                     964 E. Harrison St.
                                    Brownsville, TX 78520
                                    Phone: 956-544-0849

                                    Adolfo Cordova
                                    Law Office of Adolfo Cordova
                                     711 N Sam Houston Blvd
                                    San Benito, TX 78586-5264
                                    Phone: 956-399-1299

                                    Respectfully Submitted,

                                    *Margaret Schmucker*

                                    Margaret Schmucker
                                    Attorney for Petitioner
                                    Texas Bar No. 24030874

                                    Law Office of Margaret Schmucker
                                    9311 North FM 620 # 254
                                    Austin, Texas 78726
                                    Phone (512) 236-1590
                                    Fax (512) 524-3479

TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

GROUNDS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Course of Proceedings and Disposition Below. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Statement of the Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        1.    Guilt/Innocence Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        2.    Punishment Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

SUMMARY OF THE ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

PREFACE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

THE STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    <u>GROUND ONE</u>: Melissa Lucio was deprived of the Sixth Amendment right to legal
    representation at all critical times at and after magistration. . . . . . . . . . . . . . . . . . . . . . 28

    A.    The Applicable Substantive Constitutional Standard and the Standard of
            Review in Federal Habeas Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    B.    The CCA's Application of a Procedural Bar Does Not Preclude Federal
            Habeas Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    C.    The Portion of the CCA's Adopted Findings of Fact Which Were Relevant
            to Melissa's Claim Are Implausible in Light of the Record as a Whole and
            Not Entitled to Deference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

D.    The CCA's Adopted Conclusion of Law That "CPS Contract Therapist Beto Juarez Was Not Acting in Tandem with Law Enforcement When He Counseled Applicant" Was Contrary To, or Involved an Unreasonable Application of Supreme Court Precedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

GROUND TWO: Melissa Lucio was deprived of effective assistance of trial counsel guaranteed by the United States Constitution when her trial counsel failed to file a pre-trial motion to suppress Melissa's custodial statements. . . . . . . . . . . . . . . . . . . . . . 39

A.    The Applicable Substantive Standard and the Standard of Review in Federal Habeas Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B.    The CCA's Application of a Procedural Bar Does Not Preclude Federal Habeas Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

C.    The CCA's Adopted Finding of Fact That Melissa Had Failed to Demonstrate That a Motion to Suppress Would Have Been Granted Such That Gilman's Failure to File it Was Deficient Is Implausible in Light of the Record as a Whole. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    1.    Melissa's alleged confession was the direct result of intense psychological coercion prohibited by the Fifth Amendment under Supreme Court precedent.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    2.    Melissa's alleged confession was obtained after she had invoked her constitutional right to remain silent. . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    3.    Melissa demonstrated that Gilman's performance was deficient; not a matter of trial strategy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

D.    The CCA's Decision That Melissa Failed to Demonstrate That a Motion to Suppress Would Have Been Granted Improperly Shifts the Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

E.    The CCA's Decision That Melissa Had Failed to Demonstrate That the Outcome of the Trial Would Have Been Different Had Gilman Acted in the Manner She Alleged Would Have Been Appropriate Involved an Unreasonable Application of Supreme Court Precedent. . . . . . . . . . . . . . . . . . . 53

GROUND THREE: Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution when her trial counsel failed to adequately investigate and present all available testimony and evidence to support Melissa's defense and otherwise subject the State's case to meaningful adversarial

testing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

A.      The *Strickland* Standard and the Standard of Review in Federal Habeas
        Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

B.      The CCA's Decision That Melissa Had Not Overcome Her Burden to Show
        That Gilman's Actions Were Not Attributable to Sound Trial Strategy Was
        Unreasonable in Light of the Evidence Presented. . . . . . . . . . . . . . . . . . . . . . . 57

C.      The CCA's Decision That Melissa Had Failed to Show That Melissa Had
        Failed to Show That Gilman's Performance Was Deficient in Any Manner or
        That the Outcome of the Trial Would Have Been Different Had Gilman
        Acted in the Manner She Alleged Was Unreasonable in Light of the Evidence
        Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

        1.      Gilman failed to obtain the assistance of a competent forensic
                pathologist to review the medical examiner's autopsy and testify on
                Melissa's behalf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

        2.      Gilman failed to make a timely request for or adequately utilize the
                assistance of a mitigation specialist and psychologist. . . . . . . . . . . . . . . . 68

        3.      Gilman failed to adequately investigate and present available
                witnesses and documentary evidence supporting Melissa's reasonable
                explanations for Mariah's old injuries. . . . . . . . . . . . . . . . . . . . . . . . . . 75

        4.      Gilman failed to adequately investigate and present available
                witnesses and documentary evidence that Alexandra Lucio or Robert
                Alvarez could have caused Mariah's old injuries, and possibly her
                death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

        5.      Gilman failed to adequately investigate and present available
                witnesses and documentary evidence that Melissa could not have
                "severely" beaten Mariah in the 24 to 48 hours immediately prior to
                her death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

        6.      Gilman failed to dispel the notion that Melissa would not explain the
                source of Mariah's "<u>old</u>" injuries because she had caused them. . . . . . . . 90

        7.      Gilman failed to adequately investigate and present available
                evidence explaining why Melissa did not know the extent or severity
                of Mariah's "<u>new</u>" bruises and contemporaneous fatal head injury. . . . . 92

v

8.    Gilman failed to dispel the notion that Melissa was indifferent towards Mariah and ignored her needs. . . . . . . . . . . . . . . . . . . . . . . . . . . 95

D.    The CCA's Adjudication of Melissa's Ineffective Assistance of Counsel Claims Resulted in a Decision That Was Based on an Unreasonable Determination of the Facts in Light of the Evidence Presented in the State Court Proceeding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

GROUND FOUR: The trial court deprived Melissa of the constitutional right to present a complete defense when it excluded the testimony of defense experts during the guilt/innocence phase of trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

A.    The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

B.    The CCA's Decision Did Not Address Melissa's Constitutional Claim and Is Not Entitled to Deference under the AEDPA. . . . . . . . . . . . . . . . . . . . . . . . 105

C.    The State District Court deprived Melissa of the Constitutional Right to Present a Complete Defense When it Excluded the Testimony of Her Defense Experts During the Guilt/innocence Phase of Trial. . . . . . . . . . . . . . . . . . . . . . 106

GROUND FIVE: Melissa Lucio was deprived of effective assistance of trial counsel guaranteed by the United States Constitution when her trial counsel failed to file proper pre-trial motions regarding, or otherwise timely object to, improper and highly prejudicial testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

A.    The *Strickland* Standard and the Standard of Review in Federal Habeas Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

B.    The State Court's Decision to Reject of Melissas's Ineffective Assistance of Counsel Claims Was an Unreasonable Application of Supreme Court Precedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

1. Gilman failed to challenge the State's use of information obtained through custodial questioning by CPS Therapist Beto Juarez after Melissa's arrest, without a contemporaneous Miranda waiver, and without counsel present. . . . 110

2.    Gilman failed to challenge Dr. Farley's improper "expert" testimony as scientifically invalid, subjective, and conclusory. . . . . . . . . . . . . . . . 114

3.      Gilman failed to challenge the State's "Shaken Baby Syndrome" evidence as junk science, sheer speculation, and more prejudicial than probative. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

4.      Gilman failed to object to Dr. Farley's improper testimony regarding the results of forensic examinations conducted by nontestifying experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

5.      Trial counsel failed to object to the State's punishment phase questions regarding Melissa's prior, unrelated DWI conviction even though evidence of that conviction had never been admitted. . . . . . . . 129

C.      Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

GROUND SIX: Melissa was deprived of due process and due course of law when the State failed to disclose potentially exculpatory evidence in sufficient time for the defense to utilize it at trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

A.      The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

B.      The CCA's Application of a Procedural Bar Does Not Preclude Federal Habeas Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

C.      The CCA's Decision Was Contrary To, or Involved an Unreasonable Application of Supreme Court Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

GROUND SEVEN: Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution when her trial counsel failed to preserve trial error for review on direct appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

A.      The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

B.      The CCA's Decision Was Contrary To, or Involved an Unreasonable Application of Supreme Court Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

1.      Deprivation of right to counsel at and after magistration and State's subsequent use of Melissa's uncounseled statements to Juarez and DWI conviction during the punishment phase. . . . . . . . . . . . . . . . . . . . . 150

vii

2.      Erroneous admission of Melissa's custodial statement to police because it was involuntary and taken in violation of her right to remain silent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

3.      State's tardy production of CPS records and the Maggie's House interviews. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

4.      Exclusion or restriction of expert testimony by Villanueva and Dr. Pinkerman during the Guilt/Innocence phase of her trial. . . . . . . . . . . 152

GROUND EIGHT: The trial court deprived Melissa of a fair and impartial judge and jury and due process of law when he commented upon the evidence by laughing at a defense expert during testimony where such conduct was observed by the jury. . . . . 154

A.      The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

B.      The Cca's Adopted Finding of Fact That Melissa Failed to Prove That the State District Court's Facial Expression Had Not Been Placed in "Context" Is Implausible in the Light of the Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

C.      The CCA's Decision Was Contrary To, or Involved an Unreasonable Application of Supreme Court Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

GROUND NINE: Melissa was deprived of effective assistance of appellate counsel because the State failed to provide her attorney with a complete transcript. . . . . . . . . 158

A.      The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

B.      The CCA's Adopted Finding of Fact That the Audio Recording Is Completely "Audible" Is Implausible in the Recording Itself. . . . . . . . . . . . . . 160

C.      The Lack of a Transcript and Translation Necessarily Rendered Appellate Counsel's Performance Deficient and Prejudicial. . . . . . . . . . . . . . . . . . . . . . . 161

GROUND TEN: Melissa is entitled to habeas relief because she is actually innocent of the offense of capital murder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

A.      The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

B.    The CCA's Decision That the Issue Is Not Cognizable on State Habeas Review Does Not Constitute a Procedural Bar to Review in Federal Habeas Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

C.    The CCA's Adopted Findings of Fact Are Implausible in Light of the Record as a Whole. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

D.    The CCA's Decision Was Contrary To, or Involved an Unreasonable Application of Supreme Court Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

GROUND ELEVEN: The trial court violated Melissa's constitutional due process right recognized by *Beck v. Alabama*, 447 U.S. 625 (1980), to receive a jury instruction on the lesser included offense of injury to a child. . . . . . . . . . . . . . . . . . . . . . 174

A.    The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

B.    Melissa was Entitled to a Lesser Included Offense on the Offense of Injury to a Child. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

THE AEDPA PERMITS A FEDERAL EVIDENTIARY HEARING. . . . . . . . . . . . . . 177

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

ix

## STATEMENT OF JURISDICTION

Jurisdiction of this Court is invoked under 28 U.S.C. § 2254 as a Petition for Writ of Habeas Corpus from a conviction and sentence in the Criminal District Court of Cameron County, Texas following denial of relief on a state habeas application.

GROUNDS FOR RELIEF

GROUND ONE: Melissa Lucio was deprived of the Sixth Amendment right to legal representation at all critical times at and after magistration.

GROUND TWO: Melissa Lucio was deprived of effective assistance of trial counsel guaranteed by the United States Constitution when her trial counsel failed to file a pre-trial motion to suppress Melissa's custodial statements.

GROUND THREE: Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution when her trial counsel failed to adequately investigate and present all available testimony and evidence to support Melissa's defense and otherwise subject the State's case to meaningful adversarial testing.

GROUND FOUR: The trial court deprived Melissa of the constitutional right to present a complete defense when it excluded the testimony of defense experts during the guilt/innocence phase of trial.

GROUND FIVE: Melissa Lucio was deprived of effective assistance of trial counsel guaranteed by the United States Constitution when her trial counsel failed to file proper pre-trial motions regarding, or otherwise timely object to, improper and highly prejudicial testimony.

GROUND SIX: Melissa was deprived of due process and due course of law when the State failed to disclose potentially exculpatory evidence in sufficient time for the defense to utilize it at trial.

GROUND SEVEN: Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution when her trial counsel failed to preserve trial error for review on direct appeal.

GROUND EIGHT: The trial court deprived the defendant of a fair and impartial judge and jury and due process of law when he commented upon the evidence by laughing at a defense expert during testimony where such conduct was observed by the jury.

GROUND NINE: Melissa was deprived of effective assistance of appellate counsel because the State failed to provide her attorney with a complete transcript.

GROUND TEN: Melissa is entitled to habeas relief because she is actually innocent of the offense of capital murder.

<u>GROUND ELEVEN</u>: The trial court violated Melissa's constitutional due process right recognized by *Beck v. Alabama*, 447 U.S. 625 (1980), to receive a jury instruction on the lesser included offense of injury to a child.

STATEMENT OF THE CASE

**A.      Course of Proceedings and Disposition Below**

Petitioner, Melissa Elizabeth Lucio,[1] was charged by indictment with the capital murders of

her daughter Mariah. 1 CR 9.[2]  Following a jury trial in the 138th Judicial District Court of Cameron

County, Texas, she was convicted as charged. 2 CR238.  After a separate punishment hearing, the

jury answered "Yes" to the first special issue, "Yes" to the second special issue, and "No" to the

third special issue. 2 CR 247.  Accordingly, the trial court sentenced Melissa to death. 2 CR 249.

Melissa's motion for new trial was overruled on October 31, 2008. Appeal to the Court of Criminal

Appeals was automatic. Tex. R. App. Proc. 25.2(b).

Melissa filed an appellate brief with the Texas Court of Criminal Appeals (hereinafter

"CCA") raising the following points of error:

> POINT OF ERROR NO. 1.  Whether the trial judge erred in its assumption that state
> statute deprived him of a trial court's inherent jurisdiction to determine whether the
> State's evidence of future dangerousness was insufficient to support a death sentence.
> *See* Appellant's Brief at 49-54.

> POINT OF ERROR NO. 2. Whether Melissa was entitled to a new trial under Texas
> Rule of Appellate Procedure 34.6(f)(4) because she did not receive a complete
> transcript of proceedings due to the fact that her recorded statement was not
> transcribed and portions of it were inaudible.  *See* Appellant's Brief at 54-61.

---

[1] Melissa had 15 children many of whom shared the last name "Lucio."  There is also another individual who will be discussed in this brief who shares the last name "Lucio" but is unrelated.  Counsel thus takes the unusual liberty of referring to the petitioner herein by her given name "Melissa" in order to avoid confusion.

[2] "CR" refers to the Clerk's Record of Trial Proceedings and is preceded by the volume number or name and followed by the relevant page numbers.  "RR" stands for the Reporter's Record of Trial Proceedings and is preceded by the volume number and followed by the relevant page numbers.   "WR" refers to the Clerk's Writ Record of proceedings in Mr. Lucio's state application for writ of habeas corpus under Cameron County District Court cause number 07-CR-885-B-WR and Court of Criminal Appeals cause number WR-72,702-02.

1

POINT OF ERROR NO. 3. Whether the trial court erred in admitting Melissa's videotaped statement to police into evidence where it was not "voluntary beyond a reasonable doubt" because it was the result of an illegal arrest and detention and there was no break in the causal connection between the illegality and the statement. *See* Appellant's Brief at 61-65.

POINT OF ERROR NO. 4. Whether the admissible evidence was legally insufficient to support the jury's affirmative answer to the future-dangerousness special issue. *See* Appellant's Brief at 65-86.

POINT OF ERROR NO. 5. Whether the State used "tainted evidence" at the punishment phase, namely evidence of Melissa's DWI which was obtained following her arrest and magistration for murder but without benefit of legal counsel. *See* Appellant's Brief at 86-87.

POINTS OF ERROR NOs. 6 & 7. Whether the evidence was legally & factually insufficient to support Melissa's conviction for murder. *See* Appellant's Brief at 87-98.

POINT OF ERROR NO. 8. Whether the evidence was factually insufficient to support the jury's finding of that Melissa would be a future danger. *See* Appellant's Brief at 98-101.

POINTS OF ERROR NOs. 9 & 10. Whether the trial court violated Melissa's right to present evidence as to the circumstances under which her statement to police was made when it excluded the testimony of defense experts Villanueva and Pinkerton touching upon whether such statement could reasonably be deemed voluntary during the Guilt/Innocence phase of trial. *See* Appellant's Brief at 101-107.

POINT OF ERROR NO. 11. Whether the trial court violated Melissa's constitutional right recognized by *Beck v. Alabama*, 447 U.S. 625 (1980), to receive a jury instruction on the lesser included offense of injury to a child. *See* Appellant's Brief at 107-118.

POINT OF ERROR NO. 12. Whether the trial court violated Melissa's right to a fair trial when it admitted notes made by State agent Beto Juarez during "counseling" sessions with Melissa after her constitutional right to legal counsel had attached and such evidence was obtained in the absence of legal counsel and used against Melissa at trial. *See* Appellant's Brief at 118-120.

POINT OF ERROR NO. 13. Whether the trial court violated Melissa' Fifth Amendment right to confront and cross-examine witnesses when it admitted

2

statements allegedly made to Beto Juarez during "counseling" sessions with Melissa after her constitutional right to legal counsel had attached even though Juarez was not present to testify. *See* Appellant's Brief at 120-129.

POINT OF ERROR NO. 14. Whether the State's failure to timely comply with a discovery order violated Melissa's Fourteenth Amendment right to due process of law. *See* Appellant's Brief at 129-135.

The CCA affirmed. *Lucio v. State*, 351 S.W.3d 878 (2011). Petitioner's motion for rehearing was denied on November 16, 2011. Melissa timely filed a Petition for Writ of Certiorari to the United States Supreme Court. The petition was denied on June 4, 2012, at which time her conviction became final. *Lucio v. State*, ___ U.S.___, 132. S.Ct. 2712 (2012).

A state application for writ of habeas corpus was filed before Lucio's conviction became final on direct appeal. The application and supporting brief raised the following federal constitutional[3] errors:

ISSUE ONE: Melissa Lucio was deprived of the Sixth Amendment right to legal representation when she was arrested and detained for more than 90 days on capital murder charges before the court appointed counsel to represent her. *See* Applicant's Brief at 25-30.

ISSUE TWO: Melissa Lucio was deprived of effective assistance of trial counsel guaranteed by the United States Constitution *** when her trial counsel failed to file a pre-trial motion to suppress her custodial statements. *See* Applicant's Brief at 30-41.

ISSUE THREE: Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution *** when her trial counsel failed to adequately investigate and present all available testimony and evidence to support Melissa's defense and otherwise subject the State's case to meaningful adversarial testing. *See* Applicant's Brief at 41-91.

---

[3] The portion of Issues Two, Three, Five, and Seven which were based upon the Texas Constitution have been intentionally omitted from the list as not cognizable in this forum as being issues of state law.

3

ISSUE FOUR: The trial court deprived Melissa of the constitutional right to present a complete defense when it excluded the testimony of defense experts during the guilt/innocence phase of trial. *See* Applicant's Brief at 91-96.

ISSUE FIVE: Melissa Lucio was deprived of effective assistance of trial counsel guaranteed by the United States Constitution *** when her trial counsel failed to file proper pre-trial motions regarding, or otherwise timely object to, improper and highly prejudicial testimony. *See* Applicant's Brief at 96-127.

ISSUE SIX: Whether Melissa was deprived of due process and due course of law when the State failed to disclose potentially exculpatory evidence in sufficient time for the defense to utilize it at trial. *See* Applicant's Brief at 127-132.

ISSUE SEVEN: Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution *** when her trial counsel failed to preserve trial error for review on direct appeal. *See* Applicant's Brief at 132-134.

ISSUE EIGHT: Whether the trial court deprived the defendant of a fair and impartial judge and jury and due process of law when he commented upon the evidence by laughing at a defense expert during testimony where such conduct was observed by the jury. *See* Applicant's Brief at 134-136.

ISSUE NINE: Melissa was deprived of effective assistance of appellate counsel because the State failed to provide her attorney with a complete transcript. *See* Applicant's Brief at 136-139.

ISSUE TEN: Melissa is entitled to habeas relief because she is actually innocent of the offense of capital murder. *See* Applicant's Brief at 139-140.

On July 23, 2012, the State District Court adopted the prosecutor's Second Proposed Findings of Fact and Conclusions of Law without alteration or amendment and recommended the denial of habeas relief. Thereafter, the CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief. *Ex Parte Lucio*, WR 72,702-02 (January 9, 2013) (per curiam). This petition is due one year from the date of the denial of state habeas, *i.e.* on or before January 9, 2014. 28 U.S.C. § 2241.

4

**B.      Statement of the Facts**

    **1.      Guilt/Innocence Phase**

Melissa Lucio had her first child when she was 17 years old. Tab 2[4] (SX 3 at 43). She was

38 at the time of her arrest in relation to the death of Mariah Alvarez.Id. Mariah Alvarez was born

on September 6, 2004. She was Melissa's 13th child.  DX 26 at 14.

Even prior to Mariah's birth, Melissa had difficulty controlling her children. They were "very

aggressive" towards each other and towards other children including hitting and pushing, which

resulted in bumps and bruises "all the time." 35 RR 94-95, 111-112. They even bit one another. Tab

2 (SX 3 at 48). *See also* 35 RR 96 (Sonya Chavez admitting to biting); 37 RR 108 (foster mom

testifies to children biting each other). Melissa was not an aggressive person and "never disciplined

them" for their bad behavior. 35 RR 95-96.

At the time of Mariah's birth, Melissa tested positive for cocaine. DX 26 at 14. Melissa's

minor children – including Mariah – were placed in foster care on September 21, 2004, due to

neglect, not abuse. DX 23 (The Burke Foundation 90- day Treatment Plan dated 6/20/2005 - Familial

Assessment / Summary). While in foster care, all of the children were seen as aggressive to the point

of becoming violent. See, e.g., DX 23 at 16. Richard and Gabriel were both on medication for

Attention Deficit Hyperactivity Disorder. 35 RR 164. In May of 2005, Melissa's oldest son,

19-year-old John Lucio, was charged with sexually abusing his younger brothers. DX 23 at 19. In

---

    [4]  "Tab" refers to a tab of the five volume Appendix to Melissa's State Application for
Writ of Habeas Corpus filed during state habeas proceedings and which should be included in
the writ record provided to this Court by the Office of the Attorney General of Texas as part of
the record on appeal.

turn, Rene, Richard, Robert,[5] and Gabriel acted out in violent and/or sexually inappropriate ways towards each other, towards their younger sisters, and towards other little girls. See, e.g., DX 23 at 16-20, 22.

While in foster care with Ramon and Alfonsa Castillo, Mariah received weekly physical / occupational therapy because she was weak and favored the left side of her body. DX 23 (e.g., Reports of Dora Cackley dated 3/21/2005, 3/29/2005, 4/18/2005, 4/29/2005). Mariah had difficulty walking because her feet were turned to the side instead of facing front and needed special shoes to aid her. DX 23 (Report of Dora Cackley 1/4/2006, 1/23/2006). In March of 2006, while Mariah remained in foster care, she suffered a self-inflicted head injury when she lost her balance, slipped, and fell from a toy with a small set of stairs. DX 19, 21. The fall caused her to lose consciousness. DX 23 (Burke Foundation 24 hour Incident Report). After that, Mariah's foster parents noted that she had to be closely supervised because she wanted to climb everything. DX 23 (May 2006 Log of Notable Behaviors).

Throughout her time in foster care, Mariah also threw repeated temper tantrums during which she would smack her head on the floor. *See, e.g.*, DX 20, 22, 23. Due to the risk of injury to herself, Mariah's foster parents were authorized to utilize brief physical restraints on her. DX 23 (PRN/Restraint Approval). CPS documented that Mariah would frequently bite her peers in foster care. DX 23 (January 2006 Log of Notable Behaviors).

Nine of Melissa's children – including Mariah – were returned to her care on November 21st of 2006. 33 RR 170; 34 RR 46. At the time, Melissa and her husband, Robert Alvarez, were living

---

[5] Melissa's husband's name is also Robert. To avoid confusion, Melissa's husband will be referred to herein as "Robert Alvarez" or just "Alvarez" and Melissa's son will be referred to as "Robert" or "Bobby."

6

in second story apartment located on 214 East Madison. 32 RR 44, 33 RR 9; SX 13; DX 1, DX 2. Access to the apartment was by means of an exterior wooden stairwell; the stairwell was steep, and the distance between the steps was not equal so the stairs were difficult to ascend / descend. 33 RR 20-21; 34 RR 48; DX 1, 2.

When the children were returned home, Mariah had several large insect bites and/or scratches on her body that her foster parents had been treating with Lotrimin antibiotic ointment. Tab 2 (SX 3 at 50). The sore spots continued to be a problem up until the time of Mariah's death. Tab 2 (SX 3 at 50).

Melissa's sister, Sonya Chavez, saw Mariah on three occasions after she had been returned home: for about five hours on Thanksgiving Day, for about five hours the second week in December, and for less than an hour on New Year's Day. 35 RR 101, 104, 118. On each occasion, Mariah looked healthy; Chavez did not see any kind of bruises or markings on her that would indicate that she was being abused. 35 RR 101, 104, 105-106. However, on two of her visits, Chavez saw Mariah crying because of rough play with Melissa's older children and took her out of the room. 35 RR 112, 114.[6]

In December of 2006, CPS Caseworker Miguel Rodriguez visited the Lucio/Alvarez home on East Madison Street and reported that "there's a lot of chaos in this household" and that two teenage girls (Alexandra (15) and Selina (14)) were in the apartment with the younger children and that no one was watching Sara (age 3) or Mariah (age 2). DX 23 at 30. Rodriguez noted with concern

---

[6] Chavez distinguished Melissa's crying from "complaining" or "talking" about it. 35 RR 114.

that while he was there Sara started going down the stairs unsupervised. DX 23 at 30.[7]

The older boys who, it bears repeating, were aggressive to the point of becoming violent, DX 23 at 16, would "horse around" with Mariah, and Melissa explained that this caused some of Mariah's older bruises, Tab 2 (SX 3 at 19-20).  Sonya Chavez also testified that the boys "liked to wrestle a lot" and that "[t]hey would hit each other, punch each other" and that this would leave bruises. 35 RR 103, 111-112. Melissa also explained that Mariah would wake up in the middle of the night and get out of bed to play. Tab 2 (SX 3 at 20). Melissa explained that after one such episode she found Mariah with a bruise under her eye which, she believed, was the result of Mariah running into some thing or tripping over something on the floor in the dark. Tab 2 (SX 3 at 20, 31). *See also* SX 30 (bruise under eye). Mariah also had a bruise on the bottom of her foot that Melissa could not explain. Tab 2 (SX 3 at 31). Notably, however, Rodriguez had previously reported that "The Apt. is a mess with tiny things all over the floors . . .," DX 23 at 30, Mariah had developmental disabilities that made her unsteady on her feet, DX 23 (e.g., Reports of Dora Cackley dated 3/21/2005, 3/29/2005, 4/18/2005, 4/29/2005, 1/6/2006, 1/23/2006), and Maria would wander the apartment at night in the dark, Tab 2 (SX 3 at 31).

On Thursday, February 15, 2007, Melissa and her husband were moving their family from their second-story apartment to a first-floor apartment. 32 RR 35. The first story apartment was located on West Lee. 32 RR 44, 33 RR 10; SX 14. Melissa was inside the apartment packing clothes

---

[7]   Rodriguez reported his findings by phone to Angie Romo. DX 23 at 31. Angie Romo was the CPS caseworker responsible for visiting the children at least once a month after they had been returned home. 33 RR 171-173; DX 23 at 16. A CPS case worker is responsible for checking on the welfare of children in the home. 3 RR 175-76. If a CPS case worker suspected abuse, he or she would check for physical signs of injury. 33 RR 175-176. Romo followed these procedures with Melissa's children between November of 2006 and February of 2007. 33 RR 177. Romo did not report any signs of physical abuse.

and household items with her daughter, Alexandra (15). Tab 2 (SX3 at 3-4). Selina (14), Rene (9), and Richard (9), were with their dad transporting the family's belongings to the new apartment.  Tab 2 (SX 3 at 3, 5). Melissa's husband had instructed Robert ("Bobby") (7), Gabriel (6), Adriana (4), and Sarah (3) to stay inside but after he left, they went outside to play in the back yard leaving Mariah upstairs. Tab 2 (SX 3 at 3, 7).  At some point, Melissa noticed that Mariah was no longer in the apartment and went looking for her. Tab 2 (SX 3 at 6). Melissa found Mariah at the bottom of the exterior stairwell to the apartment. Tab 2 (SX 3 at 5); DX 1 (stairwell), DX 2 (stairwell). Melissa had to go down the entire flight of stairs to get to her. Tab 2 (SX 3 at 6-7).  Mariah was "not crying real heavy" indicating that she was "real hurt or anything" and Melissa did not see any marks on her except that she was "bleeding from her tooth from the bottom." Tab 2 (SX 3 at 6, 7, 14). See also SX 30 (swollen, busted lip). Melissa did not think that the other children playing in the yard had seen Mariah fall because they were around the corner of the building. Tab 2 (SX 3 at 7).  Later that afternoon, Melissa fed Mariah tamales from H.E.B. and she vomited one time. Tab 2 (SX 3 at 4). After that, Mariah seemed fine. Tab 2 (SX 3 at 4, 15). That evening, Melissa went to wash clothes and took Mariah along. *Id*. Mariah drank a Sprite "'cause she felt kind of warm" and then went to sleep. Tab 2 (SX 3 at 15).

The following day, Friday the 16th, Mariah ate cereal with milk for breakfast, and half a bologne /cheese sandwich for lunch. Tab 2 (SX 3 at 12-13). However, after that, Mariah did not seem to want to eat any more. Tab 2 (SX 3 at 13). Melissa tried to get Mariah to eat dinner, but she just wanted juice. Tab 2(SX 3 at 13, 14).

By Friday night, Mariah was having trouble breathing. Tab 2 (SX 3 at 10). Melissa thought she was just getting a cold and tried clear her nostrils. Tab 2 (SX 3 at 10). Mariah's right nostril was

"more stuffier" than her left nostril. Tab 2 (SX 3 at 10).  Also, Melissa noticed that Mariah had her mouth closed real tight – like the lockjaw her older daughter had experienced during an epileptic seizure when she was younger – but Mariah did not know what caused it in Mariah and did not think it serious enough to require medical attention because Mariah did not appear to be having a seizure. Tab 2 (SX 3 at 10-11).

At some point after the fall, Melissa also noticed what looked like bite marks on Mariah's back. Tab 2 (SX 3 at 56), SX 23. Melissa denied biting Mariah. Tab 2 (SX 3 at 41), but explained that her children had a history of biting each other and that she had asked if one of them had bit her. Melissa further explained that when they said no, she did know who else to ask. Tab 2 (SX 3 at 56).

When Mariah woke up Saturday morning, she did not want to eat again; all she wanted was water, and then she went back to sleep. Tab 2 (SX 3 at 12, 14). At this point, Melissa wanted to take Mariah to the doctor because she was acting "very different" and it was not like her to sleep so much, but the family was busy with getting settled into their new apartment, Melissa's husband needed the family's only vehicle to retrieve mattresses from storage, and Melissa was afraid the doctors would see Mariah's old bug bites, scrapes, and bruises and accuse her of child abuse. Tab 2 (SX 3 at 9, 14, 41). In the end Melissa noted that Mariah seemed to be breathing okay and decided to just wait, to let Mariah rest and see if she improved, and if she didn't they would take her to the hospital later that day. Tab 2 (SX 3 at 14, 19).

Melissa's husband left about 5:30 or 6:00 p.m. with Selina, Richard and Rene to retrieve the mattresses; Melissa instructed the other kids to just leave Mariah alone and let her sleep; and Melissa began unpacking and sorting the kids' clothes in another room. Tab 2 (SX 3 at 15-17). Melissa went to check up on Mariah while her husband was gone; she appeared to be fine, she was breathing and

10

"doing okay." Tab 2 (SX 3 at 16,17) . A short while later Melissa's husband returned and found Mariah unresponsive. Tab 2 (SX 3 at 18). Melissa's daughter called the police. Tab 2 (SX 3 at 18).

EMTs Randall Nestor and David Mendoza were the first on the scene. 33 RR 84, 98. They arrived approximately 15 minutes after being called. 33 RR 95-96. When they entered the apartment, Mariah was lying face up on the floor in the living room. 33 RR 85, 99. Although Mariah had no pulse, was not breathing, and was clinically dead, Nestor decided to treat her anyway. 33RR 86-87. As the EMTs undressed Mariah, they noted bruises to her entire body in multiple stages of healing. 33 RR 86, 89-90, 100. Nestor also noted that Mariah had a deviation of the left eye, indicating probable head trauma. 33 RR 87-88. When questioned, Melissa explained that Mariah had fallen down the stairs. 33 RR 87. Nestor incorrectly assumed Melissa meant the three steps in the front of the family's current apartment and reported this to police when they arrived. 33 RR 87.

HPD Officer Jaime Palafox was dispatched to the scene. 33 RR 64. When he arrived, the EMTs were already assisting Mariah. 33 RR 65. Melissa was kneeling at Melissa's head. 33 RR 68. Officer Palafox observed the EMTs remove Mariah's shirt. 33 RR 67. Mariah's chest and body were bruised. 33 RR 67. Melissa again explained that Mariah had fallen down the steps while the family was in the process of moving out of the Madison Street apartment. 33 RR 70.[8] HPD Officers Robert Mendiola and Javier Villlareal arrived shortly thereafter. 33 RR 75. Melissa reiterated for the third time that Mariah had fallen down the stairs at the family's previous apartment. 33 RR 77, 148.

The EMTs continued to do CPR on Mariah for at least 25 minutes while they transported her to the hospital. 32 RR 72. Dr. Alfredo Vargas, was the Emergency Room doctor on call at Valley

---

[8] Officer Palafox testified that Melissa told him that Mariah had fallen down "two" steps, but this information had actually come from EMT Nestor. 32 RR 70; 33 RR 87.

11

Baptist Emergency Hospital the evening Mariah was brought in by EMS. 32 RR 71-72. Mariah was unresponsive and dehydrated with multiple bruises of unknown age but at various stages of healing. 32 RR 72, 86. Dr. Vargas did not observe any type of contusion or abrasion that would indicate a possible head injury. 32 RR 77. However, Dr. Vargas admitted that it was possible for an impact with a hard object such as a wall or stairs to cause blood to collect under a child's skull and that usually (not "always") there is some external evidence of the impact. 32 RR 78-80.[9]

CPD Detective Rebecca Cruz was at the police station when Melissa, Robert Alvarez, and their children arrived. Det. Cruz gave Melissa a Miranda warning but did not contemporaneously advise her that she was under arrest for murder. 32 RR 28-30; Tab 2 (SX 3 at 2). Rather, Cruz advised Melissa that they were "just investigating" Mariah's death. Tab 2 (SX 3 at 2). Melissa signed the Miranda waiver at 9:53 p.m. 321RR 32; SX 1. After Melissa was Mirandized, CPD Detectives Cruz, Banda, Villareal, and Palafox began a team interrogation which lasted 5 ½ to 6 hours – until 3:15 a.m. 32 RR 33-34; 33 RR 37. Although Melissa had been up since at least 8 a.m., Tab 2 (SX 3 at 12), the detectives never offered her anything to drink or eat or an opportunity to sleep. 33 RR 38. Additionally, the armed officers repeatedly attempted to intimidate Mariah into making a confession by standing over her waving photographs in her face and yelling at her. See, e.g., Tab 2 (SX 3 at 26-27, 32, 37-38, 40-41). In one instance, Officer Banda indicated that he would like to "beat you half to death." Tab 2 (SX 3 at 26-27). By 12:15 a.m. Melissa was so exhausted she laid her head on the table to rest for a few minutes. 32 RR 56; SX 3.  This continued off and on throughout the rest of her interrogation. See SX 3, SX 4, SX 5.

_____

[9] Dr. Vargas testified that such internal injury could be revealed by a CAT scan, but that no CAT scan was taken of Mariah's head. 32 RR 78, 80.

While Melissa was being interrogated by the CPD Detectives, Texas Ranger Victor Escalon, Jr., arrived at the police station to assist with that interrogation. 33 RR 109-111, Tab 2( SX 4). Although no autopsy had yet been performed, the detectives informed Ranger Escalon that Mariah had been badly beaten and died as a result of her injuries. 33 RR 112-113.[10] Ranger Escalon further assumed that the scratches on Mariah's back were bite marks. 33 RR 124.   Ranger Escalon, attempted to get Melissa to "open up" and tell him what happened in order to confirm his belief that she had beaten Mariah and caused fatal head trauma. 33 RR 120-121. However, on cross-examination, Ranger Escalon tacitly admitted that he had no basis to suspect that Mariah's death had resulted from head trauma based on photographs that showed only injuries to her torso, arms, and legs. 33 RR 128. He testified that he had relied on his experience in making that assumption. 33 RR 128.

Melissa has repeatedly denied abusing Mariah, hitting her out of frustration, biting her, or doing anything to cause her death. See Tab 2 (SX 3, SX 4, SX 5).  Melissa never admitted to shaking Melissa, SX 2, 33 RR 136-137. Melissa's sister Sonya Chavez corroborated her statement that Mariah did not misbehave, and that Melissa did not express frustration with her. 35 RR 104. Nevertheless, Melissa was charged with capital murder because authorities assumed that "she's the only one that was with this child." 33 RR 44. *But see* DX 23 at 30 (Rodriguez reporting Mariah being supervised by Alexandra (15) and Selina (14) in December).

The following day, Officer Villareal transported Melissa to the Brownsville Dental Office

---

[10]  Det. Cruz admitted that police had no evidence that Melissa struck, shook, or threw Mariah with sufficient force to cause the brain hemorrhage that killed her. 33 RR 44. Although none of the officers were qualified as experts, and they did not yet have the medical examiner's pathology report, they "ruled out" Melissa's explanation for Mariah's injuries and blamed her for Mariah's death. 33 RR 53-54.

where Dr. Tara Rios was to take dental impressions from both Melissa and Robert Alvarez. 33 RR 148-149. En route, Melissa asked to use the phone to call her sister. 33 RR 149. Officer Villareal handed Melissa a phone, observed her dial out. 33 RR 154.[11] According to Sonya Chavez – the person on the other end of the line – Melissa stated that she did not know what had happened to Mariah, and that she was being charged with murder for spanking her kids. 35 RR 97. She never said "it wasn't Robert that did it, it was me that did it" and she did not otherwise confess to beating up on Mariah. 35 RR 97, 109.

Dr. Norma Jean Farley, the chief forensic pathologist for Cameron County, conducted an autopsy on Mariah two days after her death. 34 RR 6, 11. She spent approximately four hours measuring and photographing Mariah's external injuries, and about two additional hours conducting an internal examination. 34 RR 12; SX 22-35. During the external portion of the examination, Dr. Farley noted abrasions and scabbed areas on Mariah's scalp as well as crusted areas where she was missing hair. 34 RR 15, 21; SX 30. Dr. Farley opined that this was consistent with Mariah's hair being pulled, but did not opine as to the specific circumstances of the incident. 34 RR 15. Furthermore, Dr. Farley noted a set of scrapes across Mariah's shoulder. SX 23. Dr. Farley opined that these were "obvious" bite marks which resulted from the "dragging" of the teeth across the back." 34 RR 16, 18, 22, 33; SX 23. Although Dr. Farley believed the marks appeared to be "in the adult size," no attempt was made to match them to Melissa's dental molds. 34 RR 34. In addition,

---

[11] Officer Villareal testified that he overheard her tell the person on the other end of the line not to blame Robert [Alvarez]. However, on cross-examination, Officer Villareal admitted that he did not prepare his narrative report regarding the incident for more than a year. 33 RR 155-156.  Officer Villareal interpreted Melissa's conversation as meaning it was her fault and that she had killed Mariah, but defense counsel objected to Officer Villareal's interpretation and the objection was sustained. 33 RR 154-155.

Dr. Farley noted three "very small" abrasions in the vaginal area and a couple of little contusions on the inner thigh. 34 RR 39. Dr. Farley explained that the abrasions were just an area where the outer layer of skin had rubbed off and opined that "anything" could have caused such abrasions. 34 RR 51. Dr. Farley likewise opined that "anything" could have caused the contusions. 34 RR 51. Finally, Dr. Farley noted abrasions (scrapes) and contusions (bruises) on Mariah's face, chest, and legs. 34 RR 14-15. Dr. Farley admitted that abrasions and contusions on the shins, calves, knees, and elbows are commonly caused by, *e.g.*, a playground fall, 34 RR 15, 17, but opined that similar injuries to the chest, abdomen, pubic area, undersurface of the eye, ears, and cheeks are not. 34 RR 17, 57. In summary, Dr. Farley opined that Mariah's various injuries could not have been caused by a fall down a flight of stairs. 34 RR 34, 55, 57.  However, Dr. Farley admitted that "most" of Mariah's bruises were a "pinky, maroon" color and "that's a color we associate with an acute or recent bruise," and that they had all occurred within a one-day period. 34 RR 19, 54. Dr. Farley also admitted that bruises all over the body could be caused by a fall from a "significant height" that was not "simple," 34 RR 35, and that some people can suffer blunt force trauma and die falling down the stairs, 34 RR 55.

During the internal examination of the body, Dr. Farley noted the existence of bruising on both lungs and the right kidney. 34 RR 29. Dr. Farley did not opine as to the specific source of the bruises, but provided a non-exhaustive list of ways such bruising could occur. 34 RR 30. Furthermore, Dr. Farley noted blood around the spinal cord. 34 RR 29. Dr. Farley opined that these injuries were related to the bruises on Mariah's back and abdomen. 34 RR 29. Dr. Farley also noted the existence of a healing left arm fracture. 32 RR 83 ("skeletal survey" x-ray done at hospital); 34 RR 30. Dr. Farley opined that the fracture was 7 days to 2 weeks old. 34 RR 30-31. Dr. Farley

15

testified that such fractures "usually" resulted from "tugging" or "twisting" the arm. 34 RR 31. Neither the "skeletal survey" x-ray nor Dr. Farley's photograph of the broken bone were published to the jury or introduced into evidence. Finally, Dr. Farley noted "hemorrhage around both of the nerves that come from the eyes. 34 RR 33.

During the internal portion of the examination, Dr. Farley noted the existence of a "subdural hemorrhage" which is blood that has accumulated between the brain and the skull, 34 RR 23, a subarachnoid hemorrhage" which is blood sitting on the brain itself, 34 RR 24, and "multiple" contusions "all over" the scalp otherwise hidden by hair or simply not visible on the skin's surface, 34 RR 24, 26. The subdural hemorrhage was caused by a single blunt force trauma to the head and resulting rebound; it was not caused by shaking.[12] 34 RR 23-24, 28. According to Dr. Farley, the trauma occurred within 24 hours of Mariah's death because the injury exhibited "the beginning of the fibrin" (i.e. fresh blood) and no spindle or white blood cells. 34 RR 36, 58. However, this was just Dr. Farley's "best estimate" because the spindle cells and white blood cells indicative of healing would not appear for at least 48 to 72 hours after the initial injury. 34 RR 36, 60. Dr. Farley explained that this type of "closed head injury" would not be visible during an external examination, 34 RR 23, but added that there would be other signs of injury such as lethargy, inability to eat or drink, vomiting, seizures, abnormal breathing, and ultimately coma, 34 RR 37-38. Dr. Farley explained that such symptoms would be the result of pressure inside the skull due to swelling of the brain, 34 RR 52, and would appear "fairly quickly" after a fatal blow, but added that an adult might not recognize a child having a seizure. 34 RR 37. In summary, Dr. Farley opined that Mariah's fatal

---

[12]  Mariah did not die of injury due to "shaken baby syndrome." Mariah's neck was not broken.  34 RR 35. And shaking of a baby doesn't produce the type of hemorrhage in the scalp noted in the autopsy. 34 RR 64, 70.

16

closed head injury was the result of "non-accidental head trauma." 34 RR 53. *See also* 34 RR 39, 59. However, Dr. Farley also admitted that such an injury could be the result of slamming into a piece of furniture or a floor, 34 RR 38, and that "many" of the other contusions on Mariah's body "actually" or "probably" occurred "about the same time" as the head trauma, 34 RR 56.

Dr. Joseph Kuri, a neurosurgeon, testified regarding Mariah's brain injuries. 35 RR 4, 9. Dr. Kuri agreed that Mariah suffered a blunt force trauma to the head. 35 RR 9, 24-25. However, Dr. Kuri disagreed as to Dr. Farley's assessment that the injury necessarily occurred within 24 hours of Mariah's death, and resulted from abuse. 35 RR 25, 35 (discussing progression of symptoms); 35 RR 67, 87-88 (essentially, the cause of injury is anybody's guess). Dr. Kuri indicated that the "most important part for any doctor" in assessing an injury is the "history of the patient." 35 RR 26-28. Dr. Kuri explained that a head injury that had not resulted in an immediate loss of consciousness could get progressively worse, and the patient's progression of neurological symptoms would be important to a proper clinical diagnosis. 35 RR 28-29. Dr. Kuri further explained that blunt force trauma to the head would cause swelling of the brain resulting in increased intracranial pressure. 35 RR 31. A patient suffering from intracranial pressure due to blunt force trauma would initially experience headaches, blurred vision, and vomiting, and then gradually the patient would become drowsy and unable to move, and finally the patient would become rigid. 35 RR 31. Dr. Kuri explained that this process is not immediate, "it takes time." 35 RR 32. The main symptom is the patient's drowsiness because "[n]obody is going to die of a head injury without passing through unconsciousness." 35 RR 32. In regard to Mariah, Dr. Kuri agreed that vomiting, drowsiness, and a locked jaw on Friday would be early symptoms of brain injury the previous day, 35 RR 38-39, and that such injury could be the result of a fall down the stairs, 35 RR 64, 88.Dr. Kuri explained that a baby "rolling down"

17

a flight of stairs could produce additional, different traumas to the head. 35 RR 77. Dr. Kuri further explained that the hemorrhage in Mariah's retina would be due to the hemorrhage in the brain which infiltrated through the exit of the optic nerve. 35 RR 41. And Dr. Kuri opined that the injuries to the sides of Mariah's head were more likely the result of a fall where she hit one ear and then the other ear on the ground than from a hit by a hand. 35 RR 66. Dr. Kuri testified that children are more susceptible to head injuries than adults, and that the majority of such injuries are the result of such falls because children do not have good balance. 35 RR 48-49.

### 2.    Punishment Phase

During the punishment phase the State submitted evidence of Melissa's prior DWI conviction. The defense submitted limited expert testimony regarding Melissa's social history which included physical abuse resulting in a case of "Battered Women's Syndrome." The State used evidence of Melissa's uncounseled custodial statement to CPS Therapist Beto Juarez to discredit her experts. The defense also submitted witness testimony from sibling and a CPS caseworker to the general effect that they had not observed Melissa disciplining or abusing her children.

SUMMARY OF THE ARGUMENTS

From the EMTs and Officers who responded to the scene of Mariah's death to the Medical Examiner who conducted the autopsy, and the District Attorney who prosecuted Melissa, this case presents a classic "rush to judgment." At each step of the way, authorities took one look at the bruises on little Mariah Alvarez's body, assumed she had been abused by her mother, then refused to even consider any other possibility.

The EMTs and ER doctor – neither of whom was properly qualified as an expert in forensic pathology – opined that Mariah had been abused to death. The detectives assigned to the case then interrogated and intimidated Melissa well beyond the point of exhaustion in an attempt to validate that opinion. And the Medical Examiner's analytical process was skewed to match. In short, authorities for the State molded a case against Melissa Lucio to fit a foregone conclusion, rather than investigating her repeated explanations for Mariah's many contusions and abrasions. The State then withheld material evidence that tended to contradict its flawed case until the eve of trial.

At trial, the State presented its flawed case with little or no opposition from Melissa's defense attorneys who failed, among other things, to follow up on the incomplete exculpatory evidence that had been disclosed, failed to conduct a competent independent investigation, failed to attempt to suppress Melissa's videotaped statement as involuntary and in violation of her right to remain silent, failed to retain the services of a forensic pathologist or provide such expert with all necessary documents and autopsy evidence for independent review, failed to consult with or obtain any medical expert whatsoever until just days before trial, failed to prepare that expert witness for trial, failed to fully utilize the mitigation expert and psychologist appointed to assist in trial preparation, failed to raise objections to repeatedly improper testimony by the State's witnesses, failed to call innumerable

witnesses who would have corroborated Melissa's explanations and provided additional exculpatory evidence, and failed to lay a proper foundation for admission of documentary evidence that would also have corroborated Melissa's explanations.

The trial court compounded the problem by improperly prohibiting Melissa's defense attorneys from presenting much of the evidence they had prepared and by laughing at Melissa's only medical expert in front of the jury.

Melissa is, in fact, innocence of both child abuse and of capital murder.  Mariah's old injuries were the result of sibling on sibling violence, paternal abuse, and accidental injury. Mariah's fatal head injury and contemporaneous bruises were the delayed result of a tumble down a flight of stars either accidental or as the result of being pushed by Melissa's 15-year-old daughter Alexandra.

The CCA's rejection of Melissa's claims was based largely upon adopted Findings of Fact initially drafted by the office of the Cameron County District Attorney (who has now been convicted in  federal court of corruption in the running of that office) and that were either irrelevant to the issue or implausible in light of the evidence and thus to entitled to deference by this Court.  The CCA's decision to reject Melissa's claims which cited not a single pertinent legal authority also either failed to apply the proper constitutional standards or else applied them in a manner so unreasonable as to require the granting of federal habeas relief.

PREFACE

The deceased in this case, 2½ year old toddler Mariah, died on February 17, 2007, while then Cameron County District Attorney Armando Villalobos was gearing up to run for re-election in November of 2008.  Mariah's mother Melissa was immediately assumed to be at fault, brutally interrogated for many hours late into the night, placed under arrest, taken for magistration and detained for 90 days without receiving benefit of counsel.   After 90 days Cameron County District Judge Arturo Cisneros finally appointed counsel to represent Melissa but, for reasons as yet unknown, selected Peter C. Gilman to represent her despite the fact that Gilman had no prior capital case experience.  I CR 14.[13]  Gilman's lack of experience was readily apparent when, a year after Mariah's death, he had done so little to prepare for Melissa's trial (originally set for Monday, February 4, 2008) as to cause Judge Cisneros to comment upon it, 9 RR 5 ("I am concerned that the defense *** is not getting ready." and "I am concerned that they are not up to speed.").

Melissa's jury trial ultimately had to be rescheduled and finally took place in May and June of 2008 – some 16 months after Mariah's unfortunate death but fortuitously during the heat of Villalobos's re-election campaign.  Melissa's case was widely reported in the local media as it was the first time in some years that Cameron County had sought the death penalty and, if convicted,

---

[13] Attorney Ruben Peña was appointed special prosecutor (*i.e.* attorney *pro tem*) in a murder case against defendant Jose Alfredo "Pepe" Villareal under similarly questionable circumstances.  Peña's primary fields of practice were employment law and civil matters; he had never prosecuted a murder case.  Peña apparently received the juicy appointment because Villalobos and Peña were friends; Villalobos had moved in with Peña during his divorce.  Villareal's case was subsequently dismissed on Peña's motion in consultation with Villalobos who was not supposed to be involved.  *USA v. Villalobos*, 1:12-CR-374, District Court Document Number 244 at 18-23.  It is generally known within the Cameron County legal community that Villalobos and Gilman are also friends.

21

Melissa would be one of but 10 women on Texas Death Row.[14]  Villalobos personally participated

in Melissa's trial.  Of particular note, Villalobos examined a government witness and elicited from

him a physical demonstration of the action necessary for an infant[15] to suffer from "shaken baby

syndrome" which was of questionable scientific validity[16] without objection from either of Melissa's

trial attorneys. 33 RR 134-142.   Villalobos capitalized upon Melissa's conviction during his re-

election campaign.  Following Melissa's conviction, and Villalobos' subsequent re-election, Gilman

wound down his defense practice and both he *and his wife* went to work for the Cameron County

District Attorney's Office.  According to public records obtained through an open records request,

Gilman was personally interviewed by Villalobos on an unknown date, notified that he had been

hired on October 15, 2009, and started working four days later[17] at an annual starting salary of

---

[14] A fact Villalobos, himself, acknowledged during his own federal criminal trial.  *USA v. Villalobos*, 1:12-CR-374, District Court Document Number 239-1 at 35 ("It was the first woman ever sentenced to death in Cameron County.  This was a huge case.").

[15] This despite the fact that Mariah was not an "infant" but a 2½-year-old toddler.

[16] Since at least 2003, the scientific community has seriously questioned the validity of "shaken baby syndrome" and courts have acknowledged that admission of such evidence unchallenged by defense counsel would support an ineffective assistance of trial counsel claim. *See, e.g., Lutze v. Sherry*, 2010 WL 3398489 (Mich. S.Ct., Aug. 25, 2010) (not designated for publication). Indeed, in another Texas capital case, Travis County District Judge Jon Wisser exhibited the judicial courage in acknowledging that testimony of the state's chief experts in Cathy Lynn Henderson's capital murder case regarding the causes of head trauma in children was "scientifically flawed" and recommended that she be *exonerated*.

[17] Evidence elicited at Villalobos's federal criminal trial suggests that Gilman had actually started working at the District Attorney's office earlier.  According to former Judge Abel Limas, he had consulted with Gilman as "the prosecutor in the 197th" in September of 2009 (or possibly earlier) regarding pre-trial diversion for 19-year-old Armando Ruelas who had been charged with a first of offense of possession of marijuana.  *USA v. Villalobos*, 1:12-CR-374, District Court Docket Number 227-1 at 27-28, 228-1 at 8.  This is at last six weeks earlier than was reported to habeas counsel by Villalobos's open records division.

$80,000.[18]  Thereafter, repeated requests to Gilman by Melissa's state habeas counsel for her trial file went unheeded until counsel was forced to file a formal grievance in order to wrest them from his possession.[19]

In May of 2012, Villalobos was indicted by a federal grand jury on criminal charges. The indictment alleged that from October 2, 2006, through May 3, 2012, — a time frame encompassing both Melissa's trial and appeal, Gilman's change of employment, and much of Melissa's state writ proceedings — Villalobos was involved in a scheme to illegally generate income for himself and others through a pattern of bribery and extortion, favoritism, improper influence, personal self-enrichment, self-dealing, concealment and conflict of interest.  The indictment alleged, *inter alia*, criminal wrongdoing in relation to Villalobos's handling of an unrelated murder conviction which occurred contemporaneous to Melissa's arrest and demonstrated that her treatment as an indigent defendant with little formal education was far different from that of more moneyed defendants under Villalobos's administration.[20]  Assistant District Attorney Alfredo Padilla – who

---

[18]  Former judge Abel Limas testified that when Gilman refused to agree to pre-trial diversion for Ruelas, he went directly to Villalobos who accepted $300 from Limas for consenting to it, and Gilman later signed the papers to dismiss the case.  *USA v. Villalobos*, 1:12-CR-374, District Court Docket Number 227-1 at 26-30, 228-1 at 8, 16.

[19]  The grievance was dismissed after Gilman turned over Melissa's files.

[20]  Amit Livingston was arrested for the murder of Hermila Hernandez in late 2005. Shortly after his arrest, Livingston's father posted a $500,000 bond and Livingston was released on bail pending trial.  While the criminal case was pending, Villalobos's former law partner Eduardo "Eddie" Lucio (no relation to Melissa) filed a parallel wrongful death lawsuit against Livingston on behalf of the victim's family and estate attaching the $500,000 bail money as settlement.

On February 12, 2007 – just 5 days before Mariah's death and Melissa's arrest – Livingston plead guilty but Cameron County District Judge Abel Limas allowed him to remain at large for 60 days ostensibly to allow the man to "put his affairs in order."  Neither District Attorney Villalobos, nor First Assistant District Attorney Chuck Mattingly – the same attorneys

also participated in prosecuting Melissa's case – testified in Villalobos's federal criminal trial regarding his involvement in questionable asset forfeiture proceedings during Villalobos' administration.  During that testimony, the following exchange occurred:

> Q.     * * * You at that time were working on a capital murder case, correct?
> A.     Yes.
> Q.     What was that case?
> A.     I believe it was the Melissa Lucio case where we got the death penalty on *a lady who killed her daughter by biting her.*
> Q.     Was that the one Pete Gilman was on the other side of?
> A.     Correct, correct.
> Q.     And you were the lead counsel for the people?
> A.     Correct.
> Q.     And it was almost a full time job at the time, wasn't it?
> A.     It was.  There was a lot of material, a lot of witnesses.  *We were having trouble – not trouble, but we were trying to get the issue of probability of future dangerousness.  We spent a lot of time on that.*

*USA v. Villalobos*, 1:12-CR-374, District Court Document Number 242 at 26-27 (emphasis added).

During Melissa's state habeas proceedings in the Cameron County District Court and despite numerous unanswered questions about Gilman's handling of the case, District Judge Arturo Cisneros signed an order proposed by the District Attorney's Office to the effect that there were no issues of material fact and ordering the parties to filed proposed Findings of Fact and Conclusions of Law by June 29, 2012.  On June 19, 2012, — *ten days before that deadline* — the District Attorney's Office filed *and Judge Cisneros immediately adopted* the State's proposed findings and conclusions.  When the apparent injustice of ruling before the deadline and before Melissa's habeas counsel had even filed was brought to the State District Court's attention along with the fact that the Cameron County

---

involved in Melissa's case – objected. Livingston immediately absconded and remains at large. According to public records, the plea was part of negotiations among the prosecution, the victim's family, and defense counsel and resolved not only the criminal case but also the civil lawsuit. The day Livingston disappeared, Villalobos distributed the bail money to the victim's family and received a kickback from Lucio of $80,000 out of his legal fees.

District Attorney Armando Villalobos was under federal indictment for influence peddling with, *e.g.*, former Cameron County District Judge Abel Limas (who has since been convicted in federal court), Judge Cisneros struck the order "in the interests of justice," and ordered the parties to re-file.  This was done, but Judge Cisneros again perfunctorily signed the State's proposed Findings of Fact and Conclusions of Law as soon as they were filed and, counsel submits, likely did so without even bothering to read habeas counsel's submission on Melissa's behalf.

In May of 2013, a jury convicted Villalobos of racketeering conspiracy and five counts of extortion.[21]  Villalobos is currently scheduled to be sentenced on January 21, 2014, and faces up to 20 years on each of seven counts.  Legal proceedings in the trial of his former law partner Eduardo "Eddie" Lucio are underway as counsel drafts this brief.  Counsel has been advised that investigations into corruption at the Cameron County Courthouse are ongoing.

While habeas counsel is barred by the AEDPA from presenting "new" evidence in support of Melissa's claims, a Federal District Court may nonetheless take judicial notice of facts generally known in its own territorial jurisdiction and facts from sources which cannot reasonably be questioned including records of proceedings in its own court. *See Elgin v. Department of Treasury*, ___ U.S. ___, 132 S.Ct. 2126, (2012) (even without factfinding capabilities, Federal Circuit may take judicial notice of facts relevant to constitutional questions); Fed. R. Evid. 201.  Habeas counsel submits that it should do so here as it undertakes to determine whether the CCA's ruling – a ruling which was based on the Cameron County District Court's rubber stamp of Findings of Fact and Conclusions of Law submitted to it by a man convicted of using his public office in a criminal

---

[21] This included a conviction for accepting a bribe of $80,000 in the Amit Livingston case discussed above.

enterprise for his own personal and political gain and which fails to cite so much as a single supporting case – satisfies the applicable standard of review as being a "reasonable" interpretation and application of constitutional principles espoused by the Untied States Supreme Court or a "reasonable" determination of the facts in light of the evidence.

## ARGUMENT

## THE STANDARD OF REVIEW

This proceeding is governed by the provisions set forth in the Antiterrorism and Effective Death Penalty Act of 1996 , Pub. L. 104-132, 110 Stat. 1214 (1996) ("AEDPA").  Under the standards codified in 28 U.S.C. § 2254(d), a federal application for writ of habeas corpus shall be granted with respect to any claim that was adjudicated on the merits in state court proceedings where the adjudication of the claim:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The Fifth Circuit has interpreted this section as establishing the standards of review for each of the three different questions on which a judicial decision may rest — *i.e.*, questions of law, mixed questions of law and fact, and questions of fact.  *See [Michael Patrick] Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000), *cert. denied*, 121 S. Ct. 1420 (2001) (holding that section 2254(d)(1) controlled both questions of law and mixed questions of law and fact, while section 2254(d)(2) applied to pure questions of fact); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 121 S. Ct. 2001 (2001) (same).

A state court decision is "contrary to" established federal law if that decision is "diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme Court precedent.  *(Terry) Williams v. Taylor*, 529 U.S. 362, 404 , 405 (2000) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 495 (1976)).  Likewise, a state court adjudication that confronts a set of facts that are "materially indistinguishable" from a relevant Supreme Court decision, yet reaches a different result, is also "contrary" under the meaning of section 2254(d)(1). *Id.* 529 U.S. at 406.  A state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case.  *Id.*, 529 U.S. at 407-8.  In this regard, a federal habeas court's inquiry into reasonableness should be objective rather than subjective, and a court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.*, 529 U.S. at 411; *see also Santellan v. Cockrell*, 271 F.3d 190, 192 (5th Cir. 2001) (noting that "'most important point'" of *Williams* decision was that an "'incorrect application of federal law is not necessarily unreasonable'") (quoting *Williams*, 529 U.S. at 411-12), *cert. denied*, 122 S.Ct. 1463 (2002).  The  AEDPA applies even where the state court rejects a claim without giving any indication of how or why it reached that decision. *Schaetzle v. Cockrell*, 343 F.3d 440 (5th Cir. 2003) (Because a federal habeas court only reviews the reasonableness of the state court's ultimate decision, the AEDPA inquiry is not altered when state habeas relief is denied without an opinion) (citations omitted).

Additionally, 28 U.S.C. § 2254(e) provides that a state court findings of fact are subject to a *rebuttable* presumption of correctness. And 28 U.S.C. § 2254(e)(2) provides that even where the factual basis of a claim has not been fully developed in state court, a petitioner may present

additional evidence and the federal court may conduct an evidentiary hearing if the petitioner demonstrates that:

(A) the claim relies on--
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence: and
(B)      the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

When read together, Sections (e)(1) and (e)(2) provide the following analytical framework. First, if the state courts failed to act reasonably in determining questions of law, mixed questions of law and fact, and questions of fact, based upon the facts that were presented in state court, further analysis of the claim is necessary.  Further, if the state courts reached an unreasonable legal conclusion, a federal court is authorized to review the legal issue and any related mixed questions *de novo*.  And finally, if a state court's factual determination is unreasonable in light of the facts presented to it, the petitioner may rebut them with clear and convincing evidence that the factual finding was actually incorrect.  This clear and convincing showing is not expressly limited to evidence that was presented to the state courts, § 2254(e), and may include evidence received at an evidentiary hearing to develop new facts or evidence of actual innocence.

GROUND ONE: Melissa Lucio was deprived of the Sixth Amendment right to legal representation at all critical times at and after magistration.

Mariah Alvarez died on Saturday, February 17, 2007. That evening, Melissa Lucio was taken to the police station and interrogated for approximately six hours into the wee hours of the next morning. SX 3, SX4, SX 5.  At the end of her interrogation Melissa was arrested for capital murder,

taken for magistration,  and detained. SX 5 (arrest); I CR 12 (Melissa in custody). Melissa was

formally indicted on May 16, 2007 – nearly three months after her arrest and detention. I CR 9-10.

Melissa was finally arraigned on May 31, 2007– more than three months after her arrest and

detention – at which time the court finally – and belatedly – appointed legal counsel.  I CR 11, 14

(order appointing Peter C. Gilman).

During the more than three months from the date of Melissa's arrest for capital murder until

the appointment of counsel she was charged with an unrelated incident of Driving While Intoxicated

allegedly committed on September 15, 2006, was arraigned, and – without benefit of legal counsel

on either case – plead guilty. I CR 85 (State's Notice of Extraneous Offenses: 5/16/2007 DWI

Conviction, Cause No. 06-CCR 6849-C); 38 RR 35. During the punishment phase, the fact that

Melissa had a "prior" conviction for DWI was erroneously introduced into evidence as proof of

future dangerousness. I CR 85, 38 RR 35. Additionally, on February 14, 2008, and May 5, 2008, the

State sent CPS Therapist Beto Juarez to "treat" Melissa. Tab 7; 33 RR 184-191; 35 RR 145-148.

The State did not notify Melissa's trial counsel that it intended to send an agent to talk to Melissa,

neither of Melissa's trial counsel were present during the interview, and Juarez did not advise

Melissa of her *Miranda*[22] rights. Following the "therapy" sessions Juarez provided written reports

to CPS who, in turn, provided those reports – including Melissa's statements – to the Cameron

County District Attorney who used them to prepare its case and discredit Melissa's defense. *See*

*generally* 35 RR 145-148, 158 (DA requested CPS files which included Juarez reports); 33 RR 177

(State eliciting testimony from CPS Caseworker Joanna Estrada about contents of CPS records

during its guilt/innocence phase case-in-chief ), 38 RR 31 (punishment).

---

[22]  *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

On direct appeal Melissa's appellate counsel argued that the State had used "tainted evidence" during the punishment phase, namely a conviction for DWI which was obtained following her arrest and magistration for murder but without benefit of legal counsel.  *See* Appellant's Brief, Point of Error No. 5.   The CCA overruled the error because Gilman had failed to preserve the error by objection and "had not presented any other basis" for relief.  *Lucio v. State*, 351 S.W.3d 878, slip op. at 48.

Furthermore, Melissa's appellate counsel argued that  the trial court violated Melissa's right to a fair trail when it admitted notes made by State agent Beto Juarez during "counseling" sessions with Melissa after her constitutional right to legal counsel had attached and such evidence was obtained in the absence of legal counsel and used against Melissa at trial.   *See* Appellant's Brief, Point of Error No. 12.  Melissa's appellate counsel also argued that the trial court violated Melissa's Fifth Amendment right to confront and cross-examine witnesses when it admitted statements made to Beto Juarez during "counseling" sessions with Melissa after her constitutional right to legal counsel had attached even though Juarez was not present to testify.  *See* Appellant's Brief, Point of Error No. 13.   The CCA overruled the error because Gilman had failed to preserve the alleged constitutional errors by proper objection.  *Lucio v. State*, 351 S.W.3d 878, slip op. at 53.

During state habeas proceedings Lucio raised a claim that she had been deprived of her Sixth Amendment right to have legal counsel appointed to her at the time of magistration[23] and the error

---

[23] Texas law has no formal label for a defendant's initial appearance before a magistrate, see 41 G. Dix & R. Dawson, TEXAS PRACTICE SERIES: CRIMINAL PRACTICE AND PROCEDURE § 15.01 (2d ed.2001). "Magistration" is also referred to as a "preliminary arraignment" or "arraignment on the complaint," see 1 W. LaFave, J. Israel, N. King, & O. Kerr, CRIMINAL PROCEDURE § 1.4(g), p. 135 (3d ed. 2007), or an "article 15.17 hearing." See, e.g., Kirk v. State, 199 S.W.3d 467, 476-477 (Tex. App. 2006). Regardless of what it is called, it is the hearing at which "the magistrate informs the defendant of the charge in the complaint,

was not harmless because the State utilized the opportunity to obtain an uncounseled guilty plea to an unrelated DWI offense which was subsequently introduced as proof of future dangerousness, and to obtain uncounseled statements from Lucio through a state-employed therapist which were turned over to the District Attorney and used against Melissa at trial.  The State District Court entered two Findings of Fact regarding and relevant[24] to the instant claim.  Specifically it stated:

> 4. Applicant has not shown prejudice to the instant case as a result of her separate plea of guilty to the misdemeanor offense of Driving While Intoxicated. Applicant has not shown that her plea was a result of an unconstitutional confinement without the assistance of counsel.

> 5. Therapist Beto Juarez, a CPS contractor, was not working in tandem with police at the time he interviewed Applicant. He was retained by CPS to offer mental health counseling, not to interrogate her. * * * The purpose of his visits were non-investigatory. Therefore, Juarez was not an agent of the State such that he was required to Mirandize Applicant before speaking to her, or in any other way comply with Art. 38.22 of the Texas Code of Criminal Procedure.

Accordingly, the State District Court recommended the denial of relief , *inter alia*, on grounds that

---

and of various rights in further  proceedings," and "determine[s] the conditions for pretrial release," LaFave & Israel, CRIMINAL PROCEDURE § 1.4(g), p. 135; Tex. Code Crim. Proc. Art. 15.17.

[24]  A portion of the CCA's adopted Findings of Fact and Conclusions of Law apparently intended to address the instant claim were, in fact, irrelevant and have been redacted above.  For example whether Melissa was properly *Mirandized*, waived her right to counsel before speaking to police, and was therefore not entitled to the presence of counsel at her interrogation by law enforcement together with the State Court's Conclusion of Law that "[n]o coerced statement of the Applicant was obtained by law enforcement," are wholly irrelevant to the violation of Melissa's right to counsel at and at all times *after* magistration and whether the violation of that right resulted in prejudice to her case when solicitation of uncounseled guilty plea and statements by a State agent after magistration were admitted against her at trial.

Furthermore, whether Melissa failed to show a "causal nexus" between the 90-day delay in the appointment of counsel and the statements "obtained by police" is irrelevant because the issue is not the statements "obtained by police" at the station but the statements obtained by Juarez at the jail.  The fact that Juarez's reports were "confidential" and not disclosed to police is also irrelevant as they were disclosed directly to *the prosecutor*.

1. No coerced statement of the Applicant was obtained by law enforcement.

2. CPS contract therapist Beto Juarez was not acting in tandem with law enforcement when he counseled Applicant.

The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief. *Ex Parte Lucio*, WR-72,702-02 (Jan. 9, 2013). Additionally the CCA found that Ground One was procedurally barred. *Id.* at 2 citing *Ex parte Banks*, 769 S.W.2d 539 (Tex. Crim. App. 1989); *Ex parte Acosta*, 672 S.W.2d 470 (Tex. Crim. App. 1984).

**A.    The Applicable Substantive Constitutional Standard and the Standard of Review in Federal Habeas Proceedings**.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." The text of the Sixth Amendment thus makes clear that the right to counsel arises only upon initiation of a "criminal prosecutio[n]." A criminal prosecution begins, and the Sixth Amendment right to counsel therefore attaches, when an individual who has been placed under arrest makes an initial appearance before a magistrate for a probable-cause determination and the setting of bail. *Rothgery v. Gillespie County*, 554 U.S. 191, 199, 128 S.Ct. 2578 (2008); *Brewer v. Williams*, 430 U.S. 387, 398-399, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Michigan v. Jackson*, 475 U.S. 625, 629, n. 3, 106 S.Ct. 1404 (1986). In Texas, this occurs during "magistration." in compliance with Article 15.17 of the Texas Code of Criminal Procedure Article. *Rothgery*, 554 U.S. at 199. The Supreme Court has acknowledged no "arguable justification" for the practice of failing to appoint counsel on the heels of a defendant's first appearance. *Rothgery*, 554 U.S. at 205. Where the State elicits incriminating statements from a criminal defendant after preliminary arraignment/magistration but before indictment without counsel present, the Supreme Court has found it "'clear' that the defendant 'was deprived of ... the right to

the assistance of counsel.'" *Rothgery*, 554 U.S. at 199-200 citing *Brewer*, 430 U.S. at 397-398, 97

S.Ct 1232.

When examining mixed questions of law and fact, the Court employs "a *de novo* standard

by independently applying the law to the facts found by the district court, as long as the district

court's factual determinations are not clearly erroneous." *Ramirez v. Dretke*, 396 F.3d 646, 649 (5th

Cir.2005). "A finding is clearly erroneous only if it is implausible in the light of the record

considered as a whole." *Rivera v. Quarterman*, 505 F.3d 349, 361-63 (5th Cir. 2007).

## B.  The CCA's Application of a Procedural Bar Does Not Preclude Federal Habeas Review.

Federal review of a habeas claim is procedurally barred if the *last state court* to consider the

claim expressly and unambiguously based its denial of relief on a state procedural bar.  *Harris v.

Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038 (1989).  Moreover, in order to preclude federal habeas

review, such state procedural bar must be based on independent and adequate state law grounds.  To

be independent, the dismissal must "clearly and expressly" indicate that it rests on state grounds

which bar relief.  To be "adequate" the procedural bar must be strictly or regularly followed by state

courts and applied to a majority of similar claims.  *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir.

2001) (citation omitted); *Williams v. Puckett*, 283 F.3d 272, 280 (5th Cir. 2002) (short discussion);

*Emery v. Johnson*, 139 F.3d 191, 195 (5th Cir. 1997).

Here, the CCA was the *last state court* to consider Melissa's claim during state habeas

proceedings.  The CCA's order denying state habeas relief does not "clearly and expressly" indicate

that it rests on state grounds which bar relief.  Indeed, apart from providing citation to two state cases

it provides no clue as whether it has invoked a specifically state procedural bar or, if so, which one.

Review of the cited cases themselves does not cure the defect.  In *Ex parte Banks*, 769 S.W.2d 539, the CCA held that habeas corpus was not available to review a claim that a prospective juror was excluded in violation of a procedural statute because it did not involve a jurisdictional defect or invoke fundamental constitutional consideration.  Melissa's instant claim does not involve the exclusion of a prospective juror or a jurisdictional defect.  However, it does invoke a fundamental constitutional consideration, namely the Sixth Amendment right to have legal counsel appointed at the time of magistration and to have that counsel present during any interview conducted by a State agent thereafter.  In *Ex parte Acosta*, 672 S.W.2d 470, the CCA declined to consider a *pro se* habeas applicant's claim that the evidence was insufficient to support the trial court's probation revocation order because the same issue had been raised and addressed on direct appeal.  To the extent, if any, it may be assumed that the CCA's bare citation to *Banks* and/or *Acosta* constitutes a clear and express indication of a procedural bar to its own reconsideration of claims already raised in and rejected by that court it does not bar federal habeas reviews of claims decided on the merits in the first instance.  To the extent, if any, this Court deems the constitutional claims raised in and decided during Melissa's direct appeal to be identical to the claims in Melissa's state writ, such claims may still be considered here.  Melissa raised a related ineffective assistance of trial counsel claim in state habeas which was decided by the CCA on the merits.  That is to say Melissa's state writ raised a claim of ineffective assistance of trial counsel based upon the failure to raise proper objections at trial in order to preserve error for review.  *See* Applicant's Brief at 125-127.  The CCA addressed and rejected the claim on the merits which required it to resolve the underlying substantive constitutional issue on the merits.  *Ex parte Lucio*, WR-72,702-02, slip op. at 2.  The CCA's merit-based decision thus provides the gateway to reach the underlying constitutional violation reached and

34

decided during *Strickland*'s "prejudice" prong analysis.

**C.**   **The Portion of the CCA's Adopted Findings of Fact Which Were Relevant to Melissa's Claim Are Implausible in Light of the Record as a Whole and Not Entitled to Deference.**

The CCA's adopted Finding of Fact that Melissa had not shown that her plea of guilty to the misdemeanor offense of Driving While Intoxicated was a "result of" an unconstitutional confinement without the assistance of counsel is only marginally irrelevant.  Melissa's state writ application did not allege an "unconstitutional confinement."  Rather, Melissa's state writ alleged a deprivation of the benefit of legal counsel at and after magistration in violation of the Sixth Amendment. Moreover, Melissa *did* show that her guilty plea to the DWI charge was obtained *during* that constitutional violation and that it was used against her at trial.

The CCA's adopted Finding of Fact that "Juarez was not an agent of the State" who was "required to Mirandize" Melissa before speaking to her because his role was somehow "non-investigative" is unreasonable in light of undisputed facts.  To reiterate, the CCA admits that Juarez was "hired by" CPS.  According to the State's own CPS web site, CPS's responsibilities include "*investigating* reports of abuse and neglect of children."   *See* http://www.dfps.state.tx.us/ child_protection/ (emphasis added).  Moreover, the State asserts that "*all*" CPS reports "*must be referred to the appropriate law enforcement agency for possible criminal prosecution.*" http://www.dfps.state.tx.us/Child_Protection/About_Child_Protective_Services/investigation.asp #law (emphasis added). There was no dispute that CPS sent Juarez to talk to Melissa on February 14, 2008, and May 5, 2008 – *after* her magistration for the instant offense.  Tab 7; 33 RR 184-191; 35 RR 145-148.   There was no dispute that Juarez did *not* advise Melissa of her *Miranda* rights. There was no dispute that Juarez provided written reports to CPS regarding his conversations with

Melissa.   There was no dispute that CPS turned over its entire file on Melissa and her family directly *to the prosecutor* as it was required to do.  35 RR 145-148, 158 (DA requested CPS files which included Juarez reports).  And there was no dispute that the Cameron County District Attorney used Juarez's reports to prepare its case and discredit Melissa's defense. See, 33 RR 177 (State eliciting testimony from CPS Caseworker Joanna Estrada about contents of CPS records during its guilt/innocence phase case-in-chief ), 38 RR 31 (punishment). In light of such undisputed facts, the CCA's adopted Finding of Fact that Juarez was acting in a "non-investigative" role was implausible in light of the record as a whole and not entitled to deference.

The CCA's adopted Finding of Fact that Melissa had not shown prejudice to the instant case as a result of her separate  plea of guilty to the misdemeanor offense of Driving While Intoxicated is likewise implausible in light of the undisputed facts.  The State's evidence of Melissa's future dangerousness was weak.  According to CPS records, Melissa's minor children – including Mariah – had been placed in foster care due to passive neglect, *not* physical abuse. DX 23 (The Burke Foundation 90- day Treatment Plan dated 6/20/2005 - Familial Assessment / Summary).  While the children were in foster care after Mariah's birth Melissa had weekly supervised visits. The details of those visits were documented on standardized forms.[25] A sampling of those reports reveal – among other things – that Melissa demonstrated affection and concern for the well-being of her children; that Melissa had no particular ill will towards Mariah and at times doted on her causing the other children to become jealous; and that Melissa utilized non-violent methods of discipline such as withholding treats and redirecting the children to other activities.  Other witnesses had also

---

[25]  Copies of the selected CPS records were provided to the State Court in the Appendix at Tab 17, and discussed at length in her state writ brief.  *See* Applicant's Brief at 56-63.

indicated that Melissa was not an aggressive person and "never disciplined" her children for their bad behavior – much less beat them. 35 RR 95-96.  Presumably because of this, Alfredo Padilla admitted in sworn testimony before this Federal District Court that the Cameron County District Attorney's Office had to spend "a lot of time" on the issue of Melissa's future dangerousness. Indeed, during his testimony Padilla  initially indicated that they "were having trouble" with it.  *USA v. Villalobos*, 1:12-CR-374, District Court Document Number 242 at 26-27.  Given the limited evidence of Melissa's future dangerousness –  to anyone – Melissa's prior plea of guilty to the misdemeanor offense of Driving While Intoxicated was critical to the State's case on punishment as "a crime of moral turpitude." 37  RR169-171.  Indeed, Padilla himself apparently considered it so important that he requested permission to reopen the State's case after resting for the express purpose of admitting it into evidence.  *Id.*  Again, in light of such undisputed facts, the CCA's adopted Finding of Fact that Melissa failed to show prejudice is not merely wrong, it is objectively unreasonable.

**D.     The CCA's Adopted Conclusion of Law That "CPS Contract Therapist Beto Juarez Was Not Acting in Tandem with Law Enforcement When He Counseled Applicant" Was Contrary To, or Involved an Unreasonable Application of Supreme Court Precedent.**

The CCA's decision does not dispute that Melissa should have been appointed counsel at magistration or that the 90-day delay violated her rights to counsel.  It resolves the issue instead by finding that law enforcement did not elicit evidence from her during this time frame and so no harm resulted from the violation.   However for reasons discussed above, it's Findings of Fact is contradicted by the evidence.  The State unquestionably *did* elicit damaging evidence from Melissa during this time through its agent Juarez and also during her DWI proceedings and that evidence was

used against her at capital murder trial.

Moreover, the CCA's decision cites no Supreme Court authority in support of its ruling.  Nor can it for it is contrary to Supreme Court precedent which states that deprivation of the benefit of legal counsel at and after magistration is a violation of the Sixth Amendment.  *Rothgery v. Gillespie County*, 554 U.S. 191, 199, 128 S.Ct. 2578 (2008); *Brewer v. Williams*, 430 U.S. 387, 398-399, 97 S.Ct. 1232 (1977); and *Michigan v. Jackson*, 475 U.S. 625, 629, n. 3, 106 S.Ct. 1404 (1986).  The Supreme Court's jurisprudence does not require that evidence obtained be  "the result of" such a constitution violation, only that it be elicited by the Government or its agents *during* the constitutional violation and admitted against the defendant at trial.   In *Brewer*, the defendant surrendered to police on a charge of abduction, was taken before a magistrate for preliminary arraignment, and committed to jail. 430 U.S. at 391, 97 S.Ct. 1232. After his preliminary arraignment, and before he was indicted on the abduction charge, police elicited incriminating admissions that ultimately led to an indictment for first-degree murder. Neither of the defendant's lawyers had been present when the statements were obtained. 430 U.S. at 397-398, 97 S.Ct. 1232, 97 S.Ct. 1232. The admissions were introduced at defendant's murder trial. 430 U.S. at 394-395, 97 S.Ct. 1232. The United States Supreme Court affirmed the Eighth Circuit's conclusion that the constitutional violation entitled the defendant to a new trial. 430 U.S. at 389, 97 S.Ct. 1232. *See also Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199 (1964) (violation of right to counsel occurred at moment of post-indictment interrogation); *Kansas v. Ventris*, 556 U.S. 586, 129 S.Ct. 1841, 1845-1847 (2009) (statements taken in violation of *Massiah* inadmissible except to impeach defendant's testimony at trial).   It is worth noting that in neither *Brewer* nor *Rothgery* did the Supreme Court condition the right to a new trial upon the defendant's ability to prove prejudice

beyond the State's introduction of the evidence at trial.  Because the CCA's decision was clearly

contrary to Supreme Court precedent, Melissa is entitled to federal habeas relief.

> GROUND TWO:  Melissa Lucio was deprived of effective assistance of trial counsel
> guaranteed by the United States Constitution when her trial counsel failed to file a
> pre-trial motion to suppress Melissa's custodial statements.[26]

Mariah Alvarez died on Saturday, February 17, 2007.  That evening, while still grieving,

Melissa Lucio was taken to the police station, advised that the police were "just investigating"

Mariah's death, and team interrogated from 9:53 p.m. until 3:15 a.m. Tab 2 (SX 3 at 2); 32 RR

32-34; 33 RR 37; SX 1. Although Melissa had been up since at least 8 a.m., Tab 2 (SX 3 at 12), the

detectives never offered her anything to drink or eat or an opportunity to sleep. 33 RR 38.

Additionally, the armed officers repeatedly attempted to intimidate Mariah into making a confession

by standing over her waving photographs in her face and yelling at her. See, e.g., Tab 2 (SX 3 at 26-

27, 32, 37-38, 40-41). In one instance, Officer Banda indicated that he would like to "beat you half

to death." Tab 2 (SX 3 at 26-27). By 12:15 a.m. Melissa was so exhausted she laid her head on the

table to rest for a few minutes. 32 RR 56; SX 3. This continued off and on throughout the rest of her

interrogation. See SX 3, SX 4, SX 5.

Despite the obviously coercive nature of the interrogation, see SX 3, 4, 5, and the urging of

Melissa's psychologist, Dr. Pinkerman, see Tab 15 (Affidavit), Gilman did not file a pre-trial motion

---

[26] Despite formal requests from both Melissa's trial counsel and direct appeal counsel, Melissa's videotaped interrogation has not been transcribed by a court reporter.  However, even had the videotapes been transcribed, federal habeas counsel submits that a cold transcript does not provide one with a sufficient comprehension of the circumstances of Melissa's videotaped statement, or the extreme duress she endured during interrogation. Federal habeas counsel thus urges the Court to take the time to actually watch SX 3, SX 4 and SX 5 in their entirety. Counsel's recitation of the facts relevant to this ground, *infra*,  merely provides a quick summary of the salient points regarding the circumstances of Melissa's interrogation.

to suppress Melissa's statement as involuntary and the result of duress, nor did he provide the trial court with a supporting brief. During trial, the State played the entire videotaped interrogation for the jury. SX 3, 4, 5. 32 RR 49 et seq. When the State proffered the videotaped statements at trial, Gilman objected only on grounds that all of the voices on the recording had not been identified as required by Article 38.22 § 3(a)(4). 32 RR 49-50, 53. This despite the trial court's admonition that "my main concern is whether or not the recording in and of itself shows that it's voluntary," and "unless you have any evidence to show duress, or anything like that, I'm going to allow it to be played to the jury." 32 RR 50, 53. In short, even though provided with the opportunity to present argument and evidence of duress warranting suppression, Gilman waived the issue.[27]

On direct appeal Melissa's appellate counsel argued that the trial court erred in admitting Melissa's videotaped statement to police into evidence where it was not "voluntary beyond a reasonable doubt" because it was the result of an illegal arrest and detention and there was no break in the causal connection between the illegality and the statement.[28] *See* Appellant's Brief at 61-65 (Point of Error No. 3). The CCA overruled the error because Gilman had failed to preserve it by

---

[27] Gilman did attempt to introduce evidence through Norma Villanueva and Dr. John Pinkerman during the defense case in chief as to why Melissa might take responsibility for something she did not do, but such evidence addresses a slightly different issue than the voluntariness of her statement, was presented too late to assist in having her statement suppressed, and was deemed inadmissible by the trial court in any event.

[28] Melissa's appellate counsel also argued that she was entitled to a new trial under Texas Rule of Appellate Procedure 34.6(f)(4) because she did not receive a complete transcript of proceedings due to the fact that her recorded statement was not transcribed and portions of it were inaudible.   *See* Appellant's Brief at 54-61 (Point of Error No. 2).  The CCA rejected this claim on the merits, *Lucio v. State*, 351 S.W.3d 878, slip op. at 21-22.  As Melissa's claim and the CCA's decision were both based upon state law grounds the outcome is irrelevant to the federal constitutional claim raised in this forum.

proper objection, because it could hear Melissa being informed of her *Miranda*[29] rights during her taped statement to police, and because her subsequent course of conduct was "consistent with" a waiver of her rights.  *Lucio v. State*, 351 S.W.3d 878, slip op. at 24 citing SX 3.  In dicta the CCA went on to state that:

> [A]fter having thoroughly reviewed appellant's recorded statement, we decide that it supports the trial court's finding that it was voluntary. Appellant's recorded statement fairly reflects that the interrogation techniques employed in this case are not the type of brutal "third-degree" techniques that would render a defendant's "statements to have been involuntary in traditional terms."

*Lucio v. State*, 351 S.W.3d 878, slip op. at 24 citing *Miranda,* 384 U.S. at 455-57, ___ S.Ct. ___, and State v. Terrazas, 4 S.W.3d 720, 723-24 (Tex. Crim. App. 1999).

During state habeas proceedings Melissa raised a claim that trial counsel was ineffective for failing to file a motion to suppress Melissa's statement as involuntary, failing to present expert testimony at a suppression hearing, and failing to file a motion to suppress everything after Melissa invoked her right to remain silent (*not* her right to counsel).  Melissa specifically distinguished the claim raised in state habeas proceedings from the claim raised on direct appeal stating:

> Here, counsel alleges that trial counsel was ineffective for failing to file a motion to suppress Melissa's statement as involuntary, failing to present expert testimony at a suppression hearing. Counsel also alleges that trial counsel was ineffective for failing to file a motion to suppress everything after Melissa invoked her right to remain silent. In contrast, on direct appeal that Melissa's custodial statement was involuntary as being the result of an illegal arrest.

Applicant's Brief at 30 n.12. The State District Court entered two Findings of Fact regarding and relevant to the instant claim.  Specifically it stated:

> 6. Applicant has not shown that defense counsel was ineffective for failing to file a motion to suppress her statement to police. * * * She has failed to demonstrate that

---

[29]  *Miranda v. Arizona*, 384 U.S. 436, ___ S.Ct. ___ (1966).

had a motion to suppress been filed it would have been granted.

7. During her interview with police, Applicant stated "I want to talk to my husband, 1 don't want to talk to nobody else."  Given the context of the exchange, this was not an unambiguous statement that Applicant wished to invoke her constitutional right to remain silent. When the interviewer intimated that she could not see her husband, but would be allowed a cigarette, Applicant showed no signs of reluctance in continuing with the interview. Because this statement was not an invocation of her right to remain silent, defense counsel did not err in failing to file what would have been a futile motion to suppress based upon that statement.

Accordingly, the State District Court recommended the denial of relief , *inter alia*, on grounds that:

1.  No coerced statement of the Applicant was obtained by law enforcement.

3. Applicant has failed to show that her counsel's performance was deficient in any manner.

4. Moreover, in the cases where Applicant alleges deficiency of counsel, she has failed to show that the outcome of the trial would have been different had defense counsel acted in the manner she alleges would have been appropriate in the situation.

5. Applicant has not overcome her burden to show that defense counsel's actions were not sound trial strategy.

The CCA adopted the trial court's Findings of Fact and Conclusions of Law and denied relief.  *Ex Parte Lucio*, WR-72,702-02.  Additionally, the CCA found that Ground Two was procedurally barred.  *Id.* at 2 citing *Ex parte Banks*, 769 S.W.2d 539 (Tex. Crim. App. 1989); *Ex parte Acosta*, 672 S.W.2d 470 (Tex. Crim. App. 1984).

## A.    The Applicable Substantive Standard and the Standard of Review in Federal Habeas Proceedings.

A defendant in a criminal proceeding has a federal constitutional right to effective assistance of counsel at trial. U.S. CONST. Amend. VI. Claims of ineffective assistance of counsel are to be reviewed under the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668, 684-86

42

(1984).[30]   Under that standard, trial counsel's failure to move to suppress evidence constitutes deficient performance when the evidence would have been suppressed if objected to and the failure was not attributable to a reasonable tactical decision. *Martin v. Maxey* , 98 F.3d 844, 848 (5th Cir. 1996), citing *Kirkpatrick v. Butler*, 870 F.2d 276, 283 (5th Cir.1989), cert. denied, 493 U.S. 1051, 110 S.Ct. 854 (1990). Such deficient performance results in prejudice where the exclusion of that evidence would have had an effect on the outcome of the defendant's case. *Martin*, 98 F.3d at 848.

A confession must be suppressed if it is not the product of the defendant's free and rational choice. *See United States v. Restrepo*, 994 F.2d 173, 182 (5th Cir.1993).  When a criminal defendant files a motion to suppress, the government has the burden of proving by a preponderance of the evidence that the statements were voluntary. *United States v. Rojas-Martinez*, 968 F.2d 415, 417 (5th Cir.), cert. denied, 506 U.S. 1039, 113 S.Ct. 828 (1992), cert. denied, 506 U.S. 1059, 113 S.Ct. 995 (1993). A confession is not voluntary if it is the result of official overreaching, in the form of either direct coercion or subtle psychological persuasion. *Rojas-Martinez*, 968 F.2d at 418. Thus, a statement which starts off as voluntary may – through coercion, persuasion, threats, verbal abuse, etc. – devolve to one which is involuntary.  The issue of voluntariness is a question of law, Tex.

---

[30]  *See Burger v. Kemp*, 483 U.S. 776 (1984). Under the *Strickland* standard, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. To demonstrate deficient performance, petitioner must show that counsel's conduct falls beyond the bounds of prevailing, objective professional standards. *Strickland*, 466 U.S. at 688; *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). Even if counsel's representation was deficient, a petitioner must also affirmatively prove prejudice by demonstrating that as a result of counsels errors his trial was rendered fundamentally unfair or unreliable. To demonstrate that his trial was unreliable as a result of errors of counsel, a petitioner must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 695; *Williams*, 529 U.S. at 391. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.*

CODE CRIM. PPROC. Art. 38.22 § 6. *See also Jackson v. Denno*, 378 U.S. 368, 376-77, 84 S.Ct. 1774, 1780-81 (1964).

"An ineffective assistance of counsel claim presents a mixed question of law and fact." *Ward v. Dretke*, 420 F.3d 479, 486 (5th Cir.2005), and thus is reviewable under 28 U.S.C. § 2254(d)(1), *Davis v. Johnson*, 158 F.3d 806, 812 (1998). When examining mixed questions of law and fact, the Court employs "a *de novo* standard by independently applying the law to the facts found by the district court, as long as the district court's factual determinations are not clearly erroneous." *Ramirez*, 396 F.3d at 649. "A finding is clearly erroneous only if it is implausible in the light of the record considered as a whole." *Rivera*, 505 F.3d at 361-63.

## B.    The CCA's Application of a Procedural Bar Does Not Preclude Federal Habeas Review.

Federal review of a habeas claim is procedurally barred if the *last state court* to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar.  *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038 (1989).  The CCA was the last state court to consider Melissa's claim the claim during state habeas proceedings. As discussed *supra* under Ground One, the CCA's order rejecting Melissa's state habeas claim does not "clearly and expressly" indicate that it decision rested on state procedural grounds.  Indeed, apart from providing citation to two state cases it provides no clue as whether it has invoked a specifically state procedural bar or, if so, which one.  Furthermore, to the extent, if any, it may be assumed that the CCA's bare citation to *Banks* and/or *Acosta* constitutes a clear and express indication of a procedural bar to its own reconsideration of claims already raised in and rejected by that court it does not bar federal habeas review of claims decided on the merits in the first instance (or as an underlying constitutional violation in an

ineffective assistance of counsel claim).  Accordingly the procedural bar does not apply. Finally, the CCA's dicta in an opinion answering a claim that a statement should be suppressed as the result of an illegal arrest and detention under the Fourth Amendment may not be reasonably invoked under the legal rubric of *res judicata* to resolve a wholly separate claim of the violation of the right to remain silent under the Fifth Amendment in any event.  Finally, it has not been established that even if a "state" procedural bar had been invoked, that such bar was strictly or regularly followed by state courts and applied to a majority cases presenting claims arising from similar procedural and historical facts.

**C.    The CCA's Adopted Finding of Fact That Melissa Had Failed to Demonstrate That a Motion to Suppress Would Have Been Granted Such That Gilman's Failure to File it Was Deficient Is Implausible in Light of the Record as a Whole.**

**1.    Melissa's alleged confession was the direct result of intense psychological coercion prohibited by the Fifth Amendment under Supreme Court precedent.**

Courts consider a number of factors in determining whether a confession is the product of a free will. All of the circumstances are to be considered, including the following, but the presence or absence of any of these five factors need not be conclusive:

(1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment,

(2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession,

(3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him,

(4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel, and

(5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

*United States v. Restrepo*, 994 F.2d 173, 184 (5th Cir. 1993) citing 18 U.S.C. § 3501(b). Official overreaching, with regard to the voluntariness of the waiver of rights and to the voluntariness of the confession itself, can take forms other than physical coercion. Psychological coercion can be a form of official misconduct. *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520 (1986). Promises or inducements can taint the voluntariness of a confession. *United States v. McClure*, 786 F.2d 1286, 1289 (5th Cir.1986).

As federal habeas counsel explained during state habeas proceedings, the *Restrepo* factors favor suppression. Melissa made her videotaped statement after being taken to the police station by investigating officers, but before she was formally charged or arraigned. Melissa was told that authorities were merely "investigating" Mariah's death, not that she was a suspect or being charged with capital murder. Melissa was advised of her *Miranda* rights at the outset but as the interrogation progressed into the night the officers became ever more belligerent and verbally abusive and Melissa did not appear to understand that she could terminate the interview and/or ask for legal counsel to make it stop. Moreover, Melissa was not given any reason to believe that the interrogating officers would allow her to leave the room unless and until she told them what they wanted to hear. As a consequence Melissa was without the assistance of counsel for the duration of her interrogation which continued intermittently with multiple armed officers in the room – some of them yelling at her – for more than five hours. *Restrepo*, 994 F.2d at 184. Prisoners of war endure less.[31]

---

[31]    The third Geneva Convention outlaws everything beyond the simple asking of a question:

No physical or mental torture, *nor any other form of coercion*, may be inflicted on prisoners of war to secure from them information of any kind whatever. *Prisoners of war who refuse to answer may not be threatened, insulted*, or exposed to any unpleasant or disadvantageous treatment of any kind.

Convention (III) Relative to the Treatment of Prisoners of War. Geneva, 12 August 1949 (as

Furthermore, Melissa's experts could have – and would have – testified at a suppression hearing that the circumstances surrounding Melissa's statement rendered any confession from her unreliable. Dr. Pinkerman had "serious questions about the nature of Mrs. Lucio's interrogation and confession." Tab 15 (Affidavit). Dr. Pinkerman "was prepared to testify regarding research related to false confessions," *see, e.g.*, Tab 11 (The Psychology of False Confessions), and Melissa's specific psychological characteristics which increased the likelihood that she would "acquiesce" and make a "false confession. Tab 15 (Affidavit). Dr. Pinkerman also could have accounted for Melissa's behavior during her interrogation as being the result of a "dependent and acquiescent personality" rather than guilt. He would have explained that Melissa "appeared to take the most gratification from her role as a mother despite being overwhelmed by those responsibilities" and "appeared very capable of making self-sacrifice in providing a false confession in order to avoid investigation of her children." Id. And he could have testified that when Melissa stated, "I'm responsible for it," she was merely "taking responsibility for the whole configuration of the abuse and medical neglect by the family, leading to her daughter's death" but not to "striking Mariah in the head." *Id.*

Finally, Norma Villanueva could have – and would have – testified "about patterns of behavior with Mrs. Lucio which strongly influenced her behavior during that videotaped statement process with the investigators that night." 35 RR 142. Specifically, she could have testified regarding "the patterns of behavior as seen in the Child Protective Services records, the patterns in her family, how that influenced her decision making and how she felt with the different investigators, male and female, and also how she makes her life decisions. It influenced her behavior in that – how

_____

amended), Part III Captivity, Art. 17 (emphasis added) (available at: http://www.icrc.org/ihl.nsf/FULL/375?OpenDocument).

she felt with the different investigators male and female and how she made her decisions in answering the questions during that process. And lastly, looking at her CPS history, how – and her social history, how she deals with different people in levels of authority and also how that influenced her body language, and how body language is interpreted in different ways if you do not have her history of behaviors or patterns of behavior or her social history." 35 RR 142-143 (Bill of Particulars)[32]; DX 13-18.

### 2. Melissa's alleged confession was obtained after she had invoked her constitutional right to remain silent.

The right to remain silent protects the privilege against compulsory self-incrimination by requiring an interrogation to cease when the right is invoked. *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321 (1975) (citing *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602 (1966)); *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560 (1979). An accused who wants to invoke her right to remain silent must do so unambiguously. *Berghuis v. Thompkins*, ___ U.S. ___, 130 S.Ct. 2250, 2260 (2010). The Supreme Court explained:

> Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his " 'right to cut off questioning.' "

*Thompkins*, 130 S.Ct. at 2260 (citations omitted).  However, an accused need not "speak with the discrimination of an Oxford don," *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, (1994) (quoting Souter J., concurring in judgment).  Rather, it is enough that the accused articulate her desire sufficiently clearly that a reasonable police officer in the circumstances would understand

---

[32]   The Bill of Particulars was necessitated by the trial court's refusal to admit Villanueva's testimony on this topic during the guilt/innocence phase of Melissa's trial several days after her videotaped statement had been admitted and the opportunity to timely challenge the statement's admissibility had passed. *See* 32 RR 50, 53.

the statement.   *Id.*

During the course of her interrogation, Melissa stated to police: "I want to talk to my husband. *I don't want to talk to nobody else.*" Tab 2 (SX 4 at 13) (emphasis added). This statement is unambiguous on its face: Melissa did not want to continue talking to police. *See, e.g., United States v. DeMarce*, 564 F.3d 989 (8th Cir. 2009) *reh'g denied*, *reh'g en banc denied* (court clearly erred in concluding that defendant did not invoke his right to remain silent when, during interrogation by FBI agents at law enforcement center, defendant said, "You know, I don't want to talk to you. I'm not going to sign anything.").  Nevertheless, Ranger Escalon insisted that Melissa "finish this" statement first and continued to interrogate her. *Id.*   The CCA's decision cited to the fact that Melissa "showed no signs of reluctance in continuing with the interview" as supporting its ruling that her statement was ambiguous.  However, this flatly contradicts Supreme Court precedent. *Miranda* states,

> "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, *the interrogation must cease*. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise."

*Miranda,* 384 U.S. at 473–474, 86 S.Ct., at 1627-1628 (footnote omitted) (emphasis added).  The Supreme Court has since stated that the *Miranda* rule is a "relatively rigid requirement."  *Fare*, 442 U.S. at 718, 99 S. Ct. at 2568.  If interrogation "must cease" then it follows that subsequent discourse cannot be used to create the appearance of ambiguity where none would otherwise have existed. This assertion is borne out by Supreme Court rulings which have allowed that "events preceding" the statement or "nuances inherent in the [statement] itself" may create ambiguity and make it equivocal, *Smith v. Illinois*, 469 U.S. 91, 100, 105 S.Ct. 490, 495 (1984) (per curiam), but which have not

allowed that events following the statement may do so.[33]   A valid waiver of the right to remain silent cannot thereafter be presumed simply from the fact that a statement was in fact obtained, *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755 (1979) (quoting *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602). Thus, "an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith*, 469 U.S. at 92, 105 S.Ct. at 491.

### 3.  Melissa demonstrated that Gilman's performance was deficient; not a matter of trial strategy.

To summarize, Melissa's initial Miranda waiver notwithstanding, her videotaped statement – or at least the that portion of it which contains any incriminating or potentially incriminating statements – was involuntary and obtained in violation of her right to remain silent.  Accordingly, the CCA's decision that Melissa "failed to demonstrate that had a motion to suppress been filed it would have been granted" is contrary to Supreme Court precedent. Counsel's failure to move to suppress evidence, when the evidence would have been suppressed if objected to, constitutes deficient performance unless counsel's failure was due to a tactical decision. *Martin*, 98 F.3d at 848, citing *Kirkpatrick*, 870 F.2d at 283.

In *Kirkpatrick*, the Fifth Circuit discussed when trial counsel's failure to move to suppress evidence can – and more importantly cannot – be deemed to be due to a "tactical decision."  In *Kirkpatrick*, the Fifth Circuit resolved that under that trial counsel's failure to file a pre-trial motion

---

[33]  To interpret Supreme Court precedent otherwise is to encourage police officers to flagrantly ignore a suspect's invocation of the right to remain silent in hopes of obtaining some subsequent statement on the subject – or indeed any statement on any subject – which might later be argued to have rendered the original statement ambiguous.

to suppress evidence had been "outside the wide range of professionally competent assistance."[34] In doing so it noted that "[u]nless counsel had a tactical consideration to the contrary, *and counsel has offered none*," there was "no reason" for trial counsel not to challenge evidence seized in violation of the defendant's constitutional rights. *Id.* (emphasis added). The Fifth Circuit explained that the evidence "posed a serious threat" in that it inextricably linked the defendant to the alleged offense which was a necessary element to the jury's imposition of the death penalty and "the admissibility of these items into evidence was genuinely a close call." *Id.*

In Melissa's case, as in *Kirkpatrick*, the record does not suggest that the failure to file a motion to suppress was the result of any sound tactical consideration, *see* Discussion *infra*, Ground Three § B, and Gilman has certainly offered none. According to Melissa's defense theory of the case, Mariah's death was the unfortunate result of a fall down a flight of stairs a few days before her death. Tab 9 (Affidavit ¶ c). According to the State's theory of the case, Melissa was Mariah's sole caregiver and repeatedly abused her over a period of 88 days culminating in a final, fatal beating. 32 RR 15-18; 36 RR 17-20, 39-57. Thus, just as in *Kirkpatrick*, there was "no reason" for Gilman not to challenge evidence obtained in violation of the Melissa's constitutional rights. Also as in *Kirkpatrick*, the evidence "posed a serious threat" because, as Melissa explained during state habeas proceedings, confession evidence alone generally ensures a conviction. *See* Appellant's Brief at 37, quoting Richard P. Conti, *The Psychology of False Confessions*, J. Credibility Assessment & Witness Psychology, Vol. 2, No. 1, 14-36 14 (1999) (internal citations omitted); Tab 15 at 4.

---

[34] *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.

Finally, the admissibility of Melissa's custodial statements is minimally[35] a "genuinely close call."

Because admission of Melissa's custodial statements served no readily identifiable beneficial purpose but instead posed a threat to defense counsel's case, Gilman's failure to file a motion to suppress Melissa's custodial statement cannot be attributable to a reasonable tactical decision.

**D.     The CCA's Decision That Melissa Failed to Demonstrate That a Motion to Suppress Would Have Been Granted Improperly Shifts the Burden of Proof.**

To reiterate, when a criminal defendant files a motion to suppress, the *government* has the burden of proving by a preponderance of the evidence that the statements are admissible. *Rojoas-Martinez*, 968 F.2d at 417.   Thus, during a suppression hearing Melissa would *not* have been required to overcome a presumption that her custodial statement was admissible by demonstrating that it was the result of psychological coercion and in violation of her right to remain silent.   Rather, once the issue had been raised, the State would have been required to prove that it was not.   During state habeas proceedings the State presented *no* evidence, apart from the statement itself, on the subject.   The statement alone would have been insufficient to overcome the testimony of Melissa's experts that she had made a false confession due to intense psychological coercion and her fragile mental state.   Because the CCA's decision on the underlying issue applies the wrong standard it is not entitled to deference.   Moreover, Melissa has demonstrated that under the correct standard, the evidence would have been suppressed either in whole or in part as involuntary.   Accordingly, the CCA's decision was contrary to the Supreme Court's *Strickland* decision, as that decision has previously been discussed and applied by the Fifth Circuit to trial counsel's failure to file a pre-trial

---

[35]   Federal habeas counsel states "minimally" because in her professional opinion and for reasons previously expressed the admissibility of Melissa's custodial statements is more accurately deemed a "clear violation" of Melissa's constitutional rights than a "genuinely close call."

motion to suppress evidence in *Martin* , 98 F.3d at 848, and  *Kirkpatrick*, 870 F.2d at 283.

**E.    The CCA's Decision That Melissa Had Failed to Demonstrate That the Outcome of the Trial Would Have Been Different Had Gilman Acted in the Manner She Alleged Would Have Been Appropriate Involved an Unreasonable Application of Supreme Court Precedent.**

A petitioner proves prejudice by demonstrating that as a result of counsels errors his trial was rendered fundamentally unfair or unreliable. To demonstrate that his trial was unreliable as a result of errors of counsel, a petitioner must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 695; *Williams*, 529 U.S. at 391.  A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.*

Melissa aptly demonstrated that there is a reasonable probability that, but for Gilman's deficient performance, the result of Melissa's capital murder trial would have been different. As she explained during state habeas proceedings:

> Frequently regarded as the most unequivocal evidence of guilt, a confession relieves doubts in the minds of judges and jurors more than any other evidence. In criminal law, the confession evidence is considered to be the most damaging form of evidence produced at a trial and a prosecutor's most potent weapon -- so potent that, in the words of one legal scholar, "the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained." Confession evidence alone generally ensures a conviction.

Richard P. Conti, *The Psychology of False Confessions*, J. Credibility Assessment & Witness Psychology, Vol. 2, No. 1, 14-36 14 (1999) (internal citations omitted); Tab 15 at 4. Thus, a timely filed and defended motion to suppress would have deprived the State of its "most damaging" – indeed its only – evidence suggesting that it was necessarily Melissa who had "severely abused" Mariah repeatedly for 88 days and that it was necessarily Melissa who had inflicted Mariah's fatal

injury. It follows that absent Melissa's statement purportedly admitting some measure of fault, there is a "reasonable probability" that the result of Melissa's capital murder trial would have been different.[36]  *See generally Laboa v. Calderon*, 224 F.3d 972, 983 (9th Cir. 2000) (reasonable probability under *Strickland* exists where without evidence which could have been suppressed State had "no case"). Indeed, the trial of Melissa's husband and co-defendant (Robert Alvarez) who made no such statement *was* different as he was convicted *only* of injury to a child, was sentenced to only three years, and has already been released from prison.

Alternatively, even assuming *arguendo* that suppression of Melissa's statement would not have altered the outcome of the guilt/innocence phase of her trial, there is a reasonable probability that it would have altered the outcome of the punishment phase of her trial.  The statement served to bolster the State's otherwise weak evidence of Melissa's future dangerousness and dispel any lingering doubt regarding the truth of Melissa's claim of innocence which may have resulted in a life sentence rather than death.  Because there is a reasonable probability that but for Gilman's deficient performance the outcome of her trial would have been different, Melissa is entitled to federal habeas relief.

---

[36] Federal habeas counsel submits that this "reasonable probability" would have reached near certainty had Gilman exercised the professionalism required of a capital case trial attorney and otherwise subjected the State's theory of the case to rigorous challenge as this brief demonstrates the available evidence certainly would have allowed him to do.

GROUND THREE: Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution when her trial counsel failed to adequately investigate and present all available testimony and evidence to support Melissa's defense and otherwise subject the State's case to meaningful adversarial testing.

According to Melissa's defense theory of the case, Mariah's death was the unfortunate result of a fall down a flight of stairs a few days before her death. Tab 9 (Affidavit ¶ c). According to the State's theory of the case, Melissa was Mariah's sole caregiver and repeatedly abused her over a period of 88 days culminating in a final, fatal beating. 32 RR 15-18; 36 RR 17-20, 39-57.  During state habeas proceedings Melissa raised the following eight claims of ineffective assistance of trial counsel relating to Gilman's preparation for and presentation of her defense:

1. Trial Counsel failed to obtain the assistance of a competent forensic pathologist to review the medical examiner's autopsy and testify on Melissa's behalf.

2. Trial counsel failed to make a timely request for or adequately utilize the assistance of a mitigation specialist and psychologist.

3. Trial counsel failed to adequately investigate and present available witnesses and documentary evidence supporting Melissa's reasonable explanations for Mariah's old injuries from CPS Caseworkers, Maggie's House Interviews, other Service Providers, and John Alvarez.

4. Trial counsel failed to adequately investigate and present available witnesses and documentary evidence that Alexandra Lucio or Robert Alvarez could have caused Mariah's old injuries, and possibly her death.

5. Trial counsel failed to adequately investigate and present available witnesses and documentary evidence that Melissa could not have "severely" beaten Mariah in the 24 to 48 hours immediately prior to her death.

6. Trial counsel failed to dispel the notion that Melissa would not explain the source of Mariah's old injuries because she had caused them.

7. Trial counsel failed to adequately investigate and present available evidence explaining why Melissa did not know the extent or severity of Mariah's "new" bruises and contemporaneous fatal head injury.

55

8. Trial counsel failed to dispel the notion that Melissa was indifferent towards Mariah and ignored her needs.

Applicant's Brief at 41-90.  The State District Court entered Findings of Fact specific to each of the eight claims[37] and recommended the denial of relief as to all on grounds that:

3.  Applicant has failed to show that her counsel's performance was deficient in any manner.

4.  Moreover, in the cases where Applicant alleges deficiency of counsel, she has failed to show that the outcome of the trial would have been different had defense counsel acted in the manner she alleges would have been appropriate in the situation.

5.  Applicant has not overcome her burden to show that defense counsel's actions were not sound trial strategy.

The CCA adopted the trial court's Findings of Fact and Conclusions of Law and denied relief.  *Ex Parte Client Name*, WR-72,702-02.

**A.    The *Strickland* Standard and the Standard of Review in Federal Habeas Proceedings.**

Trial counsel's performance is judged by the familiar *Strickland* standard, *see supra*, note 30 and accompanying text.   Under that standard, trial counsel has a duty to make a reasonable investigation into the facts of the case or to make a reasonable decision that makes a particular investigation unnecessary. *McFarland v. State*, 928 S.W.2d 482, 501 (Tex. Crim. App. 1996). This duty includes a responsibility to seek out and interview potential witnesses. *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App.1990); *see also Cantu v. State*, 993 S.W.2d 712, 718 (Tex. App.-San Antonio 1999, pet. ref'd). It also includes the duty to subject the State's case to meaningful adversarial testing at trial, *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065, *Powell v. Alabama*, 287

---

[37] For the sake of brevity, the State District Court's Findings of Facts specific to each claim are not recited here in their entirety, but are available in the State Writ record as Findings of Fact ¶ 8 *et seq.*, and will be discussed as necessary and appropriate in the legal analysis which follows.

U.S. 45, 68-69, 53 S.Ct., 55, 63-64 (1932), and present all available testimony and other evidence to support the client's defense.  *Butler v. State*, 716 S.W.2d 48 (Tex. Crim. App. 1986); *Ex parte Ybarra*, 629 S.W.2d 943 (Tex. Crim. App. 1982).

A federal habeas petitioner's ineffective assistance of counsel claims are subject to *de novo* review and this Court is required to grant deference to the state court's Findings of Fact only to the extent they are plausible in light of the record as a whole. *Ramirez*, 396 F.3d at 649, *Rivera*, 505 F.3d at 361-63.

**B.    The CCA's Decision That Melissa Had Not Overcome Her Burden to Show That Gilman's Actions Were Not Attributable to Sound Trial Strategy Was Unreasonable in Light of the Evidence Presented.**

The CCA adopted four separate Findings of Fact specifically stating that Gilman's alleged deficiencies were a matter of sound trial strategy.  *See* ¶¶ 11, 19, 25, 30.  It adopted two others suggesting the same.  *See* ¶ ¶ 36, 38.  However the CCA's Findings of Fact on regarding Gilman's trial strategy are inconsistent to such a degree as to render its decision on all eight claims an unreasonable application of *Strickland*'s deficiency prong.

As to Melissa's claim that trial counsel failed to obtain the assistance of a competent forensic pathologist to review the medical examiner's autopsy and testify on Melissa's behalf, the CCA adopted the following Finding of Fact:

> 11. * * * Applicant admitted during her videotaped interview with police that she had abused the victim and caused all, except perhaps two, of the numerous contusions, including bite marks, to the victim's body; that interview was shown to the jury. Defense counsel strategically opted not to attempt to contradict these unambiguous admissions by offering alternative explanations for the contusions at trial. Instead, he conceded that the contusions were caused by Applicant, but denied that she was responsible for the blunt force trauma that actually killed the victim. This was sound trial strategy that did not constitute ineffective assistance of counsel.

Similarly, as to Melissa's claims that trial counsel failed to adequately investigate and present available witnesses and documentary evidence of alternative theories for the extensive injuries on Mariah's body, the CCA adopted the following Findings of Fact:

> 19. * * * Defense counsel's decision not to attempt to present this evidence was trial strategy because Alexandra and her sister, Celina were giving conflicting stories that were not particularly credible. Furthermore, defense counsel may have justifiable feared [*sic*] that putting those children on the stand would backfire, as they might deny having caused any abuse and point to Applicant as the perpetrator. Again, Applicant admitted during her videotaped statement that she caused all, except perhaps two, of the numerous wounds found on the victim's body. Attempting to bring in children to testify that they had caused the bruising would have simply confused the issues and would not have furthered trial counsel's strategy to argue to the jury that Applicant truthfully told the police she had caused these wounds but not the fatal blunt force trauma that killed the victim.

> 25. * * * Applicant admitted during police questioning that she caused all, except perhaps two, of these injuries, and defense counsel had to operate under that constraint. Hence, his sound trial strategy was to admit the physical abuse, but deny that Applicant inflicted the fatal blow, which she attributed to a fall down stairs.

As to Melissa's claim that trial counsel failed to adequately investigate and present available witnesses and documentary evidence supporting Melissa's reasonable explanations for Mariah's old injuries from CPS Caseworkers, forensic interviews conducted at Maggie's House of Melissa's 9-year-old sons Richard and Rene, other CPS Service Providers, and John Alvarez, the CCA adopted the following Finding of Fact:

> 30. Applicant's sons Richard and Rene also made statements to the forensic interviewer that would have been directly detrimental to Applicant's defense. They both stated that violence was a regular occurrence in Applicant's household, and that Applicant was an aggressor. Had the boys testified to this at trial, it would have impeached Applicants own expert testimony that she had no history of violence. Defense counsel's sound trial strategy was to keep the jury from hearing about Applicant's violent tendencies.

The first three Findings of Fact regarding Gilman's purported trial strategy are wholly inconsistent

58

with the fourth.

For example, if it was Gilman's "sound trial strategy" to "concede[] that the contusions were caused by Applicant, but den[y] that she was responsible for the blunt force trauma that actually killed the victim" (¶ 11), "argue to the jury that [Melissa] truthfully told the police she had caused these wounds but not the fatal blunt force trauma that killed the victim" (¶ 19), and "admit the physical abuse, but deny that [Melissa] inflicted the fatal blow" (¶ 25), then allowing CPS Caseworkers and Melissa's children to testify could do no more damage to her defense than electing not to challenge admission of Melissa's statement to the same facts.  This would remain true even if, as the CCA suggests, the children were "to deny having caused any abuse and point to [Melissa] as the perpetrator" (¶ 19), or identify her as "an aggressor" (¶ 30).[38]  Indeed, given this "trial strategy" the potential benefit of their testimony far outweighed the complete lack of any additional prejudice.

---

[38]  Federal habeas counsel submits that the CCA's Findings of Fact regarding Richard and Rene's probable testimony were unreasonable in light of the video recordings in evidence.

During his interview at Maggie's House, Richard Alvarez stated that his mom or dad would spank him on the bottom when he misbehaved, but only about once a month and never hard enough to leave marks or bruises. Video Time Index 9:58, 11:12, 11:25.  Richard stated that when his parents spanked his little sisters (Adriana (4) and Sara (3)) that they would not hit them as hard because they were younger. Video Time Index 11:25. Richard denied that his parents ever spanked Mariah because she was just a baby. Video Time Index 13:58. Richard knew this because he "watched over her." Video Time Index 13:58. Richard denied ever seeing any marks on Mariah, or on any of his other siblings. Video Time Index 9:34, 11:25, 14:22. Richard also denied that his parents ever touched him in a sexually inappropriate way. Time Index 25:18.

Likewise, during his interview at Maggie's House, and when questioned about family life with his parents and siblings, Rene stated that when he or his siblings misbehaved his mom put them "in a corner." Video Time Index 44:01. Rene also stated that his dad or mom would spank them about once a week when they misbehaved but "just on the bottom" and only "with their hand." *Id.*  They were not spanked hard enough to leave marks or bruises, and Rene denied ever seeing any such marks or bruises on any of his siblings. Video Time Index 44:56. Rene did not see any marks on Mariah when she died and did not know how she got bruised. Video Time Index 44:56.

CPS Caseworkers and Melissa's children could all have testified to other sources for Mariah's old injuries consistent with Melissa's original explanations to police, and to the fact that Melissa was not indifferent towards Mariah or her needs.  *See* Tab 17.  And Richard and Rene could have corroborated Melissa's original explanations for Mariah's old injuries as well as her story that Mariah fell down a flight of stairs.  *See* Tab 4.

Alternatively, if it was Gilman's "trial strategy to keep the jury from hearing about [Melissa's] violent tendencies" (¶ 30), then Gilman should have subjected the State's theory that Melissa was solely responsible for *all* of Mariah's injuries to meaningful adversarial testing.  In particular, Gilman should have challenged the admission of Melissa's statement to police rather than "conced[ing] that the contusions were caused by [Melissa]" (¶ 11), "argu[ing] to the jury that Applicant truthfully told the police she had caused these wounds" (¶ 19), and "admit[ting] the physical abuse" (¶ 25). Furthermore, Gilman should have challenged the scientific validity of Farley's testimony that Mariah's various old, non-fatal injuries were necessarily the result of 88 days of maternal abuse by presenting testimony of an independent forensic pathologist who was qualified to do *more* than just discuss Mariah's fatal head injury.[39]  Finally, Gilman should have presented affirmative evidence in the form of Melissa's prior consistent statements[40] plus witness testimony and CPS records that Mariah's injuries were more easily attributable to accidents or sibling-on-

---

[39]  *See infra* Ground Three § C.1 and exhibits cited therein for a thorough explanation of the substance of testimony that a forensic pathologist could have provided in support of such a defense.

[40]  *See infra* Ground Three § C.3 and exhibits cited therein for a thorough explanation of the substance of those statements.

sibling violence.[41]

While *Strickland* requires a reviewing court to grant significant deference to trial counsel's "sound trial strategy" it does not permit a reviewing court to fashion one – or in this case two mutually exclusive strategies – from thin air in order to justify its denial of habeas relief. Here, the CCA's adopted Findings of Fact reveal that Gilman's conduct was so inconsistent with either potential or probable trial strategy purportedly gleaned from the record that no such deference is required. Simply put, the CCA's adopted Finding of Fact that Gilman was acting pursuant to "sound trial strategy" is implausible in light of the record as a whole. *Ramirez*, 396 F.3d at 649, *Rivera*, 505 F.3d at 361-63.

**C.    The CCA's Decision That Melissa Had Failed to Show That Melissa Had Failed to Show That Gilman's Performance Was Deficient in Any Manner or That the Outcome of the Trial Would Have Been Different Had Gilman Acted in the Manner She Alleged Was Unreasonable in Light of the Evidence Presented.**

**1.    Gilman failed to obtain the assistance of a competent forensic pathologist to review the medical examiner's autopsy and testify on Melissa's behalf.**

During state habeas proceedings Melissa argued that Gilman's failure to timely obtain the assistance of a forensic pathologist to testify regarding Mariah's old injuries and cause of death constituted ineffective assistance of trial counsel. Applicant's Brief at 38-44. The State District Court made five Findings of Fact relevant to the claim and, as noted earlier, recommended the denial of relief on grounds Melissa had failed to satisfy either prong of the *Strickland* standard. The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief. *Ex Parte Lucio*, WR-72,7802-02.

---

[41] *See infra* Ground Three § C.3 and exhibits cited therein for a thorough explanation of the substance of the available evidence.

Melissa has already demonstrated *supra* in § B that Gilman's failure to hire an independent forensic pathologist was not a matter of any "sound trial strategy." Nevertheless it is worth pointing out that the CCA's other adopted Findings of Fact regarding Melissa's allegations of ineffective assistance are implausible in light of the evidence or irrelevant to the issue. Each such Finding of Fact will be recited and addressed individually.

(i) Deficient Performance

8. * * * Dr. [Jose] Kuri's testimony ably presented [the defense theory that the final blunt force trauma to the victim was caused by a fall sustained some 48 hours prior to death], challenging the testimony of the State's pathologist as to the age and etiology of the victim's trauma. Dr. Kuri presented testimony helpful to the defense, and defense counsel's decision to retain him was not erroneous.

According to Dr. Young, Dr. Kuri's testimony was "*egregiously inadequate* to confront the arguments provided by the state for child abuse." Tab 12 (Autopsy Report § III.C) (emphasis added). As the record itself reveals, Dr. Kuri's testimony was largely incoherent and non-responsive to the questions asked. According to Dr. Young "This may have been due to a combination of factors, such as a language barrier or that the expert was hard of hearing." Tab 12 (Autopsy Report § III.B.2) (quoting passages from 35 RR 36-38, 65-6.6). Moreover, to the extent it could be understood, it was factually incorrect. Tab 12 (Autopsy Report § III.B.3) (quoting passages from 35 RR 41, 82-83). Accordingly, Finding of Fact ¶ 8 is implausible in light of the evidence.

9. Applicant * * * points to nothing to indicate that the timing of [Kuri's] hire was erroneous, * * *.

This is largely irrelevant to the claim that Gilman failed to obtain the assistance of a competent forensic pathologist to review the medical examiner's autopsy and testify on Melissa's behalf. However, the manner and timing of Dr. Kuri's hire does reinforce the argument that

62

Gilman's failure to hire a forensic pathologist was the result of deficient performance and not the result of some trial strategy. On May 31, 2007, the trial court appointed Peter C. Gilman to represent Melissa at trial. I CR 14. The case was set for trial on Monday, February 4, 2008. 10 RR 3-4. Concerned that Gilman was not preparing for trial, the court instructed him to provide a report listing required defense experts by November 30th, 2007. 9 RR 6, 10 RR 5. Despite the trial court's order, Gilman still did not request the assistance of a forensic pathologist. The trial was rescheduled for May 28, 2008. Approximately one year after his appointment as trial counsel – "about May of 2008" – Gilman met with Ed Stapleton, counsel for Robert Alvarez. Tab 9 ¶ b. "During this time, Mr. Gilman shared his thoughts that his defense would be a fall Mariah had suffered a few days before her death." Tab 9 ¶ c. At that time Gilman and Mr. Stapleton "discussed the need for expert testimony to show the cause of death may have originated a few days before in time rather than on the day of the death." Mr. Stapleton suggested that Gilman speak to a local neurosurgeon, Jose Kuri, M.D. Tab 9 ¶ d. Thereafter, on May 22, 2008 – more than three months after the case had originally been scheduled for trial – Gilman filed his first and only motion seeking funds to hire a medical expert to assist with Melissa's defense. I CR 109. The motion requested funds to retain Dr. Jose Kuri. I CR 103, 109.17 Dr. Kuri had not performed an autopsy for more than 32 years. 35 RR 5. Gilman did not ask Dr. Kuri to prepare a written report. 35 RR 18. Melissa's re-scheduled trial began with jury selection less than a week later. I CR 81; 14 RR. During the defense case-in-chief, Gilman proffered Dr. Kuri as an expert to testify only as to the injuries to Mariah's brain – not the injuries to her body alleged to have resulted from ongoing abuse. 35 RR 9-14, 17-18. Following a *Kelly/Daubert* hearing the trial court accepted Dr. Kuri as an expert only for that limited purpose. 35 RR 18.

10. Defense counsel was not deficient for failing to retain a pathologist in this case. * * * Applicant has failed to demonstrate that a pathologist could have given any additional testimony * * * .

As Melissa has explained in her discussion regarding trial strategy *supra* under § B , it would have been beneficial to subject the State's theory that Melissa was solely responsible for *all* of Mariah's injuries to meaningful adversarial testing.  Only a forensic pathologist would have been qualified to do *more* than just discuss Mariah's fatal head injury.  "[P]athology, like psychiatry, is a sub-specialty of the science of medicine. Medicine in any of its sub-specialties eludes mathematic precision, as evidenced by the need for a 'second opinion' with regard to any important medical question. Causation or mechanism of death are examples of important medical questions addressed by pathologists that require more than an objective or rote determination." *Rey v. State*, 897 S.W.2d 333, 338 (Tex. Crim. App. 1995).

Dr. Kuri was not qualified to perform a forensic analysis. Tab 12 (Autopsy Report § III.B.1.a - II.B.1.c); 35 RR 10-11, 18.  He had not performed an autopsy for more than 32 years, 35 RR 5, and had been qualified as an expert only for the limited purpose of testifying to the injuries to Mariah's brain, 35 RR 9-14, 17-18.  During trial he repeatedly "limited himself to issues regarding the head, rather than performing the kind of global approach to the entire case required by a forensic analysis. Tab 12 (Autopsy Report § III.B.1.d) (quoting passages from 35 RR 17, 18). Thus, a forensic pathologist could have given additional testimony supporting Melissa's claim of innocence.

Specifically a forensic pathologist could have correlated Melissa's account of the events leading up to Mariah's death with the physical autopsy evidence and critiqued Dr. Farley's autopsy report and trial testimony as the product of speculation rather than scientific methodology. For example, Dr. Thomas Young, a board certified forensic pathologist, would have testified that "[t]he

64

cause of death [was] **Blunt head injury delayed effects**" and that the manner of death was an

"**[a]ccident**." Tab 12 at 1 (emphasis original). He could have explained that:

> Some children may develop reactive brain swelling to head trauma, and the swelling
> may worsen over a period of time. The swelling leads to the onset of signs and
> symptoms following a lucid interval – an interval of time where there are no
> observable signs and symptoms. This kind of situation is commonly seen with
> children following accidental head injury.

Tab 12 (Autopsy Report § I.A). He could also have explained how Melissa's description of Mariah's

worsening condition (nausea followed by "slight fever," sleep disturbances, and lethargy) fit the

known progression of signs and symptoms from an accidental head injury due to a fall. Tab 12

(Autopsy Report § I.B). He could have explained how the intracranial (subarachnoid and subdural)

hemorrhages, soft tissue (lungs and kidney) hemorrhages, dehydration, and eye pathology noted in

Dr. Farley's autopsy report were caused by the accidental head injury Melissa described. Tab 12

(Autopsy Report §§ I.C.1 - I.C.4). He could have explained why the lesions on Mariah's back

repeatedly identified at trial as "bite marks" were neither bite marks nor inflicted by Melissa. Tab

12 (Autopsy Report § I.C.5 and Bite Mark Power point). He could have explained why Dr. Farley's

assumption that Mariah's "older" lesions were necessarily the result of child abuse constituted

speculation. Tab 12 (Autopsy Report § I.C.6). And he could have pointed out how Dr. Farley missed

additional evidence of pneumonia that was "consistent with deteriorating brain function over a

couple of days as described by witnesses." Tab 12 (Autopsy Report at § I.C.7).  Accordingly, the

CCA's Finding of Fact ¶ 10 was implausible in light of the record considered as a whole.  *Rivera*,

505 F.3d at 361-63.

> 12. Applicant has failed to show that defense counsel was deficient for failing to
> retain a pathologist to explain the "mistake" in Dr. Farley's autopsy report of
> substituting intuition for a scientifically defensible interpretation of forensic

evidence. Dr. Farley clearly explained at trial the bases for her conclusion that the contusions and blunt force trauma were not the result of a fall down stairs, but rather of abuse - she drew this conclusion from the nature and location of the numerous wounds she found on the victim. This finding did not come about by "intuition;" rather, it was based on the forensic evidence she found during the autopsy. Hence, any purported "explanations" about intuition vs. interpretation would have been irrelevant and of no use to Applicant's defense, especially since Applicant admitted to causing all, except perhaps two, of the numerous contusions and abrasions found on the victim.

Whether Dr. Farley "clearly explained" her findings or not is irrelevant.  Medical experts often disagree.  Moreover, Gilman is an attorney, not a forensic pathologist.  As such he was not in a position to personally decide whether Dr. Farley's autopsy report was scientifically valid – or, even if valid, contained critical mistakes.  Failing to hire a forensic pathologist to make this assessment simply because Melissa had allegedly admitted to causing most of Mariah's injuries was indefensible in light of the fact that both before and after that interrogation Melissa denied *ever* beating Mariah.  Here, a forensic pathologist could have explained how he believed Dr. Farley's autopsy report demonstrated a critical "mistake" in its scientific methodology by "substituting intuition" for a "scientifically defensible interpretation" of available forensic evidence. Tab 12 (Autopsy Report § II.B). He also could have provided 14 specific examples of "speculative opinions from Dr. Farley's testimony." Tab 12 (Autopsy Report § II.C).  The CCA's ultimate Finding of Fact that such evidence was "irrelevant" to the jury's determination of the cause of Mariah's fatal head injury is implausible in light of the record considered as a whole. *Rivera*, 505 F.3d at 361-63.

(ii) Prejudice

9. Applicant * * * points to nothing to indicate that * * * Applicant suffered any harm or prejudice as a result of the timing of [Dr. Kuri's] hire, or that the outcome of the case would have been any different had an expert been hired at an earlier date. * * *.

Again, this is largely irrelevant to the claim that Gilman failed to obtain the assistance of a competent forensic pathologist to review the medical examiner's autopsy and testify on Melissa's behalf.  Although Gilman probably could have found another neurosurgeon who was better at being an expert witness on the limited issues to which Dr. Kuri was allowed to testify if he had made an effort to do so earlier, that simply isn't the point.

> 10. * * * Applicant has failed to demonstrate that * * * additional testimony * * * would have affected the outcome of the trial.

and

> 11. Applicant has failed to show that medical testimony challenging the etiology of the numerous contusions and abrasions found on the victim's body would have affected the outcome of the trial. * * *.

In *Ex parte Briggs*, 187 S.W.3d 458 (Tex. Crim. App. 2005), the Court of Criminal Appeals held that trial counsel was ineffective for failing to obtain the assistance of a pathologist to challenge the State's theory that Briggs had murdered her infant son.  Gilman's deficient performance was prejudicial for much the same reasons stated in that case. That is to say, even assuming that a forensic pathologist could not have proven that Melissa was "unquestionably" innocent, independent examination of Mariah's autopsy report and underlying physical evidence, raises considerable doubt as to the reliability of Dr. Farley's conclusion that Mariah's death was the result of homicide. When those records are coupled with Melissa's account of Mariah's tumble down the stairs and the evidence and testimony of other witnesses available to the defense as outlined in this brief and contained in the five volume appendix of evidence during state habeas proceedings, there is a "probability sufficient to undermine confidence in the outcome" that Mariah's death was the result of a criminal act. *See, e.g., Ex parte Briggs*, 187 S.W.3d at 470. See also *Rey v. State*, 897 S.W.2d 333, 343 (Tex. Crim. App. 1995) (reversing defendant's capital murder conviction because he did

67

not have access to an expert to testify on his behalf or "technical assistance ... to help evaluate the strength of [that] defense, ... and to identify the weaknesses in the State's case, if any, by ... preparing counsel to cross-examine opposing experts").

### 2. Gilman failed to make a timely request for or adequately utilize the assistance of a mitigation specialist and psychologist.

During state habeas proceedings Melissa argued that Gilman's failure to timely obtain the assistance of a mitigation specialist and psychologist constituted deficient performance. Melissa further argued that even after hiring Villanueva and Dr. Pinkerman, Gilman's use of them in preparing and presenting her case for trial remained constitutionally inadequate. Applicant's Brief at 48-55. The State District Court made ten Findings of Fact relevant to the claim and, as noted earlier, recommended the denial of relief on grounds Melissa had failed to satisfy either prong of the *Strickland* standard. The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief. *Ex Parte Lucio*, WR-72,7802-02.

Melissa has already demonstrated *supra* in § B that Gilman's failure to make a timely request for or adequately utilize the assistance of a mitigation specialist and psychologist was not a matter of any "sound trial strategy." Nevertheless it is worth pointing out that the CCA's other adopted Findings of Fact regarding Melissa's allegations of ineffective assistance are implausible in light of the evidence or irrelevant to the issue. Each such Finding of Fact will be recited and addressed individually.

(i) Deficient Performance - Villanueva

13. Applicant has failed to show that defense counsel was deficient in failing to afford her mitigation specialist adequate time to complete her investigation. The mitigation specialist had 5 months, 17 days to complete such investigation, and Applicant has failed to demonstrate that the tasks the mitigation expert claims she

68

needed to conduct could not have been completed within that time-frame.

Gilman did not, in fact, give Villanueva "adequate time to complete her investigation." Instead, the State District Court delayed Melissa's trial. Melissa's trial was originally set for Monday, February 4, 2008. 10 RR 3-4. As of November 21, 2007 – just10 weeks before trial – Gilman had not yet requested appointment of *any* defense exeperts. 9 RR 6. He finally did so on November 30, 2007. The State District Court granted the request on December 10, 2007. 10 RR 3. On January 30, 2008, Gilman admitted that his experts had just met Melissa for the first time the previous Monday. 10 RR 6. Although clearly dismayed by Gilman's apparent lack of due diligence, 10 RR 5, the State District Court rescheduled the trial to give Villanueva to conduct her investigation. The distinction make a difference.

Although the 5 months and 17 days the State District Court allowed Villanueva *may* have been sufficient time to complete her investigation had all the documents and witnesses been readily available to her, they were not. The record reflects that the State dragged its feet in disclosing "voluminous" and "complicated" CPS records. 15 RR 16-17; 13 RR 13; FF & CL ¶ 53. Those records contained exculpatory information as well as the identities of numerous potential witnesses. *See, e.g.,* Tab 17. However, Villanueva was *precluded* from contacting or interviewing those witnesses by an agreement extracted from Gilman by the State that he would not contact CPS caseworkers, mental health workers, mental health service providers, other service providers, siblings in foster care, foster parents, foster siblings, or any other undefined "interested parties" without first seeking leave of Court and allowing the State a chance to respond to such request, I CR 72-73, which Gilman never did. Villanueva was also *precluded* from contacting or interviewing Melissa's other adult family members until jury selection began on May 28, 2008, by Gilman

69

himself.  13 RR 8.  *See also infra* ¶ 14.

Finally, a mitigation investigation has the potential to uncover evidence or witnesses valuable to the defense even *before* the punishment phase of trial, prompt action is required lest that evidence be lost or destroyed and those witnesses disappear or die.  It is also advisable so as to allow the investigator sufficient time to obtain access to and interview witnesses to whom access is restricted and others who might be difficult to locate or hesitant to be questioned.  Accordingly, no reasonable attorney defending a capital murder case would wait until so close to the scheduled trial date to seek investigative assistance.

> 14. Applicant's mitigation specialist was provided with Applicant's family contact information when jury selection began on May 28, 2008. The mitigation specialist then had 42 days to conduct family interviews in connection with the preparation of a social history.  Applicant has produced no evidence to support any assertion that this was an insufficient length of time to gather that information. * * * [T]the mitigation expert interviewed Applicant, and sisters Diane and Sonya in connection with the report and reviewed CPS records relating to Applicant. No ineffective assistance of counsel has been shown.

The CCA counts 42 days from May 28, 2008, to the first time Villanueva was called to testify as a defense expert on July 7, 2008.  Even assuming Villanueva had those 42 days to conduct family interviews, she did not have access to critical family members who might serve as witnesses during that time frame.  Owing to Gilman's agreement, I CR 72-73, she did not have access to Melissa's minor children in CPS custody or to CPS caseworkers.

> 15. Defense counsel made full use of the mitigation expert. The mitigation expert gathered enough evidence to enable her to testify extensively regarding Applicant's social history, covering such areas as her troubled childhood, sexual abuse perpetrated upon her by her mother's boyfriend, physical abuse at the hands of her siblings, her lack of a history of aggression, her suffering physical and emotional abuse at the hands of her husband and subsequent boyfriend, her cocaine addiction, her history of homeless ness, her history of having children at a very young age, and her fitting the profile of an individual suffering from battered woman's syndrome.

70

16. The mitigation expert also testified as to Applicant's history with CPS, including when her children were taken and returned to her, the evolution of Applicant and her children's home life, aggressive behavior between siblings that allegedly occurred within the household, Applicant's poverty, and the results of various drug tests administered to Applicant by CPS. Defense counsel was not ineffective in eliciting that testimony.

17. The mitigation expert thoroughly covered issues relevant to Applicant's family and personal life, and Applicant has failed to show how defense counsel in any way erred in failing to present, pursue or develop such issues * * * .

24. Defense counsel ably and thoroughly utilized the services of Ms. Villanueva * * * in developing and presenting mitigation and future dangerousness evidence, and Applicant has failed to show any deficiency therein.

Findings of Fact ¶¶ 15, 16, 17, and 24 utterly overlook the value of a so-called "mitigation expert" in preparing for anything other than the punishment phase of trial. Admittedly a "mitigation expert" is a person whose primary purpose is to investigate evidence which might encourage a jury to sentence a capital murder defendant to life instead of death. However, a "mitigation expert" also has value in that the mitigation investigation itself might uncover evidence or witnesses valuable to the defense in support of a pre-trial motion to suppress evidence or the defendant's theory of the case during the guilt/innocence phase of trial. Both points were made during state habeas proceedings. *See* Applicant's Brief at 37-38 (discussing how Villanueva could have assisted in a suppression hearing); Applicant's Brief at 54 (discussing Gilman's failure to develop beneficial evidence for the guilt/innocence phase suggested by Villanueva's investigation); Tab 15 (Affidavit and Power Point).

(ii) Prejudice -Villanueva

14. * * * Applicant has also failed to show how any additional [family] interviews would have yielded a social history that would have affected the outcome of the trial * * *.

17. * * * Applicant has failed to show * * * that but for defense counsel's error the

71

outcome of the trial would have been different.

As discussed more fully, *supra* under Ground Two, Melissa demonstrated to the State District Court and the CCA that but for Gilman's failure to more effectively utilize Villanueva *before* trial, Melissa's custodial statement to police could have been suppressed in large part as being the result of intense psychological coercion upon a particularly susceptible individual.  Also, as just discussed in this section, Melissa demonstrated that but for Gilman's failure to develop beneficial evidence for the guilt/innocence phase suggested by Villanueva's investigation, the result of her trial would have been different.  *See supra* § C.2(i) citing Applicant's Brief at 54; Tab 15 (Affidavit and Power Point).

### (iii) Deficient Performance - Dr. Pinkerman

20. Applicant fails to point to any evidence to support her assertion that mitigation psychiatrist Dr. John Pinkerman did not have adequate time to prepare for trial. Applicant * * * fails to specify or prove what additional meetings would have yielded, how the number of meetings they had constituted error on the part of defense counsel[.] * * *

21. Applicant has failed to provide any evidence to substantiate her claim that defense counsel failed to properly utilize Dr. Pinkerman. She makes vague, conclusory claims that defense counsel failed to pursue or develop "mental health issues" and "personality dynamics" and fails to specify what exactly defense counsel did not develop, how defense counsel did not develop it, why defense counsel's failure to develop it was erroneous, * * * Applicant states only conclusion, and not specific facts.

22. Dr. Pinkerman testified extensively during punishment as to Applicant's psychological functioning, including findings that her IQ was in the low average range with verbal comprehension scores that were close to the mentally retarded range, that she was overutilizing repression and denial, that she had major depression with prior substance abuse, that she suffered from Post-Traumatic Stress Disorder (PTSD), that she was the victim of prior physical and sexual abuse both as an adult and as a child, that her PTSD caused her to have some distance from people in position or trust or authority, that there were indications that she suffered from battered woman's syndrome, that her personality features involve hysterical features,

characterized by repression, denial, isolation and disassociation of feelings and thoughts, and that there was a low probability that she would reoffend in a prison setting.  Applicant has failed to show how or why additional "development" or "exploration" of this topic was necessary, how the failure to include it constituted error on the part of defense counsel, * * *.

As to Findings of Fact ¶¶ 20, 21, and 22 Melissa submitted an affidavit from Dr. Pinkerman in support of her argument which states that in his professional opinion "the limited number of meetings between [himself and other defense team members were insufficient to integrate [their] professional work and assist in a viable and available defense in either the guilt/innocence or in the punishment phase."  The affidavit further states the nature of the beneficial information he provided which Gilman did not use, and what he would have testified to if his own expert opinions had been fully integrated into the case.  *See* Tab 15.  She also submitted a copy of a scholarly article on the psychology of false confessions which would have assisted Gilman in suppressing Melissa's custodial statement to police.   Melissa's argument was thus not "conclusory" but based upon"specific facts" which explained why additional testimony was required and what it would have accomplished.

> 23. With regard to Applicant's claim that defense counsel was deficient for failing to elicit testimony from Dr. Pinkerman regarding false confessions, because he only testified after Applicant had been found guilty, any such testimony would have been moot and of no use to the defense.

> 24. Defense counsel ably and thoroughly utilized the services of * * * Dr. Pinkerman in developing and presenting mitigation and future dangerousness evidence, and Applicant has failed to show any deficiency therein.

Findings of Fact ¶¶ 23, and 24 likewise utterly overlook the value of a psychologist in preparing for anything other than the punishment phase of trial.  A psychologist also has value in that the psychological evaluation itself might uncover evidence valuable to the defense in support of a

73

pre-trial motion to suppress evidence or the defendant's theory of the case during the guilt/innocence

phase of trial.  Both points were made during state habeas proceedings.  *See* Applicant's Brief at 36-

37 (discussing how Dr. Pinkerman could have assisted in a suppression hearing); Applicant's Brief

at 54 (discussing Gilman's failure to develop beneficial evidence for the guilt/innocence phase

suggested  by Dr. Pinkerman's evaluation); Tab 14 (Affidavit and Article).

                    (ii) Prejudice - Dr. Pinkerman

20. Applicant fails to * * * specify or prove * * * how additional defense team
meetings would have affected the outcome of the trial.

21. Applicant has failed to* * * to specify * * * how developing [evidence of
Melissa's "mental health issues" and "personality dynamics"] would have changed
the outcome of the trial.

22. * * * Applicant has failed to show * * * how this additional development or
exploration of mental health issues would have affected the outcome of the trial. *
* *

As discussed more fully, *supra* under Ground Two, Melissa demonstrated to the State District

Court and the CCA that but for Gilman's failure to more effectively utilize Dr. Pinkerman *before*

trial, Melissa's custodial statement to police could have been suppressed in large part as being the

result of intense psychological coercion upon a particularly susceptible individual.  Also, as just

discussed in this section, Melissa demonstrated that but for Gilman's failure to develop beneficial

evidence for the guilt/innocence phase suggested  by Dr. Pinkerman's evaluation, the result of her

trial would have been different.  *See supra* § C.2(iii) citing Applicant's Brief at 54; Tab 14 (Affidavit

and Article).

### 3.    Gilman failed to adequately investigate and present available witnesses and documentary evidence supporting Melissa's reasonable explanations for Mariah's old injuries.

During state habeas proceedings Melissa argued that Gilman failed to adequately investigate and present available witnesses and documentary evidence supporting her reasonable explanations for Mariah's old injuries including CPS Caseworkers, Maggie's House Interviews, other service providers, and Melissa's adult son John Alvarez.  The State District Court made ten Findings of Fact relevant to the claim and, as noted earlier, recommended the denial of relief on grounds Melissa had failed to satisfy either prong of the *Strickland* standard.  The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief.  *Ex Parte Lucio*, WR-72,7802-02.

Melissa has already demonstrated *supra* in § B that Gilman's failure to present such evidence was not a matter of any "sound trial strategy" as asserted in ¶¶ 25 and 30.  Nevertheless it is worth pointing out that the CCA's other adopted Findings of Fact regarding Melissa's allegations of ineffective assistance are implausible in light of the evidence or irrelevant to the issue.  Each such Finding of Fact will be recited and addressed individually.

(i) Deficient Performance

27. Defense counsel elicited testimony from Applicant's sister and CPS worker Joanne Estrada, both of whom testified that they had no knowledge of Applicant's ever being physically abusive to any of her children. This testimony was sufficient in furthering Applicant's allegation that she did not physically discipline her children. This testimony and any other testimony purporting to show that Applicant was not physically abusive toward her children would be of limited, if any, value given that Applicant admitted to police that she had caused the extensive injuries found on the victim. No deficiency on the part of defense counsel has been shown.

Given the numerous bruises on Mariah's body and the State's aggressive pursuit of its theory that Melissa had beaten her repeatedly of a period of 88 days, the limited testimony of a sibling

(whom the jury might perceive to be biased) and the guarded testimony of a single CPS caseworker (whom the jury might also perceive to be biased in order to avoid her own prosecution on child endangerment charges for her role in returning Mariah to Melissa's custody) was hardly "sufficient" in furthering Melissa's allegation she did not physically discipline her children.  Moreover, the purpose of additional testimony from other CPS Caseworkers and Service Providers was not *just* to demonstrate that Melissa was not abusive, but to demonstrate the existence of significant sibling-on-sibling violence as a probable alternative cause for those bruises.

For example, CPS Caseworker Sandy Perez could have authenticated her reports as business records rendering them admissible. She could also have corroborated Melissa's statement that Mariah is a "quiet baby" (Tab 17 at 18, 26, 64) and thus dispel the notion that she had somehow aggravated Melissa to the point of fatal physical abuse. Perez could also have corroborated Melissa's statement that Mariah sometimes had innocent accidents when left alone even momentarily. Specifically, she could have testified that Melissa spent more time with Mariah than with the boys (Tab 17 at 54), but with so many children sometimes needed to put her down to tend to the others (Tab 17 at 68), and that on one such occasion Mariah lost her balance and hit her head (Tab 17 at 55). Furthermore, Perez could have corroborated Melissa's statement that her other children played rough and often injured each other. Specifically she could have testified that the children were prone to violent, uncontrollable temper tantrums complete with kicking and screaming (Tab 17 at 18, 22), that they would fight for attention from their parents (Tab 17 at 46, 62,78), and fight with each other (Tab 17 at 64, 78). Indeed, she could have testified that the boys were so aggressive and rough on each other (Tab 17 at 52) that on at least two occasions Perez cut family visitation short because she had concerns for the physical safety of the littlest ones (Tab 17 at 55, 64 (visit cancelled when the

children's behavior "became disruptive & harming one another.")). Furthermore, Perez could have corroborated Melissa's statement that some of the older marks on Mariah could have been healing bug bites left over from her time in foster care. Specifically, Perez could have testified that the older children would come to visitation with bug bites (Tab 17 at 7). And Perez could have dispelled the notion that Melissa was so unconcerned for the health and well-being of her children that she would intentionally ignore a life-threatening injury. Specifically, she could have testified that Melissa noticed and asked about their various injuries, (Tab 17 at 7). Perez could also have dispelled the notion that Melissa disciplined any of her children by beating them. Specifically she could have testified that she observed Melissa isolate misbehaving children (Tab 17 at 19), but otherwise leave the discipline to her husband (Tab 17 at 65). And finally, Perez could have provided valuable evidence that Melissa was not Mariah's sole caregiver and that Melissa's husband could have caused Mariah's prior broken arm. Specifically, Perez could have testified that Melissa and her husband "took turns" looking after Mariah (Tab 17 at 72), and that she observed Melissa's husband "yanking" her older sister Adriana's arm when Adriana was only three years old (Tab 17 at 55).

Similarly, CPS Caseworker Laura Alejo could have authenticated her reports as business records rendering them admissible. She could also have dispelled the notion that Melissa held some particular ill will towards Mariah and for that reason singled her out for a fatal beating. Alejo could have testified that Melissa doted on Mariah (Tab 17 at 88 ("Melissa tells Miraha [sic] she is so pretty."), 119 ("Melissa told Miraha [sic] that she was a very pretty little girl."), 108 ("Melissa (mom) encouraged Miraha [sic] to take some small steps."), and was disappointed when she was unable to make the visitation appointment (Tab 17 at 98). Furthermore, Alejo could have corroborated Melissa's statement about some of Mariah's older injuries being the result of

roughhousing. Specifically, she could have testified that Melissa's older children were aggressive and reckless, often to the point of being totally out of control (Tab 17 at 92, 95, 101, 106, 110, 114, 129, 144, 151, 158) resulting injuries to themselves and each other (Tab 17 at 162). Alejo could also have dispelled the notion that Melissa disciplined her children with physical abuse or beat them out of frustration or anger. Specifically she could have explained that when the kids misbehaved, Melissa talked to them (Tab 17 at 84), tried to reason with them (Tab 17 at 92, 110), or redirect them (Tab 17 at 151) and sometimes raised her voice (Tab 17 at 116), but never hit them. She could also have explained that over time Melissa seemed to be improving in her ability to get the kids under control (Tab 17 at 120). Finally, Alejo could have dispelled the notion that Mariah's older injuries were necessarily Melissa's doing or that Melissa simply ignored them. Specifically  she could have testified that the older children had often come to visitation with scrapes, scratches, bruises, and torn clothes, and that Melissa expressed concern for her children's health and well-being and asked about their various injuries, (Tab 17 at 87 (scratches), 120 (scrape), 123 (fever), 138 (rash), 158 (scratches), 165 (swelling), 168 (bruise)). Melissa was equally attentive to Mariah's medical needs. Tab 17 at 123 ("Melissa (mom) said that Miraha [sic] was getting sick because she was a bit warm."), 126 ("Melissa (mom) said that Miraha [sic] looked sick."), 135 (Mariah threw up on herself and Melissa checked to see if she had a fever).

CPS Caseworker Angie Romo could have authenticated her reports as business records rendering them admissible. She could also have assisted Melissa's trial counsel in dispelling the notion that Melissa was an abusive parent. Specifically Romo could have testified that although Melissa had "her hands full with the children" when the children misbehaved she would talk to them about why they were being bad, "get after them verbally," attempted to redirect them, and denied

78

special treats or excluded children from activities for brief periods. Tab 17 at 214, 217, 223, 224, 241, 246 (Melissa disciplines by redirecting children most of the time). Romo could also have testified that Melissa was concerned that her children learned to treat other people with respect. Tab 17 at 217, 241. Finally Romo could have testified that Melissa was "good" with her children and showed no signs of being physically abusive. Tab 17 at 243.

Other CPS Caseworkers could have authenticated their own reports and provided similar helpful testimony. For example, Florentino Aguilar could have testified that there were simply too many kids for Melissa to handle on her own, and that their behavior was better when there were fewer of them for her to supervise. Tab 17 at 185, 189. Aguilar could also have testified that Rene, in particular, was "an instigator" who "tried to cause trouble and chaos." Tab 17 at 174. Jon Garza could have testified that he observed Melissa discipline Sarah for not eating by denying dessert and otherwise discipline the children by trying to redirect them. Jon Garza could also have testified that Melissa tried to teach the children good manners. Tab 17 at 231. Other CPS workers could have testified that Melissa doted on Mariah and spent more time with her which made the other kids jealous, Tab 17 at 37, 62, 69, that Mariah arrived at visitation from foster care with visible injuries and that Melissa expressed appropriate concern, Tab 17 at 38, that the children behaved better when Melissa's husband was around, Tab 17 at 44, that the older children fought over toys and Melissa tried to discipline by talking to them, Tab 17 at 178, and redirecting them Tab 17 at 195, and that Melissa was generally attentive to their needs because "she loves them very much," Tab 17 at 191.

Other CPS Caseworkers and Service Providers could have provided the jury with additional

information valuable to the defense regarding each child's behavior in the foster home setting.[42]  A

sampling of those documents reveal – among other things – that the children were hyperactive,

aggressive to the point of injury, bit one another, and acted out in sexually inappropriate ways.

For example, Mariah's Foster Mother Alfonsa Castillo and CPS Employee Dora Cackley

could both have been called witnesses during guilt/innocence regarding Mariah's history of

self-inflicted injury. Specifically Castillo could have been forced to admit that while in foster care

Mariah received weekly physical /occupational therapy because she was weak and favored the left

side of her body, see DX 23; Tab 17 at 346-349 (Reports of Dora Cackley), and that Mariah had

difficulty walking because her feet were turned to the side instead of facing front and needed special

shoes to aid her. DX 23; Tab 17 at 368-369 (Reports of Dora Cackley). Castillo could also have been

forced to admit that in March of 2006, while Mariah remained in foster care, she suffered a

self-inflicted head injury when she lost her balance, slipped, and fell from a toy with a small set of

stairs. DX 19, 21; Tab 17 at 407-410.  The fall caused her to lose consciousness. DX 23; Tab 17 at

407. After that, Castillo and her husband closely supervised Mariah because she wanted to climb

everything.  DX 23; Tab 17 at 336). The foregoing admissions would have rendered it more likely

that a toddler with a love of heights and balance issues had simply fallen down the stairs.

Furthermore, Castillo could have been forced to admit that while in foster care Mariah threw

repeated temper tantrums during which she would smack her head on the floor, see, e.g., DX 20, 22,

23, and that due to her risk of injury CPS had authorized use of brief physical restraints, DX 23; Tab

17 at 383-406 (Restraint Approval). The foregoing admissions would have corroborated Melissa's

---

[42]  Copies of selected CPS Records were collected in the Appendix to Melissa's state
application for writ of habeas corpus at Tab 17 for the Court's convenience. Many of these are
also included in the Reporter's Record as part of a bill of particulars.

statements that Mariah was prone to accidental self-injury. Finally Castillo could have been forced to admit to multiple incidents of sibling on sibling biting. See, e.g., 37 RR 108; DX 23; Tab 17 at 315. This admission would have made it more likely that Mariah's alleged "bite mark" was due to abuse by an older sibling (such as 15-year-old Alexandra), and not Melissa.[43]

Foster Parents Teddy and Mary Helen Dunlap also have been called as witnesses during guilt/innocence regarding Robert, Richard, Rene, and Gabriel. Specifically, the Dunlaps could have testified that the boys were impulsive, "very" hyper, and physically aggressive towards one other including scratching, hitting, pinching, choking, shoving, kicking, hair-pulling, and biting, see, e.g., Tab 17 at 492 et seq., requiring constant supervision and re-direction They also could have testified that the boys were sexually aggressive towards one another, towards girls at school, and towards their younger sisters resulting in referral to a therapist for intervention. Tab 17 at 492 et seq. This testimony would have corroborated Melissa's statement to police and made it more likely that Mariah's unexplained old injuries were the result of sibling on sibling violence rather than parental abuse.

28. Defense counsel was not deficient for failing to call two of Applicant's young sons, Richard and Rene, to testify. During their forensic interviews, they both stated they did not know how the victim died, and that they had seen no visible marks or bruises on the victim. It is undisputed that numerous bruises, abrasions and contusions of varying ages were found on the victim, and that Applicant admitted to police that she had caused nearly all of them. Any attempt to introduce evidence suggesting that no abuse occurred at all would have been of dubious probative value, confuse the issues, and likely cause the defense to lose credibility with the jury, especially since these two witnesses would have been young children.

29. Applicant's son Rene did advise the forensic interviewer that he saw the victim fall down some steps, but the fall he described was not at all consistent with the

---

[43] Although of "adult size" the alleged bite marks were too narrow to belong to Melissa. *See* Tab 12 at 24-38.

blunt-force trauma that actually caused the victim's death. Hence, defense counsel was not deficient for opting not to present testimony that would have been of virtually no evidentiary value.

As to ¶¶ 28 and 29, Melissa reiterates that she asserted – from the beginning – that Mariah had fallen down a flight of stairs.  Moreover, Gilman's defense theory was that Mariah had suffered a fatal head injury from a fall down a flight of stairs.  Richard corroborated both by means of a prior consistent statement. Richard stated that his mom told him Mariah had fallen down the steps at the second-story apartment the family was moving out of. Video Time Index 20:05. However, Richard added that he had seen bruises on Mariah from her fall, "one on her eye and on her arm too." Video Time Index 21:11.  Rene also corroborated Melissa's statement that Mariah fell down the stairs at the family's second story apartment on East Madison. Rene stated that Mariah fell down some steps at the "other" apartment. Video Time Index 40:05. He explained that it happened while they were waiting to move into their new place, not at the apartment where Mariah actually died. Video Time Index 40:05, 40:36. Rene described the steps where Mariah fell as "white." Video Time Index: 40:36. Compare DX 1, 2 (white stairs at old apartment) with SX 14 (bare wood stairs at new apartment). When asked,

"Did you see her fall or did somebody tell you that that's what happened?"

Rene responded,

"No, I saw it."

Video Time Index 41:00 (emphasis added). Rene explained, in essence, that when he went down the stairs Mariah started to toddle after him and then she fell down the steps. Video Time Index 41:15. Rene guessed that she fell down three steps, *id*, but was probably mistaken because the flight of stairs is actually 14 steps, DX 1, 2. Rene also could have corroborated Melissa's statement that after

the fall Mariah did not appear seriously injured. According to Rene, "she wasn't even crying." Video Time Index 41:15. Rene did not know whether she hit herself with anything on the way down or got hurt in any way and did not remember seeing any scratches or bruises on her right after. *Id.* Rene denied that anybody had told him or his siblings what to say or for them not to say anything if anyone asked any questions. Video Time Index 44:01.

Furthermore, during state habeas proceedings Melissa provided the affidavit of a forensic pathologist which states that Mariah's injuries were, in fact, "consistent with the blunt-force trauma that actually caused the victim's death." *See* Tab 12 (Affidavit). Accordingly, the CCA's Finding of Fact that their testimony would be of "dubious probative value" or of "no evidentiary value" whatsoever is implausible in light of the record as a whole.

> 31. Defense counsel was not deficient for opting not to call the victim's older brother, John Alvarez, to testify. Alvarez is a convicted felon who was previously banned from Applicant's household for sexually molesting his siblings. His history would have rendered him a less than credible witness, and defense counsel's decision not to call him certainly did not rise to the level of error.

Mitigation Specialist Carmen Fischer interviewed Melissa's 19-year-old son, John Alvarez, at the Cameron County Jail. *See* Tab 8 (Fischer Report). John could have corroborated Melissa's statements that she did not abuse any of her children and never hit Mariah. According to John, Melissa and Robert did discipline the children but never physically abused them. John saw Mariah about one-and-a-half weeks before her death and she was healthy. John never saw Melissa or Robert hit Mariah. Furthermore, John could have corroborated Melissa's explanation for at least some of Mariah's older injuries. According to John, he and all his siblings were a rowdy bunch and often fought. Finally, John could have corroborated Melissa's story that Mariah fell down a flight of stairs by means of a prior consistent statement According to John, the family talked a lot about Mariah

83

having fallen off stairs from midpoint.

John wanted to testify at Melissa's trial, but Gilman did not allow it. Admittedly, John had his own problems,[44] and was incarcerated at the time of Melissa's trial, but none that would necessarily preclude his ability to credibly testify on his mother's behalf. Indeed, according to Mitigation Specialist Carmen Fischer, "John is a very smart, insightful, loving and caring individual. He will make an excellent witness." Given the severity of the charge and the penalty Melissa was facing and the fact that there was little – if anything – John could have said or done to make Melissa's situation worse, no reasonable attorney would have failed to utilize him as a witness to contradict the State's case that Melissa was physically abusive towards Mariah and to corroborate her statement that Mariah's fatal injury and contemporaneous bruises were all the result of a tumble down the stairs.

(ii) Prejudice

The CCA's adopted Findings of Fact on this point make no specific mention regarding whether the prejudice prong of the *Strickland* analysis had been satisfied. Melissa submits that the omission of such an overwhelming amount of beneficial evidence for no sound strategic reason was necessarily prejudicial. Had the jury learned more about Melissa's other children and the overall family dynamics there is a reasonable probability that they would have believed that her alleged confession to police was merely the result of psychological coercion and that she had not in fact beaten Mariah repeatedly over a period of 88 days and ultimately to death.

---

[44] CPS records repeatedly state that John sexually abused his younger siblings, who then acted out in sexually inappropriate ways with one another and with other children.

84

4. **Gilman failed to adequately investigate and present available witnesses and documentary evidence that Alexandra Lucio or Robert Alvarez could have caused Mariah's old injuries, and possibly her death.**

During Melissa's videotaped interrogation, the investigating authorities assumed that she was the only one caring for Mariah with an opportunity to harm her. *See, e.g.*, SX 3 passim. Authorities repeatedly pressed the point in order to intimate that only Melissa had the opportunity or ability to cause Mariah's old injuries and obtain a confession for causing her death. *Id.* The State's theory of the case at trial was that Melissa had repeatedly abused Mariah and ultimately beaten her to death. The State played Melissa's entire videotaped interrogation for the jury.

During state habeas proceedings Melissa argued that Gilman had been ineffective in failing to investigate or present evidence that Melissa's 15-year-old daughter Alexandra could have been responsible for any non-accidental old injuries as well as Mariah's fall down the stairs, and that Melissa's husband Robert Alvarez could have been responsible for any non-accidental old injuries. The State District Court made five Findings of Fact relevant to the claim and, as noted earlier, recommended the denial of relief on grounds Melissa had failed to satisfy either prong of the *Strickland* standard. The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief. *Ex Parte Lucio*, WR-72,7802-02.

Melissa has already demonstrated *supra* in § B that Gilman's failure to present such evidence was not a matter of any "sound trial strategy as asserted in the second half of ¶ 19. Nevertheless it is worth pointing out that the CCA's other adopted Findings of Fact regarding Melissa's allegations of ineffective assistance are implausible in light of the evidence or irrelevant to the issue. Each such Finding of Fact will be recited and addressed individually.

(i) Deficient Performance - Alexandra

19. Defense counsel was not deficient for failing to present a questionable claim by one of Applicant's daughters, Alexandra, that "she was the reason that [the victim] fell down the stairs." This claim, even if true, is not probative evidence that someone other than Applicant caused the death of the victim. * * * .

The CCA's adopted Finding of Fact is illogical.  An admission by another person to having caused the injury which resulted in Mariah's death is necessarily probative of evidence that *if* the fall down the stairs was not accidental, then someone other than Melissa caused it.

32. Defense counsel was not deficient for not attempting to place the blame for the murder on Applicant's daughter Alexandra. The evidence submitted by Applicant in support of this claim, an unsworn hearsay "affidavit," which reports further hearsay from three sources, does not rise to the level of credible evidence justifying relief in this case.  Furthermore, even if the statements made -- that two of the victim's sisters physically struck the victim at some point -- were true, they are not probative of who administered the final blunt force trauma that caused the victim's death. Such an attempt to blame Alexandra for the victim's injuries also would run contrary to Applicant's admission to police that she was responsible for all but two of the injuries found on the victim.

The statement at issue was notarized.  The admissions against penal interest therein do not qualify as hearsay under either state of federal evidentiary rules.  Even assuming those statements were not probative of "who administered the blunt force trauma that caused the victim's death" they *were* probative of who caused all of Mariah's *other* injuries and served to contradict the assumption that Mariah had been in Melissa's exclusive care and the State's theory that Melissa had repeatedly abused Mariah over a period of 88 days.  The fact that the statements run contrary to Melissa's questionable admission of responsibility for Mariah's old injuries actually supports Melissa's claim of deficient performance.

33. Applicant has failed to demonstrate that defense counsel was deficient for failing to "further investigate" or "present evidence" placing the blame on Alexandra because she does not specify what type of further investigation should have been

done or what evidence it would have revealed.

Again, Melissa specified that additional investigation would have provided evidence that Alexandra had both motive and opportunity to injure Mariah, and had admitted to several people to having done so while Mariah was in her care.  *See* Applicant's Brief at 72-75 and evidence cited therein.

### (ii) Deficient Performance - Robert Alvarez

18. Defense counsel was not deficient in failing to point out that her husband was the last person to see the victim alive. That fact, even if true, was irrelevant to defense counsel's strategy, which was to argue that the victim's fatal injury was due to a fall down stairs that occurred some 48 hours prior to death.

34. Applicant has failed to demonstrate that defense counsel was deficient for failing to "investigate and/or present available evidence" that Applicant's husband, Robert Alvarez, could have caused some of the victim's injuries. Alvarez was one of numerous people who had access to the victim at various times, and his supposed violent nature was supported only by Applicant's self-serving reports to her mitigation experts, and contradicted by CPS records.  Moreover, Applicant admitted to police that she had caused the myriad of injuries to the victim and, when asked whether Alvarez had ever "spanked" the victim as she had done, Applicant shook her head in the negative. Defense counsel had no reasonable basis for arguing that Alvarez harmed the victim; hence, his failure to do so was not erroneous.

Melissa's assertion that Alvarez had a violent nature and thus may have been the source of Mariah's old injuries was supported by more than just her "self-serving reports to her mitigation experts" and were not, in fact, "contradicted by CPS Records."

While Mariah was in foster care, Alvarez attended supervised visits. Notably, during one such visit, Perez observed Melissa's husband "yanking" Adriana's arm when Adriana was only three years old. Tab 17 (June 14, 2005). During Mariah's autopsy Dr. Farley noted the existence of a healing left arm fracture. 32 RR 83 ("skeletal survey" x-ray done at hospital); 34 RR 30. Dr. Farley opined that the fracture was 7 days to 2 weeks old. 34 RR 30-31. Dr. Farley testified that such

fractures "usually" resulted from "tugging" or "twisting" the arm. 34 RR 31. The relevance of the evidence to the potential cause of Mariah's old injury is obvious.

Robert had also been investigated by CPS on at least one prior occasion for child abuse. Tab 2 (SX 3 at 22). See also 37 RR 207 (punishment phase testimony that Alvarez was abusive towards children); 38 RR 50 (punishment phase testimony that Alvarez was abusive towards Melissa).[45]

Melissa was not Mariah's sole caregiver; Alvarez also looked after her. CPS Caseworkers documented Alvarez holding, talking to, and playing with Mariah. *See, e.g.*, Tab 17 (2/14/2005). Notably, during two supervised visits, Perez observed that Melissa and her husband "try to divide their time with children" and specifically that they "took turns" looking after Mariah. Tab 17 (May 31, 2005 & July 12, 2005). Additionally, according to Alvarez, after the children were returned, he began working as a cook at Peso Bill's restaurant. Tab 3 (Written Statement). He worked the lunch shift from 11:30 a.m. until 2:30 p.m. *Id*. When he wasn't working, Alvarez participated in child care duties. For example, Alvarez admitted to feeding the children breakfast and to taking some of the children with him on errands.  *Id.*  He expressed no qualms about caring for Mariah or taking her out alone. Tab 2 (SX 3 at 19) (Alvarez offering to take Mariah to the hospital by himself). Notably, during his interview at Maggie's House, Rene stated that his mom and dad both took care of Mariah on the day she died. Tab 4 Time Index 38:00. Given such specific and uncontroverted evidence that Alvarez shared in caring for Mariah at least to some degree there is simply no reason for anyone to have assumed that Melissa was Mariah's sole caregiver and thus the only one capable of inflicting injury upon her.

---

[45] Alas, punishment phase testimony by a mitigation expert came too late to rebut the State's case during the guilt/innocence phase.

*None* of this evidence is a "self-serving statement" by Melissa. *All* of it is from CPS Records, the autopsy report, and the transcript . And *all* of it supports Melissa's assertion that some of Mariah's old injures could have been caused by Alvarez.

Alvarez had motive to injure Mariah and blame Melissa for it afterwards because Mariah was the only one of the children living in the home who was not his biological child and unable to defend herself. 33 RR 190; Tab 17 at 3-4. Gilman had a reasonable basis for arguing that Alvarez harmed the victim.

(iii) Prejudice

The CCA's adopted Findings of Fact on this point again make no specific mention regarding whether the prejudice prong of the *Strickland* analysis had been satisfied. Melissa submits that the omission of such an overwhelming amount of beneficial evidence for no sound strategic reason was necessarily prejudicial. Had the jury learned more about Melissa's other children and the overall family dynamics there is a reasonable probability that they would have believed that her alleged confession to police was merely the result of psychological coercion and that she had not in fact beaten Mariah repeatedly over a period of 88 days and ultimately to death.

**5. Gilman failed to adequately investigate and present available witnesses and documentary evidence that Melissa could not have "severely" beaten Mariah in the 24 to 48 hours immediately prior to her death.**

During state habeas proceedings Melissa argued that Gilman had been ineffective in failing to investigate or present evidence that  failed to adequately investigate and present available witnesses and documentary evidence that Melissa could not have "severely" beaten Mariah in the 24 to 48 hours immediately prior to her death.  The State District Court made five Findings of Fact relevant to the claim and, as noted earlier, recommended the denial of relief on grounds Melissa had

89

failed to satisfy either prong of the *Strickland* standard.  The CCA adopted the State District Court's

Findings of Fact and Conclusions of Law and denied relief.  *Ex Parte Lucio*, WR-72,7802-02.

The CCA's single adopted Findings of Fact relevant tot this issue did not suggest that

Gilman's actions were a matter of trial strategy. It stated:

> 35. Defense counsel was not deficient for failing to call Robert Alvarez as a witness
> in an attempt to prove that Applicant was not alone with the victim during the time
> frame in which the fatal blunt force trauma occurred.  Alvarez's statement to police
> indicates that he witnessed Applicant physically abuse the victim, and defense
> counsel certainly did not want that type of testimony before the jury. Furthermore,
> Alvarez's statement does not prove that Applicant was never alone with the victim;
> in fact, he states that one day prior to the victim's death he and some of his children
> left the family apartment at least twice to deliver belongings to a new residence, and
> while he was gone Applicant was alone in the apartment with the remaining children,
> including the victim. Given this evidence, defense counsel could not have credibly
> argued that Applicant was not alone with the victim prior to the murder, and his
> failure to attempt to do so was not deficient performance.

The factual inaccuracies in this Finding of Fact are discussed fully, *infra*, under Ground Ten

where Melissa has alleged that she is entitled to federal habeas relief because she is actually

innocence of capital murder.  To summarize,  available evidence demonstrated that Melissa was

never alone at home with Mariah during the 24 to 48 hour period during which experts assert the

fatal closed-head injury was inflicted or occurred and that although not alone no witness observed

her beating Mariah.  Gilman was ineffective for failing to present this evidence.

**6.      Gilman failed to dispel the notion that Melissa would not explain the source of
Mariah's "<u>old</u>" injuries because she had caused them.**

According to Dr. Farley, there was only one bruise "a little darker" on Mariah's arm, 34 RR

20, SX 26, one deep purple/bluish bruise on Mariah's torso, 34 RR 19, SX 25, one "deep maroon"

bruise along the forehead and down onto the right cheek," 34 RR 20; SX 30, one dark bruise under

Mariahs' right eye, 34 RR 20; SX 30, and one "patterned" bruise on Mariah's left thigh, 34 RR 21,

SX 32, which appeared older See 34 RR 5-60 *passim*.  During Melissa's interrogation, the detectives made much ado of Melissa's inability to explain Mariah's older scrapes and bruises. See, e.g., SX 3 *passim*. The authorities repeatedly pressed the point and intimated that Melissa would not explain because she was guilty of ongoing physical abuse and had kept Mariah covered in order to hide the bruises from her husband and her own guilt. *Id.*

The CCA's single adopted Findings of Fact suggested that Gilman's actions were a matter of trial strategy. It stated:

> 36. Defense counsel was not deficient for failing to argue that Applicant was able to explain innocuous sources for many of the victim's injuries. During her recorded statement to police, she did first attribute the victim's bruises to mosquito bites, rough play between the children and self-injury. However, later in the interview she admitted to causing all of those injuries. Once the jury heard that confession, any prior explanations were moot, and defense counsel did not err in failing to urge them at trial.

The mere fact that, after hours of interrogation, Melissa "confessed" to causing Mariah's old injuries did not render her prior explanations "moot." As already discussed *supra*, under this Ground § B, it was not sound trial strategy to just concede the point before the jury.  This is especially true where there was *so much* evidence to contradict an arguably involuntary "confession" and to support Melissa's original explanations for Mariah's older injuries.

Melissa stated that Mariah had several large insect bites and / or scratches on her body that her foster parents had been treating with Lotrimin antibiotic ointment. Tab 2 (SX 3 at 50). Given a child's tendency to scratch and pick at scabs, this explained some of Mariah's scrapes and sore spots. *See* Tab 12 (Dr. Young Autopsy Report). Melissa stated that Mariah would wake up in the middle of the night and get out of bed to play. Tab 2 (SX 3 at 20). Melissa explained that after one such episode she found Mariah with a bruise under her eye which, she believed, was the result of Mariah

running into something or tripping over something on the floor in the dark. Tab 2 (SX 3 at 20, 31). That Mariah was prone to self-injury from falling was well-documented. *See* Tab 17 at 336, 346-349, 368-369,407-411.33 *See also* 37 RR 108 (foster mom's punishment phase testimony regarding self injury). This explained the bruise under Mariah's eye. *See* SX 30. Melissa stated that Mariah was"bleeding from her tooth from the bottom" after her tumble down the stairs. Tab 2 (SX 3 at 6, 7, 14). This explained Mariah's bruised, swollen and slightly bloody lip. SX 30. And Melissa repeatedly stated that the older children played rough and hurt one another. *See, e.g.*, Tab 2 (SX 3 at 32). This statement was – and is – fully corroborated by Sonya Chavez, 35 RR 103, 111-112, and by CPS Records, *see* Tab 17 passim. This explained at least some of Mariah's older bruises. Additionally, Dr. Farley explained that "anything" could have caused the "very small" abrasions she found in Mariah's vaginal area as well as the little contusions on the inner thigh. 34 RR 39, 51. Dr. Farley also admitted that abrasions and contusions on Mariah's shins, calves, knees, and elbows are of a type commonly caused by, *e.g.*, a playground fall, 34 RR 14-15, 17.

### 7. Gilman failed to adequately investigate and present available evidence explaining why Melissa did not know the extent or severity of Mariah's "<u>new</u>" bruises and contemporaneous fatal head injury.

Mariah's multitude of "new" bruises were all of approximately the same age and occurred contemporaneously to Mariah's fatal head injury. See 34 RR 56. Thus, Mariah would have received those injuries within the 24 to 48 hours before her death. Again, during Melissa's interrogation, the detectives made much ado of Melissa's inability to explain Mariah's "new" bruises and contemporaneous fatal head injury to their satisfaction. *See, e.g.*, SX 3 *passim*. The authorities repeatedly pressed the point and intimated that Melissa would not explain because she was guilty of ongoing physical abuse and had kept Mariah covered in order to hide the bruises from her husband

and her own guilt. *Id.*

During state habeas proceedings Melissa argued, *inter alia*, that a diligent, independent investigation would have uncovered evidence to explain why Melissa did not know the extent or severity of Mariah's "new" bruises or her fatal head injury. The State District Court made a single Finding of Fact relevant to the claim and, as noted earlier, recommended the denial of relief on grounds Melissa had failed to satisfy either prong of the *Strickland* standard. The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief. *Ex Parte Lucio*, WR-72,7802-02.

The CCA's single adopted Findings of Fact suggested that Gilman's actions were a matter of trial strategy. It stated:

> 37. Defense counsel was not deficient for failing to argue that Applicant did not know the extent or severity of the victim's injuries. During her videotaped interview with police, she admitted her knowledge of the victim's injuries to the interviewing officers, stating that she did not take her child to the doctor because "I knew that they would accuse me just like y'all are accusing me now." Later, she admitted having caused all but two of those injuries to the victim. Certainly, then, Applicant knew of the injuries, since she admitted having inflicted them. Defense counsel could not have credibly argued that Applicant was unaware of what she caused.

As already discussed *supra*, under this Ground § B, notwithstanding Melissa's admissions it was not sound trial strategy to just concede before the jury that she had caused Mariah's injuries. Sound trial strategy would have been to challenge the admissions as false confessions, *see also supra* Ground Two. In light of such challenge, Melissa's statement is easily interpreted as fear that if she took Mariah to the hospital to be treated for the "new" injury (or injuries) resulting from the fall she would be blamed for inflicting the many "old" injuries regardless of how those injuries occurred. It is a statement which *supports* (rather than contradicts) Melissa's claim that she had not abused

Mariah.

Moreover, Melissa's statement is not *, ipso facto*, an admission that she  knew the extent or severity of Mariah's "new" injuries or her fatal head injury because she had "caused" them. A diligent, independent investigation would have uncovered evidence to explain why Melissa did not know the extent or severity of those injuries.  For example, Mariah was wearing a jumpsuit when she fell down the stairs. Tab 2 (SX 3 at 53). Because Mariah seemed fine after the fall, Tab 2 (SX 3 at 6, 7, 14), Melissa did not immediately undress her to check for injuries; rather, Melissa went back to packing. However, even had Melissa immediately undressed Mariah her many bruises may not yet have been visible; it takes time for a bruise to fully develop. *See generally* 34 RR 19, 54 (pink bruises recent); 34 RR 19-20 (darker, purple/bluish and maroon bruises older).

In the 24 to 48 hours after the fall, it was cold out so Mariah remained fully dressed. Tab 2 (SX 3 at 54). Meanwhile Melissa was very busy washing clothes, packing, and then unpacking, the family's belongings. Selina and Alexandra were responsible for bathing Mariah. Tab 4 Video Time Index 19:30. *See also* Tab 8 (Fisher Report) (sisters bathed Mariah). Alvarez was helping to look after Mariah. Tab 4 Video Time Index 32:30. *See also* Tab 3 (Written Statement) (Alvarez tending to Mariah). Mariah as sleeping a lot. *See, e.g.*, Tab 2 (SX 3 at 9, 11-12, 14, 15-16). And Mariah's fatal head injury was not visible on the outside of her scalp. *See* 34 RR 24, 26 ("multiple" contusions "all over" the scalp hidden by hair or not visible on skin's surface). It is thus not unreasonable to conclude that in the 24 to 48 hours immediately prior to her death, Melissa never saw Mariah fully undressed or observed the extent, or fully appreciated the severity, of her injuries from the fall.

94

8.     **Gilman failed to dispel the notion that Melissa was indifferent towards Mariah and ignored her needs.**

During the punishment phase of Melissa's trial, the State called Mariah's foster mother, Alfonsa Castilla, as a witness. During direct examination, the State elicited the following testimony from Castilla:

> Q. Now, Mrs. Castillo, when Mariah was in your care, did you happen to come into contact with the defendant in this case, Melissa Lucio? for the family visits over there in Harlingen.
>
> Q. And tell us about those visits? What happened during those visits?
>
> A. Well, it's something hard for me because I noticed that they don't put too much attention to her. The thing is hurting me because when she was a baby, I put her in the baby carrier to take her to the family visits. And I noticed -- I don't know if it was me -- I noticed that they don't put too much attention to her. They get involved with the other kids because they're already grown up. And when they come to her, the baby, she's a baby. She don't talk at the time. So, sometimes I take her out of the baby carriage and I take her over there in my arms that way -- carrying her. And after that I -- in the stroller, I don't leave the stroller because that way they carry the baby. Because I know they don't put too much attention to her. That's hurting me because I gave love to that little girl that didn't even have my blood. So they hurt me because she is able to give love. And when I go to pick it up, when the family visits finished, she's anxious to give me his arms. So -- that's all I have to say.

37 RR 99-100.

> Q. You described what happened at the visits when Mariah was still in a carriage, a baby carriage when she was still small, and when she was a baby. If you could tell us what those visits were like when she started to walk.
>
> A. It was the same thing. Like, they don't pay too much attention to her. That's what I noticed. I mean, not too attached to her. I see -- that they don't – don't put too much attention to her. So she was always anxious when she see me because she know me like hugging her and kissing and giving love.
>
> Q. Mrs. Castillo, after these visits with the defendant and her family, did you ever notice that Mariah's behavior changed in any way?

95

> A. No, not much because she knows, okay, they give you a lot of love. She hugging me too much. So I noticed different. She's trying to give more, more love and – and kind of sad sometimes because they see the other kids running or talking, and maybe she not able to do whatever the rest of the brothers are doing.

37 RR 100-101.

During state habeas proceedings Melissa assrted that Castillo's testimony had left the jury with the false impression that she was indifferent towards Mariah, ignored her needs, and preferred the other children. Melissa argued that Gilman had been ineffective in failing to present available evidence that Castillo did not, in fact, stay to observe visitation and Castillo's testimony regarding Melissa's interaction with Mariah was otherwise inaccurate. The State District Court made a single Finding of Fact relevant to the claim and, as noted earlier, recommended the denial of relief on grounds Melissa had failed to satisfy either prong of the *Strickland* standard. The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief. *Ex Parte Lucio*, WR-72,7802-02.

The CCA's single adopted Findings of Fact does suggested that Gilman's actions were a matter of trial strategy because the evidence was "superfluous." It stated:

> 38. Defense counsel was not deficient for failing to dispel the notion that Applicant was indifferent to the victim's needs. Applicant claims that defense counsel should have presented certain CPS visitation records as evidence that Applicant was a caring parent. However, the totality of evidence in this case, including numerous other records prepared by CPS, show otherwise. Given that Applicant was investigated for neglect and/or abuse in 1995, 1996, 1998, 2000, 2001, 2002, 2003 and 2004, any claim made by defense counsel that Applicant was a good parent would have been superfluous at best.

Even assuming that Melissa was repeatedly "investigated" the CCA's Finding of Fact is silent as to the result of those of investigations. Not surprisingly, CPS Records reflect that Melissa – an uneducated, poor parent of 13 children– had been found guilty of passive neglect. DX 13 (The

Burke Foundation 90-Day Treatment Plan dated 6/20/2005 - Familial Assessment Summary). Passive neglect (lack of supervision, inadequate food or clothing, etc.) is *not* the same as physical abuse (beating, biting, shaking, etc.).  Given that Mariah was indicted for beating Mariah to death, the distinction makes a difference.  Moreover it was not necessary for Gilman to prove Melissa was a "good parent"[46] merely to prove that she was not a physically abusive parent. *See supra* this Ground § B (discussing trial strategy)  The CPS Records were *not* "superfluous" to this point.

For example, CPS Supervised Visitation records do not indicate that the foster parents stayed during visitation and Sonya Chavez would have testified that they did not generally do so. See Tab 17 at 5-249; Tab 6. Moreover although Costilla admitted during direct examination that "I just leave it there, the kids and go away. So I came later to pick up my two girl[s]," 37 RR 106, but Gilman failed to cross-examine her on this point in order to draw the jury's attention to the inconsistency.

Furthermore, CPS Caseworkers could have testified that Melissa would play with Mariah (Tab 17 at 5); smile at her and feed her (Tab 17 at 16-17); "giggle" at Mariah and "spend more time" with her than the other children (Tab 17 at 24)); feed and burp Mariah and also play with her and tickle her to make her laugh (Tab 17 at 28); hold, smile, and laugh with Mariah and spend equal time with the children (Tab 17 at 36); give "each child" affection (Tab 17 at 43); try to divide her time with children (Tab 17 at 47); "spends more time with Sara & Mariah" (Tab 14 at 54), carry and feed Mariah (Tab 17 at 61); comment that Mariah "is a big girl" (Tab 17 at 66); change Mariah's diapers and take turns with her husband looking after her (Tab 17 at 71-72); spend "a little more time" with Mariah (Tab 17 at 74); tells Mariah that she is "so big and pretty" (Tab 17 at 82); hugged and kissed

---

[46] And, indeed, this was not his intent.  *See* 36 RR 24 (Gilman stating during closing argument, "my client is not up for 'Mother of the Year'."

Mariah (Tab 17 at 88); picked up Mariah (Tab 17 at 93); were disappointed when Mariah could not

make it to visitation (Tab 17 at 98); carried Mariah (Tab 17 at 109); helped Mariah walk around the

room and told her she was a very pretty little girl (Tab 1 at 108); checked on Mariah after she threw

up (Tab 17 at 135); feed Mariah (Tab 17 at 140,146), etc. Finally, Sonya Chavez offered to provide

Gilman with photographs of Melissa and Mariah taken during numerous visitations but Gilman told

Chavez they were not needed and did not seek to admit them. Those photographs would have

directly contradicted Castillo's testimony that Melissa was indifferent to Mariah and basically

ignored her needs. Tab 6 (Visitation Photos).

**D.     The CCA's Adjudication of Melissa's Ineffective Assistance of Counsel Claims Resulted in a Decision That Was Based on an Unreasonable Determination of the Facts in Light of the Evidence Presented in the State Court Proceeding.**

For all of the reasons discussed in §§ B and C above, Gilman had no legitimate reason for

failing to present *any* of the evidence submitted to the State District Court in support of Melissa's

habeas claim which included witnesses and documentary evidence:

- establishing that Mariah's fatal injury was consistent with Melissa's statement that Mariah had fallen down a flight of stairs and contradicting Dr. Farley's expert "opinion" to the contrary as scientifically flawed;

- supporting Melissa's reasonable explanations for several of Mariah's old injuries and contradicting the State's evidence that such injuries were necessarily the result of ongoing physical abuse;

- contradicting the State's evidence that Melissa was Mariah's sole caregiver and the only one with opportunity and motive to inflict injury upon her;

- establishing that Melissa could not have "severely" beaten Mariah in the 24 to 48 hours immediately prior to her death and contradicting the State's evidence that such an event ever occurred;

- explaining why Melissa did not know the extentor severity of Mariah's injuries from her tumble down the stairs and contradicting the State's theory that Melissa

was a "cold-blooded killer" who intentionally hid the injuries and allowed Mariah to die, and

- dispelling the notion that Melissa was indifferent towards Mariah and ignored her needs.

Quite to the contrary, given the State's admittedly gruesome and disturbing autopsy photographs of Mariah's battered and bruised little body, and the natural human tendency to immediately place blame on the nearest adult, *all of it* was needed and the failure to present *any part* of it was constitutionally deficient and extremely prejudicial. Only by providing probable alternative causes for *each and every one of Mariah's old injuries* could one reasonably hope to convince the jury of the truth – that notwithstanding her involuntary statement Melissa had *never* beaten or abused Mariah and that Mariah's death was instead the result of an unfortunate tumble down a flight of stairs – and obtain her acquittal.   Accordingly, Gilman's failure to subject the State's *entire* theory of the case – not just its theory as to the cause of Mariah's final fatal head injury – to meaningful adversarial testing served no conceivable purpose beneficial to Melissa's defense.  But for Gilman's failures there is a reasonable probability that the result of the proceeding would have been different. Indeed, by shifting the blame for Mariah's old injuries away from himself in similar fashion, Melissa's husband and co-defendant Robert Alvarez obtained a conviction only of injury to a child and received a mere three year sentence that has already been completed.   Accordingly, the CCA's decision to deny relief constituted an unreasonable application of of *Strickland*.   *See Ex parte Ybarra*, 629 S.W.2d 943(Tex. Crim. App. 1982) (failure to make independent investigation or interview potential witnesses resulting in failure to advance viable defense at trial deemed deficient, reasonable probability existed the result of the proceeding would have been different); *Cantu v. State*, 993 S.W.2d 712, 718 (Tex. App. – San Antonio, 1999); *McFarland v. State*, 928 S.W.2d 482,

501 (Tex. Crim. App. 1996) (en banc), abrogated on other grounds.

> GROUND FOUR: The trial court deprived Melissa of the constitutional right to present a complete defense when it excluded the testimony of defense experts during the guilt/innocence phase of trial.

During the guilt/innocence phase of trial, Gilman proffered the testimony of Norma Villanueva as an expert to testify regarding the meaning of Melissa's body language during her interrogation and regarding the relevance of Melissa's CPS records and how they reflected on the cause of Mariah's death. The trial court found Villanueva unqualified to testify as a body language expert, 35 RR 136, and disallowed Villanueva's testimony regarding her analysis of Melissa's CPS records.  35 RR 136-138. Had she been allowed to offer evidence, Villanueva would have testified about three separate issues:

> (1) "patterns of behavior with Mrs. Lucio which strongly influenced her behavior during that videotaped statement process with the investigators that night,"

> (2) "patterns of behavior as seen in the Child Protective Services records, the patterns in her family, how that influenced her decision making and how she felt with the different investigators, male and female, and also haw she makes her life decisions. It influenced her behavior in that -- how she felt with the different investigators male and female and how she made her decisions in answering the questions during that process," and

> (3) "looking at her CPS history, how – and also her social history , how she deals with different people in levels of authority , and also how that influenced her body language, and how body language is interpreted in different ways if you do not have her history of behaviours or patterns of behavior or her social history."

35 RR 142-143. See also DX 13-18 (admitted for Bill of Particulars No. 1 only).

During the guilt/innocence phase of trial, Gilman also proffered the testimony of Dr. Pinkerman as an expert to testify regarding his psychological evaluation of Melissa, her social history, and her video statement in regards to "propensity for violence" Gilman explained that part

of Dr. Pinkerman's testimony would be that Melissa had "all of the signs of being a battered woman"

and that "as a battered woman, she takes blame for everything that goes on in the family," and that

"if dealing with a male figure such as a husband she doesn't find fault with anything that a husband

does, she takes the blame for it." 35 RR 187-188. The trial court disallowed Dr. Pinkerman's

testimony regarding Melissa's "propensity for violence" and diagnosis of Battered Woman

Syndrome[47] as irrelevant to the issue of guilt or innocence. 35 RR 187-188. For purposes of the

record, Dr. Pinkerman summarized his guilt/innocence phase testimony as follows:

> On the basis of my review of information, consultation with additional experts, and
> the evaluation that I have done with the defendant Mrs. Lucio, I was going to testify
> about the characteristics and makeup of her psychological functioning. I was also
> going to address how her demeanor, both immediately after the incident and during
> the interrogation, may be understood by understanding and appreciating the
> psychological elements and previous history and background that she has lived
> through. I was also going to address the notion of how difficult it might have been
> for her to step into some of the treatment, even though it was minimally offered.

35 RR 195. See also DX 24 (admitted for Bill of Particulars No. 2).

On direct appeal Melissa argued that the trial court violated her constitutional right to present

evidence as to the circumstances under which her statement to police was made when it excluded

the testimony of defense experts Villanueva and Dr. Pinkerman touching upon whether such

statement could reasonably be deemed voluntary during the Guilt/Innocence phase of trial.

See Appellant's Brief at 101-107 (Points of Error No. 9 and 10). As to Villanueva, the CCA rejected

Melissa's point of error on grounds Gilman had failed to make it clear what Villanueva's guilt-phase

testimony would have been so the issue had not been properly preserved. In dicta, the CCA added

---

[47]  Dr. Pinkerman's evidence regarding Battered Woman Syndrome was admitted in
limited part during the punishment phase, 37 RR 219, but by then it was simply too little too
late; the damage was already done.

that it believed that Villanueva's guilt-phase testimony "had little, if any, relevance to a jury's voluntariness determination under state law" and that any error was harmless.  *Lucio v. State*, 351 S.W.3d 878, slip op. at 36-37 (Tex. Crim. App. 2011).  As to Dr. Pinkerman, the CCA rejected Melissa's point of error on grounds his claim on appeal did not comport with Dr. Pinkerman's proffered testimony at trial or with what Gilman claimed he was offering it for so the issue had not been properly preserved.  Again, in dicta, the CCA added that it believed that Dr. Pinkerman's guilt-phase testimony "had little, if any, relevance to a jury's voluntariness determination under state law" and that any error was harmless.  *Lucio v. State*, 351 S.W.3d 878, slip op. at 39-40 (Tex. Crim. App. 2011).

During state habeas proceedings Melissa raised a claim that the State District Court's rulings deprived her of the constitutional right to present a complete defense by excluding expert evidence pursuant to a state evidentiary rule that categorically and arbitrarily prohibited her from offering otherwise relevant, reliable evidence vital to her defense.  State habeas counsel was careful to distinguish the claim raised in those proceedings from the claims previously raised on direct appeal that the trial court abused its discretion by preventing Melissa from presenting evidence regarding the circumstances under which her confession was taken.  *See* Applicant's Brief at 91 n. 36.  State habeas counsel explained that "the instant issue goes to the core of the case – whether Melissa was likely to have engaged in ongoing abuse of Mariah."  *Id.*  In support of her claim Melissa submitted additional evidence in the form of affidavits executed by Villanueva and Dr. Pinkerman, plus a copy of a peer reviewed article on the psychology of false confessions and Villanueva's excluded power point presentation.  *See* Tabs 15 & 16.  In his affidavit, Dr. Pinkerman explains the relevance of his testimony to the guilt/innocence phase of Melissa's trial. He states:

The family's history indicated that several children had behavioral disorders marked by severe aggression against siblings. Prior medical records as well as CPS records suggest that there were bite marks on the children while the children were in foster care before Mariah's death. *The historical record offered little support for the idea that Ms. Lucio physically abused her children.* * * * If I had been called by defense counsel as a witness I worry [sic] would've offered my general opinions about sibling abuse and the characteristics often associated with mothers who kill their children.

Tab 15 (Affidavit) (emphasis added).

The State District Court made the following Findings of Fact relevant to the instant claim:

39. Applicant's complaint about this Court's exclusion of her mitigation experts from the guilt-innocence portion of the trial is *nearly identical* to issues nine and ten raised on direct appeal. Matters raised on direct appeal should not be re-litigated on habeas unless the judgment is subsequently rendered void or a subsequent change in the law is made retroactive. While additional evidence may warrant relief even when the issue was raised on direct appeal, Applicant has not demonstrated that she is entitled to relief herein because of any additional evidence herein.

40. Moreover, this Court did not abuse its discretion in excluding the testimony of Norma Villanueva and Dr. John Pinkerman from the guilt-innocence portion of the trial. Ms. Villanueva proffered nothing to indicate that she had any sort of specialized experience, knowledge or training in the area of interpreting body language and patterns of behavior during police interviews. Dr. Pinkerman's proffered testimony as to Applicant's psychological functioning, including how there was little support in the "historical record" for the idea that Applicant physically abused her children, that she suffered from battered woman syndrome, and the meaning of her demeanor after the incident and during questioning had no relevance to the question of Applicant's guilt or innocence.

Accordingly, the State District Court recommended the denial of relief , *inter alia*, on grounds that

6. This Court did not abuse its discretion in excluding the testimony of Norma Villanueva and Dr. John Pinkerman.

The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief. *Ex Parte Client Name*, WR-72,702-02.

**A.      The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings**.

A criminal defendant is entitled to an opportunity to explain himself and present evidence on his behalf. *See United States v. Scheffer*, 523 U.S. 303, 329 n. 16, 118 S.Ct. 1261 (1998); *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528 (1984)). Indeed, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 298, 93 S.Ct. 1038 (1973) (citations omitted); *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920 (1967).  Jurors, too, are entitled to have the benefit of the defense before them so that they can make an informed decision regarding the weight to be given the witness's testimony, though they may ultimately reject the theory.  *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105 (1974).  Thus, although the trial judge has discretion in determining whether the evidence is to be admitted or excluded, *see Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002), a criminal defendant's constitutional right to present a complete defense is violated by the exclusion of evidence pursuant to a state evidentiary rule that categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence that is vital to his defense.  *See Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727 (2006) (rule did not rationally serve any discernible purpose); *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S.Ct. 2704 (1987) (rule arbitrary); *Chambers*, 410 U.S. at 302–303, 93 S.Ct. 1038 (no explanation regarding reason for rule); *Washington*, 388 U.S. at 22, 87 S.Ct. 1920 (rule could not be rationally defended). A federal court may grant habeas relief based on an erroneous state court evidentiary ruling which violates a specific federal constitutional right or is so egregious that it renders the petitioner's trial fundamentally unfair. *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir.2005) (citing

*Castillo v. Johnson*, 141 F.3d 218, 224 (5th Cir.1998).

**B.    The CCA's Decision Did Not Address Melissa's Constitutional Claim and Is Not Entitled to Deference under the AEDPA.**

Initially Melissa notes that the CCA's adopted Findings of Fact asserted that her claim was "nearly identical" to Points of Error 9 and 10 raised on direct appeal and matters raised on direct appeal generally should not be re-litigated on habeas.  However, "nearly identical" is not "identical." For example, an objection based on evidentiary hearsay rules does not necessarily preserve a constitutional claim on the confrontation clause (or vice versa).  *See California v. Green*, 399 U.S. 149, 155, 90 S. Ct. 1930, 1933 (1970) (rejecting notion of complete overlap of the two concepts and collecting cases in which a confrontation clause violation was found despite proper admission under hearsay rules); *United States v. Chau*, 426 F.3d 1318, 1321-22 (11th Cir. 2005).  Thus, although claims based on state evidentiary rules may be "nearly identical" to claims based upon constitutional principles they are not "identical" and, if both are raised, must be addressed independently under the appropriate and applicable legal standards.  Accordingly, the CCAs attempt to resolve Melissa's constitutional claim by refusing to "relitigate" a previously rejected state evidentiary rule claim was contrary to Supreme Court precedent.  Melissa was entitled to have her constitutional claim addressed independently and under the appropriate applicable legal standard, which is *not* the "abuse of discretion standard."  *See supra* Ground Four § A discussing the proper standard of review.

Despite the alleged similarity of claims, the CCA did not invoke a procedural bar but rather rejected Melissa's constitutional claim on the merits. Specifically, it did so on grounds the State District Court "did not abuse its discretion in excluding the testimony of Norma Villanueva and Dr. John Pinkerman."  As has just been discussed however, where the issue is not raised under state

105

evidentiary rules, but rather under constitutional principles, the trial court's discretion is trumped by the constitutional right.  Because the CCA failed even to acknowledge, much less apply, the proper constitutional standard its decision is not entitled to deference under the AEDPA.  28 U.S.C. § 2254(d). Instead, the claim is reviewed *de novo*.  *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527 (2003).

**C.     The State District Court deprived Melissa of the Constitutional Right to Present a Complete Defense When it Excluded the Testimony of Her Defense Experts During the Guilt/innocence Phase of Trial.**

A rule ensuring that only reliable evidence is presented at trial serves a legitimate interest and does not unconstitutionally abridge the right to present a defense. *See United States v. Scheffer*, 523 U.S. 303, 309, 317 (1998). The rule against irrelevant evidence is such a rule. However, the evidence at issue here was not irrelevant to the issue of Melissa's guilt or innocence. In *United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996), the Seventh Circuit held that expert testimony that the defendant had a disorder that may have caused him to make a false confession should have been admitted during the guilt/innocence phase of trial. In *United States v. Cohen*, 510 F.3d 1114 (9th Cir. 2007), the Ninth Circuit held that the trial court improperly prevented defense psychologist from testifying about a personality disorder affecting defendant's ability to form intent during the guilt/innocence phase of trial. And in *Kaps v. State*, 1998 WL 209060 *8 (Tex. App. - Dallas, 1998) (not designated for publication), a Texas Court of Appeals held that testimony by defense psychologist that defendant's psychological profile showed that he was not a typical physically abusive man or one who used physical means to control his family was relevant to whether defendant shook his child causing a seizure should have been admitted during the guilt/innocence phase of trial. Moreover,

106

while testimony by Melissa's CPS case workers was both necessary and appropriate to her defense,[48] such testimony would not have been an adequate substitute for the type of overarching analysis proffered by Villanueva and Dr. Pinkerman. Villanueva and Dr. Pinkerman could have analyzed the evidence presented by CPS Caseworkers and CPS documentary records regarding Melissa's social history and psychological profile to demonstrate that she was submissive and abused – not aggressive and an abuser. Just as in the *Hall*, *Cohen*, and *Kaps* cases, such evidence was relevant to attack the credibility of the State's case by demonstrating that Melissa did not have the propensity to commit violence against Mariah typically expected of someone who had actually killed their child. Without it, the jury was unable to make an informed decision regarding the weight to be given the State's evidence of ongoing abuse. Accordingly, the State District Court violated Melissa's right to present a complete defense when it disallowed her expert's testimony during guilt/innocence as irrelevant.

> GROUND FIVE: Melissa Lucio was deprived of effective assistance of trial counsel guaranteed by the United States Constitution when her trial counsel failed to file proper pre-trial motions regarding, or otherwise timely object to, improper and highly prejudicial testimony.

According to Melissa's defense theory of the case, Mariah's death was the unfortunate result of a fall down a flight of stairs a few days before her death. Tab 9 (Affidavit ¶ c). According to the State's theory of the case, Melissa was Mariah's sole caregiver and repeatedly abused her over a period of 88 days culminating in a final, fatal beating. 32 RR 15-18; 36 RR 17-20, 39-57. During state habeas proceedings Melissa raised ten claims of ineffective assistance of trial counsel specifically relating to trial counsel's failure to raise proper objections. Five of these claims are not

---

[48] *See* Discussion *supra* Ground Three.

cognizable in federal habeas because the CCA determined that the complained of evidence was admissible under state evidentiary rules and the claims did not raise other constitutional concerns. The remaining claims were:

D. Trial counsel failed to challenge the State's use of information obtained through custodial questioning by CPS Therapist Beto Juarez after Melissa's arrest, without a contemporaneous Miranda waiver, and without counsel present.

E. Trial counsel failed to challenge Dr. Farley's improper "expert" testimony as scientifically invalid, subjective, and conclusory.

F. Trial counsel failed to challenge the State's "Shaken Baby Syndrome" evidence as junk science, sheer speculation, and more prejudicial than probative.

G. Trial counsel failed to object to Dr. Farley's improper testimony regarding the results of forensic examinations conducted by nontestifying experts.

J. Trial counsel failed to object to the State's punishment phase questions regarding Melissa's prior, unrelated DWI conviction even though evidence of that conviction had never been admitted.[49]

The State District Court entered Findings of Fact specific to each of the ten claims[50] to the universal effect that the complained of evidence was all properly admissible.  Accordingly the State District Court recommended the denial of relief as to all on grounds that:

3. Applicant has failed to show that her counsel's performance was deficient in any manner.

4. Moreover, in the cases where Applicant alleges deficiency of counsel, she has failed to show that the outcome of the trial would have been different had defense counsel acted in the manner she alleges would have been appropriate in the situation.

5. Applicant has not overcome her burden to show that defense counsel's actions

---

[49]  These claims are discussed under § B of this ground as 1 through 5.

[50] The State District Court's Findings of Facts specific to each claim are not recited here in their entirety, but are recited discussed as necessary and appropriate in the legal analysis which follows.

were not sound trial strategy.

The CCA adopted the trial court's Findings of Fact and Conclusions of Law and denied relief.  *Ex Parte Client Name*, WR-72,702-02.

**A.**     **The *Strickland* Standard and the Standard of Review in Federal Habeas Proceedings.**

Trial counsel's performance is judged by the familiar *Strickland* standard. *See supra*, note 30 and accompanying text. Under that standard, trial counsel has a duty to object to harmful trial testimony that could have been excluded upon proper objection. *See, e.g.*, *Williamson v. State*, 771 S.W.2d 601, 607 (Tex. App. - Dallas 1989); *Weathersby v. State*, 627 S.W.2d 729 (Tex. Crim. App. 1982). *See also Martin v. Maxey*, 98 F.3d at 848.  However, the erroneous admission of evidence does not merit federal habeas relief unless it is a crucial, critical, highly significant factor that renders the trial as a whole fundamentally unfair.  *Cupit v. Whitley*, 28 F.3d 532 (5th Cir. 1994); *Pemberton v. Collins*, 991 F.2d 1218 (5th Cir.), cert. denied, 510 U.S. 1025 (1993); *Thomas v. Lynaugh*, 812 F.2d 225 (5th Cir.), cert. denied, 484 U.S. 842 (1987); *Bigby v. Cockrell*, 340 F.3d 259 (5th Cir. 2003); *Lucas v. Johnson*, 132 F.3d 1069, 1079 (5th Cir. 1998).

A federal habeas petitioner's ineffective assistance of counsel claims are subject to *de novo* review and this Court is required to grant deference to the State District Court's Findings of Fact only to the extent they are plausible in light of the record as a whole. *Ramirez*, 396 F.3d at 649, *Rivera*, 505 F.3d at 361-63.

**B.**     **The State Court's Decision to Reject of Melissas's Ineffective Assistance of Counsel Claims Was an Unreasonable Application of Supreme Court Precedent.**

    **1. Gilman failed to challenge the State's use of information obtained through custodial questioning by CPS Therapist Beto Juarez after Melissa's arrest, without a contemporaneous Miranda waiver, and without counsel present.**

To reiterate the pertinent facts Mariah Alvarez died on Saturday, February17, 2007. Following a lengthy interrogation that evening, Melissa was arrested for capital murder and detained. SX 5 (arrest); I CR 12 (Melissa in custody). Melissa was formally indicted on May 16, 2007. I CR 9-10. She was arraigned and received appointed legal counsel on May 31, 2007. I CR 11, 14.  On February 14, 2008, and May 5, 2008, CPS sent Therapist Beto Juarez to "treat" Melissa. Tab 7; 33 RR 190-191. The State did not notify Melissa's trial counsel that it intended to send an agent to talk to Melissa, neither of Melissa's trial counsel were present during the interview, and Juarez did not advise Melissa of her Miranda rights. Following the "therapy" sessions Juarez provided written reports to CPS who, in turn, provided those reports – including Melissa's statements – to the Cameron County District Attorney prosecuting Melissa's case. See Tab 7; 33 RR 190-191. Pinkerman brought the conflict of interest to Gilman's attention before trial. Tab 15 (Affidavit).

During the punishment phase of the ensuing capital murder trial, Gilman objected to admission of Juarez's reports and the objections were sustained. 38 RR 36, 30-31. Nevertheless the State referred to both the existence and substance of Juarez's reports when he questioned Mitigation Expert Norma Villanueva..

    Q. (By Mr. Padilla) So if Mr. Juarez is told by Mrs. Lucio that she had not been sexually abused as a child, how would that have changed your opinion?

    A. It would have made me delve deeper.

    Q. So what you are telling me is that your opinion is based on insufficient evidence;

isn't that correct?

A. That's incorrect.

38 RR 31.  Juarez was an agent of the prosecution. *See* Discussion *supra* Ground One § C.  The State used the substance of Melissa's alleged statements to Juarez to attack her mitigation expert's opinion as based on insufficient evidence.

On direct appeal, Melissa argued that it was a violation of her rights to counsel, to a fair trial, and to confront witnesses for the trial court to admit Juarez's interview notes and to admit Melissa's alleged statements to Juarez that she had not been sexually, physically or verbally assaulted. *See* Appellant's Brief at 118-128 (Points of Error No. 12 & 13).  In so doing, Melissa argued that Gilman's general objection preserved the error for review in that forum. *See* Appellant's Brief at 121, citing *Powell v. State*, 663 S.W.2d 465, 466-467 (Tex. App.–Houston[1st Dist.]1983, no pet.).  The CCA overruled both Points of Error.  As to admission of Juarez's notes, the CCA stated, "[t]his record reflects that Juarez's notes were not admitted into evidence as appellant seems to claim." *Lucio v. State*, 351 S.W.3d 878, slip op. at  (2011).  As to admission of Melissa's alleged statements to Juarez, the CCA rejected Melissa's argument that a general objection was sufficient to preserve error.  Specifically the CCA stated:

> This record also reflects that appellant * * * made no objection to the State using this information to impeach Villanueva and Pinkerman. To the extent that appellant may have objected to the State using this information for impeachment purposes, she objected only on the basis of hearsay. Her objections in no way alerted the trial court to any claim that the State's use of this information violated her Sixth Amendment right to counsel, her Sixth Amendment right to confront the witnesses against her or any other of her constitutional rights. Appellant, therefore, failed to preserve these claims for appellate review.

*Lucio v. State*, 351 S.W.3d 878, slip op. at 53 (2011).

111

During state habeas proceedings Melissa argued that Gilman was ineffective in failing to challenge the State's use[51] of information obtained through custodial questioning by CSP Therapist Beto Juarez after Melissa's arrest, without contemporaneous *Miranda* waiver, and without counsel present. Applicant's Brief at 109-111.  More specifically Melissa argued that Gilman failed to seek an order *in limine* prohibiting the State from referring to the existence of the reports as obtained in violation of Melissa's right to counsel, failed to object to the State's cross-examination on grounds the prosecutor's questions were based on facts not in evidence, and failed to make a proper Confrontation Clause objection to the discussion of Juarez's reports.  Applicant's Brief at 111. The State District Court entered two Findings of Fact relevant to Melissa's claim. Specifically, the State District Court found that:

> 45. Defense counsel was not ineffective for failing to object to questions regarding CPS interviews of Applicant conducted by Dr. Beto Juarez for the reasons set forth in Finding of Fact No.5 herein.

To reiterate for this Court's convenience, Finding of Fact No. 5 stated:

> 5. Therapist Beto Juarez, a CPS contractor, was not working in tandem with police at the time he interviewed Applicant. He was retained by CPS to offer mental health counseling, not to interrogate her. The police were not able to see the reports made by Juarez, as they were confidential. Juarez was not directed by the police. The purpose of his visits were non-investigatory. Therefore, Juarez was not an agent of the State such that he was required to Mirandize Applicant before speaking to her, or in any other way comply with Art. 38.22 of the Texas Code of Criminal Procedure.

The CCA adopted the State District Court's Findings of Fact and denied relief.  *Ex Parte Client Name*, WR -72,702-02 .

The CCA's adjudication of Melissa's claim resulted in a decision that was an unreasonable

---

[51] Melissa challenged it's "use" not it's "admission" as documentary evidence as was done on direct appeal.

application of Supreme Court precedent.  The CCA did not dispute Melissa's assertion that Gilman had a duty to object to harmful trial testimony that could have been excluded upon proper objection, but rejected the claim on grounds the complained of evidence could not have been excluded because Juarez "was not an agent of the State" and his visits were "non-investigatory."  As has been discussed more fully *supra* under Ground One § C, these Findings of Fact are not merely wrong, they are objectively unreasonable in light of the undisputed evidence.  Gilman thus had a duty to object to the State's use of that evidence in any way that would be harmful to Melissa's defense and his failure to do so constituted deficient performance.  And the State did, in fact, use it in a way that would be harmful to Melissa's defense during the punishment phase of her trial.

To reiterate a salient point, the State's evidence of Melissa's future dangerousness was weak. According to CPS records, Melissa's minor children – including Mariah – had been placed in foster care due to passive neglect, *not* physical abuse. DX 23 (The Burke Foundation 90- day Treatment Plan dated 6/20/2005 - Familial Assessment / Summary).  While the children were in foster care after Mariah's birth Melissa had weekly supervised visits. The details of those visits were documented on standardized forms.[52] A sampling of those reports reveal – among other things – that Melissa demonstrated affection and concern for the well-being of her children; that Melissa had no particular ill will towards Mariah and at times doted on her causing the other children to become jealous; and that Melissa utilized non-violent methods of discipline such as withholding treats and redirecting the children to other activities.  Other witnesses had also indicated that Melissa was not an aggressive person and "never disciplined" her children for their bad behavior – much less beat them. 35 RR

---

[52]  Copies of the selected CPS records were provided to the State Court in the Appendix at Tab 17, and discussed at length in her state writ brief.  *See* Applicant's Brief at 50-54.

95-96.  Presumably because of this, Alfredo Padilla admitted in sworn testimony before this Federal District Court that the Cameron County District Attorney's Office had to spend "a lot of time" on the issue of Melissa's future dangerousness.  Indeed, during his testimony Padilla  initially indicated that they "were having trouble" with it.  *USA v. Villalobos*, 1:12-CR-374, District Court Document Number 242 at 26-27.  Given the limited evidence of Melissa's future dangerousness –  to anyone – discrediting defense evidence that Melissa's social history had included sexual, physical, and verbal abuse which might engender sufficient sympathy with the jury was critical to the State's case on punishment. Because Gilman failed to object to the State's use of evidence obtained in violation of Melissa's constitutional rights in a way that was  crucial, critical, highly significant factor during the punishment phase of her trial, she is entitled to federal habeas relief.

## 2.  Gilman failed to challenge Dr. Farley's improper "expert" testimony as scientifically invalid, subjective, and conclusory.

Prior to trial, the State disclosed Dr. Farley as its expert in forensic pathology. I CR 79.  Dr. Farley's autopsy report concludes, *inter alia*, that "[t]he manner of death is homicide." SX 36 at 2. Gilman filed neither a *Daubert* motion (to assess the nature and scope of Dr. Farley's expertise, question her scientific methodology, and assess the validity of her conclusion), nor a motion *in limine* (to limit the scope of her testimony).[53] During trial, Gilman objected to admission of the autopsy report because Dr. Farley was available to testify and because her report contained copies of reports from other non-testifying experts, but not because it contained a scientifically invalid conclusion, was speculative, and invaded the province of the jury. 34 RR 39, 43, 45.

---

[53]  Gilman did file a motion to depose Dr. Farley. I 47 CR 74. However, a deposition is strictly a discovery mechanism whereas a *Daubert* hearing serves a different and slightly broader purpose. One is not a substitute for the other.

During trial, Dr. Farley testified, in relevant part, as follows:

Q. [Mr. Padilla] How long did it take to perform the autopsy on Mariah Alvarez?

A. [Dr. Farley] You know, just estimating probably about six hours.

Q. And why the length of six hours?

A. The external examination is where we look at the outside of the body, and we try to document any injuries that might be present.  And the external on this case took -- you know -- about four hours.

Q. Why was that?

A. Because of the number of contusions and abrasions on the body, it took a long time to actually look at them and try to measure them, and then to try to take pictures of them so that they would show up fairly well. It took quite a long time.

Q. I mean, there's no scale for abuse. There's not -- like -- moderate to severe. But how would you classify -- you know the signs of this child's abuse throughout the body?

A. This child was severely abused. I mean, it would have been evident to a first year nursing student. I mean, there are bruises – there are contusions -- and that's a bruise -- basically that's hemorrhaging into the tissue of the body. And we've all had bruises. So you kind of know what they look like. But this child had bruises all over the body. I mean -- all over.

34 RR 11 (emphasis added). Gilman did not object.

Q. [Mr. Padilla] And the form and manner of death was, what, Doctor?

A. [Dr. Farley] The manner was homicide.

Q. Homicide? Murder?

A. Yes.

34 RR 25 (emphasis added). Gilman did not object.

During state habeas proceedings Melissa argued that, had Gilman filed a *Daubert* motion and

requested a hearing, Dr. Farley's testimony and autopsy report could have been excluded in their

entirety – or at least insofar as they purported to blame Mariah's injuries and death on abuse. Applicant's Brief at 114.  In support of her argument, Melissa submitted the autopsy report and affidavit of an independent forensic pathologist, together with a power point presentation and several scholarly articles relevant to the issue.  *See* Tab 12.  The State District Court entered a single Finding of Fact relevant to this issue. Specifically, the State District Court found that:

> 46. Defense counsel was not deficient for failing to challenge Dr. Farley's expert testimony as "scientifically invalid, subjective and conclusory."   Dr. Farley thoroughly explained the basis for her opinions as a long-practicing pathologist, and Applicant has failed to show this Court that such testimony was in any way "scientifically invalid, subjective and conclusory."

The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief.  *Ex Parte Client Name*, WR-72,702-02.

The CCA's adjudication of the claim resulted in a decision that was an unreasonable application of Supreme Court precedent.  *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S.Ct. 2786 (1993), requires that expert testimony be both reliable and relevant to the case. 509 U.S. 579. The factors relevant to assessing the reliability of scientific expert testimony are: (1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability, (2) whether the technique or theory has been subject to peer review and publication, (3) the known or potential rate of error of the technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) whether the technique or theory has been generally accepted in the scientific community. *Id.* (emphasis added).

Texas courts employ the Supreme Court's *Daubert* standard. Thus, had Gilman filed a

116

*Daubert* motion and requested a hearing Dr. Farley's testimony and autopsy report could have been excluded in their entirety – or at least insofar as they purported to blame Mariah's injuries and death on abuse. In the forensic context, different events (antecedents) can lead to the same physical evidence(consequences). For example, according to Dr. Farley bruises all over the body could be caused by a fall from a "significant height" that was not "simple," 34 RR 35, and that individual bruises could have been caused by "a slap, or – anything," 34 RR 19. Also according to Dr. Farley, blunt force trauma to the head causing death could be caused by a fall down the stairs, 34 RR 55, an impact with a piece of furniture or the floor, 34 RR 38, or by non-accidental head trauma, 34 RR 53. For this reason, an expert employing proper scientific method can state whether a witness account is consistent with the physical evidence, *see generally* 35 RR 26-28 (Kuri testifying that the "most important part for any doctor" in assessing an injury is the "history of the patient"), but cannot reliably surmise past events from physical evidence. To do so is to commit a formal logical fallacy known as the fallacy of affirming the consequent.[54] Tab 12 at 79 (Putting it All Together). In other words, proper scientific method does not permit one to "reason backwards" from a consequence and select its cause from among many possible causes. *See* Tab 12 at 69 (Classical Mistakes in Forensic Pathology); Tab 12 at 79 (Putting it All Together).

Dr. Farley's testimony and autopsy report both erroneously "affirm the consequent." Dr. Farley's testimony purports to surmise that Mariah was repeatedly and severely physically abused strictly from physical evidence obtained during Mariah's autopsy. Moreover, Dr. Farley reaches this conclusion in the complete absence of any witness to such physical abuse and despite admitting to

---

[54] There are two exceptions to this general rule, neither of which apply here: (1) where the antecedent and consequence are the same thing, and (2) where only one plausible explanation exists. *See* Tab 12 at 79 *et seq.*

the existence of possible alternative explanations for essentially all of Mariah's individual injuries. Consequently, Dr. Farley's scientific method was invalid and her testimony that Mariah was "severely abused," 34 RR 11, and that the cause of her death was "homicide," SX 36 at 2; 34 RR 25, inadmissible under *Daubert* as subjective and conclusory.[55] See, e.g., 35 RR 67, 87-88 (Kuri testifying that the specific cause of Mariah's fatal injury is "anybody's guess"); Tab 12 at 9-23.

Because Dr. Farley's testimony that Mariah was "severely abused" and that her death was a "homicide" was subjective – not scientific – and because Dr. Farley's status as a "long-practicing pathologist'" does not cure the defect in her scientific methodology, the CCA's decision that Gilman was not deficient in failing to seek to exclude it was unreasonable. Given the severity of the charge and probability of a death penalty upon conviction, no reasonable attorney would have failed to seek exclusion of such evidence by any – and every – legally available method.

_____

[55] Federal Habeas Counsel submits that Dr. Farley herself might agree that problems in her pathology department at the time of Mariah's autopsy affected her report and rendered it of questionable scientific value. Dr. Farley resigned as Cameron County's forensic pathologist in October of 2010. According to her resignation letter (which was widely reported in local news media), Dr. Farley intended to stop doing autopsies for Cameron County due to her concerns over how bodies had been transported to the pathology department (*e.g.* some without body bags) plus a "lack of investigative information on bodies received at the morgue and recently lack of cooperation by a few agencies on items requested at time of autopsy from the investigative agency for a complete forensic investigation." Her resignation letter goes on to state that "since scene investigative information and certain items related to the injuries on the decedent are needed as part of my autopsy report, I do not see a way of resolving these issues." *See* http://www.themonitor.com/article_aacad3d0-cf8e-528c-9eb9-e06bee17dbcd.html (reporting on Dr. Farley's resignation).

The problems outlined by Dr. Farley in her resignation letter tend to confirm Melissa's arguments that, without "investigative information" about, *e.g.*, Mariah's history of self-injury including her tendency to climb things and fall, about significant sibling on sibling violence including biting and hitting, and about Mariah's recent fall down a flight of wooden stairs onto a concrete pad, her opinion that Mariah was severely physically abused lacked the scientific validity required by *Daubert*. The problems also suggest that any of Mariah's injuries which could only be determined to have occurred around the time of her death may be attributable to the improper handling of her body by EMTs and others during transport.

Gilman's deficient performance resulted in prejudice to Mariah's defense. Indeed, the erroneous admission of Dr. Farley's scientifically unsound testimony was a crucial, critical, highly significant factor that rendered Melissa's trial fundamentally unfair. Dr. Farley's testimony was extremely damning and essentially instructed a "guilty" verdict. There is a reasonable probability that, but for Gilman's deficient performance, the jury would have granted more credence to Melissa's explanations for Mariah's old injuries as the result of accidents and sibling on sibling violence, and believed that Mariah's fatal head injury and contemporaneous bruises were the result of an accidental tumble down a steep flight of stairs and impact upon a concrete landing at the bottom. SX 3. This would have been especially true if Gilman had corroborated Melissa's explanation with the wealth of evidence available. *See supra* Ground three and evidence cited therein.   Accordingly, Melissa is entitled to federal habeas relief.

### 3.   Gilman failed to challenge the State's "Shaken Baby Syndrome" evidence as junk science, sheer speculation, and more prejudicial than probative.

During Melissa's capital murder trial, Dr. Vargas testified that it was "possible" to cause brain injury to a child by shaking, 32 RR 78-79, Ranger Escalon demonstrated on the prosecutor how an adult could cause head trauma to an infant by shaking, 33 RR 134-142, and Dr. Farley testified that Mariah was "severely abused," 34 RR 11.  Gilman neither challenged the State's "Shaken Baby Syndrome" evidence as junk science, nor objected to Ranger Escalon's demonstration.[56]

During state habeas proceedings Melissa argued that Gilman was deficient in failing to

---

[56] Gilman's only objection to the State's evidence in this regard was, "There was never any testimony – there was never any testimony that Melissa Lucio ever struck this child in the back of the head," 33RR 134 (emphasis added), *not* that there was never any competent expert testimony that Melissa Lucio ever *shook* this child.

challenge the State's "Shaken Baby Syndrome" evidence as junk science, sheer speculation, and more prejudicial than probative.  Applicant's Brief at117-119.  The State District Court entered a single Finding of Fact and relevant to the claim.  Specifically, the State District Court found that:

> 47. Defense counsel was not deficient for failing to object to the State's evidence of the victim being shaken as "junk science, sheer speculation and more prejudicial than probative." Shaken-baby syndrome was at best an ancillary issue at the trial. The medical experts in this case agreed that the victim was not killed by shaking, but rather blunt force trauma to the head. Because the "shaking" issue was of so little importance during the trial, Applicant has failed to show that defense counsel erred in not objecting to this testimony, and there is no reasonable probability that the outcome would have been different had this limited evidence not been introduced.

The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief.  *Ex Parte Lucio*, WR-72-702-02.

The CCA's adjudication of the claim resulted in a decision that was an unreasonable application of *Strickland*.  At the time of Melissa's trial, challenges to Shaken Baby Syndrome were hardly novel.  The scientific community had begun to seriously question Shaken Baby Syndrome as junk science at least five years earlier, *see* Tab 11 (collecting articles), and attorneys in other cases had paved the way, *see, e.g.*, Tab 11 at 65 (Motion to Exclude & Appendix filed in Dallas County Case February 17, 2006).  Even the courts were taking notice.  *See, e.g., Lutze v. Sherry*, 2010 WL 3398489 (Mich. S.Ct., Aug. 25, 2010) (not designated for publication) (suggested in dicta that: "An attorney with a client accused of killing an infant through Shaken Baby Syndrome today, depending on the facts of the case, might have a duty to challenge the validity of the science."). More recently, Travis County District Judge Jon Wisser recommended *acquittal* (not even a new trial) for Cathy Lynn Henderson who had been convicted of capital murder in the death of a 3-month-old on grounds of scientific discoveries into the causes of head trauma suggesting that the trial testimony  of the

State's medical expert had been "scientifically flawed."  Accordingly, the CCA's adopted Findings of Fact do not suggest that there was no basis for objecting to the State's Shaken Baby Syndrome evidence, or that if made the objection would have been overruled.  Instead the CCA rests its decision on the Finding of Fact that Shaken Baby Syndrome was "at best an ancillary issue at the trial" and so even if the objection had been made and sustained the result of the trial would not have been different.

The CCA's Finding of Fact was unreasonable in light of the record before it.  Melissa was indicted for intentionally or knowingly causing the death of Mariah Alvarez by "striking, *shaking*, or throwing" Tab 1; I CR 9 (emphasis added). At the time of trial the State made no request to drop the shaking allegation from the indictment.  The State's case-in-chief took just two-and-a-half days. During that brief time, the State elicited testimony from both Dr. Vargas and Ranger Escalon regarding "Shaken Baby Syndrome" and also provided the jury with a graphic visual demonstration. Dr. Vargas testified:

> Q Is it possible to create brain injury to a child by shaking him severely?
>
> A Yes.
>
> Q And, again, there is a term calledd , "Baby Shaking Syndrome"?
>
> A "Shaking Baby Syndrome"? Yes.
>
> Q That results from shaking the child so severely that the brain inside the skull does what?
>
> A It is shaken inside, also, and as it 's being shaken, it's hitting the skull. So when the brain is shaken really quickly like that , the brain is just moving back and forth and getting hurt inside the skull.

32 RR 78-79.  The topic was discussed again – repeatedly – with Ranger Escalon who also

performed a graphic physical demonstration on District Attorney Villalobos himself how an adult

could cause head trauma to an infant by shaking.

Q Can you specifically describe what you describe how shaking could cause head trauma?

A When you grab, especially a little girl like that by the arms, and you shake, it's going to shake your brain. And -- I'm not a doctor, but my experience of what I've seen, and what my time has told me in law enforcement, and what has told me, shaking -- the brain shakes. This little girl is dehydrated, she's malnourished, and she's verily fragile. It doesn't take much for her to fall apart. And the injuries that she was discussing -- or the injuries that she caused, indirectly, could cause damage to the brain by grabbing, shaking her, shaking her, and beating her.

MR. VILLALOBOS: May I have him demonstrate it on me –

THE COURT: Sure.

MR. VILLALOBOS: -- without injuring me?

THE WITNESS: (Demonstrates on the District Attorney)

* * * *

Q So you say by grabbing the arms?

A Grabbing the arms and shaking side by side, and with the level of how unhealthy she was, it wouldn't take much for her to fall apart.

* * * *

Q (By Mr. Villalobos) I am asking from your knowledge -- you're making a global statement that there is no evidence that the baby was shaken. I want to know:  How you can make such a statement?

A Well, based on overall -- on the overall part of the investigation and it's consistent with a baby being ' shaken. The injuries that Melissa caused to Mariah are consistent with the baby being shaken. Yes.

* * * *

Q As well as the evidence that she shook the child?

122

A It would lead to believe that what she did, those injuries led to the trauma, yes, sir. And I had mentioned that earlier before.

33 RR 134-142.  During closing arguments the State even argued:

We also had to prove in this case that the defendant killed Mariah by striking her, by beating her, by throwing her, by *shaking* her. * * *  That's exactly what she did. Even their own expert tells you there was hemorrhages in her eyes.  *That is the result of being shaken*, and beaten.

36 RR 19.

Given the amount of attention paid to the topic of Shaken Baby Syndrome during a blazingly fast capital murder trial, the CCA's finding that it was merely an "ancillary issue" which would not have affected the outcome of the trial is implausible.  Had Gilman challenged such evidence as "junk science" the jury might reasonably have been expected to question the validity of the rest of the State's purported scientific evidence regarding the specific causes of Mariah's injuries and ultimate death.  This would be even more true if, as Melissa has argued, Gilman *also* obtained the assistance of an independent forensic pathologist to challenge Dr. Farley's testimony and presented witnesses and other evidence of probable alternative causes for Mariah's many other injuries.  In short, Gilman's deficient performance was prejudicial and, just as Judge Wisser acknowledged in *Ex parte Henderson*, there is a reasonable probability that had the jury known the State's witnesses were testifying to "junk science" the outcome of Melissa's trial would have been different.

**4.     Gilman failed to object to Dr. Farley's improper testimony regarding the results of forensic examinations conducted by nontestifying experts.**

At trial, Dr. Farley testified on behalf of the State in the expert role of county Medical Examiner.  Dr. Farley attached reports from Laura M. Labey from NMS Labs, Frank Scribbick from Eye Pathology Laboratory, and an unnamed lab technician from the Valley Baptist Medical Center

123

Department of Laboratory Medicine to her own Autopsy Report. During trial, Gilman objected to admission of the autopsy attachments prepared by non-testifying experts and to any reference to the substance of those attachments in the body of the autopsy report. 34 RR 39, 43- 45. The objection was sustained, the State offered to redact, and the report was admitted as redacted. 34 RR 45-46. Notwithstanding the foregoing, during the State's examination of Dr. Farley the following exchange occurred:

Q. [Mr. Padilla] Did you examine the child's eyes?

A. [Dr. Farley] Yes, I did. They were sunken.

Q. What is that indicative of?

A. Usually, it's indicative of dehydration – not getting enough fluid. And I did pull the vitreous from the eyes which is the juice that keeps the eyes open and helps nourish the eyes, and it did show that the child was dehydrated from the electrolytes that we pull from the eyes.

Q. Did the eye itself, or the retina, show any injury to it?

THE REPORTER: I'm sorry?

Q. Did the eye or retina show any injury to it?

A. At these autopsies, most of the time, we will take the eyes – most of you have heard of retinal hemorrhages –

THE COURT: Doctor Farley? Slow down please.

THE WITNESS: Yes, sir. I'm sorry. He is gong to send me to jail.

THE COURT: Once you get into third gear, Mr. Flores can't take you down.

THE WITNESS: We usually hear about retinal hemorrhages, basically, because it goes along with a blunt head force trauma in children. And, so I could already see, basically – we'll take the base of the skull, and look to see if we can see injury to the eyes. And on this child there was hemorrhage around both of the nerves that come from the eyes. So that means there was something, probably, traumatically wrong

with the eyes. So we did remove them. *I send those to San Antonio because there's a specialist – like I'm a forensic pathologist – and he's an eye pathologist. So I''ll send them to him because he'll take photographs of these as well take very thin sections of them, and then give a report to what he sees.  More than just looking in and seeing a retinal bleed, which is just part of the eye where you see blood there. He can then see folds in the retina where the retina has detached and folded onto itself which is, again a sign of significant trauma to the child. And he did see this as well as the optic nerve hemorrhage that I had seen at the autopsy.*

Q. I'll draw your attention back to the bite marks on the child. You said that the mrks were there and appeared to be pulling on the flesh, correct?

A. (Nods head in the affirmative.)

Q. Were you able to determine whether those bite marks appear to be from an adult, or a child?

A. There – the thing with these bite marks, is someone dragged their teeth across it. They looked wide. One of them was 3.2 centimeters. They looked more in the adult size. *But the forensic odontologist – when you drag like that, we cannot match it to somebody. It needs to be a nice, crisp bite mark, with the bottoms of the teeth and maybe with the canines present so that she can get a nice measurement on these bite marks. So on this case, I did call her, but all she could do is just tell me that they're bite marks. The dragging, she wouldn't be able to match an individual.*

34 RR 32-34 (emphasis added). Gilman raised no objections.

During state habeas proceedings Melissa argued that Dr. Farley's testimony regarding the findings of other non-testifying experts violated her right to cross examine witnesses as that right has been defined by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct.1354 (2004), and *Melendez-Diaz v. Massachusetts*, ___ U.S. ___, 129 S.Ct. 2527, 2532 (2009), that Gilman was deficient in failing to object, and that the failure to object could not be attributable to trial strategy.  Applicant's Brief at 119-122.  The State District Court entered two Findings of Fact relevant to the claim – one as to each non-testifying expert. Specifically, the State District Court found that:

48. Defense counsel was not deficient for failing to object to Dr. Farley's testimony regarding the results of an eye pathology report. During her testimony, Dr. Farley made mention that she had personally examined the victim's eyes and saw retinal hemorrhaging indicative of blunt force trauma. She then indicated that she had sent the victim's eyes to an eye specialist, who found the same thing. Because Dr. Farley's own personal observation were substantially the same as that of the specialist, the testimony was cumulative and defense counsel's objecting to it would not have changed the outcome of the case.

49. Defense counsel was not deficient for objecting to Dr. Farley's mention that she had spoke to a non-testifying odontologist who advised her that the marks on the baby were teeth marks. Applicant did not suffer any harm as a result of that brief statement, as the record was already replete with testimony and exhibits showing that the marks were bite marks. Hence, the odontologist's statement that the marks were bite marks was simply cumulative of other testimony. Moreover, allowing the odontologist's findings into evidence was likely a strategic move – the odonotologist could say these were bite marks, but had no evidence to show that Applicant was the one who inflicted them.

The CCA adopted the State District Court's Findings of Fact and denied relief. *Ex Parte Lucio*, WR-72-702-02. The CCA's adjudication of the claim resulted in a decision that was an unreasonable application of Supreme Court precedent.

Initially, it is worth noting that the eye specialist's findings were *not* merely "cumulative" of Dr. Farley's own testimony. As Dr. Farley herself explained, the eye specialist did "more than" just observe the same optic nerve hemorrhage. Rather, the eye specialist viewed folds in the retina where the retina has detached and folded onto itself "as well as" the optic nerve hemorrhage Dr. Farley had personally observed. Dr. Farley then went to explain that this "again" was "a sign of significant trauma." Because the eye pathologist's report went beyond Dr. Farley's own findings to provide new or additional evidence of the alleged abuse it was more than "cumulative." Rather, the eye pathologist's report as testified to by Dr. Farley was clear violation of the Confrontation Clause and *Crawford* and amounted to impermissible bolstering of Dr. Farley's own credibility.

126

Likewise, the forensic odontologist's findings were *not* merely "cumulative" of other evidence.  Although the State had introduced non-expert witness testimony on the subject and an autopsy photograph of the alleged bite marks, none of that evidence could reasonably be deemed to carry the same weight with the jury as the official pronouncement of an "expert" on the subject to the effect that the parallel striations on Mariah's shoulder had been the result of a bite.  For the CCA to even suggest otherwise is contrary to the Supreme Court's *Daubert*[57] rule that experts must be able to assist the jury in their ability to understand or determine a fact already in issue.

Furthermore, allowing the forensic odontologist's damaging findings into evidence in violation of *Crawford* could *not* have been "strategic move."  As Melissa noted during state habeas proceedings, Gilman had raised a Confrontation Clause objection to admission of the autopsy attachments prepared by the eye specialist and the forensic odontologist *and* to any reference to the substance of those attachments in the body of the autopsy report. 34 RR 39, 43- 45.  In light of this fact, the CCA's finding that Gilman's failure to object to the same substantive evidence when offered through a hostile witness was "likely a strategic move" is implausible; the constitutional error and resulting damage to the defense from Dr. Farley's testimony was the same (if not worse) and warranted the same objection.  Accordingly, a reasonable attorney would have promptly objected and – if Dr. Farley had already responded to the question – requested an instruction that the jury disregard and a mistrial.

Apart from allowing Dr. Farley to bolster her own findings with the opinions of both a non-testifying eye pathologist and non-testifying forensic odontologist, Gilman's failure deprived Melissa of the opportunity to require that those individuals be called as witnesses and properly

---

[57] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 592, 113 S.Ct. 2786.

127

qualified as experts, and to cross-examine them regarding their scientific methods and conclusions. More specifically, Melissa was deprived of the opportunity to confront the forensic odontologist with the findings of another expert that (1) the perfectly parallel striations on Mariah's shoulder could not have been the result of a bite with teeth which are arched, (2) that such marks were more likely scrapes resulting from a tumble down a long flight of stairs, and (3) that even in the unlikely event they were bite marks, they were too small to have been made by Melissa's teeth.  *See* Tab 12 at 12-13 (Affidavit); Tab 12 at 24 ("Bite Mark" power point).  Such evidence would have served to contradict the State's assertion that Melissa forcefully bit Mariah as a form of physical abuse.  It would also have served to corroborate Melissa's claims that Mariah's death had been the result of an unfortunate fall down a flight of stairs causing a fatal closed-head injury[58] and that some of Mariah's older injuries were attributable to her own tendency to self-injury[59] and to significant

---

[58]  *See, e.g.,* DX 19, 21, DX 23 (Burke Foundation 24 hour Incident Report), DX 23 (May 2006 Log of Notable Behaviors regarding a prior self-inflicted head injury resulting from an accidental tumble down a much shorter flight of stairs).

[59]  *See, e.g.,* DX 20, 22, 23 (PRN/Restraint Approval regarding the need for physical restraints due to Mariah's tendency to smack her own head on the floor while in foster care), Tab 2 (SX 3 at 50) and Tab 17 at 7 (Mariah returned to Melissa from foster  care with large insect bites and/or scratches on her body which did not heal), and Tab 17 at 55 (CPS report of Mariah losing her balance during supervised visitation and hitting her own head).

sibling-on-sibling[60] violence including biting.[61]

There is a reasonable likelihood that the one-two punch of undercutting or wholly discrediting the opinions of the State's expert witnesses while simultaneously supporting Melissa's claim to innocence would have altered the outcome of Melissa's trial on guilt – or at least on punishment.  Accordingly, the CCA's conclusion that Melissa had not demonstrated prejudice from Gilman's deficient performance was an unreasonable application of *Strickland*.

> **5.** **Trial counsel failed to object to the State's punishment phase questions regarding Melissa's prior, unrelated DWI conviction even though evidence of that conviction had never been admitted.**

During the more than three months from the date of Melissa's arrest for capital murder until the appointment of counsel she was charged with an unrelated incident of Driving While Intoxicated allegedly committed on September 15, 2006, was arraigned, and – without benefit of legal counsel on either case – plead guilty. I CR 85 (State's Notice of Extraneous Offenses: 5/16/2007 DWI Conviction, Cause No. 06-CCR 6849-C); 38 RR 35.

During jury selection, Gilman filed his first – and only – motion *in limine* seeking to exclude, *inter alia*, evidence of Melissa's prior extraneous DWI conviction. I CR 140-141 ¶ B.2. On the first

---

[60] *See, e.g.,* DX 23 at 16 (all children aggressive to the point of becoming violent); 35 RR 164 (Richard and Gabriel suffering from ADHD); DX 23 at 19 (John charged with sexually abusing his younger brothers); In turn, DX 23 at 16-20, 22 (Rene, Richard, Robert, and Gabriel acted out in violent and/or sexually inappropriate ways towards each other, towards their younger sisters, and towards other little girls).  *See also* Tab 17 at 18, 22, 46, 52, 55, 62, 64, 66, 78, 92, 95, 101, 106, 110, 114, 129, 144, 151, 158, 162 (CPS reports that children arrived *from* foster care with bruises and scratches and that the children's fighting frequently go "out-of-control" especially between Richard, Rene, and Gabriel).

[61] DX 23 (January 2006 Log of Notable Behaviors) (reporting Mariah would frequently bite her peers in foster care). This was not behavior learned from Melissa; Mariah had been in foster care since birth.

day of Melissa's jury trial, Gilman brought the motion to the trial court's attention and stated, "There is only one conviction that my client has, and that's the DWI and a misdemeanor, and that's inadmissible." 32 RR 7-8. However, Gilman did not request or obtain a formal ruling on his motion. *Id.*

After resting its case for punishment, the State requested permission to reopen for the limited purpose of offering proof of Melissa's DWI conviction. 37 RR 169-171. The trial court ruled that it would allow the State to do so but did not rule on the admissibility of the evidence. 37 RR 170. The State then informed the trial court that it would offer proof of Melissa's DWI conviction after the defense had presented its case for mitigation. 37 RR 171.

Thereafter, during the defense's case for mitigation, the State questioned Melissa's witnesses regarding her prior conviction for DWI.

> Q. Did you inquire, Mrs. Villanueva, into the criminal history of Mrs. Lucio?
> A. I remember that it was discussed at the very first meeting.
> Q. Okay. Did you learn that she had a DWI conviction.
> A. I recall something like that, sir.
> Q. Did you recall discussing with her on that DWI offense she used the name Melissa Salinas
> A. No.
> Q. Would it surprise you that she used the name Melissa Salinas
> A. To an extent.

38 RR 35. Gilman neither objected on grounds the State's questions were based on facts not yet in evidence nor asked the trial court to instruct the jury to disregard. 38 RR 35. The State never reopened its case to offer proof of the DWI conviction.

During state habeas proceedings Melissa argued that Gilman was ineffective in failing to raise the necessary objection or request a curative instruction such that the State was allowed to introduce otherwise inadmissible evidence suggesting that Melissa had a habit of lying and

130

manipulation.  Applicant's Brief at 125-126.  The State District Court entered a single Findings of

Fact on the topic.  Specifically, the State District Court found that:

> 52. Defense counsel was not deficient for failing to object to the State's punishment
> phase question regarding Applicant's previous DWI conviction. This was a strategic
> decision, as the evidence would likely come in pursuant to art. 37.071 CCP and
> counsel opted to allow it to be entered through a friendly witness rather than giving
> the State the opportunity to reopen its case and have the last word with the jury.

The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied

relief.  *Ex Parte Lucio*, WR-72, 702-02.

Even assuming, *arguendo*, that proof of the conviction was admissible under state law, state

law is trumped by constitutional law.  As discussed, *supra*, under Ground One such evidence

constituted a statement elicited by the State in violation of Melissa's Sixth Amendment right to

counsel at and after her arraignment in the instant case.  *Massiah*, 377 U.S. 201, 84 S.Ct. 1199.  As

such it was inadmissible under the constitution notwithstanding any state law to the contrary.

*Ventris*, ___ U.S. ___, 129 S.Ct. at 1845-1847.  Because the CCA failed even to acknowledge, much

less apply, the proper constitutional standard its decision is not entitled to deference under the

AEDPA.  28 U.S.C. § 2254(d). Instead, the claim is reviewed *de novo*.  *See, e.g., Rompilla*, 545 U.S.

at 390, 125 S.Ct. 2456; *Wiggins*, 539 U.S. at 534.

Given the potential for harm to the punishment phase of Melissa's case discussed *supra*

under Ground One, and *infra* in this section, Melissa submits that no reasonable attorney would have

allowed the evidence to be submitted for the jury's consideration – even through a "friendly

witness."  To reiterate a salient point, the prosecuting attorney has tacitly admitted under oath that

the State's case against Melissa on future dangerousness was comparatively weak.  *See supra*

Ground One § C.  Thus, by failing to raise the necessary objection or request a curative instruction,

the State was allowed to introduce otherwise inadmissible evidence suggesting that Melissa had a habit of lying and manipulation. Apart from bolstering the State's otherwise weak evidence of Melissa's future dangerousness, the testimony elicited by the State regarding Melissa's prior DWI conviction would have served to dispel any lingering doubt regarding the truth of Melissa's claim of innocence which may have resulted in a life sentence rather than death. Because there is a reasonable probability that but for Gilman's deficient performance Melissa would have received a different sentence, she is entitled to federal habeas relief.

## C. Summary

Owing to the multiple deficiencies in performance discussed in this section and under Ground Three above – each of which independently resulted in prejudice to Melissa's defense – the State was allowed to present its case that Melissa was a "cold blooded"[62] baby killer essentially unchallenged. Nevertheless, the CCA considered and rejected each of Melissa's ineffective assistance of counsel claims on the merits. Melissa has demonstrated here that at least four of those decisions were either contrary to, or involved an unreasonable application of a variety of Supreme Court precedents on the underlying substantive claims and/or under the Supreme Court's *Strickland* standard. To the extent Melissa has demonstrated that the CCA's decisions failed to employ the proper constitutional standards or were otherwise based on an unreasonable determination of the facts in light of the evidence before it, further review is permitted by the AEDPA. 28 U.S.C. § 2254(d). Finally, to the extent the CCA's adopted Findings of Fact failed to fully resolve the factual issues necessary to reach its Conclusions of Law, a federal evidentiary hearing is warranted.

---

[62] *See, e.g.*, Tab 2 (SX 3 at 44-45).

132

GROUND SIX: Melissa was deprived of due process and due course of law when the State failed to disclose potentially exculpatory evidence in sufficient time for the defense to utilize it at trial.

Gilman timely sought discovery of, *inter alia*, "[t]he substance of all oral confessions, admissions and statements made by the Defendant to the state in connection with this case, which were not electronically recorded" and the contents of the files of Child Protective Services. I CR 20 ¶ B.3, I CR 35 ¶ 1; Tab 17 (Motion). The State objected to disclosure of disclosure of CPS documentary records as privileged. I CR 35-36. The trial court granted Gilman's motion and ordered the documents disclosed. On August 30, 2007, the State disclosed what it claimed were "all records" of CPS up to that date. I CR 72-73. At the time of the initial disclosure, the State extracted an agreement from Gilman that he would not contact CPS caseworkers, mental health workers, mental health service providers, other service providers, foster parents, foster siblings, or any other undefined "interested parties" without first seeking leave of Court and allowing the State a chance to respond to such request. I CR 72-73. On January 30, 2008, the State turned over an additional 450 - 500 pages of CPS records, some of which it claimed were duplicates of previously disclosed documents. 10 RR 10. Additionally the Court ordered that CPS update its disclosures with a supplement of all recently generated documents by May 23, 2008. 11 RR 7; 30 RR 11. As of June 24, 2008, CPS had failed to comply and the trial court ordered CPS to do so by 9:00 a.m. the following morning. 30 RR passim. On June 25, 2008, the State advised the trial court that there were 12 or 13 additional volumes of CPS records (a "voluminous" amount) 13 RR 3. After quickly reviewing the documents Gilman requested copies of approximately three boxes of documents and trial court ordered CPS to provide those by the following morning. 31 RR 15. The case proceeded to trial the following week.

133

During jury selection, Gilman complained that he had not been provided copies of photographs and reports made by CPS.

THE COURT: What else, Mr. Gilman?

MR. GILMAN: Well, the Court ordered that the CPS records be updated and given to us since the time that we got this -- two boxes full of stuff  * * * and I would certainly like the records from  the tlme that they left off In those two boxes to the present, and i t's my understanding that it was supposed to be given to me prior to the start of trial.

THE COURT: If they are not given to you, they will not be admissible.

MR. GILMAN: Well, *there might be mitigating circumstances, or mitigating importance in that.*

THE COURT: Okay. Mr. Krippel.

MR. KRIPPEL: Your Honor, I've been in contact with CPS. I've been in touch with them as recently as Friday. I'll be In touch with them, again, to see what the status is. We are inquiring and making  copies so we can provide them and get it from CPS.

MR. GILMAN: *That's not good enough, Judge.  CPS has drug their foot on this matter throughout the entire trial. I want a specific time that they be here, and no later.*  Because CPS was supposed to have those two boxes in your office by a certain date, and they were not there, and it wasn't until a week or so later before it ever carne in.

MR. KRIPPEL: I have no response to that. We're getting them as quickly as I can.

THE COURT: I will order that before the start of testimony, that they be produced.

MR. GILMAN: *Judge, that's too late. We don't have a chance we don't even have opportunity to see what it is, nor do we have an opportunity to possibly then subpoena other people.*

THE COURT: I'm going to order that before the start of testimony that they be provided to you.

MR. GILMAN: Note my exception.

THE COURT: So noted.

134

15 RR 16-17. The State District Court then allowed the trial to go forward as scheduled. 15 RR 18. During the guilt/innocence phase of Melissa's trial, Gilman also complained that the State had failed to disclose Robert Alvarez's statements, Tab 3, 32 RR 63, 33 RR 158-159, 34 RR 4, and the videotaped interviews done by CPS at Maggie's House, Tab 4, 33 RR 104-15, in time for trial. The State, in typical fashion, asserted that the material had been disclosed pursuant to the District Attorney's "open file" policy. The trial court dismissed this assertion noting for the record that the "historical problem" with the District Attorney's "open file" policy is that defense counsel doesn't necessarily know that potentially exculpatory evidence is in the file. 33 RR 104-105.

On direct appeal, Melissa argued that the State's failure to timely comply with a discovery order had violated her Fourteenth Amendment right to due process of law. *See* Appellant's Brief at 129-135, Point of Error No. 14. The CCA overruled the point of error on grounds the issue had not been properly preserved for appellate review by objection to the timing of the State's production of the CPS records. *Lucio v. State*, 351 S.W.3d 878, slip op. at 54 (2011).

During state habeas proceedings Melissa argued that the State had withheld evidence material to her defense until it was too late for it to be used at her trial. She asserted that the State District Court's comment regarding the District Attorney's reliance upon an "open file" policy acknowledged that said policy did not – and does not – resolve the *Brady* issue. Melissa also argued that, in this case, the State's tardy disclosure of evidence was compounded by its efforts to prohibit defense counsel from interviewing potential witnesses without prior approval. I CR 72-73. The State District Court entered two Findings of Fact relevant to the issue. Specifically, it stated:

> 53. The State did not violate *Brady v. Maryland* with its disclosure of certain CPS documents, as the State was in a continuous collection and disclosure of these records. Those records that were not produced until shortly before trial were a result

135

of CPS' failure to comply with this Court's order to produce them. The State did not intentionally or knowingly prevent the production of evidence; the inadvertent delay was the result of the voluminous and complex nature of the documents sought, along with the vagaries of inter-agency requests. Applicant has demonstrated no harm by the date of the final disclosure; no statement appears in either the Application itself nor the record that defense counsel felt he was unable to adequately review the material and use it at either guilt/innocence or punishment.

54. With regard to the disclosure of Maggie's house interviews, the State advised defense counsel and the Court that it did not contain *Brady* material and therefore need not be disclosed under *Brady*. This Court conducted an in camera inspection and agreed. Nonetheless, the interviews were eventually turned over to defense counsel. Even if all of the material were *Brady* material, and even if it were disclosed in an untimely fashion, Applicant has not demonstrated prejudice by the delay, and is therefore not entitled to a new trial.

Accordingly, the State District Court recommended the denial of relief on grounds that:

7. The State did not violate *Brady v. Maryland* with its disclosure of CPS documents and Maggie's House interviews.

The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief on the merits. *Ex Parte Lucio*, WR-72,702-02. Additionally the CCA found that Ground Six was procedurally barred. *Id.* at 2 citing *Ex parte Banks*, 769 S.W.2d 539 (Tex. Crim. App. 1989); *Ex parte Acosta*, 672 S.W.2d 470 (Tex. Crim. App. 1984).

A.     **The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings**.

Suppression by the prosecution of material evidence favorable to the accused after his request violates due process, irrespective of the good faith or bad faith of the prosecutor. *Brady v. Maryland*, 373 U.S. 83, __ S.Ct. ___ (1963); *Martinez v. Wainwright*, 621 F.2d 184 (5th Cir. 1980). Successful establishment of a Brady claim requires three findings: (1) that evidence was suppressed; (2) that this evidence was favorable to the accused; and (3) that the evidence was material either to guilt or punishment. *Brogdon v. Blackburn*, 790 F.2d 1164 (5th Cir. 1986), cert. denied, 481 U.S. 1042

(1987); *Monroe v. Blackburn*, 748 F.2d 958 (5th Cir. 1984), cert. denied, 476 U.S. 1154 (1980); *Drew v. Collins*, 964 F.2d 411 (5th Cir. 1992), cert. denied, 509 U.S. 925 (1993). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667 (1985); *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987). A *Brady* claim raises a mixed question of law and fact, *Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997) (citing *United States v. Bagley*, 473 U.S. 667, 679 n. 8 (1985), and *Napue v. Illinois*, 360 U.S. 264, 271-72 (1959)), and thus is reviewable under 28 U.S.C. § 2254(d)(1).

## B.    The CCA's Application of a Procedural Bar Does Not Preclude Federal Habeas Review.

Federal review of a habeas claim is procedurally barred if the *last state court* to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038 (1989). The CCA was the last state court to consider Melissa's *Brady* claim during state habeas proceedings. As discussed *supra* under Ground One § B, the CCA's order rejecting Melissa's state habeas claim does not "clearly and expressly" indicate that it decision rested on state procedural grounds. Indeed, apart from providing citation to two state cases it provides no clue as whether it has invoked a specifically state procedural bar or, if so, which one. Furthermore, to the extent, if any, it may be assumed that the CCA's bare citation to *Banks* and/or *Acosta* constituted a clear and express indication of a procedural bar to its own reconsideration of claims already raised in and decided by that court, it does not bar federal habeas review of claims decided on the merits in the first instance (or as an underlying constitutional

137

violation in an ineffective assistance of counsel claim).   Accordingly, the procedural bar does not apply.

**C.     The CCA's Decision Was Contrary To, or Involved an Unreasonable Application of Supreme Court Precedent .**

Initially the CCA excuses the State's admittedly tardy disclosure of CPS records because it was the "result of CPS's failure to comply  with [the State District Court's] order to produce them," because the State did not act "intentionally or knowingly," and because the delay was "inadvertent" due to the "voluminous and complex nature of the documents sought" and "the vagaries of inter-agency requests."   But such excuses are inadequate under proper *Brady* analysis.   CPS is a State Agency.   Moreover, it is a State Agency specifically charged with the duty to work cooperatively with prosecuting authorities in dealing with cases of suspected child abuse or neglect.   The CPS records sought clearly constituted *Brady* material.   And CPS was under a court order issued pursuant to *Brady* to turn them over with which it did not comply.

The alleged "vagaries of inter-agency requests," are irrelevant to the *Brady* analysis.   *Brady* claims have been routinely upheld where the exculpatory evidence was in the physical possession of, *e.g.*, the police, the medical examiner, the sheriff's department, or some other state agency with restricted access.   *Connick v. Thompson*, ___ U.S. ___, 131 S. Ct. 1350, 1353 (2011) (crime lab report); *Ricardo v. Whitley*, 983 F.2d 1063 (5th Cir. 1993) (police reports); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973) (Post Office Department personnel file of a government witness employed by that agency).   Indeed, the Fifth Circuit has long recognized a prosecutor is not allowed to avoid disclosure of evidence under *Brady* by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial.

138

*United States v. Trevino*, 556 F.2d 1265, 1272 (5th Cir. 1977).  Likewise, the "voluminous and complex nature of the documents sought" is irrelevant except to the extent that it might require *earlier* disclosure than the eve of trial to comport with the purpose of *Brady* to permit defense counsel sufficient time to fully review the materials, digest them, and incorporate them into a defense theory.  *See generally United States v. Clarke*, 767 F. Supp. 2d 12, 58 (D. D.C. 2011) (potential *Brady* issue arising from failure to timely disclose 15 boxes of documents resolved by granting counsel additional time to review the material, file briefs, and reopen examination of relevant witnesses).  Finally, whether the prosecutor acted in bad faith by "intentionally or knowingly" withholding the evidence is also irrelevant to a *Brady* analysis.  *Strickler v. Greene*, 527 U.S. 263, 288, 119 S.Ct. 1936 (1999) (" 'If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.' " (quoting *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392 (1976))); *Jefferson v. United States*, 730 F.3d 537 (6th Cir. 2013); *Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801, 828 (10th Cir. 1995).  In summary, the CCA's efforts to justify or excuse the State's tardy disclosure of voluminous and complicated CPS records containing significant exculpatory evidence is contrary to *Brady*.

Excuses aside, the CCA next reasons that Melissa failed to demonstrate harm simply because "no statement appears in either the Application itself nor the record that defense counsel felt he was unable to adequately review the material and use it at either guilt/innocence or punishment." However, such a particularized statement is not required to prove a *Brady* claim.  It is enough to demonstrate that large volumes of CPS documents were withheld until shortly before trial (and the CCA has acknowledged that they were), that those documents contained evidence favorable to Melissa (they did, *see*, *e.g.* Tab 17 (CPS records)), and that the evidence was material to either guilt

or punishment (it was because it refuted the State's theory of a pattern of violent physical abuse of Mariah by Melissa). But even assuming *arguendo* that such a statement is required, Melissa duly asserted and argued during state habeas proceedings that this had been done – and done repeatedly – both before and during trial. *See* Applicant's Brief at 123. Melissa has repeated those assertions in this brief for the Court's convenience. *See* discussion *supra* regarding facts relevant to this issue, citing, *e.g.*, 15 RR 17-18 (complaints made during jury selection); 15 RR 17 ("we don't even have time to see what it is, nor do we have an opportunity to possibly then subpoena other people"); 32 RR 63, 33 RR 104-105, 33 RR 158-159, 34 RR 4 (complaints made during guilt/innocence phase).

As to the video recorded "Maggie's House" interviews, according to the CCA's adopted Findings of Fact the State pro-actively withheld them. Specifically, the State "advised defense counsel and the Court" that the interviews "did not contain *Brady* material and therefore need not be disclosed." This was a blatantly false and inaccurate representation of those interviews.[63] Melissa had claimed – from the beginning – that Mariah had fallen down a flight of stairs and that Mariah's old injuries had been the result of self-injury and sibling-on-sibling violence. The videotaped "Maggie's House" interviews with Richard Alvarez (9) and Rene Alvarez (9) corroborated Melissa's claims.

The boys had been playing outside in the yard on Thursday, February 15, 2007, – the date Melissa claimed Mariah fell down the stairs. Tab 2 (SX 3 at 3, 7). Three days later, CPS took them to Maggie's House to be interviewed by a specialist. The interviews were videotaped. See Tab 4.

---

[63] Federal Habeas Counsel submits that it remained a blatantly false and inaccurate representation regardless of whether the State District Court subsequently conducted an in camera review and "agreed." The State District Court's action compounded the violation by placing a judicial stamp of approval on the State's violation of its *Brady* obligation.

During his interview, Richard corroborated Melissa's statement that she did not physically or sexually abuse any of her children and never hit Mariah.  Richard stated that his mom or dad would spank him on the bottom when he misbehaved, but only about once a month and never hard enough to leave marks or bruises. Video Time Index 9:58, 11:12, 11:25.24.  Richard stated that when his parents spanked his little sisters (Adriana (4) and Sara (3)) that they would not hit them as hard because they were younger. Video Time Index 11:25. Richard denied that his parents ever spanked Mariah because she was just a baby. Video Time Index 13:58. Richard knew this because he "watched over her." Video Time Index 13:58. Richard denied ever seeing any marks on Mariah, or on any of his other siblings. Video Time Index 9:34, 11:25, 14:22. Richard also denied that his parents ever touched him in a sexually inappropriate way. Time Index 25:18.  Richard also corroborated Melissa's story that Mariah fell down a flight of stairs by means of a prior consistent statement. Richard stated that his mom told him Mariah had fallen down the steps at the second-story apartment the family was moving out of. Video Time Index 20:05. However, Richard added that he had seen bruises on Mariah from her fall, "one on her eye and on her arm too." Video Time Index 21:11.  Finally, Richard corroborated Melissa's explanation that some of Mariah's older bruises could have been from rough horseplay with her siblings. Specifically, Richard stated that in his first foster home a boy gave him bruises on his arms and that he told an adult but no one every did anything about it. Video Time Index 9:58

Rene likewise corroborated Melissa's statement that she never abused her children or hit Mariah. Richard Connell, PhD, conducted a psychological evaluation of Rene and concluded that he was a "fairly reliable historian." See Tab 17 at 479 (Evaluation of Rene). During Rene's interview at Maggie's House, and when questioned about family life with his parents and siblings, Rene stated

that when he or his siblings misbehaved his mom put them "in a corner." Video Time Index 44:01.

Rene also stated that his dad or mom would spank them about once a week when they misbehaved

but "just on the bottom" and only "with their hand." Id.  They were not spanked hard enough to leave

marks or bruises, and Rene denied ever seeing any such marks or bruises on any of his siblings.

Video Time Index 44:56. Rene did not see any marks on Mariah when she died and did not know

how she got bruised. Video Time Index 44:56.  Furthermore, Rene corroborated Melissa's statement

that Mariah fell down the stairs at the family's second story apartment on East Madison. Rene stated

that Mariah fell down some steps at the "other" apartment. Video Time Index 40:05. He explained

that it happened while they were waiting to move into their new place, not at the apartment where

Mariah actually died. Video Time Index 40:05, 40:36. Rene described the steps where Mariah fell

as "white." Video Time Index: 40:36. Compare DX 1, 2 (white stairs at old apartment) with SX 14

(bare wood stairs at new apartment). When asked,

"Did you see her fall or did somebody tell you that that's what happened?"

Rene responded,

"No, I saw it."

Video Time Index 41:00 (emphasis added). Rene explained, in essence, that when he went down the

stairs Mariah started to toddle after him and then she fell down the steps. Video Time Index 41:15.

Rene guessed that she fell down three steps, id, but was probably mistaken because the flight of

stairs is actually 14 steps, DX 1, 2. Rene also corroborated Melissa's statement that after the fall

Mariah did not appear seriously injured. According to Rene, "she wasn't even crying." Video Time

Index 41:15. Rene did not know whether she hit herself with anything on the way down or got hurt

in any way and did not remember seeing any scratches or bruises on her right after. Id. Rene denied

142

that anybody had told him or his siblings what to say or for them not to say anything if anyone asked any questions. Video Time Index 44:01. Finally, Rene corroborated Melissa's description of Mariah's condition and the events occurring on the day of her death. Rene stated that on the morning of Mariah's death, she seemed "okay," was breathing, and was just sleeping on the bed in Melissa's bedroom. Video Time Index 32:30, 39:50. He further corroborated Melissa's statement regarding events later that afternoon. According to Rene, he, Richard, and Selina, left the apartment with their dad and when they returned Mariah wasn't breathing. Video Time Index 32:30. Rene thought that Mariah had been sick but could not explain why. Video Time Index 40:05.

Given the obvious exculpatory quality of the Maggie's House interviews, the CCA's Findings of Facts assume that all of it was *Brady* material then pursue an alternative but equally unsupportable route to rejecting Melissa's *Brady* claim. It finds instead that it was enough that the interviews were "eventually turned over to defense counsel" and that "even if" this occurred "in an untimely fashion" that Melissa has failed to demonstrate prejudice from the delay. The CCA's adopted Finding of Fact is implausible in light of the record as a whole.

Melissa argued the following standard during state habeas proceedings:

> The purpose of the *Brady* rule of disclosure is to ensure that the accused is not denied access to materially favorable evidence that is known to the government but unknown to him. *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976); *United States v. Cravero*, 545 F.2d 406, 420 (5th Cir. 1976). That purposes is thwarted – and the accused entitled to a new trial – where the State suppress Brady material until its hand is forced by the trial judge only days before trial. *Ex parte Mowbray*, 943 S.W.2d 461 (Tex. Crim. App. 1996).

Applicant's Brief at 128. Melissa then reminded the State District Court (and advised the CCA) that during the guilt/innocence phase of Melissa's trial, Gilman specifically complained that the State had failed to disclose the videotaped interviews done by CPS at Maggie's House, Tab 4, 33 RR 104-15,

in time for trial.  Melissa then explained what was contained in the suppressed statements and how similar testimony from Richard and Rene would have corroborated her case.  *See* Applicant's Brief at 131 citing to Discussion, *supra*, Ground Three §§ D and D.2. Melissa also explained that the State had limited Gilman's access to certain witnesses *including Mariah's siblings* in exchange for agreeing to release the CPS Records to him (which it must be noted the State was obligated to release to him regardless), *see* Applicant's Brief at 122 citing I CR 72-73, such that Richard and Rene were neither readily nor easily available to be interviewed or subpoenaed to testify *before*, much less *after*, the witness lists were required and  Melissa's trial was underway with trial counsels' time otherwise fully occupied.  In short, Melissa argued that the delay precluded Gilman's ability to incorporate the substance of the Maggie's House interviews into Melissa's defense (or that if it did not so preclude then Gilman was ineffective in failing to do so, *see supra*  Ground Three[64]) and that either way the omission affected the probable outcome of the trial.

Because the CCA applied multiple improper legal standards to Melissa's *Brady* claim regarding the State's tardy disclosure of "voluminous" and "complicated" CPS records, and because under the proper standard Melissa demonstrated that the evidence was both favorable to her and material to her defense, the CCA's decision to deny relief resulted from an unreasonable application of Supreme Court precedent.

> GROUND SEVEN: Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution when her trial counsel failed to preserve trial error for review on direct appeal.

> During trial Gilman failed to preserve error regarding:

> the court reporter's failure to transcribe Melissa's recorded statement or the State's

---

[64] Given the exculpatory nature of the evidence and it is one or the other.

144

failure to provide the defense with a certified transcription of that statement, *see Lucio v. State*, 351 S.W.3d 878, slip op at 21 n. 10 (Tex. Crim. App. 2011) (Point of Error No. 2);

the admission of Melissa's custodial statement to police on grounds it was involuntary, given without proper *Miranda* warning, or obtained as the result of an illegal arrest, *see Lucio v. State*, 351 S.W.3d 878, slip op at 24 (Tex. Crim. App. 2011) (rejecting argument that general objection that it was inaudible was sufficient) (Point of Error No. 3);

the State District Court's erroneous admission into evidence of "a conviction for DWI without a lawyer or jury," *see Lucio v. State*, 351 S.W.3d 878, slip op at 47-48 (Tex. Crim. App. 2011) (Point of Error No. 5);

the State District Court's erroneous exclusion of Villanueva's expert testimony during guilt-phase of trial to the effect that Melissa's ability to voluntarily give a statement to police was affected by the fact that she was a battered woman, *see Lucio v. State*, 351 S.W.3d 878, slip op at 32, 36 (Tex. Crim. App. 2011) (Point of Error No. 9);

the State District Court's erroneous exclusion of Pinkerman's expert testimony during the guilt-phase of trial to the effect that "since she was an abused woman she would agree with anything a policeman would say," *see Lucio v. State*, 351 S.W.3d 878, slip op at 38-39  (Tex. Crim. App. 2011) (Point of Error No. 10);

the erroneous admission of Beto Juarez's notes regarding his interview with Melissa and the related erroneous admission of Melissa's statements to Juarez, *see Lucio v. State*, 351 S.W.3d 878, slip op at 48, 53 (Tex. Crim. App. 2011) (rejecting argument that complaint that "He's not here" was sufficient to raise Confrontation Clause claim) (Points of Error No. 12 & 13); and

the timing of the State's production of the CPS records, *see Lucio v. State*, 351 S.W.3d 878, slip op at 54 (Tex. Crim. App. 2011) (Point of Error No. 14).

During state habeas proceedings Melissa raised a claim that Gilman had been ineffective in failing to preserve trial error for review on direct appeal.  She specifically identified two such claims ("error in admitting the 'unreliable' video recordings of Melissa's 'involuntary' statement to police" and "the Confrontation Clause violation resulting from the admission of evidence obtained from an interview by CPS Therapist Beto Jaurez"), but also incorporated by reference "any other appellate

145

issues" the CCA might subsequently deem "waived by the failure to raise proper objection." Applicant's Brief at 126. The State District Court made Findings of Fact relevant to both the underlying constitutional violations and relevant to this particular ineffective assistance of counsel claim. Specifically the State District Court stated:

4. Applicant has not shown prejudice to the instant case as a result of her separate plea of guilty to the misdemeanor offense of Driving While Intoxicated. Applicant has not shown that her plea was a result of an unconstitutional confinement without the assistance of counsel.

5. Therapist Beto Juarez, a CPS contractor, was not working in tandem with police at the time he interviewed Applicant. He was retained by CPS to offer mental health counseling, not to interrogate her. * * * The purpose of his visits were non-investigatory. Therefore, Juarez was not an agent of the State such that he was required to Mirandize Applicant before speaking to her, or in any other way comply with Art. 38.22 of the Texas Code of Criminal Procedure.

6. Applicant has not shown that defense counsel was ineffective for failing to file a motion to suppress her statement to police. * * * She has failed to demonstrate that had a motion to suppress been filed it would have been granted.

7. During her interview with police, Applicant stated "I want to talk to my husband, I don't want to talk to nobody else." Given the context of the exchange, this was not an unambiguous statement that Applicant wished to invoke her constitutional right to remain silent. When the interviewer intimated that she could not see her husband, but would be allowed a cigarette, Applicant showed no signs of reluctance in continuing with the interview. Because this statement was not an invocation of her right to remain silent, defense counsel did not err in failing to file what would have been a futile motion to suppress based upon that statement.

39. Applicant's complaint about this Court's exclusion of her mitigation experts from the guilt-innocence portion of the trial is nearly identical to issues nine and ten raised on direct appeal. Matters raised on direct appeal should not be re-litigated on habeas unless the judgment is subsequently rendered void or a subsequent change in the law is made retroactive. While additional evidence may warrant relief even when the issue was raised on direct appeal, Applicant has not demonstrated that she is entitled to relief herein because of any additional evidence herein.

40. Moreover, this Court did not abuse its discretion in excluding the testimony of Norma Villanueva and Dr. John Pinkerman from the guilt-innocence portion of the

trial. Ms. Villanueva proffered nothing to indicate that she had any sort of specialized experience, knowledge or training in the area of interpreting body language and patterns of behavior during police interviews. Dr. Pinkerman's proffered testimony as to Applicant's psychological functioning, including how there was little support in the "historical record" for the idea that Applicant physically abused her children, that she suffered from battered woman syndrome, and the meaning of her demeanor after the incident and during questioning had no relevance to the question of Applicant's guilt or innocence.

53. The State did not violate *Brady v. Maryland* with its disclosure of certain CPS documents, as the State was in a continuous collection and disclosure of these records. Those records that were not produced until shortly before trial were a result of CPS' failure to comply with this Court's order to produce them. The State did not intentionally or knowingly prevent the production of evidence; the inadvertent delay was the result of the voluminous and complex nature of the documents sought, along with the vagaries of inter-agency requests. Applicant has demonstrated no harm by the date of the final disclosure; no statement appears in either the Application itself nor the record that defense counsel felt he was unable to adequately review the material and use it at either guilt/innocence or punishment.

54. With regard to the disclosure of Maggie's house interviews, the State advised defense counsel and the Court that it did not contain Brady material and therefore need not be disclosed under Brady. This Court conducted an in camera inspection and agreed. Nonetheless, the interviews were eventually turned over to defense counsel . Even if all of the material were Brady material, and even if it were disclosed in an untimely fashion, Applicant has not demonstrated prejudice by the delay, and is therefore not entitled to a new trial.

56. Defense counsel was not deficient for failing to object to mention made at trial of the findings of Beto Juarez for the reasons stated in finding of fact 5 herein.

Accordingly, the State District Court recommended the denial of relief , *inter alia*, on grounds that

    1.  No coerced statement of the Applicant was obtained by law enforcement.

    2.  CPS contract therapist Beto Juarez was not acting in tandem with law enforcement when he counseled Applicant.

    3.  Applicant has failed to show that her counsel's performance was deficient in any manner.

    4.  Moreover, in cases where Applicant alleges deficiency of counsel, she has failed to show that the outcome of the trial would have been different had defense counsel

acted in the manner she alleges would have been appropriate in the situation.

5.  Applicant has not overcome her burden to show that defense counsel's actions were not sound trial strategy.

6. This Court did not abuse its discretion in excluding the testimony of Norma Villanueva and Dr. John Pinkerman.

7. The State did not violate Brady v. Maryland with its disclosure of CPS documents and Maggie's House interviews.

The CCA adopted the trial court's findings of fact and conclusions of law and denied relief.  *Ex Parte Lucio*, WR-72,702-02.  The CCA also rejected grounds for relief one, two, and six as "procedurally barred."  *Id.*

## A.    The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings.

Trial counsel's performance is judged by the familiar *Strickland* standard. *See supra*, note 30 and accompanying text. Under that standard, trial counsel has a duty to object to inadmissible evidence and, if the objection is sustained by the court, request a curative jury instruction and seek a mistrial if the curative instruction is given. TEX. R. EVID. 103(a)(1); TEX. R. APP. PROC. 33.1(a)(1); *Nethery v. State*, 692 S.W.2d 686, 701 (Tex. Crim. App.1985); *Duran v. State*, 505 S.W.2d 863, 866 (Tex. Crim. App.1974). *But see Alberts v. State*, 302 S.W.3d 495 (Tex. App. - Texarkana 2009) (counsel not deficient for failing to object to impermissible testimony based on strategic decision not to emphasize it). The objection must be specific, not general. *Tompkins v. State*, 774 S.W.2d 195, 218 (Tex. Crim. App. 1987), aff'd, 490 U.S. 754, 109 S.Ct. 2180 (1989) (general objection "amounts to no objection" and does not preserve error for review); TEX. R. EVID. 103(a)(1); TEX. R. APP. PROC. 33.1(a)(1). Trial counsel also has a duty to preserve error in the exclusion of evidence by an offer of proof or a bill of exceptions. *Guidry v. State*, 9 S.W.3d 133, 153 (Tex. Crim. App. 1999);

*Green v. State*, 840 S.W.2d 394, 407 (Tex. Crim. App. 126 1992); *see Johnson v. State*, 800 S.W.2d

563 (Tex. App. - Houston [14th Dist.] 1990, pet. ref'd).

A federal habeas petitioner's ineffective assistance of counsel claims are subject to *de novo*

review and this Court is required to grant deference to the State District Court's Findings of Fact

only to the extent they are plausible in light of the record as a whole. *Ramirez*, 396 F.3d at 649,

*Rivera*, 505 F.3d at 361-63.

**B.    The CCA's Decision Was Contrary To, or Involved an Unreasonable Application of Supreme Court Precedent .**

The CCA rejected seven of Melissa's points of error on direct appeal as not preserved for

appellate review by proper objection. *Lucio v. State*, 351 S.W.3d 878, (Tex. Crim. App. 2011).  The

CCA also rejected three of Melissa's state habeas claims as "procedurally barred" but without

identifying the specific source or nature of the bar.  *Ex parte Lucio*, WR-72,702-02.  For the sake of

this issue only Melissa assumes, *without agreeing*, that the nature of the bar was a failure to make

contemporaneous objection in order not to waive the possible federal habeas claim arising therefrom.

Having made such assumption, Melissa combines her discussion of six[65] of the points of error raised

on direct appeal with the three issues raised in state habeas into four topics for the sake of brevity.

For reasons more fully discussed *supra* under Ground Three § B.1, Melissa has already

demonstrated that the CCA's decision that Gilman was acting pursuant to "sound trial strategy" was

implausible in light of the record as a whole and thus not entitled to deference.   What remains, then,

is to conduct a *de novo* review and determine whether the CCA's decision that Gilman's failure to

---

[65] The seventh point of error was raised and decided under state law and the CCA's decision of that point of error on direct appeal forecloses proof of deficient performance in this forum.

preserve the alleged errors did not constitute deficient performance or that Melissa failed to show that if proper objection had been made the outcome of the trial would have been different constituted an unreasonable application of *Strickland*.

**1.    Deprivation of right to counsel at and after magistration and State's subsequent use of Melissa's uncounseled statements to Juarez and DWI conviction during the punishment phase.**

For reasons more fully discussed *supra* under Ground One § C, Melissa has already demonstrated that the CCA's adopted Finding of Fact ¶ 4 as to the DWI conviction was partially irrelevant to the constitutional claim at issue and otherwise implausible in light of the record as a whole.  Further, Melissa demonstrated that the CCA's adopted Finding of Fact ¶ 5 as to Juarez was implausible in light of the record as a whole.  *Ramirez*, 396 F.3d at 649, *Rivera*, 505 F.3d at 361-63. And if Finding of Fact ¶ 5 fails this test, then so does Finding of Fact ¶ 56.   Violation of Melissa's right to counsel occurred at the time of Juarez's "counseling" sessions and at the moment the State elicited a guilty plea from her on the DWI charge, *Massiah*, 377 U.S. 201, 84 S.Ct. 1199, rendering that evidence wholly inadmissible,  *Ventris*, ___ U.S. ___, 129 S.Ct. 1841.  Accordingly, Gilman was deficient for failing to raise a proper constitutional objection in order to preserve the claim for review.  Finally, for reasons also more fully discussed, *supra* under Ground One §§ C & D, the State's use of that evidence resulted in prejudice to her defense during the punishment phase of trial. In short, but for Gilman's deficient performance there is a reasonable probability that Melissa would have received a different sentence.

### 2.      Erroneous admission of Melissa's custodial statement to police because it was involuntary and taken in violation of her right to remain silent.

For reasons more fully discussed *supra* under Ground Two § C, Melissa has already demonstrated that the CCA's adopted Findings of Fact ¶¶ 6 & 7 as to Melissa's claim her incriminatory statements to police had been  involuntary and otherwise obtained in violation of her right to remain silent are implausible in light of the record as a whole.  *Ramirez*, 396 F.3d at 649, *Rivera*, 505 F.3d at 361-63.   Violation of Melissa's rights occurred when her will was overborne by intense psychological coercion, *Restrepo*, 994 F.2d at 184; *Connelly*, 479 U.S. at 164, 107 S.Ct. 515, and also when interrogation continued after she advised police "I want to talk to my husband. I don't want to talk to nobody else," *Mosley*, 423 U.S. at 103, 96 S.Ct. 32; *Berghuis*, ___ U.S. ___, 130 S.Ct. 2250; *Davis*, 512 U.S. at 459, 114 S.Ct. 2350; *DeMarce*, 564 F.3d 989.   Melissa's statement to police could have been at least partially suppressed.  Accordingly, Gilman was deficient for failing to file a motion to suppress raising proper constitutional objections, obtaining a pre-trial hearing on the motion, and using that hearing to present expert evidence in support of suppression. Finally, for reasons also more fully discussed, *supra* under Ground Two §§ C & D, the State's use of that evidence resulted in prejudice to her defense during both phases of her trial.  In short, but for Gilman's deficient performance there is a reasonable probability the outcome of Melissa's trial would have been different.

### 3.      State's tardy production of CPS records and the Maggie's House interviews.

For reasons more fully discussed *supra* under Ground Six § C, Melissa has already demonstrated that the CCA's adopted Findings of Fact ¶ 53 as to the State's tardy production of "voluminous" and "complicated" CPS records violated *Brady* are irrelevant or otherwise contrary

to *Brady*.  Further, Melissa demonstrated that the CCA's adopted Finding of Fact ¶ 54 as to the

State's tardy disclosure of the Maggie's House interviews established they were not timely disclosed

and that the assertion Melissa had failed to demonstrate prejudice was implausible in light of the

record as a whole.  *Ramirez*, 396 F.3d at 649, *Rivera*, 505 F.3d at 361-63.  Accordingly, assuming

*arguendo* that Gilman failed to preserve Melissa's *Brady* claims by proper objection and seek

additional time to review the evidence,[66] he was deficient.  Finally, for reasons also more fully

discussed, *supra* under Ground Two §§ C & D, Gilman's deficient performance prejudiced Melissa's

defense.  The CPS records and Maggie's House interviews contained a wealth of information which

refuted the State's theory that Melissa had repeatedly beaten Mariah and supported Melissa's

assertions that Mariah's old scrapes and bruises were the result of self-injury or sibling-on-sibling

abuse and that Mariah's fatal closed head injury was the result of an unfortunate tumble down a

flight of stairs.  In short, but for Gilman's deficient performance there is a reasonable probability the

outcome of Melissa's trial would have been different.

### 4.      Exclusion or restriction of expert testimony by Villanueva and Dr. Pinkerman during the Guilt/Innocence phase of her trial.

For reasons more fully discussed *supra* under Ground Four § B, Melissa demonstrated that

the CCA's Finding of Fact ¶ 40 and Conclusion of Law ¶ 6 applied a non-constitutional "abuse of

---

[66] For the sake of this issue only Melissa assumes, *without agreeing*, that Gilman failed to make a contemporaneous objection in order not to waive the possible federal habeas claim arising therefrom.  However the record reveals that Gilman did, in fact, object that the tardy disclosure deprived defense counsel of the opportunity to see what those records or recordings contained, or to subpoena additional witnesses with beneficial evidence whose identities were contained therein.  *See* 15 RR 16-17.  Gilman was not deficient for failing renew that objection and request for more time on the first day of trial when his initial objection had already proved futile.  *See generally Johnson v. Cockrell*, 306 F.3d 249 (5th Cir. 2002) (no duty to raise futile objection).

discretion" state law standard of review to a constitutional claim.   Because the CCA failed even to acknowledge, much less apply, the proper constitutional standard its decision is not entitled to deference under the AEDPA.  28 U.S.C. § 2254(d). Instead, the underlying claim is reviewed *de novo*. *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527 (2003).   And for more reasons more fully discussed *supra* under Ground Four § C, Melissa has demonstrated that the State District Court deprived her of her constitutional right to present a complete defense when it excluded the testimony of her defense experts during the guilt/innocence phase of trial.   Accordingly, to the extent Gilman failed to raise proper objections or make an adequate record for purposes of appellate review, he was deficient. Finally, for reasons also more fully discussed, *supra* under Ground Four § C, Gilman's deficient performance prejudiced Melissa's defense.  The excluded testimony summarized by Villanueva and Dr. Pinkerman in their respective offers of proof, *see* 35 RR 142-143, 195, DX 13-18, DX 24, combined with the information contained in their subsequently filed affidavits and supporting evidence, *see* Tabs 15 and 16, was directly relevant to Melissa's defense during the guilt/innocence phase of trial.  In short, but for Gilman's deficient performance there is a reasonable probability the outcome of Melissa's trial would have been different.

Because Melissa has demonstrated that Gilman's failure to preserve the foregoing four categories of constitutional error was both deficient and prejudicial to her defense, and that the CCA's decision to the contrary was either not entitled to deference under the AEDPA or an unreasonable application of applicable Supreme Court precedent, she is entitled to federal habeas relief.

GROUND EIGHT: The trial court deprived Melissa of a fair and impartial judge and jury and due process of law when he commented upon the evidence by laughing at a defense expert during testimony where such conduct was observed by the jury.

Immediately following Dr. Kuri's testimony during the guilt/innocence phase of Melissa's trial, the following exchange occurred:

THE COURT: Mr . Gilman, you said before proceeding further you wanted to take up some legal matters.

MR. GILMAN: Yes, sir. I don't know if the Court is aware, but during the testimony this morning, there were facial remarks of Your Honor during the testimony. And those facial remarks conveyed things, even though maybe you had no intentions of conveying things to the jury, and I just am bringing this to the Court's attention because I would like the Court to try and refrain from making any facial gestures during the time of the testimony. If the Court is pleased or humorous of something that somebody might have said, I wish the Court would take that up after the jury is out.

THE COURT: I made no conscious facial remarks for any specific purpose. But I will try and refrain from reacting in any way, either positively or negatively, as I have in the past. And any time counsel wants to make a standing bill on any of this, you are more than welcome to.

MR. GILMAN: Like I said, I don't know if the Court is aware that the Court is doing it. But I am bringing

THE COURT: I was not.

35 RR 91-92.

During state habeas proceedings Melissa raised a claim that the State District Court had deprived her of a fair and impartial judge and jury and due process of law when he commented upon the evidence by laughing at a defense expert during testimony where such conduct was observed by the jury.  The State District Court made a single Finding of Fact relevant to this issue.  Specifically it stated:

57. Defense counsel objected to this Court's alleged "facial expressions" during the testimony of Dr. Kuri; however, this occurred after Dr. Kuri had left the stand.

154

Therefore, this Court is without the benefit of a timely and specific objection and a proper context in which to place the alleged expressions. Absent such context, Applicant has failed to show that any voluntary or involuntary facial expressions constituted a comment on the weight of certain evidence.

Accordingly, the State District Court recommended the denial of relief , *inter alia*, on grounds that

8. Applicant has failed to show that any voluntary or involuntary facial expression alleged to have been exhibited by the Court constituted a comment on the weight of certain evidence.

The CCA adopted the State District Court's Findings of Fact and Conclusions of Law which denied relief on the merits.[67] *Ex Parte Lucio*, WR-72,702-02.

## A.  The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings.

The United States Supreme Court has determined when certain constitutional rights are violated fundamental error occurs. *Arizona v. Fulminante*, 499 U.S. 279, 309-10, 111 S.Ct. 1246, 1265 (1991). The Court has defined such errors as "structural defects in the constitution of the trial mechanism." *Fulminante*, 499 U.S. at 309, 111 S.Ct. at 1265.  The Court has determined these fundamental constitutional rights include the right to counsel, the right to an impartial judge, the right to not have members of the defendant's race unlawfully excluded from a grand jury, the right to self-representation at trial, and the right to a public trial.  *Id.* at 309-10, 111 S.Ct. at 1264-65. In addition to the fundamental errors established by the United States Supreme Court, a plurality of the Texas Court of Criminal Appeals, in *Blue v. State*, held another fundamental error of constitutional dimension could exist if a trial judge makes a comment that taints the presumption of innocence.

---

[67]  Because the CCA's decision did not expressly and unambiguously based its denial of relief on a state contemporaneous objection rule, but instead addressed the merits by concluding that Melissa had failed to make a necessary factual showing, this Court is not barred from reviewing the claim.

*Blue v. State*, 41 S.W.3d 129, 132 (Tex. Crim. App. 2000) (plurality opinion). *See also Marks v. State*, 617 S.W.2d 250, 252 (Tex. Crim. App.1981) (trial court's improper comment on weight of evidence results in reversible error when it benefits the State or prejudices the defendant's rights); TEX. CODE CRIM. PROC. Art. 38.05 (prohibiting trial courts from commenting on the weight of the evidence).

Whether a trial court deprives the defendant of a fair and impartial judge and jury and due process of law when he comments upon the evidence is a mixed question of law and fact, *see generally Buntion v. Quarterman*, 524 F.3d 664, 675 (5th Cir. 2008) (applying "objectively unreasonable"standard), and thus is reviewable under 28 U.S.C. § 2254(d)(1), *Davis*, 158 F.3d 806, 812.  When examining mixed questions of law and fact, the Court employs "a *de novo* standard by independently applying the law to the facts found by the district court, as long as the district court's factual determinations are not clearly erroneous." *Ramirez*, 396 F.3d at 649. "A finding is clearly erroneous only if it is implausible in the light of the record considered as a whole." *Rivera*, 505 F.3d at 361-63.

**B.     The Cca's Adopted Finding of Fact That Melissa Failed to Prove That the State District Court's Facial Expression Had Not Been Placed in "Context" Is Implausible in the Light of the Record.**

Dr. Kuri was the first witness called on the morning of July 7, 2008.  The objection was made immediately after Dr. Kuri stepped down from the witness stand.  The substance of the objection made it clear that Gilman was objecting to facial expressions which had been made "during the testimony this morning" and conveyed to the jury that the State District Court felt Dr. Kuri's testimony was "humorous."  Because, the CCA's adopted Finding of Fact is implausible in light of this record, it is not entitled to deference. *Ramirez*, 396 F.3d at 649; *Rivera*, 505 F.3d at 361-63.

156

**C.    The CCA's Decision Was Contrary To, or Involved an Unreasonable Application of Supreme Court Precedent .**

It has long been recognized that a district judge may explain and comment upon the evidence in his instructions to the jury. *See Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698 (1933). However, of equally long standing is a significant limitation upon that right. Because of the great influence which the trial judge necessarily exerts upon the jury, the court must exercise the most scrupulous care to avoid giving an unfair or one-sided impression. *Id.* at 470, 53 S.Ct. at 699; *Starr v. United States*, 153 U.S. 614, 625-26, 14 S.Ct. 919 (1894). This limitation was not observed in the present case.

The essential testimony of Dr. Farley that Mariah's fatal head injury was necessarily the result of physical abuse,  34 RR 53 ("non-accidental head trauma."), 34 RR 39, 59, was in stark contrast to Dr. Kuri's testimony that the cause of Mariah's fatal head injury could not be determined post-mortem, 35 RR 25, 35 (disagreeing with Farley's assessment of abuse), 35 RR 67, 87-88 (cause of injury is anybody's guess). The credibility of the experts as to the cause of Mariah's fatal head injury was squarely presented as a critical, and likely decisive, issue.  Indeed, Dr. Kuri's purportedly expert testimony was crucial to Melissa's defense, and, in fact, was virtually the *only* defense Gilman raised before the jury.  Accordingly, the State District Judge's troubling facial gestures impliedly instructing the jury that Dr. Kuri's expert's testimony was too "humorous" to be credible constituted reversible error.  *See, e.g.*, *United States v. Fischer*, 531 F.2d 783, 786 (5th Cir. 1976); *United States v. Martinez*, 496 F.2d 664, 668 (5th Cir.), cert. denied, 419 U.S. 1051, 95 S.Ct. 627 (1974) (where credibility of witness a key issue at trial if trial court's comments impliedly instruct jury whether or not to believe witness, then grounds for reversal exist).  This is true notwithstanding the fact that

157

Gilman made a strategic choice not to interrupt his own expert's testimony in order to make the objection. The CCA cites no Supreme Court precedent which requires that trial counsel's *objection* be made while the witness remains on the witness stand in order to prove that it was a "comment on the weight" of the witness's evidence, only that the judge's *comment* be made while the witness was testifying.   Indeed, it can reasonably be presumed that trial counsel's decision to raise the issue immediately after the witness had stepped down constituted a strategic decision to (a) not interrupt the flow of his own witness's testimony, and (b) not draw the jury's attention to it so as to minimize and impact.

Because the error was structural, the CCA's decision to deny relief constituted an unreasonable application of Supreme Court precedent.  Accordingly, Melissa is entitled to federal habeas relief.

> GROUND NINE: Melissa was deprived of effective assistance of appellate counsel because the State failed to provide her attorney with a complete transcript.

During trial, the State played the complete video recording of Melissa's statement for the jury. 32 RR 51 et seq. The statement was contained on three DVDs. SX 3, 4, 5.  During this process, it came to Gilman's attention that the court reporter was not transcribing the video and that the portions in Spanish were not being translated. 32 RR 58. Gilman reminded the trial court that the video should have been transcribed "prior to coming here" in order "to have a good record" but was not. 32 RR 62. In an effort to resolve the issue, the State offered to provide a transcribed copy from the record – complete with translations of any Spanish portions by a certified translator and that it would "provide that transcribed copy to the jury." 32 RR 62. There is no evidence that it ever did. Ultimately, the trial court found that "Mr. Gilman makes a valid point with regard to the record." 32

RR 63 (emphasis added).

During state habeas proceedings Melissa raised a claim that the video recording – which was partially inaudible, partially in Spanish, and without any identifying time index – was inadequate to the purpose of identifying and arguing appellate issues resulting in ineffective assistance of appellate counsel.   The State District Court entered two Findings of Fact relevant to this issue.   Specifically it stated:

> 55. The videotaped statement Applicant made to police, States Exhibits 3, 4 and 5, is audible.
>
> 58. With regard to Applicant's claim that her appellate counsel did not have a complete record, the record in this case shows that State's Exhibits 3, 4 and 5 are in evidence and were played to the jury. The fact that no transcription was made does not render the evidence "missing." Applicant has cited to no authority that the State is obliged to provide a transcription of videotaped statements it introduces, and both Applicant's writ and appellate counsel were able to review State's Exhibit's 3, 4 and 5. The Court of Criminal Appeals has already ruled that the record in this case is complete. *See Lucio v. State*, 351 S.W.3d 878 (Tex. Crim. App. 2011).

Accordingly, the State District Court recommended the denial of relief , *inter alia*, on grounds that

> 9. Applicant's trial, appellate and habeas counsel have a complete record of this case.

The CCA adopted the trial court's findings of fact and conclusions of law and denied relief.   *Ex Parte Lucio*, WR 72,702-02.

## A.    The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings.

Appellate counsel's performance is judged by the familiar *Strickland* standard. *See supra*, note 30 and accompanying text. Under that standard, appellate counsel has a constitutional duty to review the record for any arguable error. *In re Schulman*, 252 S.W.3d 403 n. 32 (Tex. Crim. App. 2008).

159

A federal habeas petitioner's ineffective assistance of counsel claims are subject to *de novo* review and this Court is required to grant deference to the State District Court's Findings of Fact only to the extent they are plausible in light of the record as a whole. *Ramirez*, 396 F.3d at 649, *Rivera*, 505 F.3d at 361-63.

**B.      The CCA's Adopted Finding of Fact That the Audio Recording Is Completely "Audible" Is Implausible in the Recording Itself.**

The Court's own review of SX 3, SX 4, and SX 5 will be necessary to demonstrate Melissa's assertions.  Federal Habeas Counsel advises this Court she spent many hours reviewing those three exhibits –playing them over and over while investigating and researching issues for Melissa's state writ application and supporting brief – and still there are portions which are simply inaudible. Because no official transcription was available, Federal Habeas Counsel also personally endeavoured to transcribe them but, owing to the fact that some portions were inaudible and other portions in Spanish, was not entirely successful.  Federal Habeas Counsel provided those transcriptions to the State District Court and to the CCA in the Appendix to her State Writ Application under Tab 2. Referring to those transcriptions, inaudible portions of recording occur:

in SX 3 at 3-1(11),[68] 3-2(18), 3-3(3), 3-9(1), 3-10(19), 3-19(7), 3-37(17), 3-38(13), 3-39(20), 3-40(22), 3-41(3), 3-41(13), 3-41 (14), 3-42(8), 3-43(14), 3-48(8), 3-49(3), 3-49(14), 3-50(21), 3-54(13), 3-54(19), 3-55(2), 3-56(20), 3-57(18), 3-59(14), 3-60(4),

in SX 4 at 4-2(14), 4-5(11), 4-6(3), 4-10(3), 4-10(8), 4-10(14), 4-10(19), 4-10(20), 4-11(13), 4-12(5), 4-12(8), 4-12(10), 4-13(2), 4-13(13), 4-13(14), 4-13(20), 4-14(5), 4-14(6), 4-14(15), 4-14(18), 4-14(19), 4-15(10), 4-15(11), 4-15(12), 4-16(19), 4-20(7), 4-22(10), 4-22(19), 4-23(15), 4-25(10), 4-26(6), 4-27(4), 4-27(8), 4-28(2), 4-29(10), 4-29(17), 4-29(18), 4-31(9), 4-31(18), 4-31(22), 4-32(6), 4-32(7), 4-32(8), 4-32(20), 4-33(14), 4-34(21), 4-35(10), 4-35(18), 4-35(20), 4-35(22), 4-39(16), 4-39(19), 4-43(19), 4-43(21),4-44(12), 4-44(14), 4-44(17), 4-45(11), 4-47(19),

---

[68]   Exhibit Number-Page Number(Line Number).

in SX 5 at 5-10(7), and 5-10(20).

Also referring to those transcriptions, Spanish portions of the recording occur:

in SX 3 at 3-6(6) , 3-31(8), 3-41(16), 3-41(18), 3-42(1), 3-42(5).

Moreover, when the recordings were played before the jury it was noted *in the reporter's record* that portions were either inaudible or in Spanish. 32 RR 59 (audio "very, very difficult to understand or hear" and "there are statements in Spanish"). Saying the recordings are "audible" doesn't magically make it so. Because the CCA's adopted Finding of Fact is implausible in light of the recordings and the record as a whole, it is not entitled to deference under the AEDPA.

**C.     The Lack of a Transcript and Translation Necessarily Rendered Appellate Counsel's Performance Deficient and Prejudicial.**

The CCA's adopted Finding of Fact that the audio recording was "complete" does not respond to the claim that without benefit of a certified transcription and translation the inaudible and Spanish portions of the "complete" recording nevertheless made it difficult – if not impossible – for Appellate Counsel to do his job (or for Habeas Counsel to do hers).[69] Because the CCA's decision did not identify, much less address, the claim of ineffective assistance of appellate counsel under the proper constitutional standard, it is not entitled to deference under the AEDPA. 28 U.S.C. § 2254(d). Instead, the claim is reviewed *de novo*. *See, e.g., Rompilla*, 545 U.S. at 390, 125 S.Ct. 2456; *Wiggins*, 539 U.S. at 534.

Appellate counsel has a constitutional duty to review the record for any arguable error. *In re Schulman*, 252 S.W.3d 403 n. 32 (Tex. Crim. App. 2008). In this case, the video recordings themselves were inadequate for this purpose. Accordingly Appellate Counsel's review of the record

---

[69] Both of us remain "in the dark" as to exactly what was said in portions of each of SX 3, SX 4, and SX 5.

161

for any arguable was necessarily deficient.  That deficiency prejudiced Melissa's case on direct

appeal. As the Court of Criminal Appeals has acknowledged:

> "How can we say the instant failure to provide a complete record did not contribute
> to the verdict or punishment when the failure has prevented us from having a
> complete record from which to assess the integrity of the verdict?"

*Perez v. State*, 824 S.W.2d 565, 568 (Tex. Crim. App. 1992).  As in *Perez,* the inaudible and thus

"missing" portions of the record in the instant case were "significant" and "necessary" to resolution

of Melissa's claims that the evidence was legally and factually insufficient to sustain the jury's guilty

verdict and death sentence because the State relied upon the purportedly incriminating statements

Melissa made to the police to prove that she fatally abused Mariah, and that the video recording of

her statement was statutorily and constitutionally inadmissible. *See* Appellant's Brief at 54, 63-64.

The inaudible and thus "missing" portion of the record also made it difficult – if not impossible –

for appellate counsel to identify any trial error apparent therefrom.  For example, the inaudible and

thus "missing" portion of the record was also necessary for appellate counsel to ascertain whether

police obtained Melissa's statement in violation of her right to remain silent, *see* Discussion *supra*

Ground Two § B, or obtained equally inadmissible derivate evidence, *see* Appellant's Brief at 64.

Moreover, without the benefit of a complete certified transcript, Appellate Counsel could not

properly support his argument that such evidence was inadequate by citation to the record as required

by Rule 38.1(h) of the Texas Rules of Appellate Procedure. Tᴇx. R. Aᴘᴘ. Pʀoc. 38.1(h) ("The brief

must contain * * * appropriate citations * * * to the record"). Indeed, Appellate Counsel could not

even cite to the video itself because the recordings did not have a counter or timer. SX 3, SX 4, SX 5.

Appellate counsel was forced, instead, to rely upon the judges on the Court of Criminal Appeals to,

themselves, review the entirety of the recorded statement and subject Melissa's appeal to judicial

interpretation – and indeed even speculation – as to what was said. Accordingly, Melissa is entitled

to a new trial. *Schulman*, 252 S.W.3d at n. 32; *Perez*, 824 S.W.2d at 568.

GROUND TEN: Melissa is entitled to habeas relief because she is actually innocent
of the offense of capital murder.

During state habeas proceedings Melissa raised a claim that she is actually innocent of capital

murder.  In support of that claim she argued that:

Mariah's fatal head injury was consistent with the fall down a flight of stairs described by

Melissa and witnessed by her son. Furthermore, Melissa was never alone with Mariah during the 24

to 48 hours during which she is alleged to have brutally beaten her to death and Melissa never

admitted to inflicting Mariah's fatal head injury.  And finally, Melissa's 15-year-old daughter

Alexandra had both motive and opportunity to injure Mariah and confessed in front of multiple

witnesses to having been the cause of her death. Accordingly, Melissa asserted that she was entitled

to habeas relief because she is factually innocent of the offense of capital murder. *See generally Ex*

*parte Gilbert*, 2010 WL 5233003 (Tex. Crim. App., 2010) (not designated for publication); *Ex parte*

*Tuley*, 109 S.W.3d 388 (Tex. Crim. App. 2002).

The State District Court made the following two Findings of Fact relevant to the claim:

59. The affidavits of Sonya Chavez and Esperanza Trevino, which attempt to place
blame for the murder upon two of Applicant's children, are not credible.
Furthermore, even if they were credible, they fail to establish that Applicant is
"unquestionably innocent;" that is, the affidavits fail to by themselves support a
finding of innocence by a clear and convincing standard.

60. Applicant's claim that she has shown actual innocence by virtue of her own
allegation that she was not alone with the victim fails to show such innocence by a
clear and convincing standard, especially given the circumstances set forth in Finding
of Fact No. 35 herein.

35. * * * Alvarez's statement to police indicates that he witnessed Applicant physically abuse the victim, and defense counsel certainly did not want that type of testimony before the jury. Furthermore, Alvarez's statement does not prove that Applicant was never alone with the victim; in fact, he states that one day prior to the victim's death he and some of his children left the family apartment at least twice to deliver belongings to a new residence, and while he was gone Applicant was alone in the apartment with the remaining children, including the victim. Given this evidence, defense counsel could not have credibly argued that Applicant was not alone with the victim prior to the murder, * * *.[70]

Accordingly, the State District Court recommended the denial of relief , *inter alia*, on grounds that

10. The affidavits of Sonya Chavez and Esperanza Trevino fail to support a finding of innocence by a clear and convincing standard.

11. Applicant's claim that she was never alone with the child is contradicted by the record and hence does not support a finding of innocence by a clear and convincing standard.

The CCA adopted the State District Court's Findings of Fact and Conclusions of Law and denied relief. *Ex Parte Lucio*, WR-72,702-02.  The CCA added:

"Regarding ground for relief ten, while we note that the trial court's findings and conclusions are valid on the merits, the issue is not cognizable on habeas review."

*Id.* at 2 citing *Ex parte Alba*, 256 S.W.3d 682, (Tex. Crim. App. 2008).

A.    **The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings**.

There are two types of actual innocence claims that may be raised in a collateral attack on a conviction. A bare innocence claim, or *Herrera*-type claim involves a substantive claim in which applicant asserts his bare claim of innocence based solely on newly discovered evidence.  *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853 (1993). The other actual innocence claim, a *Schlup*-type claim, we explained "is a procedural claim in which applicant's claim of innocence does not provide

---

[70] The redacted language pertains only to the ineffective assistance claim previously raised.

164

a basis for relief, but is tied to a showing of constitutional error at trial." *Schlup v. Delo*, 513 U.S. 298, 314, 115 S.Ct. 851 (1995).

The Supreme Court has assumed, without deciding, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue[71] open to process such a claim." *Herrera*, 506 U.S. at 417, 113 S.Ct. 853. The threshold showing for this assumed right would "necessarily be extraordinarily high." *Id.*; *accord House v. Bell*, 547 U.S. 518, 555, 126 S.Ct. 2064 (2006) (noting that such a standard, if it were to exist, would be higher than the standard set out in *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851 (1995), for overcoming defaulted claims). However, "[n]ever having seen such a claim that was supported by anything that even approached a 'truly persuasive demonstration' of actual innocence, '[t]he Fifth Circuit has rejected this possibility and held that claims of actual innocence are not cognizable on federal habeas review' in accordance with [its] pre-*Herrera* precedent." *Cantu v. Thaler*, 632 F.3d 157, 167 (5th Cir.2011) (alterations in original) (quoting *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003)), cert. granted, judgment vacated on other grounds, —— U.S. ——, 132 S.Ct. 1791 (2012). Melissa nevertheless raises the claim here so as not to waive the possibility of further review of the issue in the federal courts even if such review requires application of the "extraordinarily high" standard espoused in *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639 (1986), which requires a habeas petitioner to show that "a constitutional violation has probably resulted in the conviction of one who

---

[71] Federal Habeas Counsel acknowledges that "the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency," *Herrera*, 506 U.S. at 417, 113 S.Ct. 853, but raises the claim in order to preserve it for review in the Unite States Supreme Court.

165

is actually innocent."

**B.     The CCA's Decision That the Issue Is Not Cognizable on State Habeas Review Does Not Constitute a Procedural Bar to Review in Federal Habeas Court.**

In *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App.1996), the CCA held that a bare innocence claim is cognizable in an application for writ of habeas corpus. *Id.* at 205. The CCA reasoned that "Incarceration of an innocent person offends federal due process, therefore a bare innocence claim raises a constitutional challenge to the conviction."  However, to be granted relief on a bare innocence claim, the CCA held that the applicant must show that the new evidence unquestionably establishes his innocence. *Id.* at 208–09. The CCA interpreted this to mean that the applicant must prove by clear and convincing evidence that no reasonable juror would have convicted the applicant in light of the new evidence. *Id.* at 209. To determine whether a habeas applicant has reached this level of proof, the CCA directed the convicting court to weigh the evidence of the applicant's guilt against the new evidence of innocence. *Id.* at 207.  Because the CCA has acknowledged that a bare innocence claims *is* cognizable on habeas, has set forth the proper standard for reviewing such a claim, and ordered its employment even as late as 2010, *see generally Ex parte Gilbert*, 2010 WL 5233003 (Tex. Crim. App., 2010) (not designated for publication) (remanding to State District Court with instruction to consider Gilbert's bare innocence claim in habeas hearing), its decision to the contrary in this case does not constitute and "adequate" state procedural bar to consideration of Melissa's claim in this forum.

166

**C.     The CCA's Adopted Findings of Fact Are Implausible in Light of the Record as a Whole.**

The State District Court did not conduct an evidentiary hearing.[72]  Because there was no hearing, the State District Court was in no better position to judge the credibility of the sworn affidavits provided by Sonya Chavez and Esperanza Trevino than this Court.  Thus, the CCA's adopted Finding of Fact which is not supported by any evidence in the record one way or the other and is not entitled to deference. *See generally DeVille v. Whitley*, 21 F.3d 654 (5th Cir.), cert denied, 513 U.S. 968 (1994) (factual finding presumed correct *if* petitioner received a full and fair hearing on the issue).

Moreover, the finding is implausible in light of the record as a whole which demonstrated that Melissa was not Mariah's sole caregiver.  Mariah's 15-year-old sibling Alexandra had both opportunity and motive to injure her.

Alexandra had at least equal (and probably greater) opportunity to injure Mariah.  During separate interviews at Maggie's House, Richard and Rene both explained that when their parents were away doing "jobs" or getting food Daniella, or Alexandra and Selina would look after them. Tab 4; Video Time Index: 17:07, 21:11, 46:54. The time when Melissa and her husband were away doing "jobs" was not insignificant; they were trying to support a large family. See, e.g., Tab 7 at

_____

[72] Melissa did submit affidavits in support of her arguments but the State did not. Nevertheless, the State District Court issued an order that there were no "controverted, previously unresolved factual issues material to the legality of [Melissa's] confinement" which might require a hearing.  Accordingly, this is not a case where the State District Court conducted a "paper hearing" by means of dueling affidavits and review of the records as might have required this Court to grant deference to its Findings of Fact on this issue. *Compare, e.g., Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002) (deferring to credibility determinations made by state judge who held a hearing-by-affidavit, but presided over both trial and habeas proceeding).

167

1;(Melissa variously had jobs as "a cashier, a telemarketer, and a home provider"); Tab 17 at 476

(November 2006 CPS report noting that "Ms. Lucio continues to work as a home provider"); 37 RR

144 (punishment phase testimony that Melissa also occasionally left Mariah with a neighbor while

she went to work as a "provider"); Tab 3 (Robert Alvarez worked as a cook at Peso Bill's). This fact

was confirmed by CPS Caseworker Miguel Rodriguez who visited the home in December and found

Alexandra (15) and Selina (14) alone in the apartment babysitting the younger children. DX 23 at

30. According to Richard, when his older sisters were left in charge they would spank the kids

"everywhere." Tab 4; Video Time Index 11:25, 13:15. Furthermore, evidence existed that the

children inflicted bite marks on each other, 37 RR 108, and the alleged "bite marks" on Mariah's

back appeared to be "in the adult size," 34 RR 34, and at 15 years of age Alexandra was big enough

to be a potential source of those alleged "bite marks." Finally, and of particular note, Alexandra was

with  Melissa at the apartment when Mariah fell down the stairs and thus had equal opportunity to

cause her fatal injuries if such injuries were, in fact, intentionally inflicted.

Alexandra also had at least equal (and probably greater) motive to injure Mariah. Lacking

the financial resources for daycare, Melissa and Alvarez used the two oldest minor daughters,

Alexandra and Selina, as live-in babysitters. Additionally, according to Melissa's sister, Sonya

Chavez, Alexandra admitted to hitting Mariah in the face and head with a closed fist. Tab 6 (Chavez

Affidavit). This admission was made in front of Selina (Melissa's daughter), Esperanza Trevino

(Melissa's mother) and Melissa's other sister (Diane Cerda). *Id. See also* Tab 6 (Trevino Affidavit).

When asked why, Alexandra explained, "I would hit her because my mom and dad were always

doing drugs[73] and we had to take care of them [the children]." Tab 6 (Chavez Affidavit).[74]  And it

was corroborated as to substantive fact by another witness.  On June 24, 2008, Mitigation Expert

Norma Villanueva interviewed several of Melissa's family members (including Alexandra) regarding

their knowledge of the incident. During that interview, Alexandra stated that she had been angry that

day as Mariah was always crying and getting in between the other children while they were fighting

and playing. According to Villanueva, Alexandra stated that she "was the reason Mariah fell down

the stairs."

      In light of the foregoing evidence – which is consistent over the course of many interviews

with multiple individuals by different interviewers as well as with CPS records – the CCA's adopted

finding of fact that the affidavits submitted by Sonya Chavez and Esperanza Trevino are "not

credible" is implausible and not entitled to deference under the AEDPA.

      Furthermore, the State District Court's Finding of Fact that Melissa claimed to show actual

innocence merely by virtue "of her own allegation" is a misrepresentation of the argument and the

evidence as a whole. Melissa argued in her Applicant's Brief that Gilman had been ineffective in

failing to investigate and present available witness and documentary evidence that she could not

have "severely" beaten Mariah in the 24 to 48 hours immediately prior to her death.  It is the

---

     [73] Authorities did, in fact, find drug paraphernalia during a search of the new apartment. Tab 2 (SX 3 at 22). Melissa stated that it belonged to her husband and denied that she had been using. Tab 2 (SX 3 at 22). Melissa had tested clean from March 2006 through her final test on January 10, 2007. DX 25 at 1

     [74] After Alexandra admitted hitting Mariah, the conversation ended and Alexandra and Selina left. *Id.* A few days later Chavez attempted to continue the conversation but Selina informed her "that she had already talked to her sisters and that they all had agreed not to say anything and that they weren't gonna talk." Tab 6 at 3. Daniella explained to Chavez that they were refusing to speak up because they didn't want Alexandra to go to jail. *Id.*

evidence previously presented in support of *that* claim which Melissa contended also supported *this* one.  The State District Court clearly did not miss the connection because its Findings of Fact ¶ 60 relevant to *this* claim refers the reader directly to Finding of Fact ¶ 35 relevant to that earlier ineffective assistance of counsel claim.  For the Court's convenience, Melissa repeats the salient evidence regarding the timeline of events here.

> Mariah died sometime after 5:30 or 6:00 p.m. on Saturday, February 17, 2007. Tab 2 (SX 3 at 15-18); 33 RR 64 (Police Dispatch Order at 6:51 p.m.). Dr. Farley opined that Mariah's fatal head trauma likely occurred within 24 hours of her death, i.e. Friday evening. 34 RR 36, 58. Dr. Kuri disagreed and testified that it could have occurred earlier. 35 RR 25, 35 (discussing progression of symptoms); 35 RR 38-39 (vomiting, drowsiness, locked jaw on Friday early symptoms of brain injury from a fall on Thursday evening). Accord Tab 12 (Dr. Young Affidavit).

Regardless of which expert is correct as to the time of the fatal injury, Melissa demonstrated that it would have been impossible for her to beat Mariah severely enough to cause the fatal head injury and all of the contemporaneous bruises because they were never alone together during the relevant time period.

According to Alvarez's written statement to police:

> On Thursday, February 17, 2007, I got home from picking up the kids from school. I went and dropped them off at the house with my wife, Melissa Lucio. I took off to go and get Alex, Selina, and Sarah from school also. I came back and we all went inside the apartment located on Madison Street. My wife and I made sandwiches for the kids to eat. The kids were watching TV and doing their homework. Mariah was watching tv with the kids also. We stayed home for the rest of the night. I took off at about 6:00 p.m. to go check on the apartment on Lee Street. I had my sons, Richard and Rene with me to go check on the apartment. We drove over and checked on the apartment to see if the utilities were on. The light was on but the water was off. I noticed that there was a water leak under the house and I called the landlord to get it fixed. I returned to the apartment on Madison Street.

> *Everyone was at the house.* The kids were eating their sandwiches and other fruits. Mariah was doing fine on this day as well as the other kids. The kids finished their work and went to sleep. I went to sleep at about 1:00 AM or 2:00 AM. It was

me Melissa and Mariah in our bed. The other kids sleep in the living room.

Tab 3 (Written Statement) (emphasis added). Thus, according to Alvarez, Mariah was fine on Thursday and Melissa was not home alone with her anytime after school let out around 3:00 p.m. that day. Alvarez's statement continues:

> That Friday, February 16, 2007, our electricity had gotten shut off.[75] Gabriel and Adriana did not go to school for this reason and also for the reason that Gabriel had a doctor's appointment. I did not go to work either. So I waited for the kids to get out of school. Right before 3:00 PM, Melissa, Mariah, Gabriel and Adriana and I went to pick up Rene, Richard and Bobby. We went to the apartment on Lee Street.

Tab 3 (Written Statement) (emphasis added). Thus, according to Alvarez, he was with Melissa, Mariah, Gabriel, and Adriana until sometime after 3:00 p.m. on Friday. The family then went together to pick up Rene, Richard, and Bobby from school and to check on the new Lee Street apartment before returning to the old Madison Street apartment. When they returned Selina and Alexandra were both there because Alvarez took Selina with him to move some boxes, Tab 3 (Written Statement), Alexandra was helping Melissa pack, Tab 2 (SX3 at 3-4), and all of the kids not with Alvarez were also at home.

After Alvarez returned home from delivering boxes Friday evening, there is no indication from any source that he left again until Saturday afternoon or evening. Moreover, according to Rene, up to the time Alvarez left the apartment on the day of Mariah's death both parents had been taking care of Mariah. Tab 4 Video Time Index 32:30. *See also* Tab 3 (Written Statement) (Alvarez tending to already-ill Mariah).

The record thus affirmatively establishes that Melissa was never alone with Mariah during

---

[75] Presumably the electricity had been cut off on that date because the family was moving out the following day and they (or their landlord) had cancelled service.

the relevant time period and never had an opportunity to severely beat her in the manner suggested by the State's expert – at least not without the beating being witnessed. The State was unable to present a single eyewitness to any beating during the relevant time period much less a "severe" beating. The CCA's Finding of Fact ¶ 35 does nothing to contradict this argument. First, Alvarez's written statement does not, in fact, assert that he personally witnessed Melissa physically abusing Mariah; only that Alvarez noticed "bruises on Mariah's cheeks" and "bruises on her arms." Tab 3 (Alvarez Statement). Even assuming, *arguendo*, that Alvarez *ever* stated that he witnessed Melissa physically abusing Mariah, the Finding of Fact does not pin that event to the critical time frame during which Mariah's fatal head injury occurred. Accordingly, to the extent it is even relevant, it is implausible in light of the evidence upon which it relies and not entitled to deference under the AEDPA. Second, the Finding of Fact actually proves Melissa's point. It asserts that, according to Alvarez's statement, Melissa was "never alone with the victim" because it establishes that she was "alone in the apartment *with the remaining children*, including the victim" at least twice. ¶ 35 (emphasis added). Melissa did not dispute that she had been "alone in the apartment *with the remaining children*" in the State District Court and does not do so now. She points out, however, that being alone "with the remaining children" (plural) is not the same as being "alone with the victim" (singular).[76]   Moreover, the "remaining children" included at least four potential eyewitnesses to any beating which might have occurred: 15-year-old Alexandra,14-year-old Selina, 9-year-old Richard, and 9-year-old Rene. And as discussed, *supra* under Ground Six § C, both

---

[76] The CCA's related Conclusion of Law that Melissa's claim she was "never alone with the child" is "contradicted by the record," ¶ 11, is likewise "unreasonable in light of the evidence." Given the CCA's own acknowledgment that Melissa was at best only ever "alone in the apartment *with the remaining children*," ¶ 35 (emphasis added), at least four of whom were of sufficient age to be witnesses, her claim is *not* contradicted by the record.

Richard and Rene expressly denied ever observing Melissa physically abusing Mariah!  *See also*

*supra* n. 37.

**D.     The CCA's Decision Was Contrary To, or Involved an Unreasonable Application of Supreme Court Precedent .**

Admittedly the AEDPA "compels federal courts to review for reasonableness the state court's

ultimate conclusion, not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th

Cir. 2001).  However, the CCA provided *no* reasoning and, as just discussed, the CCA's Findings

of Fact were either irrelevant, implausible in light of the record, or actually support Melissa's claim

of actual innocence. Accordingly, the CCA's adjudication of the claim resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the state

court proceeding.   Moreover, Melissa submits that  review of the evidence discussed above which

clearly establishes:

> that she was never alone with Mariah during the 24 to 48 hours during which she is alleged to have brutally beaten her to death,

> that despite the presence of at least four potential witnesses at any given time during the relevant 24 to 48 period the State has *no* witness who can testify to observing Melissa beating Mariah, and

> that Mariah's fatal closed-head injury was forensically consistent with the fall down a flight of stairs described by Melissa and witnessed by her son

she has satisfied the "extraordinarily high" standard suggested by *Herrera*, and set forth in *Murray*

that the State had convicted one "who is actually innocent" of capital murder.  Accordingly Melissa

is entitled to federal habeas relief.

173

GROUND ELEVEN: The trial court violated Melissa's constitutional due process right recognized by *Beck v. Alabama*, 447 U.S. 625 (1980), to receive a jury instruction on the lesser included offense of injury to a child.

During the jury instructions conference for the Guilt/Innocence phase of trial Gilman requested a jury instruction on the lesser included offense of injury to a child. 36 RR 3-12. His proposed instruction stated:

Our law provides that a person commits an offense if he intentionally or knowingly by acts causes serious bodily injury to a child.

"Child" means a person 14 years of age or younger.

"Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

Now, if you find from the evidence beyond a reasonable doubt that on or about the 17th day of February, 2007, in Cameron County, Texas, defendant, MELISSA ELIZABETH LUCIO, did then and there cause serious bodily injury to Mariah Alvarez, a child, then you will find the defendant MELISSA ELIZABETH LUCIO guilty of injury to a child.

Unless you so find beyond a reasonable doubt or if you have a reasonable doubt thereof, you will acquit the defendant, MELISSA ELIZABETH LUCIO and say by your verdict "Not Guilty."

II CR 228-229. The State District Court waffled, 36 RR 3-12, but ultimately rejected the request stating:

I don't believe there is any testimony to show that if she's guilty, she's only guilty of the lesser offense. Had they concluded that her death was caused by lack of medical attention that she knew should have been given, then I think an injury to the child would have been a logical conclusions. But the intentional striking, if it results in death, it results in death. I'm going to deny it.

36 RR 12. The jury charge did not include the requested language II CR 231-236.

On direct appeal, Appellate Counsel asserted that injury to a child is a lesser included offense

174

of capital murder and that although there was some evidence Melissa had hit Mariah causing bruises, there was no evidence she had done so during the time frame in which the medical examiner had opined that the fatal injury had occurred. Appellant's Brief at 117-118. Appellate counsel concluded by claiming the error was not harmless beyond a reasonable doubt. The CCA overruled the point of error as inadequately briefed. *Lucio v. State*, 351 S.W.3d 878, slip op. at 29-30 (2011).

The CCA's decision to reject Melissa's *Beck* claim on independent and adequate state procedural grounds would normally bar review in federal habeas proceedings. However, a petitioner may overcome procedural bar if he can show a fundamental miscarriage of justice. *Pickney v. Cain*, 337 F.3d 542 (5th Cir. 2003). For reasons discussed *supra* under Ground Ten, Melissa asserts that that she has shown that to allow her conviction for capital murder and death sentence to stand would constitute a fundamental miscarriage of justice.

**A.    The Applicable Substantive Standard and the Standard of Review of Review in Federal Habeas Proceedings**.

Melissa reasserts her claim based on *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382 (1980), a case wherein the Supreme Court struck down as a violation of due process an Alabama law barring trial judges from giving lesser included offense instructions in capital cases. *Beck* held that "the jury must be permitted to consider a verdict of guilt of a noncapital offense 'in every case' in which 'the evidence would have supported such a verdict.' " *Hopper v. Evans*, 456 U.S. 605, 610, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) (quoting *Beck*, 447 U.S. at 643, 627, 100 S.Ct. 2382). Thus, "*Beck* held that due process requires that a lesser included offense instruction be given when the evidence warrants such instruction." Id. at 611, 100 S.Ct. 2382.

"*Beck*'s holding applies when the state trial court refuses a lesser included offense

175

instruction." *Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir.1988).  The *Corodova* court explained that "the source of that refusal, whether by operation of state law or refusal by the state trial court judge, is immaterial." *Id.* at 767 n. 2.8 In applying *Beck*'s mandate, this Circuit has adopted the federal standard, that "a lesser included offense instruction should be given 'if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater.' " *Id.* (quoting *Hopper*, 456 U.S. at 612, 102 S.Ct. 2049). This standard is " equivalent to the *Beck* standard that a lesser included instruction must be given when the evidence would have supported such a verdict." *Id.* Thus, "in a capital case, the jury must be allowed to consider a lesser included noncapital offense if the jury could rationally acquit on the capital crime and convict for the noncapital crime."  *Id.*

A *Beck* claim raise a mixed question of law and fact which is normally reviewed under 28 U.S.C. §2254(d)(1). *See generally Reed v. Quarterman*, 504 F.3d 465, 490 (5th Cir. 2007).  However because the case was never addressed on the merits, a *de novo* standard of review is applied.

## B.     Melissa was Entitled to a Lesser Included Offense on the Offense of Injury to a Child.

Admittedly Mariah's body was covered in bruises and Melissa did admit to police during her interrogation to causing many of her old injuries – truthfully or not.   But Melissa *never* admitted doing anything which might have caused Mariah's fatal head injury or contemporaneous new bruises.  She simply could not explain to police where they had come from except maybe from Mariah's recent tumble down a flight of stairs.   She just wasn't sure.  But this was explained when medical experts testified that it was a "closed-head" injury, *i.e.* one not visible on the outside of the skull or skin.  Furthermore, according to those medical experts, Mariah's fatal closed-head injury occurred 24-48 hours before her death.  Although Melissa was *never* alone with Mariah during this

176

time period, the State failed to produce a single witness who could testify to having observed Melissa

beating Mariah.  But there was evidence that Melissa had told the EMTs and police – from the very

beginning – that Mariah had fallen down a flight of stairs during the critical time window.  There is

also evidence that the physical injuries and progression of Mariah's symptoms were not inconsistent

with that fall.  Accordingly, there was *some* evidence from which the jury might find Melissa guilty

of injury to a child for causing her older injuries, but not guilty of doing anything to cause her fatal

head injury or other contemporaneous injuries.  Accordingly, under *Beck* Melissa was entitled to the

lesser included offense instruction and the State District Court's refusal to give it violated her right

to due process of law.  The error was not harmless beyond a reasonable doubt.

### THE AEDPA PERMITS A FEDERAL EVIDENTIARY HEARING

Melissa has filed her federal habeas petition after the enactment of the AEDPA.

Accordingly, Melissa's request for an evidentiary hearing is governed by 28 U.S.C. § 2254(e)(2),

which restricts the circumstances under which a federal habeas court is authorized to conduct a

hearing to review a state court decision. *Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997)

(citation omitted).  Pursuant to § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court
> proceedings, *the court shall not hold an evidentiary hearing on the claim* unless the
> applicant shows that-
>
>> (A) the claim relies on-
>>> (i) a new rule of constitutional law, made retroactive to cases
>> on collateral review by the Supreme Court, that was previously
>> unavailable; or
>>> (ii) a factual predicate that could not have been previously
>> discovered through the exercise of due diligence; *and*
>> (B) the facts underlying the claim would be sufficient to establish by
>> clear and convincing evidence that but for constitutional error, no
>> reasonable factfinder would have found the applicant guilty of the

underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added); *see (Terry) Williams v. Taylor*, 529 U.S. at 430; *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998); *Hernandez v. Johnson*, 108 F.3d 554, 558 (5th Cir. 1997) (§ 2254(e)(2) identifies limited circumstances under which a federal court may hold a habeas hearing on a claim whose factual basis was not developed in state court).

"By the terms of its opening clause the statute applies only to prisoners who have 'failed to develop the factual basis of a claim in State court proceedings.'" *Williams v. Taylor*, 529 U.S. at 430 (quoting 28 U.S.C. § 2254(e)(2)). A petitioner cannot be said to have "failed to develop" a factual basis unless the undeveloped record is a result of petitioner's own decision or omission. *Clark v. Johnson*, 202 F.3d 760, 765 (5th Cir. 2000) (citing *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998)). Diligence, for purposes of the opening clause, depends on whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend on whether those efforts could have been successful. *Williams*, 529 U.S. at 435.

In the instant case, Melissa sought a live evidentiary hearing in state habeas court where she would have the opportunity to question previously uncalled witnesses such as her other children, her mother, her sister, several CPS caseworkers, and a properly qualified forensic pathologist; and where she would also have the opportunity to question attorneys Gilman and Cordova plus Villanueva, Dr. Pinerkman, and Stapleton regarding their handling of the case. The request was denied. Because Melissa was diligent in seeking an evidentiary hearing 28 U.S.C. § 2254(e)(2) does not preclude an evidentiary hearing in this Court to supplement the evidence supporting his claims.

## CONCLUSION

For the foregoing reasons, Petitioner Melissa Lucio, respectfully requests that this Court grant

him an evidentiary hearing and all relief to which he is lawfully entitled.

Respectfully Submitted,

Margaret Schmucker
Attorney for Petitioner Melissa Elizabeth Lucio
Texas Bar No. 24030874
SD No. 30267

Law Office of Margaret Schmucker
9311 North FM 620 # 254
Austin, Texas 78726

Phone (512) 236-1590
Fax (877) 465-7066
E-Mail M.Schmucker@AppellateCourtLaw.com

## CERTIFICATE OF SERVICE

I, Margaret Schmucker, certify that today, January 9, 2014, a copy of the AO241 Petition

Form together with this supporting brief for petitioner, was served electronically upon Ed Marshall,

counsel for Respondent whose mailing address is:

Office of the Attorney General
Postconviction Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548

300 West 15th Street, 8th Floor
Austin, Texas 78701

Margaret Schmucker

180