Scanned  Jun 18, 2013

# CCA Scanning Cover Sheet



2455628

CaseNumber: WR-72,702-02

EventDate: 08/19/2011

Style 1: LUCIO, MELISSA ELIZABETH

Style 2:

Event code: 11.071 WRIT RECD

EventID: 2455628

Applicant first name: MELISSA ELIZABETH

Applicant last name: LUCIO

Offense: 19.03

Offense code: Capital Murder

Trial court case number: 07-CR-885-B-WR

Trial court name: 138th District Court

Trial court number: 320310138

County: Cameron

Trial court ID: 148

Event map code: FILING

Event description: Habeas Corpus - Capital Death

Event description code: 11.071

Remarks: 9 VOLUMES

☐ Document Scanned                                    ☐ Created or
                                                     ☐ Appended

Scanned by              date              Image ID

Comment

printed by  bhooper
printed on  8/22/2011 9:26 AM

**Scanned  Jun 18, 2013**

APPLICANT <u>MELISSA ELIZABETH LUCIO</u>       APPLICATION NO.  <u>72,702-02</u>

     11.071 APPLICATION
     FOR WRIT OF HABEAS CORPUS        <u>XXX</u>


11.071 APPLICATION FOR WRIT OF HABEAS CORPUS DENIED WITH
WRITTEN ORDER

*Per Curiam*_____        1-9-13
JUDGE                                              DATE

**Scanned Jun 18, 2013**

Court of Criminal Appeals Number:

Cause Number: **07-CR-885-B-WR**

## WRIT I

# CLERK'S RECORD

# VOLUME 1

The State of Texas

vs.

## MELISSA ELIZABETH LUCIO

Mailed to the Court of Criminal Appeals on
**MARCH 30, 2011**

Aurora De La Garza
Cameron County District Clerk

*Christi Tusa*
**CHRISTINA TUSA**
Deputy Clerk

Filed in the Court of Criminal Appeals, at Austin, Texas
the      day of          , 2011.

Louise Pearson.
Clerk of Court of Criminal Appeals

RECEIVED IN
COURT OF CRIMINAL APPEALS
AUG 19
APR 01 2011

*Louise Pearson, Clerk*

_____
Deputy

**Scanned  Jun 18, 2013**

<div style="text-align:center">Trial Court Number: **07-CR-885-B-WR**</div>

| | |
|---|---|
| EX PARTE: | APPLICATION FOR WRIT OF HABEAS CORPUS |
| **MELISSA ELIZABETH LUCIO** | FROM CAMERON COUNTY, TEXAS |
| | IN THE **138**TH  JUDICIAL DISTRICT COURT |

| | |
|---|---|
| Applicant's Name: | **MELISSA ELIZABETH LUCIO** |
| Offense: | **CAPITAL MURDER** |
| | |
| Cause Number: | **07-CR-885-B-WR** |
| Sentence: | **DEATH** |
| Date of Sentence: | **7/22/08** |
| Judge Presiding At Trial: | **HON. ARTURO C. NELSON** |
| Court of Appeals Number: | |
| Citation to Opinion: | S.W. 2d       S.W. 2d |
| | S.W. 2d       S.W. 2d |
| Hearing Held on Application: | ☐ Yes   ☒ No |
| Findings of Facts Filed: | ☐ Yes   ☒ No |
| Recommendation: | ☐ Granted  ☐ Dismissed  ☐ Denied  ☒ None |
| Judge Presiding Over Application: | **HON. ARTURO C. NELSON** |

**Scanned  Jun 18, 2013**

CAUSE NUMBER

**07-CR-885-B-WR**

| | |
|---|---|
| **The State of Texas** | IN THE **138TH** JUDICIAL |
| VS | DISTRICT COURT OF |
| **MELISSA ELIZABETH LUCIO** | CAMERON COUNTY, TEXAS |

# I N D E X

| INSTRUMENT | DATE FILED | PAGE |
|---|---|---|
| **VOLUME 1** | | |
| APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT TO SECTION 4 OF ARTICLE 11.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE | 1/13/2011 | 1 |
| APPENDIX TO APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT TO SECTION 4 OF ARTICLE 11.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE (VOLUME 1 OF 5) | 1/13/2011 | 149 |
| MELISSA LUCIO WRIT APPENDIX  DVD (PDF FORMAT) | 1/13/2011 | 221 |
| CERTIFIED BILL OF COSTS | 3/30/2011 | 222 |
| CLERK'S CERTIFICATE | 3/30/2011 | 223 |
| **VOLUME 2** | | |
| (CONT.) APPENDIX TO APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT TO SECTION 4 OF ART. 11.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE (VOLUME 1 OF 5) | 1/13/2011 | 224 |
| CERTIFIED BILL OF COSTS | 3/30/2011 | 397 |
| CLERK'S CERTIFICATE | 3/30/2011 | 398 |
| **VOLUME 3** | | |
| APPENDIX TO APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT TO SECTION 4 OF ARTICLE 11.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE (VOLUME 2 OF 5) | 1/13/2011 | 399 |
| CERTIFIED BILL OF COSTS | 3/30/2011 | 626 |
| CLERK'S CERTIFICATE | 3/30/2011 | 627 |
| **VOLUME 4** | | |
| (CONT.) APPENDIX TO APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT TO SECTION 4 OF ARTICLE 11.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE (VOLUME 2 OF 5) | 1/13/2011 | 628 |
| CERTIFIED BILL OF COSTS | 3/30/2011 | 852 |
| CLERK'S CERTIFICATE | 3/30/2011 | 853 |

U:/Appeals Department/Criminal/Index

Scanned  Jun 18, 2013

# I N D E X

| INSTRUMENT | DATE FILED | PAGE |
|---|---|---|
| **VOLUME 5** | | |
| APPENDIX TO APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT TO | | |
| SECTION 4 OF ARTICLE 11.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE | | |
| (VOLUME 3 OF 5) | 1/13/2011 | 854 |
| CERTIFIED BILL OF COSTS | 3/30/2011 | 1086 |
| CLERK'S CERTIFICATE | 3/30/2011 | 1087 |
| **VOLUME 6** | | |
| APPENDIX TO APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT TO | | |
| SECTION 4 OF ARTICLE 11.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE | | |
| (VOLUME 4 OF 5) | 1/13/2011 | 1088 |
| CERTIFIED BILL OF COSTS | 3/30/2011 | 1313 |
| CLERK'S CERTIFICATE | 3/30/2011 | 1314 |
| **VOLUME 7** | | |
| (CONT.) APPENDIX TO APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT | | |
| TO SECTION 4 OF ARTICLE 11.071 OF THE TEXAS CODE OF CRIMINAL | | |
| PROCEDURE (VOLUME 4 OF 5) | 1/13/2011 | 1315 |
| CERTIFIED BILL OF COSTS | 3/30/2011 | 1560 |
| CLERK'S CERTIFICATE | 3/30/2011 | 1561 |
| **VOLUME 8** | | |
| APPENDIX TO APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT TO | | |
| SECTION 4 OF ARTICLE 11.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE | | |
| (VOLUME 5 OF 5) | 1/13/2011 | 1562 |
| CERTIFIED BILL OF COSTS | 3/30/2011 | 1788 |
| CLERK'S CERTIFICATE | 3/30/2011 | 1789 |
| **VOLUME 9** | | |
| (CONT.) APPENDIX TO APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT | | |
| TO SECTION 4 OF ARTICLE 11.071 OF THE TEXAS CODE OF CRIMINAL | | |
| PROCEDURE (VOLUME 5 OF 5) | 1/13/2011 | 1790 |
| LETTER TO JUDGE ARTURO C. NELSON | 2/15/2011 | 1961 |
| LETTER TO D.A. | 2/15/2011 | 1962 |
| LETTER TO DEFENDANT | 2/15/2011 | 1963 |
| CRIMINAL DOCKET SHEETS | | 1964 |
| CRIMINAL INDICTMENT | 5/16/2007 | 1974 |

rml

**Scanned  Jun 18, 2013**

# I N D E X

| INSTRUMENT | DATE FILED | PAGE |
|---|---|---|
| CHARGE OF THE COURT | 7/8/2008 | 1981 |
| FORMS OF VERDICT | 7/8/2008 | 1982 |
| COURT'S CHARGE ON PUNISHMENT | 7/10/2008 | 1983 |
| FORMS OF VERDICT | 7/10/2008 | 1986 |
| JUDGMENT OF JURY-VERDICT OF GUILTY; PUNISHMENT FIXED BY JURY-NO PROBATION GRANTED; SENTENCE TO INSTITUTIONAL DIVISION (DEATH SENTENCE) | 8/1/2008 | 1988 |
| BILL OF COSTS | 3/30/2011 | 1995 |
| CERTIFIED BILL OF COSTS | 3/30/2011 | 1996 |
| CLERK'S CERTIFICATE | 3/30/2011 | 1997 |

U /Appeals Department/Criminal/Index

**Scanned  Jun 18, 2013**

FILED /2 : 26 O'CLOCK P M
AURORA DE LA GARZA, DIST. CLERK

No. 07-CR-885-B

Writ No. _____

JAN 1 3 2011

DISTRICT COURT CAMERON COUNTY TEXAS
BY _____ DEPUTY

IN THE

138th JUDICIAL DISTRICT COURT OF

CAMERON COUNTY, TEXAS

and

THE TEXAS COURT OF CRIMINAL APPEALS

---

*Ex Parte* MELISSA ELIZABETH LUCIO,

Applicant

---

APPLICATION FOR WRIT OF HABEAS CORPUS
PURSUANT TO SECTION 4 OF ARTICLE 11.071 OF
THE TEXAS CODE OF CRIMINAL PROCEDURE

---

LAW OFFICE OF MARGARET SCHMUCKER

MARGARET SCHMUCKER
512 East 11th Street, Suite 205
Austin, Texas 78701
Tel: (512) 236-1590
Fax: (512) 524-3479
SBN 24030874

ATTORNEY FOR APPLICANT,
MELISSA ELIZABETH LUCIO

**EVIDENTIARY HEARING REQUESTED**

000  1.

**Scanned Jun 18, 2013**

<u>IDENTITY OF PARTIES AND COUNSEL</u>

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**A.    Parties**

    1. Plaintiff-Appellee: State of Texas
    2. Defendant-Appellant: Melissa Elizabeth Lucio

**B.    Attorneys For Plaintiff-Appellee:**

| | |
|---|---|
| Attorney on Appeal: | Rene Gonzalez<br>Lane Haygood<br>974 East Harrison St.<br>Brownsville, TX 78520<br>(956) 544-0849 |
| Attorneys at Trial: | Armaando Villalobos, Cameron County DA<br>(SBN 00788584)<br>and<br>Alfredo Padilla, Jr., ADA (SBN 15404600)<br>Joseph Krippel, ADA (SBN 24007515)<br>Maria DeFord, ADA (SBN 24043626)<br>974 East Harrison St.<br>Brownsville, TX 78520<br>(956) 544-0849 |

**C.    For Defendant-Appellant:**

| | |
|---|---|
| Attorney on State Writ: | Margaret Schmucker (SBN 24030874)<br>Law Office of Margaret Schmucker<br>512 East 11th Street, Suite 205<br>Austin, Texas 78701 |

i

UCG **2**

**Scanned  Jun 18, 2013**

|  |  |
|---|---|
| Attorney on Appeal: | Larry Warner (SBN 20871500) |
|  | Attorney at Law |
|  | 777 East Harrison Street. |
|  | Brownsville, TX 78520 |
|  | (956) 547-4784 |
| Attorneys at Trial: | Peter C. Gilman (SBN 07952500) |
|  | 6933 N. Expressway |
|  | Olmito, TX 78575 |
|  | (956) 350-6954 |
|  | Adolfo E. Cordova, Jr. (SBN 00787286) |
|  | Law Office of Adolofo E. Cordova, Jr. |
|  | 711 North Sam Houston |
|  | San Benito, TX 78586 |
|  | (956) 399-1299 |

Respectfully Submitted,

Margaret Schmucker
Attorney for Defendant
Texas Bar No. 24030874

Law Office of Margaret Schmucker
512 East 11th Street, Suite 205
Austin, Texas 78701

Phone (512) 236-1590
Fax (512) 524-3479

ii

Scanned  Jun 18, 2013

TABLE OF CONTENTS

Page

IDENTITY OF PARTIES AND COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

    ISSUE ONE: Melissa Lucio was deprived of the Sixth Amendment right
    to legal representation when she was arrested and detained for more than
    90 days on capital murder charges before the court appointed counsel to
    represent her. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

    A.    Melissa' right to counsel attached at magistration and detention
        but no counsel was appointed for three months. . . . . . . . . . . . . . . .  26

    B.    Melissa is entitled to a new trial because the State elicited
        incriminating statements from her after the right to counsel
        attached but without counsel present and used those statements to
        prepare its case and discredit Melissa's defense. . . . . . . . . . . . . . .  27

    ISSUE TWO: Melissa Lucio was deprived of effective assistance of trial
    counsel guaranteed by the United States Constitution and the Texas
    Constitution when her trial counsel failed to file a pre-trial motion to
    suppress Melissa's custodial statements.. . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

iii

**Scanned  Jun 18, 2013**

A.     Mr. Gilman was deficient for failing to file a pre-trial motion to suppress Melissa's custodial statement as involuntary or to present supporting expert testimony at a suppression hearing.. . . . . 31

B.     Mr. Gilman was deficient for failing to file a pre-trial motion to suppress everything after Melissa invoked her right to remain silent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

C.     Mr. Gilman's deficient performance result in extreme prejudice to her defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ISSUE THREE:  Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution and the Texas Constitution when her trial counsel failed to adequately investigate and present all available testimony and evidence to support Melissa's defense and otherwise subject the State's case to meaningful adversarial testing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

A.     Trial Counsel failed to obtain the assistance of a competent forensic pathologist to review the medical examiner's autopsy and testify on Melissa's behalf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B.     Trial counsel failed to make a timely request for or adequately utilize the assistance of a mitigation specialist and psychologist. . . 48

C.     Trial counsel failed to adequately investigate and present available witnesses and documentary evidence supporting Melissa's reasonable explanations for Mariah's old injuries. . . . . . . 55

       1.     CPS Caseworkers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
       2.     Maggie's House Interviews. . . . . . . . . . . . . . . . . . . . . . . . . 63
       3.     Other CPS Caseworkers and Service Providers. . . . . . . . . . . 68
       4.     John Alvarez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

iv

**Scanned  Jun 18, 2013**

D.   Trial counsel failed to adequately investigate and present available witnesses and documentary evidence that Alexandra Lucio or Robert Alvarez could have caused Mariah's old injuries, and possibly her death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

1.   Trial counsel failed to investigate and/or present available evidence that Melissa's 15-year-old daughter Alexandra could have been responsible for any non-accidental old injuries as well as Mariah's fall down the stairs. . . . . . . . . . 72

2.   Trial counsel failed to investigate and/or present available evidence that Robert Alvarez, could have been responsible for any non-accidental old injuries – in particular Mariah's broken arm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

3.   Mr. Gilmans' failure to pursue or present evidence that someone else caused Mariah's injuires and death resulted in prejudice to Melissa's defense warranting a new trial. . . . . 78

E.   Trial counsel failed to adequately investigate and present available witnesses and documentary evidence that Melissa could not have "severely" beaten Mariah in the 24 to 48 hours immediately prior to her death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

F.   Trial counsel failed to dispel the notion that Melissa would not explain the source of Mariah's old injuries  because she had caused them. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

G.   Trial counsel failed to adequately investigate and present available evidence explaining why Melissa did not know the extent or severity of Mariah's "new" bruises and contemporaneous fatal head injury. . . . . . . . . . . . . . . . . . . . . . . . . . 84

H.   Trial counsel failed to dispel the notion that Melissa was indifferent towards Mariah and ignored her needs. . . . . . . . . . . . . . 85

v

Scanned Jun 18, 2013

I.    Mr. Gilman's deficient trial preparation resulted in prejudice to Melissa's defense during both phases of her trial. . . . . . . . . . . . . 89

ISSUE FOUR: The trial court deprived Melissa of the constitutional right to present a complete defense when it excluded the testimony of defense experts during the guilt/innocence phase of trial. . . . . . . . . . . . . 91

ISSUE FIVE: Melissa Lucio was deprived of effective assistance of trial counsel guaranteed by the United States Constitution and the Texas Constitution when her trial counsel failed to file proper pre-trial motions regarding, or otherwise timely object to, improper and highly prejudicial testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

A.    Trial counsel failed to obtain a ruling on a pre-trial motion *in limine* to exclude evidence of Melissa Lucio's prior passive neglect and failed to object to such evidence as irrelevant and unduly prejudicial when introduced at trial. . . . . . . . . . . . . . . . . . . 96

B.    Trial counsel failed to object to speculative and highly prejudicial expert testimony by non-experts during trial. . . . . . . . . . . . . . . . . 100

      1.    Dr. Vargas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
      2.    Ranger Escalon. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

C.    Trial counsel failed to challenge the improper, inadmissible, and highly prejudicial statements by the investigating officers contained in State's Exhibits 3, 4, and 5. . . . . . . . . . . . . . . . . . . 105

D.    Trial counsel failed to challenge the State's use of information obtained through custodial questioning by CPS Therapist Beto Juarez after Melissa's arrest, without a contemporaneous *Miranda* waiver, and without counsel present. . . . . . . . . . . . . . . . . . . . . . . 109

E.    Trial counsel failed to challenge Dr. Farley's improper "expert" testimony as scientifically invalid, subjective, and conclusory. . . . . 112

**Scanned  Jun 18, 2013**

F.   Trial counsel failed to challenge the State's "Shaken Baby Syndrome" evidence as junk science, sheer speculation, and more prejudicial than probative. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

G.   Trial counsel failed to object to Dr. Farley's improper testimony regarding the results of forensic examinations conducted by non-testifying experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

H.   Trial counsel failed to object to the State's cross-examination of Dr. Kuri regarding injuries to Mariah's body. . . . . . . . . . . . . . . . . 123

I.   Trial counsel failed to object to testimony by police officers regarding drug paraphernalia on grounds it was irrelevant to her guilt or innocence and more prejudicial than probative. . . . . . . . . . 123

J.   Trial counsel failed to object to the State's punishment phase questions regarding Melissa's prior, unrelated DWI conviction even though evidence of that conviction had never been admitted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

K.   Trial counsel's multiple deficiencies resulted in a failure to subject the State's case to adversarial testing. . . . . . . . . . . . . . . . . 127

ISSUE SIX: Whether Melissa was deprived of due process and due course of law when the State failed to disclose potentially exculpatory evidence in sufficient time for the defense to utilize it at trial. . . . . . . . . . 127

ISSUE SEVEN:  Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution and the Texas Constitution when her trial counsel failed to preserve trial error for review on direct appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

ISSUE EIGHT: Whether the trial court deprived the defendant of a fair and impartial judge and jury and due process of law when he commented upon the evidence by laughing at a defense expert during testimony where such conduct was observed by the jury. . . . . . . . . . . . . . . . . . . . . 134

000  8

**Scanned  Jun 18, 2013**

ISSUE NINE: Melissa was deprived of effective assistance of appellate counsel because the State failed to provide her attorney with a complete transcript. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

ISSUE TEN: Melissa is entitled to habeas relief because she is actually innocent of the offense of capital murder.. . . . . . . . . . . . . . . . . . . . . . 139

viii

006   9

Scanned  Jun 18, 2013

## STATEMENT OF JURISDICTION

Jurisdiction of this Court is invoked under The Texas Code of Criminal Procedure, Article 11.071, as a petition for writ of habeas corpus from a final judgment of conviction and sentence of death in the 138th[th] Criminal District Court of Cameron County, Texas.

1

UCC **10**

**Scanned  Jun 18, 2013**

STATEMENT OF THE CASE

Applicant was convicted in the 138th Judicial District Court of Cameron County for the offense of capital murder and sentenced to death. Applicant's motion for new trial was overruled on October 31, 2008. Appeal to the Court of Criminal Appeals was automatic. TEX. R. APP. PROC. 25.2(b).

The Clerk's Record was filed on December 12, 2008. The Reporter's Record was filed on August 7, 2009. Applicant's brief on direct appeal was filed on February 3, 2010. The State's response brief on direct was filed on September 2, 2010. Applicant's reply brief was filed on the October 4, 2010. The case was set for submission on oral argument on November 3, 2010. As of the drafting of this brief, Applicant's direct appeal remains pending. Applicant is confined in the Gatesville Unit of the Texas Department of Corrections.

Pursuant to Article 11.071 § 4(a) of the Texas Code of Criminal Procedure, the instant State Application for Writ of Habeas Corpus was due on or before the 45th day after the date the State's original brief was filed as required by Article 11.071 § 4(a) of the Texas Code of Criminal Procedure. However, pursuant to Article 11.071 § 4(b), the convicting court granted Applicant's request for a 90-day extension of that filing deadline. The instant State Application for Writ of Habeas Corpus is timely filed on or before the extended due date of January 17, 2011.

2

**Scanned  Jun 18, 2013**

STATEMENT OF THE ISSUES

ISSUE ONE: Melissa Lucio was deprived of the Sixth Amendment right to legal representation when she was arrested and detained for more than 90 days on capital murder charges before the court appointed counsel to represent her

ISSUE TWO: Melissa Lucio was deprived of effective assistance of trial counsel guaranteed by the United States Constitution and the Texas Constitution when her trial counsel failed to file a pre-trial motion to suppress Melissa's custodial statements.

ISSUE THREE: Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution and the Texas Constitution when her trial counsel failed to adequately investigate and present all available testimony and evidence to support Melissa's defense and otherwise subject the State's case to meaningful adversarial testing

ISSUE FOUR: The trial court deprived Melissa of the constitutional right to present a complete defense when it excluded the testimony of defense experts during the guilt/innocence phase of trial

ISSUE FIVE: Melissa Lucio was deprived of effective assistance of trial counsel guaranteed by the United States Constitution and the Texas Constitution when her trial counsel failed to file proper pre-trial motions regarding, or otherwise timely object to, improper and highly prejudicial testimony.

ISSUE SIX: Whether Melissa was deprived of due process and due course of law when the State failed to disclose potentially exculpatory evidence in sufficient time for the defense to utilize it at trial

ISSUE SEVEN: Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution and the Texas Constitution when her trial counsel failed to preserve trial error for review on direct appeal

3

**Scanned  Jun 18, 2013**

ISSUE EIGHT: Whether the trial court deprived the defendant of a fair and impartial judge and jury and due process of law when he commented upon the evidence by laughing at a defense expert during testimony where such conduct was observed by the jury

ISSUE NINE: Melissa was deprived of effective assistance of appellate counsel because the State failed to provide her attorney with a complete transcript

ISSUE TEN: Melissa is entitled to habeas relief because she is actually innocent of the offense of capital murder.

4

**Scanned  Jun 18, 2013**

STATEMENT OF FACTS

Melissa Lucio had her first child when she was 17 years old.  Tab 2 (SX 3 at 43).  She was 38 at the time of her arrest in relation to the death of Mariah Alvarez. *Id.*  Mariah Alvarez was born on September 6, 2004.  She was Melissa's 13th child. DX 26 at 14.

Even prior to Mariah's birth, Melissa had difficulty controlling her children. They were "very aggressive" towards each other and towards other children including hitting and pushing, which resulted in bumps and bruises "all the time."  35 RR 94-95, 111-112.  They even bit one another.  Tab 2 (SX 3 at 48).  *See also* 35 RR 96 (Sonya Chavez admitting to biting); 37 RR 108 (foster mom testifies to children biting each other).  Melissa was not an aggressive person and "never disciplined them" for their bad behavior.  35 RR 95-96.

At the time of Mariah's birth, Melissa tested positive for cocaine. DX 26 at 14. Melissa's minor children – including Mariah –  were placed in foster care on September 21, 2004, due to neglect, *not* abuse.  DX 23 (The Burke Foundation 90-day Treatment Plan dated 6/20/2005 - Familial Assessment / Summary).  While in foster care, all of the children were seen as aggressive to the point of becoming violent. *See, e.g.,* DX 23 at 16.   Richard and Gabriel were both on medication for Attention Deficit Hyperactivity Disorder.  35 RR 164.  In May of 2005, Melissa's

5

**Scanned  Jun 18, 2013**

oldest son, 19-year-old John Lucio, was charged with sexually abusing his younger brothers.  DX 23 at 19.  In turn, Rene, Richard, Robert,[1] and Gabriel acted out in violent and/or sexually inappropriate ways towards each other, towards their younger sisters, and towards other little girls.  *See, e.g.,* DX 23 at 16-20, 22.

While in foster care with Ramon and Alfonsa Castillo, Mariah received weekly physical / occupational therapy because she was weak and favored the left side of her body.  DX 23 (*e.g.,* Reports of Dora Cackley dated 3/21/2005, 3/29/2005, 4/18/2005, 4/29/2005).  Mariah had difficulty walking because her feet were turned to the side instead of facing front and needed special shoes to aid her.  DX 23 (Report of Dora Cackley 1/4/2006, 1/23/2006).  In March of 2006, while Mariah remained in foster care, she suffered a self-inflicted head injury when she lost her balance, slipped, and fell from a toy with a small set of stairs.  DX 19, 21.  The fall caused her to lose consciousness.  DX 23 (Burke Foundation 24 hour Incident Report).  After that, Mariah's foster parents noted that she had to be closely supervised because she wanted to climb everything.  DX 23 (May 2006 Log of Notable Behaviors).

Throughout her time in foster care, Mariah also threw repeated temper tantrums during which she would smack her head on the floor.  *See, e.g.,* DX 20, 22, 23.  Due

---

[1] Melissa's husband's name is also Robert.  To avoid confusion, Melissa's husband will be referred to herein as "Robert Alvarez" or just "Alvarez" and Melissa's son will be referred to as "Robert" or "Bobby."

6

**Scanned  Jun 18, 2013**

to the risk of injury to herself, Mariah's foster parents were authorized to utilize brief physical restraints on her. DX 23 (PRN/Restraint Approval).  CPS documented that Mariah would frequently bite her peers in foster care.  DX 23 (January 2006 Log of Notable Behaviors).

Nine of Melissa's children – including Mariah – were returned to her care on November 21st of 2006. 33 RR 170; 34 RR 46.  At the time, Melissa and her husband, Robert Alvarez, were living in second story apartment located at 214 East Madison. 32 RR 44, 33 RR 9; SX 13; DX 1, DX 2.  Access to the apartment was by means of an exterior wooden stairwell; the stairwell was steep, and the distance between the steps was not equal so the stairs were difficult to ascend / descend.  33 RR 20-21; 34 RR 48; DX 1, 2.

When the children were returned home, Mariah had several large insect bites and / or scratches on her body that her foster parents had been treating with Lotrimin antibiotic ointment.  Tab 2 (SX 3 at 50).  The sore spots continued to be a problem up until the time of Mariah's death.  Tab 2 (SX 3 at 50).

Melissa's sister, Sonya Chavez, saw Mariah on three occasions after she had been returned home: for about five hours on Thanksgiving Day, for about five hours the second week in December, and for less than an hour on New Year's Day.  35 RR 101, 104, 118.  On each occasion, Mariah looked healthy; Chavez did not see any

7

**Scanned  Jun 18, 2013**

kind of bruises or markings on her that would indicate that she was being abused.  35 RR 101, 104, 105-106.  However, on two of her visits, Chavez saw Mariah crying because of rough play with Melissa's older children and took her out of the room.  35 RR 112, 114.[2]

In December of 2006, CPS Caseworker Miguel Rodriguez visited the Lucio/Alvarez home on East Madison Street and reported that "there's a lot of chaos in this household" and that two teenage girls (Alexandra (15) and Selina (14)) were in the apartment with the younger children and that no one was watching Sara (age 3) or Mariah (age 2).  DX 23 at 30. Rodriguez noted with concern that while he was there Sara started going down the stairs unsupervised.  DX 23 at 30.[3]

The older boys who, it bears repeating, were aggressive to the point of becoming violent, DX 23 at 16, would "horse around" with Mariah, and Melissa explained that this caused some of Mariah's older bruises, Tab 2 (SX 3 at 19-20). Sonya Chavez also testified that the boys "liked to wrestle a lot" and that "[t]hey

---

[2] Chavez distinguished Melissa's crying from "complaining" or "talking" about it. 35 RR 114.

[3] Rodriguez reported his findings by phone to Angie Romo. DX 23 at 31. Angie Romo was the CPS caseworker responsible for visiting the children at least once a month after they had been returned home. 33 RR 171-173; DX 23 at 16.  A CPS case worker is responsible for checking on the welfare of children in the home. 3 RR 175-76.  If a CPS case worker suspected abuse, he or she would check for physical signs of injury.  33 RR 175-176.  Romo followed these procedures with Melissa's children between November of 2006 and February of 2007. 33 RR 177.    Romo did not report any signs of physical abuse.

8

**Scanned  Jun 18, 2013**

would hit each other, punch each other" and that this would leave bruises.  35 RR

103, 111-112.  Melissa also explained that Mariah would wake up in the middle of

the night and get out of bed to play.  Tab 2 (SX 3 at 20).  Melissa explained that after

one such episode she found Mariah with a bruise under her eye

which, she believed, was the result of  Mariah running into something or tripping

over something on the floor in the dark.  Tab 2 (SX 3 at 20, 31).  *See also* SX 30

(bruise under eye).  Mariah also had a bruise on the bottom of her foot that Melissa

could not explain.  Tab 2 (SX 3 at 31).  Notably, however, Rodriguez had previously

reported that  "The Apt. is a mess with tiny things all over the floors . . .,"  DX 23 at

30, Mariah had developmental disabilities that made her unsteady on her feet, DX 23

(*e.g.,* Reports of Dora Cackley dated 3/21/2005, 3/29/2005, 4/18/2005, 4/29/2005,

1/6/2006, 1/23/2006), and Maria would wander the apartment at night in the dark,

Tab 2 (SX 3 at 31).

On Thursday, February 15, 2007, Melissa and her husband were moving their

family from their second-story apartment to a first-floor apartment. 32 RR 35.  The

first story apartment was located  at 117 West Lee.  32 RR 44, 33 RR 10; SX 14.

Melissa was inside the apartment packing clothes and household items with her

daughter, Alexandra (15).   Tab 2 (SX3 at 3-4).  Selina (14), Rene (9), and Richard

(9), were with their dad transporting the family's belongings to the new apartment.

9

**Scanned  Jun 18, 2013**

Tab 2 (SX 3 at 3, 5).  Melissa's husband had instructed Robert ("Bobby") (7), Gabriel (6), Adriana (4), and Sarah (3) to stay inside but after he left, they went outside to play in the back yard leaving Mariah upstairs. Tab 2 (SX 3 at 3, 7, ).  At some point, Melissa noticed that Mariah was no longer in the apartment and went looking for her.  Tab 2 (SX 3 at 6).  Melissa found Mariah at the bottom of the exterior stairwell to the apartment.  Tab 2 (SX 3 at 5); DX 1 (stairwell), DX 2 (stairwell). Melissa had to go down the entire flight of stairs to get to her.  Tab 2 (SX 3 at 6-7).  Mariah was "not crying real heavy" indicating that she was "real hurt or anything" and Melissa did not see any marks on her except that she was "bleeding from her tooth from the bottom." Tab 2 (SX 3 at 6, 7, 14).  *See also* SX 30 (swollen, busted lip).  Melissa did not think that the other children playing in the yard had seen Mariah fall because they were around the corner of the building.  Tab 2 (SX 3 at 7).

Later that afternoon, Melissa fed Mariah tamales from H.E.B. and she vomited one time. Tab 2 (SX 3 at 4).  After that, Mariah seemed fine. Tab 2 (SX 3 at 4, 15).  That evening, Melissa went to wash clothes and took Mariah along.  *Id.*  Mariah drank a Sprite "'cause she felt kind of warm" and then went to sleep. Tab 2 (SX 3 at 15).

The following day, Friday the 16th, Mariah ate cereal with milk for breakfast, and half a bologne /cheese sandwich for lunch.  Tab 2 (SX 3 at 12-13).  However,

10

000 19

**Scanned  Jun 18, 2013**

after that, Mariah did not seem to want to eat any more. Tab 2 (SX 3 at 13). Melissa

tried to get Mariah to eat dinner, but she just wanted juice. Tab 2(SX 3 at 13, 14).

By Friday night, Mariah was having trouble breathing. Tab 2 (SX 3 at 10). Melissa

thought she was just getting a cold and tried clear her nostrils. Tab 2 (SX 3 at 10).

Mariah's right nostril was "more stuffier" than her left nostril. Tab 2 (SX 3 at 10).

Also, Melissa noticed that Mariah had her mouth closed real tight – like the lockjaw

her older daughter had experienced during an epileptic seizure when she was younger

– but Mariah did not know what caused it in Mariah and did not think it serious

enough to require medical attention because Mariah did not appear to be having a

seizure. Tab 2 (SX 3 at 10-11).

At some point after the fall, Melissa also noticed what looked like bite marks

on Mariah's back. Tab 2 (SX 3 at 56), SX 23. Melissa denied biting Mariah. Tab 2

(SX 3 at 41), but explained that her children had a history of biting each other and

that she had asked if one of them had bit her. Melissa further explained that when

they said no, she did know who else to ask.   Tab 2 (SX 3 at 56).

When Mariah woke up Saturday morning, she did not want to eat again; all she

wanted was water, and then she went back to sleep.   Tab 2 (SX 3 at 12, 14).  At this

point, Melissa wanted to take Mariah to the doctor because she was acting "very

different" and it was not like her to sleep so much, but the family was busy with

11

UCC 20

**Scanned  Jun 18, 2013**

getting settled into their new apartment, Melissa's husband needed the family's only vehicle to retrieve mattresses from storage, and Melissa was afraid the doctors would see Mariah's old bug bites, scrapes, and bruises and accuse her of child abuse.  Tab 2 (SX 3 at 9, 14, 41). In the end Melissa noted that Mariah seemed to be breathing okay and decided to just wait, to let Mariah rest and see if she improved, and if she didn't they would take her to the hospital later that day.  Tab 2 (SX 3 at 14, 19). Melissa's husband left about 5:30 or 6:00 p.m. with Selina, Richard and Rene to retrieve the mattresses; Melissa  instructed the other kids to just leave Mariah alone and let her sleep; and Melissa began unpacking and sorting the kids' clothes in another room. Tab 2 (SX 3 at 15-17).  Melissa went to check up on Mariah while her husband was gone; she appeared to be fine, she was breathing and "doing okay." Tab 2 (SX 3 at 16,17) .  A short while later Melissa's husband returned and found Mariah unresponsive. Tab 2 (SX 3 at 18).  Melissa's daughter called the police.  Tab 2 (SX 3 at 18).

EMTs Randall Nestor and David Mendoza were the first on the scene.  33 RR 84, 98.  They arrived approximately 15 minutes after being called.  33 RR 95-96. When they entered the apartment, Mariah was lying face up on the floor in the living room.  33 RR 85, 99.  Although Mariah had no pulse, was not breathing, and was clinically dead, Nestor decided to treat her anyway.  33RR 86-87.  As the EMTs

12

**Scanned  Jun 18, 2013**

undressed Mariah, they noted bruises to her entire body in multiple stages of healing. 33 RR 86, 89-90, 100.  Nestor also noted that Mariah had a deviation of the left eye, indicating probable head trauma. 33 RR 87-88.  When questioned, Melissa explained that Mariah had fallen down the stairs.  33 RR 87.  Nestor incorrectly assumed Melissa meant the three steps in the front of the family's current apartment and reported this to police when they arrived. 33 RR 87.

HPD Officer Jaime Palafox was dispatched to the scene. 33 RR 64.  When he arrived, the EMTs were already assisting Mariah. 33 RR 65.  Melissa was kneeling Melissa's head.  33 RR 68.  Officer Palafox observed the EMTs remove Mariah's shirt.  33 RR 67.  Mariah's chest and body were bruised.  33 RR 67.  Melissa again explained that Mariah had fallen down the steps while the family was in the process of moving out of the Madison Street apartment.  33 RR 70.[4]  HPD Officers Robert Mendiola and Javier Villlareal arrived shortly thereafter.  33 RR 75.  Melissa reiterated for the third time that Mariah had fallen down the stairs at the family's previous apartment.  33 RR 77, 148.

The EMTs continued to do CPR on Mariah for at least 25 minutes while they transported her to the hospital. 32 RR 72.  Dr. Alfredo Vargas, was the Emergency

---

[4] Officer Palafox testified that Melissa told him that Mariah had fallen down "two" steps, but this information had actually come from EMT Nestor. 32 RR 70; 33 RR 87.

13

OCC **22**

**Scanned  Jun 18, 2013**

Room doctor on call at Valley Baptist Emergency Hospital the evening Mariah was brought in by EMS.  32 RR 71-72.  Mariah was unresponsive and dehydrated with multiple bruises of unknown age but at various stages of healing.  32 RR 72, 86.  Dr. Vargas did not observe any type of contusion or abrasion that would indicate a possible head injury.  32 RR 77.  However, Dr. Vargas admitted that it was possible for an impact with a hard object such as a wall or stairs to cause blood to collect under a child's skull and that usually (*not* "always") there is some external evidence of the impact.  32 RR 78-80.[5]

CPD Detective Rebecca Cruz was at the police station when Melissa, Robert Alvarez, and their children arrived.  Det. Cruz gave Melissa a *Miranda* warning but did not contemporaneously advise her that she was under arrest for murder.  32 RR 28-30; Tab 2 (SX 3 at 2).   Rather, Cruz advised Melissa that they were "just investigating" Mariah's death.  Tab 2 (SX 3 at 2).  Melissa signed the *Miranda* waiver at 9:53 p.m. 321RR 32; SX 1. After Melissa was *Mirandized*, CPD Detectives Cruz, Banda, Villareal, and Palafox began a team interrogation which lasted 5 ½ to 6 hours – until 3:15 a.m. 32 RR 33-34; 33 RR 37.  Although Melissa had been up since at least 8 a.m., Tab 2 (SX 3 at 12), the detectives never offered her anything to

---

[5] Dr. Vargas testified that such internal injury could be revealed by a CAT scan, but that no CAT scan was taken of Mariah's head.  32 RR 78, 80.

14

**Scanned  Jun 18, 2013**

drink or eat or an opportunity to sleep.  33 RR 38.  Additionally, the armed officers

repeatedly attempted to intimidate Mariah into making a confession by standing over

her waving photographs in her face and yelling at her.  *See, e.g.,* Tab 2 (SX 3 at 26-

27, 32, 37-38, 40-41).  In one instance, Officer Banda indicated that he would like to

"beat you half to death."  Tab 2 (SX 3 at 26-27).  By 12:15 a.m. Melissa was so

exhausted she laid her head on the table to rest for a few minutes.  32 RR 56; SX 3.

This continued off and on throughout the rest of her interrogation.  *See* SX 3, SX 4,

SX 5.

 While Melissa was being interrogated by the CPD Detectives, Texas Ranger

Victor Escalon, Jr., arrived at the police station to assist with that interrogation.  33

RR 109-111, Tab 2( SX 4).  Although no autopsy had yet been performed, the

detectives informed Ranger Escalon that Mariah had been badly beaten and died as

a result of her injuries. 33 RR 112-113.[6]  Ranger Escalon further assumed that the

scratches on Mariah's back were bite marks.  33 RR 124.  Ranger Escalon, attempted

to get Melissa to "open up" and tell him what happened in order to confirm his belief

that she had beaten Mariah and caused fatal head trauma.  33 RR 120-121.  However,

---

[6] Det. Cruz admitted that police had no evidence that Melissa struck, shook, or threw Mariah with sufficient force to cause the brain hemorrhage that killed her.  33 RR 44. Although none of the officers were qualified as experts, and they did not yet have the medical examiner's pathology report, they "ruled out" Melissa's explanation for Mariah's injuries and blamed her for Mariah's death.  33 RR 53-54.

15

**Scanned  Jun 18, 2013**

on cross-examination, Ranger Escalon tacitly admitted that he had no basis to suspect that Mariah's death had resulted from head trauma based on photographs that showed only injuries to her torso, arms, and legs. 33 RR 128. He testified that he had relied on his experience in making that assumption. 33 RR 128.

Melissa has repeatedly denied abusing Mariah, hitting her out of frustration, biting her, or doing  anything to cause her death. *See* Tab 2 (SX 3, SX 4, SX 5). Melissa never admitted to shaking Melissa, SX 2, 33 RR 136-137. Melissa's sister Sonya Chavez corroborated her statement that Mariah did not misbehave, and that Melissa did not express frustration with her. 35 RR 104. Nevertheless, Melissa was charged with capital murder because authorities assumed  that  "she's the only one that was with this child."  33 RR 44. *But see*  DX 23 at 30 (Rodriguez reporting Mariah being supervised by Alexandra (15) and Selina (14) in December).

The following day, Officer Villareal transported Melissa to the Brownsville Dental Office where Dr. Tara Rios was to take dental impressions from both Melissa and Robert Alvarez. 33 RR 148-149. En route, Melissa asked to use the phone to call her sister. 33 RR 149. Officer Villareal handed Melissa a phone, observed her dial out. 33 RR 154.[7]  According to Sonya Chavez – the person on the other end of

---

[7] Officer Villareal testified that he overheard her tell the person on the other end of the line not to blame Robert [Alvarez].  However, on cross-examination, Officer Villareal admitted that he did not prepare his narrative report regarding the incident for more than a year. 33 RR 155-156.

16

**Scanned  Jun 18, 2013**

the line – Melissa stated that she did not know what had happened to Mariah, and that she was being charged with murder for spanking her kids. 35 RR 97. She never said "it wasn't Robert that did it, it was me that did it" and she did not otherwise confess to beating up on Mariah. 35 RR 97, 109.

Dr. Norma Jean Farley, the chief forensic pathologist for Cameron County, conducted an autopsy on Mariah two days after her death. 34 RR 6, 11. She spent approximately four hours measuring and photographing Mariah's external injuries, and about two additional hours conducting an internal examination. 34 RR 12; SX 22-35. During the external portion of the examination, Dr. Farley noted abrasions and scabbed areas on Mariah's scalp as well as crusted areas where she was missing hair. 34 RR 15, 21; SX 30. Dr. Farley opined that this was consistent with Mariah's hair being pulled, but did not opine as to the specific circumstances of the incident. 34 RR 15. Furthermore, Dr. Farley noted a set of scrapes across Mariah's shoulder. SX 23. Dr. Farley opined that these were "obvious" bite marks which resulted from the "dragging" of the teeth across the back." 34 RR 16, 18, 22, 33; SX 23. Although Dr. Farley believed the marks appeared to be "in the adult size," no attempt was made to match them to Melissa's dental molds. 34 RR 34. In addition, Dr. Farley noted

---

Officer Villareal interpreted Melissa's conversation as meaning it was her fault and that she had killed Mariah, but defense counsel objected to Officer Villareal's interpretation and the objection was sustained. 33 RR 154-155.

UGC  26

**Scanned  Jun 18, 2013**

three "very small" abrasions in the vaginal area and a couple of little contusions on the inner thigh. 34 RR 39. Dr. Farley explained that the abrasions were just an area where the outer layer of skin had rubbed off and opined that "anything" could have caused such abrasions. 34 RR 51. Dr. Farley likewise opined that "anything" could have caused the contusions. 34 RR 51. Finally, Dr. Farley noted abrasions (scrapes) and contusions (bruises) on Mariah's face, chest, and legs. 34 RR 14-15. Dr. Farley admitted that abrasions and contusions on the shins, calves, knees, and elbows are commonly caused by, *e.g.*, a playground fall, 34 RR 15, 17, but opined that similar injuries to the chest, abdomen, pubic area, undersurface of the eye, ears, and cheeks are not. 34 RR 17, 57. In summary, Dr. Farley opined that Mariah's various injuries could not have been caused by a fall down a flight of stairs. 34 RR 34, 55, 57. However, Dr. Farley admitted that "most" of Mariah's bruises were a "pinky, maroon" color and "that's a color we associate with an acute or recent bruise," and that they had all occurred within a one-day period. 34 RR 19, 54. Dr. Farley also admitted that bruises all over the body could be caused by a fall from a "significant height" that was not "simple," 34 RR 35, and that some people can suffer blunt force trauma and die falling down the stairs, 34 RR 55.

During the internal examination of the body, Dr. Farley noted the existence of bruising on both lungs and the right kidney. 34 RR 29. Dr. Farley did not opine as

UCC 27

**Scanned  Jun 18, 2013**

to the specific source of the bruises, but provided a non-exhaustive list of ways such bruising could occur.  34 RR 30.  Furthermore, Dr. Farley noted blood around the spinal cord.  34 RR 29.  Dr. Farley opined that these injuries were related to the bruises on Mariah's back and abdomen.  34 RR 29.  Dr. Farley also noted the existence of a healing left arm fracture.  32 RR 83 ("skeletal survey" x-ray done at hospital); 34 RR 30.  Dr. Farley opined that the fracture was 7 days to 2 weeks old. 34 RR 30-31.  Dr. Farley testified that such fractures "usually" resulted from "tugging" or "twisting" the arm.  34 RR 31.  Neither the "skeletal survey" x-ray nor Dr. Farley's photograph of the broken bone were published to the jury or introduced into evidence.  Finally, Dr. Farley noted "hemorrhage around both of the nerves that come from the eyes.  34 RR 33.

During the internal portion of the examination, Dr. Farley noted the existence of a "subdural hemorrhage" which is blood that has accumulated between the brain and the skull, 34 RR 23, a subarachnoid hemorrhage" which is blood sitting on the brain itself, 34 RR 24, and "multiple" contusions "all over" the scalp otherwise hidden by hair or simply not visible on the skin's surface, 34 RR 24, 26. The subdural hemorrhage was caused by a single blunt force trauma to the head and resulting

19

**Scanned  Jun 18, 2013**

rebound; it was not caused by shaking.[8]  34 RR 23-24, 28.  According to Dr. Farley, the trauma occurred within 24 hours of Mariah's death because the injury exhibited "the beginning of the fibrin" (i.e. fresh blood) and no spindle or white blood cells. 34 RR 36, 58.  However, this was just Dr. Farley's "best estimate" because the spindle cells and white blood cells indicative of healing would not appear for at least 48 to 72 hours after the initial injury. 34 RR 36, 60.  Dr. Farley explained that this type of "closed head injury" would not be visible during an external examination, 34 RR 23, but added that there would be other signs of injury such as lethargy, inability to eat or drink, vomiting, seizures, abnormal breathing, and ultimately coma, 34 RR 37-38.  Dr. Farley explained that such symptoms would be the result of pressure inside the skull due to swelling of the brain, 34 RR 52, and would appear "fairly quickly" after a fatal blow, but added that an adult might not recognize a child having a seizure. 34 RR 37.  In summary, Dr. Farley opined that Mariah's fatal closed head injury was the result of "non-accidental head trauma." 34 RR 53. *See also* 34 RR 39, 59.  However, Dr. Farley also admitted that such an injury could be the result of slamming into a piece of furniture or a floor, 34 RR 38, and that "many" of the other

---

[8] Mariah did not die of injury due to "shaken baby syndrome."  Mariah's neck was not broken. 34 RR 35.  And shaking of a baby doesn't produce the type of hemorrhage in the scalp noted in the autopsy. 34 RR 64, 70.

20

**Scanned  Jun 18, 2013**

contusions on Mariah's body "actually" or "probably" occurred "about the same time" as the head trauma, 34 RR 56.

Dr. Joseph Kuri, a neurosurgeon, testified regarding Mariah's brain injuries. 35 RR 4, 9.  Dr. Kuri agreed that Mariah suffered a blunt force trauma to the head. 35 RR 9, 24-25.   However, Dr. Kuri disagreed as to Dr. Farley's assessment that the injury necessarily occurred within 24 hours of Mariah's death, and resulted from abuse.  35 RR 25, 35 (discussing progression of symptoms); 35 RR 67, 87-88 (essentially, the cause of injury is anybody's guess).

Dr. Kuri indicated that the "most important part for any doctor" in assessing an injury is the "history of the patient." 35 RR 26-28.   Dr. Kuri explained that a head injury that had not resulted in an immediate loss of consciousness could get progressively worse, and the patient's progression of neurological symptoms would be important to a proper clinical diagnosis. 35 RR 28-29. Dr. Kuri further explained that blunt force trauma to the head would cause swelling of the brain resulting in increased intracranial pressure.  35 RR 31.  A patient suffering from intracranial pressure due to blunt force trauma would initially experience headaches, blurred vision, and vomiting, and then gradually the patient would become drowsy and unable to move, and finally the patient would become rigid. 35 RR 31. Dr. Kuri explained that this process is not immediate, "it takes time." 35 RR 32.  The main

21

OCC   30

**Scanned  Jun 18, 2013**

symptom is the patient's drowsiness because "[n]obody is going to die of a head injury without passing through unconsciousness." 35 RR 32.

In regard to Mariah, Dr. Kuri agreed that vomiting, drowsiness, and a locked jaw on Friday would be early symptoms of brain injury the previous day, 35 RR 38-39, and that such injury could be the result of a fall down the stairs, 35 RR 64, 88. Dr. Kuri explained that a baby "rolling down" a flight of stairs could produce additional, different traumas to the head. 35 RR 77. Dr. Kuri further explained that the hemorrhage in Mariah's retina would be due to the hemorrhage in the brain which infiltrated through the exit of the optic nerve. 35 RR 41. And Dr. Kuri opined that the injuries to the sides of Mariah's head were more likely the result of a fall where she hit one ear and then the other ear on the ground than from a hit by a hand. 35 RR 66. Dr. Kuri testified that children are more susceptible to head injuries than adults, and that the majority of such injuries are the result of such falls because children do not have good balance. 35 RR 48-49.

22

**Scanned  Jun 18, 2013**

## SUMMARY OF THE ARGUMENT

From the EMTs and Officers who responded to the scene of Mariah's death to the Medical Examiner who conducted the autopsy, and the District Attorney who prosecuted Melissa, this case presents a classic "rush to judgment."  At each step of the way, authorities took one look at the bruises on little Mariah Alvarez's body, assumed she had been abused by her mother, then refused to even consider any other possibility.

The EMTs and ER doctor – neither of whom was properly qualified as an expert in forensic pathology – opined that Mariah had been abused to death.  The detectives assigned to the case then interrogated and intimidated Melissa well beyond the point of exhaustion in an attempt to validate that opinion.  And the Medical Examiner's analytical process was skewed to match.  In short, authorities for the State molded a case against Melissa Lucio to fit a foregone conclusion, rather than investigating her repeated explanations for Mariah's many contusions and abrasions.  The State then withheld material evidence that tended to contradict its flawed case until the eve of trial.

At trial, the State presented its flawed case with little or no opposition from Melissa's defense attorneys who failed, among other things, to follow up on the incomplete exculpatory evidence that *had* been disclosed, failed to conduct a

23

uCC **32**

**Scanned  Jun 18, 2013**

competent independent investigation, failed to attempt to suppress Melissa's videotaped statement as involuntary and in violation of her right to remain silent, failed to retain the services of a forensic pathologist or provide such expert with all necessary documents and autopsy evidence for independent review, failed to consult with or obtain *any* medical expert whatsoever until just days before trial, failed to prepare that expert witness for trial, failed to fully utilize the mitigation expert and psychologist appointed to assist in trial preparation, failed to raise objections to repeatedly improper testimony by the State's witnesses, failed to call innumerable witnesses who would have corroborated Melissa's explanations and provided additional exculpatory evidence, and failed to lay a proper foundation for admission of documentary evidence that would also have corroborated Melissa's explanations.

The trial court compounded the problem by improperly prohibiting Melissa's defense attorneys from presenting much of the evidence they *had* prepared and by laughing at Melissa's *only* medical expert in front of the jury.

Melissa is, in fact, innocent of both child abuse and of capital murder. Mariah's old injuries were the result of sibling on sibling violence, paternal abuse, and accidental injury. Mariah's fatal head injury and contemporaneous bruises were the delayed result of a tumble down a flight of stars either accidental or as the result of being pushed by Melissa's 15-year-old daughter Alexandra.

24

**Scanned  Jun 18, 2013**

ARGUMENT

<u>ISSUE ONE</u>: Melissa Lucio was deprived of the Sixth Amendment right
to legal representation when she was arrested and detained for more than
90 days on capital murder charges before the court appointed counsel to
represent her.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused

shall enjoy the right ... to have the Assistance of Counsel for his defence." The text

of the Sixth Amendment thus makes clear that the right to counsel arises only upon

initiation of a "criminal prosecutio[n]."  A criminal prosecution begins, and the Sixth

Amendment right to counsel therefore attaches, when an individual who has been

placed under arrest makes an initial appearance before a magistrate for a

probable-cause determination and the setting of bail. *Rothgery v. Gillespie County*,

554 U.S. 191, 199, 128 S.Ct. 2578 (2008); *Brewer v. Williams*, 430 U.S. 387,

398-399, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Michigan v. Jackson*, 475 U.S. 625,

629, n. 3, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986).  In Texas, this occurs during

"magistration." in compliance with Article 15.17 of the Texas Code of Criminal

Procedure Article.[9]   *Rothgery*, 554 U.S. at 199.   The Supreme Court has

---

[9] Texas law has no formal label for a defendant's initial appearance before a magistrate, *see* 41
G. Dix & R. Dawson, Texas Practice Series: Criminal Practice and Procedure § 15.01
(2d ed.2001). "Magistration" is also referred to as a "preliminary arraignment" or "arraignment
on the complaint," *see* 1 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §
1.4(g), p. 135 (3d ed. 2007), or an "article 15.17 hearing." *See, e.g., Kirk v. State*, 199 S.W.3d
467, 476-477 (Tex. App. 2006). Regardless of what it is called, it is the hearing at which "the
magistrate informs the defendant of the charge in the complaint, and of various rights in further

25

UCL **34**

**Scanned  Jun 18, 2013**

acknowledged no "arguable justification" for the practice of failing to appoint counsel on the heels of a defendant's first appearance. *Rothgery*, 554 U.S. at 205.

A.  **Melissa' right to counsel attached at magistration and detention but no counsel was appointed for three months.**

In the instant case Mariah Alvarez died on Saturday, February 17, 2007.  That evening, Melissa Lucio was taken to the police station and interrogated for approximately six hours into the wee hours of the next morning.  SX 3, SX4, SX 5.  At the end of her interrogation Melissa was arrested for capital murder and detained.  SX 5 (arrest); I CR 12 (Melissa in custody).  Melissa was formally indicted on May 16, 2007 – nearly three months after her arrest and detention.  I CR 9-10.  Melissa was finally arraigned on May 31, 2007– *more* than three months after her arrest and detention – at which time the court finally – and belatedly – appointed legal counsel.  I CR 11, 14 (order appointing Peter C. Gilman).  Under *Rothgery*, Melissa was deprived of her Sixth Amendment right to have legal counsel appoited at the time of magistration.

---

proceedings," and "determine[s] the conditions for pretrial release," LaFave & Israel, CRIMINAL PROCEDURE § 1.4(g), p. 135;  Tex. Code Crim. Proc. Art. 15.17.

26

**Scanned  Jun 18, 2013**

**B.**    **Melissa is entitled to a new trial because the State elicited incriminating statements from her after the right to counsel attached but without counsel present and used those statements to prepare its case and discredit Melissa's defense.**

The constitutional error was not harmless. Where the State elicits incriminating statements from a criminal defendant after preliminary arraignment/magistration but before indictment without counsel present, the Supreme Court has found it "'clear' that the defendant 'was deprived of ... the right to the assistance of counsel.'" *Rothgery*, 554 U.S. at 199-200 *citing Brewer v. Williams*, 430 U.S. 387, 397-398, 97 S.Ct 1232, 51 L.Ed.2d 424 (1977). For example, in *Brewer*, the defendant surrendered to police on a charge of abduction, was taken before a magistrate for preliminary arraignment, and committed to jail. 430 U.S. at 391, 97 S.Ct. 1232. After his preliminary arraignment, and before he was indicted on the abduction charge, police elicited incriminating admissions that ultimately led to an indictment for first-degree murder. Neither of the defendant's lawyers had been present when the statements were obtained. 430 U.S. at 397-398, 97 S.Ct. 1232, 97 S.Ct. 1232. The admissions were introduced at defendant's murder trial. 430 U.S. at 394-395, 97 S.Ct. 1232. The United States Supreme Court affirmed the Eighth Circuit's conclusion that the constitutional violation entitled the defendant to a new trial. 430 U.S. at 389, 97 S.Ct. 1232. *See also Massiah v. United States*, 377 U.S. 201, 84 S.Ct.

27

000 36

**Scanned  Jun 18, 2013**

1199, 12 L.Ed.2d 246 (1964) (violation of right to counsel occurred at moment of post-indictment interrogation); *Kansas v. Ventris*, ___ U.S. ___, 129 S.Ct. 1841, 1845-1847, ___ L.Ed.2d ___ (2009) (statements taken in violation of *Massiah* inadmissible *except* to impeach defendant's testimony at trial).

During the more than three months from the date of Melissa's arrest for capital murder until the appointment of counsel she was charged with an unrelated incident of Driving While Intoxicated allegedly committed on September 15, 2006, was arraigned, and – without benefit of legal counsel on either case – plead guilty. I CR 85 (State's Notice of Extraneous Offenses: 5/16/2007 DWI Conviction, Cause No. 06-CCR 6849-C); 38 RR 35.  During the punishment phase, the fact that Melissa had a "prior" conviction for DWI was erroneously introduced into evidence as proof of future dangerousness. I CR 85, 38 RR 35.[10]

Additionally, on February 14, 2008, and May 5, 2008, the State sent CPS Therapist Beto Juarez to "treat" Melissa.  Tab 7; 33 RR 184-191; 35 RR 145-148. The State did not notify Melissa's trial counsel that it intended to send an agent to talk to Melissa, neither of Melissa's trial counsel were present during the interview,

---

[10] Following Melissa Lucio's conviction, and during the pendency of her direct appeal, direct appeal counsel sought to set aside the collateral DWI conviction in separate state habeas proceedings.

28

UL0 **37**

**Scanned  Jun 18, 2013**

and Juarez did not advise Melissa of her *Miranda*[11] rights. Following the "therapy" sessions Juarez provided written reports to CPS who, in turn, provided those reports – including Melissa's statements – to the Cameron County District Attorney who used them to prepare its case and discredit Melissa's defense. *See, generally* 35 RR 145-148, 158 (DA requested CPS files which included Juarez reports); 33 RR 177 (State eliciting testimony from CPS Caseworker Joanna Estrada about contents of CPS records during its guilt/innocence phase case-in-chief ), 38 RR 31 (punishment).

Because the State elicited incriminating statements from Melissa after her preliminary arraignment/magistration without counsel present, and the State used those statements to prepare its case and discredit Melissa's defense, Melissa was deprived of the right to the assistance of counsel and is entitled to a new trial. *Rothgery*, 554 U.S. at 199-200; *Brewer*, 430 U.S. at 397-398; *Massiah*, 377 U.S. 201.

---

[11] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

29

UCL 38

**Scanned  Jun 18, 2013**

ISSUE TWO: Melissa Lucio was deprived of effective assistance of trial counsel guaranteed by the United States Constitution and the Texas Constitution when her trial counsel failed to file a pre-trial motion to suppress Melissa's custodial statements.[12]

A defendant in a criminal proceeding has both a federal and state constitutional right to effective assistance of counsel at trial. U.S. CONST. Amend. VI; TEXAS CONSTITUTION, Art. 1 § 10.  Claims of ineffective assistance of counsel are to be reviewed under the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668, 684-86 (1984).[13]  Under that standard, trial counsel's failure to move to suppress evidence constitutes deficient performance when the evidence would have been suppressed if objected to and the failure was not attributable to a reasonable tactical

---

[12] Counsel distinguishes the claim raised in the instant proceeding from the claim raised on direct appeal. Here, counsel alleges that trial counsel was ineffective for failing to file a motion to suppress Melissa's statement as involuntary, failing to present expert testimony at a suppression hearing. Counsel also alleges that trial counsel was ineffective for failing to file a motion to suppress everything after Melissa invoked her right to remain silent.  In contrast, on direct appeal that Melissa's custodial statement was involuntary as being the result of an illegal arrest.

[13] *See Burger v. Kemp*, 483 U.S. 776 (1984). Under the *Strickland* standard, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. To demonstrate deficient performance, petitioner must show that counsel's conduct falls beyond the bounds of prevailing, objective professional standards. *Strickland*, 466 U.S. at 688; *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). Even if counsel's representation was deficient, a petitioner must also affirmatively prove prejudice by demonstrating that as a result of counsels errors his trial was rendered fundamentally unfair or unreliable.  To demonstrate that his trial was unreliable as a result of errors of counsel, a petitioner must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 695; *Williams*, 529 U.S. at 391. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.*

30

**Scanned  Jun 18, 2013**

decision. *Martin v. Maxey* 98 F.3d 844, 848 (5th Cir. 1996), citing  *Kirkpatrick v. Butler*, 870 F.2d 276, 283 (5th Cir.1989), cert. denied, 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990).  Such deficient performance results in prejudice where the exclusion of that evidence would have had an effect on the outcome of the defendant's case.  *Martin*, 98 F.3d at 848.

A.    **Mr. Gilman was deficient for failing to file a pre-trial motion to suppress Melissa's custodial statement as involuntary or to present supporting expert testimony at a suppression hearing.**

A confession must be suppressed if it is not the product of the defendant's free and rational choice. *See United States v. Restrepo*, 994 F.2d 173, 182 (5th Cir.1993). When a criminal defendant files a motion to suppress, the government has the burden of proving by a preponderance of the evidence that the statements were voluntary. *United States v. Rojas-Martinez*, 968 F.2d 415, 417 (5th Cir.), cert. denied, 506 U.S. 1039, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992), cert. denied, 506 U.S. 1059, 113 S.Ct. 995, 122 L.Ed.2d 146 (1993). A confession is not voluntary if it is the result of official overreaching, in the form of either direct coercion or subtle psychological persuasion. *Rojas-Martinez*, 968 F.2d at 418.  Thus, a statement which starts off as voluntary may – through coercion, persuasion, threats, verbal abuse, etc. – devolve to one which is involuntary.

31

OGC **40**

Scanned  Jun 18, 2013

The issue of voluntariness is a legal question and a criminal defendant is entitled to an independent finding, in the absence of the jury, of the voluntariness of an accused's statement if the question is raised . Tex. Code Crim. Proc. Art. 38.22 § 6. *See also Jackson v. Denno*, 378 U.S. 368, 376-77, 84 S.Ct. 1774, 1780-81, 12 L.Ed.2d 908 (1964). Courts consider a number of factors in determining whether a confession is the product of a free will. All of the circumstances are to be considered, including the following, but the presence or absence of any of these five factors need not be conclusive:

> (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment,
>
> (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession,
>
> (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him,
>
> (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel, and
>
> (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

*United States v. Restrepo*, 994 F.2d 173, 184 (5th Cir. 1993) citing 18 U.S.C. § 3501(b). Official overreaching, with regard to the voluntariness of the waiver of

32

UGG **41**

**Scanned  Jun 18, 2013**

rights and to the voluntariness of the confession itself, can take forms other than physical coercion. Psychological coercion can be a form of official misconduct. *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). Promises or inducements can taint the voluntariness of a confession. *United States v. McClure*, 786 F.2d 1286, 1289 (5th Cir.1986).

Despite formal requests from both Melissa's trial counsel and direct appeal counsel, the videotaped interrogation has not been transcribed by a court reporter. That this fact violated Melissa's right to a "complete record" was raised as an issue on direct appeal. As of the filing of this pleading, no ruling on that issue has been provided. However, even had the videotapes been transcribed, State Habeas Counsel submits that a cold transcript does not provide one with a sufficient comprehension of the circumstances of Melissa's videotaped statement, or the extreme duress she endured during interrogation. State Habeas Counsel thus urges the Courts to take the time to actually watch SX 3, SX 4 and SX 5 in their entirety. Counsel merely provides the following as a quick summary of the salient points regarding the circumstances of Melissa's interrogation.

Mariah Alvarez died on Saturday, February 17, 2007. That evening, while still grieving, Melissa Lucio was taken to the police station, advised that the police were "just investigating" Mariah's death, and team interrogated from 9:53 p.m. until 3:15

33

**Scanned  Jun 18, 2013**

a.m. Tab 2 (SX 3 at 2); 32 RR 32-34; 33 RR 37; SX 1.   Although Melissa had been

up since at least 8 a.m., Tab 2 (SX 3 at 12), the detectives never offered her anything

to drink or eat or an opportunity to sleep. 33 RR 38.   Additionally, the armed officers

repeatedly attempted to intimidate Mariah into making a confession by standing over

her waving photographs in her face and yelling at her. *See, e.g.,* Tab 2 (SX 3 at 26-

27, 32, 37-38, 40-41).  In one instance, Officer Banda indicated that he would like to

"beat you half to death."  Tab 2 (SX 3 at 26-27).  By 12:15 a.m. Melissa was so

exhausted she laid her head on the table to rest for a few minutes. 32 RR 56; SX 3.

This continued off and on throughout the rest of her interrogation. *See* SX 3, SX 4,

SX 5.

Despite the obviously coercive nature of the interrogation, *see* SX 3, 4, 5, and

the urging of Melissa's psychologist, Dr. Pinkerman, *see* Tab 15 (Affidavit), Mr.

Gilman did not file a pre-trial motion to suppress Melissa's statement as involuntary

and the result of duress, nor did he provide the trial court with a supporting brief.

During trial, the State played the entire videotaped interrogation for the jury. SX 3,

4, 5. 32 RR 49 *et seq.*  When the State proffered the videotaped statements at trial,

Mr. Gilman objected only on grounds that all of the voices on the recording had not

been identified as required by Article 38.22 § 3(a)(4). 32 RR 49-50, 53. This despite

the trial court's admonition that "my main concern is whether or not the recording in

34

**Scanned  Jun 18, 2013**

and of itself shows that it's voluntary," and "unless you have any evidence to show duress, or anything like that, I'm going to allow it to be played to the jury." 32 RR 50, 53. In short, even though provided with the opportunity to present argument and evidence of duress warranting suppression, Mr. Gilman waived the issue.[14]

Mr. Gilman's failure to file a motion to suppress Melissa's custodial statement as involuntary, to present supporting expert testimony at a suppression hearing, or to object to its admission at trial as involuntary constituted deficient performance. Melissa's initial *Miranda* waiver notwithstanding, her videotaped statement – or at least the that portion of it which contains any incriminating or potentially incriminating statements – could have been suppressed as involuntary.

Initially, the *Restrepo* factors favor suppression. Melissa made her videotaped statement after being taken to the police station by investigating officers, but before she was formally charged or arraigned. Melissa was told that authorities were merely "investigating" Mariah's death, not that she was a suspect or being charged with capital murder.  Melissa was advised of her *Miranda* rights at the outset but as the interrogation progressed into the night the officers became ever more belligerent and

_____

[14] Mr. Gilman did attempt to introduce evidence through Norma Villanueva and Dr. John Pinkerman during the defense case in chief as to why Melissa might take responsibility for something she did not do, but such evidence addresses a slightly different issue than the voluntariness of her statement, was presented too late to assist in having her statement suppressed, and was deemed inadmissible by the trial court in any event

**Scanned  Jun 18, 2013**

verbally abusive and Melissa did not appear to understand that she could terminate the interview and/or ask for legal counsel to make it stop.  Moreover, Melissa was not given any reason to believe that the interrogating officers would allow her to leave the room unless and until she told them what they wanted to hear.  As a consequence Melissa was without the assistance of counsel for the duration of her interrogation which continued intermittently with multiple armed officers in the room – some of them yelling at her – for more than five hours.  *Restrepo*, 994 F.2d at 184.  Prisoners of war endure less.[15]

Furthermore, Melissa's experts could have – and would have – testified at a suppression hearing that the circumstances surrounding Melissa's statement rendered any confession from her unreliable.  Dr. Pinkerman had "serious questions about the nature of Mrs. Lucio's interrogation and confession."  Tab 15 (Affidavit).  Dr. Pinkerman "was prepared to testify regarding research related to false confessions," *see, e.g.*, Tab 11 (The Psychology of False Confessions), and Melissa's specific psychological characteristics which increased the likelihood that she would

---

[15] The third Geneva Convention outlaws everything beyond the simple asking of a question:
No physical or mental torture, *nor any other form of coercion*, may be inflicted on prisoners of war to secure from them information of any kind whatever. *Prisoners of war who refuse to answer may not be threatened, insulted,* or exposed to any unpleasant or disadvantageous treatment of any kind.
Convention (III) Relative to the Treatment of Prisoners of War. Geneva, 12 August 1949 (as amended), Part III Captivity, Art. 17 (emphasis added) (available at: http://www.icrc.org/ihl.nsf/FULL/375?OpenDocument).

36

ULL  45

**Scanned  Jun 18, 2013**

"acquiesce" and make a "false confession. Tab 15 (Affidavit).  Dr. Pinkerman also could have accounted for Melissa's behavior during her interrogation as being the result of a "dependent and acquiescent personality" rather than guilt.  He would have explained that Melissa "appeared to take the most gratification from her role as a mother despite being overwhelmed by those responsibilities" and "appeared very capable of making self-sacrifice in providing a false confession in order to avoid investigation of her children." *Id.*  And he could have testified that when Melissa stated, "I'm responsible for it," she was merely "taking responsibility for the whole configuration of the abuse and medical neglect by the family, leading to her daughter's death" but *not* to "striking Mariah in the head." *Id.*

Finally, Norma Villanueva could have – and would have – testified "about patterns of behavior with Mrs. Lucio which strongly influenced her behavior during that videotaped statement process with the investigators that night."  35 RR 142.  Specifically, she could have testified regarding "the patterns of behavior as seen in the Child Protective Services records, the patterns in her family, how that influenced her decision making and how she felt with the different investigators, male and female, and also how she makes her life decisions.  It influenced her behavior in that – how she felt with the different investigators male and female and how she made her decisions in answering the questions during that process.  And lastly, looking at her

37

**Scanned  Jun 18, 2013**

CPS history, how – and her social history, how she deals with different people in levels of authority and also how that influenced her body language, and how body language is interpreted in different ways if you do not have her history of behaviors or patterns of behavior or her social history." 35 RR 142-143 (Bill of Particulars)[16]; DX 13-18.

**B.    Mr. Gilman was deficient for failing to file a pre-trial motion to suppress everything after Melissa invoked her right to remain silent.**

The right to remain silent protects the privilege against compulsory self-incrimination by requiring an interrogation to cease when the right is invoked. *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (citing *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). An accused who wants to invoke her right to remain silent must do so unambiguously. *Berghuis v. Thompkins*, ___ U.S. ___, 130 S.Ct. 2250, 2260 (2010). The Supreme Court explained:

> Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his " 'right to cut off questioning.' "

---

[16] The Bill of Particulars was necessitated by the trial court's refusal to admit Villanueva's testimony on this topic during the guilt/innocence phase of Melissa's trial several days *after* her videotaped statement had been admitted and the opportunity to timely challenge the statement's admissibility had passed. *See* 32 RR 50, 53.

38

**Scanned  Jun 18, 2013**

*Thompkins*, 130 S.Ct. at 2260 (citations omitted).

During the course of her interrogation, Melissa unequivocally invoked her right to remain silent in the manner required by *Thompkins*.  She stated:

"I want to talk to my husband.  *I don't want to talk to nobody else.*"

Tab 2 (SX 4 at 13) (emphasis added).  This statement is unambiguous: Melissa did *not* want to continue talking with police.  Nevertheless, Ranger Escalon insisted that Melissa "finish this" statement first and continued to interrogate her.  *Id.*

Although Melissa's statements responding to continued interrogation were inadmissible as having been obtained in violation of her right to remain silent, Mr. Gilman did not file a pre-trial motion to suppress.

**C.    Mr. Gilman's deficient performance result in extreme prejudice to her defense.**

A defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession. *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).  This is true even where there is ample evidence aside from the confession to support the conviction. *Malinski v. New York*, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); *Stroble v. California*, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952); *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d

39

**Scanned  Jun 18, 2013**

975 (1958).  Here, the vast majority of Melissa's videotaped statements – and in particular any incriminating or potentially incriminating comments – were made under extreme duress including physical intimidation; psychological abuse; and deprivation of food, water, and sleep.  Moreover, as the Court of Criminal Appeals aptly recognized in *Ex parte Briggs*, 187 S.W.3d at 465 n. 12, a young, uneducated mother may feel responsible for her child's death even if she did nothing legally wrong.   In similar fashion, Melissa's experts could have established that her educational, social, and psychological profile rendered her particularly likely succumb to the stress of interrogation and assume responsibility for the Mariahs' death even though she did nothing legally wrong.  Accordingly, Melissa was deprived of due process of law because her conviction was founded, at least in part, upon an involuntary confession.

Due process violation notwithstanding, there is a reasonable probability that, but for Mr. Gilman's deficient performance, the result of Melissa's capital murder trial would have been different.

> Frequently regarded as the most unequivocal evidence of guilt, a confession relieves doubts in the minds of judges and jurors more than any other evidence. In criminal law, the confession evidence is considered to be the most damaging form of evidence produced at a trial and a prosecutor's most potent weapon -- so potent that, in the words of one legal scholar, "the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical

40

**Scanned  Jun 18, 2013**

purposes, occurs when the confession is obtained." Confession evidence alone generally ensures a conviction.

Richard P. Conti, *The Psychology of False Confessions*, J. Credibility Assessment & Witness Psychology, Vol. 2, No. 1, 14-36 14 (1999) (internal citations omitted); Tab 15 at 4.  Thus, a timely filed and defended motion to suppress would have deprived the State of its "most damaging" evidence suggesting that it was necessarily Melissa who had "severely abused" Mariah repeatedly for 88 days and that it was necessarily Melissa who had inflicted Mariah's fatal injury.

ISSUE THREE:  Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution and the Texas Constitution when her trial counsel failed to adequately investigate and present all available testimony and evidence to support Melissa's defense and otherwise subject the State's case to meaningful adversarial testing.

Trial counsel's performance is judged by the familiar *Strickland* standard.  *See supra*, note 13 and accompanying text.  Under that standard, trial counsel has a duty to make a reasonable investigation into the facts of the case or to make a reasonable decision that makes a particular investigation unnecessary. *McFarland v. State*, 928 S.W.2d 482, 501 (Tex. Crim. App. 1996). This duty includes a responsibility to seek out and interview potential witnesses. *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App.1990); *see also Cantu v. State*, 993 S.W.2d 712, 718 (Tex. App.-San Antonio 1999, *pet. ref'd*).   It also includes the duty to subject the State's case to

41

UCC **50**

**Scanned  Jun 18, 2013**

meaningful adversarial testing at trial, *Strickland*, 466 U.S. at 688, 104 S.Ct. At 2065, *Powell v. Alabama*, 287 U.S. 45, 68-69, 53 S.Ct., 55, 63-64 (1932), and present all available testimony and other evidence to support the client's defense. *Butler v. State*, 716 S.W.2d 48 (Tex. Crim. App. 1986);  *Ex parte Ybarra*, 629 S.W.2d 943 (Tex. Crim. App. 1982).

According to the State's theory of the case, Melissa was Mariah's sole caregiver and repeatedly abused her over a period of 88 days culminating in a final, fatal beating. 32 RR 15-18; 36 RR 17-20, 39-57.   According to Melissa's defense theory of the case, Mariah's death was the unfortunate result of a fall down a flight of stairs a few days before her death. Tab 9 (Affidavit ¶ c).  To the extent Mr. Gilman conducted *any* independent investigation into either theory it was late in the game and unreasonably limited in scope.  Moreover, Mr. Gilman failed to challenge the State's theory – or to support Melissa's defense theory – with all available testimony and other evidence.

A.   **Trial Counsel failed to obtain the assistance of a competent forensic pathologist to review the medical examiner's autopsy and testify on Melissa's behalf.**

Mr. Gilman's failure to timely obtain the assistance of a forensic pathologist to testify regarding Mariah's old injuries and cause of death constituted deficient performance.  In *Ex parte Briggs*, 187 S.W.3d 458, 467 (Tex. Crim. App. 2005). the

42

**Scanned  Jun 18, 2013**

Court pointed out that trial counsel's decision not to consult with experts was deficient because it was not a "strategic" decision, but an "economic" one. *Ex parte Briggs*, 187 S.W.3d at 467 (internal quotes omitted).  Similarly, Mr. Gilman's failure to consult with a forensic pathologist in the instant case was not a "strategic" decision but the result of his inexplicable and professionally indefensible delay in seeking assistance from *any* medical expert until approximately one week before trial.  On May 31, 2007, the trial court appointed Peter C. Gilman to represent Melissa Lucio at trial. I CR 14.  The case was set for trial on Monday, February 4, 2008. 10 RR 3-4. Concerned that Mr. Gilman was not preparing for trial, the court instructed him to provide a report listing required defense experts by November 30th, 2007.  9 RR 6, 10 RR 5.  Despite the trial court's order, Mr. Gilman *still* did not request the assistance of a forensic pathologist.  The trial was rescheduled for May 28, 2008.

Approximately one year after his appointment as trial counsel – "about May of 2008" – Mr. Gilman met with Ed Stapleton, counsel for Robert Alvarez. Tab 9 ¶ b.  "During this time, Mr. Gilman shared his thoughts that his defense would be a fall Mariah had suffered a few days before her death."  Tab 9 ¶ c.  At that time Mr. Gilman and Mr. Stapleton "discussed the need for expert testimony to show the cause of death may have originated a few days before in time rather than on the day of the death."  Mr. Stapleton suggested that Mr. Gilman speak to a local neurosurgeon, Jose

43

**Scanned  Jun 18, 2013**

Kuri, M.D.  Tab 9 ¶ d.   Thereafter, on May 22, 2008 – more than three months *after* the case had originally been scheduled for trial – Mr. Gilman filed his first and only motion seeking funds to hire a medical expert to assist with Melissa's defense. I CR 109.  The motion requested funds to retain Dr. Jose Kuri. I CR 103, 109.[17]  Dr. Kuri had not performed an autopsy for more than 32 years. 35 RR 5.  Mr. Gilman did not ask Dr. Kuri to prepare a written report.  35 RR 18.  Melissa's re-scheduled trial began with jury selection *less than a week later*. I CR 81; 14 RR.  During the defense case-in-chief, Mr. Gilman proffered Dr. Kuri as an expert to testify *only* as to the injuries to Mariah's brain – *not* the injuries to her body alleged to have resulted from ongoing abuse. 35 RR 9-14, 17-18. Following a *Kelly/Daubert* hearing the trial court accepted Dr. Kuri as an expert *only* for that limited purpose. 35 RR 18.

A forensic pathologist could have correlated Melissa's account of the events leading up to Mariah's death with the physical autopsy evidence and critiqued Dr. Farley's autopsy report and trial testimony as the product of speculation rather than scientific methodology. For example, Dr. Thomas Young, a board certified forensic pathologist, would have testified that "[t]he cause of death [was] **Blunt head injury,**

---

[17] During pre-trial hearings, Mr. Gilman advised the trial court, "Doctor Kuri might be able to address some of the medical conditions of the child, better than Doctor Farley, who is a pathologist." 11 RR 15.  However, Mr. Gilman's judgment in this regard was equivocal ("might") and without support.

44

Scanned  Jun 18, 2013

delayed effects" and that the manner of death was an "[a]ccident." Tab 12 at 1

(emphasis original).  He could have explained that:

> Some children may develop reactive brain swelling to head trauma, and
> the swelling may worsen over a period of time.  The swelling leads to
> the onset of signs and symptoms following a *lucid interval* – an interval
> of time where there are no observable signs and symptoms.  This kind
> of situation is commonly seen with children following accidental head
> injury.

Tab 12 (Autopsy Report § I.A).  He could also have explained how Melissa's

description of Mariah's worsening condition (nausea followed by "slight fever," sleep

disturbances, and lethargy) fit the known progression of signs and symptoms from an

accidental head injury due to a fall.  Tab 12 (Autopsy Report § I.B).  He could have

explained how the intracranial (subarachnoid and subdural) hemorrhages, soft tissue

(lungs and kidney) hemorrhages, dehydration, and eye pathology noted in Dr.

Farley's autopsy report were caused by the accidental head injury Melissa described.

Tab 12 (Autopsy Report §§ I.C.1 - I.C.4).  He could have explained why the lesions

on Mariah's back repeatedly identified at trial as "bite marks" were neither bite marks

nor inflicted by Melissa.  Tab 12 (Autopsy Report § I.C.5 and Bite Mark Power

point).  He could have explained why Dr. Farley's assumption that Mariah's "older"

lesions were necessarily the result of child abuse constituted speculation.  Tab 12

(Autopsy Report § I.C.6).  And he could have pointed out how Dr. Farley missed

ULL **54**

Scanned  Jun 18, 2013

additional evidence of pneumonia that was "consistent with deteriorating brain function over a couple of days as described by witnesses." Tab 12 (Autopsy Report at § I.C.7).

Furthermore, Dr. Young could have explained the "mistake" in Dr. Farley's autopsy report of "substituting intuition" for a "scientifically defensible interpretation" of available forensic evidence. Tab 12 (Autopsy Report § II.B). He also could have provided 14 specific examples of "speculative opinions from Dr. Farley's testimony." Tab 12 (Autopsy Report § II.C).

Dr. Kuri's testimony was "*egregiously inadequate* to confront the arguments provided by the state for child abuse." Tab 12 (Autopsy Report § III.C) (emphasis added). "[P]athology, like psychiatry, is a sub-specialty of the science of medicine. Medicine in any of its sub-specialties eludes mathematic precision, as evidenced by the need for a 'second opinion' with regard to any important medical question. Causation or mechanism of death are examples of important medical questions addressed by pathologists that require more than an objective or rote determination." *Rey v. State*, 897 S.W.2d 333, 338 (Tex. Crim. App. 1995). Dr. Kuri was not qualified to perform a forensic analysis. Tab 12 (Autopsy Report § III.B.1.a - II.B.1.c); 35 RR 10-11, 18. Furthermore, Dr. Kuri repeatedly "limited himself to issues regarding the head, rather than performing the kind of global approach to the

46

**Scanned  Jun 18, 2013**

entire case required by a forensic analysis.  Tab 12 (Autopsy Report § III.B.1.d) (quoting passages from 35 RR 17, 18).  Moreover, as the record itself reveals, Dr. Kuri's testimony was largely incoherent and non-responsive to the questions asked. According to Dr. Young "This may have been due to a combination of factors, such as a language barrier or that the expert was hard of hearing." Tab 12 (Autopsy Report § III.B.2) (quoting passages from  35 RR 36-38, 65-6.6).  Moreover, to the extent it could be understood, it was factually incorrect.  Tab 12 (Autopsy Report § III.B.3) (quoting passages from 35 RR 41, 82-83).

Mr. Gilman's deficient performance resulted in prejudice to Melissa's defense. In *Ex parte Briggs*, 187 S.W.3d 458 (Tex. Crim. App. 2005), the Court of Criminal Appeals held that trial counsel was ineffective for failing to obtain the assistance of a pathologist to challenge the State's theory that Briggs had murdered her infant son. Mr. Gilman was ineffective for the same reasons stated in that case.  That is to say, even assuming that a forensic pathologist could not have proven that Melissa was "unquestionably" innocent, independent examination of Mariah's autopsy report and underlying physical evidence, raises considerable doubt as to the reliability of Dr. Farley's conclusion that Mariah's death was the result of homicide.  When those records are coupled with Melissa's account of Mariah's tumble down the stairs and the evidence and testimony of other witnesses available to the defense as outlined in

47

UCC 56

Scanned  Jun 18, 2013

this brief and supporting appendix, there is a "probability sufficient to undermine confidence in the outcome" that Mariah's death was the result of a criminal act. *See, e.g., Ex parte Briggs*, 187 S.W.3d at 470. *See also Rey*, 897 S.W.2d at 343 (reversing defendant's capital murder conviction because he did not have access to an expert to testify on his behalf or "technical assistance ... to help evaluate the strength of [that] defense, ... and to identify the weaknesses in the State's case, if any, by ... preparing counsel to cross-examine opposing experts").

**B.    Trial counsel failed to make a timely request for or adequately utilize the assistance of a mitigation specialist and psychologist.**

To reiterate, on May 31, 2007, the trial court appointed Peter C. Gilman to represent Melissa Lucio at trial.  I CR 14.  The case was set for trial on Monday, February 4, 2008.  10 RR 3-4.  As the days and months progressed, the trial court set up several status hearings because it was concerned that Mr. Gilman was not getting ready for trial.  9 RR 5.   As of November 21st, 2007 – nearly six months after his appointment and only ten weeks before trial – Mr. Gilman had not yet identified or requested appointment of *any* defense experts. 9 RR 6. The trial court instructed him to provide a report listing required defense experts as of Friday, November 30, 2007. At that time, Mr. Gilman requested appointment of Norma Villanueva, a social worker and mitigation specialist, and Mr. John Pinkerman, a psychologist.  The trial

48

ULL 57

**Scanned  Jun 18, 2013**

court granted Mr. Gilman's request on December 10, 2007.  10 RR 3.  The trial court conducted a follow-up status hearing on January 30, 2008.  At that time, Mr. Gilman informed the judge that he would not be ready for trial as scheduled, and that his recently requested and appointed experts would need until June to prepare.  10 RR 3.  The State also complained that Mr. Gilman had neither formally designated his experts 20 days in advance of trial, nor provided the substance of their testimony as required by the rules of procedure.  10 RR 4.  Mr. Gilman admitted to this fact also noting for the trial court that: "The state has the right to talk to our experts after we've designated them.  But we haven't even designated them yet.  I don't even have a report.  They just met [Melissa] for the first time last week on Monday, on a holiday, at the jail."  10 RR 6.

The trial judge expressed dismay at Mr. Gilman's lack of preparation.  Specifically, the trial judge stated:

> THE COURT: Mrs. Lucio has been in jail almost a year.
> MR. GILMAN: Yes, sir.  I'm aware of that.
> THE COURT: And what I told Mr. Krippel, holds true for the defense–
> MR. GILMAN: Yes, sir.
> THE COURT: – in my mind, it's obscene for a defendant to wait that much for trial.

10 RR 5.

49

**Scanned  Jun 18, 2013**

Mr. Gilman's handling of Melissa's case remained inadequate even following appointment of Dr. Pinkerman and Norma Villanueva.  According to Dr. Pinkerman,

> During our meetings, I discussed the use of the psychological findings in combination with Ms. Villareal's use of social history has [*sic*] mitigating factors in the event Ms. Lucio was convicted of capital murder.  Despite having ben appraised of the wealth of information available for this purpose, trial counsel did not develop this as evidence or fully present it during the punishment phase of Ms. Lucio's trial. [A]lthough I was called during the punishment phase to testify on the issue of future dangerousness, my testimony was brief and not elaborated.  *It was my impression that defense counsel failed to explore several avenues open as a result of my psychological evaluation.  These matters had been discussed prior to my testimony but were not developed.*

Tab 15 at 2 (emphasis added).  Additionally, according to Dr. Pinkerman:

> *In my professional opinion the limited number of meetings between me and other defense team members were insufficient to integrate our professional work and assist in a viable and available defense in either the guilt/innocence or in the punishment phase.*  My impression was that Mr. Cordova was asking follow-up questions but his hand were indirectly being tied by Mr. Gilman.  In our meetings and while providing testimony it was clear that mental health issues were not being fully developed or addressed.  *It was unusual, based on my past experience in capital cases, to not be used more effectively.*

> In addition, I felt there were a number of avenues that should have been developed by defense counsel regarding the mitigating factors for Ms. Lucio.  On one occasion I attempted to provide an extended answer in order to provide sufficient explanation of Ms. Lucio's personality dynamics and future risk factors.  My effort was unsuccessful.

Tab 15 at 3 (emphasis added).

ULL 59

**Scanned  Jun 18, 2013**

Similarly, Mr. Gilman's failure to hire a mitigation expert until shortly before trial, handicapped Melissa's defense.  According to Mitigation Expert Norma Villanueva, it takes approximately 9 to 12 months to conduct a quality mitigation investigation, especially when individuals who need to be interviewed are in the care of the state and access has to be obtained. Tab 16 at 21 ¶ 19.  Moreover, Mr. Gilman actively prevented Villanueva from doing her job.  For example, according to Villanueva, Mr. Gilman instructed her that CPS data was of top importance and family interviews were *not* a priority, Tab 16 at 18 ¶ 5, and only provided family contact information to conduct social history interviews *after* jury selection had commenced.  13 RR 8; Tab 16 at 20 ¶ 10.  This was "too late" into the case and was neither "customary nor appropriate when a mitigation specialist is part of the team."  Indeed, in Villanueva's experience this was highly unusual.  She explained, "I have never been denied access to the family by a defense attorney in any other case prior to this case."  Tab 16 at 21 ¶ 17.

Owing to Mr. Gilman's deficient handling of the pre-trial investigation, Villanueva needed at least two more weeks to fully prepare Melissa's mitigation evidence. 13 RR 12. According to Villanueva, mitigation evidence that was not fully developed included, among other things, "interviews with Mariah's siblings, more in-depth interviews with Ms. Lucio on the home life during her youth needed for the

51

**Scanned  Jun 18, 2013**

three generation biopsychosocial history, and interviews with Ms. Lucio's siblings."

Tab 16 at 21 ¶ 20.

Furthermore, and notwithstanding the fact that Mr. Gilman felt CPS data was

of "top importance," he failed to pursue or present the available evidence. According

to Villanueva, during a "team meeting," with Melissa's trial counsel and Dr.

Pinkerman she:

> reviewed information found in the CPS files to include physical abuse
> between siblings, the notation by a CPS caseworker citing Mr. Alvarez
> was [sic] the last one to see Mariah alive, and my concerns about a CPS
> hired therapist seeing Ms. Lucio in jail.  In addition, Dr. Pinkerman and
> I talked about battered women syndrome, and the effects on both adults
> and children who live in abusive homes and the role this played with
> Ms. Lucio and her children.   We informed the team that family history
> and patterns would help to identify and utilize this.  In addition, there
> was discussion regarding the need to find witnesses such as the school
> principal, Yvonne Montemayor, who witnessed Ms. Lucio being hit by
> Mr. Alvarez in the park near the school.  Mr. Gilman discussed hiring
> a private detective to locate Ms. Montemayor and other witness
> mentioned in the CPS files. * * * I reminded the group that mitigation
> themes needed to be developed and investigated in order to fully present
> mitigation in the sentencing phase.

Tab 16 at 19 ¶ 8. Additionally, as Villanueva's investigation progressed and issues

regarding domestic violence, battered women's syndrome, and sibling-to-sibling

violence were confirmed, she promptly informed Mr. Gilman. Tab 16 at 20 ¶ 14.  Of

particular note was Alexandra's admission that she "was the reason that Mariah fell

down the stairs." Tab 16 at 21 ¶ 11, 12, 18.  Villanueva also developed a power point

52

ULL **61**

**Scanned  Jun 18, 2013**

presentation that included "eco-maps," information from the CPS documents, and

pictures of Ms. Lucio.  Tab 16 at 1-17; Tab 16 at 20 ¶ 15.  Villanueva advised Mr.

Gilman that when he called her to testify on Melissa's behalf that he could ask her

questions about the family violence, sibling violence, and mental health issues as this

information was all included in the power point slides.  Tab 16 at 1-17.  Despite the

wealth of beneficial information available even following Villanueva's brief

investigation, Mr. Gilman failed to pursue or present it.  For example, according to

Villanueva,

> While on the witness stand, I was not questioned at all about the basic
> issues of domestic violence, sibling-to-sibling violence, or batter [*sic*]
> women's syndrome so as to be able to give the jury details on these
> mitigating factors.  In fact, I was not utilized during the sentencing [*sic*
> *s.b. guilt/innocence*] phase at all.  When I inquired about this with Mr.
> Gilman, I was advised that my services were not needed.

Tab 16 at 20-21 ¶ 15.  Accordingly, beneficial evidence not utilized during either

phase of Melissa's trial included, "sibling-to-sibling physical abuse documented in

CPS files, the history of domestic violence, Ms. Lucio's issues of battered women's

syndrome, the effects of domestic violence on Mariah's siblings, the CPS

documentation of Mr. Alvarez being the last one to see Mariah alive, and finally the

statement from Alexandra that she was responsible for Mariah falling down the

stairs." Tab 16 at 21-22 ¶ 18, 21.  *See also* Discussion *infra* Issue Three, subsections

ULL **62**

**Scanned  Jun 18, 2013**

C through H.  And finally, during Villanueva's sentencing phase testimony, the State

asked questions about an incidents which occurred while Ms. Lucio was incarcerated.

38 RR 13-14. According to Villanueva,

> The format of the questioning by the DA did not allow for full
> explanation giving the jury the impression Ms. Lucio's behavior was
> aggressive in the jail. Mr. Gilman did not address this during the cross-
> examination process at all.

Tab 16 at 21 ¶ 16.

In summary, a timely request for expert assistance would have allowed

Melissa's defense experts the opportunity to complete their respective tasks and

allowed trial counsel  to fully integrate their findings into a comprehensive trial

strategy for both phases of trial.  For example, as more fully discussed under Issue

Two above, Dr. Pinkerman and Norma Villanueva could have assisted trial counsel

with testimony supporting a motion to suppress Melissa's custodial statement.  *See*

*also* Tab 15 *passim*.  Furthermore, Dr. Pinkerman and Norma Villanueva could have

assisted trial counsel in developing CPS records into admissible evidence that

Mariah's old injuries were likely the result of sibling-on-sibling violence, not parental

abuse. Tab 15 at 2; Tab 16 at 21 ¶ 19.  Finally, they could have assisted trial counsel

in developing evidence that Melissa's history provided "little support for the idea that

Ms. Lucio physically abused her children" to support the defense theory during

54

ULL **63**

**Scanned  Jun 18, 2013**

guilt/innocence, *see* Tex. R. Evid. 404(a), and to contradict the State's evidence of future dangerousness during punishment. Tab 15 at 2. *Accord* Tab 14 at 10 ("There is really little, if any, indication that this woman represents a risk for continuing acts of violence either in or out of prison.")

C.    **Trial counsel failed to adequately investigate and present available witnesses and documentary evidence supporting Melissa's reasonable explanations for Mariah's old injuries.**

As more fully discussed, *supra*, Mr. Gilman's lack of pre-trial preparation concerned even the trial judge.  Even after obtaining access to CPS records and the assistance of Norma Villanueva, Dr. John Pinkerman, and Dr. Jose Kuri, Mr. Gilman was deficient for failing to conduct an adequate, independent investigation and/or present available witnesses and documentary evidence supporting Melissa's explanations for Mariah's old injuries.  Such evidence both existed and directly contradicted the State's theory of the case. Mr. Gilman's failure to investigate and properly utilize available CPS records and witness interviews to develop evidence supporting Melissa's explanations for Mariah's old injuries constituted deficient performance.

On June 15, 2007, Mr. Gilman requested that the State of Texas disclose the contents of CPS's files. Tab 17 (Motion).  On August 30, 2007, the State disclosed what it claimed were "all records" of CPS up to that date. A prompt and diligent

55

ULL **64**

**Scanned  Jun 18, 2013**

review of CPS records contained in that initial disclosure – i.e. those in existence up to August 30, 2007 – and of supplemental disclosures[18] would have revealed a wealth of potential witnesses and documentary evidence to corroborate Melissa's story.[19]

### 1.    CPS Caseworkers

While the children were in foster care after Mariah's birth Melissa had weekly supervised visits.  The details of those visits were documented on standardized forms.[20] A sampling of those reports reveal – among other things – that the children arrived *from* foster care with bruises and scratches; that the children's fighting frequently got "out-of-control" especially between Richard, Rene, and Gabriel; that Melissa demonstrated affection and concern for the well-being of her children; that Melissa had no particular ill will towards Mariah and at times doted on her causing the other children to become jealous; and that Melissa utilized non-violent methods of discipline such as withholding treats and redirecting the children to other activities.

----

[18]  To the extent trial counsel was unable to review or conduct follow-up investigation on Melissa's CPS records (or other evidence) due to delayed disclosure, such delay constituted a *Brady* violation. *See* Discussion *infra* Issue Six.

[19]  In a proceeding regarding the abuse or neglect of a child, evidence may not be excluded on the ground of privileged communication except in the case of communications between an attorney and client. V.T.C.A., Family Code § 261.202.  This statute applies to criminal proceedings, *Almendarez v. State* 153 S.W.3d 727 (Tex. App. - Dallas. 2005) (applied in criminal proceeding against alleged abuser), not just suits regarding the parent child relationship.

[20]  Copies of the selected CPS records are provided in the Appendix at Tab 17 for the Court's convenience.

56

**Scanned  Jun 18, 2013**

For example, CPS Caseworker Sandy Perez could have authenticated her reports as business records rendering them admissible.  She could also have corroborated Melissa's statement that Mariah is a "quiet baby" (Tab 17 at 18, 26, 64) and thus dispel the notion that she had somehow aggravated Melissa to the point of fatal physical abuse.  Perez could also have corroborated Melissa's statement that Mariah sometimes had innocent accidents when left alone even momentarily.  Specifically, she could have testified that Melissa spent more time with Mariah than with the boys (Tab 17 at 54), but with so many children sometimes needed to put her down to tend to the others (Tab 17 at 68), and that on one such occasion Mariah lost her balance and hit her head (Tab 17 at 55).  Furthermore, Perez could have corroborated Melissa's statement that her other children played rough and often injured each other.  Specifically she could have testified that the children were prone to violent, uncontrollable temper tantrums complete with kicking and screaming (Tab 17 at 18, 22), that they would fight for attention from their parents (Tab 17 at 46, 62,78), and fight with each other (Tab 17 at 64, 78).  Indeed, she could have testified that the boys were so aggressive and rough on each other (Tab 17 at 52) that on at least two occasions Perez cut family visitation short because she had concerns for the physical safety of the littlest ones (Tab 17 at 55, 64 (visit cancelled when the children's behavior "became disruptive & harming one another.")).  Furthermore,

57

UCC **66**

**Scanned  Jun 18, 2013**

Perez could have corroborated Melissa's statement that some of the older marks on Mariah could have been healing bug bites left over from her time in foster care. Specifically, Perez could have testified that the older children would come to visitation with bug bites (Tab 17 at 7). And Perez could have dispelled the notion that Melissa was so unconcerned for the health and well-being of her children that she would intentionally ignore a life-threatening injury. Specifically, she could have testified that Melissa noticed and asked about their various injuries,  (Tab 17 at 7). Perez could also have dispelled the notion that Melissa disciplined any of her children by beating them.  Specifically she could have testified that she observed Melissa isolate misbehaving children (Tab 17 at 19), but otherwise leave the discipline to her husband (Tab 17 at 65).  And finally, Perez could have provided valuable evidence that Melissa was not Mariah's sole caregiver and that Melissa's husband could have caused Mariah's prior broken arm.  Specifically, Perez could have testified that Melissa and her husband "took turns" looking after Mariah (Tab 17 at 72), and that she observed Melissa's husband "yanking" her older sister Adriana's arm when Adriana was only three years old (Tab 17 at 55).

Similarly, CPS Caseworker Laura Alejo could have authenticated her reports as business records rendering them admissible.  She could also have dispelled the notion that Melissa held some particular ill will towards Mariah and for that reason

58

ULL **67**

**Scanned  Jun 18, 2013**

singled her out for a fatal beating.  Alejo could have testified that Melissa doted on Mariah (Tab 17 at 88 ("Melissa tells Miraha [*sic*] she is so pretty."), 119 ("Melissa told Miraha [*sic*] that she was a very pretty little girl."), 108 ("Melissa (mom) encouraged Miraha [*sic*] to take some small steps."), and was disappointed when she was unable to make the visitation appointment (Tab 17 at 98).  Furthermore, Alejo could have corroborated Melissa's statement about some of Mariah's older injuries being the result of  roughhousing.  Specifically, she could have testified that Melissa's older children were aggressive and reckless, often to the point of being totally out of control (Tab 17 at 92, 95, 101, 106, 110, 114, 129, 144, 151, 158) resulting injuries to themselves and each other (Tab 17 at 162).  Alejo could also have dispelled the notion that Melissa disciplined her children with physical abuse or beat them out of frustration or anger.  Specifically she could have explained that when the kids misbehaved, Melissa talked to them (Tab 17 at 84), tried to reason with them (Tab 17 at 92, 110), or redirect them (Tab 17 at 151) and sometimes raised her voice (Tab 17 at 116), but never hit them.  She could also have explained that over time Melissa seemed to be improving in her ability to get the kids under control (Tab 17 at 120).  Finally, Alejo could have dispelled the notion that Mariah's older injuries were necessarily Melissa's doing or that Melissa simply ignored them.  Specifically she could have testified that the older children had often come to visitation with

59

Scanned  Jun 18, 2013

scrapes, scratches, bruises, and torn clothes, and that Melissa expressed concern for her children's health and well-being and asked about their various injuries, (Tab 17 at 87 (scratches), 120 (scrape), 123 (fever), 138 (rash), 158 (scratches), 165 (swelling), 168 (bruise)).  Melissa was equally attentive to Mariah's medical needs. Tab 17 at 123 ("Melissa (mom) said that Miraha [*sic*] was getting sick because she was a bit warm."), 126 ("Melissa (mom) said that Miraha [*sic*] looked sick."), 135 (Mariah threw up on herself and Melissa checked to see if she had a fever).

CPS Caseworker Angie Romo could have authenticated her reports as business records rendering them admissible.  She could also have assisted Melissa's trial counsel in dispelling the notion that Melissa was an abusive parent.  Specifically Romo could have testified that although Melissa had "her hands full with the children" when the children misbehaved she would talk to them about why they were being bad, "get after them verbally," attempted to redirect them, and denied special treats or excluded children from activities for brief periods.  Tab 17 at 214, 217, 223, 224, 241, 246 (Melissa disciplines by redirecting children most of the time).  Romo could also have testified that Melissa was concerned that her children learned to treat other people with respect.  Tab 17 at 217, 241.  Finally Romo could have testified that Melissa was  "good" with her children and showed no signs of being physically abusive. Tab 17 at 243.

ULL  69

**Scanned  Jun 18, 2013**

Other CPS Caseworkers could have authenticated their own reports and provided similar helpful testimony.  For example, Florentino Aguilar could have testified that there were simply too many kids for Melissa to handle on her own, and that their behavior was better when there were fewer of them for her to supervise. Tab 17 at 185, 189.  Aguilar could also have testified that Rene, in particular, was "an instigator" who "tried to cause trouble and chaos." Tab 17 at 174.  Jon Garza could have testified that he observed Melissa discipline Sarah for not eating by denying dessert and otherwise discipline the children by trying to redirect them.  Jon Garza could also have testified that Melissa tried to teach the children good manners. Tab 17 at 231.  Other CPS workers could have testified that Melissa doted on Mariah and spent more time with her which made the other kids jealous, Tab 17 at 37, 62, 69, that Mariah arrived at visitation from foster care with visible injuries and that Melissa expressed appropriate concern, Tab 17 at 38, that the children behaved better when Melissa's husband was around, Tab 17 at 44, that the older children fought over toys and Melissa tried to discipline by talking to them, Tab 17 at 178, and redirecting them Tab 17 at 195, and that Melissa was generally attentive to their needs because "she loves them very much," Tab 17 at 191.

Mr. Gilman's performance was both deficient and prejudicial. Although CPS's supervised visitation records contained the names of numerous individuals who had

61

**Scanned  Jun 18, 2013**

observed interactions between Melissa and her children over an extended period of time during Mariah's lifespan, Mr. Gilman failed to seek leave of court to interview any of them regarding their documented observations, 1 CR 73 (restricting defense access to witnesses), and also failed to call any of them as witnesses at trial to rebut the State's case.  As the trial court acknowledged, CPS Caseworkers could have been – and should have been – subpoenaed as witnesses for the defense to discuss Melissa's CPS records. 35 RR 137.[21] Moreover, although Melissa's CPS supervised visitation records could not be excluded from evidence during her capital murder trial on the ground of privileged communication, V.T.C.A., Family Code § 261.202; *Almendarez* 153 S.W.3d 727,  Mr. Gilman failed to even attempt to have them authenticated and admitted during the guilt/innocence phase of trial to be reviewed

---

[21] The relevant passage of the transcript reads as follows:
THE COURT: We're looking at the death of Mariah Alvarez and what did or did not cause it, and she's accused of it. So anything that reflects to [*sic*] that, one way or the other, I think, it should come in.
MR. GILMAN: All of the CPS records pertain to that, Judge, because it leads up to that point. And then subsequent thereto is important because it is dealing with the child, the CPS, a state agency dealing with this lady both before and after, and their knowledge, or lack thereof.
THE COURT: The thing is, if we had the CPS workers here.
MR. GILMAN: Judge, they bring in – they're like in federal court. I don't know if you remember going t o federal court on a pretrial hearing.  All they do is they put the most ignorant person on the witness stand and then you have to ask them questions and they know nothing, absolutely nothing. [Joanne Estrada] didn't come to work for CPS until after Mariah was dead.
THE COURT: Mr. Gilman, you could have subpoenaed her.
MR. GILMAN: Judge, I --
THE COURT: You could have subpoenaed her. Isn't that true?  35 RR 137-138.

62

**Scanned  Jun 18, 2013**

on their own merits.  *See* 42 RR *passim*; 43 RR *passim*   *See also* Tab 16 at 21 ¶ 19

(Norma Villanueva stating "[T]he CPS information could have been presented at trial

by another individual[.]").  Given the nature of the charge, the severity of the penalty

upon conviction, and the obvious benefit of presenting corroborating testimony from

those in authority who arguably knew Melissa best, no reasonable attorney would

have so completely failed to introduce the foregoing testimony and evidence during

the guilt/innocence phase of trial to dispel the notion that Melissa was an abusive

parent.[22]

### 2.    Maggie's House Interviews

Richard Alvarez (9), Renee Alvarez (9), and Robert ("Bobby") Alvarez (7),

were playing outside in the yard on Thursday, February 15, 2007, when Mariah fell

down the stairs. Tab 2 (SX 3 at 3, 7).  Three days later, CPS took them to Maggie's

House to be interviewed by a specialist.  The interviews were videotaped.  *See* Tab

4.  Assuming, without necessarily agreeing, that the State timely disclosed these

interviews to defense counsel, *see* 33 RR 104-106 and Issue Six, *infra* (regarding

alleged *Brady* violation), Mr. Gilman was deficient for failing to seek leave of court

---

[22]  Mr. Gilman did introduce *some* such evidence through his mitigation specialist Norma
Villanueva during the *punishment* phase of the trial.  *See, e.g.,* 37 RR 184 (sibling on sibling
violence including sexual abuse); 37 RR 188-189 (kids aggressive / out of control); 37 RR 190,
213 (sexual abuser John (19) being allowed to stay in the home against CPS safety plan); 37 RR
212 (violent behavior reported by foster parents).  However, by that time, Melissa had already
been convicted and the damage had already been done.

**Scanned  Jun 18, 2013**

to conduct its own interview of Richard and Renee, or to call them as witnesses for

their mother's defense.[23]

Richard Alvarez could have corroborated Melissa's statement that she did not

physically or sexually abuse any of her children and never hit Mariah.  During his

interview at Maggie's House, Richard Alvarez stated that his mom or dad would

spank him on the bottom when he misbehaved, but only about once a month and

never hard enough to leave marks or bruises.  Video Time Index 9:58, 11:12, 11:25.[24]

Richard stated that when his parents spanked his little sisters (Adriana (4) and Sara

(3)) that they would not hit them as hard because they were younger.  Video Time

Index 11:25.  Richard denied that his parents ever spanked Mariah because she was

just a baby.  Video Time Index 13:58.  Richard knew this because he "watched over

her."  Video Time Index 13:58.  Richard denied ever seeing any marks on Mariah, or

on any of his other siblings.  Video Time Index 9:34, 11:25, 14:22.  Richard also

denied that his parents ever touched him in a sexually inappropriate way.  Time Index

25:18.

_____

[23] Bobby's interview was cut short because he was tired and did not want to talk.  As a result, his interview revealed nothing of substance.

[24] The videotaped interviews have not been transcribed.  Counsel has attempted to provide reference to the relevant portions of the statements by notation of the Video Time Index on the recording.  However, these references are approximate; the relevant portions of the statements may be slightly before or after the time noted.

64

**Scanned  Jun 18, 2013**

Richard could also have corroborated Melissa's story that Mariah fell down a flight of stairs by means of a prior consistent statement. Richard stated that his mom told him Mariah had fallen down the steps at the second-story apartment the family was moving out of. Video Time Index 20:05. However, Richard added that he had seen bruises on Mariah from her fall, "one on her eye and on her arm too." Video Time Index 21:11.

Finally, Richard could have corroborated Melissa's explanation that some of Mariah's older bruises could have been from rough horseplay with her siblings. Specifically, Richard stated that in his first foster home a boy gave him bruises on his arms and that he told an adult but no one every did anything about it. Video Time Index 9:58

Similarly, Rene could have corroborated Melissa's statement that she never abused her children or hit Mariah. Richard Connell, PhD, conducted a psychological evaluation of Rene and concluded that he was a "fairly reliable historian." *See* Tab 17 at 479 (Evaluation of Rene). During Rene's interview at Maggie's House, and when questioned about family life with his parents and siblings, Rene stated that when he or his siblings misbehaved his mom put them "in a corner." Video Time Index 44:01. Rene also stated that his dad or mom would spank them about once a week when they misbehaved but "just on the bottom" and only "with their hand." *Id.*

65

UCL **74**

**Scanned  Jun 18, 2013**

They were not spanked hard enough to leave marks or bruises, and Rene denied ever seeing any such marks or bruises on any of his siblings.  Video Time Index 44:56. Rene did not see any marks on Mariah when she died and did not know how she got bruised.  Video Time Index 44:56.

Furthermore, Rene could have corroborated Melissa's statement that Mariah fell down the stairs at the family's second story apartment on East Madison.  Rene stated that Mariah fell down some steps at the "other" apartment.  Video Time Index 40:05.  He explained that it happened while they were waiting to move into their new place, *not* at the apartment where Mariah actually died.  Video Time Index 40:05, 40:36.  Rene described the steps where Mariah fell as **"white."**  Video Time Index: 40:36.  *Compare* DX 1, 2 (white stairs at old apartment) *with* SX 14 (bare wood stairs at new apartment).  When asked,

**"Did you see her fall or did somebody tell you that that's what happened?"**

Rene responded,

**"No, I saw it."**

Video Time Index 41:00 (emphasis added).  Rene explained, in essence, that when he went down the stairs Mariah started to toddle after him and then she fell down the steps. Video Time Index 41:15.  Rene guessed that she fell down three steps, *id*, but was probably mistaken because the flight of stairs is actually 14 steps, DX 1, 2.  Rene

66

**Scanned  Jun 18, 2013**

also could have corroborated Melissa's statement that after the fall Mariah did not appear seriously injured.  According to Rene, "she wasn't even crying."  Video Time Index 41:15.   Rene did not know whether she hit herself with anything on the way down or got hurt in any way and did not remember seeing any scratches or bruises on her right after.  *Id.*  Rene denied that anybody had told him or his siblings what to say or for them not to say anything if anyone asked any questions.  Video Time Index 44:01.

Finally, Rene could have corroborated Melissa's description of Mariah's condition and the events occurring on the day of her death.  Rene stated that on the morning of Mariah's death, she seemed "okay," was breathing, and was just sleeping on the bed in Melissa's bedroom.   Video Time Index 32:30, 39:50.  He further corroborated Melissa's statement regarding events later that afternoon. According to Rene, he, Richard, and Selina, left the apartment with their dad and when they returned Mariah wasn't breathing.  Video Time Index 32:30.   Rene thought that Mariah had been sick but could not explain why.  Video Time Index 40:05.

67

**Scanned  Jun 18, 2013**

3.     **Other CPS Caseworkers and Service Providers**

While the children were in foster care after Mariah's birth CPS service providers documented the details of each child's behavior in the foster home setting.[25] A sampling of those documents reveal – among other things – that the children were hyperactive, aggressive to the point of injury, bit one another, and acted out in sexually inappropriate ways.

For example, Mariah's Foster Mother Alfonsa Castillo and CPS Employee Dora Cackley could both have been called witnesses during guilt/innocence regarding Mariah's history of self-inflicted injury. Specifically Castillo could have been forced to admit that while in foster care Mariah received weekly physical / occupational therapy because she was weak and favored the left side of her body, *see* DX 23; Tab 17 at 346-349 (Reports of Dora Cackley), and that Mariah had difficulty walking because her feet were turned to the side instead of facing front and needed special shoes to aid her.  DX 23; Tab 17 at 368-369 (Reports of Dora Cackley).  Castillo could also have been forced to admit that in March of 2006, while Mariah remained in foster care, she suffered a self-inflicted head injury when she lost her balance, slipped, and fell from a toy with a small set of stairs.  DX 19, 21; Tab 17 at 407-410.

---

[25]  Copies of selected CPS Records are collected in Appendix at Tab 17 for the Court's convenience.  Many of these are also included in the Reporter's Record as part of a bill of particulars.

**Scanned  Jun 18, 2013**

The fall caused her to lose consciousness. DX 23; Tab 17 at 407.  After that, Castillo and her husband closely supervised Mariah because she wanted to climb everything. DX 23; Tab 17 at 336).  The foregoing admissions would have rendered more likely that a toddler with a love of heights and balance issues had simply fallen down the stairs.  Furthermore, Castillo could have been forced to admit that while in foster care Mariah threw repeated temper tantrums during which she would smack her head on the floor, *see, e.g.,* DX 20, 22, 23, and that due to her risk of injury CPS had authorized use of brief physical restraints, DX 23; Tab 17 at 383-406 (Restraint Approval).  The foregoing admissions would have corroborated Melissa's statements that Mariah was prone to accidental self-injury.  Finally Castillo could have been forced to admit to multiple incidents of sibling on sibling biting. *See, e.g.,* 37 RR 108; DX 23; Tab 17 at 315.  This admission would have made it more likely that Mariah's alleged "bite mark" was due to abuse by an older sibling (such as 15-year-old Alexandra), and not Melissa.[26]

Foster Parents Teddy and Mary Helen Dunlap also have been called as witnesses during guilt/innocence regarding Robert, Richard, Rene, and Gabriel. Specifically, the Dunlaps could have testified that the boys were impulsive, "very"

---

[26] Although of "adult size" the alleged bite marks were too narrow to belong to Melissa. *See* Tab 12 at 24-38.

69

UCC **78**

**Scanned  Jun 18, 2013**

hyper, and physically aggressive towards one other including scratching, hitting, pinching, choking, shoving, kicking, hair-pulling, and biting, *see, e.g.,* Tab 17 at 492 *et seq.*, requiring constant supervision and re-direction They also could have testified that the boys were sexually aggressive towards one another, towards girls at school, and towards their younger sisters resulting in referral to a therapist for intervention. Tab 17 at 492 *et seq.* This testimony would have corroborated Melissa's statement to police and made it more likely that Mariah's unexplained old injuries were the result of sibling on sibling violence rather than parental abuse.

### 4.    John Alvarez

Mitigation Specialist Carmen Fischer interviewed Melissa's 19-year-old son, John Alvarez, at the Cameron County Jail.  *See* Tab 8 (Fischer Report). John could have corroborated Melissa's statements that she did not abuse any of her children and never hit Mariah.  According to John, Melissa and Robert did discipline the children but never physically abused them.   John saw Mariah about one-and-a-half weeks before her death and she was healthy.  John never saw Melissa or Robert hit Mariah. Furthermore, John could have corroborated Melissa's explanation for at least some of Mariah's older injuries.  According to John, he and all his siblings were a rowdy bunch and often fought.  Finally, John could have corroborated Melissa's story that Mariah fell down a flight of stairs by means of a prior consistent statement.

70

**Scanned  Jun 18, 2013**

According to John, the family talked a lot about Mariah having fallen off stairs from midpoint.

John wanted to testify at Melissa's trial, but Mr. Gilman did not allow it. Admittedly, John had his own problems,[27] and is currently incarcerated, but none that would necessarily preclude his ability to credibly testify on his mother's behalf. Indeed, according to Mitigation Specialist Carmen Fischer, "John is a very smart, insightful, loving and caring individual.  He will make an excellent witness."  Given the severity of the charge and the penalty Melissa was facing and the fact that there was little – if anything – John could have said or done to make Melissa's situation worse, no reasonable attorney would have failed to utilize him as a witness to contradict the State's case that Melissa was physically abusive towards Mariah and to corroborate her statement that Mariah's fatal injury and contemporaneous bruises were all the result of a tumble down the stairs.

**D.      Trial counsel failed to adequately investigate and present available witnesses and documentary evidence that Alexandra Lucio or Robert Alvarez could have caused Mariah's old injuries, and possibly her death.**

During Melissa's videotaped interrogation, the investigating authorities assumed that she was the only one caring for Mariah with an opportunity to harm her.

---

[27] CPS records repeatedly state that John sexually abused his younger siblings, who then acted out in sexually inappropriate ways with one another and with other children.

**Scanned  Jun 18, 2013**

*See, e.g.,* SX 3 *passim.* Authorities repeatedly pressed the point in order to intimate

that *only* Melissa had the opportunity or ability to cause Mariah's old injuries and

obtain a confession for causing her death. *Id.* The State's theory of the case at trial

was that Melissa had repeatedly abused Mariah and ultimately beaten her to death.

The State played Melissa's entire videotaped interrogation for the jury.

> 1.  **Trial counsel failed to investigate and/or present available evidence that Melissa's 15-year-old daughter Alexandra could have been responsible for any non-accidental old injuries as well as Mariah's fall down the stairs.**

A diligent, independent investigation would have uncovered evidence that

Melissa's 15-year-old daughter Alexandra had both opportunity and motive to injure

Mariah sufficient to create reasonable doubt as to Melissa's guilt that no reasonable

attorney would have failed to present to the jury.

Melissa was not Mariah's sole caregiver; Alexandra babysat while her parents

were at work or running errands.  CPS returned the children to Melissa and her

husband just a few days before Thanksgiving. The children would have been on their

semester break from school over Christmas and New Year's.  Thus, contrary to the

assumptions made by the investigating officers, *see, e.g.,* SX 3, for several weeks in

the two months prior to Mariah's death the older children were *not* always at school

all day leaving Melissa home alone with Mariah. Additionally, during separate

72

**Scanned  Jun 18, 2013**

interviews at Maggie's House, Richard and Rene both explained that when their parents were away doing "jobs" or getting food Daniella, or Alexandra and Selina would look after them. Tab 4; Video Time Index: 17:07, 21:11, 46:54.  The time when Melissa and her husband were away doing "jobs" was not insignificant; they were trying to support a large family. *See, e.g.,* Tab 7 at 1;(Melissa variously had jobs as "a cashier, a telemarketer, and a home provider"); Tab 17 at 476 (November 2006 CPS report noting that "Ms. Lucio continues to work as a home provider"); 37 RR 144 (punishment phase testimony that Melissa also occasionally left Mariah with a neighbor while she went to work as a "provider"); Tab 3 (Robert Alvarez worked as a cook at Peso Bill's). This fact was confirmed by CPS Caseworker Miguel Rodriguez who visited the home in December and found Alexandra (15) and Selina (14) alone in the apartment babysitting the younger children.   DX 23 at 30. According to Richard, when his older sisters were left in charge they would spank the kids "everywhere." Tab 4; Video Time Index 11:25, 13:15.  Furthermore, evidence existed that the children inflicted bite marks on each other, 37 RR 108,  and the alleged "bite marks" on Mariah's back appeared to be "in the adult size," 34 RR 34, and at 15 years of age Alexandra was  big enough to be a potential source of those alleged "bite marks."  Finally, Alexandra was with Melissa at the apartment when Mariah fell down the stairs.  Additionally, and of particular note, Alexandra was with

73

**Scanned  Jun 18, 2013**

Melissa at the apartment when Mariah fell down the stairs and thus had equal opportunity to cause her fatal injuries if such injuries were, in fact, intentionally inflicted.

Alexandra had motive to injure Mariah. Lacking the financial resources for daycare, Melissa and Alvarez used the two oldest minor daughters, Alexandra and Selina, as live-in babysitters. Additionally, according to Melissa's sister, Sonya Chavez, Alexandra admitted to hitting Mariah in the face and head with a closed fist. Tab 6 (Chavez Affidavit). This admission was made in front of Selina (Melissa's daughter), Esperanza Trevino (Melissa's mother) and Melissa's other sister (Diane Cerda). *Id. See also* Tab 6 (Trevino Affidavit). When asked why, Alexandra explained,

> "I would hit her because my mom and dad were always doing drugs[28] and we had to take care of them [the children]."

Tab 6 (Chavez Affidavit).[29]

---

[28] Authorities did, in fact, find drug paraphernalia during a search of the new apartment. Tab 2 (SX 3 at 22). Melissa stated that it belonged to her husband and denied that she had been using. Tab 2 (SX 3 at 22). Melissa had tested clean from March 2006 through her final test on January 10, 2007. DX 25 at 1.

[29] After Alexandra admitted hitting Mariah, the conversation ended and Alexandra and Selina left. *Id.* A few days later Chavez attempted to continue the conversation but Selina informed her "that she had already talked to her sisters and that they all had agreed not to say anything and that they weren't gonna talk." Tab 6 at 3. Daniella explained to Chavez that they were refusing to speak up because they didn't want Alexandra to go to jail. *Id.*

74

**Scanned  Jun 18, 2013**

Mr. Gilman was aware of similar statements that Alexandra had been the one who hit Mariah – and possibly pushed her down the stairs – but made no effort to present this evidence at trial.  On or about June 26, 2008, Mitigation Expert Norma Villanueva interviewed several of Melissa's family members (including Alexandra) regarding their knowledge of the incident.  Tab 16 at 12.  During that interview, Alexandra stated that she had been angry that day as Mariah was always crying and getting in between the other children while they were fighting and playing. According to Villanueva, Alexandra stated that she "was the reason Mariah fell down the stairs." Tab 16 at 11.  Villanueva conveyed this information to Mr. Gilman, but was instructed not to alert anyone as it would result in criminal charges against Alexandra.  Tab 16 ¶ 12.

> 2.     **Trial counsel failed to investigate and/or present available evidence that Robert Alvarez, could have been responsible for any non-accidental old injuries – in particular Mariah's broken arm.**

A diligent, independent investigation would have uncovered evidence that Melissa's husband, Robert Alvarez, had a history of abusive conduct.  It would also have uncovered evidence that Alvarez had both opportunity and motive to injure Mariah.  Together, such evidence would have been sufficient to create a reasonable doubt as to the source of Mariah's old injuries – and in particular her broken arm. This, in turn, would have been sufficient to cast reasonable doubt on the State's case

**Scanned  Jun 18, 2013**

of a pattern of abuse by Melissa ending in an episode fatal abuse.  No reasonable attorney would have failed to present or argue such evidence to the jury.

Alvarez had a history of physical abuse. While Mariah was in foster care, Alvarez attended supervised visits.  Notably, during one such visit, Perez observed Melissa's husband "yanking" Adriana's arm when Adriana was only three years old. Tab 17 (June 14, 2005). During Mariah's autopsy Dr. Farley noted the existence of a healing left arm fracture. 32 RR 83 ("skeletal survey" x-ray done at hospital); 34 RR 30.  Dr. Farley opined that the fracture was 7 days to 2 weeks old. 34 RR 30-31. Dr. Farley testified that such fractures "usually" resulted from "tugging" or "twisting" the arm. 34 RR 31.  The relevance of the evidence to the potential cause of Mariah's old injury is obvious.

Robert had also been investigated by CPS on at least one prior occasion for child abuse.  Tab 2 (SX 3 at 22).  *See also* 37 RR 207 (punishment phase testimony that Alvarez was abusive towards children); 38 RR 50 (punishment phase testimony that Alvarez was abusive towards Melissa).[30]

Melissa was not Mariah's sole caregiver; Alvarez also looked after her.  CPS Caseworkers documented Alvarez holding, talking to, and playing with Mariah. *See,*

---

[30] Alas, punishment phase testimony by a mitigation expert came too late to rebut the State's case during the guilt/innocence phase.

76

**Scanned  Jun 18, 2013**

*e.g.,* Tab 17 (2/14/2005).  Notably, during two supervised visits, Perez observed that Melissa and her husband "try to divide their time with children" and specifically that they "took turns" looking after Mariah.  Tab 17 (May 31, 2005 & July 12, 2005).  Additionally, according to Alvarez, after the children were returned, he began working as a cook at Peso Bill's restaurant.  Tab 3 (Written Statement).  He worked the lunch shift from 11:30 a.m. until 2:30 p.m. *Id.*  When he wasn't working, Alvarez participated in child care duties.  For example, Alvarez admitted to feeding the children breakfast and to taking some of the children with him on errands.  *Id.*  He expressed no qualms about caring for Mariah or taking her out alone. Tab 2 (SX 3 at 19) (Alvarez offering to take Mariah to the hospital by himself).  Notably, during his interview at Maggie's House, Rene stated that his mom and dad both took care of Mariah on the day she died.  Tab 4 Time Index 38:00.  Given such specific and uncontroverted evidence that Alvarez shared in caring for Mariah at least to some degree there is simply no reason for anyone to have assumed that Melissa was Mariah's sole caregiver and thus the only one capable of inflicting injury upon her.

Robert Alvarez had motive to injure Mariah and blame Melissa for it afterwards because Mariah was the only one of the children living in the home who was not his biological child and unable to defend herself.  33 RR 190; Tab 17 at 3-4.

77

UCC **86**

**Scanned  Jun 18, 2013**

3.  **Mr. Gilmans' failure to pursue or present evidence that someone else caused Mariah's injuires and death resulted in prejudice to Melissa's defense warranting a new trial.**

A conflict of interest which adversely affects a lawyer's performance violates the client's Sixth Amendment right to effective assistance of counsel. *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).  The term "actual conflict" encompasses any situation in which a defense attorney faces divided loyalties such that regard for one duty tends to lead to disregard of another.  *State v. Jackson*, 275 Neb. 434, 442, 747 N.W.2d 418, 429 (2008).  Where an active conflict exists and adversely affects the attorney's performance, the *Strickland* standard is met because prejudice is presumed. *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).  Mr. Gilman was operating under just such a conflict.  His failure to present available evidence that Alexandra and Alvarez each, individually, had opportunity and motive to injure Mariah and that Alexandra, in particular, had admitted to causing Mariah's fatal injury in order to protect her from criminal prosecution, demonstrates divided loyalty[31] adversely affecting Melissa's defense and warranting a new trial.

---

[31] Even assuming, *arguendo*, no actual conflict existed, there is still a reasonable probability that, but for Mr. Gilman's failure to present this evidence, the result of Melissa's capital murder trial would have been different. Absent evidence and proper argument to contradict the State's case that Melissa was the only one caring for Mariah with an opportunity to harm her, the jury made the same inaccurate and invidious assumption.

78

UCL  87

**Scanned  Jun 18, 2013**

E.    **Trial counsel failed to adequately investigate and present available witnesses and documentary evidence that Melissa could not have "severely" beaten Mariah in the 24 to 48 hours immediately prior to her death.**

Mariah died sometime after 5:30 or 6:00 p.m. on Saturday, February 17, 2007. Tab 2 (SX 3 at 15-18); 33 RR 64 (Police Dispatch Order at 6:51 p.m.). Dr. Farley opined that Mariah's fatal head trauma likely occurred within 24 hours of her death, *i.e.* Friday evening. 34 RR 36, 58. Dr. Kuri disagreed and testified that it could have occurred earlier. 35 RR 25, 35 (discussing progression of symptoms); 35 RR 38-39 (vomiting, drowsiness, locked jaw on Friday early symptoms of brain injury from a fall on Thursday evening). *Accord* Tab 12 (Dr. Young Affidavit).

Mr. Gilman was deficient for failing to present available evidence that Melissa was never alone at home with Mariah during the relevant time period. Regardless of which expert is correct as to the time of the fatal injury, a diligent, independent investigation would have uncovered evidence that it would have been impossible for Melissa to beat Mariah severely enough to cause the fatal head injury *and* all of the contemporaneous bruises because they were never alone together during the relevant time period.

According to Alvarez's written statement to police:

On Thursday, February 17, 2007, I got home from picking up the kids from school. I went and dropped them off at the house with my

**Scanned  Jun 18, 2013**

> wife, Melissa Lucio.  I took off to go and get Alex, Selina, and Sarah
> from school also.  I came back and we all went inside the apartment
> located on Madison Street.  My wife and I made sandwiches for the kids
> to eat.  The kids were watching TV and doing their homework.  Mariah
> was watching tv with the kids also.  We stayed home for the rest of the
> night.  I took off at about 6:00 p.m. to go check on the apartment on Lee
> Street.  I had my sons, Richard and Rene with me to go check on the
> apartment.  We drove over and checked on the apartment to see if the
> utilities were on.  The light was on but the water was off.  I noticed that
> there was a water leak under the house and I called the landlord to get
> it fixed.  I returned to the apartment on Madison Street.
>    *Everyone was at the house.*  The kids were eating their
> sandwiches and other fruits.  Mariah was doing fine on this day as well
> as the other kids.  The kids finished their work and went to sleep.  I went
> to sleep at about 1:00 AM or 2:00 AM.  It was me Melissa and Mariah
> in our bed.  The other kids sleep in the living room.

Tab 3 (Written Statement) (emphasis added).  Thus, according to Alvarez, Mariah

was fine on Thursday and Melissa was not home alone with her anytime after school

let out around 3:00 p.m. that day.  Alvarez's statement continues:

> That Friday, February 16, 2007, our electricity had gotten shut
> off.[32]  Gabriel and Adriana did not go to school for this reason and also
> for the reason that Gabriel had a doctor's appointment.  *I did not go to
> work either.*  So I waited for the kids to get out of school.  Right before
> 3:00 PM, Melissa, Mariah, Gabriel and Adriana and I went to pick up
> Rene, Richard and Bobby.  We went to the apartment on Lee Street.

Tab 3 (Written Statement) (emphasis added).  Thus, according to Alvarez, he was

with Melissa, Mariah, Gabriel, and Adriana until sometime after 3:00 p.m. on Friday.

_____

[32]  Presumably the electricity had been cut off on that date because the family was moving out
the following day and they (or their landlord) had cancelled service.

**Scanned  Jun 18, 2013**

The family then went *together* to pick up Rene, Richard, and Bobby from school and to check on the new Lee Street apartment before returning to the old Madison Street apartment.   When they returned Selina and Alexandra were both there because Alvarez took Selina with him to move some boxes. Tab 3 (Written Statement), Alexandra was helping Melissa pack, Tab 2 (SX3 at 3-4), and all of the kids not with Alvarez were also at home.

After Alvarez returned home from delivering boxes Friday evening, there is no indication from any source that he left again until Saturday afternoon or evening. Moreover, according to Rene, up to the time Alvarez left the apartment on the day of Mariah's death both parents had been taking care of Mariah. Tab 4 Video Time Index 32:30. *See also* Tab 3 (Written Statement) (Alvarez tending to already-ill Mariah).

There is a reasonable probability that, but for Mr. Gilman's failure to investigate and present evidence contradicting the State's theory of the case, the result of Melissa's capital murder trial would have been different.  Available evidence affirmatively establishes that Melissa was *never* alone with Mariah during the relevant time period and thus *never* had an opportunity to severely beat her in the manner suggested by the State's expert – at least not without the beating being witnessed. The State was unable to present a single witness to *any* beating during the relevant time period much less a *"severe"* beating. Mr. Gilman's failure to present

81

**Scanned  Jun 18, 2013**

such available evidence or draw the jury's attention to a gaping hole in the State's case cannot be deemed a matter of trial strategy; no reasonable attorney would have failed to do so.

F.    **Trial counsel failed to dispel the notion that Melissa would not explain the source of Mariah's old injuries  because she had caused them.**

According to Dr. Farley, there was only one bruise "a little darker" on Mariah's arm, 34 RR 20, SX 26, one deep purple/bluish bruise on Mariah's torso, 34 RR 19, SX 25, one "deep maroon" bruise along the forehead and down onto the right cheek," 34 RR 20; SX 30, one dark bruise under Mariahs' right eye, 34 RR 20; SX 30, and one "patterned" bruise on Mariah's left thigh, 34 RR 21, SX 32, which appeared older *See* 34 RR 5-60 *passim.* During Melissa's interrogation, the detectives made much ado of Melissa's inability to explain Mariah's older scrapes and bruises. *See, e.g.,* SX 3 *passim.* The authorities repeatedly pressed the point and intimated that Melissa would not explain because she was guilty of ongoing physical abuse and had kept Mariah covered in order to hide the bruises from her husband and her own guilt. *Id.*

Mr. Gilman was deficient for failing to argue that Melissa *was* able to explain the source of many of Mariah's old injuries and to submit evidence supporting those explanations as perfectly plausible.  Melissa stated that Mariah had several large insect bites and / or scratches on her body that her foster parents had been treating

82

**Scanned  Jun 18, 2013**

with Lotrimin antibiotic ointment. Tab 2 (SX 3 at 50).  Given a child's tendency to

scratch and pick at scabs, this explained some of Mariah's scrapes and sore spots.

*See* Tab 12 (Dr. Young Autopsy Report). Melissa stated that Mariah would wake up

in the middle of the night and get out of bed to play.  Tab 2 (SX 3 at 20).  Melissa

explained that after one such episode she found Mariah with a bruise under her eye

which, she believed, was the result of  Mariah running into something or tripping

over something on the floor in the dark.  Tab 2 (SX 3 at 20, 31). That Mariah was

prone to self-injury from falling was well-documented. *See* Tab 17 at 336, 346-349,

368-369,407-411.[33]  *See also* 37 RR 108 (foster mom's punishment phase testimony

regarding self injury). This explained the bruise under Mariah's eye.  *See* SX 30.

Melissa stated that Mariah was"bleeding from her tooth from the bottom" after her

tumble down the stairs. Tab 2 (SX 3 at 6, 7, 14).  This explained Mariah's bruised,

swollen and slightly bloody lip. SX 30. And Melissa repeatedly stated that the older

children played rough and hurt one another.  *See, e.g.*. Tab 2 (SX 3 at 32).  This

statement was -- and is -- fully corroborated by Sonya Chavez, 35 RR 103, 111-112,

and by CPS Records, *see* Tab 17 *passim*. This explained at least some of Mariah's

older bruises. Additionally, Dr. Farley explained that "anything" could have caused

the "very small" abrasions she found in Mariah's vaginal area as well as the little

---

[33] These exhibits are also contained in the trial record in Defense Exhibits 19, 21, and 23.

**Scanned  Jun 18, 2013**

contusions on the inner thigh. 34 RR 39, 51.  Dr. Farley also admitted that abrasions and contusions on Mariah's shins, calves, knees, and elbows are of a type commonly caused by, *e.g.*, a playground fall, 34 RR 14-15, 17.

### G.     Trial counsel failed to adequately investigate and present available evidence explaining why Melissa did not know the extent or severity of Mariah's "new" bruises and contemporaneous fatal head injury.

Mariah's multitude of "new" bruises were all of approximately the same age and occurred contemporaneously to Mariah's fatal head injury. *See* 34 RR 56.  Thus, Mariah would have received those injuries within the 24 to 48 hours before her death. A diligent, independent investigation would have uncovered evidence to explain why Melissa did not know the extent or severity of those injuries.  For example, Mariah was wearing a jumpsuit when she fell down the stairs. Tab 2 (SX 3 at 53).  Because Mariah seemed fine after the fall, Tab 2 (SX 3 at 6, 7, 14), Melissa did not immediately undress her to check for injuries; rather, Melissa went back to packing. However, even had Melissa immediately undressed Mariah her many bruises may not yet have been visible; it takes time for a bruise to fully develop.  *See generally* 34 RR 19, 54 (pink bruises recent); 34 RR 19-20 (darker, purple/bluish and maroon bruises older).

In the 24 to 48 hours after the fall, it was cold out so Mariah remained fully dressed. Tab 2 (SX 3 at 54).  Meanwhile Melissa was very busy washing clothes,

υ 0 93

Scanned  Jun 18, 2013

packing, and then unpacking, the family's belongings. Selina and Alexandra were responsible for bathing Mariah. Tab 4 Video Time Index 19:30. *See also* Tab 8 (Fisher Report) (sisters bathed Mariah). Alvarez was helping to look after Mariah. Tab 4 Video Time Index 32:30. *See also* Tab 3 (Written Statement) (Alvarez tending to Mariah). Mariah as sleeping a lot. *See, e.g.,* Tab 2 (SX 3 at 9, 11-12, 14, 15-16). And Mariah's fatal head injury was not visible on the outside of her scalp. *See* 34 RR 24, 26 ("multiple" contusions "all over" the scalp hidden by hair or not visible on skin's surface). It is thus not unreasonable to conclude that in the 24 to 48 hours immediately prior to her death, Melissa never saw Mariah fully undressed or observed the extent, or fully appreciated the severity, of her injuries from the fall.[34]

**H.    Trial counsel failed to dispel the notion that Melissa was indifferent towards Mariah and ignored her needs.**

During the punishment phase of Melissa's trial, the State called Mariah's foster mother, Alfonsa Castilla, as a witness. During direct examination, the State elicited the following testimony from Castilla:

> Q. Now, Mrs. Castillo, when Mariah was in your care, did you happen to come into contact with the defendant in this case, Melissa Lucio?

---

[34] During her interrogation Melissa admitted that she did not take Mariah to the hospital sooner in part because she feared that hospital personnel would see Mariah's injuries and assume she had been abused. Tab 2 (SX 3 at 41). However, Melissa was never allowed the opportunity to clarify that the injuries to which she was referring were the old bumps and bruises – many of which she had already explained to the detectives.

85

0 0 94

**Scanned  Jun 18, 2013**

> A. No, not much because she knows, okay, they give you a lot of love. She hugging me too much. So I noticed different. She's trying to give more, more love and – and kind of sad sometimes because they see the other kids running or talking, and maybe she not able to do whatever the rest of the brothers are doing.

37 RR 100-101.  Castillo's testimony left the jury with the impression that Melissa was indifferent towards Mariah, ignored her needs, and preferred the other children. This was simply untrue.

Alas, Mr. Gilman failed to present available evidence that Castillo did not, in fact, stay to observe visitation and Castillo's testimony regarding Melissa's interaction with Mariah was otherwise inaccurate.  For example, CPS Supervised Visitation records do not indicate that the foster parents stayed during visitation and Sonya Chavez would have testified that they did not generally do so. *See* Tab 17 at 5-249; Tab 6.  Moreover although Costilla admitted during direct examination that "I just leave it there, the kids and go away. So I came later to pick up my two girl[s]," 37 RR 106, but Mr. Gilman failed to cross-examine her on this point in order to draw the jury's attention to the inconsistency.

Furthermore, CPS Caseworkers could have testified that Melissa would play with Mariah (Tab 17 at 5); smile at her and feed her (Tab 17 at 16-17); "giggle" at Mariah and "spend more time" with her than the other children (Tab 17 at 24)); feed and burp Mariah and also play with her and tickle her to make her laugh (Tab 17 at

0 0 95

28); hold, smile, and laugh with Mariah and spend equal time with the children (Tab 17 at 36); give "each child" affection (Tab 17 at 43); try to divide her time with children (Tab 17 at 47); "spends more time with Sara & Mariah" (Tab 14 at 54), carry and feed Mariah (Tab 17 at 61); comment that Mariah "is a big girl" (Tab 17 at 66); change Mariah's diapers and take turns with her husband looking after her (Tab 17 at 71-72); spend "a little more time" with Mariah (Tab 17 at 74); tells Mariah that she is "so big and pretty" (Tab 17 at 82); hugged and kissed Mariah (Tab 17 at 88); picked up Mariah (Tab 17 at 93); were disappointed when Mariah could not make it to visitation (Tab 17 at 98); carried Mariah (Tab 17 at 109); helped Mariah walk around the room and told her she was a very pretty little girl (Tab 1 at 108); checked on Mariah after she threw up (Tab 17 at 135); feed Mariah (Tab 17 at 140,146), etc.

Finally, Sonya Chavez offered to provide Mr. Gilman with photographs of Melissa and Mariah taken during numerous visitations but Mr. Gilman told Chavez they were not needed and did not seek to admit them. Those photographs would have directly contradicted Castillo's testimony that Melissa was indifferent to Mariah and basically ignored her needs. Tab 6 (Visitation Photos).

**Scanned  Jun 18, 2013**

evidence that such injuries were necessarily the result of ongoing physical abuse;

- uncovered evidence contradicting the State's case that Melissa was Mariah's sole caregiver and the only one with opportunity and motive to inflict injury upon her;

- uncovered evidence establishing that Melissa could not have "severely" beaten Mariah in the 24 to 48 hours immediately prior to her death and contradicting the State's evidence that such an event ever occurred;

- uncovered evidence explaining why Melissa did not know the extent or severity of Mariah's injuries from her tumble down the stairs and contradicting the State's theory that Melissa was a "cold-blooded killer" who intentionally hid the injuries and allowed Mariah to die,

- uncovered evidence that would have dispelled the notion that Melissa was indifferent towards Mariah and ignored her needs, and

- uncovered evidence contradicting the State's already weak evidence of future dangerousness during punishment.

There is a reasonable probability that, but for Mr. Gilman's deficient performance, the result of Melissa's capital murder trial would have been different.[35]

---

[35] It s notable that Melissa's husband and co-defendant, was convicted in a separate trial with different trial counsel only of injury to a child and received a three year sentence.

000 97

**Scanned  Jun 18, 2013**

ISSUE FOUR: The trial court deprived Melissa of the constitutional right to present a complete defense when it excluded the testimony of defense experts during the guilt/innocence phase of trial.[36]

A criminal defendant is entitled to an opportunity to explain himself and present evidence on his behalf. *See Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Moreover, jurors are entitled to have the benefit of the defense before them so that they can make an informed decision regarding the weight to be given the witness's testimony, though they may ultimately reject the theory. *Maxwell v. State*, 48 S.W.3d 196, 199 (Tex. Crim. App. 2001) (citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). Although the trial judge has discretion in determining whether the evidence is to be admitted or excluded, *see Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002), a criminal defendant's constitutional right to present a complete defense is violated by the exclusion of evidence pursuant to a state evidentiary rule that categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence that is vital to his defense. *Wiley v. State*, 74 S.W.3d 399, 406-07 (Tex. Crim. App. 2002) (quoting *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002) (en banc)).

---

[36] Counsel distinguishes the claim raised in the instant proceeding from the claim raised on direct appeal that the trial court abused its discretion by preventing Melissa from presenting evidence regarding the circumstances under which her confession was taken. *See* Direct Appeal Brief (citing *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)). The instant issue goes to the core of the case – whether Melissa was likely to have engaged in ongoing abuse of Mariah.

91

L 0 98

**Scanned  Jun 18, 2013**

During the guilt/innocence phase of trial, Mr. Gilman proffered the testimony of Norma Villanueva as an expert to testify regarding the meaning of Melissa's body language during her interrogation and regarding the relevance of Melissa's CPS records and how they reflected on the cause of Mariah's death. The trial court found Villanueva unqualified to testify as a body language expert, 35 RR 136, and disallowed Villanueva's testimony regarding her analysis of Melissa's CPS records. 35 RR 136-138. Had she been allowed to offer evidence, Villanueva would have testified about three separate issues:

(1) "patterns of behavior with Mrs. Lucio which strongly influenced her behavior during that videotaped statement process with the investigators that night,"

(2) "patterns of behavior as seen in the Child Protective Services records, the patterns in her family, how that influenced her decision making and how she felt with the different investigators, male and female, and also haw she makes her life decisions. It influenced her behavior in that -- how she felt with the different investigators male and female and how she made her decisions in answering the questions during that process," and

(3) "looking at her CPS history, how – and also her social history , how she deals with different people in levels of authority , and also how that influenced her body language, and how body language is interpreted in different ways if you do not have her history of behaviours or patterns of behavior or her social history."

35 RR 142-143. *See also* DX 13-18 (admitted for Bill of Particulars No. 1 only); Tab 16 (Villanueva Power Point).

92

**Scanned  Jun 18, 2013**

During the guilt/innocence phase of trial, Mr. Gilman also proffered the testimony of Dr. Pinkerman as an expert to testify regarding his psychological evaluation of Melissa, her social history, and her video statement in regards to "propensity for violence" Mr. Gilman explained that part of Dr. Pinkerman's testimony would be that Melissa had "all of the signs of being a battered woman" and that "as a battered woman, she takes blame for everything that goes on in the family," and that "if dealing with a male figure such as a husband she doesn't find fault with anything that a husband does, she takes the blame for it." 35 RR 187-188.  The trial court disallowed Dr. Pinkerman's testimony regarding Melissa's "propensity for violence" and diagnosis of Battered Woman Syndrome[37] as irrelevant to the issue of guilt or innocence.  35 RR 187-188.  For purposes of the record, Dr. Pinkerman summarized his guilt/innocence phase testimony as follows:

> On the basis of my review of information, consultation with additional experts, and the evaluation that I have done with the defendant Mrs. Lucio, I was going to testify about the characteristics and makeup of her psychological functioning. I was also going to address how her demeanor, both immediately after the incident and during the interrogation, may be understood by understanding and appreciating the psychological elements and previous history and background that she has lived through. I was also going to address the notion of how difficult

---

[37] Dr. Pinkerman's evidence regarding Battered Woman Syndrome was admitted in limited part during the punishment phase, 37 RR 219, but by then it was simply too little too late; the damage was already done.

93

υ C100

**Scanned  Jun 18, 2013**

it might have been for her to step into some of the treatment, even though it was minimally offered.

35 RR 195.  *See also* DX 24 (admitted for Bill of Particulars No. 2).  In his affidavit, Dr. Pinkerman goes on to explain the relevance of his testimony to the guilt/innocence phase of Melissa's trial.  He states:

> The family's history indicated that several children had behavioral disorders marked by severe aggression against siblings.  Prior medical records as well as CPS records suggest that there were bite marks on the children while the children were in foster care before Mariah's death. *The historical record offered little support for the idea that Ms. Lucio physically abused her children.* * * * If I had been called by defense counsel as a witness I worry [sic] would've offered my general opinions about sibling abuse and the characteristics often associated with mothers who kill their children.

Tab 15 (Affidavit) (emphasis added).

A rule ensuring that only reliable evidence is presented at trial serves a legitimate interest and does not unconstitutionally abridge the right to present a defense. *See United States v. Scheffer*, 523 U.S. 303, 309, 317 (1998).  The rule against irrelevant evidence is such a rule.  However, the evidence at issue here was not irrelevant to the issue of Melissa's guilt or innocence.  In *United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996),[38] the Seventh Circuit held that expert testimony that the defendant had a disorder that may have caused him to make a false confession should

---

[38] Texas courts may consider and rely on decisions of courts of other jurisdictions. *Lawrence v. State*, 240 S.W.3d 912 (Tex. Crim. App. 2007).

UC0101

**Scanned  Jun 18, 2013**

have been admitted during the guilt/innocence phase of trial.  In *United States v. Cohen*, 510 F.3d 1114 (9th Cir. 2007), the Ninth Circuit held that the trial court improperly prevented defense psychologist from testifying about a personality disorder affecting defendant's ability to form intent during the guilt/innocence phase of trial.  And in *Kaps v. State*, 1998 WL 209060 *8 (Tex. App. - Dallas, 1998) (not designated for publication), a Texas Court of Appeals held that testimony by defense psychologist that defendant's psychological profile showed that he was not a typical physically abusive man or one who used physical means to control his family was relevant to whether defendant shook his child causing a seizure should have been admitted during the guilt/innocence phase of trial. Moreover, while testimony by Melissa's CPS case workers was both necessary and appropriate to her defense,[39] such testimony would not have been an adequate substitute for the type of overarching analysis proffered by Villanueva and Dr. Pinkerman. Villanueva and Dr. Pinkerman could have analyzed the evidence presented by CPS Caseworkers and CPS documentary records regarding Melissa's social history and psychological profile to demonstrate that she was submissive and abused – not aggressive and an abuser. Just as in the *Hall*, *Cohen*, and *Kaps* cases, such evidence was relevant to attack the credibility of the State's case by demonstrating that Melissa did not have the

---

[39] *See* Discussion *supra* Issue Three.

95

U 0102

**Scanned  Jun 18, 2013**

propensity to commit violence against Mariah typically expected of someone who had

actually killed their child.    Without it, the jury was unable to make an informed

decision regarding the weight to be given the State's evidence of ongoing abuse.

Accordingly, the trial court violated Melissa's right to present a complete defense

when it disallowed her expert's testimony during guilt/innocence as irrelevant.

> ISSUE FIVE:  Melissa Lucio was deprived of effective assistance of
> trial counsel guaranteed by the United States Constitution and the Texas
> Constitution when her trial counsel failed to file proper pre-trial motions
> regarding, or otherwise timely object to, improper and highly prejudicial
> testimony.

Trial counsel's performance is judged by the familiar *Strickland* standard.  *See*

*supra* note 13 and accompanying text.  Under that standard, trial counsel has a duty

to object to harmful trial testimony that could have been excluded upon proper

objection.  *See, e.g., Williamson v. State*, 771 S.W.2d 601, 607 (Tex. App. - Dallas

1989); *Weathersby v. State*, 627 S.W.2d 729 (Tex. Crim. App. 1982).  *See also*

*Martin v. Maxey* 98 F.3d at 848.

A.    **Trial counsel failed to obtain a ruling on a pre-trial motion *in limine* to
      exclude evidence of Melissa Lucio's prior passive neglect and failed to
      object to such evidence as irrelevant and unduly prejudicial when
      introduced at trial.**

Rule 404 provides, in relevant part,

(a) Character Evidence Generally.  Evidence of a person's character or
character trait is not admissible for the purpose of proving action in

U  0103

**Scanned  Jun 18, 2013**

conformity therewith on a particular occasion, except: (1) *Character of accused.* Evidence of a pertinent character trait  offered: (A) by an accused in a criminal case, or by the prosecution to rebut the same

(b) Other Crimes, Wrongs or Acts: Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce the State's case-in-chief such evidence other than that arising in the same transaction.

Tex. R. Evid. 404.

Furthermore, Rule 403 provides that even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Tex. R. Evid. 403.

The State filed pre-trial notice of its intent to offer extraneous, unrelated offenses into evidence at trial including Melissa's passive neglect of her children in 1995, 1998, 2002, 2004, and 2006.  I CR 86-89, II CR 220-226.  During jury selection, Mr. Gilman filed his first – and only – motion *in limine* seeking to exclude evidence of Melissa's prior extraneous offenses and alleged misconduct.  As to the extraneous offenses, the motion requested that the Court enter an order instructing the State, its agents, its employees, and its witnesses not to mention, allude to or refer to, in any manner, any extraneous offenses in the presence of the jury.  The motion

**Scanned  Jun 18, 2013**

further requested that prior to specific mention of any offense or alleged misconduct that a hearing be conducted outside the presence of the jury to determine the purpose for which the conduct is offered, the relevance, that Melissa Lucio actually committed the alleged conduct, whether it is offered to prove a disputed issue or clarify an ambiguous act by Melissa Lucio, whether its probative value is outweighed by the prejudice, and whether the point for which it is offered can be established in some other fashion.  I CR 140-141 ¶ B.2.

On the first day of Melissa Lucio's jury trial, Mr. Gilman brought the motion to the trial court's attention and the following exchange occurred:

MR. GILMAN: I've got a motion in limine that I filed previously –

THE COURT: Okay.

MR. GILMAN: – back on May 28 – prior convictions and bad acts. They've given me numerous lists of bad acts.  There is only one conviction that my client has, and that's the DWI and a misdemeanor, and that's inadmissible, and I would also venture to say that there hasn't been any charges filed on any of the alleged bad acts, and that would not be admissible during the guilt/innocence stage.

THE COURT: Are you going into those during voir dire?

MR. PADILLA: No, Your Honor, I don't anticipate going into them.  I will go into the facts that the children were removed.  However, I only intend to ask, or to inform the jury as to why extraneous offenses will not be mentioned by me.

THE COURT: Sir, bring the jury in.

98

**Scanned  Jun 18, 2013**

32 RR 7-8.  Mr. Gilman did not request or obtain a formal ruling on his motion as it related to evidence presented during the State's case-in-chief or rebuttal witnesses. *Id.*

Thereafter, during the guilt/innocence phase of the trial, the State introduced evidence through CPS Conservatorship Worker Jo Anne Estrada that CPS investigates reports of child abuse or neglect and will petition the courts for removal and temporary custody if an investigator determines the report is valid.  33 RR 165. Estrada testified that she had been assigned as Melissa Lucio's case worker in October of 2007, that CPS had been involved with her since September of 2004 due to child neglect, and that Melissa's children had been removed from her care and placed in foster homes. 33 RR 167-169.  Estrada's testimony intimated that Melissa was a physically abusive parent.  The only conceivable purpose for such evidence was to suggest that Melissa had acted in conformity with that character trait and intentionally caused Mariah's death. Mr. Gilman did not object to Estrada's trial testimony as violating Rule 404 or Rule 403.

Mr. Gilman's failure to obtain a ruling on his motion *in limine* or to object to Estrada's trial testimony constituted deficient performance resulting in prejudice. Estrada's testimony regarding the alleged prior neglect fell within the scope of the motion *in limine* as inadmissible evidence of extraneous bad acts.  However, even if

99

**Scanned  Jun 18, 2013**

relevant and admissible for some other purpose under Rule 404(b) such evidence was more prejudicial than probative in that it reinforced speculative testimony of child abuse already introduced through Dr. Vargas, Dr. Farley and others. *See, e.g.,* 32 RR 72, 74, 80 (Dr. Vargas);  34 RR 12,  16, 19-21, 30-31 (Dr. Farley).[40]

**B.**    **Trial counsel failed to object to speculative and highly prejudicial expert testimony by non-experts during trial.**

Article 39.14(b) of the Texas Code of Criminal Procedure provides, in relevant part:

> On motion of a party and on notice to the other parties, the court in which an action is pending may order one or more of the other parties to disclose to the party making the motion the name and address of each person the other party may use at trial to present evidence under Rules 702, 703, and 705, Texas Rules of Evidence. * * * [T]he trial court shall require the other party to make the disclosure not later than the 20th day before th date the trial begins.

Furthermore, the Texas Rules of Evidence set out three separate conditions regarding admissibility of expert testimony. First, Rule 104(a) requires that "[p]reliminary questions concerning the qualification of a person to be a witness ... be determined by the court...." Tex. R. Evid. 104(a). Second, Rule 702 states: "If

---

[40] Alternatively, to the extent, if any, the trial court may be deemed to have ruled in the State's favor on Mr. Gilman's motion in limine, it deprived Melissa of due process and due course of law when it permitted testimony of prior passive neglect as relevant to establish active physical abuse leading to Mariah's death in contravention of the applicable Rules of Evidence.

100

**Scanned  Jun 18, 2013**

scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex. R. Evid. 702. And third, Rules 401 and 402 render testimony admissible only if it "tend[s] to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401, 402. These rules require a purported expert to satisfy three separate requirements before his or her testimony is admissible: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006). These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance.

Qualification is a two-step inquiry. A witness must first have a sufficient background in a particular field, but that background must also go "to the very matter on which [the witness] is to give an opinion." *Broders*, 924 S.W.2d at 153 (citing *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106 (5th Cir.1991)). Under the second step of the qualification inquiry, a witness will not always qualify as an expert

101

U. 0108

**Scanned  Jun 18, 2013**

merely by virtue of a general background.  For example, in *Broders*, the Texas Supreme Court rejected the notion that merely because the witness was a medical doctor, the witness was qualified to testify about "all medical matters" stating "there is no validity ... to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question." *Broders*, 924 S.W.2d at 152-153.  *See also Christophersen*, 939 F.2d 1112-13 (M.D. Degree insufficient to qualify witness as expert on every conceivable medical question); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719 (Tex. 1998) (not every mechanical engineer qualified to testify as expert in products liability case). Thus, in *Broders*, the Texas Supreme Court held that the trial court properly excluded the testimony of an Emergency Room doctor as to the cause of a patient's death because it failed to rise above mere speculation or offer genuine assistance to the jury. 924 S.W.2d at 153.  And in *Burruss v. State*, the Court of Appeals held that the failure to object to witnesses expressing their opinions that the victims were telling the truth constituted reversible error unless it was trial strategy to avoid offending the jury by attacking the victims.  20 S.W.3d 179 (Tex. App.- Texarkana 2000).[41]

---

[41] The Court of Appeals' opinion in *Burrus* suggests the converse, *i.e.* that the failure to object to witnesses expressing their opinions that the *defendant* was lying constituted reversible error.

U0109

**Scanned  Jun 18, 2013**

### 1.    Dr. Vargas

In the instant case, the State did not disclose or qualify the Emergency Room physician, Dr. Alfredo Vargas, as an expert in forensic pathology. I CR *passim*; 32 RR 78 (Vargas not a pathologist). During trial the State presented Dr. Vargas as an occurrence witness but elicited additional testimony regarding the source and nature of Mariah's injuries.  In particular the State elicited testimony from Dr. Vargas that the scrapes on Mariah's back were "bite marks"; that Mariah's head injuries and body bruises could have been caused by being struck with a person's hand, thrown against a wall, or shaken (i.e."Shaken Baby Syndrome"); and that Mariah was severely abused. 32 RR 74, 79-80.  Additionally, the State elicited testimony from Dr. Vargas regarding post-mortem injury and that none of the bruises, contusions, or abrasions were attributable to the EMT's attempts to revive her. 32 RR 87.  Trial counsel failed to object.  Had he done so, Dr. Vargas' harmful testimony could have been excluded on grounds he had not been disclosed and was not qualified as an expert in forensic pathology, "Shaken Baby Syndrome," or even just child abuse, and that his testimony as to the cause of Mariah's injuries and death failed to rise above mere speculation or offer genuine assistance to the jury. *Broders*, 924 S.W.2d at 152-153; *Christophersen*, 939 F.2d at 1112-13.  *See also* Discussion *infra* Issue Three, subparagraph F; Tab 11 (Motion to Exclude).

103

UL0110

**Scanned  Jun 18, 2013**

### 2.    Ranger Escalon

The State also did not disclose or qualify Ranger Escalon as an expert in forensic pathology or in body language.  During trial the State presented Ranger Escalon as a witness as to Melissa's alleged confession, but elicited additional testimony that Mariah's injuries were not caused by a fall. 33 RR 119, 129, but by head trauma, 33 RR 120, and/or shaking 33 RR 133-136, and that Melissa's demeanor during interrogation indicated that she was guilty and attempting to hide the truth, 33 RR 115-116.  Again, trial counsel failed to object.  Had he done so, Ranger Escalon's harmful testimony likewise could have been excluded on grounds he had not been disclosed and was not qualified as an expert in forensic pathology, "Shaken Baby Syndrome," or body language, and that his testimony as to the cause of Mariah's injuries and that Melissa's demeanor during interrogation indicated that she was hiding her guilt was improper *Yount v. State*, 872 S.W.2d 706, 711 (Tex. Crim. App.1993) (testimony a witness is truthful inadmissible under Rule 702), and failed to rise above mere speculation or offer genuine assistance to the jury. *Broders*, 924 S.W.2d at 152-153; *Christophersen*, 939 F.2d at 1112-13. *See also* 35 RR 128-

104

U 0111

**Scanned  Jun 18, 2013**

136 (trial court excluding "body language" interpretation by Norma Villanueva);[42]

Discussion *infra* Issue Three subparagraph F; Tab 11 (Motion to Exclude).

**C.     Trial counsel failed to challenge the improper, inadmissible, and highly prejudicial statements by the investigating officers contained in State's Exhibits 3, 4, and 5.**

Assuming, without agreeing, that Melissa's custodial statement was admissible because it was voluntary and not the result of duress,[43] Melissa's statement was not the only thing on the videotapes admitted into evidence.  Those videotapes also contained a multitude of improper, inadmissible, and highly prejudicial statements by the interrogating officers.  *See* Tab 2 (SX 3, 4, 5).

---

[42] During the defense case-in-chief, Mr. Gilman complained that the trial court was excluding Villaneuva's testimony regarding body language interpretation even though it had allowed Ranger Escalon's testimony on the same topic.  The trial court attempted to draw a distinction stating:

> There is a statement that he explained how he approached his eliciting of that statement.  He explained how he interpreted it in order to solicit that statement.  The statement is a byproduct of that.
>
> What you are asking to do is to give evidence from a person holding themselves out as an expert as to why that statement is or is not true or what was produced.

35 RR 136.  The trial court's recollection of Ranger Escalon's testimony was inaccurate.  *See* 33 RR 114-116.  However, even if accurate, such distinction makes no difference: if Norma Villanueva was not qualified to analyze Melissa's body language, then Ranger Escalon was even less so.

[43] *See* Discussion *supra* Issue Two.

**Scanned  Jun 18, 2013**

For example,[44] during the course of the interrogation, detectives made the following comments:

> When your daughter ended up going to the hospital – the medical facility – they um work with children – a pediatrician -- and they can see if something is of natural causes or not. *Mariah has a lot of bruising on her body – on her face -- okay – not consistent with a fall.*  Okay so I don't know what the real story is but there – something has to account – she's only two you can't say she was at school and somebody else did it.  *Somebody hit her.*

Tab 2 (SX 3 at 19) (emphasis added).  This comment was both made by the officer during interrogation and proffered at trial by the State for the truth of the matter asserted therein and as such constituted hearsay.  Furthermore, if this statement originated from anyone other than Dr. Vargas, it violated Melissa's right to confront witnesses against her.  *Crawford*, 541 U.S. at 68. Finally, the statement was also objectionable under *Daubert* on grounds that neither the unnamed pediatrician nor the interrogating officer had been disclosed or qualified as experts in forensic pathology.[45]

> There's no way she fell off the stairs. Okay. There's no way.  A child can fall and not have those bruises.

---

[44] Counsel provides merely a sampling of the multitude of objectionable statements made by interrogating officers throughout States Exhibits 3, 4, and 5.

[45] *See generally* Discussion *infra* this Issue, sections B and F.

0. 0113

**Scanned  Jun 18, 2013**

Tab 2 (SX 3 at 19).  This comment was inadmissible for the same reasons stated above.

He [Robert Alvarez] says that you hid those markings from him.

Tab 2 (SX 3 at 29).  This comment constituted inadmissible hearsay and violated Melissa's right to confront witnesses against her. Tex. R. Evid. 802. *Crawford*, 541 U.S. at 68.

Those are old bruises.  That's why you didn't want to pay for the doctor.

Tab 2 (SX 3 at 41).  This comment was inadmissible under *Daubert* and as speculation.

Right now it looks like you're a cold-blooded killer.

Tab 2 (SX 3 at 45).  This comment was inadmissible as speculation and because it was more prejudicial than probative. Tex. R. Evid. 402.

Also the bite marks – these – the bite marks – it's - these look like adult teeth and there's no way this happened on Thursday. I mean that – that's an old bruise. That's clearly more than four days ago.

Tab 2 (SX 3 at 51).  This comment was inadmissible as speculation, because it was more prejudicial than probative, and because the interrogating officer had not been disclosed or qualified as experts in forensic pathology capable of opining regarding the possible source or age of any of Mariah's injuries. Tex. R. Evid. 402, 702.

107

U\_0114

**Scanned  Jun 18, 2013**

Okay c'mon. That has to be a hit right there.  And that is – that's old. That's definitely not from Thursday

and

I'm just waiting for more results on the x-rays and then we'll go – You see right here – it looks like something – you know she was thrown. There's absolutely no way.  No way.

Tab 2 (SX 3 at 53).  These comments were inadmissible for the same reasons stated above.

I think that's your bite mark right there.

Tab 2 (SX 3 at 56).  This comment was inadmissible for the same reasons stated above.

Although State's Exhibits 3, 4, and 5 were replete with inadmissible out-of-court statements by the investigating officers, Mr. Gilman failed to raise a single objection or seek redaction.  Mr. Gilman's failure to do so constituted deficient performance.  There can be no legitimate excuse for such failure; no reasonable trial strategy supports allowing the jury to hear such inflammatory and damaging commentary from unqualified sources.

108

00 0115

**Scanned  Jun 18, 2013**

D.      **Trial counsel failed to challenge the State's use of information obtained
through custodial questioning by CPS Therapist Beto Juarez after
Melissa's arrest, without a contemporaneous *Miranda* waiver, and without
counsel present.**[46]

As discussed more fully, *supra*, in Issue One, a criminal defendant is deprived

of the right to effective assistance of counsel at all critical stages of a criminal

prosecution when the court fails to appoint counsel to an indigent defendant at

magistration/preliminary arraignment.  This deprivation requires reversal where the

State introduces evidence obtained through custodial questioning after

magistration/preliminary arraignment without a contemporaneous *Miranda* waiver,

and without counsel present.

To reiterate the pertinent facts Mariah Alvarez died on Saturday, February 17,

2007.  Following a lengthy interrogation that evening, Melissa Lucio was arrested for

capital murder and detained.  SX 5 (arrest); I CR 12 (Melissa in custody).  Melissa

was formally indicted on May 16, 2007.  I CR 9-10.  She was arraigned and received

appointed legal counsel on May 31, 2007.  I CR 11, 14.

---

[46] On direct appeal, Melissa argued that it was a violation of her rights to counsel, to a fair trial,
and to confront witnesses for the trial court to admit Juarez's interview notes.  In so doing,
Melissa argued that Mr. Gilman's general objection preserved the error for review in that forum.
*See* Direct Appeal Brief citing *Powell v. State*, 663 S.W.2d 465, 466-467 (Tex. App.–Houston[1st
Dist.]1983, no pet.).  To the extent, if any, the reviewing court disagrees with that assessment
and finds the issue waived, a state habeas proceeding is the appropriate forum to raise a claim
of ineffective assistance of trial counsel arising from the same operative facts.

109

**Scanned  Jun 18, 2013**

On February 14, 2008, and May 5, 2008, CPS sent Therapist Beto Juarez to "treat" Melissa.  Tab 7; 33 RR 190-191.  The State did not notify Melissa's trial counsel that it intended to send an agent to talk to Melissa, neither of Melissa's trial counsel were present during the interview, and Juarez did not advise Melissa of her *Miranda* rights. Following the "therapy" sessions Juarez provided written reports to CPS who, in turn, provided those reports – including Melissa's statements – to the Cameron County District Attorney prosecuting Melissa's case. *See* Tab 7; 33 RR 190-191.  Dr. Pinkerman and Norma Villanueva both brought the conflict of interest to Mr. Gilman's attention before trial.  Tab 15 (Affidavit); Tab 16 ¶ 6 (Affidavit).

During the punishment phase of the ensuing capital murder trial, Mr. Gilman objected to admission of Juarez's reports and the objections were sustained.  38 RR 36, 30-31.  Nevertheless the State referred to both the existence and substance of Juarez's reports when he questioned Mitigation Expert Norma Villanueva.

Q. (By Mr. Padilla) So if Mr. Juarez is told by Mrs. Lucio that she had not been sexually abused as a child, how would that have changed your opinion?

A. It would have made me delve deeper.

Q.  So what you are telling me is that your opinion is based on insufficient evidence; isn't that correct?

A.  That's incorrect.

110

ι 0117

**Scanned  Jun 18, 2013**

38 RR 31.  Beto Juarez was an agent of the prosecution. 35 RR 155, 183 The State used the substance of Melissa's alleged statements to Juarez to attack her Mitigation Expert's opinion as based on insufficient evidence.

Mr. Gilman failed to seek an order *in limine* prohibiting the State from referring to the existence of the reports as obtained in violation of Melissa's right to counsel, failed to object to the State's cross-examination on grounds the prosecutor's questions were based on facts not in evidence, and failed to make a proper Confrontation Clause objection to the discussion of Juarez's reports.

Mr. Gilman's failure to seek an order *in limine* or object to improper cross-examination constituted deficient performance resulting in prejudice to Melissa's defense.  To the extent one was even raised, Melissa's mitigation "defense" was that she was sexually, physically, and verbally abused from age 14. Beto Juarez said she told him she was not. The jury knew that a "No" answer meant death because the judge told them so. They answered "No." Admitting Juarez's evidence prejudiced the jury's consideration of Melissa's social history evidence of sexual and spousal abuse as mitigation; the jury answered "No" on the mercy question.

111

ι  0118

**Scanned  Jun 18, 2013**

E.    **Trial counsel failed to challenge Dr. Farley's improper "expert" testimony as scientifically invalid, subjective, and conclusory.**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). requires that expert testimony be both reliable and relevant to the case.  509 U.S. 579.  The factors relevant to assessing the reliability of scientific expert testimony are: (1) whether the expert's technique or theory can be or has been tested – that is, *whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability*, (2) whether the technique or theory has been subject to peer review and publication, (3) the known or potential rate of error of the technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) whether the technique or theory has been generally accepted in the scientific community.  *Id.* (emphasis added).

Prior to trial, the State disclosed Dr. Norma Jean Farley as its expert in forensic pathology.  I CR 79.  Dr. Farley's autopsy report concludes, *inter alia*, that "[t]he manner of death is homicide."  SX 36 at 2.  Mr. Gilman filed neither a *Daubert* motion (to assess the nature and scope of Dr. Farley's expertise, question her scientific methodology, and assess the validity of her conclusion), nor a motion *in*

112

0.0119

**Scanned  Jun 18, 2013**

*limine* (to limit the scope of her testimony).[47]   During trial, Mr. Gilman objected to admission of the autopsy report because Dr. Farley was available to testify and because her report contained copies of reports from other non-testifying experts, but *not* because it contained a scientifically invalid conclusion, was speculative, and invaded the province of the jury.  34 RR 39, 43, 45.

During trial, Dr. Farley testified, in relevant part, as follows:

> Q.   [Mr. Padilla]  How long did it take to perform the autopsy on Mariah Alvarez?
>
> A.   [Dr. Farley] You know, just estimating probably about six hours.
>
> Q.   And why the length of six hours?
> A.   The external examination is where we look at the outside of the body, and we try to document any injuries that might be present. And the external on this case took -- you know -- about four hours.
>
> Q.   Why was that?
>
> A.   Because of the number of contusions and abrasions on the body, it took a long time to actually look at them and try to measure them, and then to try to take pictures of them so that they would show up fairly well. It took quite a long time.
>
> Q.   I mean, there's no scale for abuse. There's not -- like -- moderate to severe. But how would you classify -- you know the signs of this child's abuse throughout the body?

---

[47] Mr. Gilman did file a motion to depose Dr. Farley. 1CR 74. However, a deposition is strictly a discovery mechanism whereas a *Daubert* hearing serves a different and slightly broader purpose. One is not a substitute for the other.

113

0 0120

**Scanned  Jun 18, 2013**

A.   *This child was severely abused.* I mean. it would have been evident to a first year nursing student. I mean, there are bruises -- there are contusions -- and that's a bruise -- basically that's hemorrhaging into the tissue of the body. And we've all had bruises. So you kind of know what they look like. But this child had bruises all over the body. I mean -- a ll over.

34 RR 11 (emphasis added).  Mr. Gilman did not object.

Q.   [Mr. Padilla] And the form and manner of death was, what, Doctor?

A.   [Dr. Farley] *The manner was homicide.*

Q.   Homicide?  Murder?

A.   Yes.

34 RR 25 (emphasis added).  Mr. Gilman did not object.

Had Mr. Gilman filed a *Daubert* motion and requested a hearing, Dr. Farley's testimony and autopsy report could have been excluded in their entirety – or at least insofar as they purported to blame Mariah's injuries and death on abuse.  In the forensic context, different events (antecedents) can lead to the same physical evidence (consequences). For example, according to Dr. Farley bruises all over the body could be caused by a fall from a "significant height" that was not "simple," 34 RR 35, and that individual bruises could have been caused by "a slap, or – anything," 34 RR 19. Also according to Dr. Farley, blunt force trauma to the head causing death could be caused by a fall down the stairs, 34 RR 55, an impact with a piece of furniture or the

114

0∪0121

**Scanned  Jun 18, 2013**

floor, 34 RR 38, or by non-accidental head trauma, 34 RR 53.   For this reason, an expert employing proper scientific method can state whether a witness account is consistent with the physical evidence, *see generally* 35 RR 26-28 (Dr. Kuri testifying that the "most important part for any doctor" in assessing an injury is the "history of the patient"), but cannot reliably surmise past events from physical evidence.  To do so is to commit a formal logical fallacy known as the fallacy of affirming the consequent.[48] Tab 12 at 79 (*Putting it All Together*).  In other words, proper scientific method does not permit anyone – not even Sherlock Holmes – to "reason backwards" from a consequence and select its cause from among many possible causes. *See* Tab 12 at 69 (*Classical Mistakes in Forensic Pathology*); Tab 12 at 79 (*Putting it All Together*).

Dr. Farley's testimony and autopsy report both erroneously "affirm the consequent." Dr. Farley's testimony purports to surmise that Mariah was repeatedly and severely physically abused strictly from physical evidence obtained during Mariah's autopsy.  Moreover, Dr. Farley reaches this conclusion in the complete absence of any witness to such physical abuse and despite admitting to the existence of possible alternative explanations for essentially all of Mariah's individual injuries.

---

[48]  There are two exceptions to this general rule, neither of which apply here: (1) where the antecedent and consequence are the same thing, and (2) where *only one* plausible explanation exists.  *See* Tab 12 at 79 *et seq.*

115

0 0122

**Scanned  Jun 18, 2013**

Consequently, Dr. Farley's scientific method was invalid and her testimony that Mariah was "severely abused," 34 RR 11, and that the cause of her death was "homicide," SX 36 at 2; 34 RR 25, inadmissible under *Daubert* as subjective and conclusory.  *See, e.g.*, 35 RR 67, 87-88 (Dr. Kuri testifying that the specific cause of Mariah's fatal injury is "anybody's guess"); Tab 12 at 9-23.

Because Dr. Farley's testimony that Mariah was "severely abused" and that her death was a "homicide" was subjective – not scientific  Mr. Gilman was deficient for failing to seek to exclude it under *Daubert*, by means of a motion *in limine*, or by timely objection on grounds it was both speculative and unduly prejudicial.  Given the severity of the charge and probability of a death penalty upon conviction, no reasonable attorney would have failed to seek exclusion of such evidence by any – and every – legally available method.  Mr. Gilman's deficient performance resulted in prejudice to Mariah's defense. Dr. Farley's testimony was extremely damning and essentially instructed a "guilty" verdict.  There is a reasonable probability that, but for counsel's deficient performance, the jury would have granted more credence to Melissa's explanations for Mariah's old injuries,  and believed that Mariah's fatal head injury and contemporaneous bruises were the result of an accidental tumble down a steep flight of stairs and impact upon a concrete landing at the bottom.  SX

116

υ  0123

**Scanned  Jun 18, 2013**

3. This would have been especially true if Mr. Gilman had corroborated Melissa's statement with the wealth of evidence available. *See* Discussion *supra* Issue Three.

**F.   Trial counsel failed to challenge the State's "Shaken Baby Syndrome" evidence as junk science, sheer speculation, and more prejudicial than probative.**

Recently, in *Lutze v. Sherry*, 2010 WL 3398489 (Mich. S.Ct., Aug. 25, 2010) (not designated for publication), a habeas petitioner raised an ineffective assistance of counsel claim based on appellate counsel's failure to raise trial counsel's failure to challenge Shaken Baby Syndrome evidence. The "heart" of petitioner's claim was a post-trial evaluation by physician that "shaking played no role in this child's injuries" and theorizing that trauma and a fall could have contributed to the child's death while "brain contusions witnessed in the autopsy were the result of the child having spent a day on a respirator." Petitioner then proceeded to cite a variety of news and law review articles that question shaken baby syndrome and argued that it was ineffective for his trial counsel not to challenge the underlying science of Shaken Baby Syndrome.

The Michigan Supreme Court rejected petitioner's ineffective assistance claim finding it "crucial" that all of the articles dated from 2003 or later whereas petitioner's trial was in 2000. The Court concluded that "it was hardly ineffective assistance for Petitioner's appellate counsel not to challenge trial counsel's failure to

117

υ 0124

**Scanned  Jun 18, 2013**

anticipate a coming wave of scientific research questioning the validity of SBS."

However, the Court suggested in *dicta* that:

> ***An attorney with a client accused of killing an infant through Shaken Baby Syndrome today, depending on the facts of the case, might have a duty to challenge the validity of the science.***

*Id.* (emphasis added). Such is the case here.

Melissa was indicted in 2007 for intentionally or knowingly causing the death of Mariah Alvarez by "striking, *shaking*, or throwing" Tab 1; I CR 9 (emphasis added). Her capital murder trial took place the following year – at least five years after the scientific community began to seriously question Shaken Baby Syndrome as junk science. *See* Tab 11 (collecting articles). Such challenges are hardly novel. *See, e.g.,* Tab 11 at 65 (Motion to Exclude & Appendix filed in Dallas County Case February 17, 2006). Accordingly, as the Michigan Supreme Court acknowledged in *Lutze*, Mr. Gilman had a duty to challenge the challenge the validity of the science.

During Melissa's capital murder trial, Dr. Vargas testified that it was "possible" to cause brain injury to a child by shaking, 32 RR 78-79, Ranger Escalon demonstrated on the prosecutor how an adult could cause head trauma to an infant by shaking, 33 RR 134-142, and Dr. Farley testified that Mariah was "severely abused," 34 RR 11. Mr. Gilman neither challenged the State's "Shaken Baby Syndrome"

118

0L0125

**Scanned  Jun 18, 2013**

evidence as junk science, nor objected to Ranger Escalon's demonstration.[49]  Mr.
Gilman's deficient performance resulted in a critical, missed opportunity to undercut
the credibility of the State's key witnesses and suppress harmful demonstrative
evidence not to mention *completely eliminate* the possibility of conviction on a
"Shaken Baby Syndrome" theory.

**G.     Trial counsel failed to object to Dr. Farley's improper testimony
        regarding the results of forensic examinations conducted by non-
        testifying experts.**

*Crawford v. Washington*, 541 U.S. 36, 68 (2004), instituted a categorical rule
barring the admission of out-of-court testimonial statements against the accused
absent opportunity for cross-examination.  The bar applies "irrespective of whether
the statement falls within a firmly rooted exception or bears particularized guarantees
of trustworthiness." *United States v. Holmes*, 406 F.3d 337, 348 (5th Cir. 2005).  Lab
reports are testimonial statements for purposes of the Confrontation Clause.  *See
Melendez-Diaz v. Massachusetts*, --- U.S. ----, 129 S.Ct. 2527, 2532, 174 L.Ed.2d 314
(2009); *United States v. Rose*, 587 F.3d 695, 700 (5th Cir. 2009).

---

[49] Mr. Gilman's only objection to the State's evidence in this regard was, "There was never any
testimony – there was never any testimony that Melissa Lucio ever *struck* this child in the back
of the head," 33RR 134 (emphasis added), *not* that there was never any competent expert
testimony that Melissa Lucio ever *shook* this child.

119

000126

**Scanned  Jun 18, 2013**

Dr. Farley attached reports from Laura M. Labey from NMS Labs, Frank Scribbick from Eye Pathology Laboratory, and an unnamed lab technician from the Valley Baptist Medical Center Department of Laboratory Medicine to her own Autopsy Report.  During trial, Mr. Gilman objected to admission of the autopsy attachments prepared by non-testifying experts and to any reference to the substance of those  attachments in the body of the autopsy report.  34 RR 39, 43- 45.  The objection was sustained, the State offered to redact, and the report was admitted as redacted.   34 RR 45-46.   Notwithstanding the foregoing, during the State's examination of Dr. Farley the following exchange occurred:

Q.     [Mr. Padilla] Did you examine the child's eyes?

A.     [Dr. Farley] Yes, I did.  They were sunken.

Q.     What is that indicative of?

A.     Usually, it's indicative of dehydration – not getting enough fluid.  And I did pull the vitreous from the eyes which is the juice that keeps the eyes open and helps nourish the eyes, and it did show that the child was dehydrated from the electrolytes that we pull from the eyes.

Q.     Did the eye itself, or the retina, show any injury to it?

THE REPORTER: I'm sorry?

Q.     Did the eye or retina show any injury to it?

A.     At these autopsies, most of the time, we will take the eyes – most of you have heard of retinal hemorrhages –

120

U. 0127

**Scanned  Jun 18, 2013**

THE COURT: Doctor Farley? Slow down please.

THE WITNESS: Yes, sir.  I'm sorry.  He is going to send me to jail.

THE COURT: Once you get into third gear, Mr. Flores can't take you down.

THE WITNESS: We usually hear about retinal hemorrhages, basically, because it goes along with a blunt head force trauma in children. And, so I could already see, basically – we'll take the base of the skull, and look to see if we can see injury to the eyes.  And on this child there was hemorrhage around both of the nerves that come from the eyes.  So that means there was something, probably, traumatically wrong with the eyes.  So we did remove them.  *I send those to San Antonio because there's a specialist – like I'm a forensic pathologist – and he's an eye pathologist.  So I"ll send them to him because he'll take photographs of these as well take very thin sections of them, and then give a report to what he sees. More than just looking in and seeing a retinal bleed, which is just part of the eye where you see blood there.  He can then see folds in the retina where the retina has detached and folded onto itself which is, again a sign of significant trauma to the child.  And he did see this as well as the optic nerve hemorrhage that I had seen at the autopsy.*

Q.   I'll draw your attention back to the bite marks on the child.  You said that the mrks were there and appeared to be pulling on the flesh, correct?

A.   (Nods head in the affirmative.)

Q.   Were you able to determine whether those bite marks appear to be from an adult, or a child?

A.   There – the thing with these bite marks, is someone dragged their teeth across it.   They looked wide.   One of them was 3.2 centimeters.  They looked more in the adult size.  *But the forensic*

121

**Scanned  Jun 18, 2013**

> *odontologist – when you drag like that, we cannot match it to somebody. It needs to be a nice, crisp bite mark, with the bottoms of the teeth and maybe with the canines present so that she can get a nice measurement on these bite marks. So on this case, I did call her, but all she could do is just tell me that they're bite marks. The dragging, she wouldn't be able to match an individual.*

34 RR 32-34 (emphasis added).  Mr. Gilman raised no objections.

Mr. Gilman raised a Confrontation Clause objection to admission of the autopsy attachments prepared by non-testifying experts and to any reference to the substance of those attachments in the body of the autopsy report, 34 RR 39, 43- 45, yet failed to raise the same objection when Dr. Farley testified to the contents of those same attachments at trial.   No trial strategy supports such a distinction; the constitutional error and resulting damage to the defense are the same.  By allowing Dr. Farley to testify regarding the opinions of a non-testifying forensic odontologist and a non-testifying eye pathologist, Melissa was deprived of the opportunity to require that those individuals be properly qualified as experts, and to cross-examine them regarding their scientific methods and conclusions.  Accordingly, a reasonable attorney would have promptly objected and – if Dr. Farley had already responded to the question – requested an instruction that the jury disregard and a mistrial.

122

0 0129

**Scanned  Jun 18, 2013**

H.    **Trial counsel failed to object to the State's cross-examination of Dr. Kuri regarding injuries to Mariah's body.**

During the defense case-in-chief, Mr. Gilman proffered Dr. Kuri as his sole medical expert to testify "about the brain" but not "about any of the other injuries on the body." 35 RR 18.  Following a *Daubert* hearing, the trial court limited Dr. Kuri's testimony to that narrow topic. 35 RR 18.  Nevertheless, on cross examination the State attempted to discredit Dr. Kuri's testimony by questioning him regarding the injuries to Mariah's body – questions which he could not answer.  *See, e.g.*, 35 RR 60-61 (bruising), 62-64 (broken bone), 71 (bruising all over body), 82-83 (bite marks).  Mr. Gilman did not object.  For reasons explained more fully *supra* in Issue Three, subsection A, Dr. Kuri's inability to answer the State's cross-examination questions rendered his expert services as "egregiously inadequate" to challenge the State's case.  Tab 12 at 23.

I.    **Trial counsel failed to object to testimony by police officers regarding drug paraphernalia on grounds it was irrelevant to her guilt or innocence and more prejudicial than probative.**

"Evidence which is not relevant is inadmissible."    Tex. R. Evid. 403. Evidence is relevant only if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401.  Even relevant evidence

123

Ú  0130

**Scanned  Jun 18, 2013**

"may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Tex. R. Evid. 403.

During Melissa's interrogation, she denied recent drug use and stated that drug paraphernalia found in the family's apartment belonged to her husband. Tab 2 (SX 3 at 22; SX 4 at 3). CPS drug test results corroborated this statement; Melissa consistently tested negative for drugs from March 2006 through her last test on January 10, 2007. DX 25 at 1. *See also* Tab 2 (SX 3 at 25). Furthermore, according to Melissa's CPS case history, her prior drug use resulted in passive neglect, not active physical abuse. *See* Tab 2 (SX 3 at 34); DX 25 (CPS Case Timeline). Nevertheless, at trial, the State repeatedly elicited testimony regarding the presence of drug paraphernalia in the home, and used it to suggest that Melissa had beaten or neglected Mariah due to a drug-induced haze. Tab 2 (SX 3 at 22-25, 34); 32 RR 44-45. Mr. Gilman failed to object.

Evidence of drug paraphernalia in the home was irrelevant to Melissa's guilt or innocence. According to every CPS drug test, Melissa stopped using drugs long before Mariah was returned to her custody. DX 25 at 1. However even assuming, without agreeing, that evidence of drug paraphernalia in the home had *some* relevance, it was nevertheless inadmissable as more prejudicial than probative. Tab 2 (SX 3 at 22-25, 34).

124

O-0131

**Scanned  Jun 18, 2013**

**J.**  **Trial counsel failed to object to the State's punishment phase questions regarding Melissa's prior, unrelated DWI conviction even though evidence of that conviction had never been admitted.**

During the more than three months from the date of Melissa's arrest for capital murder until the appointment of counsel she was charged with an unrelated incident of Driving While Intoxicated allegedly committed on September 15, 2006, was arraigned, and – without benefit of legal counsel on either case -- plead guilty. I CR 85 (State's Notice of Extraneous Offenses: 5/16/2007 DWI Conviction, Cause No. 06-CCR 6849-C); 38 RR 35.

As discussed more fully *supra* under Issue Five, subparagraph A, during jury selection, Mr. Gilman filed his first – and only – motion *in limine* seeking to exclude, *inter alia*, evidence of Melissa's prior extraneous DWI conviction. I CR 140-141 ¶ B.2. On the first day of Melissa's jury trial, Mr. Gilman brought the motion to the trial court's attention and stated, "There is only one conviction that my client has, and that's the DWI and a misdemeanor, and that's inadmissible." 32 RR 7-8. However, Mr. Gilman did not request or obtain a formal ruling on his motion. *Id.*

After resting its case for punishment, the State requested permission to reopen for the limited purpose of offering proof of Melissa's DWI conviction. 37 RR 169-171. The trial court ruled that it would allow the State to do so but did not rule on the admissibility of the evidence. 37 RR 170. The State then informed the trial court that

125

0 0132

**Scanned  Jun 18, 2013**

it would offer proof of Melissa's DWI conviction after the defense had presented its

case for mitigation.  37 RR 171.

Thereafter, during the defense's case for mitigation, the State questioned

Melissa's witnesses regarding her prior conviction for DWI.

> Q.    Did you inquire, Mrs. Villanueva, into the criminal history of
>        Mrs. Lucio?
> A.    I remember that it was discussed at the very first meeting.
> Q.    Okay.  Did you learn that she had a DWI conviction.
> A.    I recall something like that, sir.
> Q.    Did you recall discussing with her on that DWI offense she used the
>        name Melissa Salinas
> A.    No.
> Q.    Would it surprise you that she used the name Melissa Salinas
> A.    To an extent.

38 RR 35.  Mr. Gilman neither objected on grounds the State's questions were based

on facts not yet in evidence nor asked the trial court to instruct the jury to disregard.

38 RR 35.  The State never reopened its case to offer proof of the DWI conviction.

Mr. Gilman's deficient performance prejudiced Melissa's punishment-phase

defense.  By failing to raise the necessary objection or request a curative instruction,

the State was allowed to introduce otherwise inadmissible evidence suggesting that

Melissa had a habit of lying and manipulation.

126

00 0133

**Scanned  Jun 18, 2013**

**K.**   **Trial counsel's multiple deficiencies resulted in a failure to subject the State's case to adversarial testing.**

Owing to the multiple deficiencies in performance discussed in this section and under Issue Three above – each of which independently resulted in prejudice to Melissa's defense – the State was allowed to present its case that Melissa was a "cold blooded"[50] baby killer essentially unchallenged.

ISSUE SIX: Whether Melissa was deprived of due process and due course of law when the State failed to disclose potentially exculpatory evidence in sufficient time for the defense to utilize it at trial.[51]

The suppression by the prosecution of material evidence favorable to the accused after his request violates due process, irrespective of the good faith or bad faith of the prosecutor. *Brady v. Maryland*, 373 U.S. 83,  83 S. Ct. 1194 (1963); *Martinez v. Wainwright*, 621 F.2d 184 (5th Cir. 1980).  To obtain relief based on *Brady* violation, a habeas applicant bears the burden of demonstrating (1) the State suppressed evidence, (2) that is favorable to the defense, and (2) material to the issues

---

[50] *See, e.g.,* Tab 2 (SX 3 at 44-45).

[51] Appellate counsel raised a similar issue in his brief on direct appeal.  As of the filing of this pleading, no ruling on that issue has been provided.

In order to establish a *Brady* violation, a criminal defendant must frequently – though not always – provide the reviewing court with proof of evidence outside the four corners of appellate record.  *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  Accordingly, state habeas counsel includes the issue here in order to preserve it and obtain a ruling on the merits in the event that the claim is denied or dismissed on direct appeal as not having been raised in the proper forum.

127

UC0134

**Scanned  Jun 18, 2013**

of guilt or punishment.  *Brady*, 383 U.S. at 87,183 S.Ct. at 196; *Brogdon v. Blackburn*, 890 F.2d 1164, 1167 (5th Cir. 1986); *Ex parte Castellano*, 863 S.W.2d 476, 485 (Tex. Crim. App.1993). Evidence is "material" within the meaning of *Brady* if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed; a "reasonable probability" is one sufficient to undermine the confidence in the outcome. *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995); *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383-84 (1985).  The purpose of the *Brady* rule of disclosure is to ensure that the accused is not denied access to materially favorable evidence that is known to the government but unknown to him. *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976); *United States v. Cravero*, 545 F.2d 406, 420 (5th Cir. 1976). That purposes is thwarted – and the accused entitled to a new trial – where the State suppress *Brady* material until its hand is forced by the trial judge only days before trial. *Ex parte Mowbray*, 943 S.W.2d 461 (Tex. Crim. App. 1996).

Here, Mr. Gilman timely sought discovery of, *inter alia*, "[t]he substance of all oral confessions, admissions and statements made by the Defendant to the state in connection with this case, which were not electronically recorded" and the contents of the files of Child Protective Services.  I CR 20 ¶ B.3, I CR 35 ¶ 1; Tab 17 (Motion). The State objected to disclosure of disclosure of CPS documentary records

128

**Scanned  Jun 18, 2013**

as privileged. I CR 35-36. The trial court granted Mr. Gilman's motion and ordered the documents disclosed. On August 30, 2007, the State disclosed what it claimed were "all records" of CPS up to that date. I CR 72-73. At the time of the initial disclosure, the State extracted an agreement from Mr. Gilman that he would not contact CPS caseworkers, mental health workers, mental health service providers, other service providers, foster parents, foster siblings, or any other undefined "interested parties" without first seeking leave of Court and allowing the State a chance to respond to such request. I CR 72-73. On January 30, 2008, the State turned over an additional 450 - 500 pages of CPS records, some of which it claimed were duplicates of previously disclosed documents. 10 RR 10. Additionally the Court ordered that CPS update its disclosures with a supplement of all recently generated documents by May 23, 2008. 11 RR 7; 30 RR 11. As of June 24, 2008, CPS had failed to comply and the trial court ordered CPS to do so by 9:00 a.m. the following morning. 30 RR *passim*. On June 25, 2008, the State advised the trial court that there were 12 or 13 additional volumes of CPS records (a "voluminous" amount) 13 RR 3. After quickly reviewing the documents Mr. Gilman requested copies of approximately three boxes of documents and trial court ordered CPS to provide those by the following morning. 31 RR 15. The case proceeded to trial the following week.

<center>129</center>

<center>U 0136</center>

**Scanned  Jun 18, 2013**

During jury selection, Mr. Gilman complained that he had not been provided copies of photographs and reports made by CPS. 15 RR 17-18 (referring to reports by CPS Therapist Beto Juarez). Mr. Gilman pointed out that, as a consequence of the State's tardy disclosure, "we don't even have time to see what it is, nor do we have an opportunity to possibly then subpoena other people." 15 RR 17. The trial court noted his objection, but overruled it by allowing the trial to go forward as scheduled. 15 RR 18. During the guilt/innocence phase of Melissa's trial, Mr. Gilman also complained that the State had failed to disclose Robert Alvarez's statements, Tab 3, 32 RR 63, 33 RR 158-159, 34 RR 4, and the videotaped interviews done by CPS at Maggie's House, Tab 4, 33 RR 104-15, in time for trial. The State, in typical fashion, asserted that the material had been disclosed pursuant to the District Attorney's "open file" policy. The trial court dismissed this assertion noting for the record that the "historical problem" with the District Attorney's "open file" policy is that defense counsel doesn't necessarily know that potentially exculpatory evidence is in the file. 33 RR 104-105. The trial court's comment acknowledges the ongoing dispute regarding the extent of that policy and whether it does, in fact, provide the full access to documents and other evidence that it purports to provide. For example, where evidence is added to the District Attorney's file *after* defense counsel has done its initial file review, unless defense counsel receives notice that it has been added the

130

**Scanned  Jun 18, 2013**

evidence has not, in fact, been disclosed.  Accordingly, the District Attorney's assertion of disclosure pursuant to an "open file" policy did not – and does not – resolve the *Brady* issue.  In the instant case, the State's tardy disclosure of evidence was compounded by its efforts to prohibit defense counsel from interviewing potential witnesses without prior approval.  I CR 72-73

The evidence withheld by the State was material to Melissa's defense.  For example, Robert Alvarez's statement contained exculpatory evidence that Melissa had never been alone with Mariah during the 48 hours prior to her death, and that Alvarez had also cared for the infant.  *See, e.g.,* Discussion *supra* Issue Three, subparagraph D.  The Maggie's House interviews contained exculpatory evidence that Melissa never abused Mariah, that Mariah's older sisters frequently babysat while Melissa was away, that Mariah's older sisters hit the children left in their charge, and that Mariah had in fact fallen down the stairs. *See, e.g.,* Discussion *supra* Issue Three, subparagraph D.2. Because the State limited defense counsel's access to witnesses and otherwise withheld CPS documents, photographs, and exculpatory witness statements not only until days *before* trial, but until the *middle* of trial, Melissa is entitled to a new trial. *Mowbray*, 943 S.W.2d 461.

131

U 0138

**Scanned  Jun 18, 2013**

ISSUE SEVEN: Melissa was deprived of effective assistance of trial counsel guaranteed by the United States Constitution and the Texas Constitution when her trial counsel failed to preserve trial error for review on direct appeal.

Trial counsel's performance is judged by the familiar *Strickland* standard. *See supra*, note 13 and accompanying text. Under that standard, trial counsel has a duty to object to inadmissible evidence and, if the objection is sustained by the court, request a curative jury instruction and seek a mistrial if the curative instruction is given. TEX. R. EVID. 103(a)(1); TEX. R. APP. PROC. 33.1(a)(1); *Nethery v. State*, 692 S.W.2d 686, 701 (Tex. Crim. App.1985); *Duran v. State*, 505 S.W.2d 863, 866 (Tex. Crim. App.1974). *But see Alberts v. State*, 302 S.W.3d 495 (Tex. App. - Texarkana 2009) (counsel not deficient for failing to object to impermissible testimony based on strategic decision not to emphasize it). The objection must be specific, not general. *Tompkins v. State*, 774 S.W.2d 195, 218 (Tex. Crim. App. 1987), aff'd, 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989) (general objection "amounts to no objection" and does not preserve error for review); TEX. R. EVID. 103(a)(1); TEX. R. APP. PROC. 33.1(a)(1). Trial counsel also has a duty to preserve error in the exclusion of evidence by an offer of proof or a bill of exceptions. *Guidry v. State*, 9 S.W.3d 133, 153 (Tex. Crim. App. 1999); *Green v. State*, 840 S.W.2d 394, 407 (Tex. Crim. App.

132

U 0139

**Scanned  Jun 18, 2013**

1992); *see Johnson v. State*, 800 S.W.2d 563 (Tex. App. - Houston [14th Dist.] 1990, pet. ref'd).

On direct appeal, counsel argued that the trial court's error in admitting the "unreliable" video recordings of Melissa's "involuntary" statement to police was preserved by the general objection that they were inaudible.  Appellate Brief at 57-58 (quoting *In re V.B.*, 2005 WL 418710 (Tex. App. - San Antonio Feb.23,2005, no pet.)(not selected for publication). Counsel also argued that the Confrontation Clause violation resulting from the admission of evidence obtained from an interview by CPS Therapist Beto Juarez was preserved by the general objection "He's not here." Appellate Brief at 121-124 (citing *Powell v. State*, 663 S.W.2d 465, 466 (Tex. App. – Houston [1st Dist.] 1983, no. pet.; *Rodgers v. State*,205 S.W.3d 525.(Tex. Crim. App. 2006); *Baxter v. State* 66 S.W.3d 494,(Tex. App. - Austin 2001, pet. ref'd)). As of the filing of this pleading, no opinion on has been issued in Melissa's direct appeal.  To the extent, if any, the Court of Criminal Appeals concludes that these (or any other appellate issues) were waived by the failure to raise proper objection, trial counsel's performance was both deficient and prejudicial.  Melissa's statement to police could have been – and should have been – suppressed as unreliable because large portions of it were inaudible and involuntary because it was the product of an illegal arrest. Melissa's statement was critical to the State's case that Melissa abused

133

t  0140

**Scanned  Jun 18, 2013**

Mariah for 88 days and ultimately caused her death. Likewise, evidence obtained from an interview by CPS Therapist Beto Juarez could have been – and should have been -- suppressed as violating Melissa's right to counsel and to confront witnesses against her. A Confrontation Clause violation constitutes fundamental error warranting a new trial. *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

> ISSUE EIGHT: Whether the trial court deprived the defendant of a fair and impartial judge and jury and due process of law when he commented upon the evidence by laughing at a defense expert during testimony where such conduct was observed by the jury.

The United States Supreme Court has determined when certain constitutional rights are violated fundamental error occurs. *Arizona v. Fulminante*, 499 U.S. 279, 309-10, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991); *Williams v. State*, 194 S.W.3d 568, 579 (Tex. App. - Houston [14th Dist.] 2006), *aff'd*, 252 S.W.3d 353 (Tex. Crim. App. 2008). The Court has defined such errors as "structural defects in the constitution of the trial mechanism." *Fulminante*, 499 U.S. at 309, 111 S.Ct. at 1265. The Court has determined these fundamental constitutional rights include the right to counsel, the right to an impartial judge, the right to not have members of the defendant's race unlawfully excluded from a grand jury, the right to self-representation at trial, and the right to a public trial. *Id.* at 309-10, 111 S.Ct. at 1264-65; *Williams*, 194 S.W.3d at 579. In addition to the fundamental errors

134

**Scanned  Jun 18, 2013**

established by the United States Supreme Court, a plurality of the Texas Court of Criminal Appeals, in *Blue v. State*, held another fundamental error of constitutional dimension could exist if a trial judge makes a comment that taints the presumption of innocence. *Blue v. State*, 41 S.W.3d 129, 132 (Tex. Crim. App. 2000) (plurality opinion).  *See also Marks v. State*, 617 S.W.2d 250, 252 (Tex. Crim. App.1981) (trial court's improper comment on weight of evidence results in reversible error when it benefits the State or prejudices the defendant's rights); TEX. CODE CRIM. PROC. Art. 38.05 (prohibiting trial courts from commenting on the weight of the evidence).

Immediately following Dr. Kuri's testimony during the guilt/innocence phase of Melissa's trial, the following exchange occurred:

THE COURT:  Mr . Gilman, you said before proceeding further you wanted to take up some legal matters.

MR. GILMAN: Yes, sir. I don't know if the Court is aware, but during the testimony this morning, there were facial remarks of Your Honor during the testimony. And those facial remarks conveyed things, even though maybe you had no intentions of conveying things to the jury, and I just am bringing this to the Court's attention because I would like the Court to try and refrain from making any facial gestures during the time of the testimony. If the Court is pleased or humorous of something that somebody might have said, I wish the Court would take that up after the jury is out.

THE COURT: I made no conscious facial remarks for any specific purpose. But I will try and refrain from reacting in any way, either positively or negatively, as I have in the past. And any time

135

O\ 0142

**Scanned  Jun 18, 2013**

counsel wants to make a standing bill on any of this, you are more than welcome to.

MR. GILMAN: Like I said, I don't know if the Court is aware that the Court is doing it. But I am bringing it to the Court's attention.

THE COURT: I was not.

35 RR 91-92.  The trial court's facial remarks expressing humor at Dr. Kuri's testimony constituted an improper comment upon the weight to be given to testimony by Melissa's key defense witness.  Intentional or not. such comment impermissibly benefitted the State and deprived Melissa of the right to a fair and impartial judge and jury and due process of law.

ISSUE NINE: Melissa was deprived of effective assistance of appellate counsel because the State failed to provide her attorney with a complete transcript.

Appellate counsel's performance is judged by the familiar *Strickland* standard. *See supra*, note 13 and accompanying text.  Under that standard, appellate counsel has a constitutional duty to review the record for any arguable error. *In re Schulman*, 252 S.W.3d 403 n. 32 (Tex. Crim. App. 2008).

136

ι  0143

**Scanned  Jun 18, 2013**

Appellate counsel could not review a record that he did not have.[52]  During trial, the State played the complete video recording of Melissa's statement for the jury.  32 RR 51 *et seq.*  The statement was contained on three DVDs.  SX 3, 4, 5.  During this process, it came to Mr. Gilman's attention that the court reporter was not transcribing the video and that the portions in Spanish were not being translated.  32 RR 58.  Mr. Gilman reminded the trial court that the video should have been transcribed "prior to coming here" in order "to have a good record" but was not.  32 RR 62.  In an effort to resolve the issue, the State offered to provide a transcribed copy from the record -- complete with translations of any Spanish portions by a certified translator and that it would "provide that transcribed copy to the jury."  32 RR 62.  There is no evidence that it ever did.  Ultimately, the trial court found that

---

[52]  The video recordings themselves were inadequate for this purpose.  It is undisputed that portions were either inaudible or in Spanish.  32 RR 59 (audio "very, very difficult to understand or hear" and "there are statements in Spanish").  *See also* Appellate Brief at 57 ("The audio is not audible").

Appellate counsel also specifically refused to agree to "any statement of the audio" as permitted by TEX. R. APP. PROC. 34.6(f), and objected to "any trial court's copy which is not a verbatim reproduction of everything every witness said" as allowed by *Griffin v. Illinois*, 351 U.S. 12 (1956), and "any summary by the trial court" under *Draper v. Washington*, 372 U.S. 487, 497 (1963), as inadequate.

Although state habeas counsel has made an independent and personal effort to transcribe the State's video recordings of Melissa's statement for her own use, *see* Tab 2, she is not a certified court reporter or interpreter and also had difficulty with the poor quality of the audio.  Accordingly habeas counsel provides those transcripts for the court's convenience and demonstrative purposes *only* and likewise refuses to agree that this is necessarily an adequate or appropriate summary for purposes of Melissa's appeal or writ proceedings.  Habeas counsel refers the court to the videos themselves.

137

ι  0144

**Scanned  Jun 18, 2013**

*"Mr. Gilman makes a valid point with regard to the record."* 32 RR 63 (emphasis

added).

The deficient performance of appellate counsel resulting from his inability to

review a complete transcript of trial proceedings necessarily prejudiced Melissa's

case on direct appeal.  As the Court of Criminal Appeals has acknowledged:

> "How can we say the instant failure to provide a complete record did not
> contribute to the verdict or punishment when the failure has prevented
> us from having a complete record from which to assess the integrity of
> the verdict?"

*Perez v. State*, 824 S.W.2d 565, 568 (Tex. Crim. App. 1992).

As in *Perez*, the missing portion of the record in the instant case was

"significant" and "necessary" to resolution of Melissa's claims that the evidence was

legally and factually insufficient to sustain the jury's guilty verdict and death sentence

because the State relied upon the purportedly incriminating statements Melissa made

to the police to prove that she fatally abused Mariah, and that the video recording of

her statement was statutorily and constitutionally inadmissible.  *See* Appellate Brief

at 54, 63-64.  The missing portion of the record also made it difficult – if not

impossible – for appellate counsel to identify any trial error apparent from such

transcription.[53]  For example, the missing portion of the record was also necessary for

_____

[53] State habeas counsel suffers the same handicap.

138

ü  0145

**Scanned  Jun 18, 2013**

appellate counsel to ascertain whether police obtained Melissa's statement in violation of her right to remain silent, *see* Discussion *supra* Issue Two, subsection B, or obtained equally inadmissible derivate evidence, *see* Appellate Brief at 64.

Moreover, without a complete transcript, appellate counsel could not properly support his argument that such evidence was inadequate by citation to the record as required by Rule 38.1(h) of the Texas Rules of Appellate Procedure. TEX. R. APP. PROC. 38.1(h) ("The brief must contain * * * appropriate citations * * * to the record"). Indeed, appellate counsel could not even cite to the video itself because the recordings did not have a counter or timer. SX 3, 4, 5. Appellate counsel was forced, instead, to rely upon the judges on the Court of Criminal Appeals to, themselves, review the *entirety* of the recorded statement and subject Melissa's appeal to judicial interpretation – and indeed even speculation – as to what was said. Accordingly, Melissa is entitled to a new trial. *Schulman*, 252 S.W.3d at n. 32; *Perez*, 824 S.W.2d at 568.

ISSUE TEN: Melissa is entitled to habeas relief because she is actually innocent of the offense of capital murder.

Mariah's fatal head injury was consistent with the fall down a flight of stairs described by Melissa and witnessed by her son. Furthermore, Melissa was never alone with Mariah during the 24 to 48 hours during which she is alleged to have

139

0146

**Scanned  Jun 18, 2013**

brutally beaten her to death and Melissa never admitted to inflicting Mariah's injury. And finally, Melissa's 15-year-old daughter Alexandra had both motive and opportunity to injure Mariah and confessed in front of multiple witnesses to having been the cause of her death. Accordingly, Melissa is entitled to habeas relief because she is factually innocent of the offense of capital murder. *See generally  Ex parte Gilbert*, 2010 WL 5233003 (Tex. Crim. App., 2010) (not designated for publication); *Ex parte Tuley*, 109 S.W.3d 388 (Tex. Crim. App. 2002).

<u>PRAYER FOR RELIEF</u>

Applicant has alleged facts that, if true, entitle her to relief. *Ex parte Tuley*, 109 S.W.3d 388 (Tex. Crim. App.2002). To the extent additional evidence is needed to ascertain the veracity of those allegations, the trial court is the appropriate forum for making those findings of fact. *Ex parte Rodriguez*, 334 S.W.2d 294, 294 (Tex. Crim. App. 1997). The court may use any means set out in Article 11.07, § 3(d).

WHEREFORE, applicant prays that this court enter findings of fact and conclusions of law recommending relief. Alternatively, applicant prays that this court enter an order designating any issues, requiring a response brief from the State, granting applicant an evidentiary hearing to present supporting evidence, ordering transcription of the evidentiary hearing by the court reporter, and allowing the parties

0147

**Scanned  Jun 18, 2013**

to file post-hearing briefing together with proposed findings of fact and conclusions

of law.

Respectfully Submitted,

Margaret Schmucker
Attorney for Applicant Melissa Lucio
Texas Bar No. 24030874

Law Office of Margaret Schmucker
512 East 11th Street, Suite 205
Austin, Texas 78701

Phone (512) 236-1590
Fax (512) 524-3479
E-Mail M.Schmucker@AppellateCourtLaw.com

141

0148

**Scanned  Jun 18, 2013**

No. 07-CR-885-B

Writ No. _____

IN THE
138th JUDICIAL DISTRICT COURT OF
CAMERON COUNTY, TEXAS

and

THE TEXAS COURT OF CRIMINAL APPEALS

*Ex Parte* MELISSA ELIZABETH LUCIO,

Applicant

APPENDIX
TO APPLICATION FOR WRIT OF HABEAS CORPUS
PURSUANT TO SECTION 4 OF ARTICLE 11.071 OF
THE TEXAS CODE OF CRIMINAL PROCEDURE

VOLUME _1_ OF 5

LAW OFFICE OF MARGARET SCHMUCKER

MARGARET SCHMUCKER
512 East 11th Street, Suite 205
Austin, Texas 78701
Tel: (512) 236-1590
Fax: (512) 524-3470
SBN 24030874

ATTORNEY FOR APPLICANT,
MELISSA ELIZABETH LUCIO

0C0149

# Scanned  Jun 18, 2013

<u>Tab</u>                                                                                          <u>Page</u>

1.    Trial Documents
            Indictment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
            Jury Charge on Guilt / Innocence. . . . . . . . . . . . . . . . . . . . . . . . . 3
            Jury Verdict on Guilt / Innocence. . . . . . . . . . . . . . . . . . . . . . . . 9
            Jury Charge on Punishment. . . . . . . . . . . . . . . . . . . . 10
            Jury Verdict on Punishment. . . . . . . . . . . . . . . . . . . . . . . . . . 13

2.    Videotaped Interrogation of Melissa Lucio
            State's Exhibit 3 Unofficial Transcript
            State's Exhibit 4 Unofficial Transcript
            State's Exhibit 5 Unofficial Transcript

3.    Robert Alvarez Statements
            Videotaped Interrogation
            Written Statement

4.    DVD Recording of Maggie's House Interviews

5.    Photographs
            Flight of "White" Stairs to Former Second Story Apartment. . . . . . 1
            Concrete Landing, Flight of "White" Stairs to Former Second Story
                Apartment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
            Three Steps to New/Current First Story Apartment. . . . . . . . . . . . . 3

6.    Sonya Chavez Affidavit. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      Esperanza Trevnio Affidavit. . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      Visitation Photos. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7.    Beto Juarez Reports to CPS from District Attorney's Files
            February 14, 2008
            March 5, 2008

8.    Carmen Fischer Report

9.    Ed Stapleton, Affidavit

10.   Witness Letters

U. 0150

**Scanned  Jun 18, 2013**

11.    Shaken Baby Syndrome
          The Next Innocence Project: Shaken Baby Syndrome and
            The Criminal Courts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
          Shaken Baby Syndrome: Debunking the Myth. . . . . . . . . . . . . 59
          Sample Motion to Exclude Evidence & Appendix. . . . . . . . . . . 65

12.    Dr. Thomas Young, Pathologist
          Curriculum Vitae. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
          Autopsy Report and Affidavit. . . . . . . . . . . . . . . . . . . . . . . . . 9
          "Bite Mark" Power Point. . . . . . . . . . . . . . . . . . . . . . . . . . 24
          Fatal Pediatric Head Injuries Caused by Short Distance Falls.. . . . . 39
          Classical Mistakes in Forensic Pathology. . . . . . . . . . . . . . . . . 69
          Putting It All Together: The Logic Behind the Forensic Scientific
            Method and the Inferential Test. . . . . . . . . . . . . . . . . . . . 79
          Delayed Deterioration Following Mild Head Injury in Children. . . 91
          Diffuse Cerebral Swelling Following Head Injuries in
            Children: the Syndrome of "Malignant Brain Edema". . . . . 113
          Traumatic Cerebral Edema, FORENSIC NEUROPATHOLOGY,
            2nd ed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

13.    Dr. Norma Farley, Medical Examiner
          Deposition Transcript. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
          Autopsy Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

14.    Dr. Thomas G. Allen, Psychologist
          Curriculum Vitae. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
          Report and Affidavit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

15.    Dr. John Pinkerman, Psychologist
          Affidavit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
          The Psychology of False Confessions. . . . . . . . . . . . . . . . . . 4

16.    Ms. Norma Villaneuva, Mitigation Expert
          Social History Power Point. . . . . . . . . . . . . . . . . . . . . . . . . 1
          Affidavit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

17.    CPS Records
          Motion for CPS Records. . . . . . . . . . . . . . . . . . . . . . . . . . . 1
          Paternity Records (Mariah). . . . . . . . . . . . . . . . . . . . . . . . . 3

U 0151

**Scanned  Jun 18, 2013**

Supervised Visit Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Foster Parent Monthly Paperwork (Mariah).. . . . . . . . . . . . . . . . . 250
Foster Parent Visitation Reports (Mariah). . . . . . . . . . . . . . . . . . . 345
PRN/Restraint Approval (Mariah). . . . . . . . . . . . . . . . . . . . . . . . . 383
Accident Reports (Mariah). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 407
Burke Foundation Treatment Plans (Mariah).. . . . . . . . . . . . . . . . 412
CPS Placement Review Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . 454
Richard Connell, PhD, Psychological Evaluation of Rene. . . . . . . 479
Diego Rodriguez-Escobar, Psychiatric Interview of Richard. . . . . 489
Psychiatric Evaluation of Gabriel. . . . . . . . . . . . . . . . . . . . . . . . . . 492
Foster Parent Monthly Paperwork (Rene). . . . . . . . . . . . . . . . . . . 497
Foster Parent Visitation Reports (Rene).. . . . . . . . . . . . . . . . . . . . 589
Foster Parent Monthly Paperwork (Richard). . . . . . . . . . . . . . . . . 610
Foster Parent Visitation Reports (Richard). . . . . . . . . . . . . . . . . . . 695
Foster Parent Monthly Paperwork (Gabriel). . . . . . . . . . . . . . . . . 737
Foster Parent Visitation Reports (Gabriel). . . . . . . . . . . . . . . . . . . 830

Certificate of service.

Scanned  Jun 18, 2013

# TAB
# 1

Scanned Jun 18, 2013

THE GRAND JURY 9115
DOB: 06/18/69

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS

THE GRAND JURORS, for the County of Cameron and State aforesaid, duly organized as such at the FEBRUARY Term, 2007 of the 103rd Judicial District in and for said County, upon their oaths in said Court, present that MELISSA ELIZABETH LUCIO, hereinafter called the Defendant, on or about the 17th day of FEBRUARY, 2007, and anterior to the presentment of this indictment, in the County of Cameron and State of Texas, did then and there intentionally or knowingly cause the death of an individual, namely, MARIAH ALVAREZ, by striking, shaking, or throwing MARIAH ALVAREZ with defendant's hand or foot or other object unknown to the Grand Jury, and the said MARIAH ALVAREZ was then and there an individual younger than six years of age,

against the peace and dignity of the State

_(signature)_
Foreman of the Grand Jury

**07CR00000885**

000   9

_[rotated/inverted text at bottom of page]_

A D 20

Given under my hand and seal of said court, at office in Brownsville, Texas, this _____ day

_____

A D 20 _____ in Cause No. _____ styled the State of Texas vs

found a true and correct copy of the Original Bill of Indictment, filed in said Court on

I, AURORA DE LA GARZA, Clerk of the District Courts of Cameron County, Texas do hereby certify that the within and fore-

COUNTY OF CAMERON

THE STATE OF TEXAS

000   10

_(signature)_ DEPUTY

000   13

**PAGE 1**

0  0154

Scanned  Jun 18, 2013

07CR00000885

NAMES OF WITNESSES
ID# 217219  § 207 205

THE STATE OF TEXAS
vs
MELISSA ELIZABETH LUCIO

INDICTMENT

OFFENSE

CAPITAL MURDER

ARMANDO R. VILLALOBOS
County and District Attorney

A TRUE BILL

Foreman of The Grand Jury

Filed on MAY 16 2007 ___ 20

AURORA DE LA GARZA, CLERK OF DISTRICT
COURT OF CAMERON COUNTY, TEXAS

By ___ Deputy

Amount of Bail $ 1,000,000.00  5/22/07

THE STATE OF TEXAS }
COUNTY OF CAMERON

PAGE 2

I, AURORA DE LA GARZA, Clerk of the District Courts of Cameron County, Texas do hereby certify that the within and fore-
going is a true and correct copy of the Original Bill of Indictment, filed in said Court on ___
A.D. 20 ___ in Cause No. ___ styled the State of Texas vs ___

Given under my hand and seal of said court, at office in Brownsville, Texas, this ___ day ___ A.D. 20 ___

AURORA DE LA GARZA, Clerk

By ___ Deputy

0C( 10

0.0155

Scanned Jun 18, 2013

No 07-CR-885-B

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | CAMERON COUNTY, TEXAS |
| | § | |
| MELISSA ELIZABETH LUCIO | § | 138TH JUDICIAL DISTRICT |

## CHARGE OF THE COURT

**MEMBERS OF THE JURY:**

The defendant, Melissa Elizabeth Lucio, stands charged by indictment with the offense of capital murder, alleged to have been committed in Cameron County, Texas on the 17th day of February, 2007. To this charge the defendant has pleaded not guilty.

1.

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual.

A person commits the offense of capital murder when such person commits the murder as defined herein, if any, to an individual under six years of age.

2.

"Individual" means a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth.

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

3.

0156

**Scanned  Jun 18, 2013**

Now, if you find from the evidence beyond a reasonable doubt that on or about the 17th day of February, 2007, in Cameron County, Texas, the Defendant, Melissa Elizabeth Lucio, did then and there intentionally or knowingly cause the death of an individual, namely, Mariah Alvarez, by striking, shaking, or throwing Mariah Alvarez with defendant's hand or foot or other object unknown to the Grand Jury, and the said Mariah Alvarez was then and there an individual younger than six years of age, then you will find the defendant, Melissa Elizabeth Lucio, guilty of Capital Murder as charged in the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of capital murder and say by your verdict "Not Guilty".

4

Our law provides that a defendant may testify in her own behalf if she elects to do so.  This, however, is a privilege accorded a defendant, and in the event she elects not to testify, that fact cannot be taken as a circumstance against her.  In this case, the defendant has elected not to testify, and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against the defendant.

5.

You are instructed that in considering your verdict you may consider all relevant facts and circumstances surrounding the killing, if any, and the previous relationship existing between the accused and the deceased, together with all relevant facts and

PAGE 4

232

**Scanned  Jun 18, 2013**

circumstances going to show the condition of the mind of the accused at the time of the alleged killing, if any.

6.

In the event any of you took notes, you may rely on your notes during your deliberations  However, you may not share your notes with the other jurors and you should not permit the other jurors to share their notes with you  You may, however, discuss the contents of your notes with the other jurors.

Notes are not to be considered as evidence.  In the event of disagreement of testimony, the jurors may request disputed testimony to be read from the official record by the courts reporter.

A grand jury indictment is merely the means under our law by which a defendant is brought to trial in a felony prosecution.  It is not evidence of guilt and you should not consider it in passing on the question of guilt of the defendant.

The burden of proof in all criminal cases rests upon the State throughout the trial, and never shifts to the defendant.  All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt.  The fact that a person has been arrested, confined, or indicted for, or otherwise charged with, the offense gives rise to no inference of guilt at his trial.  The law does not require a defendant to prove his innocence or produce any evidence at all.  The presumption of innocence alone is enough to acquit the defendant.

The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant.

00 0158

**Scanned  Jun 18, 2013**

It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit her and say by your verdict "Not Guilty".

You are the exclusive judges of the facts proven, of the credibility of the witnesses and the weight to be given their testimony, but the law you shall receive in these written instructions, and you must be governed thereby.

In order to return a verdict, each juror must agree thereto, but jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment.

Each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors.

In the course of deliberations, a juror should not hesitate to re-examine his own views and change his opinion if convinced it is erroneous.  However, no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

From time to time throughout the trial the Court has been called upon to pass on the question of whether or not certain offered evidence might properly be admitted  You are not to be concerned with the reasons for such rulings and are not to draw any inferences from them.  Whether offered evidence is admissible is purely a question of law.  In admitting evidence to which an objection is made, the Court does not determine

PAGE 6

234

00 0159

**Scanned  Jun 18, 2013**

what weight should be given such evidence; nor does it pass on the credibility of the witness. As to any offer of evidence that has been rejected by the court, you, of course, must not consider the same; as to any question to which an objection was sustained, you must not conjecture as to what the answer might have been or as to the reason for the objection.

You are instructed that you are not to allow yourselves to be influenced in any degree whatsoever by what you may think or surmise the opinion of the Court to be. The Court has no right by any word or any act to indicate any opinion respecting any matter of fact involved in this case, nor the guilt or innocence of the Defendant. The Court has not intended to express any such opinion, and if you have observed anything which you have or may interpret as the Court's opinion upon any matter of fact in this case or of the guilt or innocence of the defendant, you must wholly disregard it.

You are instructed that the statements of counsel made during the course of the trial or during the argument, if not supported by evidence, or statements of law made by counsel, if not in harmony with the law as stated to you by the Court in these instructions, are to be wholly disregarded.

After you retire to the jury room, you should first select one of your members as your Presiding Juror. It is the Presiding Juror's duty to preside at your deliberations, vote with you, and, when you have unanimously agreed upon a verdict, to certify to your verdict by using the appropriate form attached hereto, and signing the same as Presiding Juror.

During your deliberations in this case, you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor mention any

PAGE 7

235

Scanned  Jun 18, 2013

personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.  You must not discuss nor consider punishment during your deliberations   You are to concern yourselves solely with the question of guilt or innocence without any regard whatsoever to the possible punishment for the offense charged.

You may communicate with this Court during your deliberations.   The communication must be in writing through the officer who has you in charge. Any such writing must be signed by the Presiding Juror.  After you have retired, no one has any authority to communicate with you except the officer who has you in charge.  Do not attempt to talk to the officer, or anyone else concerning any question you may have; instead address your inquiry to the Court in writing.

After you have reached a unanimous verdict, the Presiding Juror will certify thereto by filling in the appropriate form attached to this charge and signing his or her name as Presiding Juror.   The Presiding Juror will then notify the officer who has you in charge that you have reached a verdict.  Afterwards you will then be brought into open court.

Signed: July _____, 2008.

_____
Judge Presiding

FILED 9:40 O'CLOCK _____ M
AURORA DE LA GARZA, DIST CLERK

JUL - 8 2008

DISTRICT COURT, CAMERON COUNTY TEXAS
BY _____ DEPUTY

PAGE 8

236

00 0161

Scanned  Jun 18, 2013

CAUSE NO. 07-CR-885-B

THE STATE OF TEXAS                    §     IN THE DISTRICT COURT OF

VS                                    §     CAMERON COUNTY, TEXAS

**MELISSA ELIZABETH LUCIO**           §     138TH JUDICIAL DISTRICT

<u>**FORMS OF VERDICT**</u>

We, the Jury, find the Defendant, Melissa Elizabeth Lucio, **"Not Guilty"**.

_____
Presiding Juror

We, the Jury, find the Defendant, Melissa Elizabeth Lucio, **"Guilty"** of the offense of Capital Murder as alleged in the indictment.

_____
Presiding Juror

FILED 3:58 O'CLOCK ___ M
AURORA DE LA GARZA, DIST CLERK

JUL - 8 2008

DISTRICT COURT, CAMERON COUNTY, TEXAS
BY _____ DEPUTY

**PAGE 9**
238

0 0162

Scanned  Jun 18, 2013

CAUSE NO  07-CR-885-B

| | |
|---|---|
| THE STATE OF TEXAS | IN THE DISTRICT COURT OF |
| VS | CAMERON COUNTY, TEXAS |
| MELISSA ELIZABETH LUCIO | 138TH JUDICIAL DISTRICT |

138TH JUDICIAL DISTRICT

## COURT'S CHARGE ON PUNISHMENT

MEMBERS OF THE JURY:

You have found the Defendant guilty of the offense of capital murder.  You are instructed that the Defendant shall be punished by confinement in the Institutional Division of the Texas Department of Criminal Justice for Life without parole, or by death.  It is necessary now for you to determine, from all the evidence in the case, the answers to certain Special Issues which are as follows:

### SPECIAL ISSUE NO. 1

Whether there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.

You shall answer Special Issue Number 1 "Yes" or "No".

The prosecution has the burden of proving that the answer to Special Issue Number 1 should be "Yes", and it must do so by proving a "Yes" answer to Special Issue Number 1 beyond a reasonable doubt, and if it failed to do so, you must answer Special Issue Number 1 "No".

In deliberating on Special Issue Number 1, the jury shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character of the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

You may not answer Special Issue Number 1 "Yes" unless you agree unanimously

You may not answer Special Issue Number 1 "No" unless ten (10) or more jurors agree.

Members of the jury need not agree on what particular evidence supports a negative answer to Special Issue Number 1.

PAGE 10

0   244

0  0163

Scanned  Jun 18, 2013

If the jury answers Special Issue Number 1 "Yes", then you shall answer the following Special Issue Number 2; otherwise, do not answer Special Issue Number 2.

SPECIAL ISSUE NO. 2

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

You are instructed that if a jury answers that circumstance or circumstances warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed, the Court will sentence the Defendant to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life without parole.

Under the law applicable in this case, if the Defendant is sentenced to confinement for life without parole in the Institutional Division of the Texas Department of Criminal Justice, the defendant will be ineligible for release from the department on parole.

You shall answer Special Issue No. 2 "Yes" or "No".

You are instructed that you may not answer Special Issue Number 2 "No" unless you agree unanimously.

You may not answer Special Issue Number 2 "Yes" unless then (10) or more jurors agree.

Members of the jury need not agree on what particular evidence supports an affirmative finding on Special Issue Number 2.

In deliberating on Special Issue Number 2, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

If the jury returns an affirmative finding on Special Issue Number 1, and a negative finding on Special issue Number 2, the Court shall sentence the defendant to death.  If the jury returns a negative finding on Special Issue Number 1 or an affirmative finding to Special Issue Number 2, the Court shall sentence the Defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for Life without parole.

You are the exclusive judges of the facts proven, of the credibility of the witnesses, and of the weight to be given their testimony, but you are bound to receive the law from the Court which is herein given and be governed thereby.

PAGE 11

245

Scanned  Jun 18, 2013

In arriving at the answers to the above issues, it will not be proper for you to fix the same by lot, chance, or any other method that a full, fair, and free exercise of the opinion of the individual jurors.

In deliberating on this case, you shall consider the charge as a whole and you must not refer to or discuss any matters not in evidence before you.

You must not consider or mention any personal knowledge or information you may have about any facts or person connected with this case which is not shown by the evidence.  You shall not consult law books or anything not in evidence in this case.

Any further communication must be in writing signed by your presiding juror through the bailiff to the Court, except as to your personal needs which may be communicated orally to the bailiff in charge.  Do not attempt to talk to the bailiff, the attorneys or the Court regarding any questions you may have concerning the trial of the case.

After argument of counsel, you will retire to the jury room to deliberate.  When you have reached a verdict, you may use the attached forms to indicate your answers to the Special Issues, and your presiding juror should sign the appropriate form certifying to your verdict.

Signed: July _10_, 2008.

Arturo Cisneros Nelson
Presiding Judge

FILED ___ O'CLOCK ___ M
AURORA DE LA GARZA, DIST CLERK

JUL 1 0 2008

DISTRICT COURT, CAMERON COUNTY TEXAS
B ___ DEPUTY

PAGE 12

246

0 0165

Scanned  Jun 18, 2013

CAUSE NO. 07-CR-885-B

THE STATE OF TEXAS                    IN THE DISTRICT COURT OF

VS                                    CAMERON COUNTY, TEXAS

MELISSA ELIZABETH LUCIO               138TH JUDICIAL DISTRICT

FORMS OF VERDICT

Now, bearing in mind the foregoing instructions, you will answer the following
Special Issues:

SPECIAL ISSUE NUMBER 1

Do you find from the evidence beyond a reasonable doubt that there is a
probability that the Defendant would commit criminal acts of violence
that would constitute a continuing threat to society?

In your verdict, you answer "Yes" or "No".

Answer:  We, the jury, unanimously find from the evidence
beyond a reasonable doubt that the answer to Special Issue
Number 1 is "Yes"

_____
Presiding Juror

**OR**

Answer:  We, the jury, because at least ten (10) jurors agree,
find that the answer to Special Issue Number 1 is "No".

_____
Presiding Juror

If you answer to Special Issue Number 1 is "Yes", then you will answer Special
Issue Number 2; otherwise, you will not answer Special Issue Number 2.

FILED 5:25 O'CLOCK P M
AURORA DE LA GARZA DIST CLERK

JUL 10 2008

DISTRICT COURT CAMERON COUNTY TEXAS
BY _____ DEPUTY

PAGE 13

247

U 0166

**Scanned  Jun 18, 2013**

SPECIAL ISSUE NUMBER 2

Taking into consideration all of the evidence, including the circumstances of
the offense, the Defendant's character and background, and the personal moral
culpability of the Defendant, do you find that there is a sufficient mitigating
circumstance or circumstances to warrant that a sentence of life imprisonment
without parole rather than a death sentence be imposed?

In your verdict, you will answer "Yes" or "No".

> Answer.  We, the jury, because at least ten (10) jurors agree
> find that the answer to Special Issue Number 2 is "Yes".

_____
Presiding Juror

**OR**

Answer: We, the jury, unanimously find that the answer to
Special Issue Number 2 is "No".

Presiding Juror

We, the jury, return in open Court the above answers to the Special Issues
submitted to us and the same is our verdict in this case.

Presiding Juror

FILED 5:35 O'CLOCK _ M
AURORA DE LA GARZA, DIST. CLERK

JUL 1 0 2008

DISTRICT COURT, CAMERON COUNTY TEXAS
BY _____ DEPUTY

**PAGE 14**

**248**

06 0167

**Scanned  Jun 18, 2013**

STATE HABEAS ATTORNEY's TRANSCRIPTION
OF
STATE'S EXHIBIT 3

**Scanned  Jun 18, 2013**

1    CRUZ: Oh okay.  Sophie [*sic*], my name is Rebecca Cruz and this is Detective

2    SALINAS: Salinas.

3    CRUZ: Salinas.  I didn't know your first name.

4    SALINAS: That's alright.  I know you didn't.

5    CRUZ: Okay um right now I'm going – I'm going to have to read you your rights before I

6    talk to you.  Okay?

7    A.  Okay.

8    CRUZ: And uh then I'll explain to you pretty much...it's I mean it's usually when there's a

9    child fatality we [inaudible] this step.  What I'm going to do is I'm going to read you your

10   rights and if you understand I'm going to need you to initial to the left of the number.  Okay?

11   Number one says you have the right to have a lawyer present to advise you either prior to

12   any questioning or during any questioning.  Do you understand that right?

13   A.     Yes.

14   CRUZ: If you do I'll need you to initial to the left of number one.

15   A. [Initialing]

16   CRUZ: Two.  If you are unable to employ a lawyer you have the right to have a lawyer

17   appointed to counsel with you prior to or during any questioning.  Do you understand that

18   right?

19   A. [Initialing]

20   CRUZ: Three.  You have the right to remain silent and not make any statement at all and

21   that any statement you make may and probably will be used in evidence against you at your

22   trial.  Do you understand?

**Scanned Jun 18, 2013**

SX3 - 2

1    A. [Initialing]

2    CRUZ: Four.  You have the right to terminate the interview at any time.  You need to initial

3    next to number four.

4    A. Oh I'm sorry.   [Initialing]

5    CRUZ: And then where it says waiver and it says I – and you can print your first, middle and

6    last name – have been advised of my constitutional rights by – my name is Rebecca Cruz –

7    and clearly understand them?

8    Do you understand what you just initialed on?

9    A. I sign?

10   CRUZ: Yes.  And today is February 17, 2007, and it's 9:53 p.m.  Do you – Do yo understand

11   why you are being questioned at this point?

12   A. Because you said that because of the fatality of my daughter.

13   CRUZ: Okay.  Um.  That's – That's the reason why we – why why we're going to have to

14   investigate.  We need to know pretty much um how she died – the way she died – was she ill

15   or did you know...

16   A. No.  She was not ill.  The – let me see – Friday morning we had – my husband had

17   bought tamales at H.E.B. and she had eat two or three tamales and we went to um – we were

18   moving from our previous place to our [inaudible] now and we were out driving around and

19   she kept moaning you know like something hurt her and I would ask you if her stomach hurt

20   her and she would say "yes."   And then she – my husband had gotten off – I know we had

21   stopped  somewhere I don't know where it was and while he was off from the car in the store

22   she threw up on me and it was a lot of orange stuff.  And an  when he came back to the car I

U 0172

**Scanned  Jun 18, 2013**

SX3 - 3

1   told him you know she had thrown up and I told him that you know those tamales she ate

2   were no good.  And he said no if I didn't get sick why she did get sick and I told him well

3   you know she's a baby and you know [inaudible].  So yesterday we were – we were moving

4   – we were moving from the casera place – from the previous place to this new place and she

5   had fell down the stairs – it was like maybe three stairs.  Because my husband had taken my

6   second to oldest daughter

7   CRUZ: Did you see her fall?

8   A.  No I didn't see her fall but when – uh – cuz me and my older daughter were inside

9   getting all the stuff from the living room to the kitchen

10  CRUZ: Which older daughter.

11  A.  Alexandra.

12  CRUZ: Alexandra?

13  A.  Uh huh.  And um

14  CRUZ: So you were alone – so when she – when your daughter fell down – when Mariah

15  fell down you and Alexandra were alone at the home on uh -

16  A.  We were not alone.  My other children were there but they were downstairs playing.

17  CRUZ: Which children were there?

18  A.  Uh It was.

19  CRUZ: And this was about what?  Friday?

20  A.  Friday.  Yes.

21  CRUZ: And what time was that?

22  A.  No. No but it– Today is Saturday, right?

**Scanned  Jun 18, 2013**

SX3 - 4

1    CRUZ: Right.

2    A. It was Thursday.  Thursday.

3    CRUZ: Alright.  Your daughter ended up vomiting from the Tamales – from the Tamales on

4    Friday?  Or was it Thursday?

5    A. No it was Thursday because Friday we were moving there

6    CRUZ:    This is in the morning, right?  She was already sick – she was already throwing up

7    A. Thursday.  Thursday.

8    CRUZ: Okay.  Is this common for her.

9    A. No. No. No. No.

10   CRUZ: Did you think to take her to the doctor?

11   A.  No, because it only happened one time.

12   CRUZ: Oh Okay.

13   A.  She only threw up one time.

14   CRUZ: Alright.

15   A.  And she was fine Thursday because I remember Thursday night – okay Thursday

16   afternoon she threw up and then Thursday night me and my daughters you know went to

17   wash clothes and I took her with me because the other kids were asleep so I took her with me

18   to go wash clothes and she was fine.  You know –

19   CRUZ: So it wasn't in the morning it was in the afternoon

20   A.  That she threw up?  Uh huh.

21   CRUZ: Okay. My question to you is on Thursday night when she fell down which apartment

22   were you at?  Or were you at the –

U  0174

**Scanned  Jun 18, 2013**

1    A.  220 East Madison.

2    CRUZ: What apartment number was that?

3    A.  I –

4    CRUZ: If you don't remember that's fine.  Was it downstairs or –

5    A.  It was upstairs.

6    CRUZ: Upstairs?

7    A.  Uh huh.

8    CRUZ: Okay.  You were there with which children?  How many children were there?

9    A.  Okay it was Bobby, Sarah, Adriana, um and Gabriel.

10    CRUZ: And you.  And how about your husband.  Was he –

11    A.  No.  He was not there because that's when he – uh he was taking the stuff to the new

12    place on 117 West Lee.

13    CRUZ: How do you know that she fell down?

14    A. Because – uh – I did not lock the screen door because she never does this – because she

15    never goes outside.  And I guess she would hear the kids playing outside and she went

16    outside and when I was calling out for her because I was moving stuff from the bedroom and

17    uh um they were going to the kitchen and I did not see her so I went outside and she was

18    getting up from the floor.  But you know she was crying but not you know not like – heavy

19    crying so I went downstairs and I got her and she uh –

20    CRUZ: How many stairs did you go down to get her?  Did you hear

21    A.  Well I was

22    CRUZ: hear her fall or –

**Scanned  Jun 18, 2013**

1    A. No. I did not hear her fall but when I did not see her inside that's when I went outside.

2    CRUZ: When you heard her crying –

3    A. No I did not hear her crying.  No I did not hear her crying.

4    CRUZ: Okay.

5    A.  You know I went outside and she was you know getting up from the floor.    And she

6    was just you know [Spanish] – you know she did not – you know she was not crying real

7    heavy like you know like she wasn't real hurt or anything.

8    CRUZ: Did you see any marks on her?

9    A. Uh   no.  She was just bleeding from her tooth from the bottom.  She was just bleeding

10   and –

11   CRUZ: How many steps would you guess that your flight of stairs had.

12   A.  I totally detected three but I don't know I'm not sure.

13   CRUZ: I mean like from the bottom to the very top of your -

14   A. Oh I mean the flight oh there's a lot.

15   CRUZ: If you had to estimate would it be five? Ten?

16   A. No.  Maybe eight – ten – twelve.

17   CRUZ: When you saw your little girl how many steps did you have to take down more or

18   less to get to her.

19   A. Oh all the way down because I was upstairs and she was already downstairs.

20   CRUZ: Okay.  When she was crying.

21   A. Uh huh.

22   CRUZ: And you were assuming that she only fell only three steps.  How?

**Scanned Jun 18, 2013**

SX3 - 7

1   A. Well because I mean I figured she if she would have go from all the way upstairs down

2   she would have been crying louder.

3   CRUZ: But if she fell three steps you'd only walk three steps to get to her. That's what I'm

4   trying to understand. This is –

5   A. Well yeah yeah I know what you mean. I mean – Well yeah that's true because.

6   CRUZ: Well if I take three steps – [inaudible] it's going to take me three steps to get to you

7   – if you fall right now for me to get to you at that – I'm just trying to – that's why I'm asking

8   did your children see? Did you see?

9   A. No my children did not see. But like I said my children – Well see the thing is that my

10  husband had told my children to stay inside and they were inside playing with her and I

11  guess when they went outside they left –

12  CRUZ: So uh Bobby, Sarah, Adriana and Gabriel were outside and she fell down. They

13  didn't see

14  A. Uh huh.

15  CRUZ: And they didn't see her

16  A. No because they were playing around the corner with – other children were there.

17  CRUZ: She falls. What do you do?

18  A. I went downstairs to get her and I checked her and she was bleeding a little from her

19  tooth but you know she was not –

20  CRUZ: She was fine.

21  A. Uh huh. She was fine.

22  CRUZ: How do you discipline your daughter when she does something wrong?

0  0177

**Scanned  Jun 18, 2013**

SX3 - 8

1    A. She never does nothing wrong. She's a little baby.

2    CRUZ: Okay. Do you hit her?

3    A. No. We don't hit her. My husband does the discipline. My husband and I just discipline

4    on the other children – the older ones – but not the baby – she's just

5    CRUZ: Okay. How about your older children. When they mess up who does the discipline

6    in your home. Do you spank or –

7    A. My husband does. Uh huh.

8    CRUZ: Your husband does. Okay. Have you – do you ever do some of the disciplining –

9    some of the spanking.

10    A. Well yes uh I'm the daughter – well my 'cause it was four girls and –

11    CRUZ: Disciplining is not illegal. I was just asking who

12    A. Well both of us take turns – both of us take turns – because they know it's eight children

13    and you know he would take care of the boys and I would deal with girls. You know we

14    would split it in half.

15    CRUZ: How does he hit. Does he hit them with a belt or –

16    A. No. He spanks on the butt with his hand.

17    CRUZ: Okay. Never anything else. Never throwing objects?

18    A. Un uh. No.

19    CRUZ: Never getting them. Grabbing them.

20    A. Un huh.

21    CRUZ: How about you? Do you use your hand also.

22    A. Yes, well on my daughters – the little ones –

**Scanned  Jun 18, 2013**

SX3 - 9

1    CRUZ: [inaudible] on the bottom –

2    A.  Yeah if they – I mean if they got too [inaudible] to where they would do something very

3    you know like fight because the girls tend to fight with each other you know I would put

4    them in time out or spank them on the butt and you know talk to them and tell them and tell

5    them why they were being punished

6    CRUZ: Okay.  So that was Thursday.  She fell down.  She was fine.  Your husband gets

7    home.  Anything different that you noticed that um Mariah did differently.  Did she sleep

8    sound?

9    A.  Uh huh.

10   CRUZ: Did she cry more than ususal?

11   A.  No.  She did not cry.  She was just quiet – she was just quiet and –

12   CRUZ: Is that like her?

13   A.  No.  It was – well she would sleep a lot.

14   CRUZ: Was she more quiet than usual?

15   A.  No.  No.  She's a quiet baby.  She's not –

16   CRUZ: And today?  What was her day like today?

17   A.  Today she was asleep  and –

18   CRUZ: At what house?

19   A.  On uh it was on West Lee Street

20   She was asleep and she you know she was very – she – I mean I noticed that you know she

21   was very different compared to the other days right –  and she did not – I gave her water –

22   she drank water – um she slept.  But you know last night you know she was breathing heavy

0179

**Scanned  Jun 18, 2013**

SX3 - 10

1    because she had a runny nose – she was – she had a stuffy nose so she was breathing real

2    heavy.

3    CRUZ: Was she getting a cold or anything or was this the first time –

4    A.  No.  This was the first time.  I mean none of my kids had gotten ill and I mean I was

5    surprised like 'cause the weather has been changing and everything and they tend to get sick

6    when the weather changes.  So last night she – she was having trouble breathing and you

7    know I would – you know – try and clear her nostrils and this one right here [indicating

8    right nostril] this one was more stuffier than this one and she had her mouth real tight you

9    know like lockjaw.  You know I tried to open her mouth and her teeth were real stuck to

10   each other.  And I don't know if – I mean I can't say she had a seizure or she didn't but my

11   previous daughter – my oldest daughter I don't know if she would have seizures she would

12   always have her mouth locked.

13   CRUZ:  Did you tell your doctor what happened?

14   A.  No.  This was the first time this has ever happened to her.

15   CRUZ: No. Your older daughter.

16   A.  Oh yeah, my daughter was diagnosed with epilepsy when she was four or five.  But she

17   outgrew it.

18   CRUZ: But when she was small and she used to get like that you would –

19   A.  Yes.  Yes.  Oh yeah.  I mean [inaudible]

20   CRUZ: But when you saw that Mariah Alvarez got like that you didn't take her

21   A.  No because – No because it barely happened yesterday.  Last night.

22   CRUZ: Okay.  So how many epilepsies did you older have to go through – How many

**Scanned  Jun 18, 2013**

SX3 - 11

1  epilepsy attacks did she go through before you said, you know what, let me take her to the

2  doctor.

3  A.  The first one.  Because she had a seizure right in front of me.  I mean she had it –

4  CRUZ: I mean you saw the signs – you didn't think to do that until she actually had the

5  seizure with Mariah?

6  A.  Well no because the – the – the – I mean like I said I didn't know if she was having a

7  seizure or – I mean I don't know but I'm not a doctor and I should have –

8  CRUZ: But you saw all the signs that you saw with your older daughter and –

9  A.  No.  No. Just the lockjaw.  That's it.

10  CRUZ: You saw the beginning signs to it so you knew more or less that it could be

11  something like that.

12  A.  Well the beginning signs I mean – I don't know – when my daughter the seizure she fell

13  down and she started shaking and everything but Mariah never did that.

14  CRUZ: Okay. Alright.  Um So did she eat on Friday?

15  A.  Uh huh.  She ate.

16  CRUZ: She ate fine?  And well today also she was eating fine?

17  A.  Uh huh.

18  CRUZ: I know she was more asleep today.

19  A.  Uh huh.

20  CRUZ: Um – How long did she sleep.  What time did your day start today?  What time did

21  you wake up more or less?

22  A.  We woke up very early today because the kids were awake?

**Scanned  Jun 18, 2013**

SX3 - 12

1    CRUZ: Very early being more or less.  Just uh Five-ish?  Six-ish?  Ten-ish?

2    A.  Well they work – my kids woke up early and they went back to sleep and they finally

3    woke up again about eight o'clock.

4    CRUZ: And Mariah stayed asleep?

5    A. Yeah.  Uh.  Eight a.m.

6    CRUZ: Eight a.m.?

7    A.  Uh huh.

8    CRUZ: Okay.  And then um Mariah got out of bed and she -  what was her day like?  Did

9    she eat breakfast as normal?  Lunch as normal?

10   A.  No. She didn't eat.  All she wanted was water that's all.

11   CRUZ: So you feed your children according to when they want to eat?

12   A. Uh Yes.  Well usually – well usually you know in the mornings the – Richard – uh – my

13   three boys and my two older daughters go to school and then I stay home with Adriana,

14   Gabriel and Mariah.  And then Adriana and Gabriel will go to school at 11.  So basically I

15   only have those three at home so when the other ones go to school I you know feed them and

16   then Gabriel and uh Adriana will go to school and then I stay with the baby and we eat.

17   CRUZ: So she didn't eat on Friday.

18   A. Today.  Today.

19   CRUZ: Today.  But yesterday what did she eat?  One meal?  Two meals?  Three meals?

20   A. She ate two meals.

21   CRUZ: What exactly were the meals.

22   A.  Yesterday morning she ate um cereal.

0  0182

**Scanned  Jun 18, 2013**

SX3 - 13

1  CRUZ: Would that be cereal as in Malt-O-Meal or –

2  A. Uh Cinnamon Toast Crunch.

3  CRUZ: Okay.  Okay.  With milk?

4  A. Okay.

5  CRUZ: One bowl

6  A. Yeah.  Big bowl.

7  CRUZ: Big bowl.  Okay and what else did she eat?

8  A.   And then for lunch she ate a sandwich.

9  CRUZ: How much?

10  A. Just half because she didn't want to eat.

11  CRUZ: Is it like her to eat that little no?

12  A. Uh huh.  Yeah.

13  CRUZ: Okay that sandwich was it one bread or two bread?

14  A. It was one bread cut in half.

15  CRUZ: What was inside?

16  A. Bologne, ham and cheese.  I mean bologne and cheese.

17  CRUZ: What about for dinner?

18  A. Uh She didn't eat her dinner.

19  CRUZ: Okay. Um. Did she drink water or juice?

20  A. She drank fruit punch.

21  CRUZ: Fruit punch.  Okay what about water?

22  A. No water, no.

0.0183

**Scanned  Jun 18, 2013**

SX3 - 14

1    CRUZ: Okay.  So she didn't eat all day today.

2    A. Un uh.

3    CRUZ: You didn't think to force her to eat or take her to the doctor or –

4    A. Well yeah I had tried to make her eat but she didn't want to eat.

5    CRUZ: What about the doctor

6    A.  I had wanted to take her to the doctor but like I said

7    CRUZ: What happened

8    A. Uh my husband – we were having problems with the plumbing there at home. The water

9    was leaking from the – uh – from under the sink and then we didn't have hot water so my

10   husband was getting in touch with the landlord and the manager and everything.  So he was

11   going to go and pick up the beds – cause like I said we had barely moved to that place – and

12   he was going to go and pick up the beds and the – and the – and the what do you call it – the

13   dresser drawers.  And before he left I had gone cause she was sleeping – before he left I had

14   gone and checked up on her and she was fine she was breathing. And it was not cold in my

15   room but I went and got a blanket and covered her.

16   CRUZ: Was she awake or was she asleep.

17   A. No.  She was asleep.  She was asleep.  But I went in – it wasn't cold but I went in and got

18   a blanket and I covered her and – me and my daughter were talking and I say you know what

19   I want to take her to the doctor because it's not like her.  You know she's always –

20   CRUZ: How long did she not [inaudible]?  Since the fall or –

21   A. Well – uh – since the fall like I said I mean I checked her after the fall and she was fine.

22   CRUZ: Well she started acting like that after the fall or could it have been something before

**Scanned  Jun 18, 2013**

SX3 - 15

1    then?

2    A.  No.  I don't think it was before then because she was normal before.  Like I said that day

3    that she fell that same night we went to go wash clothes my daughters and I and she was

4    fine.  I bought her a Sprite and you know she drank it and everything 'cause she felt kind of

5    warm and she drank all and we went home and she fell asleep and – but the night before —

6    CRUZ: How much water does she drink a day – your baby - or did she?

7    A.  Uh.  She doesn't drink that much water.  Well yeah she – maybe like eight ounces.  I

8    don't know.

9    CRUZ: Eight ounces a day?

10    A.  I think.  I don't know.

11    CRUZ: How much water do you drink a day?

12    A.  I don't drink water.

13    CRUZ: Okay.  How about milk.  Do you give her milk.

14    A.  I don't. Well yeah she drinks milk with her cereal but she doesn't – she wouldn't drink it

15    from a cup.

16    CRUZ: Um.  What happened when they went out. So today when your husband was gone

17    Bobby's there – who was with you?

18    A.  Everybody was there.  Uh...Alex –

19    CRUZ: Because your father ended up – her father – your husband ended up coming in –

20    walking in and finding Mariah or was it just –

21    A.  No – uh yeah because he had left to go get the the the bed and the dresser and everything.

22    CRUZ: About what time?

**Scanned  Jun 18, 2013**

SX3 - 16

1   A. I don't – it was still daytime – I think it was about uh – let me see 5:30, 6:00.  About

2   6:00 something – I don't know.

3   CRUZ: He left by himself?

4   A. No. He left with my daughter Selena and Richard and Rene.

5   CRUZ: And the rest – everyone else was home with you

6   A. Alexandra, Gabriel, Adriana, Sarah, and Mariah.  And my other daughter, she had came

7   by.  Daniella.

8   CRUZ: And when he returned what happened.  Everything was fine with the kids and

9   Mariah was by herself asleep?

10  A. She was asleep so I asked the kids to leave her alone.  You know to don't bother her and

11  leave her alone.

12  CRUZ: What were they doing

13  A. Oh no.  I mean they – they were – 'cause I have two TVs.  I have one in my bedroom

14  with the DVD and one in the living room.  And they wanted to go inside the bedroom and I

15  said no just leave her alone.  Just let her sleep.  So then – uh – I gone to go check on her and

16  she was fine.  She was breathing normal because like I said last night you know she was

17  having trouble breathing from her nose because she had the – I guess she had a stuffy nose

18  so –

19  CRUZ: And these signs from the seizure was when?  The lockjaw and the dribbling of the

20  nose and having a hard time breathing –

21  A. No.  She didn't have dribbling from the nose.

22  CRUZ: Or having a hard time breathing –

0  0186

**Scanned  Jun 18, 2013**

1    A.  Yeah last night but like I said 'cause her nose was stuffed up.

2    CRUZ: So the lock– she had that and then she wasn't eating and the fall and you just

3    wanted her to – them to leave – to leave her  alone basically

4    A.  Uh huh.

5    CRUZ: Okay.  When your husband came in he found her?

6    A.  Yes.  I – I – I was in the kid's–

7    CRUZ: What were you doing?

8    A.  I was in the kid's room because like I said we barely moved to the place where we are

9    living at now and I was you know sorting out the clothes for the kids and everything and

10   putting everything away I had everything in the hall that I was getting out from their room.

11   And like I said I had just gone to go check up on her not even five or ten minutes before he

12   got there and she was fine.  She was breathing.  She was doing okay.  And then when he got

13   there – I didn't even know he was there until I saw Selena and Richard and Rene — and I

14   said well where's your dad.  And they said he's outside.  So I went the living room and I

15   asked him well where's the beds and the – the – the dresser drawers and he said that he

16   wasn't able to get them because the girl had get him the wrong key to the storage where he

17   was going to get the [inaudible].  So I said Okay so I went back to the room and I started

18   getting all the stuff – you know– organizing the clothes and everything and then I guess he

19   must have gone to the room to go check the baby because he was – he was you know he was

20   calling my name out.  And I told him to wait because  I was busy.

21   CRUZ: What were you doing?

22   A.  I was organizing the kids' clothes.

**Scanned  Jun 18, 2013**

SX3 - 18

1    CRUZ: Okay.

2    A. But I didn't know that he was in the room with the baby.  I thought he was still outside

3    'cause I heard him yelling out my name.  So he said "Melissa, come here."  And I said

4    "What do you want?"  And he said "Come here. The baby!  The Baby!"  So when I went

5    over there and he was you know kneeled down on the bed with her you know I started – you

6    know getting – you know– because he had a look on his face you know that she was dead.

7    And I told him "No!  No!" and he said "Yes."  And I went over there and you know he was

8    trying to wake her up and my other daughter was there trying to wake her up and everything

9    and I – I just left the room and I went to the baby room. [Crying]

10    CRUZ: Did you call the police?

11    A.  My daughter did.

12    CRUZ: Did your husband know about – he knew that she – that uh– that Mariah had thrown

13    up, right?

14    A.  Uh huh.

15    CRUZ: Did he know that she hadn't been eating?  Did you tell him?

16    A.  Well, no because today was the day just that she didn't eat.

17    CRUZ: Right but you didn't tell him anything.

18    A.  Yeah he noticed – he noticed that she hadn't been eating but –

19    CRUZ: And how about – about the breathing and the – the signs of the epileptic attacks that

20    your older daughter had .  Did you tell him about that also?

21    A.  Yeah.  I told him.  I told him that –

22    CRUZ: What did he say.  Did he say no, let's hold off I've got things to do.

0.0188

**Scanned  Jun 18, 2013**

1   A. No.  He didn't say that.  He told me – he said "Let's take her to the hospital."  I said

2   "No."  You know "I don't want to take her to the hospital" you know "Let's just wait."  And

3   he said, you know, "if you don't want to take her, I'll take her."  And I said "No.  Just wait.

4   We'll take her today."  And um –

5   CRUZ: So you were going to take her to the hospital?

6   A. Yeah but that's when we were having problems with the flooding and everything and the

7   – the – the – that [inaudible] and we were getting situated there.  And that's when all this

8   happened.

9   CRUZ: When your daughter ended up going to the hospital – the medical facility – they um

10  work with children – a pediatrician -- and they can see if something is of natural causes or

11  not.  Mariah has a lot of bruising on her body – on her face – okay – not consistent with a

12  fall.  Okay so I don't know what the real story is but there – something has to account –

13  she's only two you can't say she was at school and somebody else did it.  Somebody hit her.

14  Who did it?

15  A. Nobody hit her.

16  CRUZ: There's no way she fell off the stairs.  Okay.  There's no way.  A child can fall and

17  not have those bruises.

18  A. I understand.

19  CRUZ: I have medical personnel that are saying that this was abuse.

20  A. No ma'am.  I never abused my children.  Never.

21  CRUZ: Okay so how are did those bruises get there.

22  A. My – my – I have four boys and they're – they're always you know – I mean I'm not

**Scanned  Jun 18, 2013**

SX3 - 20

1    going to say fight – you know --

2    CRUZ: Did you notice did she have any bruising

3    A. Yes.  She did.  Yes.  She did.

4    CRUZ: What was it from?  You didn't ask?  The kids?

5    A. Yes.  I know it was from the kids because you know like I said they were always you

6    know horsing around playing with her

7    CRUZ: Did she cry when she was getting those bruises?

8    A. No.  She would tend to wake up in the middle of the night.  That's why – the night

9    before – uh –

10    CRUZ: She would wake up in the middle of the night why?

11    A. Yeah.  She would wake up in the middle of the night just to get up.  Just to get up.  And I

12    – she would get up and I would find her sitting down in the floor playing with my purse –

13    playing with make-up and everything.

14    CRUZ: All the time or since the fall?

15    A. No.  All the time.

16    CRUZ:  All the time.

17    A.  All the time.

18    CRUZ:  So you're saying that she got up and she caused those bruises on her own

19    A. Well I don't know but uh one time she did get up and she ended up in the [Spanish] in

20    our previous home. She ended up in the living room and she – when it was daytime she had

21    a bruise right under her eye.  I guess she must have hit herself walking out of my bedroom or

22    she fell –

**Scanned  Jun 18, 2013**

SX3 - 21

1   CRUZ: So you think she's grabbing her own body and making

2   A.  No. I'm not –

3   CRUZ:  marks on it?

4   A.  No.  I'm not saying she's doing that.  No I'm not saying

5   CRUZ: But then – I – it doesn't make any sense –

6   A.  I understand.

7   CRUZ: Um.  There were narcotics found in – There was a blanket in one of the closets in

8   your home on – the uh the home that you moved into in the bedroom where she was found.

9   A.  Uh huh.

10   CRUZ: There was a blanked folded and placed in there and it had something that appeared

11   to be urine.  Whose blanket is that?

12   A.  Oh that's the blanket that she dropped a cappuccino in it. The night before we were – uh

13   – she – let's see Saturday – Friday – Thursday night she – we had a cup of cappucino there

14   on the floor in front the TV and like I said she would like to get up in the middle of the

15   night.

16   CRUZ: So it was capuccino?

17   A.  Yeah it was capuccino on that –

18   CRUZ: What's behind that blanket in the closet?

19   A.  What closet?

20   CRUZ: The closet you put the blanket in.  Did you put that blanket in there or no?

21   A.  No.  That blanket – No.  I think my husband put that blanket in there.  I didn't put it in

22   there.

**Scanned  Jun 18, 2013**

SX3 - 22

1    CRUZ: Now the drug paraphernalia in there. Spoons. Um cans from a soda with holes in it

2    with burn marks. There was a spoon. Things indicating drug use. Who uses drugs?  Is it

3    you or your husband or –

4    A.  My husband.

5    CRUZ: is it your children?

6    A.  No. It wasn't my children.  It was my husband.

7    CRUZ: Okay do you ever use that also?

8    A.  We did.  We were – I'm not going to lie.  We were drug addicts before.

9    CRUZ: Okay.  Could it be possible that you might have been on that and that's why you did

10   not really notice that Mariah had all those br—

11   A.  Oh no.  No.

12   CRUZ: I mean

13   A.  No. No. No.

14   CRUZ: did these drugs ever make you guys do anything to your kids?

15   A.  No. No. No.

16   CRUZ: Your husband has been arrested before for beating on one of your children.  Or

17   investigated for domestic abuse by the State.

18   A.  This was a long time ago with Daniella?

19   CRUZ: Um, I believe so. So –

20   A.  Well, he didn't – he didn't –

21   CRUZ: When was the last time that you – Okay you just moved.  You can't say you kicked

22   the habit within two or three days.

0  0192

**Scanned  Jun 18, 2013**

1  A. No. We uh –                                                 SX3 - 23

2  CRUZ: Because if you quit why are you going to take your spoons and your cans.

3  A. No. We uh –

4  CRUZ: and then your baking soda with you if you kicked the habit.  Somebody is still doing
5  these drugs.  You have nine children.  You don't have a babysitter.  They're not in day care.
6  It's the weekend.  They're not with family.  They're there.  Are y'all using drugs in front of
7  your children?

8  A. No.  No.  My children don't know anything about this.

9  CRUZ: Could that be why there's no water and there you know four of them if you don't

10  A. Water?

11  CRUZ: You don't monitor how much water they take.  I mean a child is two years old.  You
12  give her maybe eight ounces of water, maybe a bowl of cereal

13  A. I mean she could – she could drink milk

14  CRUZ: bologne –

15  A. No.  No.  That's what –

16  CRUZ: There's no nutrition whatsoever and then she doesn't eat all day and it doesn't
17  bother you?

18  A. Yes it did bother me.

19  CRUZ: That's – That's my – That's my concern.

20  A. I understand.  I understand.  It did bother me.

21  CRUZ: Okay.  And the reason why it bothers me is because it led to her not living.  I mean
22  do you even feel at least one bit of remorse for her not making it due to you neglecting so

**Scanned Jun 18, 2013**

1    many telltale signs ?  Explain to me how these go here because I'm going to tell you right

2    now somebody has to account for the – for who hit her?

3    A. Nobody hit her ma'am.  Nobody hit her.

4    CRUZ: Okay.  These bruisings.  They – They all happened -  They all happened from that

5    one fall from three steps yet you have to go down maybe 10, 15 to get to her.

6    A. I mean I don't know – I mean like I said I don't know if it was three steps or if it was

7    four steps that she fell down because I mean like if you go to look at the steps – the steps

8    they're real far apart from each other; they're not –

9    CRUZ: When was the last time that you used drugs and what kind of drugs did you use?

10   A. I haven't used drugs.  I used to use drugs.

11   CRUZ: Okay.  What kind of drugs.

12   A. Cocaine.

13   CRUZ: Anything else.

14   A. No.

15   CRUZ: When was this?

16   A. Uh.  Last year. February.

17   CRUZ: Was that the first time?

18   A. No. It was – you know

19   CRUZ: When was the first time that you ever did drugs?

20   A. When I was 17.

21   CRUZ: And then you were of and on with cocaine or was it other things.

22   A. No.  It was just cocaine.

**Scanned  Jun 18, 2013**

1    CRUZ: Okay.  Your husband used to do that with you.

2    A. Uh huh.

3    CRUZ: How long have you known your husband.

4    A. 12 years.

5    CRUZ: Okay so you guys have been in a – together with a h. hit together –

6    A. Uh huh.  Off and on. Yes.

7    CRUZ: CPS has been investigating you extensively also.  When was the last time you took a

8    drug test for CPS?

9    A. Um.  Last week.

10   CRUZ: How did you do on that test?

11   A. We've been coming out negative on our drugs tests.

12   CRUZ: You have been?

13   A. Uh huh.

14   CRUZ: Okay.  You know they've been doing the tests on your husband, right?

15   A. Uh huh.

16   CRUZ: So how did he do.

17   A. Negative.

18   CRUZ: Negative

19   A. Uh huh.

20   CRUZ: So why didn't you let go of the spoon and all these things that are indicating you are

21   doing drugs.  Why did you want to go to your new home if you're not doing them.

22   A. That was my husband's.

**Scanned  Jun 18, 2013**

SX3 - 26

1    CRUZ: That was your husband's? And you knew it was there

2    A. Uh huh.

3    CRUZ: And you were okay with it?

4    A. No.

5    CRUZ: [to other officer]  Do you have any questions?

6    CRUZ: [to Melissa] I'm going to step out and I'll be right back.

7                             [Cruz leaves room.]

8                    [Melissa lays head on desk to rest.  Sniffling / Crying.]

9                             7  minutes later.

10   CRUZ: Ma'am.  This is detective Banda.  He has been talking to your husband right now.

11   We're waiting to download the pictures.  There are some markings on your child's body that

12   I want you to try to explain to me when you saw them.  When you last took a shower for her

13   because there's even bite marks on her.  And I want you to explain to me when you saw

14   what marks.  And he was talking to your husband and he might have a couple questions.

15   BANDA: First of all I'm very sad that this child died.  Unfortunately the child did not die

16   because of something that can be explained.  Right now it's unexplainable.  There's a reason

17   why the child – when I first saw you in here I knew something was wrong. You know

18   something is wrong.

19   A.  No, sir.  I don't.

20   BANDA: [Standing over Melissa.  Raising voice.] You know something is wrong!

21   A.  No, sir.  I don't

22   BANDA: [Standing over Melissa yelling.]  If I bring you all these pictures – if I beat you

0  0196

**Scanned  Jun 18, 2013**

1    half to death like that little child was beat I bet you'd di, too.

2    A. [Cowering] Sir, I did not beat my daughter, sir.

3    BANDA: [Yelling] No?

4    A. [Cowering] I'm not that cruel to my children.

5    BANDA: [Standing over Melissa yelling.] What are those bruises on your little child?  This

6    is a two year old!

7    A. [Cowering.] I know, sir. I know.

8    BANDA: [Yelling.] This is a two-year-old!

9    A. I know. I did not beat my daughter. I did not beat my daughter.

10    BANDA: [Yelling.] The child beat itself up?!

11    A. No, sir. I'm not saying that.

12    CRUZ: If you have those markings would you want help?  That's – You would want

13    medical help right. Why wouldn't you get that for your daughter?

14    A. Because –

15    CRUZ: The plumbing?

16    A. No. No. I uh had not uh –

17                           [Banda leaves room.]

18    CRUZ: He's going to get those pictures but I mean the plumbing that doesn't cut it.

19                           [Cruz leaves room.]

20    CRUZ: I need – I need your ring.

21    BANDA: Let's photograph that piece.

22                           [Melissa removes ring and hands it to Cruz.]

**Scanned  Jun 18, 2013**

SX3 - 28

1    CRUZ: Do you have any other jewelry on you?

2    A.  No.

3    CRUZ: Do you wear this ring all the time.

4    A.  Uh huh.

5    CRUZ: Do you wear any other rings.

6    A.  Un unh.

7    CRUZ: I I'll just get that and uh –

8    BANDA: Let's just put it this way.  That's going to be considered evidence.

9    A.  Okay.

10    CRUZ: There were some markings on your child that looked like they could leave that mark

11    so you can't say that you didn't have anything to do with any of her markings.  If this was

12    just discipline, I need to know.  Because I'm going to tell you right now – that ring – if it

13    matches up those markings – the doctors match it up – it's on you.  Is it going to stick or is it

14    going to come out no match?

15    A.  No match.

16    CRUZ: No.  Okay.  Who else would it be.

17    A.  I don't know ma'am.  I mean –

18    CRUZ: You know what –

19    BANDA: Do this and –

20    CRUZ: Your husband wanted to go to the doctor and you said No.  Is that correct?

21    A.  Uh huh. Yes.

22    CRUZ: Why did you do that?

**Scanned  Jun 18, 2013**

SX3 - 29

1    A.  Because I told him

2    BANDA: [Belligerent.] You didn't want the doctor to see the bruisings.

3    CRUZ: He says that you hid those markings from him.  Did he see how badly she was hurt

4    or did you always cover her up with clothes?

5    A.  No.  He was -- He was always working.  He was always working --

6    CRUZ: So he never saw her the way she is right now.

7    A.  Un uh.

8    CRUZ: So if he saw her he would be shocked.

9    A.  Well he – no because he saw her yesterday and he told me what happened to her on that

10   --

11   CRUZ: He saw which ones?

12   A.  The one on her arm –

13   CRUZ: Any other ones?

14   A.   And I would always tell him look the kids – I have four boys –

15   CRUZ: How much of her body did he see yesterday?

16   BANDA: None.

17   CRUZ: If you take a polygraph are you going to fail or are you going to pass.

18   A.  I'll pass.

19   CRUZ: You'll pass.  Are you sure you were not on anything.

20   A.  No, ma'am.  No.

21   CRUZ: Let me go see if those pictures are ready.

22   BANDA: I'll see

**Scanned  Jun 18, 2013**

SX3 - 30

1        [Cruz leaving the room.]

2    BANDA: You know I hate to – when they first asked me if  ever wanted to work in this

3    division that's she's working  I told them I could never hand  it.  Because I have two

4    children. I love them so much that I could never even think  panking them let alone

5    discipline.  As a parent, not just as a human being, as a pareu.  You gave birth to this little

6    girl.  You gave birth to this little girl.  What happened?  What happened.

7    A.  I don't know. [Crying]

8    BANDA:  What happened?  Did the pressure just get to you

9    A.  No, sir.  I don't abuse my kids.  I don't.

10   BANDA: This is not –

11   A.  I don't abuse my kids.

12   BANDA: Sometimes we let things get out of hand.  Sometimes we've gone too far and we

13   realize later that we've gone too far and we look back and we say I should never have done

14   that.  Is that – or is this one of those times?

15   A.  No. No. No. No. No.

16   BANDA: You need to think hard.  You need to think about your child that you no longer

17   have.  That you will no longer be able to enjoy. [inaudible] This is the most heart wrenching

18   thing that can ever happen to a person.  This little girl was so bruised – your child – your

19   daughter that you –  It's hard.  It's tough to have said that if this little child could come back

20   to us exactly what happened, I bet she would tell us it was not her brothers or her sisters.

21   A.  It was not me.

22

0 0200

**Scanned  Jun 18, 2013**

SX3 - 31

1    BANDA: Who was it then?  Who was it.  Tell us who it was

2    A. I don't know who it was.  I mean she – uh – it's like I tol   the lady she would get up in

3    the middle of the night – she would go and – and I would ha  e to close the door from her

4    room because she would like to go -- in the previous apartme t that we were staying at – the

5    kids would sleep in the [Spanish "living room"] because tha

6    BANDA: Right.  Right.  I understand that.

7    A. Place we were staying at – we were staying at temporaril  -- and she would go to the

8    [Spanish "living room"] and uh you know it was dark.  It wa  dark.  And I guess she would

9    trip over them and fall down and I mean –

10   BANDA: What happened to her foot?

11   A. Where.

12   BANDA: On the bottom of her foot.  What's wrong with her foot?

13   A. What's wrong with her foot?

14   BANDA: I don't know.  That's what I want you to explain to me.

15   A. I don't know.

16   BANDA: There's a  huge bruise -- she has on her foot.

17   A. I don't know.  I never saw that bruise.  I mean uh –

18   BANDA: Once you see it you're going to see it you're going to tell me a blind person

19   wouldn't have missed it because this welt is so enormous.

20              Cruz re-enters room with photographs and sits down.

21   CRUZ: All those markings are from the fall? [Shows Melissa photo.] One fall?

22   BANDA: Don't you –

0  0201

**Scanned  Jun 18, 2013**

SX3 - 32

1    CRUZ: How did she get the rest of them?  Was it your husband?  Was it?

2    A.  BANDA: [Standing over Melissa yelling.] Don't you feel sorry for this little girl?

3    A.  Yes, I do.

4    BANDA: [Standing over Melissa yelling.]  Don't you feel sorry, Melissa?

5    A.  Yes, I do.

6    BANDA: [Standing over Melissa yelling.] Look at that!

7    A.  I did not hurt my daughter.  I would not hurt my children

8    CRUZ:  You did not let her get medical attention either, especially it started with her – her

9    epileptic –

10    A.  No.  I did not say she –

11    CRUZ: You said it was the signs –

12    A.  I, I said she – her jaw was locked.

13    CRUZ: You take her shower – you see all these markings on her.  Whose teeth marks are

14    these?

15    A.  Oh I don't know about that bruise.

16    BANDA: And you don't know about that one?

17    A.  I, I, I noticed the bruise on her but like I told the lady, I –

18    BANDA: Can you miss a bruise that big?

19    A.  Uh my kids – my kids would play rough with her –

20    BANDA: [Belligerent] This is not a bruise from one time.

21    A.  No but my kids – I mean I have a lot of children.  They all tend to get together and they

22    fight and they wrestle and everything and she would go and she would go and she would

0  0202

**Scanned  Jun 18, 2013**

SX3 - 33

1   play with them and I would –

2   BANDA: I'll tell you something right now – just by seeing these right here –  both of you are

3   going to get hit for it

4   A.  Why?  We didn't do nothing.

5   BANDA: That.  Neglect of medical attention.  That.  Do you think when the jury sees this

6   they're going to say oh – it was just the children?

7   A.  I did not abuse my daughter.  I would not –

8   BANDA: I'm not saying you abused your daughter.

9   A.  I'm not – I never –

10  BANDA: I'm didn't say you abused your daughter.  I never said that.

11  A.  I would never abuse my children.  Never.

12                          Cruz re-enters room.

13  CRUZ: [to Banda] Let me – let me go get this warrant real quick.  The District Attorney is

14  here –

15                          Cruz leaves room.

16  BANDA: If something didn't happen -- that's the district attorney that's out there.  That tells

17  you how important this is going to be.  Not to me.  I get to go home.  I'll go home at five, six

18  o'clock in the morning if I have to.  He's going to decide what going to go on here.  First

19  thing he's going is how cooperative are you – both you and your husband.

20  A.  I'll – I'll be very cooperative.  I don't have nothing to --

21  BANDA: No.  That baby's not saying anything – that you're being cooperative.  The best

22  thing that you can do – I know you're not telling me everything that's going on. I know you

0  0203

**Scanned  Jun 18, 2013**

SX3 - 34

1   haven't.

2   A.  I did not abuse my daughter.

3   BANDA: I never said that you abused your daughter.  I never said that.  Something

4   happened to that little child – it's going to be up to you and your husband to explain.  Why?

5   Because you're the mother and he's the father.  Now, I'm not going to be the one that's

6   judging you.  I will tell you when they see you being just like I never hurt my daughter and

7   they throw those pictures on the screen you know what the first thing that [inaudible] is

8   going to be – they're going to have no sympathy for you.

9   A. I understand.  I mean I would feel the same way if it was somebody else in my shoes.

10   BANDA: That's right.

11                                    Extended silence.

12   BANDA: Have you ever been investigated by CPS?

13   A.  Yes.

14   BANDA: For what?

15   A.  Um – My kids were in foster care and they got returned back to us November the 21st.

16   BANDA: Okay.   What was the situation for having them to be removed from your house.

17   Your house in [inaudible].   What was the reason for taking them away?

18   A. Uh, drug use.

19    BANDA: Was it cocaine or?

20   A. Uh huh.

21   BANDA: Both you and him?

22   A. Me.

0 0204

**Scanned  Jun 18, 2013**

1    BANDA: You?

2    A. Uh huh.

3    BANDA: Okay.  Are you sure?

4    A. Uh huh.

5    BANDA: You clean right now?

6    A. Uh huh.

7    BANDA: For how long?

8    A. Since February of last year.

9    BANDA: Completely clean?

10   A. Uh huh.

11   BANDA: Has he?

12   A. Has he used?

13   BANDA: Uh huh

14   A. Uh huh.

15   BANDA: Has he been clean?

16   A. Oh yeah he's been clean too – he's been clean – Well, he was locked up –

17   BANDA: I'm just going to tell you like I told him. There was a death in a household and

18   crime scene was over there.  That means the whole residence was searched.  And I told him

19   and I said I'm going to ask you one more time – and take into consideration what I just told

20   you – the whole house was searched – now I'll tell you the same thing – have you been clean

21   the whole time?

22   A. Uh huh.

0.0205

**Scanned  Jun 18, 2013**

1    BANDA: Has he been clean?

2    A. Up to now?

3    BANDA: Uh huh

4    A. No.

5    BANDA: Did you know about it?

6    A. Uh huh.

7    BANDA: Did he tell you?

8    A. Yes. I knew.

9    BANDA: How did you know?

10    A. Because he told me.

11    BANDA: What was the last time that you remember that he told you that he'd done it?  I

12    mean – uh – he already told me so it's not news to me.

13    A. Yesterday.

14    BANDA: Okay. Were you able to tell? Did you ask him what? Or did you see him do it?

15    A. No. I mean, I– I– I knew where he was going to go.

16    BANDA: He never did it in the household?

17    A. Huh?

18    BANDA: He did it in the household?

19    A. Uh huh. [nodding]

20    BANDA: So your knowledge of it – the fact that it was found  - and guess what – I just told

21    you – I'm gonna ask you – I'm gonna ask you like I asked him – honesty plays a big factor.

22    Be honest with me and I'll be honest with you.  And you get to some point and you say okay

**Scanned  Jun 18, 2013**

SX3 - 37

1   I saw this. This is what I saw. This is what I did. This is what might've happened. And you

2   say nothing happened in that house. That you can look back and say I should've never done

3   that.

4   A. In the house we are in right now, No.

5   BANDA: In the apartment?

6   A. No.

7   BANDA: What do you think is going to happen to you?

8   A. I don't know.

9   BANDA: What do you want to happen to you?

10  A. Right now?

11  BANDA: Right now.

12  A. I wish I was dead.

13  BANDA: I'd probably feel the same way. I'd feel the same way as you. You know why? If

14  I were you I'd be telling myself this would've never happened. This would've never

15  happened. That's all the reason I [inaudible]. I'll be honest with you. I don't know what's

16  going to happen to you. I won't be surprised if you don't get out of here with attempt to a

17  child [inaudible] – if you do the best way to [inaudible] is to tell us what happened. You

18  need to tell us.

19  A. I don't abuse my daughter.

20  BANDA: What happened? Why did she get all those bruises? You have to know.

21  A. I don't know.

22  BANDA: [Yelling.] Tell us! You have to know! You were with her! You were with her

U 0207

**Scanned  Jun 18, 2013**

SX3 - 38

1    every day.  Every single day you were with her.

2    A.  I was

3    BANDA: I know you were.

4    A.  I didn't abuse my daughter.

5    BANDA: I never said you abused your daughter.  You know exactly what happened to her.

6    A.  No I don't!

7    BANDA: You know exactly what happened to her!

8    A.  No.  I' don't.

9    BANDA: Yes, you do!  You knew exactly what happened to her.  The only way we're going

10   to find out what happened is if you tell us what happened so we can start taking care of

11   everything else.

12   A.  So what do you want me to tell you that –

13   BANDA: [Yelling]  [inaudible] You know what happened to her!

14   A.  No I don't.  No I don't.

15   BANDA: You know exactly what happened to her.  Those pictures speak for themselves.

16   Have you seen the pictures?

17   A.  Yes.

18   BANDA: You haven't seen all of them.  Those bruises are not from horseplay; they're not

19   from kids playing around.

20   A.  I did not hit my daughter.

21   BANDA: You need to account for that.  You need to tell us

22                                   [Melissa yawning.]

**Scanned  Jun 18, 2013**

1    BANDA: Either tell us right now what happened or we can start helping you take care of this

2    situation before it gets any further.  And it gets any worse for you.  Accidents happen.

3    Maybe this was an accident.

4    A.  An accident like what?

5    BANDA: That's what we need to find out here?  It looks like it was either an accident or it

6    was intentional.

7    A.  It was not intentional.

8    BANDA: Well if it was an accident then you need to let us know what happened.  Put it out

9    on the table.  What happened?

10   A.  I don't know what happened to her.

11   BANDA: Well obviously you do.

12   A.  No. I don't.

13   BANDA: You obviously do.  You were the only one there with her.  You say you were the

14   only one there with her.  All your other children go to school at one point or another.

15   A.  Uh huh.

16   BANDA: All you children go to school and –

17   A.  All my other children go to school

18   BANDA: and the other three youngest go at 11 o'clock and then it's just you and Mariah.

19   A.  Uh huh.

20   BANDA: Okay.  And I mean [inaudible] it was intentional or it's an accident.

21   A.  No it wasn't intentional; it wasn't an accident.

22   BANDA: It's one or the other.

0  0209

**Scanned  Jun 18, 2013**

SX3 - 40

1    A.  I did not put those bruises on her.

2    BANDA: How did she get them?

3    A.  I don't know how she got 'em.

4    BANDA: You have to know.

5    BANDA: [yelling] You have to know!  You said it – I spend it with her every day.  I spend

6    all my time – she's with me all the whole time – you have to know where she got her – I see

7    a bruise on child's arm I know exactly where he got it.  Why    Because I'm going to go find

8    out.  I'm going to start asking questions. If I see another one, I'm going to find out where

9    that one came up from.  If I have -- seen a hundred bruises believe me I'm going to find out

10    where they came from.  If I see bite marks I'm going to know where they came from.  I can't

11    believe those bite marks are from your kids either.  Those are huge bite marks.

12    A.  I–

13    BANDA: Those are big bite marks.

14    A.  Are you trying to say I bit my daughter?

15    BANDA: I'm not trying to say you did.  I'm trying to find out who did.  How it happened.

16    How did all those bruises get there.  You saying we put those bruises and bite marks on her

17    or –

18    A.  No.

19                    [another officer enters with photos]

20    BANDA: No wonder your husband never saw her without any clothes, right?

21    A.  I did not abuse my daughter.

22    BANDA: You're not going to [inaudible] any more.  Look at this.  Tell me that isn't a bite

**Scanned  Jun 18, 2013**

1   mark.

2   A. I did not bite my daughter.

3   BANDA:  Just once.  Look. [inaudible].  She can suffer all this and you can still say I did not

4   – I don't know what happened.  Here.  There's more over here.  These right here.  Those are

5   old bruises.  That's why you didn't want to pay for the doctor.

6   A. Yes, because I knew that they would accuse me just like I know that ya'll are accusing

7   me

8   BANDA: [Standing over Melissa and yelling] Well you have a dead child now!  We're not

9   accusing you.  We know somebody did it.  We're trying to find out who did it.  If it wasn't

10   you I don't think somebody crept in there in the middle of the night and went up to your

11   child and specifically singled her out so he could bite her on the back and walk out and

12   bruise a baby and walk out while you're pretending to be asleep or say oh the baby got up

13   and went and hurt himself or herself. [inaudible].  Check it out.  Even the child's feet are

14   freakin bruised. [inaudible].  See that.  I bet you we can [inaudible].  I bet you it's there.

15   A. That's not mine.

16   BANDA: [Spanish.]  I told you that's what it was.

17   A. Where is it at?

18   BANDA: [Spanish.]

19   A. I don't know.

20   BANDA: I don't know either.

21   OFFICER: How do you not know?  That's your child.  How do you not know where all

22   those bruises – where all those bruises come from?

**Scanned  Jun 18, 2013**

SX3 - 42

1    BANDA: [Spanish.]

2    A. [Shaking head no.]

3    BANDA: Okay.  I got ya. [Voice raised.] What's all that on the bottom? [Spanish] You

4    don't know where she got those either?

5    A. [Spanish.]

6    BANDA: You don't know what those are?

7    A. Scratches I think.

8    BANDA: [inaudible] If it was my child, I'd know. [inaudible]

9    OFFICER: You know you'd say anything to defend yourself.  You didn't think to defend

10   your daughter that you loved so much that she died.

11   A. I did love my daughter.  I still love my daughter.

12   BANDA: Well what happened to her?  You know exactly what happened to her.

13   OFFICER: Now's your chance to put it up.  Now's your chance to tell us exactly what

14   happened. Like we said either it was intentional or it was an accident. Butt his happened.

15   There's no going back on it.  You can't bring your daughter back. We can't bring your

16   daughter back.

17                              Melissa sniffling / crying.

18   OFFICER: Is your frustration.

19   A. No.

20   OFFICER: Then what was it?

21   A. I did not abuse my daughter.

22   OFFICER: I'm not saying you abused her.  You said it yourself you had eight children to

0 0212

**Scanned  Jun 18, 2013**

1    look after.

2    A.  Yes, I do.

3    OFFICER: I know. I know you do.  You have eight children to look after.  You can't tell me

4    it didn't get to you.  You can't tell me the frustration

5    A.  All of 'em get to me – All of 'em get to me – So why take it out on the baby for?

6    OFFICER: Because she's a baby.

7    A.  No.

8    OFFICER: You just answered your own question.  Because she can't talk.  She can't stand

9    up for herself.

10   A.  She could talk.  She talked.

11   OFFICER: Would she stand up for herself?

12   A.  No.  She's a baby.

13   OFFICER: Exactly.

14   BANDA: [inaudible] you need to stand up for her.

15                              Banda leaves the room.

16   OFFICER: How old are you?

17   A.  38.

18   OFFICER: How old were you when you had your first child.

19   A.  17.

20   OFFICER: You spent more than half your life pregnant, right?  Did you ever get to do

21   anything for yourself?

22   A.  [shaking head no]

Scanned  Jun 18, 2013

# TAB

# 2

0: 0168

**Scanned  Jun 18, 2013**

First DVD Recording
of
Melissa Lucio
Custodial Interrogation



**Scanned  Jun 18, 2013**

SX3 - 44

1    OFFICER: It was always looking after the children wasn't i

2    A.  That never bothered me.

3    OFFICER: Obviously it did.  You saw the pictures.  You sa  the pictures of your child.

4    You need to tell us right now what exactly happened.  This   your chance to set it straight

5    because right now it looks like capital murder.  Right now it looks like you're a cold-

6    blooded killer.  Now are you a cold blooded killer?

7    A.  No.  I'm not.

8    OFFICER: Or were you a frustrated mother who just took it  ut on her – for whatever reason

9    A.  [crying] No.

10   OFFICER: It's gotta be one – one or the other.  There's no other – There's nothing else here.

11   Either you're a cold blooded killer who has no remorse – no remorse whatsoever for that

12   two-and-a-half year old child that's dead or a frustrated mother or it was an accident.

13   Accidents happen.  Was she a bad kid?  Was she a restless kid?

14   A.  [Crying] No.

15   OFFICER: She would wake up in the middle of the night – would it make you upset when

16   she woke up in the middle of the night and play with your makeup and went through your

17   purse and made a mess.

18   A.  Un unh.

19   OFFICER: How do you explain all those bruises.  You have to be able to explain all those

20   bruises one way or another.  How do you explain all those bruises.  You can't say it's

21   horseplay.  Kids play but not like that!  Right now's the time. Melissa.  Right now's the time

22   to put it up.  Lay it on the table.  Just lay it out Melissa.  Right now is the time.  Like I said it

0214

**Scanned  Jun 18, 2013**

1    was an accident or it was cold blooded and planned.  If it was an accident –

2    A.  I didn't abuse my daughter.

3    OFFICER: We're not saying you did.  Maybe it was discipline that went a little too far.  If

4    you didn't abuse your daughter who did?  Who did?  Meliss, if you didn't abuse your

5    daughter, who did?  You know the answer.  You know.  You know.

6    A. [Shaking head no.]

7    OFFICER: Yes you do. You can shake your head all you want.  But plain and simple,

8    Mariah is dead.  Plain and simple it's cut and dried.  Mariah s dead.  And Mariah did not die

9    because she fell down the stairs or because of bad tamales.  Mariah is dead because

10   somebody beat her.

11        If you do anything for this baby bring back a little closure to her life. Give her a little

12   closure to her life.  Give her something.  Because it's obvious you never gave her anything

13   else.  Give her something.

14        You're going to have to explain yourself.  One way or another.  And maybe we're

15   not the ones you have to answer to.  I think you know who you have to answer to.  Are you a

16   religious person?

17   A. [shaking head no] un unh

18   OFFICER: You don't go to church or anything?

19   A. [shaking head no] un unh

20   OFFICER: Do you believe in God?

21   A. [nodding head yes]

22   OFFICER: Do you believe you are going to have to face him ne day?  Can yo go up there

**Scanned  Jun 18, 2013**

1    with a clean conscience.  Are you going to be able to face him with a clear conscience and

2    know that you're okay?

3    A. [nodding head yes]

4     OFFICER: You know something.  What do you know?  You know something.  You can't

5    tell me – Melissa you can't tell me the child is going to get those bruises from playing with

6    other children.  You saw those bruises.  We saw those bruises.  Most of us here have

7    children.  You know it.

8                                    Officer enters room.

9    OFFICER: An hour and fifteen

10                                   Officer exist room.

11   OFFICER: Do you have anything to say for yourself?  You know how this is going.  You

12   know how this looks.  You don't know how this looks.  You wanna know how this looks.  It

13   looks like you're a cold-blooded killer.

14   A. I'm not.

15   OFFICER: You keep saying that.  You keep saying that you're not.  Prove to us that you're

16   not.  How are you not a cold-blooded killer?  How are you not cold-blooded?  How are you

17   doing to change our minds and prove to us that you're not a cold-blooded killer?

18   A. I don't know how to change your minds.

19   OFFICER: Well you can start by telling us the truth.  Start by telling us the truth.  Did it go a

20   little too far?

21                                   [Melissa yawning.]

22        Is that what happened?  It went a little too far?  Did she make you mad?

**Scanned  Jun 18, 2013**

SX3 - 47

1    A. No.

2    OFFICER: Then what happened?  What happened?  Did you plan to do this?

3    A. No.

4    OFFICER: Did you plan it or was it an accident?

5    A. It was neither one.

6    OFFICER: Well then what was it.  It had to have been one of the other.  There is no third

7    choice here.  You either killed her on purpose or she died accidentally.

8    A. I don't know how she died.

9    OFFICER: We don't either.  That's what we want to find out

10   A. I don't know how she died.  I did not kill my baby.

11   OFFICER: It could have been a combination of things.  It could have been a combination of

12   everything.  Butt hose bruises didn't just appear on her.  Bruises don't just appear on

13   somebody. How do you explain all those bruises? Seriously how do you explain them?  How

14   do you explain them?  Melissa how do you explain all those bruises?

15   A. I don't know how to explain them.

16   OFFICER: Well you have to.  There's got to be something.  Something.  What is it?  How

17   did those bruises get on her body.  All over her body.  It's not like a bruise on her knee or a

18   bruise on her elbow or a bruise on the chin maybe where she fell.  It's not that.  It's all over.

19   There's scratches.  There's bite marks. There's all kinds of stuff.  She was abused.  There's

20   no doubt in my mind.  You keep saying you didn't abuse her  You didn't abuse her.

21   Somebody did.  And right now its pointing towards you .  It's all pointing towards you .

22   You're in a hole right now.  You're digging yourself deeper.  The facts are – The facts are in

0.0217

**Scanned  Jun 18, 2013**

SX3 - 48

1       the photos. The facts speak for themselves.  The pictures speak – they say – tons of things.

2               All we want to know is what happened.

3       A.  I don't know what happened.

4       OFFICER: You have to know what happened.  We're past that.  We're past the you're not

5       knowing. We're past that.  We know Mariah was abused.  You can't say that she wasn't.

6       Like I said we're past that.

7                               Cruz re-enters the room.

8       CRUZ: We're just waiting for the x-rays and uh [inaudible] and everything.  You're sure

9       there's nothing.

10      A. [nodding head no]

11      CRUZ: Okay because all the information that was – that we're getting from your family and

12      your husband –  we're going to meet up and uh we're going to share that information. So

13      you're saying it was not your husband?

14      A. [Shaking head no.] Un unh.

15      CRUZ:  and it's not you?

16      A. [Shaking head no.]

17      CRUZ:  It just happened?

18      A.  I don't know how it happened.

19      CRUZ: Okay.  You were never concerned about the bite marks or anything like that?

20      A.  Yes but like I told you my kids were always playing – I mean they –

21      OFFICER: Those are not kid bites.  Yeah we're past that. –

22      CRUZ: Okay.

**Scanned  Jun 18, 2013**

SX3 - 49

1    OFFICER:  We're past that.

2    CRUZ: Okay we're gonna go meet.  And I need to see – just call the hospital and see if they

3    have any uh any [inaudible] .  If they got any fractures or injuries.  They ran some um x-rays.

4    And we're going to see how bad the x-rays are.  If there are old injuries. You have to know

5    something about it.  They're saying it's old but they need somebody to --

6    A.  What's old?

7    CRUZ: The injuries were not from two days ago.  It's old injuries.  That means it's a pattern

8    of abuse that's been going on with some body from this case.  So, they're waiting for the

9    doctor to read the x-rays and they're going to give us a report.  That's what I'm waiting on

10   and I'll let you know.

11                         Cruz and Officer leave room

12                         Melissa resting head in hand

13                   Melissa resting head on table.  Sniffling / Crying.

14   CRUZ: Alright [inaudible] a case.  The hospital is saying that there were old injuries.  The

15   injuries are old and uh there was no way that it happened on a fall.  There is definitely abuse.

16   Your husband is saying it was you?

17   A.  That I abused my daughter?

18   CRUZ: He's saying it was you.  Why would lie about that?

19   A.  I don't know.  Why did – How did my daughter die?

20   CRUZ: These.  Physical abuse.

21   A.  Physical abuse?

22   CRUZ: What's your definition of that? [Showing photograph]  Is that uh – a three-step fall?

0  0219

**Scanned  Jun 18, 2013**

SX3 - 50

1    Look at this.  Right here.  She's bleeding or something.  I mean – if my niece had only that

2    I'd already been going to the doctor like crazy.  What do you think about that?  Right here

3    these markings right there on her arm – her shoulder– look at the back of her neck– it's

4    bruised.  Who got her dressed in the morning?  Did she cry when you put her clothes on?

5    A.  No.

6    CRUZ: No?  Obviously she was numb with all the beatings.   What are these right here?

7    A.  These were all sores I guess those were.

8    CRUZ: What kind of sores?

9    A.  I don't know.

10   CRUZ: Did you think to take her to the doctor?

11   A.  These – no – these scars were already there.

12   CRUZ: Was she born with them?

13   A.  No.  They're probably mosquito bites or something.

14   CRUZ: Mosquito bites or something.  Did you think to get her some medication for that.

15   A.  Yes, they gave me Lotrimin.

16   CRUZ: Who – uh – who's they?

17   A.  The – uh – the doctor.

18   CRUZ: Who's her doctor?

19   A.  She didn't – she didn't have uh – she – when she came back with me – November 21st

20   she came back they gave me – her foster parents gave them – gave me her medication and

21   everything which was – she had tick bites.  And she did not have uh [inaudible] there.

22   CRUZ: Did she get cut there or what?  Was she still in diaper .

**Scanned  Jun 18, 2013**

MELISSA LUCIO
WRIT APPENDIX



**Scanned  Jun 18, 2013**

# CERTIFIED BILL OF COSTS

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

I, Aurora De La Garza, Clerk of the District Courts of Cameron County, Texas, do hereby certify that the foregoing is a true and correct account of the costs accrued in the following entitled and numbered cause:

Cause Number: **07-CR-885-B-WR**

| | | |
|---|---|---|
| **The State of Texas** | § | IN THE **138**[th] JUDICIAL |
| VS. | § | DISTRICT COURT OF |
| **MELISSA ELIZABETH LUCIO** | § | CAMERON COUNTY, TEXAS |

Given under my hand and seal of office in the **30**[TH] day of **MARCH**, 2011.

Aurora De La Garza
District Clerk

By: _____
**CHRISTINA TUSA**, Deputy

0222

**Scanned  Jun 18, 2013**

# CLERK'S CERTIFICATE

THE STATE OF TEXAS                        §
                                          §
COUNTY OF CAMERON                         §

      I, Aurora De La Garza, Clerk of the District Courts of Cameron County, Texas, do hereby certify that the foregoing transcript contains true and correct original copies of all proceedings as to the Writ of Habeas Corpus in:

<div align="center">

Cause Number:  **07-CR-885-B-WR**

**WRIT I**

The State of Texas

VS

**MELISSA ELIZABETH LUCIO**

</div>

As they appear on file and of record in this office.

      Given under my hand and seal of said Court of Cameron County, Texas, on **Wednesday, March 30, 2011**.

<div align="right">

Aurora De La Garza
District Clerk
Cameron County

</div>



Christina Tusa
Deputy Clerk

ṵ 0223