REPORTER'S RECORD

VOLUME 32 OF 44 VOLUMES

TRIAL COURT CAUSE NO. 07-CR-885-B

- - - - - - - - - - - - x

STATE OF TEXAS              :    IN THE DISTRICT COURT
                           :
VS                         :    138th JUDICIAL DISTRICT
                           :
MELISSA ELIZABETH LUCIO    :    CAMERON COUNTY, TEXAS

- - - - - - - - - - - - x

JURY TRIAL - DAY ONE

    On the 30th day of June, 2008, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable **Arturo C. Nelson**,
Judge Presiding, held in Brownsville, Cameron County,
Texas.

    Proceedings reported by computerized stenotype
machine.

FILED IN
COURT OF CRIMINAL APPEALS

AUG 06 2009

Louise Pearson, Clerk

ORIGINAL

Adelaido Flores, Jr.
Certified Shorthand Reporter

2

```
 1                    A P P E A R A N C E S

 2         APPEARING FOR THE STATE:

 3            HON. ALFREDO PADILLA, JR.
              State Bar No. 15404600
 4            & HON. JOSEPH KRIPPEL
              State Bar No. 24007515
 5            & HON. MARIA DE FORD
              State Bar No. 24043626
 6            Assistants to the Criminal District Attorney
              Cameron County Courthouse
 7            974 E. Harrison Street
              Brownsville, Texas  78520
 8            Telephone:  (956) 544-0849
              Fax:  (956) 544-0869 Fax
 9

10         APPEARING FOR THE DEFENDANT:

11            HON. PETE GILMAN
              State Bar No. 07952500
12            6933 N. Expressway
              Olmito, Texas  78575
13            Telephone:  (956) 350-6954
              Fax:  (956) 350-8056
14

15         APPEARING FOR THE DEFENDANT:

16            HON. ADOLFO E. CORDOVA, JR.
              State Bar No. 00787286
17            Law Office of Adolfo E. Cordova, Jr.
              711 North Sam Houston
18            San Benito, Texas  78586
              Telephone:  (956) 399-1299
19            Fax:  (956) 399-4484

20

21

22

23

24

25
```

```
 1              VOLUME 32

 2      CHRONOLOGICAL INDEX - JURY TRIAL - DAY ONE

 3    6/30/08                              PAGE   VOL

 4    Invocation Of The Rule                 3     32

 5    Discussion: Daubert Mot.               4     32

 6    Motion in Limine                       7     32

 7    Jury Sworn in                          8     32

 8    Court's Instructions                   8     32

 9    Indictment Read                       13     32

10    Opening Statements by Mr. Padilla     14     32

11    Opening Statements by Mr. Gilman      18     32

12    STATE'S WITNESSES:
```

| NAME | DX | CX | RDX | RCX | VDX | VOL |
|------|----|----|-----|-----|-----|-----|
| Rebecca Cruz | 24 | | | | 36 | 32 |
| Deft's. Mot./3822 | | | | | 49 | 32 |
| Court's Ruling in re: Tapes | | | | | 52 | 32 |
| Deft. Objects/Exculpatory | | | | | 62 | 32 |

```
18    STATE'S WITNESSES:
```

| NAME | DX | CX | RDX | RCX | VDX | VOL |
|------|----|----|-----|-----|-----|-----|
| Alfredo Vargas, MD | 69 | 79 | 86 | 87 | | 32 |
| Rebecca Cruz | 88 | | | | | |
| Adjournment | | | | | 92 | 32 |
| Certificate of Court Reporter | | | | | 92 | 32 |

```
 1                  ALPHABETICAL WITNESS INDEX
                                                VOIR
 2    NAME                  DX   CX   RDX   RCX  DIRE    VOL

 3    Cruz, Rebecca         24                    36     32
      Cruz, Rebecca (2x)    88
 4    Vargas, Alfredo MD    69   79   86    87           32

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
1                    P R O C E E D I N G S
2                 (Defendant and Jury not present.)
3              THE COURT:   Call now, Cause Number
4    07-CR-885-B, State of Texas versus Melissa Elizabeth
5    Lucio.
6              MR. PADILLA:   State is present and ready,
7    Your Honor.
8              MR. GILMAN:   Mrs. Lucio is not here, Judge.
9              THE COURT:   Where's Mrs. Lucio?
10             MR. GILMAN:   I think they're getting her.
11   She was down the hall.
12             THE COURT:   Have you had a chance to visit
13   with her this morning, sir?
14             MR. GILMAN:   Yes, sir.
15             THE COURT:   Let's take care of a few
16   housekeeping matters.  I am assuming that the rule on
17   witnesses is going to be invoked?
18             MR. GILMAN:   Yes, sir.
19             THE COURT:   Do you have any witnesses in
20   the courtroom present, sir?
21             MR. PADILLA:   No, sir.
22             THE COURT:   Does the State have any
23   witnesses in the courtroom?
24             MR. PADILLA:   Not at this time, Your Honor.
25             MR. GILMAN:   Judge, from our conversation
```

1   last week, I was under the impression that the State will
2   present their witnesses and evidence and will take --
3   excuse me -- most of this week if not all of it and I
4   should be prepared to present my evidence and my witnesses
5   as early as next week.  Is that what the Court was
6   thinking?
7              THE COURT:  That's my understanding.
8              MR. GILMAN:  Is that right?
9              MR. PADILLA:  That's correct.
10             MR. GILMAN:  So I imagine -- I don't want
11  to have people line-up.
12             THE COURT:  I understand, but that is my
13  understanding of how it's going to proceed.
14             MR. PADILLA:  The only exception to
15  invoking the rule, we are asking that the case agent,
16  Rebecca Cruz, be allowed to remain in the courtroom, Your
17  Honor.
18             THE COURT:  Any objections?
19             MR. GILMAN:  No, not really.  One other
20  thing, too, is that, I got Doctor Kuri, and the State
21  wants to be able to ask him or take him on voir dire.
22  When is the Court thinking of taking my experts on voir
23  dire?  Are we going to do it on Monday for next week?
24             THE COURT:  Yes, sir.
25             THE COURT:  That pertains to your Daubert.

1        MR. PADILLA:  And also on the issue of
2   timely designation, because we ran into that problem last
3   time, Judge, that they were not timely designated --
4        THE COURT:  I understand.  I'm going to
5   overrule your objections as to timely designation of
6   experts.
7        MR. PADILLA:  Your Honor, I can understand
8   the Court's ruling, but that puts us into a predicament,
9   Your Honor, first and foremost, we have not been provided
10   an expert in this matter, to allow the State of Texas to
11   give a controverting affidavit concerning what Doctor Kuri
12   is going to testify to or what Mr. Villanueva is going to
13   testify to.  I mean that puts us in a bind in the sense
14   that we don't have an expert report, and that's why we
15   have the rules.
16        THE COURT:  That is on a civil case, sir.
17        MR. PADILLA:  I understand, sir, but we are
18   entitled to get a report from them as to what their
19   opinions and findings are.
20        THE COURT:  Well, gentlemen, let's --
21        MR. PADILLA:  I just want the record to
22   reflect that we didn't waive it and we did address it
23   before.
24        THE COURT:  Yeah.
25        MR. GILMAN:  One other matter.  Doctor Kuri

1    is not going to contradict Doctor Farley in the cause of

2    death, but he would -- it may be beneficial if he could

3    listen to Doctor Farley's testimony.  The cause of death

4    was a blunt -- a blow to the head and brain hemorrhage.

5    My expert Doctor Kuri is not --

6              THE COURT:  I'll allow both experts to

7    listen to each other.

8              MR. PADILLA:  Judge, we would object to

9    that.  Obviously, he has an opinion.  It should be based

10   upon the pathology report.  We took the deposition of

11   Doctor Farley.  That's available for the doctor.  So we're

12   going to object to that for the record.

13             THE COURT:  I will take that up a little

14   bit later.

15             MR. PADILLA:  Thank you, sir.

16             THE COURT:  Anything else, sir?

17             MR. GILMAN:  When is Doctor Farley going to

18   be testifying so I can make sure that --

19             THE COURT:  The State said Doctor Farley

20   will probably be testifying Monday of next week.

21             MR. PADILLA:  Judge, I did speak to

22   Mr. Gilman on Friday.  It looks like Doctor Farley will be

23   available and I tentatively scheduled her for Wednesday

24   afternoon, to testify, at 1:30.  That's why I anticipated

25   concluding the case by Thursday, and put Doctor Farley on

1    Wednesday afternoon.

2              THE COURT:  Any other changes, Mr. Padilla?

3              MR. PADILLA:  No, Your Honor.  That's -- I

4    mean we anticipate calling Jaime Palafox, the EMS

5    officers, probably CPS this afternoon.  Rebecca Cruz, this

6    afternoon, the case agent, and we have CPS probably in the

7    morning.  And we have four or five other witness, and we

8    will bring Doctor Farley on Wednesday.

9              THE COURT:  Bring the jury in.  Just a

10   minute.

11             MR. GILMAN:  I've got a motion in limine

12   that I filed previously --

13             THE COURT:  Okay.

14             MR. GILMAN:  -- back on May 28 -- prior

15   convictions and bad acts.  They've given me numerous lists

16   of bad acts.  There is only one conviction that my client

17   has, and that's the DWI and a misdemeanor, and that's

18   inadmissible, and I would also venture to say that there

19   hasn't been any charges filed on any of the alleged bad

20   acts, and that would not be admissible during the

21   guilt/innocence stage.

22             THE COURT:  Are you going into those during

23   voir dire?

24             MR. PADILLA:  No, Your Honor, I don't

25   anticipate going into them.  I will go into the facts that

1   the children were removed. However, I only intend to ask,

2   or to inform the jury as to why extraneous offenses will

3   not be mentioned by me.

4            THE COURT: Sir, bring the jury in.

5            **(Jury present, defendant present.)**

6            THE BAILIFF: All rise for the jury.

7            THE COURT: Come on in and sit down,

8   please. Will all of you please rise and raise your right

9   hands.

10            **(Jury sworn by the Court.)**

11            "Do you solemnly swear or affirm that the

12   case of State of Texas against the defendant, you will a

13   true verdict render according to the law and under the

14   evidence, so help you God."

15            THE JURORS: I do.

16            THE COURT: Please be seated. Ladies and

17   gentlemen of the jury by the oath that you have just taken

18   you now become active participants in the administration

19   of justice. At any time you can not clearly hear the

20   proceedings don't hesitate to let it me be known to myself

21   or to the Court staff. Also, sometimes, things are

22   imminent. You have to go to the restroom, you have an

23   emergency of one sort or another, or you got a coughing

24   spell. Things happen. If you do, just raise your hand

25   and let my bailiff know, or let me know, and we will

9

1    immediately take a break.  It's not a problem.  This is a

2    service.  This is not supposed to be a punishment.

3        So if you have any questions, if it gets too hot or

4    too cold, let me know and we'll make this as comfortable

5    as possible, and we will try this case as expeditiously as

6    possible within the bounds of justice.

7        Don't feel offended if the lawyers don't try to

8    communicate with you directly in any way when they are not

9    supposed to.  It's okay to say hello, goodbye and things

10   of that sort.  But other than that nobody is supposed to

11   talk to you at all about this case.  If anybody tries to

12   talk to you about this case please or inform me

13   immediately, or inform the bailiff immediately.  I remind

14   you -- remember during voir dire, we went through it once

15   before.  You are not supposed to discuss this case with

16   your spouses, boyfriends, girlfriends, "comadres",

17   "compadres", best friends, or anybody.  You are not

18   especially supposed to discuss this case among yourselves

19   until the last bit of evidence is in, the written charge

20   is in front of you and the attorneys give closing

21   arguments.  It is only, at that time, that you are

22   supposed to start discussing this case among yourselves.

23   I remind you as well that the decisions you are to make

24   are supposed to be done only from the evidence introduced

25   in this court.  I remind you that I've already instructed

1    you, don't do any independent research as a juror.  Your

2    decision is supposed to be on the evidence as submitted to

3    you by this Court.

4        Now when the witnesses take the stand you will be the

5    judges of the credibility and the weight of the evidence

6    that those witnesses testify in.  But you are not supposed

7    to be discussing this with each other until the last bit

8    of evidence is in.  Do not do any reading of any newspaper

9    articles, listening to TV, radio.  If somebody starts

10   talking about the case around you which happens sometimes,

11   walk away.  Don't be there.  If your family starts talking

12   about the case, walk away.  You are not supposed to be

13   listening to anything.  Now, you can take notes if you

14   choose to take notes.  But those notes are only for the

15   purposes of refreshing your recollection.  They are not

16   supposed to be used during deliberation -- and say, "You

17   see?  That's what the witness said.  My notes reflect

18   that.  They are not supposed to be used like that.  They

19   are only supposed be used to help you remember.  Not in

20   terms of persuasion at all.

21       Do not go to any locations.  Do not any inspect

22   anything.  Again the decisions you make are supposed to be

23   done only on the evidence admitted in this Court, during

24   this trial.  The lawyers may choose to give opening

25   statements.  They may not choose to give opening

1   statements.  They may reserve that right.  But, typically,

2   opening statements are given by the State first.  The

3   defense may choose to make an opening statement, or

4   reserve the right to make an opening statement when it's

5   their turn to proceed.

6       Then we'll go ahead and hear the evidence.  The State

7   will go first; the defense will go second.  Then the

8   rebuttal evidence may be had by the State or the defense

9   as well.  So this is kind of the normal way that that

10  proceeds.  You shouldn't concern yourselves with the

11  objections of the attorneys or what my rulings are.

12      The Court has no right, nor does it intend to make

13  any comment at all as to the weight of the evidence, or

14  any part of the case.  You are the only ones that are

15  supposed to make those decisions.  Not I.  So if I

16  inadvertently misspeak, or make a comment, remember, you

17  are the only exclusive judges of the facts.  You are the

18  ones who make that decision.  The statement of the

19  attorneys, the indictment, the statement of the court none

20  of that is evidence.  The only evidence that there is

21  going to be is that which comes from the witness stand or

22  from the exhibits.  Some of the testimony or exhibits may

23  be introduced for a very limited purposes.  If that

24  occurs, I will ask you to consider that evidence only for

25  that expressed limited purpose and you must do so under

12

1    your oath.  Each of you must determine the facts as you

2    see them.  To do so you must evaluate the credibility of

3    the witnesses and decide the weight and value to be given

4    their testimony.  But that's strictly your purview.  Your

5    responsibility.  That's what you are supposed to do.  In

6    considering the weight and value of the testimony of a

7    witness, you should consider the person's appearance,

8    attitude, behavior, person's interest in the outcome of

9    the case, his or her relationship to the defendant, or the

10   State of Texas --

11                    Please turn off all phones.

12                    (Interruption held off the record.)

13       The inclination of the witness to tell the truth, the

14   probability or improbability of the witness' statement,

15   the reasonable inference from those statements, and all of

16   the factors that you think will help you in giving the

17   testimony of that witness, and the degree of credibility

18   you feel it deserves.

19       Again, I remind you, the defendant is never required

20   to testify.  The defendant is never required to prove her

21   innocence.  The defendant is never required to introduce

22   any evidence at all.

23       Both parties have the right to cross examine each

24   other's witnesses.  When the defendant is finished

25   presenting their witnesses, if any, then the prosecutor

1    may put on rebuttal witnesses and then the defense may put

2    on rebuttal witnesses as to that.

3        At the conclusion of all of the evidence, I will read

4    to you the Court's charge, and each side will present

5    closing arguments.  At that point, you go to the back --

6    as I explained to you all before -- the first thing you do

7    is elect your presiding juror.  And then, and only then,

8    will you begin to deliberate in the case.

9        Okay.  Now we need to do what is called the formal

10   reading of the indictment.

11       Mr. Padilla do you care to do that?

12                MR. PADILLA:  Yes, Your Honor.

13       In 07-CR-885-B, in the name and authority of the

14   State of Texas, the Grand Jurors of County of Cameron, and

15   state aforesaid, duly organized as such on the February

16   Term, 2007, of the 103rd District Court in an aforesaid

17   county, upon their oaths in said court present that

18   Melissa Elizabeth Lucio, hereinafter called the defendant,

19   on or about the 17th day of September, 2007 and anterior

20   to the presentment of indictment, in the County of Cameron

21   and State of Texas intentionally and knowingly caused

22   death of an individual, namely, Mariah Alvarez, by

23   striking or shaking or throwing Mariah Alvarez, with

24   defendant's hand, foot, or other object unknown to the

25   Grand Jury, and said defendant, Mariah Alvarez was an

14

| | |
|---|---|
| 1 | individual younger than six years of age.  Against the |
| 2 | peace and dignity of the State, signed foreperson of the |
| 3 | Grand Jury. |
| 4 | THE COURT:  And that's Mariah Alvarez? |
| 5 | MR. PADILLA:  Mariah. |
| 6 | THE COURT:  I heard "Mariah". |
| 7 | MR. PADILLA:  It's Mariah. |
| 8 | MR. GILMAN:  To which we enter a plea of |
| 9 | not guilty. |
| 10 | THE COURT:  A plea of "not guilty" has been |
| 11 | entered. |
| 12 | Mr. Padilla?  Do you wish to make an opening |
| 13 | statement? |
| 14 | MR. PADILLA:  Yes, Your Honor. |
| 15 | May it please the Court?  Mrs. De Ford, Mr. |
| 16 | Krippel, Mr. Gilman, and, Mr. Cordova?  Good morning |
| 17 | ladies and gentlemen.  We started about a week later than |
| 18 | we anticipated on starting.  You will hear now the |
| 19 | evidence that is going to be introduced in this case.  The |
| 20 | evidence that we are going to be introducing in this case |
| 21 | is as follows: |
| 22 | First and foremost that Mariah Alvarez was |
| 23 | born on September 6, 2000.  The evidence is going to show |
| 24 | that she had, to her misfortune, a birth certificate that |
| 25 | was never issued to her.  But the evidence is going to |

1    show that 15 days after her birth the child along with

2    seven other siblings belonging to Mrs. Lucio, were removed

3    by Child Protective Services.  The evidence is going to

4    show that Child Protective Services intervened, and made

5    effort to reunite the family back together, as the law

6    requires.

7              You're going to hear evidence for about a

8    two year period that this child is in a foster care, and

9    being held under the care of a foster parent of the

10   parent, and no help or care was given the child by the

11   parent.

12             You are also going to hear evidence that on

13   or about November 2006, Judge Ricardo Flores, the Family

14   Law Court of Cameron County, ordered the children to be

15   returned to Melissa Elizabeth Lucio, and Mariah Alvarez

16   was then turned over to her mother.

17             The evidence is going to show that the

18   child was with her for about 88 days.  The evidence is

19   going show that during those 88 days, she suffered a cruel

20   and brutal life.  The evidence is going to show that this

21   child suffered numerous contusions, numerous abrasions.

22   The evidence is going to show that she was assaulted on

23   many places.  You're going to hear evidence that this

24   child had a spinal fracture.  The pathologist is going to

25   testify that this spinal fracture was caused by the

1    twisting of the arm to a point that it breaks.  You're

2    also going to hear evidence that the child was not treated

3    for this spinal fracture, was mending and curing by itself

4    because the child never received any medical treatment.

5    You're going to hear evidence that this child had numerous

6    contusions, numerous abrasions all over her body.  You're

7    going to hear evidence that the child had bite marks all

8    over her back, and bite marks all over her arms.  You're

9    going to hear that the defendant also had pinched the

10   child in the vaginal area causing all kinds of bruises.

11   And you're going to hear that on or about February 17,

12   2007, that this child suffered what the pathologist is

13   going to tell you, was a serious blow to the head which

14   causes hemorrhaging inside of the brain, which inevitably

15   led to the death of the child.

16            The evidence is going to show that on

17   February 17, 2007, around, 7:51p.m. the City of Harlingen

18   was called -- EMS was called through 911 -- and dispatched

19   an officer in response to the child.  You're going to hear

20   that the siblings of Mariah Alvarez the deceased, and the

21   father attempted to resuscitate the child.  You are going

22   to hear evidence that the mother had absolutely -- would

23   not even attempt to aid the child at all.  You're going to

24   hear evidence that the child was pronounced dead at 7:58

25   p.m, at night by Doctor Vargas, the emergency doctor at

1    Valley Baptist Medical Center.  You are going to hear from

2    the pathologist, Doctor Farley who is going to testify to

3    the fact that she did an autopsy on the child.  You are

4    going to hear evidence from the doctor that this is a

5    classic case of child abuse, and one of the most serious

6    she had ever seen.  She's going to testify to all of the

7    numerous contusions, the bite marks, the pinch marks, and

8    you will hear evidence what appears to be bruising so

9    severe that you can see the hand marks on the legs and

10   where the leg was squeezed.  You're going to hear evidence

11   that the child as a result of blows, had a ruptured spine,

12   that the child had bruised kidneys, that the child had

13   bruised lungs.  There is evidence that some of the

14   injuries are consistent with suffocation.  You are going

15   to hear evidence that what caused this child to die was

16   the massive blow to the cranial area.  That caused

17   hemorrhaging of the brain, and bleeding of the brain.  And

18   as a result of that blow, the doctor identifies clearly as

19   having something of great force to have caused those

20   injuries, and the child's death.  The evidence is going to

21   show that this was a cold, bloody, brutal murder.  That

22   the person who committed the act knew the differences

23   between right and wrong, committed the acts with

24   knowledge, and caused this child to die as a result of her

25   actions.

1    And I believe that when the trial is

2    concluded the only reasonable verdict in this case is

3    being guilty of capital murder of a child under the age of

4    six as charged in the indictment.

5    MR. GILMAN:  Good morning, ladies and

6    gentlemen.  As Mr. Padilla said, what we are saying to you

7    right now is not evidence.  This is our kind of a summary

8    of what we think the evidence is going to show.

9    Melissa Lucio has 14 children born to her.

10   Melissa Elizabeth Lucio was first married to Guadalupe

11   Lucio and had five children.  She later separated from

12   Mr. Lucio and hooked up with Mr. Alvarez -- or Robert

13   Alvarez.

14   Robert Alvarez and Melissa Lucio had a

15   number of children after that.  Rene was born February 9,

16   2007, Richard was born in January of '78 -- of '98.

17   Robert was born in October of '99, Gabriel was born in

18   November 2000.  And Adriana was born in June of '02, Sara

19   was born in June of '03, and Mariah was born in September

20   of '04.  At the time that Mariah was born she was born at

21   home.  And, I guess maybe a woman who has had as many

22   babies as my client, maybe it's easier for her to have

23   babies there, but they didn't get to the hospital on time.

24   She was taken to the hospital soon after the birth, by an

25   ambulance.  Melissa was removed from the hospital before

1    the baby because of complications of the umbilical cord.

2              Child Protective Services stepped in.

3    Child Protective Services had known of Melissa Lucio and

4    her children for sometime before that.  You're going to

5    hear testimony that Child Protective Services removed all

6    of the children -- even the oldest one that were a product

7    of Guadalupe Lucio.  Those children were sent off to their

8    biological father, Mr. Lucio, in Houston, Texas.

9              You're going to hear testimony that the

10   children that are the product of Robert Alvarez were all

11   turned over to foster care.  Where there's numerous

12   problems.

13             You're going to hear testimony that Melissa

14   Lucio is a mother that had very little or no money.

15   Extremely poor.  You're going to hear testimony that at

16   one time in their life they were homeless, and lived in a

17   park.

18             You're going to hear testimony that these

19   people did the best they could with what little they had.

20   When Mariah was born, she and Melissa Lucio, never

21   relatively got together very much because the Child

22   Protective Services took her, and she was raised by foster

23   care for the first two or three years of her life.

24   Melissa Lucio -- there is going to be evidence -- that

25   Melissa Lucio was testing positive for cocaine.  And she

1   tested positive for, done by Child Protective Services, up

2   until February of '06.

3                   In November of '06, Child Protective

4   Services came and put all of the children with Melissa

5   Lucio, and washed their hands and walked away.

6                   You're going to hear testimony that Child

7   Protective Services came back one time after that to check

8   on the children, although, Child Protective Services was

9   the managing conservative of all of the children, and

10  their job was to protect the children as managing

11  conservators and their job was also to take care of the

12  medical children of all of the children.

13                  You're going to hear testimony that my

14  client is not up for "Mother Of The Year."  You're going

15  to hear testimony that my client isn't a good mother.

16  She's not.  I'm not going to stand up here and tell you

17  that she's a "Mother Teresa" or the greatest mother in the

18  world.  My client is guilty of injury to a child.  She is

19  guilty of injury to a child because she didn't get medical

20  attention to that child, Mariah, and she passed away.

21                  My client is not guilty of beating her

22  child to death.  My client, Melissa Lucio, is not guilty

23  of murdering her child.  She loved her and wanted to take

24  care of her, and she was in constant fear that Child

25  Protective Services would take her away.

1          You're going to hear testimony that Mariah

2      fell down a flight of stairs.  She fell down a flight of

3      stairs on a Thursday, and she died slowly two days

4      afterwards.   There was bleeding in the brain, and a

5      hemorrhage in this brain, and two days later, she passed

6      away.

7          You're going to hear testimony that this

8      family was then taken.  They were -- it was a Saturday,

9      and Melissa Lucio was awaken at 6:00 o'clock in the

10     morning to try and feed her children and to take care of

11     them for the day.  Mariah didn't wake up.  Melissa Lucio

12     was taken down to the police station.  Melissa Lucio

13     talked to the police, and you will probably see a video of

14     Melissa Lucio talking to the police.  You're going to see

15     that Melissa Lucio -- and the evidence is going to show --

16     that Melissa Lucio is a battered woman and has all of the

17     classic symptoms of a battered woman.  Melissa Lucio is

18     going to say in her statement things that were not

19     necessarily true, but she'll say things to please people.

20         Evidence is going to be shown that this

21     child died from a brain hemorrhage.  This is a

22     circumstantial evidence case that the State is trying to

23     present to you on whether there was a beating, a throwing

24     by hitting this child.  We submit to you, that the

25     evidence will show that this child fell from the stairway,

1    down to the floor, and down to the ground.  Not inside of

2    the house.  Not inside of the carpet.  But from the

3    outside, of a two story building.

4              This child was injured, but she was also

5    injured by other members of the family.  Stop and think.

6    This child is one of 12.  Stop and think what it would be

7    like to feed 12 children at any given meal.  The evidence

8    is going to show that it takes more than a loaf of bread

9    just to feed the family for lunch.

10             The evidence is going to show that Child

11   Protective Services did not do everything they could for

12   these children, and for Melissa Lucio.  And it's

13   unfortunate that this child fell downstairs.  It's

14   unfortunate that Melissa Lucio didn't see, or know that

15   this child was injured as badly as it was.  But Melissa

16   Lucio did not act on how badly she was hurt, or to get her

17   to a medical doctor.  My client is guilty of injury to a

18   child.  Thank you, Your Honor.

19             THE COURT:  Gentlemen?  More people have

20   come into the courtroom.  I just want to verify whether or

21   not there are any witnesses in the courtroom as the rule

22   on witnesses has been invoked.

23             MR. PADILLA:  No, Your Honor.

24             THE COURT:  Call your first witness.

25             MR. PADILLA:  Jaime Palafox.

23

```
 1                    MR. GILMAN:  Again, the rule is invoked,

 2    Judge?

 3                    THE COURT:  Yes, sir.

 4                    MR. PADILLA:  The witness is not available.

 5                    We would call Rebecca Cruz that will be

 6    called in secondly.

 7                    THE COURT:  Mr. Krippel, I am assuming that

 8    you are going to go get her?

 9                    MR. KRIPPEL:  That's what I do, Your Honor.

10                    MR. PADILLA:  Just to inform the Court

11    Mr. Palafox's father just passed away, I believe last

12    week.  But we will have him here shortly.

13                    THE COURT:  At the beginning we always have

14    some hiccups -- or some things that go wrong.  I trust

15    things will go smoother.

16                    MR. PADILLA:  I trust --

17                    THE BAILIFF:  He is not present, Your

18    Honor.

19                    THE COURT:  What about Rebecca Cruz?

20                    THE BAILIFF:  She's here.

21                    THE COURT:  Bring her in.

22                    MR. PADILLA:  She is the case agent, Your

23    Honor.  Will she be allowed to remain?

24                    THE COURT:  Pardon me?

25                    MR. PADILLA:  She's the case agent.  Will
```

1    she be allowed to remain after she testifies?

2                    THE COURT:  Mrs. Cruz?  Please take the

3    witness before sitting down, I'm going to ask you to raise

4    your right hand.  Is that telephone off?

5                    THE WITNESS:  It's off.

6                    THE COURT:  Okay.  Sit down, and make

7    yourself comfortable.  Proceed, Mr. Padilla.

8                         **REBECCA CRUZ,**

9      having been first duly sworn, testified as follows:

10                    **DIRECT EXAMINATION**

11   **BY MR. PADILLA:**

12       Q    Would you please state your name for the record?

13       A    It's Rebecca Cruz.

14       Q    Would you move the microphone to the front so

15   that we can hear you?

16       A    Rebecca Cruz, sir.

17       Q    Yes, ma'am.  And how are you employed?

18       A    I am employed with the Harlingen Police

19   Department.

20       Q    And are you a certified police officer?

21       A    Yes, sir, I am.

22       Q    How long have you been a certified police

23   officer?

24       A    Ah, seven years.  That's approximately.

25       Q    What is your classification right now?

25

```
 1   Detective?
 2        A     Yes.  Crimes against children.
 3        Q     How long have you been classified as a
 4   detective?
 5        A     Since October of 2003.
 6        Q     As a detective can you tell the jury what your
 7   responsibilities are?
 8        A     As an -- as detective pretty much crimes against
 9   persons.  Not only children, but sometimes adult cases
10   also.  It depends.  I investigate a variety of crimes
11   against persons.
12        Q     And were you the case agent assigned on the
13   Mariah Alvarez case?
14        A     Yes, I was.
15        Q     And do you recall more or less when was the
16   first time that you had any contact on that case?
17        A     Contact?  Pretty much right after the incident
18   the other day.
19        Q     That was on February 21, 2007, is that correct?
20        A     That's correct.
21        Q     Were you phoned immediately after?
22        A     I was off duty and I was called in.  Yes, sir.
23        Q     And from -- you had an opportunity to review
24   your report, correct, that you prepared in this case?
25        A     Yes.  I did.  As a matter of fact, if I can --
```

1      Q   Well, we'll go with question and answer, and you

2   can advise us of such.  But -- and I said February 21.  I

3   think it was February 17, 2007.  That was when you were

4   first called into the case, is that correct?

5      A   I believe so.

6      Q   How were you advised that you needed to -- you

7   know -- assist in the case?

8      A   I received a phone call from, I believe it was a

9   Sergeant Turner, that told me --

10           MR. GILMAN:  Your Honor, I object to

11   anything that he may have told them.  It might have been

12   hearsay.

13           THE COURT:  Sustained.

14           MR. PADILLA:  No problem, Your Honor.

15      Q   (By Mr. Padilla) As a result of the phone call,

16   what did you do, if anything?

17      A   I went directly back to the station and I was to

18   wait until the persons that were involved were brought

19   into the station to take statements.

20      Q   Okay.  And did you yourself have an opportunity

21   at all to go to the residence where the child was found?

22      A   I did not.

23      Q   As a result, then, who -- what did you do next

24   after you were stationed at the police station?

25      A   Once at the police station, I waited.  The whole

1   family showed up.  I called Child Protective Services

2   because I was aware that there was going to be a large

3   amount of children that were going to be coming in.  And

4   when we saw the family come in, we saw the mother and the

5   father and I waited to call -- called for more detectives

6   so we could have -- so we could sort out who was going to

7   interview the home first.

8       Q    Okay.  And did you have an opportunity, then, to

9   interview any of the parties involved in the case?

10      A    I did.  I started the interview for Melissa

11  Lucio.

12      Q    Okay.  And at the time that she came in, what

13  was her condition?

14      A    Her condition?

15      Q    What was her emotional condition?

16      A    It was -- it was relieved -- there was no

17  emotion.  No emotion.

18      Q    At the inception, was she crying because her

19  child had died, or, was she saying anything?  Let me ask

20  you this, the first time that she came in at the station,

21  was she a suspect, or was she just a witness?

22      A    She was a witness.  We were monitoring

23  everybody.

24      Q    Okay.  So you were interviewing her first as a

25  witness to the death of the child, correct?

28

```
 1        A     Correct.
 2        Q     At what point did she stop being a witness and
 3   started becoming a suspect?
 4        A     At the point when her story kept changing
 5   over -- within the beginning of her statement.
 6        Q     At some point, then, did you feel like you
 7   needed to Mirandize her?
 8        A     She was Mirandized.  Yes, she needed to be
 9   Mirandized.
10        Q     Can you explain to the jury what a Miranda
11   warning is?
12        A     Pretty much-reading somebody their right, giving
13   them the opportunity to seek counsel if they want to
14   proceed with the interview.
15        Q     Okay.  So you also tell them that they have the
16   right to remain silent?
17        A     Yes, sir.
18        Q     Anything they say --
19              THE WITNESS:  Your Honor, I object.  These
20   are all leading questions.
21              THE COURT:  It is preliminary.  I will
22   sustain the objection.  Just have her go through the
23   Miranda warnings.
24        Q     So at some point she becomes a suspect in the
25   case and you Mirandized her, is that correct?
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

1      A     Yes, sir.

2      Q     As a result of the Miranda warnings, did you ask

3  her to -- do you explain to her what the Miranda warnings

4  are?

5      A     Yes, I do.  I asked her to, pretty much, to let

6  me know what she doesn't understand.

7      Q     Okay.

8      A     I can repeat that and explain that.

9              MR. PADILLA:  May I approach the witness,

10 Your Honor?

11             THE COURT:  Yes, sir.

12     Q     (By Mr. Padilla) Ma'am, I will show you what

13 will be marked as State's Exhibit No. 1.  Are you familiar

14 with this document?

15     A     Yes, I am.

16     Q     The original is in your file, is that correct?

17     A     Yes, sir.

18     Q     And this is a copy of the Miranda warnings

19 statement, is that correct?

20     A     That's correct.

21             MR. PADILLA:  At this time I offer State's

22 Exhibit No. 1.

23

24             THE COURT:  Any objections?

25             MR. GILMAN:  No, sir.

```
 1              THE COURT:  It is admitted.
 2          (State's Exhibit Number 1 admitted)
 3          MR. PADILLA:  Thank you.
 4     Q    (By Mr. Padilla) Now, can you -- I draw your
 5  attention to State's Exhibit No. 1, and can you tell the
 6  jury what the Miranda warning consists of?
 7     A    The Miranda warning consists of -- it is pretty
 8  much advising a person -- it's four statements giving the
 9  person in question the opportunity to understand pretty
10  much what -- that they're being interviewed.
11              Number one, says:  "You have the right to
12  have a lawyer present to advise you prior to and during
13  any questioning," and allowing them to get an attorney if
14  they don't want to speak.  And if they agree to that, they
15  initial to the left of the number.  And then after that
16  you proceed because they initial that they understand.
17              Two:  Gives them the right to employ a
18  lawyer.  They have the right to have one appointed to them
19  if they can't afford it.  Once that is read to them, if
20  they understand, you ask them to initial to the left of
21  the number which she did.
22              Number three, "will give the individual the
23  opportunity not to speak.  And if they do decide to speak,
24  anything that they say can and may be used in evidence
25  against them at a trial.  That also is explained to them
```

1   and they initial that they understand that.

2                   And number four says, "You have the right

3   to terminate the interview at any time.  And you initial

4   to the left of the number if you understand that.  Just

5   understanding them does not mean they need to speak with

6   us.  So after that, Melissa Lucio signed a waiver at the

7   bottom printing out her name.

8                   And then it says here, "I have been advised

9   of my constitutional rights by," and she writes my name

10  down, and she dates and puts the time.  At that point is

11  when you can decide, I want to speak to this detective, or

12  do not.  And she proceeded with the interview.  And did

13  not say that she didn't want to be interviewed in any way.

14      Q    And the record reflects that at 9:53 p.m. she

15  signed a waiver, correct?

16      A    Correct.

17      Q    Who is the witness who witnessed her signature,

18  if you can read it?

19      A    "Mike Salinas."

20                   MR. PADILLA:  May I publish this to the

21  jury, Your Honor?

22                   THE COURT:  Yes, sir.

23      Q    (By Mr. Padilla) Now, Ms. Cruz, at any time that

24  you were interviewing her after she submitted and signed a

25  waiver, did she ever advise you that she wanted to

32

exercise any of her rights where she just waived what is
identified as State's Exhibit No. 1?

    A    No, sir.

    Q    And at some point, then, you started
interviewing her, is that correct?

    A    That's correct.

    Q    Who else is present during the interview?

    A    A Detective Michael Salinas was sitting in there
when I started.

    Q    Any other detective involved?

    A    Yes.

    Q    Who was that?

    A    After -- after that interview, I began the
interview, and then Detective Banda also interviewed her.
And then we also had another investigator,
J. M. Villarreal, my partner.  He interviewed him.  He
also was present.  And subsequently, she ended up getting
interviewed by Texas Ranger Escalon.

    Q    From the point that the interview first started
when she was read the Miranda warnings, did she give an
oral statement to you?

    A    Yes, she did.

    Q    And she also was continued to give an oral
statement to Detective Salinas and also to Detective
Villarreal?

33

1      A    Yes.  I stepped out, once, I think in the middle
2  of her statement with Detective Salinas is when I stepped
3  out.
4      Q    Did you learn from any other officers whether
5  she had ever invoked her rights to remain silent -- where
6  she had ever invoked her waiver of the statement?
7      A    No, sir.
8      Q    Okay.  How long a period of time did the
9  interview take place?  Over what period of time?
10     A    I want to say approximately five and a half to
11 six hours.
12     Q    Did you have a video camera that allowed you to
13 record the statement?
14     A    Yes, sir.
15     Q    Was the video camera operative?
16     A    Yes, sir.
17     Q    And was it operating properly?
18     A    Yes, sir.
19     Q    Did you have an opportunity to see the video
20 statement after you concluded that statement?
21     A    Yes, sir.
22     Q    Okay.  And did the camera record the statement
23 in its entirety?
24     A    Yes, sir.
25     Q    Now there were times on the video statement,

1  that there was a break in the recording.  Is that correct?

2      A    At one point there was.

3      Q    Was there anything unusual, or extraordinary

4  that happened during the time that there was a camera

5  break?

6      A    Not that I am aware of.

7      Q    At some point, then, she proceeds to conclude

8  her statement, correct?

9      A    Yes, sir.

10      Q    After she does her statement, what do you do

11  then?

12      A    After she provides her statement?

13      Q    Yes, ma'am.  Do you continue your investigation?

14      A    Yes, sir.

15      Q    What do you do in your investigation?  What, if

16  anything, do you do?

17      A    During the investigation -- well, there was so

18  many things happening at the same time.  I mean, I had a

19  CPS worker that was at the opposite end of the office

20  speaking with all of the children.  I would go and see

21  what the children were telling her.  And then we got the

22  addresses of the home, the two residences.  I believe the

23  Lucio family was moving out from one residence to another

24  one.  So I got those residences also so we could-- you

25  know -- work up the search warrant, and to find out what

1    happened, and where, because of the inconsistencies, and

2    at that point --

3         Q    Were the inconsistencies coming from what

4    Mrs. Lucio was telling you?  Was it coming from what other

5    witnesses were telling you?  What inconsistencies are you

6    talking about?

7         A    The inconsistencies as to how this child

8    sustained these injuries.  The story changed.  At that

9    point, it wasn't one of those -- it changed.  So we knew

10   that more happened, more than what was known.  So at that

11   point that's why we continued to look at every aspect --

12        Q    Did you personally have an opportunity to see

13   the child or not?

14        A    Only -- before the interview?

15        Q    Before or after the interview?

16        A    I showed up at the autopsy the next day.

17        Q    I'm sorry?

18        A    The only time I saw the child -- well, I saw

19   photos at that time, and I did show up to the autopsy.

20        Q    To the autopsy?

21             THE COURT:  Mrs. Cruz?  I am going to ask

22   you to speak into the mike please.

23             THE WITNESS:  Okay.

24        Q    (By Mr. Padilla) So were you there -- at the

25   autopsy?

```
1        A     Yes, sir.

2        Q     So you were there from the time that the child

3    was first taken into the autopsy room, is that correct?

4        A     Yes, sir.

5        Q     Let me show you a photograph and ask you if you

6    can identify this photograph?

7        A     Yes, sir.

8        Q     And who is that?

9        A     That is Mariah Alvarez.

10             MR. PADILLA:  At this time, Your Honor, I'm

11   going to offer State's Exhibit No. 2.

12             MR. GILMAN:  Proper predicate has not been

13   laid, Judge, in reference to Number Two.

14             THE COURT:  Ladies and gentlemen of the

15   jury, I am going to ask you to step outside for just a

16   minute, if you would.  It's legal arguments.  It won't be

17   very long.

18                (Jury left the courtroom 10:09 a.m.)

19                    VOIR DIRE EXAMINATION

20   BY MR. GILMAN:

21             MR. GILMAN:  Are you going to allow me to

22   take her on voir dire?

23

24             THE COURT:  Sure.

25        Q     (By Mr. Gilman) Did you take this picture,
```

37

|   |   |   |
|---|---|---|
| 1 | | ma'am? |
| 2 | A | No, sir. |
| 3 | Q | Was this picture taken by somebody else? |
| 4 | A | Yes, sir. |
| 5 | Q | Who took that picture? |
| 6 | A | That particular picture, I'm not aware of it, is |

7  the Child Adult and Abuse Response Team, at the Valley

8  Baptist Medical Center.  Or, it could have been our

9  Investigator, Tim Flores.

10              MR. GILMAN:  I'm going to object at this

11  time to entering this picture, Your Honor.  It was a

12  picture taken by someone else.

13              MR. PADILLA:  Through this witness, I have

14  laid the proper predicate.  Obviously, she was there.

15  And, you know --

16              THE COURT:  The issue is that --

17              MR. PADILLA:  I can ask her if she was

18  present during the time those pictures were taken.  I can

19  ask her that.

20              THE COURT:  Yeah.

21              MR. PADILLA:  Judge, I probably had an

22  understanding that we were going to allow these to come in

23  evidence.  These were taken by the physician, but she was

24  present.  I didn't think this was going to be an issue,

25  but I will be happy to lay the proper predicate.

38

1          MR. GILMAN:  I mean, I'm not making

2     anything an issue, Judge.  The thing is, I don't want to

3     jump from Point A to Z in a couple of seconds.  I mean,

4     let's take them in orderly fashion.  I wasn't expecting

5     them to bring in this picture, at this particular time.

6          MR. PADILLA:  This is the only picture I

7     intend to offer through this witness -- that I intend to

8     offer through this witness.

9          THE COURT:  Is that at the time of this

10    autopsy?

11         MR. PADILLA:  Yes, sir.

12         THE COURT:  Was this witness there?

13         MR. PADILLA:  Yes, sir.  I mean, I can ask

14    her to lay the predicate.

15         THE COURT:  Well, I think you need to lay

16    the predicate.

17         MR. PADILLA:  Yeah, I'll be glad to.  But I

18    didn't think it was going to be an issue.  But if it's

19    going to be an issue, then I'll lay the ground further.

20    If that's going to be the issue, I will lay the proper

21    predicate.

22         THE BAILIFF:  One of the jurors took a

23    break in the restroom.

24         THE COURT:  Oh, okay.  She saw her at the

25    autopsy?

1          (speaking to a bailiff Mr. Cisneros?)   Give

2     the lady her phone back.   Call in Rebecca Cruz.   Judge

3     bring them in, bring her back in.

4                **(Jury present at 10:13 a.m.)**

5               THE COURT:   Please be seated.   Ladies and

6     gentlemen of the jury, this is going to happen quite a bit

7     during the trial.   First of all, you should not concern

8     yourselves with the objections.   You should not concern

9     yourselves with what my rulings are on this matter.   You

10    are supposed to be making your decision only on the

11    evidence that is admitted.   So please don't let these

12    interruptions influence you one way or the other.   It was

13    a legal issue that I needed to take up.

14               Mr. Padilla, please proceed.

15               MR. PADILLA:   Thank you very much.

16      Q    (By Mr. Padilla) Mrs. Cruz, again, drawing your

17    attention, again, to State's Exhibit No. 2, the photograph

18    that you said was of the child Mariah Alvarez.   Correct?

19      A    That's correct.

20      Q    To your knowledge the City of Harlingen

21    Investigation Team was taking photographs at the autopsy,

22    is that correct?

23      A    That's correct.

24      Q    Okay.   And this picture truly and accurately

25    portrays what it intends to depict was the child Mariah

40

```
 1    Alvarez, is that correct?

 2         A    Yes.

 3         Q    It was taken by someone within your department.

 4    Is that correct?

 5         A    Yes, sir.

 6              MR. PADILLA:  At this time I will reoffer

 7    State's Exhibit No. 2.

 8              MR. GILMAN:  Go ahead.

 9              (State's Exhibit Number 2 admitted)

10              THE COURT:  It's admitted.

11              MR. PADILLA:  May I publish it to the jury?

12              THE COURT:  Yes, sir.

13         Q    (By Mr. Padilla) Now did you get an opportunity

14    to observe the autopsy?

15         A    Yes, sir.

16         Q    Was Norma Jean Farley the pathologist in charge

17    of the autopsy?

18         A    Yes, sir.

19         Q    How long did the autopsy take, more or less?

20         A    Not quite an hour; about 45 minutes,

21    approximately.

22         Q    And after the autopsy, what, if anything, did

23    you do?

24         A    Pretty much all I did was just document -- just

25    document what I could.  I took some photos.
```

1    Q    Uh-huh.

2    A    That's pretty much what I did, and then I waited

3  for the autopsy report to submit it with the case file.

4    Q    And, did you yourself have an opportunity to

5  speak to Doctor Farley concerning the autopsy or not?

6    A    Yes, I did speak to her about it.

7    Q    After that -- after the autopsy, what did you

8  personally do?  Did you leave the scene?  Did you go

9  somewhere?  What did you do in reference to the case?

10   A    I'm looking at the offense report (Reviewing).

11  Okay, the autopsy had, let me see (Reviewing).  Pretty

12  much after the autopsy, I did a follow up with Child

13  Protective Services to see if the children had made any

14  outcries of physical abuse.

15   Q    And after that, did you participate in the

16  arraignment of the defendant at all?

17   A    Yes, I went with -- let me see.  The arraignment

18  was to be held -- it was held in -- in the Cameron County

19  Olimito jail.  That's where the arraignment took place.

20  Myself and Detective J. M. Villarreal, we did go standby

21  for her arraignment.

22   Q    And what was Melissa Lucio charged with?

23   A    Elizabeth Lucio was charged with capital murder,

24  after it was brought to my attention -- after she had

25  spoken with DPS Ranger Escalon.

42

1      Q     After she was arraigned, did the judge post a

2   bond, or set a bond for her?

3      A     Her bond was set at two million dollars.

4      Q     Okay.  Do you see Melissa Elizabeth Lucio that

5   was arraigned that day and charged with capital murder

6   here in the courtroom?  Is she here in the courtroom?

7      A     Yes, sir, I do.

8      Q     Can you point her out?

9      A     She's the lady wearing the stripe shirt, to my

10  left.

11               MR. PADILLA:  I ask that the record reflect

12  she has identified the defendant, Your Honor.

13               THE COURT:  The record will reflect that

14  she has identified the defendant.

15     Q     (By Mr. Padilla) Now, was anybody else charged

16  pertaining to this case?

17     A     Her husband, Robert Antonio Alvarez was charged.

18     Q     And what was he charged with?

19     A     With injury to a child by omission.

20     Q     So he was charged with the fact that he didn't

21  intervene on behalf of the child.  Is that what it was

22  tantamount to be?

23     A     That's correct.

24     Q     And what was his bond set at?

25     A     His bond was set at one million dollars.

43

1     Q     After the defendant was arraigned, what action,
2     if any, did you take?
3     A     Started to follow up with the previous addresses
4     where they proceeded to talk to -- pretty much to see if
5     anybody had witnessed, or seen anything, and started --
6     Q     Did you investigate an allegation that the child
7     had fallen on some steps?
8     A     Yes, sir.
9     Q     And where was that at?
10    A     There were two residences.  There was an
11    apartment on 117 West Lee.  And then there was another
12    address -- let me see -- 214 East Madison, Number 9.
13    There was inconsistencies -- we wanted to pretty much see
14    the area because, apparently, that was the initial story
15    that the child had fallen.
16    Q     Did you find anything of significance, any blood
17    matter, or anything, that would have indicated to you that
18    somebody had fallen and injured themselves on those steps?
19    A     No, sir.
20    Q     Did you have an opportunity to go inside the
21    house where the people were residing on Madison?
22    A     Yes.
23    Q     What was the condition of the house?
24    A     The condition of the house on Madison -- she was
25    moving out.  So when I went in there, mostly it was --

44

1    mostly vacant.

2         Q    Did you have an opportunity, then, when you went

3    to 117 West Lee, Apartment 8, did you have an opportunity

4    to go inside the house?

5         A    Yes, sir.

6         Q    What, if anything, significant, did you find

7    inside of the house?

8         A    I found -- inside of that home, there was no

9    furniture in the living room.  It was, I remember there

10   was one mattress on one of the bedroom floors.  I know

11   that there was what appeared to be drug paraphernalia that

12   was in the bedroom.  I don't know whose bedroom it was.

13   The one with the mattresses.  It looked like it wasn't

14   settled in.  It was consistent with Mrs. Lucio's story

15   that they were moving.  They were moving.  So, there was a

16   lot of clothes.  It wasn't really settled.  It didn't

17   really look like anybody was settled into this home.

18        Q    Did you attempt to get search warrants on this

19   case?

20        A    Yes.  Before we searched, there was a search

21   warrant for both apartments and that was before we went to

22   -- before I went to go and --

23        Q    And who issued those search warrants?

24        A    The search warrants would have been --

25   (Reviewing)    Judge Migdalia Lopez issued them on

45

1    February 18.

2         Q    And did you execute those search warrants?

3         A    Yes, sir.

4         Q    Did you find anything of significance in this

5    case pursuant to those warrants?

6         A    There were seven warrants issued.  On each one,

7    I would have to go one by one to see what was taken.

8         Q    Can you tell us -- all seven -- what was the

9    statement at the police department or where was it located

10   at that time?

11        A    The first warrant was for Melissa.

12             MR. GILMAN:  I object, Your Honor.  There

13   are -- seven warrants?

14             THE COURT:  That's what she said.

15             MR. GILMAN:  Are we going to introduce

16   those warrants, and is she is going to show what each one

17   -- what we are talking about, or what?

18             THE COURT:  I don't know.

19             MR. GILMAN:  Well, I'm going to object to

20   her just talking about warrants, where we don't even see

21   what the warrant is, or what she's looking for or anything

22   like that.

23             MR. PADILLA:  I think she was asked, "what

24   those warrants were, and what they were attempting to

25   find.  So that's obviously what we're leading to.

46

1            THE COURT:  I'm going to overrule the

2    objection.

3        Q     (By Mr. Padilla) Seven warrants were issued.

4    Did you yourself execute those warrants or somebody else?

5        A     Myself and Ranger Escalon, both did.

6        Q     Did you find anything significant at either

7    residence or on the person of Melissa Elizabeth Lucio,

8    pertaining to the warrants?

9        A     Let me look through my notes.  Pretty much what

10   we did was the search warrant because of those steps,

11   photos -- measurements of the stairs.

12       Q     Nothing significant about this?

13       A     Significant?  No, sir.

14       Q     Now let's get back to the issue of the video

15   statement that was made.  You previously testified that,

16   Mrs. Lucio waived her Miranda warnings.  Have you had an

17   opportunity to look at the videotape, and can you identify

18   all of the voices on the video?

19       A     In the video where she was being interviewed?

20       Q     Yes.

21       A     Mostly.

22       Q     Well, you interviewed her.  Whose actual voices

23   appear on the tape?

24       A     Well it's J. N. Salinas -- Detective J. M.

25   Salinas, Detective J. M. Villarreal, Detective Jesus

Adelaido Flores, Jr.
Certified Shorthand Reporter

47

1    Banda, and Ranger Escalon.  His voice is on there.

2        Q    And, yourself?

3        A    And myself.

4        Q    Okay.  And, again, you previously identified the

5    video you say that the items -- nothing has been added or

6    deleted to that video.  Correct?

7        A    That's correct.

8        Q    Up until the time the statement terminates, the

9    witness, the declarant, is then asked, that she is

10   invoking her right to remain silent.  Correct?

11       A    That's correct.

12       Q    Did you threaten her to make the statements?

13       A    No.

14       Q    Did you keep food from her, or water, if she

15   wanted it?

16       A    It was available to her if she wanted it.

17       Q    As a matter of fact, at one time she asked for a

18   cigarette, and you all -- she stepped out and smoked a

19   cigarette, is that correct?

20       A    Yes, sir.

21       Q    Were you threatening her?  Were you telling her

22   that she needed to make a statement?  Or was she making

23   the statement of her own volition?

24       A    No, sir.  She wasn't threatened in any way.

25       Q    So, in your opinion, as a law enforcement

48

1     officer you felt that that statement was voluntary.   Is

2     that correct?

3           A     That's correct.

4           Q     Now, the original video was taken on what they

5     call a mini DVD, is that correct?

6           A     That's correct.

7           Q     And you transferred them to three DVDs, is that

8     correct?

9           A     That's not correct.   Our evidence specialist --

10          Q     The evidence technician did that?

11          A     -- he did that.

12          Q     You had the opportunity to review the tapes, and

13    to your knowledge, they represent an exact copy of your

14    original.   Correct?

15          A     That's correct.

16                MR. PADILLA:   Your Honor, we previously

17    tendered a copy to defense.   We are offering State's

18    Exhibit No. 3, which is entitled statement of Melissa

19    Lucio Disk 1, State's Exhibit No. 4 which is styled

20    Melissa Lucio Disk 2, and State's Exhibit No. 5, which is

21    styled Melissa Number Three, Your Honor.

22                MR. GILMAN:   I'm going to object to these

23    coming in because they don't comply with the statute.

24                THE COURT:   Ladies and gentlemen again, we

25    have another legal argument that I need to take up.   Let's

49

1    just take a ten minute break at this time.  And -- is

2    there coffee ready?

3                    THE BAILIFF:  There is.

4                    THE COURT:  Grab a cup of coffee.

5                    **(Jury not present at 10:27 a.m.)**

6                    MR. GILMAN:  Under 3822.

7                    THE COURT:  How is it not relevant?

8                    MR. GILMAN:  Well, 3822 requires all voices

9    on the recording be identified, and they're not.  There

10   are people that are walking in and out.  People are

11   yelling things, talking -- and they're not identified.

12   They are not even shown -- some of them.  And -- according

13   to -- 3822, they got to be -- it's got to be in

14   compliance.

15                   THE COURT:  It's got to be what, sir?

16                   MR. GILMAN:  It's got to be in compliance.

17   This is an interrogation type of video.

18                   MR. PADILLA:  Your Honor --

19                   THE COURT:  So the issue is whether or not

20   the voices and the recording are identified?

21                   MR. PADILLA:  She has identified the

22   voices.

23                   THE COURT:  And she's testified that she

24   has -- is able to identify the voices.

25                   MR. GILMAN:  I believe she did not say that

1   Your Honor.  I think she said she could identify "most".

2   She did not use the word "all".  And I don't believe it's

3   up to her to identify them.  I think it has got to be

4   identifiable to whomever is doing that video.

5                 THE COURT:  I understand.  But my main

6   concern is whether or not the recording in and of itself

7   shows that it's voluntary.  After it's voluntary, then the

8   other concern is whether or not the voices can be

9   identified.  Whether they are included within the copy of

10  the statement, or not, is a separate issue.  So, I'm going

11  to look at the first part of the recording with regard to

12  the voluntariness of it --

13                 MR. PADILLA:  Yes, sir.

14                 THE COURT:  -- and then set it up.

15                 MR. GILMAN:  It's going to take longer than

16  that, Judge, because at the beginning, Officer Cruz starts

17  talking.  And then later on, other people are coming in,

18  and yelling.  Other times, other officers --

19                 THE COURT:  My concern --

20                 MR. GILMAN:  The second tape is Escalon.

21                 THE COURT:  My concern is whether or not

22  it's voluntary, first of all.  That's my first cut of it.

23  And then the issue as to whether or not the voice can be

24  identified.  The only way to determine that is within the

25  body of the video itself, or through Mrs. Cruz's

51

1   testimony.

2                   So I'm going to take a short break while

3   you all set that up.

4                   **(Recess from 10:29 a.m. to 10:36 a.m..).**

5                   **(Jury not present; defendant present.)**

6                   THE COURT:   In Cause Number 07-CR-885-B,

7   the State of Texas versus Melissa Elizabeth Lucio.   Let

8   the record reflect that before the jury was sworn in

9   Mrs. Lucio was present along with her two attorneys and

10  the State is being represented by Joe Krippel, Al Padilla

11  and Maria De Ford.   We are all now coming back from the

12  break.   They got the video set up.   Proceed.

13                  (Videotape Played with Officer Cruz

14  interviewing the defendant and stopped at 10:37 a.m.)

15                  THE COURT:   Put it on pause, just a minute.

16  Mrs. Cruz there was a voice there.   Can you identify that

17  voice?

18                  THE WITNESS:   That's Detective J. M.

19  Salinas.

20                  THE COURT:   Okay.   And as we proceed

21  throughout the interview, you will be able to identify

22  each and every voice?

23                  THE WITNESS:   Your Honor, I misconstrued

24  the question, when I said "mostly."   I thought I was going

25  to have to name every individual officer right then and

1    there.   That's what I misconstrued.   I thought I was going

2    to have to name each and every individual officer that was

3    there in this sequence.

4                    THE COURT:   The question is:   Can you

5    identify every voice, Mrs. Cruz?

6                    THE WITNESS:   Yes.

7                    THE COURT:   Okay.   Thank you.   Proceed.

8                    (Video 1 Continues to Play and paused at .

9    10:40 a.m.)

10                   THE COURT:   Mr. Padilla, would you stop it

11   please?

12                   It appears to me that she understood her

13   rights, and that it was voluntary.   So, unless you have

14   any evidence to show any duress, or anything like that,

15   I'm going to allow it to be played to the jury.

16                   MR. GILMAN:   All right.   Note my exception.

17   Even though I don't think it's in compliance with the

18   statute.

19                   THE COURT:   I understand, sir.

20                   All right.   Put it back to the beginning.

21                   MR. KRIPPEL:   That's fine, Your Honor, I

22   just wanted to find out --

23                   THE COURT:   Put it back to the beginning.

24   Rewind to the beginning.

25                   Mr. Padilla that's with the caveat that

1    Mrs. Cruz will be able to identify each and every witness.

2              MR. PADILLA:  Yes, sir.  Does the State

3    want us to stop it when there's a new person coming in?

4              THE COURT:  My suggestion is that it would

5    be proper forum for you to pause it, and to identify the

6    people, so there's no question.

7              MR. PADILLA:  Thank you, Your Honor.

8              THE COURT:  Are you all ready?

9              MR. PADILLA:  Yes, Your Honor.

10             THE COURT:  (Speaking with the technician)

11   And you're probably going to have to stay there and

12   continue to pause it.

13             THE TECHNICIAN:  Yes, sir.

14             THE COURT:  Because I know at the very

15   beginning, we have a voice and we have someone that needs

16   to be identified.  Okay?  Bring the jury back in.

17             **(Jury present, defendant present at 10:42**

18             **a.m.)**

19             THE COURT:  Please be seated.

20             MR. PADILLA:  Your Honor, at this time, we

21   would offer State's Exhibit Nos. 3, Four and Five which

22   are the three DVD tapes of the statement of Mrs. Lucio.

23             MR. GILMAN:  And I would ask that my

24   objection be noted, Judge.

25             THE COURT:  Your objection is noted,

```
1    counsel.  They're admitted.

2              (State's Exhibit Number 3-5 admitted)

3              MR. GILMAN:  And if the Court is going to

4    hear these three CDs, I'm going to have a running

5    objection throughout the entire time.

6              THE COURT:  Your running objection is

7    granted, sir.

8              MR. PADILLA:  May I proceed from the

9    beginning, Your Honor?

10             MR. CORDOVA:  Your Honor may I move to the

11   other side?

12             THE COURT:  Yes, sir, you may.  Proceed.

13             (State's Exhibit No. 3 was played, and

14   paused at 10:44 a.m.)

15             THE COURT:  Okay.  That's Detective Cruz.

16   If they are self-identified within the tape, keep on

17   going.

18             (State's Exhibit No. 3 continued to play

19   and paused at 11:48 a.m.)

20             MR. PADILLA:  Can you pause it please?

21   Q     Detective Cruz, who is the officer that walked

22   into the door?

23   A     That is Detective Frank Ralph.

24   Q     And does he interview the defendant or not?

25   A     I believe he was speaking with her husband in --
```

1    at a different section of the department.

2         Q    But he himself does not interrogate the

3    defendant, correct?

4         A    No, sir.

5         Q    He was just there for the position?  He was just

6    there with respect to dropping off some pictures?

7         A    That's correct.

8              THE COURT:  Proceed.

9              **(State's Exhibit No. 3 continued to be**

10   **played at 11:49 a.m. until 12:01 p.m. when it was paused)**

11             THE COURT:  Put it on pause, please.

12             MR. PADILLA:  Can you pause it?

13        Q    Detective Cruz, who walked into the room?

14        A    I just stepped in, and then I stepped out.

15        Q    So that was you opening the door, walking in and

16   then walking out?

17        A    Yes.

18             THE COURT:  How much longer is it on this

19   CD?

20             MR. PADILLA:  Judge, I'd say about ten

21   minutes.

22             THE COURT:  Okay.  Let's finish this one

23   up, and then we'll break for lunch.

24             **(State's Exhibit No. 3 was continued to be**

25   **played, until it was paused, where defendant was left**

1    **alone, as she laid her head on the table for approximately**

2    **fifteen minutes.   Tape was paused at 12:15 a.m.)**

3               THE COURT:  Any way to fast forward this?

4               MR. PADILLA:  I don't know what the

5    defendant's position is on that.

6               MR. GILMAN:  No, sir.  You wanted to see

7    this tape, and you're going to see it!  I don't think it

8    should be edited.

9               THE COURT:  No, I don't think it should be

10   edited.  But I think we can fast forward, as long as we

11   can see the vivid.  Nothing else is happening.  I think --

12              MR. GILMAN:  We don't know if any other

13   person in the Harlingen Police Department is going to peek

14   their head in and say something else that we won't be able

15   to hear.

16              THE COURT:  Ladies and gentlemen, we're

17   going to go ahead and pause it, and we're going to go

18   ahead and take a break for lunch.  We obviously don't know

19   how much longer it's going to be.

20              MR. PADILLA:  Judge, for the record, it's

21   goes a lot faster when you're doing something else.  I've

22   seen it about four or five different times.  If you're

23   doing something else, it seems like it goes a lot faster.

24              THE COURT:  Yeah -- but this is all we're

25   doing.

1              Come back at a quarter till two.  Normally,

2      we break from 12:00 to 1:30.  Come back at a quarter till

3      2:00, and we'll be ready to start a little bit earlier if

4      possible.  As soon as you get here, we'll be ready to go.

5              All rise for the jury.

6              **(Recess from 12:16 till 1:44 p.m..)**

7              **(Jury not present.)**

8              THE COURT:  You may be seated.  We're

9      missing two jurors.  But my understanding, Mr. Gilman, you

10     wanted to make something on the record?

11             MR. GILMAN:  Yes, sir.

12             THE COURT:  Okay.  Hold on.  Where is

13     Mr. Padilla?

14             MRS. DE FORD:  He should be on his way,

15     back, Judge.  If not, he's probably downstairs.

16             MR. KRIPPEL:  We're playing the video

17     still, are we not?  Or, is there a legal issue that needs

18     to be taken up?

19             THE COURT:  Apparently.  I don't know what

20     it is, but we'll find out.  What is the nature of the

21     record you want to make?

22             MR. GILMAN:  Judge, it has come to my

23     attention in talking to our court reporter --

24             THE COURT:  Yes, sir.

25             MR. GILMAN:  -- that he is not taking any

1  of this down from the video.

2  　　　　　THE COURT:  He is having a difficult time,

3  making the transcription.  So what he is going to do, is

4  attach a copy of the videotape and write down "Video

5  Played".

6  　　　　　MR. GILMAN:  Okay.

7  　　　　　THE COURT:  For the purposes of perfecting

8  the record.

9  　　　　　MR. GILMAN:  Because it's going to get

10  worse.  Because when we get to the second video.  I

11  mean --

12  　　　　　THE COURT:  (Interruption held off the

13  record in reference to a bailiff)

14  　　　　　THE BAILIFF:  I'm sorry.

15  　　　　　MR. GILMAN:  The second disk that we are

16  going to do, there is an officer who is testifying,

17  interrogating my client that is in a very -- it's in a

18  whisper.  And it's very, very difficult to understand or

19  hear.

20  　　　　　THE COURT:  Is there any way to raise the

21  volume?

22  　　　　　MR. PADILLA:  No, Your Honor.  I mean

23  unless we get another set of speakers -- we can add two

24  speakers to it.  But in and of itself, they all ask for a

25  tech person, to see if we can get it.  We might have to

59

```
 1   add bigger speakers than this one to see if we can get it.
 2              MR. GILMAN:  And further, as evidenced this
 3   morning of what we've witnessed so far, there are
 4   statements in Spanish that were never translated.  And,
 5   this court reporter is -- even though he may know or may
 6   not know what is said, he is not in a position to
 7   transcribe, or to translate what anything is said in any
 8   kind of foreign language.
 9              MR. PADILLA:  May I interject?  I think
10   some of the CPS people have arrived.
11              THE COURT:  Anybody who is a potential
12   witness in this case, the rule on witnesses has been
13   invoked.  I'm going to ask that you wait outside.  Anybody
14   who is not a witness in the case, is more than welcome to
15   stay.
16              MS. SMITH:  Well, nobody in here has been
17   subpoenaed.
18              THE COURT:  Okay.  Good enough.
19              MR. KRIPPEL:  Your Honor, they are all
20   witnesses, so they do need to leave.
21              THE COURT:  Are you saying that there is a
22   potentiality that you're going to call them as a witness?
23              MR. KRIPPEL:  Everyone of them has a
24   potential that they're going to be called.
25              THE COURT:  Including the regional counsel?
```

60

1           MR. KRIPPEL:  Well, Your Honor --

2           THE COURT:  I'm asking.

3           MR. KRIPPEL:  I don't know, Your Honor.  I

4   don't imagine any reason why the regional counsel would be

5   called.

6           THE COURT:  The brush of a "potential

7   witness" paints too broadly.  Be a little bit more

8   specific, please.

9           MR. KRIPPEL:  I am just making the Court

10  aware.

11          THE COURT:  Okay.  I will ask everybody to

12  step outside except for the regional counsel.  Mrs. Smith?

13  You have any personal knowledge of this case, do you?

14          MS. SMITH:  Only from what I've been

15  talking to my clients about.

16          THE COURT:  Do you any personal knowledge

17  of the facts of this case?

18          MS. SMITH:  Personal knowledge?  No.

19          THE COURT:  Thank you.  You may be seated.

20  Everybody else, please wait outside.

21          Okay.  Where were we?

22          MR. PADILLA:  Mr. Gilman was addressing the

23  Court.

24          THE COURT:  With regard to the Spanish, I

25  think you were going to reply.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1      MR. PADILLA:  Judge, there are some, but

2  very minimal, Judge.

3      THE COURT:  The phrases I've heard is

4  "living room" and "kitchen," and she used them

5  interchangeably, and then almost translates them herself.

6  Other than that, they're minimal.

7      MR. GILMAN:  The Court needs to know or

8  remember that the people "up north" at the Court of

9  Criminal Of Appeals are not Spanish speaking.  And to have

10  a good record, this video should have been transcribed

11  prior to coming here, and it's not.

12      MR. PADILLA:  Your Honor, we still have an

13  opportunity to transcribe.  We can provide a transcribed

14  copy from the record.

15      THE COURT:  Have you already done that?

16      MR. PADILLA:  No, but I can do it, Judge.

17      THE COURT:  And, what you may want to do,

18  is to have a certified copy of the translations?

19      MR. PADILLA:  Yes, sir.

20      THE COURT:  -- insertions by a translator.

21  You don't have a lot of that.

22      MR. PADILLA:  Correct.  I don't think there

23  is going to be more than that.  I know it's very minimal.

24  We're coming up to Ranger Escalon.  That's all in English.

25  I don't remember there being any Spanish being used.  I

1     can have it transcribed, and have a copy to counsel.  And

2     if the Judge thinks it's necessary to present it to the

3     jury, we will provide that transcribed copy to the jury.

4              THE COURT:  I think Mr. Gilman makes a

5     valid point with regard to the record.  But other than

6     that, anything else, sir?

7              MR. GILMAN:  Yes, sir.  I have not heard

8     it, but I have heard from others that the statement Robert

9     made has exculpatory information on it.

10             THE COURT:  Mr. Alvarez, you mean?

11             MR. GILMAN:  That's correct, Robert

12    Alvarez.

13             THE COURT:  Yes, sir.

14             MR. GILMAN:  That the statement that he

15    made has some exculpatory matters on there that should

16    have been given to me, and has not been given to me.  And,

17    although, I have not reviewed that, I would like to have

18    that statement so I can at least review it.

19             MR. PADILLA:  Your Honor?  From our

20    recollection I have not read it as early as last Friday.

21    There is no exculpatory evidence on that.

22             THE COURT:  Produce it for in-camera

23    inspection.

24             MR. PADILLA:  Thank you.

25             MR. GILMAN:  Not the written statement, but

1    the individual statement.

2                THE COURT:  Produce both for in-camera

3    inspection.

4                MR. PADILLA:  Thank you.

5                Is that it Mr. Gilman?

6                MR. GILMAN:  I believe that's it.

7                THE COURT:  What I'll do, I'm going to --

8    if there is anything that is potentially Brady material, I

9    will make it available to you.  All right?

10               MR. PADILLA:  Judge, the other matter I

11   have is Doctor Vargas who is here today, I was thinking of

12   taking him out of order because he needs to be in Midland

13   tomorrow, Judge.  He was the emergency room treating

14   physician.  I don't anticipate being very long with him,

15   Judge.  I am just trying --

16               THE COURT:  You're the one that started the

17   videotape.  How does it fit in?

18               MR. PADILLA:  Well, Judge, he is going to

19   testify as to the child.  We still got about four hours of

20   video left.  So it's going to use up the rest of the day.

21   But he will be available tomorrow, if we don't get to him

22   today, but he has to be in Midland tomorrow.  My

23   anticipation is to call him out of order and allow me to

24   put him on to give that evidence.

25               THE COURT:  You knew he was going to

1    testify.  He was on your list of witnesses.

2              MR. GILMAN:  This is the emergency room

3    doctor?

4              THE COURT:  Yes.

5              MR. GILMAN:  Yes.

6              THE COURT:  So there was no surprise?

7              MR. GILMAN:  I knew he was going to

8    testify.

9              THE COURT:  Okay.

10             MR. PADILLA:  I would suggest, maybe, if we

11   can finish the first tape, and allow me to put Doctor

12   Vargas on.  If not then he'll have to come in Tuesday.

13             THE COURT:  Do you have any objections?

14             MR. GILMAN:  No.

15             MR. PADILLA:  Or we can put him on now --

16             THE COURT:  No, no.  I want to at least

17   conclude one -- just finish that, before we put on the

18   other one.  After we conclude with the first one, you can

19   put on Doctor Vargas, and then you can start your second

20   one.

21             MR. PADILLA:  Thank you, Your Honor.

22             THE COURT:  (Speaking to the technician)

23   If there is a way to -- where we have a tremendously long

24   periods where nothing is said and if we can just fast

25   forward those, maybe at double speed, with sound, that way

65

```
 1    we know when sound is being done.

 2                Is that possible?

 3                THE TECHNICIAN:  It won't play sound during

 4    fast forward.

 5                THE COURT:  Well -- no.  Then we need the

 6    sound.

 7                MRS. DE FORD:  I believe this video is the

 8    only one that has those pauses.  There is maybe about ten

 9    more minutes of this video left and the last two videos do

10    not.

11                THE COURT:  I heard that 15 minutes ago,

12    Mrs. De Ford.

13                MRS. DE FORD:  But this is me saying it.

14                MR. PADILLA:  But that's Maria saying it,

15    Judge.  So you know it's true.

16                THE COURT:  It has more credibility.

17                MR. PADILLA:  I hear you.  (Laughing)

18                THE BAILIFF:  They're here, Judge.

19                THE COURT:  All the jurors are here?  Are

20    you ready?

21                MR. PADILLA:  We're ready, Your Honor.

22                THE COURT:  Where is Mrs. Cruz?  Where is

23    your witness, Mr. Padilla?

24                MR. PADILLA:  She should be available.  She

25    should have been here earlier.
```

1           THE COURT:  It's your case, Mr. Padilla.

2    Coordinate your witnesses.

3           MR. PADILLA:  Yes, sir.  She's out in the

4    hallway, Judge.

5           **(Discussion off the record at the bench.)**

6           THE COURT:  Call the jury back in.

7           **(Jury present at 1:54 p.m.)**

8           THE COURT:  Cause Number 07-CR-885-B State

9    of Texas versus Melissa Elizabeth Lucio, we're back after

10   the lunch break.  Let the record reflect that the

11   defendant is present along with her two attorneys,

12   Mr. Gilman and Mr. Cordova.  The State is being

13   represented by Mrs. De Ford and Mr. Padilla.  Proceed.

14   Just a minute.

15          We're going to finish the videotape then

16   we're going to take one witness out of turn.  And then

17   they want to do Tape Two.  Okay?  Just so you know what is

18   going on.

19          **(State's Exhibit No. 3, the videotape, was**

20   **played at 1:58 p.m. and was paused at 2:03 p.m.)**

21          THE COURT:  Mr. Padilla?

22          MR. PADILLA:  Can we stop that?

23      Q   Detective Cruz, who is the gentleman that just

24   walked in?

25      A   That was Detective J. M. Villarreal.

```
 1        Q     He was also one of the individuals that
 2   questioned Mrs. Lucio in this matter?
 3        A     That is correct.
 4        Q     He was in the process of sitting down, and had a
 5   clipboard in his hand.  Is that correct?
 6        A     That's correct.
 7                  MR. PADILLA:  Okay.  Go ahead.
 8                  (State's Exhibit No. 3 was continued to be
 9   played, and paused.  Some CPS people came in at
10   approximately 2:06 p.m, Video continued, and paused at
11   2:11 p.m.)
12                  MR. GILMAN:  Is there something wrong with
13   this machine, Judge?
14                  THE COURT:  Just bear with it until the end
15   of this.
16                  (Videotape continued to be played at
17   2:12 p.m till 2:15 p.m. )
18                  THE COURT:  Pause, it please.  The voice
19   was that of Detective Salinas as he walked in?
20                  MR. GILMAN:  Is that the Court's finding?
21                  THE COURT:  No.  I saw him walk in.  I saw
22   him walk in on the videotape, and he had been identified
23   previously.
24        Q     (By Mr. Padilla) Detective Cruz?  Can you
25   identify the person-- can you identify the voice of the
```

1    person that just walked in right now?

2         A    That's Detective J. M. Salinas.

3                   **(State's Exhibit No. 3 was continued to be**

4    **played and paused at 2:26 p.m.)**

5                   MR. GILMAN:  Another statement from another

6    person, Your Honor, that has not identified.

7                   THE COURT:  Detective Salinas was

8    identified earlier.  Go ahead and pause it.

9                   MR. GILMAN:  I don't know if it's the same

10   J. M. Salinas.

11                  MR. PADILLA:  May I proceed, Your Honor?

12                  THE COURT:  Yes.

13        Q    (By Mr. Padilla) The voice of the individual

14   that is speaking out, who is that?

15        A    That's Detective Salinas.

16        Q    He was a witness that was previously identified

17   as being present and also questioned previously, correct?

18        A    That's correct.

19                  **(State's Exhibit No. 3 was continued to be**

20   **played at 2:27 p.m. till its conclusion)**

21                  THE COURT:  Is that the end of the first

22   tape?

23                  MR. PADILLA:  That concludes the first

24   portion of the videos, Your Honor.

25                  At this time, Your Honor we ask leave of

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    the Court to take a witness out of turn prior to viewing

2    exhibits State's Exhibit Nos. 4 and 5.  Dr. Vargas has to

3    be in Midland tomorrow.

4                   THE COURT:  Any objections, Mr. Gilman?

5                   MR. GILMAN:  No, sir.

6                   THE COURT:  Detective Cruz, would you

7    please step down?

8                   MR. PADILLA:  We call Dr. Vargas.

9                   **(Witness enters the courtroom)**

10                  THE COURT:  Doctor Vargas, before sitting

11   down would you please raise your right hand.

12                  **(Witness Sworn in By The Court.)**

13                  **ALFREDO VARGAS, M.D.,**

14      having been first duly sworn, testified as follows:

15                  **DIRECT EXAMINATION**

16   BY MR. PADILLA:

17      Q    Good afternoon, sir.  Would you please tell --

18   state your name for the record?  Your name, please?

19      A    Alfredo Vargas.

20      Q    Doctor Vargas, what is your profession?

21      A    I'm the emergency room doctor.

22      Q    And how long have you been an emergency room

23   doctor?

24      A    This is my 30th year.

25      Q    And where did you receive your medical training?

70

```
1        A    At the University of Texas in San Antonio

2   Medical School there.

3                    THE COURT:  Can you raise your voice just a

4   little bit, Doctor Vargas please?

5                    THE WITNESS:  Yes, sir.

6        Q    (By Mr. Padilla) Has your practice been mostly

7   in the field of medicine?

8        A    It's always been in medicine.

9        Q    And you are licensed by the State of Texas?

10       A    Yes, sir.

11       Q    And you are licensed by law to practice

12  medicine, is that correct?

13       A    Yes.

14       Q    And presently where do you practice medicine?

15       A    Valley Baptist Emergency Hospital there.

16       Q    And were you practicing emergency medicine back

17  on February 17, 2007?

18       A    Yes.

19       Q    Did you have an opportunity at any time, sir,

20  that evening, or during that day, to meet a child by the

21  name of Mariah Alvarez?

22       A    Yes.  She came in by EMS.

23       Q    And what were the circumstances surrounding

24  that?

25       A    We received a call that a pediatric in full
```

1    arrest was on the way in.  They had been doing CPR which

2    is cardiac pulmonary resuscitation for at least 25

3    minutes, and they were on there way in, so we prepared for

4    her.

5         Q    When she arrived what, if anything, did you do,

6    sir?

7         A    I saw a small child unresponsiveness, looking

8    dehydrated with multiple bruises all over her body.  There

9    were various stages of healing.  Some were recent, some

10   were older, and some were almost gone.  But various stages

11   of healing -- and it was -- it was unforgettable.

12        Q    Did you make an effort to resuscitate the child?

13        A    We gave her Epinephrine through the vein that

14   had been established by EMS, and she had no rhythm at all

15   in her cardiac monitor.

16        Q    Was the subject then declared dead?

17        A    Yes.

18        Q    And this incident, of what you know happened,

19   was in Cameron County, Texas?  Is that correct?

20        A    Yes.

21        Q    And you are a treating physician here in Cameron

22   County, Texas?

23        A    Yes.

24        Q    Sir, I'm going to draw your attention to several

25   photographs that have been identified for purposes of your

1    review as State's Exhibit No. 6, State's Exhibit No. 7,

2    State's Exhibit No. 8, State's Exhibit No.  9, State's

3    Exhibit No. 10, and State's Exhibit No. 11, sir.

4         A    Yes.

5         Q    Are you familiar with the person in these

6    photographs?

7         A    Yes.

8         Q    And does the picture accurately portray the

9    scene as to when those photographs were taken?

10        A    Yes.

11        Q    Now the photographs contain certain tracheal

12   tubes and other items that are attached to the child.  Is

13   that as a result of an effort to try to resuscitate the

14   child?

15        A    Yes.

16                   MR. PADILLA:  At this time, I offer 7

17   through 11.

18                   MR. GILMAN:  You mean, Six through 11?

19                   MR. PADILLA:  Six through 11.

20                   THE COURT:  Any objections, Mr. Gilman?

21                   MR. GILMAN:  No, sir.

22                   THE COURT:  All right.  They will be

23   admitted.

24              **(State's Exhibit Number 6-11 admitted)**

25        Q    (By Mr. Padilla) Sir, I want to draw your

1  attention to State's Exhibit No. 8 and we usually use

2  projectors -- from the old school -- but I just want to

3  point out some things.  Now, Exhibit Number 8 is what,

4  sir.  Can you tell me, please?

5      A    This is a picture of the child's lower

6  extremities.  She has an identification bracelet.  She has

7  a right foot I.V. in place on the left leg.  She has a

8  saline interosseous line which is put directly into the

9  tibia -- one of the lower bones of the leg.  And it's

10  difficult to establish the line.  Otherwise, we would have

11  to give some more fluid, blood or whatever.

12             This is a method of getting into the

13  central circulation very easily.  You place the

14  interosseous needle into the bone, and -- or hookup the

15  I.V. or blood, or whatever, on each tibia.

16      Q    Now Exhibit Number Eight appears to be abrasions

17  and contusions, does it not?

18      A    Yes.

19             MR. PADILLA:  May I publish that to the

20  jury, Your Honor?

21             THE COURT:  Yes, sir.

22      Q    (BY MR. PADILLA)  I draw your attention now to

23  State's Exhibit Seven -- excuse me -- State's Exhibit Six

24  for the purpose of this hearing.  What does that show?

25      A    This shows -- it's like a couple of bite marks,

1    and multiple ecchymosis which is bruising scattered

2    throughout the back, the arms, the elbows and the

3    buttocks.

4         Q    And this is to the child Mariah Alvarez, is that

5    correct?

6         A    Sir?

7         Q    Is this to the child Mariah Alvarez?

8         A    Yes.

9              MR. PADILLA:  Your Honor, I would like to

10   publish these to the jury.

11        Q    (BY MR. PADILLA)  Sir, I would draw your

12   attention to Exhibit Number Seven.  Again, it shows that

13   the child has kind of a mechanical device attached to her

14   abdomen.  What is that for?

15        A    Those are the leads to determine if there is any

16   cardiac activity.

17        Q    And, again, the body shows numerous bruises and

18   contusions, is that correct?

19        A    Exactly.

20        Q    Again, I draw your attention, sir, to State's

21   Exhibit No. 9 which appears to be -- a picture of No. 7

22   but a side view.  That's the child Mariah Alvarez, and

23   there are bruises and contusions to her left side.  Is

24   that correct?

25        A    Yes, sir.  There are.

75

1       Q     Sir, I draw your attention to State's Exhibit

2   No. 10.   There's an item that stayed on the child's mouth.

3   What is that?

4       A     This is an endotracheal tube that goes directly

5   to the lungs.  And this is used to ventilate the patient.

6       Q     And, again, the patient does distinguish several

7   bruises, contusions, and also abrasions on the left side

8   of the face, is that correct?

9       A     Yes.  And some on the neck there.

10      Q     I draw your attention, sir, to Exhibit Number

11  11.  Again, is that the body of Mariah Alvarez as you

12  recall it?

13      A     Yes.

14      Q     And does it have certain abrasions and

15  contusions on it, and it also has the other tubes that

16  have been placed on her body in an effort to try to

17  resuscitate her, is that correct?

18      A     Correct.

19      Q     Doctor, after you were unable to resuscitate the

20  child, did you have an opportunity to make a physical

21  inspection of the child?

22      A     Yes.

23      Q     And what were you able to observe?

24      A     Well, the child was undressed.  The child was --

25  seemed to be small for her age.  She was dehydrated.  She

1   had signs of tenting, meaning -- when you pull up on the

2   skin like this, it tends to stay up like this, which is a

3   sign of dehydration as opposed to the skin -- when you do

4   this -- it will just go straight down.  That's on a well

5   hydrated person.  So she was well dehydrated, and just --

6   multiple bruises all over her.

7       Q    Did you make an inspection of her cranial area

8   at all?

9       A    Yes.  With my hands, and my visual.

10      Q    Were you able to find any type of contusion or

11  abrasion that would indicate to you a possible head

12  injury?

13      A    I could not see any sign of that.

14      Q    Normally when a person, or a child strikes their

15  head sufficiently to cause some injury, what do you

16  normally see on the exterior -- of the head?

17      A    We see children that have fallen and hit their

18  head almost every single day in the emergency room.  And

19  usually there is some sign -- either a small bruise, small

20  swelling, or large hematoma which is a collection of blood

21  underneath the skull.  Sometimes lacerations.  But usually

22  there is something there, depending on severity -- and it

23  depends on what shows up.

24      Q    Now other than the child having multiple

25  abrasions and contusions and other injuries, you did not

1    observe any injury to the cranial area to say that the
2    child had suffered a fall or an injury, as a result of a
3    fall, did you?
4         A    No.
5         Q    Normally when a person falls and hits their head
6    on the ground, what happens to the brain -- the inside of
7    the brain?
8         A    The brain is floating in cerebral spinal fluid
9    -- what we call CSF.  The brain is always floating inside
10   the skull.  And, let's say, the head falls and hits the
11   ground, the brain will continue going and hit itself
12   against the side of the skull.  And -- of course it floats
13   there.  So that's some protection for the brain.
14        Q    Now you're not a pathologist.  Is that correct?
15        A    No.
16        Q    Normally, sir, in a head injury where you see
17   multiple hematoma, and multiple brain injuries or blood,
18   what is that indicative to you as a medical doctor?
19        A    On the outside, you mean?
20        Q    On the inside?
21        A    On the inside?  If -- nowadays we use Cat Scans
22   for the head, and we can see fresh blood in there.  But,
23   usually, when the brain is hit hard enough, it will
24   actually bruise the brain.  And just like you see -- you
25   know -- like when you fall down and bruise your skin, this

78

1    is actually what you see when you remove the skull and

2    look at the brain.  It's black and blue.  So, depending

3    upon the severity, it can be fairly severe, barely

4    noticeable, and sometimes you can see blood collection

5    inside.  But again, depending upon the severity of the

6    injury.  But the brain floats.  And that's an attempt to

7    just protect the brain.  But you can develop multiple

8    bruises inside -- or on top of the brain.

9        Q    Is it possible, sir, to cause brain injuries by

10   striking a child -- let's say a two year old child -- with

11   your hand?

12       A    Yes.

13       Q    Is it possible to cause brain injuries to a

14   child if you throw a child against the wall?

15       A    Yes.

16       Q    Is it possible to create brain injury to a child

17   by shaking him severely?

18       A    Yes.

19       Q    And, again, there is a term called, "Baby

20   Shaking Syndrome"?

21       A    "Shaking Baby Syndrome"?  Yes.

22       Q    That results from shaking the child so severely,

23   that the brain inside the skull does what?

24       A    It is shaken inside, also, and as it's being

25   shaken, it's hitting the skull.  So when the brain is

79

1    shaken really quickly like that, the brain is just moving

2    back and forth and getting hurt inside the skull.

3       Q    In the sense, I mean -- I know we don't have a

4    scale for severity, but was this child in your opinion

5    severely abused?

6       A    I have never seen anything in 30 years like

7    this.  I have never seen a child -- and I've seen many,

8    many children and adults also -- but this is the absolute

9    worst that I've ever seen.

10      Q    Doctor, this child -- does this child appear to

11   be under the age of six?

12      A    Yes.

13           MR. PADILLA:  I will pass the witness.

14                   **CROSS-EXAMINATION**

15   **BY MR. GILMAN:**

16      Q    Doctor Vargas, I got a couple of questions.  You

17   said here possible causes to brain injury, was shaking and

18   hitting, and whatnot.  Can a brain injury also be caused

19   by falling down the stairs?

20      A    Yes.

21      Q    You also said that you used Cat Scans.  Was a

22   Cat Scan used --

23      A    No.

24      Q    -- back in February of '07?

25      A    On the patient?

80

1       Q      Yes.

2       A      No.  The patient was dead already.

3       Q      So when you first got involved in this case,

4   there was absolutely no responsiveness that EMS ever

5   noticed before the child ever got to you?

6       A      Correct.

7       Q      Is that correct?

8       A      Correct.

9       Q      So this child was basically dead on arrival?

10      A      Correct.

11      Q      Was that your decision?

12      A      Yes.  It was -- the decision was made in the

13  emergency room, yes.

14      Q      And that decision has to be done by you, I'm

15  assuming?

16      A      Correct.

17      Q      And what time did you make such a decision?

18      A      Ah, it was -- I don't remember the time, but it

19  was somewhere around 7:30, or so, at night.

20      Q      Did you make a report?

21      A      The report to the police?

22      Q      Yes.

23      A      Yes, it was made.  I didn't make it, but it was

24  already made.  The police were there.

25      Q      And would it be on that report?

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
1        A    It usually is, yes.

2                 MR. GILMAN:  Can I have that report, Judge,

3   so that the Doctor can see it?

4                 MR. PADILLA:  Judge -- I don't remember

5   seeing a report from Doctor Alvarez.

6                 THE COURT:  From Doctor Vargas?

7                 THE WITNESS:  No, I didn't make the report.

8   But the report had been made to the Harlingen -- to the

9   police department -- and they were there already.

10                MR. PADILLA:  The report, I guess, was the

11  concern of the possible criminal offense?

12                THE WITNESS:  Yes.

13       Q    (By Mr. Gilman) So you made no report as far as

14  what you did in this particular case?

15       A    I didn't get a report.

16       Q    And your job as the emergency room doctor is to

17  try and resuscitate a person, or a child, when they come

18  in, such as this one.  Is that correct?

19       A    Yes.

20       Q    And you were unable to do that?

21       A    Correct.

22       Q    So you didn't do any other follow-up work after

23  that, after you made the determination that this body

24  could not be resuscitated?

25       A    No.
```

1      Q     There were no Cat Scans, no X-rays -- nothing?

2      A     There were some X-rays done, what is called, the

3    skeletal survey.  As part of the -- on any child, where

4    there is a question of abuse, we try to get a skeletal

5    survey as a baseline of what may have happened.

6      Q     Okay.  Were you able to determine the cause of

7    death?

8      A     No.

9      Q     Was there any bleeding from the ears, the nose,

10   the mouth, or anywhere around the head?

11     A     No.

12     Q     To your knowledge, was there any bleeding at the

13   -- when the child was recovered from EMS?

14     A     At the scene, you mean?

15     Q     Yes, sir.

16     A     I don't know.

17     Q     Okay.  Would they have reported that to you?

18     A     They usually do, yes.

19     Q     So if they didn't report it to you the chances

20   are there was no sign of blood or anything like that,

21   right?

22     A     I really cannot say that.

23     Q     Did you talk to the police about this case?

24     A     As far as like -- what happened?

25     Q     Yes.  Did you talk to them at any time?

1      A      Yes, they were there.   I remember speaking to

2  someone.   I don't know who.

3      Q      Was it a male or a female?

4      A      A male.

5      Q      A male?

6      A      Uh-huh.

7      Q      And the pictures that counsel showed you just a

8  few minutes ago that are being circulated to the jury, are

9  those pictures that you took, or are those pictures that

10  somebody else took?

11      A      These are pictures that are taken by what is

12  called the CAART people.   C-A-A-R-T (spelling by witness)

13  people which stands for "Child To Adult Abuse Response

14  Team".   And now we have that in place to where any trauma

15  -- or any patient that has sustained some sort of assault,

16  usually -- to try and document the injury and obtain a

17  report from the patient.   And this is called the CAART

18  Evaluation.   So they will have cameras and they will

19  document whatever injuries there are.

20      Q      And this was done after you finished with this

21  body, is that correct?

22      A      Yes.

23      Q      You indicated that there was bruising on the

24  body at different levels of healing?

25      A      Yes.

84

1      Q      Could you explain that.

2      A      A bruise is a sign of injury.  It usually will

3  begin when the blood vessels and -- these are very tiny

4  blood vessels, and they could be huge, too -- but most of

5  them when we look at a bruise there are very small vessels

6  inside of the skin.  When there is force applied to it

7  those vessels will bust open and bleed.  Since they can't

8  return to the central circulation, it just stays there.

9  So initially what you see is, you know, the black and blue

10  mark of a bruise.

11          As the body heals, it reabsorbs all of this

12  blood.  As it's reabsorbing the blood, it then changes

13  colors.  And this is a matter of days when a bruise is

14  completely reabsorbed.  So it will change from the initial

15  black and it will eventually turn just light blue, and

16  it'll turn greenish, and yellowish until it is barely

17  seen.  And then eventually, all of that blood will just be

18  completely reabsorbed by the body.  So this is how you can

19  tell where a bruise is recent or if it's happened in the

20  past several days.  And it's almost like a laceration

21  where initially it's open and bleeding, and all of this.

22  And once it starts healing, you will see a scab forming.

23  And, eventually, it will replace itself with skin or scar

24  tissue, so that you can determine the age of the wound

25  like the laceration.  Same thing with bruising.

1      Q      And this bruising, could you tell from looking

2   at this child when most of the bruising had taken place?

3      A      When most of the bruising had taken place?  I

4   cannot tell how many days.  No.  I can just tell that

5   there were different -- some were fresh, some were recent

6   and some were old.

7      Q      Would -- in all medical probability, sir, would

8   that be consistent, the bruising, consistent with falling

9   downstairs?

10     A      That bruising?  No.

11     Q      No?

12     A      From one fall from the stair?  No.

13     Q      Okay.  Are there parts of our body that bruise

14  more -- or differently than other parts of our body?

15     A      By "differently," do you mean --

16     Q      Others.  If I'm working on my yard and I get a

17  bruise on my arm, or my hand that bruises differently than

18  a bruise on my shoulder, or my leg.  Is that true with

19  everyone?

20     A      Well, depending upon the trauma involved.  It

21  depends on the trauma involved.

22     Q      Okay.  And then some people bruise easier than

23  others?

24     A      Some do.

25     Q      What is that a result of?

86

1    A    Well, it can be a result of -- a result of what

2    is called coagulopathy which is problem with clotting.  It

3    could be the result of different forces applied to the

4    body as part of the trauma.

5    Q    Did you do any tests on any of the bruising --

6    any blood type testing?

7    A    Blood typing?  No.

8                    MR. GILMAN:  Pass the witness.

9                    **REDIRECT EXAMINATION**

10   **BY MR. PADILLA:**

11   Q    Doctor, will a body contain a bruise after it's

12   dead?  If someone strikes a dead body, will it bruise?

13   A    The body will develop what is called lividity

14   and the blood -- let's say the body is faced up.  Some of

15   the blood will trickle down to the bottom.  So when you

16   turn the body over, it's all, confluently, a different

17   color.  But that's not a bruise; that's lividity.

18                    MR. PADILLA:  May I approach?

19                    THE COURT:  Yes.

20   Q    (By Mr. Padilla) Doctor of all of the bruising,

21   the contusions, and abrasions that you see on this child,

22   would any of these be attributable to the emergency

23   medical technicians attempt to revive the child?

24   A    I don't see a single area that would be

25   consistent with the results of resuscitation.

87

```
1        Q    So all of those injuries would have been there
2    prior to EMS getting involved, is that correct?
3        A    Correct.
4        Q    In your medical opinion?
5        A    Correct.
6             MR. PADILLA:  I will pass the witness, Your
7    Honor.
8             THE COURT:  Anything else?
9                      RECROSS-EXAMINATION
10   BY MR. GILMAN:
11       Q    Did you talk to Doctor Farley at all about this
12   case, Doctor?
13       A    No.
14            MR. GILMAN:  Thank you, sir.  Nothing
15   further.
16            THE COURT:  You may step down.
17            MR. PADILLA:  May the witness be excused?
18            THE COURT:  You may be excused.  Thank you
19   for coming.
20            (Witness excused at 3:30 p.m.)
21            THE COURT:  You may be excused, sir.
22            THE WITNESS:  Thank you, Your Honor.
23            THE COURT:  Call your next witness.
24            MR. PADILLA:  We would like to play the
25   video before the jury.
```

1              **REBECCA CRUZ, (RESUMED)**

2        having been first duly sworn, testified as follows:

3                   **DIRECT EXAMINATION**

4    **BY MR. PADILLA:**

5                   THE COURT:  Bring back Mrs. Cruz.

6                   MR. CORDOVA:  May I again go over there?

7                   MR. GILMAN:  My objection still stands?

8                   THE COURT:  You got a running objection,

9    Mr. Gilman.

10                   I remind you, Detective Cruz, that you are

11   still under oath.

12                   THE WITNESS:  Yes, Your Honor.

13                   THE COURT:  Well, you know what:  Let's do

14   this.  It's almost four o'clock.  Let's take a ten minute

15   break, and give you chance to get coffee and do whatever

16   you need to do, and give him a chance to set it up and

17   make sure it's working all right.

18                   MR. PADILLA:  We are going to switch

19   laptops.

20

21              **(Recess from 3:45 p.m. to 3:57 p.m.)**

22                   THE COURT:  Mr. Padilla, do you wish to lay

23   a predicate with the jury?

24                   MR. PADILLA:  Judge, I think that is

25   Exhibit No. 4.  The Court has already accepted it.  This

1   is the second portion of the video statement made by

2   Mrs. Lucio.

3                   MR. GILMAN:  May I ask --

4                   THE COURT:  Your objection is a running

5   objection.

6                   MR. GILMAN:  Right.  But is there a lapse

7   between Number Three and Number Four?

8                   MR. PADILLA:  Your Honor, I don't remember

9   whether there was testimony, or there wasn't.  But I'll

10  ask Mrs. Cruz.

11                  THE COURT:  Please do so.

12      Q    (By Mr. Padilla) Mrs. Cruz?  Have you had an

13  opportunity to view the exhibit -- which we are about to

14  view, which is the second portion of the statement -- was

15  there any lapse from the beginning of the first portion to

16  the second portion?

17      A    No, sir.  It was back to back.

18                  MR. PADILLA:  At this time we ask to play

19  that in front of the jury.

20                  THE COURT:  Just a minute, please. ladies

21  and gentlemen of the jury, there have been times that you

22  have gotten exhibits.  Some of those exhibits have been

23  somewhat shocking.  I remind you that you're not supposed

24  to be talking with each other about this case at all until

25  the last bit of evidence is in.  So please don't discuss

1    this and please pay attention to what's going on at the

2    moment, please.  Go ahead, sir.

3                    **(State's Exhibit No. 4 was played at 3:28**

4    **p.m., and paused at 3:40 p.m.)**

5        Q    (By Mr. Padilla) Detective Cruz, the man who

6    comes into the interview the hearing, he identifies

7    himself as Victor Escalon.  Who is that?

8        A    It's Texas Ranger Victor Escalon.

9        Q    Was he called in to assist in interviewing the

10   defendant?

11       A    Yes.

12                   MR. PADILLA:  May I proceed, Judge?

13                   **(State's Exhibit No. 4 was continued to be**

14   **played, till its conclusion at 4:58 p.m.)**

15                   THE COURT:  Can we have the lights please?

16                   MR. PADILLA:  That's the second portion of

17   the video.

18                   THE COURT:  Good stopping point.

19                   MR. PADILLA:  It looks like it.

20                   THE COURT:  Ladies and gentlemen we are

21   going to break for today.  We will start tomorrow morning

22   at 9:00 o'clock.  Before you leave, I remind you again,

23   you are not supposed to talk to anybody about this case,

24   not to each other, not to your wife, not even to your best

25   friends -- "comadres," "compadres" -- don't talk to

```
1    anybody about this case.  You are not supposed to start
2    discussing the case until the last bit of evidence is in,
3    you get the charge from the Court and you hear the
4    arguments from the attorneys.  Up to that point you are
5    not supposed to discuss this at all.  We will see you
6    tomorrow morning and start right at 9:00 o'clock.
7                    (Jury excused.)
8                    You need to give the DVDS to Mr. Padilla.
9    Although, they've already been admitted.  So they go to
10   the court reporter.
11                   Do we get off the record?
12                   MR. PADILLA:  Just, I would like to stay on
13   the record.
14                   THE COURT:  Okay.  We need to stay on the
15   record?  Okay.
16                   MR. PADILLA:  Pursuant to the Court's
17   request, I am tendering to the Court at this time the
18   voluntariness confession of Robert Antonio Alvarez for
19   inspection and I also have viewed the DVD, and I am also
20   trying to retrieve --
21                   THE COURT:  Okay.
22                   And I will go ahead and review it tomorrow.
23   We are now off the record.
24                   (Recess from 5:00 p.m. till July 1, 2009 at
25                    9:00 a.m.)
```

92

1    THE STATE OF TEXAS:

2    COUNTY OF HIDALGO:

3                    CERTIFICATE OF COURT REPORTER

4        I, ADELAIDO FLORES, JR, Official Court Reporter in

5    and for the 430th Judicial District Court of Hidalgo

6    County, State of Texas, do hereby certify that the above

7    and foregoing contains a true and correct transcription of

8    all portions of evidence and other proceedings requested

9    in writing by counsel for the parties to be included in

10   this volume of the Reporter's Record, in the

11   above-entitled and numbered cause, all of which occurred

12   in open court or in chambers and were reported by me.

13       I further certify that this Reporter's Record of the

14   proceedings truly and correctly reflects the exhibits, if

15   any, admitted by the respective parties.

16       WITNESS MY OFFICIAL HAND on this the 7th day of July,

17   2009.

18       _____
         ADELAIDO FLORES, JR., Texas CSR
19       Official Court Reporter
         430th District Court
20       111 SO. 9th Street
         Edinburg, Texas 78539
21       (956) 318-2900
         Certificate No. 1117
22       Expiration Date: 12/31/10

23

24

25

Adelaido Flores, Jr.
Certified Shorthand Reporter