*76020*

1

1    REPORTER'S RECORD

2    VOLUME 33 OF 44 VOLUMES

3    TRIAL COURT CAUSE NO. 07-CR-885-B

4  - - - - - - - - - - - - - x
   STATE OF TEXAS          :   IN THE DISTRICT COURT
5                          :
   VS                      :   138th JUDICIAL DISTRICT
6                          :
   MELISSA ELIZABETH LUCIO :   CAMERON COUNTY, TEXAS
7  - - - - - - - - - - - - - x

8

9    JURY TRIAL - DAY TWO

10

11       On the 1st day of July, 2008, the following

12   proceedings came on to be heard in the above-entitled and

13   numbered cause before the Honorable **Arturo C. Nelson**,

14   Judge Presiding, and a petit jury, held in Brownsville,

15   Cameron County, Texas.

16

17

18

19       Proceedings reported by computerized stenotype

20   machine.

**FILED IN**
**COURT OF CRIMINAL APPEALS**

AUG 06 2009

Louise Pearson, Clerk

ORIGINAL

21

22

23

24

25

Adelaido Flores, Jr.
Certified Shorthand Reporter

2

```
 1              A P P E A R A N C E S

 2    APPEARING FOR THE STATE:

 3         HON. ARMANDO VILLALOBOS
           State Bar No. 00788584
 4         Criminal District Attorney for Cameron County
           - AND -
 5         HON. ALFREDO PADILLA, JR.
           State Bar No. 15404600
 6         & HON. JOSEPH KRIPPEL
           State Bar No. 24007515
 7         & HON. MARIA DE FORD
           State Bar No. 24043626
 8         Assistants to the Criminal District Attorney
           Cameron County Courthouse
 9         974 E. Harrison Street
           Brownsville, Texas  78520
10         Telephone:  (956) 544-0849
           Fax:  (956) 544-0869 Fax
11

12    APPEARING FOR THE DEFENDANT:

13         HON. PETE GILMAN
           State Bar No. 07952500
14         6933 N. Expresway
           Olmito, Texas  78575
15         Telephone:  (956) 350-6954
           Fax:  (956) 350-8056
16

17    APPEARING FOR THE DEFENDANT:

18         HON. ADOLFO E. CORDOVA, JR.
           State Bar No. 00787286
19         Law Office of Adolfo E. Cordova, Jr.
           711 North Sam Houston
20         San Benito, Texas  78586
           Telephone:  (956) 399-1299
21         Fax:  (956) 399-4484

22

23

24

25
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
1                          VOLUME 33

2            CHRONOLOGICAL INDEX - JURY TRIAL - DAY 2

3     7/01/08                              PAGE    VOL

4

5     STATE'S WITNESSES:

6     NAME               DX    CX   RDX   RCX   VDX    VOL

7     Rebecca Cruz        4    16    47    54           33
      Jaime Palafox      63    71    72                 33
8     Robert Mendiola    74    78                       33
      Randall Nester     80    94                       33
9     David Mendoza      96                             33
      Victor Escalon    108   126   133   136           33
10    Victor Escalon                138                 33
      Javier Villarreal 143   155               151     33
11

12    Court Ex. 1 (to be sealed)                162     33

13    Joanne Estrada     163   178                       33

14    Adjournment                              197      33

15

16    Certificate of Court Reporter           198      33

17

18

19

20

21

22

23

24

25
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

1                     ALPHABETICAL WITNESS INDEX
                                                      VOIR
2      NAME                    DX    CX    RDX    RCX   DIRE    VOL

3      Cruz, Rebecca            4    16     47     54            33
       Escalon, Victor        108   126    133    136           33
4      Escalon, Victor                     138                  33
       Estrada, Joanne        163   178                         33
5      Mendiola, Robert        74    78                         33
       Mendoza, David          96                               33
6      Nester, Randall         80    94                         33
       Palafox, Jaime          63    71     72                  33
7      Villarreal, Javier     143   155                  151    33

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         Adelaido Flores, Jr.
                     Certified Shorthand Reporter

1

2                        **INDEX OF EXHIBITS**

3       **STATE'S EXHIBITS:**

4       NO.   DESCRIPTION              OFFERED    RECEIVED    VOL

5       12    Photo-Vehicle               9          9         33
        13    Photo-Madison Complex       9          9         33
6       14    Photo-Lee St. Apts.         9          9         33
        15    Photo-Coke can             11         11         33
7       16    Photo-Baking Soda          11         11         33
        17    Photo-Burnt Coke Can       11         11         33
8       18    Photo-Paraphernalia        11         11         33
        19    Photos-Family              14         14         33
9       20    Photos-Celebs. & Family    14         14         33

10                       **INDEX OF EXHIBITS**

11      **DEFENDANT'S EXHIBITS:**

12      NO.   DESCRIPTION              OFFERED    RECEIVED    VOL

13      1     Photo-Stairway             45         45         33
        2     Photo-Stairway             45         45         33
14      3     Photo-Stairway            133        133         33

15

16

17

18

19

20

21

22

23

24

25

3

```
1              P R O C E E D I N G S
2         (Defendant present; Jury not present.)
3              THE COURT:  You may be seated.  Thank you
4    very much.  Mr. Cordova gave us permission to start
5    without him.
6              I will now recall 07-CR-885-B State of
7    Texas versus Melissa Elizabeth Lucio.  Let the record
8    reflect that the defendant is present along with Honorable
9    Pete Gilman, the Honorable Maria De Ford and the Honorable
10   Al Padilla is here representing the State.  Bring the
11   jury, and let's get ready to resume, sir.
12             MR. PADILLA:  Yes, sir.  We're ready.
13             MR. GILMAN:  This is -- are you going to
14   introduce the next exhibit?
15             THE COURT:  When do you anticipate the
16   Alvarez DVD to be available, sir?
17             MR. PADILLA:  Sir, it should have been
18   available on Friday.  I had it on Friday.  I just can't
19   find it.  It was on my desk.  I will get it.  I know that
20   Mr. Stapleton has a copy of it, but I will ask him to
21   provide me a copy to make it available to you.
22             THE COURT:  He was just here.
23             MR. PADILLA:  I know.  I will have somebody
24   from my staff call him.
25             (Jury present 9:04 a.m.)
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

1          THE COURT:  Please be seated.  If we wait
2    for everybody to sit down before we all sit down, we're
3    going to be waiting a long time.  Thank you.  Please be
4    seated.  I am more about substance than style.  It's just
5    a matter of doing this expeditiously as possible.  Good
6    morning, how are y'all doing?
7          JURY MEMBERS:  Good morning.
8          THE COURT:  Are y'all ready to resume?
9    Again I remind you, if you need a break, make me a sign or
10   something and let me know.  Okay?
11         Mr. Padilla would you resume?
12         **REBECCA CRUZ,**
13   having been first duly sworn, testified as follows:
14         **DIRECT EXAMINATION**
15   **BY MR. PADILLA:**
16         MR. PADILLA:  Yes, Your Honor, at this time
17   we would ask to publish State's Exhibit No. 5 and we offer
18   into evidence, which is a continuation of the interview of
19   Mrs. Lucio, Your Honor.
20         THE COURT:  Yes, sir.
21         **(State's Exhibit No.  5 was played)**
22         MR. PADILLA:  Ms. Cruz, can you please
23   identify the individuals that are speaking on the camera?
24   A    Yes, sir.  That is Texas Ranger Victor Escalon
25   speaking with Detective J. M. Villarreal.

1     Q     And they are the same people from disk number

2   two?

3     A     That is correct.  They are setting up the

4   camera.

5             MR. GILMAN:  I still have a running

6   objection, do I not, Judge?

7             THE COURT:  Yes, you do.

8             MR. GILMAN:  Thank you.

9             **(State's Exhibit No. 5 was played in its**

10  **entirety til 9:21 a.m.)**

11            MR. GILMAN:  Are we through with this,

12  Judge?

13            THE COURT:  Pardon me?

14            MR. GILMAN:  Are we through with this?

15            MR. PADILLA:  No, Judge.  I'm going to use

16  the overhead projector for some of the photographs.

17            THE COURT:  Obviously, not.

18            MR. PADILLA:  We can slide it over, if it's

19  interfering with Mr. Gilman.  You want me to do that?

20            MR. GILMAN:  Yes, sir.

21            THE COURT:  I'm sorry.  Put it over there

22  please.

23            Proceed Mr. Padilla.

24     Q     Mrs. Cruz -- I'm going to draw your attention

25  back to the video that you've seen yesterday afternoon and

6

1    this morning, at the end of the second portion of the

2    video, which was where Escalon or Ranger Escalon is

3    talking to Mrs. Lucio.  At the end of the video, the

4    camera is turned away from her.  Do you recall that?

5         A     Yes, I do.

6         Q     What was the purpose of moving the camera away

7    from her?

8         A     We turned that camera off at that point so we

9    could collect the evidence that she had agreed to provide.

10        Q     And she had signed off a statement agreeing to

11   voluntarily give samples, is that correct?

12        A     Yes, sir.  A waiver.

13        Q     At that point when we see Ranger Escalon with

14   something that appears to be a tool box, does that have

15   the items in there to remove those samples.  Is that what

16   it's for?

17        A     Yes, sir.

18        Q     It's my understanding -- or what samples did you

19   retrieve from Mrs. Lucio?

20        A     I assisted Ranger Escalon in retrieving hair

21   samples and the nail clippings.

22        Q     Did you do any swabbings for DNA purposes or

23   anything of that nature, or not?

24        A     Yes, sir.  We did.

25        Q     And those samples have been -- I would assume

7

1    were submitted to the State, or to the district attorney's

2    office?

3         A    They were submitted to our crime lab.

4         Q    Was there anything significant from the hair

5    samples that the nail scrapings or any other evidence that

6    you collected on that date?

7         A    No, sir.

8         Q    Now you also did have an opportunity did you

9    not, later on to execute -- get search warrants for the

10   purposes of retrieving evidence.  Is that correct?

11        A    That's correct, sir.

12        Q    And when you retrieved the search warrants, do

13   you recall what the search warrants were for?

14        A    Yes.  There was a search warrant to search the

15   residence on 117 -- I believe it was -- let me look that

16   up.  The two residences, the one on Lee Street and then

17   the one on Madison Street.  And we got to ascertain the

18   search warrant for the vehicle that they had, and let me

19   look real quick.  (Reviews).

20             Okay.  The residence on 214 East Madison --

21   that's the residence that they were moving out of -- and a

22   search warrant for Melissa Lucio's dental mold

23   impressions.  The residence at 117 West Lee.  A search

24   warrant for Robert Alvarez, a search warrant for the

25   family vehicle, and a search warrant for Robert Alvarez's

```
 1    DNA, and one for Melissa's DNA as well.
 2        Q    Did you have an opportunity, then, to execute
 3    the warrant in an effort to retrieve evidence concerning
 4    this case?
 5        A    Yes, sir.
 6        Q    Let me draw your attention that I'm going to
 7    mark as State's Exhibit No. 12, Exhibit Number 13 and
 8    Exhibit Number 14 --
 9                 MR. PADILLA:  May I approach the witness?
10                 THE COURT:  Yes, sir.
11        Q    -- and ask you, if you are familiar with these
12    photographs, and do they truly and accurately portray of
13    what its attempting to depict thereon on the date that
14    those photographs were taken?
15                 THE COURT:  Twelve, 13 and 14?
16                 MR. PADILLA:  Yes, sir.
17                 THE WITNESS:  This photograph is a
18    photograph of the --
19        Q    First, can you identify them as representing the
20    items that you viewed for the purposes of executing your
21    warrant?
22        A    Yes.
23                 MR. PADILLA:  At this time I just want to
24    offer 12, 13 and 14, Your Honor.
25                 MR. GILMAN:  No objections, Your Honor.
```

9

```
 1              THE COURT:  It'll be received into
 2    evidence.
 3              (State's Exhibit Number 12-14 admitted)
 4       Q    Ma'am, State's Exhibit No. 12 is a picture of
 5    what?
 6       A    Of the family vehicle.
 7       Q    Were you able to attempt to locate any type of
 8    evidence inside of that vehicle?
 9       A    No, sir.
10       Q    Were you able to find any evidence in that
11    vehicle?
12       A    Actually this search warrant was served by Danny
13    Cortez and Randy Mitchell, and they did not find anything
14    in particular as far as the evidence.
15       Q    But to your knowledge, that is the vehicle that
16    was used by Mr. Alvarez and Mrs. Melissa Lucio; is that
17    correct?
18       A    Yes, sir.
19              MR. KRIPPEL:  I would like to publish 12,
20    Your Honor, to the jury.  May I publish it?
21              THE COURT:  Yes, sir.
22       Q    Now Exhibit 13, can you tell us what that's a
23    picture of?
24       A    This is a picture of the complex on Madison
25    Street.
```

```
 1        Q    Is that the resident that Mrs. Lucio testified
 2   that she was moving from?
 3        A    That's correct.
 4                  MR. PADILLA:  At this time I would like
 5   permission to publish Number 13 to the jury?
 6        Q    (By Mr. Padilla) Now Exhibit Number 14, what is
 7   that a picture of, ma'am?
 8        A    This is a picture of the complex that the
 9   defendant was moving into on Lee Street.
10        Q    That's 117 Lee, Apartment Eight?
11        A    Correct.
12        Q    And Apartment 8 is the one identified here with
13   an open door here in the middle of the picture?
14        A    With a light on, yes, sir.
15                  MR. PADILLA:  May I publish this to the
16   jury?
17                  THE COURT:  Yes, sir.
18        Q    There was some testimony -- there was some
19   testimony elicited during the interview that as a result
20   of your search warrant, you were able to retrieve certain
21   items that would be considered drug paraphernalia, did you
22   not?
23        A    That's correct.
24        Q    That was as a result of a warrant being issued
25   by a district judge giving you permission to go onto the
```

11

```
 1    premises to look for evidence.  Is that right?
 2         A    That's correct, sir.
 3                   MR. PADILLA:  May I approach the witness?
 4                   THE COURT:  Yes, sir.
 5         Q    (By Mr. Padilla) I draw your attention to
 6    Exhibit numbers 15, 16, 17 and 18, and I will just ask you
 7    if you are familiar with the photographs, and if they
 8    truly and accurately portray the scene as when the
 9    photographs were taken?
10         A    Yes, sir.
11                   MR. PADILLA:  At this time, Your Honor, I
12    want to offer 15, 16 17, and 18 into evidence.
13                   THE COURT:  Any objections, Mr. Gilman?
14                   MR. GILMAN:  No, sir.
15                   THE COURT:  They'll be admitted.
16                   (State's Exhibit Number 15-18 admitted)
17         Q    Now 15, 16, 17 and 18 represent what, Detective
18    Cruz?
19         A    Exhibit Number 15 is what is believed to be drug
20    paraphernalia.  It was a photograph taken in the house of
21    117 Lee Street where they were moving into.  It's a Coke
22    can, I believe, used as drug paraphernalia.  In this same
23    room, there's baking soda and a spoon.
24         Q    In your training as a peace officer, what is
25    baking soda normally used for?
```

1        A    It is normally used for drug use, with crack

2    cocaine -- with cocaine.  It's usually -- this is

3    paraphernalia that is used with cocaine.

4        Q    Is it used to dilute the cocaine?

5        A    To dilute the cocaine.

6        Q    Okay.  And I'll draw your attention to State's

7    Exhibit No. 17.  What does that represent?

8        A    No. 17, again, is another soda can -- an

9    aluminum soda can -- also believed to be used for the use

10   of drugs.

11       Q    Now the picture seems to have very burnt marks

12   on it.  Is that usually a common way of using crack

13   cocaine, by using cans and then heating up the cocaine?

14       A    Yes, sir.

15       Q    I will draw your attention, then, to State's

16   Exhibit No. 18.  What is that a picture of?

17       A    Eighteen is, again, a photograph of baking soda

18   that is used close to the area where this cocaine was

19   found.

20       Q    And these items were located at the new

21   residence, correct?

22       A    That's correct.

23       Q    So in addition to all of the furniture, they

24   were moving over the drug paraphernalia, is that correct?

25                   MR. GILMAN:  Objection, Your Honor.  That's

13

```
 1    leading.
 2                    THE COURT:  Sustained.
 3                    MR. PADILLA:  May I publish 15, 16, and 17
 4    and 18 to the jury.
 5                    THE COURT:  Yes, sir.
 6        Q    (By Mr. Padilla) As a result of the search
 7    warrant -- you went to the residence occupied by Mrs.
 8    Lucio.  Is that correct?
 9        A    That's correct.
10        Q    Did you have an opportunity, at that point, to
11    locate a photograph of the family?
12        A    Yes, sir.
13        Q    And did you seize those photographs as evidence?
14        A    Yes, sir.
15                    MR. PADILLA:  May I approach the witness?
16                    THE COURT:  Yes, sir.
17        Q    I'm going to draw your attention to what we have
18    identified as State's Exhibit No. 19 and State's Exhibit
19    No. 20.
20                    THE COURT:  Nineteen and 20?
21                    MR. PADILLA:  Nineteen and 20, Your Honor.
22    I'm sorry.
23        Q    (By Mr. Padilla) Are these the items that you
24    confiscated as evidence on the date that you executed the
25    search warrant?
```

14

1       A     Yes, sir.

2                  MR. GILMAN:   No objections, Judge.

3                  THE COURT:   Exhibits 19 and 20 will be

4    admitted.

5                  **(State's Exhibit Number 19 & 20 admitted)**

6                  MR. PADILLA:   Thank you, Your Honor.

7       Q    Now, these photographs -- the items as we have

8    them identified here and marked, this is the way that they

9    were taken as evidence, is that correct?

10      A     That is correct.

11      Q     Okay.  And there appears to be pictures of

12   Mr. Alvarez?

13                 MR. GILMAN:   Your Honor, I object to

14   counsel leading and testifying from what appears -- the

15   item speak for themselves, and this witness can speak for

16   herself.

17                 MR. PADILLA:   I'll rephrase my question,

18   Your Honor.

19                 THE COURT:   Thank you.

20      Q     (By Mr. Padilla) The photograph consisting of

21   State's Exhibit 20, can you identify any of the parties on

22   there?

23      A     This appears to be Mariah Alvarez with her

24   father -- with her biological father, pretty much just

25   looking for any kind family photos with Mariah.  These

1    were collected in the process of just looking for any

2    traces of her in the residence.

3        Q    And the photograph in the back of State's

4    Exhibit No. 19, that was located in the back when you

5    picked it up, is that correct?

6        A    That is correct.

7            MR. PADILLA:  May I publish this to the

8    jury?

9            THE COURT:  Yes, sir, you may.

10       Q    (By Mr. Padilla) Detective Cruz, after you

11   executed the search warrants, did you yourself do anything

12   further in the investigation?

13       A    Right after the search warrants were served, I

14   believe, it was, let's see (Reviews).  After the search

15   warrants were served, the defendant had already been

16   arrested, and charged with this.  Further investigation

17   was to interview neighbors.

18       Q    And so did you interview neighbors?  Or did

19   somebody else within the department do that?

20       A    Myself and other officers.

21       Q    Okay.  After that, was that the extent of your

22   involvement in the case?

23       A    Yes, sir.

24            MR. KRIPPEL:  Your Honor, at this time, I

25   pass the witness.

16

```
 1               THE COURT:  Mr. Gilman?
 2                    CROSS-EXAMINATION
 3  BY MR. GILMAN:
 4      Q    Mrs. Cruz, you were -- or you called yourself
 5  the case agent.  What does that mean?
 6      A    I'm a detective for Harlingen Police Department.
 7      Q    But I believe you were characterized as the case
 8  agent?
 9      A    I did not characterize myself as such, sir.
10      Q    So all you are is the detective, and you are the
11  lead detective in this case?
12      A    I am the detective that was assigned this case,
13  sir.
14      Q    And as the detective assigned to this case, does
15  everything go through you?
16      A    Everything does not go through me.  What I do, I
17  collect all of the evidence involved and I submit the case
18  to the district attorney's office, sir.
19      Q    But you are aware of everything that came from
20  the Harlingen Police Department to the district attorney's
21  office?
22      A    Yes, sir.  I am.
23      Q    And if there was some investigation going on in
24  this case, you would know about it?
25      A    Yes, sir.  I would.
```

```
 1        Q     Now, you say you did seven search warrants, one
 2   of which was on the Madison Street Apartment?
 3        A     Yes, sir.
 4        Q     What -- what apartment did you search?
 5        A     Ah, at this time I only have the residence on
 6   214 East Madison.
 7        Q     So you don't know which apartment you searched?
 8        A     The apartment was not written on.  It's not
 9   written on my investigative report.  No, sir.
10        Q     And 214 East Madison is an apartment complex, is
11   it not?
12        A     Correct.
13        Q     And how many apartments are at 214 East Madison?
14        A     I am not aware of how many apartments there are,
15   sir.
16        Q     I'm going to hand you some photos.  Do you
17   recognize any of those photos?
18        A     This photo right here is going to be, 214 East
19   Madison, the apartment upstairs.
20        Q     Okay.  Did you search that apartment?
21        A     Yes, sir.  I did.
22        Q     I'm going to mark that as Defendant's Exhibit
23   No. 1.  All right?
24        A     The second photo is the exact same photo just
25   slightly different.
```

18

```
 1        Q    Okay.  I'm going to mark that as Defendant's
 2   Exhibit No. 2.
 3        A    Okay.  And this third one is to the very right
 4   hand side of the apartment.  This is the opposite end of
 5   that.  The opposite end of the complex.  Those two were at
 6   the far left.
 7        Q    Okay.
 8        A    And this is at the opposite end of the apartment
 9   complex.
10             THE COURT:  That's a photo of what?
11             MR. GILMAN:  I offer it.
12        Q    All right.  This is State's Exhibit No. 13.
13   Where does Defendant's Exhibit No. 1 and 2 show up on
14   State's Exhibit No. 13?
15        A    Okay.  These are not on this photograph.
16        Q    Okay.
17        A    At the time that I initially started drafting
18   the search warrant for this apartment, sir, it was
19   believed that it was this apartment.  However, photos were
20   taken of this apartment, and it was not searched.  It was
21   the one to the far left.
22        Q    So this photo here is the one on the far right
23   of the picture.  But that's not --
24        A    Correct.  So that is not where the search
25   warrant was served.
```

1      Q     And the stairways that are shown on Defendant's

2  Exhibit No. 1 and 2 don't appear on State's Exhibit

3  No. 13?

4      A     No, sir.

5      Q     Okay.  Did you take any pictures of the stairs

6  other than -- I mean, these are mine.  I mean, did you

7  take any pictures?

8      A     Myself and Trooper Escalon, we both took photos

9  when we served the search warrant, sir.

10     Q     So you took the pictures of the same stairway

11 that I have?

12     A     The ones that I have?  Yes, sir.  Those are the

13 ones to the far left.

14     Q     Of that photo?

15     A     Just so that I'm clear, can you repeat that

16 question?

17     Q     Well, what pictures did you take pictures of?

18     A     I took a picture of the whole complex.

19     Q     Okay.  What stairs did you take pictures of, if

20 you took pictures of any stairs?

21     A     I took pictures of both.  Initially, it was

22 believed that Melissa Lucio was moving out of the

23 apartment to the far right.  It was further.  Later, I

24 found out it was the one to the left --

25     Q     Okay.

1      A      -- when I found out that I took photos of the

2   right one, sir.

3      Q      Okay.  Where are those photos?

4      A      Those photos should be in the case file if I'm

5   not mistaken.

6      Q      Should be on what?

7      A      Should be in the case file, sir.

8      Q      Which means what?  With the district attorney's

9   office?

10     A      That some of them were submitted with the

11  district attorney's office.

12     Q      So it's with the district attorney's office?

13     A      Yes.

14     Q      Okay.  And why did you take pictures of the

15  stair?

16     A      Because that is where the defendant is claiming

17  that her child sustained the injuries.

18     Q      Okay.  And did you check the steepness of the

19  stairs?  Did you check the distance between the steps of

20  the stairs?

21     A      Let me look at my notes, sir.  (Reviews)  Yes,

22  sir.  I did.

23     Q      What was the steepness of the stairs?

24     A      The steepness of the stairs, it was not measured

25  on my notes here, but they were pretty steep, sir.

1    Q    And what was the distance between the steps?
2  Were they all the same, or were they different?
3    A    No, sir.  They were different.
4    Q    So it was difficult steps to go up and down on?
5    A    Yes, sir.
6    Q    Now, when did you go into this apartment on
7  Madison that Melissa Lucio had moved out of?
8    A    The search warrant was executed on
9  February 19, 2007 at approximately 1:45 p.m., sir.
10   Q    Okay.  But did you go into the right apartment?
11   A    Yes, sir.
12   Q    And what were you looking for?
13   A    Any kind of evidence of maybe of abuse -- any
14 kind of signs.  At this point we were looking for
15 everything and anything just to figure out how Mariah got
16 hurt -- how she ended up dead, sir.
17   Q    And did you find anything in that apartment?
18   A    Not anything pertinent, sir.
19   Q    Did you find anything on the stairs, or did you
20 test anything on the stairs?
21   A    No, sir.
22   Q    Was there anything in the apartment when you
23 went and searched?
24   A    Not that much, sir.
25   Q    What was there?

```
 1        A     It was pretty much vacant.

 2        Q     You said, "pretty much vacant," which means that

 3   it wasn't vacant.  So, what was there?

 4        A     Actually, there was no furniture or anything

 5   whatsoever, sir.

 6        Q     Were there curtains on the window?  Were there

 7   shades on the window?

 8        A     No.  It was pretty much -- when people move,

 9   they leave behind boxes of-- you know -- a box where they

10   already sweep up the floor.  And that's all we found,

11   pretty much.  There was no furniture, or anything else,

12   sir.

13        Q     You said that you took hair samples of Melissa

14   Lucio?

15        A     Yes, sir.

16        Q     And what did your hair samples indicate or show,

17   or anything like that?

18        A     At this point, sir, I have not received any

19   report that was submitted to our crime lab, sir.

20        Q     And that was submitted when?

21        A     I don't have the date and time at this point.

22        Q     I'm sorry.  I can't hear you.

23        A     As soon as they were collected which would have

24   been February 17, 2007, that's when they were submitted as

25   evidence.
```

23

```
 1         Q    And you haven't received anything back?
 2         A    No, sir.
 3         Q    So is it safe to say that we don't have anything
 4    from the hair sample at this point?
 5         A    At this point?  No, sir.
 6         Q    You said that you took nail clippings from
 7    Melissa Lucio.  What did you do with the nail clippings?
 8         A    Those were submitted as well, sir.
 9         Q    Was anything obtained as a result of those nail
10    clippings?
11         A    Not that I am aware of.
12         Q    Is it safe to say that, nothing as of this time,
13    has been detected?
14         A    That I am aware of, no, sir.
15         Q    Well, you would be aware of everything in this
16    case, wouldn't you?
17         A    Yes, sir.
18         Q    This is your case?
19         A    Yes, sir.
20         Q    You said that you took swabs.  What do you mean
21    by that when you say you took swabs?
22         A    You get a Q-Tip and you swab saliva off of a
23    person.
24         Q    From inside of their mouth?
25         A    From inside of their mouth, sir.  Yes, sir.
```

1       Q    Okay.   And what, if anything, did you get from

2   the swabs from Melissa Lucio?

3       A    Those were submitted as well, sir.

4       Q    As of this time, have you gotten anything back?

5       A    No, sir.

6       Q    Is there any physical evidence that you picked

7   up at the Madison apartment that indicates that Melissa

8   Lucio was there?

9       A    No, sir.

10      Q    How many bedrooms did that Madison apartment

11  have?

12      A    I counted two, sir.

13      Q    And how many people lived in that two bedroom

14  apartment?

15      A    I'm not sure, sir.

16      Q    How many people were living with Melissa Lucio

17  on the 17th of February, 2007?

18      A    I'm not sure sir.

19      Q    You said that you took the dental records --

20      A    Yes, sir.

21      Q    -- of Melissa Lucio.  And did those dental

22  records match up to anything?

23      A    Not that I am aware of, sir.

24      Q    And you would be aware of anything if they had?

25      A    Yes, sir.

1        Q     You say that you did a search of the vehicle.
2   Was anything obtained from the vehicle?
3        A     No, sir.
4        Q     And what sort of things were you looking for
5   when you were looking through the vehicle?
6        A     I was looking for bodily fluids from Mariah
7   because the defendant had said that Mariah had gotten
8   really sick from her stomach, and had been fed tamales,
9   and she had thrown up.  So that's when she knew she was
10  ill.  I believe that was within 48 hours of the victim's
11  death.  I wanted to see if there was anything there to,
12  maybe, examine if she had been -- you know -- if this
13  would lead to -- you know -- whether she had gotten food
14  poisoning.  I wasn't ruling anything out at this point.
15  That's why we were looking at the family vehicle.
16       Q     And you didn't find anything?
17       A     No, sir.
18       Q     There's been testimony that Melissa Lucio had
19  used drugs.  Did you drug test her?
20       A     Child Protective Services, they drug tested her.
21  I did not drug test, sir.
22       Q     When was the last time that she was drug tested
23  by Child Protective Services?
24       A     You would have to ask her that.
25       Q     Did you ever investigate that?

1          A      No, sir.

2          Q      Why wasn't she drug tested the night that you

3     had her there all night long?

4          A      She was drug tested, sir, by Child Protective

5     Services.

6          Q      The 17th of February, 2007?

7          A      The night that she was detained, Child

8     Protective Services personnel showed up and one of the

9     case agents checked -- offered Melissa Lucio a drug exam.

10         Q      She took it?

11         A      You would have to get with Child Protective

12    Services on that, sir.

13         Q      You would have known about it, wouldn't you?

14         A      I requested -- I submitted a request for the

15    records, sir.  I didn't receive everything to include that

16    drug test, sir.

17         Q      So if you don't know about it, it probably

18    doesn't exist?

19         A      Can you repeat that question, sir?

20         Q      If you don't know about it, it probably doesn't

21    exist?

22         A      I wouldn't say that.

23         Q      The results would not have been favorable to

24    your case.  Is that safe to say?

25         A      No, sir.

27

```
 1        Q     You mean to tell me that Child Protective
 2   Services would drug test somebody, maybe find out that
 3   they tested positive for drugs, and never tell you, the
 4   case agent, who is working on this case?
 5                 MR. PADILLA:  First and foremost, I object.
 6   It calls for speculation on the part of the witness as to
 7   why CPS may have done something or not, is not within her
 8   parameter to answer that.
 9                 THE COURT:  She stated, she didn't know.
10   I'm listening, Mr. Gilman.
11                 MR. GILMAN:  Judge I think it's a
12   legitimate cross examination question.
13                 THE COURT:  It calls for speculation.  She
14   said, she didn't know.  Ask her what she knows.
15        Q     (By Mr. Gilman) Well, did you request any of
16   this information from Child Protective Services?
17        A     Yes, sir.  I did.
18        Q     When did you request it?
19        A     I requested it that night, and also throughout
20   the investigation.  We usually do share information, sir.
21        Q     And you never received it?
22        A     I received a small -- a small amount, sir.
23        Q     A small amount of what?
24        A     Pretty much the basic -- the basic information
25   that gets faxed to our agency, sir.
```

1      Q    I am talking about the drug test.

2      A    No, sir.  I did not get that.

3      Q    Well, why wouldn't you test for drugs if you had

4  heard that people were using drugs, that night that she

5  was there all night?

6      A    At this point I just wanted to find out who was

7  responsible for the death of Mariah since it was found

8  that it was not natural causes.  That was secondary to me

9  at that point, sir.

10     Q    In fact, you never asked her?

11     A    If I asked her, for a drug test?

12     Q    You never asked her?

13     A    The reason I did not is because Child Protective

14  Services did.  There is an examination results, sir.

15     Q    You did not ask Melissa Lucio to take a drug

16  test, did you?

17              MR. PADILLA:  Your Honor, I'm going to

18  object.  That question has been asked and answered.

19              MR. GILMAN:  No.  It has not been answered.

20              THE COURT:  I'm going to overrule the

21  objection.  Just answer the question, Detective.

22     Q    You did not ask her, did you?

23     A    I did not have to because she had already agreed

24  to take one for Child Protective Services.  So this is the

25  same night that she was arrested.

1        Q    Well, ma'am, if you are the case agent and this

2    is your case, and if you are trying to build the case

3    against her, I would think that you would have such

4    information available to you.  And you didn't.  And here

5    it is, a year and a half later, and you still don't have

6    that information, do you?

7                    MR. PADILLA:  Judge, I object to the form

8    of the question.  It is a argumentative.

9                    THE COURT:  I'm going to overrule the

10   objection.  Answer the question.

11                   THE WITNESS:  Child Protective Services

12   should have that information, sir.

13       Q    Is the answer to that question:  No, I don't

14   have the information.  Is that correct?

15       A    That is correct, sir.

16       Q    Okay.  What information was obtained at the Lee

17   residence?

18       A    At the Lee residence, those photographs, those

19   two sheets from -- with the photos of Mariah Alvarez, and

20   photographs, sir, Exhibit Numbers 19 and 20 --

21       Q    Okay.

22       A    -- were taken from the residence and tagged.

23   And the photographs, (Reviews) Okay.  And the photographs

24   taken were Exhibits 14 16, 17, 18, and 15, sir.

25       Q    Okay.  And on 17 is a picture of a Doctor Pepper

```
1    can?
2         A    That is correct.
3         Q    Was that Doctor Pepper can ever tested for drugs
4    or, is this a conclusion that you have drawn that it is
5    drug paraphernalia?
6         A    It's a conclusion for drug paraphernalia.
7         Q    So you never tested it to see if drugs were ever
8    inside that?
9         A    No, sir.
10        Q    And I believe you testified that 18 was baking
11   soda?
12        A    Yes, sir.
13        Q    Is that the only thing that you wanted to show
14   with that photo, is the baking soda?
15        A    Yes, sir.
16        Q    Isn't it true, Officer Cruz, that you can go
17   into most houses in Brownsville, Harlingen, San Benito,
18   and anywhere in Cameron County, and most houses have
19   baking soda?
20        A    I wouldn't -- can you repeat the question?
21        Q    Do you have baking soda at your house?
22        A    No, sir.
23        Q    You don't have baking soda at your house?
24        A    Yes, sir.
25        Q    Do you cook?
```

31

```
 1        A    No, sir.
 2                   MR. PADILLA:  Your Honor, I'm going to
 3   object to the relevance, as to whether she cooks or not.
 4                   THE COURT:  I'm going to overrule the
 5   objection.
 6                   MR. PADILLA:  It's also immaterial, Your
 7   Honor.
 8                   THE COURT:  Please move on, Mr. Gilman.
 9                   MR. GILMAN:  I'm getting there, Your Honor.
10        Q    (By Mr. Gilman) On State's Exhibit No. 16.  What
11   is the purpose of that?
12        A    The can -- drug paraphernalia, sir.
13        Q    This is a Coke can -- a Coca-Cola can?
14        A    Yes, sir.
15        Q    Was this Coca-Cola can tested for any kind of
16   drugs --
17        A    No.
18        Q    -- or is this a conclusion that you made,
19   deciding that that's drug paraphernalia?
20        A    It was a conclusion based on being next to a
21   burnt spoon -- if you put all three of them together, sir
22   it paints a different picture than if you look at it
23   individually, sir.
24        Q    Okay.  These are your photos.  And State's
25   Exhibit No. 16, is a picture of the baking soda.  Is that
```

32

1      the same baking soda box?

2          A      With the spoon next to it, yes, sir.

3          Q      Okay.  And was that spoon tested?

4          A      No, sir.

5          Q      It was not tested.  It's just a conclusion that

6      you've made.  Is that correct?

7          A      That's correct, sir.

8          Q      Exhibit Number 19, there's two little children

9      at the top of 19.  State's Exhibit No. 19, who were those

10     children?

11         A      I don't know, sir.

12         Q      And there's a picture toward the bottom of a

13     male holding a child.  Who is the child?

14         A      The child is believed to be Mariah Alvarez, sir.

15         Q      And who is the male?

16         A      Her father.

17         Q      And who is that?

18         A      That would be Mister -- excuse me -- Robert

19     Antonio Alvarez, sir.

20         Q      And on 20, do you know any of these people?

21         A      This is the same male, I believe, being Robert

22     Antonio Alvarez with his daughter, Mariah, sir.

23         Q      Is that the only thing that is identifiable?

24         A      Yes, sir.

25         Q      Okay.  Where did you have the dental records

Adelaido Flores, Jr.
Certified Shorthand Reporter

33

1  done?

2      A    Ah, they were done at 1601 East Alton Gloor by

3  Tera Rios, sir.

4      Q    And those dental records did not match up with

5  anything.  Is that what you're telling me?

6      A    We don't have test results on that, sir.

7      Q    So as of right now, we don't have those dental

8  records matching up with anything?

9      A    That is correct.

10     Q    Were any dental records taken of anybody else

11 other than Melissa Lucio?

12     A    The dental records of her significant other were

13 also taken of Robert Alvarez.

14     Q    Did those dental records taken from Robert

15 Alvarez match up with anything else?

16     A    There were no results at this point.

17     Q    Were dental records ever taken of any of the

18 children that were living with Melissa Lucio at Madison

19 and Lee Street?

20     A    Not that I'm aware of, sir.

21     Q    Well, you would have been aware of anything,

22 right, because you're the case agent?

23              MR. PADILLA:  That's argumentative, Your

24 Honor.  I object.

25              THE COURT:  Overruled.

1    Q    (By Mr. Gilman) Is anybody going to do anything

2    in this case without you knowing about it?

3    A    Repeat that question, sir.

4    Q    Is anybody going to be doing anything on this

5    case without you knowing about it?

6    A    It's possible, sir.

7    Q    Who?

8    A    If there is anybody that is doing something

9    without me knowing about it -- if it does happen, then

10   when I get that information, then I'll know about it, sir.

11   Q    But everybody in your department has to go

12   through you, do they not?

13   A    Everything that -- what everybody did was submit

14   it, and I put it together.  So if there is anything that

15   is outside of the investigation-- you know -- of what I

16   submitted, then I would not know about it, sir.

17   Q    So you never got dental records of any of the

18   kids that were with Melissa Lucio?

19   A    I did not request that, sir.

20   Q    And how old were the oldest children that were

21   living with Melissa Lucio?

22   A    I believe the oldest one was -- I believe -- the

23   oldest one was 11, but I'm not certain, sir.

24   Q    Eleven?

25   A    (Reviews)  Let's see.  There's six children.  Of

1   those six, 11 is the oldest.  Then there's a child born in

2   '91.  Then she's got a 17 year old, and a 16 year old

3   also.  I don't know if the 17 year old was living with

4   her, but her 16 year old was.  So I want to say, 16.

5       Q    The sixteen year old is almost all grown.

6   Aren't they?

7       A    On individual basis, sir --

8       Q    But you didn't take any dental records?

9       A    No.

10      Q    Did you take any swabs?

11      A    No, sir.

12      Q    Did you take any hair?

13      A    No, sir.

14      Q    Did you take any finger clips?

15      A    No, sir.

16      Q    What about the ring that was taken from Melissa

17  Lucio?  Where is that?

18      A    That's in evidence, sir.

19      Q    Okay.  Was that ever tested?

20      A    Ah, no, sir.  Not that I am aware of.

21      Q    Here you asked her about whether or not she hit

22  this child with rings on, and you didn't test it to see if

23  there was any DNA from the child on the ring?

24      A    I haven't submitted that for testing, sir.

25      Q    So we can safely say that there is no DNA from

1    the child on the ring as of this time?

2        A    We can safely say that a test has not been

3    submitted, sir.

4        Q    A year and a half afterwards?

5        A    That's correct, sir.

6        Q    Were any tests done on the ring, or any tests

7    done on the body of Mariah to see if the ring was part of

8    that injury?

9        A    If there was a test requested for that ring it

10   would have been submitted to the pathologist, sir.  So,

11   the question to that is the same as for the ring.

12       Q    So, you don't know?

13       A    I know that I did not submit a request for the

14   test, sir.

15       Q    During the interview -- and you heard it on the

16   tapes here yesterday -- you started interviewing Melissa

17   Lucio right close to 10:00 o'clock at night.  This is a

18   Saturday night, is that correct?

19       A    I know it was February 17, 2007, sir.

20       Q    And that's a Saturday night.  That's what it

21   was.  I believe you testified yesterday that you were at

22   home and you were called in?

23       A    I was offduty and I got called in.  I hadn't

24   even arrived home.  I just left the office.  Didn't even

25   make it out a mile.

37

1        Q    Okay.  So when this video started, and you

2   "mirandized" Melissa Lucio, was that about the same time

3   that you met her?

4        A    Yes, sir.

5        Q    So you met her at nine something whenever the

6   mirandized statement shows?

7        A    Yes, sir.

8        Q    Where is that?  It's one of the first exhibits.

9            MR. PADILLA:  State's Exhibit No. 1.

10       Q    This State's Exhibit No. 1 at 9:53 p.m. on the

11   17th, is that right around the time that you first met

12   Melissa?

13       A    Yes, sir.

14       Q    Okay.  So you started this interrogation of

15   Melissa with this video, and if there were some three and

16   three quarter hours of video yesterday, then we're at

17   almost -- one something by the time that it finishes.  I

18   believe that's what Escalon said.  And then that was at

19   the end of the first set when Escalon finished.  But then

20   he came back later, and he started talking to her again

21   about how she hit this child and it finally finished at

22   3:15 in the morning, is that correct?

23       A    What is your question?

24       Q    Well, is that accurate?  You started around,

25   close to 10:00 o'clock, and you finished up around 3:15 in

1    the morning?

2         A    That's correct, sir.

3         Q    Now when you first met Melissa Lucio, do you

4    remember asking her if she was hungry or needed something

5    to eat?  Because you never indicated that you asked her if

6    she wanted any water or anything during the time that you

7    were interviewing her?

8         A    I didn't ask her when I was interviewing her,

9    sir.

10        Q    Did you ever offer her a glass of water, a coke,

11   or anything?

12        A    No, sir.

13        Q    Do you know what time Melissa Lucio woke up that

14   day?

15        A    No, sir.

16        Q    The children that were there with Melissa, they

17   were there at the police station, were they not, in

18   another room?

19        A    Yes, sir.

20        Q    Did you ever interview the children?

21        A    No, sir.

22        Q    You made a statement in reference to this case,

23   did you not?  I mean, a statement that you submitted to

24   the district attorney's office.

25        A    A statement?  What exactly are you referring to?

39

```
 1        Q    Did you make a statement?
 2               MR. PADILLA:  I don't think she made a
 3    report or a statement.
 4        Q    Well, did you make a report or a statement?
 5        A    Well, patrol filed the report, and I put it
 6    together.  I filed an investigative report, and I
 7    submitted it.
 8        Q    Can we have a copy?
 9        A    Sure.
10               THE COURT:  Mr. Padilla?
11               MR. PADILLA:  Yes, sir.
12        Q    (By Mr. Gilman) Did you interview the children
13    that night?
14        A    No, sir.
15        Q    Did you observe the children at all that night?
16        A    No, sir.
17        Q    Did you interview the children at a later date?
18        A    No, sir.
19        Q    Why not?
20        A    I'm not a forensic interviewer.  They were taken
21    to Maggie's House.  The older children, came in to provide
22    statements.  But the younger ones were taken to Maggie's
23    House -- the Cameron County Children's Advocacy Center, to
24    be interviewed by the forensics, sir.
25        Q    And when were they taken?
```

1       A       They were taken on -- let's see.  (Reviews).

2   Three of the children -- three of the children were taken

3   on February 20, 2007, by Child Protective Services.  Those

4   were three.  Alexandria Lucio provided a statement, and

5   Daniella Lucio which were two of her children -- so that's

6   five that were interviewed.  Two provided statements.

7       Q       Which two provided statements?

8       A       Alexandria Lucio.  She provided a statement.

9   And the second child was Daniella Lucio.  She provided a

10  statement also.  That was submitted for case file.  I

11  don't recall taking their statement, sir.

12      Q       Did you ever get a statement from Selena?

13      A       From Selena?  No, sir.

14      Q       Did you ever talk to her, or interview her?

15      A       Selena would be who, sir?

16      Q       Selena Lucio.

17      A       Selena Lucio?  No, the only contact would have

18  been -- would have been whatever officer spoke with her,

19  sir.

20      Q       Did you talk to Melissa Lucio, the child?

21      A       How old is the child, Melissa Lucio?

22      Q       She was probably around 17, at that time.

23      A       No, sir.  I did not interview her.

24      Q       Did you talk to John Lucio?

25      A       John Lucio would be -- who would John Lucio be?

41

1    One of the children?

2         Q    The son.

3         A    The son?  How old is he?

4         Q    John would be 19 at that time.

5         A    No, sir.  I did not speak with him.

6         Q    But you did speak to Daniella?

7         A    She provided a statement to somebody else, sir.

8    I did not speak with her.

9         Q    All right.  You're telling this jury that Child

10   Protective Services took some of the children over to

11   Maggie's House for an interview.  Is that what you're

12   telling us?

13        A    That is correct.

14        Q    And how many children were taken over to

15   Maggie's House?

16        A    Three of the children.

17        Q    Three of the children?  And you don't have any

18   record of that?

19        A    That is the record that there's three children

20   that were taken.

21        Q    But you don't have a copy of their interview?

22        A    That I am aware of, no.  I got this information

23   over the phone and I got the name and date, time and birth

24   of the three children and whether or not they made a

25   outcry of physical abuse or drug abuse.

42

1     Q     And did they make an outcry?

2     A     No.  The three that were interviewed, no.

3     Q     And those three are who?

4     A     If you look -- if you have a copy of that

5  investigative report, that's what I am going off of.

6     Q     Mr. Cordova does.  Just tell me which ones they

7  are.

8     A     Page eight at the bottom, it says "interview

9  with the children."  There's three.

10    Q     Which three of the children?

11    A     It's Rene Alvarez.

12    Q     Okay.

13    A     Robert Alvarez.

14    Q     Okay.

15    A     And Richard Alvarez.

16    Q     Okay.

17    A     There were other children that we couldn't

18  interview because they had been placed in custody of their

19  biological children which is Alexandria Lucio, and Selena

20  Lucio.  I believe those were placed -- those children went

21  into the custody of their biological father.  They weren't

22  easy to get ahold of after this.

23    Q     But you never interviewed those two?

24    A     No, sir.

25    Q     Selena and Alexandria?

Adelaido Flores, Jr.
Certified Shorthand Reporter

1      A      Selena and Alexandria?  Well, Alexandria Lucio
2   provided a statement.  But as far as Selena Lucio, no.
3      Q      Do you know where they are at this time?
4      A      All I have is jotted here is that they are in
5   the custody of their biological father.  Selena should be
6   an adult already.  I'm not sure if she's still there.
7      Q      Selena was 14 at the time?
8      A      No.  Born in '92.  I believe she was 16 at the
9   time.  Sixteen years old, sir.
10     Q      Okay.  Now, going through this video that we
11  listened to yesterday, you didn't have the causes of death
12  of Mariah when you made that video, did you?
13     A      The cause of death was not natural and all signs
14  were of physical abuse according to what I was getting
15  from medical personnel.
16     Q      Well, when did you find out the cause of death
17  of Mariah?
18     A      At the autopsy, sir.
19     Q      And when was the autopsy done?
20     A      It was done subsequent to the defendant's
21  interview.
22     Q      Are you talking about a day?  Two days?  Three
23  days?
24     A      I don't know the exact date offhand.  It's a
25  day -- day and a half later.

44

1    Q    And that was done by Doctor Farley?

2    A    Doctor Jean Farley, sir.

3    Q    And that's when you found out that Mariah had

4    died from the brain hemorrhage?

5    A    That's correct, sir.

6    Q    Mrs. Cruz, what evidence do you have to show us

7    that Melissa Lucio struck Mariah in the head to cause this

8    brain hemorrhage that caused her death?

9    A    Can you repeat the question?

10    Q    What evidence do you have that shows Melissa

11    Lucio struck Mariah to cause the brain hemorrhage that

12    killed Mariah?

13    A    At this point I have no evidence, sir.

14    Q    What evidence do you have that Melissa Lucio,

15    shook Mariah to the degree that it would cause a brain

16    hemorrhage in Mariah?

17    A    That would have to be a question asked to her

18    medical personnel.

19    Q    What evidence do you have right now that Melissa

20    Lucio threw Mariah, and caused the brain hemorrhage that

21    killed Mariah?

22    A    The evidence from which the defendant was

23    charged with, was her confession.

24    Q    She never says that she threw Mariah.

25    A    She's the only one that was with this child.  At

Adelaido Flores, Jr.
Certified Shorthand Reporter

45

```
1     this point, whatever medical personnel said.  What exactly

2     are you asking, sir?

3          Q    I am asking you:  What evidence do you have that

4     Melissa Lucio threw Mariah that caused brain hemorrhage

5     that killed Mariah?

6          A    That would have to be asked to the medical

7     personnel.

8          Q    So you don't have any?

9          A    I'm not a medical professional.

10         Q    But you don't have any evidence of Melissa Lucio

11    throwing Mariah?

12         A    No, sir.

13         Q    Maria --

14              THE COURT:  Any objections to photographs

15    One and Two?

16              MR. PADILLA:  Yes, Your Honor.  We have no

17    objections.

18              THE COURT:  They were shown earlier.  I was

19    just wondering when they were going to be offered.

20              MR. GILMAN:  We offer them.

21              THE COURT:  They're admitted.

22              (Defendant's Exhibit Number 1 & 2 admitted)

23              MR. GILMAN:  Can I publish these to the

24    jury?

25              THE COURT:  Yes, sir.  And you're not
```

46

1    admitting Three.

2                    MR. GILMAN:   No.   It wasn't admitted.

3        Q     (By Mr. Gilman) Do you know how many people were

4    living in this apartment on Madison, and then later, Lee

5    Street?

6        A     I do not know, sir.

7        Q     Isn't that something that would be important?

8        A     I do not know an exact number.   From what I

9    understand, from Lee Street -- let's see.   (Reviewing)

10   I'm going to round-up pretty much half of the report.

11   Let's see.   Approximately 9 kids, mother and father.

12       Q     Approximately, 9 children, and mom and dad.

13       A     That's correct.

14       Q     A total of 11 people?

15       A     Yes, sir.

16       Q     And you have interviewed Melissa Lucio seated

17   here to my far right, you've interviewed Robert Alvarez,

18   you've interviewed Daniella who wasn't living there,

19   you've interviewed Alexandria, and you said Child

20   Protective Services has interviewed Rene, Richard and

21   Robert?

22       A     That is correct.

23       Q     But you have not interviewed Selena who was also

24   living there?

25       A     I'm not sure that she was living there at the

47

1    time.  But I have not interviewed her, sir.

2                    MR. GILMAN:  I will pass, Judge.  Thank

3    you.

4                    THE COURT:  Mr. Padilla?

5                    MR. PADILLA:  Yes, Your Honor.

6                    **REDIRECT EXAMINATION**

7    **BY MR. PADILLA:**

8        Q    Let's go back to the statement -- Melissa's

9    statement.  First and foremost, when the statement was

10   taken, yourself and the other detectives and Ranger

11   Escalon did not have the benefit or knowledge of the

12   child's brain injury, did you?

13       A    No, sir.

14       Q    So, in fact, we know in the statement, the

15   defendant does admit striking the child, biting the child,

16   causing the abrasions and contusions of the child -- at

17   least the majority of them -- is that correct?

18       A    That's correct.

19       Q    And the only thing I believe from the

20   statement -- and the statement speaks for itself -- but

21   the only thing that she denied causing to the child was

22   the injury to the base of the foot and the scratch to the

23   face, is that correct?

24       A    That is correct, sir.

25       Q    Now I want to draw your attention to the Madison

```
 1    property.
 2                  MR. PADILLA:  May I approach the witness
 3    Your Honor?
 4                  THE COURT:  Yes, sir.
 5        Q     (By Mr. Padilla) An issue has been made about
 6    Exhibit 13 -- yeah -- which contains the property at
 7    Madison.  Is that correct?
 8        A     That is correct, sir.
 9        Q     And the photograph was taken on the right side.
10    You came to know that her apartment was actually on the
11    left side as you are facing it.  Is that correct?
12        A     Yes, sir.
13        Q     And the steps -- the steps appeared to be the
14    same on both sides?
15        A     That is correct.
16        Q     You said some were higher than others; is that
17    correct?
18        A     That's correct, sir.
19        Q     And I think you testified yesterday that you did
20    go over there and you attempted to look for signs that a
21    child may have fallen and had struck some of the stairs,
22    is that correct?
23        A     That's correct.
24        Q     Did you find on either side -- either on the
25    right or left side -- did you find any blood matter on any
```

1    of those stairs?

2         A    No, sir.

3         Q    Did you find any hair or anything that would

4    indicate, or any type of evidence that would indicate --

5    would have shown that someone had fallen, hitting their

6    head, and got their head injured on one of those stairs?

7         A    No, sir.

8         Q    Now the issue has been made whether you offered

9    the defendant water or food during the interview.  At any

10   time did she ask for water or food?

11        A    She asked to be excused for a restroom break.

12   She asked for a cigarette.

13        Q    Did she ever ask for water or food?

14        A    Well, no.  She did not, sir.

15        Q    At the time that you were interviewing her, did

16   she appear to you to be intoxicated?

17        A    No, sir.

18        Q    Did she -- I mean, as a peace officer you have

19   had the opportunity to be around intoxicated people, have

20   you not?

21        A    Yes, sir.

22        Q    Did she have the classic signs of slurred

23   speech?

24        A    No, sir.

25        Q    Bloodshot eyes -- or smelled of alcohol emitting

1    from her breath, things of that nature?

2        A    No, sir.

3        Q    Did she ever tell you:  "Look.  I'm drunk."  Or

4    anything of that effect?

5        A    No.

6        Q    Did she every admit to you that she was high on

7    cocaine before you started questioning her?

8        A    No, sir.

9        Q    Did she show any signs of cocaine, or did she

10   show any signs that she might have been under the

11   influence of drugs or cocaine?

12       A    No, sir.

13       Q    Was she coherent?

14       A    Yes, sir.

15       Q    Did she appear to be answering your questions as

16   you asked them, is that correct?

17       A    Yes, sir.

18       Q    At the beginning she denied any involvement, is

19   that correct?

20       A    That's correct, sir.

21       Q    And later on she admitted it?

22       A    That's correct, sir.

23       Q    The issue has been made also of the baking soda,

24   the burnt cans, and the burnt spoon.  In your training as

25   a peace officer, what is that indicative of?

```
 1        A     It is indicative of the habits that are going on
 2   in the residence, wherever they found --
 3        Q     You are not saying that Melissa Lucio was
 4   ingesting cocaine other than the fact that there was
 5   paraphernalia in the house that indicated that somebody
 6   was using cocaine, is that correct?
 7        A     That's correct.
 8        Q     As a matter of fact, Mrs. Lucio admitted in her
 9   statement that her husband had continued to use cocaine,
10   correct?
11        A     That's correct.
12        Q     At the inception when you first got involved in
13   the case, what was your primary focus at that point?
14        A     My primary focus was this child -- this child
15   just didn't die of natural causes.  This child was killed.
16   That was my primary focus:  Who is responsible first?
17   Because medical is saying it was not accidental; it was
18   not done by natural causes.
19        Q     So I would assume then you drew a conclusion
20   that Melissa Lucio killed her child --
21                  MR. GILMAN:  Objection, Your Honor, as to
22   what counsel assumes.
23                  THE COURT:  Sustained.  But it's a good
24   time for a break.  We need to take a break right.  I see
25   some signals that we need a break.  Let's take a ten
```

1    break.  You should have coffee and pan dulce waiting.

2              **(Jury not present** at 10:30 a.m.)

3              THE COURT:  Mr. Padilla it looks like we

4    are winding this witness up.  Make sure that we have our

5    next witness ready.

6              MRS. DE FORD:  We do, Your Honor.

7              MR. PADILLA:  That's Mrs. De Ford's

8    responsibility.

9              THE COURT:  You all have ten minutes.

10             **(Jury present, defendant present.)**

11             THE COURT:  You may be seated.  Thank you

12   very much.  Mr. Padilla?  Will you proceed?

13             MR. PADILLA:  Thank you, Your Honor.

14        Q    (By Mr. Padilla) Detective Cruz, were you the

15   officer that executed the search warrant on the defendant

16   Melissa Lucio?

17        A    Yes, sir.

18        Q    And who issued the arrest warrant?

19        A    The arrest warrant, District Court Judge,

20   Migdalia Lopez issued the arrest warrant.

21        Q    Now, you were asked if you had any direct

22   evidence that Melissa Lucio had struck the child or caused

23   the death of the child.  In your training as a police

24   officer and a Detective, did you feel that she was

25   responsible for the death of the child?

53

1              MR. GILMAN:  Objection.  It calls for a

2    conclusion.

3              THE COURT:  I'm going to overrule the

4    objection.

5         Q    (By Mr. Padilla) Did you, ma'am?

6         A    Repeat the question, sir.

7         Q    Yes.  As a trained police officer involved in

8    this case, did you believe that Melissa Lucio had caused

9    the death of the child?

10        A    Yes, sir.  I did.

11        Q    Is that the reason why you executed the arrest

12   warrant on her?

13        A    That's why.

14        Q    And you based it on what?

15        A    Based it on the injuries that the child had,

16   speaking to her -- showing to her each injury, her

17   changing story.  She didn't tell me.  She ended up telling

18   Ranger Escalon when she did speak with him that she was

19   responsible for all, but a toe injury and a scratch to the

20   head.  At that point, I felt there was enough to get a

21   search warrant.  She didn't shift blame on anybody else.

22   She didn't say it was her husband, or anybody else.  So,

23   at that point, she accepted responsibility and that's --

24   that is why a warrant was ascertained for her arrest.

25        Q    At any point, at any time, had she ever

54

1    implicated the children as being any of the parties

2    responsible doing any of the injuries of the child, of

3    Mariah Alvarez?

4        A    Yes, sir.  Initially, of course, she said that

5    it was the children that were responsible -- her other

6    children that were responsible for picking on her because

7    she was the smallest one.  And -- well, that story alone,

8    with the three steps versus the higher steps.  So at that

9    point we ruled out that it was the children later when she

10   did say that, also.  So --

11       Q    She did make a statement, did she not, toward

12   the end of the interview, that she was responsible for all

13   the injuries to the child, is that correct?

14                MR. GILMAN:  Objection.  Again, leading.

15                THE WITNESS:  All but two, sir.

16                THE COURT:  Sustained.  It is leading.

17                MR. PADILLA:  Thank you, Your Honor.

18       Q    (By Mr. Padilla) I'll pass the witness, Your

19   Honor.

20                    **RECROSS-EXAMINATION**

21   **BY MR. GILMAN:**

22       Q    Isn't it a fact, Officer, that the cause of

23   death was the brain hemorrhage, and you don't have any

24   evidence of Melissa Lucio ever causing any brain

25   hemorrhage?

1     A    Sir -- yes, I do.

2     Q    What evidence do you have?

3     A    I have a child that is deceased, and I have --

4  all of the markings, and I have her biological mother

5  saying:  I am responsible for all but two, which would be

6  less than 10 percent of the injuries that the medical

7  personnel claimed were not accidental.

8     Q    Come on, Mrs. Cruz.  Every one of those

9  bruises -- as bad as those bruises look -- and I admit

10  they look bad -- but those bruises didn't cause the death

11  of this little girl.  And you know that from talking to

12  Doctor Farley, isn't that right?

13     A    You would have to talk to her, and not me.

14     Q    Well you talked with her.  You're the

15  investigator.  Those bruises on that body of that poor

16  child, did not cause the death of Mariah, did it?  The

17  thing that caused the death of Mariah is the brain

18  hemorrhage.  And that's according to the autopsy report

19  and Doctor Farley, the medical people.  Isn't that right?

20     A    You would have to question Doctor Farley on

21  that, sir.

22     Q    But you drew a conclusion just a few moments ago

23  when Mr. Padilla was asking you certain questions --

24     A    Sir --

25     Q    -- but you don't want to draw a conclusion now?

56

```
1        A    I am saying the warrant was ascertained due to

2   circumstantial factors, sir.

3        Q   .Circumstantial factors?

4        A    Yes, sir.

5        Q    Of which you are telling us that you don't have

6   any evidence of Melissa Lucio striking, shaking or

7   throwing Mariah --

8        A    Of which I am telling you, sir --

9        Q    -- that caused the death of Mariah?

10       A    Yes.  And we had the child and the biological

11  owning up to it and saying:  I'm responsible for all of

12  these markings on these photos -- all of these -- with the

13  exception of maybe a small laceration to the bottom of her

14  foot and a scratch on the face.  Those are the only ones

15  she admits herself being accountable for.  At that point,

16  that's when I drafted a warrant, sir.

17       Q    Tell me, Mrs. Cruz, what is a mother going to

18  do?  Is she going to sit there and say:  No.  My husband

19  did it.  And he's drugged off.  No.  My other children did

20  it.  And they're drugged off?

21            MR. PADILLA:  Your Honor?  Is there a

22  question?

23       Q    (By Mr. Gilman) And you don't have any evidence

24  that anybody else did anything because you didn't even

25  bother to interview anybody else?
```

```
1                    MR. PADILLA:  That's speculative, Your
2        Honor.
3                    THE WITNESS:  Okay.  That is a very long
4        question.
5                    THE COURT:  Just a minute.
6            Q    Is that --
7                    THE COURT:  Just a minute!
8                    MR. GILMAN:  Whenever --
9                    THE COURT:  Just a minute.  When an
10       attorney stands up and makes an objection, you stop,
11       please.
12                   MR. GILMAN:  I didn't here him say:
13       Objection, Judge.  He just got up and started talking.
14                   THE COURT:  When he stands up, stop talking
15       please.  Your objection?
16                   MR. PADILLA:  The objection is on the basis
17       of, he is asking this witness to speculate, Your Honor.
18                   THE COURT:  (Reviews the screen).  It calls
19       for proper cross examination.  Proceed.
20                   MR. GILMAN:  Thank you, Your Honor.
21           Q    (By Mr. Gilman) So you didn't interview all of
22       these people?  You drew a conclusion.  You got emotional
23       because of the picture you saw, and you decided that
24       Melissa Lucio killed that child, and you drew that
25       conclusion, and that's the reason why you brought these
```

1    charges today.  But you have not got any evidence of her

2    striking, shaking or throwing Mariah, that would cause the

3    brain hemorrhage that killed Mariah, do you?  Because the

4    brain hemorrhage killed her.

5         A    That would have to be asked medical personnel

6    and you would have to review her confession also, sir.

7         Q    I take it from your answer, that means:  No?

8              THE COURT:  Move on, Mr. Gilman.

9         Q    (By Mr. Gilman) Did you examine Melissa Lucio's

10   hands or feet?

11        A    No, sir.  I monitored her hands, but I did not

12   observe or take photographs of her hands.

13        Q    You indicted Melissa Lucio for, "striking her

14   with her hands or foot, or objects unknown to the Grand

15   Jury."

16        A    Yes, sir.

17        Q    But yet, you did not test her hands or feet to

18   see if DNA was anywhere on her, that might be from Mariah?

19        A    The nail clippings would have had that, sir.

20             THE REPORTER:  I'm sorry.  The what?

21             THE WITNESS:  The nail cleanings would have

22   come from her hand.

23        Q    (By Mr. Gilman) Is this another conclusion that

24   you are drawing?

25        A    This was evidence that was picked up.

```
 1        Q    Okay.  But the nail clippings don't show
 2   anything, do they?
 3        A    They have not been -- we do not have any test
 4   results.  That's --
 5        Q    But that's after a year and a half ago, ma'am,
 6   are you going to have test results?  It doesn't take a
 7   year and a half to do those results, does it?
 8        A    It could be sooner; it could be longer.
 9        Q    Then why are we going to trial, if you're not
10   ready to go to trial?
11                  MR. PADILLA:  Your Honor?  This is
12   argumentative.  I object to the form of the question.
13                  THE COURT:  I will sustain that objection.
14   It's not proper for her to answer that question.
15                  MR. GILMAN:  Nothing further, Your Honor.
16   I pass the witness.
17                  MR. PADILLA:  Nothing further.
18                  THE COURT:  Officer Cruz --
19                  MR. PADILLA:  Can she remain in the
20   courtroom?
21             (Witness was excused at 10:57 a.m.)
22                  THE COURT:  Yes, sir.
23                  MR. GILMAN:  Judge, I wish to take
24   something up.
25                  THE COURT:  Hold on.  Ladies and gentlemen.
```

```
1    I'm just to ask you to step outside for just a minute.
2    There are some legal arguments.  It won't take very long.
3                 (Jury not present 10:57 a.m.)
4                 THE COURT:  Previously, you said you had no
5    objections to her remaining, Mr. Gilman.
6                 MR. GILMAN:  Yes, sir.
7                 THE COURT:  That's why I made the comment
8    that I did.
9                 MR. GILMAN:  Yes, sir.  If Officer Cruz is
10   not coming in for rebuttal, then I have no objection to
11   her sitting in.  If the State is thinking that she might
12   come in for rebuttal, then I certainly object to her
13   coming in.
14                 MR. PADILLA:  And, Your Honor, I can't
15   anticipate what evidence, if any, the defendant is going
16   to put on, whether to use her on the rebuttal or not.
17   Normally the case agent is left in the courtroom just to
18   assist us in getting the witnesses available here.
19                 MR. GILMAN:  This isn't federal court.  And
20   I never had a case agent sit in here.
21                 THE COURT:  Well, it's your decision, Mr.
22   Padilla.  If you want the ability to call her back as a
23   rebuttal witness.  Then don't let her stay in the court.
24   If you don't mind calling her in as rebuttal witness, then
25   she can stay.
```

61

1           MR. PADILLA:  Then is this going to be Quip

2    Pro Quo?  Is the defendant going to be prohibited from

3    calling her as a potential witness?

4           THE COURT:  If she stays, then he's

5    prohibited.  It's a double edged sword.  It cuts both

6    ways.  If you want to call her back as rebuttal witnesses,

7    either side then I ask that she not -- then I will order

8    that she not in be in court.  If both sides want to call

9    her back as rebuttal witness, then I ask that she wait

10    outside.  I am sure she has other things to do.  Right?

11           MR. PADILLA:  The State asks that she be

12    allowed to remain in the courtroom.

13           MR. GILMAN:  If she stays, and the Court

14    wishes to have her stay, Judge, I wish that this witness

15    would be admonished as to the rule.  None of the witnesses

16    that the State is calling were ever admonished as to what

17    the rule is.

18           THE COURT:  They have been called one at a

19    time.

20           MR. GILMAN:  Right.

21           THE COURT:  This is the first witness.  I

22    understand.

23           MR. GILMAN:  We need to do this.

24           THE COURT:  So you are foregoing your

25    opportunity to recall her back as a rebuttal witness?

```
 1              MR. PADILLA:  Yes, sir.
 2              THE COURT:  Officer Cruz?  You are going to
 3    be permitted to stay in the courtroom to assist the
 4    district attorney in the presentation of this case.  The
 5    only thing that I do ask is under the rule, no witness is
 6    to supposed to discuss the testimony within the court with
 7    any other witness.  In other words, as the other
 8    detectives and other officers come in, you are not to
 9    discuss what went on in this case, in this courtroom, with
10    them.  That's funny because the district attorney can do
11    that.  But you cannot.
12              THE WITNESS:  Okay.
13              THE COURT:  Okay?  So you may step down.
14    If you want to sit in the audience, you are welcome to sit
15    in the audience.
16              (Witness was excused at  11:00 a.m.)
17              MR. PADILLA:  Your Honor, Mrs. Cruz can sit
18    back here.  The State intends to call Jaime Palafox.
19              THE COURT:  Officer Palafox, before sitting
20    down, would you please raise your right hand.
21              (Witness was sworn in by the court.)
22                       JAIME PALAFOX,
23        having been first duly sworn, testified as follows:
24                     DIRECT EXAMINATION
25    BY MR. PADILLA:
```

```
 1                   THE COURT:  Mr. Padilla, your witness?
 2                   MR. PADILLA:  Thank you, Your Honor.
 3        Q     Would you please state your name for the record?
 4        A     My name is Jaime Palafox.
 5        Q     Mr.  Palafox I know it was difficult for you to
 6   be here yesterday because your father passed away.  My
 7   condolences to you and your family.
 8        A     Thank you.
 9        Q     Mr. Palafox, can you tell this jury how you are
10   employed?
11        A     I am a police officer for the City of Harlingen.
12        Q     And how long have you been a police officer?
13        A     Four years.
14        Q     And prior -- have you also been a police officer
15   for the City of Harlingen?
16        A     No, sir.
17        Q     Where did you work before being a police
18   officer?
19        A     Oh -- as a police officer?  Yes, sir, in the
20   city of Harlingen.
21        Q     What's your responsibility as a police officer
22   for the city of Harlingen?
23        A     To protect citizens, and prevent crime.
24        Q     And you are what we commonly call a traffic
25   officer?
```

```
 1        A    A patrol officer.
 2        Q    A patrol officer?  Excuse me and as a patrol
 3   officer, again -- you work the streets, and you sometimes;
 4   get called to serve, and you get dispatched to certain
 5   places, is that correct?
 6        A    That's correct.
 7        Q    Were you on duty back on February 17, 2007, sir?
 8        A    Yes, sir.
 9        Q    As a result did you receive a dispatch order?
10        A    Yes, sir.
11        Q    And what is -- what in general is a dispatch
12   order?
13        A    It's just a detail of an address, of the
14   location and the nature of the call that we need to
15   respond to.
16        Q    And do you recall, back on February 17, around
17   6:51 p.m, you responded to a dispatch order -- and I am
18   not asking you who called you, or what they told you, but
19   did you yourself then respond pursuant to that dispatch
20   order?
21        A    Yes, sir.
22        Q    And where did you respond to, sir?
23        A    It was 117 West Lee.
24        Q    And what you were responding to, if anything?
25        A    The dispatch call out as a female child that was
```

```
 1    turning purple, and was unresponsive.

 2         Q    How far were you from the location when you were

 3    first dispatched?

 4         A    I was approximately less than half a mile.

 5         Q    So how long did it take from the place where you

 6    were dispatched to Lee residence?

 7         A    It was within a matter of minutes.  Maybe even

 8    less than that.

 9         Q    When you arrived there, what did you see, if

10    anything?

11         A    First, as I turned the corner off of First

12    Street, I saw there was an ambulance -- a ambulance unit

13    there.  And I had seen -- and there were a lot of people

14    outside of the parking lot next to the ambulance.

15         Q    What did you do, if, anything?

16         A    I got in the patrol vehicle, I just followed the

17    group of people which led me to the apartment where I saw

18    -- I walked there, and I saw EMS personnel working --

19    helping a child.

20         Q    And by helping how many EMS officials were there

21    at the time?

22         A    At the time I saw four.

23         Q    Four?  Did you do anything to assist in an

24    effort to help the child?

25         A    Well, I usually go hands on if they need help.
```

1    At that time there was already enough personnel people,
2    and I asked them if there was anything I could do to
3    assist them.  And at that point, one of them said -- I
4    don't recall who asked if I could shine the light on them
5    because of the poor lighting conditions inside the
6    residence.
7         Q    Was that your official issued flashlight?
8         A    Yes, sir.  My light.  It's an official issue.
9         Q    Was there a frantic effort by EMS to try to
10   resuscitate the child?
11        A    Yes.
12              MR. PADILLA:  May I approach the witness
13   Your Honor?
14              THE COURT:  Yes, sir.
15        Q    (By Mr. Padilla) I am going to draw your
16   attention, sir, to State's Exhibit No. 2 and ask you, if
17   this is the child that you saw there that evening there at
18   the Lee residence?
19        A    Yes.
20        Q    Now at the time when you first got there and you
21   started assisting, was the child clothed, or was she nude
22   at the time?
23        A    The child was clothed.
24        Q    At any time, did you have the opportunity to see
25   the child unclothed?

67

1      A      Yes.

2      Q      What happened?  How did that happen?

3      A      When I asked the EMS personnel for any type of

4   assistance, they asked, of course, for me to shine my

5   light on them -- on the child.  As I put the light on, one

6   of the EMS personnel with the scissors began to cut the

7   shirt off the child.  At that time I noticed her chest,

8   which was bruised.

9      Q      Okay.  As a result of you observing that, what,

10  if anything, did you do?

11     A      First what I did -- I asked for a supervisor,

12  which the supervisor had already walked into the house.

13     Q      Who's the supervisor?

14     A      It was Sergeant Richard Turner.

15     Q      And what, if anything, did you do then?

16     A      I asked Officer Mendiola, my backup officer, to

17  start gathering information from all of the family

18  members.

19     Q      And did you continue to assist by holding the

20  light on the child that they were working on, or what did

21  you do then?

22     A      I continued to assist with the light on the

23  child, while they were working on the child.

24     Q      And you could see numerous -- what appeared to

25  be bruises and contusions all over the child's body?

1          A     Yes, sir.

2          Q     How long did EMS attempt to resuscitate this

3     child?

4          A     I don't have an exact timeframe, but it was a

5     few minutes.

6          Q     After that what happened to the child if you

7     know?

8          A     The child was transported to the hospital by

9     EMS.

10         Q     Did you then do anything after the child was

11    transported to the hospital?

12         A     Before the child -- while I was assisting with

13    the flashlight, I asked who mom was.  And mom was --

14    actually kneeling at the head of the child.

15         Q     And, at that time, did you learn that there were

16    other family members there in the residence?

17         A     Yes, I did.

18         Q     Did you have an opportunity at that point then

19    to talk to any of them?

20         A     I spoke to mom.

21         Q     Okay.  And at that time -- I mean she wasn't a

22    suspect and she wasn't under arrest for the bruising; is

23    that correct?

24         A     No.  Not at all.

25                   MR. GILMAN:  Objection, again.  Judge.

69

```
 1    Leading.
 2                 THE COURT:  It is leading, Mr. Padilla.
 3         Q    (By Mr. Padilla) Had anybody been arrested?
 4         A    No, sir.
 5         Q    You stated that you spoke to Melissa Lucio.  Do
 6    you see Melissa Lucio here in the courtroom today?
 7         A    Yes, sir.  She's standing right there.  I mean
 8    she's sitting right there.  I'm sorry.
 9         Q    What color is her shirt?
10         A    Pink.
11                 MR. PADILLA:  Your Honor, I ask that the
12    record show that the witness has identified the defendant.
13                 THE COURT:  The record will show that he
14    has identified the defendant.
15         Q    (By Mr. Padilla) Just to cover some
16    housekeeping, the residence at 117 Lee, Apartment Eight,
17    that is in Cameron County, Texas, is that correct?
18         A    Yes, sir.
19         Q    Okay.  Now when you spoke to Mrs. Lucio, did you
20    take her aside or what happened?
21         A    No.  As I spoke to Mrs. Lucio it was throughout
22    the whole ordeal while EMS was still working on the child.
23    I wanted to get some information on the child.
24         Q    How did Mrs. Lucio look?
25         A    Physically, she looked very calm.
```

1      Q     Was she crying?

2      A     No.

3      Q     Was she distraught?

4      A     No, sir.

5      Q     Did you ever ask -- did she ever ask for

6   assistance or medication from the EMS officers because --

7      A     No, sir.

8      Q     How long a period did you interview her?  For

9   how long?

10      A     About a minute.  Just asking general questions.

11      Q     And what did you -- did she say anything to you

12   about Mariah?

13      A     I asked her for basic information, name, date of

14   birth.  And then I asked her what had happened to the

15   child.  And she in turn responded by saying that the child

16   had fallen off some steps.

17      Q     Did she mention the number of steps?

18      A     She told me two steps.

19      Q     Did she tell you where allegedly the child had

20   fallen?

21      A     She told me that the fall had happened at the

22   old apartment which they were in the process of moving out

23   of which was on Madison Street, I believe.

24      Q     And did you question her at all about the other

25   bruises and the way the body looked of the child?

```
 1         A     At that point, I didn't.

 2         Q     That would be the extent of your involvement --

 3    in your investigation of the case?

 4         A     Yes, sir.

 5         Q     Did you go out on patrol or did you go back to

 6    the police station?

 7         A     I went back to the police station and started

 8    writing up the incident report.

 9         Q     And, for the record, did you provide an incident

10    report in this matter?

11         A     Yes, sir.

12              MR. PADILLA:  Your Honor, at this time I

13    will pass the witness.  I will provide to defense counsel

14    a copy of the incident report.

15                     CROSS-EXAMINATION

16    BY MR. GILMAN:

17         Q     Officer, when you say that you had to shine the

18    flashlight, was there electricity in the house?

19         A     Yes.

20         Q     It was just in a dark room?  There wasn't any

21    lights?

22         A     There wasn't any light in the living.

23         Q     There wasn't any light bulbs, or what?

24         A     I didn't notice if there was any light bulbs.  I

25    just noticed it was poorly lit.  It wasn't well lit.  I'm
```

72

```
 1    sorry.
 2         Q    And do you know how many people were living
 3    there in that house?
 4         A    After I got all of the information, I believe
 5    there were nine children, and it was Mrs. Lucio and her
 6    husband.
 7         Q    And how big of an apartment was this?
 8         A    It's a three bedroom -- I believe it was a three
 9    bedroom, and one bath apartment.
10         Q    You said that Mrs. Lucio was very calm.
11         A    Yes.
12         Q    You also mentioned in the report that she cried?
13         A    Yes, sir.  I did.
14         Q    So she was not without emotion throughout the
15    whole period?
16         A    No.  She was -- while EMS was working on the
17    child she was very calm.  Whenever a family member would
18    go over to console her, she would begin to cry
19    automatically, and then stop.
20              MR. GILMAN:  Nothing further, Judge.  Thank
21    you.
22                    REDIRECT EXAMINATION
23    BY MR. PADILLA:
24         Q    Officer, did that behavior stand out in your
25    mind that she wasn't crying?
```

73

```
1      A    Yes, it did, sir.
2      Q    Have you been to other incidents where children
3  have been unresponsive?
4      A    Yes, sir.  I have.
5      Q    And her demeanor was at least sufficient to you
6  to include in the report.  Correct?
7      A    Yes, sir.
8      Q    And as a trained police officer --
9                MR. GILMAN:  Your Honor, I object.  That's
10  a leading question already.
11                MR. PADILLA:  Your Honor, I hope he's a
12  trained peace officer.
13                THE COURT:  Well, the question is not
14  finished.
15                MR. GILMAN:  But it's going to be leading.
16  You know it's going to be.
17                THE COURT:  Mr. Gilman?  Please wait.
18                MR. PADILLA:  Your Honor, that's the extent
19  of my question, Your Honor.  I will pass the witness.
20                THE COURT:  Anything further, Mr. Gilman?
21                MR. GILMAN:  No, sir.
22                THE COURT:  You may step down.
23                     (Witness excused at 11:15 a.m.)
24                MR. PADILLA:  Your Honor, may he step down?
25                MR. GILMAN:  I don't have any questions.
```

74

1      THE COURT:  I heard you.  Thank you.

2      MR. PADILLA:  Next witness is Robert

3  Mendiola.

4      THE COURT:  Officer Mendiola, before

5  sitting down, would you please raise your right hand.

6      **(Witness was sworn in by the Court.)**

7      THE WITNESS:  Yes, sir.

8      THE COURT:  Please be sealed.

9      **ROBERT MENDIOLA,**

10  having been first duly sworn, testified as follows:

11      **DIRECT EXAMINATION**

12  BY MR. PADILLA:

13      Q     Would you please state your name for the record?

14      A     Robert Mendiola.

15      Q     And Mr. Mendiola, how are you employed, sir?

16      A     I am employed as a police officer with the City

17  of Harlingen.

18      Q     How long have you been employed as a police

19  officer with the City Harlingen?

20      A     Four years.

21      Q     How long have you been a police officer?

22      A     Four years.

23      Q     Four years?  And what are your responsibilities

24  as a police officer?

25      A     Patrol the area of Harlingen, and provide patrol

1     for the City of Harlingen.

2          Q     Were you on duty back on February 17, 2007?

3          A     Yes, sir.

4          Q     And what was your shift, then, at that time, do

5     you recall?

6          A     Two to ten.

7          Q     Were you ever back around 6:50 p.m. -- were you

8     dispatched to a certain place or not?

9          A     Yes, sir.

10         Q     And where were you dispatched to?

11         A     117 West Lee.

12         Q     And do you know what the dispatch was in

13    reference to?

14         A     Unresponsive child.

15         Q     How far away were you from that location when

16    you first got the dispatch order?

17         A     Maybe two or three miles away, sir.

18         Q     And how long a period did it take from the time

19    that you were dispatched to the residence?

20         A     Probably about four minutes.

21         Q     When you arrived there, what, if anything, did

22    you see, sir?

23         A     I walked into the apartment, I think it was

24    number eight, and viewed EMS personnel working on a small

25    child.

1       Q    Did you yourself assist, in an efforts --

2       A    Ah, no, sir.

3       Q    What did you do, then after you saw the child?

4       A    I spoke to Officer Palafox that was on the

5 scene, and he just told me to go outside and start talking

6 to the children, and to get their names.

7       Q    And at that point you were in the process of

8 just conducting an investigation; is that correct?

9       A    Yes, sir.

10      Q    And how many -- how many children belonging to

11 the owners of the apartment were there?

12      A    I can't recall, sir.  There were a whole lot of

13 them there.

14      Q    Did you have an opportunity, at that time, to

15 meet or speak to Mrs. Melissa Elizabeth Lucio?

16      A    Yes, sir.

17      Q    Is she here in the courtroom today, sir?

18      A    (Views the courtroom I don't see here, sir,

19 right now.

20      Q    You don't see her right now?

21      A    Yes, sir.

22      Q    All right.  Let me ask you this:  Did you have

23 an opportunity, at all, to discuss, with Melissa Elizabeth

24 Lucio any aspects concerning the child?

25      A    Yes, sir, I did.

77

1      Q    And what was the substance -- or what was the

2  reason why you were questioning her?

3      A    I was just talking to her about -- what had

4  happened to the child, and why she was injured on the

5  floor.

6      Q    And what, if anything, did she tell you?

7      A    She said that the child had fallen at a previous

8  address that they had, off of some stairs.

9      Q    Did she mention to you how many stairs she had

10  fallen from?

11      A    No, sir.

12      Q    What, if anything, did you do then?

13      A    From there, after I talked to her briefly, I

14  secured the crime scene -- the crime scene that they are

15  processing.

16      Q    And did you have an opportunity to talk to --

17  what was her condition like?

18      A    She was talking to me normally.

19      Q    Was she crying?

20      A    At the time, no, sir.

21      Q    Did she appear to be distraught, or concerned

22  about her child?

23      A    No, sir.

24      Q    Did she ever ask you for permission to go to the

25  hospital?

```
 1        A     Ah, no, sir.

 2        Q     From what you were able to hear and observe

 3   discuss with her, did she ever ask to get in the ambulance

 4   to ride with the child?

 5        A     Ah, no, sir.

 6        Q     How long were you there, sir, from the time that

 7   you arrived until the time that you left?

 8        A     Two hours, sir?

 9        Q     Two hours?  Did you interview other witnesses or

10   other people there at the residence?

11        A     I just spoke to the children.  Got their names

12   and date of birth -- that sort of thing.

13        Q     And after you concluded that, did you go back on

14   patrol, or did you go back to the police station?

15        A     I went back to the police station and conducted

16   my narrative.

17        Q     You prepared your narrative report?

18        A     I prepared my narrative report.

19              MR. PADILLA:  At this time, I pass the

20   witness, and I tender the narrative to Mr. Gilman.

21                        CROSS-EXAMINATION

22   BY MR. GILMAN:

23        Q     If you talked with Mrs. Lucio --

24        A     Yes, sir.

25        Q     -- do you remember ever talking to her about the
```

```
1    hospital, or going to the hospital?
2         A    Ah, no, sir.
3         Q    And you didn't remember talking to her about
4    even riding in the ambulance?
5         A    No, sir.
6         Q    That's not something that is allowed, though, is
7    it?
8         A    Allowed?
9         Q    Yes.
10        A    EMS usually let's the parents go.
11        Q    This child was unresponsive, wasn't she?
12        A    That, I don't know, sir.
13        Q    I'm sorry?
14        A    I wouldn't know.
15        Q    Okay.  You didn't see the child?
16        A    I saw her, but I didn't know the condition of
17   the child.
18                   MR. GILMAN:  Nothing further, Judge.
19                   MR. PADILLA:  Nothing further.  May the
20   witness be excused?
21                   THE COURT:  You may step down.  Thank you,
22   very much.
23
24                   (Witness was excused at  11:21 a.m..)
25                   THE COURT:  Call your next witness.
```

80

1          MRS. DE FORD:  The State calls Randall

2    Nester.

3          THE COURT:  Who?

4          MRS. DE FORD:  Randall Nester.

5          **(Witness Sworn in By The Court.)**

6          **RANDALL KENNETH NESTER,**

7    having been first duly sworn, testified as follows:

8          **DIRECT EXAMINATION**

9    **BY MRS. DE FORD:**

10          THE COURT:  Please be seated.  Go ahead,

11    ma'am.

12          MRS. DE FORD:  Thank you.

13      Q    Sir, could you please introduce yourself to the

14    jury?

15      A    Randall Kenneth Nester.  I am a paramedic.  At

16    the time I was with South Texas Emergency Care Foundation.

17    Nine 11 responded, and serviced the call.

18      Q    Now, Mr. Nester, what is your current

19    occupation?

20      A    I'm a paramedic; an EMS director.

21      Q    And where do you work?

22      A    EMS Direct.  EMS Direct -- la Feria.

23      Q    Pardon?

24      A    EMS, in La Feria.

25      Q    And how long have you been in that position?

1        A     The current one since August of last year.

2   Paramedic in general, since 2000.

3        Q     What are your duties?

4        A     My current position, I'm a field training

5   officer supervisor, and director of operations.   I

6   basically run the businesses.

7        Q     It's an ambulance company, or EMS Company?

8        A     Yes, sir.

9        Q     Prior to that, where were you?

10       A     South Texas Emergency Care Foundation And Valley

11  Air Care.

12       Q     And where is that located?

13       A     Harlingen, Texas.

14       Q     And what was your position there?

15       A     It was both ground and flight paramedic.

16       Q     What were your duties?

17       A     I responded to any 911 calls that the city would

18  offer, or that were in the city, or in the county area.

19  If I was flying, we do critical care transport from

20  hospital to hospital.   Non emergency transportation,

21  anything -- you know -- 911 services as a paramedic, we

22  do.

23       Q     I am going to ask you about your educational

24  background to become a paramedic.   Could you please the

25  jury how you became paramedic?

1          A     Well, there are multiple levels of emergency
2     care.  There is an EMT basic and intermediate paramedic.
3     I'm a licensed paramedic --
4                    THE COURT:  I'm sorry.  I'm having a hard
5     time hearing you.  Would you speak into the microphone?
6                    THE WITNESS:  Yes, sir.
7                    THE COURT:  And possibly, a little slower.
8                    THE WITNESS:  I will work on that, sir.
9     There are three levels.  Basic, intermediate, and advanced
10    paramedic.  I'm a licensed paramedic.  I am the highest
11    local certified that the State allows, or certified as
12    that.  My training, is just to be a basic -- just to be a
13    regular paramedic is two years -- of college.
14                    I've got post-graduate training in advanced
15    cardiac life support, pre-hospital trauma life support,
16    basic --
17                    THE REPORTER:  I'm sorry.  Advance cardiac
18    what?
19                    THE WITNESS:  Which part?
20                    THE REPORTER:  Advance what?
21                    THE WITNESS:  Advance cardiac life support.
22    Pre-hospital trauma life support, basic and advance
23    cardiac life support.
24                    THE REPORTER:  Slow down, please.
25                    THE WITNESS:  Yes, sir.  Sorry.  Advance

83

1    Cardiac Life Support, hospital trauma life support, basic

2    and advanced trauma life support, pediatric advance life

3    sport, hospital education for pediatric providers.  I'm a

4    EMS instructor, first aid instructor, critical care

5    paramedic, and a flight paramedic.

6         Q    And you are certified by the State of Texas?

7         A    Yes, ma'am.

8         Q    And you have to renew your license every couple

9    of years.

10        A    Every four years.  And we have -- my position is

11   157 hours, thereabouts, of continuing education, every

12   four years.

13        Q    And you have to complete that in order to get

14   your license?

15        A    Yes, ma'am.  We do.

16        Q    Now.  I'm going to take you back to February,

17   2007, specifically the 17th of February 2007.  Where were

18   you working at that time?

19        A    South Texas Emergency Care Foundation.

20        Q    And did you -- on that time, on that day, in

21   that timeframe did you -- what shift were you working the

22   first time?

23        A    I was working the flight shift, 7:00 a.m. to

24   7:00 p.m, or thereabouts, considered, as "Day Truck Out"

25   in Rio Hondo.

84

1    Q    And did you happen to come in contact with the

2    victim in this case Mariah Alvarez?

3    A    I did.  This was the last call on my shift.

4    Q    Please tell the jury how that call came about?

5    A    Well, we responded to the call because we were

6    actually already out of service, and the call came in.  It

7    was cost pending -- it was emergency cost pending, we were

8    fueling up the unit at the time to return to service and

9    we responded to this call.

10                  We arrived at the residence where we were

11   waived down by someone to show us where the residence was

12   at.  We entered the residence and found that the child was

13   in the middle of the floor.

14   Q    Now this residence that you responded to, do you

15   know where the residence was located at?

16   A    The address was at 117 West lee, Apartment One.

17   I recall that it was an apartment complex, and it was the

18   first one on the corner.

19   Q    And that apartment complex, was that in

20   Harlingen?

21   A    Yes, ma'am.

22   Q    And in Cameron County, Texas?

23   A    It was.

24   Q    And explain to the jury, you said that when you

25   walked in, you saw the child laying on the floor?

1    A    That's correct.  The baby was faced up, lying on

2  her back in the middle of the floor.  The child was

3  unattended, post lis apneic, meaning it had no pulse and

4  no respirations.  No effort to lift.  The room was dark.

5  The mother was there.  Either the father or some father

6  figure was there, and a number of children were there as

7  well.  I found that the child was there, in the floor

8  unattended.  The mother there in the room but not

9  immediately close to her child.  I don't recall exactly

10  what the dad was doing.  As I recall he was taking care of

11  the other children that were in the immediate area.

12    Q    Now you said that -- when you first entered the

13  residence, the child was unattended?

14    A    That's correct.

15    Q    At any time, did you see anybody performing CPR

16  or attempting to resuscitate this child?

17    A    I don't recall, ma'am.  As I wrote on my report

18  which was completed immediately following the recall, I

19  specifically wrote:  No care initiated prior to EMS

20  arrival.  Meaning that nobody did anything before we got

21  there.  There was no CPR being done at the time of the

22  scene.

23    Q    Now, sometime during the resuscitation efforts,

24  did you determine the age of the child?

25    A    I was told the child was two years old and I was

86

1   provided with a birthdate confirming that.

2       Q    And explain to the jury, when you got there, the

3   child, you said, was unresponsive.  Explain to them what

4   you did.  And if you could slow down for Mr. Flores

5   because he's taking everything down.

6       A    Yes, ma'am.  Initially what we do with any

7   child, any person that calls for our service, what we'll

8   do is we'll initially enter the room, I want to know how

9   many patients I have if the scene is safe, first of all,

10  for my own well-being, if I need backup from another unit

11  or supervisor, and whether I'm going -- what I'm going to

12  do with this patient.

13            I found this patient lying face down -- I'm

14  sorry -- face up on the floor, again, not breathing, no

15  pulse.  My initial assessment, of course, I need to take

16  care of that problem.  We immediately started

17  resuscitation efforts.  We started breathing for the

18  patient.  We started CPR for the patient.

19            As we removed the clothing that the patient

20  was removing, to assess the rest of the body, and found

21  bruises to the entire body in multiple stages of healing

22  suggesting ongoing injuries, multiple, different kinds of

23  injuries -- for whatever reason.  I asked the mother what

24  happened, why -- how -- you know -- I needed to know what

25  is going on with this patient.  Why they are, the way they

1  are.  And I asked the mom what happened to the baby, why

2  the call for EMS.  And she said that the baby fell down

3  the stairs.  I took note of the fact that the residence

4  that we entered was a single-story residence, and only

5  about three steps in the front.  I thought it was kind of

6  odd, and I did report that to the police department when

7  they arrived.

8           Like I said we initiated the resuscitation

9  efforts.  I started -- I actually interosseous access

10  where we put a needle into the bone to get fluids in very

11  quickly.  I gave my medications.  I put my patient on the

12  heart monitor.  At the time she had absolutely no

13  electrical activity in the heart.  The patient was

14  clinically dead when we arrived.  I told the officer on

15  the scene that that was exactly the case.  This patient

16  was dead but we're going to do everything we can, just on

17  account of the fact, that the child is the two year old.

18  We're going to give them the benefit of the doubt.

19           I also noted that the patient had a

20  deviation of the left eye -- kind of upwards and to the

21  left, generally indicative of either a congenital problem

22  such as glaucoma or more likely as a head trauma.  I asked

23  the mother if the patient had any type of medical

24  problems.  And she said:  No.  The patient has never had

25  any trouble.  Doesn't any medications for anything, and no

88

1      allergies to medications.

2                      And we continued our resuscitation efforts,

3      and we transported the patient to the hospital.   Anything

4      else I can give you specifically thereof?

5          Q      I want to ask you, in your report -- and you

6      just told the jury you indicated that Mariah's eyes were

7      deviated to the left.

8          A      Yes, ma'am.

9          Q      Explain to them what you saw -- what you mean by

10     that?

11         A      What I noted -- had they had the pictures shown

12     to them of the patient?

13         Q      They've seen some of the photographs?

14         A      Okay.   One of the photographs shows exactly what

15     I am trying to describe.   The patient's right eye was

16     essentially straight ahead.   The left eye was up into the

17     left.   Basically it's because of a nerve damage, or head

18     trauma, or something of that sort -- some form of injury.

19     I wouldn't have any idea exactly how it would have

20     happened, but that's generally the reason for an eye being

21     like that.   Generally, it's a head trauma.

22         Q      And you said also in your report -- you indicate

23     that there is bruising pretty much in every area -- and

24     your report seems to have said that.

25         A      Yes.

```
 1      Q     Explain how your report is divided up --

 2      A     Sure.

 3      Q     -- into sections?

 4      A     I have assessment here noted that is required on

 5   the EMS report.  We'll take note of the patient from head

 6   to toe.  Again, initially my concern is life threatening

 7   illnesses on any individual.  I'm going to check their air

 8   way, their breathing, their circulation, and I'm going to

 9   fix those problems before I go into anything else.

10                  THE COURT:  Mr. Nester?

11                  THE WITNESS:  Yes, sir?

12                  THE COURT:  Please slow down.

13                  THE WITNESS:  I'll have to correct those

14   things before I worry about other injuries that are

15   probably not life threatening.  But before I drop off the

16   patient or transfer care, at least, I'll have to note

17   everything from head to toe what is wrong with this child.

18   At least note that there is an abnormality or not.  What I

19   noted was that the airway was patent, but that there was

20   no breathing.  All pulses were absent.  The lower back had

21   contusions present.  The thoracic back had contusions

22   present.  There was no obvious gross fluid loss or blood

23   loss.  The central nervous system -- the patient was

24   unresponsive.  Eyes, deviation to the left.  The head

25   face, there was a hematoma present.  Left ear, and right
```

90

1    ear, and throat were, assessed with no obvious

2    abnormalities; lower extremities of the left leg, there

3    was blunt injury and bruising to the lower extremities.

4    To the right leg, blunt injury and bruising, also it says:

5    Other comments.  I wrote:  "Bruises in multiple stages of

6    healing over total body.  Pelvis had assessment of

7    abnormalities, meaning that it was intact.  It wasn't

8    obviously fractured --

9              Upper extremities:  Left hand, bruised.

10   Upper extremities:  Right hand, bruised.

11             -- ABC, breathing.  No spontaneous

12   respirations.  Abdomen, there was bruising.  Back lumbar,

13   bruising.  Back lumbar, there was bruising.  Back -- upper

14   back, there was contusions cardial vascular pulse.  Chest:

15   Bruising.  Eyes and pupils:  Dilated and nonreactive.

16   Head contusions:  Left eye and right eye were assessed

17   without abnormalities.  Meaning the sockets were intact.

18   They are not protruding.

19             Lower extremities to the left and right

20   foot were both bruised.  Neck was assessed with no

21   abnormalities.  Pelvis, and genitalia, not assessed.  She

22   had a diaper or something of that sort.  Left arm and

23   right arm with bruising and scars.

24        Q    Now you said, basically, the child was

25   clinically dead --

91

1      A     That's correct.

2      Q     -- but you initiated life saving methods?

3      A     Yes, sir.

4      Q     And what were some of the life saving methods in

5   addition to the oxygen, and the cardiac monitor?

6      A     Okay.  Initially, we obtained the vital signs

7   which were absent, but they were not present.  And EKG was

8   asystolic.  We knew there was no electrical flatline.

9                THE REPORTER:  There was no what?

10               THE WITNESS:  No electrical activity.

11               We administered oxygen, we placed a tube

12  inside their patient's lungs to breathe for the patient

13  because we have a bag that we can force ventilation.  We

14  did that, and we did breathe for the patient.  We

15  established O-axis for medications.  I gave Epinephrine

16  for 110,000.  I gave Atropine Sulfate.  I gave a second

17  dosage of Epinephrine, and I gave a second dose of

18  Atropine.  I established an IV to the right foot on the

19  way to -- I'm sorry -- on route to the hospital.  I gave

20  another dose of Epinephrine, 1:10,000.  And, of course,

21  performed CPR the entire time.

22     Q     Now in your report, I find it interesting that

23  you noticed the defendant's demeanor.  What was that?

24     A     Well, what I noted exactly was the mother was

25  somewhat distressed, but distant.  The father was

1   non-distressed and distant.  The mother was there in the

2   room.  I've had a number of calls of similar nature where

3   a child is injured or killed, or there is some problem

4   related to a child where a parent is on the scene.  Any

5   parent -- whether it be mother or father, is always trying

6   to cling to the child.  I noted the fact that the mother

7   was not -- she wasn't even within arm's reach of the child

8   much less trying to gasp, hold her, or trying to do

9   anything to hold them.  She wasn't overly distressed.  She

10  wasn't really crying or showing a whole lot of emotion.

11  She was extremely calm for the situation.  That was so far

12  out of the ordinary, that I put it into the report.

13      Q    Now, in your experience as a paramedic how many

14  child fatalities, or child cases -- child injuries have

15  you responded to, would you say?

16      A    More than a dozen.

17      Q    More than a dozen?

18      A    Yes, ma'am.

19      Q    Okay.  Can you give us a number, or you don't

20  really know?

21      A    I really don't recall, ma'am.  I've done a whole

22  lot of calls.

23      Q    How long have you been a paramedic?

24      A    Eight years.

25      Q    Eight years?  And in those eight years, you've

1    had many, many calls?

2         A     Yes, ma'am.

3         Q     Including where children are your patients?

4         A     Yes, ma'am.

5         Q     And this particular episode, basically jumped

6    out at you because the parent was not acting in the way --

7         A     That's correct.

8         Q     -- that you were expecting?

9         A     She didn't act at all like what I would expect

10   of a mother.  Not like any of them that I had ever

11   responded to in my entire career.

12        Q     Now the ones in other cases where you had

13   responded to child fatalities or child injuries, have

14   individuals tried to resuscitate their children?

15        A     They do.  They're always --

16                  MR. GILMAN:  Objection, Your Honor.  It is

17   irrelevant to the issues in this case.

18                  THE COURT:  I'm going to overrule it at

19   this time.

20                  THE WITNESS:  Yes, ma'am.  A mother or

21   parent, who generally, are caretakers in general, they'll

22   make ever effort to help if they can.  They may not be

23   trained, but they make some attempt to take care of the

24   child.  If they can't help, they can at least console

25   their child.  I had one particular instance that stood out

1    just because it was so gruesome.  A child -- their head,

2    specifically, their head and face was run over by the dual

3    wheels of a truck.  There was brain matter present.  There

4    was eyes and socket protruding from the patient.  The baby

5    was not recognizable.  The mother was over on top of the

6    child, and consoling him, and holding him -- screaming and

7    crying.  It took us close to an hour to get the pair of

8    them separated.  Every time we tried to remove her, she

9    dragged the body with her.  It's disturbing as a paramedic

10   to see something like that.  Much less, I would expect to

11   see your own child that way, but they still clinging to

12   the patient.  And in every instance, it has been that way.

13        Q    Now, Mr. Nester, in your report you also

14   indicated that the defendant had told you that the child

15   had fallen.  Do you recall the time period?

16             MR. GILMAN:  I object, Judge, to counsel's

17   questioning.  It is leading.

18             THE COURT:  It is leading.  Overruled -- I

19   mean sustained rather.

20             MRS. DE FORD:  I pass the witness, Your

21   Honor.

22                       **CROSS-EXAMINATION**

23   **BY MR. GILMAN:**

24             THE COURT:  Mr. Gilman?

25        Q    Mr. Nester, you indicated that there was -- or I

```
 1    thought you indicated that there was no blood?
 2         A    There was no gross hemorrhage, sir.  The child
 3    was not laying in a pool of blood, or anything of that
 4    sort.
 5         Q    Was there any body fluids of any kind?
 6         A    Not gross hemorrhage, or gross loss of fluids.
 7    The child wasn't laying in a pool of their own fluids.
 8    There was minimal scabbing -- things of that sort.
 9    Nothing that looked like it was new.
10         Q    And you're not trained, are you, or maybe you
11    are to determine how long this child had been clinically
12    dead?
13         A    Sir, I can determine upon arrival, signs that
14    showed that the patient is deceased such as the fact that
15    there is absolutely no electrical activity in the heart
16    which is the case on this one.  The pupils are dilated and
17    non-reactive.  Meaning that patient is brain dead.  That's
18    one of the last things to go when the brain dies.  The
19    pupils are the last things to not restrict anymore.  There
20    wasn't blood pooling, lividity, or anything like that,
21    that would indicate it was more than 20 or 30 minutes.
22    But outside of those parameters, I couldn't tell you
23    exactly how long this patient had been down.
24              I was told -- either the mother or the
25    father -- one of the individuals on the scene, that it was
```

1   approximately 15 minutes from the time they found the

2   patient wasn't breathing until we arrived on the scene.

3                   MR. GILMAN:  Thank you.  Nothing further.

4                   THE COURT:  Mrs. De Ford.  Anything

5   further?

6                   MRS. DE FORD:  No, Your Honor.

7                   THE COURT:  You may step down, sir.

8                   THE WITNESS:  Thank you, sir.

9                   MRS. DE FORD:  Your Honor may the witness

10  be excused?

11                  MR. GILMAN:  No objections.

12                  THE COURT:  You may be excused.  Thank you

13  very much.  Call your next witness.

14                  (Witness was excused at  **11:41 a.m.**.)

15                  MRS. DE FORD:  State calls David Mendoza,

16  please.

17                  THE COURT:  Mr. Mendoza.  Before sitting

18  down, would you please raise your right hand.

19                  **(Witness was sworn in by the Court.)**

20                       **DAVID MENDOZA,**

21    having been first duly sworn, testified as follows:

22                     **DIRECT EXAMINATION**

23  **BY MRS. DE FORD:**

24                  THE WITNESS:  Yes, sir.

25                  THE COURT:  Please be seated, sir.

```
 1      Proceed, Mrs. De Ford.
 2                  MRS. DE FORD:   Thank you, Your Honor.
 3          Q    Mr. Mendoza, could you please introduce yourself
 4      to the jury that he has these group here?
 5          A    Hi.  My name is David Mendoza.
 6          Q    And Mr. Mendoza, what is your current
 7      occupation?
 8          A    My current occupation, I'm a United States Army
 9      Recruiter.
10          Q    And how long have you been an Army recruiter?
11          A    I've been an Army recruiter eight months.
12          Q    And prior to that what was your occupation?
13          A    I was an emergency medical technician;
14      intermediate.
15          Q    And where were you working?
16          A    South Texas Emergency Care Foundation.
17          Q    And what type of training did you have to obtain
18      in order to become an emergency medical technician?
19          A    The type of training, you get it done at Texas
20      State Technical College, and it is basic first response,
21      with some CPR, first aid, some advance intubations,
22      mobilize the patients, basically, intermediate care.
23          Q    And how long were you an EMT?
24          A    I was an EMT for approximately seven years.
25          Q    And in those seven years where else did you work
```

1    besides -- you said you were -- back of last year, where
2    were you working?
3         A    Excuse me?
4         Q    Back in 2007, where were you working?
5         A    Oh, with South Texas Emergency Care Foundation.
6         Q    And how long did you work for them?
7         A    For seven years.
8         Q    Seven years?  What were your duties when you
9    were an EMT?
10        A    My duty as an EMT depending upon the type of
11   patient that we had, basically, drive the ambulance, do
12   mobilization on patients, start IV lines, give oxygen to
13   the patient -- intermediate stuff.  If it's something
14   critical, then the paramedic takes over.
15        Q    So how long -- were you working back with the
16   ambulance service in February 17, 2007?
17        A    Yes, I was.
18        Q    And what shift -- do you remember what shift you
19   were working on that day?
20        A    I believe it was to 7:00 a.m. to 7:00 p.m.
21   shift.
22        Q    And who was your partner on that shift?
23        A    Randall Nester.
24        Q    And is it customary for two individuals to ride
25   the ambulance?

```
 1        A     Yes an EMT, or an EMT intermediate, and a
 2   paramedic.
 3        Q     Do you recall responding to a call involving a
 4   young victim by the name of Mariah Alvarez?
 5        A     Yes, I do.
 6        Q     Could you please tell the jury what you found
 7   when the ambulance first arrived there?
 8        A     When we first arrived there, we found a
 9   pediatric patient in the living room.  It seemed to be the
10   living room because as soon as we went to the front door,
11   we saw this patient laying unresponsive, with -- basically
12   the call came in that it was an unresponsive pediatric,
13   and that's when we first started doing our assessment.
14   But initially, I saw the pediatric there in the living
15   room.
16        Q     And who was around the young victim when you
17   arrived?
18        A     When we walked in, there was nobody around.
19   There was nobody there.
20        Q     Did you later determine who the parents were?
21        A     We asked right away where the parents were.
22   There were other individuals standing (right away).
23   Standing right in front of me.  Well, not right in front
24   of me, but at a distance.  And there was a female to my
25   10:00 o'clock standing at a distance also.  And we asked
```

1    where the parents were, and that's when the mother stated

2    that she was the mom, and we started asking questions --

3    like any medical history -- as to what happened, and we

4    started asking questions like that to determine what had

5    occurred, and what type of treatment-- you know -- to go

6    with.

7         Q    And what happened after that?

8         A    After we determined who the parents were,

9    or -- ?

10        Q    Yes.

11        A    We started -- we started basically treating --

12   carry her out with the C collar and CPR backboard, and we

13   knew -- after the clothes came off, we noticed all the

14   bruises.  So right away we knew it was some type of

15   trauma-- you know -- we don't really like to chance it if

16   there's any type of neck injury, or anything like that.

17   So right away, we put the C collar and backboard on.

18        Q    Do you remember what type of bruising that you

19   saw?

20        A    Well, there was -- I know in the chest there was

21   multiple bruises -- you know-- and there was also bruising

22   to her legs-- you know.  There was some swelling to the

23   knees and-- you know -- I know we noticed some type of

24   bruising in the back.  When you do a full assessment you

25   want to know what is going on so you kind of roll them to

1    the right, or roll them to the left.

2         Q    And what happened next?

3         A    What happened next?  Well my partner, Randy --

4    you know -- he made the determination, we put the leads

5    on, and he made the determination that it was a scoop and

6    go.

7                   THE REPORTER:  A what?

8                   THE WITNESS:  A scoop and go.  That's a

9    term we use to say, that we need to get out of here.  We

10   don't -- we can't waste any time.  And that's when the

11   supervisor agreed as well.  And that's when we put the

12   patient on a stretcher and we put them on the ambulance,

13   so we can expedite them to Valley Baptist.

14        Q    And, you were in Harlingen at the time?

15        A    Yes, ma'am.

16        Q    You took them to what hospital?

17        A    To Valley Baptist Medical Center.

18        Q    And where in the hospital did you take them to?

19        A    In the emergency room.

20        Q    What happened once you got to the emergency

21   room?

22        A    The doctor started asking questions -- you know

23   -- basically, I came out because there was lot of nurses

24   in there and stuff, and we brought the stretcher out -- we

25   brought all of our equipment out, and we came back in, and

1    that's when the doctor called it.  And, basically, when

2    everything was done, I went, I have this thing that I go

3    in, and I just look at the patient and just wonder -- you

4    know -- what happened -- what was going on?  And I do

5    basically to all of the patients.  And I tell them:  "Rest

6    In Peace."  And -- I leave.

7         Q    And that was the end of the service call for

8    this particular patient?

9         A    Yes, ma'am.

10        Q    Mr. Mendoza, you said that you made contact with

11   the defendant in this case -- with Mrs. Lucio.  Did you

12   then determine that she was the mother?

13        A    Yes, ma'am.

14        Q    And do you remember her demeanor on that day?

15        A    It was -- when I saw -- you know -- it wasn't --

16   I mean as soon as we walked up-- you know -- it was kind

17   of odd not to see anybody around the child.  And -- you

18   know -- it was calm.  It was -- it wasn't like a normal

19   parent -- you know -- I'm a parent myself, and if I saw my

20   child like that, I'm going to be next to my child.  I

21   mean, I'm not going to -- I'm not going to let anybody get

22   close because that's my child.  But what we saw right

23   away, is like:  Well, that's what we have.  Who are the

24   parents?  Where's the mom?  Where's the dad?

25        Q    Did she appear upset?  Distraught?

103

1        A    When we were asking questions, no.  Usually,

2   when we ask questions, when it's a child, the mom can't

3   answer them.  And we have to literally ask a couple of

4   times.  And she didn't -- at that point, she didn't appear

5   upset at all.

6                    MRS. DE FORD:  Pass the witness, Your

7   Honor.

8                    THE COURT:  Mr. Gilman?

9                    MR. GILMAN:  We have no questions.  Judge.

10  Thank you.

11                   THE COURT:  You may step down, Mr. Mendoza.

12  Thank you very much.  May he be excused?

13                   (Witness excused at 11:50 a.m.)

14                   MR. GILMAN:  No objections, Your Honor.

15                   THE COURT:  You may be excused.  Call your

16  next witness.

17                   MR. PADILLA:  Does the Court want to start

18  on the next witness.

19                   THE COURT:  I don't know.  This witness was

20  less than ten minutes.

21                   MR. PADILLA:  The next witness is longer

22  ten minutes.

23                   THE COURT:  Let's go ahead and break for

24  lunch.  We will come back at 1:30.  Come back at 1:30.  If

25  you come back earlier, we'll start.  Remember the

1    instructions.  Don't talk to anybody, or with anybody

2    else, or among yourselves.

3

4                **(Jury not present at 11:51 a.m.)**

5                THE BAILIFF:  Mr. Padilla and Mrs. De Ford?

6    Mr. Gilman advised me that in his review of the CPS

7    records, none of the videotapes with regard to the

8    interview were with the other children, or the drug

9    testing that was contained with them in his review of

10   that.  So CPS has not provided everything.

11               MR. PADILLA:  Your Honor, I have no

12   knowledge of that.  I did tell Mr. Gilman that I did have

13   in my possession, a VHS tape that I think was prepared by

14   Monica's House or Maggie's House, but because it involved

15   the children, obviously it creates a Crawford issue, if I

16   try to introduce statements.  So I have not reviewed it,

17   Your Honor.

18               MR. KRIPPEL:  Actually, I can't speak one

19   hundred percent, but 99 percent sure that we've had the

20   videotapes of the children all along, and they've been

21   available to defense the entire time.  But I have to

22   double check just to make sure.  They have been in our

23   file and available the whole time.

24               THE COURT:  I know, but the problem,

25   historically, they're in your file and they are available,

1   but the defense doesn't necessarily know that they are

2   there.  That has been a historical problem.

3                    MR. PADILLA:  Just, for the record, the VHS

4   record that I've got in the file, we have an open records

5   file.  It's been there.  Now, obviously, it has been in my

6   possession.  I've seen it.

7                    THE COURT:  How about the drug testing?

8                    MR. PADILLA:  I have no information

9   concerning the drug testing.

10                   MR. GILMAN:  My objection is that, we had

11  the head of Child Protective Services in here, and he

12  said:  All of the files were turned over.  And not

13  everything has been turned over.

14                   THE COURT:  Mr. Gilman -- I understand.

15  But you either have to make -- in order to have some

16  motion to enforce it, you have to do -- subpoena them, do

17  a motion to hold them in contempt, or something.

18                   MR. GILMAN:  Well -- all right.

19                   THE COURT:  I'm not going to do it sua

20  sponte.

21                   MR. GILMAN:  I thought I did something by

22  asking for all of the records, and that was done a year

23  ago.  But, I feel like --

24                   THE COURT:  Let's visit this issue a little

25  bit before we bring the jury at 1:30.

1    MR. PADILLA:  Yes, sir.

2    THE COURT:  In the meantime, you all talk

3  and figure out what is going to be critical, and what is

4  not going to be critical.  I am not sure that the drug

5  testing makes any kind of difference given the age of the

6  bruises, and all that -- and everything else.  But, y'all

7  talk about it.  Okay?  See you at 1:30.

8    **(Recess from 12:00 to 1:30 p.m..)**

9    **(Jury not present.)**

10    MR. PADILLA:  I need about a minute.

11  Mr. Villalabos is on his way up to take the next witness.

12    THE COURT:  He what?

13    MR. PADILLA:  He is going to take the next

14  witness.

15    **(Brief pause in proceedings)**

16    THE COURT:  Call now 07-CR-885-B, State of

17  Texas versus Melissa Elizabeth Lucio.  Let the record

18  reflect that the defendant is present along with the

19  district attorney's office  and along with defense

20  attorneys.

21    MR. CORDOVA:  Good afternoon, Judge.

22    MR. GILMAN:  Have you had a chance to look

23  at the CD?

24    MR. PADILLA:  That's what I've been told.

25    THE COURT:  Mr. Padilla, do you have the --

```
 1    hold on.  (referring to the media)
 2                   Be sure that the instructions are that they
 3    are not to take pictures of the jury.
 4                   THE BAILIFF:  I already did, sir.
 5                   THE COURT:  Okay.  I don't want it going in
 6    when the jury goes in, I don't mind -- I'll be glad to
 7    cooperate, but I don't want the juror's faces on that.  I
 8    don't want them harassed thereafter.
 9                   MR. PADILLA:  Yes, Your Honor, on the issue
10    of the DVD tape --
11                   THE COURT:  Yes, sir.
12                   MR. PADILLA:  I'm in the processing of
13    retrieving -- I didn't get a chance to retrieve that
14    during the lunch hour, or this morning.
15                   THE COURT:  You said that this morning,
16    sir.
17                   MR. PADILLA:  I understand, Your Honor.
18    And I apologize for that.  I will have it available
19    shortly.  In fact, if Mr. Villalabos has the next witness,
20    I will have a chance to look through my box.
21                   THE COURT:  All right, sir.  Bring the jury
22    in, please.
23                   (Jury present, defendant present 1:32 p.m.)
24                   THE COURT:  You may be seated.  Thank you
25    very much.  You may sit down.
```

108

```
 1                    Let the record reflect the jury is now
 2      seated and complete.
 3                    Mr. Padilla?  Call your next witness.
 4                    MR. VILLALOBOS:  The State calls Victor
 5      Escalon.
 6                    THE COURT:  Before sitting down, please
 7      rise your right hand.
 8                    (Witness was sworn in by the Court.)
 9                         VICTOR ESCALON, JR.,
10        having been first duly sworn, testified as follows:
11                         DIRECT EXAMINATION
12      BY MR. VILLALOBOS:
13                    THE WITNESS:  Yes, sir, I do.
14          Q    Would you please introduce yourself to the jury?
15          A    My name is Victor Escalon, Junior.  I am with
16      the Texas Rangers, and I am stationed in Harlingen.
17          Q    What exactly do you do as a Texas Ranger?
18          A    I'm an investigator for the State of Texas, like
19      Rebecca Cruz sitting over there.  She's a detective for
20      Harlingen PD.  We do similar type of investigations.  I
21      work homicides, officers involved in shootings, violent
22      crimes, and public corruption.  I have a wide array of
23      investigations that I can get involved in.  But the nuts
24      and bolts are, what I just mentioned right now.
25          Q    Are you assigned a particular area or region?
```

1       A     My position where I am stationed is Harlingen

2    and I cover part of Hidalgo County, Willacy County

3    Harlingen, and San Benito.  So I cover three counties.

4       Q     What experience do you have besides being a

5    ranger?

6       A     Prior to being a ranger, I've been a ranger now

7    going on five years -- this summer, maybe five years.  And

8    prior to that, I've been with the Department of Public

9    Safety for 14 years now.  And during those 14 years, I was

10   a highway patrol trooper stationed in Zapata and Laredo

11   for four and a half years.  After that I was promoted into

12   the narcotics service where I was a sergeant

13   investigator -- doing narcotics investigations in Laredo,

14   prior to being here, stationed in the Valley.

15      Q     What type of training have you had as a ranger?

16      A     I've had numerous hours of school training,

17   academic training, from interrogation interviews, crime

18   scenes, search warrants, homicides, and violent crimes.

19   It's a large amount of hours spent in a classroom to help

20   me prepare to help me do the work out here in the field.

21      Q     Were you on duty back on February, 2007?

22      A     Yes, sir.  I was.

23      Q     Do you recall February 18, 2007, in particular?

24      A     Yes, sir.  I do.

25      Q     How did you first become involved in this

1    particular case?

2         A    It was around midnight, around 11:00 o'clock in

3    the evening.  I want to say it was the 17th of February, I

4    got a phone call from Ranger Castaneda -- he is a ranger

5    stationed in Brownsville -- that Harlingen PD had

6    conducted a homicide investigation where a two year old

7    little child was found deceased.  So I headed over to the

8    PD to assist them in however I could in the investigation.

9         Q    And was this unusual for you to be called out

10   for these types of investigations?

11        A    No.  It's not unusual.  Any time there is a

12   major crime or whatnot, we like to offer other services or

13   they call us to assist them because we have our crime lab,

14   our experience, our training, our resources that we have

15   that we make available to the community or to the local

16   police agencies here in the Valley.

17        Q    And you say "we," do you mean DPS?

18        A    When I say "we," I mean Texas Rangers, when it

19   is involving those type of investigations.

20        Q    What was your role when you first arrived at the

21   police?

22        A    When I arrived at the police station, my role

23   was to assist whoever was conducting the initial

24   investigation with Melissa Lucio, and where I had

25   information that she was a suspect in this homicide in the

```
 1    death of this two year old girl.  I found out where she
 2    was, and what investigators were interviewing her.  So my
 3    role was to assist them in the interview.
 4         Q    Now did you have to go to the crime scene at all
 5    that evening?
 6         A    No.
 7         Q    Did you ever go to the crime scene?
 8         A    No.
 9         Q    So your role would be limited to dealings with
10    the suspect at the time?
11         A    Yes, sir.
12         Q    Who did you actually meet up with when you first
13    arrived at the PD?
14         A    I met up with the supervisors there initially,
15    at the crime scene -- not at the crime scene -- but there
16    at the PD to kind of get an insight of what's occurring,
17    to investigators that were involved in interviewing
18    Melissa Lucio.
19              I met with Rebecca Cruz and she gave me an
20    update version of what was happening in the investigation,
21    or to find out where we're at, and what we do have so far
22    in this investigation.  And from there I was briefed and
23    went into the interview.
24         Q    What was your understanding of what the offense
25    was at this point?
```

```
1        A     The offense -- my understanding was, it was a
2   two year old little girl that was badly beaten and died
3   due to her injuries.  The suspect, right off the bat, are
4   going to be the mother and father.  They are the ones that
5   are going to have immediate -- or be with them all the
6   time, and are responsible for this little girl.  So we
7   have a two year old little girl that is badly beat, and we
8   have the parents in the interview room that are being
9   looked at -- strong interest -- or a strong person of
10  interest in the death of Mariah.
11       Q     Were there any reports or paperwork that you can
12  review before you went and talked to the suspect?
13       A     That was last year.  And when -- not so much
14  reports.  I was briefed by the police department -- by the
15  officers involved -- of their -- what kind of occurrences
16  or what they'd been dealing with the mother -- you know --
17  CPS was involved, and this child was taken away --
18              MR. GILMAN:  Your Honor, I object to
19  anything that he was told.  And what he is testifying to,
20  Judge, is hearsay.
21              THE COURT:  Sustained.
22       Q     (By Mr. Villalobos) Just, generally, did you
23  review any documents, or did you just talk to somebody
24  else?
25       A     I just -- I just talked to people, the
```

113

```
1    investigators there at the scene.
2         Q    Were you provided any photos?
3         A    Yes, sir.
4         Q    What type of photos were you provided?
5         A    I was provided the photos of Mariah laying naked
6    with her injuries, showing her injuries to me.
7         Q    So armed with those photos and discussions that
8    you had with the investigators, is that what you went into
9    when you went to see the suspect?
10        A    Yes, sir.
11        Q    You didn't go to the crime scene, or you didn't
12   -- there wasn't an autopsy beforehand, or anything of that
13   nature?  Just the photos, and what they told you?
14        A    Yes, sir.  That is correct.
15        Q    Could you describe how you first met the
16   suspect, the defendant here in this case?
17        A    I walked into the interview room and I noticed
18   two investigators, J. M. Martinez, and Mike Salinas
19   interviewing Melissa Lucio.  And I sat in and I observed
20   her demeanor.  And once there was a pause in the
21   interview, I introduced myself.  I told her who I was and
22   why I was here.  And that's how we started.
23        Q    Can you tell me where the interview took place?
24   Were you in the station, or were you offsite some place?
25        A    It was in the Harlingen Police Department.  It
```

1   was in the office of J. M. Martinez, and Rebecca Cruz.

2       Q    And when you state "Melissa Lucio," do you

3   recognize the person that you just identified as Melissa

4   Lucio in the courtroom today?

5       A    Yes, sir.  I do.

6       Q    Can you point her out and describe an article of

7   clothing she is wearing?

8       A    Yes, sir.  She is over here in the corner,

9   wearing a pink blouse.

10              MR. VILLALOBOS:  Your Honor, may the record

11  reflect that he has identified the defendant?

12              THE COURT:  The record will reflect that he

13  has identified the defendant.

14      Q    (By Mr. Villalobos) Now, Officer, as you went

15  in, you waited for a pause before you went in and you

16  introduced yourself?

17      A    Yes, sir.  I did.

18      Q    Can you describe to the jury how you go about

19  doing that?

20      A    Well, my initial observation -- that's when the

21  investigation starts, is when I walked into the room and I

22  see the investigators interviewing the suspect.

23              I'm just observing right now, trying to

24  soak it all in, and see what we have, and try to get a

25  better idea about this lady.  And I observe her, how she's

 1   answering these questions, her demeanor, how she's

 2   standing.  All of that is telling me -- it's like a

 3   picture, almost -- I'm observing everything, and that is

 4   already feeding me -- that's already telling me what I'm

 5   dealing with.  Okay?  And then I see the investigators and

 6   I'm just making note -- I'm am making note -- you know:

 7   Okay.  This is what I have.

 8        Q     What type of demeanor would you describe her

 9   having?

10        A     When I walked in, she was not making eye

11   contract with the investigator.  She had her head down.

12   So right there and then, I knew she did something.  And

13   she was ashamed of what she did, and she had a hard time

14   admitting to the officers what had occurred.  That's what

15   crossed my mind.  And I knew she was beat.  I knew -- when

16   I say she was "beat" -- she was giving up.  She wants to

17   tell because she's giving that slouched appearance -- you

18   know:  I did it.  I've given up.  I need to interview her,

19   visit with her a little more.  That's what I sensed.  And

20   I get that because of my experience in law enforcement,

21   and my experience in interviewing people.  Every time it's

22   pretty much similar, in demeanor, in people and that's

23   what I have experienced.

24        Q     Have you had other types of experience in your

25   experience as a trooper and investigator in interviewing

1    people?

2        A    That's one of the most common clues you would

3    call -- that you see -- somebody with their head down, and

4    like their shoulders are slouched forward, and they won't

5    look at you.  They're hiding -- hiding the truth.

6        Q    As opposed to what other type of demeanor?

7        A    If you get somebody that is being honest,

8    they're going to be upset with you.  They're going to tell

9    you: "Get out of my face.  I didn't do anything.  Leave

10   me alone.  I want my attorney."  They're going to be

11   upset.  If you're accusing somebody of doing -- especially

12   something as serious as this -- and you didn't do it,

13   you're going to be upset, and you're going to be offended,

14   and you want to get out of there.  You want to make this

15   right and clear your name.  It's black and white.  You'll

16   see the difference.  It'll stand out.

17       Q    Did you introduce yourself at some point to the

18   defendant?

19       A    Yes, sir I did.

20       Q    And describe -- can you describe how you did

21   that?  Did you just tell her your name?  Did you show her

22   your card?

23                MR. GILMAN:  Judge, we've seen the video.

24   We spent all day yesterday with the video.

25                THE COURT:  I understand.  Your objection

```
 1   is?
 2                  MR. GILMAN:  We're going over the same
 3   video that we all saw.
 4                  THE COURT:  Overruled.  Please sit down,
 5   Mr. Gilman.
 6        Q    (By Mr. Villalobos) Please describe, generally,
 7   to the jury.
 8        A    Once there was a pause -- and I observed what
 9   was going on -- I identified myself.  I said:  My name is
10   Victor Escalon, Jr.  I'm with the Texas Rangers, and I'm
11   stationed in Harlingen.  And -- I'm here to find the facts
12   in this investigation, and to put this to rest so you can
13   start healing.  That's how I introduced myself in starting
14   the investigation -- or started the interview.
15        Q    Now when you're going through the interview with
16   her, did you know the cause of death -- the exact cause of
17   death at that point?
18        A    No, sir.  I did not.
19        Q    Based upon your experience of being a police
20   officer or a ranger, and a DPS trooper, did you have a
21   suspicion of what that cause of death was?
22        A    Yes, sir.  I did.
23                  MR. GILMAN:  Objection.  It calls for a
24   medical conclusion.  We've even heard from other police
25   officers that were giving medical opinions.
```

1           MR. VILLALOBOS:  Judge, I don't think it's

2   a medical question.  It's a suspicion as to what he is

3   going to lead his response to.

4           THE COURT:  I'm going to overrule the

5   objection.  Let's move on, Mr. Villalobos.

6       Q    (By Mr. Villalobos) You can answer the question.

7       A    Ask the question one more time, please.

8       Q    Based upon your experience as a Ranger, and as a

9   trooper, and a peace officer, when you're going to conduct

10  the interview with the suspect, did you have a suspicion

11  as to what the cause of death was?

12      A    I had a suspicion.  Yes, sir, I did.

13      Q    What was your questioning, and your

14  investigation -- strike that.  That suspicion, did it lead

15  to your questioning and your investigation of the suspect?

16      A    Yes, sir.  It did.

17      Q    What had you suspected occurred here to the

18  child?

19      A    Head trauma.

20      Q    When you were discussing the injuries with the

21  suspect, what is it that you are trying to focus on when

22  you're talking to her?  What is it that you are trying to

23  accomplish?

24      A    I want her to tell me the truth, and I want her

25  to admit what she did.  This little girl was badly beaten,

1    and I wanted her to take responsibility for what she did,

2    and explain to me everything she did, how she hit this

3    little girl, and how she grabbed this little girl, because

4    all of that -- when you have a 37 -- 38 year old lady and

5    a two year old girl, the strength, the power, the

6    weight -- there's a big difference.  It doesn't take a

7    lot.  And my questions were surrounded around all of that.

8    And plus, the information she was giving me led me to

9    believe what type of injuries this little girl had

10   sustained.

11       Q    Now we've seen the video and nowhere in the

12   video -- correct me if I'm wrong -- were you told by her

13   that the injuries were sustained by a fall down the

14   stairs?

15       A    During the interview?  No, sir.

16       Q    Was there any information indicating that the

17   injuries could have been caused by a fall?

18       A    No, sir.  There was nothing indicating that.

19       Q    You had reviewed the pictures before you went in

20   to talk to her, is that correct?

21       A    Yes, sir.

22       Q    Did you review them as you were talking to her

23   as well?

24       A    Yes, sir.  I did.

25       Q    Did you see anything in the pictures to indicate

1    that the fall had occurred with this child?

2        A    No, sir.  I did not.

3        Q    What would you look for on somebody's face or

4    head to indicate that an injury had occurred from a fall?

5        A    You're going to have obvious signs of bruising,

6    markings, blood, scalp open -- you know -- it's going to

7    open up.  It's going to bleed.  There's going to be signs

8    of black and blue marks on the head-- whatnot -- obvious

9    signs.

10       Q    You're saying, you didn't see any of those signs

11   in any of those pictures that you saw?

12       A    No, sir.  I did not.

13       Q    Had you -- in your years as being a trooper and

14   ranger, have you seen other instances of head trauma?

15       A    Yes, sir.  I have seen numerous cases of head

16   trauma.

17       Q    So you've seen what you've just described to the

18   jury in other instances where we are talking about the

19   scalp being split open, blood, scrapings, and anything

20   along those lines, as far as injuries to the head?

21       A    Yes, sir.

22       Q    Were you ever told by the defendant that any of

23   the injuries were accidental?

24       A    No.

25       Q    At some point did you notice that the suspect

121

1   was going to cooperate with you or was going to actually

2   tell you what occurred?

3       A   At one point I felt -- well, it was obvious she

4   told me -- she would tell me what happened.

5       Q   And that's from the video -- we could tell it

6   took you some -- what, an hour?  Forty minutes?  Do you

7   recall?

8       A   It took about 20 minutes when she started to

9   open up with me.

10      Q   After she started discussing the injuries to

11  you, and actually displaying those injuries on the doll

12  that you provided to her, did she indicate anything after

13  that about injuries being accidental or being from a fall,

14  or from someone else?

15      A   No, sir.  She did not.

16      Q   And very clearly on the video you're asking her

17  about other people -- if anyone else had harmed that

18  child?

19      A   That is correct, yes, sir.

20      Q   Why would you ask if somebody else had harmed

21  the child?

22      A   To try to find out if other suspects had

23  caused -- or some other people that had caused the

24  death -- the injuries to Mariah.

25      Q   And I think at one point she admits to all of

1    the injuries except for the scratch on the face and one on
2    the heel?

3         A    Yes.

4         Q    At one point you also are going to gather
5    evidence from her -- actual physical evidence from her.
6    Isn't that true?

7         A    Yes, sir.  I did.

8         Q    On the video you show this huge tool box.  Can
9    you kind of describe to the jury what that huge tool box
10   is?

11        A    I carry, in my patrol car -- not my patrol
12   car -- but in my unmarked car, I carry three pieces of --
13   like suit cases, and in those I carry all of my crime
14   scene evidence -- crime scene evidence -- crime scene kit,
15   tools to collect evidence in a crime.

16        Q    So this tool box would have what kind of stuff
17   in it?

18        A    It's going to have, for example, to collect
19   hair, to collect saliva, fingerprints -- anything that you
20   would need in a crime scene, or anything that I would need
21   to collect from a person, and preserve it, package it, and
22   seal it, I'm going to have all of that in my car, or on my
23   person.

24        Q    Are you trained to gather that evidence in every
25   case?

123

1      A    Yes, sir.  I am.

2      Q    At one point the camera is moved away, I guess,

3   so you can have privacy when you're doing that.  Is that

4   the reason for removing the camera away?

5      A    The interview was terminated, and the camera was

6   turned off.

7      Q    Now could you describe -- I mean, are you having

8   to restrain her to get this evidence from her?  Describe

9   exactly what occurred.

10     A    No.  She gave consent -- written consent for me

11  to obtain her DNA -- hair.  And what I do -- I have a swab

12  like a Q-Tip, and I swab the inside of her cheeks, her

13  right cheeks and left cheek.  I'll do 10 or 20 striations,

14  or up and down movements, to get the cheek cells.  And I

15  do that on the right side, the left side, and I preserve

16  those Q-tips in the proper packaging separately.  And I

17  collect the hair, and put that separately, and that is all

18  that I did as far as collecting DNA from Melissa Lucio.

19     Q    Did you collect any fingernail clippings?

20     A    Yes, sir.  I cut her finger nails clippings and

21  we collected that.  We put that in an envelope, secured

22  that, marked it, dated it, and initialed it.

23     Q    Now you did all of this collection of evidence

24  prior to the demonstration on the doll; isn't that true?

25     A    Yes, sir.

124

1      Q     Prior to the demonstration on the doll all you
2  had was her verbal -- of what occurred.  Is that correct?
3      A     That is correct, sir.  Yes, sir.
4      Q     Now, her verbal -- and we've seen the video --
5  but in your opinion, was the verbal -- without the actual
6  demonstration -- was the verbal part really, really clear
7  as to what had occurred?
8      A     It was clear, but there just that little piece
9  missing that I needed.
10     Q     Okay.  When you gather information regarding
11 DNA, what's the purpose of that type of evidence?
12     A     The DNA, for example, the bite marks, to see if
13 we can obtain saliva from Mariah -- evidence to link her
14 back to Mariah.  That's why we do what we do, and that is
15 why we collect that evidence.  How can it help the
16 investigation to prove that Melissa did this.
17     Q     So it helps you provide identity to the suspect?
18     A     Yes, sir.
19     Q     Now if the suspect admits that they did it, and
20 they are the ones that were there and they are the ones
21 that committed the crime, DNA is actually evidence that
22 you don't necessarily have to have?
23     A     Correct.
24     Q     So after you collected the DNA evidence, there
25 was -- what occurred for the questioning to continue?  Did

125

1    you ask her to demonstrate it?

2        A    After the collection, we obtained a baby doll,

3    and we wanted Melissa to show us on video how she beat the

4    child.

5        Q    When she went through the actual demonstration

6    with the doll, was that DNA evidence crucial at that point

7    or had she already described what occurred, and that it

8    was her?

9        A    It was not crucial evidence to determine what

10   had occurred.

11       Q    But we have it any way, is that correct?

12       A    Yes, sir.  We have it just to error on the side

13   of caution.  If we need it, we have it.

14       Q    When you're collecting it, you don't know that

15   she is going in the future, describe --

16              THE REPORTER:  I'm sorry.  Can you repeat

17   that?

18       Q    (By Mr. Villalobos) Sure.  When you're

19   collecting the DNA evidence at that point, you don't know

20   that she's going to, in the future, describe in more

21   details, or tell you more details about it.  Is that true?

22       A    Yes, sir.

23       Q    Now in the video, there is no actual -- she

24   doesn't actually say that she in one direct blow, or one

25   direct shot, hits Mariah on the head, or the head area

126

```
 1   other than general spanking.  Is that true?
 2        A    Yes, sir.
 3        Q    Are the other injuries that you are pointing out
 4   to her, are they consistent with a head trauma?
 5        A    The other --
 6             MR. GILMAN:  Objection.  That calls for a
 7   medical conclusion.
 8             MR. VILLALOBOS:  I'll reword it, Your
 9   Honor.
10             THE COURT:  Reword it.
11        Q    (By Mr. Villalobos) Just to clear up, at no
12   point did she indicate that the spanking or the hitting,
13   or whatever injuries that she described to you, either
14   verbally, or her showing them to you on the doll, that
15   those were accidental?
16        A    They were not accidental.
17        Q    And the way that she phrased it, the way that
18   she showed it, would you consider that intentional?
19        A    Yes, sir.  I do.
20             MR. VILLALOBOS:  At this point Judge, I'm
21   going to pass the witness.
22             THE COURT:  Mr. Gilman, your witness.
23                    CROSS-EXAMINATION
24   BY MR. GILMAN:
25        Q    Officer, your involvement was just what we saw
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

127

1      on the video, isn't that correct?

2          A    Yes, sir.

3          Q    And after you finished the last part of that

4      video, did you leave for the evening -- or night?

5          A    No, I did not.

6          Q    Did you do anything further in this case?

7          A    Yes, sir.  I did.

8          Q    What else did you do?

9          A    After the interview was conducted, or it was

10     concluded or finished with Melissa, I drew up the search

11     warrants in this investigation.  The following morning,

12     Monday, I went also to obtain dental molds from Melissa

13     and her husband -- went to the autopsy where they did the

14     autopsy on Mariah.  Starting at 12:00 o'clock, the 18th, I

15     stayed on this case all the way until Monday, late

16     9:00 o'clock, 10:00 o'clock -- Monday night.

17         Q    The dental records, the swabs that you took from

18     her mouth, the fingernail clippings, the hair, none of

19     that matched up with anything that was gathered by either

20     you or the Harlingen Police Department, isn't that

21     correct?

22         A    It was never submitted for analysis.

23         Q    Why not?

24         A    Because at that point in time, we did not have

25     something to match it up to based on the interview we had

128

1    conducted.  It wasn't deemed necessary at that point.

2        Q    Okay.  You saw pictures.  You never saw Mariah

3    until later on when you went to the autopsy, isn't that

4    correct?

5        A    I saw pictures that night and then later on at

6    the autopsy.  That is correct.

7        Q    So what in those pictures was it that indicated

8    to you that there was head trauma?

9        A    The severe beatings to her body from head to

10   toe.  Her cheeks, her back, her stomach, her legs, her

11   vagina area.

12       Q    That indicates that there is head trauma?

13       A    There's -- that's part of the answer -- part of

14   the puzzle that I am putting here together, coupled with

15   the interview with Melissa.

16       Q    Okay.  But the head trauma you didn't learn

17   until, when you went into the autopsy, when you found out

18   there was brain hemorrhage, and that's what killed this

19   child.  Not the beatings, and the black and blue marks all

20   over this body?

21       A    Again, when she was telling me what she did to

22   that child, led me to believe based upon my experience the

23   head trauma was very suspicious in this case.

24       Q    Well, you said you went there and you talked

25   with the other officers who were interviewing her, and

129

1    those other officers told you or should have told you that

2    Melissa said that the child fell downstairs.  How did you

3    miss it?

4         A    They gave me a brief overview of what occurred.

5    I went in there.  It was my job to find the facts and find

6    out what occurred to find out what really happened.  There

7    was no signs of her falling down.  No obvious signs in the

8    picture.

9         Q    What would be a sign of falling down the stairs?

10        A    You would have red marks, scrapes, bleeding,

11   scalp open wide open, and obvious injuries to the head

12   that were indicative --

13        Q    The emergency room doctor, yesterday, stated

14   that you couldn't see that there was brain hemorrhage, and

15   that the brain hemorrhage was something that wasn't

16   noticeable until later on.

17        A    There's other signs of trauma that can cause

18   bleeding inside of the brain.  It doesn't have to be

19   visible.  Other signs of shaking -- hitting.

20        Q    Do you have any type of medical training?

21        A    No, sir.  I don't.

22        Q    Your training is just as a police officer, a

23   testifier -- someone who comes into court and testifies

24   professionally.  Isn't that part of your training?

25        A    Yes, it is.

1       Q    You never went and checked any stairs as a
2    possible way of causing injury to this child, did you?
3       A    Yes, sir.  I did.
4       Q    You did check some stairs?
5       A    Yes, sir.  I did.
6       Q    Where?
7       A    At the Madison address.  The previous apartment
8    where they were at.
9       Q    Which one?  There were a number of apartments.
10      A    You have the apartment on Lee Street where the
11   body was found -- Mariah was found.  There was another
12   apartment that they had just left, just moved away from on
13   Madison Street -- and it was a second story apartment
14   complex.  We walked the steps.  We observed to see if we
15   could find to indicate some type -- if something had
16   occurred there with Mariah.
17      Q    Which steps?
18      A    There is if I remember, correctly, there were
19   wooden steps leading up to where they lived -- this family
20   lived.  And we walked the steps back and down, and we did
21   not notice anything to show any type of injury in my
22   opinion.
23      Q    There were more than one set of steps, weren't
24   there?
25      A    There's one set of steps from the ground that

1  lead directly to the apartment Mariah lived in, and then

2  back down.  One way up; and one way down.

3       Q    Isn't there more than one set of steps?

4       A    Explain that.  What do you mean, more than one

5  set of steps?  Yes, there's seven.

6       Q    There is more than one set of wooden steps?

7       A    Yes, sir.

8       Q    I hand you here a set of steps.  And this

9  Defendant's Exhibit No. 1, indicates a set of steps.  Are

10 those the same steps?

11      A    They look very familiar, or very similar to the

12 steps I had seen that Monday morning which would be the

13 19th.

14      Q    The steps in Defendant's Exhibit No. 1 are the

15 steps according to Officer Cruz that led to the apartment

16 where Mariah -- where Melissa Lucio lived which is

17 pictured here in Defendant's Exhibit No. 3, are they not?

18 So my question is:  What steps did you go and check?

19      A    These steps -- the steps that I checked, is the

20 apartment complex that Melissa Lucio, Mariah Alvarez and

21 her family lived in.  They are wooden steps.  And the

22 reason I know this is because this is the address that was

23 given to me by Melissa where she resided prior to.  And

24 that is the address that I went to, and we searched the

25 inside of the apartment, and the steps for any type of

1    injury trauma that might have occurred in that apartment

2    complex.

3         Q    And you didn't find anything?

4         A    No, sir.

5         Q    And you don't know which steps it went to, did

6    you?

7         A    I know exactly --

8         Q    Both of those are at Madison.  Both of those

9    sets of steps in One and Three are at Madison?

10        A    Okay.  I know -- these are pictures of some

11   steps, but I know exactly where I went, and what steps I

12   went up to.  I can take it to you right now, this minute

13   and show you which steps and which apartment I was at that

14   day.

15        Q    Mr. Escalon, the jury is not out there.  And

16   what your job is here, as you well know --

17                  MR. VILLALOBOS:  Judge, I object to him

18   being argumentative.

19                  THE COURT:  Just a minute, please.  I'm

20   going to overrule that objection right now.  But,

21   Mr. Gilman, we need to move on.

22                  MR. GILMAN:  Yes, sir.

23        Q    (By Mr. Gilman) Anything you recovered in your

24   investigation in reference to this case, did you turn it

25   over to Detective Cruz?

133

```
 1        A    Yes, sir.  I did.
 2        Q    So she's kind of the case agent and would be
 3   responsible for everything dealing with this particular
 4   case?
 5        A    Yes, sir.
 6                  MR. GILMAN:  Thank you.  Nothing further.
 7                  THE COURT:  Mr. Villalobos?
 8                  MR. VILLALOBOS:  May I proceed?
 9                  MR. GILMAN:  I failed to introduce
10   Defendant's Exhibit No. 4.
11                  MR. VILLALOBOS:  We don't have any
12   objections.
13                  MR. GILMAN:  Or it's Defendant's Exhibit
14   No. 3.  Okay.
15                  THE COURT:  It'll be admitted.  Anything
16   else, counsel?
17                  (Defendant's Exhibit Number 3 admitted)
18                  MR. GILMAN:  That's it.
19                  THE COURT:  Go ahead, Mr. Villalabos.
20                       REDIRECT EXAMINATION
21   BY MR. VILLALOBOS:
22        Q    Defense counsel asked you about head trauma, and
23   you indicated "shaking."  Can you specifically describe
24   what you describe how shaking could cause head trauma?
25        A    When you grab, especially a little girl like
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    that by the arms, and you shake, it's going to shake your
2    brain.  And -- I'm not a doctor, but my experience of what
3    I've seen, and what my time has told me in law
4    enforcement, and what has told me, shaking -- the brain
5    shakes.  This little girl is dehydrated, she's
6    malnourished, and she's verily fragile.  It doesn't take
7    much for her to fall apart.  And the injuries that she was
8    discussing -- or the injuries that she caused, indirectly,
9    could cause damage to the brain by grabbing, shaking her,
10   shaking her, and beating her.
11              MR. VILLALOBOS:  May I have him demonstrate
12   it on me --
13              THE COURT:  Sure.
14              MR. VILLALOBOS:  -- without injuring me?
15              THE WITNESS:  (Demonstrates on the District
16   Attorney)  During the interview, what she told me, is, she
17   would grab her by the arm.  And then she said, she would
18   take her down the steps, she would move her around like a
19   rag doll.  That was one.  And the other -- the other ways.
20   that -- you know -- was, striking her in the back of the
21   head, or striking her to the body, and somehow indirectly
22   causing injuries to the brain.
23              MR. GILMAN:  Objection, Your Honor.  There
24   was never any testimony -- there was never any testimony
25   that Melissa Lucio ever struck this child in the back of

```
 1    the head.
 2                    THE COURT:  There was a bruise on the back
 3    of the neck.
 4                    MR. GILMAN:  There was never any
 5    testimony --
 6                    THE COURT:  I understand.
 7                    MR. GILMAN:  -- that Melissa Lucio ever hit
 8    this child.
 9                    THE COURT:  I understand.  The jury
10    remembers that the arguments of the attorneys are not
11    testimony.  And you remember what the testimony was.  So
12    you keep track of what is true and what is not true,
13    because you are the sole judges of the credibility of the
14    witnesses and the weight to be given their testimony
15    proceed.
16         Q    So you say by grabbing the arms?
17         A    Grabbing the arms and shaking side by side, and
18    with the level of how unhealthy she was, it wouldn't take
19    much for her to fall apart.
20         Q    Would you expect any markings on the arm?
21         A    There would be markings on the arm, because she
22    stated she would grab her by the arms and those are
23    present.
24         Q    Okay.  The markings on the arms are present?
25         A    Yes, sir.
```

136

```
1        Q     You can be seated.   Just to be clear, the
2   markings on whose arms?
3        A     Mariah.
4        Q     So if Mariah had markings on the arms that
5   indicated where her mother had grabbed her?
6        A     There were markings, and then by her telling me
7   that she would do that -- because she explained to me how
8   she caused the injuries.
9        Q     And that would be consistent with what you just
10  showed the jury, using me as an example.
11       A     Yes, sir.
12             MR. VILLALOBOS:   I pass the witness.
13             THE COURT:   Mr. Gilman?   Anything else?
14                    RECROSS-EXAMINATION
15  BY MR. GILMAN:
16       Q     Isn't it true, Officer, that Melissa never said
17  that she shook that child?   She said that she hit that
18  child, but she never said she shook the child?
19       A     She never said she shook the child --
20       Q.    That's different than what you testified to here
21  just a minute ago!   You're adding things, now, Officer,
22  other than from what your video says, and I object to it.
23  Stick with what your video shows because that's what you
24  did!   Isn't that correct, Officer?
25             MR. VILLALOBOS:   Your Honor, I object.   He
```

```
 1    is being argumentative.  He is not asking him a question.
 2                    THE COURT:  At the end he did.  You just
 3    didn't hear.  "Isn't that correct."  I'm going to overrule
 4    the objection.
 5        Q    (By Mr. Gilman) Isn't that true?
 6        A    Ask the question again, please.
 7        Q    She never said:  She shook the baby?
 8        A    That is correct.  She never said she took the
 9    baby.
10        Q    So all of this demonstration up here is just --
11    baloney?
12        A    No.  It's not baloney.  It was an example of
13    what possibly could have occurred -- what Mr. Villalabos
14    showed --
15        Q    You don't have any evidence --
16                    THE COURT:  Mr. Gilman?  Wait until he
17    finishes to answer before answering the question.
18                    MR. GILMAN:  Judge?  All it requires on
19    cross examine, is a yes or no.
20                    THE COURT:  I understand, sir.  Make your
21    objection that it's nonresponsive, or wait until he
22    finishes.
23                    MR. GILMAN:  Yes, sir.
24        Q    (By Mr. Gilman) You don't have any evidence of
25    Melissa Lucio shaking this child, do you?
```

1      A      No.   There is no evidence to show that she was

2  -- that she shook the child.

3      Q      And you don't have any evidence of her throwing

4  this child, do you?

5      A      The evidence is right there in the body of the

6  damage that occurred, of she testified to, or that she

7  said, she caused.  There is what she did.

8      Q      Those bruises did not cause the death of Mariah,

9  did they?

10     A      That's for a doctor to decide.

11     Q      But you're in here testifying about all of that

12  head trauma and everything else.  Those bruises did not

13  cause the death of Mariah, and you know that.

14             MR. VILLALOBOS:  Judge?  Again, I'm going

15  to object to him --

16             THE COURT:  There is no question.

17  Sustained.  Ask questions, Mr. Gilman.

18             MR. GILMAN:  Nothing further, Judge.

19             THE COURT:  Nothing further?

20  Mr. Villalabos?

21                    **REDIRECT EXAMINATION**

22  **BY MR. VILLALOBOS:**

23     Q      Ranger, there is evidence that she was grabbed?

24             MR. GILMAN:  Objection; leading.

25             THE COURT:  Sustained.

139

1     Q   (By Mr. Villalobos) You testified earlier that

2  there were grab marks on Mariah.  What does that indicate

3  to you?

4           MR. GILMAN:  Objection.  We've been through

5  this already, Judge.  We even had a demonstration.

6           MR. VILLALOBOS:  But I am having to reask

7  questions.

8           THE COURT:  Let's wind this up.  Go ahead.

9     Q   (By Mr. Villalobos) There was evidence that you

10  testified that there was a grabbing, is that correct?

11     A   Yes, sir.

12     Q   There's evidence that this child got grabbed,

13  isn't that true?

14     A   Yes, sir.

15     Q   The child died with head trauma.

16     A   Yes, sir.

17     Q   If you grab somebody with enough force, you have

18  an adult, and you have a child, wouldn't it be reasonable

19  that the child --

20           MR. GILMAN:  Objection.

21           THE COURT:  Wait until he finishes the

22  question.

23           MR. GILMAN:  I'm waiting.

24           MR. VILLALOBOS:  Judge, I will reask the

25  question.

140

```
1                    THE COURT:  Okay.
2        Q     The child -- there is evidence that the child
3   has died, is that correct?
4        A     Yes, sir.
5        Q     There is evidence that this child died of head
6   trauma, is that correct?
7        A     That is correct.
8        Q     There is evidence that the child was grabbed by
9   her mother?
10       A     That is correct.
11       Q     So how could you say there was no evidence that
12  this child was shaken?
13                   THE COURT:  Any objection?
14                   MR. GILMAN:  There is no evidence, and he
15  has already admitted, there is no evidence of her shaking.
16                   THE COURT:  He asked him the question.
17  Overruled.  Go ahead and answer the question.
18                   THE WITNESS:  Through my investigation, in
19  Melissa's statement, she grabbed this child.  She never
20  told me she shook the child, but she grabbed the child
21  with enough force-- you know -- anything is possible.
22  With all the injuries she sustained indirectly it could
23  have caused trauma to the brain.
24       Q     So that statement earlier would be incorrect you
25  gave to counsel that there is no evidence that the baby
```

141

```
 1    was shaken?
 2        A    There is no direct evidence; she didn't come out
 3    and say that the baby was shaken.  The pathologist
 4    says that she died --
 5                 MR. GILMAN:  I'm going to object to
 6    anything that the pathologist may have said.
 7                 THE COURT:  Sustained.
 8        Q    (By Mr. Villalobos) I am asking from your
 9    knowledge -- you're making a global statement that there
10    is no evidence that the baby was shaken.  I want to know:
11    How you can make such a statement?
12        A    Well, based on overall -- on the overall part of
13    the investigation and it's consistent with a baby being
14    shaken.  The injuries that Melissa caused to Mariah are
15    consistent with the baby being shaken.  Yes.
16        Q    And in the video, isn't it true, that she said:
17    I did that, other than the scratch and the heel?
18        A    Yes, sir.
19                 MR. GILMAN:  Your Honor, I object; leading.
20                 THE COURT:  Yes.
21                 MR. GILMAN:  I ask the jury to disregard.
22                 THE COURT:  Please disregard that last
23    answer.
24        Q    (By Mr. Villalobos) What did she say in
25    reference to the injuries to the child?  And when I mean
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1    "she", I mean this defendant?

 2        A    That she caused all of the injuries to the

 3    child.

 4        Q    As well as the evidence that she shook the

 5    child?

 6        A    It would lead to believe that what she did,

 7    those injuries led to the trauma, yes, sir.  And I had

 8    mentioned that earlier before.

 9        Q    So you might have been confused when you

10    answered that question in the negative?

11        A    Yes, sir.  If -- there's evidence, there's no

12    doubt about it what Melissa did to Mariah.  It might have

13    been, I misunderstood the question, and I answered that

14    way, but that's what it was.

15                    MR. VILLALOBOS:  I'll pass the witness,

16    Judge.

17                    THE COURT:  Mr. Gilman?

18                    MR. GILMAN:  Nothing further, Judge.

19                    MR. VILLALOBOS:  Nothing further Judge may

20    he be excused.

21                    THE COURT:  Any objections?

22                    MR. GILMAN:  No, sir.

23                    THE COURT:  Ranger Escalon, you may be

24    excused.

25                    (Witness excused at 2:16 p.m.)
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1                    THE WITNESS:  Thank you, Judge.
 2                    THE COURT:  Call your next witness.
 3                    MR. PADILLA:  Officer Javier Villarreal
 4       Your Honor.
 5                      JAVIER VILLARREAL,
 6         having been first duly sworn, testified as follows:
 7                        DIRECT EXAMINATION
 8       BY MR. PADILLA:
 9                    THE COURT:  Whose witness is this?
10                    MR. PADILLA:  I'll take him.
11          Q    (By Mr. Padilla) Can you please state your name
12       for the record?
13          A    Javier Villarreal.
14          Q    And Mr. Villarreal, how are you employed, sir?
15          A    I work for the City of Harlingen as a police
16       officer.
17          Q    And how long have you been a police officer for
18       the City of Harlingen?
19          A    About 16 years.
20          Q    And what unit specifically do you work for in
21       Harlingen?
22          A    Right now I am a detective in the Crimes Against
23       Children Unit.
24          Q    And as a result did you become involved in an
25       incident that happened back on February, 2007?
```

144

1    A    Yes, sir.

2    Q    Okay.  And the incident involved a child by the

3    name of Myriah Alvarez, is that correct?

4    A    Yes, sir.

5    Q    Thank you, sir.  Can you tell me how is it that

6    you became involved in that case?

7    A    I was still on duty.  It was on a Saturday, and

8    I work from eight to four.  And that investigation, I had

9    to pick up a suspect at Progreso on a warrant, and I was

10   processing him and I think it was some time after 7:00

11   o'clock.  That's when they notified me while I was in my

12   office, and they told me that there was a two year old

13   that had died and they needed me at this residence at 117

14   -- I believe it was 117 West Lee.

15   Q    And you said it was around 7:30, more or less?

16   A    Yes, when I went over there.

17   Q    Okay.  And how long did it take -- were you at

18   the police station?

19   A    I was at the police station.

20   Q    How long did it take you to get from the police

21   station to the Lee Street address?

22   A    I'd say about -- five minutes.

23   Q    When you got there, what did you see, if

24   anything?

25   A    There was a crowd outside of people, children,

1  adults, and officers -- there were officers as well,

2  Harlingen police officers.

3             I made contact with Officer Mendiola and

4  Officer Palafox and they told me that the child had passed

5  away.

6      Q    Was the child there when you arrived?

7      A    No.

8      Q    So the child was no longer there?  Correct?

9      A    Correct.

10     Q    What did you do then after your conversations

11  with Palafox and Mendiola?

12     A    There was nobody outside and we waited for the

13  crime scene investigators.  That way they could go ahead

14  and process inside of the residence.

15     Q    And what did you do next, if anything?

16     A    Basically, I was -- it was either Palafox or

17  Mendiola, they had told me the parents -- pointed out the

18  parents, and it was a Melissa Lucio and a Robert Alvarez.

19     Q    Did you have an opportunity at that point then

20  to talk to Melissa Lucio?

21     A    I just went up to them and I gave them my

22  condolence and explained that we were going to have

23  investigators coming in so that way they can process --

24     Q    How did Melissa Lucio react when you said that?

25     A    Well, she was basically, calm.  She was sitting

146

1    down by the steps.  The father, I noticed, the father was

2    crying.  He was sobbing and he was crying a lot.  He was

3    basically alone by a tree.  But Melissa was basically --

4    you know -- talking to -- it may have been daughters, or

5    relatives -- sitting down by the steps.

6         Q    Did you ever see her cry or anything of that

7    nature?

8         A    I did.  When we were waiting outside, it started

9    getting dark.  And like I said, there were police cars and

10   other vehicles.  And from the distance you could hear

11   relatives showing up in their cars.  You could hear the

12   door slamming -- crying.  You could hear them running.

13   And I noticed that Melissa would get up from the steps,

14   and she would get consoled by these relatives that showed

15   up and this is where she would start crying.

16        Q    Okay.

17        A    And then after a short conversation, then, she

18   would go back -- she'd go back to the steps, and she'd be

19   smoking sometimes, and she would be crying and she would

20   be conversing with any other person that was nearby.  And

21   then, again, I would hear another relative show up.  And

22   then I see her do the same thing.  Again, she would go off

23   and console, and she would cry.  And after they stopped

24   hugging, she would go back to sit down, and she wouldn't

25   be crying anymore.

147

```
 1        Q     How long of a period of time were you there?
 2        A     I would have to say, maybe, less than two hours.
 3        Q     After you finish your investigation, what did
 4   you do?  Did you go back to the police station, or take
 5   anybody into custody, or what?
 6        A     Well, the crime scene investigators came in, and
 7   they went in.  I know they brought out some shoes for the
 8   children.  Some were barefooted.  We wanted to take the
 9   family, including the children, over to the police
10   department.  So this is when we started rounding up more
11   police officers just to come by and give the family -- you
12   know -- rides to the police station.  Randall Mitchell was
13   the one that was processing.  And once the whole family
14   was in route to the station, I decided to go out there --
15   go back to the station to interview both parents.
16        Q     So did you participate in any of the interviews?
17        A     Yes, I did.
18        Q     At that time you were interviewing them, were
19   they suspects or were you in the process of getting
20   information?
21        A     I just tried to gather information as far as
22   what happened -- what caused the death of this two year
23   old.  The only thing in hand I had was when Officer
24   Palafox and Mendiola mentioned that they had seen some
25   bruises on the cheek area, and some on the chest -- I
```

1    guess -- when the paramedics were going to do CPR, they

2    had noticed some bruising.  They also had mentioned

3    something that the child had fallen from the stairs at

4    this previous address where they were living at.  And --

5    so -- that's basically what I had, and also that she had a

6    cold.  So --

7         Q    Did you have an opportunity to speak directly to

8    Melissa Lucio?

9         A    Yes.

10        Q    And how long of an interview did that take

11   place?

12        A    They were already interviewing Melissa.  At

13   first I started interviewing the father, and gathering

14   information as far as what happened during the day, and so

15   forth.  And I went over to where they had Melissa -- which

16   is in my office -- mine and Detective Cruz's office, and

17   apparently, before going in, I got a little "sit rep" from

18   Detective Cruz as far as --

19        Q    I'm going to ask you not to tell us what

20   somebody told you.  Let me ask you this:  Did you have an

21   opportunity at a later time to transport Mrs. Lucio

22   anywhere?

23        A    Yes.

24        Q    Where did you transport her to, and when did you

25   transport her?

149

1    A    Okay.  We had to take them from the police

2  station.  This was going to be the following day -- this

3  was Sunday.  We worked through all night Sunday, and then

4  we were going to take Melissa to the Brownsville Dental

5  Office.  And this is where they were going to get teeth

6  impressions from both Melissa and Robert Alvarez.

7    Q    Now on the way up there, you were not

8  interrogating her.  You were not asking her any questions

9  concerning the incident, is that correct?

10    A    No.  She had already given a confession.

11    Q    What happened, if anything, on the way to the

12  dental office?

13    A    Detective Rebecca Cruz.  I mean -- she was

14  driving.  Melissa Lucio was in front, and I was sitting

15  directly behind her.  She asked Detective Cruz --

16    Q    When you say "she", who is that?  Who do you

17  mean?

18    A    Melissa.

19    Q    Melissa asked?

20    A    -- to use the phone, to call her sister.

21    Q    Was she allowed to make that phone call?

22    A    Well, we decided -- we just went ahead and

23  decided to hand her the phone.

24    Q    Did she dial out?

25    A    Yeah, she dialed out.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    Q    Did she appear to be talking to her sister?

2    A    Yes.

3    Q    Were you able to overhear any statements that

4    she made?

5         MR. GILMAN:  I'm going to object to

6    anything, at this time, Judge, that she may or may not

7    have said.

8         THE COURT:  Ladies and gentlemen of the

9    jury, I'm going to ask you to please step out just for a

10   minute, I'm going to take up a couple of legal issues.

11   I'm going to call you back.  Don't get too comfortable.

12   We're going to take a break a little bit later.

13        **(Jury not present)**

14        THE COURT:  Yes, sir.  Your objection?

15        MR. GILMAN:  Well, she's already under

16   arrest, Judge.  And I'm going to object to them trying to

17   bring in anything that she says while she's under arrest.

18        THE COURT:  This is a conversation that

19   she's having with her sister.

20        MR. GILMAN:  We don't know that.

21        THE COURT:  Well, that's what he said.

22        MR. GILMAN:  Yeah.  But we don't know that.

23   This is a conversation, a one sided one.

24        THE COURT:  Do you want to take Officer

25   Villarreal on voir dire, on that one issue?

1.                      **VOIR DIRE EXAMINATION**

2        **BY MR. GILMAN:**

3          Q     Officer, did you make a narrative about this

4        telephone call?

5          A     Yes, sir.

6          Q     Is this your narrative?

7          A     Yes, sir.

8          Q     Okay.  You stated that the date that you entered

9        this narrative was June 4, 2008 at 10:47:55?

10         A     Yes, sir.

11         Q     Why did it take so long for this narrative to

12       come up?

13         A     Well at the time, well, she had already

14       confessed, and --

15         Q     She was already under arrest?

16         A     She was already under arrest, and she had

17       already given a confession, and basically it was just a

18       phone call to her sister setting -- from that conversation

19       it was just something -- setting the record straight to

20       that family.  I got out at 10:00 o'clock that evening.  I

21       never did make a supplement to that.  I did bring it up --

22       once we got to the location of the dental office -- I did

23       bring it up to Rebecca Cruz and also to Detective Ranger

24       Escalon, and then we left it at that.

25         Q     Your narrative says that on February 18, 2008,

1    you were taking her to the dental office.

2        A    On February 18?

3        Q    Yes.

4        A    2007?

5        Q    2008.

6        A    I may have made a clerical error there, sir.

7    Because, when I wrote it, it was June --

8        Q    On February 18, 2007, she was in the Cameron

9    County jail?

10       A    Yeah, it was a clerical error, sir, on my part.

11       Q    We don't know who this sister is.  You don't

12   have -- you don't have any telephone records of any kind

13   to verify that it's a sister or anybody else?

14       A    No.  Only what she had said, that she wanted to

15   talk to her sister.

16                    **(End of Voir Dire)**

17                    THE COURT:  I'm listening.

18                    MR. GILMAN:  Judge?  I don't think that

19   this is in any way in compliance with any of our Rules Of

20   Procedure, and I will object to any kind of statement

21   made.

22                    MR. PADILLA:  Your Honor, there is no

23   privilege.  Obviously, she has already been arrested, but

24   she was not being interrogated.  The witness was not

25   questioning or interrogating her to get the statement.  It

                    Adelaido Flores, Jr.
                 Certified Shorthand Reporter

```
 1    was a res gestae statement.
 2              MR. GILMAN:  It's not a res gestae
 3    statement.  She's already under arrest.  She is being
 4    transported -- this is the day after anything happened.
 5              THE COURT:  I'm going to allow it.
 6              MR. GILMAN:  Please note my exception.
 7              THE COURT:  I will note your exception.
 8    Bring the jury back in.
 9              (Jury present at 2:30 p.m.)
10              THE COURT:  You maybe seated.  Thank you.
11    Please be seated.  Mr. Padilla?  Proceed.
12              DIRECT EXAMINATION  (CONTINUED)
13    BY MR. PADILLA:
14              THE COURT:  Mr. Padilla, continue, sir.
15        Q    Okay.  Officer, then where we left off, you are
16    transporting Melissa Lucio to a dental office for a dental
17    mold, is that correct?
18        A    Yes, sir.
19        Q    And my understanding is that you testified that
20    she asked for the telephone, is that correct?
21        A    Yes, sir.
22        Q    And the phone was then handed to her?
23        A    Yes.
24        Q    Did she herself actually place the phone call?
25        A    She placed the phone call.
```

154

1              MR. GILMAN:  Your Honor?  I want a running
2      objection.
3              THE COURT:  I will grant you your running
4      objection.
5      Q     (By Mr. Padilla) And so -- did she herself make
6      the phone call?
7      A     Yes.
8      Q     Did somebody else -- from what you were able to
9      observe -- did somebody answer the phone on the other end?
10     A     Yes.  She was talking to that person.
11     Q     And what, if anything, did you hear her say to
12     that other person?
13     A     Well, during her conversation, I noticed that
14     she sounded agitated --
15             MR. GILMAN:  Objection.  Nonresponsive to
16     the question.
17             THE COURT:  I'm going to overrule the
18     objection.  Go ahead.
19     Q     (By Mr. Padilla) She appeared to be agitated?
20     A     She appeared to be agitated, and that caught my
21     attention.  And she way saying:  "Don't blame, Robert.
22     This was me.  I did it.  So don't blame Robert."  That was
23     basically it, as far as --
24     Q     So at that particular time then, did somebody
25     take the phone back, or --

1    A    No.   She was still talking.   But -- I interpret

2    that, as --

3              MR. GILMAN:   Your Honor, I object to that.

4    Now he's interpreting that call.

5              THE COURT:   I'm going to sustain that

6    objection.

7    Q    (By Mr. Padilla) Okay.   So then you yourself

8    proceeded to take her to the dental offices, is that

9    correct?

10   A    Yes.

11   Q    Did you have any other involvement after that?

12   A    After that, after they got the dental

13   impressions, they -- we then transported them to the

14   Carrisales-Rucker Detention Center there in Olmito, and

15   that's where they were arraigned.

16             MR. PADILLA:   I will pass witness.

17                    **CROSS-EXAMINATION**

18   **BY MR. GILMAN:**

19   Q    This all occurred on February of 2008?

20   A    This happened on February 17 and 18, of 2008.

21   Or 2007, yes.

22   Q    Your narrative report that you have here says

23   "2008"?

24   A    That was my mistake, sir.   That was a clerical

25   error on my part.

156

1     Q    Okay.  And it was -- you made this entry, in

2    June 4, 2008?

3     A    Yes, sir.

4     Q    Why did it take so long to make this entry?

5    This was a year and a half later.

6     A    She had already confessed.  I had -- you know --

7    from Saturday morning all the way through -- working for

8    some hours -- and I had two days off after that.  And I

9    came back and we put the case together.  I had brought it

10    up to the attention of Detective Cruz, I believe, and

11    Texas Ranger Escalon, and we left it at that.  During the

12    time, right after that phone conversation, I never did

13    make a supplement to it.

14          When this case came up, that's one thing

15    that I do recall that it happened as we were leaving the

16    city limits of San Benito, and we were right there by

17    Rancho Viejo.

18     Q    On June 15, 2007, I asked for all statements

19    that my client may or may not have made that was allegedly

20    made and I had never been given this until just -- just

21    recently.  And you kept this all of this time?

22          MR. PADILLA:  Your Honor, I object to the

23    form of the question.  Again, this document was never made

24    until June 4.  How could we provide it previous to that?

25    Our record reflects that we didn't provide a copy to

```
1    counsel because it wasn't given to us.
2                 THE COURT:  I'll overrule the objection.
3    Proceed, Mr. Gilman.
4         Q    You said, "Melissa has confessed."  What did she
5    confess to, Mr. Villarreal?
6         A    As far as inflicting those injuries -- those
7    bruises.
8         Q    That she injured the child?  She confessed to
9    that?
10        A    Yes.
11        Q    Yes?  Okay.
12                MR. GILMAN:  Nothing further, Judge.
13                MR. PADILLA:  Nothing further of this
14   witness.  May he be excused?
15                THE COURT:  Any objections to excusing
16   Officer Villarreal?
17                MR. GILMAN:  No, sir.
18                THE COURT:  You may be excused.  Good luck.
19   God bless.
20           ·      (Witness excused at 2:36 p.m.)
21                THE COURT:  Do you have a short witness,
22   Mr. Padilla or do we take a break now?
23                MR. PADILLA:  Judge we are trying to get
24   some order.  We may having a short one.  But I said that
25   before, and then it upset the Court, and I don't want to
```

1    suffer the Court's wrath.

2                THE COURT:  Let's go ahead and take a

3    break.  We're going to take our afternoon break right now.

4    Ten minutes.

5                **(Jury excused at 2:37 p.m.)**

6                THE COURT:  Mr. Gilman when your objection

7    is finished, and I have overruled your objection, it's

8    time to sit down.

9                MR. GILMAN:  And I was sitting down -- but

10   gee whiz!

11               THE COURT:  Is there somebody in the

12   prosecution's team here?  Mr. Gilman?  Do you want to look

13   at Robert Alvarez's statement?  I find there is nothing

14   Brady in it -- or exculpatory.

15               MR. GILMAN:  Are we talking the video?

16               THE COURT:  The written statement.  That's

17   all I'm saying.

18               MR. PADILLA:  Well, the video pretty much

19   follows that statement, Judge.  I personally had it

20   Friday, and I can't seem to find it.  It's somewhere in my

21   office, or it was sitting in my truck.  So far we've

22   looked in my office -- and it's possible it was in my

23   truck, and it's possible somebody might have run over it,

24   but I'll take time to go look for it.

25               THE COURT:  You've got ten minutes.

159

```
1                    MR. PADILLA:  I am going to make an effort
2       to find it.
3                    MR. CORDOVA:  Judge, you don't have the
4       DVD?
5                    THE COURT:  No, sir.  I do not.
6                    MR. CORDOVA:  I thought that's what Mr.
7       Padilla had given you.
8                    THE COURT:  No.  He gave me the written
9       statement.
10                   MR. CORDOVA:  You went back to the file and
11      got the written DVD?
12                   THE COURT:  No, sir.
13                   MR. PADILLA:  You see, we had it on Friday,
14      we went from the date.
15                   MR. CORDOVA:  No.  You showed me the paper.
16                   MR. PADILLA:  But I also had the DVD.  I am
17      going back to the office to make sure it isn't there.
18                   (Recess from 2:38 p.m. to 2:49 p.m.; jury
19                   not present)
20                   THE COURT:  Gentlemen?  Mr. Padilla?  Would
21      you please approach, gentlemen?
22                   Mrs. Nix was here earlier with regard to
23      her client.
24                   MR. PADILLA:  Yes.
25                   THE COURT:  And she wanted to have -- she
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
1    is not going to be here this afternoon when she --
2              MR. PADILLA:  She's here, Judge.
3              MR. KRIPPEL:  She is talking to her client
4    right now.
5              THE COURT:  Oh, right now.
6              MR. PADILLA:  They are signing an immunity
7    agreement.
8              THE COURT:  That's what I wanted to get on
9    the record.
10             MR. KRIPPEL:  And we needed to put that on
11   the record before they proceed, Your Honor.  That's what I
12   was going to bring to your attention.
13             THE COURT:  Okay.  So we're premature.
14             MR. PADILLA:  Judge, for the record, I
15   think --
16             THE COURT:  Yes, sir?
17             MR. PADILLA:  Good chance after we finish
18   with CPS, the only other witness that we will have is the
19   pathologist.
20             THE COURT:  We anticipate being done this
21   afternoon.
22             MR. PADILLA:  It's a possibility.  It
23   depends on how long CPS takes.
24             MR. KRIPPEL:  Other than CPS --
25             MR. GILMAN:  We might be here tomorrow.
```

1           THE COURT:  Well, let me continue the break

2    until such time.

3           MR. KRIPPEL:  It should be five minutes or

4    less.

5           THE COURT:  Tell the jury we are trying to

6    get some stuff done.  As soon as they are done, we will

7    call them in.

8           **(Recess from 2:53 p.m. to 2:55 p.m.)**

9           THE COURT:  07-CR-885-B, Mr. Krippel do you

10   have an announcement to make?

11          MR. KRIPPEL:  Your Honor, to -- the next

12   witness that we are going to call is Jo Anne Estrada.

13   Mrs. Estrada has retained -- or has gotten services of Ann

14   Nix?

15          MS. NIX:  Judge?  My client was advised to

16   get counsel.  And, for the record, we have signed a

17   transactional immunity agreement so that any testimony

18   before the Court in this matter will not be used against

19   her in any criminal prosecution and she has been

20   instructed to answer the questions to the best of her

21   ability.

22          MR. KRIPPEL:  My understanding of the law

23   is that that has to be brought to the attention of the

24   Court and also has to be approved by the Court.  So we are

25   here for your approval.

162

1          THE COURT:  Transactional immunity has to

2    do with anything involving the death of Mariah Alvarez?

3          MS. NIX:  Yes, Your Honor.  That's correct.

4          MR. KRIPPEL:  I've submitted a copy to the

5    Court for its review.

6          THE COURT:  Okay.  We will mark this as an

7    exhibit, and not for the purposes of -- only for the

8    purposes of the Court perfecting the record.  And this

9    transaction immunity agreement is hereby approved.

10          MS. NIX:  Thank you, Your Honor.

11          MR. PADILLA:  Your Honor, will the Court

12    seal it to make sure it doesn't get put in with the papers

13    that go to the jury?

14          THE COURT:  Yes, sir.  Mark it, and seal

15    it.

16          MR. KRIPPEL:  Can we get a copy first?

17          THE COURT:  When you want it sealed, it

18    really gets sealed.  Make two copies.  One for Mrs. Nix --

19          MS. NIX:  I do have a copy.

20          THE COURT:  Oh, you do?

21          MS. NIX:  Yes, sir.  Thank you.

22          THE COURT:  Then just one for Mr. Krippel.

23    Anything else?

24          MR. KRIPPEL:  No, sir.  We call Joanne

25    Estrada.

```
 1                    THE COURT:  Ms. Estrada, please take the
 2    witness stand.  Just stand there till the jury comes in,
 3    that way we are good to go.
 4                    Bring the jury in, please, and we'll swear
 5    you in when the jury comes in.
 6                    (Jury present, defendant present at 2:57
 7                 p.m.)
 8                    THE COURT:  I notice everybody grabs a
 9    chair and then makes it their own.
10                    Please be seated.  Thank you very much.
11    Mrs. Estrada, before sitting down, would you please raise
12    your right hand.
13                    (Witness was sworn in by the Court.)
14                    JOANNE ESTRADA,
15       having been first duly sworn, testified as follows:
16                    DIRECT EXAMINATION
17    BY MR. KRIPPEL:
18                    THE WITNESS:  I do.
19                    THE COURT:  Please be seated, ma'am.  Mr.
20    Krippel, your witness sir?
21                    MR. KRIPPEL:  Thank you, Your Honor.
22       Q    Thank you for being with us this afternoon
23    Mrs. Estrada.  Would you please introduce yourself to the
24    jury, please?
25       A    My name is Joanne Elizabeth Estrada.
```

```
 1          Q     And how are you currently employed,
 2   Mrs. Estrada?
 3          A     I work for Child Protective Services.
 4          Q     And what is your position?
 5          A     I'm a CPS conservatorship worker.
 6          Q     What does that mean?
 7          A     Basically it means, we handle the case once the
 8   children have been removed and placed into foster care.
 9   We make sure that the children are well cared for while in
10   foster care and offer services to the parents in order to
11   attempt reunification.
12          Q     Okay.  Have you ever testified before in a case?
13          A     Ah, yes.
14          Q     Have you ever testified up in the district
15   court, or have you testified in family court?
16          A     Family court.
17          Q     So this is your first time ever in a district
18   court?
19          A     Yes.
20          Q     This is the first time in front of a jury, or
21   have you testified in front of a jury?
22          A     First time in front of a jury.
23          Q     Are you a little nervous?
24          A     Yes.
25          Q     I want you to understand -- can you give us a
```

165

1    broad overview of how CPS works?  I mean, how does CPS

2    start with the child, and when does CPS' involvement of

3    any child done?  What is the process?  What are the steps?

4         A    Basically, once a report is called in to the hot

5    line, a worker takes in the call to determine if it meets

6    criteria of abuse or neglect.  And I guess it distributes

7    it to the area that the child belongs to, likes the south,

8    north, and from there it goes through a screening process

9    and assigned to an investigator.  The investigator would

10   go out and investigate the case, staffed with supervisors

11   to determine if there is abuse or risk of abuse or neglect

12   for the child and they petition the court for removal of

13   the children for temporary custody.

14             If the Court grants the temporary custody

15   of the child, the child is placed into foster care and the

16   parents are offered services to try to mitigate the

17   circumstances that led to the removable of the child.

18        Q    Okay.  First thing, the call comes into the hot

19   line, and then they get sent down to the region -- or the

20   areas.  Is that correct?

21        A    Correct.

22        Q    Okay.  How long does that take, the call down to

23   the region?

24        A    It depends.  I believe it's done within the same

25   day.

166

1      Q     Okay.  It is like 24 hours or less period for
2   that to happen?
3      A     Typically, yes.
4      Q     Are there different criteria for urgency of the
5   report?
6      A     Yes, there are.
7      Q     What is that criteria?
8      A     Basically, if they believe that the child is in
9   imminent danger, it's assigned, "A Priority One, which
10  means the investigator has to be out there within a matter
11  of 24 hours and make contact with the child.  AP 2 means
12  that the child is not in imminent danger, and I believe
13  it's 72 hours, of seven days.
14     Q     Okay.  So there's two criteria of how quickly
15  things are done?
16     A     Yes.
17     Q     Pretty much fast, and pretty fast -- within a
18  day or three days -- two or three days?
19     A     Something like that, yes.
20     Q     Do you work on that end with all of the
21  reporting stuff?
22     A     No, I don't.
23     Q     The next step is that an investigator goes and
24  investigates the report, correct?
25     A     Correct.

```
 1        Q    Do you work in the investigator's division?
 2        A    No, I do not.
 3        Q    Have you ever worked in the investigator's
 4   division?
 5        A    No, I have not.
 6        Q    Okay.  So you really don't know a whole lot
 7   about it.  You just kind of know what happens over there?
 8        A    Correct.
 9        Q    The investigator says:  Yes, we have a
10   likelihood, or we have evidence that shows that we need to
11   intervene.  They need to intervene.  They bring it to the
12   Court's attention.  The Court says:  Yes.  You need to
13   intervene.  Is that when you become involved at that
14   point?
15        A    Typically, yes.  There's staffing and we get
16   assigned to the case and we start working with the family.
17        Q    So you're not removable; you're reunification.
18   You are putting it all back together.  Is that correct?
19        A    Correct.
20        Q    Do you know Melissa Lucio?
21        A    Yes.
22        Q    Okay.  How many times have you met Melissa
23   Lucio?
24        A    A couple of times.
25        Q    Would you be able to identify her just by
```

```
1    looking at her?

2         A    Yes.

3         Q    Do you see her in the courtroom today?

4         A    Yes.

5         Q    Can you identify her by pointing to her and

6    identifying what article of clothing she is wearing?

7         A    She's sitting over there wearing a pink shirt.

8         Q    Thank you.

9              MR. KRIPPEL:  May the record reflect that

10   the witness has identified the defendant?

11             THE COURT:  The record will so reflect.

12        Q    I want to be careful here because I don't want

13   to know what you talked about.  How many times did you

14   meet with her?

15        A    That I've spoken to her?  Maybe a couple of

16   times.

17        Q    When you -- or when did you first get involved

18   with Mrs. Lucio's case?

19        A    I believe that I was assigned to be the case

20   worker on October 31, 2007.

21        Q    Okay.  And you have been her case worker since

22   then?

23        A    Correct.

24        Q    And who was the case worker in advance of you?

25        A    Previously?
```

169

```
 1        Q     Yes.
 2        A     It was Angie Ramos.
 3        Q     When you were assigned to be the case agent, did
 4   you inherit all of her files?
 5        A     Correct.
 6        Q     And you are now the caretaker of all her files?
 7        A     Correct.
 8        Q     Are all of the files that you keep on her case,
 9   kept in the normal course of business?
10        A     Yes, they are.
11        Q     When was CPS -- when did CPS first become
12   involve with Mrs. Lucio?
13        A     Our records indicate 2004 -- around September,
14   2004?
15        Q     What was the report, then?
16        A     I believe it was neglect of the children.
17        Q     Was Mariah born at the time of this first
18   report?
19        A     Yes.
20        Q     She was already born at that time?
21        A     I believe so, yes.
22        Q     What was the result of that initial call?  That
23   is, what action did CPS take?
24        A     The children were removed from Mrs. Lucio's care
25   and placed in foster homes.
```

```
 1        Q    By children, you mean all nine or ten, however
 2   many children she had in her care at that time?
 3        A    Correct.
 4        Q    All of her children, right?
 5        A    Correct.
 6        Q    And they were placed in foster care.
 7        A    Actually, no.  Seven were removed from her care
 8   and our records indicate that three went to their
 9   biological father in Houston.
10        Q    Okay.  How long did that condition persist?  How
11   long were they in foster care before they were returned to
12   Mrs. Lucio?
13        A    A little over two years.
14        Q    At what time were they returned to Mrs. Lucio?
15        A    November of 2006.
16        Q    At what time -- at any time after that, were
17   they then removed, again, from her care?
18        A    Yes.
19        Q    At what time?
20        A    February of '07.
21        Q    Have they ever been returned to her care, since
22   then?
23        A    No, they have not.
24        Q    During the period, from November of '06 when
25   they were returned to her care, until they were removed in
```

1   February of '07, how many visitations did CPS make

2   according to the records?

3        A    I don't remember.

4        Q    Okay.  You would have to go back to your records

5   to find out?

6        A    Yes.

7        Q    Okay.  How often -- are there any standards upon

8   which your visitations are made, or checkups or -- what

9   word do you use?

10       A    The word that we use?

11       Q    Yeah.  How do you refer to, going out and seeing

12   children that are under foster --

13       A    We typically say our monthly contacts, or

14   targeted case management, and we are required to see the

15   children at least once a month.

16       Q    So it's called contacts -- the number of

17   contacts that you have?

18       A    Yes.

19       Q    And your requirement is once a month?

20       A    Once a month.

21       Q    For each child or for each family?

22       A    Per child.

23       Q    Per child.  So if the children are in different

24   places, you got to go to each different place because you

25   got to see each child once a month?

172

```
 1       A     Correct.
 2       Q     If they're all in the same place, you go to the
 3  one place and you see all of the children?
 4       A     Correct.
 5       Q     Okay.  It's your responsibility with all of the
 6  cases that you have, to go see all of the children that
 7  you have.  Right?
 8       A     Correct.
 9       Q     So had you been the case worker back from
10  November of '06 to February of '07, it would have been
11  your responsibility to see each of those children one time
12  a month, is that correct?
13       A     Correct.
14       Q     We talked earlier about P-1 versus P-2 --
15  Priority One, Priority Two cases.  Are there also
16  echelons, or levels of contact that you are supposed to
17  keep with the family?  Or is it always once a month, for
18  every family?
19       A     I'm not sure I understand your question.
20       Q     Can the judge order more frequent, monthly
21  contacts?
22       A     The judge can order them.
23       Q     But if he orders standard work then it's once a
24  month contact, correct?
25       A     Correct.
```

1      Q     Did your records reflect the judge ordering
2  anything different in Mrs. Lucio case?
3      A     I did not see anything like that.
4      Q     So as far as you know, the records reflect the
5  order was the regular stuff -- once a month?
6      A     Correct.
7      Q     During the visit, what do you typically do?
8      A     Typically, we meet with parents.  We try to meet
9  with a child individually alone, away from the siblings,
10  away from the parents -- the foster parents, and discuss
11  how they are doing in the home, how they're eating -- how
12  they're sleeping.  Basically, how they're adjusting, and
13  how they're doing.
14      Q     Okay.  How many cases -- and we will just talk
15  in general terms -- how many cases that we have right now,
16  and other than in Mrs. Lucio's case -- how many cases do
17  you have where the family is three children or less?  A
18  quarter?  50 percent?  Three quarters?  Almost all?
19      A     You mean families that I'm working with in
20  general regardless of whether the child is in foster care?
21      Q     Yes.
22      A     I'm going to say I have maybe -- about half.
23      Q     Okay.  So would it be fair to say that the other
24  half are four or more children?  Or, would you like to
25  adjust that figure now that you've thought about it that

174

1    way?

2         A    Yeah.   Not including Mrs.  Lucio's case,

3    correct?

4         Q    Not including Mrs. Lucio's case.

5         A    The cases that I'm carrying right now, probably

6    about 75 percent of them are three or less children.

7         Q    And maybe a quarter -- are four or more

8    children?

9         A    Correct.

10        Q    How many of them are more than seven?

11        A    I don't have any case right now, other than

12   Mrs. Lucio's.

13        Q    Have you ever worked on a case where there is

14   more than seven, other than Mrs. Lucio's?

15        A    No.

16        Q    On the cases that you are working where there

17   are four children, five children, six children, are you

18   able to devote time to each child when you visit those

19   families?

20        A    Typically, I am, except maybe the babies that

21   are nonverbal.

22        Q    What do you do in those cases?

23        A    Try to interact with them, observe the

24   interactions that they are having with the foster parent,

25   with the other children in the homes, and ask questions to

1   the foster parents about the child.

2       Q   Okay.  What about those that are -- and I don't

3   know what the official term would be -- that are

4   semi-verbal?  One to 18 month olds?  Two year olds?  Those

5   beginning to speak but really cannot articulate anything

6   meaningful.  What is your interaction with them?

7       A   Typically, we try to -- at least I try to

8   interact with them, maybe sit on the floor and try to play

9   with them a little bit -- to see what their -- most of the

10  time I can't really understand much, so if I need to know

11  if they're sleeping or eating, we ask the parents or the

12  foster parents.

13      Q   Do you ever undress the children?

14      A   Not typically.

15      Q   Under what circumstances would you undress the

16  children?  And once again, we are talking globally -- just

17  generally?

18      A   Typically, if the child is complaining of

19  something, that's hurting them, or if I notice a mark on

20  them, maybe I will check their back, or something like

21  that, then I would undress them.

22      Q   And then, just talking hypothetically, what if

23  you had a case where there was a removal, and there was

24  abuse, might you check for abuse signs again once the

25  child is returned?  Or, would you typically, not do that?

1     And it's just however you typically do it.  Whatever you

2     usually do.

3          A    I can't say I've had many abuse cases.

4          Q    That's a fair answer.  If you haven't had enough

5     experience to say one way or the other what you generally

6     do, then that's a fair answer.  Would that be a factor in

7     your visitations, or is it a factor in your visitation

8     what the removal was regularly for, and when you go back

9     and visit them again?

10         A    It should be.  Yes.

11         Q    So if they were originally removed for

12    malnutrition, you're going to be checking to make sure

13    that they are correctly nourished, right?

14         A    Correct.

15         Q    And if they were originally removed for

16    abandonment because you found them being left alone a lot,

17    you would be making sure that they weren't being left

18    alone, right?

19         A    Correct.

20         Q    So it stands to reason if they were removed for

21    abuse, you might be checking for signs of abuse?

22         A    Yes.

23         Q    But if they weren't removed for abuse, you may

24    or may not?  You may have no reason to check for those

25    signs, correct?

1      A     I guess, yes.

2      Q     (Laughing)  I'm not trying to put words in your

3   mouth.  I'm just trying to understand how you operate out

4   there in the field, that's it.  So, do you -- would you,

5   or would you not?

6      A     I guess you would kind of keep it in the back of

7   your mind and maybe look for signs of it.

8      Q     Okay.  In your review of the records in this

9   case, was there any indication to you that CPS had not

10  followed its mandates with regard to the Lucio children?

11  That is the monthly visitations.

12     A     Not that I'm aware of.

13     Q     Okay.  You are aware, that --

14               MR. KRIPPEL:  One moment, Your Honor.

15               **(Brief pause in proceedings)**

16     Q     (By Mr. Krippel) What involvement did CPS have,

17  or what action did CPS take on February 17, 2007 and

18  immediately thereafter?  That is, upon the death of

19  Mariah, and then immediately thereafter?

20     A     Our records indicate there was an investigation

21  opened, and the children were removed and placed into

22  foster care.

23     Q     Okay.

24               MR. KRIPPEL:  Pass the witness, Your Honor.

25               THE COURT:  Mr. Gilman?

178

```
 1              CROSS-EXAMINATION
 2   BY MR. GILMAN:
 3              MR. GILMAN:  Thank you, Judge.
 4      Q    Isn't it true Mrs. Estrada -- you remind me of
 5   federal court when the federal people send their least
 6   experienced person to come in --
 7              MR. KRIPPEL:  Objection, Your Honor.  Side
 8   bar.  I don't know what that's about.
 9      Q    You haven't been --
10              THE COURT:  Just a minute.  He made an
11   objection.  Please stop.  I will sustain the objection.
12              MR. KRIPPEL:  I ask that it be struck and
13   the jury is to disregard it.
14              THE COURT:  Ladies and gentlemen of the
15   jury, the comments of attorneys are not evidence as I told
16   you before.  Strike that from the record.  Go ahead.
17      Q    (By Mr. Gilman) You started in October of '07?
18      A    As --
19      Q    With Child Protective Services?
20      A    With the department?  No.  As the case worker,
21   yes.
22      Q    When did you start with Child Protective
23   Services?
24      A    I started in January of 2007.
25      Q    Were you familiar with this case before October
```

179

1    of '07?

2         A·    No, I was not.

3         Q     But in October of '07, you then became familiar

4    with this case?

5         A     I can't say October.  Maybe towards November, I

6    started reading up on it more and visiting with the

7    children.

8         Q     Are you aware that Child Protective Services

9    were involved with Mrs. Lucio long before September of

10   '04?

11        A     No.

12        Q     The other day you were in court, with -- who is

13   the head of your office?

14        A     What do you mean?

15        Q     In Harlingen.

16        A     Who is my supervisor?

17        Q     Who is the head person in Harlingen for Child

18   Protective Services?

19        A     My supervisor is Luis Zavala.

20        Q     Okay.  Mr. Zavala was here in court the other

21   day, and you were here in court the other day in reference

22   to some records that Child Protective Services has dealing

23   with Mrs. Lucio.  Isn't that right?

24        A     Correct.

25        Q     And we were asking for all of the records and

1    y'all provided all of the records, is that correct?

2         A    Correct.

3         Q    So we now have all of the records dealing with

4    Mrs. Lucio?

5         A    You should.

6         Q    Okay.  Do you remember back in -- or did you see

7    in your records back in February 17, 18, 2007, that a drug

8    test was done on Melissa Lucio or on Robert Alvarez?

9         A    I don't remember seeing anything.

10        Q    You remember it dating back to September of '04,

11   when these children were removed from Mrs. Lucio care?

12   And these children, I am referring to:  Rene, Richard

13   Robert, Gabriel, Adriana, Sara and Mariah.  Mariah was

14   just born, is that right?

15        A    I believe so, yes.

16        Q    Those children spent two years and a few months,

17   with foster care.  Is that right?

18        A    Yes.

19        Q    Child Protective Services in 2004 filed a case

20   in dealing with these children.  Isn't that correct?

21        A    Yes.

22        Q    Y'all were the managing conservators of these

23   children.  You all were responsible for these children.

24   Is that correct?

25        A    Correct.

1        Q     Did your Court order where you were the managing
2   conservator of these children, did it include Selena and
3   Alexandria?
4        A     I don't remember.
5        Q     These are Selena Lucio and Alexandria Lucio,
6   where they went, supposedly, with their biological father
7   to Houston?
8        A     I don't remember exactly what was on the court
9   order for September of 2004.
10        Q     Child Protective Services has filed, right now,
11   a termination of the parent child relationship between
12   Mrs. Lucio and those children, isn't that correct?
13        A     Correct.
14        Q     From September, 2004, to November, 2006
15   visitation was arranged by Child Protective Services for
16   Mrs. Lucio and her children, is that correct?
17        A     I believe so, yes.
18        Q     That was done on a weekly basis, was it not?
19        A     I am not sure how often it was.
20        Q     Would it surprise you if I told you it was done
21   on a weekly basis?
22        A     No.  That is typical procedure.
23        Q     If they lived in Harlingen, do you normally try
24   and conduct these visitation sessions in Harlingen?
25        A     Yes.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1          Q     Do your records reflect that Melissa Lucio and

2     her children would meet and that there was difficulty in

3     controlling the numbers of children?

4          A     I have not read the visitations report from the

5     time before September of 2006.

6          Q     So you're not aware of that?

7          A     Huh-uh.   No.

8          Q     Are you aware of the fact that Child Protective

9     Services had to divide the children up because there was

10    too many of them to handle during the visitation with

11    Mrs. Lucio?

12         A     Ah, I was not aware of that.

13         Q     Were you aware that Rene, Richard, Robert and

14    Gabriel were very aggressive in their foster care, during

15    that period of time?

16              MR. KRIPPEL:  Objection, Your Honor.  She

17    clearly has indicated that she is not going to be aware of

18    any of this stuff.  He is trying to testify through her.

19              MR. GILMAN:  No.  I'm just asking if she is

20    aware, Judge.

21              THE COURT:  He has the right to ask

22    questions.  Overruled.

23         Q     (By Mr. Gilman) Are you aware of that, ma'am?

24         A     I've been previously told about the aggression

25    of the children.

183

```
1      Q    And isn't it true that that aggression of the
2   children still continues to this day?
3      A    I don't believe the children are aggressive.
4      Q    You don't believe they are?
5      A    In my experience with them I wouldn't say that
6   they are aggressive.
7      Q    Isn't that what their foster parents report on a
8   monthly basis to your department, even until now?
9           MR. KRIPPEL:  Objection, Your Honor
10  hearsay.
11          THE COURT:  That's part -- make reference
12  to the documents.
13     Q    If it's in your document, do you recall?
14     A    I can't recall all the documents.
15     Q    Okay.  Do you recall in the documents beginning
16  September of '04 and November of '06 that Mariah -- when
17  she would get upset, she would bang her head against the
18  wall or against the floor, or go backwards?
19     A    I was not aware of that.
20     Q    You followed the protocol for visitation, do you
21  not?
22     A    Yes, I do.
23     Q    And what is that protocol?
24     A    I visit with the children at least once a month
25  in their foster home.
```

184

```
1       Q    But what is it called.  Do the children visit
2   with their mother and their father?
3       A    Not lately.
4       Q    But they have, haven't they, since February of
5   '07?
6       A    I'm sorry.  Could you repeat that?
7       Q    Since February of '07, isn't it true that the
8   children have met with their mother and father?
9       A    Three of the children -- the three eldest have
10  met with Mrs. Lucio while she has been incarcerated.
11      Q    Isn't it true that your department has done a
12  lot of interviewing, and sending therapists in an effort
13  to reunite the family?
14      A    Not since I've had the case.
15      Q    But it's again been going on since February of
16  '07?
17      A    Since February of '07, the goal for the
18  department has not been family reunification.
19      Q    It has not been?
20      A    Not that I am aware of.
21      Q    Then why would you allow visitation of the
22  parents with these children?
23      A    The therapist had approved for her to see the
24  children, and her rights have not been terminated as a
25  parent.
```

185

```
 1        Q    Are you aware that Melissa Lucio has had a set
 2   of twins while she's been incarcerated?
 3        A    Yes.
 4        Q    Are you aware that those twins have visited
 5   their mother?
 6        A    Yes, I am.
 7        Q    Why, if you are trying to terminate her parental
 8   rights, and why, if you are trying to kill this lady, are
 9   you trying to imply that the children have a relationship
10   with their mother?
11                  MR. KRIPPEL:  I object to the
12   characterizations of the testimony.
13                  THE COURT:  Objection to the
14   characterization of the testimony?
15                  MR. KRIPPEL:  Also, on relevance.
16                  THE COURT:  I'm going to sustain the
17   objection.  Mrs. Estrada, works for CPS, and CPS is not --
18   rephrase it.
19        Q    (By Mr. Gilman) You're a member of the State of
20   Texas.  That's what your organization is, is it not?
21                  MR. KRIPPEL:  Objection; relevance, Your
22   Honor.
23                  THE COURT:  Mr. Gilman?  Child Protective
24   Services is not the State of Texas who is prosecuting
25   Mrs. Lucio.
```

```
 1                    MR. GILMAN:  I am not saying that it is,
 2    Judge.
 3                    THE COURT:  Rephrase, then.
 4        Q    (By Mr. Gilman) Child Protective Service's is a
 5    branch of the State of Texas, is it not?
 6        A    Yes, it is.
 7        Q    And the State of Texas is bringing an action
 8    against Mrs. Lucio?
 9                    MR. KRIPPEL:  Objection, again on
10    relevance.
11                    THE COURT:  Overruled.
12        Q    (By Mr. Gilman) That's why you're here.  Right?
13        A    I guess.  I mean, I don't know the legal terms
14    for --
15        Q    And although you have filed motions to terminate
16    the patient/child relationship of all of these children
17    that you have in foster care including the twins that were
18    born to her in October of '07, you still allow the
19    visitation?
20        A    The visitations were court ordered and we must
21    abide by the Court order.
22        Q    You didn't oppose the Court order, though, did
23    you?
24                    MR. KRIPPEL:  Objection, relevance, Your
25    Honor.  This doesn't have anything to do with anything.
```

1              THE COURT:  I will overrule the objection.
2    But -- let's wind up, Mr. Gilman.
3              MR. GILMAN:  Thank you, Judge.
4       Q    (By Mr. Gilman) Did you make the recommendation
5    to the Judge, that they be allowed -- that they visit
6    their mother?
7       A    Ah, no.  I don't remember making a
8    recommendation.
9       Q    Mrs. Estrada, isn't it inconsistent to have, on
10   one hand, visiting mom for the kids, and the other hand,
11   the State of Texas is trying to bring a criminal action --
12             MR. KRIPPEL:  Objection, Your Honor.  Calls
13   for speculation.
14             THE COURT:  I'm going to sustain the
15   objection.  Move on to the facts of this case please.
16      Q    (By Mr. Gilman) When have you done -- or when
17   have you been there for family visits since you have taken
18   over this case in October of '07?
19      A    Family visits with the children, or with
20   Mrs. Lucio?
21      Q    With Mrs. Lucio.
22      A    I transported the three oldest boys.  I don't
23   remember if it was two or three times to the jail to visit
24   with her.
25      Q    When?

188

1          A     I don't remember the exact dates for them.   I
2     believe -- I don't remember the exact dates.
3          Q     Can you give us a ballpark?
4          A     Let me see.   We're in June.   Maybe, late
5     February, to April?   Maybe.
6          Q     And how many times did you take the twins, the
7     new babies?
8          A     I have not taken the twins; the foster parents
9     take them.
10         Q     How often have they taken them?
11         A     They take them once a week.
12         Q     They take them once a week, to see their mother?
13         A     Yes.
14         Q     To your knowledge, has Gabriel, Adriana, and
15    Sara seen their mother since February of '07?
16         A     Not to my knowledge.
17         Q     But if the record indicates that they have, then
18    they have?
19         A     I am not sure I understand.
20         Q     Well, you're saying "not to your knowledge," but
21    you're also telling us that you are not familiar with the
22    file, Isn't that right?
23         A     I am not sure I understand your questions.
24         Q     What do you know about this case?   You don't
25    really know a whole lot about this other than what you

```
 1    participated in since September 31 of '07, is that right?
 2                   MR. KRIPPEL:  Objection, again on the
 3    sidebar.
 4                   THE COURT:  Overruled.  Go ahead.
 5                   THE WITNESS:  Do I answer?
 6        Q    (By Mr. Gilman) Yes.
 7        A    Ah, I have minimal knowledge before my being
 8    assigned to the case.
 9        Q    But I have all of the documents, do I not?
10        A    You should have the documents.
11        Q    Okay.  During the two years and few months that
12    Mariah was with foster parents, how many different foster
13    parents did she have?
14        A    I believe she only had one.
15        Q    During that same period of time, do you know how
16    many foster parents the other children had?
17        A    Not off the top of my head.
18        Q    So it may have been two or three?
19        A    For the two or three year period?
20        Q    Yes.
21        A    Ah -- I believe some of them only had that one,
22    and I believe that Rene was moved to different homes.
23    That's the one I know for sure.
24        Q    And Rene is how old?
25        A    He's currently 11 years old.
```

190

1          Q      And he is the oldest child from Robert and

2    Melissa Lucio?

3          A      That I am aware of, yes.

4          Q      When these twins were born in October of '07,

5    were there any DNA tests done to see whether or not these

6    twins were a product of Robert and Melissa Lucio?

7                       MR. KRIPPEL:  Objection, Your Honor.

8    Relevance.

9                       THE COURT:  Overruled.

10                      THE WITNESS:  Yes, there were.

11         Q      (By Mr. Gilman) From September of '04, to

12   November of '06, were there any DNA testing done of Mariah

13   to determine whether or not she was a biological offspring

14   of Melissa Lucio and Robert Alvarez?

15         A      Not to my knowledge, no.

16         Q      Are you aware that Mariah was not the biological

17   offspring of Robert Alvarez and Melissa Lucio?

18         A      I was informed by the therapist.  That's all I

19   know about it.

20         Q      What therapist was this?

21         A      Beto Juarez.

22         Q      Are you aware that Beto Juarez meets with

23   Mrs. Lucio while she's in jail?

24         A      Yes, I am.

25         Q      Why would he meet with Mrs. Lucio while she's in

1    jail?

2        A    It's part of the court order services.

3        Q    Court order services to do what?  If you're

4    trying to terminate the patient/child relationship --

5        A    I -- I don't know.

6        Q    Were you subpoenaed, ma'am?

7        A    Yes, I was.

8        Q    And you are here under that subpoena?

9        A    Yes.

10              MR. GILMAN:  Nothing further, Judge.

11              MR. KRIPPEL:  We have no further questions

12   of this witness, Your Honor.

13              THE COURT:  When you say "court order

14   service", you are not referring to this court order.

15              THE WITNESS:  No.  To the CPS.

16              THE COURT:  I just wanted to make that

17   point of clarification for the jury.  May she be excused?

18              MR. GILMAN:  No.  I do not wish to excuse

19   her.

20              THE COURT:  Okay.  Then we're going to ask

21   you to be on standby.

22              MR. PADILLA:  But she can go back to work?

23              THE COURT:  You can go back to your work.

24              THE WITNESS:  Okay.

25              THE COURT:  Just be within a half hour of a

192

1    phone call.  Okay?

2                    THE WITNESS:  Okay.

3                    THE COURT:  Thank you.

4                    THE WITNESS:  Thank you.

5                    (Witness was excused a**t 3:35 p.m.)**

6                    THE COURT:  Who is your next witness,

7    Mr. Padilla?

8                    MR. PADILLA:  May we approach the bench

9    Your Honor?

10                   THE COURT:  Ladies and gentlemen of the

11   jury, I'm going to ask you to step outside for a few

12   minutes.  We've got some scheduling matters that will

13   affect you the next couple of days.  So we'll talk about

14   it in a minute.

15                   **(Jury excused 3:36 p.m.)**

16                   THE COURT:  Yes, sir, Mr. Padilla?

17                   MR. PADILLA:  Your Honor, at this time I

18   would advise the Court that the only other witness that

19   the State intends to call is Norma Jean Farley, who is a

20   pathologist in this matter.  I did speak to Ms. Farley

21   during the lunch, and we anticipate having her available

22   tomorrow.  And that's when we anticipated using her.  She

23   advised me that she's under subpoena right now.  She is

24   presently being used in McAllen, and will be in court

25   tomorrow, beginning at ten.  And I told her I anticipate

1  taking up the rest of the day, and tomorrow.  She did tell

2  me, however, she would be available to testify on Thursday

3  morning, and I told her we would advise the Court of the

4  scheduling conflict.

5           THE COURT:  So a federal judge is more

6  important than a state judge?

7           MR. PADILLA:  Judge --

8           MR. GILMAN:  He's got the nerve to come in

9  here and say that?

10          MR. PADILLA:  No, Judge.  I'm just relaying

11  what I was told.

12          THE COURT:  Was she under subpoena to this

13  Court?

14          MR. PADILLA:  No, Judge.  As a matter of

15  fact, the subpoena we had, is in our possession --

16          THE COURT:  So they were the first to

17  subpoena her?

18          MR. PADILLA:  Correct.

19          THE COURT:  Okay.  Fair enough.

20          MR. GILMAN:  Well, if she wasn't even

21  subpoenaed, Judge, why should we reset the trial?  She was

22  not subpoenaed for this case.

23          THE COURT:  I understand, Mr. Gilman.

24          MR. PADILLA:  Your Honor, for the record,

25  we had spoken about that, and we said we would wrap up our

```
 1    case by Thursday, and Mr. Gilman would be allowed a three
 2    day long weekend to allow the defense to be ready and
 3    start its defense on Monday.
 4                 THE COURT:  Those discussions were had
 5    before.
 6                 MR. PADILLA:  And we ask the Court leave to
 7    start here on Thursday morning, and allow the State to
 8    come back -- be off tomorrow -- and be back on Thursday.
 9                 THE COURT:  All right.  Barring the obvious
10    objection which I will overrule, we will work on the
11    charge the rest of the day today, skip tomorrow, coming in
12    on Thursday, and then you can put on your defense on
13    Monday.  Unless you're ready to start on Thursday.
14                 MR. GILMAN:  We might be able to start on
15    Thursday.  It really upsets Mr. Padilla because he had
16    planned on going fishing, and I know this Court wanted to
17    go fishing also.
18                 MR. PADILLA:  I can even work Friday,
19    Judge.  I'm available.
20                 MR. GILMAN:  I'm working Friday.
21                 THE COURT:  Come on -- realistically.
22                 MR. GILMAN:  I'll be available.
23                 THE COURT:  I know you had a problem with
24    one of your witnesses -- at least that's what you said --
25    and you wanted him to be present during Farley's
```

```
1    testimony.
2                    MR. GILMAN:  Yes.  And I'm hoping to
3    arrange it, and I am hoping he'll be able to make it on
4    Thursday morning when Doctor Farley is going to be
5    testifying.
6                    THE COURT:  So the scheduling -- the
7    scheduling accommodation works both ways.
8                    MR. GILMAN:  That's fine.  Depending on how
9    long Doctor Farley is going to be, and how much work the
10   Court wishes to take, maybe we can start with --
11                   THE COURT:  Do whatever.
12                   MR. GILMAN:  We'll wait until Monday.
13                   THE COURT:  I'm in for the long haul,
14   whatever it takes, is what it takes.
15                   MR. GILMAN:  I'll start Monday.
16                   THE COURT:  Okay.  Let's bring the jury
17   back in.  I'm not happy about this.  But, that's the way
18   it goes.
19                   (Jury present at 3:40 p.m.)
20                   THE COURT:  You all may be seated.  Ladies
21   and gentlemen of the jury, please be seated, What we
22   anticipate to be the State's last witness, is Doctor
23   Farley.  A federal court in McAllen had the audacity to
24   think that they were more important than this court, and
25   she had been subpoenaed to testify today.  And we
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    anticipate having Doctor Farley testify here tomorrow, and

2    then breaking up for the weekend, and giving you a long

3    weekend.  But things didn't work out that way.  So what

4    we're going to do, is, we're going to start working on the

5    written instructions of the charge.  You're going to have

6    tomorrow off.  Okay?  Come back Thursday morning, and the

7    State will finish up with Doctor Farley, and then the

8    defense will start on Monday.  We don't anticipate it

9    being very much into next week.  We anticipate it probably

10   being a couple of days; maybe a little bit longer; maybe a

11   little bit shorter.  You can't tell whether the witness is

12   going to be long or not.  But I expect next week to be a

13   relatively short week.  I apologize for the inconvenience,

14   but in the interest of justice, I think we need to try to

15   accommodate everybody.

16              Again, I remind you of your instructions.

17   You are not to speak to anybody about this case.  You are

18   not to let anybody else speak to you about this case.  You

19   are not to do any independent research.  You are not to

20   read any articles, listen to any radio or see any TV about

21   this case.  The decision you make, you are supposed to

22   make by discussing it with each other after all the last

23   bit of the evidence is in.  You have the written charge in

24   front of you, and you hear the arguments of the attorney.

25   Only then are you supposed to be discussing this.  Good

197

```
 1    luck, and we'll see you Thursday morning at 9:00 o'clock.
 2    Thank you very much.
 3                    (Jury not present.)
 4                    THE COURT:  Ladies and gentlemen, if you
 5    come to the back, I will give you copies of the charge and
 6    we will start working on that.
 7
 8                    (Recess from 3:42 p.m. till 7/03/08 at 9:00
 9                    a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

198

1    THE STATE OF TEXAS:

2    COUNTY OF CAMERON:

3                 CERTIFICATE OF COURT REPORTER

4         I, ADELAIDO FLORES, JR, Official Court Reporter in

5    and ior the 138th Judicial District Court of Cameron

6    County, State of Texas, do hereby certify that the above

7    and foregoing contains a true and correct transcription of

8    all portions of evidence and other proceedings requested

9    in writing by counsel for the parties to be included in

10   this volume of the Reporter's Record, in the

11   above-entitled and numbered cause, all of which occurred

12   in open court or in chambers and were reported by me.

13        I further certify that this Reporter's Record of the

14   proceedings truly and correctly reflects the exhibits, if

15   any, admitted by the respective parties.

16        WITNESS MY OFFICIAL HAND on this the 7th day of July,

17   2009.

18        ADELAIDO FLORES, JR.    Texas CSR
         Official Court Reporter
19       138th District Court
         974 East Harrison Street
20       Brownsville, Texas 78520
         (956) 550-1489
21       Certificate No. 1117
         Expiration Date: 12/31/08
22

23

24

25

Adelaido Flores, Jr.
Certified Shorthand Reporter