*16020*

1

1   **REPORTER'S RECORD**

2   **VOLUME 34 OF 44 VOLUMES**

3   **TRIAL COURT CAUSE NO. 08-CR-885-B**

4   - - - - - - - - - - - - x
                            :
5   **STATE OF TEXAS**          :   **IN THE DISTRICT COURT**
                            :
6   **VS**                      :   **138TH JUDICIAL DISTRICT**
                            :
7   **MELISSA ELIZABETH LUCIO**  :   **CAMERON COUNTY, TEXAS**
    - - - - - - - - - - - - x

8

9                  **JURY TRIAL - DAY 3**

10

11      On the 3rd day of July, 2008, the following

12   proceedings came on to be heard in the above-entitled and

13   numbered cause before the Honorable **A. C. Nelson,** Judge

14   Presiding, and a petit jury, held in Brownsville, Cameron

15   County, Texas.

16      Proceedings reported by computerized stenotype

17   machine.

18

19                                    **FILED IN**

20                        **COURT OF CRIMINAL APPEALS**

21                             AUG 0 6 2009

22

23                        Louise Pearson, Clerk

24            **ORIGINAL**

25

Adelaido Flores, Jr.
Certified Shorthand Reporter

2

```
 1                    A P P E A R A N C E S

 2    APPEARING FOR THE STATE:

 3         HON. ARMANDO VILLALOBOS
           State Bar No. 00788584
 4         Criminal District Attorney for Cameron County

 5         - AND -

 6         HON. ALFREDO PADILLA, JR.
           State Bar No. 15404600
 7         & HON. JOSEPH KRIPPEL
           State Bar No. 24007515
 8         & HON. MARIA DE FORD
           State Bar No. 24043626
 9         Assistants to the Criminal District Attorney
           Cameron County Courthouse
10         974 E. Harrison Street
           Brownsville, Texas  78520
11         Telephone:  (956) 544-0849
           Fax:  (956) 544-0869 FaxHON. ALFREDO PADILLA, JR.
12         State Bar No. 15404600

13

14    APPEARING FOR THE DEFENDANT:

15         HON. PETE GILMAN
           State Bar No. 07952500
16         6933 N. Expresway
           Olmito, Texas  78575
17         Telephone:  (956) 350-6954
           Fax:  (956) 350-8056
18

19    APPEARING FOR THE DEFENDANT:

20         HON. ADOLFO E. CORDOVA, JR.
           State Bar No. 00787286
21         Law Office of Adolfo E. Cordova, Jr.
           711 North Sam Houston
22         San Benito, Texas  78586
           Telephone:  (956) 399-1299
23         Fax:  (956) 399-4484
                                                          Fax
24

25
```

```
1                          VOLUME 34

2              CHRONOLOGICAL INDEX - JURY TRIAL - DAY 3

3    7/03/08                                        PAGE    VOL

4

5    Court's Discussion/Alvarez DVD                   3     34

6

7    STATE'S WITNESSES:

8    NAME                   DX    CX   RDX   RCX   VDX   VOL

9    Norma J. Farley, MD     5    52    58          43    34
     Norma J. Farley, MD                            44
10

11   State Rests                                     60    34

12

13   Motion for Instructed Verdict                   61    34

14

15   Adjournment                                     62    34

16

17   Certificate of court reporter                   63    34

18

19

20

21

22

23

24

25
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1              ALPHABETICAL WITNESS INDEX
                                              VOIR
 2    NAME               DX    CX    RDX   RCX  DIRE    VOL

 3    Farley, Norma J. MD   5   52    58          43     34
      Farley, Norma J. MD                        44
 4                       INDEX OF EXHIBITS

 5    STATE'S EXHIBITS:

 6    NO.   DESCRIPTION              OFFERED   RECEIVED   VOL

 7    21    Farley's CV                 7         7        34
      22    Photo-Deceased child       13        13       34
 8    23    Photo-Deceased Child       13        13       34
      24    Photo-Deceased child       13        13       34
 9    25    Photo-Deceased Child       13        13       34
      26    Photo-Deceased Child       13        13       34
10    27    Photo-Deceased Child       13        13       34
      28    Photo-Deceased Child       13        13       34
11    29    Photo-Deceased Child       13        13       34
      30    Photo-Deceased Child       13        13       34
12    31    Photo-Deceased Child       13        13       34
      32    Photo-Deceased Child       13        13       34
13    33    Photo-Deceased Child       13        13       34
      34    Photo-Deceased Child       13        13       34
14    35    Photo-Deceased Child       13        13       34
      36    Farley's Autopsy Report    39        46       34
15    37    Medical Demo 1             48        48       34
      38    Medical Demo 2             48        48       34
16    39    Medical Demo 3             48        48       34

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (Defendant present; jury not present.) |
| 3 | THE COURT:. Mr. Gilman? |
| 4 | MR. GILMAN:  Yes, sir. |
| 5 | THE COURT:  Mr. Padilla? |
| 6 | MR. PADILLA:  Yes, Your Honor. |
| 7 | THE COURT:  First of all let me call |
| 8 | 07-CR-885-B, State of Texas versus Melissa Elizabeth |
| 9 | Lucio.  Let the record reflect that Mrs.  Lucio is present |
| 10 | along with her attorneys and the State is being |
| 11 | represented by the regular state attorneys that have been |
| 12 | here all of the time. |
| 13 | I went over the DVD, and the statement. |
| 14 | The statement, in my opinion, did not have anything |
| 15 | exculpatory.  The DVD had some, potential exculpatory |
| 16 | stuff in it.  So I'm going to make both of them available |
| 17 | to you at the first break.  Over all, I don't think that |
| 18 | there is anything exculpatory, but there are a couple of |
| 19 | times that Mr. Alvarez says that his kids could have |
| 20 | injured the child -- jumped on her, things of that sort. |
| 21 | I think that's exculpatory enough to make it available to |
| 22 | you.  Other than that, I don't think it's going to be very |
| 23 | helpful.  But at the first break, I will make it available |
| 24 | to you, sir. |
| 25 | MR. GILMAN:  Thank you, sir. |

```
 1                    THE COURT:  That was the only housekeeping
 2   thing that I needed to do.  Anything else, sir?
 3                    MR. PADILLA:  No, sir.  We're ready.
 4                    THE COURT:  All right.  Call them in.
 5                    (Jury present at 9:04 a.m.)
 6                    THE COURT:  Be seated.  Thank you.  Good
 7   morning.  You all doing okay?
 8                    PANEL MEMBERS:  Good morning.
 9                    THE COURT:  I saw one of you at Valley
10   Baptist Hospital.
11                    Mr. Padilla, would you call your next
12   witness?
13                    MR. PADILLA:  Yes, Your Honor, at this
14   time, we call Doctor Norma Jean Farley.
15                    THE COURT:  Doctor Farley?  Please step
16   forward.
17                    Before sitting down would you please raise
18   your right hand?
19                    THE WITNESS:  Sure.
20                    (Witness was sworn in by the court.)
21                    THE COURT:  Please be seated.
22                    MR. PADILLA:  Can I move this around for
23   now until we need it?
24                    THE COURT:  Whatever makes sense.
25                    MR. PADILLA:  May I proceed, Your Honor?
```

```
1              THE COURT:  Please.
2                    NORMA J. FARLEY, MD,
3       having been first duly sworn, testified as follows:
4                      DIRECT EXAMINATION
5    BY MR. PADILLA:
6       Q     Would you state your full name for the record
7    please?
8       A     It's Norma Jean Farley.
9       Q     And Mrs. Farley, how are you employed?
10      A     I am the chief forensic pathologist for Cameron
11   and Hidalgo Counties.  I currently own my own businesses.
12   That's all I do.
13      Q     Tell me a little bit about your personal
14   background.  How long have you been a physician, or a
15   doctor?
16      A     Since 1994, I've been a physician licensed in
17   the State of Texas.  I did my medical school training at
18   the University of Texas Health Science Center in San
19   Antonio.  And when I graduated in '94, I continued
20   there -- most doctors have to do a residency -- so I
21   continued at the University of Texas and did a residency
22   in pathology both in anatomical pathology, and clinical
23   pathology, and that was from '84 to '98.  And that
24   basically means that I did training in autopsies -- mainly
25   hospital autopsies then -- as well as looking at surgical
```

```
1    path specimens, that would be like gall bladders --
2                    THE COURT:  Doctor Farley?  Excuse me for
3    interrupting.  Would you just slow down?
4                    THE WITNESS:  I get in trouble for that all
5    the time.
6                    THE COURT:  I see my court reporter is
7    typing, and he's having a hard time keeping up.
8                    THE WITNESS:  If he breathes heavily, I'll
9    know.  They sigh, usually.
10                   So I did the anatomical path which is the
11   specimens that people take out like molds, gall
12   bladders -- cancers.  We put them on a slide and diagnose
13   what it is and then let the doctors know.
14                   Clinical pathologists, generally run
15   laboratories.  They're the people at LAB CORP, the people
16   that run like Valley Baptist Laboratories.  We look at
17   peripheral smears, like blood smears and diagnose
18   leukemias, and things like that.
19                   After I finished that training at UT, I
20   stayed in San Antonio and trained at the Bexar County
21   Medical Examiner's Office which is still on the UT campus
22   and did an extra one year of forensic training, like the
23   fellowship -- after I finished that in 1999, basically.
24   So I did all of my training in San Antonio.
25                   And then I took a board -- generally after
```

1    you finish all of your training you have to take a board

2    -- you know -- in your area.  Mine is the American Board

3    of Pathology.  So I'm board certified in anatomical,

4    clinical, as well forensic pathology.

5         Q    Okay.  Did you prepare a curriculum vitae that

6    details all of your studies but also all of your duties

7    and responsibilities, as well as honors and awards that

8    you have received in the past?  Correct?

9         A    Yes.

10         Q    And I am going to show you this exhibit and ask

11    you if you can identify it.

12         A    Yes.

13         Q    Okay.

14              MR. PADILLA:  At this time I'll mark this

15    as State's Exhibit No. 21 and offer it, Your Honor.

16    First, let me show it to defense counsel.

17

18              MR. GILMAN:  No objections.

19              THE COURT:  It'll be received into

20    evidence.

21              **(State's Exhibit Number 21 admitted)**

22         Q    Doctor, just for the lay person like myself --

23    and I probably would have gone through medical school if

24    it wasn't for the biology, science, math, and all of the

25    long words -- but what does a pathologist do?

1          A    As I mentioned earlier most of us, the
2    pathologists that you see at the hospital that look at
3    surgical specimens, like if someone gets their gall
4    bladder or appendix removed, or their cancers removed, and
5    they run the laboratories, that's the general pathologist
6    that most of you know.  And then in forensic pathology, we
7    do the extra year of training in autopsies, but not the
8    usual hospital autopsies.  These are hospitals on,
9    usually, on unnatural deaths.  So homicides, suicides,
10   accidents.  Natural deaths aren't expected or in young
11   people, they will come through the office as well, and
12   there's actually a statute that outlines all of the cases
13   that must come through a forensic pathologist or medical
14   examiner's office.  So, as a forensic pathologist, we kind
15   of zero in on the autopsy part.  We sign, or we usually do
16   the cause or manner of death, meaning the death
17   certificates, and in this county the justice of the peace
18   still do the certificates.  So basically I tell him what I
19   found and he'll make a decision on whether he agrees with
20   me and then he'll sign the death certificate on the
21   individuals.
22          Q    And as far as your duties as a pathologist, you
23   do what we normally call in the general public, the
24   autopsy, correct?
25          A    That's correct.

9

1     Q    And on an average year, how many autopsies do
2     you perform?
3     A    Usually about, well, now about 300 a year.  I do
4     two counties right now, but we're about to get a second
5     pathologist who will take one of the counties, or at least
6     help shift the counties.  So we try to stay within 300 a
7     year.
8     Q    And how many of those -- do you have an idea how
9     many of those are children?
10    A    Probably about, well -- motor vehicle accidents
11    would also be children --
12    Q    Right.
13    A    -- so maybe if you add those and the drownings,
14    probably 30 or 40.  Homicide wise, maybe five a year --
15    six.
16    Q    Are you in the committee that also supervises or
17    oversees autopsy reports from other counties, or not?
18    A    No.  The Child Fatality Review is in Cameron
19    County, and they review all child deaths in Cameron
20    County.
21    Q    Do you assist in any other county in reviewing
22    data concerning the death of an individual like Bexar
23    County, or any other county?
24    A    Yes.  I used to be on the child fatality review
25    in Bexar County as well, until I left Bexar County.  I

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    used to be a medical examiner at the Bexar County Medical

2    Examiner's Office.

3        Q    And as a result of your duties you said usually

4    the justice of a peace will order an autopsy of a child --

5    or of an adult, correct?

6        A    Yes.  In this county, it's a justice of the

7    peace county, you have to have a million population in

8    your county before you are made to have a medical

9    examiner's office.  And Cameron County doesn't have a

10   million people.  So the justice of peace are like the

11   coroners that you hear about, like on TV, or in other

12   states, and we just call them justices of the peace here.

13       Q    As a result of your duties did you have an

14   opportunity to receive the body of a child by the name of

15   Mariah Alvarez?

16       A    Yes, I did.

17       Q    And when was that?

18       A    Actually, I first saw her on 2/18, but the

19   complete autopsy was done on 2/19/07.

20       Q    And normally how long does it take to perform an

21   autopsy on a child?

22       A    It actually depends on the case.  It can take an

23   hour -- an hour and a half.  Or, if there is a lot of

24   trauma or a lot of stab wounds, it can take four to eight

25   hours depending on how much trauma is seen outside of the

1  body.

2      Q    How long did it take to perform the autopsy on

3  Mariah Alvarez?

4      A    You know, just estimating probably about six

5  hours.

6      Q    And why the length of six hours?

7      A    The external examination is where we look at the

8  outside of the body, and we try to document any injuries

9  that might be present.  And the external on this case

10  took -- you know -- about four hours.

11      Q    Why was that?

12      A    Because of the number of contusions and

13  abrasions on the body, it took a long time to actually

14  look at them and try to measure them, and then to try to

15  take pictures of them so that they would show up fairly

16  well.  It took quite a long time.

17      Q    I mean, there's no scale for abuse.  There's

18  not -- like -- moderate to severe.  But how would you

19  classify -- you know the signs of this child's abuse

20  throughout the body?

21      A    This child was severely abused.  I mean, it

22  would have been evident to a first year nursing student.

23  I mean, there are bruises -- there are contusions -- and

24  that's a bruise -- basically that's hemorrhaging into the

25  tissue of the body.  And we've all had bruises.  So you

1   kind of know what they look like.  But this child had

2   bruises all over the body.  I mean -- all over.

3               MR. PADILLA:  May I approach the witness

4   Your Honor?

5               THE COURT:  Yes, sir.

6       Q   (By Mr. Padilla) Well, while we get that going,

7   Doctor, (referring to projector) I'm going to show you

8   some documents that I will mark as State's Exhibit No. 22,

9   23, 24, 25, 26, 28, 29, 30.

10              THE COURT:  Did you go through 29?  I

11  didn't hear you.

12              MR. PADILLA:  Yes, sir.  I went through 29.

13  Thirty-two.

14              THE COURT:  Thirty-one and then 32?

15              MR. PADILLA:  Yes, sir.

16      Q   (By Mr. Padilla) Thirty-three, 34, and 35.  And

17  ask you, if you're familiar with these pictures.

18      A   Yes, I am.

19      Q   Are they photographs of the deceased Mariah

20  Alvarez?

21      A   Yes, they are.

22      Q   And were they taken at or near the time that the

23  autopsy was conducted?

24      A   Yes.

25      Q   And they are true and accurate copies of the

13

```
 1   originals, is that correct?
 2        A    Yes.
 3             MR. PADILLA:  At this time I offer these
 4   Exhibits 22 through 35.
 5
 6             MR. GILMAN:  No objections, Judge.
 7             THE COURT:  They'll be received.
 8             (State's Exhibit Number 22-35 admitted)
 9        Q    (By Mr. Padilla) I'm going to draw your
10   attention, then, to what has been marked as State's
11   Exhibit No. 22.  Is this the body of the child Mariah
12   Alvarez that you had an opportunity to autopsy back on
13   February, 2007?
14        A    Yes.
15        Q    I'm going to draw your attention, then, first
16   and foremost, you said you made an external examination of
17   the child.  Correct?
18        A    Yes.
19        Q    And there appears to be numerous markings on the
20   body first -- across the face, across the chest, and
21   across both legs.  What is that consistent of?  Or, what
22   are those markings?
23        A    That's what I was calling contusions.  Most of
24   them are contusions, or bruises which are just blood
25   within the soft tissue, usually -- you know -- blunt force
```

1    trauma, meaning a slap, a hit, a punch, or a throw into

2    something hard that ruptures the tiny blood vessels and

3    you get a bruise from it.  And then others are abrasions

4    which we commonly may refer to them as scrapes.  When you

5    scrape off the superficial layer of skin like when a kid

6    falls on the playground and scrapes himself.  Those are

7    called abrasions, and you'll see in my report that I

8    mentioned those quite frequently, too.

9         Q    And there appears to be also some contusions and

10   abrasions across the face, is that correct?

11        A    Yes.  There were multiple contusions and

12   scattered abrasions on the face as well.

13        Q    Did you find any contusions or abrasions on the

14   outside of the scalp?

15        A    They're more difficult to see in the scalp.  We

16   could see the abrasions fairly well.  Little scabbed areas

17   in the scalp, and the scalp was very thin.  It looked like

18   the hair had been pulled, basically, and then there was a

19   little blood scab in that area.

20        Q    So across the head up in this area, the child

21   appears to be missing sections of hair, is that correct?

22        A    Yes.  It's very thin and then there's these

23   crusted areas where the hair would have been.

24        Q    Would that be consistent, Doctor, with the

25   child's hair being pulled away?

1      A    Yes, it would.

2      Q    Now we also see some markings here on the left

3   arm.  Do you recall that injury?

4      A    Yes, sir, there is actually -- and you'll see it

5   more on the back surface and the lateral surface of the

6   arms, but there's lots of contusions going down both

7   arms -- extremities -- arms and forearms, and even the

8   hands had contusions on them.

9      Q    Were you able to observe anything that appeared

10  to be bite marks on the arms of the child?

11     A    I wasn't for sure, and I said:  It could be a

12  bite mark, but there wasn't.  I'd have to look.  I think

13  it was on the left upper.  Yes.  On the left upper arm.

14  Yeah.  More on the back.  But the bite marks were

15  obvious -- on the right back.

16     Q    You said -- how many autopsies have you done on

17  children that have been subject to abuse in your

18  experience as a doctor?

19     A    You know I don't know how many.  I've done about

20  a thousand autopsies.  But how many were specifically

21  children --

22     Q    You don't recall?

23     A    -- yeah.

24     Q    Let me ask you this:  Do you have an opinion?

25  What is your opinion concerning these injuries?  Were they

1  severe?  Moderate?  Or how would you classify them?

2      A    You mean -- well, contusions don't usually kill

3  you.  It's not the contusion.  It's just a sign that the

4  child has been beaten.  That's why we do the internal

5  examination to figure out which slap, hit or throw killed

6  the child.  But this is a sign of significant abuse.  Just

7  the fact that there's so many bruises and abrasions on the

8  body.  When kids are this age, and they fall, most of us

9  know they fall and they get hit in the shins, the calves,

10  the knees, the elbows -- the typical places that you fall

11  down and scrape.  The chest, the abdomen, the pubic area,

12  the undersurface of the eye, and the cheeks, are not the

13  typical places that we fall down.

14      Q    Doctor, did you draw any opinion or any concern

15  about the swelling here in this area?

16      A    Well, there's a lot of contusions on that leg.

17  And when you get bleeding, you also get swelling.  And we

18  have more upclose pictures of that leg, in the knee

19  area -- on this child.

20      Q    Now the ears -- did the child suffer any

21  injuries to the ears?

22      A    Yes.  Both tops of the ears -- both of them had

23  contusions on them -- at the top of the ear, like a

24  pinching.  Some people "pop" their kids in the ears when

25  they're not listening.  But both sides have these

17

1    contusions, and it's pretty much in the same area.

2        Q    And that would be consistent with her being hit,

3    or being pinched in the area?  Is that correct?

4        A    Yes.  I mean, all of these bruises are

5    consistent with somebody being hit, or being slammed into

6    something.

7        Q    And looking at State's Exhibit No. 24, that's

8    showing the back of the child.  You said you identified

9    some bite marks.  Are these the ones that you've

10   identified as bite marks?

11       A    Yes.  There are bite marks up on the right upper

12   back.  And there's probably a better picture, because with

13   the glare you can't really see.  But they're contused and

14   they're bruised and they're abraded -- like dragging of

15   the teeth across the back, and --

16       Q    There appears to be a bite with raking, where it

17   just pulls the flesh off the back?

18       A    Yes.

19       Q    In your experience as a medical doctor would

20   that be a painful injury to have to your back?

21       A    Well, yes.  It's a -- big bite!

22       Q    And there appears to be, obviously, there is

23   bruising to the upper torso, the back portion, that

24   appears on the right side, and on the arms, correct?

25       A    Yes.

1      Q     You also found abrasions and contusions along

2  the back parts of the legs, correct?

3      A     Yes.

4              MR. GILMAN:   Your Honor, I'm going to

5  object to the leading.

6              THE COURT:   Sustained.

7  BY MR. PADILLA:

8      Q     Let me draw your attention, ma'am, to what we

9  have marked as State's Exhibit No. 25.  Can you tell us,

10  again, what that shows?

11      A     That is just trying to take a more closeup

12  picture of the trunk or torso, and that's that the

13  anterior front view of it.  And, again, you can see the

14  contusions that I was trying to photograph.

15      Q     This right here is abrasion and contusions?

16      A     That's a contusion.  That's a very deep purple,

17  kind of bluish color.  It looks like a little bit older.

18  Most of the other ones are pinky, maroon, when you're

19  looking at them.  And that's generally a color we

20  associate with an acute or recent bruise.

21      Q     Let me draw your attention then to what has been

22  marked as State's Exhibit No. 26.  I draw your attention,

23  again, to what appears to be bruising of the face.  Is

24  that what those marks are?

25      A     Yes, it is.  And you can see there's also

1   abrasions there on the face, too.  But this actually shows

2   the contusion on the arm a lot better.  It's a little

3   darker.  You can see how large the contusions are, and how

4   it goes down that left arm.  And then you can actually see

5   the lateral left leg.  I was trying to put this child on

6   the side so you can see that there was even more injuries

7   along the lateral aspect of the body.

8       Q    Doctor, would that be consistent with someone

9   grabbing the child and just squeezing the child hard?

10      A    Which one?

11      Q    As it relates to the back portion here of the

12  victim?

13      A    It could be a slap, or -- anything.  The front

14  of the leg, actually, had long, oval appearing contusions.

15  I think there's a picture of it with my hand there.  It

16  almost looks like a slap, or a very intense grab.

17      Q    What you're talking about here is what we have

18  identified as State's Exhibit No. 27 which is this area?

19      A    Actually, that's just a different area.

20      Q    I will show you what is marked as State's

21  Exhibit No. 30.  What can you tell us about these

22  injuries?

23      A    Again, you can see the contusions, kind of a

24  deep maroon look.  There's one that comes across the right

25  forehead and down onto the right cheek.  You see another

1    one under the right eye, on the right cheek.  There's also

2    one on the left cheek, and left forehead as well, and then

3    on the mid forehead.  And then all of the abrasions around

4    the nose, lips, and there are abrasions on the face as

5    well -- other areas of the face.

6         Q    This is the area that you've identified

7    previously as having loss some hair?

8         A    Yes.  Some of the hair is missing there and in

9    the other areas of the scalp.

10        Q    I will draw your attention to State's Exhibit

11   No. 31.  Does that also show some of the bruising?

12        A    Yes.  This is the lower extremities.  And it's

13   actually on the left thigh that we have those oval-looking

14   pattern contusion that look like fingers, basically.

15        Q    I will show you what is marked as State's

16   Exhibit No. 32 --

17        A    Yes.

18        Q    -- does that continue to show, again, the

19   markings on the child?

20        A    You can see it a lot better here how they're

21   long and slender, and kind of -- I think this one had a

22   little bit of a green in it as well.  I mean, it's

23   probably a little bit older.  But you can see how it looks

24   like they have a pattern to them.  Not like the other

25   bruises that are just big and oval and varying in sizes.

1    This one looks patterned.

2        Q    Doctor, I will show you another photograph on

3    Exhibit Number 23, again.

4        A    That's just a different picture of the back.  I

5    had put something under it because the autopsy table we

6    use is silver, and it was glaring too much.  So that's why

7    we switched to the blue table, and I tried this.  And it

8    really had too much glare to it, but you can see the bite

9    marks on the right back pretty well there.

10                MR. PADILLA:  May I publish these to the

11   jury, Your Honor?

12                THE COURT:  Yes, sir.

13       Q    (By Mr. Padilla) Doctor, other than the external

14   examination that you made, you also obviously did the

15   autopsy of the internal body of the child, is that

16   correct?

17       A    Yes, I did.

18       Q    Can you tell the ladies and gentlemen of the

19   jury how that is accomplished, and what does that consist

20   of?

21       A    After we do the external, and actually we'll

22   look at the hair, color, teeth, and a lot of other things,

23   we go ahead and we open the body.  We do a Y-incision on

24   the chest, and open the chest and abdominal cavities.

25                We remove the organs, weigh them, section

```
 1    them, and look at each organ.  We do the same with the
 2    brain.  We do an incision on the scalp.  Open the cranial
 3    vault, basically of the skull, and we look for injuries
 4    that might be happening in that area as well.
 5         Q    You also do an internal examination of the
 6    organs?
 7         A    Yes.  We take every organ out, weigh it and
 8    section it.
 9         Q    And after you conclude your autopsy, did you
10    draw an opinion as to the cause of death of this child?
11         A    Yes, I did.  Basically all of the injuries on
12    this child, there were some injuries on the head and
13    chest.  But most of the injuries were to the head which we
14    call blunt force head trauma.  Some people call it "closed
15    head injuries."  But, basically, it's injuries to the
16    brain.  We see that -- usually in the brain injury area
17    there's no blood.  And you have a fluid that sits in the
18    brain that nourishes your brain -- the cerebral spinal
19    fluid -- but there's no blood in the cranial cavity except
20    for blood vessels.
21              In this child, we did see something that we
22    call "subdural hemorrhage," which means blood around the
23    brain -- or blood between the brain and skull, basically.
24    This dura sits on the skull.  So this is blood that has
25    accumulated -- where it shouldn't accumulate -- and it's
```

1    due to tearing of these vessels -- the subdural area of
2    the veins, and it leaks blood into this space.
3                We also saw patchy areas of blood that is
4    sitting on the brain. We call that "subarachnoid
5    hemorrhage". And it's sitting on the brain itself, mainly
6    inferiorly, but it was in there as well, and it was
7    patched in distribution.
8                We reflected the scalp -- before we even
9    got into the skull itself -- there were multiple
10   contusions on the scalp which means bruises that scalp
11   hair will sometimes hide, or may not even be visible on
12   the skin surface, but the pictures when we reflect the
13   scalp there's lot of scalp hemorrhage where there had been
14   blows to the head as well.
15               So, even before we opened the brain, we
16   could see that there had been trauma to the scalp that we
17   couldn't see even when we were doing the external
18   examination. So, basically, the blood and the cranial
19   vault lets us know that there was significant head blow
20   trauma which just means that the child has been beat about
21   the head, or thrown into something.
22        Q    So that would be consistent with her being hit
23   by something, or being thrown against a wall or against an
24   object that would hit the head and cause injuries to the
25   child. Correct?

```
1        A      Yes.

2        Q      And the form and manner of death was, what,

3   Doctor?

4        A      The manner was homicide.

5        Q      Homicide?  Murder?

6        A      Yes.

7        Q      I'm going to draw your attention -- I know you

8   discussed the issues of the scalp.  But I want to draw

9   your attention to Exhibit Number 34.

10       A      (referring to the projector)  I'm going to let

11   him play with it -- make it wide a little bit.

12       Q      I'm from the old school, Doctor.  I usually show

13   photographs.  But nowadays, we use projectors.

14       A      I used to be a teacher, so I'm used to messing

15   with those.  That's a little -- you can see it a little

16   bit better now.

17              Basically, we reflect the scalp first,

18   before, of course, we remove the top of the skull and the

19   dark maroon red areas are called scalp contusions or

20   bruises in the scalp itself.

21       Q      Which is identified, here, here and here?

22       A      Right.  Those are actually on the skull.  And

23   then the ones on the back where the clean glove is, those

24   are scalp contusions.

25       Q      Okay.
```

25

1      A      And there are multiple scalp contusions, and you

2    can see the occipital -- that means the back.  That also

3    involved the parietal, which is a little higher.  So there

4    are multiple scalp contusions.  You can see the sizes, and

5    they range from small to maybe 2.5 centimeters.

6      Q      Let me show you what we have marked as State's

7    Exhibit No. 28.  Does that -- is that also a picture of

8    the scalp area?

9      A      Yes, it is.  That's another area -- a different

10   picture looking -- it looks like it's facing forward.

11   And, again, you see a very large area of contusion, and

12   then a smaller area of scalp contusion.  The scalp

13   contusion.  This might be better.  Here they are.  This is

14   the scalp; this is the skull.  Big area of contusion.  And

15   there are other areas of contusions -- all over the scalp.

16     Q      Were you able to measure or to number -- get a

17   number of the contusions on the child's skull?

18     A      No.  I think I called it "multiple".

19     Q      Multiple?

20     A      Yes.

21     Q      Did you have an opportunity once the skull is

22   opened, you had an opportunity, then, to draw blood,

23   correct, if there was any blood within the cranial area?

24     A      Yes.  And actually before -- while we were

25   trying to take the skull off with the saw, a lot of the

```
1    subdural hemorrhage just started coming out of the skull,

2    while we were -- while we were sawing.  It was just --

3         Q    What is that indicative of?  Bleeding?

4         A    We already knew there was a subdural at that

5    point.  Because, usually, when we cut -- it's just pretty

6    clean, and there might be a little bit of cerebral spinal

7    fluid that comes out, but not blood.  And so we knew that

8    when blood started coming out, there was probably a

9    subdural there.

10        Q    I would draw your attention to what we've

11   identified and offered as State's Exhibit No. 35.  Does

12   that show the removal of the skull and of the brain

13   itself?

14        A    Yes.  And this is the subdural -- the dura sits

15   on the skull cap.  So this white is the dura.  And you can

16   see this blood is under the dura.  So that's why it's

17   called subdural hemorrhage.  Even with this white coming

18   out, there is still quite a bit of blood left that we

19   could obviously see.  Much more on the right, but you can

20   see it here on the left as well.

21        Q    So for all practical purposes, then, you had

22   injuries on both sides of the brain?

23        A    Well, actually it's blood --

24        Q    Blood?

25        A    On both sides -- left and right -- but much more
```

1   on the right side.

2       Q    I'll show you what is marked as State's Exhibit

3   No. 33.  Can you explain what that is?

4       A    Yes.  This is after we remove the brain.  So

5   this is actually the very bottom of the skull starting

6   right about here.  And, again, the dura is still there.

7   This is the dura.  There's blood here -- coming around.

8   You can see -- this is where your spinal cord comes

9   through.  This is front; this is back.  This is all blood

10  that is sitting inside the skull, basically.  It's more of

11  the subdural hemorrhage.

12      Q    And would it require a certain amount of force

13  to cause these type of injuries?

14      A    Yes.  It's the force.  Basically, it's -- they

15  call it acceleration/deceleration.  It gets pretty

16  complicated when you start talking about acceleration and

17  tangentials.  But basically the head is going one

18  direction and it hits something.  And when it stops, it

19  bounces off of it.  And it's that force that causes this

20  kind of injury to the child.

21              If you impact something, it's much more

22  injury than shaking.  The impact causes a lot more force

23  to accumulate.

24              MR. PADILLA:  May I publish these to the

25  jury?

28

```
1              THE COURT:  Yes, sir.
2       Q     (By Mr. Padilla) Doctor after you had some --
3   concerning the head, you said the child also had internal
4   injuries, is that correct?
5       A     Yes.
6              MR. PADILLA:  Can I move this thing?   I
7   don't want it to block Mr. Gilman's view.
8       Q     (By Mr. Padilla) Doctor, what injury -- what
9   internal injuries, if any, did you find, other than the
10  head injuries?
11      A     There were some lung contusions to both lungs
12  and that's just bruising to the organ itself.  And there
13  was also a contusion to the right kidney.
14      Q     What was the condition of the spinal cord?
15      A     I opened the spinal cord on this child just to
16  see if there were injuries, just given the amount of
17  contusions we were seeing.  And there was blood around the
18  spinal cord as well.  The subdural blood.  It was in the
19  neck area, and then there was some in the thoracic and
20  lumbar.  But it was more patchy there.  Most likely from
21  what we saw in the back and abdomen, there were lots of
22  blows, and lots of contusions.  So it was probably just
23  injury due to that.  But there were no tears in the spinal
24  cord at all, meaning the spinal cord was still totally
25  intact.
```

1      Q      What type of force would be necessary to cause a

2  kidney or lungs to get bruised?

3      A      Oh, you can see that with punches or stomps --

4  or slams.  Sure.  You can get contusions from all of that.

5      Q      The child had some -- any other internal

6  injuries that were remarkable or unremarkable?

7      A      Those were the biggest injuries that I can

8  remember from my report.  There was a left arm fracture as

9  well.  And there was a skeletal survey performed by the

10  radiologist.  He may have seen that.  And the tech that

11  brought us the x-rays told us that it looked like there

12  might be a left humerus or arm fracture.  And, so we did

13  remove that humerus.  I do have photographs of that.  But

14  it basically showed a fracture of that arm in a healing

15  stage meaning that it didn't happened within the first 24

16  hours as did the subdural and subarachnoid, and that would

17  have been within -- most likely -- within at least a 24

18  hour period.  This arm was older.  It would have been more

19  in the seven to two week period because it showed evidence

20  of healing with new blood vessels coming in, with the

21  blood being reabsorbed, and with the neutrophils, the

22  early acute inflammatory cells already gone.  They weren't

23  there any longer.  So, definitely, this is a healing

24  fracture, but just gives us more evidence of a battered

25  child syndrome.

1    Q    Typically, how would a spinal cord fracture

2  occur?

3    A    Usually, it's from tugging on the arm, or

4  twisting the arm, basically.

5    Q    And I can only assume that for a child, or an

6  adult, a fracture would be a painful injury, would it not?

7    A    Yes, it would.

8    Q    Would that be something that the child would not

9  complaining of, if she has a prior fracture of the arm?

10    A    She should have been complaining of pain to that

11  arm.

12    Q    And so you estimate that maybe a week or two

13  since the fracture?

14    A    Yes.  In adults, a lot times, we would say

15  closer to two weeks.  But children tend to heal faster

16  than we heal, and there's no good studies published yet of

17  child injuries, and how fast those fractures heal.  Most

18  of our studies are on older individuals.  So that's why

19  I'm saying, it could be a week; it could be two weeks,

20  because children tend to heal must faster than the older

21  people that we did the studies on to get these dates.

22    Q    Were there any other injuries, Doctor, that you

23  were able to observe?

24    A    That's all I can -- well, on the foot there was

25  a laceration of the right foot.  Other than that, it had a

```
 1    contusion around it.  Other than that, that's just about
 2    it.
 3         Q    Did you examine the child's eyes?
 4         A    Yes, I did.  They were sunken.
 5         Q    What is that indicative of?
 6         A    Usually, it's indicative of dehydration -- not
 7    getting enough fluid.  And I did pull the vitreous from
 8    the eyes which is the juice that keeps the eyes open and
 9    helps nourish the eyes, and it did show that the child was
10    dehydrated from the electrolytes that we pull from the
11    eyes.
12         Q    Did the eye itself, or the retina, show any
13    injury to it?
14              THE REPORTER:  I'm sorry?
15         Q    Did the eye or the retina show any injury to it?
16         A    At these autopsies, most of the time, we will
17    take the eyes -- most of you have heard of retinal
18    hemorrhages.--
19              THE COURT:  Doctor Farley?  Slow down
20    please.
21              THE WITNESS:  Yes, sir.  I'm sorry.  He is
22    going to send me to jail.
23              THE COURT:  Once you get into third gear,
24    Mr. Flores can't take you down.
25              THE WITNESS:  We usually hear about retinal
```

1    hemorrhages, basically, because it goes along with a blunt

2    head force trauma in children.  And, so I could already

3    see, basically -- we'll take the base of the skull, and

4    look to see if we can see injury to the eyes.  And on this

5    child there was hemorrhage around both of the nerves that

6    come from the eyes.  So that means there was something,

7    probably, traumatically wrong with the eyes.  So we did

8    remove them.  I send those to San Antonio because there's

9    a specialist -- like I'm a forensic pathologist -- and

10   he's an eye pathologist.  So I'll send them to him because

11   he'll take photographs of these as well take very thin

12   sections of them, and then give a report to what he sees.

13   More than just looking in and seeing a retinal bleed,

14   which is just part of the eye where you see blood there.

15   He can then see folds in the retina where the retina has

16   detached and folded onto itself which is, again a sign of

17   significant trauma to the child.  And he did see this as

18   well as the optic nerve hemorrhage that I had seen at

19   autopsy.

20        Q    I'll draw your attention back to the bite marks

21   on the child.  You said that the marks were there and

22   appeared to be pulling on the flesh, correct?

23        A    (Nods head in the affirmative).

24        Q    Were you able to determine whether those bite

25   marks appear to be from an adult, or a child?

```
1        A    There -- the thing with these bite marks, is
2   someone dragged their teeth across it.  They looked wide.
3   One of the them was 3.2 centimeters.  They looked more in
4   the adult size.  But the forensic odontologist -- when you
5   drag like that, we cannot match it to somebody.  It needs
6   to be a nice, crisp bite mark, with the bottoms of the
7   teeth and maybe with the canines present so that she can
8   get a nice measurement on these bite marks.  So on this
9   case, I did call her, but all she could do is just tell me
10  that they're bite marks.  The dragging, she wouldn't be
11  able to match to an individual.
12       Q    The child had abrasions, or had some kind of
13  scarring to the buttocks.  Do you recall that?
14       A    Yes.  There were other scars, too.
15       Q    Those scars were as a result of injuries that
16  had already healed?
17       A    I can't really say for sure on those.
18       Q    Doctor, did the child show any signs of injuries
19  that would be consistent with a fall?
20       A    In the vitreous?
21       Q    Or, throughout the body?  Anything that you saw
22  that would lead you to believe that this child had
23  suffered injuries as a result of a fall?  Let's say, from
24  some steps, or stairs?
25       A    No.  In general, when a child dies in this
```

1    manner -- and this child had lots of contusions which

2    makes it easier to see the battered child -- but,

3    generally, there is some explanation for how these

4    injuries occurred.  And, generally, it is going to be a

5    fall -- let's say a fall from bunk beds, a fall from the

6    crouch.  Falling down the steps is pretty frequent here.

7    But this is a child that's been beaten.  This is a

8    battered child.

9        Q    Did you find anything on the child -- any type

10   of injuries that would be consistent with a fall, where

11   you would expect to see -- if something was there as a

12   result of the fall?

13       A    It would depend on what fall your -- where

14   they're falling from, but not bruises all over the body.

15   That's stretching it a lot, for one fall.  Maybe if they

16   fell off a house, fell off a significant height more than

17   once.  But these are -- all over the body.  This isn't a

18   simple fall.

19       Q    The child's neck -- it wasn't broken.  Was it?

20       A    No.

21       Q    No?  Is that something that you see sometimes on

22   people when they fall, that they get broken necks?

23       A    Yes, you can.  And on the elderly that fall down

24   the steps sometimes, you might see a broken neck on these

25   individuals.  They, typically, when they fall down the

35

```
 1    steps, it's not the like the tumble, bumble, "Dick Van
 2    Dike" looking thing.  Usually, they fall, and then they
 3    slide down the steps, and then they hit their head on
 4    something at the bottom of the steps, and that would cause
 5    a neck fracture.
 6        Q    Doctor, you've identified the head injuries --
 7    the injuries to the brain that caused the death?  From
 8    your medical experience, or from the tests that you did,
 9    how old an injury do you believe that was?
10        A    From The Head?
11        Q    Yes.
12        A    Basically, within 24 hours that would be our
13    best estimate.  Basically, what you do with that, is that
14    hemorrhage which is within the skull itself, we take
15    microscopic sections and we look to see if it's
16    organizing, or if it's trying to heal that area.  And the
17    body tries to do that by bringing in fibrin and
18    fiberless -- basically, walling it off, bringing in new
19    blood vessels, to try to bring it out -- and then bringing
20    in white cells to try to eat it up.  Basically that's what
21    the body will do with any contusion.
22                On this child all we had was fresh
23    hemorrhage, and the fibrin -- the beginning of the fibrin
24    which is within the 24 hour period.  It would take about
25    two to three days to start to get the spindle cells in,
```

1    and some of the white cells into the area to begin to

2    clear it out, and that was not seen.  So that's as best as

3    we can estimate it, it's within 24 hours.

4        Q    So the child died on a Saturday evening.  So you

5    estimate that these injuries would have occurred some time

6    on Friday, correct?

7        A    That's our best estimate.

8        Q    If the child suffers the type of brain injury

9    that you've identified on this exhibit, would this child

10   be able to sit up, eat Cocoa Crisps, and things of that

11   nature?

12       A    No.  Usually with this kind of hemorrhage, the

13   child has some type of immediate sign.  Most of the time,

14   they say they're very tired.  They may seize and get very

15   tense, and then relax, and get very tense, and then relax.

16   People may not realize what it is, but sometimes parents

17   will realize that that's a seizure, and they'll say,

18   they're seizing.  Yet, they've never had a seizure before.

19            The other thing they will tend to do, is,

20   the pressure increases because the brain will start to

21   swell.  They might start to vomit.  And so if an ER doctor

22   sees them, they may think they have a gastrointestinal

23   virus, or something.  But they're vomiting because of the

24   pressure in the head.  So seizing -- lethargy being very

25   tired.  Coma is very consistent.  Abnormal respirations --

1  they're breathing a little funny.  They take a big breath,

2  and then they sit.  And then it might go out.  And then --

3  ten seconds later, maybe another breath.  So the breathing

4  starts to also be affected as the brain starts to swell.

5      Q    Like on this type of injury, how far back would

6  those symptoms had been known to somebody that is watching

7  the child?  At least since the inception, or when?

8      A    It's usually fairly quickly after the fatal blow

9  occurs that they'll start to have the symptoms.  And the

10  first symptom is, they're usually, they're tired.  They

11  can't keep them awake.  That's the lethargy.  They just

12  can't get them up -- can't get them awake.  They won't eat

13  or drink, usually.  And if they do, they vomit it.

14      Q    Do they ever suffer a condition where they can't

15  open their mouth -- where their jaws are locked?

16      A    If the jaws are locked, that's probably a

17  seizure.  Because things tighten up and you have muscles

18  here that tighten and relax, tighten and relax, but it

19  shouldn't stay that way, indefinitely.

20      Q    Now you've identified that the injuries were

21  caused by a blunt force trauma to the head.  For us lay

22  people, what does blood force trauma mean?

23      A    It basically means, beat about the head with

24  something -- an object, a hand, a fist, or slammed.  This

25  age group, a lot of times, get thrown or slammed into

38

1   something -- the furniture, walls, floor.  Sometimes

2   they're stomped, if they're already down.

3       Q   So the injuries would then be consistent with

4   striking, shaking, or throwing a person either with their

5   hand, foot or some other object, would it not?

6               MR. GILMAN:  Objection.  This is a leading

7   question.

8               THE COURT:  I'm going to sustain it.

9       Q   (By Mr. Padilla) The contusions throughout

10  Mariah's body, what is your medical opinion that they were

11  a result of?

12      A   The same thing -- beating, blunt trauma.  The

13  child was beaten.

14      Q   Were you able to observe any type of contusion

15  or abrasions in the vaginal area?

16      A   There were a couple of -- I think three

17  abrasions in the vaginal area.  Very small.  I

18  photographed them and documented them.  A couple of little

19  contusions on the inner thigh, near the female genitalia.

20  But I didn't see any penetration of the vagina by

21  anything.

22      Q   Were there any other injuries to the child that

23  we have not covered here, Doctor, this morning?

24      A   Not that I know.  I mean, there's a lot.

25  They're in the autopsy report.  You'll see them in there.

```
 1        Q     Doctor, I'm going to show you what I will mark
 2   as State's Exhibit No. 36, and ask you if you've seen this
 3   document before?
 4        A     (Reviews).  Yes I have.
 5        Q     And what is that, ma'am?
 6        A     It's the autopsy report and diagrams.
 7                   MR. PADILLA:  At this time I offer State's
 8   Exhibit No. 36.
 9                   MR. GILMAN:  Your Honor, I object to it
10   Judge.  There's more in that report than just coming from
11   Doctor Farley.
12                   THE WITNESS:  Uh-huh.
13                   MR. GILMAN:  And I'm going to object to any
14   of the report going in because she has been here and able
15   to testify live.  So all it is, is an attempt to bolster
16   more of her testimony, and there's matters in there that
17   are dealing with hearsay, from other doctors, and from
18   other experts.
19                   THE COURT:  I'm going to sustain the
20   objection at this time.  But go ahead and take Doctor
21   Farley on further examination.
22        Q     Doctor Farley, this exhibit -- and you have
23   identified it as State's Exhibit No. 36, consists of 19
24   pages.  Correct?
25        A     I counted 17.
```

1    Q    Well, maybe -- I'm sorry.  I read the fax number

2    on top and maybe it is 17.  I apologize.

3    A    Seventeen.

4    Q    Okay.  I stand corrected.  Now, there's some

5    reports attached herein which are starting, I believe Page

6    12, is that correct?  These reports are part of the

7    autopsy, but were not the reports prepared by you,

8    correct?

9    A    That's correct.  We have an EMS report.  That's

10   a laboratory that does toxicology.  There's an eye

11   pathology report from the University of Texas Health

12   Science Center.  That's the eye pathologist.  It's in

13   there as well.  And then, what I believe he is talking

14   about is portions of the neuropathology report that are in

15   my report.  They are indented.  That is what his report

16   says, basically.  And he can have that report if he wants

17   it.  It's here.

18              MR. PADILLA:  Judge, at this time, I

19   removed those three reports at the end, and I'm going to

20   ask leave, Your Honor, to retrack the portions that have

21   been indented as identified by the doctor.

22              THE COURT:  Well, if she relies on them in

23   the normal course of her business in preparing an autopsy

24   report, I'm sure.

25              MR. PADILLA:  Correct.  Your Honor.  May we

41

1    take this up outside the presence of the jury?

2              THE COURT:  Yes, sir.  Ladies and

3    gentlemen, we are going to take up -- a couple of legal

4    issues.  And then we will go call you back in here.

5              **(Jury not present at 9:54 a.m.)**

6              MR. PADILLA:  Your Honor -- the only reason

7    -- may I proceed, Your Honor?

8              THE COURT:  Yes, sir.

9              MR. PADILLA:  The only reason I want to

10   remove them, Judge -- the only lack of caution, I don't

11   want to have a Crawford V. Washington, that the jury

12   consider some evidence where the person was not available

13   to be cross-examined.  If we're going to attach part of

14   his report, we may have a Crawford Washington issue,

15   Judge --

16             THE COURT:  I understand.

17             MR. PADILLA:  -- and I would prefer -- I

18   would prefer to give it to the Court to allow me to redact

19   that portion which I believe is the only matter that is

20   before the Court, Judge, which would be page six which is:

21   One, two, three, four, five, six paragraphs where she

22   incorporates the doctor's findings concerning the

23   neurological portion.  So I don't want to be in a

24   situation where this matter is retried again, Judge.

25             So I will offer it with the condition that

1    prior to the jury receiving it, we'll redact that portion.

2              THE COURT:  Mr. Gilman?

3              MR. GILMAN:  Yes, sir?

4              THE COURT:  I'm waiting for a response.

5              MR. GILMAN:  Well, Judge, what's the

6    difference between this autopsy report and a police

7    officer coming in and giving their narrative report of

8    what they've done?  Doctor Farley is here to testify.

9    She's a witness that's come in and testified.  She can

10   testify to everything that's in that document the same as

11   anybody that goes and takes the witness stand.

12             THE COURT:  Well, medical records normally

13   come in if in fact they are done in the normal course of

14   business, prepared -- you know -- at or near the time and

15   they are part of the normal practice of a pathologist.

16   So -- I mean I didn't hear Mr. Padilla connect all of the

17   dots, but he almost connected them all -- and my tendency

18   is to allow the autopsy report to come in.  I understand

19   his crepitation with regards to Crawford V. Washington,

20   and I'm going to go ahead and admit it subject to

21   redaction.  And I will note your objection, Mr. Gilman.

22             MR. GILMAN:  Yes, sir.

23             MR. PADILLA:  And, for the record --

24             THE COURT:  You can have a running

25   objection to the autopsy report.

```
1              MR. GILMAN:  Thank you, sir.

2              MR. PADILLA:  We will submit Page 2 through

3   11, Judge, of the autopsy report.  And prior to it being

4   submitted to the jury, we will redact that portion.

5              Judge, may I take the witness on voir dire

6   just concerning this document?

7              THE COURT:  Yes, sir.

8                  VOIR DIRE EXAMINATION

9   BY MR. PADILLA:

10     Q    Doctor we removed the other reports attached

11  herein, and ask you, if this is what has been marked as 2

12  through 11, if that is your work product, and if that IS

13  your report in this matter?

14     A    We still have the eye path, I think, in here,

15  don't you, or not?

16     Q    On page six, is that the --

17     A    The neuropath.  That's fine.  I mean, I didn't

18  really use -- why put it there any way -- I sent that off

19  at the request of the district attorney's office.  We can

20  see all of that grossly, the subdural and subarachnoid

21  hemorrhage.  I don't have a problem --

22     Q    What we're talking about, then, is what we have

23  identified on top is page six, but actually page five of

24  seven, the indented portion represents the information

25  that was given to you by the other doctor that you've
```

1    incorporated into your report?  Correct.

2         A    Doctor Nelson.  And, yes, when you indent, that

3    just means paraphrasing.  I did that so it would be easier

4    for people who are reviewing it.

5              MR. PADILLA:  Judge, if it was "Doctor

6    Nelson", he probably did it correctly.  Right?

7              THE COURT:  Right.

8              MR. PADILLA:  Judge.  We ask that we review

9    that portion.

10             THE COURT:  With that redaction, I will go

11   ahead and admit it for publication to the jury after the

12   redaction.

13             MR. PADILLA:  Correct.

14             MR. GILMAN:  May I ask some questions?

15             THE COURT:  Yes, sir you may.

16                   **VOIR DIRE EXAMINATION**

17   **BY MR. GILMAN:**

18        Q    Doctor Farley, on this microscopic prescription

19   that also is indented.  Is that yours, or some others?

20        A    Let me look.  Where is it?

21        Q    I got Page 7, but I don't know how accurate that

22   is.  The page after?

23        A    Page six and seven where it's indented, it says

24   very clearly:  Please see the neuropath report.  So if

25   it's indented, and it says "brain and spinal cord, that's

1   Doctor Nelson.  After that, that is mine.  He did send the

2   slides so I could look at the slides as well.  But that is

3   Doctor Nelson.

4       Q    So then under the headline of "microscopic

5   description," that which is indented, is another doctor's?

6       A    It's Doctor Nelson's.  I did also review his

7   slides.

8               MR. PADILLA:  We ask to redact that portion

9   too, Judge.  Well, we'll ask the doctors for rebuttal in

10  the case, if we need them.  But we will redact that

11  portion also, Your Honor --

12              THE COURT:  I understand.

13              MR. PADILLA:  -- just as a sign of caution.

14              THE COURT:  It will be admitted with those

15  redactions.

16              Anything else, Mr. Gilman?

17              MR. GILMAN:  The order for autopsy signed

18  by Judge Sally Gonzalez?

19              MR. PADILLA:  We will remove that, Your

20  Honor.  That's the last page.

21              THE COURT:  Is that it?

22              MR. GILMAN:  Yes, sir.  I just wish to keep

23  my objection.

24              THE COURT:  Your objections?

25              MR. GILMAN:  Yes.

1           THE COURT:  Duly noted, and running.

2           MR. PADILLA:  We would like to offer it in

3    front of the jury.  I am going to offer it as a business

4    record.

5           **(Jury present, defendant present.)**

6           THE COURT:  Please be seated.  You may

7    proceed, Mr. Padilla.

8           MR. PADILLA:  Thank you very much.

9      Q     (By Mr. Padilla) Doctor, again, I want to draw

10   your attention to State's Exhibit No. 36.  The autopsy

11   report is kept by you in the regular course of business,

12   is it not?

13     A     Yes.

14     Q     And the entries therein are made at or near the

15   time that event occurred?

16     A     Yes.  And after -- the event.

17     Q     And it's a true and correct copy of the

18   original, is it not?

19     A     Of the exact -- of my part of the report, yes.

20          MR. PADILLA:  At this time, I would offer

21   36 with the agreed redactions of it.

22          THE COURT:  Your objection is noted

23   Mr. Gilman, and it'll be admitted.

24          **(State's Exhibit Number 36 admitted)**

25          MR. GILMAN:  You mean my objection being

```
1   admitted, or is the exhibit being admitted, Judge?
2              THE COURT:  Your objection is noted, and
3   the exhibit is being admitted.
4              MR. GILMAN:  All right.  Thank you.
5              MR. PADILLA:  Can I keep it to redact it
6   later?
7              THE COURT:  Yes, sir.
8              MR. PADILLA:  Thank you, sir.
9       Q    (By Mr. Padilla) Doctor, I know we covered it,
10  but just to be sure, you are licensed to practice medicine
11  in the State of Texas, is that correct?
12      A    Yes.
13      Q    And all of your licenses are current and
14  registered in the appropriate places, correct?
15      A    Yes.
16      Q    Doctor, I'm going to draw your attention to --
17  this is part of your autopsy.
18              MR. PADILLA:  May I approach the witness?
19      A    Yes, sir.
20      Q    Doctor, even though this is an autopsy -- I'm
21  going to assign it separate numbers so we can identify it
22  by number.  I will draw your attention to 37, 38, 39 that
23  are part of your autopsy report.  Are you familiar with
24  them?
25      A    Yes, I am.
```

1          MR. PADILLA:  Judge, at this time, these

2     are -- I am going to offer the three separate pages from

3     the autopsy report for purposes of demonstrative aid to

4     the jury.

5               THE COURT:  Demonstrative?

6               MR. PADILLA:  -- to the jury.

7               THE COURT:  I will admit them for

8     demonstrative purposes, but not for admission purposes.

9     They are included as part of the autopsies?

10              **(State's Exhibit Number 37-39 admitted for**

11              **demo purposes only)**

12              MR. GILMAN:  Yes, sir.  My objection is

13    still continued?

14              THE COURT:  Understood, sir.  And it is

15    continued.

16              MR. PADILLA:  (Referring to the projector)

17    It's warming up, Judge.

18              THE COURT:  Officer Cisneros, would you

19    turn the lights off please?

20              MR. PADILLA:  May I proceed, Your Honor?

21              THE COURT:  Go ahead.

22         Q    (By Mr. Padilla) Doctor I'm going to show you

23    for demonstrative purposes what is marked as State's

24    Exhibit No. 37.  Are you familiar with these pictures or

25    these drawings?

49

```
1        A      Yes, I am.

2        Q      Did you yourself prepare them?

3        A      Yes.

4        Q      Were they prepared at the time that the autopsy

5   was performed?

6        A      Over the next day.  I had to redraw -- I had

7   scribbled a little.  But, yes.  It was probably that

8   afternoon.

9        Q      That afternoon?  And all of these markings,

10  then, represent injuries to the child, correct?

11       A      Yes.

12       Q      And I'm going to draw your attention to the

13  bottom portion of this drawing.  And all of these

14  markings, again, represent injuries that you saw on the

15  child that day, correct?

16       A      Yes.  And there is also a head diagram.

17       Q      On this picture, there's a head diagram?

18       A      Uh-huh.

19       Q      I will draw your attention to State's Exhibit

20  No. 38.  This is -- again, can you tell us what that is?

21       A      This is a drawing of the head.

22       Q      And these represent the abrasions and contusions

23  all over the head, correct?

24       A      Yes.

25       Q      And the bottom portion is the opposite side of
```

1    the head.   Does that show the abrasions and contusions as

2    well?

3         A    Yes.

4         Q    I show you State's Exhibit No. 39 for

5    demonstrative purposes.

6         A    Here you go.

7         Q    Again, these were prepared -- it was prepared by

8    you shortly after the autopsy, correct?

9         A    Yes.

10        Q    What does that show?

11        A    There are small little abrasions that I

12   mentioned.   They call them labia minora -- the stabile --

13   and you can see I marked them.   They're little linear, red

14   abrasions, and then two contusions on that left -- or,

15   sorry -- upper right thigh.

16        Q    Would that be consistent with somebody pinching

17   the area there?

18             MR. GILMAN:   Objection, Judge.   That's

19   leading.

20             THE COURT:   I'm going to sustain it.

21        Q    (By Mr. Padilla) What would cause these type of

22   injuries, Doctor?

23        A    Something in the area of rubbing off the outer

24   skin.   I mean, anything could do it.   It could be linear;

25   it could be a pinch.   It could be -- anything.

```
 1        Q     Did you order -- can you turn the lights on?
 2              THE COURT:  Thank you.
 3        Q     Doctor, did you order a drug test of the child
 4    on that day?
 5        A     Yes, I did.
 6        Q     And, again, Doctor -- like I said, I could have
 7    been a doctor if I could pronounce these words -- but I'm
 8    going to try.  What is anoxic schematic enceph -- maybe
 9    you should be asking these questions.  What is that,
10    ma'am?
11        A     Anoxic ischemic encephalopathy is just the brain
12    not getting enough oxygen.  It can be due to someone being
13    in a coma, or someone who stopped breathing and they
14    resuscitate.  It could also be from what I said earlier,
15    when the brain starts to swell up and it increases the
16    pressure.  It starts to also push down, and it may cut-off
17    its blood supply and cause some of this ischemia that
18    swells.  It infarcts, basically.
19        Q     What is ischemia?
20        A     Same thing.  Ischemia means, there is not enough
21    oxygen.  Anoxic means no oxygen.  Anoxic ischemic, the
22    nerves to your brain aren't getting the oxygen required to
23    survive.
24        Q     After -- you removed the eye from the eye
25    socket, right?
```

1      A      Yes.

2      Q      After you reviewed it what conclusions

3  concerning trauma did you reach, if any?

4      A      There are optic nerve hemorrhages.  Those are

5  the nerves that come out of the back of the eye, which are

6  very suspicious that there was some trauma to the eyes

7  which I had mentioned early.  So that's why they were

8  removed.  If I hadn't seen that, I may not have removed

9  them.  We don't always see trauma to the eyes even when

10 someone has been beat.  But if we do, then, typically I

11 will remove the eyes and look at them.

12     Q      After viewing the eye and removing it, did you

13 reach a conclusion concerning what type of trauma would

14 have caused those type of injuries?

15     A      Yeah.  It was suggestive of what we call non-

16 accidental head trauma.  I call it blunt force head

17 trauma.  It was suggested as that.  That's all I said.

18             MR. PADILLA:  Your Honor, at this time I

19 want to publish to the jury what has been offered as

20 State's Exhibit No. 21, the curriculum vitae of the Doctor

21 and we pass the witness.

22             THE COURT:  Mr. Gilman?  Your witness?

23                   **CROSS-EXAMINATION**

24 BY MR. GILMAN:

25     Q      Doctor these bruises that we've seen and these

1   contusions that we've seen in photos 22 through 35, can

2   you tell us how old those are?

3       A   Yes, most -- many of them are actually fairly

4   new but the ones that are described as getting green and

5   brown, or really deep purple, those are older contusions.

6   Basically, what we usually say, if they're recent, or if

7   they look like they're healing or older.  And there are

8   bruises on the body that are older.  Some of the abrasions

9   are scabbed, which means they're older as well, because

10   once you start to heal with the scab, then they're older

11   and they're not an acute abrasion.

12       Q   And these bite marks, they're not recent, are

13   they?

14       A   Well, it depends on what you mean by acute or

15   recent.  Within the first 24 hours, they are starting to

16   scab, basically.  So they're not something that happened

17   with the last few hours.  No.

18       Q   But you put a 24 hour period where you say that,

19   where you're estimating blunt force trauma occurred to the

20   head?  In that 24 hour period, how much of the other

21   bruising that you see on this body took place?

22       A   I can't say in that period.  There's many

23   bruises that are within that one day period.  This is a

24   subdural hemorrhage.  It looks to be within 24 hours.  So

25   do some of the contusions as well.  They're pink, maroon,

54

1    and light blue.  Those are more recent contusions.  The

2    ones that turn green or dark purple, or yellow brown.

3        Q    Can someone suffer death by falling downstairs?

4        A    Yes.  Some people can die falling down the

5    stairs.  It doesn't happen that often, actually.

6        Q    Can you have a blunt force trauma from falling

7    down the stairs?

8        A    You can suffer blunt force trauma.

9        Q    And what would be the difference from the blunt

10   force trauma that I would suffer -- or that a child --

11   excuse me -- would suffer falling downstairs compared to

12   the blunt force trauma head injury that you received --

13   that you witnessed in this autopsy?

14       A    There are so many contusions and not just to the

15   trunk, the torso, or the arms.  But to the head itself.

16   There are multiple contusions around that head which are

17   seen in the photographs.  That's not consistent with the

18   child falling down the steps.  Unless they're saying that

19   they're doing a tumble, tumble, tumble, and even then --

20   no.  It isn't even consistent.  There's a lot of

21   contusions on that scalp.  It's not consistent with that

22   history.

23       Q    But are those contusions on the scalp -- are

24   they all within your 24 hour period that you've indicated?

25       A    Yes, most of them are.  I tried to take

Adelaido Flores, Jr.
Certified Shorthand Reporter

1   microscopic sections.  Microscopic sections aren't always

2   reliable, and there are articles that say that they

3   aren't.  But I went ahead and did it on this child, and

4   did not see hemosiderin or orange pigment in the

5   macrophages --

6               THE REPORTER:  I'm sorry.  You didn't see

7   what.

8               THE WITNESS:  Orange pigment.

9               THE REPORTER:  No, before that.

10              THE WITNESS:  Microscopic sections?

11              THE REPORTER:  Yes.

12              THE WITNESS:  And I didn't see the

13  hemosiderin and microphages there.  I think a lot of the

14  contusions of the head are going to be acute contusions.

15  That's my opinion.

16      Q    Okay.  The majority of these bruisings that we

17  see in these pictures -- in these exhibits -- came about

18  prior to this head trauma?

19      A    One more time -- I'm sorry.

20      Q    The majority of these bruises that we have seen

21  in these exhibits -- 22 through 35?

22      A    Uh-huh.

23      Q    -- came about prior to the head trauma?

24      A    No.  Many of them actually occurred, probably

25  about that same time.  Pink and maroon are usually recent

1    contusions.  There's no breakdown of the hemoglobin that

2    we can see in the color.  So that would mean that they are

3    recent contusions.  So when they start look through the

4    photos and the autopsy report the pink and maroon colored

5    contusions are recent contusions.  There are some that are

6    green on the legs, and there is also on the lower abdomen

7    some green discoloration and a deep purple pubic area

8    contusion.  But many of these are fairly recent.  The

9    child was beat severely.  I mean, very severely.

10       Q    Could you have some of those bruises from

11   falling downstairs?

12       A    Not this many bruises -- no.

13       Q    I'm not saying all of them.  But you could have

14   some of those bruises falling downstairs, could you not?

15       A    You can get bruising falling down the stairs,

16   but as I said earlier, some of these are under the eye.

17   That's not a commonplace to bump your head as you're

18   tumbling down the steps.  The lower cheeks -- under the

19   chin -- the abdomen, and in the recessed areas.  No.  In

20   my opinion, this came from a beating.

21       Q    Now the bleeding from the blunt force head

22   trauma, we don't know how fast or how slow that would

23   occur, do we?

24       A    Usually it occurs at the time of the trauma to

25   the head.  You start to bleed at that point.  So we can

1    kind of narrow it down to the point that there was a fatal

2    blow.

3        Q    If I cut myself, sometimes, I'll bleed slowly,

4    and other times I will bleed a lot faster.  Do we know how

5    fast someone bleeds if you get a blow to the head?

6        A    How fast they bleed into the skull?  No.  We

7    don't measure how fast it trickles into the skull.  But as

8    the blood -- it just tells us that there has been blunt

9    head trauma to the brain.  If they think it's that

10   acceleration/deceleration, and the angular accelerations

11   that cause injuries to the nerves of the brain

12   themselves -- stretching injuries -- and actually injure

13   the neurons that fire into the brain, basically.

14       Q    What I'm getting at, is, when you say 24 hours,

15   that purely is a guestimate, is it not?

16       A    No, it's not.  And we take microscopic sections

17   of this blood, and we look for -- what I said earlier --

18   fibrin -- fresh blood -- meaning just the red cells

19   themselves.  And then if it starts to get older than 24

20   hours, we start to see spindle cells -- little fiberglas

21   coming in, as well as a white cell response trying to eat

22   up -- basically, the Pac man -- trying to eat up the red

23   cells.  And in that same pigment -- that hemosiderin, or

24   iron hemoglobin breakdown pigment in the cells, as it gets

25   older.

58

1      Q    All right.  You said the fracture on the arm was

2   healing.  So it was -- certainly, didn't come about the

3   same time that this head blunt force head trauma did?

4      A    No, it didn't.  It came about earlier which is a

5   sign of previous abuse.

6      Q    (By Mr. Gilman) Can I have just a minute, Judge?

7                THE COURT:  Yes, sir.

8                MR. GILMAN:  I'll pass the witness.

9                    **REDIRECT EXAMINATION**

10  **BY MR. PADILLA:**

11     Q    Some questions, Doctor.  In your medical

12  opinion, was the blunt force trauma that you saw here as

13  evidence, was that as a result of falling down a set of

14  stairs?

15     A    In my opinion, no.  I think I made it clear.  I

16  think it's due to being beat.  This child had more bruises

17  than I've ever seen on any case that I had before.  This

18  is a beating.

19     Q    How many years have you been practicing

20  medicine?

21     A    Huh.  Since 1994.  Fourteen years.

22     Q    You have done thousands of autopsies and

23  thousands of viewings?

24     A    Yes, I've done thousands of autopsies, and I've

25  actually reviewed every child and infant homicide in Bexar

59

1   County in San Antonio over twenty years to do a talk at a
2   national meeting, and didn't even see any of those that
3   compared.
4         Q     This is the most severe case of child abuse
5   you've ever seen?
6                     MR. GILMAN:  Objection, Judge.
7                     THE COURT:  I'm going to overrule that
8   objection.
9                     MR. GILMAN:  Note my exception.
10                    THE COURT:  I will.
11                    THE WITNESS:  Yes.
12        Q     (By Mr. Padilla) And again, it's your medical
13  opinion that the blow to the head that caused the death of
14  Mariah Alvarez, happened within 24 hours of her death,
15  correct?
16        A     Yes.  By best that we can approximate, from the
17  microscopes, within 24 hours.
18        Q     You also stated that the cause of death with
19  blunt force trauma, or beating -- what do you mean by
20  beating?
21        A     Basically, you know, being struck.  Being struck
22  all over the body -- head, torso, extremities, or being
23  thrown, slammed, stomped.  A beating.
24        Q     By the hand or foot, or by the person accused,
25  correct, or whoever is committing the act?

```
 1      A      Whoever committed the act, yes.

 2              MR. PADILLA:  Judge.  We pass the witness.

 3              THE COURT:  Mr. Gilman, anything further?

 4              MR. GILMAN:  Nothing further.

 5              THE COURT:  Can the witness be excused?

 6              MR. GILMAN:  Yes, sir.

 7              THE COURT:  Doctor Farley?  You can be

 8   excused.

 9              THE WITNESS:  Thank you.

10              THE COURT:  Ladies and gentlemen of the

11   jury.  Let's take a short break.

12              MR. PADILLA:  Judge, can I make a quick

13   announcement?

14              THE COURT:  Yes.

15              (State Rests)

16              MR. PADILLA:  Judge, at this time, the

17   State would rest.

18              THE COURT:  What we'll do, we had planned

19   to start on Monday on the defense.  Is that what you

20   wanted to do, Mr. Gilman?

21              MR. GILMAN:  Yes, sir.

22              THE COURT:  We will go ahead and break now.

23   We'll resume the trial on Monday at 9:00 o'clock.  It

24   should be a relatively short week next week.  We'll see.

25   There are no guarantees, but we will resume the trial on
```

```
 1    Monday at nine o'clock.  I was hoping to go through the
 2    trial yesterday, and give you the day off.  But it didn't
 3    work out that way.  Thank you very much.  Again, I remind
 4    you, don't talk to anybody about it.  Don't talk to each
 5    other.  Don't do any research.  Don't listen to any news
 6    media at all, or read at any articles.
 7                 Thank you all very much.  We will see you
 8    Monday morning at 9:00 o'clock.
 9                 And before the end of the day --
10                 MR. PADILLA:  In reference to 36, is it
11    admitted?
12                 THE COURT:  Yes.  Be sure that the reporter
13    gets it back on Monday.
14                 MR. PADILLA:  We'll take it downstairs
15    redact those portions and take it out.
16                 MR. GILMAN:  Your Honor, I've got a motion.
17                 THE COURT:  I'm listening.
18                 MR. GILMAN:  I'm moving for an instructed
19    verdict, Judge.  They haven't proven that my client
20    intentionally and knowingly caused the death of Mariah by
21    striking, shaking or throwing Mariah with her hand, foot,
22    or object unknown to the Grand Jury.
23                 THE COURT:  I'm going to overrule that
24    objection.  You want me to give you an explanation, I'll
25    give you an explanation.
```

62

1        MR. GILMAN:  You can say anything you want,

2   Judge.

3        THE COURT:  I understand that.  But I'm

4   going to overrule your objection.  I think the confession

5   declared that she was in charge of the child, and that the

6   child was bitten by her, was hit by her, with her hand.

7   There is no evidence that anybody else did it, and the

8   pathologist already showed that it was a battered child

9   syndrome.  So I think there is enough evidence to go to

10  the jury at the very least.

11       MR. CORDOVA:  Can we look at the charge

12  real quick?

13       MR. PADILLA:  I got a couple of minor

14  changes.

15       THE COURT:  Let's go to the back, we will

16  have a formal charge conference later, but let's go at

17  least to the back and go over it and do whatever typos or

18  corrections we need to do.

19            **(Recess from 10:26 a.m.)**

20

21

22

23

24

25

```
 1    THE STATE OF TEXAS:

 2    COUNTY OF HIDALGO:

 3                   CERTIFICATE OF COURT REPORTER

 4         I, ADELAIDO FLORES, JR, Official Court Reporter in

 5    and for the 430th Judicial District Court of Hidalgo

 6    County, State of Texas, do hereby certify that the above

 7    and foregoing contains a true and correct transcription of

 8    all portions of evidence and other proceedings requested

 9    in writing by counsel for the parties to be included in

10    this volume of the Reporter's Record, in the

11    above-entitled and numbered cause, all of which occurred

12    in open court or in chambers and were reported by me.

13         I further certify that this Reporter's Record of the

14    proceedings truly and correctly reflects the exhibits, if

15    any, admitted by the respective parties.

16         WITNESS MY OFFICIAL HAND on this the 11th day of

17    August, 2008.

18                   _____
                     ADELAIDO FLORES, JR., Texas CSR
19                   Official Court Reporter
                     430th District Court
20                   111 SO. 9th Street
                     Edinburg, Texas 78539
21                   (956) 318-2900
                     Certificate No. 1117
22                   Expiration Date: 12/31/10

23

24

25
```

64

THE STATE OF TEXAS:

COUNTY OF CAMERON:

CERTIFICATE OF COURT REPORTER

I, ADELAIDO FLORES, JR., Official Court Reporter in and for the 138th  Judicial District Court of Cameron County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-entitled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND on this the 7th day of July, 2009.

_____
ADELAIDO FLORES, JR., Texas CSR
Official Court Reporter
138th District Court
974 East Harrison Street
Brownsville, Texas 78520
(956) 550-1489
Certificate No. 1117
Expiration Date: 12/31/08

Adelaido Flores, Jr.
Certified Shorthand Reporter