REPORTER'S RECORD

VOLUME 35 OF 44 VOLUMES

TRIAL COURT CAUSE NO. 07-CR-885-B

- - - - - - - - - - - - - x

| | | |
|---|---|---|
| STATE OF TEXAS | : | IN THE DISTRICT COURT |
| | : | |
| VS | : | 138TH JUDICIAL DISTRICT |
| | : | |
| MELISSA ELIZABETH LUCIO | : | CAMERON COUNTY, TEXAS |

- - - - - - - - - - - - - x


JURY TRIAL - DAY 4

On the 7th day of July, 2008, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable **Arturo C. Nelson**,
Judge Presiding, and a petit jury, held in Brownsville,
Cameron County, Texas.




Proceedings reported by computerized stenotype
machine.

ORIGINAL

FILED IN
COURT OF CRIMINAL APPEALS

AUG 0 6 2009

Louise Pearson, Clerk

Adelaido Flores, Jr.
Certified Shorthand Reporter

2

```
 1              A P P E A R A N C E S

 2    APPEARING FOR THE STATE:

 3         HON. ARMANDO VILLALOBOS
           State Bar No. 00788584
 4         Criminal District Attorney for Cameron County
           - AND -
 5         HON. ALFREDO PADILLA, JR.
           State Bar No. 15404600
 6         & HON. JOSEPH KRIPPEL
           State Bar No. 24007515
 7         & HON. MARIA DE FORD
           State Bar No. 24043626
 8         Assistants to the Criminal District Attorney
           Cameron County Courthouse
 9         974 E. Harrison Street
           Brownsville, Texas  78520
10         Telephone:  (956) 544-0849
           Fax:  (956) 544-0869
11

12    APPEARING FOR THE DEFENDANT:

13         HON. PETE GILMAN
           State Bar No. 07952500
14         6933 N. Expresway
           Olmito, Texas  78575
15         Telephone:  (956) 350-6954
           Fax:  (956) 350-8056
16
      APPEARING FOR THE DEFENDANT:
17
           HON. ADOLFO E. CORDOVA, JR.
18         State Bar No. 00787286
           Law Office of Adolfo E. Cordova, Jr.
19         711 North Sam Houston
           San Benito, Texas  78586
20         Telephone:  (956) 399-1299
           Fax:  (956) 399-4484
21

22

23

24

25
```

```
 1                     VOLUME 35
 2          CHRONOLOGICAL INDEX - JURY TRIAL - DAY 4
 3    7/07/08                           PAGE    VOL
 4    STATE'S WITNESSES: (DAUBERT MOTION.)
 5    NAME              DX   CX   RDX   RCX   VDX    VOL
 6    Jose Kuri, MD      3    9   14                  35
 7    DEFENDANT'S WITNESSES:
 8    NAME              DX   CX   RDX   RCX   VDX    ·VOL
 9    Jose Kuri, MD     19   44   85                  35
10    Deft.Objts/Court's Demnr.              91       35
11    Sonia V. Chavez   93  100  111   114            35
12    DEFENDANT'S WITNESSES:  (DAUBERT MOTION)
13    NAME              DX   CX   RDX   RCX   VDX    VOL
14    Norma Villanueva 128  130                       35
15    DEFENDANT'S WITNESS:  (BILL OF PARTICULARS NO. 1)
16    NAME              DX   CX   RDX   RCX   VDX    VOL
17    Norma Villanueva 141                            35
18    DEFENDANT'S WITNESSES:/DAUBERT MOTION
19    NAME              DX   CX   RDX   RCX   VDX    VOL
20    Joanne Estrada   145  150   35   184   172      35
21    DEFENDANT'S WITNESSES:
22    NAME              DX   CX   RDX   RCX   VDX    VOL
23    Joanne Estrada   154  177  182
24                                          186      35
25    Both sides closed                     192      35
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1                        VOLUME 35

 2            CHRONOLOGICAL INDEX - JURY TRIAL - DAY 4

 3   7/07/08                              PAGE   VOL

 4

 5   DEFENDANT'S WITNESS:  (BILL OF PARTICULARS NO. 2)

 6   NAME                DX   CX   RDX   RCX   VDX   VOL

 7   John E. Pinkerman   194                        35

 8   Certificate of Court Reporter              197   35

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1                    ALPHABETICAL WITNESS INDEX
                                                   VOIR
 2      NAME                    DX    CX    RDX    RCX   DIRE    VOL

 3      Chavez, Sonia V.        93   100    111   114            35
        Estrada, Joanne        145   150     35   184    172     35
 4      Estrada, Joanne        154   177    182
        Kuri, Jose MD            3     9     14                  35
 5      Kuri, Jose MD           19    44     85                  35
        Pinkerman, John E.     194                              35
 6      Villanueva, Norma      128   130                        35
        Villanueva, Norma      141                              35
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                              **INDEX OF EXHIBITS**

3       **STATE'S EXHIBITS:**

4       NO.   DESCRIPTION              OFFERED    RECEIVED    VOL

5       40    Pediatric Docum.            52
        41    Affidavit/De La Garza      185        185        35

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Adelaido Flores, Jr.
Certified Shorthand Reporter

1
 
## INDEX OF EXHIBITS

2
 
**DEFENDANT'S EXHIBITS:**

3
 
| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|---|---|---|---|---|
| 4 | Kuri's Forensic Docum. | 13 | 13 | 35 |
| 5 | Kuri's Forensic Cert. | 13 | 13 | 35 |
| 6 | Photo-Deft.& Grandma | 98 | 99 | 35 |
| 7 | Photo-Dft.w/Dad | 98 | 99 | 35 |
| 8 | Deft./Wedding | 98 | 99 | 35 |
| 9 | Photo- Deft.w/Grandma | 98 | 99 | 35 |
| 10 | Photo-Deft./W Gparents. | 98 | 99 | 35 |
| 11 | Photo-Deft. as child | 98 | 99 | 35 |
| 12 | Photo-Dft. (as a child) | 98 | 99 | 35 |
| 13 | Villanueva's CV | 143 | 144 | 35 |
| 14 | CPS Case History | 143 | 144 | 35 |
| 15 | CPS Investigation/Lucio | 143 | 144 | 35 |
| 16 | CPS Info/Melissa | 143 | 144 | 35 |
| 17 | CPS Info/Mariah | 143 | 144 | 35 |
| 18 | CPS Info/Grandchild | 143 | 144 | 35 |
| 19 | Incid. Illness Report | 168 | 169 | 35 |
| 20 | Monthly Logs/P.4 | 168 | 169 | 35 |
| 21 | 3/28/06 Home Visit | 168 | 169 | 35 |
| 22 | Maria's Behavior Letter | 174 | 174 | 35 |
| 23 | Medical Records/Mariah | 176 | 176 | 35 |
| 24 | Pinkerman's CV | 196 | 196 | 35 |

15

16

17

18

19

20

21

22

23

24

25

3

```
1              P R O C E E D I N G S
2         (Defendant present; Jury not present.)
3              THE COURT:  Call now the State of Texas
4   versus Melissa Elizabeth Lucio, Cause Number 07-CR-885-B.
5   Let the record reflect that the defendant is present along
6   with the Honorable Adolfo Cordova, Pete Gilman
7   representing the Defendant.  For the State, Mr. Al Padilla
8   and Joe Krippel and Maria De Ford.
9              Call your first witness.
10             MR. GILMAN:  My first witness is Dr. Kuri.
11             THE COURT:  Dr. Kuri was previously under
12  the Daubert motion?
13             MR. PADILLA:  At this time, we would like
14  to proceed on that motion, Your Honor.
15             THE COURT:  Okay.  Dr. Kuri, would you
16  please stand up and raise your right hand, sir.
17         (Witness Sworn in By The Court.)
18              JOSE KURI, MD,
19   having been first duly sworn, testified in re: Daubert
20              Motion, as follows:
21             DIRECT EXAMINATION
22  BY MR. PADILLA:
23     Q    Doctor, would you please state your name for the
24  record?
25     A    Jose Kuri.
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

4

1      Q      And Dr. Kuri, are you a licensed medical doctor?

2      A      Yes.

3      Q      And how long have you been licensed?

4      A      Licensed in Texas?

5      Q      In Texas, yes, sir.

6      A      Since '75.

7      Q      And do you have an area of specialty in your

8  field?

9      A      Yes, sir, in neurosurgery.

10     Q      And how long have you had that expertise as a

11  neurosurgeon?  How many years?

12     A      I was -- since '66, I have been a board

13  certified neurosurgeon for 53 years.

14     Q      Are you licensed as a pathologist?  Are you

15  licensed as a pathologist?

16     A      No.

17     Q      Okay.

18     A      No.

19     Q      Have you ever in the past ever conducted any

20  pathological work?

21     A      Yes, sir.

22     Q      When was that?

23     A      Okay.  Well, you want me to answer your question

24  by answering the question, or to tell you the story of my

25  participation?

5

```
 1        Q    I don't need the "story," sir.  When was the
 2   last time that you performed an autopsy as a pathologist?
 3        A    It's been more than 32 years.
 4        Q    When is the last time, sir, as a medical doctor
 5   you gave an opinion as to the cause of death of an
 6   individual?
 7        A    I don't remember, but in my specialty it is very
 8   common with the head injuries and car accidents, things
 9   like that.  But to tell you -- but you can imagine with my
10   age how many times I have been.
11        Q    I can respect that.
12                  Again, have you ever in the past acting as
13   a medical doctor ever given or provided the cause of
14   death, and given a death certificate on the cause of
15   death?
16        A    Can you explain better?  Just to be sitting
17   here, like in this case?
18        Q    Well, no.  As a medical doctor --
19        A    Okay.
20        Q    -- have you ever provided -- first, have you
21   ever done an autopsy?  Have you?
22        A    Not in the United States.
23        Q    So, therefore, have you ever given the cause of
24   death or a reason for death on a person?
25        A    Specifically, I don't remember.  I don't
```

6

1    remember.

2         Q    Well, is it a part of your practice to give an

3    opinion on the cause of death of an individual?

4         A    No, sir.  My practice is to save lives.

5         Q    And so if you have a patient who expires, do you

6    do anything to ascertain why that person expired or not?

7         A    What is the reason that the patient died?  That

8    is part of what I know.

9         Q    That's what you know, but do you ever perform an

10   autopsy?

11        A    No, sir.  In United States, in the Rio Grande

12   Valley, it wouldn't be by a judge or judicial order, we

13   wouldn't do any autopsy.  So that is -- we don't do like

14   in my country where they had the practice -- I hope you

15   let me tell you of my practice.  That was different.  The

16   order here because of the judicial system, we have

17   advanced in the medical system.  So on autopsies -- forget

18   about it.  The pathologist do it and the ordinary doctors

19   do, it.  And you keep asking me the same question.  I am

20   not trying tobe confrontational.  I want to help and to

21   clarify.

22        Q    And I'm not being confrontational either, sir,

23   but I'm trying to figure out first what your field of

24   expertise is; and secondly, if you've ever in the past

25   ever done an autopsy?  And, obviously, you are not a

1    pathologist.

2              Have you drawn an opinion -- let me ask you

3    this.  Are you familiar with the child, Mariah Alvarez?

4         A    Yes, sir.  And it's a sad case.

5         Q    Sad case?  At any time did you have an

6    opportunity to examine the brain --

7         A    No.

8         Q    -- of Mariah Alvarez during the autopsy?

9         A    No.

10        Q    Were you able to examine the microscopic slides?

11        A    No -- no.  The report -- I read the report as

12   well and the deposition.

13        Q    Did you have an opportunity at any time, sir, to

14   examine Mariah's eyes, the retinas?  The eyes?  Did you

15   ever have an opportunity to examine them?

16        A    (Laughs).  No, sir.  How can I examine the

17   retina when I didn't examine the patient?

18        Q    So it's my understanding that the examination of

19   the child of the body would have been necessary for you to

20   draw a proper medical conclusion, would it not?

21        A    Everything that you have in your hand, this

22   report, sir, if you don't have any -- if you have never

23   seen the patient, you are asking me questions, or are you

24   giving me authority to ask questions?  I read the

25   report -- the pathology report, and the deposition.  What

8

1    test do you want me to do?  I didn't examine the patient,

2    but I read the report.  But I feel that in the matter of

3    the brain, as far as the pathology of the brain, I have

4    tremendous experience, and not because I am Jose Kuri, but

5    because of my years of practice in medicine, where at that

6    time we didn't have anything except the patient and the

7    autopsy.

8        Q    Tell me, Doctor, everything that you examined to

9    draw a conclusion in this case?  What did you examine?

10       A    The report.

11       Q    Was it the pathology report?

12       A    The pathology report and the deposition.

13       Q    Have you ever in the past, Doctor, testified to

14   a cause of death of an individual?

15       A    But -- can you elaborate that more, "cause of

16   death"?

17       Q    Have you ever been asked to give testimony in

18   court to --

19       A    To be like today?  Like an expert in that part

20   of the brain only, if I have been?

21       Q    Yes.

22       A    No.

23                MR. PADILLA:  I pass the witness, Your

24   Honor.

25                THE COURT:  Mr. Gilman?

1                      **CROSS-EXAMINATION**

2     **BY MR. GILMAN:**

3         Q    Dr. Kuri, you're here to testify only dealing

4     with the brain injuries of this child; is that correct?

5         A    Yes, sir.

6         Q    Now, I have not asked you to draw any other

7     conclusions or anything, just read the autopsy report and

8     the deposition that we took of Dr. Farley.  And then you

9     sat in here for part of her testimony the other day; is

10    that correct?

11        A    Yes, sir.  Excuse me if I drink water because I

12    take medication for the blood pressure.

13        Q    Sure.

14             And you're not contradicting Dr. Farley's

15    blunt force trauma to the head as the cause of death of

16    this child?

17        A    No.

18        Q    You're merely explaining or going to explain the

19    injuries dealing with the brain and the possibilities from

20    that injury; is that correct?

21        A    Yes, sir.

22        Q    Now, you were trained in El Salvador; is that

23    correct?

24        A    No.  I was trained here in the United States in

25    Columbia University and University of Texas.  Then I went

1   to El Salvador to pay the scholarship to the government

2   for 20 years.  And then I came back to the United States.

3          Q       And while you were in El Salvador, you were

4   active in medical school in El Salvador?

5          A       Yes.  That is why when you and I talked when you

6   asked me to review this case because it's -- and I told

7   you that I have this -- I'm sorry, that the jury is not

8   here -- you know, on this one.

9          Q       Those are certificates of completion from the

10  American Board of Forensic Medicine?

11         A       Yes.

12         Q       And American College of Forensic Examiners?

13         A       Yes, sir.

14                 THE COURT:  You wish to make Xerox copies

15  and admit them into evidence?

16                 MR. GILMAN:  Yes, please.  I am going to

17  make copies of them.

18                 THE COURT:  Any objections?

19                 MR. PADILLA:  No, Your Honor.

20                 THE WITNESS:  I don't know if he saw the

21  diploma.  I don't know.

22                 MR. GILMAN:  He is going to make the copies

23  for the Court so we can put it in evidence.

24                 THE WITNESS:  All right.  And I told you

25  that I have a diploma of the board, but I -- that is not

11

1  part of -- this is a type of curriculum.  But it's not

2  based on that.  I am not going to use it.  That kind of

3  paper it's like -- and I told you the ink -- the pen

4  without the ink is just paper.  It's a credential.  My

5  knowledge is in that part that I am going to talk to you

6  about.

7      Q    (By Mr. Gilman) Okay.

8      A    When I went back to El Salvador -- and many of

9  the people that are here, they were not born -- this --

10 the medicine, we don't have a CAT scan.  We didn't have

11 the MRI.  So we didn't have anything except the patient.

12 So the autopsy is actually of the knowledge because it

13 goes to the television, to the courthouse and transferred,

14 like I said, to the judicial system.  Usually, I would

15 order -- I ordered autopsies in the hospitals.  We don't

16 do hospital autopsies in the Rio Grande Valley except

17 through a judge.

18           MR. PADILLA:  I'm going to object to the

19 answer being nonresponsive to the question asked.

20           THE COURT:  Ask your question, Mr. Gilman.

21 It's not question and answer.

22           MR. GILMAN:  All right.

23      Q    (By Mr. Gilman) Dr. Kuri, your training in the

24 United States, your years of experience in the United

25 States has been dealing with what?

Adelaido Flores, Jr.
Certified Shorthand Reporter

12

1     A     No, no.  You asked me a question before.

2     Q     Yes, sir.

3     A     And I am going to tell you.  When I went back to

4     El Salvador, I was professor of medicine in neurology.  We

5     didn't have neurosurgery in Latin America.  We are very

6     few.  So I went to the medical school.  And for 19 years

7     all the autopsies were done in the general hospital, they

8     kept the brain for me to give class.  So we -- in the

9     classroom we have the students discuss the case medically,

10    the clinical symptoms.  And after that we took the brain

11    of the patient who died and made dissections.  So 19 years

12    of doing that every Friday, studies of the brain in my

13    hands, and cutting, and learning the history -- that was

14    the learning.  And that is the learning in the history of

15    medicine.  When nothing was done, the medicine, the

16    pathology where we talked to the doctor, the autopsies

17    taught the doctor medicine.

18              So to answer the question, yes, sir.  I was

19    involved in the medical school and I worked with the brain

20    for 19 years, basically, in my hands.

21    Q     And your -- your work here in this country is

22    with neurosurgery; is that correct?

23    A     Yes, sir.

24    Q     And what does neurosurgery have to do with the

25    brain?

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    A    Neurosurgery is brain.  I was the -- let me see.

2    "Neuro" involves the nervous system.  The nervous system

3    is brain, medulla, the spinal cord.  And surgery,

4    neurosurgery is to perform surgery in the brain.  And it

5    depends upon the pathology of the brain.  As an example --

6    you want an example?

7    Q    Yes.

8    A    Head injuries, depressed fracture, blood clot,

9    tumor of the brain, malformation.  So we open the skull

10   and remove the lesion when it is possible.

11   Q    And based on the autopsy report that you

12   reviewed and studied, as well as the deposition of this

13   child, you were able to understand and are here to testify

14   only as to what your findings are based upon that autopsy

15   report and the deposition; is that correct?

16   A    Well, tell me again.  Can you ask your question

17   again?

18        MR. GILMAN:  Your Honor, I offer these into

19   evidence.

20        THE COURT:  Show them to opposing counsel.

21        MR. PADILLA:  We have no objections.

22        THE COURT:  Defendant's Exhibit No. 4 and 5

23   will be admitted.

24        **(Defendant's Exhibit Number 4 & 5 admitted)**

25   Q    (By Mr. Gilman) Your expertise in neurosurgery

Adelaido Flores, Jr.
Certified Shorthand Reporter

14

```
1    relates to the brain because of brain injuries?
2        A    Yes, sir.
3        Q    Okay.  And you're here to testify about the
4    brain injury that this child suffered, and you're here to
5    testify based upon the findings in the deposition as well
6    as the findings in the autopsy report; is that correct?
7        A    Yes, sir.
8        Q    You're not here to contradict what Dr. Farley
9    said the cause of death was?
10       A    No, sir.
11              MR. GILMAN:  I don't know what more the
12   Court wants.
13              THE COURT:  The burden is not mine,
14   Mr. Gilman; it's yours.
15              MR. PADILLA:  May I ask a question?
16              THE COURT:  Yes, sir.
17                     REDIRECT EXAMINATION
18   BY MR. PADILLA:
19       Q    Doctor, did you prepare a written report of your
20   findings in this case?
21       A    No, sir.
22       Q    Okay.  And Doctor, as part of your review of the
23   documents in determining whatever your opinion is on this
24   case, did you have an opportunity to review an eye
25   pathology lab report?
```

```
 1        A     What I have here, this says Valley Baptist
 2   Medical Autopsy Report.  This one?
 3                   MR. PADILLA:  May I approach?
 4                   THE COURT:  Yes, sir.
 5        Q     (By Mr. Padilla) Just so we can cut to the
 6   chase, let me show you this document and ask you, sir, if
 7   you have had an opportunity to review this document prior
 8   to providing your opinion on this matter?
 9        A     This document?
10        Q     Yes.
11        A     I never saw it.
12        Q     Never saw it?  Okay.  So the only thing that you
13   saw, then, was the autopsy report; is that correct?
14        A     Yeah, and the deposition.
15                   MR. GILMAN:  Was this ever given to us?
16                   MR. PADILLA:  Sure, it was.
17                   MRS. DE FORD:  It's part of the --
18                   MR. GILMAN:  Wait a minute, please.  Just a
19   second.
20        Q     (By Mr. Padilla) Doctor, this report was
21   attached to the autopsy report, original autopsy report --
22                   MR. GILMAN:  Al, it's in --
23        Q     (By Mr. Padilla) -- that you --
24                   MR. GILMAN:  -- you've seen it.
25        Q     (By Mr. Padilla) I will ask you again, Doctor:
```

16

1    Have you seen that document that's attached to the

2    pathology report?

3         A    I don't know.  I don't remember that.

4         Q    You don't remember seeing it?  Okay.  So then --

5         A    If I saw it, I don't have it in my brain.

6         Q    Well, let me ask you this.  If you did see it

7    and you had an opportunity to review it, did it assist you

8    in coming up with your determination concerning what you

9    are going to testify to here this morning?

10        A    Well, you see what I am going to testify, you

11   are going to ask me questions.

12        Q    My question is this:  Do you remember seeing it,

13   yes or no?  Yes or no?

14        A    No.

15        Q    So, then I can assume if you didn't see it, then

16   you didn't use it to draw an opinion, correct?  Yes or no?

17        A    Tell me again because you --

18        Q    If you didn't use it and you didn't see it, you

19   couldn't have used the information in this report to draw

20   an opinion that you are going to testify about today; is

21   that correct?  Yes or no?  Yes or no, sir?

22        A    No.

23              MR. PADILLA:  That's all I have.  I pass

24   the witness.

25              THE COURT:  What is Dr. Kuri going to

17

```
1    testify to?
2                 MR. GILMAN:  He is going to talk about --
3                 THE COURT:  Unless we go into what his
4    opinion is going to be, we don't know whether the doctor's
5    opinion is valid.
6                 MR. GILMAN:  His opinion as to the cause of
7    death, Judge, is going to go into the -- the doctor kept
8    -- Dr. Farley kept talking about 24 hours.  Dr. Kuri is
9    going to be testifying that he has seen blunt force trauma
10   to the brain causing hemorrhage and death as much as 48
11   hours.  He is going to be testifying that there was no
12   shake in this -- that there is no indication of shake in
13   the brain.
14                THE COURT:  He didn't see the brain.
15                MR. GILMAN:  No.  From the pictures and
16   from the autopsy report -- excuse me -- from the autopsy
17   report he is able to draw, based upon what the testimony
18   was in the deposition, as well as the autopsy report, that
19   he can testify that there was no shaking.
20                THE COURT:  I don't know if those areas are
21   areas of expertise.
22                MR. PADILLA:  If that's what he's going to
23   testify to, but we haven't heard what he is going to
24   testify to because we have no written report.
25                MR. GILMAN:  Well, we have never asked him
```

18

1    to give a written report, Judge.

2              THE COURT:  What I want to do is I want to

3    figure out what his testimony is going to be and if it's

4    limited to those areas that's within his areas of

5    expertise.

6              MR. GILMAN:  He is only going to be talking

7    about the brain, Judge, just the brain.  We are not

8    talking about any of the other injuries on the body.

9              THE COURT:  If it's limited to those areas,

10   I'm going to allow it.  If you get far afield of his

11   expertise, you know, then we have to stop and revisit it.

12             MR. PADILLA:  That's fine.

13             MR. GILMAN:  That's fine.  All we're

14   interested in is the brain, Judge.

15             THE COURT:  Bring the jury in.

16             THE BAILIFF:  All rise for the jury.

17             **(Jury present, defendant present.)**

18             THE COURT:  You may be seated.  Thank you

19   very much.  Good morning, ladies and gentlemen of the

20   jury.

21             PANEL MEMBERS:  Good morning.

22             THE COURT:  Did you-all have a good

23   weekend?

24             PANEL MEMBERS:  Yeah.

25             THE COURT:  Again, I remind you of the

1    previous instruction.  You're not supposed to discuss this

2    case until the last bit of evidence is in.  You are not

3    supposed to be talking with each other or anybody else.

4    Mr. Gilman?

5                    MR. GILMAN:  Thank you, Judge.

6                    THE COURT:  Dr. Kuri has already been sworn

7    to tell the truth and he is going to be the Defendant's

8    first witness.  Proceed, Mr. Gilman.

9                    MR. GILMAN:  Thank you.

10                   **JOSE KURI, MD,**

11      having been first duly sworn, testified as follows:

12                   **DIRECT EXAMINATION**

13   BY MR. GILMAN:

14      Q    Dr. Kuri, would you please state your name for

15   the jury?

16      A    Jose Kuri.

17      Q    And you are a doctor living here in Brownsville,

18   Cameron County, Texas, sir?

19      A    Yes, sir.

20      Q    Can you please explain to this jury your

21   training in medicine?

22      A    Yes.  At my age, you can imagine the long

23   history of my practice.  I started medicine more than 50

24   years ago.  The medicine like every field in the area of

25   education has increased.  Computers, radio, telephone,

Adelaido Flores, Jr.
Certified Shorthand Reporter

1   it's amazing.  But the primary study of medicine and

2   history of medicine was the history of the patient, the

3   history of the information that the patient and the family

4   gives to the doctor.

5                    MR. PADILLA:  Your Honor, with all due

6   respect to the witness, the answer is nonresponsive to the

7   question asked.  The question is about his educational

8   background and training.

9                    MR. GILMAN:  He's getting to it, Judge.

10                   THE COURT:  I understand.  Answer the

11  question, Doctor, please.

12                   THE WITNESS:  I was under the impression I

13  was answering the question about the history, however,

14  through the autopsies.

15                   THE COURT:  Your training and your

16  education, Doctor.

17                   THE WITNESS:  My training and education

18  was -- I started in medicine, and later I came to the

19  United States and studied at Columbia University surgical

20  pathology, which is pathology.  And then I came to the

21  University of Texas and I studied neurosurgery.  At the

22  time I finished my neurosurgery, there were 714 doctor

23  neurosurgeons in the United States.  So I went back to

24  El Salvador, to my country.  And I was, out of

25  four million people, the only neurosurgeon.

21

1  Neurosurgeons, didn't exist.

2           So the practice we had was from trauma,

3  accidents, everything, tumors, psychosurgery, lobotomies

4  for psychiatric patient, everything.  And I came here, and

5  I was the only neurosurgeon for Brownsville for 16 years.

6  What is learning?  Practice by learning in the practice.

7  But basically it was through clinical skills of

8  examination and history of the patient, added with the

9  techniques.

10          For instance, in '75 the year I came was

11  when the CAT scan came to the science -- and medical

12  science.  And they defied the MRI.  How did I do my

13  surgery?  Examination of the patient.  Long time

14  operation, we didn't have that in the procedure.  So my

15  training is training -- is learning through students,

16  through autopsies.  That is the only way.  And in

17  medicine, in a big hospital, a 1,000 bed hospital, the

18  patients taught me.

19          And the doctor ordered -- in Latin America,

20  doctors order the autopsy, was the pathologist.  And then

21  the neurosurgeon was part of the learning.  Autopsy in

22  United States, at least in Rio Grande Valley, is sent to

23  the medical -- to the legal system we do autopsies.

24  Otherwise, we don't do like -- we do it to learn -- to see

25  what the patient died of.  When he is legally dead --

1          MR. PADILLA:  Your Honor?  Again, with all

2   due respect to the Doctor, I'll object as the answer being

3   nonresponsive.  It's not on a question and answer basis.

4          THE COURT:  Just a minute, Doctor.

5          MR. PADILLA:  It might be irrelevant or

6   immaterial.

7          THE WITNESS:  Sir, in the process of --

8          THE COURT:  Just a minute, Doctor.

9          THE WITNESS:  I'm sorry.  I didn't --

10          THE COURT:  Ask your next question,

11   Mr. Gilman.

12          MR. GILMAN:  Yes, sir.

13     Q    (By Mr. Gilman) Doctor, you got your medical

14   training here in the United States; is that correct?

15     A    Yes, sir.

16     Q    And then you went back to El Salvador?

17     A    Yes, sir.

18     Q    To repay your country for them sending you to

19   the United States for your medical training?

20     A    Yes, sir.

21     Q    While you were in El Salvador, did you head up

22   the medical school in El Salvador?  Did you help in the

23   teaching of medicine in El Salvador?

24     A    Sure.  When I went there, there were no

25   neurosurgeons.  So what is the best way to repay?  Go back

probe

1     to the medical school and teach.

2                 MR. PADILLA:  Your Honor, I object.  It's

3     nonresponsive.  Secondly, the question with the exception

4     was leading, Your Honor.

5                 THE COURT:  I'm going to sustain the

6     leading part.  Ask your next question.

7     Q     (By Mr. Gilman) When you returned to El

8     Salvador, what if anything did you do?

9     A     Practiced as a neurosurgeon on patients and

10    teach.

11    Q     And what -- how long did you teach in

12    El Salvador?

13    A     Until I came here.

14    Q     Which was how long ago?

15    A     Around '75.

16    Q     And that teaching was done in a hospital, or in

17    a classroom?  How was that teaching done?

18    A     In both.  In neurology, in the classroom and in

19    the.  On Friday, part of the specimen we had was to review

20    the brains.  I have to explain.  When the patient die or

21    they do autopsy they keep the brain in formaldehyde for me

22    to teach the students about the patient.  We read the

23    record of the patient, the medical record, and discuss

24    clinical things with the students.  And after that we cut

25    the brain so we learn the correlations -- the medical

```
 1   part -- with the rest of the brain.  So for 19 years I was
 2   cutting brain every weekend.
 3        Q    And when you came here to the United States, did
 4   you come specifically to the Rio Grande Valley or did you
 5   come to another part of the country?
 6        A    No.  I had a friend who invited me to come here
 7   and I came to Brownsville.  He told me, we don't have any
 8   neurosurgeons, and I was the only one for 16 years.
 9        Q    And you started practicing here in Brownsville
10   when, sir?
11        A    November the 7th, 1975.
12        Q    And you have been practicing here in Brownsville
13   ever since?
14        A    Yes, sir.
15        Q    Now, I asked you to review the autopsy report of
16   this child Mariah Alvarez; is that correct?
17        A    Yes, sir.
18        Q    And I also gave you the deposition of
19   Dr. Farley; is that correct?
20        A    Yes, sir.
21        Q    And based upon those two documents, you reviewed
22   them, did you not?
23        A    Yes, sir.
24        Q    And are you contradicting Dr. Farley at all in
25   the cause of death of blunt force trauma to the head?
```

1     A     No, sir.

2     Q     You agree with her finding of blunt force

3  trauma?

4     A     Yes, sir.

5     Q     Dr. Farley testified to the effect that there

6  were some 24 hours from the time that this patient

7  received the blunt force trauma to the time that she died.

8  In your experience as a neurosurgeon, have you seen blunt

9  force trauma that causes a brain hemorrhage and causes

10 death?

11    A     You can imagine 15 years in this place alone I

12 saw half of Brownsville, maybe -- in the emergency room

13 head injuries, children in car accidents.  I saw

14 everything.  So I have seen injuries.  That was part of

15 the -- of my specialty.

16    Q     There was testimony about a 24-hour period

17 before this.  Have you seen clinically a greater period of

18 time or a lesser period of time than the 24 hours that

19 Dr. Farley testified to?

20    A     Twenty-four hours is not -- is not the line.  It

21 depends on many factors.  Therefore, I accept to

22 discuss -- to answer the question the reality so that it

23 can help because it's a tremendous responsibility to give

24 good information.  A judge who is not well informed cannot

25 make justice.  So my participation, as I told you, is we

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    did the brain and we asked the clinical symptoms.  But--
2    depending upon the information you gave me -- I can say at
3    this time to explain the mechanism of why an injury killed
4    the baby.  I don't think it was explained, at least from
5    the part I listened to.
6         Q    If I were to call you, Doctor, hypothetically,
7    and say that I had a child who has fallen down stairs,
8    what are some of the questions, what are some of the
9    information that you are going to need to know from me?
10             MR. PADILLA:  Your Honor, I'm going to
11   object unless they first establish that this doctor is a
12   pediatric neurosurgeon.  He is describing a child.
13             THE COURT:  I'm going to overrule the
14   objection.
15        Q    (By Mr. Gilman) What are some of the questions
16   you're going to need to know from me?  Well, let me back
17   up a little bit.
18             How important is the history that you're
19   going to receive from me before you can tell me what is
20   going to happen?
21        A    The most important part for any doctor is the
22   history of the patient.
23        Q    Okay.  Why?
24        A    I don't know if it deals with my profession, but
25   given the history -- if the patient was talking and

1    suddenly he died, that's history.  Then, what sudden thing

2    did he die from?  Is it the heart?  Patient had a history

3    that he was hit on the head and was unconscious and was

4    not responding.

5                We see, everyday, head injuries.  In

6    boxing, the knockout is brain trauma.  So that history of

7    the patient is the most important information that the

8    doctor has.  And a doctor who just -- for example, Mr.

9    Gilman:  Mr. Kennedy had a seizure and then had another

10   seizure, and he's just 70.  History is:  Any seizure

11   disorder in a person over 40 years of age, equals brain

12   tumor vertebral malformation.  If A young lady of 20 years

13   of age, has severe headache and has loss consciousness --

14               MR. PADILLA:  Your Honor, I'm going to

15   object to the relevancy and materiality.  We are talking

16   about a child that's two years old, not somebody whose 40,

17   or 70 years old individuals --

18               MR. GILMAN:  We are talking about history,

19   Judge.  We are talking how important the history is.

20               THE COURT:  He is talking about clinical

21   history being important.  I'm going to overrule the

22   objection.

23   Q     (By Mr. Gilman) Go ahead, Doctor.

24   A     Okay.  A child has -- the family comes to the

25   doctor.  My child has been having headaches, loss of

1   balance, and tendency to be drowsy, and vomiting.  For how

2   long?  Since last week.  Constant?  Yes, constant.

3   Progressing?  Yes, progressing.  Then, I would be afraid

4   that it would be brain tumor because if its progressive

5   because there's signs of headache.  So the history is the

6   basis of the medicine.  And that is where medicine got its

7   start.  Medicine didn't have x-rays before.  We start with

8   the history of the patient, to see if he is hypochondriac

9   or is he using a prescription of epilepsy?  So history is

10  the information, and that is what really, actually, the

11  people give me time, and they want to tell the doctor more

12  and more information.  And that's the basic.  I prefer a

13  good history than any test, because if it's a --

14      Q    What are the symptoms that you would expect to

15  see in someone who has received a blunt force trauma to

16  the head?

17      A    The most important function of the brain is

18  alertness.  Being alert.  So when an injury happens, there

19  is a loss of consciousness, if it's severe.  If it's not

20  severe, no.  But loss of consciousness.  Then they regain

21  consciousness or it's progressively worse.  It depends on

22  the type of injury.  If it's a severe injury that has

23  complications, with bleeding, swelling, inability to talk,

24  inability to move.  So you take a brief examination that

25  takes about ninety seconds.  Are the eyes closed, that's a

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    bad sign.  Inability to move, is a bad sign.  Inability to

2    talk, is a bad sign.  So if the patient is unable to talk,

3    and the eyes are close and doesn't move, is dangerous.  So

4    if the patient moves the extremities, it's better without

5    moving.  Keeping the eyes open is better than if the eyes

6    are closed.

7              That is not in the pathological report.

8    It's the clinical part, and this is what I would like to

9    be asked from the pediatric.  The child, it's different in

10   certain things.  They don't have arthrosclerosis.  They

11   don't have cholesterol.  They have good circulation.  The

12   brain has to expand more because it has room, because as

13   God created man, the structure of the brain and the spinal

14   cord, and it is by bone.  You cannot touch the brain.  You

15   can touch the liver like that, and the spleen, but the

16   brain, no.  The spinal cord, no.  It's surrounded by bone.

17   So if there is an injury to the bone, if it comes through

18   a fracture in the bone -- and that piece of fragment can

19   go into the brain, or just a contusion like in this case.

20   So in the area -- so I have -- I don't know if I can use

21   this to show to the jury the circulation of the brain.

22        Q    Please.

23              THE WITNESS:  Can I show down there?

24              THE COURT:  Yes, sir.

25              THE WITNESS:  This is the brain, but there

1    is the inside of the scull.

2        Q    (By Mr. Gilman) All right.

3        A    This has a cover, called a dura.  Dura is a

4    membrane that covers the brain that separates the area.

5    Then we have the circulation here.  (Indicating).  And

6    here what we have is the -- this is the cortex that goes

7    through the brain.  The brain is like part of the body.

8                THE COURT:  Just a minute, Doctor, while

9    the court reporter re-positions himself.

10                (Brief interruption;  Court reporter

11    repositions himself closer to the witness as he approaches

12    the jury)

13                THE WITNESS:  I will try to explain to the

14    jury without too much pressure.

15                The brain and the pathological report talks

16    a lot about the temporal lobe.  This is the temporal lobe.

17    This is the frontal lobe.  This is the front.  The

18    parietal, and that's the temporal.  And this is the area

19    where the motor -- all of the cells, in order to move,

20    like the hand or the body are here, and there is sensation

21    over here.  This is the artery or the base of the skull.

22    This is the midline, like half from here, And we see one

23    part of the ventricle.  And the most important part is

24    here, the brain, and the brainstem.  And this is part of

25    the spinal cord.  This is the section of the brain on one

1   side and a section of the brain on this half.  It was

2   mentioned in the pathological report, it's the ventricle.

3   The cavities contain fluid.  This is the membrane around

4   here, which is this brain.  And this part is fluid.  This

5   is fluid, and here is more fluid.

6                The spinal fluid, which is the fluid that

7   comes when they do a spinal tap, is this fluid.

8                All right.  So in the baby, these

9   injuries -- when the head grows up in a child in the first

10  months of life, you can touch here and depress, because

11  the skull hasn't closed, hasn't closed over a year.  In

12  two years it's closed.  So when there's an injury that is

13  blunt like in any part of the body, there's swelling.  So

14  this bone here, if the brain has expanded but does not

15  push the bone because the bone is already closed.  So

16  there is pressure inside -- inside of the brain.  So the

17  brain is under pressure.

18                Okay.  Which are the symptoms of increased

19  intracranial pressure?  Symptoms:  Headache, blurred

20  vision and vomiting.  Those are the early symptoms.

21  Gradually, the patient becomes somnolent, drowsy and

22  unable to move.  Okay.  But the brain has two compartments

23  inside of the skull, the pterion (sic), which tends to

24  separate the part, and the supra pterion (sic) which is

25  the brain, and the other which is the brain stem.  It's

32

1   like a tree.  Brainstem is like the trunk of the tree,
2   then the branches.  The branches, is the brain.  And the
3   trunk is the brainstem.  They use to call it "The Tree Of
4   Life."  With any pressure, it will kill the patient.
5                It is very unusual that a patient would
6   exhibit head injury immediately.  It takes time.  So when
7   the brain swells, it has to look for a place to go out and
8   it goes through that hole called that is called pterion,
9   under pressure, and the patient becomes ridged like that.
10  When he becomes ridged, it is close to death.  So, that
11  was my training, head injuries.  Is the patient alert, can
12  talk, can move.  How did he move?  Can he react to the
13  painful stimuli?  Does he respond to questions?  So, that
14  is part of the analysis.
15               So now we have a CAT Scan, and medically.
16  The thing, medically, is drowsiness.  Nobody is going to
17  die of a head injury without passing through
18  unconsciousness.  You have to be unconscious to die.  You
19  have to be unable to open the eyes, unable to respond, and
20  in a deep coma.  So, sir, if I see a patient who receives
21  an injury, and below the eyes -- just by seeing him -- and
22  then he stops moving his hand, and, instead, is trying to
23  take the IV out, he will starts with this movement like
24  that, with the eyes closed.  This movement is a section,
25  and it's been done for more than 18 years of age of that

33

1   experiment.

2              So when a patient dies of a swelling of a

3   brain tumor or hemorrhage or edema of the brain is because

4   the brain tries to expand to come out and go through.

5   That's why you have the hernia that I mention. The

6   peduncle which is part of the brain under pressure.

7              So if I want to drink water like this, it's

8   the movement from my brain to the spinal cord, from my

9   spinal cord, to my hands.  If somebody pinches me here, I

10  feel it from here to the spinal cord.  So the brain is

11  connected to the body through the brainstem.  And when

12  that is under pressure, it becomes separated.  And after

13  the separation comes respiratory rest, and then the

14  patient dies.  So it's a process that is not just in one

15  hour.  So that is what is important, the information --

16  where the doctor says.

17             So this is the moment that I need that

18  information.  I need the information to give because I am

19  not going to contradict this one.  I am not going to

20  contradict the expert here of the people.  What I'm going

21  to do, is answer your question and answer the question of

22  the history to see what happened in 24 hours at the moment

23  he died.

24             THE COURT:  Proceed, Mr. Gilman.

25             MR. GILMAN:  Thank you, Your Honor.

34

1    Q    (By Mr. Gilman) Is it possible to have a
2    traumatic -- a blunt force trauma hemorrhage by falling
3    down the stairs?
4    A    Yes.
5    Q    And is it possible to have a falling down stairs
6    two days before death and the death was caused by a blunt
7    force trauma to the head?
8    A    Well, this patient died of blunt trauma.
9    Falling from the bed is the most frequently accident that
10   children have.  Falling from the steps, okay, that can
11   produce that.  Because this patient has several areas at
12   the same time -- occurring at the same time -- in the
13   brain.  So subarachnoidal, and also subdural and in the
14   dura, so the brain was yellow, full of blood and swelling.
15   So there was no way to discuss that -- there was edema,
16   swelling and pressure.  So a fall from a stair is a blunt
17   trauma.  Any information clinically that I need to put the
18   time because we're talking about 24 -- 48 -- 24 -- 12
19   hours.
20   Q    Okay.  And if, roughly, 12 hours later, there
21   was vomiting, would that be of significance?
22   A    Yes.
23   Q    Okay.
24   A    I mentioned vomiting as one of the symptoms of
25   increasing intracranial pressure.  But 12 hours of what?

35

```
 1        Q     I'm sorry?

 2        A     Twelve hours of what?

 3        Q     Twelve hours after the fall, some 12 hours after

 4   the fall there is vomiting, and the beginnings of being

 5   drowsy --

 6        A     Well, yeah.

 7        Q     -- are these indications?

 8        A     Yes.  Well, vomiting is a sign of increasing

 9   intracranial pressure, as I mentioned before.  Okay.

10   Drowsiness, also favors increasingly -- becoming

11   disoriented.  Twelve hours after the accident, is that

12   what --?

13        Q     Yes.

14        A     In that 12 hours?  Okay.  (Writing on Board)

15   There was an accident, and death.  So if he vomited and

16   became drowsy, that is a symptom, a result of the brain

17   swelling and hemorrhaging.

18        Q     How would you expect these symptoms to progress

19   from the time of the injury til the time of the death?

20        A     Okay.  What that type of hemorrhage affecting

21   the area that I mentioned here -- which would be doing

22   pressure -- and it would be paralysis.  He wouldn't move.

23   Is there evidence that he moved or not?

24        Q     I have -- from what we have been able to --

25              MR. PADILLA:  Your Honor, I'm going to
```

1    object, Your Honor, to this witness being told what other

2    evidence there is out there, Judge.  I object.  I don't

3    think that the question is properly couched.

4                    THE COURT:  The objection is what, sir?

5                    MR. PADILLA:  First and foremost, it is

6    assuming facts not in evidence, Judge.  If he is going to

7    be told a certain facts issues, it assumes facts that are

8    not in evidence before this jury.  So I would object on

9    those grounds.

10                   MR. GILMAN:  I disagree, Your Honor,

11   because all of the facts that I am going to give to this

12   doctor are in evidence, and they are in evidence because

13   of the video of Mrs. Lucio at the time that she was at the

14   police station.  All of this -- all of these symptoms were

15   given to the police.

16                   THE COURT:  I'm going to overrule the

17   objection at this time.  Let's keep it in question and

18   answer form.

19                   MR. GILMAN:  Yes, sir.  Thank you.

20        Q    (By Mr. Gilman) Doctor, if there is evidence

21   that on a Thursday afternoon, a child fell down the stairs

22   and a Friday morning a child was vomiting, on Friday

23   evening the child was somewhat lethargic and not opening

24   their eyes very much and started to cramp, had forms of

25   the locked jaw, and Saturday morning the jaws were shut

37

```
 1    tight, and then Saturday evening -- Saturday
 2    afternoon/evening, the child passed, are those symptoms
 3    that you would be interested in knowing if you were trying
 4    to treat this child prior to death?
 5         A    Well, these are the cases that I've seen.  This
 6    is not the first case.  Those type of cases that I have
 7    seen, that they fell, and they become drowsy.  I open the
 8    skull, and equate the hematoma with some type of edema.
 9    So I remove the bone out to avoid the pressure.
10               MR. PADILLA:  Your Honor, the response is
11    totally unresponsive to the question asked, and I object
12    to that.
13               THE COURT:  He is talking about what he has
14    seen.  Repeat your question.
15               MR. GILMAN:  I'll ask Al to read it back.
16               (Record read by Court.)
17               THE COURT:  So -- rephrase your question.
18               (Interruption held;  Reporter repositions
19    himself to original position)
20         Q    (By Mr. Gilman) The symptoms that you are
21    looking for, the symptoms that you are needing to get from
22    in the way of history are telling you what?  Do they -- do
23    they tell you how far along or to what degree a person's
24    injury that they have sustained?
25         A    From what you just mentioned?
```

1      Q     Yes, sir.

2      A     And reading the autopsy report, is hemorrhage,

3  edema and pressure in the peduncle, in the brainstem, and

4  hemorrhage in the brainstem.  It's okay.  But clinically

5  if the patient fell, and the child has some elasticity,

6  and as I mentioned the child has -- they have better

7  circulation in the brain -- the brain can tolerate more

8  pressure.  But symptoms, classical symptoms, they call

9  triad, T-R-I-D-A-I (sic, "triad?") symptoms.  Vomiting,

10 blurred vision, and headaches.  That was the information.

11 In the injury, we have vomiting and drowsiness.  Was the

12 child drowsy?

13     Q     Yes.

14     A     Okay.  That was related to the accident.

15     Q     Okay.

16     A     Then the brain is getting worse through time.

17 And then I was talking before about the kind of brain

18 movement.  What kind of movement she becomes ridged.  You

19 said she begins to cramps.  Any information about the

20 movement?

21     Q     She seems to be tired, lethargic, doesn't

22 respond in talking with people, and then later on she gets

23 jaws tight, and her body seems to tighten up.

24     A     Okay.  That's part of the complication of the

25 previous to death.  When they become decerebrated,

39

1    unresponsive, the prognosis is bad -- absolutely bad.

2         Q    And once that occurs is there much of a chance

3    of saving the child if they received medical attention

4    right away?

5         A    When they become like that, it's too late.

6         Q    Okay.

7         A    I used to operate a child because they say that

8    less than 20 years they have better prognosis after 20

9    years.  But when they are decerebrated like that.  When I

10   was young, I used to do it in my health (sic) -- but they

11   remain a vegetable.  They don't recuperate.  At the right

12   moment this was before the swelling -- the beginning to

13   vomit there or become drowsy, that's the moment that you

14   can still do it, especially now that we have the CAT scan.

15   But if he is that decerebrated, it is too late to operate.

16        Q    You talked a little about the bleeding in the

17   eyes.  Is there -- if you have a blunt force trauma to the

18   head which causes a hemorrhage, do you see it in the eyes?

19        A    Yes.

20        Q    Is it noticeable in the eyes?

21        A    Not in the eyes like that, you have to do the

22   full microscopic examination.  Even in the retina, because

23   that is part of the nervous system.  The important

24   thing -- and I haven't mentioned it because I didn't think

25   it was necessary, obviously, if a patient is a baby shaken

1   like that severely, and brought to the pediatrician but is

2   still alive and he examines the full scopic examination of

3   the retina, and finds hemorrhage in the retina that is a

4   symptom that is bad for the baby.

5        Q     The shaking of the baby?

6        A     The shaking of the child.  Because the arteries,

7   the vein that goes to the brain, and that goes back to the

8   heart, are like that.  The brain -- this is the brain and

9   this is -- my two fingers were the brain.  They shake,

10  rupture and bleed.  But there is no x-ray, and there no

11  fracture, just -- then the retinal hemorrhage in the baby

12  equal to that baby shaking.  That's a clinical symptom.

13  There is no mention there, because this is clinical.  But

14  they mention hemorrhage of retinal.  But it's not because

15  you have a hemorrhage in the brain.  That is what they

16  discussed.  Subdural, and subarachnoidal hemorrhage.  So

17  the brain was full of blood.  The retina doesn't have

18  importance.  It's obvious that we are going to expect

19  that.

20       Q     So you concluded -- you ruled out a shaking of

21  this baby?

22       A     No, no.  Remember this.  This is -- this is your

23  field.  This is your operating room, the court.  For me,

24  no.  For me, it's different.  I have to give the medical

25  part.  No.  If we don't have any history of a contusion,

1    you see the skull clean.  But somebody saw the mother
2    shaking, called the police and they take the baby to the
3    operating room -- in another case, not this one -- and the
4    doctor examines the skull, no fracture, but examined
5    through full microscopic examination, and see hemorrhage
6    with no contusion -- because shaking doesn't produce
7    hemorrhage in the skull.  So if you find retinal
8    hemorrhage, that's suspicious that there was a shaking of
9    the baby, that it was caused by edema.  That is the only
10   thing that is so important.  But we are not talking about
11   a case like that.  This is over the past.  This was -- it
12   doesn't have anything to do with that.  It is minimal, if
13   we are talking about visceritis.
14       Q    Could the falling down the stairs cause a
15   hemorrhage in the retina, if you know?
16       A    The hemorrhage in the retina is due to the
17   hemorrhage in the brain that infiltrates through the exit
18   of the optic nerve.  It's part of the -- that's the
19   result.
20       Q    All right.  I hand you what is marked as State's
21   Exhibit No. 34.  Do you see what that is?
22       A    Uh-huh.  Yes, sir.
23       Q    Can you explain to the jury, what that shows us?
24       A    Yes, understanding this is the picture.  This is
25   the skull.  But to understand it now, it will be easier if

42

1    I tell you that the technique of the autopsy to make an

2    incision here until the knife stopped at the bone, and

3    then you have the two parts, move it forward and backward,

4    and expose the skull.  So, this is the skull with the

5    hemorrhage in the scalp.

6         Q    Wait a minute, wait a minute.  The court

7    reporter can't hear again.

8         A    Okay.  I'll try and talk loud.  I'm sorry.

9         Q    Why don't you get up there and show it up there

10   from your microphone up there because that way he can hear

11   it better.

12        A    Explained about the technique.  So the scalp is

13   down, and the gray area is the skull.  And this is the

14   hemorrhage in the skull and the flap is the scalp.

15        Q    Okay.  And I will hand you here what has been

16   marked as State's Exhibit No. 28.

17        A    It's practically the same.  You see the hair --

18   there in the upper part -- the hair and the scalp that was

19   pushed down and the other part is down.

20        Q    I hand you here what has been marked as State's

21   Exhibit No. 35.  What does that show?

22        A    (Reviewing the model)  This is the brain.  The

23   blue -- that thing is a vein.  And the red thing are the

24   arteries.  To understand this, the heart sends through the

25   carotid artery the blood to the brain.  So everyday it

43

1   gives oxygen to the brain and collects through the vein,

2   and goes back to the heart, to the lungs for oxygenation.

3   So arteries are the red ones, and the red labeled "edema".

4   And this is hemorrhage -- hemorrhage of the brain.  More

5   than one side.  It could be right; it could be left.  But

6   more than one side than the other.  But it is depressing

7   to see hemorrhaging in the brain -- in the whole brain.

8   Obviously, that hemorrhage comes down and you can see it

9   in the retina.  So, this is hemorrhage in the brain.  What

10  else can I say?  One side is worse than the other.  This

11  half.  It's one side than the other.

12      Q    I'm going to hand you what is marked as State's

13  Exhibit No. 33.

14      A    Okay.  This is the dura in the brain.  You say

15  the brain was blue like that?  Okay.  Here, when I mention

16  to you before seeing that the brain inside the cavity of

17  the brain is supra =ventriculi (sic)  This is above the

18  brain.  They remove the brain and we are seeing this part

19  without brain.  This part is the brain.  This is the dura.

20  This bluish color is the brain.  And this is part of the

21  dura.  We see the ear here of the baby there?  And here,

22  in this hole, is where the brainstem goes there, and there

23  has been a contusion that would really kill the baby --

24  causing the damage to the brainstem.  And one side is

25  worse than the other.  You got hemorrhage one side more

44

1    than the other.

2              This part of the scalp from here is the

3    bone.  This is scalp.  This is hemorrhage.  They removed

4    the brain.  This is the base.  If we pinch here, it would

5    be the eye.  Under that, are the eyes.

6              THE COURT:  Mr. Gilman?

7              MR. GILMAN:  Yes, sir.  Can I have just a

8    moment?

9              THE COURT:  Yes, sir.

10             THE WITNESS:  (Witness writes down on the

11   blackboard drowsiness, vomiting and rigidity).

12             MR. GILMAN:  I will pass the witness,

13   Judge.

14             THE COURT:  Mr. Padilla?

15             MR. PADILLA:  Thank you.

16                     **CROSS-EXAMINATION**

17   **BY MR. PADILLA:**

18        Q    Dr. Kuri, you testified earlier that you

19   received training in Colombia, is that correct?  Is that

20   here in the United States?

21        A    No.

22        Q    Let me ask you this.  Where did you get your

23   medical training and where did you get your medical

24   license?

25        A    Oh, in Columbia University.

45

```
 1        Q     Right.
 2        A     Oh, I thought that you were saying "Colombia,"
 3   the country.
 4        Q     Isn't it true that you graduated from the
 5   University of El Salvador in 1948?
 6        A     In 1948?  Yes.
 7        Q     Okay.  So you got your medical training at the
 8   University of El Salvador --
 9        A     Yes.
10        Q     -- in a country that is El Salvador, correct?
11        A     Yes, sir.
12        Q     Okay.  Now, Doctor, you have been asked to give
13   certain opinions here this morning.  Have you prepared a
14   report that would show your opinions on this case?
15        A     No.
16        Q     By report, I mean a written report?
17        A     No, sir.  I didn't bring it.
18        Q     Now you spent a certain amount of time talking
19   about history of a patient, correct?  Can you answer me
20   this:  What did you look at to come up with and give your
21   opinions here today?  What did you review?
22        A     What I told you, this is the fifth time I
23   reviewed the --
24              MR. PADILLA:  Your Honor, I object to the
25   response being argumentative.  This is the first time I'm
```

46

```
 1    asking him any questions.
 2                 THE COURT:  In front of the jury.
 3    Dr. Kuri, would you just answer the question, please.
 4                 THE WITNESS:  Okay.  I reviewed the autopsy
 5    and reviewed the deposition, and I was present for --
 6    probably, part of the deposition of the doctor, the lady
 7    pathologist.
 8         Q    (By Mr. Padilla) So you were sitting out here in
 9    the audience listening to what Dr. Farley was testifying
10    to, correct?  Yes or no, sir?
11         A    Yes, sir.
12         Q    And you have now -- when you reviewed the
13    autopsy report, did you review the autopsy report and all
14    the attachments included thereto?  Everything attached to
15    it, did you review that?
16         A    I saw the -- the autopsy report.
17         Q    And when you -- who provided you the autopsy
18    report?
19         A    I'm sorry?
20         Q    Who provided you the autopsy report?
21    Mr. Gilman?
22         A    Mr. Gilman, yes.
23         Q    Now, sir are you a pediatric neurologist or not?
24         A    I'm a -- a neurosurgeon.
25         Q    Excuse me.  Are you a pediatric neurosurgeon?
```

```
 1        A     No.   I am a neurosurgeon who operates on
 2   children.
 3        Q     Well, what is your specialty, adults or
 4   children?
 5        A     There's -- my specialty is to do both of them.
 6        Q     Okay.   What percent of your practice, sir, what
 7   percent of your active practice is with children?
 8        A     The -- the population of children is less than
 9   the adult, okay?
10        Q     Okay.   So --
11        A     And the -- and now you asked me, let me answer
12   the question.   Pediatric and neurosurgeon, hydrocephalus.
13   I do hydrocephalus.   Myeloma-lingo cell tumor, I did the
14   tumor.   Trauma, that was the most I did.   Being 15 years
15   alone in neurosurgeon in Brownsville, and was enough to
16   see children and adults.
17        Q     I understand, sir.
18        A     But the definition is later.   But now at that
19   time it was neurosurgeon.   So I did both of them.   So it's
20   no different.
21        Q     And I will ask you again.   What percentage of
22   your present practice --
23        A     I can't quite say --
24        Q     Does it involve any children at all?
25        A     I'm sorry?
```

48

```
 1        Q      Does it involve any children at all?  Do you see
 2   children?
 3                    THE COURT:  Are you talking about right
 4   now?
 5                    MR. PADILLA:  In his present practice,
 6   Judge.
 7        Q      (By Mr. Padilla) In your present practice, are
 8   you seeing children?
 9        A      I don't want to be disrespectful.  I don't hear
10   you very well.  That's my problem.
11        Q      I apologize, sir.  What percent of your present
12   medical practice is with children?
13        A      At this time I am doing surgery.  In the last
14   three years, I stop doing surgery.
15        Q      When you were doing surgery, sir, what
16   percentage of your practice was children?
17        A      Compared with the adults, probably about
18   10 percent.  The children I saw in the emergency room that
19   have hydrocephalus in the hospital.  They were born with
20   hydrocephalus, and I put the shunts.  But I know about
21   children -- or a in neurosurgery.
22        Q      Well, as a matter of fact, sir, aren't children
23   more susceptible to injury by being shaken than an adult?
24        A      Oh, sure.
25        Q      Is not a child more susceptible to injury by
```

1  being struck across the head than an adult?

2     A    Yes.

3     Q    And it has to do with a lot of it, has to do

4  with their muscle buildup, correct?  Because the head is

5  usually larger in the body.  So, therefore, children are

6  susceptible to trauma to the head much easier than an

7  adult would; is that correct?

8     A    The majority of the trauma in children is one

9  year of age by four, because they don't have good balance,

10 or they fall.

11    Q    And what percent, sir, of children, or do you

12 know what percent of children actually die as a result of

13 a fall?  I mean, a child under the age of 17.  Do you know

14 what percentage?

15    A    I don't think it existed, or that it's typical.

16 It's before they pick up the CAT Scan or after they do Cat

17 scan.  So the big problem with the children is hemorrhage.

18 Trauma, is the diagnosis.  With the CAT scan, you gain --

19 the statistical now are not the same like the 30 or 40

20 years ago when I was facing the child and me.

21           MR. PADILLA:  May I approach the witness,

22 Your Honor?

23           THE COURT:  Yes, sir.

24    Q    (By Mr. Padilla) Sir, are you familiar with the

25 American Association of Neurological Surgeons?  Are you

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1    familiar with that organization?
 2         A    Yes.
 3         Q    I'm going to draw your attention, sir, to a
 4    report called "Analysis of Pediatric Head Injuries From
 5    Falls".  Is that association something that you look up
 6    to?
 7         A    Yes.  It's a good association.
 8         Q    Okay, sir.  Have you ever seen this report that
 9    I have shown you here today?
10         A    No.  But --
11         Q    Okay.  But what, sir?
12         A    Feel free to quote me anything from that report.
13         Q    Well, sir --
14              MR. PADILLA:  Let me show it first to
15    defense counsel.
16              THE COURT:  Ladies and gentlemen of the
17    jury, it might be a good time to take a break.  There is
18    coffee for you.  Let's take a ten minute break and we will
19    start up again in ten minutes.
20              THE BAILIFF:  All rise for the jury.
21              (Jury not present 10:38 a.m..)
22              THE COURT:  We are going to take a ten
23    minute break, Doctor.  Would you like coffee or anything?
24              THE WITNESS:  No, sir.
25              THE COURT:   We will see you in ten
```

1    minutes.

2                    (Brief recess at 10:38 a.m.)

3                    THE COURT:  You may be seated.  Are you

4    guys ready?  Bring the jury in, please.

5                    THE BAILIFF:  All rise for the jury.

6                    (Jury enters at 10:54 a.m..)

7                    THE COURT:  You may proceed.

8                    MR. PADILLA:  May I approach the witness,

9    Your Honor?

10                    THE COURT:  Yes, sir, please.

11        Q    (By Mr. Padilla) Doctor, before we took the

12    break, we were discussing the American Association of

13    Neurological Surgeons.  What organization is that -- or

14    who are they?

15        A    It's a very serious organization for the

16    Association of Neurological Surgeons.  They have, probably

17    the most represented of the neurosurgeons.  It is similar

18    to the American Bar Association.

19        Q    Okay.  I'm going to show you a document that is

20    an "Analysis of Pediatric Head Injuries from Falls".  Have

21    you ever seen this document?

22        A    There are 2,000 articles in medicine every

23    month.

24        Q    Okay.  Have you ever seen this article, sir?

25        A    No, sir.

52

```
 1        Q     You have not?

 2        A     No, but we can comment on it.

 3        Q     Okay.  And the reason I'm asking that, sir, is

 4   obviously, that would be something that you would look at,

 5   would you not, in trying to analyze a pediatric head

 6   injury, would you not, from falls?

 7        A     Sure.

 8        Q     Now, according to the report itself --

 9              MR. GILMAN:  I object to counsel asking

10   questions from a report that is not in evidence, Judge.

11              MR. PADILLA:  Your Honor, at this time,

12   then, I would offer this as State's Exhibit No. 40.

13              MR. GILMAN:  I object, Judge.  It hasn't

14   been proven up.

15              THE COURT:  There are no authoritative

16   treatise.  I'm going to overrule the objection, but go

17   ahead.  Before I overrule the objection, why don't you

18   show it to --

19              MR. PADILLA:  Your Honor, I have.

20              THE COURT:  -- Mr. Gilman?

21              MR. GILMAN:  Well, I haven't read it. can I

22   have time to read it?

23              THE COURT:  I understand, Mr. Gilman.  I am

24   giving you an opportunity to make your legal objection, if

25   you wish.
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

53

1        MR. GILMAN:  (Reads) We asked for experts
2   and now they're going to try and use this document as an
3   expert.  I was never given notice of this prior to trial.
4        MR. PADILLA:  That's a report, Your Honor,
5   that our office acquired on Thursday of last week.  We
6   were not privy to it until we ascertained it by Doctor
7   Farley who testified.
8        THE COURT:  I am going to allow you to use
9   it for purposes of cross examination, and will hold the
10  decision of admitting it into evidence until a later time.
11       MR. PADILLA:  Thank you, Your Honor.
12       THE COURT:  Go ahead, Mr. Padilla.
13       THE WITNESS:  Can I do a favor?  Can I see
14  it for one minute?
15       MR. PADILLA:  Yes, sir.  May I approach the
16  witness, Your Honor?
17       THE COURT:  Yes.
18       THE WITNESS:  (Reviews).  Well, this is --
19  this is a medical article written by a group of doctors
20  that belong to the American Neurological Association.  It
21  is not an official paper of the American Neurological
22  Association.  It is a contribution like if I write an
23  article and send -- written by them.  It's not the
24  American.  They belong to the American Neurological.  It
25  is an article like you've written.  So we are going to

Adelaido Flores, Jr.
Certified Shorthand Reporter

54

1    discuss because.  This is medical; but this is not

2    medical.  So the question that you have for me -- what I

3    want to tell the jury this is not the official expression

4    of the American Neurological Association.  It is an

5    article written like the 2,000 articles they have every

6    month.

7         Q    (By Mr. Padilla) Okay.  And sir, again, what is

8    the Neurosurgeon Focus?  What is that?

9         A    What?

10        Q    The Neurosurgeon Focus, what is that?  Is that a

11   treatise?  Is that something that the American Association

12   of Neurological Surgeons prepares, or uses to prepare

13   this?

14        A    I don't know.  They could be in a category, or

15   article.

16        Q    Let me ask you this, sir.  Have you, yourself,

17   ever done an analysis of pediatric head injuries from

18   falls?

19        A    Can you repeat that?

20        Q    Have you ever conducted an analysis of pediatric

21   head injuries from falls?

22        A    Sure.  That's the way I passed my board

23   examination, and --

24        Q    Have you ever written an article, sir, on the

25   analysis of pediatric head injury from falls?

Adelaido Flores, Jr.
Certified Shorthand Reporter

55

```
1        A     When I did the article -- an article here in

2   Brownsville?  No, because there is no time.  I was alone.

3   It was a quiet group.

4        Q     Let me ask you this.  When was the last time

5   that you ever considered writing a paper on the analysis

6   of pediatric head injuries from falls?

7        A     I wrote the book that is quoted by the American

8   Bar Association about the Spine Trial, and I don't think

9   that anybody in Brownsville have written like the American

10  Bar Association.  But the American Bar Association

11  published my book in 2002 about the spine.  I was planning

12  to do it about the head, but it takes time.  It's not

13  easy.

14       Q     Let me ask you this, Doctor --

15       A     It will be easy if you ask me the medical

16  question more than --

17       Q     Sir, I'll ask the question, and you provide the

18  answers, sir, with all due respect.  And if you can't

19  provide the answers, say:  You don't know, and we'll get

20  through this a lot quicker, sir.

21       A     Okay.  I haven't written any article because it

22  takes time and I was the only neurosurgeon on here.

23       Q     Okay.  What percentage of falls, sir, result in

24  falls by children?  What percentage results in death, if

25  you know?
```

56

1          MR. GILMAN:  I fail to see how that is even
2     relevant.
3          THE COURT:  I'm going to overrule the
4     objection.  Go ahead, Mr. Padilla.  If he knows.
5     Q    (By Mr. Padilla) Doctor, if you know.
6     A    I don't know.  To tell the jury speculation --
7     or -- I don't have any number because it varies.  Now it's
8     less than before because we have the CAT scan and early
9     treatment than 20 or 30 years ago before we got the scan.
10    Q    Doctor, this analysis states that of the 729
11    cases identified --
12         MR. GILMAN:  Your Honor, I object to the
13    State's use of it until it's in evidence.  He can use it,
14    you said --
15         THE COURT:  For purposes of cross
16    examination.
17         MR. GILMAN:  Right.  But he shouldn't be
18    quoting from it, Judge.
19         THE COURT:  I'm going to go ahead and allow
20    it.
21         MR. GILMAN:  Please note my exception.
22         THE COURT:  So noted.
23    Q    (By Mr. Padilla) Of the 729 cases that are
24    identified as mortality rate, it provides a 1.7 percent of
25    death of children from falls; is that correct?

57

```
1        A     Well --
2        Q     Does your study that you haven't written yet,
3    indicate, otherwise?
4        A     If it says that, that's all right.
5        Q     And they say also, that when a fall is greater
6    than 15 feet --
7              MR. GILMAN:  Your Honor, I'm going to
8    object to anything that the study said.
9              THE COURT:  The objection is overruled.
10             MR. GILMAN:  Can I have a running
11   objection?
12             THE COURT:  Yes, you do have a running
13   objection.
14       Q     (By Mr. Padilla) "That the fall of
15   15 percent" -- excuse me -- "higher than 15 feet is
16   tantamount to 2.4 mortality rate."  Do you, yourself, in
17   your studies have any information, documentation or
18   paperwork that would contradict a finding similar to that?
19       A     I respect the opinion of them, sir.
20       Q     Okay.  Dr. Kuri, you are not licensed as a
21   pathologist; is that correct?
22       A     No, sir.
23       Q     So you don't -- you, yourself, never give the
24   cause of death, correct?
25       A     Tell me again.
```

58

```
 1        Q    Do you, yourself, ever provide a cause of death
 2   in a pathology report, do you?
 3        A    I don't understand.  I have signed a lot of
 4   death certificates on a patient who come to the hospital
 5   like this one, for example, and die.  So I have death
 6   certificate because of the head injuries.
 7        Q    Here in Brownsville, Cameron County, Texas?
 8        A    Well, 16 years alone in Brownsville, how many
 9   children do you think I have seen?
10        Q    Sir, I will ask you, how many children have you
11   seen in the 16 years of your practicing?
12        A    Over 100 easily, or 500.
13        Q    My question to you is this --
14        A    I saw them in the emergency room.  They don't
15   take them to the office.  If they have injury, they call
16   me, okay?  So, if the patient was severe damage, at that
17   time when I came here, there was not CAT scan.  So we have
18   to do a lot of tests and different treatment.  Now it is
19   much better, for the future of the children.  Okay.
20             So these people who die because of the
21   injuries, I have to sign a certificate that says:  Death
22   due to head injury.  That's what you are referring to, or
23   what is it that you are referring to?
24        Q    I am asking you, sir.
25        A    No.  What you are referring to, that you need an
```

59

```
1    autopsy to give that, or --
2         Q    No.
3         A    No?  I gave -- sure --
4         Q    And you made an issue of it earlier, sir, that
5    you were going to look at the history of a person,
6    correct, in your effort to diagnose somebody?  Correct?
7         A    When the patient is brought to the emergency
8    room, he doesn't come alone, or he doesn't call the
9    ambulance.  The family calls the ambulance of somebody --
10   or if hit by the car, is taken to the emergency room.
11   That's the beginning of the history.  How he was speaking,
12   he was moving, the extremities, whether he was
13   unconsciousness, or was bleeding -- all that.  So when I
14   went to see the patient, probably it was after the
15   emergency room, calling me, and I went from 2:00 or 3:00
16   in the morning to see.  That was always in the history of
17   my cases.
18        Q    Doctor, is it possible for an adult to strike a
19   child with sufficient force in the head to cause the death
20   of that child?
21        A    This child died because of force in the head.
22        Q    Okay.  Something caused the force blunt trauma,
23   correct?  Correct?
24        A    Sure, sure.  He didn't do it by himself.
25        Q    It didn't seem to be self-inflicted, correct?
```

1        A      I'm sorry?

2        Q      It wasn't self-inflicted, correct?  The person

3   wouldn't be able to intentionally cause the type of injury

4   that this child suffered, right?

5        A ·    (Does not respond)

6               I will withdraw my question, Doctor.

7               Doctor, if you have a child --

8               MR. PADILLA:  May I approach?

9               THE COURT:  Yes, sir.

10       Q      (By Mr. Padilla) I'm going to draw your

11   attention to Exhibit 31, Exhibit 32, Exhibit 23 and 27 and

12   30.  Doctor, if a child came to a hospital and you viewed

13   the injuries of that nature to a child, and the child when

14   he arrives at the hospital is deceased, do you believe

15   that -- would you draw an opinion that the child may have

16   suffered blunt force trauma due to abuse?

17       A      You're asking -- I'm going to answer your

18   question --

19       Q      Please.

20       A      -- but not as an expert because I still am only

21   above the head, but I listened to the explanation of the

22   doctor.  You want me to talk as a general doctor, just to

23   give you that information?

24       Q      No, Doctor --

25       A      Can you show me something?  I don't want to be

1    disrespectful, but it is about the extremities.  And I
2    was -- I was considering to talk about only the brain.  I
3    have my opinion as a doctor because --
4        Q    Well, let me ask you this.  If you're sitting
5    there as a doctor, and the child is brought in there
6    unconscious, and you see those type of injuries on that
7    child, and you see what may appear to be head injuries,
8    would you as a doctor suspect child abuse as a cause of
9    death?
10       A    Child abuse always has to be considered.  Okay.
11   And this is -- this could be a cause of death.  Child
12   abuse?  Sure.
13       Q    Okay.  So what you've got to look at, is you
14   look at the child, you look at all of the bruising and
15   everything associated with that, and then you at that
16   time, you as a medical doctor, your would suspect that the
17   child may have died from blunt force trauma as a result of
18   child abuse, correct?
19   .   A    Correct.
20       Q    Then, you, yourself, can't, or aren't licensed
21   to do an autopsy on the child, would you, or an adult?
22   Are you licensed to do an autopsy?
23       A    I have never asked if I do an autopsy, but who
24   would believe me if I have not been a neurosurgeon and I
25   presented pathology?  I don't think that you have a

62

1    good -- I'm sorry -- a good understanding of an autopsy.

2    Autopsy is a procedure, like a surgical procedure --

3         Q    All right.

4         A    -- cutting the scalp, taking the whole,

5    everything out.  It's a dead person.

6         Q    What's the purpose of an autopsy, Doctor?

7         A    That's the basis of the science, to see the

8    pathology.  We reach a point that we have now is because

9    of the autopsy.  It is the best learning that we compare.

10   That's where the patient can see.  This is the medicine.

11   This is the medicine.  And then there is the clinical

12   manifestation, and that's the way the history has been

13   made for hundreds of years.

14        Q    Again, Can you tell me the reason for --

15        A    You've asked me three questions already.

16        Q    Just answer the first one then.

17        A    Okay.  The first one, as a doctor, this one

18   doesn't have anything to do with the head injury.  Okay?

19   But she said that there were different ages for the

20   injuries.

21        Q    Okay.

22        A    Even you don't want to ask me -- and she didn't

23   explain to the jury -- but I'm going to explain to the

24   jury.  She mentioned about the legal side of medicine.

25   Okay.  Everybody have seen a black eye.  There's not a

63

1    black eye in the beginning.  It's red.  The hemocyte she

2    mentioned, was is the process of healing the bruises.  So

3    the fracture of the arm is healing.  So that was not at

4    the moment of the injury.  It was before because she saw

5    in the microscope the healing.

6         Q    And you did hear, Doctor, that she estimated

7    that injury to be week or two weeks old.  You heard that,

8    did you not?  Did you hear her say that?

9         A    This one --

10        Q    Did you hear her say that?

11        A    I don't know about that, but she said --

12        Q    Nobody, Doctor, here has testified yet that that

13   arm injury happened during any alleged fall.  Do you

14   understand that?  Nobody is saying that.

15        A    No.

16        Q    Because, you know, I think you are drawing --

17        A    I want to help you -- you asked me something

18   that I told you -- and I didn't mean to comment about that

19   neither, about the arm.  But I'm a doctor who was trained

20   in that.  But not the expert.  But in the injuries, it has

21   different edges.  That's the pathology, because of the

22   lymphocyte cells.  It is like a tornado destroyed, then

23   came the cleaning, the fibroblast, the microcyte, then

24   come one who comes to repair.  So the pathology --

25   depending on the cell that he sees, he sees the activity.

64

1    So this is the typical case, fracture of the humerus.

2    It's in the process of healing because she saw the healing

3    process.

4                    Okay.   In the head is one big hemorrhage

5    like that.   This injury, she said, it was a different

6    ages -- days -- and so on.   So, she's right, because she's

7    saying in the microscope that she saw hemocyte in

8    pigments.   Maybe it didn't happened in one day.   So we see

9    in the child, injuries of different times.

10                   What we are discussing in my part here, is

11   correlating the clinical part with the brain.   I don't

12   discuss the cause of death.   It is injury, severe injury

13   because they hit her, could be fall, could be blunt

14   trauma.   It was not the shaking of the baby because the

15   hemorrhage is in the skull.   That doesn't produce

16   hemorrhage in the skull.   Okay.   So that was a direct

17   blunt that was hit in the head by something.   She fell

18   from the bed, she fell from the stairs, or she was hit by

19   her mother against the wall.   That's the type of trauma.

20   Not shaking was the trauma.   So that is clear.   That is

21   impossible to deny that this is a severe blunt trauma to

22   produce this hemorrhage, sir.

23        Q    So that could be consistent, Doctor, with

24   striking, shaking or throwing the child?

25        A    No.   Shaking -- shaking itself, no.   If the

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    throat -- for certain I cannot say.  And she didn't say it

2    happen.  It's a blunt trauma.  Could be a fall?  Could be

3    from hitting her -- hitting her with a hammer would

4    produce fracture of the skull.

5        Q    In every case, Doctor?

6        A    No.

7        Q    I mean, if there is evidence that -- you heard

8    the pathologist testify that there were injuries to the

9    ears consistent with somebody being hit across the ears,

10   do you yourself have any -- from reviewing all of the

11   records, and the photographs, and the testimony, do you

12   have an opinion?

13       A    An opinion about what?

14       Q    To contradict that, that the child was hit

15   across the side of the head causing her to hemorrhage in

16   the ears -- in that area?  Do you have any evidence, any

17   medical evidence, or any medical proof or medical opinion

18   that would contradict that?

19       A    I didn't understand your question.

20       Q    Doctor, you sat here during the testimony of

21   Dr. Farley.

22       A    I missed in part --

23       Q    Okay.

24       A    -- and she didn't talk loud.  So the -- if you

25   would be kind to tell me what she said.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1          Q      If I remember correctly, sir, and the jury can

2     understand, Dr. Farley testified that the child had

3     injuries to both sides of her head consistent with

4     somebody either pulling her head or striking her head on

5     the side.   From the photographs that you've seen, would

6     you draw -- would you draw an opinion contrary to that?

7          A      Well, about the hitting on the head like that --

8     hitting on the head?

9          Q      Yes.

10         A      It would have to be an extreme force to produce

11    a hemorrhage.   If she had a fall and hit the ear on the

12    ground and hit the other ear, it was caused by a trauma.

13    But hit by the hand, and produced the hemorrhage and

14    contusion in the ear, could be, but it would have to be

15    very severe.

16         Q      Doctor, is your testimony, again, that this

17    child fell or the injuries were the result of a fall?

18         A      No.

19         Q      That's not your testimony?

20         A      No, no, no.

21         Q      I'm sorry.   I thought that's what you testified

22    to.

23         A      I said it was a blunt trauma that could be

24    produced -- could be produced by a fall, by hitting

25    against the wall, a kind -- that type of trauma.   It's not

1    a shaking baby.  Okay?  So -- but anybody knows how it

2    happened specifically?  So we have a severe injury

3    produced by trauma.  Was not spontaneous.  It was a severe

4    trauma.  Okay?  So that is that part --

5         Q    Doctor, are you familiar with the term optic

6    nerve sheath hemorrhaging?

7         A    Yes, sir.  And I can explain easily and they can

8    see it.

9         Q    What is that, sir?

10        A    The jury can see what is.  You want me to show

11   it to you, sir?  Can I see it?

12        Q    You can show it to the jury.

13                  THE COURT:  Just speak up, Doctor.

14                  THE WITNESS:  I'm sorry?

15                  THE COURT:  Just speak up so Mr. Flores can

16   take it down.

17                  THE WITNESS:  But they have to see the

18   optic nerve --

19                  THE COURT:  That's fine, go ahead. just

20   speak up.

21                  THE WITNESS:  Okay.  This is the skull.

22   They removed the brain.  But you're going to see this

23   thing here.  That's the optic nerve.  That's the optic

24   nerve.  You see it here?  These are the optic nerves.  She

25   removed the brain, and you see blood here around the optic

68

```
 1    nerve.  This is the optic nerve.  (Indicating)  She
 2    removed -- and there's hemorrhages.  You see the
 3    hemorrhage surrounding the nerve.  This is the optic
 4    never.
 5                This is where they removed the brain and
 6    this is the part where the brainstem goes to the cranium.
 7    This is the frontal part.  This is removing the brain, and
 8    this is the optic nerve.  This is blood there.  And that
 9    is blood surrounding the hemorrhage.  (Returns to his
10    seat)
11        Q    (By Mr. Padilla) Doctor, what is the Circle of
12    Zinn?
13        A    What?
14        Q    The Circle of Zinn?  Z-I-N-N?  What is that?
15        A    Circle --
16        Q    Yes, of Zinn.
17        A    Circle of Willis or Circle --
18        Q    Circle of Zinn, Z-I-N-N (Spelling by Attorney)?
19        A    I don't know.
20             MR. KRIPPEL:  Could I approach, Your Honor?
21             THE COURT:  Yes.
22        Q    (By Mr. Padilla) You testified that you were
23    able to view all the attachments to the autopsy, correct?
24        A    (Does not respond)
25        Q    I am going to draw your attention to the last
```

1    sentence of your report.  Would you please read that to
2    yourself?
3         A    (Reads)   The letters are too small.  That I
4    have to:  "A constellation of --
5         Q    If you can read it to yourself, Doctor --
6         A    Oh, okay.
7         Q    -- once you read it, I will ask you some
8    questions about that.
9         A    (Reads).
10        Q    Have you had an opportunity to read that,
11   Doctor?
12        A    Yes, sir.
13        Q    What is the Circle of Zinn?
14        A    A Circle of Zinn is maybe something in the optic
15   nerve.  Something specific in the optic nerve.  It would
16   be a layer of the optic nerve.  But no, I am not
17   ophthalmologist to go into detail of the Circle of Zinn.
18              But the report, if you read the report, it
19   is consistent.  Let me see.  We have this kind of -- I
20   don't want to be disrespectful -- you have this type of --
21   it seems to me like if I have a 100-dollar in the right
22   pocket and one penny in the other, if I am more worried
23   about the penny when I have the one hundred dollars in the
24   other pocket.  This is about a hundred -- or a thousand
25   times more important than the retina.  The retina is a

1    result of the hemorrhage.  So it's part of the big

2    problem.

3        Q    Doctor, what does hemorrhaging to the retina

4    lead to?

5        A    A hemorrhage in the retina cannot kill the

6    patient.  If the patient was shaken, and it produced a

7    hemorrhage in the retina, that means he's not dead.

8        Q    Doctor, isn't it true that retina hemorrhaging

9    is manifestations of non-accidental trauma?  Isn't that

10.  true?

11       A    That is what I was talking about in the

12   beginning, when you shake a baby, the artery produces

13   retinal hemorrhage, and goes through the holes.  But they

14   don't produce hemorrhages in the scalp.  So the -- here I

15   show the optic nerve.  When they shake a baby like that,

16   the brain, it is smaller than the skull.  And shaking of

17   the vein that goes to the sinus, rupture and it starts

18   bleeding.  And there is hemorrhage in the brain that come

19   down to the parietal space and go down to the retina.  So

20   it's not trauma.  It's blunt trauma.  So if a patient is

21   alive and I find -- first, would be grabbing his finger

22   here, but if I find a hemorrhage in the retina and I was

23   suspicious of abuse, that would be enough without any

24   fracture, and without any type of CAT scan, then the

25   patient is alive, then I check through scopic examination

71

```
 1   and find hemorrhage in the retina, that means that the
 2   baby was beatened.
 3        Q    So if you find retinal hemorrhaging on this
 4   child --
 5        A    But he has hemorrhaging in every part of the
 6   body.
 7        Q    Would that be consistent with a beating?
 8        A    It doesn't make sense -- your question.  I don't
 9   understand.
10        Q    If they find retinal bleeding, retinal
11   hemorrhaging in the retina, in the eye --
12        A    Uh-huh.
13        Q    -- would that be consistent?
14        A    Consistent, with what?
15        Q    With the child being struck?
16        A    But we have this --
17        Q    Doctor?  I am asking you, Doctor:  Yes or no, if
18   you have retinal hemorrhaging, would that be consistent
19   with a child being struck?
20        A    Yes.
21        Q    Now, Doctor, I know that -- again, and I'm not
22   trying to belabor the point about the pathology, you were
23   never able to -- you didn't read any of the pathological
24   slides or anything that was provided as a result of the
25   autopsy, correct?
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

72

1    A    Why would it help me to read the pathological --

2    Q    I don't know, Doctor.  You're the doctor.  I'm

3 asking you.  I don't know.  You, as an expert, I want to

4 know:  Did you have an opportunity to review any of the

5 anatomical slides that were prepared for the child Mariah

6 Alvarez.  That's all I'm asking you, sir.  Yes or no?

7    A    Yes or no, what?

8    Q    Yes or no:  Did you review any of the slides?

9    A    I didn't receive the slides.  They were not

10 provided to me.

11    Q    Okay.

12    A    But I don't consider necessary in this case to

13 make this diagnosis.

14    Q    You, yourself, did not have an opportunity to

15 review the actual brain, correct?

16    A    I don't think --

17    Q    Yes or no, Doctor?

18    A    No, sir, I haven't received -- I haven't seen

19 the brain.  I have seen the pictures.

20    Q    And you also -- other than the picture you have

21 there, you didn't examine the eye of Mariah Alvarez, did

22 you?  Yes or no?

23    A    No.

24    Q    And the examination of those items would have

25 helped your opinion, correct?

73

1      A    I don't think that I need anything more to make

2    an opinion.  You have to realize that I have dealt with

3    people living with this type of injury.  I've seen them

4    alive.  This is my life.  That's part of my specialty.

5    Why do I need more than what I have in my hands?  If they

6    die on me -- and she said that clear -- she died because

7    of the brain hemorrhage.  She didn't say microscopic.  She

8    said, very clearly.  It was a very good report.

9      Q    Yes, sir.  And she also said, did she not, that

10   this child was beaten to death?  Do you remember that?

11     A    Well, that's different --

12     Q    Well, did she say that, yes or no?

13     A    I didn't hear when she said that part.  I didn't

14   hear it.  But she said that -- beaten or fallen -- or

15   blunt trauma.

16     Q    No, no.  She specifically stated that the child

17   died from a beating.

18     A    I didn't hear when she said that.

19     Q    Okay, sir.  Doctor, if we go back to the issue

20   of history, a child suffers from brain injuries -- as the

21   ones you've see there on that exhibit there in front of

22   you --

23     A    Yes.

24     Q    -- could the child still be able to eat?

25     A    No.

Adelaido Flores, Jr.
Certified Shorthand Reporter

74

```
 1        Q     Could the child be able to drink?
 2        A     No.
 3        Q     If the child suffered those type of injuries on
 4   a Thursday, could the child on Friday morning have been
 5   able to eat, drink, or talk?
 6        A     If the injuries was on a Thursday?
 7        Q     Yes.
 8        A     And the patient had this hemorrhage?  He would
 9   be drowsy and unresponsive.  You're not to give anything
10   by mouth to a person who cannot swallow it.  It would go
11   to the lungs.  It would be pneumonia.  It would be due to
12   pneumonia.  And they would not be able to swallow.
13              Now, on Friday if this injury happened on
14   Thursday and bled the way it bled, with severe trauma.
15   No, it wasn't drowsy.
16        Q     So --
17        A     -- or, unconsciousness -- I'm sorry.
18        Q     If somebody were to say that the child was fed
19   cereal, Cocoa Krispies on a Friday morning, do you believe
20   that a child in that condition could have had the
21   faculties to be able to swallow, eat, and drink on that
22   morning?
23        A     If the injury happened on Saturday and we had
24   this bleeding, I doubt it.  I doubt it.  I -- I didn't --
25   not at this moment with the eyes closed and since it was
```

1    unresponsive.

2         Q    And you say she also suffered some kind of

3    spasms, is that correct, in her arms?

4         A    No, I didn't say.

5         Q    I apologize.

6         A    I didn't say.  I was informed that she has some

7    kind of like spasms, and that explains what they saw when

8    they removed the brain is that hole where the optic nerve

9    is.  You see?  That's where the brainstem passes.  And

10   that is a report -- that is a report from the -- (Reviews:

11        Q    Doctor --

12        A    Can I read it or it's not necessary?  You don't

13   want me to read it, huh?

14        Q    You can read it, sir.  I will give you an

15   opportunity to read it, if you want to.

16        A    "The frontal temporal structure is externally

17   remarkable for side to side midline shift of the

18   mid-brain."  That's the brainstem.

19        Q    What would that mean to you, Doctor?

20        A    Wait until I finish.  Well, trauma of the

21   cerebral peduncle, in trauma of the brainstem, it was

22   compressed by the edema.  That was the cause of the

23   rigidity, and of coma.  If you're going to be in a coma,

24   nobody is going to be talking.  They're in a coma.  But --

25        Q    Doctor, have you ever in your business, in your

1    practice, excuse me --

2         A    Yes.

3         Q    -- ever studied what -- how much force would be

4    necessary to cause a brain injury?

5         A    No, sir.  That is the history where we exhibit

6    that patient fell.  But to study the fall, an engineer to

7    see the force, at the time of the -- that was -- that's a

8    baby of two years old.  The brain is so sensitive -- very

9    susceptible.  Why don't you put me the example, and I will

10   be glad to answer?

11        Q    Well, no, I just want to know that you have.

12        A    No, no.  What for?

13        Q    You read the report on brain injuries in

14   children, I just wanted to know if you ever did a study to

15   see what type of trauma was necessary to cause the

16   injuries to a child.  And if you have not, I respect that,

17   and I have no problem with that.

18        A    Well, there are two things in medicine -- the

19   book of medicine.  It says history of symptomology.  They

20   don't talk about whether it was three meters, or three

21   yards or whether it was a falling due to gravity.  If you

22   have a boy of 14, and you find out through his history

23   that he fell -- I don't think that there's a grandmother

24   who has seen a child -- or child that fell -- and was

25   worried because of a bump in the head.  So this is a

1    serious injury.  We're talking about -- there is nothing

2    to discuss.  This was a big, serious, blunt trauma to the

3    brain to produce hemorrhage.  It doesn't require to be

4    instinct to see how serious, and to see what killed the

5    baby.  Or, what force it took to put the person against

6    the wall?  That could do it.  Falling from a stair and

7    rolling down stair by stair, could hit -- this is not

8    something like that -- even though, it will kill it, and

9    the shaking, it would not explain the bleeding in the

10   scalp and in the skull.  But this was a severe trauma.

11       Q     Doctor, there is not only a sign or trauma to

12   one area of the head, there are traumas to the entire

13   head -- to the entire brain?

14       A     Yes.

15       Q     You can see that in there.  Isn't that correct?

16       A     Yes, sir.

17       Q     Wouldn't that be more consistent with a child

18   being struck numerous times across the head or would it be

19   more consistent with somebody falling down a set of steps?

20       A     Depends on -- I wish -- I wish I had some

21   clinical information on somebody, but if the baby is

22   rolling down, it could produce different trauma.

23       Q     Doctor, on the photograph --

24             MR. PADILLA:  May I approach, Your Honor?

25             THE COURT:  Yes, sir.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1      Q      (By Mr. Padilla) Would you expect, sir, for that

2  type of trauma to cause at least a welt or some sort of

3  swelling to the exterior portion of the head, if somebody

4  came down and fell a flight of steps?  Would you?

5      A      Sure.

6      Q      And I'm going to draw your attention, sir, to

7  picture number 30.  Would you expect welts or "lumps", as

8  we normally call them, across the head if she had suffered

9  a fall?

10     A      You're referring to these bruises?

11     Q      No, Doctor.  I am asking if there is trauma to

12  the head, sir, where the person -- where the child falls

13  and hits her head on the step, would you expect swelling

14  on the outside of the head?

15     A      If she hit -- wait.  Before hitting the brain

16  you hit the scalp.

17     Q      The skull, the exterior -- we are talking about

18  the exterior portion of the head.  If a child falls and

19  slams her head against the board, would you expect

20  swelling on the outside -- on the skin portion?

21     A      Any bruise produces swelling.

22     Q      Okay.

23     A      Even in the abdomen you produce swelling.

24     Q      If Dr. Farley testified that there was no

25  remarkable swelling on the outside of the head, do you

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    yourself have any medical proof to contradict that?

2         A    (Referring to the Reporter)  Can you tell me

3    what he is asking?

4         Q    I'll say it again, sir.  If Dr. Farley testified

5    that there was no welting or bruising outside of the

6    scalp, measurable, would -- if there was nothing

7    unremarkable other than some abrasions on the head, is

8    that something that you, as a medical doctor, you would

9    look into considering if a child fell down the steps or

10   not?  And I'm just asking you.

11        A    What is this?  There are no bruises on the

12   scalp.

13        Q    They could be caused -- but you've already

14   testified about blunt force trauma, by hitting somebody

15   across the head.  You've already testified to that,

16   haven't you, sir?

17        A    Yes.  This is the bruises --

18        Q    But there is nothing remarkable on the outside

19   of the scalp to show any kind of lumps, welts or something

20   indicative of a child hitting a step.

21        A    How do you explain the bruises here without any

22   trauma outside -- the bruises on the scalp?

23        Q    Let me ask you this.  With reference -- how many

24   children have you treated that have suffered brain

25   injuries as a result of a fall?

1    A    In my life, over 50 years old, you were not born

2  when I started practicing, and there were so few

3  neurosurgeons.  You can imagine how many children I saw.

4  In 50 -- in 52 years of being neurosurgeon, when no

5  neurosurgeon was here in town, how many children -- the

6  population was -- let's say there was about 20,000

7  children in the Brownsville Independent School District.

8  How many children have I seen?  It's a tremendous amount.

9    Q    And, sir, what type of injuries, external

10  injuries would you normally see when a child fell?

11    A    I have seen football injuries, falling from the

12  (Speaks in Spanish:  "columpio" (meaning:  Swings), from

13  the monkey bars parks, and car accidents.

14          I'll never forget one car accident -- I

15  don't like to tell because it impressed me the way the

16  baby died, but it was a car accident.  Saturday and Sunday

17  was the worst day for me for 16 years because the accident

18  happened on the weekend.  So -- and notice that you have

19  seen here children in the back of truck, and they fell.

20  Sometimes it kills three or four children.  You can

21  imagine in the emergency room, but not on the autopsy

22  room.  In the emergency room.

23    Q    Now, when those children fall like that, do you

24  usually see abrasions on the hands, on the knees, or the

25  elbows?

81

1      A     It depends how they turn over.  It was just like

2  one from Mike Tyson.  But this is different.  This is --

3  this is an abused child.  There's no way.  I am not

4  denying that.  I would be very unloyal to my profession,

5  to the jury and to the judge to start lying.  No, because

6  they have different ages, different ages.  It doesn't

7  happen.  And the Doctor said that the fracture didn't --

8  so we're talking about the head injury itself.  That's my

9  role.  And this isn't a blunt accident.  So he fell from

10  the left side, he have hemorrhage on the right.  Well,

11  when he hit the head like that, like that, like that, like

12  that, continuously, I've never seen that.  Probably, the

13  hand would hurt more than that, than a hammer.

14      Q     Have you had an opportunity to view the area of

15  where the child allegedly fell?

16      A     I'm sorry?

17      Q     Have you had an opportunity to see where the

18  child allegedly fell?  Have you seen the area, the steps

19  or the stairs?

20      A     Allegedly fell?

21      Q     Yeah.  There are allegations by the defense that

22  the child fell down some steps.  Have you, yourself, seen

23  those steps to try to verify whether these injuries would

24  be associated with a falling down the steps?

25      A     No.  I'm not a detective.  I have never seen the

1    information, the medical information.  I am not going to

2    see -- even if I see the stairs, how could I say where it

3    happened?  No.  This is -- this is a simple case.

4    Medically, acute brain injury, severe bran injury to kill

5    the baby.

6        Q    Would you classify the bruising on the child to

7    be severe -- being caused by severe trauma?

8        A    Sure.

9        Q    The bite marks to the child's back, that would

10   be a severe injury, would it not?

11       A    I'm sorry, I have difficulty hearing.

12            MR. PADILLA:  May I approach?

13            THE WITNESS:  Can you tell me again?  I'm

14   sorry.

15       Q    (By Mr. Padilla) Well, my question is very

16   simple.  You said that the severe, blunt force trauma to

17   the head.  I was asking you about the biting in general.

18   You would agree with me, would you not, sir, that this

19   child shows signs of severe physical trauma?

20       A    Yes.

21       Q    And that the bite marks would also be consistent

22   with severe trauma to the upper right shoulder, correct?

23       A    The bite?

24       Q    Yes.

25       A    It's not a kiss.  It's not -- it's not

83

1    manifestation of love.  This is a trauma.  It is sad to

2    see that.  It is sad to see that.

3        Q    Doctor, you were retained by the defense, right,

4    to testify here today?  By Mr. Gilman, you were retained

5    by him?

6        A    Yes, sir.

7        Q    And what amount of money or fees, if any, are

8    you being paid for your testimony here today?

9        A    That's the only thing I haven't discussed with

10   him.  You will believe me, but I -- that is the only thing

11   I haven't discussed with him.  He said that he was going

12   to send me $2,500.

13       Q    Are there any additional fees that you are going

14   to be charging Mr. Gilman?

15       A    What?

16       Q    Is that the extent of your --

17       A    To review the case, talk to him and study and

18   suffer these hours in this area, that is the only thing.

19       Q    Okay.  Are you charging for the length of time

20   that you are testifying to here today?

21       A    I don't think so.  I think that the way I

22   understand this, it is more the kind of government who

23   pays the thing.  I don't know.  But if it was the

24   government then I wouldn't charge, because it's more.

25   Usually, I charge more just for the presentation here.

84

```
1   But if it's judicial, we have a limit as to the amount of
2   money.
3        Q    Cameron County is paying you, correct?
4        A    Huh?
5        Q    Cameron County is paying you?
6        A    I understand that it is the judicial system,
7   because for two reasons.  First, it's not fair.  I work
8   the year voluntarily, in the clinic every Monday.  That's
9   like about $600 a day for six years, every Monday.  So I
10  didn't charge a penny.  But one thing is important because
11  autopsy is what made me be a doctor.  And when I see the
12  judicial system, the only one who does autopsies in the
13  Rio Grande Valley -- and we are learning.  And this is
14  justice and fair because of the order of the autopsy that
15  the judges should respect.  Because otherwise, there
16  wouldn't be an autopsy.
17             There is a kind of -- autopsy was my
18  teacher, and I have respect to them.  That is the way I
19  was trained in the old times.  We didn't have anything.
20             THE COURT:  Anything else, Mr. Padilla?
21             MR. PADILLA:  One more question, Your
22  Honor.  The -- I will pass the witness, Your Honor.
23             THE COURT:  Mr. Gilman?
24
25
```

**REDIRECT EXAMINATION**

BY MR. GILMAN:

Q    Dr. Kuri, you are part of the American College
of Forensic Examiners, are you not?

A    I am not -- I have some diploma, but I didn't
use it.  I don't want to be "point one percent" considered
in forensic.  I tried to study more for my practice in my
field of neurosurgery.  So that -- but I brought this
paper to show that I am talking as a neurosurgeon, with
experience in neuropathology.  And when I took the paper I
filled the curriculum, and everything.  I felt like a pen
without ink.  So that means nothing.  What I have here is
here, in my brain.

Q    And you are part of the American Board of
Forensic Medicine, also?

A    Yes.

Q    I realize that you don't want to --

A    No.  That's just a paper.

Q    These are marked and are put into evidence.

A    These are marked.

MR. GILMAN:  And we would submit them.

THE COURT:  Yes, sir.  They're admitted
into evidence.

THE WITNESS:  This is the first time that I
use it since I've talked to you.

86

1    Q    These are in evidence now, sir.  Okay?

2    A    Okay.  But -- it's nothing.

3    Q    Okay.  What is the big difference between

4    pathology and what you do?

5    A    Well, what I do, I work in the pathology.  Brain

6    tumor is pathology.  Blood clot is pathology.  "Patho"

7    means disease and "logy" is the Greek term of pathology.

8    What we are facing here is autopsy.  The necropsy, that is

9    what we call the word necropsy autopsy, is when they are

10   dead, and they remove everything.

11              But what I do, for instance, supposedly

12   like you saw here, the whole brain, they open the scalp

13   this way and expose the scalp.  In the old times, before

14   we cut the skin, I didn't see the injury, and this type of

15   incision, we did it in life.  We took the scalp and

16   removed bone -- the big part of the bone out, the other

17   part of the bone out, to open the dura to let the brain

18   expand.  And the bone, the flap of bone, where do we keep

19   it?  We did an incision here and under the skin because

20   steady and suture.  So when the brain was reduced, we put

21   the bone back again.  So it's like a partial autopsy.  It

22   was depressive to see -- to do it -- I did it on children

23   because they expand very fast.  The edema -- that part of

24   body I preserved it.  But I removed this part totally and

25   this part totally.  And then open the dura like here, and

87

1    to let the brain expand like that here.  See right here,

2    you open and then this swollen thing expand to give

3    room -- because of the lack of room that kills the

4    patient.  The brain tries to go out and do pressure like

5    he said here in the peduncle.  And also he said

6    microscopically, petechia.  There is more hemorrhaging in

7    the brainstem.  That's the cause of death.

8         Q    And your testimony here today is, again, only

9    from the pathology report that I gave you and the

10   deposition of Dr. Farley that I gave you?

11        A    And the pictures.

12        Q    And the pictures.  And your testimony,

13   basically, is that the falling down the stairs is

14   consistent with -- just as consistent with the cause of

15   death of this child as what the State is trying to suggest

16   as the beating?

17        A    Well, we received a patient -- a body that have

18   a severe head injury.  It was not caused by a simple

19   force.  It was caused by a serious force.  So what type of

20   serious force?  But she -- the mother hit her against the

21   wall or somebody else?  I am not saying the mother.  But

22   any person that would have caused her, okay, or fell,

23   that's trauma.  See?  There's trauma on the head.  What

24   produced it?  I don't know.  I don't think -- in the head,

25   it is specific.  There is no doubt that she died because

88

1    of the hemorrhage that was produced by the trauma.  Now,

2    if you ask me the question:  Which would be the type of

3    trauma?  So, if she fell from the stairs and rolling, if

4    that's how she died?  That could be one.  Hitting against

5    the board?  Yes.  Hit by a strong force?  Too.  It could

6    be.

7                    MR. GILMAN:  Okay.  Nothing further, Judge.

8        Q    One question, Doctor.  You are not testifying

9    that this child died as a result of falling down the

10   stairs, are you?

11       A    I'm sorry?

12       Q    You are not testifying here today that this

13   child died because she fell down a set of stairs, are you?

14       A    I don't know exactly what hit her, but the fall

15   of the stairs is -- in a child, is serious.  It's a

16   serious trauma, and maybe your paper mentioned that it was

17   one of the causes, fell from the second floor.  Sometimes

18   they leave the door -- the door opened unfortunately, when

19   they come back, the mother, the baby is on the floor dead

20   or injured.

21       Q    And you saw the report that only 2.4 children

22   die out of 100 as a result of that fall?

23                    MR. GILMAN:  Objection, Judge.  He's

24   quoting from -- again, from a report that is not in

25   evidence.

1          THE COURT:  I understand.  I'm going to go
2    ahead and overrule the objection.  Go ahead.
3          MR. GILMAN:  Note my exception.
4          THE COURT:  I'll note your exception.
5    Let's wind it up.
6    Q     (By Mr. Padilla) Doctor, again, the report
7    indicated that only 2.4 children of 100 -- or the average
8    of 2.4 out of 100 died as a result of a fall more than
9    15 feet.  You yourself don't have sufficient knowledge
10   concerning the falls of children, correct, to contradict
11   that?
12   A     I didn't question -- in a very nice way to use
13   of the English, you put me in a situation, you know --
14   (laughing)
15   Q     Doctor, I will make it simple.
16   A     If somebody makes a study after the CAT scan in
17   '75 -- and before '75 -- the CAT scan was done in three
18   minutes.  In the old time, 30 minutes to make a better
19   hole just to see a hemorrhage.  Just the exploration took
20   me two or three hours.  So if somebody made a study, the
21   early diagnosis -- they go to the emergency room and
22   immediately do the CAT scan, and see the hemorrhage, and
23   it operates exactly, how can you compare the study from
24   the last ten years with advanced respiratory therapy,
25   blood, expansion, and keeping the temperature right, hyper

90

```
 1    oxygenation and everything else to reduce the edema, where

 2    40 years ago we didn't have studies?  There are study who

 3    has a group of people, who have selected a part -- and it

 4    must be a good article to be written up -- but it doesn't

 5    say anything there talking about the experience.  But less

 6    people have died since we have had the CAT scan.  When I

 7    go -- right now when they call me from the emergency room,

 8    the doctor call me when I have a head injury, when I go

 9    there, they already have the CAT scan.  Twenty-two people

10    see -- or 20 people see --

11        Q    Is it your testimony, Doctor, that if this child

12    had been taken to the hospital to be treated after the

13    injury, they could have used a CAT scan and you could have

14    saved this child?

15        A    Well, that is the reason to be -- save the

16    child?  I don't know.  But if the patient is fatal, and is

17    immediately taken to the hospital has a better chance

18    because there is no swelling.  You can do an operation and

19    remove the blood clot.  So, he has a better chance.  But

20    it is like breast cancer.  The early diagnosis is the

21    right one.  So if everything done, like when they do the

22    colonoscopy.  It's done early.  You look for the early

23    diagnosis, before you reach the symptom of nothing.

24        Q    You will agree, Doctor, that if the child had

25    been taken for medical treatment, there is a better chance
```

1    for her surviving rather than letting her die then.   Is

2    that correct?

3         A    Well, of course.   That is -- there is no way to

4    deny that the patient -- any person who is in -- anybody

5    that has any kind of infection, cancer, heart attack,

6    everything has to do with time.   I wish my patients would

7    come when they have symptoms before having severe problem.

8                   MR. PADILLA:   Pass the witness.

9                   THE COURT:   Mr. Gilman, anything further?

10                  MR. GILMAN:   Nothing further.

11                  THE COURT:   May this witness be excused?

12                  MR. GILMAN:   Yes, Your Honor.

13                  THE COURT:   Dr. Kuri, thank you very much.

14   You may be excused, sir.

15                  (Witness excused at 12:00 p.m.)

16                  THE COURT:   We will break for lunch now.

17   Be back to start up at 1:30.

18                  (Lunch recess taken.)

19                  **(Jury not present.)**

20                  THE COURT:   State of Texas versus Melissa

21   Elizabeth Lucio.   Let the record reflect that the

22   defendant is present along with defense counsel.

23                  Mr. Gilman, you said before proceeding

24   further you wanted to take up some legal matters.

25                  MR. GILMAN:   Yes, sir.   I don't know if the

92

1   Court is aware, but during the testimony this morning,

2   there were facial remarks of Your Honor during the

3   testimony.  And those facial remarks conveyed things, even

4   though maybe you had no intentions of conveying things to

5   the jury, and I just am bringing this to the Court's

6   attention because I would like the Court to try and

7   refrain from making any facial gestures during the time of

8   the testimony.  If the Court is pleased or humorous of

9   something that somebody might have said, I wish the Court

10  would take that up after the jury is out.

11              THE COURT:  I made no conscious facial

12  remarks for any specific purpose.  But I will try and

13  refrain from reacting in any way, either positively or

14  negatively, as I have in the past.  And any time counsel

15  wants to make a standing bill on any of this, you are more

16  than welcome to.

17              MR. GILMAN:  Like I said, I don't know if

18  the Court is aware that the Court is doing it.  But I am

19  bringing it to the Court's attention.

20              THE COURT:  I was not.

21              MR. GILMAN:  That's all I have, Your Honor.

22              THE COURT:  Anything else?

23              MR. PADILLA:  Your Honor, from my personal

24  knowledge, I was not aware of any facial gestures.  I will

25  rely on Mr. Gilman's representations.

1      THE COURT:  Bring the jury in.

2      THE BAILIFF:  All rise for the jury.

3      (Jury enters at 1:27 p.m.)

4      THE COURT:  You may be seated.  Thank you

5  very much.  Mr. Gilman, who is your next witness?

6      MR. GILMAN:  We call Sonia Chavez.

7      THE COURT:  Sonia Chavez, will you please

8  stand and raise your right hand.

9      (Witness sworn)

10      THE WITNESS:  Yes, sir.

11      THE COURT:  Please be seated.

12      MR. GILMAN:  May I proceed?

13      THE COURT:  Yes, sir.

14          **SONIA V. CHAVEZ,**

15   having been first duly sworn, testified as follows:

16          **DIRECT EXAMINATION**

17  **BY MR. GILMAN:**

18      Q    Would you please state your name for the jury,

19  please, ma'am?

20      A    Sonia Valencia Chavez.

21      Q    Ms. Chavez, are you a resident of Harlingen,

22  Cameron County, Texas?

23      A    Yes, sir.

24      Q    And do you know Melissa Lucio seated here to my

25  far right?

```
 1        A     Yes, sir.

 2        Q     Are you related to her?

 3        A     Yes, sir.

 4        Q     And what is that relationship?

 5        A     She's my sister.

 6        Q     And is she your older sister?

 7        A     She's my oldest sister, yes, sir.

 8        Q     And do you have -- have you had occasion to be

 9   with your sister in the past, you meaning your family and

10   her family?

11        A     Yes.

12        Q     And can you tell this jury the relationship that

13   you've observed your sister having with her family?  Is

14   that a good relationship or a bad relationship?

15        A     It was a bad relationship.

16        Q     Could you describe how your sister would

17   interact with her children?

18        A     She never disciplined her children.  I can

19   recall numerous occasions, as my daughter was growing up

20   with her older children, that her children were very

21   aggressive towards my daughter.  And Melissa, she never

22   disciplined her kids.  And she just would state:  Behave,

23   Johnny.  Sit down, Daniella.  I am going to spank you.

24   Her kids would always hit my daughter.  They would push

25   her.  They would shove her.
```

```
 1            And sometimes I would get aggressive
 2    towards my daughter because Melissa wouldn't.  I -- I
 3    would get upset because she wouldn't discipline her kids.
 4    So, I guess, I would take it out on my daughter.  And I
 5    would spank my daughter to see if Melissa would snap and
 6    say, okay, I need to discipline my kids.
 7            But she never would.  She never did.  And I
 8    would spank my daughter.  And she would never.  She never
 9    disciplined her kids.  Just say:  Behave, sit down, I'm
10    going to spank.  She never did.  They were just words.
11    And that was upsetting because my daughter was getting
12    hit.  She was getting shoved, and she was getting pushed.
13    And she wouldn't do anything.  She wouldn't do anything.
14    She would just tell them:  Sit down.  Behave.  Don't do
15    that.  She never disciplined them.
16       Q     Did this lack of discipline on Melissa's part
17    lead you to not have very many family gatherings including
18    with Melissa's family?
19       A     Yes, it did.  It did.
20       Q     As a child growing up, Melissa was the oldest?
21       A     Melissa was the oldest.
22       Q     And did you have any other sisters?
23       A     I have a younger sister.
24       Q     And did you and Melissa ever fight as kids
25    growing up?
```

96

1     A     Yes, we did.   But, once again, I -- I would push
2  Melissa.   I would shove Melissa.   I would bite Melissa.   I
3  would pull her hair.   She never shoved back.   She never
4  pulled my hair.   My youngest sister would defend her.   I
5  would grab whatever, a shoe, and I'd smack her on the
6  head.   And she never hit me.   Diana, my sister, was the
7  one that would intervene to protect her.   She was the
8  oldest.   She would never hit us.   She never fought with
9  us.   We argued a lot.   We fought over the phone.   We
10  fought -- like for -- belongings.   But Melissa never
11  physically hit us.
12     Q     Have you ever known your sister to be an
13  aggressive type of person?
14     A     Never.
15     Q     Now, there was testimony here earlier about a
16  telephone conversation that Melissa had with one of her
17  sisters.   Was that sister you?
18     A     Yes, sir.
19     Q     Right after she was taken by the police
20  department?
21     A     Yes, sir.
22     Q     Do you remember or can you tell this jury what
23  you remember of that conversation on the telephone?
24     A     I remember Melissa called.   She said she was on
25  her way.   They were taking her to Olimito.   She was going

1    to -- they were taking her to a dentist, her and Robert,

2    and that at this moment that the police was going to both

3    residences where she lived and where she previously had

4    moved from, and that they were looking for blood.  And she

5    said:  They are not going to find any blood.  And I said:

6    What happened?  And she said:  I don't know, Sonia.  I

7    don't know what happened.

8                  She's like:  I would spank the kids.  And I

9    went:  No, Melissa, you would never spank the kids.  She's

10   like:  Yes, I would spank them.  And I'm like:  No, you

11   never spank the kids.  She never spank the kids.  She's

12   like:  Yes, Sonia.  At the end, I would spank the kids.

13   No.  She's like no -- I said:  No, she never spanked the

14   kids.  And then she said:  They are trying to charge me,

15   but Robert would never spank the kids.  That was --

16        Q    And that was your conversation?

17        A    Excuse me?

18        Q    And that was your conversation?

19        A    That was our conversation.

20        Q    You don't ever remember ever saying -- or

21   Melissa saying:  It wasn't Robert that did it, it was me

22   that did it?

23        A    No, sir.

24        Q    That was never said?

25        A    That was never said.  No, sir.

98

```
 1        Q    I have here what is marked as Defendant's
 2   Exhibit No. 6.  Do you recognize that?
 3        A    Yes.
 4        Q    And here's Defendant's Exhibit No. 7.  Do you
 5   recognize that?
 6        A    Yes.
 7        Q    And here is eight.  Do you recognize that?
 8        A    Yes.
 9        Q    Here is Defendant's Exhibit 9.  Do you recognize
10   that?
11        A    Yes, sir.
12        Q    Here's ten.  Do you recognize that?
13        A    Yes.
14        Q    And here's 11.  Do you recognize that?
15        A    Yes, sir.
16        Q    And 12, do you recognize that?
17        A    Yes.
18        Q    Are these photos that you were able to gather
19   and accumulate for me at my request?
20        A    Yes, sir.
21             MR. PADILLA:  (Reviews).
22             MR. GILMAN:  I would like to introduce
23   these into evidence, Judge, as 6 through 12.
24             MR. PADILLA:  No objections.
25             THE COURT:  Pardon me?
```

99

```
 1                    MR. PADILLA:  No objections, Your Honor.
 2                    THE COURT:  Eight through 12?
 3                    MR. GILMAN:  Six through 12.
 4                    THE COURT:  Six though 12?  I'm sorry.
 5                    (Defendant's Exhibits 6-12 admitted)
 6          Q    (By Mr. Gilman) And what is six?
 7          A    That's Melissa with my grandma.
 8          Q    Okay.  And seven?
 9          A    That's my dad with Melissa.
10          Q    And eight?
11          A    That's at Melissa's wedding date.
12          Q    When she married Mr. Lucio?
13          A    Yes.
14          Q    And nine?
15          A    That's my grandmother and Melissa.
16          Q    And ten?
17          A    Those are my grandparents and Melissa, my
18   sister, dad and myself and my brother and cousin.
19          Q    Okay.  And 11?
20          A    That's Melissa, dad and myself.
21          Q    The three of you sisters?
22          A    The three of us, uh-huh.
23          Q    Okay.  And 12?
24          A    That's Melissa.
25          Q    As a little girl?
```

100

1      A      She was a year old.

2                    MR. GILMAN:  May I publish these to the

3      jury?

4                    THE COURT:  Yes, sir.

5                    MR. GILMAN:   I pass the witness, Your

6      Honor.

7                    THE COURT:  Mr. Padilla?

8                         **CROSS-EXAMINATION**

9      **BY MR. PADILLA:**

10      Q      Ms. Chavez, I will be asking you certain

11     questions.  Sometimes I mumble.  If you don't understand

12     the question, please let me know so I can rephrase it, and

13     I will try to make it a little bit clearer, okay?

14      A      Yes, sir.

15      Q      Now, you have not provided a registration with

16     the police between law enforcement agency concerning what

17     you testified to today; is that correct?

18      A      Correct.

19      Q      Okay.  And you testified that your sister would

20     not discipline the children, correct?

21      A      Correct.

22      Q      Let me ask you.  Were you familiar with Mariah

23     Alvarez?

24      A      No, sir.

25      Q      Okay.  And Mariah Alvarez was removed from your

101

```
 1    sister, correct?  Did you know about that?
 2        A    Correct.  Yes, sir.
 3        Q    And the child -- do you recall when the child
 4    was returned to your sister?
 5        A    Yes, sir.
 6        Q    When was that?
 7        A    November of 2006.
 8        Q    And from November of 2006 to February of 2007,
 9    did you have an opportunity to see the child Mariah
10    Alvarez?
11        A    Yes, sir.
12        Q    On how many occasions?
13        A    I saw her on three occasions.
14        Q    And what were the dates, ma'am?
15        A    It was Thanksgiving.  I don't know the exact
16    date, but it was Thanksgiving of 2006.
17        Q    Uh-huh.
18        A    It was 2006, December of 2006, and New Year's
19    Day on 2007.
20        Q    Okay.  And what was the condition of the child
21    when you saw her on those three occasions?
22        A    She looked healthy.
23                 MR. PADILLA:  May I approach the witness,
24    Your Honor?
25                 THE COURT:  Yes, sir.
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

102

```
 1        Q    (By Mr. Padilla) Is the Mariah Alvarez, who's
 2   here, the same child we're talking about?
 3        A    No.
 4        Q    That's not her?
 5        A    (Shaking head in the negative form).
 6        Q    Okay.
 7        A    Excuse me?
 8        Q    Is that Mariah Alvarez?  Let me give you a
 9   better picture, ma'am.  I will show you Defendant's
10   Exhibit No. 30.  Is that Mariah Alvarez?
11        A    Yes.
12        Q    Okay.  When you saw the child, ma'am, back in
13   November, December and January, did you see all of the
14   bruisings and all the markings on this child?
15        A    No, sir.
16        Q    Okay.  How was the child dressed when you saw
17   her?
18        A    Excuse me?
19        Q    How was the child dressed when you saw her?  How
20   was the child dressed?
21        A    Dressed?
22        Q    Yes.
23        A    It was cold.  She was wearing pants, a shirt --
24        Q    Okay.
25        A    -- a jacket.
```

```
 1        Q     And what was the child's demeanor?

 2        A     What was her what?

 3        Q     How was she acting?

 4        A     She was quiet and --

 5        Q     Okay.

 6        A     As I remember Thanksgiving, there's a bedroom in

 7   my mom's room that we usually put video games if it was

 8   cold or it was raining.  And we put the Nintendo and

 9   that's where we put the kids to play.  And I remember

10   Mariah, Sara and Adriana in that room with the other boys

11   and my son.  And the boys liked to wrestle a lot.

12        Q     Okay.

13        A     They would hit each other, punch each other.  I

14   recall that time there was a lot of racket in that room.

15        Q     Let me ask you this.  Did you ever see the boys

16   strike Mariah?  Did you see them strike Mariah?

17        A     No, I didn't.

18        Q     Okay.  Did Mariah ever complain to you or to

19   Mrs. Lucio that she had been struck by her brothers?

20        A     No.

21        Q     Okay.  Did the child ever come out of that room

22   crying saying that she had been assaulted, injured or

23   anything happened to her?

24        A     Can I get back to what I was saying?

25        Q     No, no.  I'm asking you a question.  Did the
```

104

```
 1    child ever come to you and tell you or complain that she
 2    had been assaulted, hit or injured?
 3         A    No.
 4         Q    Okay.  And in December then -- more or less what
 5    part of December did you have contact with the child?
 6         A    Like the second week of December.
 7         Q    And where did you have contact with the child?
 8         A    At my mother's house.
 9         Q    Again, at that point what did the child look
10    like?
11         A    She looked okay.
12         Q    She looked okay?  Okay.  Again, at that time did
13    the child complain to you about any pain or anything that
14    was going on with her?
15         A    No.  She's two.
16         Q    Okay.  Well, did you see any kind of bruisings
17    or markings on the child that would indicate that maybe
18    the child was being abused?
19         A    No.
20         Q    Okay.  Did you discuss at all -- have any
21    conversation with your sister Melissa concerning the
22    child, Mariah Alvarez?
23         A    No.
24         Q    Did you know her to be a child that misbehaved?
25         A    No.
```

105

```
 1        Q     Did your sister at any time express frustration
 2   with the child Mariah Alvarez?
 3        A     No.
 4        Q     Okay.  So in January you say you met again on
 5   New Year's Eve?
 6        A     New Year's Day.
 7        Q     New Year's Day.  Okay.  What was the condition
 8   of Mariah Alvarez then?
 9        A     She was asleep.
10        Q     Okay.  And where was she asleep at?
11        A     On the sofa.
12        Q     At whose house?
13        A     At my mother's house.
14        Q     Okay.  Again, did the child make any
15   conversations with you or to anybody that you know of?
16        A     No.
17        Q     Did you see any bruises on the child?
18        A     No.  She was asleep.
19        Q     I mean, how close did you get to the child,
20   ma'am?
21        A     She was in the dining room sofa and I was in the
22   kitchen.
23        Q     She was asleep the whole time that you were
24   there?
25        A     Yes.
```

106

```
 1        Q    How long a period of time were you there?

 2        A    I wasn't there for more than hour.  Less than an

 3   hour.

 4        Q    Well, how was the child dressed like?

 5        A    She was wearing pants and a blouse.

 6        Q    So it's your testimony that all of this time you

 7   never saw any signs of physical abuse of the child,

 8   correct?

 9        A    Correct.

10        Q    Okay.  Now, getting back to the conversation

11   that you had concerning Mrs. Lucio's statement to you, I

12   mean, did you know at the time -- or do you know that by

13   that time, she had already confessed to causing all of the

14   injuries to the child when she called you?

15        A    I saw it in the news.  I am trying to frame

16   time.

17        Q    Well, you know, you're alleging that she told

18   you something to the effect that:  All I did was spank the

19   child, and Robert spanked the child, too.

20        A    The children.

21        Q    The children.  Okay.  Well --

22                  MR. PADILLA:  May I approach again, Your

23   Honor?

24                  THE COURT:  Yes.

25        Q    (By Mr. Padilla) You would agree, would you not,
```

107

1   ma'am that looking at pictures numbers 31 and 32 and

2   number 24 shows a lot more than just spanking, would it

3   not?

4        A    It does.

5        Q    So when she called you -- as you testified --

6   she told you that all she did was spank the child.  But

7   the evidence in those pictures doesn't reflect that, does

8   it?

9        A    No.

10        Q    It's a lot more than spanking, isn't it?

11        A    Yes.

12        Q    It sure as heck looks like child abuse, does it

13   not?

14        A    Yes.

15        Q    Okay.  After Mrs. Lucio was arrested, when did

16   you have contact with her next?

17        A    I think on Monday.

18        Q    On the Monday after?

19        A    The Monday after.

20        Q    At any time did you feel maybe compelled to go

21   down to the police department and give them a statement

22   concerning what you allegedly heard your sister telling

23   you?

24        A    No.

25        Q    Why not?

108

```
 1        A     I don't know.
 2        Q     Well, I mean, you knew she had been charged with
 3    murder -- capital murder, correct?
 4        A     Correct.
 5        Q     You never took it upon yourself at that time to
 6    say:  You know what, I need to call the police, I need to
 7    tell somebody of what my sister told me, did you?
 8        A     No.
 9        Q     Why not?
10        A     I don't know.  It just didn't cross my mind.
11    That was --
12        Q     I mean, you had evidence, did you not, at that
13    point that your sister was merely alleging that she had
14    spanked the child?  You didn't think that was important to
15    call the police?
16        A     Well, she did make a phone call.  So I'm
17    assuming you record everything.
18        Q     We are not assuming anything, ma'am.  I'm asking
19    what you did in relation to that phone call, okay?  You
20    had information that allegedly, you know, she had only
21    stated that she had spanked the child only, but you didn't
22    think that was important enough to go to the police
23    department and discuss that with them?
24        A     I don't know the law.  Whatever statements she
25    made, I don't know what she stated or what happened.
```

109

```
1        Q    Well, did she confess to beating up the child?

2        A    She didn't confess to beating up the child.

3        Q    She didn't?

4        A    No.

5        Q    Have you seen the confession?  Have you seen the

6   confession?

7        A    Okay -- the phone call she made to me, she

8   didn't confess.  She admitted to spanking the children.

9        Q    Okay.  So she didn't -- she didn't say something

10  to the effect:  Well, I don't know why they are blaming

11  Robert, I am the one that did it?

12       A    She didn't say:  I did it.  She said:  I would

13  spank the kids.

14       Q    But it's your testimony that she never did?

15       A    She never spanked the kids.

16       Q    Okay.  Was she a loving mother?

17       A    To me she was a loving mother.

18       Q    Okay.  Did Mrs. Lucio tell you that she would

19  pinch the child's private parts?

20       A    No.

21       Q    Did she ever tell you that she would strike the

22  child in the abdomen on numerous occasions?

23       A    No.

24       Q    Did she ever tell you about the bruises that

25  were inflicted on that child, that she had performed on
```

110

```
 1    her?
 2         A    No.
 3         Q    Well, how close are you to your sister, ma'am?
 4         A    I'm very close to my sister.
 5         Q    You're very close to your sister?
 6         A    Yes.
 7         Q    Okay.  You testified that Melissa had a bad
 8    relationship with whom?
 9         A    With Robert.
10         Q    With Robert?  Okay.  I mean, you are not
11    testifying here today that Robert inflicted those injuries
12    on the child, are you?
13         A    I don't know who did.
14         Q    Okay.  And she wasn't -- you say she never
15    disciplined the children; is that correct?
16         A    Correct.
17         Q    You never saw her lay a hand on the children,
18    correct?
19         A    Excuse me?
20         Q    You never saw her lay a hand on the children?
21         A    No.
22         Q    Now, ma'am, isn't it true that the only reason
23    you are here to testify is in an effort to help your
24    sister, correct?
25         A    No.
```

111

```
 1        Q     No?   When is the first time that you spoke to
 2   the defense attorneys in this case?
 3        A     November of 2007.
 4        Q     So it's your testimony under oath, ma'am, that
 5   as of November of 2007 Mr. Gilman and Mr. Cordova were
 6   representing the defendant Melissa Lucio?
 7        A     Can you repeat the question?
 8        Q     Yes, I can.   Is it your testimony under oath
 9   that as of November of 2007 Mrs. Lucio was being
10   represented by Mr. Gilman and also by Mr. Cordova?
11        A     Correct.
12        Q     Did you provide them a written statement?
13        A     No.
14        Q     Isn't it true, ma'am, the only reason that you
15   are here to testify today is you don't want to see your
16   sister convicted?   Isn't it true?
17        A     Yes.
18             MR. PADILLA:   Pass the witness, Your Honor.
19                     REDIRECT EXAMINATION
20   BY MR. GILMAN:
21        Q     Ms. Chavez, have you seen the way Melissa's
22   children react with their other siblings and your
23   children?
24        A     Yes.
25        Q     Did they physically abuse one another?
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

112

```
 1        A     Yes, sir, they did.

 2        Q     Did they cause bumps and bruises to one another?

 3        A     Yes, sir, they did.

 4        Q     Have you been aware of the -- Melissa's children

 5   bruising, the younger ones, the younger children?

 6        A     No, sir.

 7        Q     Did you ever see the results of some of that

 8   physical play that the wrestling children would bring

 9   about in the way of crying of the younger ones?

10        A     Yes, sir.

11        Q     Would they cry to their mother or cry to

12   somebody --

13        A     Yes, sir.

14        Q     -- about their older brother or sister hurting

15   them?

16        A     Yes, sir.

17        Q     Did that happen on more than one occasion in

18   front of you?

19        A     All the time.

20        Q     In those three times when you -- well, actually

21   two times that you saw Mariah, did you ever see Mariah

22   crying because of rough play that Melissa's other children

23   would bear upon her?

24        A     Yes, sir.

25        Q     Was that done in November or Thanksgiving and
```

113

```
1    then again in December?

2         A    November.

3         Q    November.

4         A    Thanksgiving of 2006.

5         Q    Okay.  What would happen if you told Melissa to

6    discipline her children --

7         A    She would yell --

8         Q    -- or did you ever tell Melissa to discipline

9    her children?

10        A    No.  I thought it.  I would get angry because

11   she wouldn't.

12        Q    Would you say anything to her?

13        A    I wouldn't say anything to her, but I'd show it

14   by being angry, by being angry at my daughter, by spanking

15   my daughter, by spanking my son when her kids would shove

16   and kick and punch my children.

17        Q    In hopes that she would understand?

18        A    In hopes that she would understand and

19   discipline her kids, to spank them and tell them:  No,

20   that's not right, you shouldn't do that.  She wouldn't.

21   She never did.  She would not discipline.  She never

22   disciplined.  She yelled a lot, but she never disciplined.

23              MR. GILMAN:  Pass the witness.

24

25
```

114

1                    **RECROSS-EXAMINATION**

2     **BY MR. PADILLA:**

3         Q    Ma'am, let me get something straight here.  When

4     did the child Mariah Alvarez complain to you about being

5     assaulted?

6         A    She didn't complain to me about being assaulted.

7         Q    Okay.  Well, you said you talked to her and that

8     she had been the subject of rough play or whatever?

9         A    I didn't say she talked to me.

10        Q    Okay.  Well, what, if anything, did you do,

11    ma'am, to attempt to protect Mariah?

12        A    I took her out of that room, sir.

13        Q    You took her out of that room?  Which room was

14    that?  Where all the --

15        A    One of the bedrooms where -- yes, I took out the

16    three little girls.

17        Q    And at that point did you call the police

18    department --

19        A    No.

20        Q    -- Child Protective Services or anybody else --

21        A    No.

22        Q    -- to intervene on behalf of the child?

23        A    No.

24        Q    Other than "taking them out of the room," what

25    else, if anything, did you do in an effort to allegedly

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    protect these children?

2        A    I intervened by telling them to stop fighting

3    the way they were fighting, to stop choking each other the

4    way they were choking each other.

5        Q    It's not your testimony, ma'am, that those

6    injuries there that you are looking at in those pictures

7    in front of you were caused by the other children, is it?

8        A    It's possible.

9        Q    Very possible, huh?

10       A    It's very possible.

11       Q    Very possible.  So if the defendant, your sister

12   testified that she did all of the injuries to her, with

13   the exception of a scratch on her face, and a foot, is it

14   also just as possible that Melissa Lucio is the person

15   that inflicted all of the injuries on that child?

16       A    No.

17       Q    That's not possible?

18       A    (Shaking head in the negative form).

19              MR. PADILLA:  May I approach, Your Honor?

20       Q    (By Mr. Padilla) It's not possible?

21       A    Not the way I know my sister.

22       Q    Because she is your sister, is that why it is

23   not possible?

24       A    No, because that's not who Melissa was.  That's

25   not how Melissa would discipline her children.

116

```
 1      Q    Well, let me ask you this.  You knew that
 2   Melissa -- that Melissa's children went to school,
 3   correct?
 4      A    Yes.
 5      Q    Okay.  You also knew that the two oldest ones --
 6   or the two youngest ones above Mariah were in half day
 7   schools, correct?
 8      A    Yes.
 9      Q    Okay.  And the children, to your knowledge,
10   would leave at 11:00 o'clock in the morning.  Correct?
11      A    Yes, sir.
12      Q    And returned back about 2:30 or 3:30, correct?
13      A    Yes, sir.
14      Q    Okay.  So who during the day would have more of
15   a one-to-one contact with this child than your sister?
16      A    I don't know.
17      Q    Well, did you ever visit her while she was there
18   with the child alone in the house?
19      A    I worked.
20      Q    You worked?  Okay.  So you didn't have any
21   contact with Mariah and Melissa when they were at their
22   house, correct?
23      A    Correct.
24      Q    You said that your sister is a very loving
25   person?
```

117

```
 1        A     Yes.
 2        Q     Would it surprise you to learn that when the
 3   child died that she made no effort to attempt to
 4   resuscitate this child?
 5        A     Would it surprise me?
 6        Q     Yes.
 7        A     No.
 8        Q     No?   Okay.   Would it surprise you that she never
 9   made contact with EMS in an effort to ascertain or to
10   explain the child's condition to the EMS technicians?
11        A     No.
12        Q     Why wouldn't it surprise you?
13        A     Because she loved her children.
14        Q     Well, I mean, if you are not attempting to
15   resuscitate your child, is that an act of love?
16        A     No.
17        Q     If you are not in there trying to talk to the
18   EMS in an effort to revive the child, is that also an act
19   of love?
20        A     No.
21        Q     Admitting that you physically abused the child
22   almost on a daily basis, is that evidence of love to you?
23        A     No.
24        Q     So for those 88 days from November the 21st to
25   2006 to February 17 of 2007, you say you had contact with
```

118

1    the child Mariah Alvarez on three occasions, correct?

2         A    Yes, sir.

3         Q    And each one lasted what, less than an hour?

4         A    No.

5         Q    How long did it last, the first visit on

6    Thanksgiving?

7         A    About five hours.

8         Q    Okay.  And the next one in December, how long

9    did that -- how long were you available to the child?

10        A    About five hours.

11        Q    And on New Year's Day?

12        A    Less than an hour.

13        Q    During the time that she was asleep, was that

14   the last visit?

15        A    Yes, sir.

16        Q    What was her physical condition at that time?

17   Did she look thin to you?

18        .A    I didn't give much attention to her.

19        Q    How many children were in the house?

20        A    Over ten.

21        Q    When the child was laying there on the sofa, did

22   you see anybody come over and hit her?

23        A    No.

24        Q    Did Melissa ever complain to you about Mariah at

25   all?

```
 1        A     No.
 2        Q     Did she ever complain to you or did she ever
 3   comment to you that she was overwhelmed of having nine or
 4   ten children with her?
 5        A     No.
 6        Q     Did she ever tell you that the child, Mariah
 7   Alvarez, was bruised and battered?
 8        A     No.
 9        Q     Do you think that you were -- was she close to
10   you or to your other sister?
11        A     To me.
12              MR. PADILLA:  Pass the witness, Your Honor.
13              THE COURT:  Mr. Gilman.
14              MR. GILMAN:  I don't have anything else of
15   this witness.
16              THE COURT:  May this witness be excused?
17              MR. PADILLA:  Yes, Your Honor.
18              MR. GILMAN:  Yes, sir.
19              THE COURT:  You may step down.
20              (Witness excused 2:02 p.m.)
21              Thank you.  Call your next witness.
22              MR. GILMAN:  I call Norma Villanueva.
23   We're going to need to set up, Your Honor, if the Court
24   will permit us.
25              THE COURT:  Ladies and gentlemen of the
```

1    jury, I am going to ask you to take just a short break,

2    about five minutes before we set up.

3                    THE BAILIFF:  All rise for the jury.

4                    **(Jury not present.)**

5                    THE COURT:  Can we take a break?

6                    (Brief recess taken 2:04 p.m..)

7                    MR. PADILLA:  My understanding, Your Honor,

8    is that the defense is calling this witness for the

9    purpose of her to testify to the CPS records, Your Honor.

10   And I just need an idea of where we're going with this.

11                   THE COURT:  One of the jurors knows this

12   witness?

13                   MR. PADILLA:  The potential witness,

14   Mrs. Villanueva?

15                   THE COURT:  Mrs. Villanueva.  Rolando

16   Gonzalez.  I don't know to what extent.

17                   MR. PADILLA:  Judge, I would ask the Court

18   to do a proper evaluation and bring the juror in here and

19   ask him if that knowledge or relationship would affect his

20   opinion in this case one way or the other.  And the State

21   will move that we excuse that juror.

22                   THE COURT:  Mr. Gilman?

23                   MR. GILMAN:  Yes, sir.

24                   THE COURT:  I need a response.

25                   MR. GILMAN:  I am getting to it, Judge.  We

121

1   listed Norma Villanueva as one of our witnesses in the --

2   at the time of jury selection when we met downstairs.

3                   MR. PADILLA:  He didn't come forward,

4   Judge.  He may recall right now.  I assume they are going

5   to find out.

6                   THE COURT:  Okay.  Let's put aside just for

7   a moment with regard to Mrs. Villanueva.  The CPS records

8   are not in evidence.

9                   MR. GILMAN:  No.

10                  THE COURT:  Okay.  Yet, CPS testified on

11  the State's case and none of the records came in as far as

12  I remember.

13                  MR. PADILLA:  Right.

14                  THE COURT:  So how is Mrs. Villanueva's

15  testimony with regard to something that is not in evidence

16  going to be relevant?

17                  MR. GILMAN:  I asked the CPS worker if she

18  had in her department turned over all of the records

19  dealing with Melissa Lucio and her children to me, and she

20  responded, yes.

21                  THE COURT:  I remember that.

22                  MR. GILMAN:  And I have all of the records

23  that the district attorney's office has turned over to me

24  dealing with Melissa Lucio.  And I will put the two boxes

25  into evidence --

122

```
 1                THE COURT:  Okay.

 2                MR. GILMAN:  -- as copies of the records.

 3      And then Mrs. Villanueva has reviewed all of those records

 4      at my request and compiled those records.  And she'll be

 5      tying these records in -- dealing with my client.

 6                There are certain psychologicals that were

 7      brought out.  There are certain things that were going on

 8      with the children that were being brought out.

 9                THE COURT:  I can see that as part of the

10      punishment.  But in this case we are talking about the

11      case in chief --

12                MR. GILMAN:  Well --

13                THE COURT:  -- and on the case in chief, I

14      am having a hard time understanding how you can get it in.

15                MR. GILMAN:  Well, we have heard also

16      testimony from the Texas Ranger, that he could walk into a

17      room and could tell by "body language" that my client

18      wanted to make a statement.  And Norma Villanueva is going

19      to be talking about the body language of Melissa during

20      her video statement.  She's also going to be talking about

21      the -- what's happened to her and the authorities with

22      Child Protective Services and how that has a bearing on

23      Melissa Lucio.

24                THE COURT:  And I understand that with

25      regard to punishment in terms of factors that are in
```

123

1    litigation, I am having a hard time understanding how it

2    affects the case in chief as to guilt or innocence.

3                    MR. GILMAN:   Judge, it goes to whether or

4    not she -- what type of personality she has.  Is she an

5    aggressive person?  Is she a nonaggressive person?

6    Whether or not she admits to things that she didn't do or

7    did do?  Whether she says one thing to men, and another

8    thing to women?  This is what she is going to be

9    testifying to.

10                   MR. PADILLA:   Judge, through all of the

11   evidence as to all the CPS records it contains hearsay on

12   top of hearsay.  Secondly, I don't think that this witness

13   who has been identified is an expert in being able to

14   decide the body language or anything of that nature.  She

15   has to prove herself as an expert.  But what we're talking

16   about is evidence that might be admissible at the

17   punishment phase but not guilt/innocence.

18                   THE COURT:   My memory is Mrs. Villanueva

19   was a social worker.

20                   MR. GILMAN:   She's a social worker, but she

21   is also certified with CPS.

22                   MR. PADILLA:   Judge, again --

23                   THE COURT:   Hold on.  How does that go as

24   to body language?

25                   MR. GILMAN:   Huh?  Judge, she has seen the

124

1    video.

2                    THE COURT:   I understand.

3                    MR. GILMAN:   And she has reviewed the

4    records, and with that --

5                    THE COURT:   What kind of education and/or

6    training does she have to interpret that?

7                    MR. GILMAN:   The same amount --

8                    THE COURT:   Hold on.  Just a minute.  I'm

9    sorry.  With regards to the factors of mitigation, I don't

10   think there is any question that Mrs. Villanueva is overly

11   qualified to testify as to that.  With regards to the

12   issue of guilt or innocence, I am having a hard time

13   trying to figure that out.  So I welcome any consideration

14   because I do not see how Mrs. Villanueva is going to talk

15   about things -- I mean, unless she has personal knowledge

16   of something with regards to the facts, how is she --

17                   MR. GILMAN:   She's going to be testifying

18   as an expert, Judge, as to the records that she received

19   and reviewed.  Then she's going to be talking about --

20                   THE COURT:   Let's do one of these things at

21   a time.  With regards to the records that she has received

22   and reviewed.  First of all, they're not in evidence. d.

23   You have the CPS people here testifying and they were not

24   admitted, how are you going to prove them up?

25                   MR. GILMAN:   That they have been all turned

125

1   over to me and I have turned those over to my client, my

2   witness.

3                    THE COURT:  I understand that.  But

4   somebody has got to testify to them being used in the

5   normal course of businesses or anything like that in order

6   for them --

7                    MR. GILMAN:  This is all of the records --

8   CPS turned over all the records that they allegedly had.

9   And if I had them, she can only testify to the records

10  that I gave her.

11                   MR. PADILLA:  Your Honor --

12                   THE COURT:  I'm listening.  Mr. Padilla?

13                   MR. PADILLA:  Your Honor, you got hearsay

14  on top of hearsay.  A lot of the therapists that made

15  records made direct reference on their notes, and it's

16  hearsay, Judge.  Those people aren't here to testify, and

17  we can't cross examine them, and --

18                   THE COURT:  It's Crawford in reverse.

19                   MR. PADILLA:  Well, it's Crawford in

20  reverse, Judge.  If they've going to offer them, they need

21  to offer them through the appropriate, and not through

22  Mrs. Villarreal -- with all due respect to her.

23                   MR. KRIPPEL:  And, it's also a chain of

24  custody problem, Your Honor.  As soon as we turn those

25  over, any kind of manipulation can happen.  When CPS

Adelaido Flores, Jr.
Certified Shorthand Reporter

126

1    brings the records in, they are personally testifying:   I

2    reviewed and compiled these set of records.   Here they

3    are.   They haven't been changed from when they are handing

4    them over, and when they are testifying as to their

5    authenticity.   We have two breaks in the chain.

6                  MR. GILMAN:   Then you've got the same

7    question, if they've turned them over to the district

8    attorney's office:   Where they manipulated or changed in

9    any way before they ever came to me.   I mean at some point

10   we got to say --

11                 THE COURT:   Absolutely.   And there is no

12   question as to that, Mr. Gilman.   But I go back to the

13   original issue with regards to guilt or innocence.   I

14   think with regards to mitigation, and you can talk about

15   all the circumstances that either take away or mitigate

16   more culpability, and that is a broad field.

17                 With regards to guilt or innocence, I'm

18   having a hard time seeing how they come in on that part of

19   the case.

20                 MR. CORDOVA:   May I say one thing, Judge?

21                 THE COURT:   I'm listening.

22                 MR. CORDOVA:   Your Honor, in this case

23   everyone keeps referring to what statement my client made

24   as a confession.   Well, we disagree that it's a

25   confession --

127

| | |
|---|---|
| 1 | THE COURT:  It's a statement. |
| 2 | MR. CORDOVA:  -- it's a statement. |

Mrs. Villanueva is here to testify as to why, in fact, she
would have given police officer's information in that
statement that was not correct, and she's going to base
that testimony on the information that she has seen from
the social --

THE COURT:  And I think if you have an
expert that is a psychologist that deals with
statements -- that has done studies on that and has done
academic background on that, that may or may not be
appropriate.

MR. CORDOVA:  I think she's qualified.  If
the Court wants to ask her a couple of questions in that
regard, if I could go into her background and have a
Daubert hearing.

THE COURT:  No, we'll hear the Daubert.  I
am still having problems with the CPS records.

MR. CORDOVA:  Yes, sir.

THE COURT:  Your witness, Mr. Gilman.

1                    NORMA VILLANUEVA,

2        having been first duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. GILMAN:

5        Q    Would you state your name please for the record?

6        A    Norma Villanueva.

7        Q    And you were asked to be here.  And what

8    preparation did you do in reference to your testimony here

9    today that brings you here?

10       A    There were several layers of preparation.  It

11   started off with meeting with y'all.  I've met with the

12   defendant, members -- one or two members of the family,

13   reviewing CPS records, reviewing the statement, DVDs that

14   she made to the police, reviewing also the written

15   statement.

16       Q    What is your educational background that gives

17   you -- that makes or shows your expertise in the area of

18   reviewing Child Protective Services records?

19       A    Well, first of all, I have a master's degree in

20   social work.  I also have a clinical license in the State

21   of Texas which allows me to do independent clinical

22   practice, which includes diagnosis of mental health

23   disorders and the treatment of mental health disorders.  I

24   also have the highest national clinical license to allow

25   me to do diagnosis and treatment of mental health

1    disorders.  I know clinical social workers are not common,

2    but there are some of us that do exist.

3                 I also for approximately four years was the

4    permanency planning team convener for Child Protective

5    Services under their contract.  And I was doing all of the

6    quality review across the Valley on cases that were

7    removals.  And I had to go through training in order to

8    obtain that contracting and then to keep it.  And I kept

9    it for four years.

10   Q    And your -- did you -- have you received any

11   type of training that helps you in dealing with people and

12   what they are trying to convey by the way they act, by the

13   way they hold their body, by the way they move their arms

14   and hands?

15   A    Yes, I have.  That's part of mental health

16   clinical training, and that started at the master's degree

17   level and then every year we have to have continuing

18   education units.  And in order to keep my clinical

19   license, I have to prove that I am doing clinical level

20   type of CEU'S.  Continuing Education Units, excuse me.

21   Q    And are you up-to-date with all of your

22   continuing education?

23   A    Yes, I am.  My license is in good standing.

24   Q    Have you been able to determine the reactions of

25   Melissa Lucio to different people in their conversations

130

1    with her?

2         A    Yes, I have.

3         Q    Are you able to see the different reactions that

4    Melissa Lucio has with dealing with Child Protective

5    Services from the time they first started in 1995 up until

6    the present time?

7         A    Yes, I have.

8         Q    Have you been able to observe through the

9    records of Child Protective Services -- Child Protective

10   Services' interaction with Mrs. Lucio and her children

11   over the years, especially from '04 to the present?

12        A    Several patterns of behavior have emerged, yes,

13   in reviewing the documents.

14                  MR. GILMAN:  Pass the witness, Judge.

15                  THE COURT:  Mr. Padilla?

16                     **CROSS-EXAMINATION**

17   **BY MR. PADILLA:**

18        Q    Mrs. Villanueva, can you -- what did you call

19   your specialized science in order to detect human thought

20   process through physical conduct?

21        A    It is part of being a mental health clinician.

22   In part of our training we look at not just the

23   intrapsychic, but the inner personal issues also, and that

24   includes body law language.

25        Q    Can you tell me one treatise or one book that I

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
1   can look at in an effort to identify this specialty?
2        A    I'm not a specialist in that area.  It is part
3   of my clinical training and --
4        Q    If you are saying you are going to sit here and
5   give me an opinion of what somebody thinks --
6        A    Uh-huh.
7        Q    -- I want to know what forms the basis of that
8   thought process.  Is it just what you think?
9        A    What forms the basis of that thought process is
10  clinical training and clinical experience, as it would
11  with any other mental health professional, first of all.
12  Second of all, it's a combination of knowing life span
13  development theories, clinical theories and human behavior
14  social environment interaction theories.
15       Q    Sounds good, ma'am.  Again, give me a treatise
16  or give me a book or give me a manual that I can look at
17  to be able to understand what you're attempting to testify
18  to here today.
19       A    There is no one manual that is widely accepted
20  in the mental health field.  There are several manuals in
21  the law enforcement field, but not in the mental health
22  field.  In the mental health field, the way we deal with
23  it is by combining, again, knowledge of human development
24  and life span development.  That would be things like
25  Ericsson, Gibson, all of the different life spans
```

132

1  theories.  And then you add to that your clinical

2  diagnostic training which includes body language as part

3  of that training.

4       Q    So anybody who gets nursing training can receive

5  the same type of training, do they not?

6       A    That is incorrect, sir.

7       Q    Let me ask you this.  Can you explain to me how

8  as you pertain to be an expert in this field -- are you

9  holding yourself out to be an expert?

10       A    I'm a mental health expert, yes, sir.

11       Q    Okay.  And as you're testifying as a mental

12  health expert, you can sit there and look at a person and

13  just by the demeanor in the face or their body demeanor,

14  that person is either telling you the truth, or not

15  telling you the truth?

16       A    Oh, no, sir, I didn't say that.  What I'm

17  saying, is, that it has to be a combination of factors.

18  When you're judging somebody's behaviors, especially when

19  it has to do with body language, if you do it solely on

20  the basis -- for example, if all I had done was just watch

21  that videotape testimony, or excuse me, statement, then I

22  shouldn't be sitting up here.

23            But you interview the person.  You look at

24  their background.  You look at their interactions with

25  other figures of authority.  You put the whole pool of

133

1   information together because you cannot know a person

2   based on watching one DVD, or as an investigator by having

3   them with you in that one instance, which is an instance

4   of duress.  You have to look at them across a life span.

5       Q    To be honest with you --

6               MR. GILMAN:  Objection, Judge.  She was not

7   allowed to finish her answer.

8               THE COURT:  I'm going to overrule the

9   objection.  I heard an end to the statement.  Go ahead,

10  Mr. Padilla.  But, do give her time.

11              MR. PADILLA:  Yes, sir.  I will give her

12  all the time she needs, Judge.

13      Q    (By Mr. Padilla) You testified what you consider

14  to be some accepted principles in your field.  And, again,

15  I know that you go back to the core, but how much training

16  have you received in trying to decipher body language,

17  specific course study for body language?

18      A    Specific courses would include my clinical

19  sources in my master's degree, number one.  Number two,

20  continuing education courses where I've been updating my

21  clinical knowledge.  It's been included in different

22  courses.  And that's for the past 20 years.

23      Q    And is there a licensing or accreditation that

24  would make this science legitimate?

25      A    Sir, there is no license specifically for the

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    interpretation of body language.  It is included in our

2    clinical license.

3        Q    So, I mean, is there any accreditation at all in

4    the field that you can tell me that you have received an

5    accreditation to do those specific functions of attempting

6    to decipher body language?

7        A    That's included in my clinical license that I

8    have at both the highest state level and the highest

9    national level.

10       Q    And that's just a clinical license, correct?

11   There are no subspecialties in that.

12       A    That is very true, sir.

13       Q    Now, what are the principles that you rely on in

14   attempting to draw yourself as an expert in the field?

15       A    As an expert in the field of mental health, it

16   would include -- which includes the interpretation of body

17   language, you utilize first of all the clinical theories

18   for diagnosis.  And then you look at also life span

19   development theories.  You look at theories of traumas.

20   You look at theories also mixed in of how to interpret

21   people's actions.

22                  It's -- if you look at the field of

23   clinical social work and psychology, you are going to see

24   that there's a wealth of literature that puts that inside

25   of the clinical field.  If you are looking for an absolute

135

1    I went and got a piece of paper that gives me a board

2    certification in that, it doesn't exist.  My board

3    certification is in the clinical mental health area.

4         Q    Have you, yourself, ever written any treatises

5    or any papers concerning the field that you are here to

6    testify about?

7         A    I have not authored, no.

8         Q    And how much time did you estimate you spent

9    with Mrs. Lucio in reviewing the video tape?

10        A    With Mrs. Lucio or reviewing the video tape?

11        Q    How about both.

12        A    Okay.  The videotape was approximately five,

13   five and a half hours.  Looking at the DVDs of her

14   statement with Mrs. Lucio, it's been seven to eight hours.

15        Q    What does my body language tell you right now?

16        A    I can't make a judgment based on just this one

17   happenstance.  If you want to sit down with me, I will

18   give you a social history, time and everything.

19        Q    I have sat down with you before.

20        A    That's not a clinically appropriate question.

21             MR. PADILLA:  I pass the witness.

22             THE COURT:  Mr. Gilman.

23             MR. GILMAN:  Nothing further, Judge.  We're

24   ready for testimony.

25             THE COURT:  With all due respect to

Adelaido Flores, Jr.
Certified Shorthand Reporter

136

1   Mrs. Villanueva, I think she is not qualified on the issue

2   of mitigation.  I do not find her to be an expert on

3   whether or not the statement was true or not true,

4   manufactured -- factored, or whatever.  I don't find that

5   she has particular expertise in that area.

6           MR. GILMAN:  Judge, the State brings in a

7   Texas Ranger and he says:  Well, body language tells me

8   this.  And, body language tells me that.  What expertise

9   did he have, if any?

10          MR. PADILLA:  He could have asked him that,

11  Your Honor.  He was there on the witness stand and was

12  subject to cross examination.

13          Additionally, Your Honor, we would ask that

14  that evidence that has been entered --

15          THE COURT:  Hold on a minute.  There is a

16  statement that he explained how he approached his

17  eliciting of that statement.  He explained how he

18  interpreted it in order to solicit that statement.  The

19  statement is a byproduct of that.

20          What you are asking to do is to give

21  evidence from a person holding themselves out as an expert

22  as to why that statement is or is not true or what was

23  produced.  Again, I think, Mrs. Villanueva, is imminently

24  qualified on the issue of mitigation.  But, you know, I am

25  familiar with clinical social workers.

137

1       THE WITNESS:  Uh-huh.

2       THE COURT:  I've got a "comadre" who is a

3  social worker, but I don't find her to be an expert in

4  that area.  I'm having problems with the CPS records, too.

5  I think that they are imminent -- I think that they are

6  within the ambient of mitigation, and I think they can be

7  talked about, and the events that they talked about, but

8  in the ambient of guilt or innocence, the fact as to

9  whether or not this did or did not happen, I don't see

10  them being relevant unless you've got something right on

11  point.

12       We're looking at the death of Mariah

13  Alvarez and what did or did not cause it, and she's

14  accused of it.  So anything that reflects to that, one way

15  or the other, I think, it should come in.

16       MR. GILMAN:  All of the CPS records pertain

17  to that, Judge, because it leads up to that point.  And

18  then subsequent thereto is important because it is dealing

19  with the child, the CPS, a state agency dealing with this

20  lady both before and after, and their knowledge, or lack

21  thereof.

22       THE COURT:  The thing is, if we had the CPS

23  workers here.

24       MR. GILMAN:  Judge, they bring in --

25  they're like in federal court.  I don't know if you

138

1   remember going to federal court on a pretrial hearing.

2   All they do is they put the most ignorant person on the

3   witness stand and then you have to ask them questions and

4   they know nothing, absolutely nothing.  This lady didn't

5   come to work for CPS until after Mariah was dead.

6               THE COURT:  Mr. Gilman, you could have

7   subpoenaed her.

8               MR. GILMAN:  Judge, I --

9               THE COURT:  You could have subpoenaed her

10  Isn't that true?

11              MR. GILMAN:  She is not released yet.  I

12  will call her back.  We will wait for her to get over here

13  and I will put it all into evidence.

14              THE COURT:  Very well.  Call her back.

15              MR. GILMAN:  Okay.  I will call her back.

16              MR. PADILLA:  What was her name?

17              THE COURT:  I'm sorry?

18              MR. GILMAN:  Joanne Estrada.

19              THE COURT:  Who is here from CPS?

20              MR. PADILLA:  The attorney.

21              THE COURT:  Call Joanne Estrada, please,

22  and have her come in.

23              I'm sorry, Madame.  Would you identify your

24  name for the record?

25              MS. EICHBERGER:  Linda Eichberger.

```
 1                    THE REPORTER:  I'm sorry.  What's your
 2      name?
 3                    MS. EICHBERGER:  Linda Eichberger.
 4                    MR. KRIPPEL:  Your Honor, just to bring it
 5      to the Court's attention, or to refresh the Court's
 6      memory, Mrs. Estrada is now represented by counsel.  So
 7      counsel has to be called, Mrs. Ann Nix.
 8                    MR. GILMAN:  I don't see --
 9                    THE COURT:  Mr. Krippel, again --
10                    MR. KRIPPEL:  -- I'm just bringing it to
11      the Court's attention.
12                    THE COURT:  Again -- I understand, but was
13      there not a transaction immunity document signed?
14                    MR. KRIPPEL:  I am just bringing it to the
15      Court's attention.
16                    THE COURT:  I am not going to worry about
17      it.
18                    MR. KRIPPEL:  I am just bringing it to the
19      Court's attention.
20                    THE COURT:  For what other purposes do you
21      want to call Mrs. Villanueva in the meantime?
22                    MR. GILMAN:  I will wait until
23      Mrs. Estrada --
24                    THE COURT:  Mrs. Villanueva, we will ask
25      you to step down, please.
```

140

```
1                    THE WITNESS:  Yes, sir.
2                    THE COURT:  Oh, just a minute.  Did I ever
3     swear you in?  I don't remember swearing you in.  I think
4     we started with --
5                    THE WITNESS:  You're right.  I didn't get
6     sworn in, sir.
7                    THE COURT:  Well, would you stand up --
8                    THE WITNESS:  Yes, sir.
9                    THE COURT:  -- and raise your right hand?
10                   "Do you solemnly swear to -- not only to
11                   tell the truth, but everything that you
12                   have said heretofore and testified to, is
13                   true and correct, so help you God?"
14                   THE WITNESS:  Yes, I do.
15                   THE COURT:   Thank you very much.
16                   THE WITNESS:  You're welcome.  Do I still
17    step down?
18                   THE COURT:  Yes.  The rule of the witnesses
19    has been invoked, Mrs. Villanueva.
20                   Tell the jury, please, that we are waiting
21    on a witness to arrive.  But that she has been called.
22    I'm going to take a short break while the other witness
23    gets here.  I would like the attorneys to come back and
24    have a conference on this, if they think it's productive,
25    too.
```

141

```
 1                    (Witness excused and Recess from 2:32 p.m.
 2              to 3:09 p.m..)
 3              THE COURT:  Okay.  Mr. Gilman?
 4              (Court & Jury not present.)
 5              MR. GILMAN:  Are you ready, Al?
 6              THE REPORTER:  Yes, sir.
 7              MR. GILMAN:  This is on a Bill of
 8    Particulars.
 9                         NORMA VILLANUEVA,
10       having been first duly sworn, testified as follows:
11    BY MR. GILMAN:
12       Q    State your name for the record, please.
13       A    Norma Villanueva.
14       Q    Okay.  And you are an expert who I've asked to
15    come in and testify, and this is the guilt/innocence on
16    this particular case; is that correct?
17       A    That is correct.
18       Q    Okay.  Can you tell the Court what your
19    credentials are to show your expertise?
20       A    Yes.  I am a licensed clinical social worker
21    licensed for private, clinical practice in the State of
22    Texas.  I am a board certified diplomate in clinical
23    social worker of a national credential.  I am also a board
24    certified forensic specialist, and that's a national
25    credential.  I've had contracts which Child Protective
```

142

1    Services.  And as part of those contracts, I've been

2    trained in their policies and procedures and their risk

3    management policies and their risk assessment instrument,

4    and also in how they do home studies, foster home studies,

5    and adoption home studies.

6         Q    Okay.

7         A    And I was their permanency planning team

8    convener for four years under contract.

9         Q    All right.  And if you are allowed to testify in

10   this particular case, you are going to testify as to what?

11        A    I was going to testify about three separate

12   issues.  The first issue was about patterns of behavior

13   with Mrs. Lucio which strongly influenced her behavior

14   during that videotaped statement process with the

15   investigators that night.

16        Q    That video statement that is in evidence in this

17   case?

18        A    That is correct.  In support of that, I was also

19   going to testify that the patterns of behavior as seen in

20   the Child Protective Services records, the patterns in her

21   family, how that influenced her decision making and how

22   she felt with the different investigators, male and

23   female, and also how she makes her life decisions.  It

24   influenced her behavior in that -- how she felt with the

25   different investigators male and female and how she made

143

1    her decisions in answering the questions during that

2    process.  And lastly, looking at her CPS history, how --

3    and also her social history, how she deals with different

4    people in levels of authority, and also how that

5    influenced her body language, and how body language is

6    interpreted in different ways if you do not have her

7    history of behaviours or patterns of behavior or her

8    social history.

9         Q    And the material that you had to base your

10   testimony on was Child Protective Services records that

11   were given to me as part of my discovery?

12        A    That is correct.

13        Q    And also, your interview with Melissa Lucio?

14        A    That is correct.

15        Q    And --

16        A    And family members.

17        Q    And family members.  Anything else?

18        A    Yes.  I also reviewed the statement, the DVD

19   statement that she made to the police and her written

20   statement.

21        Q    Okay.  Thank you.

22             MR. GILMAN:  We are going to offer a copy

23   of this.

24             **(Defendant's Exhibit Numbers 13-18 admitted**

25             **for Bill of Particulars No. 1 only )**

144

1      Q      (By Mr. Gilman) Thirteen is your curriculum
2   vitae?

3      A      Uh-huh.

4      Q      Fourteen is what?  This is a compilation --

5      A      It's a compilation of the case synopsis done by
6   the case reader from Child Protective Services.

7      Q      And 15?

8      A      This is a synopsis of Lucio case 2004/2006.

9      Q      This is Defendant's Exhibit No. 16?

10     A      Compilation of service plan information
11   specifically about Melissa Lucio, the mother.

12     Q      Seventeen?

13     A      Compilation of service plan information on
14   Mariah Alvarez.

15     Q      Eighteen?

16     A      Compilation of Lucio cases multiple, for
17   2004/2006.

18            THE WITNESS:  Anything else from me?

19            MR. GILMAN:  No.

20            THE WITNESS:  Okay.  I will wait outside.

21            **(Jury not present, defendant present.)**

22            THE COURT:  All right, sir.  Please be
23   seated.  Okay.  Mr. Gilman.

24            MR. GILMAN:  Yes, Your Honor.  Mrs. Estrada
25   is now here.

```
 1                    THE COURT:  Do you wish to call her as a
 2   witness?
 3                    MR. GILMAN:  Yes.
 4                    THE COURT:  Ms. Estrada, please step
 5   forward.  Do you wish to bring the jury?
 6                    MR. GILMAN:  Let's go with what we've got
 7   first and then you can decide.
 8                    THE COURT:  Ms. Estrada, I remind you that
 9   you have been sworn to tell the truth.  Please take the
10   witness stand.  All right.  Take the chair right now.  All
11   right.  Proceed, Mr. Gilman.
```

**JOANNE ESTRADA,**

```
13      having been first duly sworn, testified as follows:
```

**DIRECT EXAMINATION**

```
15   BY MR. GILMAN:
16        Q    You are Joanne Estrada, correct?
17        A    Yes.
18        Q    You are the same Joanne Estrada that testified
19   earlier, correct?
20        A    Yes.
21        Q    And I remind you that you are still under oath?
22        A    Uh-huh.
23        Q    You were in court the other day when your main
24   supervisor from Harlingen, Mr. Zavala, was here, isn't
25   that correct?
```

146

1      A     I wasn't here the same day.  I think I was here

2  the day before.

3      Q     And you know of all the evidence that -- all of

4  the records of Child Protective Services have been turned

5  over to the district attorney's office who subsequently

6  turned them over to me?

7      A     As far as I know, yes.

8      Q     And do these records indicate some of the other

9  records?

10     A     (Reviewing)  Yes.  The defendant's records, yes.

11     Q     That's one box.  There's another box.

12     A     I believe so.  They appear to be.

13     Q     And to your knowledge, these are all of the

14  records dealing with Melissa Lucio?

15     A     They should be.  I know I received some of them

16  last week, but that was the beginning of the -- it was

17  last week I received maybe a couple of more documents.

18     Q     But I don't have those or they are not included

19  in this box?

20     A     In the first giving of the file, they wouldn't

21  be included.  They came in afterwards.

22     Q     And then --

23              THE COURT:  Where are they?

24              THE WITNESS:  It was the last therapy

25  session note for Mrs. Lucio and Mr. Alvarez.

```
1        Q    Conducted by whom?
2        A    Beto Juarez.
3        Q    And Beto Juarez is who?
4        A    He's the therapist that was seeing Mrs. Lucio.
5        Q    And he saw Mrs. Lucio during what period of
6   time?
7        A    I believe he might have started in February of
8   this year.  I don't know exactly, but I believe
9   approximately that's when he started.  And the last time
10  he saw her, it was either the last of May or the beginning
11  of June, something like that.
12       Q    And that was at you or your department's
13  request --
14       A    Yes.
15       Q    -- that Beto Juarez interviewed Melissa Lucio?
16       A    That he provide counseling and therapy sessions,
17  yes, sir.
18       Q    And for what purpose?
19       A    It was court ordered by the CPS court.
20       Q    When was that court order?
21       A    I don't remember the date.
22       Q    Was it before you came to work on this
23  particular file?
24       A    It was after the twins were born.
25       Q    Why would the court order -- and at whose
```

148

1   request would the court order interviews of Beto Juarez

2   when there's a criminal case pending on this lady?

3      A    I don't remember.

4      Q    Do you know who requested it?  Was it done by

5   Child Protective Services or was it done by the State of

6   Texas?  Was it done by any of the defense counsels?

7      A    I don't remember who requested them.

8      Q    And these records that are contained in these

9   boxes that I have here that you looked through briefly,

10  these are records that you normally maintain in your usual

11  course of business dealing with Mrs. Lucio and her family?

12     A    Yes.

13     Q    And these are made by you and other workers that

14  have worked on this case?

15     A    Correct.

16     Q    And they are made at or near the time that this

17  information becomes available to you; is that correct?

18     A    We tend to file it as we get it.

19     Q    So if Beto Juarez makes or has an interview

20  right around the first of June, it wouldn't be in these

21  documents?

22     A    It depends on when he hands it over to me.

23     Q    But if Mariah had fallen over backwards and

24  busted her head so that they had to take Mariah to the

25  emergency room of the hospital, those records would be

149

1    contained in here, if the foster parent told you that?

2         A    Any records that were provided should be in that

3    file.

4         Q    And your foster parents tell you what goes on

5    with the child's life, do they not?

6         A    Yes.

7         Q    Do they keep records themselves?

8         A    They should, yes.

9         Q    And do they turn those records over to you?

10        A    Depending on the type of foster parent.  If they

11   have an agency, they turn them over to the agency and they

12   would turn them over to us.

13        Q    And are they -- do they keep the records as the

14   child develops?

15        A    I'm not sure how they keep their records.

16        Q    And how often do you review records with foster

17   parents?

18        A    We visit the child when we speak to the foster

19   parent approximately at least once a month.

20        Q    So during the period -- the two-year period,

21   two-plus year -- two years and two months period that

22   Mariah was under protection of Child Protective Services

23   and living in foster care, you saw that child once a

24   month?  Not you, but workers.

25        A    Previous worker or previous workers should have.

1    I don't know exactly how often they were seen.

2        Q    And their reports would be reflected in these

3    two boxes?

4        A    I believe so.

5                MR. GILMAN:  I will introduce these.  Mark

6    these boxes as evidence and put them in evidence, Judge.

7                MR. PADILLA:  May I have an opportunity to

8    question the witness, Your Honor, before?

9                MR. GILMAN:  I'll pass the witness.

10                       **CROSS-EXAMINATION**

11   **BY MR. PADILLA:**

12       Q    Mrs. Estrada, you had about a minute and a half

13   to review two boxes of documents.  Is it your testimony

14   that all the documents pertaining to Mariah Alvarez and

15   Mrs. Lucio are included in those two boxes?

16       A    I would have to go through every one of those

17   sheets.

18       Q    Now, those documents also include not only

19   Mariah Alvarez and Melissa Lucio, but also the other

20   children that were removed from the residence; is that

21   correct?

22       A    Correct.

23       Q    And some of the documents contained other

24   children who have medical records which are not certified

25   and included in those reports; is that correct?

151

```
 1         A     I'm sorry.  Can you repeat that?
 2         Q     Are there any medical records that are not
 3   certified, that are included as exhibits in those two
 4   boxes?
 5         A     There should be medical records of the other
 6   children in there, yes.
 7         Q     Are they certified?  Do they have the proper
 8   authentication?
 9         A     What do you mean, by certified?
10         Q     I am asking you:  Those documents, how did you
11   get them, the medical records?
12         A     We get them either from the agency or from the
13   foster parents.
14         Q     And do you -- well, are any of those documents
15   or any of the information on the medical records
16   considered to be confidential by nature through CPS?
17         A     Yes.
18         Q     And when those documents are prepared by CPS, at
19   the time that they are prepared, there is an expectation
20   of privacy; is that correct?
21         A     Yes.
22         Q     Now some of those documents that are in there
23   have certain directives for treatment, directives of how
24   to handle children, things of that nature, which would be
25   totally unrelated to the case that we're involved in here
```

152

1    today, which is Mariah Alvarez; is that correct?

2        A    Correct.

3                MR. PADILLA:   Judge, I would argue that,

4    obviously, these matters, although they might be relevant

5    during the punishment, we would also argue, furthermore,

6    that they are unrelated, as well as question whether they

7    are business records, but we also object on the fact that

8    it does contain hearsay matters therein.

9                MR. GILMAN:   Judge, I think --

10               THE COURT:   I'm sorry.  Go ahead.

11               MR. GILMAN:   I think they are admissible

12   because it deals with other members of the family,

13   interacting with one another, and as other members of the

14   family interact with one another I think they are very

15   relevant.

16               MR. PADILLA:   Again, Your Honor, this

17   witness is not the person who prepared the report, and is

18   testifying as to the authenticity.

19               There are also some matters in there that I

20   allege are probably hearsay, and there are also some

21   matters that should be protected and not disclosed clearly

22   as to the other children that are not a part of this

23   litigation.

24               And, Judge, we were very specific about

25   doing that.

153

1           MR. GILMAN:  But the State relies on these
2     documents.
3           THE COURT:  I will sustain the objection as
4     to those two exhibits in totality.  Some of the them are
5     relevant, some of them as being hearsay and some of it as
6     being privileged.  If there is a particular document that
7     you want to enter into evidence out of the two boxes, I
8     will be more than glad to entertain that document.
9                    **REDIRECT EXAMINATION**
10    **BY MR. GILMAN:**
11        Q    Mariah was born in September of '04; is that
12    correct?
13        A    I do not know when she was born.
14        Q    Well, you're the case worker.
15        A    I took over the case after Mariah's passing.  I
16    had never worked with Mariah.
17           THE COURT:  At this time, we have gone
18    beyond CPS records, which was the object of this witness
19    out of the presence of the jury.  We have a jury waiting.
20    Do you want to conduct your examination of Ms. Estrada in
21    the presence of the jury?
22           MR. GILMAN:  Yes, sir, I guess so.
23           THE COURT:  Take the boxes off, please, and
24    let's get the jury in.
25           THE BAILIFF:  All rise for the jury.

1          **(Jury present, defendant present** at 3:35

2          p.m.)

3          THE COURT:   You may be seated.   Ladies and

4   gentlemen of the jury, again, I remind you that when we

5   take up legal issues outside of your presence, you're not

6   to concern yourselves for the reasons for it.   You are

7   supposed to make your decision based only on what the

8   witnesses say.   The comments of the attorneys are not

9   evidence.   I have no right to make an opinion or comment

10  on any evidence.   You're the only triers of the facts.

11  And you must make your decision based on your witnesses,

12  and the evidence introduced.

13          Mr. Gilman?   Proceed, sir.

14          MR. GILMAN:   Thank you, Judge.

15                  **JOANNE ESTRADA,**

16   having been first duly sworn, testified as follows:

17                  **DIRECT EXAMINATION**

18  **BY MR. GILMAN:**

19      Q    Would you state your name again for the jury?

20      A    Joanne Elizabeth Estrada.

21      Q    Mrs. Estrada, you work for Child Protective

22  Services and you have testified previously; is that

23  correct?

24      A    Correct.

25      Q    And you are a case worker dealing with

155

```
1    Mrs. Lucio and her children; is that correct?

2         A    Correct.

3         Q    And you told us a few minutes ago outside the

4    presence of the jury that Beto Juarez was performing some

5    sort of counseling with Mrs. Lucio; is that correct?

6         A    That is correct.

7         Q    And this was as per a court order?

8         A    Yes.

9         Q    And this court order was from whom?

10        A    From CPS court with Judge Flores.

11        Q    That's not Judge Nelson who is presiding over

12   this case; is that correct?

13        A    No, it is not.

14        Q    And do you know when he, the judge, ordered this

15   counseling?

16        A    I don't remember the date.

17        Q    Was it sometime during this year, 2008?

18        A    I don't remember the date.  I'm sorry.

19        Q    I'm not trying to hold you down to the date, but

20   can you give us a ballpark figure of when this took place?

21   Within the last 12 months?

22        A    It was after the twins were born, after

23   October 7.  I don't know the exact date after that.

24        Q    So the twins were born to Mrs. Lucio in October

25   of '07; is that correct?
```

156

```
 1        A    Correct.
 2        Q.   And some time after that, the judge ordered what
 3   from Mrs. Lucio?
 4        A    The judge ordered parenting classes, individual
 5   counseling, and visitations with the twins.
 6        Q    And why was -- at whose request was parenting
 7   classes ordered and at whose request was visitation
 8   ordered, and at whose request was this counseling?
 9        A    I don't remember who did the requesting.
10        Q    Were you there?
11        A    Yes.
12        Q    Isn't that something you would make a note of?
13        A    I make note of what the court orders are.   I
14   didn't make note of who did the requesting.
15        Q    And how many times -- well, who is Beto Juarez?
16        A    Beto Juarez is the therapist who works under
17   contracted services with the department.
18        Q    And as a therapist, he is to counsel someone
19   dealing in what particular area or field?
20        A    Just basically the reasons related to the
21   removal of the children, any area in general that they
22   feel is needed.
23        Q    It's a wide open contract like that?
24        A    Basically we tend to focus on the removable of
25   the children and what the cause for the removable was.
```

157

```
 1        Q    In an effort to try to reunite the family?

 2        A    Typically, yes.

 3        Q    Isn't that what Beto Juarez was doing?

 4        A    He was providing therapeutic services.

 5        Q    I'm sorry?

 6        A    He was providing therapy to Mrs. Lucio.

 7        Q    And how often did he visit with Mrs. Lucio?

 8        A    I don't remember the number of times that he

 9   visited.

10        Q    Was it more than one?

11        A    It was more than one.

12        Q    Was it more than two?

13        A    Yes, it was more than two.

14        Q    Was it more than three?

15        A    Yes.

16        Q    Was it more than four?

17        A    I don't know.

18        Q    When was the last time that Beto Juarez visited

19   Mrs. Lucio, if you recall the time?

20        A    It was either the end of May or the beginning of

21   June of this year.

22        Q    And do you have a report that he made in

23   reference to that visit?

24        A    Not on me.

25        Q    Did he issue a report?
```

158

```
 1        A    He did give a report.
 2        Q    And who has that report?
 3        A    It would be in the office.
 4        Q    Of Child Protective Services?
 5        A    Yes.
 6        Q    Are you aware that I asked for copies of all
 7   Child Protective Services documents dealing with Melissa
 8   Lucio and her children?
 9        A    That you had requested them?
10        Q    Yes.
11        A    No.
12        Q    You were not aware of them?
13        A    I was aware that the DA's had requested them.
14        Q    And when did you -- when were you aware that the
15   district attorney's office had requested them?
16        A    I don't remember the date, but the day that I
17   came in to the court.
18        Q    When you testified last?
19        A    No.  The first time I came in and testified.  I
20   don't remember the date.
21        Q    Which is about a week before you testified the
22   first time?
23        A    I believe it was towards the end of June, but I
24   don't remember the date.
25        Q    Are you aware that -- well, when you -- when you
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

159

1    first came to work for Child Protective Services, Mariah

2    had already passed away?

3         A    When I first came to work?

4         Q    Yes.

5         A    No.

6         Q    I'm sorry.  When you took over this particular

7    case as the case worker, Mariah had already passed away?

8         A    Correct.

9         Q    But you reviewed her file, did you not?

10        A    I can't say that I reviewed her file.

11        Q    You are the case agent?

12        A    I am the case worker.

13        Q    And who is in charge of this case?

14        A    I am.

15        Q    And how can you make a recommendation on

16   anything if you haven't reviewed the entire file?

17        A    Any recommendation is not made by me alone.

18        Q    You don't make a recommendation?

19        A    We basically -- staff cases and recommendations

20   are basically done through the supervisors and program

21   directors.

22        Q    And you have never met with any supervisors or

23   program directors to make a recommendation in this case?

24        A    In the case dealing with Mariah?

25        Q    In the case dealing with Melissa Lucio.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1        A      I have.

2        Q      And how can you make a recommendation if you

3   have not reviewed all of the files?

4        A      Basically, the -- from my understanding the case

5   with Mariah through CPS course was dismissed, and I tend

6   to the focus more on the children that are alive.

7        Q      Isn't it true that the case was filed with the

8   courts in '04 when Mariah was born and that continues even

9   to this day?

10       A      Yes.

11       Q      So the case was never dismissed?

12       A      The case involving Mariah as a party to the

13  case.

14       Q      The case is all dealing with Melissa Lucio, is

15  it not?

16       A      Yes.

17       Q      So you don't know whether or not Mariah was

18  taken to Valley Regional Hospital sometime in the first

19  quarter of -- between January and April of '05?

20       A      No.

21       Q      And you're not aware of the fact that Mariah

22  used to have severe tantrums when she wasn't getting what

23  she wants and would sometimes throw herself on the floor

24  and hit herself in the head or hit her head on the floor?

25       A      I was not aware of that.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    Q    And yet those are in the records.  Are you aware

2  of that?

3                MR. PADILLA:  I'm going to object, Your

4  Honor.  I think what we have here counsel testifying, Your

5  Honor.  He can ask what document was presented to the

6  witness, and allow her an opportunity to review them,

7  Judge, for her determination.

8                MR. GILMAN:  She's saying that she has

9  reviewed some of the records.  I'm asking her if she's

10  reviewed them.

11                THE COURT:  Refer to the specific records,

12  then.

13    Q    (By Mr. Gilman) Well, in December of '05 there

14  were records dealing with Mariah going to -- having

15  tantrums at the foster parents and her hitting her head on

16  the floor.  Were you aware of that?

17    A    No, I was not.

18    Q    And you reviewed these files?

19    A    I did not review Mariah's file.

20    Q    Are you aware of in March of '06 that Mariah had

21  a self-inflicted injury?

22                MR. PADILLA:  Again, Judge I object.

23                THE COURT:  Show her the documents that

24  you're going to ask her about.

25    Q    (By Mr. Gilman) I believe you testified earlier

162

1    that you observed Melissa Lucio with the children during

2    visitation period?

3        A    Yes.

4        Q    Were you aware of the visitation periods that

5    were conducted by Child Protective Services between

6    September of '04 and November of '06?

7        A    I am aware that she had visitation during that

8    time.

9        Q    Did you review any of the records?

10       A    No, I did not read the visitation notes.

11       Q    Wouldn't those records be important in reaching

12   a plan dealing with these children as well as Melissa

13   Lucio, or it doesn't make any difference?

14              MR. PADILLA:  Your Honor, I object.  First

15   of all, we got notice, Your Honor.  I ask if she got

16   notice of this case.  It's also immaterial, Your Honor.

17              THE COURT:  Your response?

18              MR. GILMAN:  I think it's relevant.  It is

19   dealing with the children; it is dealing with Melissa

20   Lucio.

21              THE COURT:  Their concern is Mariah.

22              MR. GILMAN:  I am concerned with Mariah,

23   and to her cause of death, Judge.

24              THE COURT:  I'm going to overrule it at

25   this time, and I will allow you to go into allow you to go

163

1    into it more specifically.

2        Q    (By Mr. Gilman) The reactions and interactions

3    of Mariah's siblings, are you aware of any of that?

4        A    I'm sorry.  Can you repeat the question?

5        Q    How are the children today that you observed?

6        A    The children seem fine.  They have a strong bond

7    with one another.  Some are a little bit hyper.  They like

8    to run around.  The girls are learning how to ride bikes.

9        Q    Aren't all of the children on medication?

10       A    No.

11       Q    Which ones are not on medication?

12       A    Sara and Adriana.

13       Q    So two out of the seven are not on medication --

14       A    Two out of --

15       Q    -- or eight --

16            MR. PADILLA:  Again, I would argue as to

17   relevancy, Your Honor.

18            THE COURT:  I'm going to sustain that

19   objection.

20       Q    (By Mr. Gilman) What is the medication for, if

21   anything?

22            MR. PADILLA:  Judge, again, I would object

23   to going into medication of the present children.  It is

24   irrelevant.

25            MR. GILMAN:  Judge, it is important.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1          THE COURT:  I'm going to allow it to see

2    where you're going with it.

3       Q    (By Mr. Gilman) What is the medication for, to

4    calm these kids down?

5               MR. PADILLA:  Your Honor, I would ask -- I

6    object to leading, Your Honor.

7               THE COURT:  I'm going to overrule the

8    objection.  Go ahead.

9       Q    (By Mr. Gilman) What's this for?

10      A    I don't remember exactly what each medication is

11   for.  I know that Rene and Robert are taking medication

12   for ADHD.

13      Q    What is that?

14      A    Hyperactive attention deficit disorder.  I know

15   Richard is taking medication for ADHD and uresis.

16      Q    And what?

17      A    Uresis.

18      Q    What is that?

19      A    Bed wetting.  I know Gabriel is taking

20   medication also for ADHD and uresis.  I don't remember

21   other medication.  I think Gabriel is also taking medicine

22   for depression.

23      Q    Are you aware in the records of how many

24   different times Mariah was in different foster homes

25   during the time that she was removed from her parents in

165

```
1    '04?

2         A    I believe she was just in one home.

3         Q    Would it surprise you to know that she had been

4    in three different foster homes?

5         A    Ah, yes.

6         Q    She was in one home from September of '04 to

7    June of '06.  She was in another home in early July of

8    '06, and then another home from the end of July of '06 to

9    the time of her reunification of her family.  Are you

10   aware of all of that?

11        A    No.

12        Q    You don't know why she was moved from foster

13   care?

14        A    I do not know.

15        Q    Is that usually what happens?

16        A    It depends on case to case.

17        Q    If a child is injured or hurt when they're in

18   foster care, is there a report that they are supposed to

19   fill out?

20        A    Yes.

21        Q    Does this look like a report that was filled

22   out?

23        A    Ah, yes.

24        Q    Is that one of your forms in your department?

25        A    Yes, it is.
```

166

```
1        Q    (By Mr. Gilman) And this was a report that was
2   made -- in March of '06?
3        A    Ah, yes.
4             MR. GILMAN:   Defendant's Exhibit No. 19 is
5   being offered to the State.
6             MR. PADILLA:   (Reviews document).
7        Q    (By Mr. Gilman) Have you ever seen this document
8   before?
9        A    No, I have not.
10       Q    You've never seen it?
11       A    No.
12       Q    So you haven't reviewed the files?
13       A    No.
14       Q    Mrs. Estrada, wouldn't it be a good idea to
15   review all of the files dealing with a particular family
16   if you're the case worker involved in it?
17       A    I don't know.  It just depends.  I mean, I tend
18   to review the files and organize files for the children
19   that I am working with.  And I've never gotten anything
20   from Mariah and I just never opened the file pertaining to
21   her.
22       Q    But you are not interested in what's happened to
23   the other children prior to you taking over the case?
24   Doesn't that history tell you something?
25       A    I mean, I knew the basics of it.  I didn't go
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1    into Mariah's file and study it.

 2        Q    What about the other children that you're

 3    working with today?

 4        A    I have reviewed their file.

 5        Q    Clear back to the beginning?

 6        A    Ah, I don't know if I have gone through every

 7    single sheet in the file, but I have looked through the

 8    file to obtain information that I needed at a specific

 9    time.

10        Q    So you take things as you need them?

11        A    Typically, yes.

12        Q    Is that how it goes?

13        A    It just depends on the case.

14        Q    Does this look like a document that you would

15    provide for someone?  Does that look like one of your

16    forms?

17        A    It doesn't look like one of our forms.  It looks

18    like an agency form.

19        Q    An agency for what?

20        A    Child placement agencies.

21        Q    Is this dealing with Mariah?

22        A    Yes, it is.

23        Q    Is that an incident that took place during

24    somebody else's communications?

25        A    It should be, yes.
```

168

1    Q    And you've never seen this document before?

2    A    No.

3    Q    And if this was a document that was handed to me

4    from Child Protective Services through the district

5    attorney's office, you couldn't dispute that, could you?

6    A    Ah, no.

7    Q    Does this look like something that would be

8    generated through your office, your department?

9    A    This is a contact sheet from the agency as well.

10   Q    Okay.  Would this be kept in the normal course

11   of business dealing with Child Protective Services?

12   A    Yes.

13   Q    And the same with this other document?

14   A    Which one?

15   Q    This one here?

16   A    Ah, yes.

17   Q    So both of these documents that I am showing you

18   are related to Child Protective Services in keeping up

19   with what is going on with these children?

20   A    Correct.

21            MR. GILMAN:  I want to introduce 19, 20 and

22   21, Judge.

23            MR. PADILLA:  We have no objections.

24            THE COURT:  It'll be received into

25   evidence.

Adelaido Flores, Jr.
Certified Shorthand Reporter

169

1          **(Defendant's Exhibit Number 19-21 admitted)**

2                    MR. GILMAN:   Can I publish them to the

3     jury?

4                    THE COURT:   Yes, sir.

5          Q     (By Mr. Gilman) This is another document.   Does

6     this look like a document that you keep in the normal

7     course of your business?

8          A     Ah, yes.

9          Q     Do you recognize this document?

10         A     No, sir.

11         Q     You've never seen this before?

12         A     No.

13         Q     But this looks like a document that you would

14    normally find in some of your files?

15         A     Yes, it is.

16                    MR. PADILLA:   Judge, we would object to it

17    being a separate exhibit.   This should go with the other

18    exhibits already offered.   We ask that this document be

19    attached to that exhibit rather than a separate number.

20    May we approach?

21                    THE COURT:   You need to take this up

22    outside the presence of the jury?

23                    MR. CORDOVA:   Yes, sir.

24                    THE COURT:   Ladies and gentlemen of the

25    jury, let me ask you to step out while we take up legal

1   arguments.

2                    THE BAILIFF:   Everybody please rise.

3                    **(Jury not present 4:04 p.m.)**

4                    THE COURT:   You may be seated.   Thank you.

5                    MR. PADILLA:   Your Honor, what has been

6   marked as Defendant's Exhibit No. 22, Your Honor, appears

7   to be some medical records -- or some records from the

8   DHS, and what also appears to be medical and dental

9   treatment thereon.   This was also the incident which is

10  marked as Defendant's Exhibit No. 19, Judge.   We would ask

11  the Court to consider attaching these three pages to

12  Number 19.   I think this confuses the jury, giving the

13  jury the impression that these are multiple treatments

14  when, in fact, it involves the same treatment.

15                   MR. GILMAN:   They are separate documents,

16  Judge.

17                   THE COURT:   I know.   But do they include

18  the same event?

19                   MR. GILMAN:   They are all fro the same day.

20                   THE COURT:   Put it all together.   The jury

21  still gets to read them all.   So are you making an oral

22  motion to attach Exhibits 22 to 19 and make that a part of

23  the other?

24                   MR. PADILLA:   Correct.

25                   THE COURT:   Any objections?

171

1    MR. GILMAN:  Well, yeah.  They are separate
2  documents, Judge.  The jury can look at them to see the
3  date just the same as we can.  And she doesn't know what
4  they are.  She just knows that they were in her file.  So
5  I can't really put them together.  I can't put much of
6  anything together.
7    THE COURT:  Well, my sense is if they
8  happened on the same date.
9    MR. GILMAN:  The only problem with that,
10  Judge, is that we are assuming the right hand knows what
11  the left hand is doing.  And so far I have yet to see
12  anything in Child Protective Services where one person
13  knows what the other person is doing.
14    THE COURT:  I'm going to go ahead and allow
15  you to introduce it as a separate, unless there is any
16  objections to that.
17    MR. PADILLA:  No, sir.
18    THE COURT:  -- as a separate document, and
19  just make the argument that it's together.  What other
20  objections do you have --
21    MR. PADILLA:  Then I want to take this
22  witness on voir dire concerning the documents.
23    THE COURT:  You can take her on voir dire.
24  Why don't you give that to Mrs. De Ford and let her look
25  at that?

172

```
 1              MR. PADILLA:  Can I do it in the presence
 2   of the jury?  Or do you want to do it outside the presence
 3   of the jury?
 4              THE COURT:  Outside the presence of the
 5   jury.
 6              MR. PADILLA:  May I approach the witness?
 7              THE COURT:  Yes, sir.
 8                 VOIR DIRE EXAMINATION
 9   BY MR. PADILLA:
10        Q    I'm going to show you what has been marked as
11   Defendant's Exhibit No. 22, and ask you -- you have
12   identified this as a business record from the department,
13   correct?
14        A    Correct.
15        Q    And it involves an incident that allegedly
16   happened on or about when, ma'am?
17        A    3/23/06.
18        Q    And there is an attachment to it dated 3/23/05.
19   Do you know when that document was attached to pages one
20   and two of Exhibit No. 22?
21        A    No.
22        Q    No?  Now, the defense has already offered
23   Exhibit No. 19, which I will draw your attention to it.
24   Does it appear that the last page of this exhibit is the
25   treatment for the incident that allegedly happened on
```

173

1    Defendant's Exhibit No. 19?

2         A    (Reviewing).  It would appear like it is.

3         Q    Again, it appears that the date of this incident

4    the date signed is 3/23/06, correct?

5         A    Correct.

6         Q    And Exhibit 22 has the date of the incident of

7    medical treatment of 3/23/05; is that correct?

8         A    Yes.

9         Q    I am just asking if you have any personal

10   knowledge concerning this document and the dates on those

11   documents?

12        A    I don't have any personal knowledge.  I have not

13   seen those before.  So I have no personal knowledge or

14   opinion of those.

15        Q    Now, ma'am, I am going to draw your attention to

16   State's Exhibit No. 32.  It contains the name of the child

17   as Mariah Alvarez, correct?

18        A    Mariah Alvarez, yes.

19        Q    It has the month and year of March of 2006?

20        A    Correct.

21        Q    Attached to it are some medical treatment for

22   Mariah Alvarez dated 3/23/05.  Now, you said you never

23   did -- you don't recall seeing the document before.  Can

24   you explain or attempt to explain the difference in the

25   dates?

174

```
 1        A   Honestly, it looks like it could be a five --
 2                THE COURT:  Mrs. Estrada?  I am having a
 3   hard time hearing you.  I'm sorry.
 4                THE WITNESS:  Basically, I would not be
 5   able to make out the last number.  It could be a five, or
 6   it could be just cut off.  It doesn't seem to be all
 7   there.
 8                MR. PADILLA:  That's all I have, Your
 9   Honor.
10                THE COURT:  Bring the jury back.
11                MR. GILMAN:  I am offering it.
12                THE COURT:  Any objections to Defendant's
13   Exhibit No. 22, the document attached?
14                MR. PADILLA:  Yes, sir, I believe that --
15                (Jury present at 4:11 p.m.)
16                THE COURT:  You may be seated.  Thank you.
17                You all approach.
18                (Discussion on the record at the bench.)
19                THE COURT:  Other than the objection, do
20   you have any other objection?
21                MR. PADILLA:  No, Your Honor.
22                THE COURT:  I'm going to go ahead and admit
23   it, then you can make your argument with regard to that.
24                (Defendant's Exhibit Number 22 admitted)
25
```

175

1              **JOANNE ESTRADA,**

2       having been first duly sworn, testified as follows:

3                 **DIRECT EXAMINATION (CONT'D)**

4    BY MR. GILMAN:

5       Q    Do you know when the last time the twins visited

6    their mother?

7       A    I don't know when the last time was, no.

8       Q    Did they visit their mother at all in June?

9       A    I don't remember.

10      Q    Did they visit their mother at all in May?

11      A    I don't remember exactly when they visited.

12      Q    Did they visit at all in April?

13      A    They should have visited, yes, in April.

14      Q    But you don't know for sure whether it's May or

15   June?

16      A    There was a period when the jail was not

17   allowing Mrs. Lucio visitations.  And I don't remember the

18   exact date of that.  But during that time the twins did

19   not visit.

20      Q    And after that period ended, was visitation

21   continued?

22      A    The foster parents were taking the twins to the

23   jail, yes.

24      Q    Were you aware of every time that the twins went

25   to go see their mother?

Adelaido Flores, Jr.
Certified Shorthand Reporter

176

```
 1        A    I'm not aware of what dates they got to see her
 2   or not.
 3        Q    Are you aware of any time that the other
 4   children that are in foster care visit their mother?
 5                   MR. PADILLA:  Your Honor, again, I'm going
 6   to object to the relevancy or materiality of the other
 7   children.
 8                   THE COURT:  I'm going to sustain the
 9   objection.  It's only what has to do with this case.
10        Q    (By Mr. Gilman) You recognize this?
11        A    The whole thing?
12        Q    This hand full of documents?
13        A    (Reviewing) I have seen documents like this
14   before, but I had never seen Mariah's.
15        Q    Are these documents that you would normally have
16   in your file?
17        A    Yes, they are.
18        Q    And these are all dealing with Mariah?
19        A    Ah, yes.
20                   MR. GILMAN:  I move for the introduction of
21   Defendant's Exhibit No. 23.
22                   MR. PADILLA:  We have no objections, Your
23   Honor.
24                   THE COURT:  They're admitted.
25                   (Defendant's Exhibit Number 23 admitted)
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

177

1          MR. GILMAN:  May I publish it to the jury?

2          THE COURT:  Yes.

3      Q   (By Mr. Gilman) Are you aware, Mrs. Estrada,

4  that the twins visited their mother yesterday?

5          MR. PADILLA:  Your Honor, again, what is

6  the relevancy?  It is also irrelevant and immaterial.

7          THE COURT:  Sustained.

8          MR. GILMAN:  Pass the witness.

9                    **CROSS-EXAMINATION**

10 **BY MR. PADILLA:**

11     Q   Mrs. Estrada, good afternoon.  I will be asking

12 you some questions.  Sometimes I mumble.  Just let me know

13 so I can be a little clearer.

14          Now, normally when Child Protective

15 Services gets involved and the children are removed, why

16 is it that the department gets involved?

17     A   Ah, there is a report called in and the

18 department investigates.

19     Q   When the children are removed because you

20 believe the report is well founded, what happens then?

21     A   The children are removed.  We petition the court

22 to validate the removable of the children.  We start a

23 legal proceeding and the children are placed in foster

24 care.

25     Q   And do you then -- is the parent or parents

178

1    allowed the opportunity to appear in court to contest the

2    issue of why the children were removed?

3         A    Yes, they are.

4         Q    Normally after a hearing, what happens?  If the

5    children is left under CPS conservatorship, what happens

6    then?

7         A    Typically, the parents are given an opportunity

8    to participate in court ordered services and demonstrates

9    the ability to protect and care for their child.

10        Q    And is it the department's position in these

11   type of cases that the department is going to make every

12   effort available to try to reunite the family, to get the

13   family back together?

14        A    Typically, yes.

15        Q    And normally what you have identified, or at

16   least through some questioning, you identified some

17   services you provided.  Are those normally required as a

18   result of court order?

19        A    Those tend to be the normal services that are

20   court ordered.

21        Q    If the safety of a child is not a concern, does

22   CPS normally follow what the judge instructs the

23   department to do?

24        A    If there is a court order, the department will

25   follow it to the best of its abilities.

1       Q     In these cases -- in this case, there are
2   numerous court orders affecting the children, correct?
3       A     Ah, yes.
4       Q     And, again, whether a child or children visit
5   with the parents, that's usually mandated by the judge's
6   order, correct?
7       A     Correct.
8       Q     And if a person -- a child is taken to see the
9   parent, that's normally within the court order, correct?
10      A     Correct.
11      Q     Now, when a child is placed in foster care, how
12  does that work?
13      A     What do you mean?
14      Q     Does the CPS office have foster families that
15  the children are assigned to?
16      A     Children are placed in foster homes.  Depending
17  on the availability, we try to keep all the siblings
18  together, if available.  If not, we try to keep them in
19  close proximity of each other.
20      Q     Does the law require family visits when the
21  siblings get together?
22      A     Sibling visits are not always court ordered, but
23  we do try to keep the sibling group well bonded.  So we do
24  offer visits just for the brothers and sisters.  We do
25  want to keep the sibling bond alive.  So we do offer

1    sibling visits between the brothers and sisters.

2        Q    And you also attempt to keep -- to retain some

3    kind of bond with the mother and father and children, if

4    possible?

5        A    If it's possible and court ordered, yes.

6        Q    Is it typical for children to be moved from one

7    foster home to another?

8        A    It depends on the case.

9        Q    It's not extraordinary if a child gets moved

10   from one foster home to another, that could be just a

11   matter of course because that's what the department feels

12   is in the child's best interest, correct?

13       A    Yes.

14       Q    Now, when you go into court, CPS is named as the

15   managing conservator, correct?

16       A    Correct.

17       Q    And the parents are the possessor conservators.

18   So the parents are allowed specific visitation by the

19   court order, correct?

20       A    Correct.

21       Q    However, CPS is responsible for doing everything

22   that a parent would be, like making sure that the child is

23   clothed, fed, receives medical treatment, things of that

24   nature; is that correct?

25       A    Did you say, and then CPS would be responsible?

181

```
 1      Q    Yes.

 2      A    Yes.

 3      Q    Now, your involvement in the Mariah Alvarez case

 4   was under your direct supervision for how long?

 5      A    I was never Mariah's case worker.

 6      Q    By the time you got the case, Mariah Alvarez had

 7   already died, correct?

 8      A    Correct.

 9      Q    If the child is injured while in foster care,

10   are the foster parents allowed or required to receive

11   medical treatment for the child?

12      A    Yes.

13      Q    And that is some of the reports that you have

14   identified previously, correct --

15      A    Correct.

16      Q    -- that the child received --

17      A    Correct.

18      Q    Now you've identified Beto Juarez as a

19   therapist?

20      A    Correct.

21      Q    And any therapist --

22      A    (Coughing)  I'm sorry.

23      Q    -- would be required to visit the child or the

24   children in any case also pursuant to court order?

25      A    I'm sorry.  Can you repeat that?
```

1        Q      Would Beto Juarez be contracted to counsel the

2    children pursuant to court order?

3        A      Beto Juarez is not counseling the children.

4        Q      Who is now?

5        A      Rene, Robert and Richard see Patty Navarro about

6    once every other week.  Richard also sees Jesse

7    Applewhite.  Gabriel and Adriana see Casey Monroe weekly,

8    and Sarah sees Sharon Spears.

9        Q      So it your responsible then to supervise them

10   and to ensure that the children are receiving the required

11   counseling?

12       A      Yes.

13              MR. PADILLA:   Pass the witness.

14                      **REDIRECT EXAMINATION**

15   **BY MR. GILMAN:**

16       Q      Mrs. Estrada, you don't have any evidence at all

17   of Melissa Lucio's being physically abusive to any of the

18   children, do you, in your file?

19       A      That I have come across or read in the file, no.

20       Q      And in your visitation that is court ordered by

21   another judge, if there were any indications that you felt

22   a child would be endanger in visiting a parent, you would

23   speak out, wouldn't you?

24       A      Correct.

25       Q      And your department is represented by the -- by

1    an attorney, right?

2        A    Correct.

3        Q    And that attorney is employed by the district

4    attorney's office of Cameron County; isn't that right?

5        A    Correct.

6        Q    So if there is a court order visitation of these

7    twins that were born in October of '07, and if there is

8    court order of the other children of Melissa Lucio by

9    court order, then there must have been no opposition from

10   the State of Texas?

11                  ` MR. PADILLA:  Your Honor, I object.  That

12   calls for -- assumes facts not in evidence, Your Honor.

13                  MR. GILMAN:  Well, there wasn't any --

14                  THE COURT:  Hold on just a second.  It's

15   what she knows.  She can testify as to what she knows.

16   Only what she knows.

17       Q    (By Mr. Gilman) There is no opposition that you

18   have ever observed from the State in reference to any of

19   this visitation?

20       A    For the older children, I was not present when

21   the court orders came out, so I wouldn't know.  For the

22   twins, I don't remember any opposition.

23                  MR. GILMAN:  Pass the witness.

24                  THE COURT:  Mr. Padilla, anything further?

25                  MR. PADILLA:  May I have a second?

Adelaido Flores, Jr.
Certified Shorthand Reporter

184

```
1                    THE COURT:  Yes, sir.  Do we need to excuse
2      the jury for just a minute?
3                    MR. PADILLA:  No.
4                    (Discussion on the record at the bench.)
5                    THE COURT:  I don't know how far along you
6      are.
7                    MR. GILMAN:  I've only got a page and a
8      half more to go.
9                    (End of bench conference.)
10                   THE COURT:  Proceed, Mr. Padilla.
11                   MR. PADILLA:  Your Honor, I just showed it
12     to counsel.  I need this witness to identify it.  I'm
13     going to be offering it.  May I approach?
14                   THE COURT:  Yes, sir.
15                        RECROSS-EXAMINATION
16     BY MR. PADILLA:
17         Q    Mrs. Estrada, I'm going to show you what has
18     been marked as State's Exhibit No. 41.  This is a document
19     in Cause Number 2004-09-67-NA.  Are you familiar with this
20     document, ma'am?
21         A    Ah, yes.  I have seen that before.
22         Q    Is there an affidavit that was filed in that
23     cause number?
24         A    Yes, it is.
25                   MR. PADILLA:  At this time, I am going to
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

185

1    offer State's Exhibit No. 41, Your Honor.

2                    THE COURT:  State's Exhibit number what?

3                    MR. PADILLA:  State's Exhibit No. 41.

4                    MR. GILMAN:  I don't have any objection.

5                    THE COURT:  It will be admitted.

6                    **(State's Exhibit Number 41 admitted)**

7                    MR. PADILLA:  May I publish it to the jury?

8                    THE COURT:  Yes.

9                    MR. PADILLA:  Pass the witness.

10                   THE COURT:  Mr. Gilman, any further

11   questions?

12                   MR. GILMAN:  Nothing further of this

13   witness.

14                   THE COURT:  May this witness now be

15   excused?  Mr. Gilman?

16                   MR. GILMAN:  Yes, sir.

17                   THE COURT:  Mr. Padilla?

18                   MR. PADILLA:  Yes, sir.

19                   THE COURT:  Mrs. Estrada, you may be

20   excused as a witness.  Thank you.  Call your next witness.

21                   (Witness excused at 4:35 p.m.)

22                   MR. GILMAN:  May we approach?

23                   THE COURT:  You know what, we are going to

24   take something outside of your presence just for a minute.

25   So I am going to ask you to step out.  Won't be anything

1   longer than five minutes.  So you got a quick potty break

2   but not anything more.

3                    **(Jury not present.)**

4                    THE COURT:  Okay.  The jury is out.

5                    MR. GILMAN:  Judge, I have two witnesses,

6   Norma Villanueva that you have previously said you would

7   not allow her to testify at this stage of the trial.

8   However, she was going to be testifying to a lot of what

9   Child Protective Services has in their documents, part of

10  which is dealing with the other children that the latest

11  bit of evidence that the State introduced includes.  And

12  she was --

13                   THE COURT:  I haven't seen what that

14  evidence is.  I understand it's an affidavit, but I don't

15  know --

16                   MR. PADILLA:  Yes, Your Honor.  It's an

17  affidavit.  May I approach, please?

18                   THE COURT:  Yes.  Go ahead.

19                   MR. GILMAN:  And then, my last witness that

20  I am thinking of calling is Dr. Pinkerman during the guilt

21  or innocence stage.  And if the Court is not going to

22  allow me to have Dr. Pinkerman testify, then I would like

23  to make a bill of particulars on that also.

24                   THE COURT:  Again --

25                   MR. GILMAN:  And that would probably be

```
 1   my --
 2                    THE COURT:   Again, what are you offering
 3   Dr. Pinkerman on?
 4                    MR. GILMAN:   Dr. Pinkerman has done some
 5   tests on Mrs. Lucio and has also reviewed with her all of
 6   what has transpired during this period of time.  He has
 7   also reviewed the video statement, and he will be offering
 8   testimony about Mrs. Lucio's propensity for violence, if
 9   any.
10                    THE COURT:   Her propensity for violence is
11   something that would be done with mitigation and future
12   dangerousness.  I don't think it's appropriate in the
13   guilt/innocence.
14                    MR. GILMAN:   Well, part --
15                    THE COURT:   Educate me if you think I am
16   wrong.
17                    MR. GILMAN:   Part of his testimony is that
18   Mrs. Lucio has all of the signs of being a battered woman.
19   And as a battered woman, she takes blame for everything
20   that goes on in the family.  And if dealing with a male
21   figure such as a husband she doesn't find fault with
22   anything that a husband does, she takes the blame for it.
23   She takes the blame for everything that goes on in the
24   house.
25                    THE COURT:   Then you do by -- you try -- by
```

188

1    implication prove something that she did not do without

2    bringing any direct testimony of it.

3              MR. GILMAN:  No, the --

4              THE COURT:  I mean, I am having problems --

5              MR. GILMAN:  The video statement goes hand

6    and glove with the battered woman syndrome.  She shows all

7    of the signs in that video statement of being a battered

8    woman.

9              THE COURT:  Well, in the statement she did

10   not admit killing the child.

11             MR. GILMAN:  No, she did not.

12             THE COURT:  She admitted actions that she

13   took that could have resulted in the death.  But she

14   denied ever having anything to do with the killing of the

15   child.  So, again, I am having a hard time figuring out

16   how it goes to the guilt or innocence.  I can see it as to

17   mitigation, but I don't see it as to guilt or innocence.

18   So I will make the same ruling.  And you're welcome to

19   make your bill of particulars.

20             MR. GILMAN:  I need a bill of particulars.

21             THE COURT:  That's fine.  I'm sorry.  I

22   didn't give you a chance to respond.

23             MR. PADILLA:  That's fine.  Can I go across

24   the hall?

25             THE COURT:  Hold on.  Not yet.  Almost.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1   Yeah.  We'll take a --

2                   MR. PADILLA:  Are you doing your bill right

3   now?

4                   THE COURT:  Is Dr. Pinkerman here?

5                   MR. GILMAN:  Yeah, he is here.

6                   THE COURT:  Is he?

7                   MR. GILMAN:  Yes.  I asked him to come over

8   because I thought we were going to use --

9                   THE COURT:  My sense of what to do is to go

10  ahead and rest in front of the jury, if that's what you

11  choose to do, make your bill of particulars after the jury

12  is excused, bring them back tomorrow morning depending

13  upon on whether you've got rebuttal witnesses, have the

14  jury charge argument at 9:00 and try to have the jury

15  charge ready and argue the case at about 10:30.

16                  MR. PADILLA:  Your Honor, we need to

17  discuss the doctor from San Antonio.

18                  THE COURT:  Yeah, I am just trying to

19  finish with the jury because they are kind of

20  inconvenienced.  I need to treat it as expeditiously as

21  possible.  If you do have rebuttal witnesses because what

22  you are talking about is the witness that you are bringing

23  down is also as to guilt or innocence as to the mitigation

24  of future dangerousness.

25                  MR. PADILLA:  She's also going to testify

1    to the eye -- the retina, the retina hemorrhage.  If

2    that's the testimony we may not need him.  Then we have

3    the other --

4                    THE COURT:  Well, okay.  We will take a

5    five minute break.  Confer with Mrs. De Ford and

6    Mr. Krippel and then come back in five minutes.

7                    MR. CORDOVA:  Your Honor, can we confer

8    with my client?  We may need more than five minutes.  We

9    will need to visit with my client about certain issues.

10                   THE COURT:  Sure.  Tell the jury -- we will

11   give you ten minutes.  Tell the jury they've got ten

12   minutes because I told them that we were not going to have

13   much.  So you've got ten minutes, Mr. Padilla, to go your

14   business and come back.

15                   **(Recess from 4:42 p.m. to 4:53 p.m..)**

16                   THE COURT:  Mr. Gilman, are you ready?

17                   MR. GILMAN:  Yes, sir.  I have my witness,

18   Dr. Pinkerman, here in the courtroom.  And with the

19   Court's permission, we will put a bill of particulars

20   together with the court reporter.

21                   THE COURT:  My suggestion is that you do

22   that after you rest in front of the jury so we can excuse

23   the jury.

24                   MR. GILMAN:  That's fine, sir.

25                   THE COURT:  And then you're more than

1    welcome to do that.  How much time do you think we're
2    going to need for the charge conference?
3                  MR. PADILLA:  I don't anticipate more than
4    an hour, Judge.  I have looked at the charge that the
5    Court gave us and it's pretty boiler plate.
6                  THE COURT:  Among the corrections that were
7    made by everybody, with the exception of -- I have not
8    made a decision on the lesser included offense of injury
9    to a child, but I'll be glad to accept whatever cases you
10   have in the morning and make a decision.
11                 MR. PADILLA:  All right.  What time are we
12   having the conference?
13                 THE COURT:  My sense is to do it at 9:00.
14                 MR. GILMAN:  All right.
15                 THE COURT:  But depending on whether you
16   are going to have rebuttal witnesses.
17                 MR. PADILLA:  Judge, at this point it
18   doesn't appear that we are.
19                 THE COURT:  Pardon me?
20                 MR. PADILLA:  We are not going to have any
21   rebuttal witnesses.  We will save them for the punishment
22   phase of the jury.
23                 THE COURT:  All right.  Bring in the jury.
24                 (Jury enters at 5:00 p.m.)
25                 THE COURT:  Y'all may be seated.  Thank you

192

```
1    very much.  What say you, Mr. Gilman?
2                 MR. GILMAN:  Judge, at this time we'll
3    rest.
4                 THE COURT:  Ladies and gentlemen of the
5    jury, does the State rest and close?
6                 MR. PADILLA:  Judge, we close, Your Honor.
7                 THE COURT:  Do you close?
8                 MR. GILMAN:  We close.
9                 THE COURT:  Ladies and gentlemen of the
10   jury, at this time both parties have rested and closed,
11   which means that the evidence -- part of the case is over.
12   Tomorrow, we have to have a charge conference with regards
13   to the written instructions to the jury.  Both sides have
14   already submitted their instructions to me.  I have
15   reviewed them.  We will have arguments on that and then we
16   will be ready to submit it to you probably by
17   10:00 o'clock tomorrow morning.  So tomorrow morning come
18   in at 10:00.  We will try to have the charge ready to go
19   so you can have arguments and start deliberating.
20                 Again, I will remind you, you are not
21   supposed to discuss this case with anybody.  Do not listen
22   to the news, television or radio.  Do not let anybody
23   discuss this case around you.  If they do, walk away.  If
24   they try to talk to you about this case, report it to me
25   immediately please.  You are not supposed to make any.
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

193

1    decision at all until all of the evidence is in, which is

2    now, have the written charge in front of you with regards

3    to the instructions as to the law and then hear the

4    arguments of the attorneys.  Only after all that takes

5    place and you retire to the jury room and you are all

6    together should you start discussing the case and the

7    evidence.

8              See you tomorrow morning at 10:00 o'clock.

9    Thank you very much.  All of the evidence that has been

10   admitted, you will have an opportunity to review.  All of

11   you will have an opportunity to review all of it.

12             (Jury recessed at 5:02 p.m.)

13             THE COURT:  Okay.  You wish to propose a

14   bill of particulars?

15             MR. GILMAN:  Yes, sir.

16             THE COURT:  I don't think I have to be

17   present for that.

18             MR. GILMAN:  No, sir.  I think we can just

19   do it between the three of us.

20             THE COURT:  You get with Mr. Flores.  We

21   will see you tomorrow morning at 9:00 for the charge

22   conference.

23             MR. PADILLA:  Yes, sir.

24             MR. GILMAN:  Yes, sir.

25             THE COURT:  Going back on the record.  Will

194

1    you please raise your right hand?

2                    THE WITNESS:  Yes, sir.

3                    **(Witness was sworn in by the Court.)**

4                    THE COURT:  Do you solemnly swear to tell

5    the truth, the whole truth and nothing but the truth so

6    help you God?

7                    THE WITNESS:  I do.

8                    THE COURT:  Please be seated, sir.

9                    THE WITNESS:  Thank you.

10                    **JOHN E. PINKERMAN,**

11      having been first duly sworn, testified as follows:

12                    **DIRECT EXAMINATION**

13   **BY MR. GILMAN:**

14        Q    Okay.  Would you state your name for the Court,

15   sir?

16        A    John Edward Pinkerman.

17        Q    And you reside here in Cameron County, do you

18   not, sir?

19        A    Yes, sir.

20        Q    Okay.  And your profession is what, doctor?

21        A    Clinical psychologist.

22        Q    Okay.  And a clinical psychologist, what kind of

23   training do you have?

24        A    I have a PhD in clinical psychology that was

25   granted from the University of Detroit Mercy Hospital in

195

1    1994.

2        Q    Okay.  And what other educational backgrounds do

3    you have?

4        A    Master's degree in 1981.

5        Q    Okay.  And you've been asked to testify in this

6    case by me; is that correct?

7        A    Yes.

8        Q    And your testimony during the guilt and

9    innocence stage would be what?  What were you going to be

10   testifying to in the guilt or innocence stage?

11       A    On the basis of my review of information,

12   consultation with additional experts, and the evaluation

13   that I have done with the defendant Mrs. Lucio, I was

14   going to testify about the characteristics and makeup of

15   her psychological functioning.  I was also going to

16   address how her demeanor, both immediately after the

17   incident and during the interrogation, may be understood

18   by understanding and appreciating the psychological

19   elements and previous history and background that she has

20   lived through.  I was also going to address the notion of

21   how difficult it might have been for her to step into some

22   of the treatment, even though it was minimally offered.

23   And those are the highlights.

24       Q    Okay.  And prior to your testimony, you did

25   review the interrogation video; is that correct?

196

1      A    Yes, sir.

2      Q    All right.  Thank you.  There is no exhibits.

3           Do you have a curriculum vitae with you?

4      A    Not with me.

5      Q    All right.  That's it.  Thank you.

6           MR. GILMAN:  I will offer Defendant's

7    Exhibit No. 24 as a curriculum vitae of Dr. Pinkerman.

8    It's for the Bill of Particulars.

9           **(Defendant's Exhibit Number 24 admitted for**

10          **Bill of Particulars No. 2)**

11          **(Recess from 5:14 p.m. to 9:00 a.m., July**

12          **8, 2008.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

Adelaido Flores, Jr.
Certified Shorthand Reporter

197

```
1    THE STATE OF TEXAS:

2    COUNTY OF CAMERON:

3                    CERTIFICATE OF COURT REPORTER

4         I, ADELAIDO FLORES, JR, Official Court Reporter in

5    and ior the 138th Judicial District Court of Cameron

6    County, State of Texas, do hereby certify that the above

7    and foregoing contains a true and correct transcription of

8    all portions of evidence and other proceedings requested

9    in writing by counsel for the parties to be included in

10   this volume of the Reporter's Record, in the

11   above-entitled and numbered cause, all of which occurred

12   in open court or in chambers and were reported by me.

13        I further certify that this Reporter's Record of the

14   proceedings truly and correctly reflects the exhibits, if

15   any, admitted by the respective parties.

16        WITNESS MY OFFICIAL HAND on this the 7th day of July,

17   2009.

18                    _____
                      ADELAIDO FLORES, JR, Texas CSR
19                    Official Court Reporter
                      138th District Court
20                    974 East Harrison Street
                      Brownsville, Texas 78520
21                    (956) 550-1489
                      Certificate No. 1117
22                    Expiration Date: 12/31/08

23

24

25
```

Adelaido Flores, Jr.
Certified Shorthand Reporter