*76020*

1

REPORTER'S RECORD

VOLUME 36 OF 44 VOLUMES

TRIAL COURT CAUSE NO. 07-CR-885-B

- - - - - - - - - - - - x

| | | |
|---|---|---|
| STATE OF TEXAS | : | IN THE DISTRICT COURT |
| | : | |
| VS | : | 138TH JUDICIAL DISTRICT |
| | : | |
| MELISSA ELIZABETH LUCIO | : | CAMERON COUNTY, TEXAS |

- - - - - - - - - - - - x

JURY TRIAL - DAY 5

On the **8th** day of **July, 2008,** the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable **Arturo C. Nelson,** Judge Presiding, held in Brownsville, Cameron County, Texas.

**FILED IN**
**COURT OF CRIMINAL APPEALS**

AUG 0 6 2009

**Louise Pearson, Clerk**

Proceedings reported by computerized stenotype machine.

# ORIGINAL

Adelaido Flores, Jr.
Certified Shorthand Reporter
Cameron County, Texas

```
 1                    A P P E A R A N C E S

 2    APPEARING FOR THE STATE:

 3    APPEARING FOR THE STATE:

 4         HON. ARMANDO VILLALOBOS
           State Bar No. 00788584
 5         Criminal District Attorney for Cameron County
           - AND -
 6         HON. ALFREDO PADILLA, JR.
           State Bar No. 15404600
 7         & HON. JOSEPH KRIPPEL
           State Bar No. 24007515
 8         & HON. MARIA DE FORD
           State Bar No. 24043626
 9         Assistants to the Criminal District Attorney
           Cameron County Courthouse
10         974 E. Harrison Street
           Brownsville, Texas  78520
11         Telephone:  (956) 544-0849
           Fax:  (956) 544-0869
12

13    APPEARING FOR THE DEFENDANT:

14         HON. PETE GILMAN
           State Bar No. 07952500
15         6933 N. Expresway
           Olmito, Texas  78575
16         Telephone:  (956) 350-6954
           Fax:  (956) 350-8056
17

18    APPEARING FOR THE DEFENDANT:

19         HON. ADOLFO E. CORDOVA, JR.
           State Bar No. 00787286
20         Law Office of Adolfo E. Cordova, Jr.
           711 North Sam Houston
           San Benito, Texas  78586
21         Telephone:  (956) 399-1299
           Fax:  (956) 399-4484
22

23

24

25
```

3

```
1                    VOLUME 36

2        CHRONOLOGICAL INDEX - JURY TRIAL - DAY 5

3    7/08/08                          PAGE    VOL

4

5    Objections to Charge                3      36

6

7    Court's Ruling/Charge              12      36

8

9    Closing Arguments by MRS. DE FORD  16      36

10

11   Closing Arguments by MR. GILMAN    23      36

12

13   Closing Arguments by MR. PADILLA   39      36

14

15   Jury Notes:1 & 2                   60      36

16

17   Jury Polled                        64      36

18

19   Adjournment                        66      36

20

21   Certificate of Court Reporter      67      36

22

23

24

25
```

```
 1
 2                   P R O C E E D I N G S
 3
 4              (Jury not present.)
 5              THE COURT:   Call now the case of
 6   07-CR-885-B State of Texas versus Melissa Elizabeth Lucio.
 7   Let the record reflect that the defendant is present along
 8   with her counsel Mr. Cordova and Mr. Pete Gilman.   And the
 9   State is being represented by Mr. Krippel and Al Padilla.
10              Gentlemen, I have given you a copy of the
11   charge of the Court.   I have not included injury to a
12   child.   As I understand the law, the lesser offense would
13   be included if it is the same elements as the other
14   offense, but for one element not being included, which is
15   the lesser included offense.   And in this particular case,
16   given the fact that there is a death, there is testimony
17   that there was and intent to bite, spank severely, if I
18   remember the exact words, and cause injury to the child,
19   but there was no intent to cause death.   However, the
20   striking was done intentionally and death could reasonably
21   result therefrom.   I am having a hard time seeing injury
22   to a child as a lesser included offense right now.
23              MR. GILMAN:   I think you just said it,
24   Judge.   I think you just said it.   You gave a definition
25   of serious bodily injury.   And because there is serious
```

4

```
1    bodily injury --
2              THE COURT:  But, was it an intent to cause
3    it?  And the result of it was a death.
4              MR. GILMAN:  I think --
5              THE COURT:  Had there been no death, I
6    think there would be --
7              MR. GILMAN:  No, I think that serious
8    bodily injury includes the death.  The serious bodily
9    injury also can be the failure to give the medical
10   attention.
11             THE COURT:  But Mr. Gilman?
12             MR. CORDOVA:  Your Honor, if I may?  In
13   versus State, the Court firmly held that injury to a child
14   is a lesser included offense of capital murder.
15             THE COURT:  Let me see that.
16             MR. CORDOVA:  Secondly, Your Honor --
17             THE COURT:  Let the record reflect that
18   this is the first time that I get this.
19             MR. CORDOVA:  That is a fairly controlling
20   case.  Most cases cite that case, Judge.  It also
21   discusses negligent homicide.  In addition to that, Judge,
22   yesterday, the Court stated that the video itself was not
23   a confession as to murder.  That she did, in the video,
24   discuss the fact that she hit the child.  And the standard
25   is, if there is any evidence at all that a jury can find
```

5

1   that she committed the lesser included, then it must go to

2   the jury.

3           THE COURT:  Let me give you an example.  If

4   I get a bat and I hit you over the head with it and my

5   intent is only to teach you a lesson and it results in

6   death, is it still not murder?

7           MR. CORDOVA:  It may still be murder, yes,

8   sir.  It may be.  But the jury gets to look at all of the

9   factors there.  That's what the case law says, Judge.

10          THE COURT:  But isn't death the result of

11  hitting you over the head with a bat?

12          MR. CORDOVA:  Yes, sir.  But if it were

13  reckless, Judge, if the example that Mr. Padilla used when

14  we shot Mr. Flores with a pistol because he was twirling

15  it on a finger, isn't the result there, still death?

16          THE COURT:  But the intent was not.

17          MR. CORDOVA:  Isn't that the whole point?

18          THE COURT:  No.  There's a difference.

19  There's a difference between, intending to scare and

20  intending to strike.  And when you intend to strike, as a

21  result, you cause the death, the law says it doesn't

22  matter whether you intended to cause the death or not, if

23  that is the result of striking, then that's a murder;

24  ergo, the example of the bat.  I am just --

25          MR. GILMAN:  I disagree with that.

6

1    THE COURT:  Please tell me why.

2    MR. GILMAN:  Well, I think serious bodily

3  injury, if you look at the definition of serious bodily

4  injury, your intent is there to cause serious bodily

5  injury, which may result in death in that part of your

6  definition.  If the Court is making that ruling, the only

7  thing I am asking is the Court recognizes the fact that I

8  made a proposed charge --

9    THE COURT:  The charge is stamp filed.  The

10  proposed charge -- the proposed charge on what you claim

11  is the lesser included offense of injury to a child, is

12  stamp filed, and it's in the file, and you have filed it.

13    MR. GILMAN:  And the Court is denying that?

14    THE COURT:  That's what I'm struggling with

15  right now.  And my tendency is to deny that.

16    MR. GILMAN:  All right.  Your Honor.  Note

17  my exception.

18    THE COURT:  I will rule on it.

19    MR. CORDOVA:  One last case, Judge, is Luna

20  versus State.  This was handed down the 26th of June, of

21  this year, about a week and a half ago -- wherever we are

22  at this point.  It also holds, Judge, that -- it cites

23  Paz.  In this case there was a death of a child.  It

24  discusses capital murder.  I have highlighted that for the

25  Court, the specific arguments that the Court had, and in

```
 1    that case, the State wanted the lesser included offense.
 2    The Defendant did not want a lesser included offense, and
 3    the Court found that because injury to a child is a lesser
 4    included offense, it should have been included in the
 5    charge.
 6                   MR. PADILLA:  Your Honor, a lot of these
 7    cases -- may I address the Court?
 8                   THE COURT:  I'm listening.
 9                   MR. PADILLA:  A lot of these cases, what is
10    happening is that the State has indicted in capital
11    murder, and then included the lesser included charge on an
12    additional paragraph in the indictment alleging, you know,
13    serious bodily injury.  So there are differences.  Some of
14    these cases --
15                   THE COURT:  The Valdez case and another
16    case that I saw -- one of them had a lesser included
17    offense as a second count of the indictment.  And the
18    Valdez case I think had the indictment amended to include
19    that.  However, the indictment in this particular case --
20                   MR. CORDOVA:  Was only to capital murder,
21    Your Honor.
22                   THE COURT:  -- is only to capital murder.
23                   MR. PADILLA:  Yes, Your Honor.  The State
24    is not alleging --
25                   THE COURT:  Hold on.
```

```
 1                    MR. CORDOVA:  I'm sorry.

 2                    THE COURT:  And:  "Intentionally causing

 3      the death of an individual, namely Mariah Alvarez, by

 4      striking, shaking with the defendant's hand, foot or other

 5      object, Mariah was an individual younger than six years of

 6      age."  So it doesn't say by striking or causing bodily

 7      injury -- serious bodily injury that resulted in death.

 8      It doesn't say that.  And the testimony in this particular

 9      case is that she struck the child, that she spanked the

10      child severely.  There is circumstantial evidence of hair

11      missing from the scalp indicating that her head was used

12      and pulled in a violent way, possibly against the wall.

13      That could be a conclusion drawn from that.  And the

14      defendant's own testimony or statement was that she

15      intentionally bit the child, that she intentionally

16      spanked the child severely, that she intentionally caused

17      the injuries to the ears, which is striking to the head,

18      and who knows where the head wound up.

19                    MR. PADILLA:  And as the Court recalls, she

20      said she caused all of the injuries to the child with the

21      exception of the scratch on the face and the foot injury,

22      which would be tantamount to the head injury of how the

23      child died.

24                    THE COURT:  I don't think that was

25      specifically covered in her statement in terms of the head
```

1    injury itself.  But the circumstantial evidence could draw

2    that conclusion.

3                    MR. CORDOVA:  And it could draw the

4    conclusion that she just injured the child, Judge.  You're

5    making the argument for including it.  It's circumstantial

6    evidence, number one.  Both of you are misstating what the

7    statement said.  She didn't say she was responsible for

8    all the injuries minus the foot and scratches.  She said

9    she was not responsible for the -- the bruises on the back

10   of the neck.  There was nothing about the ear, Judge.  I

11   don't know where that comes from.  But there was no

12   testimony -- nothing on her statement about her injuring

13   the ears.  I heard that statement six times, and there is

14   nothing about ears.  There is a scratch to an ear.  She

15   says -- all she says is, there's a scratch --

16                    THE COURT:  There are bruises to the ear.

17                    MR. CORDOVA:  She was never asked about

18   that.

19                    THE COURT:  You're right about that.  As

20   far as I remember she was not asked that.

21                    MR. CORDOVA:  And he says:  What about this

22   scratch?  Or what about this?  And she says:  I think it's

23   a scratch.  How did she get it?  I don't know.  I mean, I

24   don't know.

25                    THE COURT:  She did say, she did not know.

1           MR. CORDOVA:  There were bruises to the

2    chest.

3           THE COURT:  There was a conclusory

4    statement made by Ranger Escalon that talked about:  Well,

5    you did all of the injuries except the one on the foot and

6    the scratch?  And she said:  Yes.  But that was not

7    specific enough.  I'll grant you that.

8           My problem is -- I go back to my example.

9    If I intend to hit you with a bat and it's only to catch

10   your attention and teach you a lesson, and it results in

11   death, is that not murder?

12          MR. CORDOVA:  Can a jury not look at the

13   lesser included in that case, Judge?  And the answer would

14   be, yes.  Of course they could, Judge.

15          THE COURT:  I don't know.

16          MR. CORDOVA:  Of course you could, Judge.

17   That's his argument, to say:  I intended to do it, and I

18   should have known the result being death.  But that's not

19   a conclusory situation that the Court can rule upon.

20          THE COURT:  You see, the appellant in this

21   particular case argued at trial that there was evidence

22   showing that the deadly blow could have been inflicted

23   recklessly rather than intentionally.

24          MR. CORDOVA:  Which case is that, Your

25   Honor?

11

1                THE COURT:  The Paz case.  In this

2    particular case, there is no evidence of what the deadly

3    blow was.  We do know that there were multiple contusions

4    to the head, that she had as a result of subdural

5    hematoma, and as a result of that, she died.  That was

6    what the evidence was.

7                MR. CORDOVA:  And we have evidence that

8    there was a fall on stairs.

9                MR. PADILLA:  There is no evidence of that,

10   Judge.  There is hearsay statement made by the defendant.

11   No other evidence at all in the record showing that this

12   child fell.

13               THE COURT:  If you take all of the

14   statement that she gave or -- you can't choose and take it

15   apart.  You can argue it --

16               MR. PADILLA:  Correct.

17               THE COURT:  -- but for purposes of

18   identifying whether or not there was some evidence, she

19   did state that she fell down three steps.

20               MR. PADILLA:  That she had been told.

21               THE COURT:  That she had been told, that's

22   correct.  That she had been told.

23               MR. CORDOVA:  And the last thing I'll say

24   on the issue, Judge, is that the Court is not to look at

25   the veracity of the evidence or to decide whether the

1   evidence is great evidence or not.  The Court -- if there

2   is evidence that a lesser included offense could have

3   occurred, then the Court must submit it to the jury, and

4   it's an argument for Mr. Padilla to make.

5           THE COURT:  (Court Reads)  "Some evidence

6   must exist in the record that the defendant was engaged in

7   the lesser included offense."

8           MR. CORDOVA:  I will leave it at that, Your

9   Honor.

10          MR. PADILLA:  The State doesn't believe

11  that she is entitled to a lesser included offense.

12          THE COURT:  Pardon me?

13          MR. PADILLA:  The State obviously does not

14  believe that the lesser included offense should be

15  included.

16          THE COURT:  I don't believe there is any

17  testimony to show that if she's guilty, she's only guilty

18  of the lesser offense.  Had they concluded that her death

19  was caused by lack of medical attention that she knew

20  should have been given, then I think, an injury to a child

21  would have been a logical conclusion.  But the intentional

22  striking, if it results in death, it results in death.

23  I'm going to deny it.

24          MR. GILMAN:  Note my exception, please,

25  sir.

Adelaido Flores, Jr.
Certified Shorthand Reporter
Cameron County, Texas

```
1              THE COURT:  I'll note your exception, sir.
2              MR. GILMAN:  Thank you.
3              THE COURT:  Is there anything else wrong
4    with the charge of the Court?
5              MR. PADILLA:  Judge?  I've looked at the
6    charge, and the State has no opposition to it.
7              THE COURT:  Other than that one lesser
8    included.
9              MR. GILMAN:  Without waiving my proposed
10   charge of injury to a child, and my objections thereto,
11   no.
12             THE COURT:  How much time do y'all need to
13   argue this case?
14             MR. PADILLA:  Judge, I would ask
15   respectfully 40 minutes.
16             MR. GILMAN:  That's fine.
17             THE COURT:  Okay.  Each side has 40
18   minutes.  When the jury gets there, we will go ahead and
19   do that.  It's 9:34 a.m.  Now, where did Mr. Padilla go?
20             THE BAILIFF:  He went to go get Maria.
21             THE COURT:  Will you call Mr. Rolando
22   Gonzalez in, please.
23             THE BAILIFF:  All rise for the juror.
24             (Juror enters at 10:02 a.m.)
25             THE COURT:  You may be seated.
```

14

1    Mr. Gonzalez?

2                    JUROR GONZALEZ:  Yes, sir?  (Stands)

3                    THE COURT:  Mr. Gonzalez?  Yesterday, you

4    made known to the bailiff that you knew a Norma

5    Villanueva?

6                    JUROR GONZALEZ:  Yes, sir.  At the time, I

7    didn't know first when you all mentioned the names --

8                    THE COURT:  Yes.

9                    JUROR GONZALEZ:  Maybe I didn't remember

10   the name, but I remembered her face.  I used to work with

11   her.

12                   THE COURT:  You used to work with her?

13                   JUROR GONZALEZ:  Yes.

14                   THE COURT:  Where at?

15                   JUROR GONZALEZ:  Valley Baptist Regional.

16                   THE COURT:  Is there anything in that

17   relationship that would tend to make you believe her more

18   than anybody else?

19                   JUROR GONZALEZ:  No, sir.

20                   THE COURT:  You would treat her just like

21   anybody else?

22                   JUROR GONZALEZ:  Yes, sir.

23                   THE COURT:  Do you have any questions,

24   Mr. Padilla?

25                   MR. PADILLA:  No, Your Honor.

1    THE COURT:  Mr. Gilman?

2    MR. GILMAN:  No, sir.

3    THE COURT:  We just needed to be sure.

4    JUROR GONZALEZ:  I wanted to bring it out.

5    THE COURT:  Thank you.  And I appreciate

6 it. It is better to be safe than sorry.  You may be

7 excused.

8         (Jury /Juror excused at  **10:03 a.m.**)

9    THE COURT:  Go ahead and bring them back

10 in.  Are you all ready for the jury?  Bring the jury in.

11    MR. PADILLA:  We just have to --

12    THE COURT:  Mrs. De Ford, I understand you

13 are going to give back 45 minutes?

14    MRS. DE FORD:  (Laughs)  Sure.  That'll

15 work!

16    THE COURT:  Fifteen and 25.  Is that fair?

17    MR. GILMAN:  Yes, sir.

18         (Jury enters at 10:04 a.m..)

19    THE COURT:  You all be seated.  Thank you

20 very much.  Cause Number 07-CR-885-B, State of Texas

21 versus Melissa Elizabeth Lucio.  Let the record reflect

22 that the defendant is present along with her attorneys,

23 the Honorable Adolfo Cordova and Pete Gilman.  And the

24 State is represented by Maria De Ford and Al Padilla.  The

25 jury is present and all seated.

1          Ladies and gentlemen of the jury, all of

2     the evidence is before you, and the only thing that's left

3     is to receive a charge of the Court and hear the arguments

4     of the attorneys.  I will read the charge of the Court to

5     you containing the law applicable in this case.

6               (Charge Read by the Court)

7               THE COURT:  Is the State ready to proceed

8     with closing arguments?

9               MR. PADILLA:  The State is ready.  Mrs. De

10    Ford will begin.

11              MRS. DE FORD:  Your Honor, if I may have a

12    few moments so that our young man can set up the equipment

13    for me?  It'll take a few minutes.

14              THE COURT:  Okay.  You can have two

15    minutes.

16              MRS. DE FORD:  Thank you, Your Honor.  Good

17    morning, ladies and gentlemen.  Mariah Alvarez was

18    defenseless to protect herself against this defendant.

19    She was too small.  She weighed only 25 pounds.

20              MR. GILMAN:  Objection, Your Honor.  That's

21    not in evidence.

22              THE COURT:  The weight was not in evidence.

23              MRS. DE FORD:  Your Honor, the pathology

24    report has her weight.

25              THE COURT:  Proceed.

1          MRS. DE FORD:  She was powerless to protect

2    herself against this defendant.  She couldn't defend

3    herself.  She was too small.  What could she do to stop

4    the beatings, to stop the biting?  She couldn't do

5    anything.  She was too small.

6          Ladies and gentlemen, we are asking each

7    and every one of you justice for Mariah, for the pain and

8    the suffering that she endured at the hands of the one

9    person in this room that was supposed to protect her, the

10   defendant.  This is no accident.  You've seen the

11   photographs, the beatings that this little girl endured.

12   This is no fall.  It's not an accident.

13          They expect you to believe that she

14   inflicted over 100 injuries on this little girl, but not

15   the one that killed her.  That's not what the evidence

16   said.  Look at the evidence.  No blood level.  She killed

17   this little girl, Dr. Farley told you.  She killed this

18   little girl.  She beat her to death.  This Defendant is a

19   cold-blooded murderer.  She knew exactly what she was

20   doing each and every time she struck the little girl.  It

21   wasn't an accident.  She intended to kill her.  And that's

22   what she did.

23          After that fatal blow, after she struck

24   Mariah, after she caused that head injury, she didn't help

25   this little girl.  She let her lie on that bed as her

1    brain started to swell, as she struggled to breathe.  She

2    didn't help her.  And she started seizure without food and

3    water.  She left her there to die like a wounded animal.

4    When her heart finally gave out, when she went into

5    cardiac arrest, she didn't help her.

6            She doesn't deserve your sympathy.  She

7    doesn't deserve your loyalty.  After that little girl went

8    into cardiac arrest, the paramedic told you when they got

9    there, this little girl lay on the entrance of that

10   apartment on the floor by herself.  No one there to hold

11   her, no one there to comfort her.  After she killed her,

12   she discarded her like a broken doll.  Why did she whip

13   her?  It didn't even faze her.  She was frustrated.  She

14   had too many kids.  It's no excuse for what she did to

15   this little girl.  It's not acceptable.

16           The Judge has given the jury charge.  This

17   is the law that you will apply in this case.  I wanted to

18   talk to you about a couple of things in here.  These acts

19   of the defendant were intentionally and knowingly.  This

20   is no accident.  One hundred or more injuries on this

21   girl.  She knew what she was doing.  Dr. Farley told you

22   this little girl had bruising all across her scalp.  The

23   worst case she's ever seen.  She told you she died from a

24   beating.

25           This little girl was beaten to death by

1   this defendant.  It was no accident.  She told you in her

2   confession she was responsible, no one else.  Only when

3   she finally came clean with the Ranger.  She never told

4   him this was an accident.  She never told him anything

5   about the stairs because she knew what she had done.  She

6   told you what she had done.

7           We also had to prove in this case that the

8   defendant killed Mariah by striking her, by beating her,

9   by throwing her, by shaking her.  Dr. Farley told you she

10  was beaten to death.  That's exactly what she did.  Even

11  their own expert tells you there was hemorrhages in her

12  eyes.  That is the result of being shaken, and beaten.

13  She had those injuries on both sides of her ears.  What

14  does that tell you?  She was hit on the head.  That's what

15  caused the fatal injury.  And she did it.

16          The Judge also instructed you to consider

17  all of the facts and circumstances surrounding Mariah's

18  killing, and I ask you to do that because that little girl

19  was defenseless.  There was no one there to protect her.

20  She did it supposedly out of frustration.  The biting,

21  that she bit that little girl so hard on, and you see

22  those pictures, that this little girl bled from those

23  bites.

24          She pinched her little vagina.  What kind

25  of mother does that?  What does that tell you about who

1   she is?  She's doing this to her baby girl, to her

2   daughter.  Not acceptable in our community, ladies and

3   gentlemen.  Consider everything about the facts of this

4   case of how Mariah died.

5               The State has the burden in every case to

6   prove the case beyond a reasonable doubt.  And it's a

7   burden that we accept freely because we do not want people

8   in this community to have to prove their innocence.  It is

9   our responsibility to prove them guilty.  And in this

10  case, we have proven that to you beyond all doubt, and

11  beyond every doubt.  I don't want -- there is no

12  reasonable doubt that this defendant killed that little

13  girl.  It doesn't require that we have to prove it beyond

14  all doubt or beyond every doubt, but only beyond a doubt

15  based on your common sense and reason.  We have done that,

16  ladies and gentlemen.  Her confession.

17               (Videotape confession played.)

18               THE RANGER:  "Was it intentional?

19               THE DEFENDANT:  No, it wasn't.  It was an

20  accident.

21               THE RANGER:  Show me exactly how you did

22  it.

23               THE WITNESS:  I was -- she was acting up in

24  her -- (inaudible)

25               THE RANGER:  That's a pretty good bite.

```
 1    Make you mad?
 2                    THE WITNESS:  No.
 3                    THE RANGER:  Why did you do it?
 4                    THE WITNESS:  I just did it. "
 5                    (End of Excerpt played)
 6                    MRS. DE FORD:  Ladies and gentlemen, on her
 7    confession she also tells us that she beat that little
 8    girl when she was sitting, when she was standing, when she
 9    was laying in her bed, in the bathtub.  That explains all
10    these bruises.  She is the one that did it and no one
11    else.  Dr. Vargas, the emergency room doctor for over 30
12    years tells you, this is the worst case he has ever seen.
13    He tells you -- his testimony tells you this isn't a fall.
14    That bruising is not consistent with falling.  That little
15    girl didn't have any external injuries on her head because
16    it wasn't a fall.
17                    Dr. Farley told you it's not a fall.  It's
18    impossible.  This little girl had too many contusions on
19    her scalp that caused her brain to swell.  It doesn't just
20    happen one time.  She was bleeding to death.  That's what
21    she told you.
22                    Even their own expert tells you that
23    bleeding in the eyes, that hemorrhaging is the result of
24    being struck.  He agrees with that, he tells you.  He
25    doesn't disagree with anything.  The autopsy report agrees
```

1   with Dr. Farley.  He even tells you it's possible she died

2   from being thrown.

3                   Detective Villarreal told you that on the

4   way -- after she had already been arrested, charged with

5   capital murder, she gets on the phone, calls someone and

6   tells that person:  I did it.  I'm responsible.  You have

7   all of the evidence that you need to convict Mariah's

8   killer.

9                   Ladies and gentlemen, this defendant

10  intentionally and knowingly killed that little girl.  This

11  is your community.  I ask you to care about Mariah.  I ask

12  you to care about her life.  But more importantly, I ask

13  you to care about her death and the manner in which she

14  died.  I ask that you tell this defendant that the killing

15  of children in our community is not going to be tolerated.

16  I ask you to tell her that, even though she has silenced

17  this little girl by killing her.

18                  You see her eyes call for justice.  We ask

19  that you give Mariah justice.  We ask that you find her

20  guilty of killing her baby girl, and guilty of capital

21  murder.  Thank you for your time and your services.

22                  THE COURT:  Mr. Gilman?

23                  MR. GILMAN:  Judge, can they remove some of

24  this technology?

25                  THE COURT:  I am not going to hold it

23

```
 1    against your time.  You want a five-minute warning,
 2    Mr. Gilman?
 3                MR. GILMAN:  No, sir.  About one minute.
 4                Good morning, folks.  This portion of the
 5    trial is opening statements, and not evidence.  You hear
 6    and you have heard all of the evidence that the Court has
 7    allowed from the witness stand.  If I misstate anything, I
 8    will apologize right now.  Go by what your memory is in
 9    this trial.
10                This has been a very difficult case, a very
11    difficult case because of the emotions that -- that we all
12    have.  But I want to start by talking to you a little bit
13    about the voir dire.  Remember when we brought each one of
14    you in here and you were up there on the witness stand and
15    we were asking you questions?  And one of the things that
16    I asked you was:  Are you strong enough to say to the
17    State, no?  And each one of you assured me that you were
18    strong enough to say "no" to the State.
19                We also talked about what does
20    intentionally and knowingly mean to you?  And each one of
21    you talked about what intentionally and knowingly means.
22    That you have every intention of doing that which is what
23    came about.  And the Court gives you the definition in his
24    charge.
25                What we went through at the beginning, we
```

1    went through 125 people to get to you people.  That was

2    not for nothing.  That was very important.  Because it

3    gave us an opportunity to talk to each one of you, to let

4    you know about some of the problems that are going to be

5    coming up.  We ask those questions for a reason.

6              Now, in the opening remarks that we made in

7    the beginning of the trial after you were all seated here,

8    I told you my client is not up for "Mother Of The Year."

9    I told you that my client is guilty of injury to a child.

10   She is and she has admitted that.  The question here

11   before you is whether or not on February 17, 2007, Melissa

12   Lucio intentionally or knowingly killed Mariah Alvarez.

13   That's the issue.  That's the issue.  Not whether she beat

14   her.  Not whether she broke her arm.  Not whether she's a

15   lousy mother or didn't provide for her children.  That's

16   not an issue.  The issue is whether or not she killed

17   Mariah on the 17th of February, 2007.

18             Let's take a look at this now.  The State

19   says in their indictment that she intentionally and

20   knowingly -- or knowingly, caused the death of Mariah by

21   striking her, shaking her, throwing her with her hand,

22   foot, or object unknown to the Grand Jury.  That's what

23   the State has to prove to you beyond a reasonable doubt.

24   Not whether or not this little girl was bruised from head

25   to foot.  We admit that.  We admit that.  What we do not

25

1    admit is that she killed her on the 17th of February,

2    2007.

3                     This whole case revolves around this video.

4    This video is real important.  If you have -- if you

5    cannot remember it all, play it again.  It's a long, long

6    video.  And I'm sorry for that.  But this is the key to

7    everything in this case.

8                     When Melissa Lucio was taken into the

9    police station, this video started at 10:00 o'clock at

10   night -- 9:53 I believe it says on the video -- 9:53 at

11   night.  What time was that woman awake in the morning?

12   Don't you know with that many kids around she was probably

13   up around 6:00 o'clock.  And this is 9:53.  This is a

14   woman that has nine kids around her and a husband, all day

15   long.  This is a Saturday.  At 9:53, most people are

16   getting pretty tired if they have been up around

17   6:00 o'clock in the morning.  They are probably exhausted.

18                     This is just the beginning of what's taking

19   place.  You are down at the police station.  Folks, when

20   you go down to the police station, you're not going to

21   leave.  The police are there for one purpose.  They're not

22   your friends.  They're not going to help you.  That's

23   something that we tell our kids when they're growing up.

24   They have got no intention of letting you walk out of

25   there.  Their intentions was to get something out of

1    Melissa Lucio.  And that's quite evident by Banda.  Please

2    Officer Banda was yelling and screaming at my client while

3    she's there.  She's there for over four hours before

4    Investigator Escalon -- the Texas Ranger, come in over two

5    hours.  Now we're past midnight, and she was up around

6    6:00 o'clock in the morning.

7            How do you react when you're tired?  Yeah,

8    just whatever you say.  Yeah, whatever you're saying.  I'm

9    ready.  Whatever.  Let me go home and go to sleep.  Let me

10   go home and take care of my kids.  You can hear in the

11   background of that video, the children making noise.

12           My client is there at the police station

13   without an attorney.  She doesn't have anybody telling

14   her:  Hey?  This is what you should do.  I'm suggesting

15   you do that.  Nobody is advising her.  They're taking her

16   rights, and just stomping all over them.  And then they

17   are trying to say, and they're trying to suggest:  Well,

18   we read her rights.  So therefore, everything that we did

19   is, a-okay.  Baloney!  It's not a-okay.

20           If you are intimidated, if you are yelled

21   at by a cop who gets right in your face -- yelled by a

22   police officer, you're going to be pretty well

23   intimidated.

24           How is it when you are stopped on the road

25   for some traffic violation, aren't we all nervous?  And

27

1    this is in a cramped quarters in a police station, and

2    she's being yelled at.

3                    Folks, the State wants you to believe that

4    that's a confession.  Does the State know at the time of

5    the video, the caused of death of Mariah?  No.  They don't

6    know the cause of death of Mariah until the next day when

7    they go do the autopsy.  They learn after the autopsy that

8    Mariah died from brain hemorrhage.  Blunt force trauma to

9    the head.  That's when they first know about it.

10                    She confessed to what?  She confessed to

11   bruising that child from head to foot.  She confessed to

12   neglect.  She didn't confess to murder.

13                    So where did the murder take place on the

14   17th of February, 2007?  We've got all of the people in

15   the house.  We have nine kids in a two-bedroom house.  We

16   have mom and dad.  And who did the police investigate?

17   Who did the police talk to?  Well, we've heard that they

18   talked with Melissa Lucio because we have the video.  We

19   assumed that they're talking to Robert in another room.

20   And then we learn that they talked with some of the kids.

21   Child Protective Services came and took some of the kids

22   to Maggie's House and asked them different questions.

23   Now, folks, we didn't get that information.  And I'm here

24   to tell you that we asked for it --

25                    MR. PADILLA:  Judge, I'm going to object to

```
 1   Mr. Gilman going outside of the record during closing
 2   arguments.  That's what he's doing.
 3              THE COURT:  Stay within the record.
 4              Ladies and gentlemen of the jury, you
 5   remember the testimony as you remember it and the
 6   witnesses as you remember them.
 7              MR. GILMAN:  Don't you know, folks --
 8              THE COURT:  Officer Gomez?  Check with the
 9   media, please.
10              MR. GILMAN:  Don't you know, that if those
11   kids had anything to say that would help the State's case,
12   their statements would be brought before you.
13              Folks, look at what the police did in that
14   video.  They took fingernail clippings.  They took saliva
15   from their mouth.  They took hair.  What was ever done
16   with that? Officer Cruz said:  Oh, we never got it back
17   from the lab.  Baloney!  They never sent the stuff off
18   because they say:  Ya!  We got a confession.  They didn't
19   get a confession.  Nowhere in that statement does it say
20   that I killed my daughter on the 17th of February, 2007.
21              That's what you are here for to determine
22   whether or not she did that.  And what do you have?  What
23   does the State rely upon?  Pictures like this showing the
24   black and blue.  You're supposed to get real emotional and
25   say:  Well, that poor darling kid.  That poor child!  Must
```

29

1    have been killed by her mother.  She must have been killed
2    by her mother.
3                    When did the bruises take place?  When did
4    the bite mark take place?  When did the broken arm take
5    place?  Every one of those doctors said that they were --
6    every one of those bruises were different colors.  So they
7    were taken at different stages of healing.  The broken
8    arm?  Different stages of healing.  The bite marks?
9    Different stages of healing.  Did they occur on the 17th
10   of February, 2007?  No.  Because you're not going to get
11   black and blue marks on the same day, are you?  Those
12   occurred before.
13                   They're showing you these pictures so you
14   can get all emotional and upset with my client.  And,
15   fine, you can get upset with my client for being a
16   neglectful mother, for being someone who has injured a
17   child.  But, did she kill it?  We have three doctors that
18   said:  This child died from blunt force head trauma, a
19   brain hemorrhage.  That's what killed this child.
20                   The State is here to tell you and to prove
21   to you beyond a reasonable doubt that this all took place
22   on the 17th of February, 2007.  When was this child on the
23   17th of February, 2007 beaten, thrown, kicked, hit on the
24   17th of February, 2007?  And that's what the Judge tells
25   you in the charge, that this thing took place on the 17th

of February, 2007.

Each one of these doctors all testified -- all of them say that falling down the stairs is an example of blunt force head trauma that could cause the death of an individual. It's a different conclusion that they make, which is the difference.

Dr. Vargas didn't make -- didn't draw a conclusion. He was pretty ground neutral. Dr. Farley certainly made a conclusion. She reacted the same way the State wants you to react. You see these bruises, and you're supposed to get all upset and say: Well, must have been beaten to death.

But what about something else? Who is it that tells us that this child fell down the stairs? Melissa Lucio. Isn't it funny that Melissa Lucio also tells the police in the video statement the symptoms that this child has. The vomiting. The child is lethargic with rigidity as the child gets closer and closer to death. Isn't it funny? This is a person who's not trained in medicine, and she's saying this to the police. They're not listening.

This child died from the brain hemorrhage. What caused the brain hemorrhage? We have three doctors that all agree that it could be from hitting. It could be from hitting against the wall, hitting with your fist, but

1    there also could be from falling downstairs.  Now, what is
2    it?
3                    The State has the burden of proving to you
4    beyond a reasonable doubt that my client killed this
5    child.  Where and what evidence is available to prove that
6    beyond a reasonable doubt?
7                    I asked Detective Cruz when she was here --
8    she's the case agent.  She brings everything together and
9    dumps it off at the district attorney's office and says:
10   Here's our case.  Officer Cruz, what evidence do you have
11   that Melissa Lucio caused this brain hemorrhage and killed
12   her?  None.  She says:  None.  She doesn't have any
13   evidence.  If she doesn't have any evidence, well, where
14   is the evidence?
15                   Is it Dr. Farley who has decided that
16   that's the way it is because of the emotion?  Or, did she
17   really do some background checking?  Did she do some
18   checking at all?  No.
19                   We asked these police officers:  Did you go
20   to the scene?  And then Mr. Padilla -- Mr. Padilla is an
21   experienced police officer, and he asked Officer Cruz:
22   Did you go to the stairs?  Come on.  That's a stupid
23   question.
24                   MR. PADILLA:  For the record, Your Honor,
25   I've never been a police officer, Your Honor, so --

1    MR. GILMAN:  Objection, Judge, to his

2    sidebar.

3              THE COURT:  You said:  Mr. Padilla.

4              MR. PADILLA:  He referred me as police

5    officer.

6              MR. GILMAN:  Mr. Padilla, who is an

7    attorney, who knows better than to ask a stupid question

8    like that.  Mr. Padilla asked Dr. Kuri:  Did you go to the

9    stairs?  No.  We've got police officers that are in

10   Harlingen that are supposedly trained for that.  They

11   didn't even go to the right stairs.

12             When I asked the Texas Ranger:  Did you go

13   to the apartment?  Yeah, I went to the apartment.  I went

14   to where the address was.  Well, the address is at an

15   apartment complex and there's a lot of apartments in

16   there.  Which one did you go to?  Oh, I don't know.  I

17   went to the one that's right there.  We don't even know if

18   he went to the right apartment.  They had search warrants

19   to go there.

20             Folks, they brought in a picture of baking

21   soda.  I bet if we go into every one of your homes, and

22   you probably are going to have baking soda in your house.

23   Is there something wrong with having baking soda in our

24   houses now?  We have to stop and tell her:  We don't want

25   you to no longer sell baking soda because it's drug

33

1    paraphernalia.   Come on!

2              They want you to think that because there's

3    is a can in the house -- a Coke can -- that that's drug

4    paraphernalia.  Well, folks, did they test it?  Did they

5    test it to see if there were any signs of drugs in it?

6    No.  Again, it was to get you all emotional about these

7    things.

8              But let's look at the hard cold facts.

9    This child died of a brain hemorrhage.  What caused that

10   brain hemorrhage?  Do we know what caused that brain

11   hemorrhage and who caused that brain hemorrhage?  No.

12   Melissa Lucio never says she hit her in the head.  Never

13   hit Mariah in the head.  So who hit Mariah in the head?

14             What about the people that were there?

15   Were any of them called?  No.  The police officers had

16   these search warrants and they go over to the house, and

17   they go through the car and they are looking for things.

18   They don't know what they're looking for, but they're

19   looking.

20             There is evidence supposedly that there is

21   apparently hair loss of this child.  You can have hair

22   loss because you don't have good nutrition.  You can have

23   hair loss because you're not eating properly.  Or, you're

24   not sleeping properly.  You're not getting proper

25   medicine.  You're talking about some people that are very

```
 1    poor.  Can you imagine sitting down at a meal in their
 2    house?  Just lunch, you're going to use up an entire loaf
 3    of bread and not everybody is going to get fed!
 4                  They took a lot of evidence, folks.  But
 5    they didn't do anything with it.  They said:  I've got
 6    this confession.  Confession to the neglect?  Yes.
 7    Confession to injury to a child?  Yes.  No question about
 8    it.  But is it murder?
 9                  We hear Banda on the video.  Officer Banda.
10    He didn't come in and testify, but we hear him on the
11    video.  There is no doubt in his mind that it's neglect.
12    Neglect of medical attention.  The officers know what this
13    case should be.  It's neglect.  It's a neglectful case.
14    It's an injury to a child that resulted in the death.  But
15    is there a murder?
16                  Then we have CPS, Child Protective
17    Services.  Child Protective Services takes away the
18    children right at the time that Mariah is born and brings
19    them back two years and two months later.  Brings them
20    back.  Gives them to Melissa Lucio and her husband in
21    November of 2006.  And Child Protective Services doesn't
22    bring part of this case back.  It brings all of the
23    children back and says:  Here.  Here's your family.
24    Within a short period of time this family can't even stay
25    in the same apartment that they're in and have to move.
```

1    So they move.   In a short period of time Mariah is dead.

2                        Did the system fail them?   Yeah, you bet.

3    Should those kids have ever been brought back to my

4    client?   Probably not.   She tested positive after the

5    birth of Mariah soon afterwards.   She tested positive

6    after the birth of the other children.   For child

7    Protective Services, this should have sent up red flags

8    right away.   Child Protective Services should never have

9    brought those children back, but they did.

10                        Now the question is:   On February 17, what

11   happened?   On February 17, did my client kill Mariah?

12   There is no evidence of that.   There is no evidence that

13   she struck Mariah.   There is no evidence that she kicked

14   Mariah on the 17th of February.   There is no evidence that

15   she threw Mariah against the wall on the 17th.   And there

16   is no evidence that she hit Mariah with an object unknown

17   to the Grand Jury.   There has got to be some sort of

18   evidence.

19                        For that I ask you to find my client not

20   guilty because she didn't kill this child on the 17th of

21   February, 2007.   She certainly was neglectful and she

22   certainly injured that child, but that's not what this

23   charge is.   This charge is for murder.

24                        There is testimony or evidence of the

25   defendant striking and hitting.   But I want to go back to

1   the video because the video says a lot.  The video is very

2   important.  Study that video because that's where the all

3   of the key is.  Melissa Lucio said things.  She didn't

4   have an attorney.  Nobody is there to coach her and tell

5   her what to say or how to say it.  She's there on her own.

6   She has got Salinas, Cruz, Banda, Villarreal, and Escalon.

7   Five law enforcement officers throwing questions at her.

8   She's there on her own.  Nobody is helping her.

9          And she has told everything she knows and

10  nobody is listening.  She is telling us much:  I beat this

11  child.  I neglected this child.  I hurt my child, but I

12  didn't kill her.  I didn't hit her in the head.  So how

13  did she get the brain hemorrhage?  Fell down the stairs.

14  She fell down the stairs.  Melissa Lucio says she fell

15  down the stairs.  What evidence does the State have to

16  prove to you that this is not possible, that it didn't

17  happen?  They don't have anything.

18          One of the other things that I think is

19  real important here is the police officers, when they're

20  making this video, says:  Melissa?  Would you take a

21  polygraph test?  Would you take a polygraph test?  Yeah,

22  I'll take it.  Bring it on.  Where's the polygraph test?

23          MR. PADILLA:  Your Honor, I object to that

24  first, as to the issue of the polygraph, Your Honor,

25  because counsel knows it is inadmissible.  And secondly,

1   we are going outside of the record.

2           MR. GILMAN:  No, we're not, Judge.  It was

3   there, and they left it in.

4           THE COURT:  The argument as to whether it

5   is admissible, is sustained.  So please move on.

6           MR. GILMAN:  Well, we didn't get a

7   polygraph because there isn't any.  We didn't get it.  It

8   is just like taking the saliva from the mouth.  It's just

9   like taking the fingernail clippings.  We don't get any.

10  It's just like taking the so-called drug test that they

11  had at the police station.  Well, where is it?  We never

12  got it.  It is like getting the video statements of the

13  kids that were there at the house as to what they saw and

14  observed, we don't got it.  We don't have it.  Because

15  there's nothing in there that helps the State prove their

16  case.

17          MR. PADILLA:  Your Honor, again, he is

18  going outside the record.  I would object to that.

19          THE COURT:  Mr. Gilman, stay within the

20  record.

21          MR. GILMAN:  I'm in the record, Judge.

22          Folks, you are the judges of all of the

23  witnesses that have come in and testified.  But I ask you

24  to look through that statement, that video statement.  And

25  where in there does it say that my client killed this

1   child?  What evidence does the State have, other than

2   conclusions without -- we've got to connect all of the

3   dots, folks.  We can't go from A to Z.  We've got to get

4   through every one of the dots to get to the murder.

5          Where is the murder?  The murder supposedly

6   took place on the 17th of February, 2006.  Where?  When?

7   Who did it?  The State wants you to believe that my client

8   did it, Melissa Lucio.  When did she do it?  There's no

9   evidence to that effect.  There's nothing that has been

10  brought before us except the pictures of the bruising.

11          This is a test for you, folks.  Do you want

12  to be like the State wants you to be, and be emotional and

13  say:  Yes, if you did that, you must've done the other.

14  It's not a "must've".  It's not "a probably".  It's proof

15  beyond a reasonable doubt.  They've got to prove to you

16  that I did something wrong in this country.  Not that you

17  "maybe" did something wrong.  But that I did something

18  wrong.  That's what our whole criminal justice department

19  is for.  Not that I maybe did it, or probably did it, but

20  that I did do it beyond a reasonable doubt.  Beyond a

21  reasonable doubt.  And there's a reasonable doubt, and

22  that is the possibility of falling down the stairs.

23          Did this brain hemorrhage come about by

24  Mariah maybe falling down stairs?  According to the

25  doctors, it's just as consistent of falling down the

39

1    stairs as it is of beating or hitting the child.  But

2    there is no evidence on the 17th of February, 2007, of any

3    beating, kicking, throwing or hitting.

4              Ladies and gentlemen, go back to that

5    video.  That video is the key.  And then read the charge.

6    Read the first paragraph of that charge.  Where is there

7    any evidence of any wrongdoing on the 17th of February,

8    2007?  Because that's what the Judge tells you the State

9    has to prove beyond a reasonable doubt.  And they haven't

10   done it.

11             And I ask you:  Are you strong enough?

12   This is a test.  Are you strong enough to say:  No?  My

13   client admits that she misused and abused this child.

14   She's guilty of injury to a child.  But she's not guilty

15   of murder.  Thank you.

16             THE COURT:  Mr. Padilla?

17             MR. PADILLA:  Would the Court give me a

18   two-minute warning.

19             THE COURT:  Yes, sir.

20             MR. PADILLA:  How much time do I have?

21             THE COURT:  You have 25.

22             MR. PADILLA:  Thank you.  May it please the

23   Court, Mrs. De Ford?

24             THE COURT:  Actually you have 27 minutes.

25   He finished two minutes early.

1          MR. PADILLA:  -- Mr. Cordova?  Mr. Gilman?

2          Ladies and gentlemen, again, first and

3    foremost thank you for your service here.  As we talked to

4    you when we were in the process of selecting you, we told

5    you it was going to be a tough case for you to look at.

6    We thank you for the attention that you have given us

7    here.  We believe that the evidence clearly indicates that

8    the defendant caused the death of this child.

9          The defense would have you -- well, I was a

10   defense attorney for 30 years.  Rabbit trails.  We try to

11   prove to you what the State didn't do.  We try to prove:

12   Well, the State should have done this, and the State

13   should have done that.  Well, we're not in a perfect

14   world.  If everybody had their resources available to do

15   what they had to do, if all of the officers were there and

16   available to conduct this investigation, it would be a

17   perfect world.  But we're not in a perfect world.  The

18   State brings to you the evidence.  The State has proven to

19   you guilt beyond a reasonable doubt, and the evidence is

20   there.

21          Ladies and gentlemen the defense states

22   this child died from a fall.  Look at the tape.

23   Mrs. Lucio was not there when this child allegedly fell.

24   She said "somebody told her" that the child had fallen.

25   What if anything, did she do to aid the child at that

time?  Nothing.  Absolutely nothing.

And you have the video to take back with you to the jury room.  Look at her demeanor.  Look at what she says.

Mr. Gilman wants you believe:  You know what?  Her rights were trampled on.  Dear Lord!  What?  If she had a lawyer, maybe she wouldn't have made the statement?  You know, the problem is that she did make the statement and the statement that she made was the true and correct statement at the end.  She admitted it.  She admitted that she caused all of the injuries to that child, ladies and gentlemen.

What injuries did that child have, if not a brain injury?  Well, they tried to differentiate between: Well, you know what?  I may have caused 110 bruises.  I may have caused two or three bites on the body.  I may have twisted the arm and broken it.  But you know what?  I never hit her on the head.  Is that reasonable?  Is that reasonable?  That child was slapped, according to Dr. Farley, that child was hit across the head and that's what caused the brain damage.  It wasn't a fall from the stairs.  It wasn't.  Because the evidence was inconsistent because of the abuse that this child had taken.

Ladies and gentlemen, I introduced to you about 30 pictures.  I had about 300 there.  I'm not here

1    to gain your emotion.  I'm not going to flash pictures in

2    front of you so you can say:  Well, we need to convict

3    this person because, you know what?  The child suffered.

4              The child suffered.  There is no doubt that

5    this child suffered.  The 88 days that this child was with

6    her mother, I can assure you that this child suffered

7    physical, emotional, verbal and psychological abuse.

8    Because that's what the evidence shows.  That's what the

9    evidence shows.

10              CPS didn't do it.  CPS didn't lay a hand on

11   this child.  Who are you going to blame CPS, for this

12   child's death?  No.  The person responsible is that person

13   who is sitting right there at the end, for what she did

14   it.  Yes, CPS probably shouldn't have given the child

15   back.  But you know what?  I can almost guarantee you,

16   ladies and gentlemen, if she had picked up the phone and

17   said:  You know what?  I don't want this child.  I'm tired

18   of this child.  I don't want her, I don't like her, I

19   don't need her, and I want her out of my life, CPS

20   probably would have picked up that child.

21              Why kill her?  And why only this one?  Why

22   only this one?  We'll never know.  But the bottom line is

23   she committed the acts which led to the cause of her

24   death.  This child had bruised kidneys, a bruised spinal

25   cord and bruised lungs.  How do you do that?  I mean, what

1    force does it take somebody to cause such devastating

2    injuries to a child and then say:  You know what?  I never

3    touched her across the head.  That's just totally --

4    totally unbelievable.

5                Because Dr. Farley testified that the child

6    had two small lacerations above the top of the head.  And

7    it is all consistent with the child of being hit across

8    the head.  You heard the medical testimony.

9                Dr. Vargas testified that he has been a

10   doctor for 30 years in the emergency room.  He sees a lot

11   of fallen children.  And he's also a lot of child abuse.

12   In his 30 years, this is the worst case of child abuse he

13   has ever seen.  If somebody is being injured to a point

14   where somebody classifies that as the most severe child

15   abuse case they've ever seen, don't you think this child

16   would have been hit across the head?  You don't think this

17   child got rattled?  You don't think that this child

18   suffered injuries at her hands?  Is it reasonable?

19                You can draw inferences from the evidence,

20   ladies and gentlemen.  And the inference is clear that she

21   caused those injuries because it's consistent.  It's

22   consistent with her behavior.  It's consistent with her

23   pattern of conduct towards this child.  If this child had

24   just come in with a head injury and nothing else, you

25   might have said:  You know what?  It may have been a fall.

44

```
1    Or, you know what?  One needs to blame one of the other
2    children.  Or:  Let's blame somebody else.
3                   The bottom line is when you look at the
4    video, she confesses to causing all of the injuries.  And
5    the defense would ask:  Well, how come they didn't ask
6    about the head injuries?  That's very important.  Because
7    there was no visible evidence of a head injuries.  The
8    pictures that were taken, were pictures of the body.  He
9    doesn't even ask Dr. Kuri:  Wouldn't he expect to see
10   swelling of the head if somebody had fallen down the
11   stairs?  Would you see something visible on the outside?
12                   And the officers were of the same
13   impression.  They had these photos.  They showed them to
14   her when they were questioning her about the video.  But
15   they didn't have anything at that point to indicate that
16   it was there was a head injury.  But there was a head
17   injury.  Okay?
18                   And now they tell you also that the head
19   injury happened -- the alleged fall -- an heavy emphasis
20   on the alleged -- that the alleged fall happened on
21   Thursday morning -- some time on Thursday morning.  The
22   evidence clearly shows, ladies and gentlemen, that the
23   injury happened on Friday, because that's what Dr. Farley
24   testified to.  That the evidence of the injury was totally
25   inconsistent with somebody having had suffered an injury
```

45

1    more than 24 hours before.  So what we're talking about

2    here is a head injury that occurred on that Friday, and

3    not on the Thursday.

4              But I even asked Dr. Kuri:  Well, could the

5    child have been able to eat, if she had suffered the

6    injuries on Thursday, could the child be able to eat

7    Friday morning?  He said:  No, because they had lost the

8    ability to talk, move, and/or perform any motor function

9    because of the brain injury.  So, ladies and gentlemen,

10   this incident happened on Friday.  Anything that tells you

11   it happened Thursday, is baloney.  Okay?

12              Because it fits a pattern, where you say:

13   You know what?  Why don't we just blame it on a fall on

14   the step that Mrs. Lucio never saw?  That's not what the

15   evidence shows.  The evidence indicates that the injuries

16   happened on Thursday.  And what did she testify to?  That

17   the child remained with her from 11:00 in the morning

18   until 3:00, and she was by herself, when the other two

19   younger children went to school.

20              I know that this child suffered this brain

21   injury Friday during the day.  It couldn't have been

22   Thursday.  The child wouldn't have been able to eat on

23   Friday, and would not have been attentive on Friday, as

24   the doctor testified.

25              They said:  We can prove the evidence to

46

1    you about the fall.  Ladies and gentlemen, Dr. Vargas

2    testified that he didn't see anything outside of the

3    cranial area that would be indicative of a fall.  And he

4    has seen many falls in the emergency room.

5              Dr. Farley that she found nothing outside

6    of the skull that would be indicative of receiving a fall.

7    Furthermore, she saw no abrasions on the knees, no

8    abrasions on the elbows, no abrasions on the face that

9    would be consistent with the fall.

10             And then Dr. Kuri comes in and testifies --

11   he never testified that he saw anything either in the

12   autopsy report or when he sat there and listened to the

13   evidence -- that would indicate that this child fell.  If

14   there is no evidence that the child fell, then what is he

15   doing here arguing:  Well, the fall caused the injuries.

16   There's no fall.  There is no medical evidence at all,

17   consistent with the fall.  No evidence whatsoever.

18             They want you to believe:  Well, you know

19   what?  This person is not guilty of this murder, because

20   you can't prove that there wasn't a fall.  Rebecca Cruz

21   went out there and looked at the place where this child

22   "allegedly" fell.  Again, heavy evidence on the word

23   "allegedly."  She could find no blood, no brain -- no hair

24   matter, and nothing that would be consistent with evidence

25   that the child had fallen from those stairs.  If there's

1   no evidence, then the only other reasonable circumstantial

2   evidence that we have here is, you're going to find this

3   person guilty of the offense of murder because she caused

4   the injuries, ladies and gentlemen.  She caused the brain

5   hemorrhage.  There is nothing else that's reasonable.  If

6   you look at the evidence, nothing else is reasonable.

7            And you might say:  Well, you know what?

8   Maybe.  Maybe what?  A child who suffers this type of

9   injuries, and suffers the damage throughout her body, does

10  it make any reasonable to say:  Well, you know what?  She

11  didn't cause the brain hemorrhage.  She confessed.  She

12  admitted that she caused the brain injuries.

13           We have evidence of the sister coming in

14  and saying:  You know what?  She said:  Well, I am being

15  arrested because I spanked my child.  Does that seem

16  reasonable, ladies and gentlemen?  I, respectfully, say:

17  You know what?  She never mentioned it.

18           The officer had no reason to lie.  Officer

19  Villarreal that took her statement, had no reason to lie.

20  He said that he heard her say:  I don't know why they

21  arrested Robert.  I'm the one who did it.  Did what?

22  Caused the death of the child.  The child was already

23  dead.  She had already been arrested.  She already made a

24  statement, and she had already been arraigned, and she was

25  now out on bond -- on a two million-dollar bond.

48

1          Why did she say she did it, if she didn't

2     do it?  Why not qualify it and say:  Oh, yeah.  Well, the

3     only thing that I did -- you know what -- I bit her, I

4     broke her arm, and I caused internal injuries.  But you

5     know what?  I never hit her across the head.  No.  She

6     admitted it on the statement, and she also admitted it in

7     front of the officers when she called the sister.

8          So you have to look at those things, ladies

9     and gentlemen.  It's not in a vacuum.  It's not in a

10    vacuum.  But you don't get these type of injuries -- I'm

11    not saying you should convict her because she's a

12    neglectful mom because of her children, or whatever.  She

13    has been charged.  She's been indicted, and the evidence

14    clearly proves guilt beyond a reasonable doubt because of

15    the injuries that she caused to his child.

16         Look at the videotape.  You know what?

17    Remember when the camera pulls away and they're going to

18    take her fingernail clippings, as well as her saliva and a

19    sample of her hair?  Ladies and gentlemen, because with a

20    DNA test, it would have proved that she had contact with

21    her daughter.  That, again, was another matter that you

22    should look closely as to what the video statement shows.

23    But to prove this, look at it clearly.  They tell her:

24    We're going to take some fingernail clippings from you.

25    And what does she do?  She starts cleaning her nails.

49

1    Look at that.  If she had nothing to do with causing the

2    death of a child, why is she sitting there cleaning her

3    fingernails before these clippings are picked up?  Because

4    she still was conscious enough to say:  You know what?  If

5    there is evidence there that shows my injuries to the

6    child, consistent with hitting her, consistent with

7    striking her, well -- guess what -- I'm going to sit there

8    and just clean my nails.  Why?  If all you did was

9    physically beat the child, but didn't cause the death,

10   what do you have to hide?

11           The defense would have you think:  Well,

12   you know what?  Poor Mrs. Lucio.  She didn't have a

13   lawyer.  Well, she never asked for a lawyer.  And you're

14   going to look at Exhibit No. 1, which is the Miranda

15   warnings and on there it tells you, clearly, that you can

16   have a lawyer present if you want.  She waived that.  You

17   can stop the interview, if you want.  She didn't stop it.

18   And I asked Officer Cruz:  Did you prevent her?  No.  Did

19   you keep her from having food, or water?  No.  No.  Why?

20   It's a voluntary statement, ladies and gentlemen.

21           Well, yeah, the officers were getting upset

22   with her.  And probably if all of you all would have been

23   there, you probably would have been upset.  But the bottom

24   line is:  She confessed.  She made a statement after

25   knowing what her constitutional rights were, and it was

Adelaido Flores, Jr.
Certified Shorthand Reporter
Cameron County, Texas

1  freely and voluntarily given.  She told you in her own

2  words she caused the injuries to this child.

3  Ladies and gentlemen, you see the video?

4  You see the striking, striking, striking of the child.  I

5  mean, that's sufficient to bruise the spinal cord.  I

6  mean, that wasn't a love tap.  Those bite marks weren't

7  kisses.  They're not kisses.  Surely, they're not!  This

8  kind of a child was never kissed in her life, and probably

9  was never hugged by her during this time in her life.  She

10  was beat up.  She was abused.  You know?  And all it would

11  have required was one phone to take this child away,

12  ladies and gentlemen.

13  You know, we have to send a message to the

14  public.  We live in a disposable society now.  You think

15  it's okay to throw away paper dinner plates, plastic cups,

16  and everything else?  But we don't live in a society with

17  disposable children.  And that's what I think happened

18  here.  And that's what I know, because that's what the

19  evidence shows.  This was a disposable child for her.

20  Somebody who was not cared by Mrs. Lucio, not loved by

21  Mrs. Lucio.  So, you know what?  I'm going to make her

22  suffer.  I'm going to bite her.  I'm going to hit her.

23  I'm going to make her last 88 days on this Earth a

24  miserable ending.  And you know what?  The fact is, the

25  only person that had contact with this child, who admitted

1   to committing the physical acts on this child, was

2   Mrs. Lucio.

3                   You would ask:  Well, maybe the children

4   did it.  They stated that at the beginning, that the

5   children were very unruly.  That's the evidence she knew.

6   She told you exactly how she struck the child.  She told

7   you exactly what she did.  It wasn't:  Well, maybe she

8   didn't lay a hand on her.  No.  She readily admits it.

9   And once again, all of the injuries, all of the beatings

10  and all of the bruisings and the physical assault that you

11  see are going to cause the brain damage.

12                  And the doctor testified that a child's

13  head is too large for its body at that age.  So it's

14  susceptible to brain injuries from being shaken, or being

15  hit, because their neck muscles aren't strong enough to

16  support the head.

17                  Also, because the cranial area inside the

18  head is susceptible to bruising because the gray matter of

19  the brain is not sufficiently set at that younger age.  So

20  children are susceptible to brain injuries as a result of

21  being struck.

22                  MR. GILMAN:  Objection, Judge.  This is not

23  in evidence, and now counsel is a doctor?

24                  THE COURT:  Stay within the evidence.

25                  MR. PADILLA:  Ladies and gentlemen, the

1   hair loss.  How do you explain that?  Mr. Gilman said:

2   Well, it's a lack of nutrition.  The doctor testified it

3   is also consistent with the hair being pulled out, or

4   being yanked out.  When a child's hair is being yanked and

5   pulled to a point where she loses hair, don't you believe

6   that that is going to cause the brain inside the head to

7   be rattled, and be subjected to bruising?  That's

8   consistent.  It's not consistent with malnutrition at this

9   point.  Then, again, you only have the other massive 110

10  bruises, the broken arm, the bruised lungs, the bruised

11  kidneys and the bruised spine for it.  But you can take it

12  all into consideration.

13          When you take all the evidence together,

14  ladies and gentlemen, it is a clear case of child abuse.

15  Child abuse to the point that it causes the death of this

16  child.  That's what the evidence shows.  You may argue

17  this minor point, or that minor point.  No, ladies and

18  gentlemen, the evidence is clear beyond a reasonable doubt

19  that this defendant caused the death of this child by

20  striking her, hitting her or throwing her against

21  something which is consistent with the evidence.

22          Dr. Farley told you:  This child was beaten

23  to death.  She's a pathologist, a trained pathologist.

24  She has been a trained pathologist for 20 years.  And what

25  does she tell you?  This is the worst case of child abuse

1    I have ever seen.

2              You got Doctor Vargas who has been doing it

3    for 30 years, and the pathologist for 20 years.  And they

4    jointly have 50 years of medical practice, and they tell

5    you:  This is the worst case of child abuse I've ever

6    seen.

7              What does that lead you to believe?  That

8    this child was physically struck across the trunk, across

9    the body and across the head.  Why would she not hit her

10   across the head in her fit of anger?  We don't know.  But

11   why would she not hit across the head?  You know what?

12   I'm going to slap her in the ear that causes bruising --

13   according to the doctor.  She also has bruising on the ear

14   consistent with pulling on the ear and twisting it, on

15   both sides.

16             Well, what's inside of the head, if not the

17   brain?  If you're causing injuries to the ears, to the

18   forehead, and to the brain, and onto the head, what's

19   going to happen?  It's going to cause brain injuries.

20             And the thing about it, if you look at the

21   evidence, ladies and gentlemen, and if you look at the

22   exhibits containing the picture of the brain, there's

23   going to be injuries all around the head, and all

24   throughout the head, ladies and gentlemen.  You know what,

25   you will take these back.  I'll let you take it back

54

there.

But this child had injuries all inside of
the skull -- bleeding from both sides.  As a matter of
fact, Dr. Farley testified that when she cut the skull,
all the blood just poured out.  What does that indicate to
you?  Massive head injury.  And every doctor has told you
here that that is consistent with being struck, with being
hit across the head.

That's not a fall.  It's not a fall.
Because the evidence clearly does not show a fall.  Who
here has testified that there was even a fall?  She said
she was told that that child suffered a fall.  You know
what?  That was prior to her actually finally confessing.
That was the exception.

Afterwards, she said:  You know what?  I
hit this child -- when she demonstrated:  I hit the child.
And if you recall what Ranger Escalon said:  He said:  I
came in and I knew at that time she was really guilty, or
that she was pretty beaten by this time.  She never --
when she comes clean and admits to committing those
acts -- never talks about the fall ever again.  It was
over here at the beginning when she was denying all
liability.  But after she confessed, she said:  This is
what I did.  These are the injuries that I caused.  Yes, I
did everything.  She never, again, mentions the fall.  The

1    only thing she says:  Well, you know what?  Yeah, I caused

2    these injuries.  But, hold it, hold it!  I know that this

3    child fell because I was told she fell.  She wasn't with

4    her.  She didn't see the fall.

5              The defense would make the statement:

6    Well, you know what?  Maybe they didn't know from what

7    steps she fell?  From what stairs did she fall?  And

8    that's the only thing you've heard, according to her,.

9    But how credible is she?  How credible is she, ladies and

10   gentlemen?  And how reliable is she?

11             She did the act.  She did the head

12   injuries.  She tried to minimize her involvement.  You

13   know what?  It's unfortunate, it's unfortunate.  But we've

14   got to speak for this child because this child deserves

15   justice.  Nothing can bring her back.  But you know there

16   is no reason for a child -- even an adult -- to suffer the

17   type of injury, the type of humiliation as a human being

18   that this child suffered.

19             And I don't want you to go out there and

20   find this person guilty based on the fact, you know, that

21   somehow I've influenced you or you're angry with the

22   defendant.  Don't do it for that reason.  Don't do it for

23   that reason.  You go in there because the evidence clearly

24   shows that she committed those acts, which, unfortunately,

25   caused the death of this child, and she let that child sit

1    there knowing the child was injured and did nothing about

2    it.

3                    But you know what?  Look at her statement.

4    If you go back to her statement, she says:  When Robert

5    Alvarez, the father, brings the child out and calls out to

6    her, what does she say?  Don't tell me.  Don't tell me

7    what?  Don't tell me the child is dead, because she knew

8    the child was dead.  She knew the child was dead.  Don't

9    tell me?  At that moment, she knew she had inflicted

10   sufficient injuries to this child that was going to cause

11   this child's death.

12                    Because Mr. Alvarez -- in her own

13   statement -- doesn't say:  You know what?  Come over here.

14   It's not dead.  And bring the child down.  And he calls

15   her, and the first time she doesn't go over there where

16   the child is.  The second time, when he carries the child

17   now, he calls her and her first response is:  Don't tell

18   me.  Don't tell me what?  She knew what she had done.  She

19   knew what had happened.  She knew the type of injuries she

20   inflicted on that child.  And it just got out of hand.

21   She would have preferred to have kept violating this child

22   herself, and kept on biting this child.  For what reason?

23   Why?

24                    You know what?  We don't want have to

25   establish motive.  We don't have to show you why the child

1  suffered.  All we got to show you is that on February 17,

2  2007, this defendant, Melissa Lucio, caused the death of

3  Mariah Alvarez, a child under the age six, by striking,

4  hitting her or by throwing her and causing the death of

5  this child.  You can read the indictment.  But the

6  evidence clearly shows it's murder.  It's unfortunate.

7  It's sad.  And it's also, it questions everybody's --

8              THE COURT:  Two minutes, Counselor.

9              MR. PADILLA:  Two minutes, Your Honor?

10              THE COURT:  Yes, sir.

11              THE WITNESS:  Thank you, Your Honor.

12  Ladies and gentlemen, you take with you back the charge

13  that we discussed with you.  We told you during jury

14  selection you could take it with you.  This is the law

15  that applies, that instructs you that a person acts

16  knowingly or with knowledge, with respect to the result of

17  his conduct when he is aware that the conduct is

18  reasonably certain to cause the result.

19              Ladies and gentlemen, she intentionally and

20  knowingly struck this child.  The striking caused the

21  brain hemorrhage.  The brain hemorrhaging, causing death.

22  She is guilty of this charge of capital murder.  The

23  indictment was proven to you guilt beyond a reasonable

24  doubt.  You take it with you in the jury room.  Read the

25  entire charge.

58

1          Also remember the facts.  This is where all
2     of us want justice.  So we ask that you go back there and
3     look at all of the evidence, look at all of the evidence
4     that was presented to you, and If you want to review
5     anything that was brought to you by the State, if you
6     reach down in your heart of hearts and you decide this
7     case for what it is, because it is as I told you in my
8     opening statement:  This is nothing but a cold blooded
9     murder.  And you find this defendant guilty of the offense
10    charged, and you send a message out to the public that
11    children are not disposable.  That we're not going to
12    allow child abuse in Cameron County.  We are not going to
13    allow innocent children to be killed in Cameron County.
14    Because if you do, then you're going to suffer the
15    consequences of that.  We are a system of law and the
16    system clearly protects this child.  That's why the child
17    is under six.  It was proven to you.  The law allows you
18    to consider this type of case.  Because we have vested
19    interest in protecting our children.  They have a vested
20    interest, because they are our future, ladies and
21    gentlemen.  And if you abuse and you kill a child like
22    that, it affects us all.
23          This child right now should be getting
24    ready to for kindergarten, should be getting to know about
25    Sponge Bob -- and all that stuff -- but she won't be able

1   to.  Why?  Because this lady here murdered her, and that's
2   what the evidence shows.

3            I respect you for the time you have
4   invested in this case.  I ask that you go back there and
5   render the only verdict which is true in your heart of
6   heart, and in your mind of minds, that this defendant is
7   guilty of the offense charged.  Thank you, ladies and
8   gentlemen.

9            THE COURT:  Ladies and gentlemen of the
10  jury, at this time all of the evidence is before you, the
11  Court's charge, and including the arguments of counsel are
12  before you.  I'm going to hand to the bailiff the Court's
13  charge, along with the verdict form.  It'll be left with
14  you in the jury box.

15           Once all of the members of the jury are
16  present and assembled in the jury room, and the case is
17  formally submitted to you, and then you may begin your
18  deliberations.  Please step down from the jury box and
19  accompany the bailiff to the jury room.

20           MR. GILMAN:  Judge?  The alternates?
21           THE COURT:  Except -- just a minute,
22  please.  Except for Maricela Hernandez and Emma Molina.
23  Will you please stay behind?
24           **(Jury left the courtroom at 11:29 a.m.)**
25           THE COURT:  Y'all may be seated

1   .Mrs. Hernandez and Mrs. Molina?  I want to thank you for

2   your service as alternate jurors in this cases.  We were

3   thinking that, in all probability, we would lose at least

4   one of the other jurors, or maybe two.  So your service

5   was extremely important.

6                You're going to be excused from your

7   service as jurors on this case.  You're free to go about

8   your business.  I would ask that you please not discuss

9   this case with anybody at all until after the -- until

10  after the end of the trial.  If there is a guilty verdict

11  and then we go into the punishment stage, that you not

12  discuss this case until after the last bit of the evidence

13  is in, okay?  And then you will be free to discuss it with

14  anybody you'd like.  Thank you very much.  Good luck and

15  God bless.

16               (Alternate Jurors excused at 11:30 a.m.)

17               THE COURT:  Court will be in recess --

18               MR. PADILLA:  May we approach?

19               THE COURT:  Yes, sir.  Mr. Gilman --

20               MR. GILMAN:  I am trying to get there.

21               **(Discussion off the record at the bench**

22               **with bailiff.)**

23

24               **(Recess from 11:32 a.m. till 11:54 a.m.)**

25               (Jury Notes:  1 & 2)

Adelaido Flores, Jr.
Certified Shorthand Reporter
Cameron County, Texas

1          THE COURT:  I appreciate.  All right.  I

2     have received two notes:

3               "Can you please bring us some lunch to eat

4     while deliberating, some coffee and water?"

5               We're in the process of providing that.

6               The other note is:

7               "Please allow us to see the interview of

8     Melissa Lucio of Harlingen PD in its entirety, a copy of

9     the signed Miranda rights, and all photos."

10              Both of these are signed by the presiding

11    juror, Melissa Quintanilla.  My sense is to send over all

12    of the evidence.  Is there any objection to that?

13              MR. PADILLA:  No objections from the State.

14              MR. GILMAN:  No, sir.

15              THE COURT:  Okay.

16              MR. PADILLA:  For the record, we're

17    bringing our player our tech person will provide the

18    player for the DVD, and we'll just deliver it here.

19              THE COURT:  And what we'll do, is, we'll

20    just have our bailiff set it up instead of your personnel

21    setting it up.

22              We've got an agreement to provide all the

23    evidence in.

24

25              **(Recess from 11:55 a.m. to 3:53 p.m..)**

```
 1                    (Deliberations continue.)
 2                    THE COURT:  All right.  Bring Melissa in.
 3     All right.  She's on her way.  Let me make a copy entry.
 4     Please be seated.  Bring the jury in.
 5                    (Jury enters.)
 6                    THE COURT:  In Cause Number 07-CR-885-B,
 7     State of Texas versus Melissa Elizabeth Lucio, let the
 8     record reflect that the defendant is present along with
 9     her two attorneys.  The State is also present.
10                    Ladies and gentlemen of the jury panel, I
11     have received a note that you have reached a verdict.
12     Have you reached a verdict?
13                    THE FOREPERSON:  Yes, Your Honor.
14                    THE COURT:  Will you please hand the
15     verdict to the bailiff, please.
16                    Madame Foreperson, is this verdict a
17     unanimous verdict of all the jurors?
18                    THE FOREPERSON:  Yes, Your Honor.
19                    THE COURT:  In Cause Number, 07-CR-885-B,
20     State of Texas versus Melissa Elizabeth Lucio:
21                    We, the jury find the defendant Melissa
22     Elizabeth Lucio guilty of the offense of capital murder as
23     alleged in the indictment."
24                    Ladies and gentlemen of the jury, we now
25     proceed to the punishment stage.  I'm going to -- given
```

1    that it's almost 4:00 today, I am going to start the

2    punishment stage of this case tomorrow morning at

3    9:00 o'clock.  I don't anticipate that it's going to be

4    very long in terms of evidence.  So I'm going to excuse

5    you for this evening.

6              Again, I remind you that you are not talk

7    to anybody about this case.  Don't let anybody talk to you

8    about the case.  Do not let anybody discuss this case in

9    front of you.  Don't listen to any television reporting,

10   radio news or any newspaper reports at all of this case.

11   Tomorrow morning we will start at 9:00 o'clock in the

12   morning.  Do not even discuss this case with your loved

13   ones or anyone else, please.  Tomorrow morning, I will see

14   you at 9:00 in the morning.

15             MR. PADILLA:  May I approach the bench,

16   Your Honor?

17             THE COURT:  Yes.

18             **(Discussion on the record at the bench.).**

19             MR. PADILLA:  There is a form, I think, the

20   defendant, the State and defense counsel needs to sign in

21   order to release the jury and not cause them to be

22   sequestered.  There's a specific that needs to be filed.

23             THE COURT:  I haven't seen that.

24             MR. PADILLA:  Raul probably has one on his

25   machine.

64

1        THE COURT:  Well, I looked at the rule, the

2   ruled very specifically said:  Upon motion of the jury --

3   I mean -- upon motion of one of the parties, or upon

4   motion of its own, the Court, the jury may be sequestered.

5        MR. PADILLA:  That's fine.

6        THE COURT:  Nobody has requested the

7   sequester.

8        MR. PADILLA:  That's fine.

9        THE COURT:  I'm not ordering it.  This is a

10  good jury.  They're going to follow the instructions, I'm

11  convinced.

12        MR. PADILLA:  Fine, Your Honor.  Thank you.

13        MR. GILMAN:  Judge?

14        THE COURT:  Yes, sir.

15        MR. GILMAN:  Just in an abundance of

16  caution, may I suggest that you poll the jury?

17        THE COURT:  Yeah.  If you wish to poll the

18  jury.

19        MR. GILMAN:  Yeah.

20        **(End of bench conference.)**

21        THE COURT:  A request has been made by

22  defense counsel that the jury be polled.  So I'm going to

23  ask each and every one of you whether or not this is your

24  verdict.

25        Mr. Herminio Cruz, is this your verdict?

1  I'm sorry.

2              A JUROR:  Yes, sir.

3              THE COURT:  You may sit down.  Mrs. Irma

4  Contreras Navarro?  Madame, is that your verdict?

5              A JUROR:  Yes, sir.

6              THE COURT:  Mr. Fernando Perez, is that

7  your verdict?

8              A JUROR:  Yes, sir.

9              THE COURT:  Mr. Johnny Galvan, Jr.

10             A JUROR:  Yes, sir.

11             THE COURT:  Is that your verdict?

12             A JUROR:  Yes, sir.

13             THE COURT:  Mr. Alejandro Angel Saldivar?

14 Is that your verdict, sir?

15             A JUROR:  Yes, sir.

16             THE COURT:  Mrs. Melissa M. Quintanilla, is

17 that your verdict, madame?

18             A JUROR:  Yes, sir.

19             THE COURT1:  Mrs. Ernestina Espinoza?  Is

20 that your verdict, madame?

21             A JUROR:  Yes, sir.

22             THE COURT:  Mrs. Rosanna De Leon?  Is that

23 your verdict?

24             A JUROR:  Yes, sir.

25             THE COURT:  Yes?  Mr. Rolando Gonzalez?  Is

```
 1    that you verdict, sir?

 2                    A JUROR:  Yes, sir.

 3                    THE COURT:  Mrs. Constance Poland?  Is that

 4    your verdict?

 5                    A JUROR:  Yes, sir.

 6                    THE COURT:  Mrs. Gloria Garcia?  Is that

 7    your verdict?

 8                    A JUROR:  Yes, sir.

 9                    THE COURT:  Mr. Ramiro Vargas, Jr?  Is that

10    your verdict, sir?

11                    A JUROR:  Yes, sir.

12                    THE COURT:  Again, I remind you of the

13    instructions.  You are not to discuss this case with

14    anybody at all.  And tomorrow, we start promptly at

15    9:00 o'clock with the punishment phase of this case.

16    Until then, you are excused from today.  See you tomorrow

17    morning at 9:00 o'clock.

18                    (Jury exits at 4:02 p.m.)

19                    THE COURT:  You may be seated.  Thank you

20    very much.  That's it.  See you tomorrow.  Well, let me

21    see, Mr. Gilman and Mr. Padilla.  Can I see you in the

22    back, please?

23                    (Proceedings adjourned.)

24

25
```

Adelaido Flores, Jr.
Certified Shorthand Reporter
Cameron County, Texas

1    THE STATE OF TEXAS:

2    COUNTY OF CAMERON:

3                    CERTIFICATE OF COURT REPORTER

4        I, ADELAIDO FLORES, JR, Official Court Reporter in

5    and for the 138th Judicial District Court of Cameron

6    County, State of Texas, do hereby certify that the above

7    and foregoing contains a true and correct transcription of

8    all portions of evidence and other proceedings requested

9    in writing by counsel for the parties to be included in

10   this volume of the Reporter's Record, in the

11   above-entitled and numbered cause, all of which occurred

12   in open court or in chambers and were reported by me.

13       I further certify that this Reporter's Record of the

14   proceedings truly and correctly reflects the exhibits, if

15   any, admitted by the respective parties.

16       WITNESS MY OFFICIAL HAND on this the 12th day of

17   August, 2008.

18   _____
     ADELAIDO FLORES, JR., Texas CSR
19   Official Court Reporter
     138th District Court
20   974 East Harrison Street
     Brownsville, Texas 78520
21   (956) 550-1489
     Certificate No. 1117
22   Expiration Date: 12/31/08

23

24

25

Adelaido Flores, Jr.
Certified Shorthand Reporter
Cameron County, Texas