*76020*

1

**REPORTER'S RECORD**

**VOLUME 37 OF 44 VOLUMES**

**TRIAL COURT CAUSE NO. 07-CR-885-B**

- - - - - - - - - - - - - x

STATE OF TEXAS              :   IN THE DISTRICT COURT

VS                         :   138TH JUDICIAL DISTRICT

MARIA ELIZABETH LUCIO      :   CAMERON COUNTY, TEXAS

- - - - - - - - - - - - - x

**JURY TRIAL - PUNISHMENT PHASE - DAY 6**

On the **9th day of July, 2008,** the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable **Arturo C. Nelson,**
Judge Presiding, and a petit jury, held in Brownsville,
Cameron County, Texas.

Proceedings reported by computerized stenotype
machine.

**FILED IN**
**COURT OF CRIMINAL APPEALS**

AUG 0 6 2009

**Louise Pearson, Clerk**

# ORIGINAL

Adelaido Flores, Jr.
Certified Shorthand Reporter

2

```
 1                    A P P E A R A N C E S

 2    APPEARING FOR THE STATE:

 3         HON. ARMANDO VILLALOBOS
           State Bar No. 00788584
 4         Criminal District Attorney for Cameron County
           - AND -
 5         HON. ALFREDO PADILLA, JR.
           State Bar No. 15404600
 6         & HON. JOSEPH KRIPPEL
           State Bar No. 24007515
 7         & HON. MARIA DE FORD
           State Bar No. 24043626
 8         Assistants to the Criminal District Attorney
           Cameron County Courthouse
 9         974 E. Harrison Street
           Brownsville, Texas  78520
10         Telephone:  (956) 544-0849
           Fax:  (956) 544-0869 Fax
11

12    APPEARING FOR THE DEFENDANT:

13         HON. PETE GILMAN
           State Bar No. 07952500
14         6933 N. Expresway
           Olmito, Texas  78575
15         Telephone:  (956) 350-6954
           Fax:  (956) 350-8056
16

17    APPEARING FOR THE DEFENDANT:

18         HON. ADOLFO E. CORDOVA, JR.
           State Bar No. 00787286
19         Law Office of Adolfo E. Cordova, Jr.
           711 North Sam Houston
20         San Benito, Texas  78586
           Telephone:  (956) 399-1299
21         Fax:  (956) 399-4484

22

23

24

25
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

VOLUME 37

CHRONOLOGICAL INDEX - PUNISHMENT PHASE - DAY 6

7/09/08

|  | PAGE | VOL |
|---|---|---|
| Defendant Present | 3 | 37 |
| Opening Statements by MR. VILLALOBOS | 7 | 37 |
| Opening Statements by MR. GILMAN | 10 | 37 |

STATE'S WITNESSES:   (PUNISHMENT PHASE)

| NAME | DX | CX | RDX | RCX | VDX | VOL |
|---|---|---|---|---|---|---|
| A.P. Merrillet | 11 | 31 | 37 | 38 | | 37 |
| Joanne Estrada | 39 | 67 | 78 | 80 | | 37 |
| Wendy Anaya | 87 | 91 | | | 90 | 37 |
| Alfonsa Castillo | 92 | 105 | | | | |
| Carlos J. Borrego | 115 | 127 | | | 120 | |
| June Thompson | 128 | 138 | 144 | | | 37 |
| Norma J. Farley, MD | 149 | | | | | 37 |

| | PAGE | VOL |
|---|---|---|
| Mot./Instr. Verdict | 165 | 37 |

DEFENDANT'S WITNESSES:

| NAME | DX | CX | RDX | RCX | VDX | VOL |
|---|---|---|---|---|---|---|
| Norma Villanueva | 173 | 219 | | | | 37 |

| | PAGE | VOL |
|---|---|---|
| Adjournment | 236 | 37 |
| Certificate of Court Reporter | 237 | 37 |

```
 1                  ALPHABETICAL WITNESS INDEX
                                                VOIR
 2      NAME                   DX    CX    RDX   RCX   DIRE    VOL

 3      Anaya, Wendy           87    91                 90
        Borrego, Carlos J.    115   127                120
 4      Castillo, Alfonsa      92   105
        Estrada, Joanne        39    67    78    80             37
 5      Farley, Norma J. MD   149                               37
        Merrillet, A.P.        11    31    37    38             37
 6      Thompson, June        128   138   144
        Villanueva, Norma     173   219                         37
 7                        INDEX OF EXHIBITS

 8      STATE'S EXHIBITS:

 9      NO.   DESCRIPTION              OFFERED    RECEIVED    VOL

10      42    Jail Records-Lucio          90         90         37

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

1              **INDEX OF EXHIBITS**

2    **DEFENDANT'S EXHIBITS:**

3    NO.   DESCRIPTION              OFFERED    RECEIVED    VOL

4    25    CPS Drug Tests             78    .    78         37
     26    CPS Case History           78         78         37
5    27    Book From CPS-NA           81

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Adelaido Flores, Jr.
Certified Shorthand Reporter

3

**PUNISHMENT PHASE**

**P R O C E E D I N G S**

**(Defendant present; Jury not present.)**

1
2
3
4
5
6     THE COURT:   Call now Cause Number

7     07-CR-885-B, State of Texas versus Melissa Elizabeth

8     Lucio.   Let the record -- you may be seated.   Thank you.

9     I apologize.   Let the record reflect that the defendant is

10    present, along with her two attorneys.   The State being

11    represented by the Honorable Armando Villalobos, Al

12    Padilla and Maria De Ford.

13              MR. PADILLA:   Just scheduling, we had

14    talked about the possibility the State resting by noon on

15    this matter.   I've been advised, Your Honor, that we

16    intend to call Dr. Farley, and Dr. Farley will be

17    available after lunch at 1:30.   So I was just letting the

18    judge know the possible progression of the State's case.

19    We probably have enough witnesses for the whole morning.

20    I thought I'd just let the Court know before you start.

21              THE COURT:   Okay.   Mr. Gilman?

22              MR. GILMAN:   Do you have any idea when

23    Farley is -- how long Farley is going to take?

24              MR. PADILLA:   Not all afternoon, that's for

25    sure.   I'm sure it will take some time.

4

1          MR. VILLALOBOS:  I would think that it
2  would we -- from our prospective, half an hour to 40
3  minutes.
4          MR. PADILLA:  Are you trying to get Dr.
5  Pinkerman in?
6          MR. GILMAN:  Well, I've got Norma
7  Villanueva and Dr. Pinkerman, and I told them 1:30.  So I
8  need to call them and --
9          MR. PADILLA:  And that's the reason why I
10 brought it the Court's attention is to avoid --
11         THE COURT:  Well, they will come on after
12 the State finishes.  If the State goes on after 1:30 --
13 that's all we can do.
14         MR. GILMAN:  I may just tell them to be
15 here at 2:30, if that's all right with the Court.
16         THE COURT:  If that's what you think your
17 best guess is.  My guess is -- have them come in about
18 2:15.
19         MR. PADILLA:  Okay.
20         THE COURT:  Dr. Farley may take half hour.
21 She may take an hour.  She may take 15 minutes.  I don't
22 know.  She's going to testify as to what she saw, the
23 violence related to it, I imagine.  It shouldn't be as
24 long as the case in chief.  The case in chief was a couple
25 of hours.  So it should be -- let me switch gears on you.

5

```
 1              With regard to the Court's charge on
 2    punishment, I double checked the definition of the word
 3    militate and mitigated.  And -- I was right.  It is
 4    militate.  "Militate" is to make worse.  Mitigate is to
 5    make less.  So I'm not making that typo change.
 6              Other than that, are there any other
 7    changes?
 8              MR. GILMAN:  Well, Judge --
 9              THE COURT:  Or are you not ready for that?
10              MR. PADILLA:  I'd like to wait, Judge,
11    because -- I don't want to look through it, and we are not
12    making some -- not changes but comments to it, and we need
13    to review those.
14              MR. GILMAN:  We had a word there that the
15    Court had to look up, and that I had to look up, and I'm
16    sure Mr. Padilla had to look up.  If we have to look up
17    the word to find out what the meaning is, I think it would
18    be to our advantage to have in parenthesis what the word
19    means so that the jury doesn't have that problem.  We
20    could provide them with a dictionary so that they can --
21              THE COURT:  Oh, I think that's something
22    that y'all probably just need to use during your closing
23    arguments.  You can make that definition and explain it.
24    I'd rather keep the Court's charge as clean as I can.
25    Anything else?
```

1          MR. PADILLA:  Not at this point, Judge.  If

2    anything comes up that we need to address to the Court

3    concerning the charge, we will be glad to bring it up to

4    the Court's attention as early as possible.

5          THE COURT:  Okay.  Are you all ready for

6    the jury?

7          MR. PADILLA:  Yes, Your Honor.

8          THE COURT:  All right.  Bring the jury in.

9    Are the witnesses here?

10         MR. PADILLA:  Your Honor, all of the

11   witnesses are in the back in the jury room.  We don't have

12   any other witnesses in the courtroom.

13         THE COURT:  Will all the witnesses please

14   raise your right hand?

15         MR. PADILLA:  There are no witnesses.

16         THE COURT:  No witnesses?  Please be

17   seated.

18         MR. PADILLA:  Our witnesses are in the jury

19   room.

20         THE COURT:  Mr. Walker is not going to be a

21   witnesses?

22         MR. PADILLA:  No, sir.

23         THE WITNESS:  I was kind of surprised when

24   I saw Mr. Essex and Mrs. Nix stand up.  I couldn't figure

25   out how they could be witnesses.

```
 1                    MRS. NIX:  We're standing for the jury,
 2      Your Honor.
 3                    MR. PADILLA:  They can be sworn in, Judge,
 4      if they want to be.
 5                    (Jury enters 9:09 a.m.)
 6                    THE COURT:  You may be seated.  Thank you
 7      very much.  Ladies and gentlemen of the jury, by the
 8      verdict you have rendered, we have concluded the
 9      guilt/innocence phase.  And now we go into the punishment
10      phase.  I remind you of the instructions I have given you
11      before.  Again, you're not supposed to begin deliberations
12      until after all of the evidence of this phase is in.  So
13      don't be discussing this case until that happens, okay?
14      We're starting another phase of this trial.
15                    Will the State call its first witness,
16      please?
17                    MR. VILLALOBOS:  Your Honor, may I give a
18      short opening?
19                    THE COURT:  Sure, you may.  Go ahead.
20                    MR. VILLALOBOS:  May it please the Court?
21      Mr. Gilman, and Mr. Cordova?  Good morning, ladies and
22      gentlemen.  On behalf of the State of Texas, we want to
23      thank you for your verdict yesterday.  We feel that it is
24      a verdict that is just and true.  And now we are gong to
25      proceed into the punishment phase where we will bring you
```

1  evidence to help you decide what we are going to do with
2  the defendant.

3            Two options.  To remain where she is right
4  now, which is life without parole.  Or, we will bring you
5  evidence that you can decide to give the ultimate penalty,
6  which is death penalty.  What we intend to do is bring
7  evidence -- reintroduce evidence of the trial where you
8  would happen to consider that, go back and deliberate
9  after the trial is over.  From that evidence you can glean
10 what is necessary and you can highlight certain parts of
11 that evidence during the closing.  We will reiterate
12 certain evidence and arguments.

13            We intend to bring further testimony from
14 Dr. Farley who will come in and highlight what the injury
15 and suffering that Mariah went through, what those
16 injuries actually means, and how she ruled those injuries.
17 So you will hear from Dr. Farley as well.

18            You will hear testimony, again, from the
19 CPS worker.  The CPS worker, this time, will come in and
20 will be able to testify as to the other behavior of the
21 defendant, what else the defendant has done to the other
22 children, and other factors that you can consider.

23            We are going to bring testimony of the
24 jailers while the defendant has been in jail describing
25 her behavior in jail, the suspension of privileges, the

9

```
1    violation of rules.  You can take that into consideration
2    when you deliberate.
3              We are going to have expert testimony on
4    future dangerousness which is one of the questions that
5    you will have to consider.  The expert will come in and
6    testify as to her future dangerousness to society, even if
7    she is in jail for the rest of her life.
8              You're going to hear testimony from
9    Mariah's foster parent.  This is very, very important
10   because in this trial, we're heard to speak on her behalf.
11   So you hear from her where she comes in and describes to
12   you the part, or the person that you haven't been yet
13   provided as a little girl, as a two year old, how she was
14   as a two year old, pictures of herself as a baby, that
15   have been entered into the case so far.
16             So once we hear you that evidence, we hope
17   that you will agree with us that this is no ordinary case
18   and it goes beyond the death of this simple two year old
19   it rises to the level were the ultimate sanction should be
20   death.  Thank you for your consideration.
21             THE COURT:  Mr. Gilman, do you wish to make
22   an opening statement at this time?
23             MR. GILMAN:  Brief, Judge.  Good morning,
24   ladies and gentlemen.  Again, this is not evidence.  But
25   what we intend to show when it is our turn, we have two
```

1   experts to come in and testify about the character of

2   Melissa Lucio.   It will also show her background and her

3   propensity towards violence.   You will find that Melissa

4   Lucio is not a violent person.

5           You have made this finding.   I respect your

6   decision.   I don't necessarily agree with it, but I

7   certainly respect it.

8           I think that once the evidence is all put

9   together, the State is going to be, again, attune toward

10  your motions, and I'm asking you to start -- to ask you to

11  think primarily what is the best thing to do, and I think

12  you will find that the best thing to do is put Melissa

13  Lucio in prison for the rest of her life without parole.

14  Thank you.

15          MR. VILLALOBOS:   At this time we move to

16  reintroduce all of the evidence from the guilt and

17  innocence phase of the trial.

18          THE COURT:   Ladies and gentlemen, all of

19  the evidence that was considered in the first phase of the

20  trial as to guilt or innocence, is something that you may

21  consider subject to any objections from the defense.

22          MR. GILMAN:   I wish to reserve any and all

23  objections I made during the --

24          THE COURT:   All of your previous objections

25  are recognized and accepted.   So all the evidence before

1    you in the guilt/innocence phase is evidence that you may

2    consider in the punishment phase.  So all of that evidence

3    is something that you may consider in answering the fact

4    questions -- the three questions you must answer in this

5    phase of the case.  Okay?

6                    THE COURT:  Mr. Padilla?  Call your first

7    witness.

8                    MR. PADILLA:  At this time we call A.P.

9    Merrillet.

10                   THE COURT:  A.P. Merrillet

11                   MR. PADILLA:  Merrillet, M-E-R-R-I-L-L-E-T.

12                   THE COURT:  Thank you.  Please be seated.

13                   (Witness sworn)

14                   THE COURT:  Proceed, sir.

15                         **A.P. MERRILLET,**

16       having been first duly sworn, testified as follows:

17                       **DIRECT EXAMINATION**

18   BY MR. PADILLA:

19       Q    Sir, could you please state your name for the

20   record?

21       A    A.P. Merrillet.

22       Q    Mr. Merrillet, where do you reside?

23       A    I live at Conroe, Texas.

24       Q    And what is your occupation?

25       A    I'm a criminal investigator for the State of

1    Texas Special Prosecution.   We are headquartered in

2    Huntsville.

3         Q     Can you tell the jury what the special

4    prosecution unit is?

5         A     Yes, sir.   Our office is operated from grant

6    funds out of the Governor's office, and our primary

7    responsibility is to prosecute crimes that involve the

8    Texas Prison System or employees of the prison system or

9    visitors or conspiracies to commit crimes within the

10   prison system, crimes involving property that belong to

11   the Texas Department of Criminal Justice.

12              And we operate or we're invited in by local

13   district attorneys across the state who have prisons in

14   their jurisdiction.   In other words, we don't just go to a

15   county and say:   We are here to prosecute your cases.   We

16   have to be invited in by the local elected DA.

17              Our prosecutors are sworn in as assistant

18   DAs, and they prosecute the crimes that are charged.   I,

19   as an investigator, prepare those cases for Grand Jury

20   presentation.   Then I take them to the Grand Juries across

21   the state and present them for indictment.

22              And once the case is indicted, I will

23   prepare a case for prosecution and free world court, just

24   like the court here.   I will work with the prosecutor.   I

25   will do fingerprint work, blood stain interpretation.   I

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    draft search warrants and court orders.  I am involved in

2    evidence control.  I testify as an expert frequently

3    across the state.  We are much like the DAs office, but we

4    work in about a hundred counties in the State of Texas.

5         Q    And again, your specialty -- not specialty, but

6    the type of crimes that you assist in prosecuting are

7    crimes within the prison system, correct?

8         A    Primarily.  We do prosecute what we call "free

9    world crimes," in other words, conspiracies to commit

10   crimes involving prison inmates that happen outside the

11   prison.  We will go in and prosecute those crimes as well.

12        Q    And have you testified as an expert witness on a

13   few or many occasions?

14        A    Well, I have testified in numerous capital

15   murder cases, and I have testified in hundreds of other

16   types of cases.  I testified for our office frequently.

17        Q    And you are certified for fingerprint analysis,

18   blood analysis, things of that nature; is that correct?

19        A    Yes, sir.  I have been qualified in the State of

20   Texas and in the State of Florida to testify as a

21   fingerprint expert.  I am also qualified as an expert in

22   district court to testify as a blood stain interpretation

23   expert, and a child sex crimes expert.

24        Q    And how long have you been doing this, sir?

25        A    I've been in law enforcement for 31 years, a

1    little over that now.  And I've been in this office for

2    about 19 and a half years.

3        Q    On an average day, on an average year, how many

4    cases do you work on more or less?

5        A    Our office moves about a thousand cases a year.

6               MR. GILMAN:  Excuse me, Judge.  The rule, I

7    assume, is still invoked?

8               THE COURT:  Yes, sir.

9               MR. GILMAN:  And there are no witnesses in

10    this courtroom?

11               THE COURT:  No, sir.  If there are any

12    witnesses, they will be prohibited from testifying.

13               MR. GILMAN:  Thank you, sir.

14        Q    (By Mr. Padilla) Yes, sir.  Again --

15        A    We move -- moving cases means Grand Jury

16    prosecution, pleas, such as that we work on or move

17    through the court system, 900 to 1,000 cases a year.  It

18    could go up or down depending on the year.  We get busier

19    some years than others.

20        Q    What type of cases do you typically prosecute?

21        A    We prosecute everything from capital murder that

22    occurs inside the penitentiary, all the way down to

23    briberies, escapes, assaults, sexual assaults, thefts,

24    extortions, arsons, just -- drug cases, possession of

25    prohibited items in the penitentiary.  We prosecute

15

```
1    guards, wardens, nurses, teachers, visitors.  Just about
2    every crime you have in the free world, we have in the
3    prison system.
4         Q    That includes drug possession?
5         A    Sir?
6         Q    That includes drug possessions, assaults --
7         A    Yes, sir.
8         Q    -- things of that nature?
9         A    Yes, sir.
10        Q    And you say you also prosecute wardens; is that
11   correct?
12        A    Yes, sir.  We have prosecuted four head wardens
13   to prison time.
14        Q    For what type of offenses?
15        A    One was for child sex abuse.  One was for
16   bribery.  One was for official oppression.  One was for
17   theft.
18        Q    And what's the largest sentence you've ever had
19   against a warden?
20        A    The child molester warden pled guilty for 50
21   years prison time.  We didn't have to take him before a
22   jury.  He pled before that.
23        Q    In which state?
24        A    He's in Florida.
25        Q    Now you say you go around the state testifying.
```

16

1    Now you don't testify exclusively for the state, do you?

2         A    So far it's worked out that way, but I am called

3    by both sides all of the time.  Especially in capital

4    cases -- I want to make that clear -- my primary job with

5    special prosecution unit is prosecution.  That's what our

6    name says.  So for our office I testify for the state, of

7    course.  In capital murder cases I'm called by both sides,

8    defense and prosecution.  And I cooperate with both sides.

9    I don't have -- I don't have an agenda to promote, in

10   other words.  But for some reason the defense won't call

11   me to the stand.  The State always calls me.  But I'm

12   available.

13        Q    And do you seek any additional enumeration or

14   payment for your testimony?

15        A    No, sir.  I've never been paid for coming across

16   the state to testify.

17        Q    And as a result of your experiences, have you

18   been able to form opinions concerning the workings of the

19   criminal justice system within TDC?

20        A    Yes, sir.  I have an extensive knowledge of

21   prison life, prison behavior, what happens inside the

22   penitentiary.  That's what I do every day is work these

23   cases that originate within the prison.  And I've written

24   three books.  I've written numerous articles for magazines

25   and newspapers.  I've been interviewed by many television

1   people on the subjective of prison violence, and I have

2   lectured to college classes about prison violence.

3        Q    So have you been able to, through your

4   experience and your knowledge, been able to give

5   definitions or explanations of how the criminal justice

6   works, correct?

7        A    As it applies to prison life, yes, sir.

8        Q    Now, you are not here or you have never been

9   called to testify about whether a person is a threat or a

10  future danger.  You are just here to explain to the jury

11  how the system works within TDCJ; is that correct?

12       A    Yes, sir.  And the many years that I have

13  testified in these kind of cases, I have never said that a

14  person will commit acts of future violence.  I can't do

15  that, and I am not capable of doing that.  And by the same

16  token, I won't say that they won't take opportunities to

17  be violent either.  I can't say that either.

18                 All I am here to do is to tell you folks

19  what the opportunities are in the prison system, and this

20  important decision that you have to make, you have to base

21  it upon the truth that I intend to give you.

22       Q    Now, sir, if a person is convicted of capital

23  murder and given a life sentence, is that person

24  segregated?

25       A    No, sir, not originally.  They're given an equal

1    chance to either behave, or misbehave.  When they come

2    into the prison system, they are classified.

3    Classification is the very heart of how a prison inmate

4    spends their time inside the penitentiary.  Their

5    classification determines how much so called freedoms they

6    can have inside the prison -- where they can work, where

7    they're housed, and such as that.  So the classification

8    system is very important to a prison inmate.

9            A person convicted of capital murder and

10   given a life sentence will come into the penitentiary and

11   be classified the same as a newly arrived inmate who has a

12   50-year or more sentence.  In other words, a burglar

13   with -- a habitual burglar can have a 50-year or a life

14   sentence, not be a capital murderer, but they are going to

15   come in the penitentiary and be classified based upon the

16   number of years they just received in court.  The same as

17   a capital murderer.

18            A convicted capital murderer will not be

19   treated more specially, for lack of a better term, than a

20   burglar, a forger, a robber or drug dealer with that same

21   number of year sentence.  They can live in the general

22   population.  They can work, if they choose to, go to

23   school, go to visitation, go to church, go to medical, go

24   to the library, walk to and from their cells without

25   escort, without handcuffs.  They can have cell mates who

Adelaido Flores, Jr.
Certified Shorthand Reporter

19

1    might be a lesser convict.  A cell mate of a capital

2    murderer can be a burglar.

3               That inmate has to earn more restrictive

4    custody by misbehaving, either committing disciplinary

5    infractions or committing crimes that we prosecute.  After

6    a pattern of that behavior, they will be more strictly

7    housed, but it's not automatic.

8        Q    So they're not automatically segregated into

9    individual cells because of the offense involved?

10       A    Not if they're given a life sentence.  No, sir.

11       Q    And, are you familiar with the numbers of

12    assaults that occur within the Texas Department of

13    Criminal Justice institutional Division?

14       A    Yes, sir, I am.

15       Q    And how many assaults occurred in the year 2007,

16    if you know?

17       A    Inside the penitentiary, counting minor assaults

18    and major assaults between inmates and inmates, and

19    inmates and guards, they were right at 20,000 assaults by

20    inmates upon either staff, or each other.  And that

21    includes so called minor assaults, and it goes all the way

22    up to aggravated assaults with weapons.

23       Q    Does that include all sorts of classifications

24    from burglars up to murderers?

25       A    Yes, sir.  We're working a case now where a

20

1    convicted murderer killed her cell mate last year.

2         Q    Okay.  So how many murders on an average year do

3    you work on?

4         A    Let's see.  We had five last year, and two so

5    far this year.  So one year, there's nine and one year

6    there's one.  It depends.  But the important thing to note

7    is, since 1984, there's never been a year in Texas where

8    one inmate has not -- at least one inmate has not been

9    murdered.  So we've never had a year with no murders

10   inside the penitentiary since 1984 at least.

11        Q    And has there been any staff members that have

12   been murdered from 1984 to the present?

13        A    Yes, sir, there have.

14        Q    How many?

15        A    There's four or five.  If I sit here and think

16   long enough, I can tell you their names and who killed

17   them, but I know that there's four or five.  Female and

18   male.

19        Q    The assaults that we're talking about, is it

20   inmate on inmate, or, is it also inmates on staff?

21        A    Both kinds, yes, sir.

22        Q    Both kinds.  And what type of people normally

23   interact with the people incarcerated?

24        A    There are different kinds of people daily inside

25   a prison.  Including me.  But there are, of course,

1    guards.  There are civilian employees, clerks -- there are

2    people who come and service the vending machines, you

3    know, vendors that bring cokes out or stuff and service

4    the machines.  So they are not even associated with the

5    prison at all.  They just happen to come and work there on

6    a daily basis.  Some of those have been victimized.

7              There are teachers, nurses, chaplains,

8    volunteers, ministers who come out frequently to all of

9    the prisons.  There are people who come on field trips.

10   They go through the prisons.  There are visitors --

11   numerous visitors daily that come through.  There's news

12   people.  There's any number -- of kinds of people that

13   come through any unit.

14       Q    And have those people also been subjected to

15   assaults?

16       A    Yes.  We've worked cases involving that cross

17   section of the population.  Yes, sir.

18       Q    From 1994 to 2007, there were 151 murders within

19   the Texas Department of Corrections; is that correct?

20       A    Yes, sir.  There's been 153 to date.

21       Q    To date?

22       A    Yes, sir.

23       Q    And has there been defendants who have served --

24   who are serving capital murder sentences and life

25   sentences that have committed more than one murder?

```
 1        A     Well, there have been those who have come to

 2   prison and committed murder after they have been convicted

 3   of murder.  But as far as -- there have been prison

 4   inmates who have committed more than one murder inside the

 5   penitentiary, but I don't know that they are capital

 6   murderers, if I understand you correctly.

 7        Q     Is there a furlough procedure within the

 8   Department of Corrections?

 9        A     Furlough procedures?  Yes, sir.  Even a

10   convicted capital murderer can be considered for furlough.

11   It doesn't mean they are going to get it.  But there's no

12   prohibition against them being considered for a furlough.

13        Q     What does a furlough consist of?

14        A     Primarily the most common one is like an

15   emergency situation where a family -- a close family

16   member passes away.  An inmate can, not necessarily will,

17   but can be considered to go to that person's funeral.  And

18   there's no restriction that a capital murderer cannot do

19   that.

20        Q     Now, are the -- is there a specific unit within

21   the Texas Department of Criminal Justice Division for the

22   housing of females?

23        A     There are several.  There are 12,000 inmates --

24   12,600 female inmates in the penitentiary in Texas, and

25   there are several units in Coryell County in Gatesville.
```

23

1    There is a unit, a large unit in Falls County called the

2    Hobby Unit.  There are other units, not just one unit.

3        Q    Again, the numbers are consistent, whether it's

4    a male or female unit, concerning assaults and things of

5    that nature?

6        A    Concerning what now?

7        Q    Concerning assaults and crimes of that nature?

8        A    I don't know about consistent.  Of course, there

9    are few -- there's 157,000 inmates.  There's 12,000

10   females.  So like last year we prosecuted 17 females for

11   assault type of behavior and weapons possession.  So, you

12   know, you can determine whether or not that's a big number

13   or not.  But there are fewer numbers of females in the

14   prison.  So there's fewer numbers of offenses that we

15   prosecute.

16       Q    Let me ask you again.  On how many occasions

17   have you testified on the issue of future dangerousness?

18       A    I; have no idea.  I don't keep track of it.

19       Q    And you do have firsthand experience on prison

20   violence, correct?

21       A    Yes, sir.  I've been mistakenly locked in a

22   prison cell one time and had to lie my way out of that

23   situation.  A very dangerous situation.  I have received a

24   package bomb in the mail.  I've witnessed firsthand what

25   can happen.  Yes, sir.

Adelaido Flores, Jr.
Certified Shorthand Reporter

24

1   Q Now the books that you have written, are they on

2 the issue of future dangerousness?  Is that correct?

3   A Yes, sir.

4   Q And have you ever -- you say that you have been

5 qualified as an expert in this field throughout the State

6 of Texas; is that correct?

7   A Yes, sir.  I would like to say that my book is

8 called "Future Danger," but it's primarily about the

9 opportunities to be violent.  It's about the nature of

10 violence in the prison system.  I don't write a book to

11 say:  Here's how a person becomes a future danger.  I

12 can't do that.  By the same token, I haven't been called

13 an expert in future behavior because I'm not -- I'm not an

14 educated person, as you can probably tell.  I've been

15 qualified as an expert on prison violence and the

16 opportunity to be violent in the penitentiary.

17     MR. PADILLA:  Just for the record, I would

18 ask that the record reflect that he's been qualified as an

19 expert in this case.

20     THE COURT:  The opportunities for future

21 violence in the prison?

22     MR. PADILLA:  Yes, sir.

23     THE COURT:  Any objections?

24     MR. GILMAN:  No, sir.

25     THE COURT:  Proceed, sir.

25

1      Q      (By Mr. Padilla) The classification system,

2    Mr. Merrillet, how does that exactly work?  When you go

3    in, you receive a classification?  How does that work?

4      A      Yes, sir.  It's a very complicated system, but

5    I'll boil it down as best as I can.  There are two types

6    of classification systems.  One is a time earning status,

7    it's a numbered system that's proceeded by an "S" or an

8    "L".  S1, S2.  And, L1, L2.  Those are referred to time

9    earning status.  So I will put those aside for the moment.

10             The other type of classification status

11   that really pertains to this issue is the G system.  The

12   letter G -- and a number after that letter.  "G1" is a

13   trustee, which is a convicted capital murderer with a --

14   specifically with life without parole sentence cannot be a

15   trustee, and can never achieve that status.  So that

16   doesn't apply here.  G2, G3, G4, G5.  And then from the G

17   system, it goes to an A which stands for "Administrative

18   Segregation".  That's what people think of as solitary

19   confinement.  That's the very restrictive housing.

20             So back to the "G".  "G2" is the best of

21   the inmates who are not trustees.  They are inmates that

22   are pretty well behaved.  They can work throughout the

23   unit, and have privileges.  "G3" is a little bit worse

24   inmate that has gotten into some trouble, but they're not

25   the worst yet.  "G4", they're getting worse in behavior.

1    G5 -- they're going down like that.  In other words, if

2    you have an inmate who's a G5, you know they're bad

3    behaved, discipline problem, violent, or dangerous inmate.

4              Then that "A" letter I told you about, it

5    goes from 1A, 2A, all the way down to 6A.  And once again,

6    one is a particularly good of all of the bad.  If you have

7    an A, you are a bad, bad person.  You're in solitary,

8    okay?  If you're a 1A, you're an okay bad person.  I don't

9    mean that lightly but I'm trying to explain what I'm

10   saying.  And if you go all the way down to six, you're

11   really, really bad.  That's the worse we can have.  There

12   is nothing else we can do in the penitentiary except

13   classify them way down there with that high number and the

14   "A" afterwards and put them in solitary.

15             Even then the classification plan, of which

16   I'm very familiar, mandates that a person in that "A"

17   status, administrative segregation or solitary status, has

18   to be reviewed periodically to see if they can come up out

19   of it.  If they've been good while they've been in that

20   bad area, good enough to go up a number or two, or go to

21   that "G" I was telling you about.  So you can promote from

22   a "5A" all the way up to the "G2," if you've been good

23   enough.  And vice versa.  You can go from a G2, all the

24   way down to a 5A.

25             But putting somebody in solitary because

1  they just stabbed another convict doesn't mean they're

2  going to be there forever.  They have to be reviewed.

3  It's required by their own policies, to see if they've

4  been good enough to get out of that status.

5            So -- and if I'm making sense at all, I

6  don't even know -- but that's the crux of the

7  classification system.

8       Q    After they have been classified, does an inmate

9  walk around carrying a "G3" on their chest, or "G1," or,

10 "G2," or are they just in the general population?

11      A    That's a good point.  The prison inmates, male

12 or female, whatever, wear the same uniforms.  They don't

13 wear distinctive clothing that says:  I'm a convicted

14 capital murderer.  Be careful.  Or, I'm a burglar.  Don't

15 be careful.  They all wear the same type of outfits.

16           To the guards who go to work eight, ten,

17 12, 15 hours a day, they're just convicts, and the guards

18 see them as convicts.  They don't say:  Well, there's a

19 capital murderer.  There's a child molester, and there's a

20 drug dealer.  For one thing, the guards aren't supposed to

21 know that.  Only if the inmate decides to tell them, or

22 they see it on the news, or something, but the common

23 working man guard is not supposed to know all of that.

24 They don't have access to that information.

25           Did I answer that question?

28

```
1        Q    Yes, sir.  Does that interaction there between
2    the inmates and general population, a lot of times where a
3    lot of problems occur?
4        A    The interaction between guards and inmates?
5        Q    Between inmates, when they're together?
6        A    Yes, sir.  There's a lot of interpersonal
7    violence between inmates because you have convicted felons
8    who can't get along with society anyway.  So now you've
9    put them all together in that group.  So, of course, there
10   are going to be problems -- severe problems.
11              And the same thing with guards, the inmates
12   view guards as police.  They call them the law; they call
13   them police.  They call them -- the inmates consider
14   prison guards -- cops to them.  So there is a natural
15   hatred between the two there as well.
16              Now some inmates choose to obey the rules
17   and they won't mess with the guards.  Some inmates are
18   just the opposite.
19       Q    And in reference to sexual assaults, you have
20   investigated those, correct?  Sexual assaults?
21       A    Yes, sir.
22       Q    Have you prosecuted guards for having consensual
23   sexual relations with females?
24       A    Yes, sir.  That's a violation of civil rights.
25   And we prosecute many guards for having consensual sex.
```

29

1   We prosecute guards for having nonconsensual sex as well.

2      Q     How many in the last -- so you have been working

3   in the system how many --

4      A     Nineteen and a half years.

5      Q     How many have you prosecuted?

6      A     I have no idea.  I couldn't even guess.

7      Q     Was it one, or many?

8      A     It's many.

9      Q     With reference to visitation, are prisoners

10  allowed visitation?

11     A     Yes, sir.

12     Q     Are any of them prohibited from having

13  visitation?

14     A     Are -- any what now?

15     Q     Any of them prohibited from having visitation?

16     A     Yes, sir.  If you get the A status, that "A"

17  that I told you about, they can take your visitation

18  privileges for a period.  And that applies also to, if you

19  have that good number, that "G."  It's an incentive for an

20  inmate to behave.  That's one of the privileges they have,

21  is visitation or phone calls or commissary privileges.

22  And if they get in trouble for something minor, one of

23  their punishments can be to take their visitation

24  privileges for awhile, or commissary, or something like

25  that.

30

Q    In the past, have you had the enforcement --
have you been in the position of having to prosecute
people for trying to bring in -- visitors trying to bring
in items to prisoners?

A    Yes, sir.  That happens frequently, and
sometimes they are successful in bringing in even guns.
But, thankfully, they are usually stopped before that
happens.  But we aggressively prosecute people who try to
bring those items in the penitentiary.

Q    And you also aggressively prosecute guards that
bring in drug or weapons or anything else within the
system?

A    Yes, sir.  We are not -- we don't show
favoritism or anything like that.  Like I said, the
wardens, we will go after who commits these felonies
inside the penitentiary.  Inmate, guard, warden,
visitor -- health care person.

Q    You never actually worked within the prison
system, correct?

A    That's correct.  I've never been paid as an
employee by the prison.  But for one year, several years
ago, I was detached from my office and attached to the
prison at the time called Internal Affairs Division, and I
worked in the Use Of Force Bureau.  They were very short-
staffed.  My office assigned me to them for about a year.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1  I worked for my office still and I was paid by them, but I

2  went every day over to the Prison Internal Affairs and had

3  to work with them daily for about a year.  So I was not a

4  paid employee, but I did work at, and for, the prison.

5      Q    Now, my understanding is that your office from

6  2003 to 2008 has prosecuted more or less about 3,851

7  felony offenses; is that correct.

8      A    Five-year period, yes.  About four and a half

9  year period, yes, sir.

10     Q    And do those include deadly weapons, drugs and

11  all types of offenses?

12     A    Yes, sir.  Those go from capital murder, all the

13  way down to escape, and everything in between.

14             MR. PADILLA:  I will pass the witness, Your

15  Honor.

16             THE COURT:  Mr. Gilman?

17             MR. GILMAN:  Thank you.

18                    **CROSS-EXAMINATION**

19  **BY MR. GILMAN:**

20     Q    Is it "Merrillet?"

21     A    Merrillet.

22     Q    Mr. Merrillet, how many people are serving

23  capital offenses right now?

24     A    I have no idea.

25     Q    Would it seem right that from January of '07 to

32

```
1    April 8th of this year there were approximately 1,920

2    inmates?  Does that seem about right?

3         A    I don't know.  I've never seen the number, I

4    really don't know.  I don't know.

5         Q    And of that 1,920 inmates that are serving

6    capital offenses, how many of those were ever charged with

7    any kind of assault?

8         A    I don't know the answer to that.

9         Q    Would it surprise you to understand that there

10   is only seven assaults against guards during that period

11   of time?

12        A    That does surprise me.  And I don't even believe

13   that's correct.  I don't believe that's correct.

14        Q    And that there were only eight alleged sexual

15   assaults during that period?

16        A    That's not correct either.

17        Q    Well, what is correct?

18        A    The numbers you just quoted I happen to see in

19   the Dallas the day before yesterday.  And those numbers --

20   and I'm not saying you're giving me those numbers -- but

21   the ones that I saw came from the Executive Services

22   Bureau at the prison system, and what they termed

23   "assaults" are not what our office terms "assaults."

24              We prosecute felonies that include assaults

25   upon officers that are less than what the prison calls
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

33

```
 1    assaults.  The prison puts out a document and they say:
 2    Here's how many assaults occurred in a month.  And that
 3    comes out every month.  I get that document.  What they
 4    call "assault on a guard" is an action by an inmate that
 5    requires more than mere first aid treatment upon that
 6    guard.
 7                    Our office calls an assault on a guard,
 8    which the penal code does -- if you slap a guard who is in
 9    the performance of his duties, that's a third degree
10    felony and it could be bumped up to a first degree felony.
11    So we call an assault much more than what the prison terms
12    calls an assault.  So that's why I'm saying that number is
13    not correct.  I know we prosecute numerous assaults and
14    much more than eight.
15         Q    Okay.  But I am talking just persons charged
16    with a capital offense, because that's all we are dealing
17    with here, is a person dealing with a capital offense.
18         A    You're talking about a person convicted of a
19    capital offense?
20         Q    Yes, sir.
21         A    I don't know that -- I do know that 82 convicted
22    capital murderers serving life were prosecuted by our
23    office in a three-year period ending last year.
24         Q    And how many of those 82 are women?
25         A    I really don't recall.  I really don't.
```

34

```
 1        Q    Okay.  So when you are giving these statistics
 2   to the jury, you are telling statistics about the general
 3   population that are in prison systems in the State of
 4   Texas; is that correct?
 5        A    No, sir.  I'm talking about general population
 6   and at seg, high security.  I'm talking about the
 7   population of the prison system, not just general but all
 8   the population.
 9        Q    Okay.  But that range is from the state jail
10   felony inmates to a capital offender?
11        A    That's correct.  When I talk to you about the
12   opportunity to be violent, I meant state jails all the way
13   to death row.
14        Q    And there is -- statistically, isn't there more
15   people being violent in prison than those classified as
16   capital offenders?
17        A    I would say that since there are fewer capital
18   offenders, according to what you just told me, and the
19   numbers of offenses that we prosecuted, there must be
20   fewer capital offenders committing those crimes because
21   the numbers just don't match up.
22        Q    And in the real world, there are fewer females
23   in our society here in Brownsville, in Cameron County,
24   throughout the Rio Grande Valley that are committing
25   offenses, criminal offenses than there are males; isn't
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

35

1     that right?

2         A    I have no idea.

3         Q    Well, you say you have been an investigator for

4     a good number of years.

5         A    Yes, sir.  I don't investigate how many females

6     are committing crime in Cameron County.  This is like the

7     second or third time I've ever been here.

8         Q    There are certainly fewer female inmates in the

9     prison system --

10        A    That's correct.

11        Q    -- committing violent offenses than there are

12    males?

13        A    That is correct, just as I said, yes, sir.

14        Q    Now, you said about this classification system,

15    there are G2 through 5, and then the 1A through 6A --

16        A    Yes, sir.

17        Q    Where does the majority of the female capital

18    offenders stand?

19        A    I don't know.

20        Q    When was the last time that a capital offender

21    was granted a furlough, if you know?

22        A    I don't know.

23        Q    So you just told about this furlough just to

24    throw it out?

25        A    No, sir.  I was answering truthfully a question

Adelaido Flores, Jr.
Certified Shorthand Reporter

1   put to me.  There is no restriction against a capital

2   murderer.  I thought I was clear.  A capital murderer is

3   not restricted from being considered --

4                    MR. GILMAN:  I'm going to object.  This is

5   not responsive to my question.

6                    THE COURT:  Answer the question, sir.

7                    THE WITNESS:  Yes, sir.  There is no

8   restriction against a capital murderer.

9   BY MR. GILMAN:

10      Q    And I didn't ask the question.

11      A    Oh, I thought you just did.

12      Q    You said that you didn't know when was the last

13   time a capital offender was granted furlough.

14      A    That's true.  I do not know that.

15      Q    So the statistics you are spouting here, I mean,

16   you are not backing this up with any recent statistics,

17   are you?  You are just talking.

18      A    No, sir.  I am answering questions and I can

19   back up what I say.

20                    MR. GILMAN:  Nothing further, Judge.

21                    **REDIRECT EXAMINATION**

22   **BY MR. PADILLA:**

23      Q    Mr. Merrillet, have there been escapes from the

24   TDCJ by defendants who are serving capital murder

25   sentence?

1          MR. GILMAN:  I'm going to object, Judge.

2  This gentleman obviously does not know what he is talking

3  about.  All he is doing is spouting statistics that he

4  guesses.  I don't think he has any firsthand knowledge of

5  such escapes, if any.

6          THE COURT:  I'm going to overrule the

7  objection.

8          MR. GILMAN:  Note my exception.

9     Q    (By Mr. Padilla) Let me rephrase that.  Did an

10 inmate by the name of "Turner" escape from the Plain state

11 jail and, picked up a retired guard?

12    A    Yes, sir.  That was a female.  And I know two

13 convicted capital murderers serving life name Escorino and

14 Seibers.

15         MR. GILMAN:  I object.  It is nonresponsive

16 to the question.

17         THE COURT:  Re-ask the question.

18    Q    (By Mr. Padilla) Any other the individual, sir,

19 that may have escaped while serving a sentence for capital

20 murder?

21    A    Yes, they have.

22    Q    Who are they?

23    A    Chad Seibers and an inmate, his partner named

24 Escorino.  I forgot his first name.  I apologize.  They

25 are both serving life sentences for capital murder.  They

38

1   escaped last year from the Allred Unit, in Wichita County,

2   Texas.  They were found a considerable distance away from

3   there.

4                   MR. PADILLA:  I pass the witness.

5                   THE COURT:  Mr. Gilman.

6                      **RECROSS-EXAMINATION**

7   **BY MR. GILMAN:**

8       Q      How many female units?

9       A      Well, I just spoke of one from Plain State Jail,

10  and then we prosecuted --

11      Q      That was in a state jail facility?

12      A      Yes, sir.  Plain State Jail.

13      Q      So that certainly is not a capital offender, is

14  it?

15      A      No, it's not.

16      Q      So is there any female capital offenders

17  escaping?

18      A      Not that I recall.

19                  MR. GILMAN:  Okay.  Thank you.  Nothing

20  further.

21                  MR. PADILLA:  Nothing further, Your Honor.

22                  THE COURT:  May this witness be excused?

23                  MR. PADILLA:  Yes, sir.

24                  THE COURT:  Mr. Gilman, do you have any

25  objections?

```
 1              MR. GILMAN:  No.

 2              THE COURT:  You may be excused.  Thank you,

 3   sir.  Call your next witness.

 4              (Witness was excused at 9:49 a.m.)

 5              MR. KRIPPEL:  State calls Joanne Estrada.

 6              THE COURT:  Joanne Estrada?

 7              (witness Enters The Courtroom)

 8              THE COURT:  You were already sworn to tell

 9   the truth.  However, in an abundance of caution, I am

10   going to have you take the oath again.

11              THE WITNESS:  Okay.

12              THE COURT:  Would you please raise your

13   right hand?

14              (Witness Sworn in By The Court.)

15                   JOANNE ESTRADA,

16     having been first duly sworn, testified as follows:

17                 DIRECT EXAMINATION

18   BY MR. KRIPPEL:

19              MR. GILMAN:  Judge, could we approach just

20   for a second?

21              THE COURT:  Yes, sir.

22              (Discussion on the record at the bench.)

23              MR. GILMAN:  It bothers me that we have a

24   witness --

25              THE COURT:  Hold on just a minute.
```

40

1          **(End of Bench conference.)**

2          THE COURT:  Ladies and gentlemen of the

3     jury, let me ask you to step outside while we take up a

4     legal issue for just a minute.  Got time maybe for a potty

5     break, but not much more.

6          (Jury exits at 9:52 a.m.)

7          THE COURT:  You may be seated.  Yes, sir.

8          MR. GILMAN:  Judge, it bothers me having

9     Mrs. Estrada here when she was called by the State as the

10    State's witness and then released from her obligations in

11    this case.  And now she's being brought back again and --

12    you know, it just -- she should have never been released

13    if the State had any intentions of bringing her back.  And

14    I will object to her taking the stand at this time.

15         THE COURT:  I don't think there was any

16    legal prohibition against it, Mr. Gilman.  I understand

17    your uncomfortableness about it.  I have the same one.

18    That's why I -- after she was released I administered the

19    oath again, because it was the question in my mind what

20    the legal effect of releasing her.  But I don't think

21    there is any prohibition against them or you calling a

22    witness that has already been released.  So I'm going to

23    overrule the objection.

24         MR. GILMAN:  Okay.

25         THE COURT:  Ask the jury to come back in --

41

```
 1    unless they're in the middle of a doing a potty break.  If
 2    they're in the middle of a potty break let them finish and
 3    then bring them in.
 4                    Your next exhibit will be 42.
 5                    (Jury enters at 9:54 a.m.)
 6                    THE COURT:  You may be seated.  Thank you
 7    very much.  We are missing one?  We are missing one.  Hold
 8    on.  It's Mrs. Espinoza.
 9                    A JUROR:  Excuse me.
10                    THE COURT:  Take a seat -- it's okay.
11    Proceed, Mr. Krippel.
12                    MR. KRIPPEL:  Thank you, Your Honor.
13        Q    (By Mr. Krippel) Thank you for being with us
14    again, Mrs. Estrada.  Once again, could you state your
15    name for the record, please?
16        A    Joanne Estrada.
17        Q    You are the same Joanne Estrada that testified
18    earlier in this case in the guilt/innocence stage,
19    correct?
20        A    Correct.
21        Q    You have testified before, but I just want to
22    refresh all of our memories.  You are the CPS case worker
23    on this case, correct?
24        A    Correct.
25        Q    When did you become a case worker?
```

```
1        A     October 31, 2007.

2        Q     That's after the death of Mariah, correct?

3        A     Correct.

4        Q     Okay.  When was the first call regarding Melissa

5   Lucio or her family to CPS?  What year was that?

6        A     Ah --

7              MR. GILMAN:  I'm going to object, Judge.

8   This question was asked and answered.

9              THE COURT:  I'm going to overrule the

10  objection.  As long as we are doing just a short summary

11  and get --

12       Q     (By Mr. Krippel) What year was that?

13       A     December 21, 1995.

14       Q     What was the result of that call?  Were services

15  offered or just what happened?

16             MR. GILMAN:  Again, I'm going to object.

17  Before when Mrs. Estrada was asked that same question, she

18  testified she didn't know because she wasn't employed

19  then.  There has been no showing that she's ever reviewed

20  the records prior to her taking over in October of 2007.

21  And I object to her coming in at this time and saying

22  something completely different than what she testified

23  earlier in this trial.

24             THE COURT:  Mr. Krippel?

25             MR. KRIPPEL:  Yes, sir.
```

43

```
1                    THE COURT:  Your response?
2                    MR. KRIPPEL:  I'm asking any foundational
3      questions that the Court feels is appropriate for me to
4      ask.
5                    THE COURT:  Rephrase your question.
6         Q     (By Mr. Krippel) Have you had a chance to review
7      the notes in the case since your earlier testimony?
8         A     Yes.
9         Q     Okay.  What was the result of the call that came
10     in the next day?
11        A     The investigation was ruled out.
12        Q     Okay.  What was the next call that happened?
13     What year?
14        A     I believe it was in 1996.
15        Q     Now, the '95 call, what was it?  Was it for
16     supervision, abuse or what?
17        A     Neglectful supervision.
18        Q     And that was in what?  In '96.  And what
19     happened next?  What was the call and what was the reason?
20        A     It was for neglectful supervision, again, and it
21     was ruled out and closed.
22        Q     Okay.  And these calls were -- not for Mariah
23     obviously -- because she wasn't born yet?
24        A     Correct.
25        Q     Okay.  What was the next call that came in, what
```

```
 1   year?
 2        A    1998.
 3        Q    What was the call for?
 4        A    Neglectful supervision.
 5        Q    And what was the result then?
 6     .  A    Ruled out with factors controlled.
 7        Q    Okay.  Now, one was ruled out and another one
 8   was ruled out with factors controlled.  What's the
 9   difference?
10        A    I don't know how it was ruled out previously.
11   On the other ruled out factors controlled, basically my
12   understanding is that there was some evidence of neglect,
13   but the issues had been controlled and there was no need
14   for the children to be removed.
15        Q    What's the next call?
16             THE COURT:  Excuse me.  I'm going to ask
17   you to speak into the mike.  I'm having a hard time
18   hearing you.  I don't know if the jurors are, but I am.
19             THE WITNESS:  Okay.
20        Q    (By Mr. Krippel) What's the next call that comes
21   in?
22        A    In 2000.
23        Q    And what's that call for?
24        A    Physical abuse.
25        Q    And who is the alleged perpetrator?
```

45

1       A    Melissa Lucio.

2       Q    And what were the results of that investigation?

3       A    It was reason to believe and the case was opened

4   for intense family preservation.

5       Q    Okay.  What's the difference between, "reason to

6   believe," and ruled out factors controlled?

7       A    My understanding is factors controlled means

8   that there was an incident, but that the problem had been

9   mitigated, or it had been resolved to where the family

10  didn't need services at the time anymore.  Intense family

11  preservation means there was a case open and that it's a

12  voluntarily offering of services without creating a legal

13  case.

14      Q    So there was a call, and you do an

15  investigation, and you find evidence supporting your call?

16      A    Yes.

17      Q    And then you offer services and they willingly

18  take them?

19      A    Correct.

20      Q    Okay.  What was the result of the services

21  offered or regarding that call issue?

22      A    Regarding the call?

23      Q    Yeah.  Because it's all one person, so I didn't

24  want to confuse this by calling it a case.  Regarding that

25  investigation, that particular investigation.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1        A      Ah --

2        Q      Did she successfully complete the services

3    offered?

4        A      I believe she did.

5        Q      Okay.  When is the next call that comes in?

6        A      2001.

7        Q      Is that a year later, less than a year later?

8    How long ago are we talking about?

9        A      About three months later.  No, wait.  Hold on.

10   A year later.  I'm sorry.

11       Q      Okay.  A year later, and the next call comes.

12   How long after she completes her services does the next

13   call come?

14              MR. GILMAN:  Objection, Judge.  This is

15   leading.

16              THE COURT:  It is leading.  Sustained.

17       Q      (By Mr. Krippel) When did the call in 2000 come,

18   what month?

19       A      The call in 2000 came in November.

20       Q      Okay.  When were the services completed?

21       A      I do not know.

22       Q      How long do services usually take?

23       A      It depends case by case.  I'm not familiar with

24   family preservation.

25       Q      Well, let's just talk ballpark.  Is it more than

47

```
1    one?

2                    MR. GILMAN:  Objection.  She said she

3    didn't know.

4                    MR. KRIPPEL:  Oh, Your Honor, he just asked

5    the same question today, for a ballpark figure.

6                    THE COURT:  Mr. Krippel.

7                    MR. KRIPPEL:  I am just responding to his

8    objection.

9                    THE COURT:  I understand.  I will overrule

10   the objection.  Please be seated and let's not be

11   argumentative.

12       Q    (By Mr. Krippel) Is it more than a month for

13   those services to be completed?

14       A    Typically, yes.

15                    THE COURT:  I'm sorry.  Mrs. Estrada.

16                    THE WITNESS:  Yes, sir.

17                    THE COURT:  I apologize.

18                    MR. KRIPPEL:  May I approach the witness,

19   Your Honor?

20                    THE COURT:  Yes, sir.

21       Q    (By Mr. Krippel) More or less than six months?

22       A    I think the average maybe four to six months.

23       Q    Okay.  So the average is four to six months for

24   services to be completed.  When does the call in 2001

25   come, what month?
```

48

```
1        A      November of '01.

2        Q      Okay.  And what was that 2001 call for?

3        A      Physical neglect.

4        Q      And who was the alleged perpetrator in that?

5        A      Melissa Lucio and Roberto Alvarez.

6        Q      Okay.  In November of 2001 or December of 2001,

7   has the defendant, Mrs. Lucio, been tested for drugs by

8   that point?

9               MR. GILMAN:  Objection, Your Honor.

10  Leading.

11              THE COURT:  I'm going to overrule that

12  objection.  (Reads Monitor)  Has she been tested?

13              THE WITNESS:  I don't know.

14       Q      (By Mr. Krippel) Would it be helpful to refresh

15  your memory by looking at your notes?

16       A      Maybe.

17       Q      Okay.  Why don't you do that.

18       A      (Reviewing).  She had been.

19       Q      Okay.  Do you recall how many times she had been

20  tested by 2001?

21       A      I see one test.

22       Q      And what were the results of the test?

23       A      Positive for cocaine.

24       Q      Had any of the children that she had up to that

25  point, been tested?
```

49

```
 1      A     Yes.

 2      Q     And what were the results of any of those tests?

 3      A     The child was born positive for cocaine.

 4      Q     How many children?

 5      A     Up to 2001?

 6      Q     Up to 2001.

 7      A     I believe, one.

 8      Q     So by the time of 2001, we've got one child who

 9   has tested positive for cocaine -- born tested positive

10   for cocaine.  Correct?

11      A     Correct.

12      Q     And in 2001, you said it was for --

13      A     I'm sorry?

14      Q     -- for neglect or physical abuse?

15      A     Physical neglect.

16      Q     Physical neglect.  Okay.  Pardon me.

17                  What is physical neglect?  What does that

18   mean?

19      A     Basically, neglect of the child's basic needs:

20   Food, shelter, clothing.

21      Q     So it doesn't mean physical abuse; it means

22   neglect?

23      A     Correct.

24      Q     Okay.  What action did CPS take in response to

25   that call?
```

50

```
 1        A    Ah, I see:  Ruled out; factors controlled.   I
 2   see:  Ruled out; factors controlled.
 3        Q    Okay.  When is the next call?
 4        A    In 2002.
 5        Q    Okay.  And what is that call?
 6        A    That is for neglectful supervision.
 7        Q    And the result of that call?
 8        A    It was opened to contracted family preservation.
 9        Q    Okay.  What does that mean?
10        A    If I am correct, there was a program before
11   where family preservation was contracted out to another
12   provider outside of CPS handling it.  And that's what it
13   means.  Basically it's family preservation, but not
14   handled through CPS.
15        Q    What do you mean by family preservation?  What
16   does that mean with CPS words?  What does that mean?
17        A    It means, voluntary services to preserve the
18   family unit.
19        Q    Okay.  It means that CPS is trying to keep the
20   family together, right?
21        A    Correct.
22        Q    Okay.  And they are going to provide services to
23   keep the family together, correct?
24        A    Correct.
25        Q    Now you said something about contracting out.
```

51

1    What is all of that about?

2         A    Honestly, I am not very familiar with the

3    contracting services out.  I know CPS had contracts with

4    providers who can provide services without CPS actually

5    doing the services.

6         Q    Let's just talk in general -- and not

7    necessarily about this case -- but what does it mean when

8    CPS is contracting the services out?  And I know that you

9    are not necessarily familiar it, but what does it mean in

10   general?  What happens?

11        A    Well, basically there is a contract of another

12   provider that can provide the services for the client.

13        Q    Okay.  So CPS is recommending certain services

14   and they hire somebody else to provide the services?

15        A    Correct.

16        Q    Okay.  And that's what happened on this call in

17   2002?

18        A    Yes.

19        Q    Do you know what services were provided?

20        A    No, I don't know what services were provided.

21        Q    Okay.  What's the next call?

22        A    2003.

23        Q    And what is that call for?

24        A    Physical abuse and sexual abuse.

25        Q    What was the result of that call?

Adelaido Flores, Jr.
Certified Shorthand Reporter

52

1      A      The case was closed.  Unable to determine.

2      Q      Unable to determine, that's a new phrase.  What

3  does that mean?

4      A      It means that there was not enough -- I guess I

5  don't want to say "evidence," but there was not enough

6  information to support anything.  I believe in this case

7  the child who had been identified as the victim had run

8  away and there was no way to interview her.

9      Q      I'm sorry, what was that?

10      A      The child who was the victim in the case had run

11  away and the department didn't have a way of interviewing

12  her.

13      Q      Oh, okay.  So, "unable to determine," means you

14  can't figure out one way or the other; you can't say "no",

15  and you can't say "yes"?

16      A      Correct.

17      Q      Okay.  When is the next call?

18      A      2003.

19      Q      The last call was 2003.  What month?

20      A      May.

21      Q      So when is the next time call?

22      A      June, 2003.

23      Q      What was that for?

24      A      Neglectful supervision and physical abuse.

25      Q      And who was the alleged perpetrator in that?

53

```
 1        A     Robert Alvarez and Melissa Lucio.
 2        Q     Okay.  And what happened in that call?  What was
 3   that call about?
 4        A     That was given, "a reason to believe," and it
 5   was referred to family preservation, which is voluntary
 6   services again.
 7        Q     Okay.  Was a drug test given at that time?
 8        A     Yes, there was.
 9        Q     Okay.  To whom?
10        A     To Mrs. Lucio and to Sara Alvarez.
11        Q     And Sara, I am assuming is one of her children?
12        A     Correct.
13        Q     Which child was that?
14        A     Ah --
15        Q     Let me put it in context.  Is it the oldest
16   child?
17        A     No.  It was the recent child she had just had.
18        Q     Okay.  It was the newborn?
19        A     Yes.
20        Q     What were the results of the drug test?
21        A     The child and mother tested negative for -- I
22   mean, positive for cocaine.
23        Q     So this is child number two, that tested
24   positive for cocaine, at birth?
25        A     Correct.  I'm sorry.  Yeah, that is correct.
```

54

```
 1        Q    I'm sorry, what was that?

 2        A    No, I'm sorry.  I thought I had Sara and

 3   Daniella confused, but that was Sara.

 4        Q    Okay.  That was June of '03?

 5        A    Yes.

 6        Q    And what was the result of CPS's actions in

 7   June, '03?

 8        A    "Reason to believe."  And the family was

 9   referred to voluntary services, family preservation.

10        Q    So -- more services?

11        A    Yes.

12        Q    Okay.  Next call?

13        A    2004.

14        Q    What month?

15        A    January.

16        Q    What's that call about?

17        A    Neglectful supervision and physical neglect.

18        Q    What was the result of the investigation?

19        A    Reason to believe, factors controlled, and the

20   case was closed.

21        Q    Next call?

22        A    August of 2004.  Physical neglect and neglectful

23   supervision.

24        Q    Okay.

25             MR. KRIPPEL:  Permission to approach, Your
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

55

```
 1    Honor.
 2                 THE COURT:  Yes, sir.
 3         Q    (By Mr. Krippel)  What month was that?
 4         A    That was August of '04.
 5         Q    August of '04.  What was the previous call, date
 6    or month of that?
 7         A    January of '04.
 8         Q    Well, let's start again from the beginning.
 9    What year was the first call?
10         A    December of '95.
11         Q    The second one?
12         A    '96.
13         Q    The month?
14         A    I don't have a month.
15         Q    Okay.
16         A    June of '98, November of 2000, November of 2001,
17    May of 2002, May, 2003, June, 2003, January, 2004, and
18    August of 2004.
19         Q    (Writing on sketch board)  And that's the one
20    that we were just talking about right now, right?
21         A    Correct.
22         Q    Okay.  After the January of '04 one, she got
23    services, right?
24         A    I don't show services being offered.
25         Q    Which ones did she get services for?
```

56

```
 1        A     On 11/2000, on May of 2002, on June of 2003.

 2        Q     Okay.  Did she receive services for the August

 3   '04 call?

 4        A     Yes.

 5        Q     Yes?

 6        A     Yes.

 7        Q     Okay.  Let's talk about August of '04.  What was

 8   that call for?

 9        A     That call was for neglectful supervision and

10   physical neglect.

11        Q     Okay.  Who was the alleged perpetrator?

12        A     Melissa Lucio and Robert Alvarez.

13        Q     And services were offered for that?

14        A     Yes.

15        Q     And what was the next call that came in?

16        A     That was the last call that -- the children were

17   removed at that time from Mrs. Lucio and placed in foster

18   care.

19        Q     So the children were removed in August of '04?

20        A     They were removed in September of '04.

21        Q     Okay.  Why were they removed in September of

22   '04?

23        A     I'm sorry.

24        Q     Why were they removed?  Why were the children

25   removed?
```

1       A     They were removed for physical neglect and

2    neglectful supervision.

3       Q     Well, more specifically what happened?   What was

4    going on?

5       A     Ah, seven of the children were observed to have

6    injuries and insect bites.   They were also found to be in

7    need of a bath and change of clothing.   She had just given

8    birth to the youngest child in the home.

9       Q     Which was who?

10      A     Mariah Alvarez.

11      Q     Where was Mariah born?

12      A     I'm sorry?

13      Q     Where was she born, Mariah?

14      A     In Mrs. Lucio's home.

15      Q     How did the report come in, do you know?

16      A     I believe it was called in.

17      Q     But you don't know by whom or how?

18      A     No.

19      Q     Okay.   What action did CPS take in response to

20   that call?

21      A     An investigator went out and interviewed the

22   children, the parents.

23      Q     And then they were removed?

24      A     I believe so, yes.

25      Q     What action did CPS take next?   Did they take

58

1  the children back, offer services, what happened?

2      A   CPS requested from the court for the removal to

3  valid and start a legal case.  The children were placed in

4  foster homes and services were offered to Mrs. Lucio.

5      Q   Okay.  Now, was she tested again for drugs at

6  that time?  Was Mrs. Lucio tested again for drugs at that

7  time?

8      A   She was tested.  She was given an instant test,

9  which came back positive for cocaine.

10      Q   When was she given the instant test?  When they

11  were removed, or when the investigation first started or

12  when the call came?  When was this instant test done?

13      A   I believe it was at removal.

14      Q   Okay.  Did the newborn -- was the newborn

15  tested, Mariah?

16      A   No, she was not.

17      Q   Okay.  What's the next action that CPS takes

18  after starting a legal case?  What services are offered?

19      A   I believe parenting classes, individual therapy,

20  psychological evaluation, random drug testing and a drug

21  assessment with recommended treatment.

22      Q   I'm sorry, I didn't quite hear what you said.

23  What was that again?

24      A   A drug assessment with recommended treatment.

25      Q   Okay.  And what was the result of all of those

1   services?

2         A      I believe she was testing positive for cocaine

3   at the beginning.  Towards 2006 she started testing

4   negative.  She was admitted into an in-patient service and

5   she was out two weeks afterwards.

6         Q      What does that mean?  Let me back up.  That's a

7   pretty broad question.

8                       What is an in-patient service?  I mean, not

9   that we can't figure it out, but what does that mean?

10        A      Basically, it's an in-patient rehab program.

11        Q      What does in-patient mean?

12        A      Basically, the person would go to the facility

13  and stay there, I guess, would live there while she is

14  getting treatment.

15        Q      Okay.  She was referred to that service?

16        A      Correct.

17        Q      She went?

18        A      Yes.

19        Q      Was she forced to go, or did she do this

20  voluntarily, like:  I want to go do this, or was it more

21  of a situation like:  If you want your kids back, you've

22  got to do this?

23        A      It was court ordered for her to complete the

24  required recommendations from the drug assessment.

25        Q      And how long is this in-patient program is

1    supposed to be?

2         A    It is for about 30 days.

3         Q    Okay.  Did she complete that 30 days?

4         A    No.

5         Q    Why not?

6         A    She left the facility within two weeks.

7         Q    Do we know why?

8         A    Something about her being mistreated or not

9    liking the way she was treated, something like that.  I

10   don't remember exactly.

11        Q    What's the next thing that happens with

12   Mrs. Lucio?  What's the next thing that CPS recommends?

13        A    You mean towards -- because it was a pretty long

14   case, so I am kind of curious about when you mean.

15                  MR. KRIPPEL:  Okay.  May I approach, Your

16   Honor?

17                  THE COURT:  Yes, sir.

18        Q    (By Mr. Krippel) September of '04 the children

19   all get removed, right?

20        A    Yes.

21        Q    What are the first services that are offered to

22   Mrs. Lucio?

23        A    She was offered drug testing, drug assessment,

24   individual therapy, parenting classes and psychological

25   evaluation.

1     Q     When was she offered all of that stuff?

2     A     After the removal of the children.

3     Q     So in September or was it not until the first

4  court hearing in October or November?

5     A     It was probably after the court hearing.

6     Q     And when was that?

7     A     Ah, it should have been the end of September of

8  '04.

9     Q     Okay.  So she has a court hearing within a week

10 or two?

11    A     Actually, it was recent.  The beginning of

12 October.

13    Q     Okay.  So we will say October of '04, she gets

14 all of these services.  When does she go through this

15 program?  The in-patient drug program, when is that?

16    A     (Reviews).  I would need more time to review the

17 notes.

18    Q     Take your time.  We want to make sure that we

19 get every right.  So just take care time.  And if your

20 notes don't reflect it, just say:  My notes don't reflect

21 that and I can't remember.

22              MR. GILMAN:  Objection, Your Honor,

23 leading.

24              THE COURT:  Sustained.

25              MR. KRIPPEL:  On what legal grounds, Your

1    Honor?

2                    THE COURT:  Don't tell her what to say.

3                    THE WITNESS:  I don't think I have it in my

4    notes.

5        Q    (By Mr. Krippel) Okay.  She fails to complete

6    those drug services.  You already testified to that,

7    correct?

8        A    Yes.

9        Q    Okay.  When are the next services offered?  What

10   are the next services that are offered?

11       A    They had a psychological assessment, parenting

12   classes, drug testing, individual therapy.

13       Q    How long do all of those services go on?

14       A    The psychological evaluation is done within one

15   day and the recommended treatment, depending on what the

16   psychologist recommends.  Drug testing is usually done

17   throughout the life of the case.  Parenting classes tend

18   to range from ten to 12 sessions.

19       Q    How long are the sessions?

20       A    Usually they are about once a week.

21       Q    Okay.  Did she go to all of her parenting

22   classes?

23       A    I want to say that she did.  That was in 2006.

24       Q    Okay.  So that would have taken us to somewhere

25   about February of '06, '07, '05?  What year are we in?

63

```
 1          A     I don't know exactly when she completed the

 2    parenting classes.

 3          Q     Okay.  What's the next event that happens?

 4    Well, let me ask you.  Where are the children all of this

 5    time?

 6          A     The children are in foster homes.

 7          Q     Are they all placed in the same foster home?

 8          A     No.

 9          Q     How many different foster homes do they go to,

10    if you know?

11          A     I believe initially at removal they were in two

12    homes and then they -- they moved to -- one or two out of

13    home and placed in another.  I don't remember how many

14    were removed to two different homes.

15          Q     How long is it when they were removed from

16    September of '04 until they are returned to Melissa Lucio?

17    Or.  When are they returned to Melissa Lucio?

18          A     They are returned in November of '06.

19                MR. KRIPPEL:  Permission to approach again,

20    Your Honor?

21                THE COURT:  Yes, sir.

22          Q     (By Mr. Krippel) During the period from

23    September of '04 to November of '06, what services are

24    offered to the family?

25          A     The parents were drug tested.
```

64

1      Q      What were the results of Melissa's drug test?

2      A      They were negative.

3      Q      All of them during the entire time?

4      A      During the time that the children were home?

5      Q      No.   During the time that the children were

6    removed from September of '04 to November of '06.

7      A      I believe she had positives up until the

8    beginning of '06.

9      Q      So she was frequently positive until '06 and

10   then she started testing negative?

11     A      Correct.

12     Q      Okay.   How many drug related services were

13   offered during the period from '04 to '06 when the

14   children were removed, just the one that she failed or

15   were there additional services?

16     A      What do you mean?

17     Q      She was given --

18     A      Like, what services?

19     Q      She was given referrals to this in-patient

20   program, correct?

21     A      Yes.

22     Q      And she went there for two weeks and then left?

23     A      Correct.

24     Q      Were there any other services offered for drug

25   use?

```
 1        A    I believe that was the second time she had been
 2   referred to a drug assessment.  Other than that, I don't
 3   know if she had any other drug services.
 4        Q    What other services are given to the family
 5   between September of '04 and November of '06 that you have
 6   not already mentioned?
 7        A    I -- I don't know.
 8        Q    In November of '06, the children were returned?
 9        A    November of '06, yes.
10        Q    Are there any services that are continued to be
11   offered at that time?
12        A    Honestly, I don't know.  For certain I know that
13   there was drug testing.  I don't know if the individual
14   counseling continued during that time.
15        Q    How many drug tests were offered between
16   November of '06 and February 17, '07?
17        A    Okay.  Wait.  Can you repeat that?
18        Q    Sure.  How many drug tests were offered between
19   November of '06 and February 17, '07?
20        A    I show two.
21        Q    For Mrs. Lucio, correct?
22        A    Correct.
23        Q    What were the results of those tests?
24        A    They were negative.
25        Q    Okay.  How many drug tests has Melissa Lucio
```

```
 1    been given by CPS over the course of her involvement with
 2    CPS?
 3         A     Ah, probably more than 20.
 4         Q     Can you -- do you have a list of them?
 5         A     Yeah.
 6         Q     Can you count?
 7         A     (Counting).
 8         Q     That was a rhetorical question.  Can you count
 9    them up for us?  I'm sorry.
10         A     About 30, 31.
11         Q     What percentages were passes and what percentage
12    were fails?  Or, what number were passes and what number
13    were fails?
14         A     She had about -- since '04 she about 17 or 18
15    positives and about 11 negatives.
16         Q     Okay.  Of the investigations that CPS has
17    done -- well, let me ask you this.  In February of 2007,
18    was a new case opened or was the case reopened at that
19    time?
20         A     The children were re-removed from the home.  I
21    believe there was another investigation.
22               MR. KRIPPEL:  Permission to approach?
23               THE COURT:  Yes, sir.  Go ahead.  I am
24    trying to find whether the jury wants --
25               MR. KRIPPEL:  I saw you signaling there,
```

1    Judge.  That's why I stopped.

2                   MR. GILMAN:  I do.

3                   THE COURT:  Okay.  Let's take a break at

4    this time.  Let's get ahead and take our morning break.

5                   **(Recess from 10:32 a.m. to 10:40 a.m.)**

6                   **(Jury present, defendant present.)**

7                   THE COURT:  You may be seated.  Thank you

8    very much.  All right.  Proceed, Mr. Krippel.

9                   MR. KRIPPEL:  Thank you, Your Honor.

10       Q    (By Mr. Krippel) When we left, I'd just ask you

11   if they were removed again February 17th of '07, correct?

12       A    Correct.

13                  MR. KRIPPEL:  Pass the witness.

14                  THE COURT:  Mr. Gilman.

15                  **CROSS-EXAMINATION**

16   **BY MR. GILMAN:**

17       Q    Mrs. Estrada, you have testified twice in this

18   trial before today; isn't that right?

19       A    Correct.

20       Q    And you didn't know anything the two previous

21   times, did you?

22       A    I didn't know much, no.

23       Q    So how did all of a sudden you became so

24   educated?

25       A    I was given time to review notes and I was given

68

```
 1    notes.
 2         Q    Did you have notes that you referred to in
 3    giving your testimony today?
 4         A    Yes.
 5         Q    May I see them, please?
 6         A    (Witness complies).
 7         Q    And who compiled these notes for you?
 8         A    The DA's office provided some.
 9         Q    The district attorney's office.  Who in the
10    district attorney's office compiled this for you?
11         A    I believe it was Mary Jane and Mr. Krippel.
12         Q    And when did they compile this, do you know?
13         A    No, I don't know when.
14         Q    When were you given this?
15         A    Today.
16         Q    You were given this, today, and you testified
17    about this, today?
18         A    Yes.
19         Q    So you weren't given any time to review it, were
20    you?
21         A    Not much.
22         Q    So other than the few minutes that you had
23    before you came in to testify this morning, you don't know
24    anything about these documents; isn't that correct?
25         A    Before I reviewed them this morning, no.
```

69

```
1        Q    So if I were to ask you any questions in
2   reference to this compilation of stuff that the district
3   attorney's office has compiled, you wouldn't know what, if
4   anything, to say, would you?
5        A    No.  Except for what I've reviewed.
6        Q    And nowhere in the files, that you know of --
7   Child Protective Services -- show that Melissa Lucio
8   physically abused any of her children; isn't that right?
9        A    That I had read previously in the file?  No.
10       Q    Now, prior to testifying here in court, weren't
11  you given some sort of immunity?
12       A    Ah, yes.
13       Q    Why was that?
14       A    There was talk about the department being
15  indicted, and I was encouraged to hire an attorney.
16       Q    Indicted for what?
17       A    I'm not sure.
18       Q    Criminal negligent homicide?
19       A    Honestly, I am not sure.
20       Q    You feel that your organization, your Child
21  Protective Services has done everything they could to
22  protect the interest of these children?
23       A    I think they have.
24       Q    They have?  How many times did these children
25  when they were born, test positive for cocaine?
```

70

```
 1        A    I'm sorry.  Can you rephrase that?

 2        Q    How many times did the children born to Melissa

 3   Lucio test positive for cocaine?

 4        A    I believe it was two.

 5        Q    Isn't that -- doesn't that send red flags up and

 6   say:  Hey, this person doesn't need to have kids?

 7        A    I don't know.  I was not with the department at

 8   the time that the children were born.

 9        Q    So why are you testifying about all of this

10   stuff?

11                   MR. KRIPPEL:  Objection, Your Honor.  It's

12   an inappropriate question.  It's not irrelevant.

13                   THE COURT:  Overruled.

14        Q    (By Mr. Gilman) So why are you testifying?

15        A    I was subpoenaed to testify.

16        Q    You were subpoenaed to testify?

17        A    Previously, yes.

18        Q    But don't you know you can say:  Hey, I don't

19   know.  I am not going to testify to all of this stuff.  I

20   don't think you have done everything you possibly could to

21   protect the interest of these children.  But you didn't,

22   did you?

23                   MR. KRIPPEL:  Objection, Your Honor.  That

24   is argumentative.

25                   THE COURT:  It is argumentative.
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

71

1      Q    (By Mr. Padilla) You testified a little while

2   ago that Melissa Lucio was tested, drug tested between

3   November of '06 and February of '07 two times.  When were

4   those two times?  You want your notes back?

5      A    Ah, sure.

6      Q    Do you need the notes to testify to that or do

7   you remember?

8      A    I know one of them was in January of '07.  I

9   don't remember when the other one was.

10     Q    Okay.  Would you look it up in your notes,

11  please?

12     A    (Reviewing)  January of '07 and December of '06.

13     Q    January of '07 and December of '06.  So when

14  Detective Cruz says that Child Protective Services drug

15  tested Melissa Lucio and Robert on February 17, 2007, she

16  wasn't right, was she?

17     A    I am not sure if they were drug tested by us.

18     Q    And isn't it true, Mrs. Estrada, that all the

19  services and calls show that Melissa Lucio had a drug

20  problem and was very poor?

21     A    Ah, yes.

22     Q    Tell me, why would you give children back to a

23  parent who tested positive for drugs 18 times and negative

24  for drugs 11 times?

25     A    Ah, I don't know.  I wasn't around when the

72

1    children were returned.  I know the department's

2    recommendation was not to have the children return home.

3         Q    And how do you know that that was the

4    department's position?

5         A    I had previously read the court report that was

6    filed before the court hearing that led to the children

7    being returned home.

8         Q    And when did you do that?

9         A    I don't remember the date.

10        Q    But you say that you read that?

11        A    I had read the court orders and the legal -- the

12   court reports previously.

13        Q    Before testifying here in court?

14        A    Yes.

15        Q    And this is the first time we're hearing about

16   this?

17        A    (No response).

18        Q    What do -- what do -- what do you call it in

19   your department when someone tests positive -- a mother or

20   a father tests positive and they are taking care of --

21   tests positive for drugs when they are taking of children,

22   what do you call that?

23        A    I don't think there is a specific word.  I mean,

24   you basically just say that the parent was tested positive

25   while caring for the children.

73

```
1        Q     Is that physical abuse?

2        A     No.

3        Q     If the child tests positive, is it called

4   physical abuse?

5        A     Yes, it can be.

6        Q     And why is that, because the child was born at

7   that time and tests positive for cocaine and the mother

8   tests positive for cocaine?

9        A     Yes.

10       Q     And isn't it true that the department takes

11  children away from parents when they test positive for

12  cocaine?

13       A     It -- yes.

14       Q     But it wasn't done with Gabriel or Sara, was it?

15       A     Not that I know of, no.

16       Q     Well, you would know it now that you have

17  compiled all of this information.

18       A     My notes don't state if the children were

19  removed or not.

20       Q     Can I see your notes again, please, ma'am?

21       A     (Witness complies).

22       Q     Okay.  We've got Defendant's Exhibits 25 and 26

23  here.  These are the notes that you -- somebody in your

24  department has compiled, or the district attorney has

25  compiled for you to testify here this morning; is that
```

```
 1    right?
 2                    MR. KRIPPEL:  Your Honor, I'm going to
 3    object at this time and approach the bench on just one --
 4                    THE COURT:  Sure.
 5                    MR. KRIPPEL:  -- issue.  I don't know if
 6    it's perjury or not because I know that the answers she's
 7    giving right now --
 8                    THE COURT:  Hold on just a minute.  Ladies
 9    and gentlemen of the jury, I'm going to ask you to step
10    out just a moment for legal issues.  It won't be very
11    long, so don't get too comfortable.  This one won't be
12    long.
13                    (Jury left the courtroom at 11:04 a.m.)
14                    THE COURT:  Okay.  You can sit down the
15    door is closed.
16                    MR. KRIPPEL:  Your Honor, the only -- when
17    Mr. Gilman asked initially and she responded, I knew that
18    the responses were not correct.  However, I was going to
19    clean it up on re-direct, but now he's offering exhibits.
20    I just wanted to clarify that these notes were not
21    compiled by the district attorney's office.
22                    THE COURT:  Did you hand them to her?
23                    MR. KRIPPEL:  Yes, I handed them to her
24    this morning, from the CPS files.
25                    THE COURT:  From the CPS files?
```

1      A      Okay.  My name is Alfonsa Castillo.  And I took

2   care for 22 months, this little girl.

3      Q      Mrs. Castillo, where do you live?

4      A      I live in San Pedro.

5      Q      And where is San Pedro?

6      A      On 281.

7      Q      Is that here in Cameron County?

8      A      In Brownsville.

9      Q      How long have you lived there?

10     A      Thirty-one years.

11     Q      And you mentioned to the jury in your

12  introduction that you were a foster parent?

13     A      Yes, I used to do that; not anymore.

14     Q      And where have you been a foster parent?

15     A      Excuse me?

16     Q      Where?

17     A      There in my home.

18     Q      And how long -- if you could please tell the

19  jury how long were you a foster parent?

20     A      Like more than ten years, I was a foster parent.

21     Q      And as a foster parent, did you ever come into

22  contact with the victim in this case, Mariah Alvarez?

23     A      Yes.  She was my baby.

24     Q      And please tell the jury how you came into

25  contact with that little girl?

94

1      A      She came into my care and she have 15 days --

2   all -- until the day he was removed my home.   She have 22

3   months.

4      Q      So she was in your care from the time that she

5   was 15 days old, until she was 22 months old?

6      A      Yes.

7      Q      And describe Mariah as a baby during the first

8   six months of her life to the jury, if you could.

9      A      She was -- his first six months was difficult

10  for him because the problem she had.   But after that, she

11  was a normal child.   Happy baby.   Growing normal.   So she

12  -- she was a happy baby.   She used to give a lot of love

13  and caring.   She like to hug and kisses a lot.

14     Q      Now, Mrs. Castillo, if you could explain to the

15  jury, you said that initially she had some problems.

16  Explain to them what you mean by that.

17     A      Problems because she have -- she was with drug

18  in his system.   She had the withdrawals.   But after that,

19  yeah, she was a normal kid.   Making tantrum like a normal

20  kid, but -- she was fine.

21     Q      And you say that -- if you could explain to the

22  jury -- first of all, have you taken care of children

23  before that had withdrawal symptoms?

24     A      Yes.

25     Q      Explain to the jury what some of those

Adelaido Flores, Jr.
Certified Shorthand Reporter

1   withdrawal symptoms that you saw in Mariah.

2       A   Okay.  She used to cry a lot and making some

3   like a nervous, moving his feet or hitting his feet, or

4   her hands in her cradle -- just like that -- moving too

5   much.  And like she never stayed still.  Always moving one

6   hand or feet at the same time.  And crying, because that's

7   what happened in his system.  They need more something in

8   his system.

9       Q   Now, during the time that Mariah was

10  experiencing these symptoms, did she take any medication

11  for these symptoms?

12      A   Ah, no.

13      Q   And you said these symptoms, were they just

14  present during the first six months, if you can tell the

15  jury?

16      A   Yeah.  It was during the six months after that,

17  yeah.  He was a normal child.  (Witness says "he" or "him"

18  when referring to "she" or "her".)

19      Q   Now, could you please tell the jury about some

20  of the activities that Mariah was involved in when she

21  lived in your home?

22      A   She was playing, watching TV, and playing

23  outside when she was able to run.  Taking all of the

24  activities we had in family.  Just before she left my

25  home, she was in the Head Start.  So she's involved with

1    all the kids playing, and she's playing pretty good.   So

2    she is able to -- to play with the rest of the "childs."

3         Q    Now, Mrs. Castillo, during the time that Mariah

4    was in your care, how many children were you taking care

5    of at that time?

6         A    Six or five, I used to have.

7         Q    And what were their ages?

8         A    Two, three, four.   I had two the same age.   And

9    five and six.

10        Q    And did you take care of any of Mariah's

11   brothers or sisters?

12        A    Just his sister.

13        Q    And which sister was that?

14        A    Sarita.

15        Q    And Sarita, how old was Sarita compared to

16   Mariah?

17        A    She -- when she was -- she come to my home, she

18   was a year and a half, 15 -- or 15 -- 15 to 16 months she

19   had at that time when she --

20        Q    Mrs. Castillo, could you please -- while Mariah

21   was in your care, could you describe to the jury her

22   appetite?

23        A    Oh, my goodness!   She eat so good.   She used to

24   eat a lot.   I trained her to eat like my own babies

25   because she was my baby at the time.   So she eat like

```
 1    beans, egg, any kind of food.  She don't leave anything in
 2    his plate, even a single rice.  If something is rice
 3    missing out of his plate, she pick it up and eat it.  She
 4    left his plate empty.  She's pretty good eater.
 5         Q    Now, Mrs. Castillo, because of Mariah's
 6    appetite, did you have a nickname for her?
 7         A    Yeah.  I call her my "Gorda".  And she smiled.
 8    I said:  Come on my "Gorda" and come and eat.  And she
 9    like to get·called my "Gorda", my baby.  You're my baby.
10    And she smiled at me.  So she like that, to call my
11    "Gorda" because she's "gordita."  She's chubby and she --
12    oh, my goodness.  She's -- she was my baby.
13         Q    And describe to the jury Mariah's personality so
14    that they can get to know her like you knew·her.
15         A    She was a lovely girl.  She like to receive love
16    and give love a lot.  She always happy.  She had tantrums
17    like a normal baby, but not that much.  Nothing that I
18    can't handle it.  But she's a lovely girl.
19         Q    Now the tantrums that you describe that Mariah
20    had, explain to the jury -- tell them about those
21    tantrums.
22         A    The tantrums?  Oh, she crying when she don't
23    have his toy, the toy that his sister or the other kids
24    used to have.  And she cry and sometime make the tantrum,
25    she sit down and does it and crying and crying.  But they
```

98

1    go away, the crying.

2        Q    Now, did the tantrums improve during the time

3    that you had her?

4        A    Yes, she improved a lot.

5        Q    Now, during the times that Mariah was with you,

6    did she have any -- at any time require medical treatment?

7        A    Yeah.  She have medical treatment like for

8    asthma and bronchitis -- cold -- like a normal kid.

9        Q    And you said that Mariah went to school.  Where

10    did she go to school; if you could please tell the jury.

11        A    She went to the Head Start, the early Head

12    Start.  She was there.  She was -- all the teachers loved

13    "My Gorda."  They used to call her the "Gorda," too,

14    because I tell them:  I came for my "Gorda".  And she was

15    lovely.  So everybody loved the little girl.  So she's the

16    kind of girl that everybody get in love with her.

17        Q    Mrs. Castillo, could you please tell us about

18    the relationship that you had with Mariah?

19        A    Well, she was my baby.  I called her my baby, my

20    "Gorda".  And she's -- I'm caring for her, and she used to

21    wait for my husband.  When he arrived home:  Daddy,

22    Daddy -- he would call him daddy -- because she know that

23    my husband brought something for everybody.  So she is

24    expecting something from his daddy and me.  So she always

25    called me Mommy.  So --

99

1      Q    Now, Mrs. Castillo, when Mariah was in your

2   care, did you happen to come into contact with the

3   defendant in this case, Melissa Lucio?

4      A    Yeah, when I had the family visits.  I used

5   to -- I used to take the girls for the family visits over

6   there in Harlingen.

7      Q    And tell us about those visits?  What happened

8   during those visits?

9      A    Well, it's something hard for me because I

10  noticed that they don't put too much attention to her.

11  The thing is hurting me because when she was a baby, I put

12  her in the baby carrier to take her to the family visits.

13  And I noticed -- I don't know if it was me -- I noticed

14  that they don't put too much attention to her.  They get

15  involved with the other kids because they're already grown

16  up.  And when they come to her, the baby, she's a baby.

17  She don't talk at the time.  So, sometimes I take her out

18  of the baby carriage and I take her over there in my arms

19  that way -- carrying her.  And after that I -- in the

20  stroller, I don't leave the stroller because that way they

21  carry the baby.  Because I know they don't put too much

22  attention to her.  That's hurting me because I gave love

23  to that little girl that didn't even have my blood.  So

24  they hurt me because she is able to give love.  And when I

25  go to pick it up, when the family visits finished, she's

1   anxious to give me his arms.  So -- that's all I have to

2   say.

3        Q    Now, Mrs. Castillo, just to clarify for the

4   record, when you say "her," do you mean "Mariah"?

5        A    Mariah.

6        Q    And how many of these visits did you have with

7   the defendant and with Mariah?

8        A    They have a lots.  Every week.

9        Q    And where did these visits take place?

10        A    In the Harlingen office, CPS office.

11        Q    And who was present during these visits?

12        A    Ah, the mother and the father and the sister,

13   sometimes his brother, the older brother.

14        Q    And these visits, what was the time period for

15   these visits?  Like how long -- over what period of time

16   did you go to these visits?

17        A    I believe four to six or something like that.

18        Q    Was it on weekly basis or a monthly basis?

19        A    On a weekly basis.

20        Q    And you talked about the visits when Mariah was

21   a baby.  How were the visits later when she became a

22   toddler, if you could please tell us?

23        A    Excuse me?

24        Q    You described what happened at the visits when

25   Mariah was still in a carriage, a baby carriage when she

```
 1   was still small, and when she was a baby.  If you could
 2   tell us what those visits were like when she started to
 3   walk.
 4        A    It was the same thing.  Like, they don't pay too
 5   much attention to her.  That's what I noticed.  I mean,
 6   not too attached to her.  I see -- that they don't --
 7   don't put too much attention to her.  So she was always
 8   anxious when she see me because she know me like hugging
 9   her and kissing and giving love.
10        Q    Mrs. Castillo, after these visits with the
11   defendant and her family, did you ever notice that
12   Mariah's behavior changed in any way?
13        A    No, not much because she knows, okay, they give
14   you a lot of love.  She hugging me too much.  So I noticed
15   different.  She's trying to give more, more love and --
16   and kind of sad sometimes because they see the other kids
17   running or talking, and maybe she not able to do whatever
18   the rest of the brothers are doing.
19        Q    Now Mrs. Castillo, how did you learn about
20   Mariah's death?
21        A    How I learned?
22        Q    Yes.  How did you learn that Mariah had died?
23        A    Someone called me and told me one of the kids
24   passed away.  And I have my feeling it was my "Gorda", my
25   baby.  Oh, my God!  I don't know why.  Because I know,
```

1    okay, she's not used to or did not grow up with the rest

2    of his brothers.  She is growing in another family

3    different.  They see his family every week.  So she not

4    used to -- she is not used to all the screaming.  She is

5    kind of scared.  So it's very hard for me when I hear

6    about his death.  I not even can believe it because I

7    never think it was so hard for me to hear that, one of my

8    babies -- what happened to her.

9         Q    Now, ma'am, did you have the opportunity to go

10   to Mariah's funeral?

11        A    Yes.

12        Q    And did you see her there that day?

13        A    Yes.  It's very, very hard for me.  I thought I

14   was prepared to see those things, but that was very hard.

15   I don't know if it's better -- if that was better for me

16   not going because I had just -- the last smiley face I see

17   on her.  But that was something very hard for us to handle

18   it -- the way I see her -- because she not even was my

19   "Gorda".  I said:  Oh, my goodness!  It's something that

20   hurt me a lot.

21        Q    Now, Mrs. Castillo, tell us why Mariah was

22   removed from your home.

23        A    They removed her because I have an accident.

24   They removed her to another home.  She went to the last

25   family, foster family that she have.

103

```
1          Q       And what accident happened?

2          A       What accident happened?

3          Q       Yes.

4          A       I don't know if I have to say or --

5          Q       Yes.

6          A       Yeah -- that was all right.  I have a baby with

7    the same symptoms, with drugs in his system.  And she

8    passed away under my care.  And they used to do that when

9    something happened.  They investigate.  They take away all

10   the kids.  So maybe she was sick and they removed.  When

11   she ready to go home, just took away from my home.  She

12   never see me again.  So I think it's pretty sad for her

13   because she don't have any explanation.  You have to call.

14   I see you later.  Nothing.  We don't have time to say

15   goodbye or adios.  So later the investigation, everything

16   was normal and I come back to have kids, but not her.

17         Q       So once Mariah was removed, she never went back

18   to your home?

19         A       In July -- the first of July, two years ago.

20         Q       And that was the last time you saw her?

21         A       Yeah, that was the last time I saw her.

22         Q       And Mrs. Castillo, are you still a foster parent

23   today?

24         A       No, not anymore.

25         Q       Why not?
```

104

1      A    Because it is too much for us to suffer with

2  those kids, and we put too much of our lives in those

3  kids, and I'm not ready to see more of those things

4  happen.  Because it was very hard to ask to see Mariah.

5      Q    And did you ever adopt any of the kids that were

6  under your care?

7      A    Yes, I adopted one kid.

8      Q    And how old is the child?

9      A    He's already six years old.

10     Q    And how old was he when you adopted him?

11     A    Two years and two months and one day.

12     Q    Mrs. Castillo, if Mariah had been available for

13  adoption, would you have adopted her?

14     A    I think twice to adopt her because we attach too

15  much to her, but I know it was very hard because it's a

16  big family.  But I am thinking sometimes twice talking to

17  my husband and I thought about keeping Mariah.  Sarita and

18  her was the two girls that was in my care.

19     Q    And that would be Mariah's sister?

20     A    Yes.

21              MRS. DE FORD:  I pass the witness, Your

22  Honor.

23              THE COURT:  Mr. Gilman.

24

25

Adelaido Flores, Jr.
Certified Shorthand Reporter

**CROSS-EXAMINATION**

**BY MR. GILMAN:**

1

2

3    Q    Mrs. Castillo --

4    A    Yes, sir.

5    Q    -- did you ever tell Child Protective Services

6  that you wanted to adopt Mariah?

7    A    No.  No, because --

8    Q    This was just a conversation that you had with

9  your husband?

10    A    Yes, a conversation my husband and I.

11    Q    When you took Mariah for these family visits

12  every week, was Child Protective Services able to see

13  Mariah's reaction and interactions with her brothers and

14  sisters?

15    A    Yes.

16    Q    And when you were raising -- because usually

17  when a child is born, there's a certain amount of bonding

18  period, is there not, with the mother, or with the

19  caretaker such as yourself?

20    A    Yes.  She was very attached to me.

21    Q    Yeah.  And you feel that you and Mariah bonded?

22    A    Uh-huh.  Yes, sir.

23    Q    So for all practical purposes for those 22

24  months that you had Mariah, you were Mariah's mother?

25    A    Yes.  And she was my baby.  I call:  My baby, my

106

1    "Gorda".  And she understand me that.  And I call:  Where

2    is my "Gorda"?  And she smiling at me and run to me when

3    she was a bay.  Where is my "Gorda"?  And she laughs at

4    me.

5         Q    And when you took her to the family visits every

6    week, that was difficult for you to watch Mariah with her

7    brothers and sisters; was it not?

8         A    Yes.  So I just leave it there, the kids and go

9    away.  So I came later to pick up my two girls.

10        Q    Were you concerned about Mariah when she was

11   there with her brothers and sisters?

12        A    Yes.

13        Q    Were you concerned about Mariah when she left

14   your house?

15        A    Yes, I was concerned with her.  Maybe she don't

16   have a happy family visit, but I have to take her.

17        Q    Did you tell Child Protective Services your

18   concerns about Mariah?

19        A    Yes, sometimes I tell them.

20        Q    Mariah was raised by you a certain way.

21        A    Yes.

22        Q    And she wasn't accustomed to live in a family of

23   nine, was she?

24        A    Yes.  Because that was a big family in my house,

25   but all the kids they have -- just routine.  They play, do

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    that, coloring, watching TV.  So she used to have a
2    routine.
3         Q    Mariah was very close to you?
4         A    Yes, sir.
5         Q    Is it normal for Mariah not to be close to
6    Melissa Lucio because she really didn't know her like she
7    knew you?
8         A    Ah, I think so.  But she was his mother and the
9    kids, they know their parents.
10        Q    But that was the only time she ever saw her
11   mother --
12        A    -- yes --
13        Q    Was on --
14        A    -- on family visits, yes.
15        Q    When there was the family visits?
16        A    Yes, sir.
17        Q    Now, Mariah had these temper tantrums, and she
18   would sometimes hit her head on the floor; isn't that
19   right?
20        A    Well, not too much.  Not too much hard she
21   hurting herself.
22        Q    There was one time when she had a temper tantrum
23   and she hurt herself.  She inflicted a wound on herself.
24        A    Maybe one time.
25        Q    And you didn't have to take her to the doctor

1    one time because she hit her head?

2         A    I had to take my kids to the doctor even if a

3    mosquito bite happened.

4         Q    But back in March of '06, didn't Head Start

5    notify you that Mariah had fallen and hit her head and was

6    unresponsive for a few minutes?

7         A    Yes, they make a report.

8         Q    And didn't you also report that she would -- had

9    self-inflicted wounds because of her temper tantrums?

10        A    Yes, sometimes.

11        Q    In January of '06, didn't you report to Child

12   Protective Services that Mariah had unprovoked aggressions

13   and she bites her peers -- she bites the other kids?

14        A    Yes, like a normal kid.  Every kids do that.

15        Q    That she didn't like anyone to touch her or

16   she'll scream or bite them?

17        A    Because they want to take away his toys.  Every

18   kid do that.

19        Q    Now part of your job as a foster parent, you

20   make a monthly report; do you not?

21        A    Yes.

22        Q    Or is it a weekly report?

23        A    Ah, monthly.

24        Q    Monthly report?

25        A    Yes.

109

```
1       Q    And you give that report to who?

2       A    To my supervisor.

3       Q    And your supervisor is who?

4       A    That was Maria Luisa.  When I changed the CPS to

5  the private agent.

6       Q    And you have to send that in, all of the time,

7  every month?

8       A    When I was with a private agency, I had to make

9  reports every month.  Before that, just report to the CPS

10  worker whatever happened.

11      Q    And you make one report for each child, or do

12  you make one report including all of the children?

13      A    No.  One for each.

14      Q    And you had Mariah with you from September of

15  '04 to -- through June of '06; is that right?

16      A    Yes, sir.

17      Q    And you don't know how many other foster parents

18  had Mariah after you?

19      A    After me?  She had two.

20           MR. GILMAN:  Nothing further, Judge.  Thank

21  you.

22           THE COURT:  Mrs. De Ford?

23           MRS. DE FORD:  No further questions, Your

24  Honor.

25           THE COURT:  You may step down.  May this
```

1    witness be released?

2                   MRS. DE FORD:  Yes, Your Honor.

3                   MR. GILMAN:  No objections.

4                   THE COURT:  You may be excused and you may

5    be released.

6                   THE WITNESS:  Thank you, sir.

7              (Witness was excused at **11:56 a.m..**)

8                   THE COURT:  I guess we might as well break

9    for lunch at this time.  I'm going to go ahead and allow

10   you to go to lunch.  Come back at 1:30.  We will start

11   promptly at 1:30.

12                  Again, I remind you, don't talk about this

13   case with anybody.  Don't read any news articles.  Don't

14   listen TV.  Don't listen to the radio.  You've got to make

15   the decision based on what you hear only.  Thank you.

16             **(Jury not present at 11:56 a.m.)**

17                  THE COURT:  Mr. Gilman, with regards to

18   Defendant's Exhibit No. 27 that has been offered into

19   evidence, I have reviewed it and it does have a lot of

20   privileged material with regards to the other children,

21   which would be prejudicial to them if it becomes public.

22   And it concerns me.  That's my concern.  So unless you are

23   offering it for a specific purpose other than optional

24   completeness, I'm not going to go ahead and allow it to be

25   admitted at this time.  But I will note your exception,

1  sir.

2              MR. GILMAN:  Thank you, sir.

3              THE COURT:  Anything else?  That's it.  See

4  you at 1:30.

5              (Lunch recess taken 11:57 a.m. till 1:36

6              p.m..; Jury not present)

7              MR. VILLALOBOS:  Judge, we have a matter

8  before the jury comes in.

9              THE COURT:  Yes, sir.

10             MR. VILLALOBOS:  Your Honor, the State is

11 going to ask to take leave of Court to request a witness

12 that is not on our witness list.  It's the disciplinary

13 officer from the jail.  And the reason that he's not on

14 our list that we submitted prior to trial starting is that

15 we didn't become aware that what he had, would be an issue

16 which is the disciplinary record of the defendant, until

17 during the trial when we got more records from CPS that

18 they provided the last updates on the counseling sessions

19 that indicated that she had some problems in the jail,

20 that indicated to us -- and we bent backwards from

21 there -- in order to find the disciplinary officer who is

22 present in the courtroom.

23             We already have records through the

24 custodian.  However, the actual interpretation of some of

25 these records, which were taken all the way up through

112

1    yesterday, so there is no way that we could anticipate

2    them before we started jury selection a month ago.  So for

3    those reasons, Your Honor, we are asking leave of Court to

4    put Mr. Borrego on the stand to explain some of these

5    documentations, Your Honor.

6              THE COURT:  Mr. Gilman?

7              MR. GILMAN:  Judge, with all due respect, I

8    object to him coming in this late.  If they were going to

9    use him, they should have asked way back when, and not

10   just today, right now.  I mean, if they were contemplating

11   using this individual some time back, we should have been

12   notified at that time so that we could be prepared.  But

13   now they're asking -- bringing in an additional witness

14   that we have no notice of, no knowledge of, and I have no

15   time to prepare any kind of defense or anything like that.

16             MR. VILLALOBOS:  Well, Judge, some of the

17   incidents that have occurred happened yesterday when she

18   was found guilty --

19             THE COURT:  I'm going to allow the witness

20   to testify to anything that has been -- that has gone on

21   from the time of jury selection to the present because

22   that's new.  That's new.  There is no way they would have

23   known about that before.

24             MR. GILMAN:  Note my exception, Judge.

25             THE COURT:  I will note your exception.  I

113

```
 1    understand.
 2                   MR. GILMAN:  That goes against what the
 3    whole purpose of asking for the witness list, in which the
 4    Court ordered both sides to present that witness list.
 5                   THE COURT:  Yes, sir.  And that's why I am
 6    limiting it only to what has happened between when the
 7    trial started to the present.  That doesn't exclude all
 8    witnesses with regards to facts and things that have
 9    transpired during that time.  I mean, that's as much a
10    surprise to them as it is to you.  And that shouldn't be
11    excluded.  Anything else?
12                   MR. CORDOVA:  May I address?
13                   THE COURT:  Yes, sir, please.
14                   MR. CORDOVA:  Your Honor, we took four
15    weeks to pick a jury.  And some of these things -- if you
16    are going to allow them to bring up incidents that may or
17    may not have occurred during that four week time, they had
18    plenty of time throughout this period to list him.  Trial
19    as you said, technically started six, seven weeks ago.  We
20    are here at the final moment, at the final last stretch
21    here, and they're listing him, or telling us about him.
22    That just seems unfair.
23                   THE COURT:  And I understand.  But if it is
24    as much a surprise to them as it is to you, with regard to
25    what transpired after we started selecting the jury then I
```

1    think it's perfectly appropriate.

2              MR. CORDOVA:  Over the last seven weeks,

3    Judge?

4              THE COURT:  Oh, yeah.  I am going to limit

5    it over the last seven weeks.  Yes, sir.  Okay.  With that

6    caveat, Mr. Villalobos.

7              MR. VILLALOBOS:  Yes, Your Honor.

8              THE COURT:  Are you ready for the jury?

9              MR. VILLALOBOS:  Yes.  Carlos Borrego is

10   going to be our next witness.

11             THE COURT:  All right.  Let's bring the

12   jury in.

13             THE BAILIFF:  He is out here.

14             MR. GILMAN:  Just for my clarification,

15   Judge, we are going back from May 28, to the present?

16             THE COURT:  No, sir.

17             MR. GILMAN:  What date is the Court using?

18             THE COURT:  I am looking at it right now,

19   sir.  Just a minute.  (Reviews the Docket)  Actually from

20   May 29 to the present.

21             MR. GILMAN:  May 29 to the present.

22             THE COURT:  That's when we qualified the

23   jurors.

24             **(Jury present, defendant present at 1:42**

25             **p.m.)**

1          MR. VILLALOBOS:  Your Honor, the State

2   calls Carlos Borrego.

3          THE COURT:  Mr. Borrego?  Before taking the

4   witness stand, would you please raise your right hand?

5          **(Witness Sworn in By The Court.)**

6          THE COURT:  You may proceed, Mr.

7   Villalobos.

8

9          MR. VILLALOBOS:  Thank you, Your Honor.

10          **CARLOS J. BORREGO,**

11   having been first duly sworn, testified as follows:

12          **DIRECT EXAMINATION**

13   BY MR. VILLALOBOS:

14     Q    Would you please introduce yourself to the jury?

15     A    Officer Carlos Javier Borrego.

16     Q    And where do you work?

17     A    At the Cameron County Jail Sheriff's Department.

18     Q    What is your assignment there?

19     A    I am the disciplinary officer.

20     Q    And what duties come with being a disciplinary

21   officer?

22     A    Just dealing with inmates who violate any rule

23   violations from the facility.

24     Q    What type of rule violations do you deal with?

25     A    We have over 70 different rules ranging from

116

```
1    just disrespect to staff, for fighting, possession of

2    contraband, hoarding medications, various rules.

3        Q    You say importing contraband?

4        A    Possession of contraband.

5        Q    Possession of contraband?  What exactly is

6    contraband?

7        A    Any item that is not issued by the county or any

8    item that has been altered in any way, shape or form to be

9    used in a different manner.

10       Q    What kind of -- give us specific examples of

11   what contraband you might find in jail?

12       A    A majority of the time it's -- they'll take the

13   pens and alter them.  They'll stick pieces of metal inside

14   of them.  And then instead of a pen, you have either a

15   sharp object or tattoo needle, or tattoo paraphernalia.

16       Q    Can that be harmful in some way?

17       A    If misused, yes.

18            THE COURT:  Excuse me.  Mr. Borrego, could

19   you speak into the mike, please.

20            THE WITNESS:  I'm sorry.  Yes, sir.

21            THE COURT:  Thank you.

22       Q    (By Mr. Villalobos) What other types of

23   contraband are there?

24       A    So many that -- it's tough.  We just issue out

25   certain items that inmates need, and anything that they
```

117

1    are not supposed to have is considered contraband.

2         Q    What would be the purpose for prohibiting other

3    items?

4         A    Security and safety of the facility.

5         Q    And When you say "security and safety of the

6    facility," explain to the jury what you mean?

7         A    Well, our primary objective there at the jail is

8    to make sure every inmate is safe and secure.  We are

9    supposed to take care of them at all times.  Any object

10   that is misused can either harm another inmate, harm that

11   particular inmate, or facilitate some other -- some other

12   means, you know, possible escape stuff like that.

13        Q    So you are basically limiting what they have

14   they access to so they don't make any weapons or try to

15   use it to escape?

16        A    Exactly.

17        Q    That would include pretty much any household

18   item, other than what they need to survive?

19        A    Uh-huh.

20        Q    Is that a, "yes"?

21        A    Yes, sir.

22        Q    Besides prohibiting contraband, what other types

23   of rules do you have?

24        A    Like I mention, disrespect to staff,

25   unauthorized communications.

118

```
 1      Q     What is an unauthorized communication?
 2      A     We have all inmates separated into different
 3  classification depending on severity of their case, of
 4  their current charges, gang affiliation, all that stuff.
 5  We have them separated.  They are only supposed to have
 6  contact with the people within their cells.  Communicating
 7  with someone else, we have no idea what they could be
 8  talking about, if they're, like I said, maybe planning a
 9  escape or try to hurt another inmate, hurt another guard.
10      Q     So unauthorized communication, what would be
11  some types of that?
12      A     Majority of it is just passing notes and letters
13  to one another.  We try to intercept them as much as
14  possible, but they still get through.
15      Q     And, again, is that for the safety of the
16  facility?
17      A     Safety and security, yes, sir.
18      Q     I'm going to show you what will be marked as
19  State's Exhibit No. 42 and just bring your attention to
20  the first page only.
21              MR. VILLALOBOS:  May I approach, Your
22  Honor?
23              THE COURT:  Yes, sir.
24      Q     (By Mr. Villalobos) See if you recognize that
25  copy.
```

119

1       A    Yes, sir.

2       Q    Is that a true and correct copy, what you have

3    in front of you, of the originals?

4       A    Yes, sir.

5       Q    So where did you actually get those originals?

6       A    These?

7       Q    Yes.

8       A    These are from her file.

9       Q    But who actually gave you those?

10      A    The classification sergeant, Sergeant Anaya.

11      Q    So earlier when you were waiting to testify, you

12   were handed those documents?

13      A    Yes.  In case I needed to refer to them.

14      Q    Just paying attention to the top form, those

15   documents have been admitted in evidence.  On the date of

16   this form --

17           MR. GILMAN:  Your Honor, may I take this

18   man on voir dire for just a minute?

19           THE COURT:  On what issue?  He hasn't

20   introduced anything.

21           MR. GILMAN:  No, he hasn't.  But there's a

22   possible rule violation here.

23           THE COURT:  Ladies and gentlemen of the

24   jury, I'm going to ask you to please step out for just a

25   minute while we take up a legal issue.  And then we will

Adelaido Flores, Jr.
Certified Shorthand Reporter

120

```
 1    bring you right back in.
 2                  (Jury not present at 1:48 p.m.)
 3                  THE COURT:  You may be seated.  Mr. Gilman,
 4    go ahead.
 5                  MR. GILMAN:  I'm sorry, Judge.
 6                  THE COURT:  Go ahead.  I'm doing it outside
 7    the presence of the jury because if there is no violation,
 8    I don't want to taint the jury.
 9                  MR. GILMAN:  Yes, sir.
10                  VOIR DIRE EXAMINATION
11    BY MR. GILMAN:
12        Q    Mr. Borrego, you received these documents this
13    morning?
14        A    Yes.
15        Q    And you received them from whom?
16        A    From Sergeant Anaya, Wendy Anaya.
17        Q    And did she say anything to you?
18        A    Regarding?
19        Q    These documents.
20        A    No, sir.
21        Q    She just handed these documents and that's it?
22        A    Well, I have access to these files as well.
23        Q    So why did she hand these documents to you?
24        A    In case there was anything that I needed to
25    refer to off these copies.  I didn't know if I was going
```

121

```
 1   to have copies with me or if he was going to have them
 2   or --
 3        Q    Did anybody talk to you this morning in
 4   reference to this case?
 5        A    No, sir.
 6        Q    How did you know that you were going to testify
 7   about this case?
 8        A    They told me that there going to have -- need me
 9   to refer to the file for any disciplinary actions or any
10   of the reports.
11        Q    Who is they?
12        A    Mr. -- I forgot his name.  The gentleman right
13   here in front of me.
14                  MR. GILMAN:  No further questions, Judge.
15                  THE COURT:  Okay.  Let's bring the jury
16   back in.
17                  (Jury present, defendant present at 1:50
18                  p.m.)
19                  THE COURT:  You may be seated.  Thank you.
20   Proceed, Mr. Villalobos.
21                  DIRECT EXAMINATION (continued)
22        Q    (By Mr. Villalobos) Looking at the top page, it
23   is dated yesterday; is that correct?
24        A    7/8/08, yes, sir.
25        Q    What exactly is this top page?
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

1      A     This is our observation log, medical observation

2   log.

3      Q     And what -- describe to the jury what a medical

4   observation log is.

5      A     Maybe to just determine the pattern of behavior

6   of a certain inmate placed on this log for whatever

7   reason.

8      Q     So on the log you have a listing of numbers; is

9   that correct?

10      A     Yes, sir, one through 22.

11      Q     Now, the numbers, what do they correlate to?

12      A     You want me to read them individually?

13      Q     Yes, sir.

14      A     Number one states, "Beating on door, or wall.

15   Number two states, "Yelling and screaming. "Three, is

16   crying.  Number four, is laughing.  Number five, is

17   singing.  Six, is mumbling.  Seven, is talking to self.

18   Eight, is talking to others.  Nine, is standing still.

19   Ten, is walking.  Eleven, is sitting.  Twelve, lying down.

20   Thirteen, is quiet.  Fourteen, is sleeping.  Fifteen, is

21   awake.  Sixteen, is in the shower.  Seventeen, is toilet.

22   Eighteen, is recreation.  Nineteen, watching TV.  Twenty,

23   medication.  Twenty-one, meals and fluids.  Twenty-two,

24   visitation.

25      Q     Now, on this particular one there is something

123

```
 1  written in 23 as well; is that correct?

 2       A    Yes.  It says medication as well.

 3       Q    Would that be the same as 20?

 4       A    Yes.

 5       Q    And something is written in 24; correct?

 6       A    "Not eating."

 7       Q    Now, in addition to the -- there is a time line,

 8  isn't that correct, like every 15 minutes?

 9       A    Yes, times of observation.

10       Q    And that's from 6:00 a.m. to 6:00 a.m.?

11       A    This one shows from 6:00 a.m. -- yes, all the

12  way to 6:00 a.m.  Three sections.

13       Q    A twenty-four hour period?

14       A    Yes.

15       Q    And it is broken down by 15-minute increments?

16       A    Yes.

17       Q    And at some point there is an observation done

18  on whoever this form is for; is that correct?

19       A    Yes, sir.

20       Q    And this form what we are looking at right now,

21  who does it belong to?

22       A    To Lucio, Melissa.

23       Q    The defendant in this case?

24       A    Yes.

25       Q    At some point there was an order to do an
```

124

```
 1    observation, on this particular inmate.
 2         A    Yes, sir.
 3         Q    Is that correct?
 4         A    Yes, sir.
 5         Q    Okay.  And when did the observations begin?
 6         A    4:30 p.m.
 7         Q    4:30 p.m..  Yesterday?
 8         A    Yes, on 7/8/08.
 9         Q    And they continued every 15 minutes until when?
10         A    It stopped here at 6:00 a.m.  I don't know if it
11    continued until the next day or it was just for this
12    period of time.
13         Q    Okay.  So from 4:30 yesterday until 6:00 a.m.
14    this morning?
15         A    Yes, sir.
16         Q    Is that true?
17         A    Yes, sir.
18         Q    And every 15 minutes there's a block to write in
19    for behavior in that block.  Is that true?
20         A    Yes, sir.
21         Q    Now, looking at 4:30 -- well, what does it say
22    at 4:30 that her behavior was like?
23         A    She was lying down.  It was number 12, and she
24    was lying down.
25         Q    At 4:45?
```

125

```
1        A    Again, number 12 lying down.

2        Q    Okay.  And then from 5:00 o'clock until 6:30

3   every 15 minutes, what is numbered in?

4        A    Number 14 refers to sleeping.

5        Q    Okay.  There seems to be some writing that is

6   written on top of that as well.

7        A    "Appears."

8        Q    Okay.  So that would mean, what?

9        A    "Appears to be sleeping."

10        Q    Okay.  So from 4:30 yesterday until 6:30

11   yesterday, what was her behavior?

12        A    From 4:30 yesterday until 6:30?  She was lying

13   down and appeared to be sleeping.

14        Q    Okay.  Is there any notation of crying or

15   yelling or screaming or distress?

16        A    Not within those two -- not within that time

17   period.

18        Q    So no screaming or trying to talk to the guards

19   about any sort of matter that is concerning that?

20        A    Not listed here, sir.

21        Q    At 6:45 on the next entry, what is that one?

22        A    Twenty-three; medications.

23        Q    What type of medications, if you know, would the

24   defendant be prescribed?

25        A    I don't have access to her medical files.  It
```

126

```
 1   can range anything from Tylenol to Ibuprofen, depending on
 2   whatever medical condition she's under.
 3        Q    At 7:00 o'clock, which would be the next entry,
 4   does it go back to 12:00?
 5        A    Yes, lying down.
 6        Q    Which is?
 7        A    Lying down.
 8        Q    Lying down.  So from 7:00 p.m. all the way until
 9   6:00 a.m. the next morning, what was her behavior notated
10   at?
11        A    Primarily reading numbers 14 and 12, for
12   "sleeping and lying down."  It changes at 5:15 a.m. for
13   not eating.  I'm assuming that she just refused her
14   morning breakfast.
15        Q    Okay.
16        A    And then it goes back to lying down.
17        Q    So other than not eating breakfast, from 4:30
18   yesterday after we concluded yesterday's hearing until
19   6:00 a.m. this morning, she was either lying down or
20   sleeping?
21        A    Yes, sir.
22        Q    No indications of any yelling, crying, or
23   screaming?
24        A    None listed here.
25             MR. VILLALOBOS:  Judge, may I publish -- I
```

127

```
 1    pass the witness.
 2                      THE COURT:  Mr. Gilman?
 3                      MR. GILMAN:  Thank you, Judge.
 4                   CROSS-EXAMINATION
 5    BY MR. GILMAN:
 6         Q    These rules that you have, are they typed up and
 7    given to each one of the inmates before they are entered
 8    into your jail system?
 9         A    Ah, there's a video that we play.  We did
10    publish the book and provided it to all of the cells at
11    one point.  I don't know if they're still there in the
12    cells.  If not, we -- as the inmates enter, we play a
13    video that explains these rules as well.
14         Q    And this document that you've testified to here
15    doesn't show or indicate that Mrs. Lucio did anything
16    wrong?
17         A    On this?
18         Q    She didn't violate any rules for sleeping or
19    lying down or refusing to eat?
20         A    No, sir.
21                      MR. GILMAN:  Nothing further.
22                      MR. VILLALOBOS:  Judge, I would like to
23    publish this.
24                      THE COURT:  Go ahead, Mr. Villalobos.
25                      MR. VILLALOBOS:  Other than that, we have
```

```
1   no questions.  He can be excused.
2                   THE COURT:  Any objections to the witness
3   being excused?
4                   MR. GILMAN:  No, sir.
5                   THE COURT:  You may be excused, Mr.
6   Borrego.
7                   THE WITNESS:  Thank you, Judge.
8                   THE COURT:  Don't forget your file.  Call
9   your next witness, please.
10                  (Witness was excused at  1:57 p.m.)
11                  MRS. DE FORD:  The State calls June
12  Thompson, Your Honor.
13                  THE COURT:  Mrs. Thompson, step forward.
14  Before sitting down, would you please raise your right
15  hand.
16                       JUNE THOMPSON,
17     having been first duly sworn, testified as follows:
18                      DIRECT EXAMINATION
19  BY MRS. DE FORD:
20                  THE COURT:  Please be seated.
21                  MR. GILMAN:  Judge, can we just approach
22  one more time?
23                (Discussion on the record at the bench.)
24                  THE COURT:  Yes, sir.  Do we need to excuse
25  the jury?
```

129

1            MR. GILMAN:  I don't know.  We asked for
2   the criminal record.  I have not received --
3            THE COURT:  Hold on.  I'm having a hard
4   time hearing.
5            **(End of bench conference.)**
6            THE COURT:  Ladies and Gentlemen of the
7   jury, I'm going to ask you to please step out.  I
8   apologize.
9            **(Jury not present at 1:58 p.m.)**
10            THE COURT:  If you spoke much louder, it
11   wouldn't be just on the legal issue.  You may be seated.
12   Thank you.  Yes, sir?
13            MR. GILMAN:  Judge, I had filed a motion
14   asking for the criminal record of any and all witnesses,
15   and I have not received any.  But I don't know if this
16   witness has a criminal record or not.
17            MRS. DE FORD:  Your Honor, I don't believe
18   that this witness has a criminal record.  I will verify
19   that with our investigator, but I don't believe that there
20   is anything -- any crime involving moral turpitude that
21   would require disclosure, but I will verify that with our
22   investigator.
23            THE COURT:  Okay.  Just ask her.
24            MRS. DE FORD:  Mrs. Thompson, you have been
25   sworn to tell the truth.  Do you have a criminal record?

```
 1                    THE WITNESS:  No.

 2                    MRS. DE FORD:  Okay.

 3                    THE COURT:  Okay.  Bring the jury back in.

 4               (Jury present, defendant present at 2:00

 5    p.m.)

 6                    THE COURT:  You may be seated.  Thank you

 7    very much.

 8                    Mrs. De Ford?  Please proceed.

 9                    MRS. DE FORD:  Thank you, Your Honor.

10        Q     (By Mrs. De Ford) Good afternoon, Mrs. Thompson.

11    I know you are a little nervous.  I am just going to ask

12    you question by question.  Take your time.

13                    Would you please introduce yourself to the

14    jury?

15        A     My name is June Thompson.

16        Q     Mrs. Thompson, where do you live?

17        A     I live in Harlingen, Texas.

18        Q     And can you please tell the jury what is your

19    occupation?  What do you do?

20        A     I'm a provider.

21        Q     And what is a provider?

22        A     I take care of elderly people.

23        Q     And what do you mean by:  I take care of elderly

24    people?  Explain that.

25        A     I cook, I clean.  I make sure they take their
```

1   medicines.  I help them around.  If they need to be

2   bathed, I bathe them.  If they need to be fed, I feed

3   them.

4        Q    And as part of your training as a provider, are

5   you required to be certified in something like, such as

6   CPR?

7        A    No.  But CPR is good to know.

8        Q    Now, Mrs. Thompson, do you know the defendant in

9   this case, Melissa Lucio?

10       A    Slightly, yes.

11       Q    And how did you come about to meet her?

12       A    She was my neighbor.

13       Q    And when was she your neighbor?

14       A    Ah, the year 2007, I think.

15       Q    And where were you living at that time?

16       A    I was living at 214 East Madison, Apartment 9.

17       Q    And do you know the victim in this case, Mariah

18  Alvarez?

19       A    Yes, ma'am.

20       Q    And how do you know the victim in this case?

21       A    I babysat her for one day.

22       Q    Do you know the defendant and her family, the

23  other children?

24       A    I knew the other kids, but I only knew two of

25  their names because my daughter was in their class.  My

132

1    oldest one.

2        Q    And tell us about that day when you babysat

3    Mariah.  When was that?

4        A    It was a weekday.  I got off work.  I get off

5    about 11:30.  She had asked me if I would be able to

6    babysit, and I said:  Yes.  And that day that she brought

7    her to me, I had her from I think 10:00 to 3:00.

8        Q    And would that be 10:00 in the morning?

9        A    Yes.

10        Q    And could you please tell the jury what happened

11    on that day when you had Mariah with you?

12        A    Well, the mother handed her to me.  She didn't

13    want to play.  She didn't want to -- she sat on my lap the

14    whole time.  My two year old was there.  She didn't want

15    to play with her either.  She just sat on my lap the whole

16    time.  She had an adult pamper and a bag of chips.

17        Q    And at the time Mariah was with you, did you

18    make any observations about her body?

19        A    She had a bruise on the top of her belly button

20    and on one side of her thigh.

21        Q    What did you conclude from what you saw?

22        A    The only thing I can think of is, you know, she

23    just had bruises.  She -- I don't know what they're from

24    or what.

25        Q    Now during this time that you said you lived

133

1    next door to the defendant and her family for about two

2    months, or they lived next door to you for about two

3    months, did you make any observations about the family?

4         A    No.

5         Q    Did you ever observe any of the interactions

6    between the defendant and her children?

7         A    I heard a bunch of yelling and running around

8    and a bunch of racket, a bunch of running around and

9    everything.  But she had so many kids there.  So there's a

10   bunch of screaming and running.

11        Q    Now, did you ever -- you said that you lived

12   next door to the defendant and her family for about two

13   months.  Did you ever see any interaction between the

14   defendant and Mariah?

15        A    Can you explain reactions.

16        Q    Interactions, did you ever see them together or

17   hear them together?

18        A    Well, she's usually there during the day.  She

19   had the baby and everything.  But I just heard -- I don't

20   know who was being yelled at, but there was a young child

21   that I heard crying.  That's when I came home and there

22   was a baby crying.

23        Q    Did you ever hear anything else?

24        A    A lot of cuss words.

25        Q    By whom and to whom?

134

```
 1       A     The mother to the kids and also sometimes I
 2   heard the father saying the same thing, too.
 3       Q     What kind of cuss words or what did you hear?
 4       A     Can I say it?
 5       Q     Yes, yes.
 6       A     I'm going to kick your ass and -- and other
 7   types of words.
 8       Q     And who was saying these things?
 9       A     I heard the mother twice say that.
10       Q     Did you ever hear anything else said by the
11   defendant?
12       A     That's mainly what I heard.  It's just --
13       Q     And you said that you heard screaming and
14   yelling.  Did you ever hear anything else?
15       A     I heard one time -- I don't know who it was
16   from, what child it was from, but I heard mommy stop.
17   That's what I heard.  And it was loud.
18       Q     And what was loud?
19       A     The child saying that.
20       Q     Now, the time that you had Mariah, the day that
21   you took care of her, you said you had observed bruises.
22   Did you do anything about it?  Did you do anything about
23   what you saw?
24       A     No.
25       Q     And why didn't you do anything?
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

135

```
 1        A     I was scared.  I mean, what I've always been
 2   told is don't get into anybody's business.
 3        Q     Pardon me?
 4        A     What I've been told is not to be getting into
 5   anybody's business.
 6        Q     Now, did you, yourself, ever have any
 7   interactions with the defendant?
 8        A     No.  It was usually hi.
 9        Q     I'm sorry?
10        A     It was hello, bye -- that's it.
11        Q     Mrs. Thompson, did you ever hear a little girl
12   screaming?
13        A     Yes.
14        Q     Tell us about that.  Tell the jury about that,
15   what you heard on that day.
16        A     I just heard a little girl screaming.  I mean,
17   it wasn't just screaming.  It was more like a yell.  She
18   was yelling.  She was screaming like really bad.  Not --
19   it wasn't a good scream.
20        Q     And this yelling or screaming, where was it
21   coming from?
22        A     From inside her apartment.
23        Q     ·And did you hear anything else along with that
24   yelling and screaming?
25        A     I heard a belt.
```

```
 1        Q    And why do you believe that you heard a belt?
 2        A    Because I've been spanked with a belt.  I know
 3   what a belt sounds like.
 4        Q    And that's what you believe you heard?
 5        A    Yes.
 6        Q    And during this period in the day when you heard
 7   it, was it the daytime, the nighttime?  When did you hear
 8   it?
 9        A    It was during the day towards mid afternoon.
10        Q    Now you said that during the time that Mariah
11   was with you on that day that you took care of her, she
12   just sat on your lap.  What was she doing when she was
13   sitting on your lap?
14        A    She wasn't doing anything.  She just sat there.
15   My daughter was watching cartoons.  She didn't want to sit
16   on the floor with my daughter.  She didn't want to play
17   with her toys.  My daughter tried to give it to her.  She
18   didn't want to play.  She just sat on my lap and held me.
19   That's it.
20        Q    And explain to the jury what you mean that she
21   just sat on your lap and held you.
22        A    Like she was frightened, that she didn't -- I
23   mean, I've never really taken care of the baby.  I've
24   never held her or anything.  She just came to me and
25   clinged on me.
```

1       Q     And this was during the whole time that you had

2    her?

3       A     Yes.

4       Q     Did you find that unusual?

5       A     Yes.

6       Q     Why was it unusual to you that she was clinging

7    to you?

8       A     Because I used to be a day care teacher and

9    sometimes it's -- if they don't know you, they're scared.

10   I mean, if a child is crying out to you, you don't know

11   how to do it.  That's the only way to do it.

12      Q     What do you mean by that?  Could you explain --

13            MR. CORDOVA:  Judge, I'm going to object.

14   This lady is not qualified to give us any of those

15   opinions as to what the child would react to or why the

16   child was fearful or how the child should or should not

17   react.

18            THE COURT:  I'm going to overrule the

19   objection.  It's going as to what she observes.

20            MR. CORDOVA:  But she's being asked about

21   other children and what she observes of other children.

22            THE COURT:  That's different.  I'm going to

23   overrule the objection.

24      Q     (By Mrs. De Ford) You can go ahead and respond.

25      A     She just looked frightened.  She was just -- I

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    mean, like I said, I've never had -- I've never seen the

2    look in a child's eye like that.  She just -- she didn't

3    want to move.

4         Q    Now, Mrs. Thompson when the defendant -- who

5    came to pick up the child?

6         A    The father.

7         Q    And what happened when the child was picked up?

8         A    Nothing.  The baby went back to the father.

9              MRS. DE FORD:  I pass the witness, Your

10   Honor.

11                    **CROSS-EXAMINATION**

12   BY MR. CORDOVA:

13        Q    Good afternoon, Mrs. Thompson.  My name is

14   Adolfo Cordova.  I'm going to ask just a few questions,

15   ma'am.  When was it that you said that you were asked to

16   see -- or watch Mariah?  What day was this?

17        A    I don't know.  I don't remember what day it was.

18        Q    You were asked --

19        A    It was during the week.

20        Q    I'm sorry.  You said you lived next to Melissa

21   for two months.  Was it towards the beginning of those two

22   months, towards the end, or what?

23        A    No.  It was about the middle of it.  I am not

24   sure, sir.

25        Q    And you saw bruises?

Adelaido Flores, Jr.
Certified Shorthand Reporter

139

```
 1        A    Yes.
 2        Q    And is there any police reports of those
 3   bruises?
 4        A    No, sir.
 5        Q    Were you aware that Mariah had fallen down some
 6   stairs?
 7        A    No, sir.
 8        Q    Did you see her fall down any stairs?
 9        A    No, sir.
10        Q    Would you agree with me that the stairs there in
11   the Madison Apartment, were fairly steep?
12        A    What is steep?
13        Q    Very -- they were pointed down --
14        A    Yes.
15        Q    They were fairly dangerous, would you agree with
16   me?
17        A    Yes.
18        Q    The yelling that you heard, I believe you said
19   that Melissa had a lot of children?
20        A    Yes.
21        Q    Was that something you would expect -- I mean,
22   there were seven, eight, nine children living in that
23   apartment; is that correct?
24        A    Yes.
25        Q    And your kids -- how many children do you have?
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1        A    I have three, but I have two living with me.
 2        Q    All right.  The third one is not living with
 3   you?
 4        A    No, sir.
 5        Q    Why not?
 6        A    My grandmother has got guardianship because
 7   after having him he was in the hospital a lot and I was
 8   working two jobs.
 9        Q    So you gave up guardianship of your child to
10   your grandmother?
11        A    Yes.
12        Q    All right.  The two children you have, how old
13   are they?
14        A    My oldest one is eight and my other little girl
15   is -- right now she's four.
16        Q    And they yell, they scream; do they not?
17        A    Yes.
18        Q    That's what kids do; do they not?
19        A    Yes.
20        Q    They cry.  That's normal for kids to do that;
21   isn't that true?
22        A    Yes.
23        Q    You said that Mariah was brought over with a bag
24   of chips and an adult diaper?
25        A    Yes.
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1          Q     Did you ever offer to help the family:  Here,

 2    let me give you some diapers that fit properly?

 3          A     No, sir.

 4          Q     Did you ever offer to give them any food?

 5          A     No, sir.

 6          Q     Did you ever offer or try to find any help for

 7    them from any agencies or entities?

 8          A     No, sir.

 9          Q     You claim that a child was being hit with a

10    belt?

11          A     Yes.

12          Q     You don't know which child that was?

13          A     No, sir, I don't.

14          Q     Do you know if it was a boy or a girl child?

15          A     It sounded like a little girl.

16          Q     Was there a police report made by you for that

17    incident?

18          A     No, sir.

19          Q     When did you move into the Madison Apartments?

20    Do you remember the month?

21          A     It was June 3rd.

22          Q     June 3rd of?

23          A     Of 2007.

24          Q     Okay.  And you're the one who moved out of the

25    Madison Apartments or did Melissa move out?
```

142

1      A    Melissa moved out first.

2      Q    And do you know when she moved out?

3      A    No, sir.

4      Q    You were working as a provider during this

5  period of time, and were you providing for your

6  grandmother?

7      A    Yes, sir.  I started providing again.

8      Q    When you moved in there, as you sit here do you

9  recall -- when you moved in, Melissa was already there

10  with her family; is that right?

11      A    No.  I was there first.

12      Q    Okay.  And how long had you been there before

13  Melissa moved in?

14      A    Ah, going on a year.

15      Q    When Melissa moved in, how long did it take for

16  y'all to recognize each other or start to know each other,

17  a couple of weeks, a month?

18      A    Seven weeks.

19      Q    Was it after that that Melissa asked you to

20  watch Mariah?

21      A    Yes.

22      Q    So if you had been there for two months -- if

23  you were living together for two months, then it would

24  have been at least the latter part of June or sometime in

25  the early part of July when she asked you to watch Mariah.

1    Is that fair to say?

2        A    Yes.

3                MR. GILMAN:   Can we have a moment, Judge?

4        Q    (By Mr. Cordova) The two months that you were a

5    neighbor of Melissa you said were June and July; is that

6    correct?

7        A    I believe so, sir.

8        Q    Are you aware that Melissa did not get Mariah

9    back, and the jury has heard testimony about this, until

10   November?

11       A    She had said that, yes.

12       Q    Okay.  And by her saying that, you're meaning

13   Melissa?

14       A    Yes.

15       Q    So if Melissa did not get Mariah until November

16   and kept her until February, how was it that you're

17   watching Mariah during June or July?

18       A    Sir, honestly I don't keep up with dates.  I

19   don't keep up with -- you know, I lose track.  I just

20   remember her moving in.  A couple had moved out and she

21   moved in.  It was several weeks and then she asked me to

22   watch the child.

23       Q    I'm not -- I'm not asking you for days.  I'm

24   just asking you for months.

25       A    I don't keep up, sir.  I know that -- I moved in

144

1    on June 3 because my mother had just went into the

2    hospital.  That's the only reason why I know.

3         Q    Excuse me.  You don't have any idea when it was,

4    what month or date that you saw Mariah?

5         A    No, sir.

6              MR. CORDOVA:  Pass the witness, Judge.

7              THE COURT:  Mrs. De Ford.

8              MRS. DE FORD:  Thank you, Your Honor.

9                    **REDIRECT EXAMINATION**

10   BY MRS. DE FORD:

11        Q    Mrs. Thompson, you are confused about the dates?

12        A    Yes.

13        Q    You just know that you took care of Mariah?

14        A    Yes, ma'am.

15        Q    And you said earlier that when you took care of

16   Mariah on that day, the defendant was going to work?

17        A    Yes.

18        Q    Do you know what her occupation was?

19        A    Providing.

20        Q    And what do you mean by providing?

21        A    One time I had talked to her -- she said she

22   used to be a provider -- and then she was going to go for

23   her job.

24        Q    So she was a provider just like you were?

25        A    Yes.

```
 1        Q    And after Mariah's death, did the police talk to
 2   you?
 3        A    Yes.
 4        Q    And you gave a statement to the police?
 5        A    Yes.
 6        Q    And in that statement -- do you have that
 7   statement with you?
 8        A    Yes.
 9        Q    Do you remember telling the police that you were
10   afraid of --
11             MR. CORDOVA:  I'm going to object to
12   anything --
13             MRS. DE FORD:  I will rephrase, Your Honor.
14             THE COURT:  Sustained.
15        Q    (By Mrs. De Ford) Do you have the statement with
16   you today?
17        A    Yes, ma'am.
18             MRS. DE FORD:  May I approach the witness,
19   Your Honor?
20             THE COURT:  Yes, ma'am.
21             THE WITNESS:  This is the same copy.
22        Q    (By Mrs. De Ford) Do you remember giving this
23   statement to the police?  This is your statement?
24        A    Uh-huh.
25        Q    Mrs. Thompson, do you remember giving that
```

146

1   statement?

2       A    Yes.

3       Q    And the police asked you about the interaction

4   with the defendant?

5                  MR. CORDOVA:   Judge, I'm going to object.

6   She is attempting to bolster this person through her

7   statement, the statement that she gave to the police.   She

8   has already testified as to what she had seen or what she

9   recall to the jury.

10                  MRS. DE FORD:   Your Honor, if I may

11  respond?   This young lady is nervous.   I am just giving

12  her an opportunity to review her statement before I ask

13  her any other questions.

14                  THE COURT:   You might ask her if the

15  statement would refresh her recollection.

16                  MRS. DE FORD:   Yes, Your Honor.

17                  THE COURT:   I'm going to sustain the

18  objection at this time.

19      Q    (By Mrs. De Ford) Mrs. Thompson, would looking

20  at the statement refresh your recollection of what

21  happened?

22      A    Yes, ma'am.

23      Q    Do you need an opportunity to take a look at it

24  before I ask you some more questions.

25      A    Ah, yes.

```
1        Q     Go ahead.

2        A     (Reviews).

3        Q     Now, Mrs. Thompson, you were very hesitant to

4    come forward in this case?

5        A     Yes.

6        Q     Why is that?  Could you please tell the jury?

7              MR. CORDOVA:  I'm going to object, Judge.

8    That's irrelevant in this matter.

9              THE COURT:  I'm going to overrule the

10   objection.

11       Q     (By Mrs. De Ford) You can go ahead and answer

12   it.

13       A     Because I just -- I'm just a very nervous

14   person.  I didn't want to be seen or heard.

15             THE COURT:  Proceed, Mrs. De Ford.

16             MRS. DE FORD:  Yes, Your Honor.

17       Q     (By Mrs. De Ford) Mrs. Thompson, did you make

18   any statements to the officers regarding your relationship

19   with the defendant in this case?

20             MR. CORDOVA:  Objection, Judge, leading.

21             THE COURT:  Sustained.  Did you make any

22   statements?  No.  Did you make any statements?  That's not

23   leading.

24             THE WITNESS:  What was the question again?

25       Q     (By Mrs. De Ford) Did you make any statements to
```

148

```
 1    the police regarding your relationship with the defendant?
 2        A    Ah, I believe so.  I never really actually hung
 3    out and talked to her or anything.  It was just --
 4                    MRS. DE FORD:  I pass the witness, Your
 5    Honor.
 6                    MR. CORDOVA:  May I proceed, Your Honor.
 7                    THE COURT:  Yes.
 8                    MR. CORDOVA:  I would like to see the
 9    statement that she's using to refresh her memory.  May I
10    have just a moment, Your Honor?
11                    THE COURT:  Yes, sir.
12                    MR. CORDOVA:  Nothing further of this
13    witness, Judge.
14                    THE COURT:  Mrs. De Ford, anything further?
15                    MR. GILMAN:  Your Honor, we didn't
16    redirect -- or recross, so she doesn't get anymore.
17                    MRS. DE FORD:  Nothing further, Your Honor.
18                    THE COURT:  I didn't expect there to be.
19    Mrs. Thompson, you may step down.  You are excused.  Thank
20    you very much.  Call your next witness.
21                    (Witness was excused at 2:28 p.m.)
22                    MR. VILLALOBOS:  Judge, this witness is not
23    released from subpoena.  We may call her on rebuttal.
24                    THE COURT:  Tell her not to leave, please.
25                    MR. VILLALOBOS:  Judge, we recall
```

149

```
 1    Dr. Farley.
 2                 THE COURT:  Dr. Farley, you were released
 3    once before.  Out of an abundance of caution, I'm going to
 4    ask you to raise your right hand to swear you in again.
 5                 THE WITNESS:  Okay.
 6                 NORMA J. FARLEY, M.D.,
 7
 8      having been first duly sworn, testified as follows:
 9                      DIRECT EXAMINATION
10    BY MR. VILLALOBOS:
11                 THE COURT:  Do you promise to do it slowly?
12                 THE WITNESS:  Very slowly.
13                 THE COURT:  All right.  Mr. Villalobos?
14       Q    (By Mr. Villalobos) Would you please introduce
15    yourself again to the jury.
16       A    Yes.  My name is Norma Jean Farley.  I'm the
17    pathologist for Cameron and Hidalgo County.
18       Q    And you are the same Dr. Farley that testified
19    earlier in the trial in the guilt/innocence phase?
20       A    Yes.
21       Q    And have any of your credentials been revoked or
22    terminated since your prior testimony?
23       A    No.
24       Q    Doctor, we are going to go back and discuss in
25    more detail about the injuries.  Do you have the autopsy
```

1    report that was admitted here in front of you?

2         A    Yes.

3         Q    I believe it is State's Exhibit No. 36.

4         A    Yes, it is.

5         Q    And this is your report; is that correct?

6         A    Yes, it is.

7         Q    On the first page, Doctor, you have the

8    diagnosis that you gave in this particular case; is that

9    true?

10        A    Yes.

11        Q    Doctor, what I want to do is ask you what they

12   actually mean in terms of real life.  For example, the

13   first one you have under A -- I mean, 1A, can you

14   pronounce what it is that you wrote there?

15        A    That is subarachnoid hemorrhage.  And it says

16   acute and multifocal, which just means it's something that

17   happened very recently and it's not in one spot, but in

18   multiple different spots.

19        Q    What exactly is a sub -- I can't pronounce that.

20        A    Subarachnoid hemorrhage just means there is

21   blood within the skull.  And kind of a simple way to

22   remember it, it's blood directly on top of the brain

23   between a membrane, between the brain and the skull.  So

24   that's the arachnoid.  So since it's under it, it's

25   subarachnoid hemorrhage or blood.

151

1      Q    How would that type of injury occur?

2      A    In this case, the injury would occur from the

3  blunt force head trauma, which was number one, blunt force

4  head trauma.  So we often see subarachnoid hemorrhage or

5  blood directly over the brain when someone has been struck

6  or hit about the head or thrown into something.

7      Q    Now, would the force of that strike have to be

8  severe?

9      A    Yes, it would be a great force.  It is not like

10  a motor vehicle accident when have a lot of velocity.  It

11  is more of a forceful strike.

12      Q    Would it be a painful strike?

13      A    Yes, it would be painful.

14      Q    Now, when you're dealing with a child, do they

15  have the same type of reception of pain that an adult

16  would have?

17      A    Well, this child is over two.  So they would be

18  very similar to us, except for much smaller.

19      Q    Does that mean they do feel pain?

20      A    Yes.

21      Q    Similar to what an adult would feel?

22      A    Yes.

23      Q    What did you have under B?  What do you have

24  written there?

25      A    That's that second type of hemorrhage you can

1    get in the skull, and it's called subdural hemorrhage.

2    And basically that's also blood within the skull itself,

3    but it's between the dura, which sits right on the skull

4    bone -- and the brain -- so it's beneath that dura, so

5    it's called subdural hemorrhage.  And, again, that's just

6    blood within the cranium within the skull, and it's

7    another sign of significant blunt force head trauma.

8         Q    When you say "significant," is that a lot force

9    behind that?

10        A    Yes.  That's a significant blow to the head.  It

11   is not like you trip and hit your head.  This is a

12   significant blow to the head again.

13        Q    Would that type of blow be painful?

14        A    Yes.

15        Q    Would it cause blacking out or anything -- any

16   other symptoms other than bleeding?

17        A    Yes.  I mean, when people get, you know, struck

18   in the head to this degree, a lot of times they'll just

19   say they're lethargic or, basically, they're just not

20   acting -- they're kind of sluggish, and not as alert as

21   they used to be.  And that would be lethargy when you hear

22   that term.

23             Some of these children that have been

24   reported to seize -- that's a common complaint when

25   someone gets significant blunt head trauma, is that their

153

1  arms are seizing or their body is twitching or their arms

2  come straight out in front of them.  That's often that

3  trauma to the head that pulls on the neurons, and damages

4  the neurons which fire in your brain, and causes this kind

5  of seizure type of activity.

6          Vomiting is quite common.  They may say

7  that the child vomits.  And then towards the end the brain

8  will swell meaning cerebral edema, which is one of the

9  things that were listed here, too.  And when the brain

10  starts to swell, it can't go very far because the skull is

11  keeping it inside of the head, and, so, basically, it may

12  try to squeeze down into the spinal cord.  And then you

13  may see funny breathing where they breathe, and then stop,

14  and they breath, and then they stop.  And that's what is

15  usually going on with the cerebral edema or swelling.

16      Q    So the hemorrhaging would cause the swelling?

17      A    The hemorrhaging is a sign of the severe brain

18  injury.  The swelling itself is often just from that brain

19  injury.

20      Q    And the swelling itself would cause the edema?

21      A    Yes, that's swelling.  So edema means swelling.

22      Q    And then you said it would cause problems with

23  breathing?  Can you describe again -- how does it stop you

24  from breathing?

25      A    It can cause problems breathing because the

Adelaido Flores, Jr.
Certified Shorthand Reporter

154

1   brain swells so much that it just can't go any farther,

2   and it starts to put pressure on your brainstem, the lower

3   part of the brain attached to the spinal cord because it's

4   got nowhere else to go.  So it starts to put pressure in a

5   downward fashion.

6       Q    Now these injuries, would they be apparent to

7   somebody that were looking at the person suffering this

8   injury?

9       A    Yes.  There should have been some type of change

10  or unusual behavior of the child, fairly quickly after the

11  blow, the direct blow that causes the significant bleeding

12  to occur.  And it might just be that -- they're sluggish,

13  and you can't wake them up.  They're not eating -- you

14  know -- and they're not drinking, and they're kind of

15  sleeping at first, maybe looking like they're sleeping --

16  coming in and out of consciousness -- and then some of the

17  other seizures may occur, and the vomiting may occur.

18      Q    The delay in breathing, would that be noticeable

19  on a child?

20      A    Yes.

21      Q    Would it be more noticeable than an ordinary

22  cold or chest coughing?  I mean, is there a difference

23  between the two?

24      A    Yes.  Once the brain starts to swell, then it's

25  more like the breathing you get when someone looks like

1    they're about to die and they take a breath, and they

2    don't breath for awhile, and they take -- they take that

3    kind of agonal like breathing, at the very end.

4         Q    So it's the body trying to survive?

5         A    Yes.

6         Q    On "C"  -- pronounce that for us.

7         A    Anoxic ischemic encephalopathy.  It's a big

8    word.  Basically, it just means as the brain starts to

9    swell, it starts to cut off its own blood supply.  The

10   vessels that are coming up through the spinal cord, and

11   into the cranium from the neck begin to be pinched off,

12   and it doesn't get as much blood as it should.  Usually,

13   due to the swelling.  So, basically, it means ischemia,

14   and not enough oxygen to the brain.

15        Q    On the person, what does the person actually do

16   when that occurs?  I mean, is it noticeable?  Does the

17   person walk around normally?

18        A    Usually, by that stage, we start to see --

19   they're are just in a coma.  They're not waking up

20   anymore.  They may be breathing and the heart still may be

21   beating, but they're not awake or alert anymore at this

22   time.

23        Q    The last thing you have on the first section is

24   multiple scalp hemorrhages.  What exactly do you mean by

25   that?

1      A    Those are the contusions or areas of hemorrhages

2  that we showed on the photographs within the scalp,

3  frontal and in the back, and I think those photographs

4  were admitted, but there are multiple of them.  It is not

5  one or two.  There are multiple contusions or areas of

6  hemorrhage.  We went through this before, but, you know,

7  basically when there is a blow to the head, these tiny

8  vessels may tear and leak and that's how you get blood

9  into the scalp.

10      Q    So each hemorrhage could be a different blow?

11      A    Yes, unless it's something very long.  But most

12  of them -- it could be different knuckles, you know,

13  causing different contusions, but -- so it may not all be

14  different blows, but there are multiple blows.

15      Q    Would there be significant force on the blows?

16      A    Enough to tear the blood vessels, yes.

17      Q    Going down to section three where you have the

18  evidence of battered child syndrome, you notate bite

19  marks.  You've already testified that there was at least

20  two bite marks?

21      A    Yes, on the right back, there were two -- at

22  least two bite marks.

23      Q    And for the record, and also for the jury, would

24  those be painful as well?

25      A    Yes, because as you saw from the photographs and

157

1    I described before, it's like the teeth were dragged along

2    the skin and caused abrasions, like you would get when a

3    child falling on concrete and getting abrasions.  It

4    actually drug off the layers of skin where the bite marks

5    were and we got abrasions there which are those dragging

6    off of the skin, and it crusted over.  And then both bite

7    marks had contusions, the bruising around itself.  So as

8    they bit, they actually busted the blood vessels in that

9    region.

10        Q    So it's actually forcefully hitting the area and

11   trying to bite at the same time?

12        A    Mainly just the biting.  Very, very forceful

13   biting.

14        Q    You described the right foot laceration and

15   contusion.  Do you recall how severe that was?

16        A    Yes.  And we discussed this.  It's like the

17   bottom of the right foot, there's a tear in the skin, a

18   laceration to the skin.  And then around, there's a

19   contusion to go with it.

20        Q    Would that be a significant blow to cause that

21   injury?

22        A    Yeah, That can actually be a scratch with

23   something -- or something different than a blow since

24   there's a tear in it.  It could be either one.

25        Q    Would that injury be painful?

Adelaido Flores, Jr.
Certified Shorthand Reporter

158

```
 1        A      Yes.

 2        Q      You described the left humerus fracture.

 3        A      Yes.

 4        Q      What exactly is that?

 5        A      That's the left arm that was fractured, and I

 6   told you it was kind of a spiral looking fracture of that

 7   left arm, and it shows healing -- stages of healing in

 8   it -- and I believe I said, you know, it could be  two

 9   weeks old, or it could be as little as seven days old.

10   But it's a sign of an older injury than what we have at

11   the head because it's already trying to pull itself back

12   together and form new bone in that region.

13        Q     Now, the fact that it's an old injury, does that

14   mean it was no longer painful?

15        A     No.  Because there was no splint on it and it

16   wasn't in a sling, or anything.  So basically that arm was

17   still being used by the child.  It wasn't immobilized.

18   So, yes, that would be painful, because when you move it,

19   then, of course, it's trying to separate back apart again

20   because there is nothing holding it together like a cast

21   would.  A cast, basically, makes you feel a little bit

22   better, because it keeps everything kind of tight in one

23   place so you can't bend that arm and re-injure it.

24        Q     So the fact that it's not being splintered or

25   not being treated would cause severe pain everyday that
```

159

```
 1    it's being used?

 2         A    Yes, it would cause pain.  I mean, just like a

 3    fracture -- if anybody has had a fracture, it's painful.

 4    Very painful.

 5         Q    What about the initial fracture?  In order to

 6    cause that type of injury, would that have to have been a

 7    significant blow?

 8         A    It could be a blow, or it could also be a pull

 9    and a twist at the same time -- like when you grab someone

10    and twist their arm, and flip it.  It would be very

11    forceful.

12         Q    Would it be very painful?

13         A    Yes.

14         Q    You described a bilateral lung contusion.

15    Bilateral, would that mean both lungs?

16         A    Yes.  Both lungs had bruises in the lung tissue

17    itself.

18         Q    So how would you actually get that type of

19    injury?

20         A    Again, it could be from a blow.  And I think I

21    mentioned before, a lot of these are on the posterior

22    lateral lungs.  It could even be like a stomp, or

23    something like that, that caused it.

24         Q    But you'd have to get pass the rib cage.  So, I

25    mean, would it have to be pushing the rib cage into the
```

1  lung?  I mean, describe how that kind of blow could occur?

2      A    Yes.  Because the lungs sit inside the ribs, so

3  basically -- yeah, it would have to be a punch, or a

4  stomp, or something, like the fist, getting in and hitting

5  the lung itself.  That's a pretty forceful blow.

6  Children's ribs, and an infant's ribs, are very pliable.

7  They move very easily.  They often don't fracture when

8  ours would fracture, because they do move.  So, basically,

9  it would move -- it would be a blow that moved the rib

10  and, hit the lung and came back out without breaking the

11  rib or tearing the lung, basically.

12      Q    Would it cause a loss of breath?

13      A    Yes.

14      Q    So the feeling that we've all gone through of

15  losing your air, would that be the result of one of those

16  punches or blow?

17      A    Yes, yes.  Because once it hits it, then, of

18  course, the air is getting pushed out, and then the blood

19  starts to fill in that area where the bruise is in the

20  lung.

21      Q    You go on to describe a right kidney contusion.

22  Again, how would you get one of the types of injuries?

23      A    Again, the same way.  It's most likely a

24  punch -- you can get a punch in the kidney area.  Or, you

25  can get a kick, or a stomp, in the same area.  Basically,

161

```
 1      it has to go in and hit the kidney, which sits kind of
 2      back in this area.  So it would have to actually hit the
 3      kidney and leave this bruise, and then come back out
 4      again.
 5           Q    But that would be a severe blow?
 6           A    Yes.
 7           Q    And it obviously would be painful?
 8           A    Yes.
 9           Q    Now you described multiple crusted abrasions,
10      and thinning of the scalp hair.  I believe you described
11      that as pulling of the hair?
12           A    Yes.  It could be due to the pulling of the hair
13      since the hair is also thin where we have the scabs.
14           Q    Now, would the fact that a child is
15      malnutrition, mal -- didn't eat properly or dehydrated, if
16      she was -- in the manner that she was, would that mean
17      that you could pull her hair out real easily, or would it
18      still cause injury when you pulling the hair?
19           A    Well, it did cause injury because we have the
20      scabbed lesions there.  Can it get more brittle when you
21      don't eat right?  Sure, it can get more brittle, but it
22      tends to break off.  Your hair just breaks off.  It
23      doesn't pull the root out.  It might just break because
24      you're just not -- don't have enough vitamins or minerals.
25           Q    In this particular instance, the roots were
```

162

1    actually being pulled out?

2        A    Best that I can tell, there's scabbed abrasions

3    and there's very little hair in the region where we've

4    seen these scabs.

5        Q    Again, it would have to be severe force to pull

6    out the hair?

7        A    Yeah.  It would be like when you grab someone

8    and try to yank their hair out.

9        Q    And, of course, that would be painful as well?

10       A    Yes.

11       Q    And then you described the frenulum injury, and

12   that's the piece holding her lip to her gum?

13       A    Yeah, it's the one between your upper teeth, the

14   little piece of mucosa that sits there.  That was no

15   longer present.  And there was scar tissue in that area.

16   So she didn't have that little lip of mucosa connecting

17   the lip to the gum line.

18       Q    Now, how would an injury to that part of your

19   body occur?

20       A    Most of the time it's from some kind of blow to

21   your mouth, basically, a hit.  You know, it could happen

22   just from, you know, someone hit you in the mouth and,

23   basically, you just tear that little piece off.

24       Q    Would it be a significant blow?

25       A    Yeah, it would be a significant blow.

Adelaido Flores, Jr.
Certified Shorthand Reporter

163

```
 1        Q     Would it cause intense pain as well?

 2        A     Yes, it could.  And another way, I didn't think,

 3   if you put your hand over someone's mouth and they were

 4   really trying to fight you, you might put a little tear in

 5   it.  Not -- this is totally gone now.  There is just

 6   nothing left there.

 7        Q     Going to your report on page six of seven under

 8   "toxicology" -- do you have it that?

 9        A     Yes.

10        Q     The first line there reveals -- and there is a

11   word that starts with a "B," how do you pronounce that?

12        A     Benzoyl-ecgonine.

13        Q     What is that?

14        A     It's a metabolite to cocaine.

15        Q     And where was this metabolite to cocaine found?

16        A     Postmortem blood.  Basically on all autopsies

17   that are forensic autopsies, we'll see some type of

18   toxicology.  And on this infant we sent postmortem blood

19   to test for any kind of drugs, even -- Tylenol, or

20   anything.  We sent it to toxicology.  And on this case, it

21   picked up a metabolite -- which just means a breakdown

22   product of cocaine -- of less than 50 nanograms per

23   milliliter.

24        Q     So there was presence of that cocaine substance

25   in Mariah's blood?
```

1      A     Yes.

2      Q     How would that margin be found in her blood?   I

3   mean, what are the ways that it could get in her blood?

4      A      If somebody is smoking crack, you know, you

5   could get second-hand smoke just like you do from smoking

6   cigarettes.  If something is on the counter and she got

7   into it somehow you could.  If someone gave it to her, of

8   course, you could.  But I don't know which method it would

9   have gotten into her blood.  All I'm saying is the

10   metabolite was found.

11      Q     So the cocaine was in her system at some point?

12      A     Yes.

13      Q     We just don't know how it got into her system?

14      A     Yes.

15      Q     Could cocaine be used to sedate a child?

16      A      Not usually.  Cocaine usually pretty much

17   excites people.  It gets you pretty up and going and it

18   doesn't usually make you -- like alcohol would make you a

19   little sedated, but cocaine usually excites.  It's a

20   stimulant.

21      Q     Okay.  Possibly trying to re-awaken a child

22   that's out?

23      A      It's possible, but I'm not sure how she got it.

24   But yeah, it might stimulate someone.

25                 MR. VILLALOBOS:  I'll pass the witness at

Adelaido Flores, Jr.
Certified Shorthand Reporter

165

1   this time.

2                          THE COURT:  Mr. Gilman?

3                          MR. GILMAN:  We have no questions, Judge.

4                          THE COURT:  Dr. Farley, you are excused.

5                          THE WITNESS:  Thank you.

6                          THE COURT:  Thank you for testifying a bit

7   slower.  Call your next witness.

8                          (Witness was excused at **2:48 p.m..**)

9                          MR. PADILLA:  Your Honor, at this time the

10  State rests.

11                         THE COURT:  Mr. Gilman, you may call your

12  first witness.

13                         MR. GILMAN:  Judge, I wish to take some

14  matters up.

15                         THE COURT:  It is good time for a break

16  anyway.  Let's go ahead and take a break.

17                         **(Jury not present at 2:49 p.m.)**

18                         THE COURT:  You may sit down.  Thank you.

19  Close the door, please.  Okay.

20                         MR. GILMAN:  Judge, I will move for a

21  directive verdict in the -- in this phase.  I will direct

22  the Court's attention to the Berry versus State of Texas,

23  Court of Criminal Appeals case, that was handed down in

24  May of '07.  I believe the Court is familiar with it.

25  I've given the Court a copy of it.  I don't believe that

166

1   the State has shown future dangerousness in this case to

2   warrant getting past what the Court has indicated in the

3   Berry case.

4                   MR. PADILLA:   Your Honor, I believe if you

5   look at the Berry case, it's very specific, Your Honor,

6   that issue had to do -- I think there was also -- if you

7   look at the wording, and the Court's concern in the matter

8   of the issue of trying to connect something to the other

9   event of the child, Your Honor, I believe that --

10                  THE COURT:   An abandonment of the child,

11  and the death of the child.

12                  MR. PADILLA:   Your Honor, it would have

13  caused death of a child, Your Honor.   In that case, there

14  was a concern about -- you know, in that instance, I don't

15  think -- made that decision, but I don't think it changed

16  the law on this.   There are plenty of cases that have come

17  in the past.   I draw the Court's attention to the Barn

18  versus State, Your Honor, and also the case involving

19  Salazar versus State, Your Honor, which are two cases that

20  states that the crime itself, the elements of the crime is

21  sufficient -- I have marked these on my copy -- that that

22  is sufficient for the jury to consider future

23  dangerousness, Judge, and just that fact, and that fact

24  alone, and I will draw the Court's attention to the items

25  that we have highlighted therein.   We had a situation in

Adelaido Flores, Jr.
Certified Shorthand Reporter

167

1    one of the cases where a gentleman killed a two year old

2    child by striking it in the back of the head.   The medical

3    report came back that the child's back of the head

4    appeared to be like jello.   The man took off to go get a

5    six pack of beer, came back and later on and called in and

6    said, you know:   Please don't let them know that I was

7    with the child, Judge.   And based upon that fact, and that

8    fact alone, the fact that it involved a two year old

9    child, the seriousness of the crime, the brutality of the

10   crime was sufficient to overcome the burden, and they did

11   not reverse the case, and they affirmed it, saying that

12   the State had met its burden of proving sufficient

13   evidence just from the facts of the crime itself, Your

14   Honor.   So we don't believe that a directive verdict --

15              THE COURT:   I'm going to deny the motion

16   for directive verdict at this time.

17              MR. VILLALOBOS:   Judge, is that book

18   complete?   May we remove that from --

19              THE COURT:   I wish you would.   That's why I

20   put it there.

21              MR. GILMAN:   Judge --

22              THE COURT:   I'm listening.

23              MR. GILMAN:   -- with all due respect and --

24              THE COURT:   I understand.   I read the Berry

25   case.   I read one of these cases.   I didn't read all these

```
 1   cases.
 2                   MR. GILMAN:   These cases were prior to
 3   Berry.
 4                   THE COURT:   I understand, sir.
 5                   MR. GILMAN:   But the wording here, I think
 6   is important.   The State's evidence which consisted of
 7   appellant's murder of the child, her subsequent
 8   abandonment of another child, and her lack of remorse for
 9   these crimes -- an unlikely possibility that she might
10   become pregnant in prison, does not prove beyond
11   reasonable doubt that there is a probability that she'll
12   commit crimes -- criminal acts of violence that would
13   constitute a continuing threat to society.   The Court goes
14   on to say, if I could continue, Judge --
15                   THE COURT:   Yes, sir.
16                   MR. GILMAN:   -- it did not prove that any
17   other stimulus that led to a violent or dangerous act in
18   any other context.   It did not show that she had harmed or
19   attempted to harm any of her other children or an
20   unrelated child or any other person.
21                   Further, the State's final argument
22   exasperated the heavy, emotional impact of the offense by
23   inviting the jury to use an improper standard as
24   consideration of future dangerousness.
25
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1                    THE COURT:  I understand, Mr. Gilman.  I
 2       understand your argument.  At this time, I am denying your
 3       motion for directive verdict.
 4                    MR. GILMAN:  Yes, sir.
 5                    THE COURT:  I'm reserving myself the right
 6       to rule on this later.  I just want you all to understand
 7       that.
 8                    MR. PADILLA:  Correct.
 9                    THE COURT:  You've got about eight, ten
10       minutes to take a break and then we'll come back.
11                    (Recess from 2:54 p.m. till 3:03 p.m.)
12                    MR. PADILLA:  Judge, I'm going to -- on the
13       record, Judge, I'm going to ask permission to reopen,
14       Judge, for the specific purpose of offering a judgment of
15       conviction, Your Honor, which I just got, after we had
16       rested.  I had the conviction itself, and we were looking
17       for the photo to attach, and we had to get it from the
18       warehouse, and we got a judgment with the defendant.  But
19       it is of the defendant.
20                    THE COURT:  What's the conviction of?
21                    MR. PADILLA:  Of a DWI, Your Honor.
22                    THE COURT:  DWI, what?
23                    MR. PADILLA:  A DWI.
24                    THE COURT:  A DWI is not a crime of moral
25       turpitude.
```

1            MR. PADILLA:  I would ask permission to be

2   allowed to reopen, Judge, so that we can attempt to admit

3   it.  If the Court does not allow it to be admitted, then

4   so be it.

5            MR. GILMAN:  I'm going to object.

6            THE COURT:  Go ahead, sir.  I'm listening.

7            MR. GILMAN:  They've rested.

8            MR. VILLALOBOS:  Judge, we've rested and

9   they brought us the photo right as we sat down.  I mean,

10  we gave them notice under 404 (b) about the previous

11  conviction.

12            THE COURT:  They had notice?

13            MR. VILLALOBOS:  Yes, Judge.  It was part

14  of the 404 (b) notice.

15            THE COURT:  Well, if you got notice, I'm

16  going to go ahead and allow it.  I'm not sure whether I'm

17  going to admit it.

18            MR. GILMAN:  Judge, this other matter --

19  this is all stapled together.  But this isn't part of the

20  judgment, this back page, which is the picture.  They've

21  got a judgment, and they're going to have to prove up that

22  judgment that she's one and the same person.  They're

23  going to have to do that by bringing in experts on

24  fingerprints, and whatnot, Judge.  They can't just prove

25  it up by grabbing a picture of somebody, and slapping on

Adelaido Flores, Jr.
Certified Shorthand Reporter

171

```
 1    judgment and saying:  Hey.  This is the same person.
 2                    THE COURT:  You're right about the picture
 3    not being part of the judgment.
 4                    MR. PADILLA:  It's not part of the
 5    judgment, but it is part of the court's file, Judge.  But
 6    -- that's fine.  After they rest, I'll re-offer it at that
 7    time.  We can do then.  No problem.
 8                    THE COURT:  I'm sorry.  You all sit down,
 9    please.  I apologize.  I should have taken care of that
10    earlier.
11                    MR. PADILLA:  We will re-offer it at that
12    time.
13                    THE COURT:  Mr. Gilman, do you have your
14    first witness, sir?
15                    MR. GILMAN:  Judge, we're waiting for the
16    cart because we've got an overhead projector that we're
17    going to use.  We've got the computer to run.
18                    MR. CORDOVA:  It's a Powerpoint projector.
19                    THE COURT:  Who is bringing the cart?
20                    MR. CORDOVA:  The district attorney's
21    office said we could borrow theirs.
22                    MR. PADILLA:  We ordered it about ten
23    minutes ago.  It's on its way.
24                    MR. GILMAN:  I have two witnesses, Judge.
25    It'll probably take us into tomorrow.
```

```
 1                    THE COURT:  Okay.

 2                    MR. PADILLA:  This is going to be the same

 3    witness, the lady that was a late designation.  The Court

 4    needs to make a ruling on whether she was designated

 5    timely.

 6                    THE COURT:  I'm going to allow her

 7    testimony.

 8                    MR. PADILLA:  You're going to allow her to

 9    testify, Your Honor.  And prior to her testimony as to

10    certain aspects, will I be able to take her on voir dire

11    concerning --

12                    THE COURT:  Will you be able to do that,

13    concerning her qualifications?

14                    MR. PADILLA:  Yes, sir, if it becomes an

15    issue.

16                    THE COURT:  Pardon?

17                    MR. PADILLA:  If it becomes an issue, which

18    I suspect it will.

19                    THE COURT:  Are you all ready?

20    Mr. Cordova?

21                    MR. CORDOVA:  Yes, Judge.

22                    THE COURT:  Bring the jury in, please.

23                    (Jury present, defendant present 3:13 p.m.)

24                    THE COURT:  You may be seated.

25    Mrs. Villanueva, would you please stand up and raise your
```

173

1    right hand, please.

2

3

4                          **NORMA VILLANUEVA,**

5      having been first duly sworn, testified as follows:

6                        **DIRECT EXAMINATION**

7    **BY MR. GILMAN:**

8                    THE WITNESS:  Yes, I do, sir.

9                    THE COURT:  Please be seated.  Your

10   witness, Mr. Gilman.

11        Q     Would you state your name for the jury, please?

12        A     Yes.  My name is Norma Villanueva.

13        Q     And Mrs. Villanueva, you are a resident of

14   where?

15        A     Hidalgo County.

16        Q     And you have been hired by me; is that correct?

17        A     That is correct.

18        Q     As per court order?

19        A     Yes, that is correct.

20        Q     And your job is to do what, ma'am?

21        A     My job was to look through Child Protective

22   Services' records, do a family history and social history

23   on the defendant, and to look at issues, mental health

24   issues that could have been influenced the statement and

25   also her behaviors.

174

```
 1        Q     In that process, did you meet with Melissa Lucio
 2   at any time?
 3        A     Yes, I did.
 4        Q     And, approximately how many visits did you make?
 5        A     Approximately three visits, sir.
 6        Q     And did you review the video statement that
 7   Melissa Lucio made at the police station?
 8        A     Yes, I did.
 9        Q     I'd like to start with -- did you see all of the
10   Child Protective Services' records that I had and was
11   given?
12        A     Yes, I did.
13        Q     Did you compile those as best as you could?
14        A     Yes, I did.
15        Q     The first involvement of Child Protective
16   Services had -- well, let me back up.  You graduated from
17   university of what?
18        A     Our Lady of the Lake University.
19        Q     That's in San Antonio, Texas?
20        A     Yes, sir, it's in San Antonio.
21        Q     And did you receive any further degree?
22        A     Yes.  I have bachelor's degree in social work.
23   I have master's degree in social work.
24        Q     And do you have any other specific training?
25        A     Yes, I do.  I have a clinical license.  I am
```

175

1   licensed both nationally and in the State of Texas for

2   private independent clinical practice.  I am also

3   recognized as a diplomate in clinical social work and as a

4   diplomate in forensic specialty.

5       Q    And are you presently working on a doctorate

6   degree?

7       A    Yes, I am.  I'm presently working on a doctorate

8   degree in psychology.

9       Q    Approximately when did you get involved with

10  this case?

11      A    I got involved in this case this year, early in

12  the year.  It was approximately March.

13      Q    And did you -- you've received the copies of all

14  of the documents of Child Protective Services that were

15  given to me; is that correct?

16      A    Yes, that is correct.

17      Q    And you were able to review them; is that

18  correct?

19      A    Yes, that is correct.

20      Q    And the first involvement of Child Protective

21  Services on Melissa Lucio occurred when?

22      A    The first involvement occurred in 1995.

23      Q    And in 1995, how many children did Melissa Lucio

24  have?

25      A    She had five children.

176

1      Q    Was she married at that time?

2      A    Ah, yes, she was still legally married to

3    Mr. Lucio.

4      Q    Was Robert Alvarez on the scene at that time?

5      A    Yes.  She met him and moved in with him in 1994.

6      Q    Is this evidence that you have gathered through

7    your social history?

8      A    Yes.

9      Q    The involvement that Mrs. Lucio had with

10   Mr. Lucio was nonexistent from what time?

11     A    Mr. Lucio abandoned the family in August of

12   1994.

13     Q    So since that time Mr. Lucio has resided where,

14   do you know?

15     A    I believe he was originally from the Houston

16   area.  I don't recall if he is still there right now.

17     Q    In your compiling of these records, did you at

18   any time see if Melissa Lucio has had problems with drugs

19   or alcohol?

20     A    Yes, there's extensive records about cocaine

21   use.

22     Q    And when was the earliest indication of cocaine

23   use from Child Protective Services records?

24     A    There was an annotation in the file in 1998

25   stating that although she admitted to using drugs, that no

Adelaido Flores, Jr.
Certified Shorthand Reporter

177

1    drug testing was done.

2        Q    That was as early as 1998?

3        A    Yes, that is correct.

4        Q    The next drug use was approximately when?

5        A    If you go by Mrs. Lucio and family reports, it

6    was ongoing.  If you go by CPS records, in the next open

7    case, which was in the year 2000, it was noted that the

8    children were telling the investigators that "Uncle

9    Richard" was living with them and using drugs and that

10   dad, which is Mr. Alvarez, was using drugs and mom also.

11   And there was no inquiry as to the extent of the drug use.

12   And, there was also no inquiry as to "Uncle Richard" or

13   drug testing at that time.  And that's also --

14       Q    This is the children telling Child Protective

15   Services?

16       A    That is correct.  The investigator.

17       Q    And this is in 2000?

18       A    2000, correct.  Uh-huh.

19       Q    And in 2000, what children does Mrs. Lucio have?

20       A    In 2000, she has four children by Mr. Alvarez at

21   that time.

22       Q    And that is?

23       A    Their names are Rene, Richard, Robert and

24   Gabriel.

25       Q    Now when she had Gabriel, did she test positive

Adelaido Flores, Jr.
Certified Shorthand Reporter

178

1    for cocaine?

2        A    Yes, she did.  She tested positive for cocaine

3    and so did Gabriel.

4        Q    The children were not removed?

5        A    No, the children were not removed.  It was

6    called a family preservation case.

7        Q    Which means what?

8        A    Which means the children don't get removed.

9    What is supposed to happen is a worker works with the

10   family helping them correct whatever issues are risk

11   factors.

12       Q    Does the file indicate what, if anything, was

13   done with this family, other than that they made that

14   notation?

15       A    Yes.  According to the file and the case reader,

16   she started parenting classes, and did not complete

17   parenting classes.  There was no water in the home.

18   Again, there was no inquiry as to the extent of drug use.

19   Mrs. Lucio had not found work, and Mr. Alvarez was only

20   doing odd jobs.  So those were the two contributing

21   factors to the financial problems in the home.

22       Q    Can you tell us -- tell the jury her next

23   involvement with drugs, if any?

24       A    Her next involvement with drugs, well, again, if

25   you interview Mrs. Lucio, she'll tell you that --

1        MR. PADILLA:  Your Honor, I'm going to

2  object as being nonresponsive to the question asked.

3        THE COURT:  (Reads screen)  Her next

4  involvement with drugs.  Overruled.  Go ahead.

5        THE WITNESS:  I can answer?

6        THE COURT:  Yes.

7        THE WITNESS:  Okay.  If you talk to

8  Mrs. Lucio, she'll tell you that she was using drugs

9  ongoing the entire time.  In the CPS records there was an

10  annotation by the case reader -- there were two cases in

11  2001 -- and the case reader stated that there was no

12  action on the first call that was in November.  In

13  December when they did take action, there were no drug

14  testings done and no inquiry as to drugs.  That's the only

15  annotation in the Child Protective records regarding drugs

16  for the year 2001.

17    Q    (By Mr. Gilman) Did you have a contract at one

18  time with Child Protective Services?

19    A    Yes, I've had several contracts with them.

20    Q    Do they have certain guidelines that they have

21  to follow --

22    A    Yes.

23    Q    -- or try to follow?

24    A    Yes.  One of the contracts that I've had with

25  Child Protective Services in the past was a permanency

180

1    planning team convener.  And you get trained on their
2    policies and their procedures, and you work with them as a
3    team in trying to make sure that the standards are met in
4    that particular contract.
5        Q    Have you found in going through this material
6    that Child Protective Services was following their own
7    guidelines and standards?
8        A    The best way I can answer that is to tell you
9    that the commentary that I am making here, is not my
10    opinion.  It's the commentary from their own case reader
11    who is their internal quality review person.  So when I
12    make comments like:  Did not complete parenting classes,
13    no children's interviews -- those aren't my judgments.
14    Those are quotes from the case reader who was doing their
15    own internal quality review.
16       Q    So we have Gabriel being born with -- testing
17    positive with cocaine and his mother being tested positive
18    for cocaine.  And the next child after Gabriel is who?
19       A    It's Adriana.
20       Q    And was Adriana ever tested for cocaine?
21       A    Adriana wasn't tested that I could find in the
22    records; however, the case reader does note that there was
23    drug use by Mrs. Lucio.  This is the case in 2002 right
24    after Adriana was born.  They did put down a family
25    preservation case, and the case was closed due to the

Adelaido Flores, Jr.
Certified Shorthand Reporter

181

1    risks being reduced.

2        Q    Risks being --

3        A    Reduced.

4        Q    What risks are we talking about?

5        A    They're not clear on it.  We're talking about

6    the case on August of 2002 through June of 2003, was when

7    they were under family preservation.  And the case reader

8    notes that no drug testing was done and there was -- at

9    that time that's when they also started to notice sexual

10   activity that was inappropriate with some of the children.

11   So there is also a comment made about that not being

12   inquired into.

13       Q    These notes indicate that these people were

14   poor, or did they have money?

15       A    All of the notes throughout will speak to the

16   poverty level, about the misuse of food stamps, the fact

17   that there was often utilities being turned off, lack of

18   furniture, lack of food.

19       Q    At one point in their lives they had no water in

20   their house?

21       A    On more than one occasion.  On one occasion they

22   were living homeless in the park.

23       Q    And does Child Protective Services document

24   that?

25       A    Yes, they did.

182

1      Q    Did Child Protective Services give them any help

2  or assistance when they were homeless in the park?

3      A    Yes.  When the family was homeless in the park,

4  there is a note from Child Protective Services that they

5  tried to encourage the parents to go to a homeless

6  shelter, and there is a comment that the parents refused.

7  And there was another instance where the family was going

8  to be evicted because they were late on their rent, and

9  they gave them a stipend for their rent.

10     Q    When they were homeless in the park, how many

11 children did Melissa Lucio have?

12     A    Seven.

13     Q    Five from Mr. Lucio and two from Robert Alvarez?

14     A    No.  The seven were from Mr. Alvarez.  I am not

15 counting the older children because the older children

16 were in and out of her life.  With so much flux, it's hard

17 to say who was there the entire time.  You have Alexandria

18 being mentioned constantly, and Selena.  John was ordered

19 to stay out of the home, but sometimes he would be in the

20 home.  And Melissa and Daniella were in and out of the

21 home.

22     Q    So when they were in the park, you have Selena

23 and Alexandria and then you have Robert, Richard and Rene.

24 Who else?

25     A    Gabriel, Adriana, Sara.  You have also --

183

1      there's a question about Daniella and Melissa because

2      according to the records some of the children were already

3      being spread out at least temporarily to some of the

4      relatives.

5           Q     Daniella is the oldest one --

6           A     That is correct.

7           Q     -- oldest child?  And Melissa is?

8           A     The next to oldest.

9           Q     The next to oldest?

10          A     Uh-huh.  Oh, excuse me.  There is John in

11     between the two girls.

12          Q     So prior to Mariah's birth, there is ample

13     evidence of excessive drug use by both Melissa and Robert?

14          A     That is correct.

15          Q     Is there any indication of how well the children

16     are doing in school, those that are attending?

17          A     Yes.  Those are from educational records and

18     also some of the commentary by the foster parents.  We're

19     talking about a multiple type of diagnoses the children

20     had.  Several had ADHD, several had depression, several

21     had aggression, opposition, or defiant.  In school, it was

22     very minimal to medium type of behaviors.  There was

23     problems with some of the younger boys sexually acting out

24     much later on, but academic performance was minimal.

25          Q     During the time before Child Protective Services

184

1    removed the children in September of '04, do we have any

2    indication of how well the kids were doing in school, if

3    any?

4         A    Prior to '04?  Not really.

5         Q    So the only records that are any indication of

6    any school activity for these children, are after

7    September of '04 when they were removed?

8         A    Yes, when Child Protective Services took over.

9         Q    Now during this period of time when Child

10   Protective Services took the children from September of

11   '04 to November of '06, do the records indicate how well

12   the children were adjusting to their foster parents' life?

13        A    Apparently the behaviors from the children were

14   always volatile.  They would stabilize for a little while

15   and follow structure.  It wouldn't last long.  Then they

16   would become disruptive.  Their usual ways of dealing with

17   frustration was very aggressive, physically acting out.

18   Some of the boys were sexually acting out also.  There was

19   constant comments about pushing, shoving, biting, kicking,

20   not just between the siblings when they were placed

21   together, but also between children and foster children.

22        Q    Were there indications of any hitting,

23   physically hitting or beating on one another?

24        A    Yes.

25        Q    On more than one occasion?

Adelaido Flores, Jr.
Certified Shorthand Reporter

185

```
 1        A     On more than one occasion.

 2        Q     Are there any indications from the file before

 3  November of '06 that Child Protective Services did not

 4  want to give the children back to Melissa Lucio?

 5        A     I never saw the permanency plan be other than

 6  family reunification until the very later service plans.

 7        Q     So up to November of '06, Child Protective

 8  Services' plan was always to return the children to

 9  Melissa Lucio?

10        A     Yes.  Temporarily they were willing to do

11  relative placement until the mother and/or father

12  completed services.  The problem is services were never

13  completed.

14        Q     So Melissa Lucio never completed any kind of

15  drug education -- drug screening, drug --

16        A     She would participate in drug testing, and

17  towards the end she was coming out clean.  She started

18  substance abuse counseling.  She started parenting

19  classes.  She started mental health counseling.  What I

20  could glean from the records is there was a constant start

21  and stop of service.  Apparently there is one therapist

22  that she gained good repertoire with, and she stayed with

23  that therapist for a good amount of time.

24        Q     Did Child Protective Services do anything when

25  Melissa Lucio failed to fulfill their requirements?
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    A    It was documented in the file.  And the comments

2    that I would see from their case readers mostly had to do

3    with comments of:  "Did not complete, and lack of follow

4    up."

5    Q    So Child Protective Services failed to do what

6    they were supposed to do?

7    A    They didn't follow up on the failure to follow

8    the court ordered services.

9    Q    In November of '06, the children were brought

10   back to Mrs. Lucio and placed on her door step.  Is that

11   something that CPS does?  I mean, do they just come and

12   give all the children back all at once or do they bring

13   them back a little at a time?

14   A    In my experience while I was the permanency

15   planning team convener, I saw them use two different

16   styles.  One style was the plan would be made that the

17   mother could not handle all of the children and the

18   children would be given back to her in little small

19   groups.  And as she showed that she was able to be

20   resilient and a good parent, more children would be added

21   to the picture.

22                    I recall one very large family that had 12

23   siblings in the Willacy County area, where approximately

24   half of the children were returned to the mother in steps

25   and the other half, the rights were terminated.  The

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    mother just could not handle all 12 children.  So Child

2    Protective Services has different modes of dealing with

3    the parents, depending on their judgment of the parent's

4    ability to properly care for the children.

5         Q    And during this period of time from September of

6    '04 to November of '06, did the file indicate that

7    visitations were conducted so that Melissa Lucio could see

8    her children?

9         A    Yes, supervised visits were being conducted.

10        Q    Supervised meaning under the care of Child

11   Protective Services?

12        A    Yes.  Child Protective Services has contracts

13   whereby individuals that are not CPS employees are the

14   ones doing the observation and the documentation for them.

15        Q    So how do we know whether or not Child

16   Protective Services even knows what's going on in those

17   visitations?

18        A    What happens during a supervised visitation is,

19   again, it's a contractor.  There are state approved forms

20   that are created by Child Protective Services that the

21   observers have to fill out and they have two to three days

22   to get the original notes to the case worker and then they

23   keep copies for their file.

24        Q    So do we have any indication of how many times

25   during this period of time from September of '04 to

1    November of '06 that there were visitations conducted?

2         A    I can't give you the exact numbers, but there

3    were supervised visitations that included Mrs. Lucio alone

4    and then Mrs. Lucio with Mr. Alvarez.  And the case

5    readers and the CPS notes state very specifically that the

6    meetings were extremely disruptive.  The children were

7    quote, unquote "out of control", and Mrs. Lucio could not

8    discipline them.  It reached such a chaotic point that

9    they chose to split the children up.  Mrs. Lucio could not

10   handle the eight children for two hours once a week.  So

11   they split the visiting to two visits so that she had only

12   a smaller group of children to deal with.  And even

13   then --

14        Q    So this -- this was a decision that Child

15   Protective Services made?

16        A    That is correct.

17        Q    And this continued on for how long?

18        A    If I recall, the supervised visits occurred over

19   almost a three-year time period, on and off.

20        Q    How much of this supervised visitation were

21   divided up so that you had one group of kids at one time

22   and another group of kids at another time?

23        A    If I recall correctly, I believe it was the last

24   year.

25        Q    So Child Protective Services had -- certainly

189

1    had noticed that Mrs. Lucio was having difficulty with all

2    of the children together?

3        A    Yes.  "Unable to discipline," is a note that is

4    constantly seen.  "Children being disruptive."  "Children

5    being aggressive with each other."  "Not able to meet all

6    the children's needs."

7        Q    During these visitations, these were visitations

8    with what children?

9        A    These were visits with the seven younger

10   children.

11       Q    This is the seven Alvarez children?

12       A    The seven Alvarez children.

13       Q    What happened to the Lucio children?

14       A    The older children were also included in the

15   earlier visits while they were in care.

16       Q    The older Lucio children were sent off to

17   Houston at one point?

18       A    Yes, they were.

19       Q    Do we know when the older Lucio children came

20   back, if -- when?

21       A    The older children left in the 2004 timeframe.

22   And I saw a note that said that the children were sent to

23   Houston and that there was no courtesy check done by any

24   CPS case worker in Houston on behalf of our case workers

25   here.  I'm sorry, I did not document when the children

Adelaido Flores, Jr.
Certified Shorthand Reporter

190

1    returned.

2        Q    From November then of '06 when Mrs. Lucio got

3    the children back, does it indicate where she was living

4    at that time in November of '06?

5        A    Yes.  In November of '06, she was in an

6    apartment.  And CPS had to get involved again in December

7    of '06 because she was not able to pay rent.  There was no

8    electricity.  There had been rumors that John was being

9    allowed to stay there, and that was against the safety

10   plan that CPS had created for Mrs. Lucio.  And what

11   happened was that was when they were assisted with the

12   rent, where they were given money for one month's rent.

13       Q    In December of '06?

14       A    December of '06, that's correct.  And both

15   adults were testing negative for drugs at that time.  They

16   were drug tested.

17       Q    Did Child Protective Services go back and check

18   at all later on in December or any time in January or any

19   time in February of '07?

20       A    Not that I found in the notes.  And at that time

21   they were moving again.  The family was in the process of

22   moving again.

23       Q    Does Child Protective Services know when and

24   where they are moving?

25       A    I didn't see it documented.  So my impression is

191

1     that they didn't know.

2          Q     At this time in January -- in December -- in

3     December of '06, January of '07 and early February of '07,

4     Child Protective Services is the managing conservator of

5     those children; are they not?

6          A     Yes, they are.

7          Q     And as managing conservators, they are

8     responsible for those children?

9          A     Yes, they are.

10         Q     And the parents are possessory conservators and

11    have visitation rights with their children; is that

12    correct?

13         A     I believe those are the correct terms.  I'm

14    sorry.  I am not that familiar with some of the legal

15    terms.

16         Q     In going through these records up until December

17    of '06, did it indicate that Melissa Lucio was ever

18    violent at all with any of these children?

19         A     No.  In looking at all of the charges that were

20    placed against her, all of the risk factors that were

21    identified, they always had to do with physical neglect,

22    with not having food, the children being uncleaned, the

23    children not being properly supervised --

24         Q     Or the drugs?

25         A     Or the drugs, yes.

192

```
 1        Q      Going then into January and February of '07, is
 2   there any indication that Child Protective Services made
 3   any visits to the Lucio family, Melissa Lucio and her
 4   family --
 5        A      No, there is not.
 6        Q      -- at any time during that period?
 7        A      No, there is not.
 8        Q      Okay.  Now you did a social history of Melissa
 9   Lucio also; did you not?
10        A      Yes, I did.
11        Q      And Melissa Lucio was -- had -- there were three
12   girls; is that correct?
13        A      That's correct.
14        Q      And Melissa was the oldest girl?
15        A      Yes.
16        Q      Was she -- is there any indication that she was
17   ever abused as a young child?
18        A      Yes, she was.  She was sexually abused by one of
19   her mother's lovers, a live-in lover, and it lasted for
20   approximately two years, the duration that he was in the
21   home.
22        Q      Was anything ever done with that?
23        A      No.  She told her mother and her mother chose
24   not to do anything about it.
25        Q      Now, did Melissa Lucio have any brothers?
```

193

```
1        A      Yes.
2        Q      And how many brothers did she have, do you know?
3        A      Melissa Lucio had a total of four brothers.
4   Three brothers, excuse me.
5        Q      I'm sorry?
6        A      Excuse me, three brothers.  Sorry.
7        Q      And what was her relationship with her siblings?
8        A      The social history that I obtained showed that
9   Melissa was closest to Sonia and Diane, the two sisters
10  closest to her in age.  However, Sonia was very physically
11  aggressive with her, would hit her, would pinch her, bite
12  her.  And Diane was the protector.  And whenever Melissa
13  was being bullied by anybody in school, both Sonia and
14  Diane would protect her.  Those were the closest
15  relationships.  With the brothers it seemed to be more
16  distant.  There was some physical abuse there, punching
17  and biting, but emotionally it seemed rather distant.
18       Q      Melissa is older than Sonia and Diane, and yet
19  the younger sibling sisters are protecting the older?
20       A      That is correct.
21       Q      And the younger sibling Sonia is beating up on
22  her older sister?
23       A      That is correct.
24       Q      So did you gather from this information that
25  Melissa is not a very aggressive person?
```

194

1      A      If you look at her history, she has no history

2   of aggression at all as a child, adolescent or through her

3   entire CPS history, which was a good part of her adult

4   life.

5      Q      Is there any kind of abuse by her first

6   marriage?

7      A      Yes.  Her first husband, which was her only

8   legal marriage, Mr. Lucio, he was an acholic.  And he was

9   emotionally and verbally abusive most of the time and

10  physically abusive when he was drunk.  But being an

11  alcoholic, that was quite active.  There was also a very

12  manipulative relationship there with her sister-in-law

13  Sylvia, who introduced her to cocaine.  She was 16 years

14  old.

15     Q      Melissa was 16 at the time?

16     A      Yes.  Melissa got married at the age of 16.

17     Q      So her first involvement was at age 16 with

18  drugs?

19     A      Yes.  Her sister-in-law Sylvia was the one who

20  introduced her to drugs.

21     Q      And the last involvement of any drug activity

22  was when?

23     A      Approximately -- she had been testing negative

24  in the latter part of 2007 -- in her drug test by CPS.  So

25  her last involvement with drugs was some time in the early

2007.

Q    Okay.  Early 2007 is when Mariah passed.

A    Oh, excuse me.  2006.  I apologize.  2006 she
was -- late 2006, she was coming out clean.  And earlier
in the year was when she was having still some positives
coming out.

Q    Was there any kind of abuse that Melissa would
suffer because of Robert?

A    Yes.  There are reports that Mr. Alvarez was,
again, emotionally and verbally abusive.  These are
reports documented by CPS from neighbors and from the
children.  And they note that when they were homeless,
that there was a school principal that saw Mr. Alvarez
punch Mrs. Lucio in the park.

Q    With this many children, did anybody or is there
any indication in the records that -- did anybody talk
with Melissa Lucio in reference to birth control or --

A    That's a difficult subject because State
employees are not allowed to tell mothers you need to get
on birth control.  That's usually is left up to the
therapeutic providers.  I do not know if that was
mentioned to her or not.

          I can tell you that Mrs. Lucio -- by report
during the social history -- states that in between the
two batch of kids from the two men, she voluntarily got on

1    Norplant.  She says that she had side effects from that

2    birth control.  But state employees are not allowed to

3    suggest to people that they need to be on birth control.

4         Q     So Child Protective Services does suggest to

5    people that they need to be on birth control?

6         A     That's correct.  They're not allowed to.

7         Q     Not any of their contracted service people?

8         A     Well, that's where the gray line is.  Because a

9    therapeutic provider can bring it up in a therapeutic

10   mode.  I don't know if that was done or not.

11        Q     Now, did you prepare some graphs in relation to

12   this social history and the interaction with Child

13   Protective Services --

14        A     Yes, I did.

15        Q     -- on Melissa Lucio's life?

16        A     Yes, I did.

17        Q     Could you explain that to the jury, please?

18        A     Yes, I can.  The important thing here is looking

19   at the patterns of behavior that Mrs. Lucio has.  In this

20   first one, as you can see, she's one to six -- that's a

21   baby picture of her.  The father was absent from the home.

22               What characterized this home, is the mother

23   was working 24/7.  The men that her mother would get

24   involved with, basically, would not do anything to help

25   the family.  So the mother was absent and leaving the

197

1    children in the care of these male caretakers.  And all of

2    the children will agree that no matter which male their

3    mother got with, they were violent towards the mother.

4                 Here you see a picture of Melissa.  She's

5    six years old.  At the age of six is when she was sexually

6    abused by her stepfather.  She was also being, as I said

7    before, physically abused by Sonia, her sister and --

8         Q    Which one is Melissa?

9         A    Melissa is the taller older one.

10        Q    And Sonia?

11        A    And Sonia is the next one.

12        Q    And Diane?

13        A    And then Diane, the little one on the end.

14                Now, if you look at the face, you will find

15   that with Melissa there is always consistency in her

16   pictures.  There's consistency as to what we clinicians

17   call a flat effect, just that sort of a dead pan face.

18   But that's also very characteristic of children that have

19   been abused, especially, if they're not being protected.

20   You will find with her that that's constant.  She always

21   seemed to take the helpless role, the victim role, and

22   didn't really do anything to defend herself ever.

23                Here you're looking at her age six.  This

24   is her sister's birthday when her sister turned six.

25   Melissa is the one with the checker board dress that has

198

1    the little lace.  And again, if you look at it, they are

2    at a birthday party, a children's birthday party.  And you

3    see Melissa pretty much will have the same little grimace

4    on her face, even at a birthday part that is supposed to

5    be a fun event for children.

6              At the age of eight is when the sexual

7    abuse stopped, by the way.

8              Ages 12 to 16, you will see that the last

9    two stepfathers, by the report of all of the children,

10   they were not abusive to the children at all.  They were

11   abusive only to the mother.

12             Melissa started to meet Mr. Guadalupe Lucio

13   at the age of 16.  They started to go out.  They started

14   to become intimate, and at that point Mr. Lucio approached

15   Melissa's mother, and said that he wanted to marry her,

16   and they did the parent thing of confronting him about

17   where are you going to take her, where are you all going

18   to live?  And he was given permission to marry the 16 year

19   old.

20             This is Melissa at the age of 16.  Again,

21   as any 16 year old, very much a child.  And if you will

22   look, very much the same face.  It's always the same

23   grimace that you'll see on her.

24        Q    All right.  At this time does she then start

25   producing children?

Adelaido Flores, Jr.
Certified Shorthand Reporter

199

1      A     Very quickly.  As you can see, the first child
2  was born in April of 1987.  The second child in December
3  of 1987, and the third child August of '88.  So she had
4  her first three children very young.
5               And I will, again, remind every one that at
6  the age of 16 moving fresh to Houston, she was introduced
7  to cocaine by her sister-in-law and was already
8  experimenting with cocaine.
9               She had the next set of children, again,
10  very quickly.  And you'll look and you'll see that Selena
11  came along in '92.  Alexandria, in '91.
12               Now, one of the things that was rather
13  interesting in this frame of '92 to '96, this is when
14  everything was falling apart with her and Mr. Lucio.  The
15  physical abuse had become very rampant.  He abandoned the
16  family.  She was not at that point willing to be
17  protective of herself or her children, and he's the one
18  that left.  As a matter of fact, they were packing for a
19  family trip, and he did not come home to join them, and
20  that's how she started inquiring.  In fact, she made a
21  Missing Person's Report to the police because she was
22  wondering what had happened to her husband only to find he
23  had gone to his mother's house because he was going to be
24  leaving her.
25      Q     Is that in Houston or down here?

```
 1        A      In Houston.   After Mr. Lucio leaves them, that
 2   is when she moves back down here down to the Valley.
 3                  MR. PADILLA:   Your Honor?   I'm going to
 4   object.   I know -- we are having a lot hearsay material
 5   coming in, and we have been sitting here listening to the
 6   story, Judge, but I would like to, if we could possibly
 7   keep it to question and answer.   And also, it seems like
 8   there's a lot of hearsay coming in, Judge, and I would
 9   like an opportunity to object to some of that hearsay,
10   unless she first establishes how it is that got that
11   information.
12                  THE COURT:   The objection as to the
13   question and answer is sustained.   Please keep it to
14   question and answer.
15                  MR. GILMAN:   Yes, sir.
16        Q      (By Mr. Gilman) The information you've gathered
17   here is from Child Protective Services and doing a social
18   history of Melissa Lucio; is that correct?
19        A      That is correct.
20        Q      And who did you talk with in reference to
21   gathering all of this information?
22        A      I interviewed the defendant, Mrs. Lucio.   I
23   spoke with her sister Sonia, and also the mother and
24   sister Diane.
25        Q      And by bringing this information, you're trying
```

1    to get an overall picture, are you not, of Melissa Lucio?

2        A    Yes.

3        Q    Now, when you say that she was introduced to

4    drugs at an early age in Houston, you're saying that

5    that's based upon what you have been told?

6        A    That is correct.

7        Q    Okay.  And we're not saying this as being

8    necessarily truthful, but this is information you have

9    gathered from your interviewing and developing a social

10   history?

11       A    That is correct.

12                MR. PADILLA:  Your Honor --

13                THE COURT:  I am listening.

14                MR. PADILLA:  -- I would object.  This is

15   calling for hearsay.  She is trying to offer evidence, but

16   it's based upon a lot of hearsay statements.

17                THE COURT:  I understand.  I'm going to

18   overrule the objection.

19       Q    (By Mr. Gilman) And this is what a social

20   history is; is it not?

21       A    That is correct.  If you look at the issue of

22   mitigation and how it is described as how it should be

23   done, it does consist of interviews of the defendant, of

24   what's called collaterals, which are family members, and

25   also looking at records.

```
 1              THE COURT:  Proceed, Mr. Gilman.
 2              MR. GILMAN:  Thank you.
 3       Q    (By Mr. Gilman) Now, at this point you've got
 4   marked here in red that CPS in 1995 charges her with
 5   neglectful supervision; is that correct?
 6       A    That is correct.
 7       Q    But no action was taken?
 8       A    That is correct.
 9       Q    But she is using cocaine during this period of
10   '92 to '96?
11       A    That is correct.
12       Q    And she starts with her birth control?
13       A    Yes.
14       Q    Do we have any indication of how long this birth
15   control lasted before she stopped doing it?
16       A    Less than a year due to side effects.
17       Q    What kind of side effects bothered Melissa?
18       A    The two side effects that she stated to me were
19   weight gain and acne.
20       Q    Is weight gain and acne something that is a side
21   effect for a lot of birth control devices --
22              MR. PADILLA:  Your Honor, unless she has
23   been qualified as a doctor --
24       Q    (By Mr. Gilman) -- if you know?
25              MR. PADILLA:  -- I would object to her
```

1   giving an opinion.

2               MR. GILMAN:   I'll withdraw it.   I'll

3   withdraw.

4        Q    (By Mr. Gilman) All right.   Going to the next

5   period from '97 to '98, what happens during this period?

6        A    There's an open CPS case in 1998.   There was

7   cocaine abuse.   And Alexandria and Selena went to live

8   with their father for eight months.   This was at

9   Mrs. Lucio's insistence.   She informed Mr. Lucio that she

10  could not handle trying to start her life over and all the

11  children, so she had Alexandria and Selena live with the

12  father.

13       Q    This is when she has seven children?

14       A    That is correct.

15       Q    So there is some sort of relationship between

16  Melissa and Mr. Lucio?

17       A    Only because of the children, yes.

18       Q    She knows how to get ahold of him?

19       A    Yes.

20       Q    And you are saying that Alexandria and Selena

21  then lived with their father for only eight months?

22       A    That's correct.

23       Q    All right.   The next period is from '99 to 2000.

24       A    Within this timeframe is when Gabriel was born

25  and the family had the open case for family preservation.

1    And the notes in the CPS file, you know, speak as I said

2    before to the constant fighting between the children, to

3    the fact that her brother Richard was supposedly living

4    with them and using drugs; however, that could not be

5    corroborated.  She started but did not complete the

6    parenting classes.  The water had been turned off.  And

7    one of the issues there that was a concern to the case

8    reader was there no inquiry made as to the extent of drug

9    use, even though Mrs. Lucio admitted to drug use.

10        Q    But during this period of time Alexandria and

11   Selena had come back?

12        A    That is true, yes.

13        Q    Is there any indication of why they returned?

14        A    No.

15        Q    And Robert and Gabriel are both born?

16        A    Yes.

17        Q    Was there any indications at Robert's birth of

18   any drug use?

19        A    No, not that I could find.

20        Q    But in Gabriel's there was?

21        A    Yes.

22        Q    So by the year 2000, we have nine children?

23        A    That is correct.

24        Q    The year 2001, what transpires in 2001?

25        A    There were two cases called in for physical

1    neglect.  And the annotation from the case worker say

2    "factors controlled," which basically means they went out

3    there, checked on it and found that there was no serious

4    issue.

5                  The family was then after that time found

6    homeless in the park.  And that is where that school

7    principal told one of the investigators from CPS that they

8    saw Mr. Alvarez hitting Mrs. Lucio.  The case reader noted

9    that there were no children interviewed on the second

10   ground.  The drug testing was not done.  And Mr. Lucio,

11   the biological father, was not contacted to let him know

12   that some of his biological children were homeless.

13                  And this is the only time where I saw that

14   Mr. Alvarez spoke up about Melissa to a case worker.  He

15   told a CPS investigator that Mrs. Lucio was so depressed

16   she's giving up.  I have never seen an annotation of

17   Mr. Alvarez speaking to a CPS employee about Mrs. Lucio

18   prior to this statement.  And it's the only time.

19        Q    She is giving up?

20        A    Those were the words that were documented.

21        Q    And yet Child Protective Services does

22   absolutely nothing?

23        A    They did not remove the children.  The family

24   was voluntarily asked to seek relatives to help them out.

25        Q    2002.

```
 1        A     In May there was a case for neglectful
 2   supervision, which was found reason to believe.  So
 3   consequently they went to family preservation services
 4   that lasted several months.  One of the initial things
 5   that caused the first phone call was Gabriel was seen in
 6   the street chasing cars, and the two girls were being
 7   sexually active and that was concern.  Daniella was
 8   reportedly having sex with 20 and 30 year old men.  And
 9   Melissa, the daughter, was having sex with younger
10   neighbors that were anywhere from a year to two years
11   different than her age.  This is documented in the CPS
12   records.  Mrs. Lucio admits to drug use.
13        Q     But no drug testing?
14        A     Right.  The red color is what was in the record
15   by the case worker.  The more pinkish, purplish color is
16   the case reader's commentary about the case worker's work.
17        Q     Going to 2003 then.
18        A     There's a report where Mr. Alvarez is accused of
19   sexual abuse.  And what ends up happening is they do
20   interview Melissa, the daughter, and they interview the
21   other children.  And what they found is that the teenager
22   recanted.  She said that she was just angry, and that she
23   had said that Mr. Alvarez had sexually abused her and it
24   wasn't true, and that the bruise that she had on her arm
25   was from her boyfriend.  So she recanted.  And because she
```

1    recanted, that was closed.   The police did get involved.

2            The only time that you see the words

3    "physical abuse" used by Child Protective Services in

4    regards to Melissa Lucio, the mother, is when babies are

5    born positive for cocaine.   And this did happen during

6    this timeframe of 2003 with Sara.

7        Q    I noticed in here you've got a dotted line.   It

8    looks like a red dotted line from Melissa to Robert

9    Alvarez.   And then a darker, more frequent dotted line,

10   between the two of them.   What does that indicate?

11       A    The dark red lines are indicative of their being

12   violence, physical violence and emotional abuse in the

13   relationship.   The little dotted line is the drug

14   relationship.

15       Q    Now, is this violent and abusive relationship

16   between Melissa and Robert, is that documented in the

17   Child Protective Services file?

18       A    Yes, it is.

19       Q    And the drug relationship, is that reflected in

20   the Child Protective Services?

21       A    Yes, it is.   However, Melissa is not always the

22   one reporting it to CPS.   In fact, when it comes to

23   stating that Mr. Alvarez was physically abusive, it

24   generally would never be Melissa.   Again, that pattern of

25   not standing up for herself.   It was typically the

208

1    children.

2        Q    You have this red dotted line and the other

3    dotted line under it which shows the violent and drug

4    relationship, and you have that clear back to 1992 and

5    '96.  Now, Robert came on the scene again in '96.  So I'm

6    assuming that that is the period that we're talking about?

7        A    Right.

8        Q    So throughout the relationship between Melissa

9    and Robert Alvarez, it's been a drug relationship, as well

10    as a violent and abusive relationship?

11        A    Yes.  A lot of violent arguing also and

12    everything in front of the children.

13        Q    Now, Sara when she was born, she tested positive

14    for cocaine?

15        A    That is correct.

16        Q    When Adriana was born, did she test positive for

17    cocaine?

18        A    I didn't see that noted, so I didn't document

19    it.

20        Q    And when Sara was tested for -- positive for

21    cocaine, was Melissa tested positive for cocaine?

22        A    Yes.

23        Q    So we have now at least two children that have

24    tested positive for cocaine at birth?

25        A    That is correct.  And we know at this time from

1    CPS records that she was ordered to do substance abuse
2    sessions, but there was no annotation as to how much she
3    did and if she completed them.
4        Q    Going to '04, Mariah is born in September of
5    '04?
6        A    That is correct.
7        Q    What happens prior to Mariah's birth?
8        A    We have another open case for neglectful
9    supervision and physical neglect, which again were the
10   typical problems being found.   The case was closed without
11   any action taken.   And then Mariah was born.   There was
12   also a risk factor noted because Mariah was born positive.
13       Q    You have August of '04 risk indicated, Mariah
14   and Daniella.   What does that mean?
15       A    Yes.   What happened in '04, excuse me, in eight
16   of '04 there was a case where Daniella was found to be at
17   risk, and they were monitoring it.   But then Mariah was
18   born.   And when Mariah was born, she was born at home.   So
19   she wasn't drug tested.   But when they got her into the
20   hospital -- and I don't remember if it was two or three
21   days afterwards -- but in the CPA records it was either
22   two or three days afterwards that she was taken to the
23   hospital.   Then they drug tested Mariah, and she was found
24   to be positive for cocaine.   So they did a risk indicator
25   and they merge the two calls into one.

210

```
 1        Q    Daniella at this time is considerably older?
 2        A    Yes.
 3        Q    She is the oldest child and she is already 17;
 4   is she not?
 5        A    Right.  But they noted that she was at risk and
 6   there's no --
 7        Q    What does at risk mean?
 8        A    They have no explanation as to why they noted
 9   Daniella to be at risk.  This is also the time when CPS
10   notes in their notes that the boys are all sexually acting
11   out with each other, with typically Alexandria, and also
12   with neighbors.  The home was always dirty because the
13   children were always urinating on themselves, is what CPS
14   was saying.
15        Q    And we still see this drug relationship and
16   violent abusive relationship between Melissa and Robert
17   Alvarez?
18        A    That is correct.  And bruises were noted on the
19   children from them being aggressive with each other.
20        Q    Going to 2004 to 2005, Mariah is born in 2004 in
21   September?
22        A    Uh-huh.
23        Q    What is CPS doing?
24        A    Well, what we see here is, again, in January of
25   2004 the neglectful supervision.  We were seeing that
```

1    collaterals aren't being interviewed, which is a concern

2    for the case reader.  That the documentation didn't

3    include that they verified that the 911 call was really

4    made when Mariah was born.  And then the safety check that

5    wasn't done in Houston.

6        Q    The safety check?

7        A    Yes, the safety check.  When children are having

8    an open case in one region in Texas, and they move to a

9    different region in Texas, there is supposed to be a

10   safety check done out of courtesy by the Child Protective

11   Services workers in that region just to let the local

12   people know what is happening with the children.

13       Q    So when the older children were sent up to see

14   their father, the five older children to see Mr. Lucio in

15   Houston, nobody knows if they arrived or lived with him

16   and for how long?

17       A    According to the case reader, it says no

18   courtesy check done for children in Houston.

19       Q    So Child Protective Services down here just sort

20   of washed their hands of the older ones?

21       A    They did not ask for a courtesy check.  That's

22   correct.

23       Q    Now at this particular time we have the children

24   under foster care?

25       A    That is correct.

212

1          Q     And foster care parents are giving reports to
2     Child Protective Services?
3          A     That is correct.
4          Q     And Child Protective Services notes in their
5     records note what, about the foster care?
6          A     The records note that the foster parents are
7     talking about violent behaviors, aggressive behaviors
8     towards the other foster children, towards each other.
9     There's a lot sexualized behavior also between the
10    children and the foster children also.  The children are
11    difficult to discipline.  They are not accustomed to
12    structure.  It was during this timeframe also that the
13    supervised visits were split.
14         Q     Now, during this aggressive acting out that the
15    children had while they were with their foster parents,
16    the records indicate that -- or did you notice that the
17    records had indicated that the children were putting feces
18    on the walls and floors?
19         A     There was an annotation to that.  There was also
20    an annotation that the children would urinate on
21    themselves during the day, the younger children.  But that
22    all the children in care would urinate, would bed wet,
23    would urinate at night.
24         Q     Directing your attention to the next, 2006, this
25    is when Melissa Lucio receives her children back in

213

1    November of 2006.

2         A    Uh-huh.

3         Q    What is transpiring with Child Protective

4    Services?

5         A    Well, they had to open another case in December

6    of 2006 due to the unstable housing.  As I was saying

7    before, they were about to lose their apartment.

8    Mr. Alvarez was stealing furniture.  That was documented

9    by the CPS worker.  And again, the 18 year old John was

10   supposed to never go back into the home again.  The

11   neighbors were stating that he was in the home.  The

12   supervised visit were again split.

13              And this case had an annotation that it was

14   closed administratively because the adults tested negative

15   for cocaine.  And they gave them that monetary assistance

16   for the rent.

17        Q    So Child Protective Services brings the children

18   back November 21st just before Thanksgiving?

19        A    Yes.

20        Q    And then December before Christmas, I'm

21   assuming, they get this report and nothing is done?

22        A    They gave a rent subsidy and drug tested the

23   parents, and that was the extent of it.  And then the case

24   was closed.

25        Q    And there is still a violent relationship

1    between Melissa and Robert?

2         A    According to the CPS and the interviews of the

3    neighbors and the children, yes.

4         Q    Robert tested negative for drugs at that time in

5    early December?

6         A    Yes.  That is correct.

7         Q    Were any of the children interviewed, to your

8    knowledge, in December when Child Protective Services were

9    there?

10        A    I honestly don't recall.

11        Q    Did you ever remember seeing a drug test by

12   Child Protective Services on Saturday the 17th of

13   February, 2007?

14        A    No, I don't.

15        Q    Since Mariah's passing in February of 2007, to

16   your knowledge, has Melissa Lucio seen her children?

17        A    There have been visitations at the jail.

18        Q    And do you know how often she sees her children?

19        A    I believe it was scheduled to be weekly, but I

20   am not sure that they have been occurring weekly.

21        Q    Does that also include the fact that she gave

22   birth to twins --

23        A    Yes.

24        Q    -- in October of 2007?

25        A    Yes, that is correct.

1      Q     You've indicated in your -- through your

2    testimony and you talk about Melissa's kind of blank

3    stare.  Did you see this blankness reflected in the

4    audio -- or the video at the police station?

5      A     Yes.

6                MR. PADILLA:  Your Honor, I'm going to

7    object to that.  If we are going into a narrative, unless

8    I take her on voir dire on the issue of whether she's

9    qualified.

10               THE COURT:  Well, on the --

11               MR. PADILLA:  I just want to make sure

12   that -- I'm going to object to anything further in that

13   line of questioning.

14               MR. GILMAN:  I don't know what he is

15   objecting to, so I'm going to continue.

16     Q     (By Mr. Gilman) And this blank stare, did you

17   see this during that interview process?

18     A     Yes, I did.

19     Q     And is that blank stare the same type of blank

20   stare you saw at other times through other pictures?

21     A     Yes, it is.

22     Q     When people are -- have such a blank stare, does

23   that give you any kind of call for attention?

24     A     In clinical work we are trained that there are

25   certain --

1          MR. PADILLA:  Your Honor, can I reurge my

2     objection, Your Honor.  I think the Court knows exactly

3     where we're going.

4          THE COURT:  I am not going to make

5     preemptive rulings right now.

6          Q     (By Mr. Gilman) Go ahead, ma'am.

7          A     In clinical work we are taught and trained that

8     when we do social histories, that one of the things that

9     we look at is patterns of behavior.  And we look at the

10    behavior of the person sitting in front of us.  We try to

11    look at pictures that people can make available, videos

12    and whatever.  And one of the things that is very classic

13    with Mrs. Lucio is her consistency, whether it is in a

14    picture or a video.  And I did bring two examples.

15         Q     Can you show us those examples?

16         A     Yes.  We skipped that one.

17               This is the picture you have seen of her as

18    a child.  And there's a picture taken from the statement

19    DVD or the interview DVD that she did with the officers.

20    And you will see it's very similar posture, very similar

21    look on the face.

22               And then the next one.  And again, even

23    similarity of again posture and facial expression.  It's

24    very consistent through her whole lifetime.  It's nothing

25    that is present just from this moment in time.

1      Q    Okay.  So your records in interviewing her have

2   indicated that she has been abused from a young age and

3   this abuse has continued up until this time, this period?

4      A    That is correct, yes.

5      Q    And this appearance of Mrs. Lucio indicates that

6   she is still under abuse?

7      A    No.  It's just -- it's just a classic symptom of

8   individuals that are abused.

9      Q    If things happen, if a tragedy happens such as a

10  child dying is that something you would expect Mrs. Lucio

11  to get this blank stare?

12              MR. PADILLA:  I object.  It's speculative,

13  Your Honor.

14              THE COURT:  It's what she would expect.

15  Overruled.

16      Q    (By Mr. Gilman) Yes, ma'am.  You can answer.

17      A    Or I may answer?  Okay.  It fits with her

18  pattern.  It fits with her pattern.

19      Q    What do you mean?

20      A    Whether -- if you see pictures of Mrs. Lucio,

21  whether it's in a happy event or if it's during the ages

22  that she was being sexually abused, it's the similar

23  facial expressions, similar body language -- so she does

24  have a pattern if you look at her through the years.

25      Q    So it would not be surprising to you if I told

1    you that when EMS arrived to do whatever they had to do

2    with Mariah, Melissa was not hovering over the child?

3        A    That is correct.

4        Q    And that would be consistent with her background

5    and abuse that she had gone through?

6        A    That is correct.

7        Q    And this shrugging of the shoulders, this

8    closing down, is that typical of a battered wife, battered

9    woman?

10       A    Yes.  And also children who have been sexually

11   abused.

12              MR. PADILLA:  Your Honor, I object.  Again,

13   she's not answering the question.  That requires a yes or

14   no response to the question.  She likes to add additional

15   rhetoric.  To her responses, I'm objecting, because she's

16   going pass the question asked, and I would ask that the

17   witness be instructed to answer the question with a "yes"

18   or "no" answer.

19              THE COURT:  Overruled.

20              MR. PADILLA:  Thank you, Your Honor.

21       Q    (By Mr. Gilman) Are you familiar with the

22   battered woman syndrome?

23       A    Yes.

24       Q    Could you explain to the Court what battered

25   woman syndrome is, or to the jury?

219

1    A    There is a lot of research that's been done on

2  the type of personality attributes, emotional reactions

3  and body language that women will typically display if

4  they're in an abusive relationships.  And the research has

5  been around for many, many years.  Mrs. Lucio in my

6  opinion does fit that profile.

7                  THE COURT:  Move on, Mr. Gilman.

8                  MR. GILMAN:  Thank you, sir.  Pass the

9  witness.

10                  **CROSS-EXAMINATION**

11  **BY MR. PADILLA:**

12    Q    Good afternoon, Mrs. Villanueva.

13    A    Good afternoon.

14    Q    I will be asking you certain questions.  If you

15  don't understand, please advise me because we are going to

16  assume that your response is responsive to my question,

17  okay?

18    A    Yes.

19    Q    Furthermore, sometimes I mumble.  If I do, let

20  me know and I will try to mumble more clearly, okay?

21    A    Sounds fine.

22    Q    Ma'am, first and foremost, have you read -- have

23  you prepared a written report consistent with your

24  representations you have made to this jury here today?

25    A    No, I have not.

```
 1        Q     Why not?

 2        A     My testimony has been done in a PowerPoint

 3   presentation that you see before you.

 4        Q     Do you have any personal notes that you have

 5   available that you took while interviewing the alleged

 6   individuals to come up with your opinions?

 7        A     Yes, I do.

 8        Q     Do you have them with you?

 9        A     No, I do not.

10        Q     Why not?

11        A     My testimony was prepared on a PowerPoint.

12        Q     Okay.  I suspect that we will be here this

13   afternoon and part of tomorrow.  Can you bring those with

14   you tomorrow?

15        A     Yes, I may.

16        Q     Okay.  Now, ma'am, first and foremost, you met

17   Melissa Lucio on three occasions, correct?

18        A     That is correct.

19        Q     Okay.  And I would assume that the first meeting

20   would have been on or about March 7th when you were first

21   retained, correct?

22        A     Yes, sir.

23        Q     And how long did the first meeting take?

24        A     About an hour.

25        Q     How long did the second meeting take?
```

221

```
 1          A     That one was closer to about three.
 2          Q     And the third meeting?
 3          A     The same, sir.
 4          Q     And you interviewed her two sisters and her
 5    mother, correct?
 6          A     That is correct.
 7          Q     And what other -- let me ask you this:  Did you
 8    interview any of the law enforcement officers that were
 9    involved in the investigation of the death of Mariah
10    Alvarez?
11          A     No, I did not.
12          Q     Did you review their reports?
13          A     I reviewed one report, sir.
14          Q     And as a trained professional to give an
15    opinion, wouldn't the surrounding circumstances of the
16    death of Mariah Alvarez be important to you, yes or no?
17          A     That's difficult to answer "yes" or "no" to,
18    sir.
19          Q     Okay.  Well, everything you do is not in a
20    vacuum, correct?
21          A     That is correct.
22          Q     And your responsibility -- let me ask you this:
23    You've been retained you said by Mr. Gilman, correct?
24          A     That is correct.
25          Q     And how much are you being paid for your
```

222

```
1    testimony here?
2         A    So far nothing, sir.
3         Q    What are you going to bill Cameron County for
4    your services here today?
5         A    I bill my regular clinical hourly fee.
6         Q    How much do you charge for a clinical hour,
7    Mrs. Villanueva?
8         A    Eighty-five dollars.
9         Q    How much do you estimate you will bill Cameron
10   County for the work you have been involved in this case?
11   How many hours have you put into it?
12        A    Total?
13        Q    Yes, ma'am.
14        A    I don't have my bills with me, but we're looking
15   at easily seven, -- $8,000.
16        Q    Okay.  And those are paid by Cameron County,
17   correct?
18        A    That is correct.
19        Q    I'll talk faster to get you out of here early.
20             Ma'am, in reference to the documents that
21   you reviewed, what documents, if any, did you review
22   concerning this case?
23        A    I reviewed all of the CPS records.
24        Q    Let me ask you this:  Where did you acquire
25   those CPS records from?
```

1        A       From Mr. Gilman.

2        Q       You didn't have any independent acquisition of

3    any other documents, correct, other than what Mr. Gilman

4    gave you?

5        A       That is correct.

6        Q       How much time did that take you to review?

7        A       Again, I'm going to guestimate because I don't

8    have my bill in front of me, but we're looking at well

9    over 30, 35 hours.

10       Q       And it involved what, about two large boxes of

11   documents provided to you?

12       A       Yes, approximately.

13       Q       And all you did in your endeavor was to look

14   through those documents and prepare a PowerPoint, correct?

15       A       No.   There were also quite a few summaries.

16       Q       Okay.   Summaries by whom?

17       A       By myself.

18       Q       Did you, yourself, personally contact any of the

19   workers who worked on the case and prepared the reports?

20       A       No, I did not.

21       Q       Why not?

22       A       Because that is not customary.

23       Q       Well, I mean, you left the impression on the

24   jury that CPS, you know, some of the entities seem to be

25   nonresponsive or you didn't know what they meant.   What

224

1   prohibited you from picking up the phone, calling a worker

2   and say:  You know what, I've got a report here on

3   January 22, 2005 where you made an entry.  I'm confused.

4   What does it mean?

5       A    I was going by the case reader's evaluation of

6   their work.

7       Q    But why didn't you call?  You've already

8   testified that there was some areas that you didn't

9   believe -- or you didn't know what they meant.  Why didn't

10  you pick up the phone and call --

11      A    I don't believe I said that, sir.

12      Q    You didn't say that?

13      A    I don't believe I said that.  I said that there

14  were instances in which it was not clear, and the case

15  worker and the -- excuse me, the case reader was

16  questioning things.

17      Q    Okay.  And if something is not clear, how do you

18  make it clearer?

19      A    I don't have access to the case reader.

20      Q    Isn't the name of the case reader available to

21  you in the file?

22      A    No.

23      Q    It's not?

24      A    It was blacked out.

25      Q    Okay.  Did you ever ask Mr. Gilman to request

1    the Court to provide the name of that reader?

2         A    No, I did not.

3         Q    Now, did you have an opportunity, ma'am, to

4    review what are entitled:  "Confidential Treatment

5    Progress Notes"?

6         A    Yes, some.

7                   MR. PADILLA:  May I approach the witness,

8    Your Honor?

9                   THE COURT:  Yes, sir.

10        Q    (By Mr. Padilla) Ma'am, it's been your testimony

11   here today -- it appears from what I've been able to

12   derive from your testimony is, first and foremost, you

13   blame Mrs. Lucio's condition to sexual abuse, correct, at

14   an early inception, correct?

15        A    That's what started things, yes.

16        Q    Have you seen this confidential treatment

17   progress report?

18        A    I don't recall seeing this one.  I'm sorry.

19        Q    Okay.  Well, is this the type of document that

20   is normally prepared, you know, by CPS or the persons that

21   are contracted to work with CPS?

22        A    Contractors are supposed to supply reports, yes.

23        Q    Okay.  And if this was part of the documents

24   that were delivered to Mr. Gilman, is it your testimony

25   here under oath today that this document was never

226

```
1    provided to you or you've just never seen it period?

2         A    Sir, I am telling you I don't recall.

3         Q    Okay.  Well, let me ask you if you recall this.

4    I am going to draw your attention to a portion -- a

5    portion of the report that says subjective.

6         A    Uh-huh.

7         Q    And this is a report, again, that appears to be

8    done on Melissa A. Lucio, correct?

9         A    That is correct.

10        Q    And --

11             MR. GILMAN:  Are we going to mark this,

12   Judge, if we are going to be testifying from the document?

13             MR. PADILLA:  Judge, I've got a clean copy.

14             THE COURT:  Are you offering it into

15   evidence?

16             MR. PADILLA:  I've got a clean copy, Judge.

17   Mine is marked, but I will get a clean copy.  I will have

18   Mr. Gilman look at my marked copy before we introduce it.

19   Judge, I need to get a copy that is not marked.  I will

20   mark this as State's Exhibit --

21             MR. GILMAN:  Judge, I'm sorry, but I don't

22   ever remember seeing it.  With all of the documents that I

23   have, I can't sit here and tell this Court that I've never

24   received it.  I don't remember seeing it.

25             THE COURT:  I understand.
```

1          MR. PADILLA:  Judge, let me introduce it

2    later.  I'm just going to -- I'll get a copy, a clean

3    copy.

4          THE COURT:  We will deal with that issue

5    later.

6      Q    (By Mr. Padilla) Would it surprise you, ma'am,

7    that Mrs. Lucio -- if Mrs. Lucio made a statement to the

8    effect that she had never been subjected to any physical

9    or sexual abuse, would that surprise you?

10     A    No.

11     Q    And if she were to make such a statement in

12   March of 2007, that in and of itself would not be

13   surprising to you?

14     A    True.

15     Q    Why would she tell you one thing and tell a

16   therapist another?

17     A    That's very typical behavior of an individual

18   with this past, just the same as she would not admit to

19   the CPS workers that, in fact, she was being a victim of

20   domestic violence.  Neighbors and the children would tell

21   them.  That's very typical behavior.

22     Q    So what you're telling me is everything she told

23   CPS may have all been a lie, correct?

24     A    No, it's not a lie.

25     Q    Well, if you're telling me that Mrs. Lucio will

228

1  lie about anything because she has some condition in her

2  mind or in her background, I mean, then we really don't

3  know whether the information you've provided up here is

4  true or untrue; isn't that correct?

5       A    That's incorrect.

6       Q    Okay.  Did you have an opportunity, ma'am, to --

7  you said you interviewed family members.  Did you have an

8  opportunity to interview Mr. Lucio?

9       A    No.

10      Q    Why not?

11      A    Primary reason, I needed a lot more time.

12      Q    But Mr. Lucio could have provided some

13 verification to some of the allegations made by Mrs.

14 Lucio, and could also substantiate your -- all of the

15 other matters that you testified to here today concerning

16 her relationship with Mr. Lucio, that Mr. Lucio was an

17 abusive person, that Mr. Lucio did this, and Mr. Lucio did

18 that, how could you make those statements without speaking

19 to Mr. Lucio?

20      A    Collaterals.

21      Q    What's a collateral, ma'am?

22      A    The collaterals are all the other people that

23 you interview.  When there's consistency between all of

24 the collaterals, it's just basic interviewing.

25      Q    Are police officers collaterals?

```
 1        A    Yes, but they are not often available --
 2        Q    Are they good collaterals?
 3        A    Not often good for social history.
 4        Q    They're here to offer what, ma'am?  An excuse
 5   for what Mrs. Lucio did?
 6        A    No, it's not an excuse.
 7        Q    Well, that's what it appears like.  You haven't
 8   interviewed Mr. Lucio.  Did you interview Mr. Alvarez?
 9        A    No, I did not.
10        Q    Then how can you draw an opinion and state that
11   Mr. Alvarez is the reason Mrs. Lucio is the way she is,
12   when you have not even interviewed Mr. Alvarez?
13        A    We had the opportunity presented to us and it
14   was withdrawn.
15        Q    Then why not make a statement to the effect:
16   You know what, I haven't interviewed Mr. Lucio, so I
17   really don't know what the involvement of Mr. Lucio and
18   Mrs. Lucio -- sorry, Mr. Alvarez and Mrs. Lucio.  I mean,
19   you made it seem like that you have interviewed
20   Mr. Alvarez.  Mr. Alvarez is the culprit.  Mr. Alvarez is
21   the guilty person.  Mr. Alvarez is the accuser.  He's
22   abusive.  He has battered this woman, but you've never
23   even spoken to him; isn't that correct?
24        A    There's a lot of collateral information and
25   interviews that were corroborated by Child Protective
```

1   Services, that that is in fact what was occurring.

2       Q    Ma'am, isn't it true that you only saw the

3   reports you wanted to see and you only interviewed the

4   people you interviewed because you were going to slant

5   your representations here today?  Isn't that true?

6       A    Not only is that untrue, I resent my

7   professionalism being attacked and my ethics.

8       Q    Ma'am, how many documents from CPS did you

9   review?  Again, do you remember the numbers?

10      A    I don't remember the exact number, of course

11  not.

12      Q    But your notes tomorrow will reflect to us all

13  the documents you reviewed, correct?  Because you took

14  notes when you were reviewing those documents.

15      A    There are summaries.

16      Q    All right.  Now, did you -- how many of the

17  children did you personally interview?

18      A    None.

19      Q    Don't you think it's important, Mrs. Villanueva,

20  to -- before you can sit here and attempt to blame CPS for

21  the death of Mariah Alvarez that you have an opportunity

22  to interview the children, to ascertain whether their

23  representations being made in those folders is true or not

24  true?

25      A    Mr. Padilla, if you are doubting my testimony,

 1    you are doubting CPS's records --

 2                   MR. PADILLA:  Your Honor, I'm going to

 3    object as being nonresponsive.

 4                   THE COURT:  Answer the question,

 5    Mrs. Villanueva.

 6                   THE WITNESS:  Could you ask it again, then?

 7         Q    (By Mr. Padilla) Ma'am, if you are going to come

 8    in here and give an opinion concerning not only the death

 9    of Mariah Alvarez, the alleged psychological disability of

10    the children, the instability of the household, the lack

11    of money, and how these actions have affected Mrs. Lucio

12    and the children, why not interview the children?

13         A    It was well documented in CPS records and

14    verified by CPS employees.

15         Q    And it's your testimony -- you are a social

16    worker, right?

17         A    Yes, I am.

18         Q    As a social worker you don't think you could

19    have gotten valuable, reliable information from the

20    children that you could have added to what CPS had

21    provided?

22         A    Give me three more months, yes.

23         Q    Okay.  So what you're telling us, then, is you

24    didn't have enough time to complete your study and

25    complete your report.  Is that correct?

232

```
 1        A    What I am telling you, sir, is that my

 2   information that I am basing this testimony on has very

 3   little to do with my opinion.  It has to do with what has

 4   been documented and verified in formal state records by

 5   state employees.  If you do not trust that information,

 6   then perhaps someone else should be on the stand.

 7             MR. PADILLA:  Your Honor, I'm going to

 8   object to the response.

 9             MR. GILMAN:  Judge, he is not allowing her

10   to finish.  If he wants to let her finish --

11             THE COURT:  She's not answering the

12   question.  Answer the question, Mrs. Villanueva.

13        Q    (By Mr. Padilla) Ma'am, again, it was your job

14   to compile CPS records.  Were you hired to look into the

15   background of Mrs. Lucio, her family, her environment and

16   everything else that she did?

17        A    Both.

18        Q    Okay.  Then why didn't you interview the family?

19        A    I did to a certain extent.

20        Q    Okay.  You interviewed her sisters, two sisters

21   and her mother, right?

22        A    Correct.

23        Q    Okay.  No contact with any of the other -- any

24   of the CPS personnel, correct?

25        A    That is correct.
```

233

1     Q     No contact with anybody involved who

2     investigated the death of Mariah Alvarez, correct?

3     A     That is correct.

4     Q     No investigation of anybody else, any of the

5     police officers who were involved in the investigation of

6     the death of Mariah Alvarez, correct?

7     A     That is correct.

8     Q     No discussions with any of the EMS technicians

9     that were at the scene when the child was alone and was

10    removed from the house and already deceased.  You didn't

11    talk to them either?

12    A     That is correct.  I am not a private

13    investigator.

14    Q     Ma'am, but you're giving opinions as if you

15    were.

16    A     No.  I'm giving opinions on social history and

17    CPS records.

18    Q     Let's continue, ma'am.  What is the purpose of

19    you preparing a social history?

20    A     The purpose of preparing a social history is to

21    give background information on the client that can be

22    corroborated by records, and that is what I did.  Number

23    one.

24          Number two, the second purpose is outlined

25    by the Supreme Court of the United States is to humanize

Adelaido Flores, Jr.
Certified Shorthand Reporter

234

```
 1    the defendant.   Number three --
 2         Q    Let's stop there.   I'll allow you to get to
 3    number three.   So it's your testimony because somebody is
 4    charged --
 5                   MR. PADILLA:   May I approach the witness,
 6    Your Honor?
 7                   THE COURT:   Yes, sir.
 8         Q    (By Mr. Padilla) The State of Texas is here to
 9    protect the interest of Mary Alvarez.   Okay?
10         A    Mariah.
11         Q    Mariah.   Okay.   Ma'am, I don't know if you have
12    seen this --
13         A    Actually, I have seen all the autopsy pictures,
14    sir.
15         Q    Okay.   Well, good, I just want to make sure that
16    we are talking about the right person.
17         A    We absolutely are.
18         Q    Okay.   Good.   I mean, I hate to be talking about
19    somebody else.   All right.   Give me number three now.
20    We're are at three.
21         A    And the third purpose is to be able to talk
22    about a person's emotional makeup as seen by their social
23    history.
24         Q    Okay.   So we can humanize Mrs. Lucio by
25    convicting her of intentionally and knowingly murdering
```

235

1    her own child.  Is that your position?

2         A    That's not my position at all.

3         Q    Well, you just testified that the State of

4    Texas, that you know -- is it your opinion, ma'am, that

5    the State of Texas through the Cameron County District

6    Attorney's Office has attempted dehumanize Mrs. Lucio?

7         A    No, I didn't say that.

8         Q    Any information derived concerning that point,

9    would be moot, okay?  How much time did you spend talking

10   to Mrs. Lucio's mother?

11        A    Approximately, five and a half hours.

12        Q    And from the information she gave you, what

13   action, if any, did you take to verify any of the

14   information she may have given you?

15        A    It was corroborated by the daughters and also

16   some of the CPS records.

17        Q    That's not the answer to the question, ma'am.

18   What action, if any, did you take concerning the

19   verification of anything the mother may have told you?

20        A    I did answer the question.  The actions taken

21   were it coincided with what was in the CPS records and I

22   also --

23                   MR. PADILLA:  Your Honor --

24                   THE COURT:  Just a minute.  Just a minute.

25   Stop it.  When I am talking, everybody stops.  The

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    question was:  What actions did you take?  That was the

2    question, Mrs. Villanueva.

3                      THE WITNESS:  I interviewed collateral --

4                      THE COURT:  Hold on.  Hold on.  We're going

5    to break early for the day.  Tomorrow morning we're

6    starting at 9:00 o'clock.  Keep the questions clear.  Keep

7    the answers to the questions only clear, and let's try and

8    come back with just an attitude of asking questions and

9    answering them.  We'll see you tomorrow morning at 9:00.

10                     I will remind you about your obligations.

11   You have instructions not to talk to anybody, not to read

12   any newspapers, and not to let anybody talk to you.  Don't

13   listen to TV.  Don't listen to radio.  If anybody starts

14   talking about the case in front of you, walk away.  We

15   will see you tomorrow morning at 9:00.

16                     Thank you very much.

17                     **(Recess from 4:50 p.m. till 9:00 a.m. July**

18                     **10, 2008)**

19

20

21

22

23

24

25

Adelaido Flores, Jr.
Certified Shorthand Reporter

237

1  THE STATE OF TEXAS:

2  COUNTY OF CAMERON:

3              CERTIFICATE OF COURT REPORTER

4      I, ADELAIDO FLORES, JR, Official Court Reporter in

5  and ior the 138th Judicial District Court of Cameron

6  County, State of Texas, do hereby certify that the above

7  and foregoing contains a true and correct transcription of

8  all portions of evidence and other proceedings requested

9  in writing by counsel for the parties to be included in

10 this volume of the Reporter's Record, in the

11 above-entitled and numbered cause, all of which occurred

12 in open court or in chambers and were reported by me.

13     I further certify that this Reporter's Record of the

14 proceedings truly and correctly reflects the exhibits, if

15 any, admitted by the respective parties.

16     WITNESS MY OFFICIAL HAND on this the 14th day of

17 August, 2008.

18                                      

   ADELAIDO FLORES, JR.,, Texas CSR
19    Official Court Reporter
   138th District Court
20    974 East Harrison Street
   Brownsville, Texas 78520
21    (956) 550-1489
   Certificate No. 1117
22    Expiration Date: 12/31/08

23

24

25

Adelaido Flores, Jr.
Certified Shorthand Reporter