*16020*

1

| | |
|---|---|
| 1 | **REPORTER'S RECORD** |
| 2 | **VOLUME 38 OF 44 VOLUMES** |
| 3 | **TRIAL COURT CAUSE NO. 07-CR-885-B** |
| 4 | - - - - - - - - - - - - - x |
| 5 | STATE OF TEXAS              :  IN THE DISTRICT COURT |
| 6 | VS                         :  138TH JUDICIAL DISTRICT |
| 7 | MARIA ELIZABETH LUCIO      :  CAMERON COUNTY, TEXAS |
| 8 | - - - - - - - - - - - - - x |
| 9 | |
| 10 | **JURY TRIAL - PUNISHMENT PHASE - DAY 7** |
| 11 | On the **10th day of July, 2008,** the following |
| 12 | proceedings came on to be heard in the above-entitled and |
| 13 | numbered cause before the Honorable **ARTURO C. NELSON,** |
| 14 | Judge Presiding, and a petit jury, held in Brownsville, |
| 15 | Cameron County, Texas. |
| 16 | Proceedings reported by computerized stenotype |
| 17 | machine. |

**FILED IN**
**COURT OF CRIMINAL APPEALS**

AUG 0 6 2009

**Louise Pearson, Clerk**

# ORIGINAL

Adelaido Flores, Jr.
Certified Shorthand Reporter

2

```
 1              A P P E A R A N C E S

 2   APPEARING FOR THE STATE:

 3       HON. ARMANDO VILLALOBOS
         State Bar No. 00788584
 4       Criminal District Attorney for Cameron County
         - AND -
 5       HON. ALFREDO PADILLA, JR.
         State Bar No. 15404600
 6       & HON. JOSEPH KRIPPEL
         State Bar No. 24007515
 7       & HON. MARIA DE FORD
         State Bar No. 24043626
 8       Assistants to the Criminal District Attorney
         Cameron County Courthouse
 9       974 E. Harrison Street
         Brownsville, Texas  78520
10       Telephone:  (956) 544-0849
         Fax:  (956) 544-0869
11

12   APPEARING FOR THE DEFENDANT:

13       HON. PETE GILMAN
         State Bar No. 07952500
14       6933 N. Expresway
         Olmito, Texas  78575
15       Telephone:  (956) 350-6954
         Fax:  (956) 350-8056
16

17   APPEARING FOR THE DEFENDANT:

18       HON. ADOLFO E. CORDOVA, JR.
         State Bar No. 00787286
19       Law Office of Adolfo E. Cordova, Jr.
         711 North Sam Houston
20       San Benito, Texas  78586
         Telephone:  (956) 399-1299
21       Fax:  (956) 399-4484

22

23

24

25
```

```
 1                        VOLUME 38

 2    CHRONOLOGICAL INDEX - JURY TRIAL - PUNISHMENT (CONT'D)

 3    7/10/08                              PAGE    VOL

 4

 5    DEFENDANT'S WITNESSES:   (PUNISHMENT PHASE - CONTINUED)

 6    NAME                DX    CX    RDX   RCX   VDX    VOL

 7    Norma Villanueva           3    55    57           38
      Pinkerman, John E.   60
 8    John E. Pinkerman         81   133   135           38

 9    Discussion/Charge                          108     38

10    John E. Pinkerman              136                 38

11    Both sides closed                          137     38

12    Closing Arguments by MRS. DE FORD          142     38

13

14    Closing Arguments by MR. CORDOVA           148     38

15

16    Closing Arguments by MR. GILMAN            151     38

17

18    Closing Arguments by MR. PADILLA           158     38

19

20    Closing Arguments by MR. VILLALOBOS        168     38

21

22    Jury's Verdict                             173     38

23

24    Adjournment                                177     38

25    Certificate of Court Reporter             178     38
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1                    ALPHABETICAL WITNESS INDEX
                                                  VOIR
 2     NAME                   DX    CX    RDX   RCX   DIRE    VOL

 3     Pinkerman, John E.    60    81    133   135           38
       Pinkerman, John E.                136                 38
 4     Villanueva, Norma            3     55    57           38

 5                       INDEX OF EXHIBITS

 6     STATE'S EXHIBITS:

 7     NO.   DESCRIPTION            OFFERED    RECEIVED    VOL

 8     44    Therapy Notes            25
       45    Pinkerman's Report      114        114        38
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1                     P R O C E E D I N G S
 2              THE COURT:  Let's bring the jury in.
 3              THE BAILIFF:  All rise for the jury.
 4              (Jury present, defendant present at 9:05
 5              a.m.)
 6              THE COURT:  Again, I remind you if you need
 7    a break or whatever, make a sign and let me know or tell
 8    the bailiff.  No problem.
 9              This is Case Number 07-CR-885-B, State of
10    Texas versus Melissa Elizabeth Lucio.  Let the record
11    reflect that the defendant is present along with her two
12    counsel, and the State is being represented by Mr.
13    Villalobos and Mrs. De Ford.
14              Mr. Padilla, would you continue with your
15    cross-examination.
16                     CROSS-EXAMINATION
17    BY MR. PADILLA:
18              MR. PADILLA:  Thank you, Your Honor.
19         Q    Good morning, Mrs. Villanueva.
20         A    Good morning.
21         Q    You are the same witness who was testifying here
22    yesterday, correct?
23         A    Pardon me, sir?
24         Q    You're the same Ms. Villanueva who was
25    testifying here yesterday?
```

4

```
 1        A     Mrs. Villanueva, yes, sir.

 2        Q     Mrs. Villanueva, if I raised my voice to you

 3   yesterday, I apologize for doing that.  No intent to -- if

 4   you felt like I was attacking your professional

 5   evaluations, I'm not.  What I am attempting to derive is

 6   the methodology that you use in normally making your

 7   opinion, okay?

 8                  Now, maybe to start off, let's go back a

 9   little bit.  You were retained by Mr. Gilman, correct?

10        A     Correct.

11        Q     And that was in March of this year, correct?

12        A     Correct.

13        Q     Do you recall that date?

14        A     No, sir, I don't.

15        Q     And you were retained for what purpose?

16        A     I was retained to do mitigation, which included

17   social history, reviewing CPS records and trying to

18   identify patterns of behaviors for Mrs. Lucio.

19        Q     And the result, to the blameworthiness in this

20   case; is that correct?

21        A     I was not instructed at all to make judgments

22   about the innocence or guilt, sir.

23        Q     Well, how long have you been a mitigation

24   expert?

25        A     Since 1996.
```

1      Q    And how many mitigation trials have you ever
2  testified in?
3      A    Testified in?  Between ten, maybe 11.
4      Q    Is there ever a case that you have been retained
5  where, after reviewing all of the facts which you
6  perceived to be the necessary facts and circumstances, you
7  were unable to draw or prepare a report or an opinion
8  concerning your client?
9      A    I do not always prepare reports.  That depends
10  on the attorneys request.  Opinions -- I just usually
11  state the facts the way I see them rather than opinions,
12  sir.
13      Q    In this case I know we went into certain areas
14  yesterday that we were possibly discussing when we broke,
15  and correct me if I'm wrong, but you interviewed the
16  defendant Melissa Lucio, correct?
17      A    Correct.
18      Q    For about six hours in total, correct?
19      A    Approximately.
20      Q    All right.  And did you discuss the facts with
21  her in the case?
22      A    Actually, no.  On one occasion I asked her to
23  give me how she recalled that date but not the rest of
24  facts.  Not at all.
25      Q    Did you believe that that was strange, that she

1  didn't want to discuss the facts with you?

2      A    Absolutely not.

3      Q    When you were there, were you not -- when you

4  first interviewed her you identified yourself as somebody

5  that was hired by Mr. Gilman I would assume to assist in

6  her defense, correct?

7      A    That is correct.

8      Q    Did she at any time during that first interview,

9  second interview or third interview, did she ever discuss

10  the facts of the incident with you?

11      A    Yes, she did.

12      Q    Now, after that, you discussed the case then

13  with her mother, correct, and her two sisters?

14      A    I did not discuss the case with them.  I

15  discussed the social history with them.

16      Q    At any time in your conversations with her

17  mother, did you ask her if they thought that she was

18  capable of killing her child?

19      A    No.

20      Q    When you met the sisters, did you at any time

21  ask them their opinion concerning whether or not Ms. Lucio

22  was capable of killing her child?

23      A    I did not ask them.  I was given the

24  information.

25      Q    The information by whom?

Adelaido Flores, Jr.
Certified Shorthand Reporter

1      A      The sisters and the mother.  I did not ask them.

2 They volunteered the comments.

3      Q      And at that time, did you ask them what they

4 formed their opinion on?

5      A      Yes, I did.

6      Q      And did you include those findings -- well, you

7 prepared no original report, correct?

8      A      That is correct.

9      Q      After you discussed the facts with the two

10 sisters, with whom -- or what other individuals did you

11 discuss Mrs. Lucio's predicament, Mrs. Lucio's prior

12 history, who else?

13      A      With the legal team.

14      Q      And if I state -- correct me if I'm wrong, and I

15 think we covered this already, but you never met with

16 Mr. Lucio, correct?

17      A      That is correct.

18      Q      Mr. Lucio, according to your investigation and

19 discussions with Melissa Lucio and her mother and two

20 sisters, had identified him as being an abusive person,

21 correct?

22      A      And the CPS records also, sir.

23      Q      Well, what, if anything, did you personally do

24 to ascertain any of the facts derived from CPS or from the

25 statements made by Mrs. Lucio's mother and two sisters?

8

1        A    My interviews were with Mrs. Lucio, the sisters
2    and the mother.
3        Q    Did you go down to the police department and
4    attempt to locate any police records that would have
5    indicated that criminal charges have been filed by
6    Mrs. Lucio against Mr. Lucio for battery, for assaults,
7    for terroristic threats or anything of that nature?
8        A    Sir, I didn't go to the police department, but I
9    did do a -- I may not use the proper terminology, but the
10   State of Texas website check.
11       Q    In the website, how many instances of abuse
12   against Mrs. Lucio did you find?
13       A    I did not find any, sir.
14       Q    Would you surmise, then, in your experience that
15   there was never any charges filed against Mr. Lucio,
16   correct?
17       A    As far as I could find, no, sir.
18       Q    Did you go in the same website and attempt to
19   locate individuals, possible acts of violence against
20   Mrs. Lucio concerning Mr. Robert Alvarez?
21       A    I didn't make that attempt, sir.
22       Q    What, if anything, did you find?
23       A    I did not find anything, sir.
24       Q    What did that lead you to believe?
25       A    That she never filed reports.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    Q    Did you, then -- after you had that information

2 and had it available to you, did you ever contact any of

3 the landlords where Mrs. Lucio lived during the time that

4 she resided with Mr. Lucio and Mr. Alvarez?

5    A    I did not.

6    Q    Do you think that maybe that might have been

7 something that you could have used in an effort to

8 ascertain whether the assaults, if they happened, may have

9 happened?

10    A    We had some eyewitness reports in the CPS

11 records.  Excuse me.  We had some eyewitness reports in

12 the CPS records.  And all the stories match between the

13 CPS records, what their investigators found, what the

14 family was telling me and what Mrs. Lucio was telling me.

15 It all matched.

16    Q    You were not limited, were you, ma'am, to the

17 amount of time or the money you could spend to investigate

18 this case, were you?

19    A    The time limit came simply because of the timing

20 of the trial, sir.

21    Q    Well, if it's your job to be thorough -- and

22 that is your job, correct?

23    A    It's my job to do the best I can with the time

24 and opportunities that I'm given, yes, sir.

25    Q    You're sitting here today testifying trying to

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1    make light of the fact that Mrs. Lucio acted in the way

 2    she did because she was sexually assaulted as a child and

 3    because she is a battered woman; isn't that correct?

 4         A    I don't believe I've made that phrase or that

 5    comment, sir.

 6         Q    Then you have no opinion at all concerning why

 7    Mrs. Lucio may have killed her child; is that correct?

 8         A    I have an opinion, but I haven't been asked what

 9    that opinion is.  I've been stating only facts that are

10    corroborated by CPS investigative records.

11         Q    In fact you testified here yesterday afternoon

12    that you're an expert in body language, correct?

13         A    I didn't say that, sir.

14         Q    Well, I mean, you made the assertion to the

15    ladies and gentlemen of the jury that just by looking at

16    photographs of how a body is seated --

17         A    I stated that there was a --

18         Q    Answer the question when I finish, okay, ma'am?

19         A    Yes, sir.

20         Q    I will give you the opportunity to answer.

21              You testified here yesterday that by

22    looking at a photograph that is about 33 years old, by

23    looking at a picture of the defendant which was

24    interviewed a year and a half ago that you could draw an

25    opinion that she was submissive.  Furthermore, you went on
```

1    to state that the reason why she was that way was because

2    of the alleged sexual assaults and the alleged domestic

3    violence against her.  Did you or did you not say that?

4        A    I said if one looks at the pictures and you look

5    at the patterns of behaviors, that the way that she used

6    her body and her facial expressions utilized in the

7    interrogation video, and the statement video were similar

8    to her habits of the past, that it was not a new behavior.

9    That's what I stated yesterday.

10       Q    And what happened in the past would have

11   included cocaine abuse?

12       A    That is correct.

13       Q    Would have included assault and behavior between

14   herself and her significant other, correct?

15       A    That is correct.  Yes.

16       Q    Would have included also assaults on the

17   children?

18       A    Incorrect.  I never stated that nor found proof

19   of that.

20       Q    Did you ever contact an individual by the name

21   of Janet Thompson --

22       A    No, sir.

23       Q    -- who was the neighbor of Mrs. Lucio?

24       A    No, sir.

25       Q    Did you contact any neighbors of Mrs. Lucio at

12

1    all?

2         A    No, sir.

3         Q    Again, would that not have been an important

4    fact in determining what your opinion, if any, you had

5    concerning the issue that you are testifying here today?

6         A    It would have been helpful, yes, sir.

7         Q    So am I true in understanding, ma'am, that you

8    have drawn an opinion in this case without really going

9    outside of the CPS records and your conversation with

10   Mrs. Lucio, correct?  Yes or no?

11        A    Would I -- I can't answer that with a yes or no

12   answer, sir.

13        Q    Let me hear your response.

14        A    My response is simply that with the time given,

15   I did due diligence first in looking at the official

16   records, which is the first phase of litigation.  Then you

17   corroborate with family and the defendant.  And then you

18   go on to other collaterals.  I simply ran out of time.  I

19   got to do the first two phases, and I did them to the best

20   of my ability.  And then the trial started and time ran

21   out.  But everything I have testified to, Mr. Padilla, in

22   the records, has been investigated by CPS.  The truth

23   cannot be truth for you and not for me because it's the

24   same records and I have not misquoted the records.

25        Q    I haven't drawn an opinion.  You have.  The

Adelaido Flores, Jr.
Certified Shorthand Reporter

13

1   evidence is -- the evidence, ma'am, is as follows --

2       A    And I have stated only the facts.

3           MR. PADILLA:   Judge, can we ask her to

4   answer the questions?

5           THE COURT:   You all are starting to argue

6   with each other again.

7           THE WITNESS:   Okay.

8           THE COURT:   Mrs. Villanueva, answer only

9   the question.

10          THE WITNESS:   Yes, sir.

11          THE COURT:   Don't instruct the jury,

12  Mr. Padilla.   That's the Court's providence.

13          MR. PADILLA:   My apologies to the Court,

14  Your Honor.   I meant no disrespect to this Court.

15          THE COURT:   Proceed.

16      Q    (By Mr. Padilla) Mrs. Villanueva, if there is

17  evidence to the fact that this defendant, Melissa Lucio,

18  has threatened and had physically assaulted her children,

19  would that change your opinion in this case?

20      A    I would need to see those facts, sir.

21      Q    If there's evidence on the record that

22  Mrs. Lucio is aggressive and starts fights at the jail,

23  would that be something that would change your opinion?

24      A    I would like to see that.

25          THE COURT:   Mrs. Villanueva, answer the

14

1    question.   Either it changes your opinion or it doesn't.

2    Just answer the question, Mrs. Villanueva.

3              MR. PADILLA:  May I approach the witness,

4    Your Honor?

5              THE COURT:  Yes, sir.

6       Q   (By Mr. Padilla) I am going to draw your

7    attention to what is marked as State's Exhibit No. 42,

8    which is in evidence.  I draw your attention to the date

9    of December 12, 2007.

10          Let me ask you this first before I go any

11    further.  You never went down to the Cameron County jail

12    to look at the disciplinary records of the defendant,

13    Melissa Lucio, before surmising an opinion, correct?

14       A   I did not.

15       Q   There's evidence here that indicates on

16    December 12, 2007 the defendant, Melissa Lucio, had a

17    verbal disagreement with other inmates at the Cameron

18    County jail, okay?  If you had that knowledge available to

19    you, would it have affected your opinion on this case?

20       A   No.

21       Q   I draw your attention now to the next page on

22    December 12, 2007 saying that the defendant was

23    transferred into the dorm infirmary because of verbal

24    argument with an inmate.  Knowing that, would that have

25    changed your opinion in this case?

```
 1          A    No.
 2          Q    I draw your attention now to a document dated
 3   December 11, 2007 as to Melissa Lucio indicating that she
 4   showed disrespect to other inmates and was yelling at
 5   other inmates.  Knowing that, would that have changed your
 6   opinion concerning Mrs. Lucio in this matter?
 7          A    No.
 8          Q    I will draw your attention now to a separate
 9   document of the same date signed by Sergeant Villarreal,
10   again, detailing the same incident.  Again, it wouldn't
11   have changed your opinion, correct?
12          A    Correct.
13          Q    There's another document here dated December 10,
14   2007 concerning Melissa Lucio alleging disrespect to a
15   guard, or intimidating a guard.  Knowing that, would that
16   have changed your opinion concerning Melissa Lucio?
17          A    No.
18          Q    I draw your attention now to -- it's page two of
19   the incident report.
20          A    Uh-huh.
21          Q    A document dated, I believe, February 15, 2008
22   concerning Melissa Lucio indicating she was involved in a
23   fight and inciting riotous behavior.  If you had known
24   that, would that have changed your attitude concerning
25   your opinion on Mrs. Lucio on this matter?
```

16

```
 1        A    I would have wanted to read the facts of exactly
 2    what happened, sir.
 3        Q    But you never yourself took the time or the
 4    effort, the initiative first to go down there, check with
 5    the disciplinary records and then try to verify what
 6    discipline, if anything, was taken against Mrs. Lucio,
 7    correct?
 8        A    I did not.
 9        Q    I now draw your attention, ma'am, to a document
10    dated February 17 -- excuse me.  I'm sorry.  March 12 of
11    2008.  "Melissa Lucio fighting, transferred to the
12    infirmary."  If you had known that incident, would that
13    have changed your opinion at all concerning Mrs. Lucio in
14    this matter?
15        A    No.  It was verbal fighting.
16        Q    Do you differentiate between verbal --
17             MR. PADILLA:  Well, strike that, Judge.
18        Q    I now draw your attention to a report which is
19    dated March 12, 2008, involving an incident at the
20    dormitory concerning a fighting.  If you had that
21    information available to you prior to making a
22    determination on this case on Mrs. Lucio, would that
23    change your opinion in this matter?
24        A    No.
25        Q    There is an incident report dated 4/16/08,
```

17

1    ma'am, involving Melissa Lucio charging her with

2    unauthorized communication with a person inside of the

3    facility.  If you had known that incident, would that have

4    changed your opinion at all concerning your opinion in

5    this case?

6         A    No.

7         Q    I will draw your attention, ma'am, to an

8    incident marked April 16, 2008 against Melissa Lucio

9    alleged possession of contraband.  Had you known of that

10   incident or does knowing of that incident change your

11   opinion of Melissa Lucio at this time?

12        A    I would need to see the other part of the report

13   with the facts.

14        Q    If the Defendant Lucio had contraband on her

15   person -- and I'm not saying that she did, but let's say

16   that she had it on her person inside of the jail, would

17   that change your opinion, that act as committed, would

18   have been as a result of what you testified to previously,

19   of being sexually abused when she was a child or because

20   she was a battered woman?

21        A    That can't be answered with a yes or no answer,

22   sir.  I'm sorry.

23        Q    I now draw your attention, ma'am, to another

24   document which I believe was dated February 15, 2008.

25        A    Yes.

18

1    Q    There's allegations that Melissa Lucio assaulted
2  another inmate.  Knowing that fact at all, would that
3  change your opinion that you are presenting here in front
4  of this Court concerning Mrs. Lucio?
5         A    (Reviewing) No.
6         Q    I will draw your attention now to a document
7  that is dated December 1, 2007 against the defendant,
8  Melissa Elizabeth Lucio, alleging that she was in
9  possession of tattoo paraphernalia.  If you had known the
10 fact that she had been charged with possession of tattoo
11 paraphernalia, would that have changed your opinion that
12 you are giving here today or yesterday concerning
13 Mrs. Lucio?
14        A    No.
15        Q    Mrs. Villanueva, have you ever had an
16 opportunity to go down there to retrieve the school
17 records for Mrs. Lucio?
18        A    No, sir.
19        Q    What elementary school did she attend?
20        A    Sir, I'm sorry, I don't even have that in
21 memory.
22        Q    Well, do you have your notes here with you
23 today?
24        A    No, sir.  I don't have those notes in front of
25 me.  No.  I don't recall at all.

Adelaido Flores, Jr.
Certified Shorthand Reporter

19

1    Q    You never asked her what elementary school she
2  went to?
3    A    I did, but I don't recall.  That was so far back
4  at the beginning, I can't even guess.
5    Q    As a social worker you didn't attempt to --
6  again, you are not saying that you were limited in time,
7  but did you send any letter requesting what school
8  district did she go to?
9    A    Harlingen.
10   Q    Did you ever send a letter to the Harlingen
11  School District requesting copies of those documents?
12   A    No, I haven't done that yet, sir.
13   Q    What secondary school did she go to?  By that I
14  mean, junior high and middle school.
15   A    I don't remember, sir.
16   Q    So then I would assume you can't remember that
17  you didn't request copies of documents from the middle
18  school concerning Mrs. Lucio?
19   A    I didn't request any academic records, sir.
20   Q    Well, wouldn't that be important to you as a
21  social worker to determine first her educational
22  intellect, her ability to learn, whether she had made any
23  statements to counselors, any type of outcries, anything
24  of that nature that you as a trained social worker could
25  have used to determine what Mrs. Lucio was telling you and

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1    what CPS records reflected to you were consistent or

 2    inconsistent?

 3         A    I haven't gotten to that point yet, sir.

 4         Q    Okay.  Did you ever, in your capacity as a

 5    social worker, before you drew your opinion retrieve any

 6    medical records concerning the defendant?

 7         A    There were some records from the Valley Baptist.

 8    But right now, I do not recall the dates at all, sir.

 9         Q    Did you, yourself, ever send correspondence to

10    the Valley Baptist Medical Center requesting copies of

11    documents pertaining to Mrs. Lucio?

12         A    I did not.

13         Q    How about pertaining possibly to Mr. Lucio?

14         A    I did not.

15         Q    Maybe pertaining to Mr. Alvarez?

16         A    I did not ask for hospital records.

17         Q    How about hospital records for the children?

18         A    I did not ask for any hospital records.

19         Q    Did you find out who the treating physician were

20    for the children?

21         A    Yes.

22         Q    And did you request medical records for any of

23    those children for the treating doctors?

24         A    No, I went by the summaries and CPS records.

25         Q    As a trained social worker, you don't believe
```

1   that having the actual medical documents would be

2   beneficial to you in trying to draw an opinion concerning

3   Mrs. Lucio in this case?

4       A    I relied on the CPS records being accurate.

5       Q    And let's just, for the sake of discussion,

6   assume that the CPS records are inaccurate, then your

7   opinion in this case would also be inaccurate, correct?

8       A    Unfortunately, so.

9       Q    Were you hired to look at CPS records?  Were you

10  hired to look at all facts and circumstances surrounding

11  Mrs. Lucio, her children, her husbands, her boyfriends,

12  her lovers?

13      A    I was hired to do a social history and look

14  through CPS records.

15      Q    But the majority of the time were spent on the

16  CPS, correct?

17      A    (Cell phone rings) Oh, I apologize.  I thought I

18  had turned my phone off.  May I turn it off?

19      Q    Please.  Let me check if mine is off, too.

20      A    I apologize.

21              THE WITNESS:  I apologize, Judge.

22      Q    Okay.  And yesterday you testified that

23  previously you had worked -- you had contracted CPS,

24  correct?

25      A    Contracted, sir.

22

1      Q      And contracted for what?

2      A      Permanency planning team convener.

3      Q      Fancy name.   What does that mean in general and

4  English terms to us?

5      A      What that means is that back at that point was

6  when Child Protective Services was contracting a lot of

7  their work out to different people, and one of the

8  contracts out there was to meet with the CPS team which

9  included the case worker, the supervisors, sometimes the

10 investigator, and review cases in which children had been

11 removed and were in conservatorship, go over their case

12 plans, go over the other contract workers to make sure

13 that the contractors were getting the workers what they

14 needed, and to put together the plan from a quality point

15 of view.

16     Q      And I assume at this point you hadn't done that;

17 is that correct?

18     A      No, sir.

19     Q      Why not?

20     A      Because the contract was closed because they

21 decided to bring the work back in-house.

22     Q      So you, yourself, are responsible for

23 undertaking many of the duties, that or some of the duties

24 that the CPS workers were responsible for, correct?

25     A      To review, yes, and to do oversight.

Adelaido Flores, Jr.
Certified Shorthand Reporter

23

1      Q      Was it common or uncommon for children sometimes

2  to be removed for up to two years?

3      A      Yes.

4      Q      And looking at this permanency plan, you were

5  mandated on many occasions to conduct certain actions

6  based on court orders, correct?

7      A      Yes.  Uh-huh.

8      Q      And was it your policy or the department's

9  policy to violate the court's order?

10      A      Absolutely not.

11      Q      The department has a staff of attorneys, do they

12  not?

13      A      Yes.

14      Q      And I assume that some of the cases that you

15  worked on, they sought the legal remedies on behalf of the

16  children, correct?

17      A      I'm sorry.  Could you ask that again?

18      Q      Yes.  CPS is a team of attorneys that represent

19  CPS is, correct?

20      A      That is correct.

21      Q      And in the cases that you were involved in when

22  you were doing the permanency plans, were any attorneys of

23  CPS involved in attempting to get court orders affecting

24  those children?

25      A      Yes.

1          Q     So CPS doesn't do everything in a vacuum,
2     correct?
3          A     Inside of their own agency.
4          Q     Well, they are subjected to court order, court
5     review?
6          A     Oh, absolutely.  Yes.
7          Q     Like everybody else?
8          A     Absolutely.  Yes.
9          Q     When you had a meeting with Mrs. Lucio for six
10    hours, did you ever ask her or did you ever inquire as to
11    whether she had ever used any aliases before?
12         A     Any what, sir?
13         Q     Aliases.
14         A     Aliases?
15         Q     Yes.
16         A     No, I did not.
17         Q     If you knew she had used aliases in the past, is
18    that something that might have affected your opinion in
19    this matter?
20         A     It would have added to it.
21         Q     And I would assume that if it added she would
22    use aliases because she was sexually abused when she was a
23    child or because she is a battered woman, correct?
24                    MR. GILMAN:  I'm going to object.  What
25    relevance is alias?

1          THE COURT:  I will overrule the objection.

2   Let's wind it up, Mr. Padilla.

3          MR. PADILLA:  May I approach, Your Honor?

4          THE COURT:  Yes, sir.

5          MR. PADILLA:  We will mark this as State's

6   43.

7          THE COURT:  It should be marked as State's

8   Exhibit No. 44.

9          MR. PADILLA:  At this time I am going to

10  offer State's Exhibit No. 44, Your Honor.

11         THE COURT:  Any objections, Mr. Gilman?

12         MR. GILMAN:  I believe it's an affidavit,

13  Judge, drawn by somebody else.

14         THE COURT:  Hold on a second.  Ladies and

15  Gentlemen of the jury, I'm going to ask you step out just

16  for a minute, please.  I haven't seen that document.  I am

17  going to ask you all to go ahead and step out.  I haven't

18  seen the document myself.

19         **(Jury not present at 9:39 a.m.)**

20         THE COURT:  Your position?

21         MR. PADILLA:  Exhibit 44 are therapy notes

22  prepared in this case that provided part --

23         MR. GILMAN:  I can't hear, Counsel.  I'm

24  sorry.  There's a lot noise.

25         THE COURT:  Step forward.

Adelaido Flores, Jr.
Certified Shorthand Reporter

26

1           MR. PADILLA:   The documents are therapy
2    notes prepared for Mrs. Lucio by the gentlemen assigned by
3    CPS that shows some of the records -- CPS records that had
4    previously been identified belonging to the therapist --
5    by Mrs. Estrada -- and those are just his notes concerning
6    the interview with the defendant.  I'm going to offer it.
7           THE COURT:   What's the objection?
8           MR. GILMAN:   It's hearsay.  It's all part
9    of the record.  What do I do?  Bring in the entire set of
10   records that I've got from Child Protective Services, and
11   then the Court didn't allow the book to go in.
12          THE COURT:   Does Mrs. Villanueva have any
13   personal knowledge of that?  Well, go ahead and ask that.
14          MR. GILMAN:   She said yesterday that she
15   didn't, if you remember.
16     Q     (By Mr. Padilla) Mrs. Villanueva, in reviewing
17   the numerous CPS documents, do you recall seeing a
18   document titled:  "Confidential Treatment And Progress
19   Notes On Mrs. Lucio"?
20     A     No, I don't.
21     Q     And if they are part of Mr. Gilman's
22   documents --
23     A     Sir, all I can say is to the best of my
24   knowledge, I don't recall those notes.  There were very
25   few actual treatment notes.  It was mostly --

Adelaido Flores, Jr.
Certified Shorthand Reporter

27

1          THE COURT:  Mrs. Villanueva, just answer
2     the question.
3          THE WITNESS:  Okay.
4          THE COURT:  Don't go on, please.  I'm going
5     to sustain the objection to the motion on hearsay.
6          MR. PADILLA:  I would like to proceed and
7     offer it another way.  I still got part --
8          THE COURT:  Do what you have to do.
9          MR. PADILLA:  I will do what I have to do.
10          THE COURT:  Deal with each issue as it
11     comes up.  Bring the jury back in, please.
12          **(Jury present, defendant present at 9:42**
13          **a.m.)**
14     Q     (By Mr. Padilla) Mrs. Villanueva, did you -- in
15     reviewing the CPS documents, how many documents were
16     there?
17     A     I don't have the exact count, sir.  There were
18     two boxes the first time.
19     Q     And when you were reviewing the documents, did
20     you ever learn whether Mrs. Lucio was seeing a therapist
21     or not?
22     A     Yes.
23     Q     And was that therapist Jesus Roberto Juarez, to
24     your knowledge?
25     A     His name was Mr. Juarez, yes.

Adelaido Flores, Jr.
Certified Shorthand Reporter

28

1      Q      Did you have an opportunity at any time to see

2  the confidential treatment progress notes that were

3  prepared by Mr. Juarez concerning Mrs. Lucio?

4      A      No.

5      Q      Specifically, do you remember ever seeing a

6  confidential treatment progress note dated March 14, 2008?

7      A      No, I don't.

8      Q      Now, Mr. Juarez, do you have any personal

9  knowledge of him or who he is?

10     A      I have met him, yes.

11     Q      And to your knowledge, is he a CPS employee or

12  private contractor?

13     A      A contractor.

14     Q      Before you prepared your opinion on this case,

15  at any time did you have an opportunity to call Mr. Juarez

16  and discuss Mrs. Lucio in general?

17     A      No.

18     Q      Why not?

19     A      The primary reason is I was, number one, going

20  by the summary of his notes on CPS records; and number

21  two, I did not have a confidentiality release.  When a

22  therapist is under contract with Child Protective

23  Services, they do not release the records to any third

24  parties aside from Child Protective Services, or the

25  family court judge.

29

```
1        Q    And also, Mrs. Villanueva, you could have called
2    Mr. Pete Gilman, and he can file a motion with the Court
3    requesting that the Court review those documents in
4    camera, and if relevant release them to you; isn't that
5    correct?
6        A    That is correct.
7        Q    You didn't do that in this case, did you?
8        A    We had a discussion.
9        Q    You had a discussion concerning that, but
10   nothing was done on it, correct?
11       A    My understanding is he did ask for CPS to give
12   those records to him.
13       Q    And you reviewed the summaries on Mr. Juarez,
14   correct?
15       A    Pardon me, sir?
16       Q    You reviewed the summaries that Mr. Juarez had
17   given to you, correct?
18       A    That is correct.
19       Q    Oh, but you don't recall what those summaries
20   contained, if anything, correct?
21       A    Not off the top of my head, no.
22       Q    Well, let me show you -- then I will ask you
23   just to review what is marked as State's Exhibit No. 44
24   and ask you now that you've remember reading the summaries
25   if you ever read this summary before?
```

30

```
1        A     I do recall some sections of it.

2        Q     Okay.  And so you've seen this document and you

3   used it as part of your evaluations and part of the -- of

4   your evaluation of Mrs. Lucio and you also used it in

5   coming up with an opinion?

6        A     I never saw that document, sir.  I don't believe

7   I did.  I saw the summaries.

8        Q     You saw the summaries.  What parts of them?

9        A     (Nods head in the affirmative).

10       Q     Well, do you recall in your review of the

11  summaries back in March of this year that Mrs. Lucio

12  denied ever being sexually abused as a child?

13       A     That was not in the summaries.

14       Q     So if you had called Mr. Juarez and asked him

15  about that, would that have changed your opinion in the

16  case?

17       A     It would have made me delve deeper.

18       Q     Okay.  And you saw --

19             MR. PADILLA:  At this time I offer the

20  report, Your Honor.

21             MR. GILMAN:  Again, I'm going to object.

22  Judge, Mr. Juarez isn't here.  There's a number of

23  different dates.

24             THE COURT:  What's the legal objection?

25             MR. GILMAN:  It's hearsay.
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

31

1          THE COURT:  Sustained.

2     Q     (By Mr. Padilla) So if Mr. Juarez is told by

3  Mrs. Lucio that she had not been sexually abused as a

4  child, how would that have changed your opinion?

5     A     It would have made me delve deeper.

6     Q     So what you are telling me is that your opinion

7  is based on insufficient evidence; isn't that correct?

8     A     That's incorrect.

9     Q     You held yourself out not today but yesterday as

10 an expert on body language, correct?

11    A     I never used those terms, sir.  You did.

12    Q     Well, can you tell me what treatise, what book,

13 what author I can look at to ascertain the -- how to

14 interpret body language?

15    A     I did not interpret body language.  I showed

16 patterns of behavior.  There's a difference.

17    Q     Let me ask it again, ma'am.  The patterns of

18 behavior, if you are going to show the patterns of

19 behavior, why show photographs?

20    A     That's where the pattern is evident and can be

21 shown.

22    Q     How many photographs did you see of Mrs. Lucio?

23    A     There was a photo album that had at least eight,

24 ten pages.  Then there were anywhere from ten, 15, single

25 pictures aside from that different age ranges.

32

```
1        Q    Why didn't you include all of them?  If your
2    research is so thorough and the pattern is so clear, why
3    didn't you include all of the photographs up on your
4    projection?
5        A    Because in essence of time I chose the ones that
6    were most demonstrative to show it in a summarized
7    fashion.
8        Q    Isn't it true those are going to assist
9    Mrs. Lucio and that's the only one that you picked out,
10   those two photographs?
11       A    No.
12                MR. PADILLA:  May I approach, Your Honor?
13                THE COURT:  Yes, sir.
14       Q    (By Mr. Padilla) It's your testimony here under
15   oath today there were no photographs available where Mrs.
16   Lucio is seen smiling?
17       A    Yes, there are.
18       Q    What is that indicative of?
19       A    She was a child.  Even children that are abused
20   will smile.
21       Q    And truth be told, you haven't verified any of
22   the abuse, correct?
23       A    It has been corroborated through family stories
24   and CPS records.
25       Q    What have you verified, ma'am?  Let me ask you
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

1  this:  Can you name to me the culprit who allegedly

2  molested Melissa Lucio by name?

3      A    Frankly right now, sir, my mind is spinning.

4  You'll have to let me look through my paperwork.

5      Q    Well, with all due respect, ma'am, you are being

6  brought in here to give this jury information concerning

7  Mrs. Lucio on her alleged sexual assault.  I would assume

8  that you would have at least have identified somebody by

9  name and would be sufficient and knowledgeable with that

10  name to be able to provide it to us.

11                MR. GILMAN:  Objection, Judge.  She's not a

12  prosecutor.

13                THE COURT:  Mr. Padilla, there is no

14  question there.

15                MR. PADILLA:  I will try to ask questions.

16                THE COURT:  Please ask questions.

17                MR. PADILLA:  I will try to ask questions,

18  Your Honor.

19      Q    (By Mr. Padilla) How many times was Melissa

20  Lucio allegedly assaulted, ma'am?

21      A    She stated that they were quote, unquote several

22  occasions in a two year period.

23      Q    And what were you able to verify from your

24  personal investigation that would corroborate that?

25      A    The mother did corroborate that Mrs. Lucio did

34

1    inform her of that.

2         Q     Let me show you what I will mark as -- not mark.

3    I'm going to show it to you.   They were defense exhibits.

4    I will show you Defendant's Exhibit No. 6.   This has been

5    identified as Mrs. Lucio --

6         A     Uh-huh.

7         Q     -- at a young age?

8         A     Right.   With the paternal grandmother.

9         Q     Is that prior or after the assault?

10        A     Prior.

11        Q     Look at Defendant's Exhibit No. 7.   Again, who

12   is that?

13        A     That's the father and that's prior.

14        Q     Okay.   And when exactly did the assault occur?

15        A     Approximately she said age six to seven.

16        Q     Okay.   I'm going to draw your attention to

17   Defendant's Exhibit No. 8.   Who is that?

18        A     That's Melissa Lucio on her wedding date.   She

19   was 16.

20        Q     She was smiling, correct?

21        A     Yes.

22        Q     And how many photos did you see of Mrs. Lucio --

23   other than the two -- I know you said several albums --

24   other than the two that you've identified or that were

25   added here to your PowerPoint?

                    Adelaido Flores, Jr.
                 Certified Shorthand Reporter

```
 1          A    I'm sorry.  Could you ask that again?
 2          Q    How many photographs did you personally view
 3     concerning Mrs. Lucio?
 4          A    As I stated before, there was a picture album
 5     that had maybe around ten pages to it -- full of
 6     pictures -- and then there was another set of loose
 7     pictures.
 8          Q    I remember seeing a picture with three children,
 9     correct, the three sisters up there, too?
10          A    Yes.
11          Q    They had the same facial expression, correct?
12          A    That was during a birthday party, yes.
13          Q    Did you inquire, Mrs. Villanueva, into the
14     criminal history of Mrs. Lucio?
15          A    I remember that it was discussed at the very
16     first meeting.
17          Q    Okay.  Did you learn that she had a DWI
18     conviction?
19          A    I recall something like that, yes, sir.
20          Q    Did you recall discussing with her on that DWI
21     offense she used the name Melissa Salinas?
22          A    No.
23          Q    Would it surprise you that she used the name
24     Melissa Salinas?
25          A    To an extent.
```

1          Q      On how many occasions did you review the video

2     of Mrs. Lucio's statement with the police department?

3          A      Three different times.

4          Q      Did you take notes concerning those -- that

5     video or not?

6          A      The first time I didn't.  I was just watching

7     it.

8          Q      Okay.  The second or third time?

9          A      Some notes.

10         Q      Do you have the notes with you?

11         A      No, I do not.

12         Q      Where are those notes?

13         A      I'm not sure I even kept them because they were

14    my own notes just for further questioning.

15         Q      We had a little discussion yesterday where you

16    advised us in front of the jury that you had notes on this

17    case.  Did you bring those notes with you?

18         A      On my interviews.

19         Q      And the remainder of notes concerning your

20    interpretation, your evaluations, your considerations,

21    those aren't here?

22         A      Not of the video.

23         Q      Now you said that you were familiar with CPS,

24    the internal operations of CPS, correct?

25         A      To a certain extent, yes.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1      Q    Let us suppose that a person is confined in the

2    penitentiary and that person becomes pregnant.  Would the

3    department automatically be allowed to remove that child

4    when that child is born?

5             MR. GILMAN:  I object.  We are on a fishing

6    expedition again.

7             THE COURT:  What's the legal -- what's the

8    legal objection?

9             MR. GILMAN:  Judge, we're talking about

10   things that aren't even relevant nor --

11            THE COURT:  I'm going to overrule the

12   objection.  Go ahead.

13      Q   (By Mr. Padilla) So, ma'am, if a defendant, and,

14   obviously, if a female defendant gets pregnant in prison

15   does the department automatically have the right, as far

16   as you know, to remove the children from that environment?

17            MR. GILMAN:  What department are we talking

18   about, Judge?  Objection.

19            MR. PADILLA:  I will rephrase the question.

20            THE COURT:  Rephrase the question.

21      Q   (By Mr. Padilla) Okay.  Talking about your

22   experience with CPS, if an individual, obviously a female

23   individual, becomes pregnant while incarcerated in the

24   Texas Department of Corrections, does Child Protective

25   Services have automatic authority to remove that child

1    from the mother, if you know?

2         A    Can I tell you what I do know?

3         Q    Answer the question, Mrs. Villanueva.

4                   THE COURT:  Yes or no.  Yes or no.

5                   THE WITNESS:  I'm not an expert on the law.

6    I can't answer that question.

7         Q    (By Mr. Padilla) When CPS provides a permanency

8    plan for the children either to someone like you in the

9    past that was contracted and no longer contracted now it

10   is done internally, that's done for each individual child,

11   correct?

12        A    Correct.

13        Q    So the department will take no action concerning

14   a child unless there is some court order requiring action,

15   correct?

16        A    Correct.

17        Q    Now in your experience with CPS, if you know --

18   and if you don't, that's fine.  Does CPS have the legal

19   authority -- by CPS, I mean Child Protective Services,

20   have the legal authority to protect the fetus?

21        A    I don't know.

22        Q    Mrs. Villanueva, there is some testimony -- at

23   least from you and also from a review of the CPS

24   records -- that on several occasions Mrs. Lucio attempted

25   to avail herself of drug treatment provided through CPS,

1    correct?

2        A    Correct.

3        Q    And is it correct also that she abandoned those

4    programs?

5        A    Yes.

6        Q    Did you, yourself, as a social worker

7    investigate Mrs. Lucio, ever contact any of the drug

8    education or programs where Mrs. Lucio was interned to

9    ascertain why she dropped out of the programs?

10       A    No treatment providers were contacted because

11   they're CPS contractors.

12       Q    Again, did you or your attorney ever make an

13   effort to locate the name of the individuals and subpoena

14   them to provide you that information?

15       A    We did.

16       Q    You did?

17       A    We did discuss it.

18       Q    You discussed it.  To your knowledge, was any

19   action taken?

20       A    I'm not sure.

21       Q    You have provided documents concerning the drug

22   treatment.  Is that something that you would have reviewed

23   in drawing an opinion concerning Mrs. Lucio in this case?

24       A    Yes, I utilized the summaries from CPS.

25       Q    That's correct.  But if you were provided

1    something from the actual providers, by that I mean the

2    actual drug treatment facilities, that's something that

3    you would have reviewed, correct?

4         A    Yes.

5         Q    To be thorough, correct?

6         A    Yes.

7         Q    Were you able to ascertain from discussions with

8    Mrs. Lucio and her mother and her sisters how frequently

9    her drug use was?

10        A    Yes.

11        Q    How frequent was it?

12        A    It was ongoing from the age of 16 until very

13   recently in 2006.  There were typically short periods

14   where she would stop using that would last anywhere from a

15   week to at least a couple of months.

16        Q    Did you ever inquire as to why she stopped?

17        A    One of the times that she -- oh, yes.

18        Q    And could it have been that maybe she couldn't

19   afford the drugs?  Was that ever discussed?

20        A    I don't believe that was the case.

21        Q    Do you know how much she was spending per day on

22   cocaine use?

23        A    No, I do not.

24        Q    You made an issue that the defendants lived in a

25   level of poverty, correct?

1      A      That is correct.

2      Q      Would you in your professional opinion as a

3  licensed social worker think that poor people are more

4  likely to kill their children than people with money?

5      A      Absolutely not.

6      Q      And some of the poverty may have been caused

7  because they're using all of the money to buy cocaine;

8  isn't that correct?

9      A      Yes.

10      Q      And not only did Mrs. Lucio have a cocaine

11  habit, the husband, Mr. Alvarez, also had a cocaine habit,

12  correct?

13      A      Yes.

14      Q      Were there not, in some of these discussions

15  about Mrs. Lucio and Mr. Alvarez -- indications that they

16  were using their food stamp money and other resources to

17  go buy cocaine?

18      A      Yes.

19      Q      So the children weren't being fed because the

20  food stamps were being converted into cash, correct?

21      A      That is well documented, yes.

22      Q      It's also well documented, is it not, that they

23  were not paying the rent even though Mr. Alvarez was

24  working, isn't that correct?

25      A      Off and on, yes.

42

1     Q    And, also that -- and Mrs. Lucio had also
2  worked, had she not?
3     A    In the last place, yes.
4     Q    What type of work was she doing?
5     A    I don't recall.
6     Q    How much money was the family bringing in on a
7  weekly basis?
8     A    I never got an exact figure on that.
9     Q    How much was Mrs. Lucio receiving from the AFDC
10 from Mr. Lucio, if you know?  And AFDC stands for Aid For
11 Family with Dependent Children.  How much money was the
12 government providing Mrs. Lucio for Mr. Lucio's children?
13    A    I recall two different amounts.  I recall one
14 amount in the 1,100-dollar range.  I believe.  I am not
15 100 percent sure.  And then there was another amount that
16 I saw that I believe was somewhere in the 1,200-dollar
17 range.  I'm guessing.  I'm estimating.
18    Q    There was something between 1,100 or $1,200 you
19 were able to review from CPS records that she was getting
20 on behalf of the Lucio children, correct?
21    A    I believe I'm recalling correctly, sir.
22    Q    And were there any food stamps being provided to
23 the household?
24    A    Yes, sir.
25    Q    How much in food stamps was being provided to

Adelaido Flores, Jr.
Certified Shorthand Reporter

43

1    the household?

2         A    If I recall, that was also somewhere in the

3    range of -- ranging between -- I believe I recall I saw

4    one report that said in the $1,000 range and another one

5    that was higher.  Again, I am guessing, but it was higher.

6    Maybe around 1,200 or 1,100 also.

7         Q    If the food stamps were between 22 or $2,400 a

8    month, she received 5,000, correct?

9         A    Yes.  Approximately, yes.

10        Q    And you saw in your summary of the CPS records

11   that a lot of times the household was devoid of any food

12   in the refrigerator, correct?

13        A    Correct.

14        Q    How were the children being fed, if you were

15   able to obtain the CPS records?

16        A    According to the CPS records, the children would

17   be taken to Loaves and Fishes at 4:00 o'clock in the

18   afternoon for that meal.  And I don't recall the weekend

19   times, but that was documented also.

20        Q    As a matter of fact, the CPS records also

21   indicate, do they not, Mrs. Villanueva, that Mr. Alvarez

22   and Mrs. Lucio weren't even paying their rent on time,

23   correct?

24        A    That is correct.

25        Q    And while they were homeless, did you ascertain

44

1    whether they ever contacted CPS or any governmental entity
2    to assist them in trying to find a house?
3         A    Yes.
4         Q    Did the government assist them to do that?
5         A    CPS did attempt to try to help them with that,
6    and the help was refused.
7         Q    Now, several of the children in your testimony
8    were born with cocaine dependence, correct?
9         A    Yes.
10        Q    Which obviously meant that even though
11   Mrs. Lucio was pregnant, she still continued to consume
12   cocaine, correct?
13        A    That's correct.
14        Q    Did you discuss that with her?
15        A    Yes, I did.
16        Q    With Mrs. Lucio?
17        A    Yes, I did.
18        Q    What, if anything, were you able to learn
19   concerning that?
20        A    It can be classified as addictive behavior.  The
21   behavior of an addict.
22        Q    As a social worker, how do you get away from
23   addictive behavior?
24        A    Pardon me, sir?
25        Q    How did you treat addictive behavior?

45

1    A    There are many different ways of doing it, and

2    one of the ways is in-patient treatment.

3    Q    But if you have no incentive and no initiative

4    to want to control your drug consumption, it doesn't

5    really matter how many facilities are out there.  If the

6    person doesn't go in and follow the program and the

7    regimen, it is very unlikely that that person will be able

8    to kick the habit, correct?

9    A    Correct.

10   Q    Yesterday you were discussing that you

11   identified risk factors.  Do you recall that?

12   A    I believe so.

13   Q    What is a risk factor?

14   A    Child Protective Services has what is called a

15   risk assessment instrument and they identify risk factors

16   in that risk assessment.

17   Q    And that is what you reviewed to ascertain what

18   CPS did or didn't do to assist Mrs. Lucio and the

19   children, correct?

20   A    No, sir, I didn't ascertain that.  I was quoting

21   from their case reviewer, who obviously was using the risk

22   assessment.

23   Q    Did Mrs. Lucio at any time blame CPS for her

24   injuring the child?

25   A    No.

Adelaido Flores, Jr.
Certified Shorthand Reporter

| | |
|---|---|
| 1 | Q    Is blaming CPS for their actions, isn't that a |
| 2 | theory of convenience now at this point?  Is it convenient |
| 3 | to blame CPS? |
| 4 | A    I don't believe I have ever been on this witness |
| 5 | stand and stated that CPS was responsible. |
| 6 | Q    Well, let me ask you this:  If the defense -- |
| 7 | and by "the defense" I mean Mrs. Lucio through her |
| 8 | attorneys, are attempting to sway this jury to say that |
| 9 | CPS didn't do what they were supposed to do and they're at |
| 10 | fault -- |
| 11 | MR. GILMAN:  Judge, are we now attacking, |
| 12 | back and forth, the attorneys through the witness?  I'm |
| 13 | going to object to this line of questioning. |
| 14 | THE COURT:  Ladies and gentlemen of jury, |
| 15 | I'm going to ask you to step outside, please. |
| 16 | **(Jury not present at 10:12 a.m.)** |
| 17 | MR. PADILLA:  May I address the Court? |
| 18 | Judge, it's just part of the questions, Your Honor, based |
| 19 | on the following factors:  She, herself, just testified |
| 20 | that she's not blaming CPS; however, the defense asked, |
| 21 | you know, insinuated and made reference to the fact that |
| 22 | CPS didn't do their job, that what happened to this child |
| 23 | was a result of CPS's action, or inaction, and that's why |
| 24 | I'm going into that, Judge, if I may be allowed. |
| 25 | THE COURT:  The question will be allowed. |

47

1          MR. PADILLA:  She didn't blame them.  Why

2   is counsel going into this witness as to something that I

3   may have said?

4          THE COURT:  Hold on.  In the guilt or

5   innocence phase, it is impossible for the prosecutor to

6   strike the defendant over her attorney's shoulders.

7          THE REPORTER:  I'm sorry, Judge.

8          THE COURT:  In the guilt or innocence

9   phase, it is impossible for the prosecutor to strike the

10  defendant over the attorney's shoulder.  At least that's

11  how the cases described them.

12         MR. PADILLA:  Yes Judge, but --

13         THE COURT:  Just a minute.  This is a

14  penalty phase.  However, in an abundance of caution, I'm

15  going to instruct you to rephrase that question, and not

16  make comment on what the defendant's attorneys may or may

17  not have talked about with CPS.  For that fact, you called

18  her to question her yourself, Mr. Padilla, whether CPS did

19  anything they did.

20         MR. PADILLA:  Correct, Your Honor.

21         THE COURT:  But, you know, go into whatever

22  CPS did or did not do.  But do not address it as

23  defendant's attorney, please.

24         MR. PADILLA:  Yes, sir.

25         THE COURT:  Bring the jury back in.

```
1        (Jury present, defendant present at 10:14
2        a.m.)
3            THE COURT:  You may be seated.  Ladies and
4   gentlemen of the jury, again, I remind you what the
5   attorneys say or question or whatever is not evident.  The
6   only evidence is what you hear on the witness stand and
7   what is admitted into evidence, okay?  So that is the only
8   evidence that you are to consider.
9            Continue with your questioning please,
10  Mr. Padilla.
11      Q    (By Mr. Padilla) Again, Mrs. Villanueva, the
12  issue of CPS.  Now, I think we established already that
13  it's always CPA's efforts to reunify the family, correct?
14      A    That is the number one objective.
15      Q    And if the parents refuse to follow the
16  suggestions and directives of CPS, does that make it more
17  difficult or easier to get the children back?
18            MR. GILMAN:  Judge, I'm going to object.
19  Again, we are getting into matters that aren't in the
20  field of this case.
21            THE COURT:  Overruled.  Proceed.
22      Q    (By Mr. Padilla) If the children were removed
23  from parents and the parents do not follow the directives
24  and the suggestions of CPS, does it make it easier or more
25  difficult to get the children back?
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

49

1        A      More difficult.

2        Q      In your conversations with Mrs. Lucio,

3   Mrs. Villanueva, did you learn that she was studying to be

4   a certified nurses assistant?

5        A      At one point, yes.

6        Q      And did you learn that she dropped out halfway

7   through the course?

8        A      Yes.

9        Q      Did you inquire as to why she dropped out of the

10  course?

11       A      Yes.

12       Q      Why?

13       A      Lost interest, depression and substance abuse.

14       Q      Did she ever tell you that she lost interest in

15  her children, too?

16       A      No.

17       Q      You testified yesterday or yesterday afternoon

18  that at one time the family was homeless, correct?

19       A      That is correct.

20       Q      And also that Child Protective Services

21  attempted to assist them in moving into a homeless shelter

22  but they refused, correct?

23       A      Yes.

24       Q      Why did they refuse, if you know from your

25  conversations with them or with review of the CPS records?

1      A     There were conflicts between Mrs. Lucio and

2   Mr. Alvarez.   That's also the time that the principal saw

3   him hitting her.   And there was still substance abuse

4   happening.

5      Q     The principal, did you contact him?   Did he give

6   you a statement to come into court to testify about the

7   alleged abuse?

8      A     Attempts were made to find that principal.

9      Q     Who made the attempts?

10      A     One of the attorneys.

11      Q     But you, yourself, did not?

12      A     No.   I'm not an investigator.

13      Q     You're not an investigator, but you've been

14   hired, have you not, ma'am, to review all of the

15   circumstances of Mrs. Lucio?

16                  MR. GILMAN:   Argumentative, Your Honor.

17                  THE COURT:   I'm going to overrule the

18   objection.   Mr. Padilla, we need to wind this up.

19                  MR. PADILLA:   I'm sorry, Your Honor.

20                  THE COURT:   We need to wind this up.

21   Unless you are going into new areas, I will instruct you

22   not to be repetitive.

23                  MR. PADILLA:   Thank you, Your Honor.   I

24   will move along to what I perceive to be new area.

25      Q     (By Mr. Padilla) Mrs. Villanueva, did you have

51

1   an opportunity to visit or to talk to Mrs. Castillo, who

2   was the foster care mother of Maria Alvarez?

3        A    No.

4        Q    Would that not be a pertinent item in developing

5   your social history?

6        A    Individuals under contract with Child Protective

7   Services don't talk to third parties.  You have to go

8   through the case worker.

9        Q    Did you ever contact the case worker to attempt

10  to talk to the foster mother who was caring for the child,

11  Mariah Alvarez?

12       A    No, I did not.

13       Q    I'm sorry?

14       A    No, I did not.

15       Q    Now, you also testified yesterday that

16  Mrs. Lucio has three brothers, correct?

17       A    I don't recall.  I might have.

18       Q    Maybe you didn't testify to that.  Do you recall

19  at this point how many brothers Mrs. Lucio has?

20       A    I'm sorry.  I blanked out on that.

21       Q    Let me ask you this:  Not knowing the amount but

22  knowing that there are some out there, did you ever make

23  any contact with any of the other brothers to ascertain

24  the allegations of sexual abuse of Melissa Lucio?

25       A    I did not.

Adelaido Flores, Jr.
Certified Shorthand Reporter

52

1      Q    You also testified yesterday concerning the
2  children, that some of the children have considerable
3  amount of problems, correct?  Either emotional or physical
4  problems, correct?
5      A    Correct.
6      Q    Anywhere ranging from sexual activity, to bed
7  wetting, to attention deficit disorders and things of that
8  nature, correct?
9      A    Correct.
10     Q    Did you contact any of your workers to ascertain
11  what the department's position was concerning the
12  children?
13     A    I did not contact any CPS employees.
14     Q    Would it surprise you, ma'am, that -- or do you
15  know -- let me ask you this:  Do you know that Child
16  Protective Services has filed a petition to terminate the
17  parental rights of Mr. and Mrs. Lucio's children?
18     A    Yes, I was aware.
19     Q    And has that knowledge played any part in your
20  opinion in this case?
21     A    That's difficult to answer with only a yes or
22  no, sir.  I'm sorry.
23     Q    Okay.  That's fine.  From reviewing the CPS
24  records, Mrs. Villanueva, is it your opinion, if you have
25  one, that what the children are going through now is

Adelaido Flores, Jr.
Certified Shorthand Reporter

53

1    partly responsible for the lack of parental guidance by

2    Mrs. Lucio and Mr. Alvarez?

3         A    Yes.

4         Q    There was a question asked of you yesterday

5    afternoon concerning discipline of the children.  Do you

6    remember that, if you do?

7         A    I'm sorry.  I don't recall.

8         Q    Okay.  I'll pass on it.  The PowerPoint that you

9    presented here yesterday was derived from the notes that

10   you made during your investigation, correct?

11        A    Yes.  And the CPS records.

12        Q    You testified yesterday afternoon that you

13   probably need about three more months to give an opinion,

14   correct?  I mean, in those three more months of work that

15   would allow to give an opinion?

16        A    To finish doing other interviews and things of

17   that sort, yes.

18        Q    Had you had three months or you started three

19   months earlier, it's quite possible that your opinion may

20   have been different than it is today; is that correct?

21        A    Ah, probably not.

22        Q    Probably not?

23        A    Unless I find something drastically different.

24        Q    Ma'am, if you can't find anything drastically

25   different, then you don't look for it, correct?

54

```
 1                    MR. GILMAN:  Objection.
 2                    MR. PADILLA:  Your Honor, I'm asking --
 3     Judge, I'm just asking.
 4                    MR. GILMAN:  Drastically --
 5                    MR. PADILLA:  I'm asking, Judge.
 6                    THE COURT:  I am going to overrule the
 7     objection.
 8                    MR. PADILLA:  That would be my last
 9     question.
10         Q    (By Mr. Padilla) Okay.  If you can't find
11     anything, we don't know -- I mean, you can't know what
12     your opinion would have been because you never completed
13     the work and it's quite possible your opinion would be
14     different if you had done your complete investigation,
15     correct?  Yes or no?
16         A    That's difficult to answer with a yes or no
17     answer.  If you'd allow three sentences.
18         Q    Yes or no, ma'am?
19         A    Ask me the question again.
20                    MR. PADILLA:  Judge, at this time I would
21     pass the witness, Your Honor.
22                    THE COURT:  Mr. Gilman?
23                    REDIRECT EXAMINATION
24     BY MR. PADILLA:
25         Q    The information that you received was Child
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

55

```
 1    Protective Services' notes and interviewing that you did
 2    in this case; is that right?
 3         A    That's correct.
 4         Q    And you had to rely upon what people told you
 5    and what Child Protective Services indicated in their
 6    file?
 7         A    That is correct.
 8         Q    Isn't it true, ma'am, that you didn't go to the
 9    foster parents because I told you, you couldn't go to
10    those because of court order?
11              MR. PADILLA:  I object to the form of the
12    question, Your Honor.  You can ask generally why she
13    didn't go.
14              THE COURT:  I'm going to sustain the
15    objection.
16         Q    (By Mr. Gilman) Are you aware of any court
17    parameters as to what we could do and couldn't do with
18    Child Protective Services' notes?
19         A    Yes.
20         Q    Is foster parents one of those?
21         A    Yes, it is.
22         Q    Going to the jail records that Mr. Padilla
23    showed you, the jail records that he showed you indicated
24    that Mrs. Lucio was assaulted.  She didn't do the
25    assaulting; isn't that correct?
```

56

1      A    That is correct.

2      Q    And it shows that Mrs. Lucio was living in a

3  dorm when the paraphernalia was discovered; is that

4  correct?

5      A    That is correct.

6      Q    And nobody took responsibility for the

7  paraphernalia, all of the ladies in the dorm were

8  punished?

9      A    That is correct.

10     Q    And also those records indicate that Mrs. Lucio

11  was trying to prevent a fight?

12          MR. PADILLA:  Your Honor, I object to that.

13  I'm going to object to that type of question, unless he

14  first allows this witness to review the document to show

15  what it is.  I think defense attorney --

16          THE COURT:  I'm going to sustain the

17  objection.

18     Q    (By Mr. Gilman) Well, the documents should speak

19  for themselves, then, don't they?

20     A    Yes, they do.

21     Q    And all of that that you saw, you read?

22     A    The ones that Mr. Padilla showed me, I read.

23     Q    Okay.  And the jury can go back and read each

24  one?

25     A    That is correct.

1           MR. GILMAN:  All right.  Pass the witness.

2                   **RECROSS-EXAMINATION**

3     **BY MR. PADILLA:**

4        Q    Mrs. Villanueva, who has more power, CPS or a

5     sitting district judge, if you know?

6        A    I am not sure.  I would assume that it would be

7     the judge, but I can't be sure.

8        Q    And in the past you know that if you make a

9     reasonable inquiry from the judge, the judge would give

10    you appropriate orders reflecting reviewing of the

11    children's record and medical records or any records,

12    correct?

13       A    I'm sorry.  I didn't get the question.

14       Q    Well --

15              MR. GILMAN:  That's because it wasn't one,

16    that's why.  Objection.

17              THE COURT:  Sustained.  Ask a question,

18    Mr. Padilla.

19              MR. PADILLA:  Sir, I will pass the witness.

20              MR. GILMAN:  Nothing further.

21              THE COURT:  You may step down.  May the

22    witness be excused?

23              MR. PADILLA:  No, Your Honor.  I want to

24    keep her on call.

25              (Witness was excused a**t 10:29.**)

                    Adelaido Flores, Jr.
                 Certified Shorthand Reporter

1          THE COURT:  Okay.  Step down.  Be within a

2   half hour's call.  At this time I think it's probably

3   logical to take a break, unless you don't want one.  If

4   you don't want one, we will continue.  We will take a

5   break for ten minutes.

6          **(Jury not present at 10:30 a.m..)**

7          MR. GILMAN:  I want to put some matters on

8   the record.

9          THE COURT:  Mr. Padilla isn't here.

10          MR. GILMAN:  We can do it when we get back.

11   Before the jury comes back, I would like to put matters on

12   the record.

13          THE COURT:  Let's do it now.  Mr. Padilla?

14          MR. GILMAN:  Judge, during the time that

15   we're conducting this trial and both of us attorneys are

16   trying to get evidence from the witness stand --

17          THE COURT:  Yes, sir.

18          MR. GILMAN:  -- unfortunately, we have

19   jurors that don't seem to care very much about this trial

20   or think it's very funny.  But they're talking amongst

21   themselves and laughing as opposed to paying attention.

22   Maybe they're bored with this trial, but I think out of

23   respect for the Court and this trial, they should not be

24   communicating with each other or laughing during the time

25   of the trial.

```
 1                    THE COURT:  I understand.  Anything else,
 2      sir?
 3                    MR. GILMAN:  No, sir.
 4                    THE COURT:  We will see you all in about
 5      ten minutes.
 6                    MR. PADILLA:  Thank you.
 7                    (Recess from 10:32 a.m. to 10:45 a.m.)
 8                    THE COURT:  All right.  Are you ready?
 9                    MR. GILMAN:  Yes, sir.
10                    THE COURT:  Dr. Pinkerman, I'm assuming
11      you're next.  Mr. Gilman, who are you calling as your next
12      witness?
13                    MR. GILMAN:  Dr. John Pinkerman.
14                    THE COURT:  Dr. Pinkerman, would you please
15      raise your right hand?
16                    (Witness Sworn in By The Court.)
17                    THE WITNESS:  I do.
18                    THE COURT:  Please be seated.  Your
19      witness, Mr. Gilman.
20                    MR. GILMAN:  Thank you.
21                        JOHN E. PINKERMAN,
22        having been first duly sworn, testified as follows:
23                        DIRECT EXAMINATION
24      BY MR. GILMAN:
25          Q    State your name for the jury, please, sir.
```

60

1          A       John Edward Pinkerman.

2          Q       And you live where, sir?

3          A       In Port Isabel, Texas.

4          Q       And Dr. Pinkerman, what is your educational

5    background?

6          A       I have attained a clinical psychology degree

7    from the University of Detroit at Mercy Hospital, and that

8    was in 1994.  Prior to that, I was a master's level

9    psychologist working since 1981.

10         Q       And you got your bachelor's degree where, sir?

11         A       Michigan State University.

12         Q       You are now a licensed psychologist here in the

13   State of Texas?

14         A       Yes, sir.

15         Q       And do you have any other licenses?

16         A       I am also licensed as a school psychologist.

17         Q       In what areas of specialization have you been?

18         A       Psychological assessment, some geriatrics, some

19   with adolescents and forensics.

20         Q       Do you have any teaching experiences?

21         A       Yes, sir.

22         Q       What kind of teaching experiences have you

23   taught?

24         A       I taught at the graduate college of education at

25   the University of Texas Pan American, for three and a half

1    years.  Program that I taught in was guidance and

2    counseling training.  Guidance and counseling, staff and

3    LPCs to enter the human and education field to help kids

4    primarily.

5         Q    Have you been a guest lecturer at any school?

6         A    Several, mostly up north.

7         Q    Up north we're talking Michigan --

8         A    Yeah.

9         Q    -- where it's cold?

10        A    Yes.

11        Q    In your professional experience, could you tell

12   us a little bit about your professional experience?

13        A    Okay.  I worked for 15 years in a juvenile court

14   setting doing assessment of parents and children coming

15   before the court.  Some of those cases involve child abuse

16   and neglect.  Probably 80 percent of those cases were

17   delinquent cases.  That was prior to moving to Texas.  And

18   then when I came to Texas, I worked as a supervisor for

19   the Texas Department of Mental Health and Mental

20   Retardation in the Harlingen office.  And gradually opened

21   my own practice with my partner, Dr. Gonzalez, and we've

22   been working throughout the Valley since about 1998 for a

23   little over ten years.

24        Q    Have you published anything?

25        A    Published an article on a survey of Canada and

1    the United States on the composition of juvenile courts

2    and the process they use in doing psychological testing

3    and what's the nature of the psychological test that they

4    use in the process of their court work.

5         Q    And have you done any professional training in

6    continuing education?

7         A    Yes, sir.

8         Q    Would you tell the jury about that?

9         A    I repeatedly attended conferences and trainings

10   and workshops on forensic psychology, the area where

11   there's the overlap between the law and the practice of

12   psychology.  And those topic areas included capital murder

13   cases but also child custody, civil cases involving both

14   possibly personal injury.  I also do a lot of training in

15   the area of EAP, Employee Assistance Programs, and peer

16   support programs.  I do training for the Border Patrol.

17   I'm in the process of getting enrolled as a provider for

18   the -- I guess it is DEA, Drug Enforcement Administration.

19   Have done some consultation with local fire department and

20   local police departments.

21        Q    And you were hired by me through a court order;

22   is that correct?

23        A    Yes, sir.

24        Q    To appear as a mitigator; is that correct?

25        A    Yes, sir.

```
 1        Q     And have you appeared in other criminal cases,
 2   capital murder cases?
 3        A     Yes.
 4        Q     And in how many other capital murder cases have
 5   you appeared in?
 6        A     I was trying to estimate and in capital murder
 7   cases I would say five or six, and in murder cases, maybe
 8   three more.
 9        Q     And you're being paid through this court order;
10   is that correct?
11        A     Yes.
12        Q     Doctor, did you meet with Melissa Lucio who is
13   seated here to my far right?
14        A     Yes, I did.
15        Q     How many times have you met with her?
16        A     The report that I've given outlines the number
17   of times, the dates that I met with her.  I met with her
18   probably close to 12 hours starting back in January or
19   February of this year.
20        Q     And did you give any kind of test or anything
21   like that to help you in reaching opinions in this case?
22        A     Yes, I did.
23        Q     Would you describe what sort of tests were
24   given?
25        A     There are a battery of tests that we normally
```

```
 1    administer that tries to look at, number one, a criteria
 2    of the general intelligence, and what kind of components
 3    go into that are both verbal and performance abilities.
 4    And the importance of that is that if one's ability
 5    general intelligence is compromised in a way that would
 6    give --
 7                    MR. VILLALOBOS:  Your Honor, I'm going to
 8    object to nonresponsive.  He asked what kind of test.  He
 9    is going through each explanation.
10                    THE COURT:  Sustained.
11    BY MR. GILMAN:
12        Q    Explain each test and what the tests are
13    designed to cover.
14        A    I'm sorry.  I got --
15        Q    Would you explain the tests that you have
16    given --
17        A    Oh, okay.
18        Q    -- to Melissa Lucio, and what you were trying to
19    -- the information you were trying to get from those
20    tests?
21        A    Okay.  The information on the first test was
22    what I just mentioned, the Wechsler Adult Intelligence
23    Skill, Third Edition.
24        Q    And what, if anything, does that test show?
25        A    Exactly what I just said.  It gives us a
```

1    general -- a general IQ score and that score is broken

2    down into subtests.

3         Q    And the next test, if any?

4         A    The Minnesota Multiphasic Personality

5    Inventory-2.  That's a general personality questionnaire

6    that's often used in a wide variety of settings.  It's

7    probably the most utilized personality measure in our

8    repertoire as psychologists.  The other test is the Millon

9    Multiphasic -- I'm sorry, the Millon Clinical Multiaxial

10   Inventory, III.  And that, again, tries to assess

11   personalty factors from a slightly different perspective.

12              There were other screen tests that I

13   employed that were not as substantial in their general

14   scope, but things like I draw a person -- I also had her

15   do a sentence completion.  These are the kinds of

16   procedures and methods that we use to corroborate our

17   clinical impression over the course of our assessment.

18        Q    And in your interview, do you also gain a

19   history of Mrs. Lucio?

20        A    Yes.

21        Q    Where did you get this history?

22        A    From her.  I also obtained information from

23   Mrs. Norma Villanueva.  She was also consulting on the

24   case in regard to the social history and background.

25        Q    And did you review the video statement of

1    Mrs. Lucio while she was at the police station?

2         A    Yes, I did, on at least two occasions.

3         Q    Did you observe or make any observations of

4    Mrs. Lucio during your interviews with her?

5         A    Yes.

6         Q    Would you tell us what those observations were?

7         A    My general impressions were that at least

8    initially she seemed -- her behavior, her manner, her

9    demeanor seemed at odds or incongruent with what I

10   understood why she was being evaluated.  She seemed low

11   key, reserved, sort of disconnected from feelings.  As the

12   interview went on, you know, she gradually became more I

13   think relaxed.  She was always cooperative in the

14   assessment that I did.  I think the biggest thing that

15   struck me was in her performance on one of the tests it

16   seem that --

17              MR. VILLALOBOS:  Judge, I object.  It is

18   not in a question format.  He asked for general

19   observation.  He's getting into more than what he asked

20   for.  I object to the narrative.  I would ask for it to be

21   a question and answer.

22              THE COURT:  I will overrule the objection,

23   but I will ask you to try to keep it in question and

24   answer form.

25              MR. GILMAN:  Yes, sir.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1          Q     (By Mr. Gilman) Go ahead, Doctor.

2          A     Help me with your question, I guess.

3          Q     All right.  You've made observations dealing

4   with her behavior.  Have you made any kind of diagnostic

5   assessment, intelligent personality factors that you

6   gleaned from these tests in observations?

7          A     Yes, I did.

8          Q     Could you explain to the jury what you found?

9          A     Okay.  Specifically with the IQ, her overall IQ

10  is 82.  That's a low average.  Her performance IQ falls in

11  the average range and verbal IQ in the low average range.

12  Another score that's derived from that is called the

13  verbal comprehensive score.  And that score fell in the

14  border line range, which means that it's close to the

15  mentally retarded range.  Not that it fell on the mentally

16  retarded range, but it was close.  It was a score of 78.

17  Scores in the -- any of our scores are estimated to fall

18  within a range so that if a person retook the evaluation,

19  their score might fall plus or minus within a predicted

20  range.

21         Q     Why are these scores on these tests important?

22         A     They help us understand the strengths and

23  weaknesses of the individual.  And in this particular

24  instance before the Court, if somebody has limitations in

25  their ability to communicate, understand and process

68

1    information up to the point where they're compromised in

2    mental retardation, the Court needs to know that.

3        Q    And your findings in this case?

4        A    In the part of the assessment with the

5    intelligence test, the other part is more of a personality

6    test to determine my general diagnostic impressions.  And

7    my general diagnostic impressions of her were that she was

8    overutilizing a lot of repression and denial.  And

9    repression to the point where, again, a disconnect between

10   thoughts and feelings or experiences and feelings.  And I

11   saw that in both her test behavior and in my observations

12   that I reported earlier.

13            In assigning diagnosis to her, what I

14   identified is that she had a presentation consistent with

15   major depression with prior substance abuse which was in

16   remission.  But maybe most importantly post traumatic

17   stress disorder in how she, I guess, psychologically was

18   organized.  And those are the three major areas of concern

19   that I saw with her.  She was also, and I also

20   acknowledged it in a different report, the victim of prior

21   physical and sexual abuse both as an adult and as a child.

22       Q    And how do these now help shape an opinion that

23   you've made?  Why are we going through all of this?  What

24   is the importance of this?

25       A    As you introduced, I am asked to help in this

```
 1    case the jury to look at mitigating factors.  And I am
 2    prepared to explain my version of what mitigating factors
 3    are.
 4         Q    And your mitigating factors are basically in
 5    compliance with the normally accepted educational tools
 6    that are used in determining this; is that correct?
 7         A    Yes.
 8         Q    So these tests that you've given, are these
 9    tests that you would have to give anybody in the same type
10    of situation?
11         A    Yes.
12         Q    The information you get varies from patient to
13    patient?
14         A    Correct.
15         Q    Now, based upon the test scores and in talking
16    with her as well as the social study, what were you able
17    to determine?
18         A    I guess the process, the methodology that I used
19    has been reviewed.  What I'm looking to -- is trying to
20    understand all of the mitigating factors that would
21    address not the issue of criminal responsibility --
22    because that's already been decided -- but the issue of
23    moral responsibility and trying to take a look at -- there
24    aren't -- my professional stance and approach is not to
25    try to find excuses for somebody, but to provide a way
```

1      that all of us could look at the issue of moral

2      responsibility and all of the mitigating factors that may

3      lead a person off the path that normally we would expect

4      people to take.

5                    So I'm trying to look at all of the factors

6      that are in my domain of expertise and say:  In what way

7      did her normal trajectory as a child, as an adolescent and

8      as an adult get derailed all along the way?  And what

9      choice point did she have and not have that may have led

10     her to this position in life that she's before the Court?

11                   And our notion here is that there are all

12     of us that don't have this circumstance, may not have a

13     lot of these adverse events and adverse aspects and

14     factors in our life.  And they in a way give us a higher

15     degree of moral responsibility because we haven't had to

16     live those derailing experiences in our own trajectories.

17     Of course, everyone goes through tough times.  But tough

18     times can have an accumulative effect and tough times --

19                   MR. VILLALOBOS:  Your Honor, again, I

20     object to the narrative.

21                   THE COURT:  I'm going to sustain the

22     objection.  It is a narrative.

23                   MR. GILMAN:  Judge --

24                   THE COURT:  Ask the question.

25                   MR. GILMAN:  I'm trying to, Judge.  Just a

1   second, please.

2       Q    (By Mr. Gilman) All right.  You indicated that

3   there were different parts of her life that have affected

4   her in the choices that she has made.  What are some of

5   the matters that -- what are some of the things in her

6   life that have affected and created the person that we

7   have here?

8       A    Okay.  Some general factors and not factors that

9   are all inclusive, but early on she certainly had been

10  sexually abused.  There were lots of issues of physical

11  violence that she was subject to and sibling

12  relationships.  She married at an early age, started a

13  life and career, and a role as a mother.  And I think

14  those two factors sort of set a stage or directory for the

15  vulnerability that she had.

16                One point I would disagree or add to, you

17  know, is your question asked me about choices.  But

18  sometimes these kind of events remove some of the element

19  of choice.  What I'm trying to describe, her personality

20  functioning, when you've been victimized repeatedly over

21  your life, it's not unexpected, like we would expect

22  people with post traumatic stress disorder, to have some

23  suspicion, distrust or distancing occur from those that

24  were in positions of trust or authority.  And I think

25  that's a pattern that I observed in looking at her total

72

1    picture.

2         Q    Did you observe any indications of being a

3    battered woman?

4         A    There were many associated factors to that, and

5    there's a pro and a con to the data that I have.  You

6    know, she herself didn't acknowledge the issue of

7    battering because she defines it as physical violence.

8    Battering or the battered women syndrome also includes

9    subtle and even nonverbal coercions and power and control

10   dynamics, as well as the physical and sexual connotations

11   that go along.  I should have said just yes.  But, you

12   know, I'm really trying to educate the Court and the jury.

13        Q    Yes, sir.

14             THE COURT:  Go ahead, Mr. Gilman.

15        Q    (By Mr. Gilman) And did you make any kind of

16   violent risk assessment or anything like that?

17        A    I did.

18        Q    Would you explain to the Court what you were --

19   I mean, to the jury here what you're trying to find out in

20   a violent risk assessment?

21        A    Trying to answer the question that in the future

22   what is the probability and risk associated with her

23   conduct and what factors may exacerbate that, but also

24   what factors may -- again, the word mitigate reduce the

25   likelihood of her risk for reoffending or for committing

1    aggressive acts.

2         Q    Were you able to draw a conclusion?

3         A    Yes.

4         Q    And what did you use to reach that conclusion.

5         A    Her presentation in the interview, the history

6    that I had before me, her description of the history, the

7    psychological testings like I'd done with her in my formal

8    psychological evaluation, and then the large body of

9    literature both in the psychological literature and in the

10   State Department of Corrections literature that talks

11   about the different levels of risk for offenders within a

12   prison population.  Because when I'm looking at the risks,

13   I'm not considering getting the parameters of the present

14   circumstances any issue of risk to the community.  That is

15   often not a part of my assessment.

16        Q    And your opinion then, sir, is what?

17        A    Her risk -- there's -- okay.  I'll try to just

18   answer your question.  There's a low probability that

19   she's a risk to reoffend --

20        Q    Okay.

21        A    -- in a prison setting.

22        Q    Why?

23        A    Because of her psychological factors or features

24   that I assessed, because of her own personal history, the

25   lack of any aggression and violence, any prior assaults in

74

1    her history, the profile of her age because people tend to

2    be more aggressive the younger they are and she's now, I

3    think, 39.  The factor of the context in which the

4    violence occurred, which is very different in the context

5    in a prison setting.  I think her history of responding

6    well while she has been incarcerated where there hasn't

7    been any personal violence or problems.  All those factors

8    led me to that conclusion.

9              And when I say low probability, it's

10   unrealistic for me to say there's no probability.  We all,

11   I think, know that that science isn't that accurate.  It's

12   more accurate than it used to be, but we also know that in

13   our common sense tells us that anybody "could lose it"

14   under certain circumstances.  You can't say there's no

15   probability.

16       Q    Were you able to determine if Mrs. Lucio was

17   disciplined at all during the time that you visited her in

18   jail?

19       A    Yes.

20       Q    From this evidence, does that help you in making

21   this assessment?

22       A    Yes.

23       Q    And why and how did that help you in making the

24   assessment?

25       A    The nature of her disciplinary problems helped

75

```
 1   me make that.
 2        Q     What were the disciplinary problems that you
 3   heard?
 4        A     She possessed, and I don't know what the details
 5   were, a tattoo apparatus.  She also had attempted to pass
 6   a note or a letter to another inmate.  And then she got
 7   into some argument with another female inmate.
 8        Q     And what, if anything, did that -- and maybe the
 9   results of, of whatever discipline she received, did that
10   tell you?
11        A     Well first, I guess, the factor being that she's
12   not seeking out and challenging others, you know, in an
13   aggressive way.  And the second thing was that she
14   successfully completed the sanctions.  She was able to
15   accept that consequence and go forward.
16        Q     When you visited Mrs. Lucio, you visited her in
17   the jail; is that correct?
18        A     Yes, sir.
19        Q     Did you ever see in the jail a set of rules that
20   the inmates were supposed to follow?
21        A     No, I didn't.
22        Q     Did you at any time ever find out if any of the
23   inmates were given a set of rules in writing or anything
24   like that?
25        A     No, I didn't.
```

76

1       Q     So whatever rules there are in any particular

2   day, she complied it with whatever the rules were that

3   day?

4                   MR. VILLALOBOS:  Judge, I object.  That's

5   speculative.  How would you know --

6                   THE COURT:  Sustained.  He says he didn't

7   know what the rules were.

8       Q     (By Mr. Gilman) Well, we don't know what the

9   rules are, do we?

10      A     No.

11      Q     And we don't know if she knows what the rules

12  are, do we?

13      A     No, I don't know.

14      Q     Is the assessment, Doctor, that you made are

15  generally accepted methods of determining risk in your

16  field?

17      A     Yes, it is.

18      Q     Okay.  Earlier you said that Melissa's behavior

19  was not congruent with the acts accepted -- or that she's

20  accused of, but you didn't finish.

21      A     Okay.

22      Q     What was is it that you were trying to tell us?

23      A     Can you be more specific?

24      Q     Unfortunately, I can't.  I'm trying to fill in

25  where you were cut off.  You were talking about Melissa's

Adelaido Flores, Jr.
Certified Shorthand Reporter

77

1  behavior and not being congruent with the act or the
2  charges that she had pending against her.
3       A    Okay.  Part of what I looked at is group data as
4  well as individual data, and that's where the research
5  comes in.  And what I was trying to understand is to what
6  extent does she match what has been developed as
7  categories for women who have been involved in killing
8  their children.  In all those categories there, about six,
9  there's only one that seems to possibly resemble her
10 situation, except there isn't history with her of prior
11 aggression against children.
12      Q    So based on that you are able to help draw the
13 conclusion?
14      A    That she's not -- my impression would be that
15 she doesn't fit any of those six categories strongly but
16 slightly in that one area.
17      Q    So what do we find from that if she doesn't fit
18 into those categories, then what?
19      A    Part of those categories involve determination
20 of -- and like my evaluation -- what is a high risk
21 configuration would be if you fit into those categories.
22 If you were mentally ill, and had a lot of problems with
23 aggression.  People who are diagnosed schizophrenia, or
24 bipolar, are likely to be more involved in physical
25 aggression.  She doesn't have those diagnoses.  People who

1    -- many of the infant murders that occur, of course,

2    before the first year of life.  She is not in that

3    category.  Part of the risk assessment would be that if

4    she is going to have access to that population again?  No,

5    I don't see that happening.

6         Q    Another category is a retaliating mother?

7         A    Yes, sir.

8         Q    Did she fit into that?

9         A    No, sir.

10        Q    And a merciful mother?

11        A    A merciful mother who would be a child who's

12   chronically sick, handicapped, disfigured and the mother

13   acts on that motivation.

14        Q    And the unwanted or unexpectant mother, she

15   doesn't fit into that?

16        A    No, sir.

17        Q    Now during the interview at the police station,

18   the video, there were some periods of time when it showed

19   just a blank expression on Melissa Lucio.  Is there

20   anything that could be determined by that?

21        A    You have to be more specific.

22        Q    Well, does a blank expression that she exhibited

23   during this time when the police officer is yelling at

24   her, or during the time when people are chewing her out,

25   or something like that, during that interview, does that

```
 1    indicate anything?  Does that help us in determining what
 2    kind of person she is?
 3         A    It was another source of data for me to look at
 4    in trying to understand her general presentation.  Her
 5    personality features involve a lot of what we call
 6    hysterical features.  And hysterical features are
 7    characterized by repression denial, the isolation in it,
 8    disassociation of feeling and thoughts.  And that's what I
 9    thought I saw with her in those interviews, and that's
10    what I think I see in her as a consequence of both the
11    depression, but also that long history of early childhood
12    abuse and into adulthood with the abuse and misuse that
13    she went through.  So that emotional numbing that I --
14    this disassociation that I saw also may have been part of
15    having lost her child.
16              And all of us react differently to loss.
17    Some of us get frivolous and goofy and other people shut
18    down, and some of us get really angry and some of us cry.
19    And what I was trying to sort out was how her reaction and
20    demeanor in that statement added to me understanding her
21    total personalty function and -- I'm sorry.  I'm going on,
22    but it's his job to catch me.
23         Q    And during that interview process when the
24    police officer is yelling at the person, at Mrs. Lucio,
25    she's not fighting back, she's not arguing back, she's not
```

1    saying:  Hey, wait a minute, you're out of line.  She's

2    not saying anything.  Does that indicate the type of

3    personality she is or does that help?

4        A    It helped me in that kind of extremely stressful

5    circumstance.  One of the rules of thumb that I use as a

6    psychologist is that when people come in to see me or

7    they're involved in a stressful circumstance -- because

8    seeing a shrink is a stressful circumstance.  Most of us

9    are not real comfortable with that initially.  What we

10   look at is the person's first demeanor, their first way

11   presenting themselves.  And in her situation there were a

12   lot of nonverbal queues about how she was acting, a lot of

13   queues in the way that she responded.  She kept her eyes

14   cast off.  The fact that she wasn't contending any of the

15   statements, that to me was congruent with that impression

16   that this is a common method of handling situations for

17   her.

18       Q    Close down?

19       A    Yes.

20       Q    So if society or -- if she's in a prison

21   situation and someone's yelling at her or something like

22   that, she's basically going to withdraw as opposed to be

23   aggressive and attack?

24       A    Again, I would say it's a probabilitistic

25   statement.  It's more probable that she would withdraw and

```
1    not respond.
2                    MR. GILMAN:  Pass the witness, Judge.
3                    THE COURT:  Mr. Villalobos?
4                         CROSS-EXAMINATION
5    BY MR. VILLALOBOS:
6         Q    Dr. Pinkerman, my name is Armando Villalobos.
7    I'll be asking you some questions.  If you don't
8    understand them, please have me restate them and I will be
9    happy to do so.
10        A    Thank you.
11        Q    Going back -- you said you are Dr. John Edward
12   Pinkerman; is that correct?
13        A    Yes, sir.
14        Q    And Doctor, you went through your licensing and
15   your history with Mr. Gilman, but what I want to ask you
16   is -- forgive me for asking you, but I have to.  What kind
17   of problems did you have with your licensing?  Have you
18   had a problem with your licensing before?
19        A    Yes, sir.
20        Q    Specifically in 2006, sanctions from the board
21   of psychologist; is that correct?
22        A    Yes, sir.
23        Q    What exactly is a failure to substantiate
24   forensic services?
25        A    You know to this date I'm not sure.
```

1        Q     You don't know why you had trouble?

2        A     I could give you my version of it.  I was asked

3    to do an evaluation of two adults and two children in a

4    contested custody issue, and I recall making the decision

5    at that time in writing the report that I was going to

6    throw caution to the wind and stick my neck out on behalf

7    of the kids.  And I developed an intervention and

8    recommendation that attempted to reunite the family that

9    was, as I've had other independent evaluators look at, was

10   balance for both parents.  However, one of the parents had

11   a history of litigious prior lawsuits.  Did file a

12   complaint against the board.  My work was reviewed and I

13   was found to be violating a standard in practice.  That

14   was resulting in a probation which I successfully

15   completed.  That is the only issue and circumstance that's

16   ever occurred to me.

17       Q     You haven't had any other in Michigan?

18       A     No, sir.

19       Q     On the five or six capital murders and the three

20   or four murders that you participated, how many of them

21   involved a mother brutally killing her child?

22       A     None.

23       Q     Have you personally worked on any, whether it

24   was a student, an intern, volunteer, on any case involving

25   a mother who has brutally murdered her child?

```
 1        A    Yes.

 2        Q    Could you describe your involvement in that

 3   particular case?

 4        A    In those cases it would have been back in

 5   Michigan and it would have been involved in consultation

 6   and workshops, clinical discussions with colleagues about

 7   individual cases.

 8        Q    Were you involved in the actual case dealing

 9   with the actual defendant?

10        A    I may have been involved in doing psychological

11   evaluations with members of the family, but I don't think

12   any of the actual defendants.

13        Q    You said that you met with the defendant for 12

14   hours, more or less?

15        A    Yes, sir.

16              MR. VILLALOBOS:   Your Honor, may I

17   approach?

18              THE COURT:   Yes, sir.

19        Q    (By Mr. Villalobos) Before I start questioning

20   on the report, I want to make sure this -- this was given

21   to me by the defense counsel, so this is all I have.

22   Forgive my notes on it.  I just want to make sure it's the

23   right one.

24        A    Yes.

25        Q    Okay.  And this report you gave to the defense
```

84

1    on July 9 of this year, which would have been two days

2    ago?

3        A    Yes, sir.

4        Q    Now you already testified that you went through

5    the several techniques.  How long does the Millon exam

6    take?

7        A    It varies.  It could be anywhere from 20 minutes

8    to a half hour.

9        Q    What about the sentence completion blank?

10       A    In her case it took longer than usual.  She was

11   quite deliberate.  And I remember her finishing and she

12   overlooked that it had a second page.  And the directions

13   specified that you turn it over and finish on the other

14   side.  So that took probably 50 minutes.

15       Q    What about the Wechsler -- is it Wechsler Adult

16   Intelligence Scale?

17       A    Yes.  That was close to two hours.

18       Q    And the Minnesota Multiphasic Personality

19   Inventory?

20       A    About an hour and 45 minutes.

21       Q    And the -- is it Millon?

22       A    Uh-huh.

23       Q    -- Millon Clinical Multiaxial Inventory-III?

24       A    About 45 minutes.

25       Q    So it was about eight or nine hours that you

85

1    actually discussed things with her?

2         A    Yes.

3         Q    Or does that 12 hours also include document --

4    include clinical and document review?

5         A    No.

6         Q    Now, Doctor --

7         A    When I say ten to 12 hours, it would be face to

8    face contact with Mrs. Lucio.

9         Q    So in addition to the testing?

10        A    No.

11        Q    Now, you said that your purpose here is for

12   mitigating factors?

13        A    Yes, sir.

14        Q    Obviously mitigating would be to explain the

15   person's good points to the jury?

16        A    No.

17        Q    No?  Well, you said it wasn't to make an excuse;

18   is that correct?

19        A    Yes.

20        Q    But isn't that what you're saying, that because

21   of her life that's why she did this particular act?

22        A    No.

23        Q    So her history has nothing to do with the act.

24   Is that what you're saying then?

25        A    No.

1    Q   Then if it doesn't have anything to do with the

2   act or it does have anything to do with that, which is it?

3    A   I have gotten confused.  What are you asking me?

4    Q   Well, does her history have anything to do with

5   the act itself, with the murder, her brutally killing the

6   child?  Is that what you're telling the jury?

7    A   The jury has made that determination.  What I am

8   trying to inform is how does her personalty features

9   relate to the issue of mitigation.

10    Q   I understand that and maybe I'm not being clear,

11   and I apologize for that.  You are here to give the jury a

12   picture of her history as best as you can, mitigating

13   factors, what her personality is based on her history and

14   I presume birth because you are born with a natural

15   personality; is that true?

16    A   Yes.  The genetic factors really do load into

17   the personality.

18    Q   Well, we're here, and you're here because she

19   killed her daughter.  You know that, right?

20    A   Yes.  That's what she's convicted of, yes.

21    Q   Are you saying that you don't believe she killed

22   her daughter?  Is that what you are saying?

23    A   It's not important whether I have an opinion

24   about that and that's beyond my purpose.  My purpose is to

25   do an assessment about mitigation.

87

```
 1        Q    Well, then obviously this major traumatic event
 2   where she killed her daughter would be a factor of her
 3   personalty, would it not?
 4        A    Yes.
 5        Q    I mean, it is a violent -- a very violent act,
 6   is it not?
 7        A    Yes.
 8        Q    You are aware of the injuries sustained by that
 9   child, aren't you?
10        A    To some degree.
11        Q    To some degree?
12        A    I've read some things about it.
13        Q    Have you reviewed the autopsy report and the
14   pictures?
15        A    Yes.
16        Q    So you are aware of the brutal beating that this
17   child suffered?
18        A    No, because I don't -- I'm a psychologist.  I
19   mean, I saw pictures.  I didn't make too strong of an
20   opinion about how those injuries -- I don't have an
21   opinion about --
22        Q    Well, Doctor --
23        A    It was obvious that child had been very
24   seriously hurt.
25        Q    Well, that child was brutally beaten, and she
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

88

```
1    has become responsible for that beating.
2         A    Uh-huh.
3         Q    Now doesn't that mean that she's a very violent
4    person?
5         A    Earlier I attempted -- no.  I just want to give
6    you -- try to give you your straight answer real simple.
7         Q    What do you call a person that beats a child to
8    death then if they're not violent?
9         A    You just -- I don't know if I can answer it if
10   you're framing it that way.  Earlier I explained that --
11        Q    Well, Doctor, it's nothing fancy about it.
12   You're either violent or you're not.
13             MR. GILMAN:  Judge, he's asking questions
14   that he cannot answer.  If he wants an answer, he's going
15   to have to let him --
16             MR. VILLALOBOS:  I think he is refusing to
17   answer.
18             MR. GILMAN:  I don't believe that he is
19   refusing anything, Judge.  I think he is trying to be as
20   helpful as he can.
21             THE COURT:  Okay.  Gentlemen, I'm going to
22   overrule the objection.  Doctor, just answer the question.
23   If you need to explain, say:  I need to explain.
24             THE WITNESS:  Thank you.  Please ask the
25   question.
```

89

1    Q    (By Mr. Villalobos) When you brutally beat a
2    child, how can you not consider that violent?
3    A    Please restate your question.
4    Q    When you beat a child, how can you not consider
5    that violent?
6    A    I didn't say that.
7    Q    So you are agreeing that that is a pretty
8    violent act?
9    A    Yes.
10   Q    And when someone commits a pretty violent act,
11   wouldn't it be safe to say that they are violent?
12   A    No, not in my profession.
13   Q    Not in your profession?
14   A    May I qualify my answer?
15   Q    I'll be asking you some more questions.  You'll
16   have a chance to do that?
17            THE WITNESS:  Your Honor, may I qualify
18   that?  You asked if I --
19            THE COURT:  Dr. Pinkerman, Mr. Gilman can
20   ask other questions to clarify that.
21            THE WITNESS:  Yes, sir.
22            THE COURT:  But at this point just answer
23   the questions, please.
24   Q    (By Mr. Villalobos) You said that the defendant
25   had trouble on the verbal part of the exam?

1        A      Yes, sir.

2        Q      Did you give or administer the exam in Spanish?

3        A      No, sir.

4        Q      Do you know Spanish?

5        A      No, sir.

6        Q      I don't want to presume anything, but your

7   partner is Gonzalez.  Does he know Spanish?

8        A      No.  Because my partner's a female.

9        Q      I'm sorry.  Does she know Spanish?

10       A      That's okay.  Absolutely.

11       Q      Was she not able to assist you?

12       A      Help me.  What's the question?

13       Q      Well, if she can't understand it in English, did

14   it occur to you that maybe she can do it in Spanish and

15   maybe communicate better to you?

16       A      I determined before I began the assessment, and

17   based also upon her request or permission that the

18   evaluation could be reasonable and valid conducted in

19   English.

20       Q      But if she didn't understand it properly,

21   wouldn't that affect the score?

22       A      No.  You're confusing issues.  Verbal

23   comprehension, whether it would be in English or Spanish,

24   is a construct based on the psychological testing and the

25   individual items and how they load into the subtests.  In

1    her case, she has some difficulty handling information

2    that comes from other people and understanding in

3    processing.  She's much better with visual information to

4    see things and to size things up that way.

5         Q    Well, wouldn't that be also true of somebody who

6    doesn't understand the language?

7         A    It could be.

8         Q    And you didn't inquire into that possibility?

9         A    Yes, I did.

10        Q    You indicated that you relied on the history

11   from her, from Mrs. Villanueva and those are the two

12   people that you actually talked to regarding her history?

13        A    Yes, sir.

14        Q    So the history -- a lot of what you're basing it

15   on, is based on that history -- a lot of your opinions in

16   this report.  Isn't that a fair statement?

17        A    A certain proportion.  I disagree with the "a

18   lot."  But it is a part of the total data that I use to

19   make the determination, the recommendations, and the

20   diagnostic impressions.

21        Q    You testified because of the extensive sexual

22   and physical abuse and you made the diagnosis based on

23   that, that would come from her history, would it not?

24        A    Yes.  Uh-huh.

25        Q    So did you review any police reports or any

1    reports yourself detailing the actual alleged sexual abuse
2    and physical abuse by Mrs. Lucio?
3         A    Okay.  Not by her and I didn't review any that
4    were done to her.
5         Q    That information would have been gleaned from
6    Mrs. Villanueva?
7         A    Yes, sir.
8         Q    Did you inquire with Mrs. Villanueva of where
9    she got that information?
10        A    Her information derived from the review of those
11   records, of Child Protective Services, from interviews
12   with family members, from review of statements, the
13   historical record that she was accessing for the social
14   history.
15        Q    Okay.  So that is what she told you; is that
16   correct?
17        A    Correct.
18        Q    So you have to take her word at that; isn't it
19   true?
20        A    Yes.
21        Q    Now, CPS records would have information
22   regarding the specific child that those records apply to.
23   Wouldn't that be true?
24        A    Yes.
25        Q    So it wouldn't necessarily detail anything about

1    the parent.  It would be more so of what the child is

2    going through?

3         A    When I -- okay.  If you're asking me in general,

4    when I've seen CPS records they involve the allegations,

5    and the perpetrators or the alleged perpetrators are

6    discussed in the allegations.

7         Q    What I'm trying to get at is that those CPS

8    records are not going to detail the child -- I'm sorry,

9    the childhood years, or the problems that the defendant

10   had.  It's going to detail what specific child we're

11   dealing with?

12        A    Well, part of the CPS records involve clinical

13   records of psychological evaluations of some of the kids.

14   And some of those records may -- and I can't recall

15   specifically -- have made reference to the parents'

16   personal and social history.

17        Q    But you're not sure in this particular instance?

18        A    I'd have to look at the records, sir.

19        Q    Now, when you interviewed -- well, first of all,

20   you're familiar that the defendant has several kids?

21        A    Yes, sir.

22        Q    A family, I think, of what, 12?  I'm sorry, 14

23   children.

24        A    Yes, sir.

25        Q    You realized that she also came from a very

94

```
 1    large family herself?

 2         A    Yes, sir.

 3         Q    I think another -- at least six more?

 4         A    Yes, sir.

 5         Q    Okay.  Plus the parents?

 6         A    Yes, sir.

 7         Q    Plus the defendant's parents?  Another two more.

 8    So we're talking over 20 people at least that could be

 9    possibly interviewed.  Would you agree with me on that?

10         A    That I could have interviewed?

11         Q    Well, that someone could have interviewed when

12    you are trying to deal with a social study or a history of

13    somebody.

14         A    Yes, I would agree with you on that.

15         Q    Do you think it would be wise that out of 20

16    plus people that you interview at least three or four?

17         A    That I?

18         Q    Anybody would interview three or four.  Is that

19    what you would have done?

20         A    In answer to that, it would be a good practice

21    to do so.

22         Q    To do what, to interview?

23         A    To have direct interviews.

24         Q    With three or four or as many as the 20 plus

25    people that you can?
```

95

1          A      The standard -- the practice on that is not
2      numerical.  What you are looking to do is identify
3      collaborative information and information that would be as
4      accurate as you can in order to, again, have
5      substantiation for your position.
6          Q      You would want to have accurate information.
7      That means that you would want to have information on both
8      sides of the coin, so to speak?
9          A      Yes, sir.
10          Q      If you limited your interview and your
11      information to the defendant and those closest to her
12      only, does that help your accuracy?
13          A      It wouldn't be a good practice.
14          Q      It would make sense if you want accuracy to go
15      outside of the small circle of the defendant, who
16      obviously is here because of a murder and the possibility
17      death penalty, and go to people outside that circle to try
18      to get accuracy.  Wouldn't that be true, Doctor?
19          A      Yes.
20          Q      Did you inquire if that occurred in
21      Mrs. Villanueva's social history?
22          A      No.
23          Q      She has testified that she has not gone outside
24      of that small circle.  Would that be a problem in your
25      opinion on this report?

1       A      No.

2       Q      Why not?  It's not accurate.

3       A      No, I am not drawing that conclusion.  What I'm

4   saying is that based on the level of work she did and the

5   factual information as she related it to me in combination

6   with my interview with Mrs. Lucio, there is enough

7   collaborative information that wouldn't undermine the

8   opinions that I have, my diagnostic impression.

9       Q      Even though it wasn't an accurate detailing of

10  information like you described just a minute ago to the

11  jury?

12      A      Well, let me -- if I may try to answer that.

13  Because as we all know there is a certain point of

14  diminishing returns in obtaining information and what I

15  would look at in the procedure methodology that I employ,

16  I'm looking at -- in an efficient way -- taking the

17  multiple sources and multiple methods that I have, pulling

18  that together at a certain point.  Yes, I could go ahead

19  and do six or eight more hours of testing, for example,

20  but I'm not sure incrementally that's going to give me

21  anymore accuracy, anymore level of certainty in what I

22  did.  So my methodology almost ethically gets constrained

23  by the need to be efficient about it.

24      Q      So you're saying that ethically you cannot

25  question more people?

97

1       A     No, I didn't say that.

2       Q     You're saying that you talked to her and since

3    she says she's gone through this physical and sexual abuse

4    that you feel like if you talked to the other 17 people,

5    they would have said the same thing.  You're assuming

6    those other 17 people would say the same thing.  That's

7    diminishing returns, is it not?

8       A     I think it's the old notion of sampling when we

9    do statistics, as an example.  You don't go out and survey

10   the whole population.

11      Q     Well, sampling again, Doctor, you're only going

12   to sample her particular group.  Does that make sense,

13   Doctor?

14      A     It makes sense in one level is that we assume

15   that people are going to be honest and cooperative and

16   that they're not going to be disassembling.

17      Q     So you are assuming that this brutal murderer of

18   a child is going to be honest with you?

19      A     I assume that there's a level of disclosure and

20   honesty, but I also in the psychological testing that I

21   administered have checks and balances to that.  And in my

22   psychological tests there are ways to detect if somebody's

23   exaggerating or minimizing.  In her case, she was

24   forthright.  She was cooperative about how she approached

25   the testing.  She didn't try to make herself out to look

1    like she's real sick.  And, she also didn't try to make

2    herself look like she was totally virtuous.  To me, that's

3    another anchor point that helps me assess the reliability

4    of the source of information that she's giving me when I

5    do my interview.

6        Q    Well, Doctor, that kind of conflicts with your

7    report where you are indicating that she's minimally aware

8    of the serious implication of the charges against her.

9    How's that being forthright with you?

10       A    I don't understand that question at all.

11       Q    You're saying she's being forthright, honest.

12   She's kind of purging herself to you, but in your reports

13   you say --

14       A    No, I didn't say that.

15       Q    Well, that's what it seems like you are saying

16   to this jury.  Are you not telling this jury that you are

17   basing your opinions on her being honest and forthright

18   with you?

19                   THE COURT:  Answer the question, Doctor.

20                   THE WITNESS:  As I -- I think I've answered

21   it.

22       Q    (By Mr. Villalobos) Well, you're saying that

23   you're basing it -- and correct me if I'm wrong but --

24       A    Uh-huh.

25       Q    -- in your opinion that she is being honest and

99

1    forthright with you?

2         A     I answered that earlier.

3         Q     Answer it again.

4         A     Okay.

5         Q     Is that a yes or no?

6         A     No.

7         Q     She's not being honest and forthright?

8         A     No, I.  Can't answer your question like that.

9         Q     Doctor, you're playing games with the jury.

10              MR. GILMAN:  Objection, Judge.  Counsel is

11   being argumentative.

12              THE COURT:  You are.  Objection sustained.

13   Ask your questions, Mr. Villalobos.

14              MR. VILLALOBOS:  Yes, Your Honor.

15        Q     (By Mr. Villalobos) You do have an opinion in

16   your report that she's minimally aware of the serious

17   implications of the charges against her?

18        A     That was my impression, yes.

19        Q     What date did you first see her?

20        A     I think it was January 18.  The report would

21   specify that.

22        Q     January 18 of which year?

23        A     Of this year.

24        Q     So this would be almost a year after the murder?

25        A     Yes.

1      Q      Obviously by that point she would know that

2  she'd been charged with a crime of capital murder; is that

3  true?

4      A      Yes.

5      Q      By that time, she would know that we're seeking

6  the death penalty; isn't that true?

7      A      That's where the psychological evaluation tries

8  to enlighten us.

9      Q      Well, I asked you if she would be aware of that

10  by that point?

11      A      Partially.

12      Q      Partially?

13      A      That's why I'm saying that in the statement,

14  that she's partially, minimally aware.

15      Q      And in fact, she still according to your report,

16  is in denial and is still talking about reuniting herself

17  with her children?

18      A      Yes, sir.

19      Q      You talked about her IQ.  Are you telling the

20  jury that she's mentally retarded?

21      A      No, sir.

22      Q      Well, in your professional opinion, is the

23  defendant mentally retarded?

24      A      No, sir.

25      Q      You talked about -- well, the defense counsel

1   asked you about there being no set of rules in the jail,

2   that because there's no set of rules she didn't know that

3   she was violating rules.  Do you remember that line of

4   questioning?

5       A   Yes.

6       Q   Are you saying that the defendant has to be told

7   what the rules are in order to know right from wrong?

8       A   No.

9       Q   So she wouldn't have to have been told:  Do not

10  torture your daughter for 88 days and kill her in order

11  for her not to do that?

12                  MR. GILMAN:  I'm going to object to that.

13                  THE COURT:  I'm going to overrule the

14  objection.

15                  THE WITNESS:  I didn't hear your comment,

16  Judge.

17                  THE COURT:  I overruled the objection.  Go

18  ahead and answer the question.

19                  THE WITNESS:  Okay.  Please rephrase.

20      Q   (By Mr. Villalobos) She doesn't have to be told

21  in a written form of rules:  Do not brutally kill your

22  daughter for her not to have done it?

23      A   Correct.

24      Q   So the written rules are pretty much irrelevant

25  in this matter?

102

```
 1          A    I don't have any opinion about that.
 2          Q    You indicated that the disciplinary records were
 3     very vital for you in your opinion?
 4          A    No.
 5          Q    No?  Well, you described to Mr. Gilman that they
 6     were.  Do you recall that?
 7          A    I didn't use the word vital.
 8          Q    Well, what word did you use?
 9          A    That they are part of the whole picture.
10     They're a piece of data, and those pieces of data are all
11     important in trying to look at risk assessment and the
12     probability that she could be violent in the future.
13          Q    Now, when did you see those reports or those
14     documents?
15          A    I'm trying to think.  I think one of them was in
16     the first part of this year, and the other two I haven't
17     seen.
18          Q    Then how are you basing your opinion on these
19     documents that you haven't seen?
20          A    The documents, or the relating to me that the
21     offenses or the disciplinary action occurred?
22          Q    Okay.  Well, forgive me.  I had assumed that you
23     saw the documents.  But let me ask you:  How did you
24     become aware of the disciplinary action?
25          A    She had told me and then on one of the
```

103

1    disciplinary actions I was told by Norma.

2         Q    You were told by whom?

3         A    Norma.

4         Q    By Norma?

5         A    Mrs. Villanueva.

6         Q    Oh, I see.  Okay.  I'm sorry.  So you never saw

7    any of the actual documents from the jail?

8         A    No, sir.

9         Q    Now the disciplinary actions that you are

10   referring to are the tattooing equipment and the passing

11   of notes; is that correct?

12        A    Ah, yes.

13        Q    Now when somebody is doing something secretly,

14   whether it's passing of notes secretly or hiding something

15   like tattoo equipment, doesn't that normally say to

16   somebody that they know that it's wrong to have that or to

17   do that behavior?

18        A    Yes.

19        Q    Were you aware that she had twins while she was

20   incarcerated?

21        A    Yes, sir.

22        Q    Well, you stated that she would not have access

23   to that population.  And again, I'm going to have to

24   presume that you meant babies.  Is that what you meant in

25   that statement?

104

```
1        A    I meant children.
2        Q    Okay.  Did you know that she had access or that
3   she continues to have access to her twins?
4        A    Yes.
5        Q    So how can you make a statement that she would
6   not have access to that population when she currently
7   enjoys access to that population?
8        A    In the normal discourse or normal conduct of
9   what I understand of a correctional facility, they do
10   permit supervised visits, but I understand that children
11   aren't there 24 hours a day.  Children aren't in the
12   custody of parents in that correctional facility.
13       Q    We're dealing with the word "access".  You said
14   that they would not have access.  That would be incorrect?
15       A    In the sense that in an adult prison, they don't
16   have kids in the prison.
17       Q    Do you know that for a fact?
18       A    Everything in my experience tells me that they
19   don't incarcerate kids and adults together.
20       Q    Do you know that for a fact --
21       A    I don't know for a fact.
22       Q    I'm not saying that they're incarcerating these
23   twins.  What I am saying is that do you know the maternity
24   ward in the prison, how they have the children and how
25   they stay with the children for awhile?
```

1       A    Yes, I've heard of that.  But I haven't been

2    there.

3       Q    Okay.  Wouldn't that be access to a child?

4       A    Yes.

5       Q    So that earlier statement would be incorrect?

6       A    In the -- okay.  It would be.

7       Q    It would be.

8       A    I'm qualifying my answer.

9       Q    Okay.  Thank you.  Doctor, you've admitted that

10    you were incorrect once.  Thank you.

11       A    I'm allowed to make a statement --

12            MR. GILMAN:  I object to that statement.

13            THE COURT:  All right.  I'm going to

14    sustain the objection.  No sidebar.  Let's keep it

15    question and answer.

16            MR. GILMAN:  I'm going to ask the court to

17    instruct the jury to disregard it.

18            THE COURT:  Yes, sir. ladies and gentlemen

19    of the jury --

20            MR. VILLALOBOS:  My apologies to the Court.

21            THE COURT:  -- the comments of the

22    attorneys are not evidence.  You are only to consider the

23    evidence that comes from the witness stand and that is

24    introduced and is admitted in evidence.  That's just not

25    evidence.  Please disregard it.

```
 1                    MR. VILLALOBOS:  I apologize, Your Honor.
 2                    THE WITNESS:  May I also qualify that
 3      answer?
 4                    MR. VILLALOBOS:  I'll ask you a question
 5      here.
 6                    THE COURT:  Dr. Pinkerman?  Just answer the
 7      questions.  I think we'll go through this quicker if you
 8      do that.
 9                    THE WITNESS:  Okay.
10           Q    (By Mr. Villalobos) Have you ever worked in one
11      of the prison systems?
12           A    I've worked in the Michigan Department of
13      Corrections subcontract which was a locked facility, yes,
14      and I've gone into quite a few prisons and jails.
15           Q    So you are aware that crime does occur in the
16      prison system?
17           A    Yes, sir.
18           Q    You are aware that there are drugs in the prison
19      system?
20           A    Yes, sir.
21           Q    That murders occur in the prison system?
22           A    Yes, sir.
23           Q    All right.  And that assaults take place in the
24      prison system?
25           A    Yes, sir.
```

1    Q    Now, do they all occur in a violent -- I'm
2    sorry, in a confrontational setting?
3    A    I don't know what you mean by confrontational
4    setting.
5    Q    You indicated earlier that your opinion of her,
6    the way she was blank faced, the way she would retract
7    herself when somebody would start yelling at her or being
8    aggressive with her, that she's in your opinion not the
9    type to be violent in a confrontational setting; is that
10   correct?
11   A    Yes.
12   Q    Now, there are nonconfrontational settings in
13   which a crime could take place; isn't that?
14   A    Yes.
15   Q    You could kill somebody in their sleep?
16   A    Yes.
17   Q    You could suffocate a child or somebody weaker
18   than you who is not being confrontational with you?
19   A    All of those things are possible.
20   Q    You know that -- I'm sorry.  Are you aware of
21   these nonconfrontational crimes within the prison system?
22   A    Yes.
23   Q    They do occur?
24   A    Yes.
25   Q    Are you aware that inmates do get pregnant in

1    the prison system?

2         A    Yes.

3         Q    And that the defendant is still within the

4    childbearing years?

5         A    That's a medical opinion, but I am thinking that

6    would be -- yes.

7              MR. VILLALOBOS:  Your Honor, I've got

8    plenty of questions.  I'm not going to finish before

9    lunch.

10             THE COURT:  I was hoping.

11             MR. VILLALOBOS:  I apologize.

12             THE COURT:  Ladies and gentlemen of the

13   jury, we're going to go ahead and break for lunch.  We

14   will see you back at 1:30.  I remind you of the

15   instructions.  Don't discuss this case with anybody, not

16   even amongst yourself until all of the evidence is in.

17   Thank you very much.  We will see you at 1:30.  No

18   laughing with each other either.

19             **(Lunch recess)**

20             THE COURT:  All right.  Mr. Padilla,

21   Mr. Villalobos, I've got the proposed charge as I've

22   signed it.  Only change that I made -- please step

23   forward, Mr. Gilman and Mr. Cordova.  The only change that

24   I made is that I put a signature date at the end.  I'm

25   hoping this is going to make the charge conference at the

1    appropriate time faster.  We will see you all at 1:30.

2                     (Lunch recess taken.)

3                     THE COURT:  Are you ready?  We don't have

4    much longer.

5                     MR. VILLALOBOS:  It depends, Your Honor.  I

6    want to be thorough in my cross examination.

7                     THE COURT:  Ready, Doctor?

8                     THE WITNESS:  Yes, sir.

9                     (Jury enters at 1:28 p.m.)

10                    THE COURT:  You may be seated.  Thank you

11   very much.  It is now 1:28.  Let the record reflect that

12   this is Case Number 07-CR-885-B, State of Texas versus

13   Melissa Elizabeth Lucio.  The defendant is present along

14   with her two counsel.  The State is being represented by

15   the attorneys as before.

16                    **CROSS-EXAMINATION (Continued)**

17   **BY MR. VILLALOBOS:**

18                    THE COURT:  Mr. Villalobos, I believe it

19   was your last testimony that we would like to put on the

20   record.

21        Q    (By Mr. Villalobos) Doctor, are you aware of the

22   defendant meeting with a Jesus Juarez?

23        A    I don't recall the name.

24        Q    Or the therapist while she was incarcerated?

25        A    I heard that she had contacts with someone.

110

```
1        Q      Did you review any of the notes?

2        A      No, sir.

3        Q      Did you discuss anything with Mr. Juarez?

4        A      No.

5        Q      Would it surprise you to learn that in February

6    of this year --

7               MR. GILMAN:  Objection, Your Honor.  And I

8    want them to be asking about notes from somebody else that

9    is not even here appearing in court.

10              THE COURT:  Is your objection as to the

11   admission of that document on a hearsay basis?

12              MR. GILMAN:  Yes, sir.

13              THE COURT:  Sustained.  (Court Reads

14   Monitor)  "However, would it surprise you to learn that."

15   That's proper cross examination.

16       Q      (By Mr. Villalobos) Would it surprise you to

17   know that in February of 2008 in her history to him, she

18   claimed no physical or sexual abuse?

19       A      No, it wouldn't.

20       Q      Why is that?

21       A      As I said in some of my previous statements, she

22   has a history of being very suspicious and distrustful.

23   She obviously hasn't had the opportunities to develop that

24   kind of a trusting relationship with the agency and with

25   maybe him.
```

111

```
 1        Q     But she would automatically trust you and tell
 2   you the truth as opposed to him?
 3        A     As I said, I look to a lot more collaborative
 4   information than just what she tells me.
 5        Q     Well, the time line here is you were hired in
 6   January of '08; is that correct?
 7        A     Yes, sir.
 8        Q     And Norma was hired in March of '08; is that
 9   correct?
10        A     I don't know.
11        Q     This was made in February of '08.  You don't
12   think it was made in anticipation of her defense -- the
13   changing of her story?
14        A     I have no opinion.
15                   MR. GILMAN:   Where and what is changing of
16   what story?
17                   MR. VILLALOBOS:   I will clarify it.
18                   MR. GILMAN:   We're talking about
19   speculation.
20                   THE COURT:   Rephrase your question.
21        Q     (By Mr. Villalobos) You don't think that it
22   would be the defendant changing her story once she figures
23   out that it is to her benefit to claim physical and sexual
24   abuse?
25        A     I'm sorry.  I don't think what?  I'm not trying
```

112

1    to be -- I'm just -- I'm losing it.

2         Q    Well, Doctor, common sense.  If the defendant is

3    charged and convicted of capital murder and facing the

4    death penalty, she's meeting with experts that are helping

5    her at her defense.  After she meets with them, wouldn't

6    she have a better picture of what she needs to do to

7    defend herself?

8         A    As I said before, her average -- her IQ was low

9    average.

10        Q    You are saying she can't figure that out, how to

11   help herself?

12        A    Her weakness is verbal comprehension, the verbal

13   integration of information and putting the big picture

14   together.  She doesn't do that real well.  Now, that's the

15   psychological explanation for what kind of question you're

16   asking me.

17        Q    The question I'm asking:  Is it a possibility

18   that she would say one version and then change the version

19   in order to help herself in this trial?

20        A    Yes, sir.

21        Q    Going back to your report, do you have a copy

22   with you?

23        A    No, I don't.

24        Q    Did you get a copy to the defense or the

25   original to the defense?

1     A     Yes, sir.

2     Q     Do you recall in your report indicating that she

3  denied any feelings of sadness, anger or anxiety?

4     A     What page?  It would be helpful if I see the

5  report.

6               MR. VILLALOBOS:  Your Honor, I would

7  request that the defense would give him a copy of his own

8  report, if they have an extra one, or allow them to make a

9  copy.

10               MR. GILMAN:  I will be glad to give it to

11  him, Your Honor.  I will be glad to introduce it into

12  evidence.

13               MR. VILLALOBOS:  I would move that it be

14  introduced into evidence.

15               MR. GILMAN:  That's fine.

16               MR. VILLALOBOS:  This would be State's

17  Exhibit -- 44?

18               THE COURT:  Forty-five I'm sorry.

19               MR. GILMAN:  That's for the State.

20               MR. VILLALOBOS:  I appreciate the defense

21  counsel introducing it for me.

22     Q     (By Mr. Villalobos) Can you review that real

23  quick?

24     A     Sure.  (Reviewing) And which page?

25     Q     Just to make sure that is your report, a copy of

```
 1    your report.
 2                    MR. VILLALOBOS:  Judge, did you already
 3    admit it?
 4                    THE COURT:  It's admitted.
 5                    (State's Exhibit Number 45 admitted)
 6                    MR. VILLALOBOS:  Okay.
 7                    THE COURT:  I'm not sure it was clear,
 8    Mr. Villalobos.  Thank you.
 9                    THE WITNESS:  It appears to be an accurate
10    copy.
11        Q    (By Mr. Villalobos) Okay.  On page three,
12    behavior, observations, mental status.
13        A    Yes.
14        Q    She denied feelings of sadness, anger, anxiety?
15        A    Yes.
16        Q    She denies having specific phobias or bad
17    dreams?
18        A    Yes.
19        Q    She's relatively calm?
20        A    Yes.
21        Q    Page six at the very bottom of the page, you
22    write:  "She likely has a history of disregarding the
23    social conventions and rules."
24        A    Yes.
25        Q    Does that translate to, that she just doesn't
```

115

1   follow the norm, society's normal rules?

2        A      In general, yes.  That her attitude and behavior

3   would not be the average or typical.   On certain

4   occasions, it would be.  On certain occasions, it wouldn't

5   be.

6        Q      Now going to the next page on page seven is

7   where you put discussing battered woman syndrome; is that

8   correct?

9        A      I'm discussing I guess the consequences of what

10  her life experience has led her to be as far as her

11  psychological organization.   I have not used that

12  descriptor.

13       Q      Well, in your testimony you indicated that you

14  felt that she was a battered woman syndrome?

15       A      No.

16       Q      No.   You disagree with that?

17       A      I said that of the six categories, she resembled

18  only that battered woman category, at the exclusion of the

19  others.   And she has characteristics that are associated

20  with that.   To say "battered woman" without some of the

21  collaborative information is difficult to say.

22       Q      Can Norma Villanueva assess her as having a

23  battered woman syndrome or a battered person syndrome?   Is

24  she qualified to assess her and diagnose her with that?

25       A      Yes, she is.

116

1       Q    Do you agree with that diagnosis?

2       A    I can't agree or disagree with what Norma's work

3  is.

4       Q    Well, do you feel that this defendant has

5  battered woman's syndrome?

6       A    I can't answer, yes or no.

7       Q    Why not?

8       A    Because my answer would be in the middle.

9       Q    It would be in the middle?

10      A    Yeah.

11      Q    Isn't it a diagnosis?  Either you have it or you

12  don't; isn't that correct?

13      A    I did not -- no, it's not.

14      Q    So you can be kind of ill?

15      A    People can be a little anxious or severely

16  anxious.  These syndromes are not concrete.  That's not

17  like a broken leg whether you have it or not.  My

18  diagnosis on page ten doesn't include battered woman.  I

19  included that she was a victim of traumatic tress.

20      Q    So at least when you wrote that, you were under

21  the impression that she was not diagnosed with battered

22  woman syndrome?

23      A    Under the impression from what source I guess?

24      Q    Well, it's your report.  You just read your

25  diagnosis, and it's not on there.  So it would be safe to

117

1    assume that on July 9, 2008 you did not diagnose her with

2    battered woman syndrome?

3         A    Battered woman syndrome isn't a DSM-4 diagnosis.

4         Q    Correct.  But you could have made a notation to

5    it?

6         A    That's not the usual practice.

7         Q    Well, let's go on to page seven.  You indicated

8    that there's generally six categories on mothers who

9    killed their children?

10        A    Correct.

11        Q    The first one is mentally ill mother psychotic

12   episode and you have ruled that one out?

13        A    Correct.

14        Q    The retaliating mother revenge against the

15   father, and you ruled that one out?

16        A    Yes, sir.

17        Q    I'll skip three because that's one we'll be

18   talking about.  Let's go to four, the merciful mother, the

19   terminally ill child.  You ruled that one out?

20        A    Yes, sir.

21        Q    Let's go to six, the unwanted or unexpected

22   mother.  And you ruled that one out?

23        A    Yes.

24        Q    It wouldn't appear to you that this child was

25   unwanted?

118

```
 1        A     Are you -- again, you're asking a professional
 2   opinion and my rule was to diagnose and look at the
 3   mitigating circumstances.
 4        Q     Well, just so I can be clear, with the unwanted .
 5   or unexpected mother would that translate to the mother
 6   not wanting the child, even one that's already been born,
 7   or is it just strictly for a pregnant woman?
 8        A     It would be I suppose both, you know --
 9        Q     Okay.
10        A     That a pregnant mother could try to terminate
11   the life of the fetus, and I think in my understanding an
12   unwanted or unexpected mother that kind of a mother murder
13   occurs within those first couple of years of life.
14        Q     So a two year old would fit that category?
15        A     A little older.
16        Q     So is it because of the age of the child that
17   you have ruled that out.  Or are there other factors that
18   you ruled that out?
19        A     There were no other factors that told me that
20   Mariah was unwanted.  I heard nothing to that effect.
21        Q     So the actual act itself, 88 days of being beat
22   to death wouldn't be a factor for you of being unwanted?
23        A     It would be a factor.
24              MR. GILMAN:  Objection, Your Honor.  There
25   is no testimony of 88 days of beating.
```

```
1              THE COURT:  Sustained.
2      Q    (By Mr. Villalobos) The severe beating of the
3   child, wouldn't that be a factor of being unwanted?
4      A    Well, I'm not comfortable making opinions into
5   that.
6      Q    Well, you're ruling it out.  Wouldn't you want
7   to at least explore the death of the child to rule out
8   that cause?
9      A    Again, my focus is on understanding Mrs. Lucio
10  and trying to assist in the determination of the
11  mitigating factors, the aggravating factor of the child's
12  death is established.
13     Q    Number five:  The battering woman.  Impulsive
14  murder with rage.  You ruled that out in your report,
15  haven't you?
16     A    I said that she doesn't meet the strict criteria
17  for any of those.
18     Q    This brutal beating of the child does not seem
19  to you to be an impulse murder with rage?
20     A    I'm not addressing those kinds of concerns.  I'm
21  a psychologist.  I'm addressing -- and I wasn't addressing
22  the state of her mind at the time of the offense.  I'm
23  sorry.  I was not.
24     Q    The depressed mother postpartum syndrome within
25  first months of life, that's number three, the one we
```

1    skipped?

2         A    Uh-huh.  Yes.

3         Q    Now in your report you indicated that there's no

4    evidence that a severe depressive episode accompanied this

5    incident?

6         A    Correct.

7         Q    So in essence you've ruled out that one as well?

8         A    Correct.

9         Q    So you've ruled out all six of the battered

10   woman's syndrome that you have listed here?

11        A    No.  These aren't battered woman syndromes.

12        Q    These are partly battered women?

13        A    Yes, sir.

14        Q    So you ruled out the six reasons that mothers

15   would kill their children?

16        A    There are more reasons.  There are an infinite

17   number of reasons that a mother would do so.  It's just

18   that the literature both in the United States, North

19   America and across cultures suggests that these are the

20   majority categories.  So it's possible that somebody could

21   fall outside of those categories and that's what I think

22   her circumstance was.

23        Q    Did you put that anywhere in this report?

24        A    Yes.  I put it in the first paragraph of page

25   eight, that she does not meet the criteria for all of

1    those, and that she had an episode of depression likely,

2    but there is no evidence that the episode accompanied the

3    incident.

4        Q    So that's writing saying that it falls outside

5    of the categories?

6        A    Right.

7        Q    Above that what you just read, you indicate

8    there seems to be low probability that Mrs. Lucio

9    committed the fatal violence against Mariah when factoring

10   the personality, past history and gender?

11       A    Correct.

12       Q    So you have made a conclusion on your end that

13   she probably wouldn't have committed this crime?

14       A    At that point based upon the psychological

15   factors, not on any other kinds of legal determination, I

16   am trying to see if -- does her profile of personality,

17   age, whole life history, all of those factors, except what

18   we would think of this is a mother who murders and I

19   didn't see it.

20       Q    Okay.  So you could never have predicted that

21   she would have committed this murder?

22       A    No.

23       Q    And you cannot predict whether she'll murder

24   again?

25       A    No.  I mean, yes.  I agree with it.

122

1      Q     On number 11, page 11 -- I'm sorry.

2      A     Okay.

3      Q     Under mitigation because you're mainly here for

4    the mitigation; is that correct?

5      A     Yes, sir.

6      Q     Well, let's start on page ten just so we can go

7    through the entire section on mitigation.  The first

8    paragraph of mitigation you're explaining what mitigation

9    is?

10     A     Yes, sir.

11     Q     Okay.  So that doesn't necessarily apply to

12   Mrs. Lucio.  You're just telling whoever is reading this

13   report what it is -- what mitigation is?

14     A     Yes.

15     Q     The second paragraph when you're talking about

16   factors, again, you're explaining what mitigation is to

17   whoever is reading this report?

18     A     Correct.

19     Q     Going to page 11 that top paragraph goes with

20   the previous page; is that correct?

21     A     Yes, sir.

22     Q     The next paragraph, which would be the third

23   paragraph is, again, explanation of what mitigation is?

24     A     I got lost.  Excuse me, sir.  On the first

25   paragraph of page 11?

123

```
1        Q    Where it says:  "Persons with good life
2    circumstances, with families, social or religious support,
3    you go on and you end it -- "did not compromise or average
4    expected development," that paragraph is just standard,
5    boiler plate of what mitigation is?
6        A    No.  I mean, it's my take on it.
7        Q    I don't mean to downplay when I say boiler
8    plate, but that's an explanation of what mitigation is.
9    It doesn't necessarily apply to the defendant?
10       A    You're asking me two questions or one?
11       Q    I'm asking you:  Does that apply specifically to
12   the defendant?
13       A    It's the perspective that I am using in looking
14   at mitigation issues, yes.
15       Q    The next paragraph is actually a question.  Is
16   that true?
17       A    Yes, sir.
18       Q    A final paragraph which is five lines, that is
19   specific to this defendant; is that correct?
20       A    Yes.
21       Q    So that is the meat of your mitigation for this
22   defendant; is that correct?
23       A    I don't -- ask again.  Meat?
24       Q    Yes.  The meat of your mitigation factors.  You
25   have a bunch of introductions as to what it is.  You
```

124

1    explain somebody that has a great life and then a question

2    and then you get into about four lines about this

3    particular defendant.  That's the meat of your mitigation,

4    isn't that correct, on this report?

5         A    It is a summary statement, yes.

6         Q    In it you stated that she reached a point in

7    which she couldn't intervene with her children and failed

8    to protect Mariah?

9         A    Yes.

10        Q    Are you under the -- were you under the

11   understanding that someone else harmed her and all she did

12   was failed to protect her?

13        A    No.  Again, I didn't address the causation.

14   What I'm trying to think that any mother would have looked

15   to that pattern of abuse and -- in a normal situation, a

16   normal mother would have protected the child.

17        Q    Well, when you're -- you're hired to be a

18   mitigation expert; is that correct?

19        A    Yes, sir.

20        Q    Mitigation comes after conviction.  Is that

21   true?

22        A    Yes.

23        Q    So you have to have a conviction in order for

24   there to be an issue of mitigation?

25        A    Yes, sir.

125

```
1        Q    Now, wouldn't it make sense for you to go into
2    the actual event, because that is what your job is, to
3    come in after the conviction to explain the mitigation?
4        A    I got lost in -- what's your question?
5        Q    You're saying that you did not go into the event
6    with Mrs. Lucio or with the defendant; isn't it true?
7        A    Yes.
8        Q    So you skipped that entirely?
9        A    No.  I go into the event.  I did review the
10   circumstances, and I also viewed the videotape or the DVD,
11   or whatever, of her statement, but I did ask her what
12   occurred in that circumstance.
13       Q    Well, but you don't -- that's part of her
14   history; isn't that true?
15       A    Yes.
16       Q    So the history of beating a child, wouldn't that
17   be important for you to use for the mitigation?
18       A    In her statements to me, she acknowledged and on
19   the video she acknowledges hitting the child.
20       Q    Again, so then you're not even considering that
21   a murder occurred when you're doing your diagnosis?
22       A    Again, I'm trying -- those factors are for the
23   Court.  You know, my psychologist role isn't to consider
24   whether or not it happened.
25       Q    I understand that, Doctor.  But your job is to
```

1    come in here and present mitigation based on her history;

2    isn't that true?

3        A    Multiple factors including her history, yes.

4        Q    Well, if her history includes a violent act, why

5    is it that you just leave that out in your determination?

6        A    Why are you saying that I left it out?  I guess

7    I don't get it.

8        Q    Because you're not acknowledging it.  In your

9    report you're saying it's failure to protect, or in your

10   opinion, low probability that it occurred in the first

11   place.

12       A    Let me go back and pull out -- "Failed to

13   protect Mariah.  She couldn't intervene with her own

14   children.  That all of the factors, as I mentioned before,

15   her personality, the prior victimization in combination

16   with having the stress of so many children placed in her

17   care, apparently tipped the balances of factors and

18   impaired her judgment and control.  That's psychology

19   speak for:  Yeah.  Something happened.  She did it.

20       Q    Ah, okay.  So --

21       A    The balance and control --

22       Q    Impaired her control and judgment is actually

23   beating this child to death?

24       A    No, sir.  I'm not going -- she has been

25   convicted of that crime.

1      Q    You state the stress of having so many children

2   placed in her care like -- so it was involuntary in your

3   opinion that these children were thrust upon her?

4      A    No, that's not my opinion.

5      Q    To have 14 children, that has to be pretty much

6   a conscious act, wouldn't you think?

7      A    It could be motivated by a number of factors,

8   yeah.

9      Q    On the violence risk assessment, the next

10  paragraph, the last two sentences you say:  She has no

11  history of interpersonal violence?

12     A    Yes.

13     Q    Well, in your psychological way of talking, on

14  the paragraph above you say that there was?

15     A    Yes.

16     Q    So which is correct?

17     A    She has an acknowledged history of striking her

18  child, but what I am referencing in there is there was no

19  history of police reports, of arrests for interpersonal

20  violence, meaning with adults, with children.  She didn't

21  have a criminal record in that regard.

22     Q    Well, she was brought to you from the jail.

23  That wouldn't be a history of it?

24     A    At that time that I saw her she hadn't been

25  convicted.

1      Q     So the next paragraph -- I mean, the next

2   sentence that event was not under consideration.  So the

3   reason that we're here today which she was convicted for

4   was not even considered in your report?

5      A     No.   If -- no.   You're wrong.

6      Q     I'm wrong.   Okay.   Well, explain why that event

7   is not under consideration.

8      A     It's a reference to the previous sentence.

9      Q     Which is:  "She has no history of interpersonal

10  violence."

11     A     The next sentence.

12     Q     Oh, we're supposed to understand that that

13  sentence goes back, two sentences back?

14     A     Yes.

15     Q     The last page of your report, page 13.

16  Compliance.   "She has generally complied to correctional

17  rules and limits."

18     A     Yes, sir.

19     Q     Is that while she's locked up?

20     A     Yes.

21     Q     The next one:  "She seems able to consistently

22  avoid misjudgments and poor behavior."

23   ·  A     Yes, sir.

24     Q     You stand by that statement?

25     A     Yes.

129

```
 1        Q     Drug use, a history of it while she's pregnant,
 2   beating her child to death and that's consistently
 3   avoiding misjudgment and poor behavior?
 4        A     Compliance implies, compliance within that
 5   structured setting of a correctional facility.  That's
 6   exactly what I'm referencing.  I'm not generalizing it to
 7   the past or all those other issues.  It's not uncommon for
 8   people who need and have a much more diversed and have a
 9   very distressing criminal history -- in the community not
10   being able to manage themselves within a locked facility
11   do fine for years and years.
12        Q     The last thing you have is level of
13   incarceration.  You put "severe"?
14        A     Yes, sir.
15        Q     Will be in strict correctional supervision, what
16   exactly does that mean?
17        A     It means that she wouldn't be eligible for
18   things like a trusteeship.  She wouldn't be allowed to do
19   a community program.  She's not going to be seen at that
20   lowest level of criminal justice correctional facility.
21        Q     Are you familiar with the system of, I guess,
22   ranking the inmates?  They give them a ranking or monitor?
23        A     Yes -- well, the inmates --
24        Q     What is the scale?
25        A     There are two components to it.  One is the
```

1    general population and that's broken into about six areas.

2    Another one is those that have to have sanctions in their

3    security placement.  And, again, those go up five to six

4    notches.

5         Q     So you're aware that she could be at the level

6    right below trustee?

7         A     Above it?

8         Q     Right below -- well, we'll use the scale going

9    down.

10        A     Okay.  All right.  Going down.

11        Q     The trustee being highest?

12        A     Yes, sir.  Yeah.

13        Q     She can actually achieve the ranking or status

14   or monitor label of the level right below it?

15        A     And I think it's important, like you said, she

16   can achieve that.  It's not something that is given to

17   her.

18        Q     Well, everyone that's sent to prison starts out

19   in the general population.  I'll strike that.  This

20   defendant will start off in general population.  Are you

21   aware of that?

22        A     Yes.

23        Q     So she's already in the G rankings upon

24   arriving?

25        A     Yes.

```
1        Q     And she would have to actually start messing up
2   to go down on the G rankings to get to the A rankings?
3        A     Yes, sir.
4        Q     And then she can continue to go up and down on
5   the G and A rankings, which was explained to us by another
6   witness.  But you would agree with that?
7        A     Yes, sir.
8        Q     So how is it that her incarceration can be
9   stated as being severe?  Is that your term just for
10  general incarceration?
11       A     Yes.  As I said, it's describing major felony
12  incarceration.  It's not, you know, the local country club
13  farm prison setting.  It's not trusteeship.  It's meaning
14  that she will be under lock and key.
15       Q     Well, in the prison system?
16       A     Yes.  That's what I mean.
17       Q     But you're not saying she's going to be any
18  stricter in the prison system, than any other defendant
19  that goes in her same shoes?
20       A     Let me put it this way.  There are statistics
21  that are different for men and women in incarceration.
22  Approximately 70 percent of the capital murder defendants
23  are in the general population.
24       Q     So she's going to -- well, I think we've already
25  gone through that.  I'll strike that.
```

132

```
1              One of the things that you indicated for
2    her lack of -- your opinion of her lack of violence in the
3    future was her age?
4         A    Yes, sir.
5         Q    You supposed that she was 38 or 39?
6         A    Yes, sir.
7         Q    She committed this crime 18 months ago.  You're
8    saying 18 months would have aged her out of committing any
9    future murders?
10        A    No.
11        Q    She's obviously not decrepit; is that correct?
12        A    No.
13        Q    You don't think she's capable of murdering
14   someone in the next 30 years or 40 years absent that
15   traumatic injury?
16        A    We've talked about there's always a probability
17   that something could happen.  I've already identified that
18   I think in the prison population she would be a low risk.
19        Q    Well, you identified her as a low risk to even
20   commit this offense, true?
21        A    I wasn't asked to assess that.
22             MR. VILLALOBOS:  Judge, at this time I'll
23   pass the witness.
24             THE COURT:  Mr. Gilman.
25
```

133

**REDIRECT EXAMINATION**

BY MR. GILMAN:

1    Q    If an inmate is allowed visitation with family members -- they're being watched, are they not?

2    A    Yes.

3    Q    I mean, you can't go in a prison and it's like being in your homes.  You're being watched all of the time, are you not?

4    A    Yes.  Let me qualify that.  I am not an expert on Texas Department of Corrections Procedure, but when I have been in jails and prisons, I have seen family visit and it's never a solitary issue.  And when I've been in prisons, it's never a solitary issue.

5    Q    So if a family member of Melissa Lucio, for instance, a child of hers goes and sees her, that child is going to be watched, are they not?

6         MR. VILLALOBOS:  Judge, I would object. He's already indicated that he's not aware of that.  He's not an expert, so he would be speculating.

7         THE COURT:  He just wants to see if he knows.  If he doesn't know, he doesn't know.

8    Q    (By Mr. Gilman) Answer the question, please.

9    A    My experience has been that they are supervised visits.  They may be in a community room, a large room. But there are staff there.  There are video monitors going

1  on.

2      Q    And if the parent/child relationship between

3  Melissa Lucio and her children is terminated by Child

4  Protective Services and the district attorney's office,

5  then there wouldn't be any kind of danger of killing

6  anymore children, would there?

7      A    Part of the risk assessment that I look at is

8  the situation and the context.  It's not only the personal

9  issues of the individual, but the situation.  It was like

10 what you said, that reduces her risk of harming a child to

11 near zero.  I cannot, in good conscious, say zero because

12 anything is possible.

13     Q    If a woman were to be charged with killing a

14 child under the age of six, and that woman has her tubes

15 tied so she can no longer produce any children or has a

16 hysterectomy so she cannot produce anymore children, that

17 would certainly lower the factor also, would it not?

18     A    Yes.

19          MR. GILMAN:  I pass the witness.

20                    **RECROSS-EXAMINATION**

21 **BY MR. VILLALOBOS:**

22     Q    Are you saying that because they're supervised

23 they are not going to commit anymore crimes, people in

24 prison?

25     A    No.

135

1      Q    Because it's true they're supervised or they're

2  supposed to be at least 24 hours a day.

3      A    Yes, sir.

4      Q    We know that there's staggering amounts of

5  crimes that still occur in the prison system?

6      A    No.

7      Q    There isn't any crime occurring in the prison

8  system?

9      A    No.  I disagree with you saying that.

10     Q    Okay.  Well, you're playing word games here.

11 Tell me, is there crime being committed in the prison

12 system?

13     A    Absolutely.  Yes.  You said "staggering

14 "amounts.

15     Q    Okay.

16     A    I don't --

17     Q    Strike the staggering.

18          Is there crime occurring in the prison

19 system?

20     A    Yes, sir.

21     Q    Several thousands of crimes occurring in the

22 prison system?

23          MR. GILMAN:  Objection.  There is not --

24 even with their witnesses, there was never any thousands.

25          THE COURT:  Sustained.

1      Q     (By Mr. Villalobos) Well, would it surprise you

2  that there was 14,000 in 2007?

3      A     No.  I recall being or learning that there are a

4  quarter of a million people incarcerated.

5      Q     And it's just 14,000 assaults in 2007.  So

6  there's still other types of crimes other than assaults?

7      A     Yes, sir.

8      Q     So there is crime occurring even when they're

9  supervised?

10      A     Absolutely.  It's possible.

11      Q     Well, not only possible, it does happen?

12      A     Yes.

13             MR. VILLALOBOS:  Pass the witness.

14                    **REDIRECT EXAMINATION**

15  **BY MR. GILMAN:**

16      Q     Are you aware that there's only 12,000 female

17  inmates in the prison system in 2007?

18      A     No, I wasn't.

19             MR. GILMAN:  Nothing further, Your Honor.

20             MR. VILLALOBOS:  Nothing further.

21             THE COURT:  May this witness be excused?

22             MR. VILLALOBOS:  Yes, Your Honor.

23             THE COURT:  You may be excused.

24             THE WITNESS:  Thank you, Your Honor.

25             THE COURT:  Call your next witness.

1          MR. GILMAN: We rest, Judge.

2          THE COURT: Does the State rest and close?

3          MR. VILLALOBOS: Your Honor, we rest and

4     close.

5          THE COURT: Does the defense close?

6          MR. CORDOVA: We close, Judge.

7          THE COURT: Ladies and gentlemen of the

8     jury, we are now at the time that I've got to prepare the

9     charge. It'll take just a little bit. I've already given

10    all counsel a copy of the charge. We just have some legal

11    issues to take up. As soon as we are done with that, we

12    will proceed with the next stage. So you have a break

13    right now a little bit early. It will probably be about

14    15 to 20 minutes.

15          **(Jury not present at 2:07 p.m.)**

16          MR. CORDOVA: Your Honor, before you get

17    into the charge conference, Norma Villanueva is still

18    here. Can she be released now?

19          THE COURT: Now that both parties have

20    rested and closed, yes.

21          MR. CORDOVA: Your Honor, I just want to

22    ask --

23          THE COURT: Yes, sir. Okay. Would you

24    like to put something on the record?

25          MR. GILMAN: Yes, sir. Judge, I would like

1    to renew my motion for instructed verdict.  I don't think

2    that the State has shown improvement as per Berry that

3    she's a future dangerousness.

4              THE COURT:  I understand.

5              MR. PADILLA:  Your Honor, in the case of

6    law, I think 3707 (1) clearly states that the Court shall

7    provide those questions and I think the answers.

8              THE COURT:  I'm going to overrule the

9    motion for directive verdict at this time.

10             MR. GILMAN:  Thank you.

11             THE COURT:  All right.  Now moving on to

12   the charge conference.  Do you have any proposed requests

13   for instructions or questions?  I've not received any from

14   either side.

15             MR. PADILLA:  We have none, Your Honor.

16             THE COURT:  Be seated.  I apologize.  We

17   are going about our businesses and I didn't even notice.

18             MR. PADILLA:  The State has reviewed the

19   proposed charge.  My understanding is that we have now

20   gone to two special issues.  One concerning the law of

21   parties has been removed from the Court.

22             THE COURT:  That's correct.

23             MR. PADILLA:  Based on that information to

24   the Court, we have no objections to the form of the charge

25   and also to the form of the verdicts attached thereto.

```
1              THE COURT:  Mr. Gilman, do you have any
2    proposed or request for instructions?
3              MR. GILMAN:  No, Judge.  No, sir.
4              THE COURT:  Do you have any objections to
5    the charge as proposed by the Court?
6              MR. GILMAN:  No.
7              THE COURT:  I will go ahead and have copies
8    made for the jury.  How much time does each side need?
9              MR. PADILLA:  We would ask for an hour,
10   Your Honor.
11             MR. GILMAN:  Judge, we didn't even use an
12   hour in the guilt or innocence.  I would ask for 15
13   minutes.
14             THE COURT:  I will give half an hour to
15   both sides.
16             MR. PADILLA:  Would the Court -- can we ask
17   for 40 minutes, Your Honor?
18             MR. VILLALOBOS:  Your Honor, this is a
19   capital murder case, Your Honor.  This is not a normal
20   case.  I think we should be allowed to have --
21             THE COURT:  On the guilt or innocence you
22   took 40 minutes.  They took 40 minutes.  Mr. Villalobos.
23             MR. VILLALOBOS:  And you are reducing it to
24   the -- for the asking of a capital murder, Your Honor.
25             THE COURT:  I'll give you 40 minutes.
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1      Fine.   Your point is well made.   I will give you 40
 2      minutes, but I am not going to increase it.
 3                      MR. PADILLA:   The Court will allow to split
 4      three ways if you want?
 5                      THE COURT:   Sure.   You can split it any way
 6      you want.
 7                      MR. PADILLA:   Thank you, Your Honor.
 8                      THE COURT:   I just need to know how much
 9      for each -- what kind of warning you need and that's fine.
10                      MR. VILLALOBOS:   Can we have a moment to
11      discuss that?
12                      THE COURT:   Of course, you can.   I've got
13      to get copies of this made anyway.
14                      MR. VILLALOBOS:   Thank you, Your Honor.
15      The State is going to be dividing ten, ten and 15.
16                      THE COURT:   How many?
17                      MR. PADILLA:   Give me two minute warning.
18                      THE COURT:   Three minute warning,
19      Mr. Villalobos?
20                      MR. VILLALOBOS:   Yes, Your Honor.
21                      THE COURT:   Mr. Gilman, are you ready?
22                      MR. GILMAN:   Yes, sir.   Okay.
23                      THE COURT:   Everybody get ready for the
24      jury to come in.   All right.   Bring the jury in.
25                      (Jury present, defendant present at 2:19
```

Adelaido Flores, Jr.
Certified Shorthand Reporter

```
 1                    p.m.)
 2                    THE COURT:   Let the record reflect Case
 3      Number 07-CR-885 by the State of Texas versus Melissa
 4      Lucio, the defendant is present and along with counsel.
 5      The State is being represented along with counsel.   The
 6      jury is seated.
 7                    Ladies and gentlemen of the jury, all of
 8      the evidence is now before you.  I remind you of the
 9      instruction that you had before.  Violations of
10      instruction would cause this case to have to be retried
11      again.  So please I remind you, don't do it.  And if you
12      see any violations of these instructions, stop immediately
13      and inform the Court.
14                    I am now going to read the Court's charge
15      in this case.   The State of Texas versus Melissa Elizabeth
16      Lucio.
17                    (Punishment Charge Read)
18                    THE COURT:  You will now listen to
19      arguments of counsel.  Mrs. De Ford, would you proceed?
20                    MRS. DE FORD:   Yes, Your Honor.   Thank you.
21                    Ladies and gentlemen, on behalf of
22      Mr. Villalobos and our office, I thank you for a verdict.
23      It is a true and just verdict in this case.   I thank you
24      for hearing Mariah's call for justice.   I want to take you
25      back to the beginning of this trial, and I want to talk to
```

142

1    you about what the defense told you.

2              The defense argued at the beginning of this

3    trial that Mariah died of injury to the child.  She was

4    beaten.  Now, the first expert told you that the defendant

5    -- there is no history of aggression at all.  She's

6    obviously wrong.  That's not what the defense told you.

7    That's not what the video shows.  And she demonstrates on

8    that video how she hit that little girl time and time

9    again.  There is history of aggression.  Mariah's death is

10   proof of that.  What can you conclude from the first

11   expert's testimony?  She is simply wrong.  She got it

12   wrong.

13             The next expert tells you:  No history of

14   violence.  Again, remember what Mr. Gilman himself told

15   you?  She's guilty of injury to a child.  She's guilty of

16   beating that little girl.  Well, obviously this expert got

17   it wrong, too.  He tells you, well, posttraumatic stress.

18   She's suffering from stress.  She's suffering from

19   depression.  She also might have battered wife syndrome.

20             What can you conclude?  Look at Mariah.

21   You've seen the photographs.  No history of violence?

22   Really?  Are we talking about the same person, the same

23   defendant?  They got it wrong.

24             I want to talk to you about Mariah and the

25   nature of this crime against her.  Because we've all seen

1    the photographs.  We heard from Dr. Vargas who told us
2    it's the worst he's ever seen in his 30 years.  Dr. Farley
3    told us the same thing.  Worst case of child abuse ever in
4    our community.  Look at this little girl.  Look at her.
5    She was defenseless, innocent.  Her daughter.
6                    The nature of this crime speaks for itself.
7    She was beaten to death.  This is not one time.
8    Deliberate acts, over, and over, on this poor little girl.
9    This is a crime of hatred.  A crime of violence.  Not just
10   one time.  Not an accident.  The manner of death of which
11   this little girl died is also tragic.  It's also horrific.
12                    There's many of you on this jury that work
13   in the medical field and can understand the suffering that
14   she endured from her little brain swelling.  Dr. Farley
15   told you that brain swelling inside her head, went into
16   her spinal cavity, she would have suffered.  She would
17   have trouble breathing.  She would have seizures and just
18   lay there.  She let her lay there and suffer.
19                    A very painful cruel death.  That is what
20   is so horrific about this case, that this little girl laid
21   there in that bed when she could have simply called for
22   help, taken her to the doctor, done something to protect
23   this little girl.  The manner of death in this case is so
24   horrific because she suffered for so long, this little
25   baby girl.  It was simply torture and cruel.

```
 1              I want you to think about that as you're
 2    considering the decision in this case.  Excuses.  She was
 3    frustrated.  She was poor.  Ladies and gentlemen, many of
 4    us in this community grew up poor, have parents that did
 5    whatever they could to make it and we survived.  The
 6    problem in this case she was getting money.  She was
 7    getting food stamps.  She was getting benefits.
 8              They were using all of that money for
 9    cocaine.  Being poor is no excuse for what occurred here.
10    Use your common sense.
11              All of us have gone through periods of
12    struggle in our lives, periods of frustration.  We don't
13    go around beating up little innocent children to get rid
14    of that frustration.  Inexcusable.  That's what it is,
15    inexcusable.  We know the defendant's true character by
16    this offense, about what she has done.
17              The paramedics told you, that little
18    sergeant.  That EMT said:  I wondered when we were in the
19    ER what happened to this little girl and I said to her:
20    Go in peace.  They told you that when they got there, this
21    little girl was laying at the foot of that apartment on
22    the floor by herself without any comfort like a broken
23    doll.  They didn't even know who the parents were because
24    no one was around.  Imagine what those last few moments of
25    that little girl's life must have been.  That is what is
```

145

so horrific about this case.

And look at her confession.  Look at her
demeanor.  After the verdict, Officer Borrego told you,
well, she slept fine.  No problems.  What did that tell
you of how coldhearted she is?  It speaks for itself.
Even their own expert told you she shows no sadness, no
remorse for what she has done to this little girl.
Unbelievable.  Consider the very tragic circumstances in
this case.

I want to talk to you about the
continuing -- the things Mr. Merrillet talked to you
about.  He told you about the crimes that happens in
prison.  The same crimes that happened in our community
happened there.  And I want you to look at her jail record
because this jail record speaks to you about the type of
person that she is.  And in the short time that she's been
in jail she has had physical altercations, verbal
altercations, been in possession of contraband,
unauthorized communication, inciting a riot, and
confrontational towards the staff.  What does that tell
you about the type of person that she is now?  And that's
only here in our jail.  Imagine what she's going to be
like when she gets to Huntsville or wherever she ends up.
Look at these records, because they records speak for
themselves.

Adelaido Flores, Jr.
Certified Shorthand Reporter

1           This defendant is like a dog that bites a

2    human person.  Once that dog bites, they will always have

3    -- there will always be a probability that it will bite

4    again.  Same thing with this defendant.  Her record speaks

5    to you, and tells you:  This isn't going to end here.

6    This isn't going to end with Mariah.  This is going to

7    continue.

8           I want to talk to you about Mariah and

9    about her life because this is what this case is really

10   about, about her life.  Mrs. Castillo got up here and she

11   told you about that little girl.  And we all got to meet

12   Mariah, like what a happy child she was.  How she loved

13   attention.  How she loved to give hugs and kisses.  How

14   she had a hearty appetite.  And that's why she called her

15   my "Gordita".

16          This defendant has ended that life without

17   remorse.  Has taken away anymore birthdays for that little

18   girl.  No future proms, nothing.  She's been robbed of her

19   future by this defendant.

20               THE COURT:  Two minutes, Counselor.

21               MRS. DE FORD:  Thank you, Your Honor.

22          During jury selection we talked about what

23   might come, that you might have to consider the death

24   penalty.  And each and every one of you told us that if

25   the circumstances merited it, you could consider it.  I

1  ask you to have the courage to consider it because this
2  case deserves it.  I want you to look at all of the
3  circumstances in the case because this case, the nature of
4  the crime, the victim was so innocent and blameless, the
5  way that she suffered merits that she deserved -- that she
6  get the death penalty.  And I ask, again, for justice for
7  Mariah.  And I ask each and every one of you on behalf of
8  Mr. Villalobos and everyone in our office that you
9  consider it, and that you have the courage to do what is
10  just and right.  Thank you for your time and thank you for
11  your service.
12                  THE COURT:  Mr. Gilman?
13                  MR. GILMAN:  Are they through with their
14  opening?
15                  THE COURT:  No. they're reserving their
16  time.
17                  MR. PADILLA:  We're reserving our time.
18                  MR. GILMAN:  I didn't hear that.
19                  THE COURT:  I apologize.  I assumed.
20                  MR. CORDOVA:  Judge, I don't believe that
21  I'll take more than ten minutes, but if I do, if the Court
22  would advise me, please, at ten minutes.
23                  THE COURT:  Yes, sir.  How much time or
24  notice do you need?
25                  MR. CORDOVA:  Just one minute before.

148

```
1              THE COURT:  Okay.  Yes, sir.

2              MR. CORDOVA:  Good afternoon.

3              PANEL MEMBERS:  Good afternoon.

4              MR. CORDOVA:  My name is Adolfo Cordova.

5    I've been relatively quiet throughout this trial.  You all

6    have heard very little from me, but I felt it infinitely

7    important to get up and talk to you all about it this

8    matter.

9              I, like Mr. Gilman, respect your verdict.

10   I don't necessarily have to agree with it, but I respect

11   it.  But I think that in closing arguments that you've

12   heard and the evidence that has been presented during this

13   punishment phase and carried over from the

14   guilt/innocence, this is an emotional case.  And they tug

15   on your emotional heartstrings here.  If we take out all

16   of the facts other than the fact that we have a

17   two-year-old child that's dead, we would all agree it's a

18   tragedy.

19             I'm not here to belittle that.  But there

20   are certain circumstances here that make this more of a

21   tragedy.  But this is a tug on your heartstrings here.

22   Again, everything that you are to consider comes in as

23   facts from this witness chair.  You are to decide the

24   questions that you're being asked beyond a reasonable

25   doubt.  That includes the questions that you're being
```

1    asked to answer now.  The two questions.

2                    The first question has to do with future

3    dangerousness.  What have we heard one scintilla of

4    evidence as to future dangerousness of this person?

5                    We had the guy, Mr. Merrillet, or whatever

6    his name was, from Conroe.  If you take his own

7    statistics, he never spoke about Melissa specifically.

8    Never once did he talk about her.  In fact, he came up

9    here and told you, I'm not going to talk about her.  I

10   don't know her life.  So he gives us statistics.

11                   What are the statistics he gave us about

12   the future dangerousness of criminals in general?  He told

13   us there are 12,000 female inmates in the Texas Department

14   of Corrections as of 2007.  That's 12,000.  How many

15   assaults were there in that population?  Seventeen.  That

16   is one one-hundredth of a percent.

17                   What else do they bring you here?  They

18   bring you the jail records.  This is one thing where I

19   agree with the State.  Please, look at Melissa's jail

20   records.  Look at them.  They bring to you that she was in

21   a dorm with eight people and they found tattooing

22   equipment above the lights.  None of the girls would admit

23   to having been the owner of it.  So that is evidence of

24   future dangerousness?  Oh, but she was in a fight.  Look

25   at the fight.  You all look at them.  I saw you all

1    looking at the records.  She got in blocked punches in one

2    of the fights.  The other one, the girl hit her.  Please.

3    There's not a scintilla of evidence of future

4    dangerousness, much less beyond a reasonable doubt.

5                    What else do they bring here of future

6    dangerousness?  To answer question number one, she's got a

7    past history, a criminal history.  What was that?  A DWI.

8    If we poll the people in this courtroom today sitting

9    here, throughout this courtroom there would be a good

10   number of folks who've gotten a DWI.  It doesn't mean that

11   they are a future danger.  It's not a crime of moral

12   turpitude.

13                    What didn't they show you?  They didn't

14   show you one past act of physical abuse to any children.

15   Not one.  They didn't show you one past act where she's

16   ever been charged with a crime involving any physical harm

17   to anyone else.

18                    The second question that you are going to

19   be asked to answer is regarding mitigation factors.

20   Mr. Gilman will address all of these things much better

21   than I.  Much more intensely than I.  But I ask you to

22   consider her history, her background.  Is being poor an

23   excuse?  Absolutely not.  Is being hooked on drugs an

24   excuse?  Absolutely not.  There is a mechanism there for

25   helping this family that we've all heard extensively about

151

1    in this courtroom, and that mechanism didn't get involved

2    and didn't care enough to help anybody here.

3                 If you look at the evidence that you've

4    been presented in regard to her future dangerousness

5    mitigating factors, there's no question that beyond a

6    reasonable doubt that the State has not met that burden.

7    Thanks for your attention.

8                 THE COURT:  Mr. Gilman.

9                 MR. GILMAN:  Good afternoon.

10                PANEL MEMBERS:  Good afternoon.

11                MR. GILMAN:  Both sides have 40 minutes and

12   in 40 minutes we have to sum up what we want you all to

13   consider in the jury room.  I would like to bring your

14   attention to the word "probability".  During voir dire --

15   during the beginning stages of this trial, I asked you or

16   I tried to ask each one of you what probability meant.

17                And the only way I can ask is:  Is there a

18   probability that we're going to have a hurricane this

19   year?  Or a possibility that we're going to have a

20   hurricane this year?  And there's a possibility that we're

21   going to have a hurricane this year.  Because a

22   "probability" means a likelihood.  There's not a

23   likelihood.  There's a possibility that we may have a

24   hurricane, but not a probability.  That's real important.

25   It's a more assured thing if it's a probability.  There's

Adelaido Flores, Jr.
Certified Shorthand Reporter

152

1    a possibility that we could get in an automobile accident

2    driving home tonight.  Is there a probability?  Heck, no.

3    Because if there were a probability, we wouldn't get in

4    our cars and drive home.  We'd probably all take a walk.

5    And some of us it would take all night to get there.  So

6    there's a possibility that we can get in an accident

7    tonight.  Not a probability.  A probability is a pretty

8    sure thing.

9              Now during the testimony the State brings

10   in, Mister Conroe -- whatever the gentleman's name -- the

11   investigator from up in the prison system, and he told us

12   about some statistics, which I think I really need -- I

13   love it when people bring statistics on me, because he

14   says that there's a little less than 160,000 people in

15   prison.  I think it was 156.  But I rounded it off to 160,

16   it makes my math easier.  Of that there's only 12,000

17   women prisoners.  12,000.  If we do the math there, it

18   comes out to seven -- to eight percent of the population

19   in prison are women.  So those women that are sitting on

20   the jury, that just goes to show you women are better at

21   conducting yourselves than us men because we seem to get

22   into more trouble than you.

23             Okay.  Now, how many assaults were there

24   last year?  He says there were 17.  Seventeen assaults.

25   And if we take the 12,000 females, divide that into the 17

Adelaido Flores, Jr.
Certified Shorthand Reporter

1    assaults, we're going to get that percentage of -- this
2    number, roughly.  Okay.  So what is that percentage wise?
3    It's a .01 percent.
4                    All right.  This is Brownsville.
5    Brownsville has roughly 150,000 to 200,000 people.  If we
6    take the same percentage, that means we're going to have
7    15 to 20 assaults in a year.  Fifteen to 20 assaults in a
8    year.  The Brownsville Police Department would have a
9    holiday if they found out that they were only going to
10   have 15 or 20 assaults this year.  They have that on any
11   Friday or Saturday night.
12                    So the point here is the likelihood of an
13   assault occurring in prison is less than that occurring
14   here in our own community, in Brownsville.  I'm sorry I
15   didn't do the statistics for the Harlingen, San Benito or
16   every other community we've got in the county.  But I'm
17   thinking Brownsville because I'm more familiar with the
18   number of people that we have here in Brownsville.
19                    What is the probability -- because that's
20   the issue here -- of Melissa Lucio committing greater acts
21   of violence?  If it's one one-hundredths of a percent,
22   that's pretty slim.  Pretty slim.
23                    Child Protective Services is a state
24   organization.  A State organization is supposed to go out
25   and they have a mission statement to protect all of our

1    children in our community.  I'm not real happy with Child

2    Protective Services.  I'm sorry.  But if you have a

3    different feeling about them, please keep with your own

4    feelings.  But Child Protective Services is represented by

5    the district attorney's office.  Child Protective Services

6    attorneys are in the district attorney's office.  They

7    filed an action to terminate the parent/child relationship

8    between a mother, and father and their children.  They

9    have filed a petition to terminate the parent/child

10   relationship between Melissa Lucio and her children.  They

11   haven't done anything on it for quite some time.  As a

12   matter of fact, it was done back in 2004 when Mariah was

13   born and they haven't done anything.

14            Now, I could sit here and complain about

15   Child Protective Services, but that's not an excuse and I

16   don't mean it to sound as if it's an excuse because I'm

17   not trying to make excuses for Melissa Lucio's actions.

18   You found her guilty of this offense.  But now the

19   question is:  What are we going to do with Melissa Lucio?

20            And you've got two choices.  Is there a

21   probability of continuing acts of violence?  Probably not.

22   We've heard that from the State's main person who they

23   bring down because just from the statistics, there's no

24   probability.  We heard it from Dr. Pinkerman who also said

25   there's very little probability that she would ever do

1    anything of violence.

2                   So then we go into the next issue, and

3    that's dealing with the personal, moral culpability of the

4    defendant.  There is sufficient mitigating circumstances

5    or circumstances to warrant that a sentence of life

6    imprisonment be awarded.

7                   When you're little -- and if you have

8    brothers and sisters, and I guess, depending on if you are

9    the youngest or the oldest, your parents will say:  You

10   don't hit your brother or your sister.  Or, if they hit

11   you, you get in trouble if you're the oldest because you

12   hit them back.  And don't your parents say:  Two wrongs

13   don't make a right.  Two wrongs don't make it right.

14                  Mariah is dead.  I'm sorry for that.  I

15   really am.  She was a little girl, and she was just

16   starting out in her life.  But we're not going to bring

17   her back.  There's no way we can bring her back.  But I

18   have 13 other children that were born by this woman.  And

19   yes, she's probably going to have her rights terminated on

20   them, but at some point those kids want to go and see who

21   there mother is.  And I hope they go and look to find out

22   who their mother is.  And I'm hoping that you come back

23   and find her -- that you allow her to live in prison so

24   that those kids can somehow connect with their mother and

25   get some sort of an understanding of why this all took

1   place, because they've got some heavy duty talking to do.

2   Some really heavy duty talking.

3              There's things said in this courtroom that

4   these kids have never heard before.  There's things said

5   in this courtroom that the mother of Melissa Lucio has

6   never heard before.  That the sisters never heard before.

7   The system is failing, folks, if all we do is we go out

8   there and say:  Let's kill her.  That may be your gut

9   feeling.  Maybe you're infuriated with somebody who kills

10  a child.  And that's understandable.  But that's not the

11  legal question.  The legal question is:  Whether there's a

12  probability of continuing acts of violence.

13             And then, what do your moral tell us?  What

14  do your morals tell us?  Do we kill somebody else because

15  they, themselves, have killed?  I don't think that's what

16  the legislature intended when they made this law.  I think

17  what the legislature is wanting to do is, they're saying

18  if we can't have this person alive anymore because of

19  their continuing violence, then we have no alternative but

20  to terminate their life.

21             Is Mrs. Lucio at that point?  I think not.

22  I think not.  Take a look at the jail records.  I think

23  the jail records are interesting.  Mrs. Lucio did not know

24  she was being categorized.  I'm surprised that counsel

25  even brings up the fact that every 15 or 20 minutes

1    somebody is going by and checking to see if she's asleep

2    or not or if she's lying down.  How many times are you

3    depressed and you're upset and all you want to do is just

4    lay down?  And now they're trying to use that against her?

5                    If you're wondering what happens to the

6    rest of your life because you are found guilty of a

7    capital murder, what are you going do?  It's not like you

8    can stand around in the jail bars and bang on the wall.

9    If she had done that, the State would be up here telling

10   you that she has continuing acts of violence.  She's

11   banging on the door.  She's rattling the cages.  This

12   person is going to be caged up, folks, for the rest of her

13   life with no chance of ever getting out.  Do two wrongs

14   make a right?  I think not.

15                    I ask you to answer these questions.  No,

16   there's no probability that Melissa Lucio will have

17   continuing acts of violence.  And I ask you to answer the

18   second question, yes, there are mitigating circumstances.

19   Don't cut those 13 children off from checking their roots.

20   We learn a lot from our parents regardless of where they

21   may be.  But isn't it better to ask questions so you can

22   learn from her, for those kids to be able to ask Mom:

23   Why, Mom?  Why did you do it?  And get some sort of an

24   answer so they can somehow understand.  Thank you.

25                    THE COURT:  Mr. Padilla.

1          MR. PADILLA:  May it please the Court and

2     the counselors.  Ladies and gentlemen, again, I first and

3     foremost thank you very much for your verdict.  I feel

4     it's the only appropriate verdict in this matter.

5     Furthermore, it took us about four and a half to five

6     weeks to pick the 12 of you to sit here in this trial.

7     And we picked you because the State felt that you would

8     consider the evidence, would consider all of the cases.

9     And we asked you from day one we were going to ask at the

10     end of the trial when the evidence is heard, that we are

11     going to ask that the Defendant be sentenced to death.

12     That's how we started off and that's what we are

13     mentioning it here.

14          And we also told you that the State, even

15     if it's a capital murder case, doesn't always ask for

16     death.  The State can abandon a request for death, but

17     there are some crimes that are so vicious, so inhuman that

18     the State must ask for the death penalty.  The State has a

19     burden to make sure that people follow the law because

20     we're a system of laws.  We've got to live with the law.

21     It's not a dog eat dog world out there.  If you don't

22     follow the laws, there are consequences.

23          And don't come in here and complain after

24     you committed a criminal violation.  You know what?  I

25     shouldn't be sentenced to this.  I shouldn't do this

159

1    thing.  You know?  Why?  Because the laws are out there

2    for everybody.  So it shows you because we know that this

3    is a difficult decision, but we have -- the State of Texas

4    has complete faith in you that once you look at all of the

5    evidence, the only appropriate verdict in this case is a

6    sentence of death.

7                      This child suffered.  This child was

8    humiliated.  This child was murdered in a brutal fashion,

9    ladies and gentlemen.  If it was a situation where, let's

10   say, Mrs. Lucio needed money for her cocaine habit and she

11   walked in and shot a Circle K person, we would be talking

12   about a different matter.  That's not what happened here.

13   This child was brutalized.

14                      They're telling us:  Oh, well, we're

15   pulling on your heart.  I offered a minimal amount of

16   pictures to you here today during the trial just to

17   demonstrate the injuries that this child suffered.  We are

18   not trying to infuriate you.  But what we are asking for

19   is some justice here, because -- isn't that what's

20   required?

21                      And, you know, defense comes in and gives

22   you numbers.  You know, it's funny.  They pick 17

23   assaults.  Well, ladies and gentlemen --

24                      MR. PEREZ:  Objection.  The defense didn't

25   pick them.  This is the --

1          MR. PADILLA:  Judge, they are picking the

2     17 assaults --

3          THE COURT:  Mr. Padilla, move on.

4          MR. PADILLA:  Thank you.  They paint the 17

5     assault numbers.  But, guess what?  They didn't pick up

6     the sexual assaults.  They didn't pick up murders.  They

7     didn't pick drug paraphernalia, drug possession.  Yes.

8     Let's go over the lowest number possible so we can make it

9     seem like it's only 15 or 20 violations.

10          Mr. Merrillet said:  You know what?  I

11     don't get paid to come and testify.  I work for the

12     special unit.  And all he does, is come in court and

13     prosecute criminal defendants who have violated the law.

14     His involvement was here to give you a sense, and a feel

15     of what happens within the penitentiary, because all of

16     the type of the offenses that occur in the free world

17     occur within the penitentiary.  Okay?

18          So then the question becomes -- and we

19     discussed that issue with you, ladies and gentlemen --

20     that society in this instance involves where the person is

21     incarcerated.  That's that person's society.  Is this

22     person a continuing threat?  If you're a cold-blood

23     murderer, show some remorse.  Because I think -- if you're

24     really going to mend, and you're going to change your

25     life, you're going to accept -- the first thing you've got

1    to do is accept that you did something wrong because

2    nothing never changes.  Because if you think what you did

3    was right, how are you going to change?

4              Show some remorse.  Show some feelings.

5    Show some burden.  That, I think, is tantamount on whether

6    you've accepted your punishment, and you've accepted your

7    verdict, and you will go on with your life and carry on.

8    That's what you have to look at.

9              As we sit here, the defense brings us

10   certain witnesses.  Mrs. Villanueva testifies to you:

11   Well, you know what?  It's real easy for me.  I'm going to

12   do a social study, and I'm going to come up with a reason.

13   And I didn't even come up with a reason as to why she did

14   it.  She even testifies to that -- other than the fact --

15   that she didn't do it.  But you know what?  If she did do

16   it, because she was sexually assaulted as a child.  And

17   because, you know what?  She was also a battered woman.

18             Ladies and gentlemen, is there any evidence

19   to that?  She didn't talk to a single individual,

20   Mrs. Villanueva did, to ascertain that.  But you know

21   what, it fits good into a pattern for the defense.

22             Well, you know what?  And I've talked to

23   you during the first part, about the rabbit trails out

24   there.  Let's bring up this issue that she was sexually

25   assaulted, and they bring up this issue, and that she's a

1    battered woman, and that maybe the jury will buy it, and
2    say:  You know what?  Hey!  That's the reason why she did
3    it.

4                     What evidence is out there that's the
5    reason why she did it?  They'll never know why she did it.
6    We don't have to establish motive as to why she did it.
7    But she did it.  And it wasn't because she was a battered
8    woman.  Because as the doctor stated to you, that he
9    looked at all of the testing -- at all of the six,
10   different, possible grounds that may have been to
11   establish her culpability.  And lo and behold, none of
12   them apply to her.  They may be from outside of that
13   funnel that they're just leading you to.  So there is no
14   evidence at all concerning the issue of the battered
15   woman.

16                   And secondly, the issue about the sexual
17   assault, what evidence is there?  Ladies and gentlemen,
18   the defense would also ask you:  Well, she never violated
19   the law.  Every time she purchased cocaine that was a
20   violation of the law.  Every time she consumed cocaine, it
21   was a violation of the law.  If She didn't cause, is a
22   different matter.  But they were ready to say:  You know
23   what?  We have one assault, and one assault only, and --
24   Dear Lord!  We're trying to kill somebody who one assault
25   no there's a strong litany of violations out there because

1    the evidence clearly shows -- if You take back those CPS
2    reports, and if they really love the children -- if she
3    really loved the children as she is now attempting to make
4    you believe, well I need to see my 13 children.  First and
5    foremost, she would have fed them, she would have clothed
6    them, she would have taken care of them, she would have
7    used the food stamp money to take care of those children.
8    She would have used her AFDC funds to take care of these
9    children.  No.  What were they doing with it?
10                   Smoking it.  That's what they were doing
11   with that money.  Whose fault is it that they were doing
12   that?  It's her fault.  And they come in here and trying
13   to blame CPS.  Oh, CPS should have this, and CPS should
14   have done that.  CPS didn't lay a hand on this child.  And
15   yes maybe they committed an error in returning this child
16   to her.  But you know what?  She's the one that battered
17   this child.  She's the one that bit the child.  She's the
18   one that pounded that child until that child died.  Is
19   that CPS's fault.  It's not.
20                   Well, the State of Texas -- CPS is
21   represented by the district attorney's office.  So what?
22   But they're trying to say -- they're trying to blame us.
23   The district attorney's office?  We're here to prosecute.
24   We're doing what the law requires us to do.  But for them
25   to come in here and try to dissolve themselves of all

164

```
1    liability by trying to blame CPS, is unfortunate, not
2    true.
3               And this is just a last ditch effort to
4    attempt to absolve themselves of any liability.  We did
5    nothing wrong.  She did nothing wrong.  All she did was:
6    She spanked the baby, as Mrs. Chavez said.
7               That's not what happened out there.  Don't
8    come in here and try to pull the wool over your eyes,
9    because you heard the evidence.  You're strong enough to
10   make this decision.  And we sat here for four and a half
11   weeks.  And when we brought you in here, we discussed
12   this.  And we told you that you were going to have to
13   answer this question, whether there is a probability that
14   the defendant would commit acts of violence that would
15   constitute a continuing threat to society.  And we talked
16   about probability, and we discussed it.  And I told you --
17   and I gave you a "more likely than not" definition.  Then
18   number two had been taken out because it's not all
19   parties, and we discussed that too.  Okay?
20              And then the other question that was going
21   to be asked to answer was whether to take into
22   consideration all of the evidence including the
23   circumstances of the offense.  The circumstances of it.  I
24   told you look at that.  Look at the gruesomeness of the
25   killing.
```

1          This wasn't an isolated incident where she
2     lost it and she killed this child.  She made this child
3     suffer.  Every time she injured this child she had to have
4     gotten some pleasure from it because she didn't do it one
5     time.  She did it over a period of weeks and probably
6     months.
7          Is this a person that you want out there in
8     a society of prisoners?  She has already shown a tendency
9     to be violent, ladies and gentlemen, to be abusive, to be
10    aggressive and to injure innocent people.  She's just as
11    likely to go after innocent -- other innocent individuals,
12    people that may be within the prison system.  Because
13    Mr. Merrillet has told you that they don't classify them
14    by capital murder.  They can put him in with a burglar,
15    with somebody who's writing hot checks.  She can victimize
16    other individuals.
17         So, therefore, getting back to the issue at
18    hand, look at the moral culpability.  Look at the
19    circumstances surrounding that.  And also, you've got to
20    look at the situation where all the circumstances of the
21    offense, her character, her background and whether there's
22    any mitigating factors in her favor.
23         What are the mitigating factors in her
24    favor?  Oh, I want to be spared from the death because
25    I've got 13 children out there.  What has she ever done

1    for the 13 children?  She's using the 13 children now to

2    get away from her responsibility.  What has she done for

3    them.  Did you hear Mrs. Villanueva come in and say:  You

4    know what?  I've interviewed.  Pursuant to the children,

5    they want to be with their mother.  They want her here.

6    Do they miss her?  No.  The children are carrying on with

7    foster parents.  And they're probably having a better life

8    than the life they had with Mrs. Lucio, and Mr. Alvarez.

9              Because all they were ever involved with

10   was drug possession, drug use and drug paraphernalia.

11   That's all they would do.  They didn't care about the

12   children.  You know what the children guaranteed them?

13   The food stamp money that you can convert to drugs, and

14   the AFDC check that you can convert to drugs.  That's what

15   the children represented to them.  Because they sure as

16   heck weren't feeding them.  They weren't caring for them.

17   They weren't taking them to the doctor.

18              So why would you want to have 13 children

19   with you?  Because the State of Texas gives you that

20   money.  And because -- and that's evident by the fact that

21   they were evicted under the investigation for failure to

22   pay their rent.  That the house was a pigpen according to

23   some of the reports.  Why?  If you're getting 24 or $2,500

24   a month, and they're working, why do they not have the

25   resources to buy groceries?  It's bad for cocaine.

167

```
1                THE COURT:  Three minutes.
2                MR. PADILLA:  Three minutes?  That's all
3    the children to them.  The children represent to them
4    cocaine.  Money.  Money.  That's all it was.
5                So it's unfortunate.  It's difficult.  I
6    wish I was out fishing somewhere and not having to worry
7    about this case and the 12 of you would like to be   .
8    somewhere else besides here.
9                But you know what, it's gut check time.
10   You've got to look inside of you and say:  You know what?
11   This is not what we allow to happen in Cameron County,
12   Texas.  You have to send a message.  And I talked about
13   disposable children.  There is no such thing as a
14   disposable child in this world, ladies and gentlemen,
15   because there's always somebody that wants that child, if
16   you just take the effort to help that child.
17   Unfortunately, that did not happen to Mariah.  But I think
18   that if she were here, she would ask for justice.
19               She doesn't want to be on death row?
20   That's unfortunate.  She brought it upon herself.  She
21   brought it upon herself.  She has nobody to blame but
22   herself.  She can't blame the 12 of you.  She can't blame
23   the State.  She can't blame CPS.  She can't blame the
24   public.  She can't blame her landlord.  The only person
25   she needs to blame when she goes back to her cell, is just
```

1    look in the mirror.  She brought it upon herself.  She is

2    responsible for these acts.  These acts require justice.

3                So when I ask you, ladies and gentlemen,

4    when you go back there because you promised me that you

5    would consider all of the evidence in this case, is decide

6    that:  Yes.  She is a threat to society.  And, no:  That

7    there are no mitigating factors in her favor for a life

8    sentence over death.  Because that's what the evidence

9    shows.  That is what is required morally of all of us, to

10   look at the evidence and to decide the case based upon the

11   evidence and make this wrong a right.  Not two wrongs.

12   We're making one right into a right.

13               I ask you to go back there and decide the

14   case.  And, again, it's:  "Yes.  She is a continuing

15   threat to society.  And, "no, that there are no mitigating

16   factors in favor of life over death.

17               Ladies and gentlemen of the jury, thank you

18   for your attention.  I look forward to your verdict.

19               MR. VILLALOBOS:  May it please the Court,

20   Counsel?  Good afternoon, ladies and gentlemen.  I, too,

21   want to thank you.  I know I thanked you before.  But this

22   is the second part of the trial that is very, very

23   difficult to go through because you are having to decide

24   this person's fate of what the law allows you to decide.

25               But you have to remember what this trial is

1    about.  We've had several witness experts who have come
2    and are paid to testify to give their opinions of what
3    should happen to this person or how this crime occurred.
4    You have seen the attorneys, the different personalities,
5    even the Court.  That's not what this trial is about.  You
6    need to put that behind you.  Our personalities, our
7    fights, our discussions with these experts.  Focus on what
8    this case is truly about.  It's not about the 13 kids.
9    It's not about whether Pinkerman or the guy from the jail
10   is a good guy or not.  It's about the murder of Mariah.
11                  The defense and most of the witnesses don't
12   want you to even think about that.  They want you to think
13   about why we're here, and that's being emotional.
14                  They don't even want to consider it when
15   they're doing their testing, when they're trying to decide
16   whether or not this person was violent.  They don't even
17   want to consider the fact or the reason that we're here in
18   this courtroom today.  They want to bypass that.  They
19   want to kind of just gloss over that, and say:  Well, her
20   history, her violence, everything else in her past, there
21   is a low probability that she'll do any sort of violent
22   action.
23                  Well, they're wrong right out of the chute.
24   Based on that past, what did she do?  Beat this child to
25   death!  And we don't use that lightly, ladies and

1    gentlemen.  Beating somebody to death, a punch, a kick in

2    the stomach.  You've seen the pictures.  You can go back

3    and look at them again.  The autopsy report they showed,

4    it's almost like they colored when a child colors a

5    coloring book, on the diagram.  That is a brutal beating

6    of a child.  Dr. Farley told you how her arm was broken,

7    how she had to survive with an arm being broken, the pain

8    of that arm moving without a cast, without a splint.  And

9    they want you to just:  No.  Don't think about that.  If

10   that upsets you, and if it gets you mad.  It should.

11   Don't apologize for being mad about that.  I'm not.

12         They want you to say:  Don't focus on

13   emotions, but she's here crying now.  But when she's not

14   in front of you, what does she do?  She sleeps like a

15   baby.  She doesn't show sadness.  She doesn't show

16   remorse.  But when she's in front, let's turn on the

17   tears.  Where were those tears when she was beating

18   Mariah?

19         Focus on why we're here.  The act itself --

20   the act itself -- is evidence of future dangerousness,

21   ladies and gentlemen.  The act itself.  No expert here and

22   no one here can predict what this woman will do.  They

23   tell you when they get to jail, they don't tell the guards

24   or anybody what she's in for.  You don't think she can go

25   to the infirmary and handle other pregnant women, handle

171

1   people in her bunk mates, people that she could harm?

2   She's already shown you that she can.

3                He wants to talk about a hurricane

4   shortened to a timeframe of one year.  We're talking 40 to

5   60 years that this woman will still be alive.  You don't

6   think she's displayed the ability to harm somebody in the

7   future?

8                Try to marginalize her behavior in jail

9   now.  That's what we're being accused of.  We've looked at

10  the little things to show a consistent pattern.  Even now

11  when she's caught in jail, awaiting trial, whatever rules

12  she can still break, she's still breaking them.

13                Her own people say, she has a history of

14  that.  She's not going to change her stripes.  Is she

15  going to do that automatically because you spared her?

16  No.  She's never going to change her stripes.

17                I hope you never have to share the same

18  room with a murderer like you're doing here today.

19                Mariah.  That's what this trial is really

20  about.  That little girl.  How can anybody who has been

21  with children, have children, work with children, do

22  something like that?  When you're with a child.  The

23  beautiful essence of being with a child.  You've heard the

24  testimony.  This wasn't a problem child, one that's crying

25  all the time.  This is like the children that we deal with

172

everyday.  Aren't they?  The kind that you look at, that
you play with, and that you can't wait to be around.
That's what this trial is about.  Her.  No one else but
her.

Please consider that.  Please don't ignore
that.  The little girl was a fighter.  Beat and beat.
Bones broken.  Couldn't breathe.  Her brain being
compressed into her spinal cord.  And that little girl
still wanted to live on, until she finally couldn't.
That's what this trial is about.

You know, we talked about messages.  And a
lot of times it brings us horror.  But, it's not.  This is
Cameron County.  Beautiful Cameron County.  Small towns.
Friday night football.  Large families.  Barbecues,
picnics.  Kids.  Cousins.  Aunts, and uncles.  And you
start looking at the paper in the news today, and all of
those problems that you think are big city are now coming
to our county.  We don't take this lightly.  One capital
murder.  We're not asking for life.  We don't take this
lightly.

We don't want this type of individual or
behavior in our county.  And I think that you need to step
up and help us send that message.  We have to stop it now.
We have to act with deliberation and we have to act
swiftly and put an end to it now.  If we want to retain

1    our standard of life, our home -- the way we know it now,

2    the way it was known in the past, we have to stop it now.

3    I'm asking you to help me stop it.  Thank you.

4                    THE COURT:  Ladies and gentlemen of the

5    jury, at this time all of the evidence, the arguments of

6    counsel and the charges together is before you.  I'm going

7    to hand the verdict form to the bailiff that will escort

8    you back in the jury room.  Once all of the members are

9    present and assembled, you may begin your deliberations.

10   Thank you very much.

11                   THE BAILIFF:  All rise for the jury if.

12                   (Jury begins deliberation at 3:23 p.m.)

13                   THE COURT:  The Court is in recess until

14   the verdict is returned.

15                   **(Recess from 3:23 p.m. to 5:27 p.m.)**

16                   **(Jury present.)**

17                   THE COURT:  07-CR-885-B, state of Texas

18   versus Melissa Lucio.  Let the record reflect that the

19   defendant is present along with two counsel, that the

20   State along with the usual counsel is also being

21   represented.  I have received a note from the jury that

22   they have reached a verdict.  Bring the jury in, please.

23                   THE COURT:  Have you reached a verdict?

24                   THE FOREPERSON:  Yes, Your Honor.

25                   THE COURT:  Have you handed the verdict

Adelaido Flores, Jr.
Certified Shorthand Reporter

174

1    form to the bailiff?  Would you please hand the verdict

2    form to the bailiff.  Mrs. Lucio, would you please stand

3    up to receive the verdict.

4            Special Issue Number One:  "Do you find

5    from the evidence beyond a reasonable doubt that there is

6    a probability that the defendant would commit criminal

7    acts of violence that would constitute a continuing threat

8    to society?  And the verdict is yes or no.

9            "We, the jury, find unanimously from the

10    evidence beyond a reasonable doubt that the answer to

11    special number one is:  Yes."

12            Special Issue Number Two:  "Taking into

13    consideration all of the evidence including the

14    circumstances of the defense, and defendant's character

15    and the background of the person's moral culpability of

16    the defendant, do you find there is sufficient mitigating

17    circumstances or circumstances to warrant that a sentence

18    of life in prison without parole rather than death

19    sentence be imposed?  Your verdict, you will answer, yes

20    or no.

21            Answer:  "We the jury unanimously find that

22    the answer to special issue number two is no."

23            We, the jury, in open court return in open

24    court and the same as our verdict in this case.  You may

25    be seated.  Yes, sir.

175

```
1                    MR. VILLALOBOS:  We just ask that you
2      accept the verdict.
3                    THE COURT:  I have received the verdict.
4      Ladies and gentlemen of the jury, you are now excused --
5                    MR. GILMAN:  Judge, I wish to poll the
6      jury.
7                    THE COURT:  Very well.  Mr. Herminia Cruz,
8      is that your verdict?
9                    A JUROR:  Yes, sir.
10                   THE COURT:  Mrs. Irma Contreras Navarro, is
11     that your verdict?
12                   A JUROR:  Yes, sir.
13                   THE COURT:  Mr. Fernando Perez, is that
14     your verdict?
15                   A JUROR:  Yes, sir.
16                   THE COURT:  Mr. Johnny Galvan, is that your
17     verdict?
18                   A JUROR:  Yes, sir.
19                   THE COURT:  Alejandro Angel Saldivar?
20     Mr. Saldivar, is that your verdict?
21                   A JUROR:  Yes, sir.
22                   THE COURT:  Ms. Quintanilla, is that your
23     verdict?
24                   A JUROR:  Yes, sir.
25                   THE COURT:  Mr. Ernestina Espinoza, is that
```

176

```
1    your verdict?
2              A JUROR:  Yes, sir.
3              THE COURT:  And Mrs. Rosanna De Leon, is
4    that your verdict?
5              A JUROR:  Yes, sir.
6              THE COURT:  Mr. Rolando Gonzalez, is that
7    your verdict?
8              A JUROR:  Yes, sir.
9              THE COURT:  Mrs. Constance Poland, is that
10   your verdict?
11             A JUROR:  Yes, sir.
12             THE COURT:  Mrs. Gloria Garcia, is that
13   your verdict?
14             A JUROR:  Yes, sir.
15             THE COURT:  Mr. Ramiro Vargas Ramos, is
16   that your verdict?
17             A JUROR:  Yes, sir.
18             THE COURT:  Ladies and gentlemen of the
19   jury, you are excused from jury service.  You may now
20   choose to talk to people or not talk to people.  That's
21   your prerogative.  You don't have to talk to anybody if
22   you don't want to.  And you may do so, if you want to.
23   That's totally within your purview.  Nobody can make you
24   talk if you don't want to.  And if you choose to, then you
25   are more than welcome to.
```

```
 1              I would ask that you please meet back in
 2   the jury room just for a minute, but you are excused from
 3   the instructions that this Court has given hereto.
 4              THE BAILIFF:  All rise for the jury.
 5              (Jury exits at 5:30 p.m.)
 6              THE COURT:  This Court is in recess until
 7   further orders.
 8              (Proceedings adjourned at 5:33 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

178

THE STATE OF TEXAS:

COUNTY OF CAMERON:

CERTIFICATE OF COURT REPORTER

I, ADELAIDO FLORES, JR, Official Court Reporter in and ior the 138th Judicial District Court of Cameron County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-entitled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND on this the 15th day of August, 2008.

ADELAIDO FLORES, JR., Texas CSR
Official Court Reporter
138th District Court
974 East Harrison Street
Brownsville, Texas 78520
(956) 550-1489
Certificate No. 1117
Expiration Date: 12/31/08

Adelaido Flores, Jr.
Certified Shorthand Reporter