# Scanned  Jun 18, 2013  *CCA Scanning Cover Sheet*



2493908

CaseNumber: WR-72,702-02
EventDate: 08/10/2012
Style 1: LUCIO, MELISSA ELIZABETH
Style 2:
Event code: 11.071 ADD'L VOLUME

EventID: 2493908
Applicant first name: MELISSA ELIZABETH
Applicant last name: LUCIO
Offense: 19.03
Offense code: Capital Murder
Trial court case number: 07-CR-885-B-WR
Trial court name: 138th District Court
Trial court number: 320310138
County: Cameron
Trial court ID: 148
Event map code: GENERIC
Event description: Habeas Corpus - Capital Death
Event description code: 11.071
Remarks: 5TH SUPPLEMENTAL CLERK'S RECORD

☐ *Document Scanned*                    ☐ Created or
                                         ☐ Appended

Scanned by          date        Image ID

Comment

**Scanned  Jun 18, 2013**



## AURORA DE LA GARZA
### CAMERON COUNTY DISTRICT CLERK

CRIMINAL DEPARTMENT – APPEALS SECTION
974 EAST HARRISON STREET
BROWNSVILLE, TEXAS 78520

Wednesday, August 08, 2012

Hon. Louise Pierson                           Certified Mail Number:
Clerk, Court of Criminal Appeals          **7011 1150 0000 5890 6794**
P. O. Box 12308
Austin, Texas 78711                            Trial Court Number:
                                                        **07-CR-885-B-WR**

                                          Court of Criminal Appeals:


                                                   The State of Texas
                                                            VS
                                          **MELISSA ELIZABETH LUCIO**

Dear Ms. Pierson,

Enclosed please find the **WRIT I 5TH SUPPLEMENTAL CLERK'S RECORD** in the Post
Conviction Writ of Habeas Corpus in the above entitled and numbered cause.  If it meets with
your approval, please file.  By copy of this letter I am advising all counsel of this transmittal.

Thank you for your prompt attention to this matter.

Sincerely,


**Freddy Cardoza**
Deputy Clerk
cc:
**COURT OF CRIMINAL APPEALS**
**D.A.'S OFFICE- APPELLATE DIVISION**
**HON. MARGARET SCHMUCKER**
**FILE**


| CIVIL | CRIMINAL | CHILD SUPPORT | JURY | FAX |
|-------|----------|---------------|------|-----|
| (956) 544-0838 | (956) 544-0839 | (956) 544-0840 | (956) 544-0842 | (956) 544-0841 |

**Scanned  Jun 18, 2013**

Court of Criminal Appeals Number:

Cause Number: **07-CR-885-B-WR**

### WRIT I

# 5TH SUPPLEMENTAL CLERK'S RECORD

The State of Texas

vs.

## MELISSA ELIZABETH LUCIO

---

Mailed to the Court of Criminal Appeals on
**August 08, 2012**

Aurora De La Garza
Cameron County District Clerk

**Freddy Cardoza**
Deputy Clerk

---

Filed in the Court of Criminal Appeals, at Austin, Texas
the        day of            , 2011.

Louise Pearson.
Clerk of Court of Criminal Appeals

Deputy

**Scanned  Jun 18, 2013**

Trial Court Number: **07-CR-885-B-WR**

| | |
|---|---|
| EX PARTE: | APPLICATION FOR WRIT OF HABEAS CORPUS |
| **MELISSA ELIZABETH LUCIO** | FROM CAMERON COUNTY, TEXAS |
| | IN THE **138**th  JUDICIAL DISTRICT COURT |

Applicant's Name: **MELISSA ELIZABETH LUCIO**

Offense: **CAPITAL MURDER**

Cause Number: **07-CR-885-B-WR**

Sentence: **DEATH**

Date of Sentence: **07/22/08**

Judge Presiding At Trial: **HON. ARTURO NELSON**

Court of Appeals Number:

Citation to Opinion:  S.W. 2d    S.W. 2d
S.W. 2d    S.W. 2d

Hearing Held on Application: ☐ Yes  ☒ No

Findings of Facts Filed: ☐ Yes  ☒ No

Recommendation: ☐ Granted ☐ Dismissed ☐ Denied ☒ None

Judge Presiding Over Application: **HON. ARTURO NELSON**

**Scanned  Jun 18, 2013**

CAUSE NUMBER

**07-CR-885-B-WR**

**THE STATE OF TEXAS**                                   IN THE **138TH** JUDICIAL

VS                                                      DISTRICT COURT OF

**MELISSA ELIZABETH LUCIO**                             CAMERON COUNTY, TEXAS

# I N D E X

| INSTRUMENT | DATE FILED | PAGE |
|---|---|---|
| OBJECTIONS TO FINDINGS OF FACT AND CONCLUSIONS OF LAW | 8/8/2012 | 1 |
| BILL OF COSTS | 8/8/2012 | 30 |
| CERTIFIED BILL OF COSTS | 8/8/2012 | 31 |
| CLERK'S CERTIFICATE | 8/8/2012 | 32 |

U:/Appeals Department/Criminal/Index

**Scanned  Jun 18, 2013**

FILED $9:00$ O'CLOCK A M
AURORA DE LA GARZA, CLERK

AUG 0 8 2012

DISTRICT COURT OF CAMERON COUNTY, TEXAS
_____ freddy _____ DEPUTY

Cause No. 2007-CR-885-B

EX PARTE                           )   In the 138th

                               )   Judicial District Court

MELISSA ELIZABETH LUCIO     )   of Cameron County, TX

### OBJECTIONS TO FINDINGS OF FACT AND CONCLUSIONS OF LAW

      The Court has granted Applicant permission to filing objections to its Findings of Fact and Conclusions of Law.  The Court has not set a filing deadline and none exists under the rules of procedure applicable to state habeas proceedings.

      The Court signed the State's proposed Findings of Fact and Conclusions of Law on July 23, 2012.  Applicant, Melissa Elizabeth Lucio objects to the District Court's Findings of Fact and Conclusions of Law as not based in fact or in law.  The findings of fact fail to cite to supporting evidence in the record and are contradictory to the record and to the evidence provided by Applicant in the Appendix to her Application.  The conclusions of law fail to cite to any controlling state or federal law and are contradictory thereto.  Applicant Melissa Elizabeth Lucio objects to each paragraph of the Court's Findings of Fact and Conclusions of Law for the following, non-exhaustive[1] list of reasons:

1. Applicant was taken into police custody and interrogated on February 17, 2007. Applicant was properly Mirandized and waived her rights before speaking to police; therefore, Applicant was not entitled to the presence of counsel at her interrogation.

      OBJECTION:  Although Applicant, Melissa Elizabeth Lucio, waived her right to counsel at the inception of her interrogation on February 17, 2007,  Lucio remained "entitled to the presence of counsel at her interrogation" under both the Texas and

---

[1] Applicant reserves the right to raise and argue additional objections in subsequent state and federal court proceedings.

1

001

Scanned  Jun 18, 2013

United States Constitution upon request.

2.  Applicant was not brought before the Court for a magistration hearing until after the statement she gave police was obtained. Hence, the earliest time Applicant could have been appointed counsel would have been after Applicant provided her statements to police.

3.  Although a 90-day delay ensued between Applicant's initial appearance before a magistrate and the eventual appointment of counsel, Applicant has not shown a causal nexus between the delay in the appointment of counsel and the statements obtained by police.

> OBJECTION:  Applicant, Melissa Elizabeth Lucio *has* shown a causal nexus between the 90-day delay between Applicant's initial appearance before a magistrate and statements made to State authorities.
>
> During the more than three months from the date of Melissa's arrest for capital murder until the appointment of counsel and specifically on February 14, 2008, and May 5, 2008, the State sent CPS Therapist Beto Juarez to "treat" Melissa. Tab 7; 33 RR 184-191; 35 RR 145-148. Juarez did not advise Melissa of her Miranda rights and Melissa did not have the benefit of counsel during the interview. Following the "therapy" sessions Juarez provided written reports to CPS who, in turn, provided those reports – including Melissa's statements – to the Cameron County District Attorney who used them to prepare its case and discredit Melissa's defense. See, generally 35 RR 145-148, 158 (DA requested CPS files which included Juarez reports); 33 RR 177 (State eliciting testimony from CPS Caseworker Joanna Estrada about contents of CPS records during its guilt/innocence phase case-in-chief ), 38 RR 31 (punishment).

4. Applicant has not shown prejudice to the instant case as a result of her separate plea of guilty to the misdemeanor offense of Driving While Intoxicated. Applicant has not shown that her plea was a result of an unconstitutional confinement without the assistance of counsel.

> OBJECTION: During the more than three months from the date of Melissa's arrest for capital murder until the appointment of counsel she was charged with an unrelated incident of Driving While Intoxicated allegedly committed on September 15, 2006, was arraigned, and – without benefit of counsel on either case – plead guilty. I CR 85 (State's Notice of Extraneous Offenses: 5/16/2007 DWI Conviction, Cause No. 06-CCR 6849-C); 38 RR 35. During the punishment phase, the fact that Melissa had a "prior" conviction for DWI was erroneously introduced into evidence as proof of future dangerousness. I CR 85, 38 RR 35.

5. Therapist Beto Juarez, a CPS contractor, was not working in tandem with police at the time he interviewed Applicant. He was retained by CPS to offer mental health counseling, not to interrogate her. The police were not able to see the reports made by Juarez, as they were confidential. Juarez was not directed by the police. The purpose of his visits were non-investigatory.  Therefore, Juarez was not an agent of the State such that he was required to Mirandize Applicant before speaking to her,

2

**Scanned  Jun 18, 2013**

or in any other way comply with Art. 38.22 of the Texas Code of Criminal Procedure.

> OBJECTION: Although CPS Therapist Beto Juarez has been contracted by CPS and not the police or the District Attorney, CPS works with the police and the District Attorney in prosecuting alleged child abusers. Juarez's allegedly "confidential" report was provided to the District Attorney's office. Accordingly, Juarez was an agent of the State and required to *Mirandize* Applicant, Melissa Elizabeth Lucio.

6. Applicant has not shown that defense counsel was ineffective for failing to file a motion to suppress her statement to police. The record shows that at the time the statement was given Applicant received the required statutory warnings, indicated that she understood them, and proceeded to answer the officers' questions. She has failed to demonstrate that had a motion to suppress been filed it would have been granted.

> OBJECTION: Although Applicant Melissa Elizabeth Lucio was advised of her Miranda rights at the outset, as the interrogation progressed into the night the officers became ever more belligerent and verbally abusive and Melissa did not appear to understand that she could terminate the interview and/or ask for legal counsel to make it stop. SX 3, 4, 5.

> Defense expert Dr. Pinkerman reviewed the videotape and urged Gilman to file a motion to suppress Melissa's statement due to the obviously coercive nature of the interrogation. Tab 15 (Affidavit). Dr. Pinkerman "was prepared to testify regarding research related to false confessions," see, e.g., Tab 11 (The Psychology of False Confessions). Dr. Pinkerman also could have accounted for Melissa's behavior during her interrogation as being the result of a "dependent and acquiescent personality" rather than guilt. He would have explained that Melissa "appeared to take the most gratification from her role as a mother despite being overwhelmed by those responsibilities" and "appeared very capable of making self-sacrifice in providing a false confession in order to avoid investigation of her children." Id. And he could have testified that when Melissa stated, "I'm responsible for it," she was merely "taking responsibility for the whole configuration of the abuse and medical neglect by the family, leading to her daughter's death" but not to "striking Mariah in the head." Id.

> Defense Expert Norma Villanueva reviewed the videotape. Villanueva could have – and would have – testified "about patterns of behavior with Mrs. Melissa which strongly influenced her behavior during that videotaped statement process with the investigators that night." 35 RR 142. Specifically, she could have testified regarding "the patterns of behavior as seen in the Child Protective Services records, the patterns in her family, how that influenced her decision making and how she felt with the different investigators, male and female, and also how she makes her life decisions. It influenced her behavior in that – how she felt with the different investigators male and female and how she made her decisions in answering the questions during that process. And lastly, looking at her CPS history, how – and her social history, how she deals with different people in levels of authority and also how that influenced her body language, and how body language is interpreted in different ways

3

**003**

Scanned  Jun 18, 2013

if you do not have her history of behaviors or patterns of behavior or her social history." 35 RR 142-143 (Bill of Particulars)16; DX 13-18.

7. During her interview with police, Applicant stated "I want to talk to my husband, I don't want to talk to nobody else." Given the context of the exchange, this was not an unambiguous statement that Applicant wished to invoke her constitutional right to remain silent. When the interviewer intimated that she could not see her husband, but would be allowed a cigarette, Applicant showed no signs of reluctance in continuing with the interview. Because this statement was not an invocation of her right to remain silent, defense counsel did not err in failing to file what would have been a futile motion to suppress based upon that statement.

OBJECTION: Under the Texas Constitution, invocation of the right to remain silent can be manifested informally by anything said or done that could reasonably be interpreted as a desire to invoke that right. Watson v. State, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988). A suspect does not need to use any particular word or phrase to invoke the right to remain silent. Ramos v. State, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008). Any declaration of a desire to terminate the contact or inquiry should suffice. Id. Melissa clearly and unambiguously invoked her right to remain silent and declared her desire to terminate contact and inquiry when she stated, "I want to talk to my husband. I don't want to talk to nobody else." Tab 2 (SX 4 at 13) (emphasis added). Compare, e.g., Tolliver v. Sheets, 594 F.3d 900, 923 (6th Cir. 2010), cert. denied, 131 S.Ct. 605 (2010); Mayes v. State, 8 S.W.3d 354 359 (Tex. App. – Amarillo 1999, no pet); and Simpson v. State, 227 S.W.3d 855, 858 (Tex. App. – Hous. [14th Dist.] 2007, no pet.).

OBJECTION: The suspect need not object to further questioning in order to protect the right to remain silent, Watson v. State, 762 S.W.2d 591, 599 (Tex. Crim. App. 1988), and a valid waiver of the right to remain silent cannot thereafter be presumed simply from the fact that a statement was in fact obtained, North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755 (1979) (quoting Miranda, 384 U.S. at 475, 86 S.Ct. 1602). Thus, "an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." Smith v. Illinois, 469 U.S. 91, 100, 105 S.Ct. 490 (1984). The fact that Melissa continued to talk cannot, therefore, be used to cast doubt upon her unambiguous invocation of the right to remain silent.

8. Defense counsel retained and called to testify a qualified medical expert, Dr. Jose Kuri, to rebut the testimony of the State's pathologist regarding the cause of the victim's death. Defense counsel's strategy in this case was to assert that the fatal blunt force trauma to the victim was caused by a fall sustained some 48 hours prior to death. Dr. Kuri's testimony ably presented this theory of the case, challenging the testimony of the State's pathologist as to the age and etiology of the victim's trauma. Dr. Kuri presented testimony helpful to the defense, and defense counsel's decision to retain him was not erroneous.

OBJECTION: According to the State's theory of the case at trial, Melissa was Mariah's sole

4

**Scanned  Jun 18, 2013**

caregiver and repeatedly abused her over a period of 88 days culminating in a final, fatal beating. 32 RR 15-18; 36 RR 17-20, 39-57. In order to rebut the State's theory of the case it was necessary to do *more* than just present evidence that Mariah's death was the unfortunate result of a fall down a flight of stairs a few days before her death. Tab 9 (Affidavit ¶ c), it was necessary to present evidence to rebut the State's overarching theory of ongoing abuse.

Dr. Kuri is a neurosurgeon, not a forensic pathologist. He had not performed an autopsy for more than 32 years. 35 RR 5. During the defense case-in-chief, Gilman proffered Dr. Kuri as an expert to testify only as to the injuries to Mariah's brain -- not the injuries to her body alleged to have resulted from ongoing abuse. 35 RR 9-14, 17-18. Following a Kelley/Daubert hearing the trial court accepted Dr. Kuri as an expert only for that limited purpose. 35 RR 18. Dr. Kuri repeatedly "limited himself to issues regarding the head, rather than performing the kind of global approach to the entire case required by a forensic analysis. Tab 12 (Autopsy Report § III.B.1.d) (quoting passages from 35 RR 17, 18). Dr. Kuri's testimony was largely incoherent, non-responsive to the questions asked, and at times factually incorrect. Tab 12 (Autopsy Report § III.B.3) (quoting passages from 35 RR 41, 82-83).

9.  Applicant asserts that defense counsel should have retained an expert sooner than he did, but points to nothing to indicate that the timing of the hire was erroneous, that Applicant suffered any harm or prejudice as a result of the timing of the hire, or that the outcome of the case would have been any different had an expert been hired at an earlier date. Therefore, she has not shown ineffective assistance of counsel as to this point.

OBJECTION: On May 22, 2008 – more than three months after the case had originally been scheduled for trial – Gilman filed his first and only motion seeking funds to hire a medical expert to assist with Melissa's defense. I CR 109. The motion requested funds to retain Dr. Jose Kuri. I CR 103, 109.17. Melissa's re-scheduled jury trial began with jury selection less than a week later. I CR 81; 14 RR.

OBJECTION: During the defense case-in-chief, Gilman proffered Dr. Kuri as an expert to testify only as to the injuries to Mariah's brain -- not the injuries to her body alleged to have resulted from ongoing abuse. 35 RR 9-14, 17-18. Following a Kelley/Daubert hearing the trial court accepted Dr. Kuri as an expert only for that limited purpose. 35 RR 18.

OBJECTION: A properly qualified forensic pathologist retained in adequate time to review not only the autopsy report, but also autopsy slides, photographs, and other evidence collected from CPS, Applicant, Applicant's family, and other sources could have explained the "mistake" in Dr. Farley's autopsy report of "substituting intuition" for a "scientifically defensible interpretation" of available forensic evidence, and provided 14 specific examples of "speculative opinions from Dr. Farley's testimony." Tab 12 (Autopsy Report §§ II B., II.C).

5

**Scanned  Jun 18, 2013**

10.  Defense counsel was not deficient for failing to retain a pathologist in this case. Dr. Kuri testified that the victim's fatal injury was consistent with blunt force trauma from a fall down stairs. He further testified that the symptoms Applicant claimed the victim displayed in the day prior to her death could have been related to a progressive worsening of the victim's condition as a result of the blunt force trauma. Applicant has failed to demonstrate that a pathologist could have given any additional testimony that would have affected the outcome of the trial.

> OBJECTION: In order to rebut the State's theory of the case it was necessary to do *more* than just present evidence that Mariah's death was the unfortunate result of a fall down a flight of stairs a few days before her death. Tab 9 (Affidavit ¶ c), it was necessary to present evidence to rebut the State's overarching theory of ongoing abuse.  During the defense case-in-chief, Gilman proffered Dr. Kuri as an expert to testify only as to the injuries to Mariah's brain – not the injuries to her body alleged to have resulted from ongoing abuse. 35 RR 9-14, 17-18. Following a Kelley/Daubert hearing the trial court accepted Dr. Kuri as an expert only for that limited purpose. 35 RR 18. Dr. Kuri repeatedly "limited himself to issues regarding the head, rather than performing the kind of global approach to the entire case required by a forensic analysis. Tab 12 (Autopsy Report § III.B.1.d) (quoting passages from 35 RR 17, 18).  An independent forensic pathologist such as Dr. Thomas Young could have given additional testimony such as  why the lesions on Mariah's back repeatedly identified at trial as "bite marks" were neither bite marks nor inflicted by Melissa. Tab 12 (Autopsy Report § I.C.5 and Bite Mark Power point), why Dr. Farley's assumption that Mariah's "older" lesions were necessarily the result of child abuse constituted speculation, Tab 12 (Autopsy Report § I.C.6, § II.B, § II.C). Such evidence would have undercut the State's theory of the case and raised reasonable doubt that Mariah had been subjected to ongoing abuse by Applicant culminating in an intentionally inflicted fatal head injury.

11.  Applicant has failed to show that medical testimony challenging the etiology of the numerous contusions and abrasions found on the victim's body would have affected the outcome of the trial. Applicant admitted during her videotaped interview with police that she had abused the victim and caused all, except perhaps two, of the numerous contusions, including bite marks, to the victim's body; that interview was shown to the jury. Defense counsel strategically opted not to attempt to contradict these unambiguous admissions by offering alternative explanations for the contusions at trial. Instead, he conceded that the contusions were caused by Applicant, but denied that she was responsible for the blunt force trauma that actually killed the victim. This was sound trial strategy that did not constitute ineffective assistance of counsel.

> OBJECTION: During interrogation, Melissa repeatedly denied abusing Mariah, hitting her out of frustration, biting her, or doing anything to cause her death. Tab  2 (SX 3, SX 4, SX 5). Melissa never admitted to shaking Mariah. SX 2, 33 RR 136-137.

> During interrogation Melissa stated that Mariah had several large insect bites and / or scratches on her body that her foster parents had been treating with Lotrimin antibiotic ointment, Tab 2 (SX 3 at 50); that Mariah would wake up in the middle of the night and get

6

Scanned  Jun 18, 2013

out of bed to play and  that after one such episode she found Mariah with a bruise under her eye which, she believed, was the result of Mariah running into something or tripping over something on the floor in the dark. Tab 2 (SX 3 at 20, 31); and that the older children played rough and hurt one another, *see, e.g.*, Tab 2 (SX 3 at 32).  Although this explained many of Mariah's scrapes, sore spots, and bruises, Melissa was not given any reason to believe that the interrogating officers would allow her to leave the room unless and until she told them what they wanted to hear, whether it was true or not.

Defense expert Dr. Pinkerman reviewed the videotape and was prepared to testify to the obviously coercive nature of the interrogation, Tab 15 (Affidavit), and regarding his research related to false confessions,  see, e.g., Tab 11 (The Psychology of False Confessions).  Dr. Pinkerman informed Gilman that any alleged admission was the result of her "dependent and acquiescent personality" rather than guilt.

Under such facts, there was no conceivable benefit to trial counsel's alleged "strategic decision" not to contradict any admissions made during interrogation with medical testimony supporting Melissa's original explanations for many of Mariah's old injuries and that any such admissions were thus, coerced and involuntary.

OBJECTION: The State failed to provide *any* proof that trial counsel in fact made such a strategic decision.

12. Applicant has failed to show that defense counsel was deficient for failing to retain a pathologist to explain the "mistake" in Dr. Farley's autopsy report of substituting intuition for a scientifically defensible interpretation of forensic evidence. Dr. Farley clearly explained at trial the bases for her conclusion that the contusions and blunt force trauma were not the result of a fall down stairs, but rather of abuse - she drew this conclusion from the nature and location of the numerous wounds she found on the victim. This finding did not come about by "intuition;" rather, it was based on the forensic evidence she found during the autopsy. Hence, any purported "explanations" about intuition vs. interpretation would have been irrelevant and of no use to Applicant's defense, especially since Applicant admitted to causing all, except perhaps two, of the numerous contusions and abrasions found on the victim.

OBJECTION:  An expert employing proper scientific method can state whether a witness account is consistent with the physical evidence, see generally 35 RR 26-28 (Dr. Kuri testifying that the "most important part for any doctor" in assessing an injury is the "history of the patient"), but cannot reliably surmise past events from physical evidence. To do so is to commit a formal logical fallacy known as the fallacy of affirming the consequent.48 Tab 12 at 79 (Putting it All Together).

Proper scientific method does not permit anyone – not even Sherlock Holmes – to "reason backwards" from a consequence and select its cause from among many possible causes. See Tab 12 at 69 (Classical Mistakes in Forensic Pathology); Tab 12 at 79 (Putting it All

7

**007**

Scanned  Jun 18, 2013

Together).

A properly qualified forensic pathologist could have explained to the jury why Dr. Farley's testimony and autopsy report both erroneously "affirmed the consequent" when it surmised that Mariah was repeatedly and severely physically abused strictly from physical evidence obtained during Mariah's autopsy and in the complete absence of any witness to such physical abuse and despite admitting to the existence of possible alternative explanations for essentially all of Mariah's individual injuries. In other words, a forensic pathologist could have explained why drawing conclusions just from the nature and location of the bruises found on the victim during autopsy without taking into account the family's history and the circumstances of Mariah's last 48 hours was not scientifically sound.

13.  Applicant has failed to show that defense counsel was deficient in failing to afford her mitigation specialist adequate time to complete her investigation. The mitigation specialist had 5 months, 17 days to complete such investigation, and Applicant has failed to demonstrate that the tasks the mitigation expert claims she needed to conduct could not have been completed within that time-frame.

OBJECTION:  Authorization to hire the mitigation specialist was obtained on December 10, 2007.  10 RR 3.  Applicant's repeatedly re-scheduled trial finally started when the jury was empaneled on May 28, 2008.

It takes approximately 9 to 12 months to conduct a quality mitigation investigation. Tab 16 at 21 ¶ 19.  However, even assuming 5 months and 17 days could have been sufficient, Gilman actively prevented Mitigation Specialist Norma Villanueva from doing her job by instructing her that CPS data was of top importance and family interview for purposes of preparing a social history were not a priority, Tab 16 at 18 ¶ 5, and by providing family contact information only after jury selection had commenced, 13 RR 8; Tab 16 at 20 ¶ 10. Furthermore, Melissa's minor children were in the care of the state and access had to be obtained from the Court by Gilman for Mitigation Specialist Norma Villanueva but was not. Thus Applicant has amply demonstrated at least two critical tasks the mitigation expert claims she needed to conduct that could not have been completed prior to trial: interviewing adult family members and interviewing children in the State's custody.  Furthermore, the mitigation specialist was was denied access to all CPS documents until February 14, 2008, and to the final three boxes of critical CPS records that were not disclosed by the State until *after* June 25, 2008. Applicant has demonstrated that additional mitigation evidence that was not fully developed due to Gilman's performance included, inter alia, "interviews with Mariah's siblings, more in-depth interviews with Ms. Lucio on the home life during her youth needed for the three generation biopsychosocial history, and interviews with Ms. Lucio's siblings." Tab 16 at 12 ¶ 20. 119.  Moreover, Applicant has demonstrated that a timely request for assistance would not only have allowed Melissa's defense experts the opportunity to complete their respective tasks, but would have allowed trial counsel to fully integrate their findings into a comprehensive trial strategy for both phases of trial.

8

008

Scanned  Jun 18, 2013

14. Applicant's mitigation specialist was provided with Applicant's family contact information when jury selection began on May 28, 2008. The mitigation specialist then had 42 days to conduct family interviews in connection with the preparation of a social history. Applicant has produced no evidence to support any assertion that this was an insufficient length of time to gather that information. Applicant has also failed to show how any additional interviews would have yielded a social history that would have affected the outcome of the trial - the mitigation expert interviewed Applicant, and sisters Diane and Sonya in connection with the report and reviewed CPS records relating to Applicant. No ineffective assistance of counsel has been shown.

> OBJECTION: A quality mitigation investigation requires more time where individuals who need to be interviewed are in the care of the state and access has to be obtained. Tab 16 at 21 ¶ 19. Melissa's minor children were in the care of the State and access had to be obtained from the Court by Gilman for Mitigation Specialist Norma Villanueva. Even assuming, *arguendo* that the 42 days when Gilman was involved in jury selection was sufficient for him to obtain access, he failed to do so. Because he failed to do so Norma Villanueva had ZERO days to interview, *e.g.*, Richard, Rene, and Bobby. Videotaped interview of Richard and Rene made at Maggie's House three days after Mariah's death indicated that each had information critical to Melissa's defense regarding Mariah's fall down the "white" stairs, the fact that Melissa was *not* Mariah's sole caregiver, and that Melissa *never* mistreated Mariah, that was never explored. *See, e.g.,* Maggie's House Interview Time Index 41:15 (fall); 40:05, 40:36, 41:00; DX 1, 2 (white stairs at old apartment); SX 14 (bare wood stairs at new apartment).

15. Defense counsel made full use of the mitigation expert. The mitigation expert gathered enough evidence to enable her to testify extensively regarding Applicant's social history, covering such areas as her troubled childhood, sexual abuse perpetrated upon her by her mother's boyfriend, physical abuse at the hands of her siblings, her lack of a history of aggression, her suffering physical and emotional abuse at the hands of her husband and subsequent boyfriend, her cocaine addiction, her history of homelessness, her history of having children at a very young age, and her fitting the profile of an individual suffering from battered woman's syndrome.

> OBJECTION: Notwithstanding the fact that Gilman felt CPS data was of "top importance" he failed to present evidence found in CPS files by the Mitigation Specialist that Robert Alvarez was the last person to see Mariah alive, physical abuse and aggressiveness between siblings (including Mariah); documentation that Melissa was a victim of childhood sexual abuse; documentation that Melissa was a victim of domestic violence and self-medicated with drugs and alcohol; or scholarly literature.

> Critical evidence that was not fully developed or utilized due to Gilman's performance included, inter alia, evidence that Alvarez was the last person to see Mariah alive; that CPS Therapist Beto Juarez had been sent to see Melissa in jail, that Melissa suffered from battered

9

**Scanned  Jun 18, 2013**

woman's syndrome, that there was significant sibling-to-sibling violence, and that Alexandra had admitted that she "was the reason that Mariah fell down the stairs." Tab 16 passim.

16.  The mitigation expert also testified as to Applicant's history with CPS, including when her children were taken and returned to her, the evolution of Applicant and her children's home life, aggressive behavior between siblings that allegedly occurred within the household, Applicant's poverty, and the results of various drug tests administered to Applicant by CPS. Defense counsel was not ineffective in eliciting that testimony.

OBJECTION:

17.  The mitigation expert thoroughly covered issues relevant to Applicant's family and personal life, and Applicant has failed to show how defense counsel in any way erred in failing to present, pursue or develop such issues, much less that but for defense counsel's error the outcome of the trial would have been different.

OBJECTION:  According to the Mitigation Expert's affidavit defense counsel did *not* allow her to thoroughly cover evidence relevant to the mitigation special issue and explained in general terms what that evidence was.  The Mitigation Expert's summary of the available evidence that defense counsel did *not* allow her to cover is evidenced in more detail by the documents contained in Applicant's appendix.

18.  Defense counsel was not deficient in failing to point out that her husband was the last person to see the victim alive. That fact, even if true, was irrelevant to defense counsel's strategy, which was to argue that the victim's fatal injury was due to a fall down stairs that occurred some 48 hours prior to death.

OBJECTION: Evidence that Melissa's husband was the last person to see Mariah alive was relevant to contradict the State's case that Applicant was Mariah's "sole caregiver" either from the time Mariah was returned by CPS in November or during the last 48 hours of her life.

19.  Defense counsel was not deficient for failing to present a questionable claim by one of Applicant's daughters, Alexandra, that "she was the reason that [the victim] fell down the stairs." This claim, even if true, is not probative evidence that someone other than Applicant caused the death of the victim.  Defense counsel's decision not to attempt to present this evidence was trial strategy because Alexandra and her sister, Celina were giving conflicting stories that were not particularly credible. Furthermore, defense counsel may have justifiable feared that putting those children on the stand would backfire, as they might deny having caused any abuse and point to Applicant as the perpetrator. Again, Applicant admitted during her videotaped statement that she caused all, except perhaps two, of the numerous wounds found on the victim's body. Attempting to

10

**010**

**Scanned  Jun 18, 2013**

bring in children to testify that they had caused the bruising would have simply confused the issues and would not have furthered trial counsel's strategy to argue to the jury that Applicant truthfully told the police she had caused these wounds but not the fatal blunt force trauma that killed the victim.

> OBJECTION: Applicant's defense was that Mariah had fallen down the stairs and this fall resulted in the closed head injury that resulted in her death. The State's alleged trial strategy supporting the trial counsel's decision not to present exculpatory evidence is sheer speculation not supported by any evidence; trial counsel did not interview Alexandra or Selina and thus could not have made any reliable independent assessment as to the credibility of their statements. Evidence that the children had caused each other injuries would not have "confused" the issue but clarified the circumstances of Mariah's existence leading up to her death.

20. Applicant fails to point to any evidence to support her assertion that mitigation psychiatrist Dr. John Pinkerman did not have adequate time to prepare for trial. Applicant claims Dr. Pinkerman felt he did not have enough meetings with defense counsel, but fails to specify or prove what additional meetings would have yielded, how the number of meetings they had constituted error on the part of defense counsel, or how additional defense team meetings would have affected the outcome of the trial. No deficiency on the part of defense counsel has been shown.

> OBJECTION: Dr. Pinkerman's affidavit states that "In my professional opinion the limited number of meetings between me and other defense team members were insufficient to integrate our professional work and assist in a viable and available defense in either the guilt/innocence or in the punishment phase." His affidavit then goes on to explain exactly *how* additional team meetings could have affected the presentation of Melissa's defense.

21. Applicant has failed to provide any evidence to substantiate her claim that defense counsel failed to properly utilize Dr. Pinkerman. She makes vague, conclusory claims that defense counsel failed to pursue or develop "mental health issues" and "personality dynamics" and fails to specify what exactly defense counsel did not develop, how defense counsel did not develop it, why defense counsel's failure to develop it was erroneous, or how developing it would have changed the outcome of the trial. Relief should be denied because the Applicant states only conclusion, and not specific facts.

> OBJECTION: Dr. Pinkerman's affidavit states that "It was my impression that defense counsel failed to explore several avenues open as a result of my psychological evaluation" and that those matter were discussed but not developed at trial. Dr. Pinkerman's affidavit also "specifies" the additional evidence that was not developed or used by defense counsel, e.g. evidence of the coercive nature of Melissa's interrogation, the likelihood that she made a false confession, behavioral disorders among Melissa's other children marked by severe aggression against siblings, the absence of characteristics often associated with mothers who kill their children that were not present, and the distinction between Melissa's statement

11

011

Scanned  Jun 18, 2013

which takes "responsibility for the whole configuration of the abuse and medical neglect by the family leading to her daughter's death" but not admitting striking Mariah in the head.

22. Dr. Pinkerman testified extensively during punishment as to Applicant's psychological functioning, including findings that her IQ was in the low average range with verbal comprehension scores that were close to the mentally retarded range, that she was overutilizing repression and denial, that she had major depression with prior substance abuse, that she suffered from Post-Traumatic Stress Disorder (PTSD), that she was the victim of prior physical and sexual abuse both as an adult and as a child, that her PTSD caused her to have some distance from people in position or trust or authority, that there were indications that she suffered from battered woman's syndrome, that her personality features involve hysterical features, characterized by repression, denial, isolation and disassociation of feelings and thoughts, and that there was a low probability that she would reoffend in a prison setting.  Applicant has failed to show how or why additional "development" or "exploration" of this topic was necessary, how the failure to include it constituted error on the part of defense counsel, or how this additional development or exploration of mental health issues would have affected the outcome of the trial. No ineffective assistance of defense counsel has been shown.

> OBJECTION: Applicant has explained that additional "development" or "exploration" of the foregoing topics was necessary to support a motion to suppress Melissa's custodial statement, to assist defense counsel in developing CPS records into admissible evidence that Mariah's old injuries were likely the result of sibling-on-sibling violence (not parental abuse), and to provide support critical background information discrediting the State's case that Melissa has physically abused her children.

23. With regard to Applicant's claim that defense counsel was deficient for failing to elicit testimony from Dr. Pinkerman regarding false confessions, because he only testified after Applicant had been found guilty, any such testimony would have been moot and of no use to the defense.

> OBJECTION: Applicant's point was not that defense counsel was deficient for failing to elicit testimony from Dr. Pinkerman regarding false confessions *after* Applicant had been found guilty, but that defense counsel was deficient for failing to elicit such testimony in support of a motion to suppress evidence *before* trial.

24. Defense counsel ably and thoroughly utilized the services of Ms. Villanueva and Dr. Pinkerman in developing and presenting mitigation and future dangerousness evidence, and Applicant has failed to show any deficiency therein.

> OBJECTION: Applicant has provided affidavits from both Ms. Villanueva and Dr. Pinkerman stating that defense counsel did not, in fact, ably and thoroughly utilize their services, explaining the additional evidence available, how that evidence would have discredited the State's theory of the case and/or supported Melissa's theory of the case, and

12

012

Scanned  Jun 18, 2013

how any reasonable defense attorney would have been utilized such evidence in Melissa's defense.

25. Defense counsel was not deficient for failing to introduce alternative theories of the extensive injuries found on the victim's body. Applicant admitted during police questioning that she caused all, except perhaps two, of these injuries, and defense counsel had to operate under that constraint. Hence, his sound trial strategy was to admit the physical abuse, but deny that Applicant inflicted the fatal blow, which she attributed to a fall down stairs.

> OBJECTION: Counsel did not "have to operate" under the constraint that Melissa had "admitted during police questioning that she had caused all, except perhaps two, of [Mariah's] injuries." For reasons already explained, counsel could have successfully challenged that admission as a false confession resulting from the inherently coercive nature of Melissa's lengthy interrogation and could have presented evidence why Melissa would have taken "responsibility for the whole configuration of the abuse and medical neglect by the family leading to her daughter's death" without actually having inflicted the injuries herself. It was not "sound trial strategy" to "admit the physical abuse" because this was a major component of the State's case and apart from statements made under duress it had no support in her entire CPS case history or from any occurrence witness.

26. Applicant has failed to show that defense counsel was deficient for failing to call certain CPS workers and foster parents to testify, because she has failed to demonstrate that their testimony would have been beneficial to her, or that it would have affected the outcome of the trial. Moreover, the matters the CPS workers and foster parents would supposedly have testified to were either irrelevant or cumulative of testimony given by other witnesses in the case.

> OBJECTION: Applicant has demonstrated, at length, how the testimony of Melissa's CPS case workers would have been beneficial to her defense and that it could have affected the outcome of the trial by directly contradicting the State's case that Melissa had a history of physically abusing her children, that Melissa had a particular animus towards Mariah, that Melissa was Mariah's sole caregiver for the 88 days preceding her death, and that Melissa had repeatedly abused Mariah during that time. This evidence was neither irrelevant nor cumulative of any testimony given by other witnesses in the case.

27. Defense counsel elicited testimony from Applicant's sister and CPS worker Joanne Estrada, both of whom testified that they had no knowledge of Applicant's ever being physically abusive to any of her children. This testimony was sufficient in furthering Applicant's allegation that she did not physically discipline her children. This testimony and any other testimony purporting to show that Applicant was not physically abusive toward her children would be of limited, if any, value given that Applicant admitted to police that she had caused the extensive injuries found on the victim. No deficiency on the part of defense counsel has been shown.

13

013

Scanned  Jun 18, 2013

OBJECTION: CPS worker Joanne Estrada did not supervise all of Melissa's visits with her children while she was in foster care and could not have testified to the quality or nature of her interaction with them except in the most general terms. As Applicant explained in her supporting brief, other CPS workers could have added significantly to the jury's understanding of Melissa's nurturing and non-confrontational parenting methods and the fact that she doted on and protected Mariah rather than exhibited animus towards her. CPS worker Joanne Estrada was not the CPS worker who visited Melissa's house and observed Alexandra and Selina alone with the younger children or the chaos of the household on that particular day. And again, Applicant's admission to police could have been challenged by defense counsel and would have been challenged by any competent defense counsel.

28. Defense counsel was not deficient for failing to call two of Applicant's young sons, Richard and Rene, to testify. During their forensic interviews, they both stated they did not know how the victim died, and that they had seen no visible marks or bruises on the victim. It is undisputed that numerous bruises, abrasions and contusions of varying ages were found on the victim, and that Applicant admitted to police that she had caused nearly all of them. Any attempt to introduce evidence suggesting that no abuse occurred at all would have been of dubious probative value, confuse the issues, and likely cause the defense to lose credibility with the jury, especially since these two witnesses would have been young children.

OBJECTION: Whether Richard or Rene knew how Mariah had died was irrelevant; they were kids not experts. However, both had relevant and critical evidence regarding Melissa's parenting methods, possible alternative sources for Mariah's many bruises (namely harsh treatment by Alexandra), and one of them had observed Mariah falling down the "white" stairs and the family's previous residence which corroborated the explanation Melissa had given to both the EMTs and Police as the cause for Mariah's head injury.

29. Applicant's son Rene did advise the forensic interviewer that he saw the victim fall down some steps, but the fall he described was not at all consistent with the blunt-force trauma that actually caused the victim's death. Hence, defense counsel was not deficient for opting not to present testimony that would have been of virtually no evidentiary value.

OBJECTION: This finding is based on the assumption that Mariah only fell down two or three steps. Applicant has demonstrated how this assumption is flawed and through proper use of an independent forensic pathologist how the fall Melissa described, and that Rene witnessed, was in fact consistent with the blunt-force trauma that caused Mariah's death. Alternatively, even assuming the assumption of a short fall was correct, another district court has recently recommended habeas relief in the case of fellow death row inmate Cathy Lynn Henderson for failure to present evidence of how a short fall could result in a fatal closed head injury. Accordingly, Applicant has demonstrated that defense counsel was deficient for opting to present testimony that was of critical evidentiary value.

14

**014**

Scanned  Jun 18, 2013

30. Applicant's sons Richard and Rene also made statements to the forensic interviewer that would have been directly detrimental to Applicant's defense. They both stated that violence was a regular occurrence in Applicant's household, and that Applicant was an aggressor. Had the boys testified to this at trial, it would have impeached Applicant's own expert testimony that she had no history of violence. Defense counsel's sound trial strategy was to keep the jury from hearing about Applicant's violent tendencies.

> OBJECTION: Richard and Rene stated that violence was a regular occurrence in Applicant's household but did *not* state that Applicant was an aggressor. Richard and Rene both stated that physical discipline was limited to normal spanking and neither ever observed Applicant abusing Mariah. This would not have impeached Applicant's own expert testimony. Even Richard and Rene denied that Applicant had any "violent tendencies."

31. Defense counsel was not deficient for opting not to call the victim's older brother, John Alvarez, to testify. Alvarez is a convicted felon who was previously banned from Applicant's household for sexually molesting his siblings. His history would have rendered him a less than credible witness, and defense counsel's decision not to call him certainly did not rise to the level of error.

> OBJECTION: Tab 8 (Fischer Report). John could have corroborated Melissa's statements that she did not abuse any of her children and never hit Mariah. According to John, Melissa and Robert did discipline the children but never physically abused them. John saw Mariah about one-and-a-half weeks before her death and she was healthy. John never saw Melissa or Robert hit Mariah. Furthermore, John could have corroborated Melissa's explanation for at least some of Mariah's older injuries. According to John, he and all his siblings were a rowdy bunch and often fought. Finally, John could have corroborated Melissa's story that Mariah fell down a flight of stairs by means of a prior consistent statement. According to John, the family talked a lot about Mariah having fallen off stairs from midpoint.
> "John is a very smart, insightful, loving and caring individual. He will make an excellent witness." Tab 8 (Fishcher Report). Given the severity of the charge and the penalty Melissa was facing and the fact that there was little – if anything – John could have said or done to make Melissa's situation worse, no reasonable attorney would have failed to utilize him as a witness to contradict the State's case that Melissa was physically abusive towards Mariah and to corroborate her statement that Mariah's fatal injury and contemporaneous bruises were all the result of a tumble down the stairs.

32. Defense counsel was not deficient for not attempting to place the blame for the murder on Applicant's daughter Alexandra. The evidence submitted by Applicant in support of this claim, an unsworn hearsay "affidavit," which reports further hearsay from three sources, does not rise to the level of credible evidence justifying relief in this case. Furthermore, even if the statements made -- that two of the victim's sisters physically struck the victim at some point -- were true, they are not probative of who administered the final blunt force trauma that caused the victim's death. Such an attempt to blame Alexandra for the victim's injuries also would run contrary to Applicant's admission to police that she was responsible for all but two of the injuries found on the victim.

15

015

**Scanned  Jun 18, 2013**

> OBJECTION: Applicant submitted the sworn statements of multiple occurrence witness who recounted Alexandra making statements against her legal interest regarding the cause of Mariah's old injuries and her death. Tex. R. Evid. 803(24). The statements were signed before a notary. This is not an "unsworn hearsay 'affidavit'." Applicant has not been granted the opportunity to call these witnesses to the stand during an evidentiary hearing. According to the State's theory of the case at trial, Melissa was Mariah's sole caregiver and repeatedly abused her over a period of 88 days culminating in a final, fatal beating. 32 RR 15-18; 36 RR 17-20, 39-57. The evidence was relevant to prove who had abused Mariah during those 88 days and, by extension, to raise reasonable doubt as to the State's claim that Melissa was necessarily responsible for Mariah's fatal injury. For reasons already discussed, Applicant's admission to police was likely a "false confession" in which she took "responsibility for the whole configuration of the abuse and medical neglect by the family" and does not provide basis for the State's allegation of a reasonable defensive "trial strategy."

33. Applicant has failed to demonstrate that defense counsel was deficient for failing to "further investigate" or "present evidence" placing the blame on Alexandra because she does not specify what type of other investigation should have been done or what evidence it would have revealed.

> OBJECTION: Applicant has demonstrated that additional investigation would have revealed that Melissa was *not* Mariah's sole caregiver during the 88 days she was back in Melissa's custody, that Alexandra repeatedly babysat Mariah while her parents were working or running errands were even observed doing so by at least one CPS case worker, that Alexandra did not like babysitting her siblings, and that Alexandra physically abused Mariah because she could not fight back.

34. Applicant has failed to demonstrate that defense counsel was deficient for failing to "investigate and/or present available evidence" that Applicant's husband, Robert Alvarez, could have caused some of the victim's injuries. - Alvarez was one of numerous people who had access to the victim at various times, and his supposed violent nature was supported only by Applicant's self serving reports to her mitigation experts, and contradicted by CPS records. Moreover, Applicant admitted to police that she had caused the myriad of injuries to the victim and, when asked whether Alvarez had ever "spanked" the victim as she had done, Applicant shook her head in the negative. Defense counsel had no reasonable basis for arguing that Alvarez harmed the victim; hence, his failure to do so was not erroneous.

> OBJECTION: Applicant has demonstrated that defense counsel failed to investigate or present evidence that her husband, Robert Alvarez, had a history of abusive conduct including "yanking" a 3-year-old's arm in a fashion that may have caused Mariah's healing twisted-arm fracture, that Alvarez had been investigated on at least one prior occasion for child abuse, and that Alvarez "took turns" with Melissa taking care of Mariah. Again, reliance upon Melissa's "admission" to police was not sound strategy in light of evidence that the admission was coerced and otherwise a "false confession." Also, according to his

16

Scanned  Jun 18, 2013

own statement Alvarez was with Mariah off and on throughout the last 48 hours of her life and thus had opportunity to harm her. Counsel's failure to present the foregoing evidence for the purpose of raising reasonable doubt was below the applicable standard of care for reasonable counsel in a capital murder case.

35. Defense counsel was not deficient for failing to call Robert Alvarez as a witness in an attempt to prove that Applicant was not alone with the victim during the timeframe in which the fatal blunt force trauma occurred. Alvarez's statement to police indicates that he witnessed Applicant physically abuse the victim, and defense counsel certainly did not want that type of testimony before the jury. Furthermore, Alvarez's statement does not prove that Applicant was never alone with the victim; in fact, he states that one day prior to the victim's death he and some of his children left the family apartment at least twice to deliver belongings to a new residence, and while he was gone Applicant was alone in the apartment with the remaining children, including the victim. Given this evidence, defense counsel could not have credibly argued that Applicant was not alone with the victim prior to the murder, and his failure to attempt to do so was not deficient performance.

> OBJECTION: Alvarez's statement to police indicates that he did not know how Mariah got her bruises. To the extent Alvarez's statement indicates that he witnessed Applicant physically abuse Mariah it does so only at the suggestion of police who had, notably, failed to take into consideration the possibility that Mariah's injuries could have come from her siblings. Alvarez also had a motive to lie to police and deflect blame from himself as it was he, not Melissa, who had a case history of abuse with CPS.
> "Alone in the apartment with the remaining children" is not "alone with the victim"; the "remaining children" included at least one teenager. Thus defense counsel could have used Alvarez's statement to credibly argued that Applicant did not have the opportunity to abuse Mariah during the relevant time frame without being observed and that she was not observed doing so.
> No reasonable counsel would have failed to utilize Alvarez's history of abuse to raise doubt as to Melissa's guilt and to use his statement to prove that Melissa was never alone with Mariah during the last 48 hours of her life.

36. Defense counsel was not deficient for failing to argue that Applicant was able to explain innocuous sources for many of the victim's injuries. During her recorded statement to police, she did first attribute the victim's bruises to mosquito bites, rough play between the children and self-injury. However, later in the interview she admitted to causing all of those injuries. Once the jury heard that confession, any prior explanations were moot, and defense counsel did not err in failing to urge them at trial.

> OBJECTION: The "later" portion of the statement which contained the alleged admissions occurred after Melissa had invoked her right to remain silent, was the result of coercion, and her innate tendency to make a false confession. Melissa's prior explanations were not rendered moot to the extent they were supported by CPS records, witness statements, and other evidence. The State's alleged "defense strategy" to rely on Applicant's contradicted

17

**017**

**Scanned  Jun 18, 2013**

admission of abuse constituted a blatant failure to subject the State's case to meaningful adversarial testing.

37. Defense counsel was not deficient for failing to argue that Applicant did not know the extent or severity of the victim's injuries. During her videotaped interview with police, she admitted her knowledge of the victim's injuries to the interviewing officers, stating that she did not take her child to the doctor because "I knew that they would accuse me just like y'all are accusing me now." Later, she admitted having caused all but two of those injuries to the victim. Certainly, then, Applicant knew of the injuries, since she admitted having inflicted them. Defense counsel could not have credibly argued that Applicant was unaware of what she caused.

> OBJECTION: Even though Melissa admitted that she did not take Mariah to the doctor because she knew they would accuse her of abuse, Melissa still may not have known the full extent or severity of Mariah's injuries. Mariah's closed head injury was not visible from the outside even to medical personnel. Melissa did not even complete high school and thus did not know that the progression of Mariah's symptoms over the 48 hours leading up to her death were indicative of a closed head injury. Melissa thought Mariah was simply sick with a stuffy nose.  . The State's alleged "defense strategy" to rely on Applicant's contradicted admission of abuse constituted a blatant failure to subject the State's case to meaningful adversarial testing

38. Defense counsel was not deficient for failing to dispel the notion that Applicant was indifferent to the victim's needs. Applicant claims that defense counsel should have presented certain CPS visitation records as evidence that Applicant was a caring parent. However, the totality of evidence in this case, including numerous other records prepared by CPS, show otherwise. Given that Applicant was investigated for neglect and/or abuse in 1995, 1996, 1998, 2000,2001,2002,2003 and 2004, any claim made by defense counsel that Applicant was a good parent would have been superfluous at best.

> OBJECTION: Passive neglect due to poverty and drug abuse is not the same thing as active physical abuse. Applicant was investigated for neglect, not abuse. CPS visitation records prior to the return of her children indicate that she had tested clean for drugs for many months, was becoming a better parent, and had never been observed abusing any of her children. Rather than being "superfluous" this evidence was critical to the jury's assessment of the State's theory of the case that Melissa was physically abusive towards Mariah.

39. Applicant's complaint about this Court's exclusion of her mitigation experts from the guilt-innocence portion of the trial is nearly identical to issues nine and ten raised on direct appeal. Matters raised on direct appeal should not be re-litigated on habeas unless the judgment is subsequently rendered void or a subsequent change in the law is made retroactive. While additional evidence may warrant relief even when the issue was raised on direct appeal, Applicant has not demonstrated that she is entitled to relief herein because of any additional evidence herein.

18

018

Scanned  Jun 18, 2013

> OBJECTION: "Nearly identical" is not "identical." Counsel has outlined the distinction between the claims in Applicant's brief. Brief at 84 n. 36. The distinction makes a difference. This is not "re-litigation" of a previously litigated claim.

40. Moreover, this Court did not abuse its discretion in excluding the testimony of Norma Villanueva and Dr. John Pinkerman from the guilt-innocence portion of the trial. Ms. Villanueva proffered nothing to indicate that she had any sort of specialized experience, knowledge or training in the area of interpreting body language and patterns of behavior during police interviews. Dr. Pinkerman's proffered testimony as to Applicant's psychological functioning, including how there was little support in the "historical record" for the idea that Applicant physically abused her children, that she suffered from battered woman syndrome, and the meaning of her demeanor after the incident and during questioning had no relevance to the question of Applicant's guilt or innocence.

> OBJECTION: The Court allowed Ranger Escalon to testify the meaning of Melissa's body language without proof of any "specialized experience, knowledge or training in the area of interpreting body language and patterns of behavior." Villanueva was *more* qualified than Escalon due to her training and experience as a social worker and therapist. Both federal courts and Texas courts have held that evidence of the type proffered by Dr. Pinkerman *is* relevant to the issue of Applicant's guilt or innocence. *See, e.g., United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996); *United States v. Cohen*, 510 F.3d 1114 (9th Cir. 2007); *Kaps v. State*, 1998 WL 209060 *8 (Tex. App. – Dallas, 1998) (not designated for publication).

4 1. Defense counsel did not err in not objecting or otherwise attempting to exclude CPS evidence pertaining to Applicant's history of abuse and neglect of her children. The evidence was permissible because it spoke to the previous relationship between Applicant and the victim. At trial, Applicant marshaled the defensive theory that the victim's death was called by a fall down stairs; this brought Applicant's intent into issue, making the abuse evidence relative and probative under Tex. Code Crim. Proc. 38.36.

> OBJECTION: CPS evidence indicated Applicant had previously neglected her children. Passive neglect and active abuse are not the same thing.
>         If evidence of the "previous relationship between Applicant and the victim" was admissible and relevant to Melissa's intent, then it was deficient for trial counsel not to marshal that same evidence in support of its defensive theory.

42. Defense counsel did not err by failing to object to portions of the testimony of the emergency room physician, Dr. Alfredo Vargas, who was not previously designated as an expert witness. Dr. Vargas did not testify as an expert when describing his views of the victim's injuries. Instead, he testified as a lay witness under Texas Rule of Evidence 70 1, making observations or inferences rationally based on the perception of Dr. Vargas and helpful to a clear understanding of his testimony or the determination of a fact in issue.

Scanned  Jun 18, 2013

OBJECTION: Dr. Vargas's testimony was neither as an observation of abuse as it happened nor was it a rational for him to infer parental abuse without knowing the social dynamic of the family.  The State did not present Dr. Vargas's testimony as that of a lay witness under Texas Rule of Evidence 701 but as the testimony of a medical professional as to Mariah's cause of death.

43. Defense counsel did not err in not objecting to portions of the testimony of Ranger Victor Escalon, who was not previously designated as an expert witness. Again, Ranger Escalon's testimony was that of a lay witness under Texas Rule of Evidence 701, making observations and inferences rationally based on his testimony of the determination of a fact in issue.

OBJECTION:  If it was permissible for Ranger Escalon as a lay witness to make "observations and inferences" as to the meaning of Melissa's body language during interrogation, then it was also permissible for Villanueva to make her own "observations and inferences" as to the meaning of Melissa's body language during interrogation.  It violates due process to permit the State to proffer one without allowing Applicant to proffer the other.

44. Defense counsel was not deficient for failing to object to comments made by investigating officers during the taping of her oral statement. Their statements regarding the injuries seen on the victim were lay observations pursuant to Texas Rule of Evidence 701. Their statements regarding the injuries, as well as statements advising Applicant that her significant other claimed that Applicant hid those injuries from him, were not hearsay because they were not offered for the truth of the matter asserted. Instead, these statements were made to Applicant to advise her as to how and why she had become a suspect. Moreover, any officer testimony regarding such injuries was harmless because it was cumulative of testimony from both Dr. Vargas and Dr. Farley.

OBJECTION:  Police statements regarding Mariah's old injuries exceeded the scope of Texas Rule of Evidence 701 when the officers accused Melissa of causing them, insisted that this was the only explanation for them, and called Melissa a "cold blooded baby killer." These statements were offered both to Melissa and to the jury for the truth of the matter asserted, i.e. that parental abuse was the only explanation for Mariah's injuries.  The error was not harmless because it was cumulative as it reinforced Dr. Vargas and Dr. Farley's scientifically indefensible "backwards reasoning" as to their cause.

45. Defense counsel was not ineffective for failing to object to questions regarding CPS interviews of Applicant conducted by Dr. Beto Juarez for the reasons set forth in Finding of Fact No. 5 herein.

OBJECTION: Defense counsel was ineffective for failing to object to questions regarding CPS interviews of Applicant conducted by Dr. Beto Juarez for the reasons set forth in the objections to Finding of Fact No. 5 herein.

46. Defense counsel was not deficient for failing to challenge Dr. Farley's expert testimony as "scientifically invalid, subjective and conclusory." Dr. Farley thoroughly explained the basis for her

20

020

Scanned  Jun 18, 2013

opinions as a long-practicing pathologist, and Applicant has failed to show this Court that such testimony was in any way "scientifically invalid, subjective and conclusory."

> OBJECTION: The fact that Dr. Farley "explained" the basis for opinions does not *ipso facto* render them scientifically sound.  Applicant has provided the affidavit of an independent pathologist explaining, in great detail, why Dr. Farley's expert testimony was "scientifically invalid, subjective, and conclusory."

47. Defense counsel was not deficient for failing to object to the State's evidence of the victim being shaken as "junk science, sheer speculation and more prejudicial than probative." Shaken-baby syndrome was at best an ancillary issue at the trial. The medical experts in this case agreed that the victim was not killed by shaking, but rather blunt force trauma to the head. Because the "shaking" issue was of so little importance during the trial, Applicant has failed to show that defense counsel erred in not objecting to this testimony, this limited evidence not been introduced.

> OBJECTION: Ancillary or not, the evidence was presented and it was deficient for trial counsel not to subject it to meaningful adversarial testing.  This is particularly true given the visual demonstration of shaken baby instigated by the now-federally-indicted elected District Attorney, Armando Villalobos.

48. Defense counsel was not deficient for failing to object to Dr. Farley's testimony regarding the results of an eye pathology report. During her testimony, Dr. Farley made mention that she had personally examined the victim's eyes and saw retinal hemorrhaging indicative of blunt force trauma. She then indicated that she had sent the victim's eyes to an eye specialist, who found the same thing. Because Dr. Farley's own personal observation were substantially the same as that of the specialist, the testimony was cumulative and defense counsel's objecting to it would not have changed the outcome of the case.

> OBJECTION:   Whether the testimony was the same or not is irrelevant.  By seeking a second opinion, Dr. Farley tacitly admitted that she was not qualified to make an assessment of Mariah's eye pathology.  Because she was not qualified, she could not be effectively cross-examined.  Only the eye specialist who confirmed the finding could be effectively cross-examined.  Counsel's inability to cross-examine the eye specialist violated her constitutional rights and prejudice must be presumed because the burden is on the State to prove the error was harmless and it is impossible to state how such cross-examination might have changed the outcome of the case.

49. Defense counsel was not deficient for objecting to Dr. Farley's mention that she had spoken to a non-testifying odontologist who advised her that the marks on the baby were teeth marks. Applicant did not suffer any harm as a result of that brief statement, as the record was already replete with testimony and exhibits showing that the marks were bite marks. Hence, the odontologist's statement that the marks were bite marks was simply cumulative of other testimony.  Moreover, allowing the odontologist's findings into evidence was likely a strategic move -- the odontologist

21

021

**Scanned Jun 18, 2013**

could say these were bite marks, but had no evidence to show that Applicant was the one who inflicted them.

> OBJECTION: By seeking a second opinion, Dr. Farley tacitly admitted that she was not qualified to make an assessment of the alleged "bite marks" on Mariah's back. Because she was not qualified, she could not be effectively cross-examined. Only the forensic odontologist could be effectively cross-examined. Counsel's inability to cross-examine the forensic odontologist violated her constitutional rights and prejudice must be presumed because the burden is on the State to prove the error was harmless. The fact that the odontologist's out-of-court statements were "cumulative of other testimony" does not render the error harmless where a) the "other testimony" was from non-qualified lay-witnesses, and b) Applicant has provided the affidavit of a qualified forensic pathologist and a power point demonstrating that the alleged "bite marks" are merely parallel scrapes from a fall and that they do not match Applicant's teeth in any event.

50. Defense counsel was not deficient for opting not to object to certain questions asked Dr. Kuri by the State. Dr. Kuri was retained by defense counsel to testify regarding the blunt force trauma that caused the victim's death. In an effort to frame Dr. Kuri's testimony, the State asked him if he could opine as to the other injuries found on the victim's body. D.r Kuri rightfully said he could not. This was proper questioning on the part of the State, and there was nothing to which defense counsel could have objected.

> OBJECTION: The question was objectionable because it exceeded the scope of direct examination which was limited to testimony about Mariah's head injuries. The State should not have been allowed to ask *any* questions of Dr. Kuri about old injuries to the rest of Mariah's body. The State's question was particularly objectionable because it was intended to – and did – make Dr. Kuri look less qualified than Dr. Farley to ascertain Mariah's ultimate cause of death.

51. Defense counsel was not deficient for opting not to object to testimony regarding drug paraphernalia found in Applicant's home. The paraphernalia was contextual evidence offered to show the jury the circumstance of the environment within which Applicant had continually abused and eventually murdered the victim. As such, this was not objectionable testimony. Moreover, defense counsel vigorously challenged the State's theory that materials found were drug paraphernalia both through cross-examination and closing argument. Furthermore, even excluding this evidence would not have affected the outcome of the trial, since the jury was informed that Applicant had failed at least 17 of the 29 drug tests administered by CPS.

> OBJECTION: Available evidence not presented to the jury indicated that Applicant had *not* "continually abused" Mariah and, at a minimum, cast reasonable doubt upon the State's case that she had "murdered" her. The paraphernalia evidence was prejudicial, not "contextual." The fact that Applicant had failed 17 drug tests taken *prior to the return of her children* did not render the evidence relevant because Applicant had *passed* all of her recent drug tests

22

022

Scanned  Jun 18, 2013

including all of her drug tests after the return of her children. If the paraphernalia evidence was proof of anything it was proof that Robert Alvarez had continued to use drugs and, according to CPS records, Robert Alvarez *did* have a history of physically abusing his kids while on drugs.

52. Defense counsel was not deficient for failing to object to the State's punishment phase question regarding Applicant's previous DWI conviction. This was a strategic decision, as the evidence would likely come in pursuant to art. 37.071 CCP and counsel opted to allow it to be entered through a friendly witness rather than giving the State the opportunity to reopen its case and have the last word with the jury.

> OBJECTION: The State has failed to present evidence as to why counsel failed to object to the State's punishment phase question regarding Applicant's DWI Conviction and its assumption as to defense counsel's trial strategy is unsupportable. Applicant's DWI conviction was obtained *after* her right to counsel had attached in the instant offense but *without the benefit of said counsel to advise her as to the collateral implications of a guilty plea*. This violated Applicant's right to counsel in the instant offense. Thus Applicant's guilty plea would have been inadmissible as a violation of her right to counsel under the United States Constitution. The United States Constitution supercedes the authority of Texas Code of Criminal Procedure Art. 37.071. Thus, the State could *not* have reopened its case and had "the last word with the jury" without concession by defense counsel as to the admissibility of inadmissible evidence. NO reasonable defense attorney would have considered it reasonable "trial strategy" to make such a concession where it would be possible to keep the evidence out entirely. The error was not harmless. The State used Applicant's inadmissible DWI conviction as evidence of her future dangerousness.

53. The State did not violate *Brady v. Maryland* with its disclosure of certain CPS documents, as the State was in a continuous collection and disclosure of these records. Those records that were not produced until shortly before trial were a result of CPS' failure to comply with this Court's order to produce them. The State did not intentionally or knowingly prevent the production of evidence; the inadvertent delay was the result of the voluminous and complex nature of the documents sought, along with the vagaries of inter-agency requests. Applicant has demonstrated no harm by the date of the final disclosure; no statement appears in either the Application itself nor the record that defense counsel felt he was unable to adequately review the material and use it at either guilt/innocence or punishment.

> OBJECTION: The State failed to comply with a court order to produce CPS case records. The State's "continuous collection" of such documents did not excuse its failure to disclose boxes of documents in its possession well in advance of trial. Whether the State acted intentionally or knowingly is irrelevant to the *Brady* analysis. Applicant has demonstrated harm because the "voluminous and complex nature of the documents sought" precluded counsel from adequately reviewing them or incorporating their contents into his defensive theory before trial. Applicant has provided copies of critical documents and provided the

23

023

Scanned  Jun 18, 2013

court with a non-exhaustive list of witnesses contained in those documents that were withheld and the exculpatory evidence those documents and those witnesses could have provided had the materials been disclosed earlier. *See* Appellant's Brief at 49-83, 120-124 and supporting Appendix documents cited therein.

54. With regard to the disclosure of Maggie's house interviews, the State advised defense counsel and the Court that it did not contain Brady material and therefore need not be disclosed under Brady. This Court conducted an in camera inspection and agreed. Nonetheless, the interviews were eventually turned over to defense counsel. Even if all of the material were Brady material, and even if it were disclosed in an untimely fashion, Applicant has not demonstrated prejudice by the delay, and is therefore not entitled to a new trial.

> OBJECTION: The Maggie's House interview tapes contained *Brady* material. Specifically, they contained statements by Richard and Rene that Applicant never hit them or Mariah, that Alexandra *did* hit them and Mariah, that Applicant was *not* Mariah's "sole caregiver, and that Rene had seen Mariah fall at least part way down the exterior "white" wooden stairwell at the family's prior second-story apartment and suffer a cut to her lip and at least one bruise. Applicant has demonstrated prejudice because after Melissa and Robert Alvarez were arrested, Richard and Rene were placed into foster care. As a consequence, it was necessary to obtain a court order in order to have them produced for an interview by a member defense team. Because the tapes were not disclosed prior to trial, there was little or not time to review them, obtain the necessary permission, conduct the interview, conduct follow-up investigation, and incorporate the evidence obtained therefrom into a comprehensive defensive strategy. Applicant has demonstrated how counsel's failure to subject the State's allegation that she had repeatedly abused Mariah to meaningful adversarial testing prejudiced her defense and resulted in an unreliable verdict.

55. The videotaped statement Applicant made to police, States Exhibits 3, 4 and 5, is audible.

> OBJECTION: The videotaped statement Applicant made to police is not entirely audible. There are portions that cannot be heard or understood at all and other portions that cannot be heard and understood without replaying the tape over and over or having a transcript to follow, and there are portions of the tape which are in Spanish but have not been translated. *See* SX 3, 4, 5, and Counsel's own attempts to transcribe contained in the Appendix to her Application.

56. Defense counsel was not deficient for failing to object to mentions made at trial of the findings of Beto Juarez for the reasons stated in finding of fact 5 herein.

> OBJECTION: Defense counsel was deficient for failing to object to mention made at trial of the findings of Beto Juarez because 1) Juarez was a non-testifying expert so admission of those statements constituted hearsay and otherwise violated Applicant's right to confront witnesses against her, and 2) because Juarez was acting as an agent of CPS – a state agency

24

024

**Scanned  Jun 18, 2013**

– when he interviewed Applicant and CPS provided copies of his reports to the State in violation of her constitutional rights as discussed in the OBJECTIONS to Finding of Fact 5 herein.

57. Defense counsel objected to this Court's alleged "facial expressions" during the testimony of Dr. Kuri; however, this occurred after Dr. Kuri had left the stand. Therefore, this Court is without the benefit of a timely and specific objection and a proper context in which to place the alleged expressions. Absent such context, Applicant has failed to show that any voluntary or involuntary facial expressions constituted a comment on the weight of certain evidence.

> OBJECTION: The issue of the Court's facial expressions was raised at trial and made a part of the record. The Court now operates under a conflict of interest which disqualifies it from making this finding. It cannot be both witness and judge. The alleged "facial expressions" must therefore be presumed to have occurred as alleged and the issue of impact of such taken up by another court.

58. With regard to Applicant's claim that her appellate counsel did not have a complete record, the record in this case shows that State's Exhibits 3, 4, and 5 are in evidence and were played to the jury. The fact that no transcription was made does not render the evidence "missing." Applicant has cited to no authority that the State is obliged to provide a transcription of videotaped statements it introduces, and both Applicant's writ and appellate counsel were able to review State's Exhibit's 3, 4, and 5. The Court of Criminal Appeals has already ruled that the record in this case is complete. *See Lucio v. State*, 35 1 S.W.3d 878 (Tex. Crim. App. 2011).

> OBJECTION: State's Exhibits 3, 4, and 5 are not entirely audible and the State has failed to provide the promised transcript.

59. The affidavits of Sonya Chavez and Esperanza Trevino, which attempt to place blame for the murder upon two of Applicant's children, are not credible. Furthermore, even if they were credible, they fail to establish that Applicant is "unquestionably innocent;" that is, the affidavits fail to by themselves support a finding of innocence by a clear and convincing standard.

> OBJECTION: Applicant has not been granted an evidentiary hearing to demonstrate the credibility of Sonya Chavez and Esperanza Trevino. Based on the affidavits alone, the Court of Criminal Appeals is in the same position to determine their credibility as the trial court and should reject its finding as contrary to the evidence which demonstrates that the statements of Sonya Chavez and Esperanza Trevino are consistent with the prior statements of Richard and Rene at Maggie's House and other credible evidence.

60. Applicant's claim that she has shown actual innocence by virtue of her own allegation that she was not alone with the victim fails to show such innocence by a clear and convincing standard, especially given the circumstances set forth in Finding of Fact No. 35 herein.

Scanned  Jun 18, 2013

OBJECTION:  It is not Applicant's "own allegation" that she was not alone with the victim, but rather a timeline of events based on evidence provided by multiple family members including her sons Richard, Rene, and her husband Robert Alvarez.  Applicant has alleged facts, supported by evidence, which if true would entitle her to relief based on the fact that she was not alone with Mariah during the 48 hours prior to her death and no one witnessed her beating Mariah in the manner or by any means suggested by the State's theory of the case.  She has, therefore, demonstrated actual innocence by a clear and convincing standard.

CONCLUSIONS OF LAW

1. No coerced statement of the Applicant was obtained by law enforcement.

OBJECTION: Although Applicant waived her right to counsel, her subsequent statement was not entirely voluntary.  The circumstances of the interrogation became progressively more coercive until Applicant's will was overborne rendering any subsequent admission of guilt involuntary and inadmissible.

2. CPS contract therapist Beto Juarez was not acting in tandem with law enforcement when he counseled Applicant.

OBJECTION: Because CPS is a state agency that works with law enforcement and the District Attorney's office to prosecute child abusers and because CPS turned over Beto Juarez's "confidential" nots to the District Attorney's Office, CPS contract therapist Beto Juarez was acting in tandem with the prosecutor and the police when he interviewed Applicant.

3. Applicant has failed to show that her counsel's performance was deficient in any manner.

OBJECTION: Applicant has demonstrated that counsel was deficient for all of the reasons alleged in her application.

4. Moreover, in the cases where Applicant alleges deficiency of counsel, she has failed to show that the outcome of the trial would have been different had defense counsel acted in the manner she alleges would have been appropriate in the situation.

OBJECTION: Applicant has demonstrated that the outcome of the trial would have been different had counsel timely obtained the assistance of qualified experts and fully incorporated their findings into his defensive theory.

5. Applicant has not overcome her burden to show that defense counsel's actions were not sound trial strategy.

26

026

**Scanned  Jun 18, 2013**

OBJECTION: No reasonable attorney would have failed to test the State's theory that Applicant had repeatedly abused Mariah to meaningful adversarial testing by filing a pre-trial motion to suppress her statement and by presenting all available evidence that Applicant did not, in fact, have a history of physically abusing her children and that no one ever saw her mistreat Mariah.

6. This Court did not abuse its discretion in excluding the testimony of Norma Villanueva and Dr. John Pinkerman.

OBJECTION: The court abused its discretion in excluding the testimony of Norma Villanueva and Dr. John Pinkerman because, according to both federal and Texas state courts, their evidence should have been admitted.

7. The State did not violate *Brady v. Maryland* with its disclosure of CPS documents and Maggie's House interviews.

OBJECTION: The *Brady* rule requires that the State disclose exculpatory or potentially exculpatory evidence in sufficient time for it to be used at trial by the defense.  The disclosure of the complete CPS records and the Maggie's House interviews was made too late for trial counsel to review, conduct follow-up investigation and interviews, and incorporate findings into a comprehensive defensive theory

8. Applicant has failed to show that any voluntary or involuntary facial expression alleged to have been exhibited by the Court constituted a comment on the weight of certain evidence.

OBJECTION: Applicant has made a showing of a material fact which, if true, would entitle her to relief.  The court operates under a conflict of interest when it attempts to resolve this issue.

9. Applicant's trial, appellate and habeas counsel have a complete record of this case.

OBJECTION: Applicant's videotaped confession was never transcribed and portions of it are barely audible or inaudible or in Spanish that was never translated.

10. The affidavits of Sonya Chavez and Esperanza Trevino fail to support a finding of innocence by a clear and convincing standard.

OBJECTION: Applicant does not rely solely upon the affidavits of Sonya Chavez and Esperanza Trevino to support a finding of evidence.  Rather, Applicant relies, *inter alia*, upon the collective evidence that she has never physically abused *any* of her children; that she was *not* Mariah's sole caregiver during the 88 days prior to her death; that there are multiple explanations for Mariah's old injuries which have been deemed possible and even probable by medical experts; that one of Applicant's minor children observed Mariah fall

27

027

**Scanned  Jun 18, 2013**

down the "white" stairs just as Applicant had explained, that Mariah's closed head injury was not apparent on the outside of her skull even by medical experts; that Mariah's progression of symptoms from the time of the fall until her death are consistent with Applicant's recollection of the timeline of events during the family's move.

11. Applicant's claim that she was never alone with the child is contradicted by the record and hence does not support a finding of innocence by a clear and convincing standard.

OBJECTION: Applicant's claim that she was never alone with Mariah during the 48 hours prior to her death is not contradicted by any record evidence cited to by the State.  Applicant has provided extra-record evidence that she was never alone with Mariah during the 48 hour prior to her death. This creates a disputed issue of material fact which has not been explored by means of an evidentiary hearing.

12. Applicant is not entitled to habeas relief.

OBJECTION: Applicant is entitled to habeas relief.

Respectfully Submitted,

*Margaret Schmucker*

Margaret Schmucker
Attorney for Defendant
Texas Bar No. 24030874

Law Office of Margaret Schmucker
13706 Research Blvd., Suite 211-F
Austin, Texas 78750

Phone (512) 236-1590
Fax (877) 465-7066

28

**Scanned  Jun 18, 2013**

CERTIFICATE OF SERVICE

I hereby certify that on this the 6th day of August, 2012 a true and correct copy

of the foregoing document was mailed, by United States Mail, postage pre-paid, to:

Michael Bloch
Cameron County District Attorney's Office
Appellate Division
964 E. Harrison St.
Brownsville, Texas 78520

Margaret Schmucker
Attorney for Melissa Elizabeth Lucio

**Scanned  Jun 18, 2013**

# BILL OF COSTS

Cause Number: **07-CR-885-B-WR**

| | | |
|---|---|---|
| **The State of Texas** | § | IN THE **138**[th] JUDICIAL |
| VS. | § | DISTRICT COURT OF |
| **MELISSA ELIZABETH LUCIO** | § | CAMERON COUNTY, TEXAS |

| | |
|---|---|
| Clerk's Record | **$32.00** |
| Preparation Fee ($15.00 per Volume) | **$15.00** |
| Postage and Handling | **$10.00** |
| Amount Due | |
| | **$57.00** |

P30

**Scanned  Jun 18, 2013**

# CERTIFIED BILL OF COSTS

THE STATE OF TEXAS                §

                                  §

COUNTY OF CAMERON                 §

I, Aurora De La Garza, Clerk of the District Courts of Cameron County, Texas, do hereby certify that the foregoing is a true and correct account of the costs accrued in the following entitled and numbered cause:

Cause Number:  **07-CR-885-B-WR**

| | | |
|---|---|---|
| **The State of Texas** | § | IN THE **138**th JUDICIAL |
| VS. | § | DISTRICT COURT OF |
| **MELISSA ELIZABETH LUCIO** | § | CAMERON COUNTY, TEXAS |

Given under my hand and seal of office in the **08**th day of **August**, 2012.

Aurora De La Garza
District Clerk



By:_____

      **Freddy Cardoza**, Deputy

**031**

**Scanned  Jun 18, 2013**

# CLERK'S CERTIFICATE

THE STATE OF TEXAS                §
                                  §
COUNTY OF CAMERON                 §

    I, Aurora De La Garza, Clerk of the District Courts of Cameron County, Texas, do hereby certify that the foregoing transcript contains true and correct original copies of all proceedings as to the Writ of Habeas Corpus in:

Cause Number:  **07-CR-885-B-WR**

**WRIT I**

The State of Texas

VS

**MELISSA ELIZABETH LUCIO**

As they appear on file and of record in this office.

    Given under my hand and seal of said Court of Cameron County, Texas, on **Wednesday, August 08, 2012**.

Aurora De La Garza
District Clerk
Cameron County

**Freddy Cardoza**
Deputy Clerk

032