United States District Court
Southern District of Texas

**ENTERED**

September 28, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MELISSA ELIZABETH LUCIO, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION  NO. B-13-125 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

**Memorandum and Order**

This case is before the Court on Petitioner Melissa Elizabeth Lucio's Petition for Writ of Habeas Corpus (Docket No. 6), Respondent Lorie Davis' Motion for Summary Judgment (Docket No. 18), and Lucio's Reply (Docket No. 30).  For the following reasons, Respondent's Motion for Summary Judgment is granted and Lucio's petition is denied and is dismissed with prejudice.

I.    **Background**

Lucio was convicted of capital murder and sentenced to death for the murder of her two year old daughter, Mariah.  The Texas Court of Criminal Appeals ("TCCA") summarized the facts of Lucio's case, as developed at trial.

> The evidence presented in this case shows that, at about 7:00 p.m. on Saturday, February 17, 2007, paramedics were dispatched to an apartment where [Lucio] lived with nine of her children and an adult male named Robert Alvarez, who was the father of at least seven of these children and whom [Lucio] referred to as her husband. One of the paramedics (Nester) testified that, when the paramedics entered the apartment, they found Mariah unattended and lying on her back in the middle of the floor not breathing and with no pulse. Nester observed that [Lucio]'s "distant" and not "overly distressed" behavior was "so far out of the ordinary" that he "put it into the report." Nester also testified that he "noted the fact that [Lucio] was not—she wasn't

even within arm's reach of the child much less trying to gasp [sic], hold her, or trying to do anything to hold them [sic]."

[Lucio] told police and paramedics at the scene that Mariah had fallen down some stairs. Mariah was transported to a hospital emergency room where she was pronounced dead. The condition of Mariah's body indicated that she had been severely abused. There were bruises in various stages of healing covering her body, there were bite marks on her back, one of her arms had been broken probably about two to seven weeks before her death, and she was missing portions of her hair where it had been pulled out by the roots. The emergency room physician (Vargas) testified that this was the "absolute worst" case of child abuse that he had seen in his 30 years of practice. Vargas also testified that his emergency-room visual and manual inspection of Mariah indicated no apparent signs of a head injury.

The chief forensic pathologist for Cameron and Hidalgo Counties (Farley), who conducted Mariah's autopsy on Monday, February 19, 2007, testified that Mariah's cause of death was "blunt force head trauma," which would have occurred within 24 hours prior to her death, and it would have been immediately apparent that Mariah was in distress and in need of medical attention. Farley testified that Mariah suffered "multiple contusions" to her head area and that "blunt force head trauma … basically means, beat about the head with something—an object, a hand, a fist, or slammed." Farley testified that these injuries would not have been caused by falling down some stairs and that this was the most severe case of child abuse she had ever seen.

On the night of February 17, 2007, several investigators questioned [Lucio] for about five hours, beginning at about 10:00 p.m. This interview was videotaped and was admitted into evidence in three separate DVDs (State's Exhibits, 3, 4, and 5). [Lucio] initially told the police that Mariah had fallen down some stairs on Thursday night, February 15, 2007. For about three hours, [Lucio] denied any knowledge of how Mariah became so badly bruised and suggested that her older children could have been responsible.

Texas Ranger Escalon began to question [Lucio] about two and one-half hours into the interrogation. Escalon testified at trial that, while he observed other investigators questioning her, he could tell from [Lucio]'s demeanor that she was "beat" and that she was "hiding the truth."

2

Q. [STATE]: Now, Officer, as you went in, you waited for a pause before you went in and you introduced yourself?

A. [ESCALON]: Yes, sir. I did.

Q. Can you describe to the jury how you go about doing that?

A. Well, my initial observation—that's when the investigation starts, is when I walked into the room and I see the investigators interviewing the suspect.

I'm just observing right now, trying to soak it all in, and see what we have, and try to get a better idea about this lady. And I observe her, how she's answering these questions, her demeanor, how she's standing. All of that is telling me—it's like a picture, almost—I'm observing everything, and that is already feeding me—that's already telling me what I'm dealing with. Okay? And then I see the investigators and I'm just making note—I'm am [sic] making note—you know: Okay. This is what I have.

Q. What type of demeanor would you describe her having?

A. When I walked in, she was not making eye contact with the investigator. She had her head down. So right there and then, I knew she did something. And she was ashamed of what she did, and she had a hard time admitting to officers what had occurred. That's what crossed my mind. And I knew she was beat. I knew—when I say she was "beat"—she was giving up. She wants to tell because she's giving that slouched appearance—you know: I did it. I've given up. I need to interview her, visit with her a little more. That's what I sensed. And I get that because of my experience in law enforcement, and my experience in interviewing people. Every time it's pretty much similar, in demeanor, in people and that's what I have experienced.

3

> Q. Have you had other types of experiences in your experience as a trooper and investigator in interviewing people?

> A. That's one of the most common clues you would call—that you see—somebody with their head down, and like their shoulders are slouched forward, and they won't look at you. They're hiding—hiding the truth.

Escalon testified that [Lucio] began to "open up" with him after about 20 minutes of questioning. [Lucio]'s recorded statement reflects that she told Escalon that she, and only she, had been "spanking" or "hitting" Mariah since sometime in December 2006. [Lucio] stated that Alvarez never "hit" or "spanked" Mariah and that Alvarez was unaware of most of the bruises on Mariah's body. [Lucio] also stated that none of the other children "beat" Mariah and that no one except [Lucio] "beat" Mariah. [Lucio] also stated that Mariah had been in her care for at least the previous three days. The jury also saw [Lucio] on the videotape demonstrate with a doll how she abused and "spanked" Mariah.

[Lucio] also stated that she would "hit" Mariah when [Lucio] got mad. [Lucio] also described how she pinched Mariah's vagina and how she would sometimes grab and squeeze Mariah's arm. [Lucio] described how she bit Mariah twice on the back at different times about two weeks before Mariah's death. [Lucio] said that on one occasion she bit Mariah on the back for no reason while she was combing Mariah's hair. [Lucio] said, "I just did it." [Lucio] also stated that she would "spank" Mariah several times "day after day."

[Lucio] stated that Mariah was "sick" on the day that she died, but that she was afraid to take Mariah to the doctor because of all the bruises on her. [Lucio] also stated that Mariah would not eat and that her breathing was heavy. [Lucio] said that Mariah slept all day on February 17, 2007, and that she would lock her teeth together when [Lucio] would try to feed her. This was consistent with "blunt force head trauma symptoms that Farley described.

> Q. [STATE]: If the child suffers the type of brain injury that you've identified on this exhibit, would this child be able to sit up, eat Cocoa Crisps, and things of that nature?

4

A. No. Usually with this kind of hemorrhage, the child has some type of immediate sign. Most of the time, they say they're very tired. They may seize and get very tense, and then relax, and get very tense, and then relax. People may not realize what it is, but sometimes parents will realize that that's a seizure, and they'll say, they're seizing. Yet, they've never had a seizure before.

The other thing they will tend to do, is, the pressure increases because the brain will start to swell. They might start to vomit. And so if an ER doctor sees them, they may think they have a gastrointestinal virus, or something. But they're vomiting because of the pressure in the head. So seizing—lethargy being very tired. Coma is very consistent. Abnormal respirations—they're breathing a little funny. They take a big breath, and then they sit. And then it might go out. And then—ten seconds later, maybe another breath. So the breathing starts to also be affected as the brain starts to swell.

Q. Like on this type of injury, how far back would those symptoms had [sic] been known to somebody that is watching the child? At least since the inception, or when?

A. It's usually fairly quickly after the fatal blow occurs that they'll start to have the symptoms. And the first symptom is, they're usually, they're tired. They can't keep awake. That's the lethargy. They just can't get them up—can't get them awake. They won't eat or drink, usually. And if they do, they vomit it.

Q. Do they ever suffer a condition where they can't open their mouth—where their jaws are locked?

A. If the jaws are locked, that's probably a seizure. Because things tighten up and you have muscles here that tighten and relax, tighten and relax, but it shouldn't stay that way, indefinitely.

Escalon also testified that, when he questioned [Lucio], he did not

know, but he suspected, that Mariah had died from a fractured skull. Escalon can be seen and heard on the videotape informing [Lucio] that an autopsy would be performed on Mariah and asking [Lucio] "if they're going to find a fractured skull." [Lucio] replied that an autopsy would show that Mariah did not have a fractured skull, and [Lucio] denied hitting Mariah in the head. Escalon also testified at trial:

> Q. [STATE]: Now when you're going through the interview with her, did you know the cause of death—the exact cause of death at that point?
>
> A. [ESCALON]: No, sir. I did not.
>
> Q. Based upon your experience of being a police officer or a ranger, and a DPS trooper, did you have a suspicion of what that cause of death was?
>
> A. Yes, sir. I did.
>
> &ast; &ast; &ast;
>
> Q. What had you suspected occurred here to the child?
>
> A. Head trauma.
>
> &ast; &ast; &ast;
>
> Q. And I think at one point she admits to all of the [visible] injuries except for the scratch on the face and one on the heel?
>
> A. Yes.
>
> &ast; &ast; &ast;
>
> Q. Now in the video, there is no actual—she doesn't actually say that she in one direct blow, or one direct shot, hits Mariah on the head, or the head area other than general spanking. Is that true?

A. Yes, sir.

* * *

Q. [DEFENSE]: Okay. But the head trauma you didn't learn until, when you went into the autopsy, when you found out there was brain hemorrhage, and that's what killed this child. Not the beatings, and the black and blue marks all over her body?

A. [ESCALON]: Again, when she was telling me what she did to that child, led [sic] me to believe based upon my experience the head trauma was very suspicious in this case.

* * *

Q. The emergency room doctor, yesterday, stated that you couldn't see that there was brain hemorrhage, and that the brain hemorrhage was something that wasn't noticeable until later on.

A. There's other signs of trauma that can cause bleeding inside of the brain. It doesn't have to be visible. Other signs of shaking—hitting.

A police officer (Villarreal) testified that he allowed [Lucio] to make a cell-phone call to her sister while he was transporting [Lucio] to a dental office for a dental mold. Villarreal testified that [Lucio] appeared to be agitated and that he heard her say during the telephone call, "Don't blame Robert. This was me. I did it. So don't blame Robert."

The defense presented the testimony of a medical expert (Kuri), who seemed to testify that Mariah's fatal injuries could have been caused by a fall down the stairs.

Q. [DEFENSE]: And your testimony, basically, is that the falling down the stairs is consistent with—just as consistent with the cause of death of this child as what the State is trying to suggest as the beating?

7

> A. Well, we received a patient—a body that have [sic] a severe head injury. It was not caused by a simple force. It was caused by a serious force. So what type of serious force? But she—the mother hit her against the wall or somebody else? I am not saying the mother. But any person that would have caused her, okay, or fell, that's trauma. See? There's trauma on the head. What produced it? I don't know. I don't think—in the head, it is specific. There is no doubt that she died because of the hemorrhage that was produced by the trauma. Now, if you ask me the question: Which would be the type of trauma? So, if she fell from the stairs and rolling, if that's how she died? That could be one. Hitting against the board? Yes. Hit by a strong force? Too. It could be.

During closing jury arguments, the defense argued that the jury should acquit [Lucio] because she was guilty only of "injury to a child" for the nonfatal injuries that she inflicted upon Mariah before the fatal injuries that Mariah suffered for which [Lucio] disclaimed responsibility. The defense also claimed that [Lucio] was guilty only of "injury to a child" for failing to get medical attention for these fatal injuries. The defense thus claimed that [Lucio] did not cause any of Mariah's fatal injuries. The defense also questioned whether the State's evidence excluded the possibility that these fatal injuries were caused by Mariah falling down stairs.

> [DEFENSE]: Now, in the opening remarks that we made in the beginning of the trial after you were all seated here, I told you my client is not up for "Mother Of The Year." I told you that my client is guilty of injury to a child. She is and she has admitted that. The question here before you is whether or not on February 17, 2007, Melissa Lucio intentionally and knowingly killed Mariah Alvarez. That's the issue. That's the issue. Not whether she beat her. Not whether she broke her arm. Not whether she's a lousy mother or didn't provide for her children. That's not an issue. The issue is whether or not she killed Mariah on the 17th of February, 2007.

* * *

8

This whole case revolves around this video. This video is real important. If you have—if you cannot remember it all, play it again. It's a long, long video. And I'm sorry for that. But this is the key to everything in this case.

* * *

Folks, the State wants you to believe that that's a confession. Does the State know at the time of the video, the caused [sic] of death of Mariah? No. They don't know the cause of death of Mariah until the next day when they go do the autopsy. They learn after the autopsy that Mariah died from brain hemorrhage. Blunt force trauma to the head. That's when they first know about it.

She confessed to what? She confessed to bruising that child from head to foot. She confessed to neglect. She didn't confess to murder.

* * *

But I want to go back to the video because the video says a lot. The video is very important. Study that video because that's where the [sic] all of the key is [sic]. Melissa Lucio said things. She didn't have an attorney. Nobody is there to coach her and tell her what to say or how to say it. She's there on her own. She has got Salinas, Cruz, Banda, Villarreal, and Escalon. Five law enforcement officers throwing questions at her. She's there on her own. Nobody is helping her.

And she has told everything she knows and nobody is listening. She is telling us much: I beat this child. I neglected this child. I hurt my child, but I didn't kill her. I didn't hit her in the head. So how did she get the brain hemorrhage? Fell down the stairs. She fell down

9

the stairs. Melissa Lucio says she fell down the stairs. What evidence does the State have to prove to you that this is not possible, that it didn't happen? They don't have anything.

* * *

And there's a reasonable doubt, and that is the possibility of falling down the stairs.

The State argued that the evidence and inferences from the evidence that [Lucio] abused Mariah show that it was [Lucio] who inflicted Mariah's fatal injuries.

[STATE]: What injuries did the child have, if not a brain injury? Well, they tried to differentiate between: Well, you know what? I may have caused 110 bruises. I may have caused two or three bites on the body. I may have twisted the arm and broken it. But you know what? I never hit her on the head. Is that reasonable? Is that reasonable? That child was slapped, according to Dr. Farley, that child was hit across the head and that's what caused the brain hemorrhage. It wasn't. Because the evidence was inconsistent because of the abuse that this child had taken.

* * *

But the bottom line is she committed the acts which led to the cause of [Mariah's] death. This child had bruised kidneys, a bruised spinal cord and bruised lungs. How do you do that? I mean, what force does it take somebody to cause such devastating injuries to a child and then say: You know what? I never touched her across the head. That's just totally—totally unbelievable.

* * *

You can draw inferences from the evidence, ladies

10

and gentleman. And the inference is clear that she caused those injuries because it's consistent. It's consistent with her behavior. It's consistent with her pattern of conduct towards this child. If this child had just come in with a head injury and nothing else, you might have said: You know what? It may have been a fall.

The State presented evidence at the punishment phase that [Lucio] has a prior driving-while-intoxicated conviction. The State also presented evidence that [Lucio] committed several disciplinary violations in the county jail such as fighting with and having verbal disagreements with other inmates, possession of contraband, unauthorized communication with another person, and being disrespectful to a guard. The defense characterized these incidents as minor. The State also presented the testimony of a criminal investigator (A.P. Merrillet) for the State of Texas Special Prosecution Office, who testified about the opportunities that a life-sentenced [Lucio] would have to commit criminal acts of violence in prison. Merrillet also testified that he had prosecuted many prison guards for having consensual and nonconsensual sex with female inmates. The defense elicited testimony from Merrillet on cross-examination from which a jury could conclude that there would be a low statistical probability that a life-sentenced [Lucio] would be dangerous in prison.

The State also presented the testimony of Estrada, who was a Child Protective Services (CPS) case worker. Testifying under a grant of transactional immunity because "[t]here was talk about [CPS] being indicted" as a result of Mariah's death, Estrada testified that CPS removed Mariah and all of the other children living with [Lucio] from [Lucio]'s home for physical neglect and negligent supervision just after Mariah was born on September 6, 2004, and placed them in foster care. [Lucio] visited Mariah while she was in foster care. CPS returned Mariah and eight other children to [Lucio]'s home on November 21, 2006. [Lucio] told the police, during her recorded statement, that she was not close to Mariah because CPS removed Mariah from her home three weeks after she was born.

Estrada also testified about the various contacts that CPS had with [Lucio] between December 21, 1995, and Mariah's death on February 17, 2007. Estrada testified that the CPS investigated various

11

allegations, usually involving allegations of neglect and neglectful supervision, in 1995, 1996, 1998, 2000, 2001, 2002, 2003, and 2004. Estrada testified that [Lucio] often tested positive for cocaine and that two of [Lucio]'s newborns tested positive for cocaine during this period of time. Estrada testified that "since '04 [[Lucio]] had about 17 or 18 positives and about 11 negatives." The defense suggested, through its cross-examination of Estrada, that CPS should not have returned the children "to a parent who tested positive for drugs 18 times and negative for drugs 11 times."

Estrada also testified that [Lucio] tested negative in the two drug tests that were offered between November 2006 and February 17, 2007. In her recorded statement, [Lucio] told the police that she had not used drugs since February 2006, but that Alvarez had recently begun using crack cocaine. The police found paraphernalia for smoking crack cocaine in a search of [Lucio]'s apartment after Mariah's death. Farley testified that Mariah had cocaine in her blood at the time of her death. Other evidence was presented that [Lucio] received about $5,000 per month in welfare benefits most of which the State claimed [Lucio] used to support a cocaine habit.

[Lucio] presented the testimony of two mitigation experts (Villanueva and Pinkerman). These experts testified, based primarily on [Lucio]'s statements to them after the charges in this case had been filed, that [Lucio] was depressed and that she was a battered woman and had been sexually abused as a child. For example, Villanueva and Pinkerman testified,

> Q. [DEFENSE]: Was she—is there any indication that she was ever abused as a young child?

> A. [VILLANUEVA]: Yes, she was. She was sexually abused by one of her mother's lovers, a live-in lover, and it lasted for approximately two years, the duration that he was in the home.

> * * *

> Q. [DEFENSE]: Is there any kind of abuse by her first marriage?

> A. [VILLANUEVA]: Yes. Her first husband, which

12

was her only legal marriage, Mr. Lucio, he was an alcoholic. And he was emotionally and verbally abusive most of the time and physically abusive when he was drunk. But being an alcoholic, that was quite active. There was also a very manipulative relationship there with her sister-in-law Sylvia, who introduced her to cocaine. She was 16 years old.

* * *

Q. [DEFENSE]: And your findings in this case?

A. [PINKERMAN]: In the part of the assessment with the intelligence test, the other part is more of a personality test to determine my general diagnostic impressions. And my general diagnostic impressions of her were that she was overutilizing a lot of repression and denial. And repression to the point where, again, a disconnect between thoughts and feelings or experiences and feelings. And I saw that in both her test behavior and in my observations that I reported earlier.

In assigning diagnosis to her, what I identified is that she had a presentation consistent with major depression with prior substance abuse which was in remission. But maybe most importantly post traumatic stress disorder in how she, I guess, psychologically was organized. And those are the three major areas of concern that I saw with her. She was also, and I also acknowledged it in a different report, the victim of prior physical and sexual abuse both as an adult and as a child.

Villanueva also testified that [Lucio] "has no history of aggression at all as a child, adolescent or through her entire CPS history, which was a good part of her adult life." Pinkerman testified that there is a low probability that [Lucio] is a risk to reoffend "in a prison setting."

Q. [DEFENSE]: And what did you use to reach that conclusion. [sic].

13

A. [PINKERMAN]: Her presentation in the interview, the history that I had before me, her description of the history, the psychological testings like I'd done with her in my formal psychological evaluation, and then the large body of literature both in the psychological literature and in the State Department of Corrections literature that talks about the different levels of risk for offenders within a prison population. Because when I'm looking at the risks, I'm not considering getting the parameters of the present circumstances any issue of risk to the community. That is often not a part of my assessment.

Q. And your opinion then, sir, is what?

A. Her risk—there's—okay. I'll try to just answer your question. There's a low probability that she's a risk to reoffend—

Q. Okay.

A. —in a prison setting.

During its initial closing jury arguments, the State emphasized the "horrific" circumstances of this offense, [Lucio]'s "history" of violence against Mariah, and [Lucio]'s misbehavior in the county jail in arguing that "[t]his isn't going to end with Mariah. This is going to continue."

[STATE]: The defense argued at the beginning of this trial that Mariah died of injury to the child. She was beaten. Now, the first expert told you that the defendant—there is no history of aggression at all. She's obviously wrong. That's not what the defense told you. That's not what the [police] video shows. And she demonstrates on that video how she hit that little girl time and time again. There is history of aggression. Mariah's death is proof of that. What can you conclude from the first expert's testimony? She is simply wrong. She got it wrong.

The next expert tells you: No history of violence. Again, remember what [[Lucio]'s lawyer] told you?

14

She's guilty of injury to a child. She's guilty of beating that little girl. Well, obviously this expert got it wrong, too.

* * *

What can you conclude? Look at Mariah. You've seen the photographs. No history of violence? Really? Are we talking about the same person, the same defendant? They got it wrong.

I want to talk to you about Mariah and the nature of this crime against her. Because we've all seen the photographs. We heard from Dr. Vargas who told us it's the worst he's ever seen in his 30 years. Dr. Farley told us the same thing. Worst case of child abuse ever in our community. Look at this little girl. Look at her. She was defenseless, innocent. Her daughter.

The nature of this crime speaks for itself. She was beaten to death. This is not one time. Deliberate acts, over, and over, on this poor little girl. This is a crime of hatred. A crime of violence. Not just one time. Not an accident. The manner of death of which this little girl died is also tragic. It's also horrific.

There's many of you on this jury that work in the medical field and can understand the suffering that she endured from her little brain swelling. Dr. Farley told you that brain swelling inside her head, went into her spinal cavity, she would have suffered. She would have trouble breathing. She would have seizures and just lay there. She let her lay there and suffer.

A very painful cruel death. That is what is so horrific about this case, that this little girl laid there in that bed when she could have simply called for help, taken her to the doctor, done something to protect this little girl. The manner of death in this case is so horrific because she suffered for so long, this little baby girl. It was simply torture and cruel.

15

\* \* \*

> And I want you to look at her jail record because this jail record speaks to you about the type of person that she is. And in the short time that she's been in jail she has had physical altercations, verbal altercations, been in possession of contraband, unauthorized communication, inciting a riot, and confrontational towards the staff. What does that tell you about the type of person that she is now? And that's only here in our jail. Imagine what she's going to be like when she gets to Huntsville or wherever she ends up. Look at these records, because they records [sic] speak for themselves.

> This defendant is like a dog that bites a human person. Once that dog bites, they will always have—there will always be a probability that it will bite again. Same thing with this defendant. Her record speaks to you: This isn't going to end here. This isn't going to end with Mariah. This is going to continue.

The defense argued during its closing jury arguments that the State did not present "one scintilla of evidence as to future dangerousness."

> [DEFENSE]: The first question has to do with future dangerousness. What have we heard one scintilla of evidence as to future dangerousness of this person?

> We had the guy, Mr. Merrillet, or whatever his name was, from Conroe. If you take his own statistics, he never spoke about Melissa specifically. Never once did he talk about her. In fact, he came up here and told you, I'm not going to talk about her. I don't know her life. So he gives statistics.

> What are the statistics he gave us about the future dangerousness of criminals in general? He told us there are 12,000 female inmates in the Texas Department of Corrections as of 2007. That's 12,000. How many assaults were there in that population? Seventeen. That is one one-hundredth of a percent.

16

What else do they bring you here? They bring you the jail records. This is one thing where I agree with the State. Please, look at Melissa's jail records. Look at them. They bring to you that she was in a dorm with eight people and they found tattooing equipment above the lights. None of the girls would admit to having been the owner of it. So that is evidence of future dangerousness? Oh, but she was in a fight. Look at the fight. You all look at them. I saw you all looking at the records. She got in blocked punches in one of the fights. The other one, the girl hit her. Please. There's not a scintilla of evidence of future dangerousness, much less beyond a reasonable doubt.

What else do they bring here of future dangerousness? To answer question number one, she's got a past history, a criminal history. What was that? A DWI. If we poll the people in this courtroom today sitting here, throughout this courtroom there would be a good number of folks who've gotten a DWI. It doesn't mean that they are a future danger.

What didn't they show you? They didn't show you one past act of physical abuse to any children. Not one. They didn't show you one past act where she's ever been charged with a crime involving any physical harm to anyone else.

\* \* \*

Is there a probability of continuing acts of violence? Probably not. We've heard that from the State's main person who they bring down because just from the statistics, there's no probability. We heard it from Dr. Pinkerman who also said there's very little probability that she would ever do anything of violence.

During its final closing jury arguments, the State emphasized [Lucio]'s behavior in the county jail and her abuse of Mariah over a period of time in support of its argument that [Lucio] "has already shown a tendency to be violent ... to be abusive, to be aggressive and to injure innocent people."

17

[STATE]: This wasn't an isolated incident where she lost it and she killed this child. She made this child suffer. Every time she injured this child she had to have gotten some pleasure from it because she didn't do it one time. She did it over a period of weeks and probably months.

Is this a person that you want out there in a society of prisoners? She has already shown a tendency to be violent, ladies and gentlemen, to be abusive, to be aggressive and to injure innocent people. She's just as likely to go after the innocent—other innocent individuals, people that may be within the prison system. Because Mr. Merrillet has told you that they don't classify them by capital murder. They can put him [sic] in with a burglar, with somebody who's writing hot checks. She can victimize other individuals.

\* \* \*

Try to marginalize her behavior in jail now. That's what we're being accused of. We've looked at the little things to show a consistent pattern. Even now when she's caught in jail, awaiting trial, whatever rules she can still break, she's still breaking them.

Her own people say, she has a history of that. She's not going to change her stripes. Is she going to do that automatically because you spared her? No. She's never going to changer her stripes.

*Lucio v. State*, 351 S.W.3d 878, 880–91 (Tex. Crim. App. 2011)(f00tnotes omitted).

The TCCA affirmed Lucio's conviction and sentence, *id*, and the Supreme Court of the United States denied Lucio's petition for a writ of *certiorari*, *Lucio v. Texas*, 132 S.Ct. 2712 (2012). On January 9, 2013, the TCCA denied Lucio's application for a writ of habeas corpus. *Ex Parte Lucio*, No. WR-72702-02, 2013 WL 105179 (Tex. Crim. App. Jan. 9, 2013). Lucio filed this federal

petition on January 9, 2014.

## II.  The Applicable Legal Standards

### A.  The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).  Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)), *abrogated on other grounds by Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but

19

unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 406. "In applying this standard, [courts] must decide (1) what was the decision of the state courts with regard to the questions before [them] and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc). The solitary inquiry for a federal court under the "unreasonable application" prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254 (d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). The State court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997).

### B.  Summary Judgment Standard in Habeas Corpus Proceedings

In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts of the case in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (The "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"). "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). This principle is limited, however; Rule 56 applies insofar as it is consistent with established habeas practice and procedure. *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (citing Rule 11 of the Rules Governing Section 2254 Cases). Therefore, § 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmoving party. *See id*. Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" regarding the state court's findings of fact, those findings must be accepted as correct. *See id*. Thus, the Court may not construe the facts in the state petitioner's favor where the prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness in 28 U.S.C. § 2254(e)(1) should not apply. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981); *Emery v. Johnson*, 940 F.Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997).

### III.  Analysis

Lucio's petition raises 25 claims for relief, including subclaims. These are addressed below.

A.    **Use of a State Agent**

Lucio first contends that her Sixth Amendment right to counsel was violated when Beto Juarez, a therapist for Texas Child Protective Services ("CPS"), interviewed her after her initial appearance before a magistrate in this case. Juarez met with Lucio to provide court-ordered mental health counseling in jail. *See* 35 Tr. at 147.

Juarez turned over his reports of the interviews to the prosecutor in the capital murder case. During the course of these interviews, Lucio made statements that were used by the prosecution during the punishment phase of Lucio's capital murder trial.

Lucio complains that Juarez was acting as an agent of the prosecution and that conducting the interviews without counsel present violated her Sixth Amendment rights. Based on these alleged violations, she contends that her statements to Juarez should have been suppressed.

The parties agree that Lucio's Sixth Amendment right to counsel in this case attached by the time of her initial appearance. Respondent argues, however, that Lucio's claim for relief is without merit.

It is beyond dispute that the Sixth Amendment right to counsel is offense-specific. *Texas v. Cobb*, 532 U.S. 162, 168 (2001). In denying Lucio's state habeas corpus application, the state habeas court found that Juarez was not working in conjunction with the prosecution in the capital murder case, and that the purpose of his visits was not investigatory. 4 Supp. CR at 5.[1] The state habeas court therefore found that Juarez was not acting in tandem with law enforcement and his notes did not implicate Lucio's Sixth Amendment rights. *Id.* at 16.

---

[1]    "Supp. CR" refers to the supplemental clerk's record submitted in connection with Lucio's state habeas corpus proceeding.

Lucio argues that the state habeas court's conclusions were unreasonable. She contends that Juarez' visits were investigatory in nature because it is CPS' responsibility to investigate child abuse. She also analogizes Juarez' evaluation with a pre-trial psychiatric evaluation.

As noted above, the Sixth Amendment right to counsel is offense-specific. Juarez was not there to investigate any criminal offense. The fact that information came out that was potentially damaging to Lucio in her capital murder case is no different than harmful information coming to light in a completely unrelated criminal investigation. If, for example, the police suspected Lucio in a second, unrelated murder, and obtained information harmful to Lucio in this case while investigating that second murder, there can be no question that such information would not have been excludable during the punishment phase on Sixth Amendment grounds. Similarly, there can be no doubt that the many years of CPS records created before Lucio's arrest for capital murder were admissible at the punishment phase. Lucio's attempt to conflate the prosecution of the capital murder case with the child protective work of CPS does not change this.

Juarez was not involved in a criminal investigation. Lucio had no Sixth Amendment right with regard to Juarez' work. Therefore, the admission of her statements to Juarez did not violate her Sixth Amendment rights. At a minimum, the state habeas court's conclusion that Juarez' actions did not implicate Lucio's Sixth Amendment rights was neither an unreasonable determination of the facts, not an unreasonable application of Supreme Court precedent. That conclusion is therefore entitled to deference, and Lucio is not entitled to relief on this claim.

**B.    Ineffective Assistance of Counsel**

In her second, third, fifth, seventh, and ninth claims for relief, Lucio contends that she received ineffective assistance of trial and appellate counsel. Respondent argues that some of these

23

claims are procedurally defaulted, and that all are without merit.

    1.    <u>Failure to Move to Suppress Custodial Statements</u>

In her second claim for relief, Lucio contends that trial counsel, Peter C. Gilman, was ineffective by failing to move to suppress statements she made to the police after her arrest. Lucio does not dispute that she received *Miranda* warnings and waived her *Miranda* rights. She argues, however, that she was interrogated for a prolonged period of time without food or water, and was threatened and intimidated by police officers who also took advantage of her physical exhaustion and psychological vulnerabilities. Respondent counters that this claim is procedurally defaulted and without merit.

    a.    <u>Procedural Default</u>

The procedural default doctrine may bar federal review of a claim. "When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural rule is independent and adequate to support the judgment." *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001). The Supreme Court has noted that

> [i]n all cases in which a state prisoner had defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "This doctrine ensures that federal courts give proper respect to state procedural rules." *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997) (citing *Coleman*, 501 U.S. at 750-51); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (finding

24

the cause and prejudice standard to be "grounded in concerns of comity and federalism").

To be "adequate" to support the judgment, the state law ground must be both "firmly established and regularly followed." *Ford v. Georgia*, 498 U.S. 411, 424 (1991). If the state law ground is not firmly established and regularly followed, there is no bar to federal review and a federal habeas court may consider the merits of the claim. *Barr v. Columbia*, 378 U.S. 146, 149 (1964). An important consideration in determining whether an "adequate" state law ground exists is the application of the state law ground to identical or similar claims. *Amos v. Scott*, 61 F.3d 333, 340-41 (5th Cir. 1995). The adequacy of a state law ground to preclude federal court review of federal constitutional claims is a federal question. *Howlett v. Rose*, 496 U.S. 356, 366 (1990). If the state court decision rests on federal law, then there is no bar to federal habeas corpus review.

> [W]hen . . . a state court decision fairly appears to rest primarily on federal law, or to be interwoven with federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.

*Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983); *see also Coleman v. Thompson*, 501 U.S. 722 (1991) (applying the presumption in the context of habeas).

Lucio first raised this claim in her state habeas corpus application. The TCCA found the claim defaulted, but did not explain the basis for the finding of default.[2] Instead, the TCCA cited two of its own opinions. In *Ex Parte Banks*, 769 S.W.2d 539 (Tex. Crim. App. 1989), the TCCA held that a claim that could have been raised on direct appeal is procedurally defaulted if raised for the first time in habeas corpus. In *Ex Parte Acosta*, 672 S.W.2d 470 (Tex. Crim. App. 1984), the court held that claims raised and rejected on appeal will not be reconsidered in an application for

---

[2]    In the alternative, the TCCA found the claim meritless.

25

habeas corpus.  Lucio argues that this citation to two cases renders the finding of default ambiguous.

The TCCA's citations concerned findings that several of Lucio's claims were defaulted. Read in context, it is clear that the default of this claim was based on the *Banks* rule that the claim could have been raised on direct appeal.  There is no ambiguity.

This Court finds, however, that the *Banks* procedural bar is not regularly applied with regard to ineffective assistance of counsel claims.  The TCCA has repeatedly stated that ineffective assistance claims are generally brought in habeas corpus because they often require factual development outside the trial record.  *See, e.g., Tong v. State,* 25 S.W.3d 707, 714 n. 10 (Tex. Crim. App. 2000)("Because a record focused on the conduct of trial counsel is not typically developed at trial, it is often difficult to review an effective assistance of counsel claim on direct appeal. Hence, these claims are usually better raised in a post-conviction application for a writ of habeas corpus.") Because this procedural bar is not regularly applied in this context, it is not a bar to federal habeas corpus review.  *Barr*, 378 U.S. at 149;  *Amos*, 61 F.3d at 340-41.

b.   <u>Ineffective Assistance</u>

To prevail on a claim for ineffective assistance of counsel, Petitioner

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In order to prevail on the first prong of the *Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.   *Id.* at 687-88.  Reasonableness is measured against prevailing

26

professional norms, and must be viewed under the totality of the circumstances. *Id.* at 688. Review of counsel's performance is deferential. *Id.* at 689.

Lucio made statements to the police in which she acknowledged a history of physically abusing Mariah, but denied killing her. She now argues that she was subjected to harsh, coercive conditions that exploited her physical exhaustion and psychological vulnerabilities, and rendered her statement involuntary in violation of her Fifth Amendment rights.

The Supreme Court has noted that "all [cases finding a compelled self-incriminatory statement] have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164, (1986). Therefore, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984).

In this case, despite Lucio's attempts to portray it otherwise, there was no compulsion. The police questioned her in an office for about four hours after informing her of her rights to remain silent, to have counsel present, and to terminate the interview at any time. *See* State's Exhibit ("SX") 3 at 0:10-1:40. The record shows that, contrary to Lucio's current assertion that she was deprived of food and drink, she was offered water. 32 Tr. at 47; CR at 249.[3] When Lucio asked for a cigarette, she was given one and allowed to go outside to smoke. 32 Tr. at 47. She was not threatened. With the exception of a few brief exchanges in which one officer raised his voice, the

---

[3]      "Tr." refers to the transcript of Lucio's trial; "CR" refers to the Clerk's Record in Lucio's state habeas corpus proceeding.

27

tone of the interview was conversational.

The only point at which Lucio even arguably asked to terminate the interview was a statement that"I want to talk to my husband.  I don't want to talk to nobody else."  CR at 249.  When Lucio asked to speak to her husband, the officer asked her if she wanted any water.  She replied that she wanted a cigarette.  The officer replied:  "Ok.  Let's finish this.  Ok?  I'll get you a cigarette.  Ok? Let's get this out of the way."  There was a brief inaudible portion of the video, after which Lucio stated:  "It's gonna be a long . . . It's a long story.  Everything's long."*Id.*  At that point, the officer left the room.  When he returned, he asked Lucio to tell her story, and she did.

> Once [*Miranda*] warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966) (footnote omitted).  However, "[i]f an accused makes a statement [invoking her rights] that is ambiguous or equivocal . . . the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights."  *Berghuis v. Thompkins*, 560 U.S. 370, 381, (2010) (internal quotation marks and citations omitted).

Lucio's statement that she wanted to speak to her husband and nobody else was not an

unequivocal invocation of her *Miranda* rights. At that point, she had been speaking to the police for an extended period of time, and she never stated that she wanted to end the interview. She subsequently volunteered that she had a long story to tell. Lucio's statement was, at most, an ambiguous expression that she no longer wanted to talk to the police. She did not expressly state that she wished to remain silent, nor did she invoke her right to counsel. In light of this ambiguity, the police were not required to stop the interview. Because the statement was admissible, trial counsel was not ineffective for failing to seek suppression, nor can Lucio show any *Strickland* prejudice because there is virtually no probability that any such motion would have been successful. At a minimum, the TCCA's conclusion that there was no Fifth Amendment violation, and thus no ineffective assistance of counsel, *see* 4 Supp. CR at 5, was reasonable and is entitled to deference under the AEDPA. Therefore, Lucio is not entitled to relief on this claim.

2.  Failure to Investigate

Lucio next argues that counsel failed to investigate, develop, and present evidence supporting her current theory that Mariah's older injuries were caused by a combination of rough treatment by her siblings, insect bites, and Mariah scratching at the insect bites. Specifically, she contends that counsel: (1) failed to obtain the assistance of a competent forensic pathologist; (2) failed to make a timely request for, or adequately utilize, a mitigation specialist and psychologist; (3) and (4) failed to investigate and present evidence and witnesses supporting her explanations for Mariah's injuries; (5) failed to investigate and present evidence that Lucio could not have severely beaten Mariah in the 24 to 48 hours preceding Mariah's death; (6) failed to dispel the idea that Lucio would not explain the cause of Mariah's injuries because she caused them; (7) failed to investigate and present

29

evidence that Lucio did not know the extent and severity of Mariah's fatal injury; and (8) failed to dispel the idea that Lucio was indifferent toward Mariah. The TCCA found that counsel's alleged failures were the product of reasonable trial strategy.

Counsel's explanation for Mariah's fatal injury was the same as that now advanced by Lucio. In his opening statement, counsel told the jury that Mariah died as a result of injuries sustained when she fell down a flight of stairs and was also injured by other family members. 32 Tr. at 21-22. He argued that Lucio was a battered woman who made a false confession to please the police officers who were questioning her. *Id.*

### a.) Evidence Supporting Lucio's Theory of the Case

Gilman elicited testimony from state's witnesses showing that the police never submitted for analysis physical evidence obtained from Lucio, including hair samples, fingernail clippings, saliva swabs, dental records, and Lucio's ring. 33 Tr. at 22-24, 59, 127. He thereby established that there was no physical evidence demonstrating that Lucio caused Mariah's death.

Counsel attempted to call a mitigation specialist and a psychologist to offer a theory that Lucio gave a false confession because she was suffering from battered woman's syndrome and, as a result, would tend to be compliant to any authority figure. 35 Tr. at 126-35, 141-44, 194-96. The trial court, however, excluded this evidence, leaving counsel to present his alternative theories in the face of Lucio's confession. *Id.* at 136. In closing argument, counsel argued that the confession was the result of exhaustion, intimidation, and an effort to cover for her husband and/or children. 36 Tr. at 25-27. He also argued an alternative theory that Lucio was guilty only of injuring Mariah, but not killing her. 36 Tr. at 34.

30

The TCCA found that counsel pursued a reasonable trial strategy. 4 Supp. CR at 16. Lucio argues that the findings are contradictory, and thus unreasonable. For example, she contends that the TCCA's findings that counsel both conceded that Lucio beat Mariah while working to exclude evidence that she beat her other children is inconsistent and contradictory. *See* Pet. at 57-61. In fact, there is nothing contradictory in conceding what Lucio admitted to in her confession while seeking to exclude additional evidence of other bad acts that would paint Lucio as cruel and sadistic, make the jury less likely to believe that she did not inflict the fatal injuries and, looking ahead to a possible penalty phase, make Lucio appear to be a pathologically violent person.

Lucio now argues that counsel should have called some of Lucio's children and a CPS caseworker to support his alternative theory of Mariah's injuries. Respondent points out, however, that there were risks involved in calling these witnesses. The children had made statements in the past portraying a dysfunctional, sometimes violent, household, and telling conflicting stories about the events leading up to Mariah's death. *See*, *e.g.* 2 CR at 316-28, 352-53. Gilman's decision not to call the children was therefore reasonable, the TCCA's conclusion is also reasonable, and Lucio is not entitled to relief on this claim..

### b.)    Expert Witness

Lucio argues that counsel was ineffective for failing to retain "a competent forensic pathologist" to testify about the causes of Mariah's injuries. Counsel retained an expert, Dr. Jose Kuri, a neurosurgeon. Dr. Kuri testified that Mariah's fatal injuries could have been caused by a fall down a flight of stairs. 35 Tr. at 34. He also presented evidence through a CPS caseworker that some of Lucio's other children were physically aggressive, supporting the theory that they might

31

have caused the injuries, 33 Tr. at 182-83; 35 Tr. at 163-64, and that Mariah had thrown tantrums in which she hit her head against the floor or a wall, 33 Tr. at 183; 35 Tr. at 161; Defense Exhibits ("DX") 19-22. Counsel further presented evidence, through Lucio's sister, that Lucio never disciplined her children and that the children were aggressive toward each other. 35 Tr. at 94-95, 100, 113.

Lucio now identifies a forensic pathologist, Dr. Thomas Young, who states that Dr. Kuri's testimony was "egregiously inadequate to confront the arguments provided by the state for child abuse." Lucio also argues that Dr. Kuri's testimony was "largely incoherent and non-responsive to the questions asked." Pet. at 62. The TCCA found that Dr. Kuri's testimony "ably presented" the defense theory that Mariah's fatal injuries were caused by a fall.

The state habeas court found:

> Defense counsel retained and called to testify a qualified medical expert, Dr. Jose Kuri, to rebut the testimony of the State's pathologist regarding the cause of the victim's death. Defense counsel's strategy in this case was to assert that the fatal blunt force trauma to the victim was caused by a fall sustained some 48 hours prior to death. Dr. Kuri's testimony ably presented this theory of the case, challenging the testimony of the State's pathologist as to the age and etiology of the victim's trauma. Dr. Kuri presented testimony helpful to the defense, and defense counsel's decision to retain him was not erroneous.

4 Supp. CR at 5.

Dr. Kuri testified that he had been, as of the time of trial, board certified in neurosurgery for 53 years, and had been licensed to practice medicine in Texas since 1975. 35 Tr. at 4. He was educated at Columbia University and the University of Texas. *Id.* at 9. He possesses certificates of completion from the American Board of Forensic Medicine and the American College of Forensic

Examiners. *Id.* at 10.

Dr. Kuri stated that he is not a pathologist, but was asked to testify only about Mariah's brain injuries. *Id.* at 4-5, 9. In fact, there was no dispute in this case as to the cause of Mariah's death; it was blunt force trauma to her head. *Id.* at 24-25. The only dispute was, and is, as to whether that trauma resulted from a fall, and, if not, whether Lucio inflicted the fatal blow. Dr. Kuri was well qualified to testify concerning Mariah's fatal injury and did, in fact, testify that it could have been caused by falling down the stairs approximately 48 hours before her death. *Id.* at 34-39.

Lucio cites two Texas state cases for the proposition that counsel is ineffective for failing to obtain the assistance of a pathologist, or an expert to help evaluate the strength of the defense or the weaknesses in the State's case. *See* Pet. at 67-68 (citing *Ex Parte Briggs*, 187 S.W.3d 458 (Tex. Crim. App. 2005), and *Rey v. State*, 897 S.W.2d 333 (Tex. Crim. App. 1995)). These cases are of no help to Lucio.

In *Briggs*, the TCCA found ineffective assistance of counsel when defense counsel failed to consult any medical expert in a case arising out of the death of a child in which the case turned on whether the child died of natural causes. 187 S.W.3d at 466-67. Moreover, the record established that Briggs' attorney did not pursue expert medical testimony for economic, rather than strategic, reasons. *Id.* In *Rey*, the TCCA reversed a conviction because the trial court improperly failed to provide funds for the defendant to retain an expert. 897 S.W.2d at 335.

In contrast to *Briggs*, Lucio's counsel did retain an expert. That expert was an experienced, board certified neurosurgeon asked to testify about the possible causes and timing of Mariah's fatal brain injury. In contrast to *Rey*, Lucio had access to an expert witness.

33

Lucio cites no case holding that an attorney is deficient for relying on the expert opinion of a medical doctor who is board certified in a relevant specialty. Nor does she cite any case holding that a subsequent expert opinion disagreeing with the expert trial witness' opinion is sufficient to establish ineffective assistance of counsel. In light of Dr. Kuri's qualifications and counsel's reasonable reliance on Dr. Kuri's expertise, counsel was not deficient for using Dr. Kuri as the medical expert in this case.

c.)   <u>Mitigation Specialist and Psychologist</u>

Lucio next complains that counsel did not retain a mitigation specialist and psychological expert early enough in the process to give them adequate time to perform their work to constitutional standards.

1.)   <u>Mitigation Specialist</u>

The record shows that the retained mitigation specialist, Norma Villanueva, first spoke to Lucio on January 22, 2008. Lucio complains that this was too late because the trial was scheduled to begin on February 4, 2008. She acknowledges, however, that the trial was reset for April. This change in schedule was based on counsel's statement to the court that the mitigation specialist needed the additional time. 10 Tr. at 5-6. A subsequent change moved the beginning of jury selection back to May 27, 2008.

At a pretrial hearing on that date, Villanueva stated that she had been working on her mitigation investigation for approximately two and a half months, and needed approximately two more weeks. 13 Tr. at 10-13. The record shows that jury selection did not begin until June 2, 2008, 15 Tr. at 1, and the first defense witness was not called until July 7, 2008, 35 Tr. at 19. Villanueva

34

did not testify until July 9, 2008. 37 Tr. at 173.

Even if the Court accepts Lucio's contention that counsel was tardy in retaining Villanueva, Lucio fails to demonstrate *Strickland* prejudice. While a January 22 start date may well have been too late to prepare for a trial beginning on February 4, as Lucio's trial was originally scheduled, her trial did not actually begin until June 2. Lucio makes no showing that this time–over four months–was inadequate.

Lucio also argues that a mitigation investigation might be useful in discovering helpful witnesses, and that the allegedly late start handicapped Villanueva, and counsel, in that regard. Again, however, the first defense witness was not called until July 7, 2008, more than five months after Villanueva began her work.

Lucio also argues that the State was dilatory in producing CPS records, handicapping Villanueva's work. Villanueva, however, testified that she reviewed the CPS records. 37 Tr. at 173. Lucio points to nothing supporting her claim that the timing of the production of the records hampered Villanueva's work.

Lucio also argues that, had Villanueva been more fully utilized before trial, she could have helped to develop a psychological profile that would have been helpful in suppressing Lucio's custodial statement as the result of undue psychological pressures. As discussed above, however, a Fifth Amendment violation requires a showing of police misconduct, *Colorado v. Connelly*, 479 U.S. 157, 164 (1986), and there is no evidence supporting Lucio's claim that the police overreached, or that her statement was anything but fully voluntary.

Lucio also complains that Gilman prevented Villanueva from speaking to CPS caseworkers

35

and Lucio's children and other family members. The state habeas court found that Villanueva was provided with family contact information six weeks before trial, and that Lucio did not show that six weeks was inadequate time for Villanueva to do so. 4 Supp. CR at 7. This conclusion is reasonable. Moreover, Villanueva testified that she did not ask for contact information for CPS caseworkers, 37 Tr. at 223-25, and did not contact the children because all the information she needed was in the CPS files. *Id.* at 231. The state habeas court was reasonable in crediting Villanueva's testimony on these issues.

Lucio fails to demonstrate any *Strickland* prejudice from the timing of Villanueva's hire, or from counsel's utilization of Villanueva. Therefore, she is not entitled to relief on this portion of her claim.

2.)   <u>Psychologist</u>

Lucio similarly argues that counsel was late in retaining Dr. Pinkerman, resulting in less than optimal utilization of his expert services. In support of this claim, she cites a statement by Pinkerman that he would have liked to have more meetings with the defense team. She further claims that, had Pinkerman been on board earlier, he could have helped counsel craft a better argument for suppressing Lucio's custodial statement.

Respondent counters that having fewer meetings than the expert might desire does not prove ineffective assistance. Indeed, Lucio does not demonstrate that Pinkerman had inadequate time to perform his work, and the state habeas court's finding to that effect, 4 Supp. CR at 8, is entitled to deference.

As to the confession, as discussed above, Lucio fails to demonstrate any police misconduct,

36

or any action by the police or any other state agent that rendered her statement anything less than voluntary. Lucio is not entitled to relief on this claim.

### d.)   CPS Caseworkers, Foster Parents, and Children

Lucio next complains that counsel was ineffective by failing to investigate and call various CPS caseworkers, foster parents for her children, and some of her children to testify that she was not violent and to provide explanations for Mariah's older injuries.

The Fifth Circuit has held that "complaints based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain." *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (citing *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983), *cert. denied*, 467 U.S. 1251 (1984)). "In order for the appellant to demonstrate the requisite *Strickland* prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." *Id.*

The state habeas court found that counsel elicited testimony from one CPS caseworker, Joanne Estrada, and from Lucio's sister. They both testified that they had never seen Lucio physically abuse her children. 4 Supp. CR at 9. In light of this testimony, and Lucio's statement to the police admitting that she caused Mariah's injuries, the TCCA found that the additional testimony Lucio now argues counsel should have presented would have been "of limited, if any, value . . . ." *Id.*

Lucio disputes this finding, arguing that the jury may have discounted Estrada's testimony

37

because she may have feared facing prosecution for returning Mariah to Lucio's custody. Lucio further speculates that the jury might have discounted Lucio's sister's testimony as biased in favor of her sister.

Estrada played no role in returning Mariah to Lucio's custody as she only began work on the case after Mariah's death. 35 Tr. at 159. Therefore, Lucio's speculation about the jury's concerns about Estrada giving self-interested testimony is unfounded.

Lucio fails to demonstrate that any of the other CPS caseworkers would have been available to testify (or why *those* caseworkers, who worked on the case *before* Mariah's death, would not have been seen by the jury as self-interested). The TCCA's conclusion that such witnesses would merely have been cumulative is reasonable.

Mariah's foster mother did testify in the punishment phase, and her testimony was not helpful to Lucio. Alfonsa Castillo, Mariah's foster mother, testified that Mariah sometimes threw tantrums, but that they were becoming less frequent as she got older. She talked about watching Mariah go through withdrawal from the cocaine that was in her system when she was born. 37 Tr. at 94-98. She also testified that Lucio showed little interest in Mariah during supervised visits. *Id.* at 99-100. Lucio fails to demonstrate that guilt-innocence phase testimony by Castillo would have been helpful to her.

Lucio next argues that counsel should have called two of her young sons, Richard and Rene, to testify that Mariah fell down some stairs. She identifies portions of interviews conducted with the boys in support of her claim that they would have testified helpfully.

The state habeas court found that counsel was not ineffective because attempts to suggest that

38

there was no abuse would have caused Lucio to lose credibility in the eyes of the jury. 4 Supp. CR at 9-10. Respondent now points out numerous inconsistencies in the boys' statements, and between their statements and Lucio's. For example, respondent points out that, while Richard said Mariah fell down some steps, he said it was only two steps, and that he knew this because his mother told him. 2 CR at 327-28. Richard said that he saw bruises on Mariah's eye and arm after the alleged fall, but also denied seeing the bruises. *Id.* at 316, 321, 328. Rene said that he saw Mariah fall down three steps after Lucio told her to wait on the steps, but Lucio said that she went outside to find Mariah when she didn't see her in the house and found her at the bottom of the stairs. Lucio also told the police that none of the children saw Mariah fall down the stairs. *Compare Id.* at 345 and 1 CR at 176. In light of the numerous inconsistencies and contradictions in the boys' statements, the state habeas court's conclusion that counsel made a reasonable decision not to call the boys is, itself, reasonable. It is therefore entitled to deference, and Lucio is not entitled to relief on this claim.

e.)   <u>Offering an Alterative Suspect</u>

Lucio next argues that counsel was ineffective by failing to accuse Lucio's 15 year old daughter Alexandra or her husband of murdering Mariah. Lucio argues that Alexandra made statements admitting to striking Mariah. The state habeas court found that the statements were not probative because they did not address the question of who administered the fatal blow. Lucio argues that this is unreasonable because the evidence would show that Alexandra was responsible, at a minimum, for some of Mariah's older injuries. This, in turn, would blunt the State's case accusing Lucio of engaging in long term physical abuse of Mariah.

Lucio acknowledged in state habeas that Gilman was aware of Alexandra's statements, but

39

decided not to pursue that theory of the case. 1 CR at 84. The record further shows that Lucio told Gilman that Alexandra would deny harming Mariah if called to testify. It thus appears that counsel made a strategic choice not to present evidence that would be recanted or contradicted, and would risk alienating the jury by attempting to deflect blame to a teenager. Moreover, Alexandra's statements against her penal interest that now appear in an affidavit by Lucio's sister and that Lucio argues could have been used for impeachment were made approximately two years after the trial, in May 2010. SH at 366. Thus, any argument Lucio might have that denials on the stand could be impeached with Alexandra's statements against her own penal interest falls flat, because those statements were not made until well after the trial concluded. The state habeas court's conclusion that counsel made a reasonable strategic decision not to offer Alexandra as the murdered was a reasonable conclusion.

Lucio also claims counsel should have pointed to Lucio's husband, Robert Alvarez, as the killer. She points to material in the record showing that Alvarez had been seen yanking another child's arm, and that he had some opportunity to inflict the fatal injury on Mariah. She points to nothing, however, indicating that he actually did so. In light of Lucio's confession, an attempt to shift blame to Alvarez would likely have failed, and would have carried with it the risk of damaging Lucio's credibility and making her seem even less sympathetic to the jury. Counsel was not deficient for not pursuing this theory.

### f.)   Evidence of Other Causes of Mariah's Injuries

Lucio next argues that Gilman was ineffective by failing to investigate and present witnesses and documentary evidence that she could not have severely beaten Mariah in the 24 to 48 hours prior

40

to Mariah's death.[4]  Lucio notes that there was some evidence supporting a theory that Mariah's older injuries resulted, at least in part, from insect bites and rough play by Mariah's siblings.

In rejecting this claim, the state habeas court found that counsel was not deficient because Lucio originally offered these explanations to the police, but then recanted and admitted responsibility.  4 Supp. CR at 11.  Respondent further notes the extent and severity of Mariah's injuries, including bruises on her arms, hands, ears, torso, legs, scalp, and neck, adult size bite marks on her back, hair missing from her scalp, and abrasions on her vagina.  34 Tr. at 15-38.  Mariah also had a subdural hemorrhage and bruising on her lungs and right kidney.  *Id.* at 27-28.  She had blood around her spinal cord.  *Id.*  Both the emergency room doctor who saw Mariah and the pathologist who performed Mariah's autopsy testified that this was the worst case of child abuse they had ever seen.  32 Tr. at 79; 34 Tr. at 58.

It was reasonable for counsel to not aggressively pursue this theory.  He did elicit some testimony that the children were rough with each other but, in light of the extensive and severe nature of Mariah's injuries and Lucio's statement to the police, aggressively arguing that Mariah's injuries were accidental and/or the result of insect bites would have damaged the defense's credibility.  It is therefore reasonable to conclude that such argument would have had virtually no chance of changing the verdict.  The TCCA's conclusion that counsel was not ineffective for failing to pursue this theory was a reasonable one.

---

[4]    Lucio breaks out into three separate subclaims the contention that counsel should have presented alternative theories, that counsel should have countered the argument that Lucio could not explain Mariah's old injuries, and that Lucio was unaware of the extent of Mariah's new injuries.  The latter two claims involve much the same evidence and are subject to the same analysis.  Therefore, these two arguments are both addressed under one heading.

Finally, Lucio argues that counsel failed to dispel the idea that Lucio was aware of Mariah's new injuries.  She told the police that Mariah was wearing a jumpsuit when she suffered her fatal injuries and now argues that this covered up her bruises.  She also now argues that she was busy unpacking her family into a new apartment, and therefore did not notice the extent of Mariah's injuries.  The state habeas court found that Lucio admitted to the police that she caused most of Mariah's injuries, and that counsel therefore could not have credibly denied that she was unaware of what she caused.  4 Supp. CR at 11-12.

Lucio again argues that counsel should have argued that Lucio's confession was false, and the result of police coercion.  According to Lucio, he could have argued that she was unaware of the injuries.  As discussed above, however, there is no evidence of police coercion.

Counsel attempted to present expert testimony in support of Lucio's argument that she was uniquely vulnerable to giving a false confession because of her psychological state, but the trial court did not allow the evidence.  Faced with no opportunity to present this theory, coupled with Lucio's inculpatory confession, counsel made a reasonable strategic decision not to argue a theory that the jury was unlikely to believe, *i.e.* that Lucio was unaware of the extent of Mariah's injuries.  Counsel did not render deficient performance in this regard.

### g.)   Lucio's Attitude Toward Mariah

Mariah's foster mother, Alfonsa Castillo, testified that Lucio and her husband did not pay much attention to Mariah during supervised visits.  37 Tr. at 99-101.  Lucio contends that counsel was ineffective for failing to counter the impression that Lucio was indifferent to Mariah, ignored her needs, and preferred her other children.  She argues that there was evidence that Castillo did not

42

stay to observe the visits and her testimony was inaccurate. She argues that Lucio's sister could have testified that Lucio was an attentive parent, and that CPS records reflect a great deal of positive interaction between Lucio and Mariah.

In rejecting this claim, the state habeas court found that CPS investigated Lucio for neglect in 1995, 1996, 1998, 2000, 2001, 2002, 2003, and 2004.  4 Supp. CR at 12.  The court thus found that "any attempt to argue that she was a good parent would have been superfluous at best."  *Id.*

Lucio argues that there is a big difference between passive neglect and abuse, and that she did not have to prove that she was "a good parent."  While Lucio is correct, her argument moves the goal posts.  Her claim for relief is that counsel failed to counter testimony that she was an indifferent parent, not an abusive one.  CPS records showing numerous instances of child neglect are certainly relevant to this issue.  While Lucio is correct that she was not required to prove that she was a good parent, additional evidence that she had a long history of being a neglectful one would not have helped her case.  The state habeas court's conclusion that counsel was not ineffective for failing to pursue this line of defense was reasonable.

C.    <u>Right to Present a Complete Defense</u>

Lucio next contends that the trial court's ruling that Villanueva could not testify regarding the meaning of Lucio's body language during her interrogation, and on the relevance of Lucio's CPS records to Mariah's cause of death, denied Lucio her constitutional right to present a complete defense. Lucio states that Villanueva would have testified concerning Lucio's patterns of behavior and how that showed in her videotaped interview with police, how her documented patterns influence her decision making and affected how she interacted with the interviewers, and how Lucio

43

deals with people in positions of authority.  35 Tr. at 142-43.

Lucio also complains about the trial court's ruling barring Dr. Pinkerman from testifying that Lucio is a battered woman and, as such, "takes blame for everything that goes on in the family . . . ."  35 Tr. at 187-88.  The trial court ruled that ths testimony was irrelevant to guilt-innocence.

While there is no dispute that a criminal defendant has a right to present a defense, "lawmakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  A defendant's due process rights are violated if the evidentiary rules are arbitrary or "disproportionate to the purposes they are designed to serve."  *Id.*

Rules barring evidence that is irrelevant are present in both the Texas and Federal Rules of Evidence.  *See, e.g.*, Fed. R. Evid. 401.  Some relevant evidence is excludable, for a variety of reasons.  *See, e.g.*, Fed. R. Evid. 403.  Similarly, courts are authorized to exclude expert or scientific evidence when the proffered expert is not qualified, or when the evidence is unreliable.  *See, e.g.*, Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  The evidentiary rules invoked by the trial court were neither arbitrary nor disproportionate, but were rooted in longstanding and well accepted principles of evidence law.  Lucio's real complaint, then, is not with the rules themselves, but with the trial court's application of those rules to her particular case.

In reviewing evidentiary rulings of a state court, a federal habeas court "do[es] not sit as a super state supreme court to review error under state law."  *Skillern v. Estelle*, 720 F.2d 839, 852 (5th Cir. 1983), *cert. denied*, 469 U.S. 873 (1984).  A federal court may grant habeas relief "only when the trial judge's error is so extreme that it constitutes a denial of fundamental fairness under the Due

Process clause." *Bailey v. Procunier*, 744 F.2d 1166, 1168 (5th Cir. 1984).

Lucio's attempt to dress up this state evidence law claim as a constitutional claim is unconvincing. Lucio wished to introduce "battered woman" evidence in support of her argument that her confession was involuntary. However, she makes no showing that the trial court's exclusion of Villanueva's testimony on the basis of Villanueva's lack of expert qualifications was incorrect. Moreover, as discussed above, the videotape of Lucio's police interview makes clear that there was no police misconduct, or any police action that rendered Lucio's statements involuntary.

Dr. Pinkerman's proposed testimony was only tangentially related to the question of Lucio's guilt or innocence, and created a risk of requiring significant time and effort litigating a collateral issue. The jury was able to see the videotape of the interview and form their own judgment as to voluntariness. As discussed above, the evidence that anyone but Lucio inflicted the fatal injuries is tenuous at best. The exclusion of Pinkerman's false confession testimony as irrelevant did not deny Lucio a fair trial, and thus did not violate her right to due process. This claim is without merit.

### D.    Failure to File Pretrial Motions

Lucio next raises five claims of ineffective assistance of counsel, arguing that counsel should have filed a number of pretrial motions.

#### 1.    Motion to Suppress Statements Made to Beto Juarez

Lucio first argues that counsel should have moved to suppress testimony about the existence and substance of Beto Juarez' CPS reports on the grounds that Lucio's statements to Juarez were obtained in violation of her Fifth and Sixth Amendment rights. As discussed above, however, Juarez was not an agent of the prosecution, and was not engaged in a criminal investigation, when he spoke

45

to Lucio.  Therefore, as also explained above, his interviews with Lucio did not implicate her Fifth

or Sixth Amendment rights, and any pretrial motion seeking to suppress the statements on those

grounds would have been without merit.  Counsel's failure to raise a meritless claim did not

constitute deficient performance.  *See, e.g., Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995)

("Counsel cannot be deficient for failing to press a frivolous point"); *Koch v. Puckett*, 907 F.2d 524,

527 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions

or objections."). In addition, because such claim would have been without merit, it is not reasonably

probable that counsel would have obtained any relief.

   2.   <u>Motion to Suppress Autopsy Evidence</u>

   Lucio next claims that counsel should have filed a *Daubert* motion to challenge the scientific

validity, and thus admissibility, of the forensic pathologist's opinion that Mariah was abused and her

death was a homicide.  She contends that the conclusions reached by the pathologist, Dr. Norma

Farley, were not scientifically sound.

   The state habeas court rejected this claim, finding that Lucio failed to demonstrate that Dr.

Farley's testimony was scientifically invalid, subjective, or conclusory.  Lucio argues that this was

an unreasonable application of the Supreme Court's decision in *Daubert v. Merrell Dow

Pharmaceuticals*, 509 U.S. 579 (1993).

   Even if Lucio is correct that the Texas state courts incorrectly applied *Daubert*, she fails to

state a claim for relief.  *Daubert* announced a standard for the admission of expert and scientific

evidence under the Federal Rules of Evidence; it did not articulate a rule of constitutional law.  *See

Castillo v. Johnson*, 141 F.3d 218, 221 (5th Cir. 1998).  While states are free to adopt the *Daubert*

46

standard, they are not constitutionally required to do so.  Texas has, *see, e.g., Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 720-28 (Tex. 1998),  but its adoption of the *Daubert* standard does not create a new constitutional right.

At most, Lucio now argues that the state habeas court improperly applied Texas evidence law in rejecting her claim.  However, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether the conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Because the Texas state courts have determined that there was no basis to exclude Dr. Farley's opinion and conclusions under Texas law, there was no basis for a pretrial motion to exclude this evidence, and counsel did not render deficient performance by failing to file such a motion.

### 3.  Shaken Baby Evidence

Dr. Alfredo Vargas, the emergency room doctor, and Escalon testified that shaking a baby could cause head trauma.  Lucio claims that counsel was ineffective by failing to challenge this testimony as junk science.

Dr. Vargas included shaking a baby in a list of events that could cause internal bruising of the brain. 32 Tr. at 78-79.  On cross examination, Dr. Vargas acknowledged that she was unable to determine Mariah's cause of death.  *Id.* at 82.

Escalon testified that he suspected Mariah's death was caused by head trauma, and stated that shaking can cause bleeding in the brain. 33 Tr. at 129.  Gilman asked Escalon if he had any medical training, and Escalon acknowledged that he did not.  *Id.*  Escalon went on to explain why he

suspected head trauma, and stated that "the injuries that [Lucio] caused, indirectly could cause damage to the brain by grabbing, shaking her, shaking her, and beating her." *Id.* at 134. Escalon demonstrated on the prosecutor how shaking a baby might cause brain injury. On cross examination, however, Escalon admitted that Lucio never said that she shook Mariah. *id.* at 136. Upon further questioning by Gilman, Escalon acknowledged that "[t]here is no evidence to show that she . . . shook the child." *Id.* at 138.

In denying this claim, the state habeas court found that Gilman was not ineffective because "[s]haken-baby syndrome was at best an ancillary issue at the trial," and noted that "[t]he medical experts in this case agree that the victim was not killed by shaking, but rather blunt force trauma to the head." 4 Supp. CR at 13. The state habeas court's conclusion is reasonable. Whether shaken baby syndrome is scientifically valid or not, counsel elicited testimony from both Vargas and Escalon that they had no evidence that Lucio shook Mariah. Shaken baby syndrome was not put forth as the cause of death. Thus, even if Gilman should have objected on the grounds Lucio now urges, Lucio cannot demonstrate any likelihood that the verdict would have been different had he done so. She therefore, at a minimum, fails to demonstrate any *Strickland* prejudice, and is not entitled to relief on this claim.

### 4.   Reports by Non-Testifying Experts

Appended to the autopsy report prepared by Dr. Farley were reports by Laura M. Labey from NMS Labs, Frank Scribbick from Eye Pathology Laboratory, and an unnamed lab technician from Valley Baptist Medical Center. Gilman objected to the admission of these attachments and to any reference to the attachments in the autopsy report. 34 Tr. at 39, 44-46. The objection was sustained,

the reports and references redacted, and the redacted report received in evidence.  34 Tr. at 45-46.
 Dr. Farley, however, testified that she sent Mariah's eyes to be examined by an eye pathologist, who
saw folds in the retina, indicating significant trauma, and also saw optic nerve hemorrhaging, which
Dr. Farley also observed.  Dr. Farley also testified that the marks that she identified as bite marks
were examined by a forensic odontologist, who stated that they were bite marks, but that she could
not link them to a particular person.  *Id.* at 33-34.

Lucio argues that Farley's references to these reports violated her Sixth Amendment right to
confront witnesses against her.  She raised this issue in state habeas, citing *Crawford v. Washington*,
541 U.S. 36 (2004), and *Melendez-Diaz v. Massachusetts*, ___ U.S. ___, 129 S.Ct. 2527 (2009).  The
state habeas court rejected the claim, finding that the report of the eye pathologist was merely
cumulative of Dr. Farley's own conclusions, and that the odontologist's conclusions were
cumulative of other evidence that the marks were, in fact, bite marks.

Lucio argues that these conclusions are unreasonable.  She contends that the evidence was
not merely cumulative because the eye pathologist observed and commented on the folds in the
retina, as well as the optic nerve hemorrhage, whereas Dr. Farley only commented on the
hemorrhage.  She argues that the odontologist's conclusion was not merely cumulative because the
other evidence that the marks were bite marks was not expert testimony.  Lucio contends that the
marks were actually scrapes from falling down the stairs.

While Lucio cites both *Crawford* and *Melendez-Diaz, Melendez-Diaz* did not come out until
2009, the year after Lucio's trial.  Counsel cannot be deemed ineffective for failing to anticipate any
new holding or clarification that had not yet issued.  The issue, then, is whether *Crawford* dictated

49

an objection to the references to non-testifying experts' opinions.

In *Crawford*, the defendant was convicted of assault for stabbing a man he claimed tried to rape his wife. At trial, the prosecution played a tape recorded statement the defendant's wife gave to police describing the stabbing. The defendant had no opportunity to cross-examine his wife. 541 U.S. at 38-40. The Court held that the confrontation clause prohibits the introduction of *testimonial* out-of-court statements, even if they fall within a firmly rooted hearsay exception. *Id.* at 50-51. While the Court did not give a detailed explanation of the kinds of statements constituting "testimonial" statements, the Court did give three broad examples:

> [1] *ex parte* in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably be expected to be used prosecutorially . . .[2] extrajudicial statements. . . contained in testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . [and, 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52. Texas case law prior to *Melendez-Diaz* held that autopsy reports were not testimonial. *See, e.g., Wood v. State*, 299 S.W.3d 200, 208 (Tex. App. – Austin, 2009)(citing several pre-*Melendez-Diaz* cases).

Respondent points out that Gilman did, in fact, have a running objection to the entire autopsy report, but that the trial judge indicated that the portions now at issue were admissible as hearsay exceptions. *See* 34 Tr. at 42-46. In light of the state of the law at the time of Lucio's trial, Gilman was not ineffective for failing to do more. This claim is without merit.

5.      Evidence of DWI

Lucio argues that counsel was ineffective by failing to object to the admission during the punishment phase of her prior conviction for driving while intoxicated. As noted above, before her capital murder trial, Lucio pled guilty to a DWI committed in 2006. The plea followed Lucio's arrest and arraignment in this case. The plea was made without the assistance of counsel. Lucio argues that the admission of that conviction into evidence in this case violated her Sixth Amendment right to counsel.

Before trial, Gilman filed a motion *in limine* to keep the DWI out. The trial court never ruled on the motion. 1 CR at 140-41. Gilman later reminded the court of his motion, but the trial court again declined to rule. 32 Tr. at 7-8.

During the defense's punishment phase case, the State asked to reopen its case to admit the DWI. Gilman again objected, but the court granted the request. 37 Tr. at 170. The prosecution stated that it would seek to admit the conviction after the defense rested. *Id.* at 171. Gilman noted that the State would have to prove the conviction through fingerprints or some other proof that Lucio was the person convicted. *Id.* Instead, the State asked Lucio's mitigation specialist whether she was aware of the conviction and that Lucio used an alias. 38 Tr. at 35. The witness stated that she was aware of the DWI, but not the alias. *Id.* Gilman let the DWI come in this way.

In rejecting this claim, the state habeas court found that Gilman made a strategic decision to allow the conviction to come in this way, *i.e.*, "through a friendly witness," because it would have been admissible under TEX. CODE CRIM. PROC. art. 37.071. SH at 15. Lucio now argues that this was unreasonable because the conviction was inadmissible because it was based on a Sixth

51

Amendment violation.

As discussed above, however, Sixth Amendment rights are offense-specific.  While Lucio asserts that her DWI plea was made without the benefit of counsel, she makes no argument for why the DWI conviction was inadmissible in this case other than that it was entered after she was charged with capital murder.  Her Sixth Amendment right to counsel in this case, however, did not extend to the DWI case.  Lucio thus identifies no basis for excluding the DWI plea.  Because the conviction was admissible, the TCCA's conclusion that Gilman made a strategic choice to allow the conviction to come in through limited questioning of a friendly witness, rather than proof of Lucio's use of an alias through fingerprint evidence, was a reasonable conclusion.  It is therefore entitled to deference.

E.    *Brady*

Lucio contends that she was denied due process when CPS failed to turn over documents containing information useful in Lucio's mitigation case in sufficient time for the defense to use them at trial.  Respondent argues that the claim is procedurally defaulted.

The TCCA found the claim defaulted, but did not explain the basis for the finding of default.[5] Instead, the TCCA cited to two of its own opinions.  In *Ex Parte Banks*, 769 S.W.2d 539 (Tex. Crim. App. 1989), the TCCA held that a claim that could have been raised on direct appeal is procedurally defaulted if raised for the first time in habeas corpus.  In *Ex Parte Acosta*, 672 S.W.2d 470 (Tex. Crim. App. 1984), the court held that claims raised and rejected on appeal will not be reconsidered in an application for habeas corpus.  Lucio argues that this citation to two cases renders the finding of default ambiguous.

---

[5]    In the alternative, the TCCA found the claim meritless.

The TCCA's citations concerned findings that several of Lucio's claims were defaulted. Read in context, it is clear that the default of this claim was based on *Banks*; Lucio did not raise a *Brady* claim in her direct appeal, therefore, *Banks* addresses the procedural posture of this claim and *Acosta* does not. There is no ambiguity, and the claim is procedurally barred. That bar precludes this Court from reviewing Lucio's claim absent a showing of cause for the default and actual prejudice attributable to the default, or that this Court's refusal to review the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

"Cause" for a procedural default requires a showing that some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule, or a showing of a prior determination of ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Amadeo v. Zant*, 486 U.S. 214, 222 (1988). Lucio makes no showing of cause.

A "miscarriage of justice" means actual innocence, either of the crime for which she was convicted or of the death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992). "Actual innocence of the death penalty" means that, but for a constitutional error, she would not have been legally eligible for a sentence of death. *Id.*

To show actual innocence,

> [T]he prisoner must 'show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial, the trier of the facts would have entertained a reasonable doubt of his guilt.

*Kuhlmann v. Wilson*, 477 U.S. 436, 455 n.17 (1986). More succinctly, the petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a

reasonable doubt" in light of the evidence now presented. *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

Lucio argues throughout her petition that the evidence she contends Gilman either improperly failed to present or improperly failed to exclude, or that was otherwise improperly excluded, would show that she is actually innocent. As discussed in regard to Lucio's substantive claims, however, she fails to demonstrate that evidence was improperly admitted or not presented, or that she was prejudiced by any error that did occur. She therefore fails to demonstrate that it is more likely than not that no reasonable juror would have found her guilty but-for any such error. Therefore, this Court's refusal to review this claim will not result in a fundamental miscarriage of justice. Because this claim is procedurally defaulted, and because Lucio fails to demonstrate either cause for the default or that she is actually innocent, this Court cannot grant relief on this claim.

### F.    Failure to Preserve Error

In her final claim of ineffective assistance of trial counsel, Lucio contends that Gilman was ineffective for failing to preserve error for appellate review. She identifies seven specific instances of alleged failure to preserve error: 1) failure to transcribe Lucio's recorded statement or the State's failure to provide such a transcript; 2) admission of custodial statement on the grounds that it was involuntary or the result of an illegal arrest; 3) admission into evidence of Lucio's DWI conviction; 4) exclusion of Villanueva's expert testimony on Lucio's ability to give a voluntary statement to the police; 5) exclusion of Dr. Pinkerman's expert testimony as to the voluntariness of Lucio's statement to the police; 6) admission of Beto Juarez' notes; and 7) the timing of the State's production of CPS records.

1.    Unexhausted Claims

Lucio acknowledges that she specifically identified only two of these issues in her state

habeas corpus application:  Admission of the video of her statement to the police, and admission of

Juarez' notes.  Pet. at 145.  She also states that she "incorporated by reference 'any other appellate

issues' the CCA might subsequently deem 'waived by the failure to raise proper objection.'"  *Id.* at

145-46.  Respondent argues that the claims not specifically identified in Lucio's state habeas

application are unexhausted.

AEDPA requires that a prisoner exhaust available State remedies before raising a claim in

a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a state court shall not be granted
> unless it appears that (A) the applicant has exhausted the remedies
> available in the courts of the State; or (B)(I) there is an absence of
> available State corrective process; or (ii) circumstances exist that
> render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  As the Fifth Circuit explained in a pre -AEDPA case, "federal courts must

respect the autonomy of state courts by requiring that petitioners advance in state court all grounds

for relief, as well as factual allegations supporting those grounds.  "[A]bsent special circumstances,

a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court

before he may seek federal habeas relief."  *Orman v. Cain*, 228 F.3d 616, 619-20 (5th Cir. 2000);

*see* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in

custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the

applicant has exhausted the remedies available in the courts of the State. . . .").

Lucio argues that the claims are properly exhausted because the TCCA had not yet issued its

55

opinion on Lucio's direct appeal at the time she filed her state habeas application, and she therefore did not know which claims that court would find unpreserved. This argument is unconvincing.

Any instance of deficient performance by trial counsel occurred at the time of trial. These claims were ripe immediately following Lucio's conviction and sentencing, and were in no way dependent on the TCCA's decision on Lucio's direct appeal. If Lucio had concerns that some of the claims of error she raised on appeal were not properly preserved for appellate review, then she had an obligation to raise any ineffective assistance of trial counsel claims related to the failure to preserve those points of error in her state habeas application. There was no downside risk to doing so. At most, any such claim would have been rendered moot if the TCCA found that the underlying claim was properly preserved. Therefore, all of these claims other than the claims that counsel failed to preserve error concerning admission of the video of Lucio's statement to the police, and the admission of Juarez' notes are unexhausted and this Court may not consider them. *Knox v. Butler*, 884 F.2d 849, 852 n.7 (5th Cir. 1989).

Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present her unexhausted claims. *Rose v. Lundy*, 455 U.S. 509 (1982). Such a result in this case, however, would be futile because Petitioner's unexhausted claims would be procedurally barred as an abuse of the writ under Texas law. On habeas review, a federal court may not consider a state inmate's claim if the state court based its rejection of that claim on an independent and adequate state ground. *Martin v. Maxey*, 98 F.3d 844, 847 (5th Cir. 1996). A procedural bar for federal habeas review also occurs if the court to which a petitioner must present his claims to satisfy the exhaustion requirement would now find the

unexhausted claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Texas prohibits successive writs challenging the same conviction except in narrow circumstances. Tex. Code Crim.Proc.Ann. art. 11.071 § 5(a). The TCCA will not consider the merits or grant relief on a subsequent habeas application unless the application contains sufficient specific facts establishing the following:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or
>
> (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072.

*Id.* The TCCA applies its abuse of the writ doctrine regularly and strictly. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (per curiam).

Petitioner claims that she could not have presented these claims in her state habeas application because the factual or legal basis for the claim was unavailable because the TCCA had not yet decided her direct appeal. As discussed above, however, that argument is specious: the factual and legal bases for the claims existed as of the time counsel failed to preserve error. No subsequent finding that the error was unpreserved was required.

Lucio also contends that she is actually innocent. As discussed above, however, she fails

to demonstrate that, had any erroneously excluded evidence been admitted, or erroneously admitted evidence been excluded, that no rational juror could have found her guilty, or eligible for a death sentence. Therefore, Petitioner's unexhausted claims do not fit within the exceptions to the successive writ statute and would be procedurally defaulted in the Texas courts. *Coleman*, 501 U.S. at 735 n.1. That bar precludes this Court from reviewing Petitioner's claim absent a showing of cause for the default and actual prejudice attributable to the default, or that this Court's refusal to review the claim will result in a fundamental miscarriage of justice. *Id.* at 750. As discussed in detail above, however, Lucio demonstrates neither cause nor a fundamental miscarriage of justice. Therefore, this Court cannot grant relief on the unexhausted claims.

       2.    <u>Exhausted Claims</u>

As discussed in detail above, in connection with Lucio's claims that counsel should have moved to suppress her statement and Juarez' notes, there was no underlying constitutional violation. Lucio fails to demonstrate that her statement was involuntary, or that Juarez' actions violated her Fifth or Sixth Amendment rights. Because the admission of these pieces of evidence was not erroneous, there was no error for counsel to preserve, and he did not render deficient performance.

**G.**    **<u>Judicial Comment on the Evidence</u>**

Lucio contends that her right to a fair trial by an impartial judge was violated because the trial judge made a facial expression during the testimony of her expert, Dr. Kuri. Following Dr. Kuri's testimony, the following exchange occurred between the trial judge and Gilman:

> THE COURT: Mr. Gilman, you said before proceeding further you wanted to take up some legal matters.
>
> MR. GILMAN: Yes, sir. I don't know if the Court is aware, but

during the testimony this morning, there were facial remarks of Your Honor during the testimony. And those facial remarks conveyed things, even though maybe you had no intentions of conveying things to the jury, and I just am bringing this to the Court's attention because I would like the Court to try and refrain from making any facial gestures during the time of the testimony. If the Court is pleased or humorous of something that somebody might have said, I wish the Court would take that up after the jury is out.

THE COURT: I made no conscious facial remarks for any specific purpose. But I will try and refrain from reacting in any way, either positively or negatively, as I have in the past. And any time counsel wants to make a standing bill on any of this, you are more than welcome to.

MR. GILMAN: Like I said, I don't know if the Court is aware that the Court is doing it. But I am bringing it to the Court's attention.

THE COURT: I was not.

35 Tr. at 91-92.

The state habeas court denied relief on this claim, finding that Lucio "failed to show that any voluntary or involuntary facial expressions alleged to have been exhibited by the Court constituted a comment on the weight of the evidence." SH at 17. This conclusion is reasonable.

It is beyond dispute that due process guarantees a criminal defendant a fair trial by an impartial judge. *See, e.g.*, *Rose v. Clark*, 478 U.S. 570, 577 (1986). In this case, though, the only evidence that the trial judge made any kind of expression is the exchange quoted above. This exchange does not identify when the alleged expression was made, what it was, whether any juror actually saw it, or why the judge made it. While Lucio states in her point heading on this issue that the judge "laughed" at the witness, nothing in the record supports that conclusion. Lucio presents nothing to rebut the state habeas court's conclusion that the judge did not comment on the evidence,

not does she present any evidence that she was denied a fair trial.  This claim is without merit.

**H.**    **Ineffective Assistance of Counsel Based on Failure to Provide a Complete Transcript**

Lucio next complains that the State deprived her of effective assistance of appellate counsel because her statement to the police was never transcribed.  The video of the interview was played for the jury, but the court reporter never transcribed it.  The State offered to provide a transcript of the interview, 32 Tr. at 61-62, but apparently never did.

A defendant is constitutionally entitled to effective assistance of appellate counsel when she has a right to appeal under state law.  *Evitts v. Lucy,* 469 U.S. 387, 395 (1985). The *Strickland* two-prong standard applies to claims of ineffective assistance of appellate counsel.  *Duhamel v. Collins,* 955 F.2d 962, 967 (5th Cir. 1992).

In her state habeas application, Lucio complained that the video recording was inadequate to identify and argue appellate issues, complaining in particular that it was partially inaudible and some of the words spoken in the interview were in Spanish. The state habeas court found that the video was audible, that Lucio had the video, and that she failed to cite any authority holding that the State is obliged to provide a transcript of videotaped statements.

Lucio argues that the state habeas court's finding that the video was audible is an unreasonable finding based on the record.  This Court has reviewed the video and found a number of short, isolated segments were, in fact, inaudible. The segments in question are, however, small and isolated, consisting of a word or two here and there.  The video is mostly audible, and the state habeas court's conclusion is reasonable.  *See also Lucio v. State*, 351 S.W.3d 858, 892 n.13 (Tex. Crim. App. 2011)(finding "that a word here or there might be inaudible").

Citing Texas law, Lucio argues that appellate counsel has a duty to review the record for error. This much seems uncontroversial. Lucio then goes on to argue, however, that the video recordings themselves were inadequate for this purpose. Pet. at 161. This argument is wholly conclusory.

The only case Lucio cites in support of this argument is *Perez v. State*, 824 S.W.2d 565 (Tex. Crim. App. 1992). In *Perez*, the court reporter's notes and tapes were lost, preventing the preparation of a trial record. *Id.* at 566. In sharp contrast, Lucio's counsel had the video of her police interview. Nothing was lost, and the state habeas court correctly found that Lucio had a complete record of the proceedings. She fails to demonstrate that appellate counsel was hindered in his ability to review the record and identify issues for appeal.

## I.  <u>Actual Innocence</u>

In her tenth ground for relief, Lucio contends that she is entitled to habeas corpus relief because she is actually innocent of capital murder based on her theories that Mariah's fatal injury was either caused by a fall, or caused by someone other than Lucio. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). This is so because "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." *Id.* Therefore, this claim is not cognizable on federal habeas corpus review.

## J.  <u>Lesser Included Offense Instruction</u>

In her final claim for relief, Lucio argues that she was denied due process when the trial court

refused her request for a jury instruction on the lesser included offense of injury to a child. Due process requires a jury charge "on a lesser included offense if the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit h[er] of the greater," *i.e.*, "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense . . . ." *Beck v. Alabama*, 447 U.S. 625, 635, 637 (1980) (citing *Keeble v. United States*, 412 U.S. 205, 208 (1973)). Under these circumstances, "the failure to give the jury the . . . option of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction. Such a risk cannot be tolerated in a case in which the defendant's life is at stake. *Beck*, 447 U.S. at 637. A lesser included offense charge is required under these circumstances to avoid presenting the jury with a false dichotomy: either convict a defendant who is guilty of a serious non-capital crime (but not a capital crime) on the capital charge, or acquit her so as to avoid convicting her of the more serious offense. *See, e.g.*, *Hopper v. Evans*, 456 U.S. 605, 611 (1982). "[I]f the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [Texas] is constitutionally prohibited from withdrawing that option from the jury in a capital case." *Beck*, 447 U.S. at 638.

This claim is procedurally defaulted. Lucio raised this claim on direct appeal, but the TCCA found that the claim was inadequately briefed. *Lucio v. State*, 351 S.W.3d 878, 895-96 (Tex. Crim. App. 2011). The Fifth Circuit recently made clear that a dismissal for inadequate briefing is an independent and adequate state procedural ground.

> A survey of the TCCA's capital sentencing jurisprudence reveals that it regularly rejects claims, both on direct and postconviction review,

on the basis that these claims are inadequately briefed . . . . [W]e hold now that under the prevailing standards, Texas's rules have been regularly followed by its courts, and applied to the majority of similar claims. . . . Our sister courts of appeal, in addressing analogous provisions from other states, have likewise found them to act as independent and adequate state procedural bars. *See House v. Hatch*, 527 F.3d 1010, 1029–30 (10th Cir. 2008) (holding that New Mexico's requirement of adequate briefing is an independent and adequate procedural bar to federal habeas relief); *Clay v. Hatch*, 485 F.3d 1037, 1040–41 (8th Cir. 2007) (holding that Arkansas's proper abstracting rule is an independent and adequate procedural bar to federal habeas relief).

*Roberts v. Thaler*, 681 F.3d 597 (5th Cir. 2012). *Roberts* thus makes it clear that the TCCA's dismissal of this claim as inadequately briefed constitutes a procedural default.

Lucio acknowledges that this claim is procedurally defaulted, but argues that this Court can consider it under the fundamental miscarriage of justice exception. As discussed above, however, Lucio fails to satisfy that standard. Therefore, this Court cannot grant relief on this claim.

## IV. Certificate of Appealability

Lucio has not requested a certificate of appealability ("COA"), but this court may determine whether she is entitled to this relief in light of the foregoing rulings. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA *sua sponte*. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.") A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request. *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").

63

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000). The Supreme Court has stated that

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253© is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000).

The Court has carefully considered each of Lucio's claims and concludes that each of the claims is foreclosed by clear, binding precedent. Lucio thus fails to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Court therefore concludes that Lucio is not entitled to a certificate of appealability.

64

## V. **Conclusion and Order**

For the foregoing reasons, it is ORDERED as follows:

1.      Respondent Lorie Davis' motion for summary judgment (Docket Entry No.

18) is GRANTED;

2.      Petitioner Melissa Elizabeth Lucio's Petition for a Writ of Habeas Corpus (Docket

Entry No. 6) is DENIED and DISMISSED WITH PREJUDICE; and

3.      No Certificate of Appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas, on this _28_ day of September, 2016.

Hilda G. Tagle
United States District Judge